

Olapade                                                                                    DRAFT

*Don't Do As I Say Or As I Do – State Constitutional Law In The Texas Supreme Court*

I.    *Introduction*

On the evening of June 24, 1993, sixteen-year-old Elizabeth Pena and fourteen-year-old Jennifer Ertman were returning to their Houston home when they encountered Jose Ernesto Medellin, a Texas resident who was born in Mexico but lived in the United States most of his life and spoke, read, and wrote fluent English. After a failed attempt to engage Elizabeth in conversation, Medellin grabbed her, threw her to the ground, robbed her of her cartoon anime watch, and then participated in the brutal gang rape and murder of both innocent girls. When Medellin ran into Christina Cantu later the next morning, he bragged that the murder would have been easier with a gun, recounted his strangulation of one of the girls with a shoelace to Cantu, and then showed Christina his blood-soaked underwear. Once Christina convinced her husband to report the heinous crime to the Houston Police Department and Texas Rangers, it was too late. Texas authorities found both bodies in a state of severe decomposition and were only able to identify both girls through their dental records.

Medellin was taken into custody five days later. And shortly thereafter, was read his *Miranda* warnings, signed a written waiver of his Fifth Amendment rights,[1] and in a remorseless fashion told Houston police officers how each girl had pleaded for her life before he killed them. In the ensuing trial before the Harris County Criminal Court, Medellin was convicted of murder during the course of a sexual assault – a capital offense in the Lone Star State and, sentenced to death. Only after the Texas Court of Criminal Appeals, the state's court of last resort for criminal matters, affirmed the conviction on direct review, did Medellin's lawyers argue for the first time, in the words of Justice Cardozo, that he ought to go "free because the constable…[had] blundered" in not notifying the Mexican consulate that an individual who had spent the vast majority of his life in Texas was being detained as was ostensibly required by the Vienna Convention on Consular Relations. Because of ignorance regarding how a single international law claim interacted with state procedures, after nearly two additional years of litigation before the International Court of Justice (ICJ) and the Texas Criminal Appeals Court, the Supreme Court finally ended the matter by holding that Medellin's attorneys had procedurally defaulted on their claims under Texas law and that neither President Bush nor the ICJ could compel Texas courts to reopen the matter. The result is that Jose Medellin might well have been a free man today had his lawyers paid attention to Texas' Rules of Appellate Procedure.

This is not to suggest that Medellin did not deserve the sentence he received, that the author personally wishes that Medellin's attorneys would have raised the Vienna Convention claim, or that the Constitution imposes limits on Texas' ability to execute grown men who rape and murder helpless teenagers, it is only to indicate that many attorneys on both sides of the political spectrum may be disserving their clients by not raising state claims out of ignorance. This article explores a a similar malicious habit in the Texas judiciary and provides a critique of the Texas Supreme Court's recent embrace of federal rules and standards in State constitutional cases at the expense of the 1876 Texas Constitution. The piece proceeds in three parts. Part II provides a brief overview

---

[1] *Miranda* technically does not purport to be an interpretation of the Fifth Amendment's text but rather imposes a prophylactic rule to avoid violations of the Self-incrimination Clause. See *Dickerson v. United States*, 530 U.S. 428 (2000); see also Akhil Reed Amar and Renee B. Lettow, *Fifth Amendment First Principles: The Self-Incrimination Clause*, 93 MICH. L. REV. 857 (1995); Yale Kamisar, *Can (Did) Congress 'Overrule' Miranda?*, 85 CORNELL L. REV. 883 (2000).

of State Supreme Court lock-stepping and concludes that the practice is at odds with the political and legal tradition that prevailed during both the ratification of the Bill of Rights and Fourteenth Amendment. Part III focuses on the Texas Supreme Court's lockstepping practices in State takings cases involving oil and gas matters and concludes that the Court's current embrace of federal doctrine has created a regime that is at odds with maximum mineral production and the desires of leading political elites in the State. Part IV highlights how the Office of the Texas Solicitor General can assist the State Supreme Court in avoiding lock-stepping.

II.     *State Supreme Court Lockstepping*

State constitutions are the foundation of American constitutional law.[2] By 1783 – four years before the federal Constitution was sent to the States for ratification – every state except Rhode Island and Connecticut had formally adopted a written constitution and the majority of charters contained declarations of rights.[3] Of course, these State constitutions not only pre-dated their federal counter-part but also served as the template for several provisions in the national compact.[4] Nowhere was this synergy clearer than during the ratification debate on the need to secure the same rights against the national government that the People enjoyed against their States.[5] The fact that the federal Constitution omitted a declaration of rights when it was submitted to the states "stood in sharp contrast to the state constitutions…virtually all of which contained explicit provisions" to that effect.[6] Thus, when James Madison and his Federalist colleagues eventually relented and agreed to propose twelve draft articles that would eventually become the bill of rights,[7] the constitutions of the several states served as a model.[8] Indeed, Donald Lutz has demonstrated that the Federal Bill of Rights, rather than having its origins in Magna Charta or the English Bill of Rights of 1689, emerged from state and colonial antecedents.[9]

More specifically, Madison refrained from using the amendments proposed by the state ratification conventions as a condition for approval of the Constitution because most of those

---

[2] See generally Gordon Wood, THE CREATION OF THE AMERICAN REPUBLIC, 1776-1787 (1969).

[3] Hans Linde, *First Things First: Rediscovering the State's Bills of Rights*, 9 U. BALT. L. REV. 379, 381 (1980).

[4] Saul Cornell, THE OTHER FOUNDERS: ANTI-FEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999); see also John Adams, THOUGHTS ON GOVERNMENT (1776); Thomas Jefferson, NOTES ON THE STATE OF VIRGINIA (1785).

[5] David J. Siemers, RATIFYING THE REPUBLIC 164 (2002).

[6] *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 137 (1996) (Souter J., dissenting).

[7] Two of the amendments that the First Congress proposed were not ratified in the late eighteenth century. The first amendment, which limited congressional pay raises, incidentally enough, was ratified in 1992 as the Twenty-Seventh Amendment at the behest of an average term paper written by Gregory Watson, a sophomore economics undergraduate student at the University of Texas at Austin, who served as an aide to Texas State Senator Ric Williamson. Jonathan D. Mcpike, *Merit Pay and Pain: Linking Congressional Pay to Performance*, 86 IND. L.J. 335 n.300 (2011); see also Richard B. Bernstein, *The Sleeper Wakes: The History and Legacy of the Twenty-Seventh Amendment*, 61 FORDHAM L. REV. 497, 536 (1992). The second amendment dealt with congressional apportionment. For an enlightening discussion on implicit ratification time limits on amendment ratification, see Lawrence Tribe, A Constitution We Are Amending: In Defense of a Restrained Judicial Role, 97 HARV. L. REV. 433 (1983); Walter Dellinger, The Legitimacy of Constitutional Change: Rethinking the Amendment Process, 97 Harv. L. Rev. 386, 431 (1983); John R. Vile, *Limitations on the Constitutional Amending Process* 2 CONSTITUTIONAL COMMENTARY 373 (1985); Sanford Levinson, *Authorizing Constitutional Text: on the Purported Twenty-Seventh Amendment*. 11 CONSTITUTIONAL COMMENTARY 101 (1994); Michael S. Paulsen, *A General Theory of Article V: The Constitutional Lessons of the Twenty-Seventh Amendment*, 103 Yale L.J. 677 (1993); 16 Op. O.L.C. 85 (1992).

[8] Donald Lutz, *The State Constitutional Pedigree of the U.S. Bill of Rights*, 22 PUBLIUS 19 (1992); Leonard Levy, ORIGINS OF THE BILL OF RIGHTS 1-11 (1999).

[9] Donald Lutz, THE ORIGINS OF AMERICAN CONSTITUTIONALISM (1988).

Olapade                                                                                   DRAFT

provisions either denied power to the federal government or required a two-thirds vote to exercise certain prerogatives in Article I §8.[10] Among "the colonial documents that stood as background to the state bills of right [were] the New York Charter of Liberties and Privileges (1683), the Laws and Liberties of New Hampshire (1682), Penn's Charter of Liberties (1682), the General Laws and Liberties of Connecticut (1672), the Maryland Toleration Act (1649), the Laws and Liberties of Massachusetts (1647), and the Massachusetts Body of Liberties (1641)."[11] (See Tables 1 and 2)

Table 1

| Prevalence of Rights by Number of States | | | | | |
|---|---|---|---|---|---|
| Right | Number of States | Right | Number of States | Right | Number of States |
| Free Exercise | 13 | God in Preamble | 6 | Property Escheats | 3 |
| Civil Jury | 12 | Ceremonial Deism | 6 | Imposition of Martial Law | 3 |
| Criminal Jury | 11 | Ex Post Facto | 6 | Debtors' Prison | 3 |
| Free Press | 10 | Bills of Attainder | 6 | Emigration | 3 |
| Excessive Fines | 10 | Takings | 6 | Equal Protection | 3 |
| Reform Government | 9 | Legal Recourse | 6 | Inviolable Constitution | 3 |
| Suffrage | 9 | Trial in State | 6 | Native American Rights | 3 |
| Subordinate Military | 9 | Legislator Speech Rights | 6 | Freedom of Speech | 2 |
| Due Process | 9 | Duty to Provide Public Schools | 6 | Public Trial | 2 |
| Excessive Bail | 9 | Taxes | 6 | Retroactive Civil Laws | 2 |
| Privileges and Immunities | 9 | Bear Arms | 5 | Corruption of Blood | 2 |
| Establishment Clause | 8 | Not to Bear Arms | 5 | Treason | 2 |
| Oaths | 8 | Religious Qualification | 5 | Impairment of Contract | 2 |
| Free Elections | 8 | Quartering of Soldiers | 5 | Monopolies | 2 |

---

[10] Jack Rakove, JAMES MADISON AND THE CREATION OF THE AMERICAN REPUBLIC (2007).
[11] Donald Lutz, *The State Constitutional Pedigree of the U.S. Bill of Rights*, 22 PUBLIUS 33 (1992)

3

Olapade                                                                          DRAFT

| | | | | | |
|---|---|---|---|---|---|
| Power over Government Offices | 8 | Impartial or Independent Judge | 5 | Grand Jury | 2 |
| Standing Armies | 8 | Separation of Powers | 5 | Privilege from Civil Process | 2 |
| Search and Seizure | 8 | Immigration | 5 | Forced Bondage | 2 |
| Probable Cause | 8 | Habeas Corpus | 4 | One Person, One Vote | 1 |
| Self-Incrimination | 8 | Suicide | 4 | Property | 1 |
| Confrontation | 8 | Proportionality | 4 | Jury as Fact Finder | 1 |
| Informed of Charges | 8 | Sanguinary Laws | 4 | Uniform Government | 1 |
| Cruel & Unusual | 8 | Feudalism | 4 | | |
| Titles of Nobility | 8 | Privilege from Arrest | 4 | | |
| Power to Suspend Laws | 8 | | | | |
| Assembly and Petition | 7 | | | | |
| Right to Counsel | 7 | | | | |
| Speedy Trial | 7 | | | | |
| Obtain Witnesses | 7 | | | | |
| Natural Inalienable Rights | 7 | | | | |
| Fundamental Principles | 7 | | | | |

Table 2

| Prevalence of Rights by Population | | | | | |
|---|---|---|---|---|---|
| Right | Number of States (%) | Right | Number of States (%) | Right | Number of States (%) |
| Free Exercise | 94 | God in Preamble | 42 | Property Escheats | 15 |
| Civil Jury | 92 | Ceremonial Deism | 60 | Imposition of Martial Law | 15 |

Olapade                                                                      DRAFT

| | | | | | |
|---|---|---|---|---|---|
| Criminal Jury | 88 | Ex Post Facto | 52 | Debtors' Prison | 25 |
| Free Press | 78 | Bills of Attainder | 50 | Emigration | 16 |
| Excessive Fines | 78 | Takings | 50 | Equal Protection | 24 |
| Reform Government | 74 | Legal Recourse | 38 | Inviolable Constitution | 25 |
| Suffrage | 67 | Trial in State | 50 | Native American Rights | 17 |
| Subordinate Military | 78 | Legislator Speech Rights | 39 | Freedom of Speech | 14 |
| Due Process | 83 | Duty to Provide Public Schools | 41 | Public Trial | 14 |
| Excessive Bail | 78 | Taxes | 47 | Retroactive Civil Laws | 5 |
| Privileges and Immunities | 74 | Bear Arms | 44 | Corruption of Blood | 21 |
| Establishment Clause | 49 | Not to Bear Arms | 29 | Treason | 13 |
| Oaths | 43 | Religious Qualification | 30 | Impairment of Contract | 18 |
| Free Elections | 69 | Quartering of Soldiers | 36 | Monopolies | 19 |
| Power over Government Offices | 69 | Impartial or Independent Judge | 36 | Grand Jury | 22 |
| Standing Armies | 69 | Separation of Powers | 53 | Privilege from Civil Process | 11 |
| Search and Seizure | 69 | Immigration | 36 | Forced Bondage | 4 |
| Probable Cause | 69 | Habeas Corpus | 28 | One Person, One Vote | 2 |
| Self-Incrimination | 69 | Suicide | 23 | Property | 11 |
| Confrontation | 69 | Proportionality | 21 | Jury as Fact Finder | 2 |
| Informed of Charges | 69 | Sanguinary Laws | 21 | Uniform Government | 20 |
| Cruel & Unusual | 73 | Feudalism | 48 | | |

Olapade                                                                                        DRAFT

| Titles of Nobility | 74 | Privilege from Arrest | 31 | | |
| Power to Suspend Laws | 69 | | | | |
| Assembly and Petition | 49 | | | | |
| Right to Counsel | 43 | | | | |
| Speedy Trial | 58 | | | | |
| Obtain Witnesses | 53 | | | | |
| Natural Inalienable Rights | 59 | | | | |
| Fundamental Principles | 68 | | | | |

Table 3

| Distribution of Rights Across the States (1787) | | |
|---|---|---|
| State | Date of Constitution | Number of Rights in the Constitution |
| New Hampshire | 1784 | 50 |
| Pennsylvania | 1776 | 48 |
| Massachusetts | 1780 | 48 |
| Maryland | 1776 | 40 |
| North Carolina | 1776 | 38 |
| Delaware | 1776 | 35 |
| Virginia | 1776 | 34 |
| Georgia | 1777 | 19 |
| New York | 1777 | 18 |
| New Jersey | 1776 | 10 |
| South Carolina | 1778 | 9 |
| Rhode Island | 1663 | 8 |
| Connecticut | 1662 | 4 |

Table 4

| Distribution of Rights Across States 1787 | | |
|---|---|---|
| State | Date of Constitution | Number of Rights in Constitution |
| New Hampshire | 1784 | 50 |
| Pennsylvania | 1776 | 48 |
| Massachusetts | 1780 | 48 |

Olapade                                                                                          DRAFT

| Maryland | 1776 | 40 |
| North Carolina | 1776 | 38 |
| Delaware | 1776 | 35 |
| Virginia | 1776 | 34 |
| Georgia | 1777 | 19 |
| New York | 1777 | 18 |
| New Jersey | 1776 | 10 |
| South Carolina | 1778 | 9 |
| Rhode Island | 1663 | 8 |
| Connecticut | 1662 | 4 |

Of course, the resulting Bill of Rights, however, only protected a few of these privileges.[12] The ratification of these provisions, however, initially had little, if any, practical effect on the operation of the governments of the several states, because in the words of Justice Kennedy, "the framers split the atom of sovereignty."[13] Indeed, as a matter of elementary political theory in the eighteenth century, most theorists assumed that sovereignty "must reside somewhere in every political unit [as] a single, undivided, final power higher in legal authority than any other power."[14] This assumption was echoed repeatedly by both James Madison and Alexander Hamilton in *The Federalist* No. 9,[15] 32,[16] and 51[17] and the Supreme Court's unanimous decision in *Barron v. City*

---

[12] For a nice yet sophisticated and scholarly introduction to the topic, see Hugo Black, THE BILL OF RIGHTS (1960); Learned Hand, THE BILL OF RIGHTS (1958); Akhil Amar, THE BILL OF RIGHTS (1998).

[13] *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) (Kennedy, J., concurring).

[14] Bernard Bailyn, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION 198 (1967).

[15] The Federalist No. 9, at 323 (Clinton Rossiter ed., 1961) ("The definition of a CONFEDERATE REPUBLIC seems simply to be "an assemblage of societies," or an association of two or more states into one state. The extent, modifications, and objects of the federal authority are mere matters of discretion. So long as the separate organization of the members be not abolished; so long as it exists, by a constitutional necessity, for local purposes; though it should be in perfect subordination to the general authority of the union, it would still be, in fact and in theory, an association of states, or a confederacy. The proposed Constitution, so far from implying an abolition of the State governments, makes them constituent parts of the national sovereignty, by allowing them a direct representation in the Senate, and leaves in their possession certain exclusive and very important portions of sovereign power. This fully corresponds, in every rational import of the terms, with the idea of a federal government").

[16] The Federalist No. 32, at 198 (Clinton Rossiter ed., 1961) ("[A]s the plan of the convention aims only at a partial union or consolidation, the State governments would clearly retain all the rights of sovereignty which they before had, and which were not, by that act, EXCLUSIVELY delegated to the United States. This exclusive delegation, or rather this alienation, of State sovereignty, would only exist in three cases: where the Constitution in express terms granted an exclusive authority to the Union; where it granted in one instance an authority to the Union, and in another prohibited the States from exercising the like authority; and where it granted an authority to the Union, to which a similar authority in the States would be absolutely and totally CONTRADICTORY and REPUGNANT. I use these terms to distinguish this last case from another which might appear to resemble it, but which would, in fact, be essentially different; I mean where the exercise of a concurrent jurisdiction might be productive of occasional interferences in the POLICY of any branch of administration, but would not imply any direct contradiction or repugnancy in point of constitutional authority").

[17] The Federalist No. 51, at 323 (Clinton Rossiter ed., 1961) ("[i]n a single republic, all the power surrendered by the people is submitted to the administration of a single government; and the usurpations are guarded against by a division of the government into distinct and separate departments. In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself").

Olapade                                                                                                    DRAFT

*of Baltimore*, which rejected the proposition that the federal bill of rights applied against the States, confirmed this theory of dual sovereignty.[18]

To quote former Oregon Supreme Court Justice Hans Linde, however, today, "most state courts" including the Texas Supreme Court as this article will demonstrate, "adopt federal constitutional law as their own. Bowing to the nationalization of constitutional discourse, they 'tend to follow whatever doctrinal vocabulary is used by the United States Supreme Court, discussed in the law reviews, and taught" in the nation's elite law schools.[19] Thus, Texans do not claim the right not "to give evidence against"[20] themselves rather they "take the fifth" and expect "Miranda warnings."[21] And journalists in California "do not invoke their prerogative to "speak, write and publish…sentiments on all subjects"[22] but demand their First Amendment rights. Indeed, "it is a fiction too long accepted that provisions in state constitutions textually identical to the Bill of Rights were intended to mirror their federal counterpart. The lesson of history is otherwise: the Bill of rights was based upon the corresponding provisions of the first state constitutions, rather than the reverse."[23] This emphasis on the U.S. Supreme Court at the expense of State courts of last resort is not completely unprecedented. Indeed, a State Supreme Court's authority to interpret its state constitution is limited by the Supreme Court to the extent that the latter's expansive interpretation of individual rights provisions in the first eight amendments presents the former with less opportunities to do the same. Indeed, during the zenith of the activist Warren Court, the "Supreme Court took such complete control of the field that state judges could sit back in the conviction that their part was simply to await the next landmark decision."[24] The Court's docket numbers confirm this position as more than half of the docket in the 1960s involved appeals from state court decisions while only 30% do now.[25]

This obsession with federal constitutional doctrine is all the more puzzling because state constitutions were intended to act as, and turned out to be, the primary guarantors of individual

---

[18] *Barron v. Baltimore*, 32 U.S. 243 (1833); see also *Texas v. White*, 74 U.S. 700 (1869).
[19] Hans Linde, *E Pluribus – Constitutional Theory and State Courts*, 18 GA. L. REV. 165 (1984); *Employment Div., Dep't of Human Res. of State of Or. v. Smith*, 485 U.S. 660, 665, 108 S. Ct. 1444, 1447, 99 L. Ed. 2d 753 (1988); *Delaware v. Van Arsdall*, 475 U.S. 673, 701, 106 S. Ct. 1431, 1446, 89 L. Ed. 2d 674 (1986) (Stevens, J., dissenting); *Massachusetts v. Upton*, 466 U.S. 727, 738, 104 S. Ct. 2085, 2091, 80 L. Ed. 2d 721 (1984) (Stevens, J., concurring); *Miller v. Griffin-Alexander Drilling Co.*, 873 F.2d 809, 813 (5th Cir. 1989); *Ex parte Tucci*, 859 S.W.2d 1, 15 n.41 (Tex. 1993); *Scott v. State*, 80 S.W.3d 184, 193 n.4 (Tex. App. 2002); *Succession of Lauga*, 624 So. 2d 1156, 1167 (La. 1993); State v. Skok, 318 Conn. 699, 724, 122 A.3d 608, 623 (2015) (Zarella, J., concurring); *State v. Oliver*, 188 Ga. App. 47, 55, 372 S.E.2d 256, 263 (1988) (Beasley, J., concurring); Com. v. Gonsalves, 429 Mass. 658, 669, 711 N.E.2d 108, 115 (1999) (Ireland, J., concurring); State v. Saari, 152 Vt. 510, 522, 568 A.2d 344, 351 (1989) (Mahady, J., concurring); *People v. Tisler*, 103 Ill. 2d 226, 263, 469 N.E.2d 147, 165 (1984) (Goldenhersh, J., dissenting);
[20] TEX. CONST. Art. I §10; *In re Medina*, 475 S.W.3d 291, 294 (Tex. Crim. App. 2015).
[21] See, e.g., L.M. Sixel, *The Right to Avoid Self-Incrimination Has Limits On Job*, HOUST. CHRON., (October 11, 2002); *Speaking of Silence: Court Weakens Miranda Rights, Rules Silence Is No Protection Against Self-Incrimination*, HOUST. CHRON., (June 9, 2010).
[22] CALI. CONST. Art. I §2(a).
[23] *People v. Brisendine*, 531 P.2d 1099, 113 (Cal.1975); see also *Edgewood Independent School District v. Kirby*, 777 S.W.2d 391 (Tex.1989); *Morath v. The Texas Taxpayer and Student Fairness Coalition*, 490 S.W.3d 826 (Tex.2016).
[24] Robert Welsh and Ronald Collins, *Taking State Constitutions Seriously*, CENTER MAGAZINE (1981).
[25] Brett Gerry, *Parity Revisited: An Empirical Comparison of State and Lower Federal Court Interpretations of Nollan v. California Coastal Commission*, 23 HARV. J. L. & PUB. POL'Y 233 91999); John Kilwein and Richard Brisbin, *U.S. Supreme Court Review of State High Court Decisions - From the Warren through the Rehnquist Courts*, 89 Judicature 146, 147 (2005).

rights for most of American history.[26] The modern-day presumption that similarly worded state and federal constitutional provisions bear identical meanings stems in large part from the Fourteenth Amendment's ratification.[27] Although the Fuller, Waite, White, and Taft Courts adopted constrained readings of the Privileges and Immunities[28] and Equal Protection Clauses[29] while enforcing a robust reading of the Due Process Clause in "right to contract" cases,[30] the

---

[26] *Id.*; The *Slaughter-House Cases*, 83 U.S. 36 (1873); James Gardner, *The Failed Discourse of State Constitutionalism*, 90 MICH. L. REV. 761, 773 (1992); Robert Fitzpatrick, Note, *Neither Icarus or Ostrich, State Constitutions as an Independent Source of Individual Rights*, 79 N.Y.U. L. REV. 1833 (2004).

[27] *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (plurality opinion) ("The constitutional Amendments adopted in the aftermath of the Civil War fundamentally altered our country's federal system).

[28] See, e.g., *Civil Rights Cases*, 109 U.S. 3 (1883).

[29] See, e.g., *Pace v. Alabama*, 106 U.S. 583 (1883); *Gong Lum v. Rice*, 275 U.S. 78 (1927); *Giles v. Harris*, 189 U.S. 475 (1903); *Plessy v. Ferguson*, 163 U.S. 537 (1896); *Cumming v. Richmond County Board of Education*, 175 U.S. 528 (1899).

