**Medical Legal Partnership**

From: **Allison Rabkin Golden** <allison.rabkingolden@gmail.com>
Date: Friday, November 30, 2018
Subject: Fwd: [YHeLPS] Medical Legal Partnership – Info Session Wednesday, 12/5 at 12:10 in SLB 108
To: Allison RabkinGolden <allison.rabkingolden@gmail.com>

Hi HAVEN Volunteers,

Hope the end of your semester is going well. I know many of you have individually asked me about other MLP opportunities, so we wanted to bump the below info session as a great way to learn more about how to get involved with MLPs at YLS, directly from those involved in the Transitions and Palliative Care MLPs.

Thanks again for all of your hard work at HAVEN this semester, we so enjoyed working with you all and look forward to seeing you again in the spring!

Cheers,
Alice, Abigail, and Allison

**Temporary Restraining Order Project**

From: **Becca Steinberg** <besteinberg@gmail.com>
Date: Monday, April 8, 2019
Subject: TRO shift this week!
To: justin.smallwood@yale.edu, "Bennett, Jacob" <jacob.bennett@yale.edu>, "Brooks, Meghan" <meghan.brooks@yale.edu>, "Anderson-Hamilton, Travis" <travis.anderson-hamilton@yale.edu>, "Wallace, Caroline" <caroline.wallace@yale.edu>, "Lloyd, Allaya" <allaya.lloyd@yale.edu>, "Avi-Yonah, Michael" <michael.avi-yonah@yale.edu>, "Himes, Annie" <annie.himes@yale.edu>, "Reinhardt, Max" <max.reinhardt@yale.edu>, "Moraes Liu, Juliana" <juliana.moraesliu@yale.edu>, "Lustbader, Zach" <zach.lustbader@yale.edu>, habib.olapade@yale.edu, laura.pietrantoni@yale.edu, "Alston-Harmon, Jordan" <jordan.alston-harmon@yale.edu>, "Simmons, Mary Ella" <maryella.simmons@yale.edu>, "Block, Geoffrey" <geoffrey.block@yale.edu>, "Kinkley, Adam" <adam.kinkley@yale.edu>, "Murphy, Jake" <jake.murphy@yale.edu>, "Burrell, Key'Toya" <keytoya.burrell@yale.edu>

Hi TRO Volunteers,

This is a reminder that you have a shift this week! Please see the schedule at the bottom of this email. Unless noted otherwise, morning shifts are 9:30 AM - 1:00 PM, and afternoon shifts are 1:00 PM - 4:30 PM.

If you cannot make one of your shifts, please first email other volunteers and see if someone can trade with you. It is best to email volunteers who work on the same day/time as you, but on a different week. If you can't find anyone to trade, please email me. If there is a mistake in the below chart, please also email me.

The full semester schedule can be found here:

https://docs.google.com/spreadsheets/d/1gNEZnKBD-uhOV2Mih7iEVlArsZfSqveKpNLd8cK7oLw/edit#gid=0

Try to arrive 10 minutes early for your shifts because it takes a few minutes to get through security. The courthouse is a 10 minute walk from the law school. Remember, if you are the first person to arrive in the morning, you can get the key from Nancy's office on the second floor (in the clerks' office; you can also sign in on the whiteboard there). **Please return the key as soon as the second person on the morning shift arrives!** If you are the last to leave, make sure the door is locked behind you. Dress code for the office is business casual (no jeans, please). **At the end of your shift, don't forget to fill out the spreadsheet on the computer** and to shred any partially-completed applications or notes that are lying around.

We have assigned a director and a back up director for each day to be the coordinator. If you have any questions are issues that come up, please call or text one of the coordinators for the day. The names are listed in the office, as are our phone numbers.

Thanks everyone for your efforts!

Becca

**Capital Assistance Project**

**From:** Habib Olapade <habibyale@gmail.com>
**Sent:** Friday, July 5, 2019 4:51 PM
**To:** habib3355@outlook.com
**Subject:** Fwd: Question

---------- Forwarded message ----------
From: **Habib Olapade** <habibyale@gmail.com>
Date: Monday, February 25, 2019
Subject: Question
To: Rob Lee <roblee@vcrrc.org>

Thanks, Rob! I'll check in with the folks here and see what form I should send over!

On Wed, Feb 20, 2019 at 11:33 AM Rob Lee <roblee@vcrrc.org> wrote:

Habib,


I do not have records other than our email exchanges. If, however, you have an estimate of the time your contributed to VCRRC projects, I am happy to confirm your work and time.  Let me know.

--

Rob Lee

Executive Director

Virginia Capital Representation Resource Center

2421 Ivy Road, Suite 301

Charlottesville, Virginia 22903

(434) 817-2970

(434) 817-2972 (fax)

roblee@vcrrc.org


On Wed, Feb 20, 2019 at 10:00 AM Habib Olapade <habibyale@gmail.com> wrote:

Hi Rob!

I hope this note finds you swell and that you are having a delightful day! I'm collecting bar exam information for New York and wanted to see if you had records of my time for CAP that I could give to the State Board examiners? Please advise. Thanks!

Best,

Habib

**Hurricane Florence Legal Aid**

From: **Williams, Jesse** <jesse.williams@yale.edu>
Date: Wednesday, September 26, 2018
Subject: Give 90 minutes to Hurricane Florence victims on Friday?
To: "Stilwell, Victoria" <victoria.stilwell@yale.edu>


Hey, y'all --

Thanks again to everyone who came out last week. The ABA team we helped out were emphatic about how important your work was -- probably made a full week's difference in how quickly that guide got into the hands of folks who need it. An extra shout-out to Lauren Blazing & Taylor Morris, who went the extra mile on a guide to getting fees waived for immigration documents.

We've received a few requests from N.C. Disability Rights to help with the aid they're providing to Hurricane Florence victims. They need us to check in with a few folks who had a hard time at shelters during the storm, and they need a fact sheet on education access after the storm.

Tori & I are going to lead another session to try to get this stuff done: Friday, 2:30 - 4 P.M. I know it's not an ideal time, and that it's already been a hell of a week (and it's only Wednesday). But there are folks in NC/SC who need these 90 minutes much more than we do.

Let me know if you can make it. We'll be in Baker 125.