[30] *Lochner v. New York*, 198 U.S. 45 (1905); see also, John E Nowak and Ronald Rotunda, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE §15.2 (2007); *Edwards v. Kearzey*, 96 U.S. 595, 596, 24 L. Ed. 793 (1877); *Allgeyer v. State of La.*, 165 U.S. 578, 583, 17 S. Ct. 427, 429, 41 L. Ed. 832 (1897); *United States v. Dewitt*, 76 U.S. 41, 42, 19 L. Ed. 593 (1869); *Cotting v. Godard*, 183 U.S. 79, 101, 22 S. Ct. 30, 39, 46 L. Ed. 92 (1901); *Dobbins v. City of Los Angeles*, 195 U.S. 223, 25 S. Ct. 18, 49 L. Ed. 169 (1904); *McLean v. State of Arkansas*, 211 U.S. 539, 29 S. Ct. 206, 53 L. Ed. 315 (1909); *Truax v. Corrigan*, 257 U.S. 312, 42 S. Ct. 124, 66 L. Ed. 254 (1921); *State of Missouri ex rel. Sw. Bell Tel. Co. v. Pub. Serv. Comm'n of Missouri*, 262 U.S. 276, 43 S. Ct. 544, 67 L. Ed. 981 (1923); *Charles Wolff Packing Co. v. Court of Indus. Relations of State of Kansas*, 262 U.S. 522, 526, 43 S. Ct. 630, 632, 67 L. Ed. 1103 (1923); *Shafer v. Farmers' Grain Co. of Embden*, 268 U.S. 189, 45 S. Ct. 481, 69 L. Ed. 909 (1925); *Tyson & Bro.-United Theatre Ticket Offices v. Banton*, 273 U.S. 418, 47 S. Ct. 426, 71 L. Ed. 718 (1927); *Ribnik v. McBride*, 277 U.S. 350, 48 S. Ct. 545, 72 L. Ed. 913 (1928); *Williams v. Standard Oil Co. of Louisiana*, 278 U.S. 235, 49 S. Ct. 115, 73 L. Ed. 287 (1929); *St. Louis Cotton Compress Co. v. State of Arkansas*, 260 U.S. 346, 347, 43 S. Ct. 125, 125, 67 L. Ed. 297 (1922); *New York Life Ins. Co. v. Head*, 234 U.S. 149, 34 S. Ct. 879, 58 L. Ed. 1259 (1914); *State of Louisiana ex rel. Elliott v. Jumel*, 107 U.S. 711, 2 S. Ct. 128, 27 L. Ed. 448 (1883); *Fisk v. Police Jury of Jefferson*, 116 U.S. 131, 135, 6 S. Ct. 329, 331, 29 L. Ed. 587 (1885); *Port of Mobile v. Watson*, 116 U.S. 289, 296, 6 S. Ct. 398, 402, 29 L. Ed. 620 (1886); *Seibert v. United States*, 122 U.S. 284, 7 S. Ct. 1190, 30 L. Ed. 1161 (1887); *Bank of Minden v. Clement*, 256 U.S. 126, 41 S. Ct. 408, 65 L. Ed. 857 (1921); but see *Munn v. People of State of Illinois*, 94 U.S. 113, 114, 24 L. Ed. 77 (1876); *Muller v. State of Oregon*, 208 U.S. 412, 28 S. Ct. 324, 52 L. Ed. 551 (1908); *Block v. Hirsh*, 256 U.S. 135, 41 S. Ct. 458, 65 L. Ed. 865 (1921); *Bos. Beer Co. v. State of Massachusetts*, 97 U.S. 25, 24 L. Ed. 989 (1877) *Ruggles v. People of State of Illinois*, 108 U.S. 526, 2 S. Ct. 832, 27 L. Ed. 812 (1883); *Stone v. Farmers' Loan & Tr. Co.*, 116 U.S. 307, 6 S. Ct. 334, 29 L. Ed. 636 (1886); *Morgan's Louisiana & T. R. & S. S. Co. v. Bd. of Health of State of Louisiana*, 118 U.S. 455, 6 S. Ct. 1114, 30 L. Ed. 237 (1886); *Johnson v. Chicago & P. Elevator Co.*, 119 U.S. 388, 7 S. Ct. 254, 30 L. Ed. 447 (1886); *Dow v. Beidelman*, 125 U.S. 680, 8 S. Ct. 1028, 31 L. Ed. 841 (1888); *Kidd v. Pearson*, 128 U.S. 1, 9 S. Ct. 6, 8, 32 L. Ed. 346 (1888); *Georgia R.R. & Banking Co. v. Smith*, 128 U.S. 174, 9 S. Ct. 47, 48, 32 L. Ed. 377 (1888); *Mugler v. Kansas*, 123 U.S. 623, 8 S. Ct. 273, 295, 31 L. Ed. 205 (1887); *Budd v. People*, 143 U.S. 517, 12 S. Ct. 468, 36 L. Ed. 247 (1892); *Brass v. N. Dakota ex rel. Stoeser*, 153 U.S. 391, 14 S. Ct. 857, 860, 38 L. Ed. 757 (1894); *Louisville & N.R. Co. v. Kentucky*, 161 U.S. 677, 16 S. Ct. 714, 716, 40 L. Ed. 849 (1896); *Minneapolis & St. L.R. Co. v. State of Minnesota*, 186 U.S. 257, 22 S. Ct. 900, 46 L. Ed. 1151 (1902); *N. Sec. Co. v. United States*, 193 U.S. 197, 24 S. Ct. 436, 48 L. Ed. 679 (1904); *Chicago, B. & Q.R. Co. v. McGuire*, 219 U.S. 549, 31 S. Ct. 259, 55 L. Ed. 328 (1911); *Lindsley v. Nat. Carbonic Gas Co.*, 220 U.S. 61, 31 S. Ct. 337, 55 L. Ed. 369 (1911); *Mondou v. New York, N.H. & H.R. Co.*, 223 U.S. 1, 32 S. Ct. 169, 56 L. Ed. 327 (1912); *Minnesota Rate Cases*, 230 U.S. 352, 33 S. Ct. 729, 57 L. Ed. 1511 (1913); *Atl. Coast Line R. Co. v. City of Goldsboro*, 232 U.S. 548, 34 S. Ct. 364, 58 L. Ed. 721 (1914); *German All. Ins. Co. v. Lewis*, 233 U.S. 389, 34 S. Ct. 612, 58 L. Ed. 1011 (1914); *Michigan Cent. R. Co. v. Michigan R. Comm'n*, 236 U.S. 615, 35 S. Ct. 422, 59 L. Ed. 750 (1915); *Chicago & A.R. Co. v. Tranbarger*, 238 U.S. 67, 35 S. Ct. 678, 59 L. Ed. 1204 (1915); *Rast v. Van Deman & Lewis Co.*, 240 U.S. 342, 36 S. Ct. 370, 60 L. Ed. 679 (1916); *New York Cent. R. Co. v. White*, 243 U.S. 188, 37 S. Ct. 247, 61 L. Ed. 667 (1917); *Union Dry Goods Co. v. Georgia Pub. Serv. Corp.*, 248 U.S. 372, 39 S. Ct. 117, 63 L. Ed. 309 (1919); *Producers' Transp. Co. v. R.R. Comm'n of State of Cal.*, 251 U.S. 228, 40 S. Ct. 131, 64 L. Ed. 239 (1920); *Bd. of Trade of City of Chicago v. Olsen*, 262 U.S. 1, 43 S. Ct. 470, 475, 67 L. Ed. 839 (1923); *State of Washington ex rel. Stimson Lumber Co. v. Kuykendall*, 275 U.S. 207,

Olapade                                                                           DRAFT

gradual acceptance of the "selective incorporation" doctrine in the mid-twentieth century enforced most of the provisions in the first ten amendments against states and their instrumentalities.[31] But while selective incorporation and the Supremacy Clause set a floor for state protection of constitutional rights, they do not dictate that State Supreme Courts must interpret provisions in their state constitutions in lockstep with their federal counter-parts – even when the clauses are identically worded.[32]

The hierarchical nature of the legal profession, for ill or good, has exacerbated this dilemma. In the words of New Hampshire Supreme Court Justice, Charles Douglas, law clerks working for State Supreme Court Justices are often drawn from a handful of institutions where, outside of torts, contracts, and property – which tend to feature a steady diet of cases from the New York Court of Appeals, California Supreme Court, or Court of Queen's Bench, they "have only been taught or are familiar with federal cases." As the geographically diverse class, "fans out after graduation" to positions of influence in their home states, the "federal bias spreads." This lack of

48 S. Ct. 41, 72 L. Ed. 241 (1927); *Holden v. Hardy*, 169 U.S. 366, 18 S. Ct. 383, 42 L. Ed. 780 (1898); *Hopkins v. United States*, 171 U.S. 578, 586, 19 S. Ct. 40, 43, 43 L. Ed. 290 (1898); *United States v. Joint-Traffic Ass'n*, 171 U.S. 505, 509, 19 S. Ct. 25, 27, 43 L. Ed. 259 (1898); *Austin v. State of Tennessee*, 179 U.S. 343, 343, 21 S. Ct. 132, 45 L. Ed. 224 (1900); *Williams v. Fears*, 179 U.S. 270, 21 S. Ct. 128, 45 L. Ed. 186 (1900); *W. W. Cargill Co. v. State of Minnesota*, 180 U.S. 452, 21 S. Ct. 423, 45 L. Ed. 619 (1901); *Nutting v. Com. of Massachusetts*, 183 U.S. 553, 558, 22 S. Ct. 238, 240, 46 L. Ed. 324 (1902); *Booth v. People of State of Illinois*, 184 U.S. 425, 22 S. Ct. 425, 46 L. Ed. 623 (1902); *Patterson v. Eudora*, 190 U.S. 169, 23 S. Ct. 821, 47 L. Ed. 1002 (1903); *Atkin v. State of Kansas*, 191 U.S. 207, 24 S. Ct. 124, 48 L. Ed. 148 (1903); *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643 (1905); *Nw. Nat. Life Ins. Co. v. Riggs*, 203 U.S. 243, 27 S. Ct. 126, 51 L. Ed. 168 (1906); *Berea Coll. v. Commonwealth of Kentucky*, 211 U.S. 45, 29 S. Ct. 33, 53 L. Ed. 81 (1908); *Prudential Ins. Co. of Am. v. Cheek*, 259 U.S. 530, 42 S. Ct. 516, 66 L. Ed. 1044 (1922); *U.S. ex rel. Milwaukee Soc. Democratic Pub. Co. v. Burleson*, 255 U.S. 407, 41 S. Ct. 352, 65 L. Ed. 704 (1921); *Munday v. Wisconsin Tr. Co.*, 252 U.S. 499, 40 S. Ct. 365, 64 L. Ed. 684 (1920); *Provident Sav. Life Assur. Soc. v. Commonwealth of Kentucky*, 239 U.S. 103, 36 S. Ct. 34, 60 L. Ed. 167 (1915); *Equitable Life Assur Soc of U.S. v. Pennsylvania*, 238 U.S. 143, 35 S. Ct. 829, 59 L. Ed. 1239 (1915); *Atl. Coast Line R. Co. v. Riverside Mills*, 219 U.S. 186, 31 S. Ct. 164, 55 L. Ed. 167 (1911); *Bothwell v. Buckbee-Mears Co.*, 275 U.S. 274, 48 S. Ct. 124, 72 L. Ed. 277 (1927); *Highland v. Russell Car & Snowplow Co.*, 279 U.S. 253, 49 S. Ct. 314, 73 L. Ed. 688 (1929); *Nw. Fertilizing Co. v. Vill. of Hyde Park*, 97 U.S. 659, 24 L. Ed. 1036 (1878); *Kirtland v. Hotchkiss*, 100 U.S. 491, 492, 25 L. Ed. 558 (1879); *Connecticut Mut. Life Ins. Co. v. Cushman*, 108 U.S. 51, 2 S. Ct. 236, 27 L. Ed. 648 (1883); Denny v. Bennett, 128 U.S. 489, 9 S. Ct. 134, 32 L. Ed. 491 (1888); *Oshkosh Waterworks Co. v. City of Oshkosh*, 187 U.S. 437, 23 S. Ct. 234, 47 L. Ed. 249 (1903). Similar results were accomplished through the use of the dormant commerce clause, takings clause, sovereign immunity doctrine, and constructions of the Fourteenth Amendment that treated corporations as natural persons. See *Hall v. De Cuir*, 95 U.S. 485, 24 L. Ed. 547 (1877); *Hannibal & St. J.R. Co. v. Husen*, 95 U.S. 465, 466, 24 L. Ed. 527 (1877); *Antoni v. Greenhow*, 107 U.S. 769, 2 S. Ct. 91, 27 L. Ed. 468 (1883); *Wabash, St. L. & P. Ry. Co. v. State of Illinois*, 118 U.S. 557, 7 S. Ct. 4, 30 L. Ed. 244 (1886); *Philadelphia & S. M. S.S. Co. v. Com. of Pennsylvania*, 122 U.S. 326, 7 S. Ct. 1118, 30 L. Ed. 1200 (1887); *Santa Clara Cty. v. S. Pac. R. Co.*, 118 U.S. 394, 6 S. Ct. 1132, 30 L. Ed. 118 (1886); *Covington & C. Bridge Co. v. Commonwealth of Kentucky*, 154 U.S. 204, 14 S. Ct. 1087, 1088, 38 L. Ed. 962 (1894); *Missouri Pac. Ry. Co. v. Nebraska*, 164 U.S. 403, 17 S. Ct. 130, 41 L. Ed. 489 (1896); *John A. Carton & Co. v. Illinois Cent. R. Co.*, 59 Iowa 481, 13 N.W. 67 (1882).

[31] William Domnarski, THE GREAT JUSTICES, 1941-54: BLACK, DOUGLAS, FRANKFURTER, AND JACKSON IN CHAMBERS XXX (2006); *Cantwell v. Connecticut*, 310 U.S. 296 (1940); *Everson v. Board of Education*, 330 U.S. 1 (1947); *Gitlow v. New York*, 268 U.S. 652 (1925); *Near v. Minnesota*, 283 U.S. 697 (1931); *DeJonge v. Oregon*, 299 U.S. 353 (1937); *Edwards v. South Carolina*, 372 U.S. 229 (1963); *Ker v. California*, 374 U.S. 23 (1963); *Hurtado v. California*, 110 U.S. 516 (1884); *Benton v. Maryland*, 395 U.S. 784 (1969); *Malloy v. Hogan*, 378 U.S. 1 (1964); *Chicago, Burlington & Quincy Railroad Co. v. City of Chicago*, 166 U.S. 226 (1897); *In re Oliver*, 333 U.S. 257 (1948); *Duncan v. Louisiana*, 391 U.S. 145 (1968); *Pointer v. Texas*, 380 U.S. 400 (1965); *Argersinger v. Hamlin*, 407 U.S. 25 (1972).

[32] Barry Latzer, *Four-Half Truths About State Constitutional Law*, 65 TEMP. L. REV. 1123 (1992).

attention is particularly puzzling given that research and argument novelty is often seen as an indispensable criterion for elevation to tenure in all of the nation's elite law schools – many of which each employ several faculty members who collectively have written all there might be to write from every conceivable ideological direction on constitutional law. Such a pattern is counterintuitive because an article exploring the ninth tier of review in equal protection cases that has ostensibly eluded members of the bench and bar is likely less certain to catch the attention of a tenure committee than a comprehensive analysis of a heretofore neglected state constitutional provision that uses all of the traditional modalities to conclude that the clause offers more or less protection than its federal counterpart?[33] Finally, the current position of the several State courts is also baffling because "a lawyer today representing someone who claims some constitutional protection and who does not argue that the state constitution provides that protection is skating on the edge of malpractice."[34] This is particularly the case because §387 of the Second Restatement of Agency and Canon 7 of the American Bar Association's Model Rules of Professional Conduct compel lawyers to represent their clients zealously "within the bounds of the law."[35] Comment 1 to Rule 1.3 of the Model Rules of Professional Conduct, moreover, obliges lawyers to "act with commitment and dedication to the interests of the client."[36] However, given that lawyers litigating constitutional issues in state courts rarely, if ever, make claims based on the state constitution – even in matters where the two closest provisions on point have been interpreted differently – state courts could simply remedy the matter by sanctioning advocates who gloss over the claim in their briefs; indeed, the Vermont and Florida Supreme Courts already have.[37]

The Fourteenth Amendment thesis, though, has limited explanatory capacity because it assumes that State Supreme Courts only defer to Supreme Court precedent when interpreting state constitutional provisions that have a federal analogue. State courts of last resort, though, have adopted the federal analysis when interpreting structural constitutional provisions that the selective incorporation doctrine purportedly left lie sleeping. To take just one example, consider the political question doctrine a requirement that most first year law students are taught is a *sui generis* feature of Article III's Case and Controversy Clause and a product of the fact that, in the unforgettable words of Yale Law School Professor Harold Koh, "federal courts are courts of limited subject matter jurisdiction."[38] The doctrine is usually reserved for peculiar disputes that, if resolved, would produce tension between the three branches such as where there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department;"[39] or "a lack of judicially discoverable and manageable standards for resolving"[40] a matter; or it is impossible to decide a dispute "without an initial policy determination"[41] unfit for an Article III court's resolution; or unfeasible to resolve the matter "without expressing…the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision…; or the potentiality of embarrassment from multifarious pronouncements by various departments

---

[33] Phillip Bobbitt, CONSTITUTIONAL FATE (1982).

[34] Robert Welsh and Ronald Collins, *Taking State Constitutions Seriously*, 14 The Center Mag. 6, 12 (Sept./Oct. 1981).

[35] RESTATEMENT (SECOND) OF AGENCY §387 (1957); MODEL CODE OF PROFESSIONAL RESPONSIBILITY Canon 7 (1981).

[36] MODEL RULES OF PROFESSIONAL CONDUCT 1.3 cmt. 1 (1995).

[37] *State v. Jewett*, 500 A.2d 233 (Vt. 1985); *Traylor v. State*, 596 So.2d 957 (Fla. 1992).

[38] Louis Henkin, *Is There a "Political Question" Doctrine?*, 85 YALE L.J. 597 (1976).

[39] *Nixon v. United States*, 506 U.S. 224 (1993).

[40] *Luther v. Borden*, 48 U.S. 1 (1849); but see *Gaffney v. Cummings*, 412 U.S. 735 (1973).

[41] *Coleman v. Miller*, 307 U.S. 433 (1939).

Olapade                                                                                    DRAFT

on one question."[42] Some State Supreme Courts, though, have adopted similar rules for their constitutions even though their constitutions mention no such doctrine and state courts are tribunals of general, not limited, jurisdiction.[43] This difference is reflected in, among other things, the practice of State Supreme Courts in North Carolina, Alabama, Florida and other states of rendering advisory opinions or adopting laxer standing requirements than Article III imposes.[44] Other state courts have heavily relied upon the Supreme Court's reading of the federal Speech and Debate Clause[45] and Presentment Clause[46] in interpreting corresponding state constitutional provisions without pausing to reflect on the merits of the theories of political economy that the doctrines presuppose.[47]

While it is true that the U.S. Constitution secures a common degree of protection for citizens of all fifty states, the Supreme Court has appropriately chosen to exercise restraint in adopting and enforcing broad readings of the bill of rights and Fourteenth Amendment. This is so for at least two reasons. First, in the words of Justice Brandeis "[i]t is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."[48] Supreme Court precedent, though, "is binding on all jurisdictions within the union."[49] As Sixth Circuit Judge Jeffery Sutton has noted, once the Court settles a matter, further experimentation with potentially rewarding alternative approaches in other jurisdictions is foreclosed.[50] Indeed, state criminal law

---

[42] *Baker v. Carr*, 369 U.S. 186, 217 (1962); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974).

[43] *Aldinger v. Howard*, 427 U.S. 1 (1976); *Brown v. McDaniel*, 244 Ark. 362 (1968); *Witten v. Sternberg*, 475 S.W.2d 496 (Ky. 1971); *Leslie v. Griffin*, 25 S.W.2d 820 (Tex. Civ. App. 1930); *Prudential–Bache Sec., Inc. v. Commissioner of Revenue*, 412 Mass. 243, 588 N.E.2d 639, 642 (1992); *Bennett v. Board of Trustees for Univ. of N. Colorado*, 782 P.2d 1214, 1216 (Colo.App.1989), cert. denied, 797 P.2d 748 (Colo.1990); *Pace Constr. Co. v. Missouri Highway and Transp. Comm'n*, 759 S.W.2d 272, 274 (Mo.App.1988); *Terracor v. Utah Bd. of State Lands & Forestry*, 716 P.2d 796, 798–99 (Utah 1986); *State by McClure v. Sports and Health Club, Inc.*, 370 N.W.2d 844, 850 (Minn.1985), appeal dism'd, 478 U.S. 1015, 106 S.Ct. 3315, 92 L.Ed.2d 730 (1986); *Smith v. Allstate Ins. Co.*, 483 A.2d 344, 346 (Me.1984); *Ardmare Constr. Co. v. Freedman*, 191 Conn. 497, 467 A.2d 674, 675 n. 4, 676–77 (1983); *Horn v. County of Ventura*, 24 Cal.3d 605, 156 Cal.Rptr. 718, 726, 596 P.2d 1134, 1142 (1979); *Stewart v. Board of County Comm'rs of Big Horn County*, 175 Mont. 197, 573 P.2d 184, 186, 188 (1977); *State ex rel. Albritton v. Moore*, 238 La. 728, 116 So.2d 502, 504 (1959).but see *Ex parte Rodriguez*, 39 Tex. 705 (1874).

[44] *Advisory Opinion in re Homesteads and Exemptions of 1869*, 227 N.C. 715, 43 S.E.2d 73 (1947); FLA. CONST. art. IV, § 1(c); *N. Broward Hosp. Dist. v. Fornes*, 476 So.2d 154, 155 (Fla.1985); *Alabama Alcoholic Beverage Control Board v. Henri–Duval Winery, L.L.C.*, 890 So.2d 70 (Ala.2003); *Mangum v. Raleigh Board of Adjustment*, 362 N.C. 640, 642, 669 S.E.2d 279, 282 (2008); *In re Opinions of the Justices, In re Amend. to Sec. 93 of the Const.*, No. 1, 96 So. 487 (Ala. 1923); but see *Alamo Express, Inc. v. Union City Transfer*, 309 S.W.2d 815, 827-28 (Tex. 1958); *Gattis v. Duty*, 349 S.W.3d 193, 203 (Tex. App. 2011); *Louisville/Jefferson Cty. Metro Gov't v. Metro Louisville Hosp. Coal., Inc.*, 297 S.W.3d 42, 44 (Ky. Ct. App. 2009)

[45] Joseph Blocher, *Reverse Incorporation of State Constitutional Law*, 84 S. CAL. L. REV. 323 (2011)

[46] *Id.*

[47] *Jessen Assocs., Inc. v. Bullock*, 531 S.W.2d 593 (Tex. 1975); FLA. CONST. art. III, § 8(b); ALA. CONST. art. V §125.

[48] *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis J., dissenting).

[49] *Traylor v. State*, 596 So.2d 957 (Fla. 1992).

[50] Jeffery Sutton, 51 IMPERFECT SOLUTIONS: STATES AND THE MAKING OF AMERICAN CONSTITUTIONAL LAW 174 (2018). While many scholars have endorsed theories of federalism that are predicated on the assumption that mobile populations that can leave jurisdictions with policies that they disagree with, Yale Law School Professor Susan Rose-Ackerman has demonstrated that federalism would still have a significant impact on State policy formation even if one were to presume that only capital was mobile. See Susan Rose-Ackerman, *Does Federalism Matter? Political Choice in a Federal Republic*, 89 J.POL.ECON. 152 (1981). The theory here is that, in a unitary system of government, a law will pass if and only if

Olapade                                                                                                    DRAFT

scholars have elaborated on the benefits of under-enforcing constitutional commands and statutory provisions in other contexts. While under-enforcement can be the product of a large offender class,[51] limited resources for minor offense prosecution,[52] the target demographics' exclusion from, or inclusion in, the governing coalition,[53] the lamentable but inevitable over-breath of many criminal codes, or police training,[54] in the constitutional context, the Court's rightful unwillingness to exercise jurisdiction over a contested matter such as assisted suicide might reflect the morally ambiguous status of the practice.[55] Third, because Supreme Court precedent applies with equal force through the fifty diverse and independent states, this uniformity may fail to take account of regional differences that bear on a rule's or standard's ability to further the attainment of pareto-optimality in the state.[56] To take one example, consider the special English common law rule applicable to straying farm animals and its rejection in western states such as Texas and California. It is difficult to use fencing to prevent cattle, sheep, and other domestic farm animals from straying onto adjacent parcels. These straying animals can and do inflict considerable damage on neighboring property particularly in areas of dense cultivation. In states such as Maine, New Hampshire, or Massachusetts, however, the alternative to fencing is costly because barrier erection would often pose prohibitive costs as abandoning fruit, berry, or vegetable cultivation that would otherwise take place on the land would be impractical and ranching is not a primary source of income in these regions. Under these conditions, a rule of strict liability is optimal because it forces

---

(1)   $N(_xR_y) > N(_yR_x)$

Where y is the status quo in a unitary system, x is a proposed legislative change, R is the binary relation of weak preference, and N signifies the number of people in each subset. The math for securing the passage of legislation is different, though, for a federal system as a law will pass only if:

(2)   $N_1[_xR_z(G)] + N_2[_xR_w(G)] \geq N_1[_z(G) R_x] + N_2[_w(G) R_x]$

People living in x-type states have $_xR_z$ or $z(G)R_x$ or both. Those in set B(G) have $_xR_w(G)$, $w(G) Rx$ or both. In a unitary system, voters have $_xR_y$, $_yR_x$ or both. See the table below for a matrix of possible policy preference combinations.

|  | xRz(G) | Z(G)Rx | xRw(G) | W(G)Rx |
|---|---|---|---|---|
| xRy | A₁ (favor x) | A₃(positive spill-ins to x) | B₁(favor x) | B₃(positive spill-ins to x) |
| yRx | A₂(negative spill-ins to x) | A₄ (oppose x) | B₂(negative spill-ins to x) | B₄(oppose x) |

Thus

(3)   $N(A_3 \cup B_3) \leq \geq N(A_2 \cup B_2)$.

Or in other words, the existence of states and cities that regulate activities may cause some voters to favor central control of an activity that they would prefer to be unregulated under other conditions.

[51] Margaret Raymond, *Penumbral Prosecution*, 105 COLUM. L. REV. 583 (2005).
[52] Samuel Buell, *The Upside Over Overbreadth*, 83 N.Y.U. L. REV. 1491 (2008).
[53] John Hart Ely, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW 73-105 (1980).
[54] See Irving Zelchner, *Book Review*, NEW JERSEY LAWYER 51 (1981).
[55] See, e.g., Alexander Bickel, *The Supreme Court, 1960 Term -- Foreword: The Passive Virtues*, 75 HARV. L. REV. 40 (1961);  See *Confirmation Hearing on the Nomination of Samuel A. Alito, Jr. to be an Associate Justice of the Supreme Court of the United States Before the S. Comm. on the Judiciary*, 109th Cong. 381 (2006) (statement of Samuel A. Alito).
[56] *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973).