Yours,

Jesse

**Lowenstein Human Rights Pro Bono Project**

On Sat, Jan 5, 2019, 2:13 PM O'Connor, Carrie <carolyn.oconnor@yale.edu> wrote:

Dear Habib,

I learned so much about fisheries in Spain from your piece and found that information well-grounded in data. I have some suggestions that I think will strengthen your points and conclusion. Please find attached my line edits & comments. Excuse the heavy redlines as I try to show people what I mean when I suggest a change & provide helpful sources so people know what I am thinking about. These truly are meant as suggestions & starting points. Here is an overview of my ideas on how to improve the piece:

(1) *Framing.* I think you focused almost exclusively on fisheries, which is a great place to start. However, the piece did not much discuss migrant workers in the fishing industry or whether Spain's legislation, policies, and regulations were effectively preventing issues that would violate their human rights. I think you can structure the piece as (a) talking about how important the fishing industry is and how important foreign workers have become to that industry in Spain; (b) the international rights and domestic laws, policies, and protections in place; and (c) what challenges migrant workers face in Spain; and (d) the

strengths and weaknesses in Spain's legal protections to meet the rights of migrant workers in Spain's fishing industry.

(2) *Sources*. You do not have any citations in the piece beyond for some of the data, so I wasn't able to tell where your information was coming from and when it was published. Please use footnotes. As you mostly focused on the fisheries sector, I added some resources at the bottom of the document and attached some here as well. From my quick review, it seemed like there is limited information available in English that directly addresses migrant abuses in Spain's fishing industry. So, you can discuss that issue & then highlight why abuses are likely occurring, drawing from the reports about trafficking, human rights, and labor issues that migrants in general experience in Spain.

(3) *Voice*. Perhaps due to the technical focus, you to write your sentences mostly in the passive voice, where it is unclear who is doing what to whom and what harm that causes. I made edits to show what I mean by this that I hope are helpful. The issue, particularly in a human rights framing, is that a passive voice loses track of who is responsible for the harm and the solution. In addition, you left out any analysis. I'm really interested in hearing your own voice come through and to what extent you think Spain's taking the right normative & legal approach to respect workers' human rights.

Please don't hesitate to let me know if you have any questions.

Best,

Carrie

Carolyn O'Connor

J.D. Candidate, Yale Law School, 2019

Master of Arts in Law and Diplomacy Candidate, The Fletcher School, 2018

carolyn.oconnor@yale.edu |609-240-1928

**New Civil Liberties Alliance**

**From:** Habib Olapade <habibyale@gmail.com>
**Sent:** Thursday, February 28, 2019 3:53 PM
**To:** Peggy Little <peggy.little@ncla.legal>
**Subject:** Re: NCLA Work

Thanks, Peggy! Six hours sounds about right! How can I get this confirmed in writing?

Habib Olapade

Stanford University | Class of 2017

Yale Law School | Class of 2020

Linkedin: https://www.linkedin.com/in/habib-olapade-31637b80/

Twitter: https://twitter.com/habib_olapade

Instagram: https://www.instagram.com/liftinglegally/

On Fri, Feb 22, 2019 at 4:44 PM Peggy Little <peggy.little@ncla.legal> wrote:

Hi Habib,

The only work I show from you is the three case summaries sent to me on December 3.   The way this normally works is that you tell me the time it took for you to set up the case alerts, read the cases, and summarize them.   This would have involved a few hours work, but I'm not able to certify what time it took without timekeeping information from you.

Similar work at Penn by students with a similar number of cases involved 6-12 hours of work depending on whether your research involved federal cases, state cases or both.

Perhaps your Westlaw or Lexis login information from that time period will help you in accurately reporting the time spent.

Please let me know.

Thank you

Peggy

**Revenge Porn Model Statute Drafting**

From: **Habib Olapade** <habibyale@gmail.com>
Date: Tuesday, November 27, 2018
Subject: RE: Update
To: ABeltz@nylag.org

Hi Amanda!

I hope this note finds you swell and thanks for giving me this assignment! Here is the memo you requested. Thanks!


Best,


Habib

On Wed, Nov 21, 2018 at 11:33 AM Amanda Beltz <ABeltz@nylag.org> wrote:

I don't know – Alan sent the uniform unauthorized disclosure of intimate images draft and I wanted to learn more about the process and what was happening in other states. I am not aware of anything else but if there is, would love to know!


Amanda


Amanda M. Beltz

Director

Matrimonial & Family Law Unit

Domestic Violence Appellate Representation Project

**New York Legal Assistance Group**

7 Hanover Square, 18th Floor

New York, NY 10004

Tel: 212-613-5023 | Fax: 212-714-3085

abeltz@nylag.org | www.nylag.org

Pronouns: She/her/hers

**Colorado Pro Bono Appeals Project**

From: **Jordan Saint John** <jordansaintjohn@gmail.com>
Date: Wednesday, April 3, 2019
Subject: Appeal results
To: Habib Olapade <habibyale@gmail.com>


Hello Habib, I hope you are well and that your studies are coming along nicely.

I just received notice today that the mandate issued in my appeals, which means the order came down some time ago. However, I never saw it. I have now learned that this occurred because there were five separate appeals, three of which another law firm handled (also pro bono), and all the appeals were consolidated under the number of one of their cases, so it was served to them but not to me.

Anyway, I now have a copy of the order and our client (mother) prevailed on every issue, as she should have. In other words, justice was served. I thought you might like reading the opinion. I removed the caption and all identifying info (names, case numbers) that I spotted.

Thanks again for your contribution to this result! Best wishes to you in your law school career and beyond-

--

*Jordan Saint John*

**Saint John Law LLC**
*Legal Analysis and Writing*

*Civil Appeals*

320 E Costilla Street

Colorado Springs, CO 80903

(719) 440-5792

https://coloappeal.com/

CONFIDENTIALITY NOTICE: The contents of this e-mail and any attached files are confidential and legally privileged. The information is intended only for the named recipient. If you receive this e-mail in error, please notify me by replying to this email. Thank you.