Olapade                                                                                          DRAFT

the owner to consider either reducing the size of her herd or posting a 'GTT sign' and moving to an area with less cultivation.[57] Conditions were different, however, in the West. Because livestock raising was not a marginal activity and millions of acres were unsuited for cultivation in the absence of sophisticated irrigation systems, fencing construction was cheaper and the state courts accordingly adopted the negligence standard for tort suits involving straying cattle.[58] Decentralization provides additional gains because only a few states are sufficiently large to warrant the application of a similar "federalism discount" in the decisional process.[59] Indeed, while this paper is focused specifically on Texas, one might suspect, as many in the legal academy do, that the different modes of selection for state court judges (as opposed to their federal counterparts) would naturally facilitate an inclination to capitalize on this institutional dynamic (see Table 3).[60]

Table 5

| Retention Method | State | Current Appointment Method | Original Method |
|---|---|---|---|
| Retention Election | Pennsylvania | Partisan | Leg. |
| | Maryland | Merit Plan | Gov. |
| | Indiana | Merit Plan | Gov. |
| | Illinois | Partisan | Leg. |
| | Missouri | Merit Plan | Gov. |
| | Florida | Merit Plan | Leg. |
| | Iowa | Merit Plan | Leg. |
| | California | Gov. | Partisan |
| | Kansas | Merit Plan | Partisan |
| | Nebraska | Merit Plan | Partisan |
| | Colorado | Merit Plan | Partisan |
| | South Dakota | Merit Plan | Partisan |
| | Wyoming | Merit Plan | Partisan |
| | Utah | Merit Plan | Partisan |
| | Oklahoma | Merit Plan | Partisan |
| | Arizona | Merit Plan | Nonpartisan |
| | New Mexico | Gov. with Commission | Partisan |
| | Alaska | Merit Plan | Merit Plan |
| Nonpartisan Election | Georgia | Nonpartisan | Leg. |
| | North Carolina | Nonpartisan | Leg. |
| | Kentucky | Nonpartisan | Gov. |
| | Tennessee | Gov. with Commission | Leg. |
| | Ohio | Nonpartisan | Leg. |

[57] Michael Ariens, LONE STAR LAW: A LEGAL HISTORY OF TEXAS 1-20 (2011).
[58] Coby Dolan, *Examining the Viability of Another Lord of Yesterday: Open Range Laws and Livestock Dominance in the Modern West*, 5 ANIMAL LAW 147 (1999).
[59] Jeffrey Sutton, *San Antonio Independent School District v. Rodriguez and Its Aftermath*, 94 VA. L. REV. 1963 (2008); Angela Morris, *Texas Supreme Court Allows UNT Law Grads to Take Bar Exam*, TEXAS LAWYER (December 14, 2016).
[60] See generally Jed Handelsman Shugerman, THE PEOPLE'S COURTS (2012).

Olapade                                                                                          DRAFT

| | Mississippi | Nonpartisan | Leg. |
|---|---|---|---|
| | Arkansas | Nonpartisan | Leg. |
| | Michigan | Nonpartisan | Gov. |
| | Wisconsin | Nonpartisan | Partisan |
| | Minnesota | Nonpartisan | Partisan |
| | Oregon | Nonpartisan | Partisan |
| | Nevada | Nonpartisan | Partisan |
| | Montana | Nonpartisan | Partisan |
| | North Dakota | Nonpartisan | Partisan |
| | Washington | Nonpartisan | Partisan |
| | Idaho | Nonpartisan | Partisan |
| Partisan Election | Louisiana | Partisan | Gov. |
| | Alabama | Partisan | Leg. |
| | Texas | Partisan | Gov. |
| | West Virginia | Partisan | Partisan |
| Governor | Delaware | Gov. with Legislative Consent | Gov. |
| | New York | Gov. with Commission | Gov. |
| | Maine | Gov. | Gov. |
| Legislative Election | South Carolina | Leg. | Leg. |
| | Vermont | Gov. with Commission | Leg. |
| Legislative Appointment | Connecticut | Gov. with Commission | Leg. |
| | Virginia | Leg. | Leg. |
| Judicial Nominating Committee | Hawaii | Merit Plan | Merit Plan |
| Judges Serve Until 70 | New Jersey | Gov. | Gov. |
| | New Hampshire | Gov. | Gov. |
| | Massachusetts | Gov. | Gov. |
| Life Tenure | Rhode Island | Leg. With Commission | Leg. |

        To be sure there are certain steps that the several States could take to ameliorate this issue. Although all fifty states require newly minted (or cross-jurisdictional) lawyers to take an oath to "solemnly swear that [they] will support the Constitutions of the United States, and of th[e] state" where they intend to practice, only seven states – Delaware, Florida, Indiana, Louisiana, Mississippi, Pennsylvania, and Tennessee – even bother to ask questions about their state constitutions on their bar exams.[61] Two states which have adopted the Uniform Bar Exam – New York and Washington – still, to the chagrin of many third year students and recent clerks, still

---

[61] DEL. BD. B. EXAM'RS R. 12; FLA. BD. B. EXAM'RS 4-22; IND. BD. L. EXAM'RS,
http://www.in.gov/judiciary/ble/2375.htm; LA. SUP. CT. R. XVII, §7(A); MISS. B. R. IX.5; PA. B. ADMIS. R. 203, att. I; TENN. SUP. CT. R. 7, art. IV, §4.04.
see, e.g., TEXAS GOV'T CODE § 82.037.

require applicants to take and pass a separate state-specific examination that does test state constitutional law.[62] Finally, two western states – Arizona and Montana – require testers to take a seminar on state constitutional law prior to admission to the bar.[63] While State Supreme Courts and Bar Examination Committees have the prerogative "to prescribe the curriculum for its" admissions test,[64] state constitutional law ought to be tested in at least one question. Here, one that arguably intersects with the previous discussion of the Fourteenth Amendment's requirements: true or false: may a claimant successfully challenge the validity of a state or local law under the State's constitution even after the U.S. Supreme Court holds that relief is not available under an identically worded provision in the U.S. Constitution?"[65] The inquiry is admittedly an opportunity for easy points but, one wouldn't know it, if she or he examined a few appellate briefs on Westlaw or LexisNexis.[66]

The locus of the blame, though, lies with the Supreme Court because it has refused to accord State courts of last resort sufficient respect when searching for adequate and independent state grounds in their decisions. Thus, "when…a state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion," the presumption is not that the matter is unreviewable under the statute authorizing certiorari review of state Supreme Court provisions, 28 U.S.C. §1257.[67] Rather, the Court "accept[s] as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so."[68]

As the Oregon Supreme Court stated in *Sterling v. Cupp* "[t]he proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim."[69] This is required, "not for the sake either of parochialism or of style, but because the state does not deny any right claimed under the federal Constitution when the claim before the court in fact is fully met by state law."[70] The text of the Fourteenth Amendment itself arguably compels state courts to consider state constitutional claims before deciding federal ones for how might a state deny an individual of "due process" or "equal protection" if it's governing charter satiates the federal standard? After all, nothing prevents a state constitution from forming "part of the total state action in a case" and supplying the "process" or "protection" that is due.[71] This exact policy

---

[62] N.Y. Bd. L. Exam'rs R. 6000.3(c); Wash. Admis. & Prac. R. 5(b)(1).
[63] See Ariz. Sup. Ct. R. 34(j); Mont. B. Admis. R. VIII.
[64] *Epperson v. State of Ark.*, 393 U.S. 97, 107 (1968).
[65] Jeffery Sutton, 51 Imperfect Solutions: States and the Making of American Constitutional Law 194 (2018).
[66] *Id.* at 1-40.
[67] *Michigan v. Long*, 463 U.S. 1032, 1040 (1983).
[68] *Id.*
[69] *Sterling v. Cupp*, 290 Or. 611, 614, 625 P.2d 123, 126 (1981).
[70] *Id.*; see also *State v. Kennedy*, 295 Or. 260 (1983); *State ex rel. Oregonian Pub. Co. v. Deiz*, 289 Or. 277 (1980); State v. Spada, 286 Or. 305 (1979); *State v. Sims*, 287 Or. 349, 353 n.1, 599 P.2d 461 (1979); State v. Spada, 286 Or. 305, 309, 594 P.2d 815 (1979); *State v. Smyth*, 286 Or. 293 (1979); *State v. Scurlock*, 286 Or. 277 (1979); *State v. Heintz*, 286 Or. 239 (1979) (concurring opinion); *State v. Greene*, 285 Or. 337 (1979) (concurring opinion); *State v. Flores*, 280 Or. 273 (1977); *Brown v. Multnomah County Dist. Ct.*, 280 Or. 95 (1977); *State v. Ivory*, 278 Or. 499 (1977); *State v. Valdez*, 277 Or. 621 (1977); *State v. Florance*, 270 Or. 169 (1974); *State v. Brown*, 262 Or. 442 (1972).
[71] Hans Linde, *Without Due Process: Unconstitutional Law in Oregon*, 49 Or. L. Rev. 125, 144 (1970).

rationale underlies the canon of constitutional avoidance as the canon, properly applied,[72] first requires judges to engage in a preliminary factual inquiry to determine whether a litigant's claim poses a risk of requiring constitutional adjudication at all.[73] Indeed, application of this reading of the Due Process Clause to State action has at least three benefits in this context. First, the practice accords proper respect to State officials by correctly presuming that these individuals preferred not to press the limits of the Constitution through their conduct.[74] Second, the practice provides "a low salience mechanism for…underenforced constitutional norms"[75] by permitting state executive officials to "reflect and deliberate before plunging into constitutionally sensitive issues."[76] Third, insisting on complete state process here will ensure that judges will be less likely to adjudicate cases instrumentally through their use of the canon and settle the expectations of state officials who begin to make preparations in anticipation of litigation.

III.     *Lockstepping in the Texas Supreme Court and Court of Appeals in Oil and Gas Takings Cases*

These lessons have ready application in oil and gas estate takings cases within Texas and matters implicating constitutional amendments limiting excessive expenditures on the state level. As seasoned energy litigators know, in Texas, the rule of capture is a common law rule that exempts drilling landowners from liability for draining oil and gas from underneath their neighbor's land – subject to restraints from reasonable regulation and countervailing common law causes of action for trespass, negligence, and nuisance.[77] The doctrine is a direct corollary of the

---

[72] Anthony Vitarelli, *Constitutional Avoidance Step Zero*, 199 YALE L.J. 836 (2010); see also *Mossman v. Higginson*, 4 U.S. 12 (1800).

[73] William N. Eskridge Jr., INTERPRETING LAW (2006); Antonin Scalia and Bryan Gardner, READING LAW 259 (2012); *United States v. Delaware & Hudson Co*., 213 U.S. 366 (1909); *DeBartolo Corp. v. Gulf Coast Trades Counc*., 485 U.S. 568 (1988); *Crowell v. Benson*, 285 U.S. 22 (1932); *United States v. X-Citement Video, Inc*., 513 U.S. 64 (1994); Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. REV. 109 (2010); Matthew Stephenson, *The Price of Public Action: Constitutional Doctrine and the Judicial Manipulation of Legislative Enactment Costs*, 118 Yale L.J. 2 (2008); Cass Sunstein, *Nondelegation Canons*, 67 U. Chi. L. Rev. 315 (2000); Ernest Young, *Constitutional Avoidance, Resistance Norms, and the Preservation of Judicial Review*, 78 Tex. L. Rev. 1549 (2000); Adrian Vermeule, *Saving Constructions* GEO. L.J. 1945, 1949 (1997); see also Jonathan F. Mitchell, *Reconsidering Murdock: State-Law Reversals as Constitutional Avoidance*, 77 U. CHI. L. REV. 1335 (2010); but see Richard Posner, *Statutory Interpretation – In the Classroom and In the Courtroom*, 50 U. Chi. L. Rev. 800 (1983); Frank Easterbrook, *Do Liberals and Conservatives Differ in Judicial Activism?*, 73 U. COLO. L. REV. 1401 (2002).

[74] Cf, Richard Hasen, *Constitutional Avoidance and Anti-Avoidance by the Roberts Court*, SUP. CT. REV. 181 (2009); see also *Rust v. Sullivan*, 500 U.S. 173 (1991); *Clark v. Martinez*, 543 U.S. 371 (2005); *United States v. Delaware & Hudson Co*., 213 U.S. 366 (1909); *Blodgett v. Holden*, 275 U.S. 142 (1927) (Holmes, J., concurring); *Bond v. United States*, 572 U.S. ___ (2014); *Heckler v. Mathews*, 465 U.S. 728, 741 (1984); *Ashwander v. Tennessee Valley Auth*., 297 U.S. 288 (1936) (Brandies, J., concurring)

[75] William Eskridge, Phillip Frickey, and Elizabeth Garrett, CASES AND MATERIALS ON LEGISLATION: STATUTES AND THE CREATION OF PUBLIC POLICY 918 (2007).

[76] William Eskridge, DYNAMIC STATUTORY INTERPRETATION 286 (1994).

[77] Bruce Kramer and Owen Anderson, *The Rule of Capture – An Oil and Gas Perspective*, 35 Envtl. L. 899 (2005); Robert Hardwicke, *The Rule of Capture and Its Implications as Applied to Oil and Gas*, 13 Tex. L. Rev. 391 (1935); Joseph Shade, PRIMER ON THE TEXAS LAW OF OIL AND GAS 5 (2004); Habib Olapade, *Practice Note: The Rule of Capture in Oil and Gas Law*, available at https://www.linkedin.com/pulse/rule-capture-oil-gas-law-habib-olapade/?published=t; *Houston & Texas Central Railway Co. v. East*, 98 Tex. 146, 81 S.W. 279 (1904); *Barshop v. Medina County Underground Water Conservation Dist*., 925 S.W.2d 618, 625–26 (Tex.1996); *Friendswood Dev. Co. v. Smith–Southwest Indus., Inc*., 576 S.W.2d 21, 25 (Tex.1978); *City of Corpus Christi v. City of Pleasanton*, 154 Tex. 289, 276 S.W.2d 798, 800 (1955); *Getty Oil Co. v. Jones*, 470 S.W.2d 618 (Tex. 1971). In Texas, the rule of capture has also been extended to groundwater extraction activities. See *Sipriano v. Great Spring Waters of Am., Inc*., 1

Olapade                                                                                          DRAFT

first-in-time rule of possession and, in fact, was first recognized in an 1843 Exchequer Case, *Acton v. Blundell* where Chief Justice Tindall found that a person "who owns the surface may dig therein, and apply all that is there found to h[er] own purposes at h[er] free will and pleasure."[78] Of course, as every first year law student learns, although American courts initially applied the first possession rule to distinguish domesticated animals from *ferae naturae* – wild animals such as foxes, boars, and jackrabbits – reasoning that they were to be disposed of as property interests to the private person in constructive possession, state courts in the nineteenth century treated oil and natural gas reservoirs as analogues to wild animals creating the rule of capture in the process.[79] The rule further incentivizes energy production by forcing landowners who are concerned that their neighbors will tap into their oil, natural gas, or aquifer groundwater to extract the resources as soon as possible and coheres well with the states' statutes of fraud, taxation measures, and recording acts.[80] This rule is somewhat contradictory, however, because Texas courts have long recognized the ownership of oil and gas in place.[81] Under this theory the landowner not only owns the rights to the oil and gas beneath the property but also, has the right to create a separate mineral estate in a conveyance even if the minerals have not been extracted and reduced to actual possession.[82] Once real property has been severed into mineral and surface estates, however, the mineral owners needs some means to access the oil or natural gas for development.[83] The result is

---

S.W.3d 75, 76 (Tex. 1999); *Barshop v. Medina Cty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 625 (Tex. 1996); *Lower Nueces River Water Supply Dist. v. City of Pleasanton*, 251 S.W.2d 777, 779 (Tex. Civ. App. 1952); *City of Sherman v. Pub. Util. Comm'n of Texas*, 643 S.W.2d 681, 686 (Tex. 1983); Petro Pro, Ltd. v. Upland Res., Inc., 279 S.W.3d 743, 753 n.4 (Tex. App. 2007); *City of San Marcos v. Texas Comm'n on Envtl. Quality*, 128 S.W.3d 264, 271 (Tex. App. 2004); *S. Plains Lamesa R.R., Ltd. v. High Plains Underground Water Conservation Dist.* No. 1, 52 S.W.3d 770, 776 (Tex. App. 2001); Bartley v. Sone, 527 S.W.2d 754, 760 (Tex. Civ. App. 1974), writ refused NRE (Dec. 31, 1975); *Pecos Cty. Water Control & Imp. Dist. No. 1 v. Williams*, 271 S.W.2d 503, 505 (Tex. Civ. App. 1954), writ refused NRE; Cantwell v. Zinser, 208 S.W.2d 577, 579 (Tex. Civ. App. 1948); Farb v. Theis, 250 S.W. 290, 292 (Tex. Civ. App. 1923); Comanche Duke Oil Co. v. Texas Pac. Coal & Oil Co., 298 S.W. 554, 559 (Tex. Comm'n App. 1927); *Gen. Crude Oil Co. v. Harris*, 101 S.W.2d 1098 (Tex. Civ. App. 1937), writ dismissed; *Edwards Aquifer Auth. v. Day*, 274 S.W.3d 742, 756 (Tex. App. 2008), aff'd, 369 S.W.3d 814 (Tex. 2012). Howard Williams and Charles Meyers, OIL AND GAS LAW 218.8 at 243 (2002). Kentucky courts have also adopted the rule. See *Long v. Louisville & N.R. Co.*, 128 Ky. 26, 107 S.W. 203, 205 (1908).
[78] *Acton v. Blundell*, 152 Eng. Rep. 1223, 1235 (Ex. Ch. 1843); *Pierson v. Post*, 3 Cai. R. 175 (1805); *Johnson v. M'Intosh*, 21 U.S. 543 (1823); but see Eric Kades, *Dark Side of Efficiency: Johnson v. M'Intosh and the Expropriation of American Indian Lands*, 148 U. PA. L. REV. 1065, 1190 (2000) ("whatever the ultimate normative conclusion, the entire process of expropriating America is a stunning example of…war and plunder… attempts to whitewash everything…cannot paint over these dark facts").
[79] *State v. Ohio Oil Co.*, 49 N.E. 809 (Ind. 1898); *Kelly v. Ohio Oil Co.*, 49 N.E. 399 (Ohio.1897); *Westmoreland & Cambria Natural Gas Co. v. DeWitt*, 18 A. 724 (Pa. 1889); Ana Schepens, *Prospecting for Oil at the Courthouse: Recovering for Drainage Caused by Secondary Recovery Operations*, 50 ALA. L. REV. 603 (1999).
[80] Susan Black-Lieb, *Fishing in Muddy Waters: Clarifying the Common Pool Analogy as Applied to the Standard for Commencement of a Bankruptcy Case*, 42 AM. U. L. REV. 337 (1993); *Hermann v. Thomas*, 143 S.W. 195 (Tex. Civ. App. – Galveston 1911); Richard Hemingway, THE LAW OF OIL AND GAS 1.9 (1991).
[81] *Tex. Co. v. Daugherty*, 176 S.W. 717 (Tex. 1915).
[82] *Wilderness Cove, Ltd. v. Cold Spring Granite Co.*, 62 S.W.3d 844 (Tex. App. – Austin 2001, no pet.); *Bagby v. Bredthauer*, 627 S.W.2d 190 (Tex. App. – Austin 2001, no pet.); Richard Hemingway, THE LAW OF OIL AND GAS 1.3 (1991).
[83] *Guffey v. Stroud*, 16 S.W.2d 527 (Tex.1929); *Davis v. Devon Energy Prod. Co., L.P.*, 136 S.W.3d 419, 423 (Tex. App. 2004); *Tarrant County Water Control & Improvement Dist. v. Haupt*, 854 S.W.2d 909, 911 (Tex.1993); *Key Operating & Equip., Inc. v. Hegar*, 403 S.W.3d 318, 327 (Tex. App. 2013), rev'd, 435 S.W.3d 794 (Tex. 2014); *Valence Op. Co. v. Texas Genco, LP*, 255 S.W.3d 210, 215–16 (Tex.App.-Waco 2008, no pet.); see also *Brown v. Lundell*, 162 Tex. 84, 344 S.W.2d 863 (1961); *Cox v. Davison*, 397 S.W.2d 200 (Tex.1965); *TDC Eng'g, Inc. v. Dunlap*, 686 S.W.2d 346, 348 (Tex. App. 1985), writ refused NRE (July 3, 1985); *City of Lubbock v. Coyote Lake*

that Texas courts have read implied easements granting access to as much of the surface as is reasonably necessary to extract the materials in oil and natural gas leases.[84] Consequently, under Texas law, mineral owners of a severed estate hold rights of ingress, egress, exploration, and surface use to facilitate extraction.[85]

The 1876 Texas Constitution was amended in 1890 to create the Texas Railroad Commission. As regulars at the lege know, the name is something of a misnomer because most of the state agency's work involves oil and natural gas regulation.[86] The Commission was originally given extensive powers to regulate express companies as well as railroad rates, operations, and terminals that were capacious by late nineteenth century standards.[87] The Railroad Commission, though, temporarily lapsed into obscurity with Congress' creation of the now-defunct Interstate Commerce Commission (ICC) and the Supreme Court's decision in the *Shreveport Rate Cases* permitting the ICC to regulate both interstate and intrastate rates for railroads delivering passengers and goods from Texas to Louisiana and cities within Texas.[88] Once, however, lege entrusted the Commission with regulating the state's expanding oil and gas industry in the massive East Texas Field and Panhandle region, which supplied much of the global demand for petroleum at the time, the Railroad Commission became one of the most powerful state agencies in the union.[89] In 1917, the state Constitution was amended again to force lege into passing laws limiting overproduction and waste of non-renewable resources.[90] The Railroad Commission responded two years later with the promulgation of Rule 37: the nation's first well-spacing rule, which altered the common law rule of capture and prohibited the drilling of any well within 300 feet of any other well and within 150 feet of a property line.[91] The Commission is currently the leading body within Texas regulating the oil and gas industry – passing regulations conserving oil and gas reservoirs by preventing unnecessary waste, and prorating natural gas production, facilitating the pooling of production from common reservoirs.[92]

In Texas, however, counties and cities, oddly enough, have concurrent jurisdiction over mineral resources, and on a not infrequent basis, have passed local ordinances stymying

---

*Ranch, LLC*, 440 S.W.3d 267, 272 (Tex. App. 2014); *Ball v. Dillard*, 602 S.W.2d 521, 523 (Tex.1980); *Petty v. Winn Expl. Co.*, 816 S.W.2d 432, 433–34 (Tex. App. 1991), writ denied (Sept. 18, 1991); *Sun Oil Co. v. Whitaker*, 483 S.W.2d 808 (Tex.1972).

[84] *Akers v. Stevenson*, 54 S.W.3d 880 (Tex. App. – Beaumont 2001, pet. Denied); *Placid Oil Co. v. Lee*, 243 S.W.2d 860, 862 (Tex. Civ. App. – Eastland 1951, no writ).

[85] See, e.g., *Yates v. Gulf Oil Corp.*, 182 F.2d 286, 289 (5th Cir.1950).

[86] William Childs, THE TEXAS RAILROAD COMMISSION: UNDERSTANDING REGULATION IN AMERICA TO THE MID-TWENTIETH CENTURY (2005).

[87] Randolph Campbell, GONE TO TEXAS: A HISTORY OF THE LONE STAR STATE 329 (2003); The constitutionality of the Railroad Commission's powers was quickly affirmed by the U.S. Supreme Court. See *Reagan v. Farmer's Loan & Trust Co.*, 154 U.S. 362 (1894).

[88] *Shreveport Rate Cases*, 234 U.S. 342 (1914).

[89] Cullen Godfrey, *A Brief History of the Oil and Gas Practice in Texas*, 68 TEX. B.J. 812 (2005).

[90] Tex. Const. art. XVI. 59(a) ("[T]he preservation and conservation of all such natural resources of the State are each and all hereby declared public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto.").

[91] Jared Hall, *Both Eyes Open or One Eye Closed: Does the Reasonable and Prudent Operator Standard Handicap Mineral Lessees in the Prevention of Drainage?*, 7 Tex. Tech. Admin. L.J. 179 (2006); Oxford Oil Co. & Prod. Co., 22 F.2d 597 (5th Cir.1927); *Brown v. Humble Oil & Ref. Co.*, 83 S.W.2d 935 (Tex.1935).

[92] Tex. Nat. Res. Code Ann. 81.051(a); 85.046; 86.081; 102.011; Tex. Admin. Code 3.1-3.106 (2003).