--

Habib Olapade

Stanford University | Class of 2017

Yale Law School | Class of 2020

Linkedin: https://www.linkedin.com/in/habib-olapade-31637b80/

Twitter: https://twitter.com/habib_olapade

Instagram: https://www.instagram.com/liftinglegally/

Connecticut Food Bank

**From:** Habib Olapade <habibyale@gmail.com>
**Sent:** Friday, July 5, 2019 5:43 PM
**To:** habib3355@outlook.com
**Subject:** Fwd: Connecticut Food Bank: IMPORTANT NOTICE: CT OPEN VOLUNTEERS NEEDED

---------- Forwarded message ----------
From: **VolunteerHub Messaging** <b02@b.volunteerhub.com>
Date: Friday, August 17, 2018
Subject: Connecticut Food Bank: IMPORTANT NOTICE: CT OPEN VOLUNTEERS NEEDED
To: Habib Olapade <habib.olapade@yale.edu>



Good day CFB Volunteers,

Thanks to all those who signed up to volunteer at the CT Open this summer. Volunteers are still needed and so we are encouraging others to sign up TODAY! Volunteer shifts run from Sunday August 19- Saturday, August 25, 2018. Each day there are 2-3 shifts, generally around 3 hours. You will receive credentials to enter the arena as well so you can watch the matches, grab a bite to eat and enjoy the day before or after your shift. Children are welcome to assist with adult supervision.

All shifts are posted on Volunteer Hub and you can use the link below to sign up:

https://ctfoodbank.volunteerhub.com/EventGroup/Index/98429

Please contact Mia Freedenfeld, Special Events Manager via email at mfreedenfeld@ctfoodbank.org OR telephone

O: (203) 741-9758 M: (203) 317-9929 with any questions, or if you need additional information. We would love to have you volunteer!

Thanks for supporting the mission of the Connecticut Food Bank and see you at the CT OPEN!

Sincerely,

Delores

Connecticut Food Bank, 2 Research Parkway, Wallingford, CT 06492

Powered by VolunteerHub.com

**Marshall-Brennan Project**

From: **Steinberg, Becca** <becca.steinberg@yale.edu>
Date: Sunday, September 23, 2018
Subject: [TheWall] Volunteer with the Marshall-Brennan Project!
To: Habib Olapade <habibyale@gmail.com>
Cc: "Gonzalez, John" <john.gonzalez@yale.edu>

Hi Habib,

Thanks so much for your email! We are really excited that you are volunteering this semester! We are working with the teacher at Coop to make sure we can coordinate the logistics appropriately, and will email you back within the week.

All the best,

Becca

On Fri, Oct 26, 2018 at 6:50 PM Habib Olapade <habibyale@gmail.com> wrote:

Hi Becca!

I hope this note finds you swell and that you are having a delightful evening! Could you please pass on the sign up sheet for the MB high school tutoring project? Please advise. Thanks!

Best,

Habib

Becca Steinberg

J.D. Candidate, Class of 2020

Yale Law School

(314) 971-6139 | becca.steinberg@yale.edu


**Upturn Amicus Curiae Assistance**


From: **Habib Olapade** <habibyale@gmail.com>
Date: Saturday, November 10, 2018
Subject: Upturn amicus help: research questions
To: logan@upturn.org

Hi Logan!

I hope this note finds you swell and that you are having a delightful day! Here is the memo you requested. Thanks!

Best,

Habib


TO: Logan Koepke

FROM: Habib Olapade

RE: §203 Statutory Conflict

## Memo

### I.    Discussion

Section 804(a) of the Fair Housing Act forbids discrimination on account of race, religion, sex, or family status when selling or renting housing. 42 U.S.C. §3604(a). This prohibition is accompanied by a ban on ads that state a preference with respect to any of the protected classes, thus, it is illegal:

> "[t]o make, print, or publish, or cause to be made, printed, or published
> any notice, statement, or advertisement, with respect to the sale or rental

of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination."

42 U.S.C. §3604(c). The statute, however, exempts "any single-family house sold or rented by an owner…[who] does not own more than three such single-family houses." Here, online forum providers such as Facebook resemble common carriers such as telephone companies because they neither make nor publish any discriminatory advertisement, text message, or conversation that may pass over their networks. *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 668 (7th Cir.2008). Message screening, moreover, can prove costly and economically inefficient because filters are unable to catch every discriminatory ad and maintaining a screening staff can raise labor costs. The Communications Decency Act arguably resolves this dilemma by immunizing outlets such as Facebook from being held accountable for the ill-advised decisions of its users. 47 U.S.C. §230(c). That statute provides in part:

> "(1) **Treatment of publisher or speaker.** No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
>
> (2) **Civil liability.** No provider or user of an interactive computer service shall be held liable on account of—(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1)."

§230(c) is best read as a definitional clause that permits entities such as Facebook to remain "providers" and thus be eligible for immunity under §230(c) as long as the information came from someone else rather than the company itself. This position has been almost uniformly adopted. See, e.g., *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir.2008); *Zeran v. America Online Inc.*, 129 F.3d 327, 330 (4th Cir.1997); See *Green v. America Online*, 318 F.3d 465, 470–71 (3d Cir.2003); *Batzel v. Smith*, 333 F.3d 1018, 1031 n. 18 (9th Cir.2003); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122–25 (9th Cir.2003); *Ben Ezra, Weinstein & Co. v. America Online, Inc.*, 206 F.3d 980, 984–85 (10th Cir.2000); *Blumenthal v. Drudge*, 992 F.Supp. 44, 51–52 (D.D.C.1998); *Parker v. Google, Inc.*, 422 F.Supp.2d 492, 500–01 (E.D.Pa.2006); *Dimeo v. Max*, 433 F.Supp.2d 523, 530–31 (E.D.Pa.2006); *Whitney Info. Network, Inc. v. Verio, Inc.*, No. 2:04CV462FTM29SPC, 2006 WL 66724, 2–3 (M.D.Fla. Jan.11, 2006); *Associated Bank–Corp. v. Earthlink, Inc.*, No. 05–C–0233–S, 2005 WL 2240952, 3–4 (W.D.Wis. Sept.13, 2005); *Morrison v. American Online, Inc.*, 153 F.Supp.2d 930, 932–34 (N.D.Ind.2001); *Barnes v. Yahoo!, Inc.*, No. Civ. 05–926–AA, 2005 WL 3005602, *2–3 (D.Or. Nov.8, 2005); *Landry–Bell v. Various, Inc.*, No. Civ.A. 05–1526, 2005 WL 3640448, *1–3 (W.D.La. Dec.27, 2005); *Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp.2d 1090, 1117–18 (W.D.Wash.2004); *MCW, Inc. v. Badbusinessbureau.com, LLC*, No. Civ.A.3:02–CV–2727–G, 2004 WL 833595, *7–8 (N.D.Tex. Apr.19, 2004); *Noah v. AOL Time Warner, Inc.*, 261 F.Supp.2d 532, 537–38 (E.D.Va.2003); *Smith v. Intercosmos Media Group, Inc.*, No. Civ.A. 02–1964, 2002 WL 31844907, (E.D.La. Dec.17, 2002); *PatentWizard, Inc. v. Kinko's, Inc.*, 163 F.Supp.2d 1069, 1071 (D.S.D.2001); *Marczeski v. Law*, 122 F.Supp.2d 315, 327 (D.Conn.2000); *Donato v. Moldow*, 374 N.J.Super. 475, 487–500, 865 A.2d 711, 718–27 (2005); *Austin v. CrystalTech Web Hosting*, 211 Ariz. 569, 573–74, 125 P.3d 389, 393–94 (2005); *Barrett v. Fonorow*, 343 Ill.App.3d 1184, 1193–94, 279 Ill.Dec. 113, 121, 799 N.E.2d 916, 924 (Ill.Ct.App.2003); *Doe v. America Online, Inc.*, 783 So.2d 1010, 1012–17 (Fla.2001); *Schneider*