Olapade                                                                                    DRAFT

entrepreneurs from extracting minerals.[93] Concurrent municipal oil and gas regulation nonetheless remains "widespread and…accepted" within the state.[94] Conflicts naturally arise because, while the Railroad Commission is often concerned primarily with enforcing state wide uniform production standards and, for good, has developed a healthy relationship with the entities that it regulates, local governments in Hill Country with large urban populations such as Bexar County and Travis County tend to stress attenuated public health concerns when policing non-renewable ventures. Indeed, since 1935, Texas courts have recognized concurrent municipal authority to regulate oil and natural gas wells alongside the Railroad Commission.[95] This is so despite the onerous nature of federal regulations alone. Indeed, industries often benefit from environmental regulation in part because their preferences for environmental regulation far surpasses that of the public.[96] It follows that the primary losers in this process are those who lack the incentive or ability to influence the political process – the dispersed, powerless public that is forced to endure decreased entrepreneurial competition and pay higher prices for the goods they consume to subsidize the preferences of environmental interest groups. Because, in the words of James Buchanan and Gordon Tullock, "the existence of external costs imposed on the individual by collective action…is inherent in the operation of any collective decision-making rule [that has not obtained unanimous consent],…minority voters are forced to accede to actions which they cannot prevent and for which they cannot claim compensation for" resulting damages. Put differently, non-unanimous voting rules make it possible for some people to obtain goods and services without being forced to bear their full costs. This phenomenon, of course, is nothing new and can be traced back to George Stigler's landmark 1971 RAND Journal of Economics article which observed that "as a rule, regulation is acquired by the [regulated] industry and is designed and operated primarily for its benefit."[97] Through the savvy use of regulation, those regulated can use government action to create rents for themselves. To take a familiar example involving lawyers, Thomas Jefferson once observed that all that was "necessary to form a lawyer" was "access to a library, and directions in what order the books are to be read."[98] Yet, at least in the United States, the legal profession, for some good, has artificially limited the supply of lawyers by requiring that pupils first obtain an undergraduate degree, take the LSAT, attend an accredited law school, pass the MPRE, and pass the bar exam for the jurisdiction(s) where they wish to practice.[99] While these requirements increase the overall quality of representation, it cannot be denied that they also permit lawyers to charge higher prices for their services than would otherwise be the case in a less regulated regime. Cotton textile mill regulation provides yet another example. Indeed in 1982, Michael Maloney and Robert McCormick found that Occupational Safety and Health Administration's promulgation of

[93] Jan Laitos and Elizabeth Getches, *Multi-Layered, and Sequential, State and Local Barriers to Extractive Resource Development*, 23 VA. ENVTL. L.J. 1 (2004).
[94] Perry Pearce, *The Spectrum of Choices: Formulation and Implementation of Regulatory Land Use Decisions Affecting Mineral Development*, in 3 MINERAL DEVELOPMENT AND LAND USE (1995).
[95] See, e.g., *Klepak v. Humble Oil & Ref. Co.*, 177 S.W.2d 215 (Tex. Civ. App. – Galveston 1944), *writ of error refused for want of merit without reported opinion*; Unger v. State, 629 S.W.2d 811 (Tex. App.-Fort Worth 1982), *petition for discretionary review refused without reported opinion*, June 2, 1982; Shelby Operating Co. v. City of Waskom, 964 S.W.2d 75 (Tex. App.-Texarkana 1997); *Tysco Oil Co. v. Railroad Commission*, 12 F. Supp. 195 (S.D. Tex. 1935); *Tysco Oil Co. v. Railroad Commission*, 12 F. Supp. 202 (S.D. Tex. 1935); BCCA Appeal Grp., Inc. v. City of Houston, 496 S.W.3d 1 (Tex. 2016)
[96] Richard L. Revesz, *Federalism and Environmental Regulation: A Public Choice Analysis*, 115 HARV. L. REV. 553 (2001).
[97] George Stigler, *The Theory of Economic Regulation*, 2 BELL J. ECON. & MGMT. SCI. 3 (1971).
[98] Letter from Thomas Jefferson to John Garland Jefferson, 11 June 1790.
[99] Lawrence Friedman, A HISTORY OF AMERICAN LAW 463-501 (2005).

stricter cotton dust regulations in tandem with the Supreme Court's equal divided affirmance of the D.C. Circuit's decision in *Fri v. Sierra Club*, which effectively required the EPA to adopt stricter cooper-smelting regulations, increased firm costs and reduced textile mill output.[100] Oddly enough, however, the common stock prices for publicly traded textile companies increased after this regulatory one-two punch ostensibly in part because the relative benefits of regulation in raising prices outweighed the direct compliance costs.[101] This is far from an isolated incident as similar issues have been documented with federal regulation of miles-per-gallon standards.[102] More than that, the EPA itself often restricts market entry in the oil and gas market by imposing stricter pollution control requirements on new firms whilst permitting existing market participants to satisfy lower standards.[103] Large upfront investments in pollution abatement equipment raise the minimal capital demands of doing business harming consumers and small energy start-ups of all stripes.[104]

Even though Texas, thankfully, is a right to work state, labor unions also benefit from this arrangement.[105] This is so because "if labor is organized in the polluting industries, unions may bargain for higher wages to be paid from rents generated by regulatory-derived output restrictions."[106] Thus "union leaders [are expected to] support stricter enforcement of standards so long as the gain in worker wages and total dues was greater than the additional cost of bargaining."[107] A skeptic might counter that the political process will often prevent inefficient environmental regulation in scenarios where the public clearly opposes regulations and is able to successfully articulate that preference to political elites.[108] Democratic politics, though, is often ineffective in constraining rent-seeking for at least two reasons.[109] First, because voters have little incentive to invest time, money and effort to learn about the details of alternative policies, they embrace rational ignorance and consequently are unable to understand all the details of energy legislation or EPA implementation.[110] Second, and perhaps, more importantly, Arrow's Theorem often correctly predicts that politicians will be unable to aggregate their disparate preferences into a coherent social ranking.[111] The result is a grave but well documented deficiency in the state populace's ability to defend its collective interests.[112]

---

[100] Michael Maloney and Robert McCormick, *A Positive Theory of Environmental Quality Regulation*, 25 J.L. & ECON. 99 (1982).

[101] *Id.* at 109-21.

[102] Bruce Yandle, *Fuel Efficiency by Government Mandate: A Cost-Benefit Analysis*, 6 POL'Y ANALYSIS 291, 300 (1980).

[103] Robert Hahn, *The Political Economy of Environmental Regulation: Towards a Unifying Framework*, 65 PUB. CHOICE 21, 27 (1990).

[104] Thomas Dean and Robert Brown, *Pollution Regulation as a Barrier to New Firm Entry: Initial Evidence and Implications for Future Research*, 38 ACAD. MGMT. J. 288, 299 (1995); Robert Quinn and Bruce Yandle, *Expenditures on Air Pollution Control Under Federal Regulation*, 16 REV. REGIONAL STUD. 11 (1986).

[105] Nancy Rose, Labor Rent Sharing and Regulation: Evidence from the Trucking Industry, 95 J. Pol. Econ. 1146 (1987).

[106] Bruce Yandle, *Economic Agents and the Level of Pollution Control*, 40 PUB. CHOICE 105 (1983).

[107] *Id.*

[108] Sam Peltzman, *Toward a More General Theory of Regulation*, 19 J.L. & ECON. 211 (1976).

[109] A.C. Pritchard and Todd Zywicki, *Finding the Constitution: An Economic Analysis of Tradition's Role in Constitutional Interpretation*, 77 N.C.L. REV. 409 (1999).

[110] James Fishkin, THE VOICE OF THE PEOPLE: PUBLIC OPINION AND DEMOCRACY 1-16 (1995).

[111] See generally Kenneth Arrow, SOCIAL CHOICE AND INDIVIDUAL VALUES (1951).

[112] See generally Mancur Olson, THE LOGIC OF COLLECTIVE ACTION (1965).

Olapade                                                                                        DRAFT

     To the extent that any environmental regulation of Texas' oil and gas facilities is permitted to occur at all, however, these measures ought to include economic incentive systems such as pollution charges, transferable pollution permits, and waste deposit and refund programs, to achieve environmental goals while avoiding many of the dysfunctions of centralized regulation. Charges, for instance, impose a fee or tax on each ton or other unit of pollution discharged. Transferable pollution permits achieve the same result by limiting the total units of pollution permitted, issuing freely-marketable permits equal in number to the units permitted, and requiring energy producers to have permits equal to their discharges. Because pollution control is costly and the number of discharge permits is limited, the permits will command a positive price. More than that, since firms will have to buy a permit for each unit of pollution they emit, they will effectively pay a tax proportionate to the amount of pollution they emit. By way of contrast, deposit and refund systems impose a tax on waste-creating activities and then give a refund for each unit of waste that is recycled or properly disposed of. In effect, they impose a net tax on each unit of waste that an enterprise fails to recycle or dispose of properly. The decentralized flexibility that comes with economic incentive systems offers at least six advantages over command and control regulation.

     First, incentive systems achieve large cost savings by giving firms with relatively low control costs an incentive to control above the level mandated by uniform regulation while allowing firms with high costs to control less. Indeed, as Yale Law School Professor Bruce Ackerman has argued, environmental regulations on oil and gas firms that require best available technology implementation are counterproductive because they waste billions of dollars by ignoring variations among wells in the cost of reducing pollution,[113] ignoring geographic variations in pollution effects,[114] penalizing productive industries because they can 'afford' the costs of regulatory compliance,[115] harm international competitiveness,[116] and reinforcing agency inertia.[117] Second, government administrators do not need to acquire the detailed information needed to determine the feasible and appropriate level of control for each plant or product. Instead, once an economic system is in place, control decisions are made by plant executives and engineers, not career politicians. The result is that delays, distortions, and centralized regulation costs are greatly reduced. Third, as is not the case with mandated specific control technologies, incentive systems permit regulators to impose control technologies in a flexible manner. Economic incentives, therefore, permit each energy firm to devise the control methods that are the most appropriate, effective, and cheapest for its particular circumstances. Fourth, incentive systems do not impose penalties on new products and plants. Indeed, all sources of pollution or chemical risk are subject to the same incentive level as new products and plants do not have to go through a cumbersome review process. Fifth, economic incentives provide firms with a carrot to devise new products or

[113] See also Thomas H Tietenberg, EMISSIONS TRADING, AN EXERCISE IN REFORMING POLLUTION POLICY (1965); Robert Crandall, CONTROLLING INDUSTRIAL POLLUTION (1983); INCENTIVE ARRANGEMENTS FOR ENVIRONMENTAL PROTECTION (1983); Lester Lave, THE STRATEGY OF SOCIAL REGULATION (1981); Bruce Ackerman and William Hassler, CLEAN COAL/DIRTY AIR: OR HOW THE CLEAN AIR ACT BECAME A MULTIBILLION-DOLLAR BAIL-OUT FOR HIGH-SULFUR COAL PRODUCERS (1981); Bruce Ackerman, Dale W. Henderson, James W. Sawyer, Jr., and Susan Rose-Ackerman, THE UNCERTAIN SEARCH FOR ENVIRONMENTAL QUALITY (1974);
[114] Stephen Breyer, ACTIVE LIBERTY 102 (2005); see also Stephen Breyer, REGULATION AND ITS REFORM (1982).
[115] Peter Huber, *The Old-New Division in Risk Regulation*, 69 VA. L. REV. 1025 (1983).
[116] Joseph Kalt, *The Impact of Domestic Environmental Regulatory Policies on U.S. International Competitiveness*, in ENERGY AND ENVTL. POL'Y CENTER, JOHN F. KENNEDY SCH. OF GOV'T HARV. U., Discussion Paper Series (1985).
[117] Robert Crandall and Paul Portney, NATURAL RESOURCES AND THE ENVIRONMENT: THE REAGAN APPROACH (1984).

production technologies that reduce pollution or chemical risk. This state of affairs is preferable to a centralized regulatory regime because under the latter arrangement firms only have an incentive to find cheaper ways to comply with existing regulations. Sixth, incentive systems for firms to pay for using the public's air and water resources provide the government with new sources of revenue for national defense and deficit reduction. One might counter than an environmental policy centered on economic incentives would be perverse because it deprecates basic values by permitting human health and environmental integrity to be traded for dollars. This claim, however, confounds ends with means and simply ignores the fact that resources must be allocated on the basis of weighting competing values in a society with limited resources. More specifically, the mere fact that a jurisdiction uses economic incentives to achieve its environmental goals does not mean that the goals themselves must be selected through cost-benefit analysis. No one doubts, for instance, that it would be desirable to ensure that the beach waters in Miami, Malibu, Makaha, or Myrtle Beach remain clear and scenic – the only question is whether the imposition of unnecessary costs through regulatory regimes that even prominent environmentalists have been critical of is the best way to accomplish that goal.

Placing federal environmental policy to one side, though, both the U.S. Constitution's Takings Clause and Article I §17 of the Texas Constitution prevent the commandeering of private property without just compensation.[118] Even though the two clauses are not worded identically, the Texas Supreme Court has deferred to the Supreme Court's interpretation of the Fifth Amendment in state takings cases despite a wide range of center-right criticism decrying several doctrines in the field from conservative members of the bench, bar, and professoriate.[119] More than that, the Texas Supreme Court in one instance has even assumed without deciding that federal takings claims must be adjudicated before reaching the merits of identical state claims despite the Fourteenth Amendment's implicit condemnation of the practice because, again, part of the process the State provides includes the protection provided by the State constitution.[120] One might retort that this practice is quite harmless because it has no ultimate effect on case disposition. There are two responses to this claim. First, it can be rather difficult to determine whether an event or rule is

---

[118] U.S. CONST. amend. V; TEX. CONST. art. I §17.

[119] See, e.g., Bernard Siegan, ECONOMIC LIBERTIES AND THE CONSTITUTION (1980); Michael W. McConnell, *Contract Rights and Property Rights: A Case Study in the Relationship between Individual Liberties and Constitutional Structure*, 76 CALIF. L. REV. 267 (1988); Richard Epstein, *The Mistakes of 1937 A Federalist Society Symposium: Constitutional Protections of Economic Activity: How They Promote Individual Freedom*, 11 Geo. Mason U. L. Rev. 5 (1988); Frank Easterbrook, *The Constitution of Business A Federalist Society Symposium: Constitutional Protections of Economic Activity: How They Promote Individual Freedom - Panel II: The Takings Clause, the Contracts Clause, and Other Economic Rights Provisions of the Constitution*, 11 Geo. Mason U. L. Rev. 53 (1988).

[120] *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922 (Tex. 1998); City of Houston v. Trail Enterprises, Inc., 300 S.W.3d 736 (Tex. 2009); City Of Houston v. O'Fiel, No. 01-08-00242-CV, 2009 WL 214350 (Tex. App. Jan. 29, 2009); Buffalo Equities, Ltd. v. City of Austin, No. 03-05-00356-CV, 2008 WL 1990295 (Tex. App. May 9, 2008); City of Houston v. Kolb, 982 S.W.2d 949 (Tex. App. 1999); City of Crowley v. Ray, 558 S.W.3d 335 (Tex. App. 2018), reh'g denied (Sept. 20, 2018), review denied (Mar. 29, 2019); City of Houston v. Mack, 312 S.W.3d 855 (Tex. App. 2009); TCI W. End, Inc. v. City of Dallas, 274 S.W.3d 913 (Tex. App. 2008); Maguire Oil Co. v. City of Houston, 243 S.W.3d 714 (Tex. App. 2007); City of Anson v. Harper, 216 S.W.3d 384 (Tex. App. 2006); City of Harlingen v. Obra Homes, Inc., No. 13-02-268-CV, 2005 WL 74121 (Tex. App. Jan. 13, 2005); Coble v. City of Mansfield, 134 S.W.3d 449 (Tex. App. 2004); Mont Belvieu Square, Ltd. v. City of Mont Belvieu, Tex., 27 F. Supp. 2d 935 (S.D. Tex. 1998); In re Am. State Bank to Obtain Testimony of Wade, No. 07-03-0483-CV, 2005 WL 1967262 (Tex. App. Aug. 16, 2005); LJ&J Corp. v. City of Dallas, No. CIV. 3:94-CV-2420-H, 1998 WL 320257 (N.D. Tex. June 8, 1998).

Olapade                                                                                          DRAFT

outcome determinative.[121] Justice Frankfurter's opinion in *Guaranty Trust v. York*, a relatively well-known choice-of-law decision, provides an apt illustration of this dynamic.[122] That case involved a New York equity proceeding asserting a breach of fiduciary duty by Guaranty Trust in its dealings with the holders of certain notes. The Court here was solely concerned with whether the suit either was time barred under the Empire State's statute of limitations or a federal court sitting in equity could apply the common law doctrine of laches to permit a suit that would have been untimely under state law so long as the defendant would not have suffered prejudice from the delay.[123] Justice Frankfurter began by attempting to harmonize federal equity practice with *Erie Railroad Co. v. Tompkins*'s infamous command that "there is no federal general common law"[124] and that to the extent that the "common law…is enforced in a state…[it] is not the common law generally but the law of that State existing by the authority of that state:"[125]

> From the beginning, there has been a good deal of talk in the cases that federal equity is a separate legal system. And so it is, properly understood. The suits in equity of which the federal courts have had "cognizance" ever since 1789 constituted the body of law which had been transplanted to this country from the English Court of Chancery. But this system of equity "derived its doctrines, as well as its powers, from its mode of giving relief."…In giving federal courts "cognizance" of equity suits in cases of diversity jurisdiction, Congress never gave, nor did the federal courts ever claim, the power to deny substantive rights created by State law, or to create substantive rights denied by State law (internal citations omitted).[126]

The result is that federal courts sitting in diversity could apply equitable doctrines so long as they gave effect to the parties' rights as defined by state law and, thus, were duty bound to apply state law where enforcement of the opposing federal rule would "substantially affect the enforcement of the right as given by the State."[127] The problem? Members of the bench, bar, and ivory tower have struggled since to arrive on a reasonable and principled consensus on what constitutes a rule that "substantially affect[s] the enforcement of the right as given by the State."[128] Second, this counter-claim also assumes that the Texas Supreme Court, while deferring to Supreme Court precedent, is at least following the applicable cases correctly. It is not even clear, however, that this is true because, as of the time of this article's writing, litigants raising federal takings claims are still required to exhaust state remedies before their Fifth Amendment arguments may be considered.[129] Because this exhaustion requirement is a creature of the Texas Supreme Court's

---

[121] Linda J. Silberman, Allan R. Stein, Tobias Barrington Wolff, CIVIL PROCEDURE: THEORY AND PRACTICE 430-40 (2017).

[122] *Guaranty Trust Co. v. York*, 326 U.S. 99 (1945).

[123] Tobias Wolff, *Choice of Law and Jurisdictional Policy in the Federal Courts*, 165 U. PA. L. REV. 1863 (2017).

[124] Henry Friendly, *In Praise of Erie – and of the New Federal Common Law*, 39 N.Y.U. L. REV. 383 (1964).

[125] *Id.*

[126] *Guaranty Trust Co. v. York*, 326 U.S. 99, 105 (1945); see also C.C. Langdell, SUMMARY OF EQUITY PLEADING xxvii (1877).

[127] *Guaranty Trust Co. v. York*, 326 U.S. 99, 105 (1945).

[128] Linda J. Silberman, Allan R. Stein, Tobias Barrington Wolff, CIVIL PROCEDURE: THEORY AND PRACTICE 430-40 (2017); Peter Westen and Jeffrey Lehman, *Is There Life for Erie after the Death of Diversity?*, 78 MICH. L. REV. 311 (1980).

[129] *Williamson City. Planning v. Hamilton Bank*, 473 U.S. 172 (1985); *Hollywood Park Humane Soc'y v. Town of Hollywood Park*, No. SA-03-CA-1312-XR, 2004 U.S. Dist. LEXIS 3957, at 2-7 (W.D. Tex. Mar. 10, 2004); but see

ripeness doctrine which originally stems from the U.S. Constitution's "case or controversy" requirement in Article III, if one were to ignore the Due Process Clause for the moment, consideration of federal claims before their state counterparts would be permissible if Texas courts maintained less permissive justiciability requirements than their federal counterparts. The problem? Again, the Texas Supreme Court has summarily adopted federal standing and ripeness doctrines without so much as pausing to reflect on the merits of doing so.[130]

This reflexive assimilation extends beyond procedural rules and effects substantive doctrine as well. To see why this is so a brief review of the Supreme Court's Fifth Amendment Takings Clause doctrine is in order. Takings can either be physical or regulatory in nature – although the former is more common.[131] In actions involving real property, a possessory taking occurs when a federal or State official directly appropriates an individual's interest or title in their land.[132] Thus, property and constitutional law scholars alike often refer to possessory takings as physical takings because in most condemnation matters, "the condemner physically enters upon the condemnee's land and compels the transfer to itself of an estate or lesser interest, such as an easement."[133]  In the words of Justice Stevens, though, possessory takings "are as old as the Republic itself and, for the most part, involve the straightforward application of per se rules."[134] Thus, when "the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof."[135] Regulatory takings, by way of contrast, occur once state authorities have, in the words of Justice Holmes, "go[ne] too far" with a "government regulation of private property" such that the regulation becomes "so onerous that its effect is tantamount to a direct appropriation or ouster."[136] Two types of regulatory takings are viewed as "per se" condemnations under this framework. "First, where government requires an owner to suffer a permanent physical invasion of her property – however minor – it must provide

---

*Knick v. Township of Scott*, 862 F.3d 310 (3d Cir. 2017) cert granted to determine "[w]hether the Court should reconsider the part of the Supreme Court's *Williamson County* decision that requires property owners to exhaust state-court remedies before litigating takings claims in federal courts?" For criticism of the doctrine, see Michael W. McConnell, *Horne and the Normalization of Takings Litigation: A Response to Professor Echeverria*, 43 Env. L. Rep. 10749 (2013); Scott A. Keller, *Judicial Jurisdiction Stripping Masquerading As Ripeness: Eliminating the Williamson County State Litigation Requirement for Regulatory Takings Claims*, 85 Tex. L. Rev. 199 (2006); J. David Breemer, *You Can Check Out but You Can Never Leave: The Story of San Remo Hotel-the Supreme Court Relegates Federal Takings Claims to State Courts Under A Rule Intended to Ripen the Claims for Federal Review*, 33 B.C. Envtl. Aff. L. Rev. 247, 247 (2006); Josh Patashnik, *Bringing A Judicial Takings Claim*, 64 Stan. L. Rev. 255 (2012); Michael M. Berger, *Happy Birthday, Constitution: The Supreme Court Establishes New Ground Rules for Land-Use Planning*, 20 Urb. Law. 735, 756 (1988); Michael Berger, *Vindicating the Rights of Private Land Development in the Courts*, 32 Urb. Law. 941 (2000); Joel Block, *Takings Claims: Are the Federal Courts Truly Open?*, 8 Mo. Envtl. L. & Pol'y Rev. 74 (2001); Thomas E. Roberts, *Fifth Amendment Taking Claims in Federal Court: The State Compensation Requirement and Principles of Res Judicata*, 24 Urb. Law. 479, 511 (1992); but see Jonathan F. Mitchell, *Judicial Review and the Future of Federalism*, 49 Ariz. St. L. J. 1091 (2017).

[130] *Alamo Express, Inc. v. Union City Transfer*, 309 S.W.2d 815, 827-28 (Tex. 1958); *Gattis v. Duty*, 349 S.W.3d 193, 203 (Tex. App. 2011);

[131] See, e.g., *Yee v. City of Escondido*, 503 U.S. 519, 522 (1992) (dividing takings claims into physical invasion and regulatory takings claims); *Kelo v. City of New London*, 545 U.S. 469 (2005).

[132] Jan Laitos, Law Of Property Rights Protection: Limitations On Governmental Powers §8.02 (2007).

[133] William Stoebuck, Nontrespassory Takings In Eminent Domain 1 (1977); see generally Richard Epstein, Takings: Private Property And The Power Of Eminent Domain (1985).

[134] *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002).

[135] *United States v. Pewee Coal Co.*, 341 U.S. 114, 115 (1951).

[136] *Id.*

Olapade                                                                                          DRAFT

just compensation."[137] Second, the government must provide remuneration when it pursues a "regulation that completely deprives an owner of "all economically beneficial us[e]" of her property" but such payment is limited to the extent that "background principles of nuisance and property law" independently restrict the owner's intended use of the property.[138] Otherwise, regulatory claims are evaluated under the multi-factor test annunciated in *Penn Central Transp. Co. v. New York City*.[139] This standard looks to (1) "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations," and (2) the "character of the governmental action" – i.e. whether the state action amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good."[140] As Energy Law Professor Bruce Kramer has noted, early federal and Texas takings litigation over local authority to regulate oil and gas projects often failed to distinguish between substantive due process, equal protection, and takings claims.[141] From the beginning of the 1970s to the late 1990s, the Texas Supreme Court relied on the test set out in *City of Austin v. Teague* to resolve state takings claims.[142] *Teague* involved a property owner who sought a "water development permit" from Austin to improve an 8 ½ acre lot near Highway 35.[143] Although the City's staff originally granted the application, the Planning Commission and City Council ultimately denied the permit to preserve natural wetlands near the southern portion of downtown Austin. After a jury trial, the city lost and then appealed. The Texas Supreme Court articulated a separate test for adjudicating §17 takings claims that would impose liability upon the state when its action "rendered [the real property] wholly useless," "the government burden created a disproportionate diminution in economic value or caused a total destruction of the value," or when the "government's action against an economic interest of an owner [was] for its own advantage."[144] The Court clarified this admittedly cryptic standard in *Taub v. City of Deer Park* when it found that a compensable taking arises only when a regulatory action constitutes an unreasonable interference with the landowner's right to use and enjoy her property.[145] Under this revised approach, Article I, §17 did not compel the state and its cities to guarantee the "profitability of every piece of land subject to its authority" and the burden was on the aggrieved landowner to prove a "sufficiently severe economic impact" to succeed on the merits with a state takings claim. This regime ostensibly changed, however, in 1998 when the Texas Supreme Court incorporated the *Penn Central* test into its State takings clause analysis in *Mayhew v. Town of Sunnyvale* and formally surrendered its role as a conservative "laboratory of democracy" in *Sheffield*

---

[137] See *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking).
[138] *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992).

[139] 438 U.S. 104 (1978).
[140] *Id.*
[141] Bruce Kramer, *The Pit and the Pendulum: Local Government Regulation of Oil and Gas Activities Returns from the Grave*, in 50 SOUTHWEST LEGAL FOUNDATION INSTITUTE ON OIL AND GAS LAW AND TAXATION §4.01 (1999); see also *Champlin Ref. Co. v. Corp. Comm'n*, 286 U.S. 210 (1932); *Thompson v. Consol. Gas Util. Corp.*, 300 U.S. 55 (1937).
[142] *City of Austin v. Teague*, 570 S.W.2d 389 (Tex. 1978).
[143] *Id.* at 390.
[144] *Id.* at 392.
[145] *Taub v. City of Deer Park*, 882 S.W.2d 824 (Tex. 1994).