*v. Amazon.com, Inc.*, 108 Wash.App. 454, 459–67, 31 P.3d 37, 39–43 (Wash.Ct.App. Sept.17, 2001); *Doe One v. Oliver*, 46 Conn.Supp. 406, 410–11, 755 A.2d 1000, 1003–04 (2000); see also *Novak v. Overture Servs., Inc.*, 309 F.Supp.2d 446, 452–53 (E.D.N.Y.2004) (citing *Carafano* instead of *Zeran*, but to the same effect); *Beyond Sys., Inc. v. Keynetics*, Inc., 422 F.Supp.2d 523, 536–37 (D.Md.2006) (CDA preempted the Maryland Commerical Electronic Mail Act and noting that "[c]ase law clearly establishes that CDA immunity applies even where an ISP knew of its customers' potentially illegal activity"); cf. *Barrett v. Rosenthal*, 114 Cal.App.4th 1379, 9 Cal.Rptr.3d 142, 150–67 (Cal.Ct.App.2004) (disagreeing with *Zeran's* holding).

    If the preceding analysis does not aide your client, it could be argued that there is not a irreconcilable conflict between the FHA and DCA. After all, the imposition of liability on those who make, print, or publish discriminatory notices, statements, or advertisements is necessary to achieve the legislative purposes of the FHA. Congress intended to achieve fair housing throughout the United States by deterring discrimination, supporting desegregation, and compensating victims. Supporters of the FHA in both the House and Senate repeatedly argued that the new law should both expand housing choices for minorities and foster racial integration. Senator Mondale, for instance, the principle sponsor of the FHA, stated that the basic purpose of [fair housing] legislation was to permit people who have the ability to do so to buy any house offered to the public if they can afford to buy it." 11 Cong. Rec. 3421 (Feb. 20, 1968). Senator Javits explained that housing discrimination is a "vital issue" and it was "a fundamental element of dignity that a man may enjoy a good home in a good neighborhood without hindrance." 114 Cong. Rec. 2703 (Feb. 8, 1968). Integration was equally important as non-discrimination to the Congress that passed the FHA in 1968. Senator Mondale repeatedly expressed the concern that "we are going to live separately in white ghettos and Negro ghettos." 114 Cong. Rec. 2276 (Feb. 6, 1968). Senator Mondale explained that the purpose of the FHA was to replace ghettos with "truly integrated and balanced living patterns." *Id.* at 3422 (Feb. 20, 1968). Congressman Emanuel Cellar, Chairman of the House Judiciary Committee, expressed the need to eliminate "the blight of segregated housing patterns." *Id.* at 9959 (Apr. 10, 1968). Senator Ted Kennedy also stressed the need for congressional action to address segregation stating that:

> "[a]s long as the Negro American remains isolated from other Americans and denied equal access to good housing, he will continue to live in segregation, forced to pay a higher price for the limited inferior housing to which he does have access. His children will continue to go to segregated schools of inferior quality, and his family will continue to experience segregation in most other aspects of their daily lives, cut off from the society that surrounds them."

*The Civil Rights Act of 1966, and Related Bills: Hearing on S. 3296 Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 89th Cong. 68 (1966). The ban on discriminatory notices, statements, and advertisements contained in §3604(c) could be seen as crucial to furthering the purposes of the FHA by reducing barriers that might deter persons in the protected classes from seeking homes in neighborhoods that must be open to them. Courts have repeatedly recognized that discriminatory advertisements deter prospective renters and buyers before they can even get into the door to apply for a home. See, e.g., *United States v. Hunter*, 459 F.2d 205, 214 (4th Cir.1972). It could be pressed that §3604(c) also advances the goals of the FHA by banning practices that might create "a public impression that segregation in housing is legal." *Spann v. Colonial Vill*, 899 F.2d 24, 30 (D.C. Cir.1990). Discriminatory statements and advertisements are seen by both unsophisticated housing providers and home seekers as well as sophisticated ones. The continuing prevalence of discriminatory notices, statements, and advertisements encourages housing providers and members of the protected classes to believe that discrimination in housing is the accepted norm, despite the FHA's ban on such practices. *Id.*

    The importance of §3604(c) to furthering the goals of the FHA, moreover, are further reflected in the broad interpretation that courts have consistently given to the provision. Violations do not require proof

of discriminatory intent. *Jancik v. Dep't of Hous. And Urban Dev*., 44 F.3d 553 (7th Cir.1995). Instead, the general standard for claims under §3604(c) is whether the ordinary reader or listener would understand the statement as indicating a discriminatory preference. *Hunter*, 459 F.2d at 215. Congress, furthermore, refused to exempt most homeowners. 42 U.S.C. §3603(b). Indeed, discriminatory notices, statements, and advertisements in a wide variety of mediums such as telecommunication for the deaf, oral statements, newspaper advertisements, and the like have been held to violate §3604(c). *United States v. Space Hunters*, 429 F.3d 416 (2d Cir. 2005); *Jancik*, 44 F.3d at 556-57; *Hunter*, 459 F.2d at 210; *United States v. Plaza Mobile Estates*, 273 F. Supp. 2d 1084 (C.D. Cal. 2003); *Fair Housing Cong. v. Weber*, 993 F. Supp. 1286 (C.D. Cal.1997). In a similar vein, a variety of different intermediaries have been held liable under §3604(c) for publishing, printing, or causing to be made, printed or published, discriminatory advertisements, notices or statements. See, e.g., *Hunter*, 459 F.2d at 210; *Mayers*, 465 F.2d at 663; *Whatley Heights Neighborhood Coal v. Jenna Resales Co*., 447 F. Supp. 838, 842 n.3 (E.D.N.Y.1978).