Olapade                                                                                              DRAFT

*Development Co. v. City of Glenn Heights* with its admonition that Texas courts should "look to federal takings cases for guidance in applying our own [State] constitution."[146]

"An [appointive] despotism was not the government we fought for."[147] When the Supreme Court adopts a deferential standard of review of a particular class of constitutional claims, it often does so with the implicit understanding that its power "to stay experimentation in things social and economic is a grave responsibility as [d]enial of the right to experiment may be fraught with serious consequences to the nation."[148] More specifically, to the extent that a lax standard of review reflects not only the Court's perceived institutional incompetence to impose a uniform standard on fifty different jurisdictions with different circumstances,[149] but also, its invitation to state courts and legislatures to fill the regulatory void, blind adherence to the federal standard undermines the dual sovereignty system.[150] This is particularly the case with Texas – a state where the current regime of political elites ostensibly disagrees deeply with the notion that review under the Fifth Amendment's Takings Clause should be deferential at all.[151] Consider at least five problems with current doctrine. First, under current federal takings doctrine, city authorities in Dallas, San Antonio, and El Paso have abrogated the common law presumption of free and unrestrained use by subjecting the landowner's rights to the demands of ever increasing zoning regulations.[152] To take just a few examples, under common law principles, a landowner can develop a property in whatever manner the owner prefers so long as the owner's use does not constitute a nuisance to her neighbors or the community at large.[153] Some Texas cities also often elect to impose enormous "development fee" or "impact fee" exactions for government permits in an abusive manner.[154] These one-time fees which are imposed on builders and then passed onto home-owners through

---

[146] *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 934 (Tex. 1998); *New State Ice Co. v. Liebmann*, 285 U.S. 262 (1932) (Brandeis, J., dissenting); *Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660 (tex. 2004).

[147] Thomas Jefferson, NOTES ON THE STATE OF VIRGINIA, Query 13, 120—21 (1785).

[148] *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis J., dissenting) see also *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973) ("[t]hese practical considerations, of course, play no role in the adjudication of the constitutional issues presented here. But they serve to highlight the wisdom of the traditional limitations on this Court's function. The consideration and initiation of fundamental reforms with respect to state taxation and education are matters reserved for the legislative processes of the various States, and we do no violence to the values of federalism and separation of powers by staying our hand.)"

[149] Stephen Breyer, ACTIVE LIBERTY 56-66 (2005).

[150] Jeffery Sutton, 51 IMPERFECT SOLUTIONS: STATES AND THE MAKING OF AMERICAN CONSTITUTIONAL LAW 1-30 (2018).

[151] See, e.g., Brief of the States of Texas, Arizona, and North Dakota as Amicus Curiae in No. 14-725, Horne v. Department of Agriculture; Vetoing Property Rights, https://www.gregabbott.com/hands-off-our-land/; Tell Lawmakers to Stop Abuse of Property Rights, https://www.gregabbott.com/petition-poll/tell-lawmakers-stop-abuse-property-rights/; Greg Abbott for Texas Governor: Property Tax Platform, https://www.gregabbott.com/wp-content/uploads/2018/01/PropertyTaxReform.pdf; Governor Greg Abbott Pushes For Limits on School Property Tax Hikes, https://www.expressnews.com/news/politics/texas_legislature/article/Gov-Greg-Abbott-pushes-for-limit-on-school-13358780.php; High Property Taxes are the Epicenter of Texas Lt. Gov. Dan Patrick's Re-Election Campaign, https://www.houstonchronicle.com/news/politics/texas/article/High-property-taxes-are-the-epicenter-of-Texas-13330954.php Bonnen Chairs Committee Examining Property Rights And Coastal Issues, http://www.dennisbonnen.com/index.php/insider-s-report/item/23-bonnen-chairs-committee-examining-property-rights-and-coastal-issues. Nate Persily, "Introduction," in PUBLIC OPINION AND CONSTITUTIONAL CONTROVERSY 10 (2008).

[152] Houston, to the delight of those who prefer to live in close proximity to a variety of businesses and housing structures, as avoided this pitfall. Bernard Siegan, *Non-Zoning in Houston*, 13 J.L. & ECON. 71 (1970).

[153] Keith Hirokawa, *Property as Capture and Care*, 74 ALB. L. REV. 175, 198 (2010).

[154] *Ehrlich v. City Of Culver City*, 911 P.2d 429 (1996); *Home Builders Ass'n v. City of Scottsdale*, 930 P.2d 993 (Ariz. 1997).

Olapade                                                                                                    DRAFT

higher prices, are used by cities to fund the construction of roads, sidewalks, parks, and fire stations.[155] While impact fees first appeared during the 1950s in California,[156] they are now commonplace in hundreds of city codes across the State including in McKinney, Austin, Pearland, Keller, New Braunfels, Frisco, San Marcos, College Station, Houston, Baytown, Fort Worth, Frisco, El Paso, Allen, Galveston, Greenville, Arlington, Boerne, Taylor, South Lake, Seguin, Tomball, Missouri City, Dallas, Magnolia, Midland, Brownsville, San Antonio, Orange, Corpus Christi, and Lubbock, among many others.[157] Indeed, a 2006 survey by Kansas State University researchers concluded that the fees add $11,000 to the going rate for the most valuable asset that most American families will ever own. While municipalities often justify development fees as necessary to fund public improvements or administrative costs, in reality, the devices are little more than extortionary tools targeted at real estate developers or parties who have chosen to construct their own home to cover budget shortfalls that city officials could not address through generally applicable taxes. Under current federal takings doctrine, there must be a nexus and a rough proportionality between an imposed condition (or in this case fee) and the anticipated public harm.[158] Where impact fees are wildly disproportionate to the anticipated impact of the development, resort to the courts is often the only way individuals can secure relief. A case from California provides a cautionary tale of this standard's flexibility. When Jozette Banzon and her husband decided that they wanted to build a single-family home for their children on a corner plot in Elk Grove, California, California officials conditioned the construction permit on the couple paying $240,357 for road improvements in the surrounding community. While there was a rough relationship between the fee and the condition because it is common, and now expected, for suburban homes to have access to public streets, the State effectively attempted to force one family to subsidize the cost of road construction for an entire neighborhood rather than ask all the citizens of Elk Grove to pay for a public good that they all benefit from.[159] The difficulties don't stop here, though, because of the vices of triple taxation and regulation. Building permits are often difficult to obtain because land use authorities are vested with wide-discretion to make judgment calls as to whether proposed projects satisfy zoning requirements.[160] This discretion permits municipal authorities to hold applications in perpetual limbo to extract concessions from homeowners and businesses that employ state residents.[161] Because there can be no return on a real estate investment that cannot be developed while an application is pending, this practice hits small business, female,

---

[155] Ronald H. Rosenberg, *The Changing Culture of American Land Use Regulation: Paying for Growth with Impact Fees*, 59 SMU L. Rev. 177 (2006)

[156] Brian Blaesser and Christine Kentopp, *Impact Fees: The Second Generation*, 38 WASH. U. J. URB. & CONTEMP. L. 55, 60 (1990).

[157] Brief for the Institute of Justice and the Cato Institute as Amici Curiae Supporting Petitioner at 11-12, *Koontz v. St. Johns River Water Management District*, 133 S.Ct. 2586 (2012) (No. 11-1447).

[158] *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987); *Dolan v. City of Tigard*, 512 U.S. 374 (1994); see also *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 595, 133 S. Ct. 2586, 2589, 186 L. Ed. 2d 697 (2013); *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S. Ct. 2448, 2457, 150 L. Ed. 2d 592 (2001); *Lambert v. City & Cty. of San Francisco*, 529 U.S. 1045, 120 S. Ct. 1549, 1551, 146 L. Ed. 2d 360 (2000); *Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 676 (1st Cir. 1998); *Commercial Builders of N. California v. City of Sacramento*, 941 F.2d 872 (9th Cir. 1991); *Hillcrest Prop., LLP v. Pasco Cty.*, 915 F.3d 1292, 1298 (11th Cir. 2019); *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1352 (Fed. Cir. 2003); *Boone v. United States*, 743 F. Supp. 1367, 1377 (D. Haw. 1990), aff'd, 944 F.2d 1489 (9th Cir. 1991); *Amoco Oil Co. v. Vill. of Schaumburg, No.* 91 C 4973, 1992 WL 229591, at *3 (N.D. Ill. Sept. 11, 1992); *Skoro v. City of Portland*, 544 F. Supp. 2d 1128 (D. Or. 2008).

[159] These political process problems are not new. See generally John Hart Ely, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW (1980); see also *McCulloch v. Maryland*, 17 U.S. 316 (1819).

[160] See, e.g., *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 995 (2d Cir. 1997).

[161] Richard Epstein, *The Harms and Benefits of Nollan and Dolan*, 15 N. ILL. U. L. REV. 479, 483 (1995).

and minority business owners the hardest. Texas has a peculiar interest in avoiding this result because the previous three Governors, George W. Bush, Rick Perry, and Greg Abbott, have all prioritized the cultivation of a business friendly environment through tax initiatives designed in part to recruit young, highly educated, but over taxed individuals from the East and West Coasts to the State and, directed their state Solicitors General to further that objective through state litigation and amicus brief filings in other jurisdictions.[162]

Fourth, regardless of one's beliefs on whether modern takings doctrine should be overruled to conform with the original understanding of the Clause,[163] one could argue, as New York University Law Professor Richard Epstein and Georgetown Law Professor Randy Barnett have, that current doctrine is nonetheless still out of step with that understanding.[164] As Stanford Law Professor Michael McConnell has recounted, during the mid-eighteenth century, compensation for government takings were made through statutory authorization or judicial decision.[165] By 1789, though, only Vermont and Massachusetts, included just compensation requirements in their constitutions.[166] While there are few sources from the 1791 congressional debates that touch on of the Takings Clause and scholars disagree on the present significance of the provision,[167] the Just Compensation Clause has a long pedigree in the English common law. Indeed, at common law, as Sir Edward Coke argued, it was axiomatic that the negative right to own property was coextensive with the right to make reasonable use of the property, and to do so at the exclusion of the rest of the world.[168] As William Blackstone elaborated, the right of property is an "absolute right, inherent in every Englishman…which consists in the free use, enjoyment, and disposal of all his [or her] acquisitions, without any control or diminution save only by the laws of the land."[169] More than that, Blackstone also insisted that if the legislature required a landowner to surrender her or his property for the common good, it had to render to the holder "a full indemnification and equivalent for the injury thereby sustained."[170] Even if one disagrees with the central thesis of Professor Epstein or Professor Barnett, the central point here is not that their perspective on the Takings Clause ought to be adopted as a matter of federal constitutional law but rather, that the Texas bench and bar, which is ostensibly staffed by many self-declared original public meaning originalists ought to consider this discrepancy as just one more reason to resist lock-stepping in this area.

---

[162] See generally Wayne Thorburn, RED STATE: AN INSIDER'S STORY OF HOW THE GOP CAME TO DOMINATE TEXAS POLITICS (2014); For illustrative filings, see *Robinson v. Crown Cork & Seal Co.*, No. 06-0714, 2008 Tex. LEXIS 5 (Tex.Jan 11, 2008); *Methodist Healthcare System v. Rankin*, 307 S.W.3d 283 (Tex.2010); *City of Pasadena v. Smith*, 292 S.W.3d 14 (Tex. 2009);

[163] Antonin Scalia, 1997 Wriston Lecture: On Interpreting The Constitution, available at: https://www.manhattan-institute.org/html/1997-wriston-lecture-interpreting-constitution-8063.html; J Harvie Wilkinson III, COSMIC CONSTITUTIONAL THEORY: WHY AMERICANS ARE LOSING THEIR INALIENABLE RIGHT TO SELF-GOVERNANCE (2011); Richard Posner, LAW, PRAGMATISM, AND DEMOCRACY (2003).

[164] See Richard Epstein, TAKINGS: PRIVATE PROPERTY AND THE POWER OF EMINENT DOMAIN (1985); Randy Barnett, RESTORING THE LOST CONSTITUTION (2003).

[165] Michael W. McConnell, *Contract Rights and Property Rights: A Case Study in the Relationship between Individual Liberties and Constitutional Structure*, 76 CALIF. L. REV. 267 (1988)

[166] Mass. Const. of 1780, pt. I, art. X, reprinted in 1 Federal or State Constitutions, Colonial Charters, And Other Organic Laws of the United States 958 (1878); Vt. Const. of 1786, ch. I, § 2, reprinted in 1 Federal or State Constitutions, Colonial Charters, And Other Organic Laws of the United States 1859 (1878).

[167] ; Compare Bruce Ackerman, PRIVATE PROPERTY AND THE CONSTITUTION (1977) with Richard Epstein, TAKINGS: PRIVATE PROPERTY AND THE POWER OF EMINENT DOMAIN (1985).

[168] See 1 Edward Coke, THE INSTITUTES OF LAWS OF ENGLAND, ch. 1 sec. 1 (1797).

[169] 1 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 41 (1765).

[170] *Id.* at 139.

Olapade                                                                                                    DRAFT

Fifth, *Williamson County*'s exhaustion requirement also introduces federal confusion into Texas' state courts. If the reader will recall from Part II, that decision requires that a plaintiff "seek just compensation through the procedures the State has provided for doing so" before turning to the federal courts.[171] It follows that in cases before Texas state courts presenting both state and federal takings claims, one would assume that the nominal order for claim disposition would assign priority to state claims not only because of *Williamson County*, but also, the Due Process Clause. However, because Texas state courts are also courts of limited subject matter jurisdiction and impose the same ripeness requirements on litigants that their Article III counterparts do, some have reversed the claim disposition order ostensibly from confusion. This state of affairs, however, is unnecessary because it is far from clear that *Williamson County*'s doctrinal underpinnings even support a state litigation requirement. To take just one example, the Court in *Williamson* drew an analogy to *Ruckelshaus v. Monsanto Co*., a case concerning claims brought against the federal government under the Tucker Act. There, Monsanto alleged that the government's disclosure of trade secrets submitted confidentially in compliance with the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) amounted to an unconstitutional taking.[172] The Tucker Act, however, provided the exclusive procedural mechanism for providing compensation as well as a federal forum for resolving those cases.[173] *Monsanto* was only concerned with the question of whether the company could bring its Tucker Act suit immediately or first had to exhaust FIFRA's remedial provisions, which required the company to participate in settlement or arbitration proceedings. Notice, though, how the Court uses *Monsanto*'s holding in a case solely about two twentieth century federal statutes passed after the switch in time that saved nine, as a major premise to support the following conclusion about the meaning of a Constitutional provision ratified in 1791:

> taking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act…Similarly, if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation.

The problem? We aren't in Westminster Hall anymore: as every first year constitutional law student learns, constitutional provisions take precedence over statutes, the former supersedes the latter if there is a conflict, and, perhaps with the exception of the Dormant Commerce Clause, Reconstruction Amendments, Nineteenth, Twenty-Third, Twenty-Fourth, and Twenty-Sixth Amendments, Congress' *ipse dixit* on one occasion alone a century removed from the founding or Fourteenth Amendment's ratification cannot control constitutional questions.[174] The other case cited in *Williamson County* for the state court exhaustion principle, *Parrat v. Taylor*, a Due Process Clause decision, likewise does not support this result.[175] In *Parrat*, the Court found that a prisoner's due process claim under 42 U.S.C. §1983 did not become ripe until the inmate exhausted adequate state post-deprivation remedies.[176] *Parrat* itself, however, did not require a party to

---

[171] 473 U.S. 185, 194.
[172] 467 U.S. 998.
[173] 28 U.S.C. §1491.
[174] Saikrishna Prakash and John Yoo, *People ≠ Legislature*, 39 HARV. J. L. & PUB. POL'Y. (2016).
[175] 451 U.S. 527 (1981).
[176] 451 U.S. at 543.

pursue each and every conceivable state court remedy available.[177] Sixth, even assuming for the sake of argument, that Texas state courts treated county courts as if they were sovereign entities with reserved constitutional prerogatives that preceded the formation of the 1836 republic or the State itself after its admission to the union in 1845 (and they don't),[178] *Williamson County* would still create a regime where property owners would be deprived of a State forum for violation of their Fifth Amendment rights. This is so because the claim and issue preclusion doctrines would bar the re-litigation of claims or issues in State court once a county court resolved them.[179] On this question, *Williamson County*'s interpretation in the inferior federal courts provides a cautionary tale. Indeed, the various circuit courts of appeals have applied the claim and issue preclusion doctrines to hold that once a takings case is litigated in state court, it cannot be re-litigated in federal court.[180] In sum, the requirement of duplicative adjudication of the same claim, in addition to being a time-wasting hurdle for courts and litigants even when a federal claim is allowed, often altogether bars federal courts from reviewing plaintiffs' Fifth Amendment claims for just compensation. In fact, between 1990 and 1997, federal courts, citing *Williamson County*, declined to review over 90 percent of all cases that dealt with land use takings.[181] In the words of Justice Brennan, for no other class of federal constitutional plaintiffs, "who are entitled to full consideration of their claims on the merits," is "the courthouse door" slammed so often.[182] This is not to say that *Williamson County*'s mandate that State takings claims be considered before federal ones is not ultimately correct – the Due Process Clause commands it. But to the extent that the rule

---

[177] *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 n.14 (1985); see also J. David Breemer, *Overcoming Williamson County's Troubling State Procedures Rule: How the England Reservation, Issue Preclusion Exceptions, and the Inadequacy Exception Open the Federal Courthouse Door to Ripe Takings Claims*, 18 J. LAND USE & ENVTL. L. 209, 229 (2003).

[178] Although the idea does sound fanciful, there are some southern states that have maintained gubernatorial electoral regimes that accorded a status to counties that resembles the position of the States in the union today. See, e.g., *Gray v. Sanders*, 372 U.S. 368 (1963). Also, the reference to counties here is rather consequential as cities, but not counties, with home rule authority "possess the power of self-government and look to the Legislature not for grants of authority, but only for limitations on their authority." TEX. LOC. GOV'T CODE § 51.072(a); *Dall. Merch.'s & Concessionaire's Ass'n v. City of Dall.*, 852 S.W.2d 489, 490–91 (Tex.1993); *BCCA Appeal Grp., Inc. v. City of Houston*, 496 S.W.3d 1, 7 (Tex. 2016). In any event, for the purposes of the claim being made here, the distinction is one without a difference because "[t]he Texas Constitution mandates that no city ordinance "shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this State." TEX. CONST. art. XI, § 5(a). Therefore, a home-rule city's ordinance is unenforceable to the extent that it is inconsistent with either the federal or State constitutions. The result is that if one subscribes to the claim that the conservative political elites in the State believe that Williamson County was incorrectly decided in part because it prevents claimants from litigating in the federal, State, or local forum of their choice, as the recent amicus brief filed by Ken Paxton, Scott Keller, Jeffrey Mateer, and Bill Davis in *Knick v. Township of Scott* suggests, the State Supreme Court ought to not impose this federal requirement on local courts – regardless of whether the local entities retain any rulemaking authority. Brief for Texas and Oklahoma as Amici Curiae Supporting Petitioners at 1, Knick v. Township of Scott., 138 S.Ct. 1262 (2018) (No. 17-647).

[179] *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001).

[180] See, e.g., *Rainy Bros. Constr. Co. v. Memphis & Shelby County Bd. of Adjustment*, 178 F.3d 1295 (6th Cir. 1999); *Frontal Royal and Warren County Indus. Park Corp. v. Town of Frontal Royal*, 135 F.3d 275 (4th Cir. 1998); *Dodd v. Hood River County*, 136 F.3d 1219 (9th Cir. 1993); *Fields v. Sarasota Manatee Airport Auth.*, 953 F.2d 1299 (11th Cir. 1992); *Wilkinson v. Pitkin County Bd. of County Comm'rs*, 142 F.3d 1319 (10th Cir. 1998); *Palomar Mobilehome Park Ass'n v. City of San Marcos*, 989 F.2d 362 (9th Cir. 1993); *Fields v. Sarasota Manatee Airport Auth.*, 953 F.2d 1299 (11th Cir. 1992); *Peduto v. City of North Wildwood*, 878 F.2d 725 (3d Cir. 1989).

[181] Alex Annett, The Heritage Foundation, *How Congress Can End the "Regulatory Limbo" Blocking Property Owners' Access to Justice*, FYI No. 154 October 1, 1997.

[182] See, e.g.,, Gregory Stein, *Regulatory Takings and Ripeness in Federal Courts*, 48 VAND. L. REV. 1, 23 (1995) ("the state compensation portion of [Williamson] finds no parallel in the ripeness cases from other areas of the law").

and other abstention doctrines are ostensibly a product of a national court seeking to respect the jurisdiction of fifty different state court systems,[183] why are state courts of last resort with limited subject matter jurisdiction and ripeness requirements adopting this peculiar exhaustion doctrine and confusing lower state courts in the process?

If the people of Texas have not "ceased to be their own rulers" and refuse to "resign their Government into the hands of" the Supreme Court, the question then becomes which interpretation of Article I §17 best adheres to the provision's text, history, structure, and purpose as well as the State of Texas' unique ethos.[184] This inquiry is of particular interest to Texas' oil and gas litigators because the Texas Supreme Court has not yet decided what standard applies to municipal ordinances that limit or prohibit oil and gas development specifically without providing just compensation.[185] The First Court of Appeals' decision in *Trail Enterprises, Inc. v. City of Houston* (*Trail II*), provides some guidance.[186] There, the City of Houston passed an ordinance prohibiting mineral drilling in lands that it exercised extraterritorial jurisdiction over and annexed Trail Enterprises' mineral bed beneath Lake Houston. In the initial 1995 lawsuit in the Fourteenth District Court, Trail Enterprises lost on summary judgment because their adverse possession claim was time barred by the state Civil Practice and Remedies Code.[187] In 1997, Houston attempted to commandeer the mineral-rich land surrounding Lake Houston through similar means and Trail Enterprises filed an inverse condemnation action challenging the ordinance. After both parties filed cross motions for summary judgment and the District Court granted the City's request, Trail

---

[183] See *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); Susan Bandes, *The Rooker-Feldman Doctrine: Evaluating Its Jurisdictional Status*, 74 NOTRE DAME L. REV. 1175 (1999).

[184] Abraham Lincoln, First Inaugural Address, available at http://avalon.law.yale.edu/19th_century/lincoln1.asp (last accessed April 8, 2019); see also Phillip Bobbitt, CONSTITUTIONAL FAITH (1982).

[185] The Texas Supreme Court's 2004 decision in *Sheffield Development Company v. City of Glenn Heights*, 140 S.W.3d 660 (Tex.2004), dealt with land development and zoning, which presents different concerns from mineral extraction. Not only have several Texas court of Appeals explicitly declined to extend the *Sheffield* framework to oil and gas extraction, others have commented that the decision is no different from other land use restrictions that Texas courts have found could support an inverse condemnation proceeding for nearly a century. For cases declining to extend the Sheffield framework to other areas, see *Rowlett/2000, Ltd. v. City of Rowlett*, 231 S.W.3d 587 (Tex. App. 2007); *Vill. of Tiki Island v. Ronquille*, 463 S.W.3d 562 (Tex. App. 2015); *City of Lorena v. BMTP Holdings, L.P.*, 409 S.W.3d 634 (Tex. 2013); *BMTP Holdings, L.P. v. City of Lorena*, 359 S.W.3d 239 (Tex. App. 2011), aff'd, 409 S.W.3d 634 (Tex. 2013); *Comunidad Balboa, LLC v. City of Nassau Bay*, 402 S.W.3d 479 (Tex. App. 2013); *Baker v. City of Robinson*, 305 S.W.3d 783 (Tex. App. 2009). For a list of illustrative inverse condemnation proceedings, see, e.g., *City of Wink v. Griffith Amusement Co.*, 129 Tex. 40, 100 S.W.2d 695, 700 (1936); *City of Abilene v. Burk Royalty Co.*, 470 S.W.2d 643, 646 (Tex.1971); *State v. Momin Prop., Inc.*, No. 01–12–00854–CV, 2013 WL 2445076, *7 (Tex.App.-Houston [1st Dist.] June 6, 2013, pet. filed); *City of Houston v. Texan Land & Cattle Co.*, 138 S.W.3d 382, 387 (Tex.App.-Houston [14th Dist.] 2004, no pet.); *Westgate, Ltd. v. State*, 843 S.W.2d 448, 452 (Tex.1992); *City of Dallas v. Blanton*, 200 S.W.3d 266, 271 (Tex. App.--Dallas 2006, no pet); *Gen Servs. Com'n v. Little-Tex Insulation Co.*, Inc., 39 S.W.3d 1, 598 (Tex. 2001); Bell v. City of Dallas, 146 S.W.3d 819, 825 (Tex. App.-- Dallas 2004, no pet); *Edwards Aquifer Authority v. Day*, 369 S.W.3d 814 (Tex. 2012), *City of Austin v. Teague*, 570 S.W.2d 389 (Tex. 1978); DuPuy v. City of Waco, 396 S.W.2d 103 (Tex. 1965); *State v. Fiesta Mart, Inc.*, 233 S.W.3d 50, 53 (Tex. App.--Houston [14th Dist.] 2007, pet. denied); see also, Timothy Riley, Note, *Wrangling with Texas Urban Wildcatters: Defending Texas Municipal Oil and Gas Development Ordinances Against Regulatory Takings Challenges*, 34 VERMONT L. REV. 340 (2007).

[186] *Trial Enters., Inc. v. City of Houston* (Trail II), No. 14-01-00441-CV, 2002 Tex. App. LEXIS 1872 (Tex. App.-Houston Mar. 14, 2002).

[187] *Trail Enterprises, Inc. v. City of Houston*, 957 S.W.2d 625, 631 (Tex. App. 1997).