Internet sites such as Facebook, just like newspapers, can "print," or "publish" discriminatory advertisements and make public discriminatory preferences of third parties in the sale or rental of real estate. Discriminatory statements that find their way on the internet, however, have a far greater audience than their counterparts in the physical press. The National Association of Realtors recently reported that nearly three-quarters of homebuyers viewed the Internet as a useful tool in their home search. As housing advertisements on Internet sites replace those in newspapers, it would be advisable for courts to apply §3604(c) in a way that effectuates the FHA's purpose of expanding housing choice and eliminating residential segregation. To immunize Facebook and other internet sites from §3604(c) liability would undermine the FHA by reversing the progress that has been achieved since 1968 in eradicating overt forms of discrimination.

It could be argued that the CDA does not alter this analysis one iota because the statute and the exemption contained in §203(c) deal only with obscene and otherwise offensive materials on the Internet. Indeed, the FHA is referenced nowhere in the statute's language. The result is that immunization under §203 for violations of the FHA is plausible only if the CDA implicitly repealed §3604. Courts will find an implicit repeal "where provisions in two statutes are in irreconcilable conflict or where the latter Act covers the whole subject of the earlier one and is clearly intended as a substitute." *Branch v. Smith*, 538 U.S. 254, 273 (2003). It could be contended that the laws at issue here – the FHA and CDA – are not in conflict with one another because the former address discrimination in housing while the later was drafted to promote the free exchange of ideas and information over the internet. See, e.g., *Carafano v. Metroslpash.com, Inc*., 339 F.3d 1119, 1122 (9th Cir.2003). This analysis is corroborated by the fact that there is a presumption against implicit repeal. William N. Eskridge, Jr. et al., Legislation and Statutory Interpretation 274-75 (2000); Antonin Scalia and Bryan Garner, Reading Law 327-333 (2012).

**American Constitution Society Pro Bono**

**From:** Olapade, Habib
**Sent:** Tuesday, August 28, 2018 7:25:47 PM
**To:** ashah@acslaw.org
**Subject:** Pro Bono Memo


Hi K.C.!


I hope this note finds you well. Here is the memo you requested. Thanks!

Take it easy,


Habib

# Kavanagh Memo

## I.   Introduction

On June 27, 2018, Donald Trump nominated Brett Kavanagh for a position as an Associate Justice on the United States Supreme Court. President Trump described Kavanagh has a "judge's judge" having "impeccable credentials" and a "proven commitment to equal justice under the law." Kavanagh has had a distinguished legal career. He was born in Washington, where his mother was a public-school teacher, on February 12, 1965. Martha Kavanaugh went on to become a prosecutor and later state judge in Maryland, where Kavanagh was raised and where, like Justice Neil Gorsuch, he attended Georgetown Preparatory School. After graduating from Yale College in 1987 and Yale Law School in 1990, Kavanaugh spent two years as a law clerk, for Judge Walter Stapleton on the Third Circuit and Alex Kozinski on the Ninth Circuit. He followed a one-year fellowship in the office of U.S. Solicitor General Kenneth Starr with a clerkship for Justice Kennedy during the 1993 October Term. Kavanaugh went on to join Starr at the Office of the Independent Counsel, where he led the investigation into the death of Vincent Foster, an aid to Bill Clinton, and helped write the 1998 Starr Report to Congress, which outlined eleven grounds for Clinton's impeachment. Kavanaugh was later a partner at the law firm of Kirkland & Ellis, where he specialized in appellate law. He moved to the White House after President George W. Bush was elected and worked in the West Wing for five years, first as a counsel to the president and then as staff secretary to the president.

Bush first nominated Kavanaugh to the D.C. Circuit on July 25, 2003, but the nomination was stalled in the Senate for nearly three years, with Democratic senators falsely claiming that Kavanaugh's government track record revealed him to be overly partisan. During Kavanaugh's second confirmation hearing, in May 2006, Chuck Schumer (D-NY) observed "from the notorious Starr report, to the Florida recount, to the President's secrecy and privilege claims, to post 9-11 legislative battles including the Victims Compensation Fund, to ideological judicial nomination fights, if there has been a partisan political fight that needed a very bright legal foot soldier in the last decade, Brett Kavanaugh was probably there." Despite similar objections from other Democratic senators, Kavanaugh was eventually confirmed by the Senate on May 26, 2006, by a vote of 57-36. As of the end of 2017, Kavanaugh had written opinions in 286 cases. Because the D.C. Circuit's caseload is weighted toward review of administrative agency decisions, most of Kavanaugh's opinions – 122 to be exact – have touched on the field of administrative law.

## A. Environmental Law

Judge Kavanaugh has exhibited a very clear track record of solicitousness to regulated job creators. These instincts will likely place him to the right of Chief Justice Roberts in environmental cases shifting Roberts to the center of the court. As a consequence, we can expect that a Kavanaugh confirmation would usher in a court that is considerably more sympathetic to America's job creators. Because of the *sui generis* nature of many environmental law cases, and their entanglement with administrative law issues, one might expect that it would be difficult to identify general trends for individual judges. A strong commitment to *Chevron* deference, for example, might cut in favor of a stringent regulation in one case and industry-friendly deregulation in another. Nevertheless, in some high-profile environmental cases, the Court does split along standard ideologies lines, with the liberal justices coming down in favor of outcomes that depress economic growth and the conservative justices favoring industry. It is in these more ideologically charged cases that Kavanaugh's positive disposition towards over-regulated industry is likely to have the most impact.