Enterprises appealed, and the First Court of Appeals reversed.[188] In reaching this conclusion, the Court clarified that Article I §17 was violated only if the Houston ordinance did not "substantially advance[d] legitimate state interests; denied property owners all economically viable use of their property, or unreasonably interfered with property owners' right to use and enjoy their property."[189] Here, unreasonable interference is determined by analyzing the "economic impact of the regulation and the extent to which the regulation interferes with distinct investment-backed expectations."[190] In evaluating a regulation's economic impact, the relevant comparison is between the taken value and the value remaining with the property excluding "anticipated gains or potential future profits."[191] And the permitted and existing uses on the property are the "primary expectations" of a property owner when considering investment-backed expectations.[192] The First Court of Appeals' test is the appropriate standard for Article I §17 Statewide for two reasons. First, unlike a traditional land development project, oil and gas ventures often affect both horizontal and vertical property interests and implicate multiple estate claims if the petroleum has been severed from the surface or held by a third party through a lease.[193] Texas law, rightly, has long encouraged non-renewable energy production to promote commerce and national self-sufficiency;[194] indeed, as the Texas Supreme Court declared in 1977:

> the landowner is regarded as having absolute title in severalty to the oil and gas in place beneath [her or] his land. The only qualification of that rule of ownership is that it must be considered in connection with the law of capture and is subject to police regulations. The oil and gas beneath the soil are considered a part of the realty. Each owner of land owns separately, distinctly and exclusively all the oil and gas under [her or] his land and is accorded the usual remedies against trespassers who appropriate the minerals or destroy their market value."[195]

Thus, "every owner or lessee is entitled to a fair chance to recover the oil or gas in or under [her or] his land, or their equivalent in kind, and any denial of such fair chance amounts to

---

[188] *Trial Enters., Inc. v. City of Houston* (Trail II), No. 14-01-00441-CV, 2002 Tex. App. LEXIS 1872 (Tex. App.-Houston Mar. 14, 2002).

[189] *Id.* at 7.

[190] *Id.*

[191] *Id.* at n.5.

[192] *Id.*

[193] Owen Anderson, John Dzienkowski, John Lowe, Robert Peroni, David Pierce, Ernest Smith, OIL AND GAS LAW AND TAXATION 1-14 (2017).

[194] Sergio Chapa, *Texas crude oil production breaks 1970s record* HOUST. CHRON. (2019).

[195] *Elliff v. Texon Drilling Co.*, 146 Tex. 575, 580, 210 S.W.2d 558, 561 (1948); see also *Halbouty v. R.R. Comm'n*, 163 Tex. 417, 357 S.W.2d 364 (1962); *SWEPI, L.P. v. Camden Res., Inc.*, 139 S.W.3d 332 (Tex. App. 2004); Gregg v. Delhi-Taylor Oil Corp., 162 Tex. 26, 344 S.W.2d 411 (1961); *Seagull Energy E & P, Inc. v. R.R. Comm'n of Texas*, 99 S.W.3d 232 (Tex. App. 2003), order withdrawn (July 2, 2004), aff'd sub nom. *Seagull Energy E & P, Inc. v. R.R. Comm'n*, 226 S.W.3d 383 (Tex. 2007); *Shelby Operating Co. v. City of Waskom*, 964 S.W.2d 75 (Tex. App. 1997); *Browning Oil Co. v. Luecke*, 38 S.W.3d 625 (Tex. App. 2000); *R.D. Oil Co. v. R.R. Comm'n of Texas*, 849 S.W.2d 871 (Tex. App. 1993); *Ryan Consol. Petroleum Corp. v. Pickens*, 266 S.W.2d 526 (Tex. Civ. App. 1954), aff'd, 155 Tex. 221, 285 S.W.2d 201 (1955); *Breton Energy, L.L.C. v. Mariner Energy Res., Inc.*, 764 F.3d 394 (5th Cir. 2014); *In re Hawn*, 149 B.R. 450 (Bankr. S.D. Tex. 1993), aff'd in part sub nom. *Hawn v. Am. Nat. Bank.*, No. CIV. A. C-93-102, 1996 WL 142521 (S.D. Tex. Jan. 23, 1996); *In re Hess*, 61 B.R. 977 (Bankr. N.D. Tex. 1986); Brown v. United States, No. 1-279, 1970 WL 337 (N.D. Tex. June 17, 1970).

Olapade                                                                                                    DRAFT

confiscation."[196]  In furtherance of this state objective, it follows that when evaluating the impact of a municipal oil and gas ordinance that curtails or prohibits production, Texas courts ought not to aggregate the mineral estate with the surface estate. This is so because aggregation of both interests would likely preclude a takings claim to a municipal regulation that prohibited drilling.[197] After all, in the words of Federalist Society Property Rights Group Chairman, James Burling "if only a portion of the beneficial or productive use of the parcel of property is completely destroyed, or if  only a distinct severable property interest (such as a mineral right) is completely destroyed, then a court may find that there is a partial taking."[198] This approach is consistent with the Texas Supreme Court's obligation to assign an independent meaning to the state's takings clause that does not simply follow the U.S. Supreme Court's interpretation of the Fifth Amendment. Indeed, the U.S. Supreme Court "repeatedly has held that the relevant parcel to be examined is not the affected portion of the property but the entire parcel, or what the Court calls the parcel as a whole."[199] The confiscatory rule can be traced back to *Penn Central* where Justice Brennan quipped that "in deciding whether a particular governmental action has effected a taking, th[e] Court focuses both on the charter of the action and on the nature and extent of the interference with rights in the parcel as a whole."[200] Explicit adoption of the standard, though, did not come until *Keystone Bituminous Coal Ass'n v. DeBenedictis*, a case concerning a coal mine operator seeking to enjoin enforcement of a Pennsylvania law requiring operators to leave a certain amount of coal behind to prevent damage subsidence.[201] There, the Court in commenting that takings claimants may not rely "on…legalistic distinctions within a bundle of property rights" rejected the coal operator's assertion that the support estate – the coal left in place to avoid subsidence – should be separated from the mineral estate.[202] The Texas Supreme Court, to its credit, has previously suggested that estates ought to be analyzed separately but has declined to make the point clear. To take just a few examples, the Court has compared taken and remaining property interests in eminent domain challenges[203] and summarily dismissed an opinion from the Second Court of Appeals in Fort Worth that adopted the parcel-as-a-whole test.[204] Second, again, given that several Texas energy law doctrines, even those that purportedly qualify absolute rights in the mineral estate, have been consciously designed to incentivize production and accelerate oil extraction (see Appendix II),[205] Texas state courts ought to consider reading Article I §17's requirement of

---

[196] *Gulf Land Co. v. Atl. Ref. Co*. 131 S.W.2d 73 (Tex. 1939); Atl. Ref. Co. v. R.R. Comm'n of Tex., 162 Tex. 274, 346 S.W.2d 801 (1961); *Texaco, Inc. v. R.R. Comm'n of Texas*, 716 S.W.2d 138 (Tex. App. 1986), writ refused NRE (Dec. 3, 1986); *Colorado Interstate Gas Co. v. Sears*, 362 S.W.2d 396 (Tex. Civ. App. 1962), writ refused NRE (Feb. 13, 1963); *Lightning Oil Co. v. Anadarko E & P Onshore LLC*, 480 S.W.3d 628 (Tex. App. 2015), aff'd sub nom. Lightning Oil Co. v. Anadarko E&P Onshore, LLC, 520 S.W.3d 39 (Tex. 2017).
[197] Douglas Kendall, TAKINGS LITIGATION HANDBOOK: DEFENDING TAKINGS CHALLENGES TO LAND USE REGULATIONS 24 (2000).
[198] James Burling, *Private Property Rights and the Environment After Palazzolo*, 30 B.C. ENVTL. AFF. L. REV. 1, 51 (2002).
[199] Timothy Dowling, *The Parcel-as-a-Whole Rule and its Importance in Defending Against Regulatory Takings Challenges*, in TAKING SIDES ON TAKING ISSUES: PUBLIC AND PRIVATE PERSPECTIVES 76 (2002).
[200] *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 130-31 (1978); *Andrus v. Allard*, 444 U.S. 51, 65 (1979).
[201] *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987).
[202] *Id.* at 500.
[203] *Taub v. City of Deep Park*, 882 S.W.2d 824, 827 (Tex. 1994); *City of Austin v. Capitol Livestock Auction Co*., 453 S.W.2d 461 (Tex. 1970).
[204] *Town of Flower Mound v. Stafford Estates Ltd. P'ship*, 135 S.W.3d 620 (Tex. 2004).
[205] The table in Appendix I was obtain with the courtesy of the Texas Railroad Commission. See Texas Crude Oil Production and Well Counts, Texas Railroad Commission, available at https://www.rrc.state.tx.us/oil-gas/research-and-statistics/production-data/historical-production-data/crude-oil-production-and-well-counts-since-1935/

Olapade                                                                                         DRAFT

"adequate compensation" for takings as requiring a just and reasonable return on equity.[206] By way of background, in financial accounting, return on equity is the cost to the oil and gas firm of raising capital. To attract investors, of course, an oil and gas firm must offer a sufficient risk-adjusted expected return on equity that should be commensurate with returns on investments in other enterprises having corresponding risks and sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital. Otherwise put, a return on equity should allow a utility to adequately compete for the investor's dollar. The emphasis here is not on the returns of current shareholders, but rather ensuring that future capital may continue to be attracted so long as other operations remain in the black. This conception of compensation aligns well with an economic analysis of the concept because as former Seventh Circuit Judge and law-and-economics scholar, Richard Posner, has underscored, in determining compensation the primary question is whether "the shareholders [or sole proprietor or partners] had notice of the" likelihood that the monetary value of their interest in the relevant venture could be decreased through a given regulation.[207] Indeed, assuming the firm in question has issued either debt or equity instruments to finance its operations, no compensation may be due at all. This is so because "if the investors are bondholders, the regulated firm is presumably paying them a rate of interest sufficiently high to compensate them for the disadvantages that the [state or city ordinance] may impose upon them." And "[i]f they are stockholders, the rate of return on equity capital…presumably was, when the [initial investment was made], sufficiently high to make the investment remunerative."[208] Because markets with decent liquidity are presumed to be information efficient,[209] those who take a conservative view of financial markets and securities regulation, ought to be more supportive of state remuneration for takings involving rural homesteads, sole proprietorships, or limited partnerships, or corporations qua corporations that do not own all of their stock rather than corporate shareholders. This theory would likely bear the most practical implications in derivative shareholder suits by recalcitrant investors seeking to have the state provide them with compensation that they already implicitly gained in the market.[210]

---

*Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 13 (Tex. 2008); *Halbouty v. R.R. Comm'n.*, 163 Tex. 417, 357 S.W.2d 364, 374 (1962); *Elliff v. Texon Drilling Co.*, 146 Tex. 575, 210 S.W.2d 558, 561 (1948); *Corzelius v. Harrell*, 143 Tex. 509, 186 S.W.2d 961, 964 (1945); *Brown v. Humble Oil & Ref. Co.*, 126 Tex. 296, 83 S.W.2d 935, 940 (1935); *Stephens County v. Mid–Kansas Oil & Gas Co.*, 113 Tex. 160, 254 S.W. 290, 292 (1923); see also *Houston & Tex. Cent. Ry. Co. v. East*, 98 Tex. 146, 81 S.W. 279, 280 (1904); *Ryan Consol. Petrol. Corp. v. Pickens*, 155 Tex. 221, 285 S.W.2d 201, 210 (1955) (Wilson, J., joined by Hickman, C.J., and Garwood, J., dissenting). The rule of capture in this instance encourages many of the inefficiencies that property and tort scholars have associated with regulations that encourage 'races to the courthouse' or in this cases 'races to drill.' *Pierson v. Post*, 3 Cai. R. 175 2 Am. Dec. 264 (1805); see also Richard Posner, ECONOMIC ANALYSIS OF LAW XXX (2014). Nonetheless, even though Texas no longer has the infant energy industry that was the initial justification for the rule, neither the state Supreme Court or lege has saw fit to abolish the rule through its 115-year existence ostensibly for policy reasons.
[206] Tex. Const. Art. I §17.
[207] Richard Posner, ECONOMIC ANALYSIS OF LAW 464 (2014).
[208] *Id.* at 465.
[209] Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, THE JOURNAL OF FINANCE 383–417 (1970)
[210] While one could argue that homeowners, farmers, and small business owners also receive implicit compensation in the form of bolstered reap property values, because the market for these goods is not nearly as information efficient as a publicly traded exchange, one cannot be certain that the correct amount of compensation is being rendered. This position is consistent with related securities law scholarship by prominent Republicans in the field; see also Joseph A. Grundfest, *Disimplying Private Rights of Action under the Federal Securities Laws: The SEC's Authority*, 107 HARV. L. REV. 961 (1994) (arguing for the cubing of private rights of actions for shareholders under SEC Rule 10b-5); John

Olapade                                                                                    DRAFT

State taxation provides yet another example of this phenomenon. Article VIII §22 of the 1876 Texas Constitution limits government expenditure increases in a two-year appropriations cycle. The provision's lackluster performance has been accentuated by other aspects of the state constitution which ironically despite Article II §1's admonition that the powers of the state government "shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy" concentrated powers in the hands of the Lieutenant Governor and House Speaker in response to a series of seemingly abusive vetoes by James (Pa) Ferguson in the early Twentieth Century.[211] The Lieutenant Governor is often considered the most powerful figure in Texas politics because she has the power to appoint members to Senate committees, assign bills to those committees, and exercise control over several aspects of the budget process.[212] The Governor, by way of contrast, is usually confined to (1) calling special sessions (which often prove necessary because lege meets for only 180 days every two years);[213] (2) delivering state of the state addresses;[214] (3) vetoing or signing bills;[215] (4) filing vacancies that may arise in the state's U.S. Senate delegation and on various state agencies and courts;[216] (5) serving as commander-in-chief of the state militia;[217] (6) projecting the amount of revenue needed to carry out state expenditures;[218] (7) granting reprieves and pardons with the recommendation of the State Board of Pardons and Parole;[219] (8) declaring special elections for certain elective offices;[220] (9) extraditing fugitives;[221] and (10) proposing the State budget. The 1876 Constitution, though, contains other limits on state taxation – lege may not collect taxes via statutes that impose levies on a subset of individuals who themselves are part of a large group of similarly situated taxpayers;[222] public funds may not be distributed to individuals, associations, or municipal corporations except in matters involving "public calamity;"[223] ad valorem taxes are prohibited;[224]

---

C. Coffee, Jr., *Reforming the Securities Class Action: An Essay on Deterrence and its Implementation*, 106 COLUM. L. REV. 1534 (2006).

[211] Ironically, while many today view the Texas Governorship as a stepping stone to higher national office within the Republican Party, and is exempt from complying with writs of mandamus or quo warranto issued by the State courts, the Texas Governor is actually the fifth most power executive official in the state behind the Lieutenant Governor, Attorney General, Secretary of State, Comptroller?, and Agricultural Commissioner. See TEX. CONST. art. V, §3; see also In re Occidental Chem. Corp., 561 S.W.3d 146 (Tex. 2018), reh'g denied (Dec. 14, 2018); In re Allcat Claims Serv., L.P., 356 S.W.3d 455 (Tex. 2011); Johnson v. Tenth Judicial Dist. Court of Appeals at Waco, 280 S.W.3d 866, 874 (Tex. Crim. App. 2008); City of Round Rock v. Whiteaker, 241 S.W.3d 609, 635 (Tex. App. 2007); A & T Consultants, Inc. v. Sharp, 904 S.W.2d 668, 672 (Tex. 1995); Clear Lake City Water Auth. v. Salazar, 781 S.W.2d 347, 349 (Tex. App. 1989); Pat Walker & Co. v. Johnson, 623 S.W.2d 306, 308 (Tex. 1981)

[212] Brian McCall, THE POWER OF THE TEXAS GOVERNOR 5 (2010).

[213] TEX. CONST. art. IV, §8.

[214] TEX. CONST. art. IV, §9.

[215] TEX. CONST. art. IV, §14.

[216] U.S. CONST. amend. XVII; see also David Schleicher, *Federalism and State Democracy*, 95 TEX. L. REV. 763 (2017).

[217] TEX. CONST. art. IV, §7.

[218] TEX. CONST. art. IV, §9.

[219] TEX. CONST. art. IV, §11.

[220] TEX. CONST. art. IV, §12.

[221] TEX. CONST. art. IV, §10.

[222] TEX. CONST. art. VII, §3.

[223] TEX. CONST. art. III, §51.

[224] TEX. CONST. art. VIII, §1-e.

and the state budget must remain balanced with certain qualifications.[225] Given these limitations, delegated revenues from the state's gasoline tax and public lottery are of substantial importance.[226]

The amendment, though, has also been less than effective in constraining government largess because of the Texas Supreme Court's reliance on federal concepts from foreign relations law in interpreting the provision. To take just one example, in *Hendee v. Dewhurst*, the Third Court of Appeals found that §22 was self-executing only to the extent that it "prohibited legislative action that is inconsistent with its provisions" but did not speak to the judicial enforceability of the provision's taxation and expenditure clauses.[227] The Court's citation practice in a case involving only a state constitutional question is peculiar. In Texas:

> "a constitutional provision is said to be *self-executing* if it supplies a *sufficient rule by means of which the right given may be enjoyed and protected*, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which these principles may be given force of law…quoting *T. Cooley, Constitutional Limitations*." Similarly, "a "*political question*," at least as it has been defined in the federal courts, is one that involves (1) "a lack of judicially discoverable and manageable standards for resolving it," or (2) "a textually demonstrable constitutional commitment to a coordinate political department…quoting *Baker v. Carr* (italics added)".[228]

There are at least two noteworthy features from this passage. First, while it is customary for public international law scholars to speak of "self-executing" treaties, the concept is ostensibly foreign to state constitutional law because questions there do not implicate the same separation-of-powers or national security concerns that their federal counterparts do; indeed, state statutes or policies that conflict with federal action in this realm are at risk of scythe via preemption.[229] A "self-executing" treaty is a treaty that creates a domestic legal obligation in the absence of implementing legislation.[230] Although all treaties that create private rights of action are self-executing, not all self-executing treaties necessarily create private rights of action. Thus, the Third Restatement on Foreign Relations Law cautions that "whether a treaty is self-executing is a question distinct from whether the treaty creates private rights or remedies."[231] This is all well and good but to quote Yale Law School Professor Harold Koh, "is international law really state law?"[232]

One might counter that the Texas Supreme Court's hesitance to essentially imply a cause of action from a state constitutional provision is not controversial because federal courts have expressed similar reticence in interpreting Article III's "arising under" clause and the federal question statute 28 U.S.C. § 1331. The flaw? Again, this comparison hoists apples next to oranges

---

[225] TEX. CONST. art. III, §49a.
[226] TEX. TAX CODE ANN. 162 (Vernon 2006); TEX. GOV'T CODE ANN. 466.357 (Vernon 2006).
[227] *Hendee v. Dewhurst*, 228 S.W.3d 354 (Tex. App. 2007).
[228] *Id.* at 369.
[229] *Zschernig v. Miller*, 389 U.S. 429 (1968).
[230] Oona A. Hathaway, Sabria McElroy & Sara A. Solow, *International Law at Home: Enforcing Treaties in U.S. Courts*, 37 YALE J. INT'L L. 51-76 (2012).
[231] *Id.*
[232] Harold Koh, *Is International Law Really State Law*, 111 HARV. L. REV. 1824 (1998).

because it assumes a regime of limited subject matter jurisdiction for both federal and state courts – a concept at odds with hornbook first-year civil procedure. Second, the opinion's citation to Thomas Cooley's *Constitutional Limitations* turns a blind eye to the fact that the work was pivotal in securing support for the doctrine of substantive due process, a standard that, of course, originally appeared in Chief Justice Taney's intellectually dishonest and universally condemned opinion in *Dred Scott v. Sanford*, in the mid nineteenth century – a reason why many left-of-center and right-of-center legal scholars refrain from relying on the treatise in their own scholarship.[233] In a state such as Texas where the rule of law and the right to life are regarded as almost sacrosanct and references to the evil of *Dred Scott* in Republican primary debates (where judges must actually stand for election among intensely partisan voters) serves as a political dog whistle for abortion ban support, this reliance is baffling.[234] As Justice Scalia, once recounted, the Due Process Clause "has been interpreted to prevent the government from taking away certain liberties beyond those…that are specifically named in the Constitution."[235] Skeptics of this theory need look no further than to Emanuel Leutze's 1859 portrait of Roger Taney that hangs in the Harvard Law School's Caspersen Room. The painting depicts Taney in the second year after the Court's "greatest self-inflicted wound."[236] In the words of Justice Scalia, "Taney is in all

> black, sitting in a shadowed red armchair, left hand resting upon a pad of paper in his lap, right hand hanging limply, almost lifelessly, beside the inner arm of the chair. He sits facing the viewer and staring straight out. There seems to be on his face, and in his deep-set eyes, an expression of profound sadness and disillusionment. Perhaps he always looked that way, even when dwelling upon the happiest of thoughts. But those of us who know how the lustre of his great Chief Justiceship came to be eclipsed by Dred Scott cannot help believing that he had that case—its already apparent consequences for the Court and its soon-to-be-played-out consequences for the Nation—burning on his mind. [As he sought to call…the contending sides of national controversy to end their national division by accepting a common mandate rooted in the Constitution.[237]

"When [women and] men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct" that "by foreclosing all democratic outlet for the deep passions issues arouse, by banishing the issue from the political forum that gives all participants, even the losers, the satisfaction of a fair hearing and an honest fight, by continuing the imposition of a rigid national rule instead of allowing for

---

[233] See, e.g., Akhil Amar, AMERICA'S CONSTITUTION: A BIOGRAPHY (2006); Joshua Hawley, *The Intellectual Origins of (Modern) Substantive Due Process*, 93 TEX. L. REV. 275 (2014). Although Taney is frequently and rightfully derided for this opinion, he was one of the most influential jurists in the early nineteenth century and the legal mastermind behind many of Andrew Jackson's polices. See Bernard Schwartz, *Supreme Court Superstars: The Ten Greatest Justices*, 31 TULSA L.J. 93 (1995).
[234] *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 1001–02 (1992) (Scalia, J., dissenting).
[235] Antonin Scalia, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 24 (1997).
[236] Charles Evans Hughes, THE SUPREME COURT OF THE UNITED STATES: ITS FOUNDATION, METHODS AND ACHIEVEMENTS 50 (1928).
[237] *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 1001–02 (1992) (Scalia, J., dissenting).

regional differences," it intensifies political anguish.[238] "It may or may not be a good thing to guarantee individual liberties…but the Due Process Clause…by its inescapable terms guarantees only process."[239] The result is that the words of Justice John McLean ring true on this matter for "when a strict interpretation of the Constitution, according to the fixed rules which govern the interpretation of laws, is abandoned, and the theoretical opinions of individuals are allowed to control its meaning, we have no longer a Constitution; we are under the government of individual men, who for the time being have power to declare what the Constitution is, according to their own views of what it ought to mean."[240] Even if one disagrees with this analysis on substantive due process, which would be fair, at the very least they ought to be able to see why it would be inadvisable for judges seeking re-election in a Republican primary dominated by Christian fundamentalists to be citing to legal literature that sophisticated voters could fairly associate with on-demand abortion.

Third, this importation of the federal political question doctrine, a measure that was initially conceived with delicate matters of national or international importance in mind, is inappropriate on the State level for yet another reason: in Texas, a State plaintiff has a virtually indefeasible right to have her claims adjudicated in a State forum once she has properly invoked that court's subject matter jurisdiction.[241] One might counter that this response assumes the conclusion that the political question doctrine does not place limits on the subject-matter jurisdiction of Texas State courts. Fair enough. To this contention, the response must be that as a purely logical matter, why does it follow that the mere *ipse dixit* that the *federal* political question doctrine constrains the jurisdiction of *Texas* courts under the *Texas* constitution is true simply because federal courts are so constrained? This reasoning would be unacceptable in any other context. If a first year contracts or sports law student told her professor that Tom Brady's contract was subject to team waiver merely because Aaron Judge also happened to have a contract that was subject to waiver, without another constitutionally grounded premise devoid of personal policy preferences, that assertion would be sternly rejected. Yet, the only response that one could present here is that this logical fallacy is much ado about nothing because nine admittedly elected judges said so. Here as elsewhere the words of Former Solicitor General Robert Jackson ring true: the Texas Supreme Court is "not final [within the State] because [it is] infallible…[it is] infallible only because [it is] final."

IV.     *How the Texas Solicitor General Can Prevent Lockstepping*

The Office of the Texas Solicitor General, though, has the institutional capacity to prevent lock-stepping in the Lone Star State's appellate courts through direct intervention under Texas Rule of Appellate Procedure 58.8, certification under State Appellate Rule 58.1, amicus filings under State Appellate Rule 11, and the corresponding processes under Federal Rules of Appellate Procedure 15 and 29. From the first occasion that John Hemphill, Royall Wheeler, and Abner Lipscomb convened the Texas Supreme Court's "Old Court" in December 1846 to the late twentieth century, courts of last resort in the Lone Star state conducted their proceedings without

---

[238] *Id.*

[239] Antonin Scalia, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 24 (1997).

[240] *Dred Scott v. Sandford*, 19 How. 393, 621 (1857) (McLean, J., dissenting).