Two little known dissents in which Kavanagh parted ways from even his moderately-conservative colleagues on the D.C. Circuit Court help illustrate his general tendencies in environmental cases. In *Sierra Club v. EPA*, in 2008, Kavanaugh sat on a panel with two fellow Republican appointees: then-Chief Judge David Sentelle, who was appointed by President Reagan, and Judge Thomas Griffith, who, like Kavanaugh, is a President George W. Bush appointee. That case involved a challenge by the Sierra Club to a Bush-era EPA regulation that relaxed monitoring requirements associated with a permitting program under the Clear Air Act. Writing for the majority, Griffith found that the EPA had overstepped its statutory authority and struck down the rule. In his dissent, Kavanaugh noted that he "agreed completely with the majority opinion about bedrock principles of statutory interpretation," yet arrived at the opposite result – for him, the most natural interpretation of the act was one that favored the agency's less stringent approach. Another case in which Kavanaugh disagreed with like-minded colleagues was the D.C. Circuit's 2010 decision in *Howmet Corp. v. EPA*, which involved an industry challenge to an EPA interpretation of one of its regulations under the Resource Conservation and Recovery Act.[1] The agency had determined in an enforcement action that a particular chemical was "spent material" and therefore subject to regulation after it had been used in an industrial cleaning process. Writing for herself and Sentelle, Judge Janice Rodgers Brown found that the regulation in question was ambiguous and deferred to the agency's interpretation. Kavanaugh disagreed, arguing that the "EPA's argument mangles the language of [its] 1985 regulations." He would have voided the agency enforcement action that relied on that interpretation.

Kavanaugh employed a pragmatic approach to administrative law to reach these outcomes. This approach was especially clear in an opinion concerning challenges to Obama-era Clean Air Act regulations. In *White Stallion Energy Center v. EPA*, in 2014, the majority upheld a regulation that imposed more stringent controls on mercury pollution from coal-fired power plants.[2] In dissent, Kavanaugh argued that the agency was obligated to consider compliance costs when determining whether it was "appropriate and necessary" to regulate these sources - its failure to do so was, in his eyes, fatal to the regulation.[3] After granting certiorari in the case, the Supreme Court in 2015 vindicated Kavanaugh's view in *Michigan v. E.P.A.* Justice Scalia, writing for a 5-4 majority, held that the statutory language "appropriate and necessary" required that the agency consider costs at the earliest stage in its rulemaking.[4]

## B.  Election Law

Kavanagh's perspective on the relationship between campaign finance reform and the First Amendment can be gleaned from an opinion he wrote in *RNC v. FEC*.[5] Before delving into *RNC*, though, some basic details on the Supreme Court's complex rulings on campaign finance would be useful. In *Buckley v. Valeo*, the Supreme Court held that monetary contributions to a political campaign, and expenditures either by the campaign or on behalf of the campaign constituted speech protected by the First Amendment.[6] Thus, under this regime, in order to limit campaign contributions and expenditures, the federal government must point to a substantial government interest. The Supreme Court recognized one such interest in the government's goal of combating 'quid pro quo' corruption or the appearance of such corruption in politics. The court, though, has consistently afforded stronger First Amendment protection to expenditures by individuals or groups as compared to contributions to candidates or their political parties because of the court's view that contributions raise a greater risk of quid pro quo corruption.

---

[1] *Howmet Corp. v. E.P.A.*, 614 F.3d 544 (D.C. Cir. 2010).
[2] *White Stallion Energy Center v. E.P.A.*, 748 F.3d 1222 (D.C. Cir.2014)
[3] For more, see *EME Homer City Generation v. EPA*; 696 F.3d 7 (D.C. Cir.2012) (finding that the EPA could not issue Federal Implementation Plans (FIP) without giving States an initial opportunity to implement the required reductions through State Implementation Plans (SIP) or SIP revisions).
[4] *Michigan v. E.P.A.*, 576 U.S. ___ (2015).
[5] *RNC v. FEC*, 698 F.Supp.2d 150 (D.C. Cir. 2010).
[6] *Buckley v. Valeo*, 424 U.S. 1 (1976).

*RNC* involved one subset of this complex matrix of statutes and regulations governing the use of money in political campaigns – contributions to political parties. In the terminology frequently adopted by the courts, campaign contributions made directly to a candidate in support of their election are referred to as 'hard money' while contributions to organizations for general election activities are termed 'soft money.' Before BCRA was enacted, these soft money contributions to political campaigns were unrestricted. Because some of these expenditures could have an indirect effect on federal elections, Congress enacted BCRA to cure a potential loophole that would allow contributions to a political party but bypass the per-individual hard-money restrictions. BCRA imposed annual restrictions on the amount a national political party could receive from an individual donor regardless of how the party sought to use the money. It also limited how state and local political parties used contributions in certain circumstances that could have an impact on a federal election, such as certain get-out-the-vote or issue-advocacy campaigns. In 2003, the Supreme Court upheld BCRA's limitations against a facial attack in *McConnell v. FEC*.[7] In *RNC*, however, the Republican National Committee, as well as the California Republican Party and local Republican parties brought an as-applied challenge to these same limits. The parties alleged that they sought to raise unlimited soft money only for state and local activities that would have little if no connection to federal elections. In other words, the parties promised not to provide any benefits to soft-money donors beyond the benefits afforded to hard-money donors who contributed the maximum allowed by the statute.

The three judge panel here upheld the restrictions even in light of these promises by the political parties. It should be noted, though, that Kavanagh's opinion rightfully expressed hostility towards the Supreme Court's views in *McConnell*. It questioned the theory that these limits could be justified simply by the close connection between political parties and candidates or officeholders, and more than once explained that its hands were tied by binding Supreme Court precedent. Kavanagh's take on the matter can also be gleaned from another opinion he wrote while sitting on the D.C. Circuit in a case called *Emily's List v. FEC*. That case involved a challenge to FEC regulations that limited how nonprofit organizations could spend and solicit money towards advancing their organization's goals. The court concluded that nonprofits could make unlimited expenditures from their soft money accounts but that direct contributions from an organization to campaigns or political parties could be restricted to hard-money contributions only. Importantly, it distinguished the limits upheld by *McConnell* on political parties as unique to those entities and not applicable to nonprofit organizations because there was no evidence in the record that non-profits have sole access to federal candidates or that a close connection between candidates and non-profits existed.[8]

## C. <u>Healthcare</u>

Kavanaugh's history with Obamacare, however, is more modest. Kavanaugh's dissent in *Seven-Sky v. Holder*, a 2011 appeal to the D.C. Circuit, is of particular interest here. That case concerned the constitutionality of the individual mandate. There, a panel majority consisting of Larry Silberman and Harry Edwards upheld the statute against a constitutional challenge. Kavanaugh, though, would not have reached the merits on the ground that the court lacked jurisdiction to hear the case because the Anti-Injunction Act barred any pre-enforcement lawsuit challenging the assessment or collection of a tax. The dissent is thorough taking 33 pages of the Federal Reporter. The dissent explains how the individual mandate was

---

[7] *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003).