[241] One could argue that such a policy implicitly underlies the Texas Supreme Court's admonition "that when [the Court's] jurisdiction is properly invoked as to one point set forth in the application for writ of error, [it] acquire[s] jurisdiction of the entire case." *Harry Eldridge Co., Inc. v. T.S. Lankford & Sons, Inc.*, 371 S.W.2d 878, 879 (Tex.1963).

the assistance of a state solicitor general.[242] During this interim period, though, the need for able assistance was apparent. To take just a few examples, Justice Lipscomb, a native South Carolinian who had read law in the offices of John C. Calhoun, previously served as Chief Justice of the Alabama Supreme Court, and was often assigned to write the Court's procedure cases, was often forced to pen plainly written opinions that were devoid of citation to legal authorities. Justice Wheeler, a classically educated lawyer from Vermont and law firm partner alongside Texas 'fire-eater' Williamson Oldham, also struggled as he rarely wrote on matters that did not involve criminal law and released dissenting opinions that the bar deemed repetitive.[243] Even the most learned of the three, the Chief Justice suffered difficulties. Hemphill had graduated second in his class at Jefferson College where he was known for his facility with languages, also read law under Senator Calhoun, and gained notoriety in the state for his treatises on Spanish land law earning him the honorific title as the "John Marshall of Texas."[244] However, Hemphill's rightful frustration with the archaic English common law pleading system, and his proclivity to suggest the incorporation of the much more efficient Spanish and Mexican procedures into Texas courts, aroused the ire of his colleagues on the bench as well as that of bar practitioners.[245] More than that, because the 1845 Court was statutorily required to ride circuit and hear cases in three cities – Austin, Galveston, and Tyler – pressures to produce uniform opinions were accentuated.[246] The result is that the Court issued only 100 opinions – most of which concerned issues of debt, land titles, and procedure – after its first term.[247] Under Chief Justice Oran Roberts' leadership, the Civil War Court fared little better due in large part to private violence against suspected unionists, which a few members of the political elite such as Sam Houston denounced. In any event, because Texas had attracted an uncomfortable amount of debtors from Mississippi, Alabama, and Tennessee from the 1840s to 1850s because of its lax collection laws and the Civil War, the legislature froze collections on bonds, promissory notes, bills of exchange, and contracts until 1864. Thus, "though the courts were kept open for criminal business relating to military operations there was little else of a judicial nature transacted during the war period."[248] The Texas Supreme Court's relatively recent amendments to the Texas Rules of Appellate Procedure during the 1990s suggest that its concern with an overburdened docket has a modern analogue. To take just one example, prior to 1990, appeals from the Texas Court of Appeals to the State Supreme Court were theoretically a matter of right and required only the filing of a fifty-one-page petition for a writ of error under Texas Rule of Appellate Procedure 133.[249] After increased docket loads began to take their toll during the 1980s, however, the Court modified that provision in the 1990 amendments to Appellate Rule 133 such that "in all cases where the Supreme Court is not satisfied that the opinion of the court of appeals in all respects has correctly declared the law but is of the opinion that the application presents no error which requires reversal, or is of such importance to the jurisprudence

---

[242] Texas technically has two state courts of last resort – the Texas Supreme Court, which handles appeals in civil cases and the Texas Court of Criminal Appeals, which, as its name suggests, reviews criminal matters.

[243] See, e.g., *Coles v. Kelsey*, 13 Tex. 75 (Tex.1854); but see *Jones v. State*, 13 Tex. 168 (1854).

[244] Andrew Walker, *Mexican Law and the Texas Courts*, 55 BAYLOR L. REV. 225, 244 (2003)

[245] Sydney Samuels, REPORT ON CEREMONY COMMEMORATING THE 100 YEARS OF EXISTENCE OF THE SUPREME COURT OF TEXAS.

[246] See, e.g., Letter of Royall Wheeler to Oran M. Roberts, (September 20, 1849).

[247] See, e.g., *Foster v. Van Norman*, 1 Tex. 636 (Tex.1846); *Cobbs v. Coleman*, 14 Tex. 594 (Tex.1855).

[248] Dudley Wooten, A COMPREHENSIVE HISTORY OF TEXAS, 1685-1897 144 (1898).

[249] *In re Johnson*, 569 S.W.2d 882 (Tex.1978); *Trad v. General Crude Oil Co.*, 474 S.W.2d 183 (Tex.1971). Michael Hatchell and Robert Calvert, *Some Problems of Supreme Court Review*, 6 ST. MARY'S L.J. 303, 309 (1974); *Nagle v. Nagle*, 633 S.W.2d 796, 802 (Tex. 1982)

of the State as to require correction," the Court would deny the petition. Rule 133 has since been repealed. Its modern analogues, however, Texas Rule of Appellate Procedure 53 and 56, not only make clear that "[t]he petition for review procedure replaces the writ of error procedure" but also, that the Court will eschew appeals as of right in granting the petition in favor of considering

> whether the justices of the court of appeals disagree on an important point of law; whether there is a conflict between the courts of appeals on an important point of law; whether a case involves the construction or validity of a statute; whether a case involves constitutional issues; whether the court of appeals appears to have committed an error of law of such importance to the state's jurisprudence that it should be corrected; and whether the court of appeals has decided an important question of state law that should be, but has not been, resolved by the Supreme Court.[250]

OSG is significant in this context because the Texas Solicitor General is well equipped to assist the Texas Supreme Court in avoiding lock-stepping as the various state attorneys general, for the most part, are well positioned to help federal courts accommodate different jurisdictions with diverse policy preferences. Prominent members of the appellate bench and bar have long called for this development. Chief Justice Warren Burger lamented the quality of state appellate advocacy and filings before the Supreme Court at a conference at Georgetown Law during the early 1980s.[251] Indeed, as Justice Scalia recounted, this was a period when "states were throwing away important points of law, not just for their state, but for the other 49" as well. [252] Things appeared to have changed since that time, though. The states' turnaround can be traced to 1982 with the foundation of a Supreme Court advocacy group within the National Association for Attorneys General office. The move, of course, coincided with the low point of judicially enforced federalism in *Garcia v. San Antonio Metropolitan Transit Authority*.[253] In the words of NAAG Supreme Court Project Founder, Douglas Ross, coordination was intended to eliminate this deficiency as "states should have guardians of their interests on watch…to maximize the effectiveness of …[their] role in making our federalism a reality" (See Table 6).[254]

Table 6

| State Amicus Participation in Supreme Court Cases 1960-1994 | | | | | |
|---|---|---|---|---|---|
| Year | Number of Cases | Percentage of Supreme Court Docket | Number of Briefs Filed | Number of Individual State Interventions | Number of Victories |
| 1960 | 4 | 3 | 8 | 11 | 2 |
| 1961 | 8 | 7 | 11 | 33 | 4 |
| 1962 | 13 | 10 | 40 | 124 | 6 |

[250] Tex. R. App. P. 56.
[251] Warren Burger, *Conference on Supreme Court Advocacy Foreword*, 33 CATH. U. L. REV. 525 (1983).
[252] Jennifer Senior, *In Conversation with Antonin Scalia*, N.Y. Mag. (Oct. 6, 2013).
[253] 469 U.S. 528 (1995).
[254] Douglas Ross, *Safeguarding Our Federalism: Lessons or the States from the Supreme Court*, 45 PUB. ADMIN. REV. 723 (1985). The author is greatly indebted to Shane Gleason for Figure I. Shane Gleason, *The Dynamics of Legal Networks: State Attorney General Amicus Brief Coalition Formation*, 39 JUST. SYS. J. 253 (2018).

Olapade                                                                                                    DRAFT

| 1963 | 7  | 5  | 7   | 20   | 3  |
|------|----|----|-----|------|----|
| 1964 | 8  | 7  | 18  | 21   | 3  |
| 1965 | 5  | 5  | 9   | 86   | 2  |
| 1966 | 18 | 17 | 20  | 20   | 7  |
| 1967 | 16 | 13 | 25  | 58   | 5  |
| 1968 | 12 | 11 | 47  | 76   | 3  |
| 1969 | 17 | 15 | 58  | 75   | 8  |
| 1970 | 13 | 10 | 25  | 63   | 6  |
| 1971 | 13 | 9  | 17  | 69   | 5  |
| 1972 | 21 | 13 | 39  | 71   | 12 |
| 1973 | 14 | 9  | 24  | 72   | 10 |
| 1974 | 17 | 12 | 54  | 192  | 7  |
| 1975 | 25 | 16 | 68  | 145  | 9  |
| 1976 | 21 | 14 | 34  | 174  | 9  |
| 1977 | 26 | 19 | 134 | 207  | 8  |
| 1978 | 13 | 9  | 65  | 75   | 6  |
| 1979 | 12 | 9  | 13  | 67   | 4  |
| 1980 | 11 | 8  | 36  | 169  | 7  |
| 1981 | 17 | 11 | 25  | 298  | 7  |
| 1982 | 18 | 12 | 29  | 524  | 10 |
| 1983 | 22 | 15 | 33  | 509  | 11 |
| 1984 | 33 | 21 | 47  | 329  | 19 |
| 1985 | 30 | 19 | 41  | 303  | 18 |
| 1986 | 48 | 31 | 491 | 658  | 27 |
| 1987 | 40 | 27 | 257 | 472  | 13 |
| 1988 | 40 | 27 | 53  | 494  | 24 |
| 1989 | 39 | 29 | 47  | 764  | 21 |
| 1990 | 39 | 29 | 98  | 1403 | 16 |
| 1991 | 22 | 35 | 63  | 754  | 14 |
| 1992 | 40 | 20 | 25  | 434  | 9  |
| 1993 | 31 | 45 | 48  | 588  | 16 |
| 1994 | 40 | 30 | 38  | 572  | 11 |

Figure 1



Table 7

Olapade                                                                                          DRAFT

| Citations to Amicus Briefs in Supreme Court Opinions 2008-2013 | |
|---|---|
| Total Citations to Amicus Briefs | 606 |
| Citations to Statements of Fact | 124 |
| Citations for Facts in a Majority Opinion | 75 |
| Citation for Facts Without a Party Response | 89 |
| Citations for Facts to Amicus Briefs Alone | 76 |

These efforts have been successful as the reversal rates for State court of last resort decisions adopting the position of the State Solicitor General have decreased somewhat from the 1960s – after accounting for the Court's shrinking docket load following Byron White's retirement from the bench.[255]

Table 8

| U.S. Supreme Court Disposition of State High Court Decisions 1953-2003 | | | |
|---|---|---|---|
| | Warren Court (1953-1969) | Burger Court (1969-1986) | Rehnquist Court (1986-2004) |
| Affirmed | 250 | 252 | 168 |
| Reversed | 268 | 194 | 68 |
| Remanded | 394 | 386 | 292 |

The Supreme Court's rules have contributed to this trend by according the states some preferred status with intervention and amicus filings. Under 28 U.S.C. §2403, for instance, states may intervene if the constitutionality of a state statute is drawn into question.[256] Supreme Court Rule 29.4(c) supplements this statutory provision by requiring petitioners to serve notice of a constitutional challenge to a state statute "on the Attorney General of that State."[257] In a similar vein, just as the U.S. Solicitor General may file an amicus brief in the Court as of right under Supreme Court Rule 37.4,[258] a corresponding privilege is extended to "State[s], Commonwealth[s], Territory[ies], or Possession[s]" when the amicus brief is "submitted by its Attorney General."[259]

The result has been steady improvement in oral argument advocacy. In 2005, for instance, Chief Justice Roberts noted that "the rise of Supreme Court and appellate practice departments in major law firms" and "a corresponding development on the state and local government side" was a welcome "phenomenon of the past twenty-five years."[260] Former Third Circuit Judge Ruggero Aldisert, the author of a widely read book on appellate brief writing among legal writing

---

[255] Because Justice White believed strongly that certiorari should be granted whenever there was a conflict among the circuits, the Court's decreased caseload following his departure was not all that surprising and must be accounted for when evaluating these figures. See Ruth Bader Ginsberg, *Remembering Justice White*, 74 U. Colo. L. Rev. 1283, 1285 (2003).
[256] 28 U.S.C. §2403.
[257] Sup. Ct. R. 29.4(c).
[258] Sup. Ct. R. 37.4.
[259] *Id.*
[260] John Roberts, Oral Advocacy and the Re-emergence of a Supreme Court Bar, 30 J. Sup. Ct. Hist. 68, 77 (2005).

Olapade                                                                                                          DRAFT

instructors,[261] has made similar comments in public going so far as to argue that "appellate advocacy is specialized work…draw[ing] upon talents and skills which are far different from those utilized in other facets of practicing law."[262] Thus, the fact that one is "a good trial lawyer does not mean that [she or he] will be a qualified appellate advocate."[263] Perhaps the most influential reason for this development in the Lone Star state has been demand from Attorneys General John Cornyn, Greg Abbott, and Ken Paxton for staff with substantial experience in handling high-stakes appeals,[264] strategic appellate litigation and amicus brief filing in courts beyond the Red and Texarkana Rivers, and a perceived need to present consistent positions before the various Texas Court of Appeals, the Texas Supreme Court, the Texas Court of Criminal Appeals, and the Fifth Circuit. To give the reader a taste of the expansive nature of OSG's litigation docket, the Office has represented the interests of Texas before the United States District Court for the District of Columbia,[265] the Seventh Circuit,[266] the D.C. Circuit,[267] and even the North Dakota Supreme Court.[268] Courts across the nation have also recognized OSG's reputation for exemplary work by inviting the Office to participate in pending cases. Of particular note here is the Supreme Court's 2009 invitation to Solicitor General Ted Cruz to express the views of *Texas* alone in *Medellín v. Texas*, a case involving whether the ICJ's *ex post* determination that an arrested murderer and rapist was entitled to embassy notification under the Vienna Convention on Consular Relations could void the rapist's conviction and subsequent death penalty sentence. While it is customary for the Court to regularly call upon the U.S. Solicitor General to express her views on such matters (known as a 'CVSG' among appellate practitioners) and, it at least used to be customary for the Court to invite the states as a group to express their views,[269] this is the only recorded instance in which a single state has been invited to file.[270] The Texas Supreme Court and Fifth Circuit have entered similar invitations.[271]

The Texas Office of the Solicitor General (or OSG as agency insiders refer to the establishment)[272] can be traced back to Dan Morales' 1993 order creating the 'State Solicitor' position within the Texas Attorney General's Office. The position was abolished in 1995 but the

---

[261] Ruggero Aldisert, WINNING ON APPEAL: BETTER BRIEFS AND ORAL ARGUMENT (1992).

[262] *Id.* at 3.

[263] *Id.*

[264] James Ho, *The Office of the Solicitor General: Ten Years of Representing Texas Interests*, TEXAS APPELLATE ADVOCATE 104 (2009).

[265] *Newdow v. Roberts*, 2009 WL 10695674 (D.D.C. 2009).

[266] *Sherman v. Koch*, 623 F. 3d 501 (7th Cir. 2010).

[267] *Seegars v. Gonzalez*, 396 F.3d 1248 (D.C Cir. 2005); *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007).

[268] *Hansen v. Scott*, 687 N.W.2d 247 (N.D. 2004).

[269] During the mid-twentieth century, the several states, for instance, were invited to participate as a group in *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954); *Brown v. Board of Education of Topeka*, 349 U.S. 294 (1955); *Milne v. Milne*, 381 U.S. 948 (1965); *Younger v. Harris*, 401 U.S. 37 (1971); *Brandenburg v. Ohio*, 395 U.S. 444 (1969); *Reed v. Reed*, 404 U.S. 71 (1971); *South Carolina v. Katzenbach*, 383 U.S. 301 (1966).

[270] James Ho, *The Office of the Solicitor General: Ten Years of Representing Texas Interests*, TEXAS APPELLATE ADVOCATE (2009).

[271] See, e.g., *Order, State of Texas v. $281,420.00 in U.S. Currency*, No. 08-0465 (Tex. Dec. 19, 2008); Order, In re J.O.A., 283 S.W.3d 336 (Tex. Mar. 27, 2009); Order, in re Memorial Hermann Healthcare Sys., No. 08-1046 (Tex. Sept. 25, 2009); Order, City of Dallas v. VSC, LLC, No. 08-0265 (Tex. June 5, 2009); Order, City of Dallas v. Stewart, No. 09-0257 (Tex. Nov. 20, 2009); Perez v. Region 20 Education Service Center, 307 F.3d 318 (5th Cir. 2002); *Rothgery v. Gillespie County*, 491 F.3d 293 (5th Cir. 2007).

[272] James Ho, *The Office of the Solicitor General: Ten Years of Representing Texas Interests*, Texas Appellate Advocate (2009).

Olapade                                                                                    DRAFT

original office occupant, Max Renea Hicks, was followed by two state attorneys, Javier Guajardo
and Jim Todd, and continued to coordinate appellate litigation for the State. In 1999, after John
Cornyn retired from Seat Seven on the Texas Supreme Court, he created the OSG.[273] The OSG
performs three essential duties for the State of Texas. First, the office supervises all appellate
litigation for the Attorney General and, much like the U.S. Solicitor General for litigation involving
the national government,[274] approves all civil and criminal appeals in state and federal courts
involving the state, its agencies, and its officials. While the majority of the state's appeals in the
various Texas Court of Appeals are handled by the able lawyers in the trial divisions of the
Attorney General's Office, OSG provides input on the arguments that are made on the appellate
level, edit briefs written by trial division attorneys, and moot advocates. Second, OSG attorneys
personally handle those matters that are determined to be of overriding significance. To take just
a few example, Solicitors General Greg Coleman, Ted Cruz, James C. Ho, Jonathan Mitchell, and
Scott Keller have argued in cases involving the status of state procedural defaults under
international law,[275] the constitutionality of state and federal legislative districts that are based on
total citizen (as opposed to resident) population,[276] certificates of appealability under AEDPA,[277]
and the Religious Land Use and Institutionalized Persons Act[278] before the Supreme Court. OSG
has also been party to high profile appeals involving the University of Texas' pre-2000 affirmative
action program,[279] UT's top-ten percent plan,[280] Ralph Nader's challenge of the Texas Election
Code's signature and filing requirements,[281] a facial challenge to Indiana's 2005 voter
identification statute,[282] the defense of a three drug lethal injection protocol,[283] the defense of
capital punishment for child rape,[284] the proper standard for determining inmate mental capacity,[285]
*Batson* challenges,[286] the adequacy of state jury instructions in capital cases,[287] the Ex Post Facto
Clause,[288] the Prison Litigation Reform Act,[289] the Twenty-First amendment and dormant
commerce clause,[290] Native American gambling operations,[291] ERISA preemption,[292] the Texas
Open Meetings Act,[293] the Texas Public Information Act,[294] state sovereign immunity,[295] the Texas

[273] Ryan J. Owens & Patrick C. Wohlfarth, *State Solicitors General, Appellate Expertise, and State Success Before the U.S. Supreme Court*, 48 LAW & SOC'Y REV. 657 (2014).
[274] Drew Days III, *No Stripped Pants and Morning Coat: The Solicitor General In The State And Lower Federal Courts*, 11 GA. ST. L. REV. 645 (1995).
[275] *Medellín v. Texas*, 552 U.S. 491 (2008).
[276] *Evenwel v. Abbott*, 578 U.S. ___ (2016).
[277] *Gonzalez v. Thaler*, 565 U.S. 134 (2012).
[278] *Sossamon v. Texas*, 563 U.S. 277 (2011).
[279] *Hopwood v. Texas*, 78 F.3d 932 (1996).
[280] *Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198 (2016).
[281] *Nader v. Connor*, 332 F. Supp. 2d 982 (W.D. Tex. 2004) aff'd, 388 F.3d 137 (5th Cir. 2004) (per curiam).
[282] *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008).
[283] *Baze v. Rees*, 553 U.S. 35 (2008).
[284] *Kennedy v. Louisiana*, 554 U.S. 407 (2008).
[285] *Panetti v. Quarterman*, 551 U.S. 930 (2007).
[286] *Thaler v. Haynes*, 559 U.S. 43 (2010).
[287] *Smith v. Texas*, 550 U.S. 297 (2007).
[288] *Carmell v. Texas*, 529 US 513 (2000).
[289] *United States v. Ruiz*, 536 U.S. 622 (2002)
[290] *Siesta Village Market LLC v. Steen*, 595 F.3d 249 (5th Cir. 2010).
[291] *Kickapoo Traditional Tribe of Texas v. Texas*, 129 S.Ct. 32 (2008).
[292] *Aetna Health Inc. v. Davila*, 542 U.S. 200 (2004)
[293] *Rangra v. Brown*, 566 F. 3d 515 (5th Cir. 2009).
[294] *Abbott v. City of Dallas*, 453 S.W.3d 580 (Tex. App. 2014).
[295] *Tooke v . Mexia*, 197 S.W.3d 325 (Tex. June 30, 2006).

Transportation Code,[296] the Texas Pledge of Allegiance,[297] tort reform,[298] and state antitrust settlements.[299] Finally, OSG advises the Attorney General and other attorneys within the agency on complex constitutional and legal questions. It should be noted, though, that the Opinions Committee overseen by the Deputy Attorney General for Legal Counsel, not the OSG, issues formal written opinions on the Attorney General's behalf.

Skeptics might contend that this proscription will not be as effective as it could be because of recent amicus brief filing trends at the Court.[300] Indeed, experienced members of the Supreme Court Bar routinely consent to amicus brief filings in their cases and, even in those instances, where consent is withheld, the Court often grants motions for leave to file, with the effect of "permitting essentially unlimited numbers of filings of amicus briefs in argued cases."[301] This problem is compounded by the fact that states used to file as amici in cases before the Court *en mass* rather than as one unit.[302] State amicus briefing may also suffer from reliance on authorities that were created in anticipation of litigation. This conduct is particularly problematic because federal courts do not tolerate it elsewhere as Evidence Rule 803(6) discounts business records created in anticipation of litigation as they are presumed to inaccurately reflect firm activities. While manufacturing factual records in collusive cases has been a regular activity since the Marshall Court,[303] the problem has been exacerbated by the internet. As Allison Larson, Michael Rustad, and Thomas Koenig have highlighted, this problem is acute in matters involving "junk social science" where "empirical findings [are] presented to the Justices by amici…[and] have the aura of social science but do not follow the scientific truth-seeking norms that regulate valid research."[304] This development, though, is not much of a surprise because members of the Supreme Court bar maintain close relationships with repeat-player institutional amici and amici often cite to studies that they have funded or conducted themselves.[305] Amicus representation at the Court has also suffered from briefing presenting minority positions in social science or hard science fields. This conundrum has been complicated by the fact that groups claiming no expertise on the relevant factual subjects have nonetheless been submitting these factual authorities to the Court.

A skeptic might reply that these problems are much ado about nothing because the adversarial system provides enough checks on misinformation. The theory here is that because amicus briefs at the merits stage are due seven days after the brief for the litigant the amicus

---

[296] *Texas Department of Transportation v. City of Sunset Valley*, 146 S.W.3d 637 (Tex. 2004).

[297] *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1 (2004).

[298] *Watson v. Harris County Hospital Association*, No. 2:08CV81 (E.D. Tex. 2008).

[299] *In re Lease Oil Antitrust Litigation*, 570 F.3d 244, 251 (5th Cir.2009).

[300] Joseph Kearney and Thomas Merrill, *The Influence of Amicus Briefs on the Supreme Court*, 148 U. PENN. L. REV. 743 (2000).

[301] *Id.*

[302] Cornell W. Clayton; Jack McGuire, *State Litigation Strategies and Policymaking in the U.S. Supreme Court*, 11 KAN. J.L. & PUB. POL'Y 17, 23 (2001).

[303] *Griswold v. Connecticut*, 381 U.S. 479 (1965).

[304] Allison Orr Larsen, *The Trouble with Amicus Facts*, 100 Va. L. Rev. 1757 (2014).

[305] Marc Galanter, *Why the "Haves" Come out Ahead: Speculations on the Limits of Legal Change*, 9 LAW & SOCIETY REVIEW 95 (1974);; see also Brief for the Generic Pharmaceutical ass'n as Amicus Curiae Supporting Respondents, FTC v. Actavis, Inc., 133 S. Ct. 2223 (2013); Brief of the National Venture Capital Ass'n as Amicus Curiae in Support of Respondent, Ass'n for Molecular Pathology v. Myraid Genetics, 133 S. Ct. 2107 (2013); Brief of the National Ass'n of Criminal Defense Lawyers as Amicus Curiae in Support of Petitioners Supporting Reversal, Smith v. United States, 133 S. Ct. 714 (2013).

supports is filed, there will be sufficient incentive to call attention to the error.[306] Murphy's Law, though, suggests otherwise. Indeed, most appellate advocates would at least think twice about drawing attention to a brief with data that ostensibly supports the other side, especially when it might have been unread, in the hopes that the Justices would agree with a methodological critique of a study cited in the brief and disregard it altogether.[307] More than that, given that information from amici is presented after the record is closed, briefing provides the only check for incorrect factual citations. The low response rate to these errors are indicative of the adversarial system's failure.

This problem could be combated in a number of ways. One set of solutions would focus on limiting the number of briefs purporting to provide expert testimony by restricting the number of amicus briefs with new extra-record factual information. Indeed, District Courts routinely engage in this practice under Federal Rule of Evidence 702, which declares that any proffered testimony on scientific, technical, or specialized knowledge must be based on sufficient facts or data, be the product of reliable principles and methods, and result from a consistent application of principles and methods to the facts of the case.[308] If that option proved unsatisfactory, the Court could instead decline to accept any amicus brief filed with factual claims that were not backed with an explanation of the data methods; require that statements be supported with publicly available data (rather than emails or articles that are ostensibly on file with the author but closed to scrutiny by the Justices); permit parties to respond to unreliable facts in amicus briefs; or as former Seventh Circuit Judge Richard Posner has done, scold amici in opinions for unreliable statements.[309] Yet another suggestion flows from an analogy to the Federal Rules of Evidence. Under Evidence Rule 704, there are strict limits on expert witnesses offering opinions on the law or generally opining on the case's outcome.[310] The theory here is that the commentary detracts from the status of the expert as a neutral advisor. In a similar vein, the Court, borrowing a move from the Second Circuit, could impose a rule forbidding any amicus brief presenting factual claims from adding any additional legal argument.[311] The reform could potentially improve amicus brief accuracy by discouraging state advocacy groups from making stretch factual claims beyond their institutional capacity and facilitating more scrutiny for fact-checking among the Justices and their clerks. Third, the Court could make a point of ensuring that factual questions relevant to the case were disclosed in the certiorari grant – especially if a field of professionals who are underrepresented as amici before the Court such as scientists possess expertise over the matter.[312] The Court, for instance, could appoint an amicus to brief the fact it is more interested in learning about, appoint a special master to hear the submitted views and screen out factual claims as it does

---

[306] See Sup. Ct. R. 37(3)(a).

[307] Stephen M. Shapiro, Kenneth S. Geller, Timothy S. Bishop, Edward A. Hartnett, and Dan Himmelfarb, SUPREME COURT PRACTICE (2013).

[308] Fed. R. Evid. 702.

[309] *Ryan v. Commodity Futures Trading Commission*, 125 F. 3d 1062 (CA7, Posner, J., in chambers, Sept. 16, 1997).

[310] Fed. R. Evid. 704.