[8] For more, see *Bluman v. FEC*, 800 F.Supp.2d 281 (D.C. Cir.2011) (upholding provisions of BCRA that banned certain contributions and expenditures by foreign citizens in U.S. elections); *Independent Institute v. FEC*, 816 F.3d 113 (D.C. Cir.2016) (finding an as-applied constitutional challenge to campaign disclosure rules for certain non-profit organizations sufficient to justify review by a three judge panel because the claims were not wholly insubstantial); *Pursuing America's Greatness v. FEC*, 831 F.3d 500 (D.C. Cir.2016) (finding that plaintiffs had a substantial likelihood of success on the merits in challenge to FEC limits on use of candidate names by unauthorized political committees); *Wagner v. FEC*, 717 F.3d 1007 (D.C.Cir. 2013) (upholding restrictions on contributions by government contractors); *SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir.2010) (striking down individual contribution limits to independent expenditure-only groups but upholding reporting requirements on such organizations).

enforced by the IRS and presented various counter-arguments to the majority's statutory claims. In the last part of his opinion, Kavanaugh signaled that the individual mandate might well be constitutional under Congress' taxing power. The dissent is significant for two reasons. First, the opinion suggests that if Kavanaugh had reached the merits that he would have decided the issue in the same way that Chief Justice Roberts did in *NFIB v. Sebelius* – opting to uphold the individual mandate under the taxing clause. Second, the opinion suggests that Kavanaugh is mindful of the counter-majoritarian difficulty and is willing to use the passive virtues to avoid politically fraught decisions.[9]

## D.  Federal Indian Law

Judge Kavanagh's record on Native American legal issues is rather sparse. Kavanagh, however, did write a majority opinion for the D.C. Circuit in one case – *Vann v. United States Department of the Interior* – that could provide some insight.[10] Before the Civil War, members of the Cherokee Nation had slaves. Those slaves were freed in 1866 under a treaty negotiated with the United States, which guaranteed, among other things, that the freedwomen and men would have "all the rights of native Cherokees" in perpetuity. Those rights included the right to tribal membership and the right to vote in tribal elections. At some point, though, the tribe concluded that these individuals were no longer members and could not vote in tribal elections. After the individuals descended from these bondswomen and men brought suit to enforce the treaty, the tribe retorted that neither it, nor its Principal Chief, could be subjected to suit because of sovereign immunity. In rejecting this claim, Kavanagh argued that the *Ex Parte Young* doctrine – which allows suits for declaratory and injunctive relief against government officials in their official capacities despite the sovereign immunity of the government itself – permitted the cause to proceed. While it would be improper to infer much from this short opinion, at the very least *Vann* does disclose Kavanagh's willingness to apply legal principles neutrally in this context.

**Texas Appellate Advocate**

From: **Jody Sanders** <jody.sanders@kellyhart.com>
Date: Monday, December 10, 2018
Subject: Texas Appellate Advocate
To: Habib Olapade <habibyale@gmail.com>


Many thanks!


Sent from VMware Boxer

On Dec 10, 2018 7:07 PM, Habib Olapade <habibyale@gmail.com> wrote:

No problem, Jody! Here is my edited copy. Thanks!

On Mon, Dec 3, 2018 at 1:17 PM Jody Sanders <jody.sanders@kellyhart.com> wrote:

If you have time, you can take this one.  Don't worry about the table of contents or authorities, those won't be included in the published version.  Thanks!

---

[9] For more, see *University of Texas M.D. Anderson Cancer Center v. Sebelius*, 650 F.3d 685 (D.C. Cir.2011) (hospital had to be given opportunity to show net financial impact of new drugs).
[10] *Vann v. United States Department of the Interior*, 701 F.3d 927 (D.C. Cir.2012).

**From:** Habib Olapade [mailto:habibyale@gmail.com]
**Sent:** Monday, December 03, 2018 11:22 AM
**To:** Jody Sanders
**Subject:** Texas Appellate Advocate

Hi Jody!

I hope this note finds you swell and that you are having a delightful day! Would you happen to have any other article drafts for the appellate advocate that you would prefer for me to go over to save you time? Please advise. Thanks!

Best,

Habib

**Asian-American Legal Defense Fund**

From: **Judy Lei** <jlei@aaldef.org>
Date: Wednesday, October 10, 2018
Subject: RE: AALDEF Exit Poll Project follow-up
To: Habib Olapade <habibyale@gmail.com>

Hi Habib,

Confirmed and see you there!

Cheers,

Judy

Judy Lei

Voting Rights Organizer

jlei@aaldef.org

212.966.5932 x206

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
99 Hudson Street, 12th FL, New York, NY 10013-2815
Defending the civil rights of Asian Americans since 1974
tel: 212.966.5932  fax: 212.966.4303  www.aaldef.org
Facebook: bit.ly/aaldef  Twitter: @aaldef
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Confidentiality Note: The information transmitted in this email, including

attachments, is intended only for use by the individual or entity named

above and may contain legally privileged and/or confidential information.

If you are not the intended recipient, you are hereby notified that any

retention, distribution or copying of this email, and any attachments thereto,

is strictly prohibited.  If you received this email in error, please notify me

immediately at 212.966.5932 and permanently delete the original and any

copies of this email. Thank you.

**From:** Habib Olapade [mailto:habibyale@gmail.com]
**Sent:** Saturday, October 06, 2018 3:53 PM
**To:** Judy Lei
**Subject:** Re: AALDEF Exit Poll Project follow-up


Thanks, Judy! Can I RSVP for the Weil training on October 24th? Please advise. Thanks!

On Wed, Oct 3, 2018 at 5:08 PM Judy Lei <jlei@aaldef.org> wrote:

Dear Habib,


Thank you so much for signing up to become an AALDEF Exit Poll Volunteer on Election Day. You signed up when our training locations were still being finalized. I noticed you're from Yale Law School, and we do not have any training sessions in Connecticut. However, we do currently have six trainings being offered in NY.