[311] See *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992); *Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705 (2d Cir. 1989); *FAA v. Landy*, 705 F.2d 624 (2d Cir. 1983).

[312] See, e.g., Stephanie Tai, *Friendly Science: Medical, Scientific, and Technical Amici Before the Supreme Court*, 78 WASH. U. L.Q. 789 (2000).

Olapade                                                                                                          DRAFT

for the very few cases arising under its original jurisdiction,[313] or simply inform the bar of its desire through the certiorari grant.

A different but related concern focuses on the rise of brief ghosting writing by, and collusion with, other parties. The Court, though, has ample tools to deal with this concern as well. Indeed, Supreme Court Rule 37.6 normally requires amicus briefs to indicate whether the counsel of record authored the brief in whole or part, whether she or he funded "the preparation or submission of the brief," and to identify every individual or entity that also made financial contributions in the "first footnote on the first page" of the brief.[314] States, however, are currently exempted from this requirement. There is no reason, however, why the Court couldn't simply amend the provision to police interest group ghost writing or payments that are, rightly or wrongly, understood to influence brief credibility. This reform, among other things, would provide states with an incentive to keep amicus deliberations and preparations within their offices where institutional constraints are more likely to align with state interests.

CONCLUSION

Texas is an exceptional State in an exception nation. The reasons for this were laid out by Justice Brandeis nearly a century ago in *Whitney v. California* as "those who won our independence" both at Yorktown and San Jacinto knew "that it is hazardous to discourage thought, hope and imagination; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies, and that the fitting remedy for evil counsels is good ones.." To be sure these words were uttered in the context of a dispute concerning an individual rights claim against the State, but the Texas Supreme Court's current pattern of embracing federal doctrine with nary a consideration for the peculiar circumstances in which it is situated or, the fact that the federal doctrines were crafted to facilitate State experimentation is a silence that is all the more menacing because it "discourages" Texans from exercising the first freedom: the right to govern themselves as "a free and independent" polity that is unencumbered by State legal rules designed for a union of fifty different governments rather than Texas itself.

---

[313] Stephen M. Shapiro, Kenneth S. Geller, Timothy S. Bishop, Edward A. Hartnett, Dan Himmelfarb, SUPREME COURT PRACTICE (2013).
[314] SUP. CT. R. 37.6.

Appendix I

| Year | Crude Oil Production (Mbbl) | Daily Avg. Production (Mbbl/day) | Number of Producing Wells | Percent Change in Production | Avg. Per Well Production (bbl/day) | Crude Oil Reserves as of Jan. 1 (Mbbl) |
|---|---|---|---|---|---|---|
| 2018 | 1,274,569 | 3,492 | 187,401 | 24.13% | 18.63 | n/a |
| 2017 | 1,026,765 | 2,813 | 187,139 | 5.35% | 15.03 | 15,936 |
| 2016 | 974,612 | 2,663 | 178,927 | -3.00% | 14.88 | n/a |
| 2015 | 1,004,774 | 2,752 | 193,807 | 11.58% | 14.20 | 13,057 |
| 2014 | 900,492 | 2,467 | 190,331 | 28.07% | 12.96 | 14,058 |
| 2013 | 703,119 | 1,926 | 179,797 | 31.88% | 10.71 | 12,004 |
| 2012 | 533,141 | 1,457 | 167,864 | 35.36% | 8.68 | 11,101 |
| 2011 | 393,880 | 1,079 | 161,402 | 10.36% | 6.69 | 8,108 |
| 2010 | 356,911 | 978 | 158,451 | 3.59% | 6.17 | 6,356 |
| 2009 | 344,527 | 944 | 157,807 | -0.61% | 5.98 | 5,496 |
| 2008 | 346,632 | 947 | 156,588 | 3.10% | 6.07 | 4,555 |

Olapade                                                                                          DRAFT

| Year | Crude Oil Production (Mbbl) | Daily Avg. Production (Mbbl/day) | Number of Producing Wells | Percent Change in Production | Avg. Per Well Production (bbl/day) | Crude Oil Reserves as of Jan. 1 (Mbbl) |
|------|----------------------------|----------------------------------|----------------------------|-------------------------------|-------------------------------------|-----------------------------------------|
| 2007 | 336,222 | 921 | 153,223 | -1.37% | 6.01 | 5,122 |
| 2006 | 340,885 | 934 | 151,832 | -0.97% | 6.15 | 4,871 |
| 2005 | 344,226 | 943 | 151,286 | -1.43% | 6.23 | 4,919 |
| 2004 | 349,233 | 957 | 151,205 | -2.24% | 6.33 | 4,613 |
| 2003 | 357,240 | 979 | 153,461 | -1.94% | 6.38 | 4,583 |
| 2002 | 364,314 | 998 | 155,865 | -3.84% | 6.40 | 5,015 |
| 2001 | 378,849 | 1,038 | 159,357 | -4.97% | 6.51 | 4,944 |
| 2000 | 398,678 | 1,092 | 161,097 | -2.00% | 6.76 | 5,273 |
| 1999 | 406,815 | 1,115 | 162,620 | -11.08% | 6.90 | 5,339 |
| 1998 | 457,499 | 1,253 | 170,288 | -6.42% | 7.40 | 4,927 |
| 1997 | 488,860 | 1,339 | 175,475 | -1.32% | 7.60 | 5,687 |
| 1996 | 495,378 | 1,357 | 175,277 | -3.24% | 7.72 | 5,736 |

Olapade

DRAFT

| Year | Crude Oil Production (Mbbl) | Daily Avg. Production (Mbbl/day) | Number of Producing Wells | Percent Change in Production | Avg. Per Well Production (bbl/day) | Crude Oil Reserves as of Jan. 1 (Mbbl) |
|---|---|---|---|---|---|---|
| 1995 | 511,962 | 1,403 | 177,397 | -5.45% | 7.91 | 5,743 |
| 1994 | 541,482 | 1,486 | 179,955 | -5.76% | 8.26 | 5,847 |
| 1993 | 574,568 | 1,577 | 186,342 | -6.22% | 8.46 | 6,171 |
| 1992 | 612,692 | 1,677 | 193,310 | -5.27% | 8.67 | 6,441 |
| 1991 | 646,776 | 1,770 | 196,292 | 0.13% | 9.02 | 6,797 |
| 1990 | 645,941 | 1,765 | 194,962 | -0.70% | 9.05 | 7,106 |
| 1989 | 650,514 | 1,784 | 190,821 | -6.83% | 9.35 | 6,966 |
| 1988 | 698,224 | 1,909 | 196,580 | -3.70% | 9.71 | 7,043 |
| 1987 | 725,029 | 1,988 | 199,354 | -7.53% | 9.97 | 7,112 |
| 1986 | 784,106 | 2,150 | 200,055 | -5.60% | 10.75 | 7,152 |
| 1985 | 830,597 | 2,281 | 210,477 | -1.76% | 10.84 | 7,782 |
| 1984 | 845,502 | 2,313 | 207,451 | -0.42% | 11.15 | 7,557 |

Olapade                                                                                                          DRAFT

| Year | Crude Oil Production (Mbbl) | Daily Avg. Production (Mbbl/day) | Number of Producing Wells | Percent Change in Production | Avg. Per Well Production (bbl/day) | Crude Oil Reserves as of Jan. 1 (Mbbl) |
|------|------|------|------|------|------|------|
| 1983 | 849,072 | 2,328 | 197,983 | -2.60% | 11.76 | 7,539 |
| 1982 | 871,780 | 2,388 | 191,319 | -2.87% | 12.48 | 7,616 |
| 1981 | 897,573 | 2,459 | 183,991 | -3.60% | 13.36 | 8,093 |
| 1980 | 931,078 | 2,544 | 175,673 | -4.85% | 14.48 | 8,206 |
| 1979 | 978,544 | 2,681 | 169,826 | -6.00% | 15.79 | 8,284 |
| 1978 | 1,040,966 | 2,852 | 166,365 | -5.46% | 17.14 | 8,911 |
| 1977 | 1,101,137 | 3,017 | 163,746 | -4.58% | 18.42 | 9,751 |
| 1976 | 1,153,941 | 3,153 | 160,546 | -2.68% | 19.64 | 10,080 |
| 1975 | 1,185,683 | 3,248 | 160,603 | -3.22% | 20.22 | 11,001 |
| 1974 | 1,225,166 | 3,357 | 159,702 | -2.54% | 21.02 | 11,756 |
| 1973 | 1,257,057 | 3,444 | 159,090 | -0.50% | 21.65 | 12,144 |
| 1972 | 1,263,412 | 3,452 | 167,233 | 6.85% | 20.64 | 13,023 |

| Year | Crude Oil Production (Mbbl) | Daily Avg. Production (Mbbl/day) | Number of Producing Wells | Percent Change in Production | Avg. Per Well Production (bbl/day) | Crude Oil Reserves as of Jan. 1 (Mbbl) |
|---|---|---|---|---|---|---|
| 1971 | 1,182,371 | 3,239 | 172,696 | -2.09% | 18.76 | 13,195 |
| 1970 | 1,207,625 | 3,309 | 177,221 | 9.08% | 18.67 | 13,063 |
| 1969 | 1,107,146 | 3,033 | 183,141 | 1.78% | 16.56 | 13,809 |
| 1968 | 1,087,825 | 2,972 | 187,681 | 1.30% | 15.84 | 14,494 |
| 1967 | 1,073,848 | 2,942 | 192,100 | 7.35% | 15.31 | 14,077 |
| 1966 | 1,000,325 | 2,741 | 196,308 | 7.24% | 13.96 | 14,303 |
| 1965 | 932,810 | 2,556 | 197,924 | 0.45% | 12.91 | 14,299 |
| 1964 | 928,606 | 2,537 | 199,119 | 1.44% | 12.74 | 14,573 |
| 1963 | 915,420 | 2,508 | 198,236 | 2.39% | 12.65 | 14,648 |
| 1962 | 894,023 | 2,449 | 197,659 | -0.08% | 12.39 | 14,849 |
| 1961 | 894,765 | 2,451 | 196,396 | 0.30% | 12.48 | 14,758 |
| 1960 | 892,084 | 2,437 | 192,627 | -5.54% | 12.65 | 14,859 |

Olapade

DRAFT

| Year | Crude Oil Production (Mbbl) | Daily Avg. Production (Mbbl/day) | Number of Producing Wells | Percent Change in Production | Avg. Per Well Production (bbl/day) | Crude Oil Reserves as of Jan. 1 (Mbbl) |
|---|---|---|---|---|---|---|
| 1959 | 944,410 | 2,587 | 188,934 | 3.79% | 13.69 | 14,322 |
| 1958 | 909,958 | 2,493 | 182,633 | -13.99% | 13.65 | 14,555 |
| 1957 | 1,057,997 | 2,899 | 176,705 | -1.94% | 16.41 | 14,783 |
| 1956 | 1,078,886 | 2,948 | 168,930 | 7.62% | 17.45 | 14,933 |
| 1955 | 1,002,480 | 2,747 | 158,598 | 5.03% | 17.32 | 14,982 |
| 1954 | 954,434 | 2,615 | 149,142 | -4.61% | 17.53 | 14,998 |
| 1953 | 1,000,545 | 2,741 | 142,159 | -0.92% | 19.28 | 14,916 |
| 1952 | 1,009,793 | 2,759 | 136,398 | 1.80% | 20.23 | 15,314 |
| 1951 | 991,983 | 2,718 | 130,309 | 21.29% | 20.86 | 13,581 |
| 1950 | 817,842 | 2,241 | 123,271 | 11.03% | 18.18 | 13,509 |
| 1949 | 736,627 | 2,018 | 115,483 | -17.54% | 17.47 | 12,484 |
| 1948 | 893,314 | 2,454 | 109,643 | 9.45% | 22.38 | 11,777 |

| Year | Crude Oil Production (Mbbl) | Daily Avg. Production (Mbbl/day) | Number of Producing Wells | Percent Change in Production | Avg. Per Well Production (bbl/day) | Crude Oil Reserves as of Jan. 1 (Mbbl) |
|---|---|---|---|---|---|---|
| 1947 | 816,188 | 2,236 | 105,537 | 7.98% | 21.19 | 11,646 |
| 1946 | 755,900 | 2,071 | 103,109 | 0.65% | 20.09 | 11,470 |
| 1945 | 751,045 | 2,058 | 101,225 | 1.34% | 20.33 | 10,835 |
| 1944 | 741,126 | 2,025 | 99,746 | 26.16% | 20.30 | 11,324 |
| 1943 | 587,436 | 1,609 | 98,596 | 22.94% | 16.32 | 11,545 |
| 1942 | 477,828 | 1,309 | 98,757 | -4.28% | 13.25 | 10,975 |
| 1941 | 499,208 | 1,368 | 98,802 | 2.58% | 13.85 | 10,623 |
| 1940 | 486,662 | 1,330 | 95,214 | 2.12% | 13.97 | 9,768 |
| 1939 | 476,550 | 1,306 | 89,914 | 1.66% | 14.52 | 9,447 |
| 1938 | 468,782 | 1,284 | 85,137 | -7.37% | 15.08 | 6,422 |
| 1937 | 506,067 | 1,386 | 77,565 | 20.84% | 17.87 | 6,010 |
| 1936 | 418,776 | 1,144 | 68,054 | 11.49% | 16.81 | 5,500 |

Olapade

DRAFT

| Year | Crude Oil Production (Mbbl) | Daily Avg. Production (Mbbl/day) | Number of Producing Wells | Percent Change in Production | Avg. Per Well Production (bbl/day) | Crude Oil Reserves as of Jan. 1 (Mbbl) |
|------|------|------|------|------|------|------|
| 1935 | 375,617 | 1,029 | 59,461 | | 17.31 | |

Appendix II

| TOTAL OIL PRODUCTION (Barrels; includes Crude Oil and Condensate) | | | | | | | |
|------|------|------|------|------|------|------|------|
| **MONTH** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| JANUARY | 70,389,862 | 88,184,951 | 106,430,474 | 103,227,974 | 98,832,934 | 119,146,904 | * 109,324,168 |
| FEBRUARY | 65,307,192 | 81,161,303 | 99,249,640 | 95,511,793 | 92,352,860 | 110,624,811 | |
| MARCH | 73,974,640 | 91,784,947 | 111,751,958 | 100,795,371 | 102,458,086 | 126,752,515 | |
| APRIL | 72,728,627 | 91,472,560 | 106,690,777 | 96,366,141 | 99,363,039 | 124,019,080 | |
| MAY | 77,387,599 | 95,141,780 | 108,410,874 | 97,821,347 | 105,188,727 | 127,750,854 | |
| JUNE | 76,016,307 | 94,326,889 | 103,257,049 | 93,925,827 | 102,657,016 | 127,486,161 | |
| JULY | 80,104,720 | 99,677,998 | 106,351,981 | 97,048,490 | 106,690,695 | 130,896,160 | |
| AUGUST | 81,145,372 | 101,320,503 | 105,301,469 | 96,981,915 | 103,655,785 | 132,255,311 | |
| SEPTEMBER | 80,081,193 | 98,435,217 | 101,893,334 | 93,394,165 | 105,599,467 | 129,358,872 | |
| OCTOBER | 83,437,832 | 103,907,879 | 104,724,393 | 97,607,824 | 115,426,253 | 130,758,505 | |
| NOVEMBER | 80,853,978 | 103,267,671 | 101,143,026 | 94,713,837 | 115,232,587 | 122,753,754 | |
| DECEMBER | 86,238,457 | 109,668,841 | 102,554,033 | 97,949,036 | 120,433,982 | 123,624,465 | |
| **ANNUAL TOTAL** | 927,665,779 | 1,158,350,539 | 1,257,759,008 | 1,165,343,720 | 1,267,891,431 | 1,505,427,392 | |

| TOTAL NATURAL GAS PRODUCTION (MCF, includes Gas Well Gas and Casinghead Gas) | | | | | | | |
|------|------|------|------|------|------|------|------|
| MONTH | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| JANUARY | 689,606,267 | 702,890,851 | 746,296,987 | 714,412,898 | 653,253,467 | 699,468,584 | 679,550,371 |
| FEBRUARY | 630,037,438 | 637,549,094 | 685,985,260 | 671,225,030 | 605,077,183 | 650,827,479 | |
| MARCH | 702,013,642 | 722,331,694 | 762,917,457 | 713,938,165 | 666,873,634 | 733,852,830 | |

Olapade

DRAFT

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| APRIL | 684,439,214 | 713,889,454 | 741,845,766 | 685,749,892 | 651,723,516 | 716,457,943 | |
| MAY | 714,481,165 | 745,803,909 | 759,720,229 | 705,196,352 | 682,939,803 | 755,441,365 | |
| JUNE | 694,387,106 | 726,205,334 | 732,938,127 | 681,500,728 | 666,953,721 | 736,473,267 | |
| JULY | 718,075,326 | 749,059,150 | 759,338,461 | 696,848,205 | 697,566,269 | 762,940,418 | |
| AUGUST | 719,351,370 | 755,100,023 | 754,661,181 | 692,648,065 | 680,258,596 | 771,091,687 | |
| SEPTEMBER | 695,629,503 | 724,572,217 | 730,172,608 | 659,690,760 | 670,294,749 | 744,692,325 | |
| OCTOBER | 719,788,421 | 755,318,323 | 745,157,455 | 679,336,796 | 712,261,271 | 755,427,176 | |
| NOVEMBER | 685,071,863 | 731,230,129 | 715,960,414 | 649,066,106 | 699,590,282 | 720,407,243 | |
| DECEMBER | 696,372,118 | 770,689,437 | 723,731,905 | 654,312,369 | 717,307,159 | 730,282,186 | |
| **ANNUAL TOTAL** | **8,349,253,433** | **8,734,639,615** | **8,858,725,850** | **8,203,925,366** | **8,104,099,650** | **8,777,362,503** | **679,550,371** |

| TOTAL CRUDE OIL PRODUCTION (measured in barrels) | | | | | | | |
|---|---|---|---|---|---|---|---|
| MONTH | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| JANUARY | 59,013,475 | 74,510,672 | 90,315,435 | 88,918,117 | 86,705,477 | 103,990,663 | * 96,064,595 |
| FEBRUARY | 54,887,618 | 68,710,680 | 84,535,271 | 82,422,997 | 81,256,151 | 96,747,354 | |
| MARCH | 61,933,783 | 77,744,773 | 95,356,097 | 87,008,780 | 90,501,499 | 110,609,793 | |
| APRIL | 61,005,704 | 77,365,246 | 91,045,454 | 83,083,641 | 87,603,862 | 108,276,215 | |
| MAY | 65,024,669 | 80,422,718 | 92,200,695 | 84,321,718 | 92,857,373 | 111,719,392 | |
| JUNE | 64,195,092 | 80,385,946 | 88,343,333 | 81,132,527 | 90,653,160 | 111,765,936 | |
| JULY | 67,898,603 | 84,755,118 | 91,261,976 | 84,220,871 | 93,660,015 | 114,458,898 | |
| AUGUST | 69,010,889 | 86,398,557 | 90,417,960 | 83,841,469 | 90,976,872 | 116,255,573 | |
| SEPTEMBER | 68,036,771 | 84,436,665 | 87,648,814 | 81,033,576 | 92,061,920 | 113,776,113 | |
| OCTOBER | 70,314,436 | 88,470,519 | 89,922,549 | 85,032,414 | 99,989,942 | 114,688,399 | |
| NOVEMBER | 68,346,873 | 87,923,182 | 86,720,797 | 82,793,460 | 100,400,818 | 107,465,913 | |
| DECEMBER | 72,737,651 | 92,997,807 | 88,112,275 | 85,893,473 | 104,933,766 | 108,223,309 | |
| **ANNUAL TOTAL** | **782,405,564** | **984,121,883** | **1,075,880,656** | **1,009,703,043** | **1,111,600,855** | **1,317,977,558** | **96,064,595** |

| CONDENSATE (condensate production from gas wells, measured in barrels) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **MONTH** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |

Olapade                                                                                    DRAFT

| JANUARY | 11,376,387 | 13,674,279 | 16,115,039 | 14,309,857 | 12,127,457 | 15,156,241 | * 13,259,573 |
|---|---|---|---|---|---|---|---|
| FEBRUARY | 10,419,574 | 12,450,623 | 14,714,369 | 13,088,796 | 11,096,709 | 13,877,457 | |
| MARCH | 12,040,857 | 14,040,174 | 16,395,861 | 13,786,591 | 11,956,587 | 16,142,722 | |
| APRIL | 11,722,923 | 14,107,314 | 15,645,323 | 13,282,500 | 11,759,177 | 15,742,865 | |
| MAY | 12,362,930 | 14,719,062 | 16,210,179 | 13,499,629 | 12,331,354 | 16,031,462 | |
| JUNE | 11,821,215 | 13,940,943 | 14,913,716 | 12,793,300 | 12,003,856 | 15,720,225 | |
| JULY | 12,206,117 | 14,922,880 | 15,090,005 | 12,827,619 | 13,030,680 | 16,437,262 | |
| AUGUST | 12,134,483 | 14,921,946 | 14,883,509 | 13,140,446 | 12,678,913 | 15,999,738 | |
| SEPTEMBER | 12,044,422 | 13,998,552 | 14,244,520 | 12,360,589 | 13,537,547 | 15,582,759 | |
| OCTOBER | 13,123,396 | 15,437,360 | 14,801,844 | 12,575,410 | 15,436,311 | 16,070,106 | |
| NOVEMBER | 12,507,105 | 15,344,489 | 14,422,229 | 11,920,377 | 14,831,769 | 15,287,841 | |
| DECEMBER | 13,500,806 | 16,671,034 | 14,441,758 | 12,055,563 | 15,500,216 | 15,401,156 | |
| **ANNUAL TOTAL** | **145,260,215** | **174,228,656** | **181,878,352** | **155,640,677** | **156,290,576** | **187,449,834** | **13,259,573** |

| GAS WELL GAS (natural gas production from gas wells, measured in MCF) | | | | | | | |
|---|---|---|---|---|---|---|---|
| **MONTH** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| JANUARY | 571,451,210 | 553,140,275 | 562,328,711 | 510,413,005 | 450,867,586 | 466,886,011 | * 439,864,494 |
| FEBRUARY | 520,072,502 | 498,474,719 | 508,769,539 | 478,602,109 | 414,825,809 | 431,057,598 | |
| MARCH | 577,263,970 | 560,292,982 | 561,659,662 | 506,790,758 | 454,343,153 | 482,109,862 | |
| APRIL | 558,327,639 | 550,975,696 | 541,145,493 | 487,773,323 | 443,585,759 | 467,684,324 | |
| MAY | 580,066,898 | 573,927,811 | 551,403,271 | 501,820,663 | 460,554,236 | 492,173,062 | |
| JUNE | 562,197,560 | 554,181,433 | 529,124,219 | 482,247,642 | 448,918,510 | 477,354,902 | |
| JULY | 579,024,616 | 568,280,014 | 545,678,209 | 489,830,251 | 469,786,144 | 493,226,706 | |
| AUGUST | 577,074,794 | 568,934,080 | 541,293,112 | 486,709,591 | 458,248,762 | 495,574,603 | |
| SEPTEMBER | 553,932,220 | 543,287,029 | 520,923,126 | 462,284,741 | 450,873,178 | 473,159,636 | |
| OCTOBER | 575,238,810 | 566,538,755 | 532,682,605 | 474,028,045 | 476,267,695 | 481,184,196 | |
| NOVEMBER | 546,239,724 | 550,131,353 | 513,994,182 | 451,133,537 | 467,272,212 | 460,261,424 | |
| DECEMBER | 551,986,540 | 576,866,146 | 518,977,754 | 454,136,191 | 480,014,560 | 468,735,121 | |
| **ANNUAL TOTAL** | **6,752,876,483** | **6,665,030,293** | **6,427,979,883** | **5,785,769,856** | **5,475,557,604** | **5,689,407,445** | **439,864,494** |

| CASINGHEAD GAS (casinghead gas production from oil wells, measured in MCF) | | | | | | | |
|---|---|---|---|---|---|---|---|
| MONTH | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| JANUARY | 118,155,057 | 149,750,576 | 183,968,276 | 203,999,893 | 202,385,881 | 232,582,573 | * 239,685,877 |
| FEBRUARY | 109,964,936 | 139,074,375 | 177,215,721 | 192,622,921 | 190,251,374 | 219,769,881 | |
| MARCH | 124,749,672 | 162,038,712 | 201,257,795 | 207,147,407 | 212,530,481 | 251,742,968 | |
| APRIL | 126,111,575 | 162,913,758 | 200,700,273 | 197,976,569 | 208,137,757 | 248,773,619 | |
| MAY | 134,414,267 | 171,876,098 | 208,316,958 | 203,375,689 | 222,385,567 | 263,268,303 | |
| JUNE | 132,189,546 | 172,023,901 | 203,813,908 | 199,253,086 | 218,035,211 | 259,118,365 | |
| JULY | 139,050,710 | 180,779,136 | 213,660,252 | 207,017,954 | 227,780,125 | 269,713,712 | |
| AUGUST | 142,276,576 | 186,165,943 | 213,368,069 | 205,938,474 | 222,009,834 | 275,517,084 | |
| SEPTEMBER | 141,697,283 | 181,285,188 | 209,249,482 | 197,406,019 | 219,421,571 | 271,532,689 | |
| OCTOBER | 144,549,611 | 188,779,568 | 212,474,850 | 205,308,751 | 235,993,576 | 274,242,980 | |
| NOVEMBER | 138,832,139 | 181,098,776 | 201,966,232 | 197,932,569 | 232,318,070 | 260,145,819 | |
| DECEMBER | 144,385,578 | 193,823,291 | 204,754,151 | 200,176,178 | 237,292,599 | 261,547,065 | |
| ANNUAL TOTAL | 1,596,376,950 | 2,069,609,322 | 2,430,745,967 | 2,418,155,510 | 2,628,542,046 | 3,087,955,058 | 239,685,877 |