**Would you like to attend any training sessions in NYC?**


**NEW YORK**
**Tuesday, October 9**

Shearman & Sterling LLP (CLE Training)
599 Lexington Ave, Rm TBD, Lunch, 12:00 PM

**Wednesday, October 17**

Columbia Law School APALSA

435 W 116th St, New York, NY 10027 – Exact location TBD

**Tuesday, October 23**
New York University Law School APALSA

NYU Law School, Furman Hall, 245 Sullivan Street (not open to the public)

Cleary Gottlieb LLP (CLE Training)
One Liberty Plaza, Rm. 3902, Dinner, 6:00 PM

**Wednesday, October 24**
Weil Gotshal LLP (CLE Training)
767 Fifth Avenue, Dinner, 6:00 PM

**Thursday, October 25**
Milbank, Tweed, Hadley & McCloy LLP (CLE Training)
28 Liberty St, Lunch, 12:30 PM

Many thanks,

Judy

Judy Lei

Voting Rights Organizer

jlei@aaldef.org

212.966.5932 x206

*************************************************************************
ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND
99 Hudson Street, 12th FL, New York, NY 10013-2815

Defending the civil rights of Asian Americans since 1974
tel: 212.966.5932  fax: 212.966.4303  www.aaldef.org
Facebook: bit.ly/aaldef  Twitter: @aaldef
*******************************************************************************

Confidentiality Note: The information transmitted in this email, including

attachments, is intended only for use by the individual or entity named

above and may contain legally privileged and/or confidential information.

If you are not the intended recipient, you are hereby notified that any

retention, distribution or copying of this email, and any attachments thereto,

is strictly prohibited.  If you received this email in error, please notify me

immediately at 212.966.5932 and permanently delete the original and any

copies of this email. Thank you.

**International Refugee Assistance Project**

From: **Brown, Rachel** <rachel.brown@yale.edu>
Date: Monday, September 17, 2018
Subject: [IRAP] Slides from Final Training
To: "Lalwani, Nikita" <nikita.lalwani@yale.edu>, "Brito, Pilar" <pilar.brito@yale.edu>


Hi All ,


Thanks for attending the final IRAP session today! And for bearing with us through all of the trainings! We are so grateful for your time and commitment to IRAP. Attached are the slides from today's presentation and be sure to send in your applications and client confidentiality forms.


Best,
Rachel

**From:** Olapade, Habib
**Sent:** Sunday, September 16, 2018 7:18:14 PM
**To:** Brito, Pilar
**Subject:** IRAP Docs


Hi Pilar!

I hope this note finds you well and that you are having a delightful Sunday evening! Here are the IRAP docs you requested. Thanks!


Stay chillin,


Habib

**Black Law Students Association Pre-Law Mentoring**

 From: **Harold Ekeh** <harold.ekeh@yale.edu>
Date: Sunday, December 9, 2018
Subject: Re: Thank You
To: habibyale@gmail.com
Cc: sorenjschmidt@gmail.com


Thanks for the introduction Habib!


Soren, it is great to meet you. I would love to talk over coffee before the winter break if you are still around/available. I am free on the 14th and 15th anytime during the day, and on other days during the week. If not, we could hop on a quick phone call at your convenience. Let me know what would work best. Looking forward to speaking with you!


Best,


Harold Ekeh

Davenport | Yale '19

EVC

On Sat, Dec 8, 2018 at 12:26 PM Habib Olapade <habibyale@gmail.com> wrote:

Wonderful, Harold! I'm looping in Soren Schmidt, a good law school friend of mine who also happened to work at CLS over the summer and hopefully he can answer your questions about the organization. Soren, thanks so much for offering to speak with Harold!

On Fri, Dec 7, 2018 at 11:19 PM Harold Ekeh <harold.ekeh@yale.edu> wrote:

Hi Habib,

I hope your weekend is going well! Just wanted to say thank you for taking the time to meet with me yesterday. I really appreciate your insights into the application process and the wide variety of post-graduate opportunities available to me. Whenever you get a chance, I would love to connect with your contact at the Campaign Legal Center, and if you could share the resources for Torts, Civ Pro, and Contracts, I would appreciate it! I will be sure to keep you posted on my progress and reach out to you with any questions I have. Thanks again and I hope you have a great break!

Yours,

Harold Ekeh

Davenport | Yale '19

**Stanford University Alumni Interview Program**

From: **Stanford OVAL** <noreply@stanford.edu>
Date: Wednesday, February 6, 2019
Subject: New OVAL RD Interview Assignment - Action Required
To: Habib Olapade <habibyale@gmail.com>

Greetings Habib,

You have received a new interview assignment for applicant **Seto**. Please log in to the **MyOVAL portal** as soon as possible and follow the instructions to accept this interview assignment and view the applicant's contact information.

The deadline for submitting Regular Decision (RD) interview reports is ***Tuesday, February 19 at 5:00 pm (PST);*** however, we appreciate receiving reports earlier.

**Reminder:** If you have *any* pre-existing relationship with an assigned candidate or his/her family, or you cannot conduct an interview for any reason, please immediately email your OVAL leadership team (whose contact information is displayed at the bottom of your **My OVAL Profile**) so the applicant can be reassigned if possible.

On behalf of everyone at the Office of Undergraduate Admission, thank you!

Sincerely,

Your Stanford OVAL Team

**New Haven Book Bank Volunteering**

From: **Victoria Smith** <vsmith@newhavenreads.org>
Date: Thursday, February 7, 2019
Subject: Re: Book Bank Memo for the Month of February
To: Habib Olapade <habibyale@gmail.com>

Hi Habib,

Let me check the calendar and get back to you. February 15 is a Friday. Would you want to switch your day to Friday permanently?

On Mon, Feb 4, 2019, 3:58 PM Habib Olapade <habibyale@gmail.com> wrote:

Hi Victoria!

I hope this note finds you swell and that you are having a delightful day! Can I come in to volunteer on February 15th from 12-2? Please advise. Thanks!

Best,

Habib

**Asylum Seeker Project**

From: **Habib Olapade** <habibyale@gmail.com>
Date: Wednesday, October 31, 2018
Subject: [YLS ASAP 18-19] Research memos for BIA appeal
To: Liz Willis <liz.willis@asylumadvocacy.org>

Of course!

On Fri, Oct 26, 2018 at 2:43 PM Liz Willis <liz.willis@asylumadvocacy.org> wrote:

I will send an email with additional details later today, if that's okay!

On Fri, Oct 26, 2018 at 2:29 PM Habib Olapade <habibyale@gmail.com> wrote:

Hi Liz!

I hope this note finds you well! I was recently assigned to write a memo on the limits of IJ authority and was wondering if you could send along the amicus briefs for the project? Please advise. Thanks!

Best,

Habib

On Friday, October 26, 2018, Liz Willis <liz.willis@asylumadvocacy.org> wrote:

Hi Habib,

Great, I will send a separate email with additional details!

Thank you!

Liz