Exhibit J

## Delaware Supreme Court Procedure - Part I

Published on December 10, 2018

Edit article

View stats

 Habib OlapadeStatus is online

Habib Olapade

Student at Yale Law School

217 articles

This brief practice notice provides an introduction to injunctions and stays pending appeal, corporate disclosures, and briefing requirements in the Delaware Supreme Court for corporate appellate litigators.


I. Injunctions and Stays Pending Appeal


When a party appeals from an interlocutory or final judgment granting, dissolving, or denying an injunction, the Chancery Court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal. The Chancery Court may impose terms it considers proper for the security of the rights of the adverse party, including requiring the appellant to post a bond. Del. Ch. Ct. R. 62(c). To obtain a stay pending appeal, the appellant must 'give sufficient security,' often in the form of a supersedeas bond. Del. Const. art. IV, §24. A party seeking a stay must first file the motion with the trial court. Del. Sup. Ct. R. 32(a). The trial court has discretion to approve as sufficient the 'type, amount, and form of the security.' Del. Sup. Ct. R. 32(c). On motion from either party, the Supreme Court then may either affirm or review the discretion of the lower court granting or denying the stay, including its decision to approve or disapprove the collateral as sufficient security. Homestore, Inc. v. Tafeen, 886 A.2d 502 (Del. 2005). In reviewing a lower court's grant or denial of a motion to stay pending appeal, the Supreme Court applies a four-prong test requiring the court to: (1) make a preliminary assessment of the likelihood of success on the merits of the appeal, (2) assess whether the petitioner will suffer irreparable injury if the stay is not granted, (3) assess whether any other interested party will suffer substantial harm if the stay is granted, and (4) determine whether the public interest will be harmed if the stay is granted. Kirpat, Inc. v. Del. Alcoholic Beverage Control Comm'n, 741 A.2d 356, 357 (Del. 1998). The Supreme Court rules provide further guidance concerning the type, amount, and form of security required and even include a sample supersedeas bond. Del. Sup. Ct. R. 32(c)(i)-(iii); Del. Sup. Ct. R. Form J.


II. Corporate Disclosures and Briefing Requirements

Each party litigating before the Delaware Supreme Court must file a disclosure of corporate affiliations and financial interest: either (1) within 15 days of the docketing of the notice of appeal or (2) concurrently with the filing of a motion or other document seeking to expedite the proceedings. Del. Sup. Ct. R. 7(g). Sample stock forms are available from the Supreme Court's website. Del. Sup. Ct. R. Form P. The appellant's opening brief must include a copy of the order or orders being appealed and any separate written or transcribed rationale of the trial court. The appellant must include these items at the end of the brief and not in the appendix. Del. Sup. Ct. R. 14(b)(vii). Additionally, the appellant must serve and file an appendix with its brief. The appendix must include: a table of contents, the trial court docket entries, the portions of the trial transcript necessary to convey a fair and accurate account of the context in which the claim of error occurred, a transcript of all evidence relevant to the challenged finding or conclusion, and the other parts of the record material to the questions presented. Del. Sup. Ct. R. 14(e). Alternatively, the parties may agree to a joint appendix. Del. Sup. Ct. R. 14(f). The timing for filing the opening, answering, and reply briefs are as follows: the appellant must serve and file its opening brief and appendix no later than 45 days after the notice of appeal if there is no transcript or the parties have not ordered or designated any further transcripts; or 30 days after filing of the record in all other cases. The appellee must serve and file its answering brief no later than 30 days after service of appellant's brief and appendix and, the appellant may serve and file a reply brief no later than 15 days after service of appellee's brief and appendix. Del. Sup. Ct. R. 15(a). If the appellant's reply brief includes matter answering a cross-appeal, the appellant must serve and file the reply brief and reply appendix no later than 30 days after service of appellee's brief and appendix. Moreover, the appellee may serve and file a reply brief directed to those cross-appeal matters no later than ten days after service of the appellant's reply brief. Del. Sup. Ct. R. 15(a)(iii), (a)(v).

III. Word and Page Limits

Without leave of the Supreme Court, opening or answering briefs must not exceed 10,000 words. Reply briefs must not exceed 5,500 words. Del. Sup. Ct. R. 14(d). If there is a cross-appeal, the appellee's combined opening and answering brief on cross-appeal must not exceed 14,000 words, the appellant's reply brief must not exceed 10,000 words, and the appellee's reply brief must not exceed 5,500 words. Del Sup. Ct. R. 14(d), 15(v). Word limits do not include the front cover, the table of contents, the table of citations, the signature block, or any footer that meets the criteria specified in Delaware Supreme Court Rule 10.2(5). Del. Sup. Ct. R. 14(d).

**Trouble in Pennsylvania with the Noerr-Pennington Doctrine**

Published on October 25, 2018

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Don't count your chicks until they hatch. For proof, look no further than the story of Brian O'Neill, a Pennsylvania real estate dealer. In 2005, O'Neill purchased property in Chester County's East Whiteland Township. The visual scene, though, was less than pristine. Indeed, from 1950 to 2000, several owners and operators manufactured stainless steel tubes on the land releasing significant amounts of toxic chlorinated solvents into the locality's groundwater. When O'Neill took an entrepreneurial chance on the plot, however, Pennsylvania decided to cut him a deal: in exchange for O'Neill's agreement to partially detoxify the soil, Quaker State officials would refrain from arraigning him before the bar. O'Neill's wager appeared to have paid off in 2014 when East Whiteland announced its intent to rezone his plot into a residential area and encouraged him to construct a 228 residence townhome on the premises.

Enter Maya Van Rossum and her proprietorship – Delaware Riverkeeper Network. Delaware Riverkeeper, one of the few parties that stood to lose from this welfare maximizing arrangement, took to its soapbox to stop the deal from going through. During the rezoning campaign, the firm published false broadsides warning Pennsylvanians that O'Neill sought to "expose [them] to more toxins and put 200+ homes on the contaminated land!" And that O'Neill would walk away with "$1 million [of] our taxpayer money" in the process. After the referendum collapsed, O'Neill brought suit claiming that Delaware Riverkeeper's advocacy violated the Sherman Act. Delaware Riverkeeper, though, has denied liability retorting that the First Amendment guarantees it, and its agents, the right "to speak as [they] think" withdrawing the matter from the political process.[1]

The mere fact, however, that one can do something certainly doesn't mean that she or he ought to. Indeed, in the words of the great American novelist, Samuel Langhorne Clemens, "it is by the goodness of God that in our country we have those three unspeakably precious things: freedom of speech, freedom of conscience, and the prudence never to practice either of them." Placing this moral lesson to the side, though, there is a real question as to whether Delaware Riverkeeper's activities were constitutionally protected in the first place. The Noerr-Pennington doctrine which originated with the Supreme Court's holdings in Eastern Railroad Presidents Conference v. Noerr Motor Freight and United Mine Workers v. Pennington is particularly relevant here.[2] Under the Noerr-Pennington doctrine, an individual is immune from antitrust liability for exercising her First Amendment right to petition the government.[3] As a general matter, this exemption applies regardless of the defendant's motivation in waging their media campaigns. This interpretation of the Sherman Act is based on rather strong version of the constitutional avoidance doctrine cautioning the Court to "not lightly impute to Congress an intent to invade…freedoms protected by the Bill of Rights such as the right to petition." [4]

One caveat, though, to the Noerr-Pennington doctrine is the 'sham' exception which denies immunity to "illegal and reprehensible practices which may corrupt the…administrative and judicial process such as lobbying activity that is "ostensibly directed toward influencing governmental action that is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." In Professional Real Estate Investors v. Columbia Pictures, the Supreme Court adopted a two-part definition of sham antitrust litigation: first, it "must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" second, the litigant's subjective motivation must "conceal an attempt to interfere directly with the business relationship of a competitor…through the use of government process as opposed to the outcome of that process as an anticompetitive weapon."[5]

The Pennsylvania Superior Court's prior decision in Wawa Inc. v. Alexander Litwornia & Associates is on point here.[6] There, one of the appellant's competitors "enlisted defendants Litwornia in a scheme to distribute false and disparaging information to municipal authorities and community groups to generate opposition and a video tape containing false statements was disseminated to government bodies and citizen groups to foster resistance to appellant's proposed food market. In Wawa, the Court found that the proliferation of false information that severe traffic congestion, safety hazards, and fatalities would result from the food market's development was "aimed at interfering directly with the business relationship of a competitor" and that "this type of conduct translates into a sham of inaccurate information communicated to incite the public" and therefore, the Noerr-Pennington doctrine did not apply. As it was there, so it is here as Delaware Riverkeeper employed "a sham of inaccurate information communicated to incite" private citizens to oppose O'Neill's plan at the East Whiteland Township site. In furthering that goal, Delaware mirrored Wawa's conduct by participating in a concerted effort to spread "false and disparaging information to municipal authorities and community groups to generate opposition." The result? Where there's smoke, there may not be a fire.

[1] Whitney v. California, 274 U.S. 357, 375 (1927) (Brandeis J. concurring).

[2] 365 U.S. 127 (1961); 381 U.S. 657 (1965).

[3] David Meyer, A Standard for Tailoring Noerr-Pennington Immunity More Closely to the First Amendment Mandate, 95 Yale L.J. 823 (1985).

[4] Public Citizen v. U.S. Department of Justice, 491 U.S. 440, 465-66 (1989) ("when the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."); California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 612-13 (1972).

[5] Professional Real Estate Investors v. Columbia Pictures, 508 U.S. 49, 60-61 (1993).

[6] 817 A.2d 543 (Pa.Super 2003).

**Why the Justice Department's Decision to not Defend the ACA is Correct**

Published on July 7, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Earlier this year, Texas Attorney General Ken Paxton, seventeen other State Attorneys General serving with Republican Governors, Mississippi Governor Phil Bryant, Maine Governor Paul LePage, and two individuals filed a civil lawsuit against Health and Human Resources Secretary (and Yale Law alum) Alex Azar in the United States District Court for the North District of Texas' Forth Worth Division. The thirty-three page complaint, among other things, alleges that the Patient Protection and Affordable Care Act (popularly referred to as 'Obamacare') is now unconstitutional because of changes that the Trump Administration's Tax Cut and Jobs Act have made to the statute. Normally, whenever a federal statute's constitutionality is assailed in a District Court proceeding, the Justice Department's Civil or Criminal Appellate Division intervenes to defend the law. In a letter to House Speaker Paul Ryan, however, U.S. Attorney General Jeff Sessions announced that the Trump Administration will not defend the law – drawing criticism from several corners of the legal academy. A closer look at this situation, though, suggests that this criticism is unwarranted.

To see why this is so we must start with first principles: Article II Section III Clause Five of the U.S. Constitution provides that the President "shall take care that the laws be faithfully executed." While legal commentators have disagreed over the precise requirements that the Take Care Clause imposes on the President, all concede that the provision prevents the President from claiming a 'dispensing power' to cherry pick which laws she or he will enforce. On most occasions, the President adheres to the Take Care Clause by, inter alia, defending federal statutes in lawsuits and enforcing them against private and public actors. In law as in life, though, things are never quite this simple. For before [the President] enter[s] on the execution of [her] office," the Constitution also commands that she swear that she will "preserve, protect, and defend the Constitution." What happens, however, when the President wants to "take care that a law is…executed" and enforce an arguably unconstitutional statute but determines that she cannot because enforcement would violate her oath? That hypothetical captures the problems in this case.

One thing, though, is clear: in certain circumstances, the President may appropriately decline to enforce an unconstitutional statute. Take Myers v. United States (1926), for instance. There, the Supreme Court sustained President Wilson's position that a Reconstruction-Era statute preventing him from removing a postmaster was unconstitutional and, that the President's signing of the law precluded neither his administration nor subsequent administrations from assailing the statute. This position has been repeatedly reaffirmed in the Attorney General's Officially Reported Opinions, presidential signing statements, and subsequent Supreme Court cases involving congressional practices that intrude upon the President's constitutional powers. Moreover, in disputes between the President and either Congress or the Courts, it is particularly crucial that the President retain discretion to defend federal statutes because other litigants may be unable to challenge them.

This analysis leaves one critical question: on what basis did Attorney General Sessions and President Trump conclude that the federal government could not intervene in the Texas case? After all, the mere fact that the President can decline to defend an unconstitutional statute does not mean that Obamacare – in its current form – fits this description. This observation is significant because our republic is one of laws not women or men and, if a reasonable argument can be made in defense of President Obama's signature statute, the Attorney General's decision appears to be the product of force or will rather than judgment.

Here, we needn't fear. One of Obamacare's purposes was to increase the number of Americans covered by health insurance and decrease the cost of health care. To achieve this goal, the statute

contains an 'individual mandate' requiring most Americans to maintain "minimum essential" health insurance coverage. Individuals who did not comply with the mandate were forced to pay a penalty fee to the Federal Government. In NFIB v. Sebelius (2012), the Supreme Court held that this mandate would be unconstitutional but for the fact that the penalty fee was a constitutional exercise of Congress' power to "lay and collect taxes." While commentators disagreed on whether the Court did the nation a disservice or performed a Solomonic act of statesmanship, all agreed that the mandate's status as a tax was the only thing standing between the statute and history's dustbin. There matters stood until November 2016.

Enter Donald J. Trump and his team of gifted lawyers culled from the membership rolls of the Federalist Society. On December 22, 2017, the President signed into law the Tax Cuts and Jobs Act of 2017. This new legislation eliminated Obamacare's penalty fee, without eliminating the mandate itself. What remains, therefore, is the individual mandate, without any accompanying exercise of Congress's taxing power. Just like a prized Rembrandt or Rubens, which has been revealed to be the product of an unknown assistant, Obamacare stands a shadow of what it once was. The only difference is that the Rubens or Rembrandt may be left standing to trick the unwary viewer by the close of this year.

Skeptics might retort with two arguments. First, one might question whether federal courts should sit in on colluded controversies in which both the plaintiff and defendant agree that a statute is unconstitutional.  America's adversarial system is premised on vigorous advocacy designed to "sharpen the presentation of issues upon which the court[s] so largely depend for illumination of difficult constitutional questions." This illumination cannot occur if the litigants are bedfellows instead of jousters. Our skeptic's contention is unavailing, though, because both the House General Counsel and Senate Legal Adviser have the statutory authority to intervene in a suit and defend a federal statute on those rare occasions when the Attorney General determines that she cannot. The second objection, however, is far more serious: the Attorney General's client is "We the People" not the President, therefore, any directive from Trump to Sessions ought not to be heeded because it clashes with Justice Department norms that date back to the Watergate scandal. Under this line of argument, it matters not that President, and not the Attorney General, is electorally accountable; it matters not that the Attorney General serves at the pleasure of the President; nor does it matter that the Executive Branch is organized in a unitary nature with the President placed at its head.

Instead, all we are to care for, our skeptic lectures us, is that after John Mitchell and Richard Kleindienst, Nixon's two Attorneys General, were sentenced to prison for obstructing Congress' investigation of Watergate, Justice Department lawyers developed an unwritten tradition for ignoring presidential directives in decision-making and that the Carter and Ford Administrations endorsed these concessions to over-zealous Congresses notwithstanding the policy's constitutional shortcomings. There are two responses to this claim. First, Article II vests the President – not the people – with "the Executive Power." Since 1789, this grant, for good or ill, has been understood to vest her or him with the ability to fire officers whose position have been created through statute. While certain offices within the Justice Department such as the Solicitor General's office have developed needed neutrality norms that serve them well on a day-to-day basis, in our representative democracy, the buck stops on 1600, not 950, Pennsylvania Avenue. In the same manner that a general counsel serves a corporation's board of directors and regards the directors as her client even though the board is elected by the company's shareholders, so too does the Attorney General serve the President. Second, assuming that the President is not Mr. Session's client, there is still no reasonable claim that can be made in Obamacare's defense because Congress has removed the keystone from the arch.

**A Few Thoughts on the Engel Syria OLC Opinion**

Published on July 7, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Justice Department's Office of Legal Counsel has recently made headlines for the legal justification it provided in defense of President Trump's strikes in Syria. In particular, the Office and its head, Steven Engel, have come under fire from OLC alum Jack Goldsmith and his colleagues in academia for "articulat[ing] an extraordinarily broad conception of the president's authority to use military force abroad through air strikes without congressional authorization." While there is certainly a great deal of force to the Goldsmith critique, one question has gone unasked in this debate: ignoring the formidable justicability hurdles posed by Article III, to what extent should federal judges defer to the Engel opinion and its reasoning? While the Court itself has not confronted this issue head on, its cases suggest that little, if any deference, is due.

The Office of Legal Counsel's History

The Office of Legal Counsel's opinion writing obligation traces its origins to § 35 of the Judiciary Act of 1789. In addition to establishing the Office of the Attorney General, that provision made it her duty "to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned and to give [her] advice and opinion on questions of law when requested by the President of the United States." In contrast to the Secretaries of State, Treasury, and War, who were given a salary that would be large enough to sustain full-time employment, the Attorney General was given no clerical staff, no centralized power to coordinate the government's litigation, and diminished compensation as he was expected to litigate for the government on a part-time basis and use his position in government to recruit clients for his private practice. Indeed, President Washington reportedly used this carrot to attract Edmund Randolph to the post. The Office of Attorney General, however, apparently remained such an unattractive position that Theophilus Parson, Joseph Holt and others declined to serve in the post – even after they were nominated by the President and confirmed by the Senate.

There was good reason for this. Within a rather short period of time, the duties of the Office became overwhelming. Antebellum Congresses exacerbated the Attorney General's coordination problem by hiring private attorneys to conduct the government's litigation in lower courts (which was quite expensive) and appointing numerous solicitors "who served as specialists in the various [federal] departments" "leading to confusion over just what the law was and who was responsible for directing the legal affairs of the executive branch."

The 1870 Judiciary Act ended this confusion by creating the Justice Department and Office of the Solicitor General. The organic statute mandated that the occupant be "learned in the law" (to date, the SG is only federal official who is mandated to meet this requirement), represent the United States in front of the Supreme Court, and manage the government's litigation in lower federal and state courts. As Congressman Thomas Jenckes of Rhode Island explained, the Solicitor General was to be someone:

"of sufficient learning, ability, and experience that [she or he could] be sent to New Orleans or to New York, or into every court wherever the government has an interest in litigation, and there present the case of the United States as it should be presented."

And present he did. Benjamin Helm Bristow, the first Solicitor General, was an exceptional lawyer, loyal Republican, and ardent defender of African-American civil rights. Before his appointment as the tenth justice, he was a United States Attorney in Kentucky where he aggressively prosecuted Klansmen. President Grant felt that Bristow was the right man for the job – he was committed to enforcing the Civil War Amendments and the legislation implementing their provisions with broad legal theories that would allow the national government to target public and private discrimination. Bristow was very successful in federal district and appellate courts at convincing judges to accept his cavalier positions.

This initial experiment with specialization, though, bred more. During the Roaring Twenties, for instance, Solicitor General William Mitchell delegated the OSG's opinion rendering function to a specialized assistant, whose position was subject to presidential nomination and senate confirmation in 1933. This state of affairs did not last long, however. In 1950, the Eighty-First Congress shifted the assistant solicitor's duties to the newly created Executive Adjudications Division, which was subsequently replaced during the Eisenhower Administration with the modern Office of Legal Counsel by Attorney General Herbert Brownell. For the purposes of this comment, the OLC's composition and internal operating procedures are also relevant. From 1953 until 1976, the Office's staffing procedures were quite, but not exactly, similar to the OSG's current practice: only the head Assistant Attorney General and one deputy were political appointees. The other staffers were career civil servants who could draw on a large reservoir of institutional memory to assist in bill commenting, oral advice delivery, and opinion writing and, resist political pressure to approve unconstitutional executive programs. Things have changed. The current OLC staff is composed largely of uncomfortably young 'Attorney-Advisors' boasting plum feeder clerkships and appellate fellowships who move on to academia or more coveted government positions after working in the Office for two or three years. As a result, in the words of Yale Law School Professor Bruce Ackerman, the OLC is long on raw legal talent and faith in their President's cause but short on institutional memory.

With one rather minor exception involving the military, there is no formal requirement that executive agencies submit legal questions to the OLC. The Office itself, however, has placed a few limits on its opinion-rendering function. First, the OLC will not provide advisory opinions on matters that have not actually arisen in the administration of an executive department or issues that are currently being litigated in the courts. Second, the OLC will not provide a written opinion to a requesting agency, with the exception of the White House Counsel's Office, unless the officials agree to abide by its final conclusion. The President himself has bolstered this limit with Executive Order 2877, which provides that "any opinion or ruling by the Attorney General upon any question of law arising in any department, executive bureau, agency or office shall be treated as binding upon all departments, bureaus or offices therewith concerned." Third, OLC disfavors rendering oral advice on major matters opting for a formalized writing process instead. Fourth, like any other appellate court, OLC requires agencies seeking to resolve a legal dispute internally within the executive branch to submit their detailed positions in written form to the office. Indeed, Executive Order 12,146 "encourages" all executive agencies to submit legal disputes to the Attorney General, and requires executive agencies "whose heads serve at the pleasure of the President" to submit such disputes to the Attorney General "prior to proceeding in any court, except where there is specific statutory vesting of responsibility for a resolution elsewhere." While initial opinion drafts are prepared by Attorney-Advisers, on most occasions, multiple levels of review ensure that the final product is polished and well-reasoned. Given the OLC's peculiar staffing patterns and operating procedures , administrative law scholars have developed two theories to help explain its actions - the neutral expositor model and the advocate model.

The 'Neutral Expositor' Model

Some OLC alumni such as former Assistant Attorney General Randolph Moss have endorsed the neutral expositor model. Under this theory, the OLC's advising function and means of existing within the executive branch can create a conflict of interest that jeopardizes the objectivity of the appointed attorneys running the agency. On the one hand, the President swears to "take care that the laws be faithfully executed." In the process of executing the laws, the President must interpret them as objectively and accurately as possible. Under this 'neutral model,' OLC attorneys must strive to render advice that reflects their honest judgment of what the law requires – even if that judgment conflicts with political expediency.

This conception of the Attorney General's advice-rendering function has deep roots and dates back to Caleb Cushing's 1854 opinion to President Franklin Pierce on the Office and Duties of the Attorney General. In that opinion, Cushing opined that his statutory obligation to provide advice on legal matters was "quasi-judicial" as he did not consider his role to be analogous to a [private] "counsel giving advice to the Government." Indeed. in Cushing's opinion:

"In the discharge of the [statutory duty to provide legal advice and opinions], . . . the action of the Attorney General is quasi-judicial. H[er] opinions officially define the law, in a multitude of cases, where h[er] decision is in practice final and conclusive,--not only as respects the action of public officers in administrative matters, who are thus relieved from the responsibility which would otherwise attach to their acts,--but also in questions of private right, inasmuch as parties, having concerns with the Government, possess in general no means of bringing a controverted matter before the courts of law, and can obtain a purely legal decision of the controversy, as distinguished from an administrative one, only by reference to the Attorney General."

In support of this position, it is often argued that the OLC has an incentive to find and argue in support of its best view of the law because executive agencies do not have to solicit advice from the OLC but do so voluntarily because the branch has a reputation for producing work that is fair, neutral, and scholarly and, can use the OLC's opinions to deflect criticism and provide an imprimatur of legal legitimacy or its controversial actions. Given that most agencies already employ a general counsel capable of marshaling a bouillabaisse of arguments to support a proposed course of action and that an agency's general counsel is more accessible than an OLC attorney, most executive officials who turn to the OLC do so in pursuit of impartial legal advice. This reputation for imparity, moreover, would be sullied if OLC attorney-advisers begin issuing opinions that employ every colorable argument to support executive action.

B. The 'Advocate' Model

Other executive branch scholars such as Northwestern Law Professor, John McGinnis have adopted an advocate model in explaining the office"s behavior. Under this approach, the relationship between OLC and the President is somewhat analogous to the relationship between a private attorney and client. Under this 'advocate model,' solicited OLC attorney-advisers should offer any colorable argument to justify executive action notwithstanding the proposal's actual legal merits. Should the matter end up in court, the argument runs, the adversarial process will allow judges to properly resolve the issue. Here, in a similar vein to Holmes' infamous "bad [woman or] man, who care[d] only for the material consequences which [legal] knowledge enable[d] him to predict," the President resorts to her lawyers only for "a prophecy that if [s]he does certain things [s]he will be subjected to disagreeable consequences." Despite the simplicity and appeal of this position, the OLC's unique circumstances highly suggest that Article III Courts owe its opinions little, if any deference, in the adjudicative process. To see why this is so, a brief overview of the Court's deference doctrines in the administrative law context is in order.

II. Degrees of Deference in Administrative Law

Chevron Deference

In Chevron USA, Inc. v. Natural Resources Defense Council, Inc., the Supreme Court held that generally, courts must accept an agency's reasonable interpretation of the ambiguous terms of a statute that the agency administers. In deciding whether to accord Chevron deference to an agency's interpretation of a given statute, courts proceed in two steps:

"First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."

If Congress has not spoken to the precise question at issue, the Chevron analysis proceeds to step two:

"if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."

At Chevron step two, courts scrutinize the reasonableness of the agency's construction of the statute. In determining the boundary of "permissible" interpretations, courts should use all of the "traditional tools of statutory construction."

Mead Deference

The Chevron, framework, however, does not apply to all agency constructions of a statute that an agency administers. In United States v. Mead Corporation, for instance, the Supreme Court explained that "administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." According to the Court, "delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent."

Thus, the question that determines whether the Chevron framework applies at all — sometimes referred to as "Chevron step zero" by administrative law scholars — is whether the agency interpretation at issue is the product of an exercise of law-making authority that has been delegated to the agency by Congress. In other words, some agency interpretations may not trigger the Chevron two step framework, because the agency may be unable to show "that [its] interpretation claiming deference was promulgated in the exercise of [law-making] authority."

Where agency interpretations have been promulgated following notice-and-comment rulemaking or through precedential opinions,the Chevron two-step framework will apply. The analysis, though, becomes more complex once one considers agency interpretations that are not the product of notice-and-comment rulemaking or were not announced in published opinions.

In Barnhart v. Walton, for instance, the Supreme Court explicitly rejected a bright-line rule that would have foreclosed Chevron deference for agency interpretations that were not the product of the notice-and-comment rulemaking process. According to the Barnhart Court, whether Chevron deference applied to these less formal agency interpretations depended on "the interpretive method used and the nature of the question at issue." Under Barnhart, "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency ha[d] given the question over a long period of time" determined whether courts should afford the agency Chevron deference.

C. Auer Deference

An exception to this deferential standard of review, often called Auer deference, provides that when an agency regulation merely repeats the words of the statute without elaboration on a particular point. Here, when the agency simply 'parrots' the statute's text in promulgating a regulation, the appropriate level of deference is the level the agency would receive when interpreting the statute, which is Chevron or Skidmore deference (see Part III.C below), depending on the circumstances. Put differently, an agency does not receive heightened deference when it simply restates the language of the statute in a regulation and then interprets its own regulation.

D. Skidmore Deference

Of course, when a court concludes in a particular case that the Chevron framework does not apply to an agency's interpretation of the law at issue, the court typically will consider the matter under the less deferential Skidmore standard. Under Skidmore, "an agency's interpretation is entitled to respect only to the extent it has the 'power to persuade" and, the weight granted to "a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."

IV. Application to the Office of Legal Counsel

The Office of Legal Counsel (OLC) does not fit into the Court's administrative law framework neatly. The OLC is a unique agency because its primary task is to resolve legal disputes between executive agencies. The OLC, in other words, functions as a quasi-court that is distinct from run-of-the-mill agency arbitration boards and adjudicatory panels because there is no clear statutory provision that permits judicial review of OLC opinions. OLC staff's professional qualifications

reflect the office's institutional design. While a plurality of OLC attorney-advisors have impressive academic credentials, clerkship experience, and a deep understanding of the Supreme Court's separation-of-powers jurisprudence, OLC attorneys resemble federal judges in the sense that they are generalists and do not usually have specialized technocratic or subject area knowledge of a particular regulatory domain. Therefore, in comparison to other independent regulatory agencies such as the EPA or SEC, the case for deference to OLC opinions is rather weak because, all things being equal, a judge's assertion as to what a given statutory provision means is just as, if not more informed, as an OLC attorney's conjecture.

Moreover, as NYU Law Dean, Trevor Morrison has documented, while office rightly vigorously defends executive prerogatives against congressional usurpation, in some circumstances the legal basis for the executive's position has been questionable at best. In the past fifty years, for instance, OLC attorney-advisers have authorized: the kidnapping of foreign nationals in clear contravention of international law, recess appointments within a two-day period between senate pro forma sessions, non-compliance with reporting requirements in the War Powers Act – even in conflicts that last longer than 60 days, warrantless wiretapping of some domestic telephone and email conversations in clear violation of the Foreign Intelligence Surveillance Act (FISA) and, executive refusal to comply with judicial summons to answer an indictment alleging criminal contempt of Congress.

While these instances may not be entirely representative of the OLC's work, they do suggest that the Assistant Attorney General in charge of OLC can cave to political pressure when the White House needs legal support for a policy position. But, even assuming that the OLC's unusual structure and pro-executive proclivity, has no bearing on whether courts should defer to its opinions, the OLC opinions lack the staying power and consistency to warrant judicial deference.

Courts defer to consistent agency positions for two reasons. First, an agency's maintenance of a consistent position suggests that it is not manipulating its interpretive discretion for arbitrary ends. Second, in general, courts often defer to consistent agency positions because is easier for private parties to comply with stable policies. An agency can demonstrate the consistency of its position by, among other things, showing that its current position is consistent with past positions or, that a new position is unlikely to change in the future. OLC can do neither. As a preliminary matter, the OLC does not disclose certain opinions containing classified government information so a judge may not have the information needed to decide if a position is consistent. Moreover, OLC opinions are often delivered orally so attorney-advisors can dodge compliance with the Freedom of Information Act. Finally, as the torture memo saga has made clear, OLC attorney-advisors generally do not hesitate to overturn past opinions whenever enough pressure has been put on them from superiors notwithstanding the Office's re-commitment to stare decisis after David Barron's tenure. On balance, this skepticism is a good thing. While OLC may have the final word within the executive branch - subject of course to the Attorney General and President's oversight, our

system of checks and balances requires the courts to take a second look in actual cases and controversies.

**New Mexico State Court Appeals - Part II**

Published on June 30, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In New Mexico, a party may appeal as of right: final judgments or decisions, interlocutory orders or decisions which practically decide the merits of the action, final orders after entry of a judgment which affect substantial rights. (NMSA 1978, § 39-3-2.) A judgment is generally final if all issues of law and fact are determined and the trial court disposes of the case to the fullest extent possible (B.L. Goldberg & Assocs. v. Uptown, Inc., 1985-NMSC-084, 705 P.2d 683, 684 (N.M. 1985)). However, New Mexico courts will sometimes look to the practical substance of the judgment, rather than its technical form, to determine whether a judgment is final (Kelly Inn No. 102, Inc. v. Kapnison, 1992-NMSC-005, 824 P.2d 1033, 1038 (N.M. 1992)). A district court may also direct entry of a final judgment as to one or more, but fewer than all, claims or parties, when: either: an action presents more than one claim for relief; or multiple parties are involved. (NMRA 1-054.)

Parties also have an express right of appeal from: special statutory proceedings, civil contempt judgments, child custody orders, child abuse and neglect orders, and specified orders and final judgments regarding arbitration matters. See also NMRA 1-023(F) and 12-203.1; Salcido v. Farmers Ins. Exch., 2004-NMCA-006, ¶ 11, 134 N.M. 797, 800, 82 P.3d 968, 971 (N.M. Ct. App. 2003).).

For civil appeals as of right, a party must file a notice of appeal within 30 days after entry of the judgment or order appealed from (NMRA 12-201(A)(1)(b)). A notice of appeal sent to the court by mail or commercial courier is timely filed if it is postmarked or date-stamped at least one day

before the due date and the certificate of service so states (NMRA 12-201(F)). A party starts a civil appeal as of right by filing a notice of appeal in the district court and serving it on all parties (NMRA 12-202(A)). The notice must comply with NMRA 12-202(B), (C), and (E).

For most appeals as of right, the appellant may move the district court for a stay and generally must post a supersedeas bond (NMRA 1-062(D)). When the appellant seeks to stay enforcement of a monetary judgment, statute requires that the bond be for double the amount of the judgment (NMSA 1978, § 39-3-22(A)). For appeals by permission, the availability of a stay depends on the nature of the appeal. If the Court of Appeals, however, grants an application for an interlocutory appeal, the district court proceedings are automatically stayed unless the Court of Appeals orders otherwise (NMRA 12-203(F)).

For an appeal as of right to the New Mexico Court of Appeals, the appellant must file a docketing statement in the Court of Appeals within 30 days after filing the notice of appeal (NMRA 12-208(B)). The docketing statement must comply with NMRA 12-208(D). The appellant must serve copies of the docketing statement on all parties, the district court judge, the court reporter, and the district court clerk (NMRA 12-208(C)). No party may file a response to a docketing statement (NMRA 12-208(I)). The Court of Appeals reviews the docketing statement and the record proper (i.e., the pleadings and other papers filed in the district court) and issues a notice assigning the appeal to one of the following three procedural tracks summary calendar, legal calendar, or the general calendar. (NMRA 12-210(A).

For appeals assigned to the summary calendar, the court issues a proposed disposition of the appeal. The parties may respond with memoranda in support of or in opposition to the proposed disposition within 20 days of service of the calendar assignment notice. The court then may reassign the appeal to the legal or general calendar, issue another proposed summary disposition, or decide the appeal on the merits. (NMRA 12-210(D).) Cases decided on the summary calendar are typically not briefed.

Appeals assigned to the legal or general calendars may also be placed on the court's expedited bench decision program, in which case: special rules governing the timing and length of briefs apply, the appeal is given priority in submission and scheduling of oral argument, and the appeal is decided promptly after argument. (NMRA 12-210(E).)

The New Mexico Court of Appeals may order oral argument at its discretion (NMRA 12-319). Oral argument may be held in cases assigned to the legal calendar, the general calendar, and the expedited bench decision program. There is no oral argument in cases assigned to the summary calendar. (NMRA 12-319(A). A party may request oral argument by including the request on the cover page of a brief, motion, application, or petition or by filing a separate request for oral argument (NMRA 12-319(B)). Unless the court orders otherwise, oral argument is limited to 30 minutes per side (NMRA 12-319(E)).

**Nebraska State Court Appeals - Part II**

Published on June 30, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In Nebraska, parties may appeal decisions by the state district courts to either the Nebraska Court of Appeals or the Nebraska Supreme Court (Neb. Const. art. I, § 23; Neb. Rev. Stat. § 25-1912). When an appellant properly files an appeal, the appellee has the right to a cross-appeal against any other party to the appeal (Neb. Ct. R. § 2-101(E)). A party may appeal as of right any district court judgment, decree, or final order. (Neb. Rev. Stat. § 25-1912(1).) A judgment is any final determination of the rights of the parties in an action (Neb. Rev. Stat. § 25-1301(1)). By way of contrast, an order is final if it disposes of the merits of the case and leaves nothing for further consideration by the court. A final order reviewable by an appellate court is one that either affects a substantial right in an action, determines the action, and prevents a judgment or affects a substantial right made in a special proceeding or on a summary application in an action after judgment is rendered. (Neb. Rev. Stat. § 25-1902; Brozovsky v. Norquest, 437 N.W.2d. 798, 800 (Neb. 1989); Kremer v. Rural Cmty. Ins. Co., 788 N.W.2d 538, 545 (Neb. 2010). Nebraska courts

have considered multiple factors when determining whether an order affects a substantial right. See Deines v. Essex Corp., 879 N.W.2d 30, 33 (Neb. 2016).

Interlocutory orders are not appealable in Nebraska. The Nebraska Supreme Court and the Nebraska Court of Appeals have broad concurrent appellate jurisdiction in virtually all types of cases, including appeals from civil, criminal, and administrative matters as well as matters from special tribunals. On the other hand, the Nebraska Supreme Court has exclusive jurisdiction to hear appeals involving: capital cases, cases imposing life imprisonment, appeals that include a challenge to the constitutionality of a state statute. These appeals automatically bypass the Court of Appeals and are heard directly by the Supreme Court. (Neb. Rev. Stat § 24-1106(1).

To initiate an appeal, the appellant must file the notice of appeal within 30 calendar days after entry of the judgment, decree, or order being appealed (Neb. Rev. Stat. § 25-1912(1)). Within 30 days of the entry of the judgment or order being appealed, the appellant must both file a notice of appeal with the clerk of the trial court and pay the $100 docketing fee. (Neb. Rev. Stat. §§ 25-1912(1) and 33-103; Neb. Ct. R. § 2-101(A)).

In Nebraska appellate courts, oral argument is available in all cases, except on a petition to bypass (unless ordered by the Nebraska Supreme Court) (Neb. Ct. R. § 2-102(B)(3)). However, no party may participate in oral argument without filing a brief (Neb. Ct. R. § 2-111(E)(4)). Oral argument must not exceed ten minutes per side (Neb. Ct. R. § 2-111(E)(1)). The parties may reserve a portion of their allotted time for rebuttal.

**Massachusetts State Court Appeals - Part II**

Published on June 30, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In Massachusetts, a party may appeal as of right all final judgments to the Massachusetts Appeals Court (M.G.L. ch. 231, § 109). A final judgment is an act of the trial court that finally adjudicates the rights of the parties affected by the judgment (Mass. R. Civ. P. 54(a)). Moreover, a party may appeal certain interlocutory rulings by permission to the Massachusetts Appeals Court (M.G.L. ch. 231, § 118). Fabre v. Walton, 781 N.E.2d 780, 784 (Mass. 2002). Depending on the nature of the

interlocutory order and the specific trial court that issued the order, an interlocutory appeal may be addressed to either the Appeals Court or to a single justice of the Appeals Court. Interlocutory orders appealed to the Appeals Court include orders involving preliminary injunctions from: the Superior Court, the Land Court, the Housing Court, the Probate and Family Court. (M.G.L. ch. 231, § 118.)

There is no right to appeal the denial of a petition to the single justice of the appeals court relating to an interlocutory order (Carista v. Berkshire Mut. Ins. Co., 476 N.E.2d 606, 607 (Mass. 1985)). However, the single justice may grant leave to appeal the interlocutory order to a panel of the Appeals Court or may report the action to the full court

A notice of appeal of a final judgment must be filed with the clerk of the trial court within 30 days of the date of the judgment (M.G.L. ch. 231, § 109). This time period is tolled until the motions listed in Massachusetts Rule of Appellate Procedure 4(a).

The time for filing a notice of appeal or a petition for relief begins to run on the date the judgment or the order was entered on the docket, not the date it was rendered (Standard Register Co., Inc. v. Bolton-Emerson, Inc., 623 N.E.2d 502, 503 (Mass. App. Ct. 1993)).

A party starts an appeal as of right to the Massachusetts Appeals Court by filing a notice of appeal with the clerk of the trial court (Mass. R. App. P. 3(a)). The notice of appeal must designate: the name of the party or parties taking the appeal and the judgment, decree, adjudication, or order, or part thereof, from which the appeal is being taken. (Mass. R. App. P. 3(c).) A party starts an interlocutory appeal by permission by filing a petition seeking relief from the order. The petition for interlocutory relief should comply with the Standing Order Concerning Petitions to the Single Justice. Finally, there are no limitations on the types of cases that may be argued before the Appeals Court. The right to an oral argument is not absolute, however, and the court may dispense with it as it pleases. (Sabatinelli v. Travelers Ins. Co., 341 N.E.2d 880, 883 (Mass. 1976).) Unless the Appeals Court directs otherwise, each side has 15 minutes for oral argument. Rebuttal is not permitted. To request additional time, a party must show good cause. This request may be made by letter addressed to the clerk reasonably in advance of the date fixed for the argument. The appellate court may also terminate the argument whenever the court deems that further argument is unnecessary (Mass. R. App. P. 22(b).

**Arizona State Court Appeals - Part II**

Published on June 30, 2018

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Parties generally may appeal the following orders and judgments of the Arizona Superior Court to the Arizona Court of Appeals: final judgments, including grants of summary judgment disposing of the entire case; final orders affecting a substantial right that are made in a special proceeding or on a summary application in an action after judgment; postjudgment orders; postjudgment special orders; and interlocutory judgments that determine the rights of the parties and direct an accounting or other proceeding to determine the amount of the recovery, and other items as well. For more, see A.R.S. § 12-2101. Judgments and orders must be signed to be appealable (Occhino v. Occhino, 793 P.2d 1149, 1151 (Ariz. Ct. App. 1990)). The Arizona Court of Appeals may consider both questions of law and questions of fact, assuming the issues are properly presented and preserved (Clark v. Renaissance W., LLC, 307 P.3d 77, 79 (Ariz. Ct. App. 2013)).

An appellant normally must file a notice of appeal within 30 days of the entry of judgment (Ariz. R. Civ. App. P. 9(a)). Filing any of the following motions listed in Ariz. R. Civ. App. P. 9(e) extends the period until 30 days after the court enters a signed order deciding the last such motion. A party may file a notice of cross-appeal until 20 days after the filing date of the notice of appeal or 30 days after the entry of the judgment being appealed, whichever is later (Ariz. R. Civ. App. P. 9(b)). Generally, the deadline for filing a notice of appeal is considered jurisdictional and cannot be extended (James v. State, 158 P.3d 905, 908 (Ariz. Ct. App. 2007)).

A party starts an appeal as of right by filing a notice of appeal with the clerk of the superior court entering the judgment (Ariz. R. Civ. App. P. 8(a)). The notice of appeal must comply with Ariz. R. Civ. App. P. 8(c). The party generally must also pay the filing fee required by statute to the superior court when the party files the notice of appeal (Ariz. R. Civ. App. P. 8(e); A.R.S. § 12-2107). A party starts an appeal by filing a Petition for Special Action that includes the items specified in (Ariz. R.P. Spec. Act. 1 and 7(e). Except for money judgments against the State or its agencies or political subdivisions, judgments are not stayed automatically on appeal (Ariz. R. Civ. App. P. 7(a); Ariz. R. Civ. P. 62(e)(1)). However, it should be noted that a party may obtain a stay by filing a supersedeas bond in the superior court (Ariz. R. Civ. App. P. 7(a)(1)). The amount of the bond may be set by stipulation or motion (Ariz. R. Civ. App. P. 7(a)(2)).

In the Arizona appellate courts, the record on appeal consists of: the official trial court record, which includes: pleadings; minute entries; exhibit lists and exhibits; the index of record; and other items filed in the superior court through the date of the notice of appeal. (Ariz. R. Civ. App. P. 11(a).)

Parties seeking oral argument must file a separate request no later than ten days after the earlier of: the date the appellant files the reply brief or the date the reply brief is due, if the appellant does not file a reply brief. (Ariz. R. Civ. App. P. 18(a).) However, the Arizona Court of Appeals may decide an appeal without argument if: the appeal is frivolous, the Court recently decided the dispositive issue or issues in another case, or the argument would not significantly assist the Court. (Ariz. R. Civ. App. P. 18(b).)

**New Mexico State Court Appeals - Part I**

Published on June 30, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

A party may not appeal as of right from the New Mexico Court of Appeals to the New Mexico Supreme Court (NMRA 12-502). Instead, a party may obtain review of final decisions of the Court of Appeals by petitioning the Supreme Court for a writ of certiorari (NMRA 12-502).

There is no restriction on the types of issues the New Mexico Supreme Court may consider. Generally, the Supreme Court limits certiorari review to cases involving: conflicts between decisions of the Supreme Court and the Court of Appeals, conflicts between decisions of the Court of Appeals, significant questions of law under the federal or state constitution, and issues of substantial public interest. (NMSA 1978, § 34-5-14(B); NMRA 12-502(C)(2)(d).)

 The New Mexico Supreme Court ordinarily considers only the issues on which a petition for writ of certiorari was granted (NMRA 12-502(C)(2)(b); Fikes v. Furst, 2003-NMSC-033, ¶ 8, 134 N.M. 602, 605, 81 P.3d 545, 548 (N.M. 2003)). However, the court may review other issues necessary to the proper disposition of an appeal (State v. Muniz, 2003-NMSC-021, ¶ 5, 134 N.M. 152, 154, 74 P.3d 86, 88 (N.M. 2003)).

 A party must file a petition for writ of certiorari with the Supreme Court clerk within 30 days after either: the entry of the Court of Appeals' decision or the disposition by the Court of Appeals of the last timely filed motion for rehearing. (NMRA 12-502(B). Of course, the New Mexico

Supreme Court's rules permit a party to file a motion before the Court for an extension of time for filing a petition for writ of certiorari (NMRA 12-309). Please consult NMRA 12-502(C) for cert petition requirements and NMRA 12-504(B)(1) for extraordinary writ rules.

The petitioner must attach any opinions, orders, transcripts, or other papers indicating the respondent's position on the matter in question. The petitioner may attach any pleadings or other papers necessary to inform the court of the circumstances from which the petition arises and why the Supreme Court should grant the requested relief. (NMRA 12-504(B)(2).)

In appeals from final decisions by the Court of Appeals, any stay granted in the matter pending review by the Court of Appeals remains in effect until the Supreme Court rules on the appeal (NMSA 1978, § 39-3-22(F)). A party may also move the Supreme Court to stay the lower courts' ruling pending review (NMRA 12-309).

If the New Mexico Supreme Court grants certiorari, the court directs how further briefing proceeds (NMRA 12-502(I)). Ordinarily, the court orders the parties to submit new briefs and establishes a briefing schedule. Under a typical scheduling order: the petitioner's opening brief is due approximately 45 days after the date of the order granting certiorari, the respondent's answer brief is due 45 days after service of the opening brief, the petitioner's reply brief is due 20 days after service of the answer brief. (See NMRA 12-210(B).)

Finally, the New Mexico Supreme Court may grant oral argument at the request of a party or on its own motion (NMRA 12-319 and 12-502(J)). The court typically grants argument if requested in general civil appeals. Unless the court orders otherwise, oral argument is limited to 30 minutes per side (NMRA 12-319).

**Nebraska State Court Appeals - Part I**

Published on June 30, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Further review by the Nebraska Supreme Court of a ruling by the Court of Appeals is not a matter of right but of judicial discretion, and there are no secondary appeals as of right in civil cases in Nebraska (Neb. Ct. R. § 2-102(G)). A party may appeal any opinion or order disposing of the appeal by the Nebraska Court of Appeals to the Nebraska Supreme Court by filing a petition for further review. There are no restrictions on the types of issues the Nebraska Supreme Court can consider (Neb. Rev. Stat. § 24-204).

The Supreme Court has full discretion to decide whether it will review a Nebraska Court of Appeals decision. If the Supreme Court grants the review, it will only review the errors assigned in the petition for further review and discussed in the supporting memorandum brief. The Supreme Court may limit the issues to one or more of those raised by the parties and may notice plain error at its discretion. (Neb. Ct. R. § 2-102(G).)

A party seeking to appeal a final order or judgment by the Nebraska Court of Appeals must file a petition for further review and a brief in support of the petition within 30 days after the release of the opinion or entry of the order of the Court of Appeals disposing of the appeal, whichever occurs later (Neb. Ct. R. § 2-102(F)(1)). If the party first timely files a motion for rehearing, the time to file a petition for further review is tolled (Neb. Ct. R. § 2-113(A);

Within ten days after the release of the opinion of the court or the entry of the order disposing of the appeal, the party must file in the Court of Appeals both the original and one copy of: a motion for rehearing or a brief in support of the motion. A party begins an appeal to the Nebraska Supreme Court from the Nebraska Court of Appeals by: filing an original and one copy of both: a petition for further review and a memorandum brief in support of the petition.

The party must file the petition and brief with the clerk of the Supreme Court within 30 days after the release of the opinion or entry of the order of the Court of Appeals.

**Massachusetts State Court Appeals - Part I**

Published on June 30, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In Massachusetts there are no appeals as of right to the Supreme Judicial Court (M.G.L. ch. 211A, § 11). A party may appeal by permission to the Supreme Judicial Court rulings from: trial courts (for certain rulings, after first entering the appeal in the Appeals Court), the Appeals Court, a single justice of the Appeals Court, or a single justice of the Supreme Judicial Court. (M.G.L. ch. 211A, §§ 10, 11.)

In appeals from an Appeals Court case, the Supreme Judicial Court reviews the trial court's decision, so that the party designated the appellant in the Appeals Court typically remains the appellant in the Supreme Judicial Court, regardless of who prevailed in the Appeals Court.

The Supreme Judicial Court has appellate jurisdiction over all issues presented in a case properly within its jurisdiction (Bradford v. Baystate Med. Ctr., 613 N.E.2d 82, 85 (Mass. 1993)). If the court intends to limit the scope of its review, its order granting appellate review will indicate any limitations. The court may also later amend the order to focus on a limited set of issues, for instance where the parties' briefs focus on a limited set of issues (Moronta v. Nationstar Mortg., LLC, 64 N.E.3d 1287, 1289 (2016).)

 Applications to the Supreme Judicial Court for leave to obtain direct appellate review (DAR) must be filed within 20 days after the appeal has been docketed in the Appeals Court (Mass. R. App. P. 11(a); see Ashford v. Mass. Bay Transp. Auth., 659 N.E.2d 273, 276 (Mass. 1995)). The filing of an application for DAR does not extend the time for filing briefs in the Appeals Court or taking any other action required by the applicable rules (Mass. R. App. P. 11(e); Moreover, unless the court orders otherwise, the notice of appeal from the decision of a single justice must be filed with the clerk of the Supreme Judicial Court for Suffolk County within seven days of the entry of the judgment appealed from (MA R S CT Rule 2:21).

The time for filing a notice of appeal or a petition for relief begins to run on the date the judgment or order was entered on the docket. (Standard Register Co., Inc. v. Bolton-Emerson, Inc., 623 N.E.2d 502, 503 (Mass. App. Ct. 1993)). Moreover, the Supreme Judicial Court's rules permit a party may file a motion for an extension of time. The motion must show good cause for the extension. The court may extend the time to start an appeal up to one year from the expiration of the time originally prescribed. (Mass. R. App. P. 14(b); Lawrence Sav. Bank v. Garabedian, 727 N.E.2d 97, 100 (Mass. App. Ct. 2000).)

The rules for further appellate review (FAR) are different. Here, the Supreme Judicial Court grants a FAR application "for substantial reasons affecting the public interest or the interests of justice" (M.G.L. ch. 211A, § 11). A FAR application must receive the votes of three of the Supreme Judicial Court's seven justices to succeed (Mass. R. App. P. 27.1(e)). An application for leave to obtain FAR must include: a request for leave to obtain FAR, a statement of prior proceedings in the case, including whether any party is seeking a rehearing in the Appeals Court, a short statement of facts relevant to the appeal, a statement of the points in the Appeals Court decision on which further appellate review is sought, a statement not exceeding ten pages indicating why further appellate review is appropriate, including citations to relevant authority, and a copy of the rescript and opinion, if any, of the Appeals Court. (Mass. R. App. P. 27.1(b). If the Appeals Court entered a memorandum and order referring to another document (for example, a brief or judge's findings and rulings), a copy of that document or, if appropriate, the pertinent pages of that document, must be attached to the application (Mass. R. App. P. 27.1(b)).

Within ten days after the filing of an application for FAR, any party to the appeal may file an opposition. The opposition must: not exceed ten pages, state the reason why the application should not be granted, and not restate the statement of prior proceedings and facts stated in the application, unless the opposing party is dissatisfied with that statement. (Mass R. App. P. 27.1(c).)

A party may file an application requesting direct appellate review (DAR) of an appeal docketed in the Appeals Court. (Mass. R. App. P. 11(f)). The Supreme Judicial Court grants DAR only if the case deals with questions of: first impression or novel questions of law that should be submitted for final determination to the Supreme Judicial Court, questions concerning the US or Massachusetts Constitution that have been raised in a Massachusetts court, or questions concerning the public interest so that justice requires a final determination by the full Supreme Judicial Court. (M.G.L. ch. 211A, § 10; Mass. R. App. P. 11.)

A party may file an application with the full Supreme Judicial Court requesting DAR (Mass. R. App. P. 11(a)). A vote of two of the Supreme Judicial Court's seven justices is required to grant

DAR (Mass. R. App. P. 11(f)). The application for DAR must include a: request for DAR, statement of prior proceedings in the case, short statement of facts relevant to the appeal, statement of the issues of law raised by the appeal, together with a statement indicating whether the issues were raised and properly preserved in the lower court, brief argument on these issues that does not exceed ten pages, statement of reasons why DAR is appropriate, and a copy of any written decision, memorandum, findings, rulings, or report of the lower court relevant to the issues on appeal. (Mass. R. App. P. 11(b).)

 Within ten days after the filing of an application for DAR, any party to the appeal may file an opposition statement. The opposition statement must: not exceed ten pages, state the reason why the application should not be granted, and not restate the statement of prior proceedings and facts stated in the application, unless the opposing party is dissatisfied with that statement. (Mass R. App. P. 27.1(c).) Massachusetts courts do not issue any executions for judgments or permit any proceedings for the enforcement of a judgment until the time to appeal the judgment has expired (Mass. R. Civ. P. 62(a)). The taking of an appeal also stays execution on the judgment during the pendency of the appeal (Mass. R. Civ. P. 62(d)). A timely application for further appellate review stays issuance of the rescript (decision) of the Appeals Court until the application is decided (Mass. R. App. P. 23).

 Unless the Supreme Judicial Court directs otherwise, each side has 15 minutes for oral argument. Rebuttal is not permitted. The Supreme Judicial Court may also terminate the argument whenever the court deems further argument unnecessary (Mass. R. App. P. 22(b)).

### Arizona State Court Appeals - Part I

Published on June 30, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In Arizona, the court of last resort is the Arizona Supreme Court. Except in limited cases, there is no appeal as of right to the Arizona Supreme Court. Parties have a right to a direct appeal to the Supreme Court in certain election matters, like challenges to candidate nomination petitions (Ariz. R. Civ. App. P. Rule 10(d)(1)). While some statutes may appear to confer a right of appeal in certain civil actions to the Arizona Supreme Court because they refer to the Supreme Court, not the Court of Appeals. Those statutes predate the legislative creation of the intermediate Court of

Appeals and are generally understood to have been amended implicitly. (Ariz. Podiatry Ass'n v. Dir. of Ins., 422 P.2d 108, 111-12 (Ariz. 1966).

A party can seek appellate review of any Court of Appeals decision by filing a petition for review at the Arizona Supreme Court (A.R.S. Const. art. 6, § 5(3); Ariz. R. Civ. App. P. 23). However, the Supreme Court has discretion to deny review without explanation. A party may also appeal lower court interlocutory orders by filing a petition for special action. (Az. St. Spec. Act Rule 1.) A party may also petition the Supreme Court for review of any grant or denial of special action relief by the Court of Appeals, including a refusal to accept jurisdiction in the case (Az. St. Spec. Act Rule 8(b); Ariz. R. Civ. App. P. 23). Finally, it should be noted that there are no restrictions on the types of issues the Arizona Supreme Court may consider (Valley Med. Specialists v. Farber, 982 P.2d 1277, 1280-81 (Ariz. 1999)).

Assuming the issues are properly presented and preserved, the Arizona Supreme Court may consider: any issues raised in the petition or cross-petition for review and in its discretion, additional issues raised in the lower courts even if the lower courts did not address them. (A.R.S. Const. art. 6, § 5(3); City of Phoenix v. Fields, 201 P.3d 529, 534 (Ariz. 2009); Ariz. R. Civ. App. P. 23(k)(2).)

A party must file a petition for review within: 30 days of the Court of Appeals issuing a decision, unless a motion for reconsideration is filed or 15 days of the final disposition of the motion, if a party has filed a motion for reconsideration (which is due within 15 days of the Court of Appeals issuing a decision). (Ariz. R. Civ. App. P. 22(c) and 23(b)(2).)

On the other hand, a party may file a cross-petition for review within the later of: 15 days a petition for review is served or 30 days after the Court of Appeals issues its decision. (Ariz. R. Civ. App.

P. 23(b)(2)(C).) A party opposing a petition or cross-petition may file a response brief within 30 days from service of the petition or cross-petition. A response brief is not mandatory, and the failure to file a response is not an admission that the petition should be granted. However, the court may order any party to file a response to a petition or cross-petition. (Ariz. R. Civ. App. P. 23(f).) A party can seek to extend the time to start an appeal by filing a motion requesting an extension of time in the Arizona Supreme Court (Ariz. R. Civ. App. P. 23(b)(1)).

A party starts a permissive appeal by filing a petition for review with the clerk of the Arizona Supreme Court. Grounds for requesting review include that: (1) no Arizona decision controls the point of law in question, (2) an Arizona Supreme Court decision should be overruled or qualified, (3) the Arizona Court of Appeals rendered conflicting decisions, (4) important issues of law have been incorrectly decided.

(Ariz. R. Civ. App. P. 23(d)(3).)

In Arizona, a judgment is not stayed automatically: on appeal at the Court of Appeals or while a petition for review is pending. Parties may obtain a stay of enforcement and execution of a judgment by filing a supersedeas bond in the Superior Court. The amount of the bond may be set: by stipulation, on a noticed motion, or ex parte, supported by a motion with an affidavit. (Ariz. R. Civ. App. P. 7(a), (b)(1).) In addition, Arizona courts may enter stays while an appeal is pending. Parties must make applications for stays, in the first instance, in the Superior Court. (Ariz. R. Civ. App. P. 7(c).)

An Arizona appellate court decision is not final until the appellate court issues a mandate (Ariz. R. Civ. App. P. 24(a)). The Court of Appeals issues a mandate: when the time for filing a petition expires, if no party files a petition for review or 15 days after the Arizona Supreme Court issues

an order denying review, if a party files a petition for review in the Arizona Supreme Court. (Ariz. R. Civ. App. P. 24(b).)

In the Arizona Supreme Court, the record on appeal consists of: the pleadings, minute entries, exhibits, other documents filed with the Arizona Superior Court, a certified transcript, documents filed in the Arizona Court of Appeals, and the Arizona Court of Appeals' decisions and orders.

Moreover, the appellant must submit the following materials along with the petition for review: acopy of the Arizona Court of Appeals' decision, if the petition is for review of an order declining special action jurisdiction, a copy of the Arizona Superior Court's decision of the special action challenged, and an appendix containing only the documents in the record on appeal that are necessary for a determination of the issues raised by either the petition or the cross-petition. (Ariz. R. Civ. App. P. 23(d)-(e).)

For appeals at the Arizona Supreme Court, there are usually four briefs: a petition, a response to the petition, if review is granted, simultaneously submitted supplemental briefs from the petitioner and the respondent. (Ariz. R. Civ. App. P. 23.) A petition for review must be filed within: 30 days of the Court of Appeals issuing a decision, unless a motion for reconsideration is filed or 15 days of the final disposition of the motion, if a party has filed a motion for reconsideration (which is due within 15 days of the Court of Appeals issuing a decision). (Ariz. R. Civ. App. P. 22(a) and 23(b).) A party opposing a petition may file a response brief within 30 days from service of the petition (Ariz. R. Civ. App. P. 23(f)). If the Supreme Court grants review, the order granting review will generally set the schedule for any supplemental briefs (Ariz. R. Civ. App. P. 23(k)).

**How to Handle An Appeal Before New York's Court of Appeals**

Published on June 28, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In normal course appeals, the New York Court of Appeals' clerk typically sends the parties a letter setting deadlines for the parties' briefs. With or without a letter, the briefing schedule is generally about the same. Unless the clerk directs otherwise: the appellant must serve and file its opening brief within 60 days after: service and filing of a notice of appeal; or entry of an order granting leave to appeal (not notice of entry). Moreover, the respondent must serve and file its brief within 45 days after service of the appellant's brief. And the appellant may serve and file a reply brief within 15 days after service of the respondent's brief. (N.Y. Ct. R. § 500.12(b)-(d).)

If the opposing party served its brief by overnight delivery, US mail from within New York, or US mail from elsewhere in the US, the respondent or appellant may add one, five, or six days, respectively, to the times stated above when serving and filing the respondent's brief and the reply brief (CPLR 2103(b)(2), (6)). In most normal course appeals, the clerk issues a scheduling letter after one of the following: the filing of the preliminary appeal statement, the conclusion of any jurisdictional review, if the court does not request alternative merits review, and the conversion of the appeal from alternative merits review to normal course briefing. (N.Y. Ct. R. § 500.12(a).)

Please consult the following regulations for appellant brief requirements: N.Y. Ct. R. §§ 500.1(a), (f) and 500.13; 22 New York Codes, Rules and Regulations (NYCRR) § 130-1.1a and N.Y. Ct. R. §§ 500.1(a), (f) and 500.13; 22 NYCRR § 130-1.1a for respondent brief regulations. Here, attorneys often add material that the Court of Appeals' rules neither require nor forbid. The court usually accepts briefs containing this material. Attorneys commonly include: the county clerk's index number and any appellate division docket number on the cover, a preliminary statement after the table of authorities (the preliminary statement often introduces the court to the issues in the case and provides an overview of the appellant's arguments or themes), and a conclusion after the argument. The conclusion should concisely state exactly what the appellant wants the court to do.

**How to Handle An Appeal Before New York's Third Department**

Published on June 28, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Third Department's local rules establish two different potential deadlines by which an appellant must perfect an appeal (that is, file the opening brief and the reproduced full record, appendix, or statement in lieu of record on appeal). In the Third Department, attorneys comply with the rule that an appeal deems abandoned any appeal that is not perfected within nine months of the date of the notice of appeal or order granting leave to appeal (N.Y. Ct. R. § 800.12). Absent an order requiring the appellant to perfect sooner, the court usually accepts as perfected any appeal where all of the necessary papers (that is, the appellant's brief, record, and any appendix) are filed within the nine-month deadline.


Unlike the First Department, the Third Department does not have a term system requiring filing by particular dates for hearing in a particular month. The Third Department hears appeals on a rolling basis, generally in the order in which they were perfected. After the appellant's brief has been accepted for filing, the Third Department clerk typically mails to each respondent a scheduling memorandum requiring the respondent to serve and file its brief within 45 days from the date of the memorandum (N.Y. Ct. R. § 800.9(b)). The appellant may serve and file a reply brief within ten days after service of the respondent's brief (N.Y. Ct. R. § 800.9(c)).


For appellant brief requirements, please consult CPLR 2101(c), 5528(a); 22 NYCRR § 130-1.1a; N.Y. Ct. R. § 800.8(a). Although not required, appellants also normally include a: table of authorities after the table of contents, preliminary statement after the table of authorities, and a conclusion after the argument. For respondent brief requirements, please consult CPLR 2101(c), 5528(b); 22 NYCRR § 130-1.1a; N.Y. Ct. R. § 800.8(a). Although not required, respondents normally include a: table of authorities after the table of contents, preliminary statement after the table of authorities, conclusion after the argument. If there is a cross-appeal, the respondent's principal brief must address both the appeal and the cross-appeal. N.Y. Ct. R. § 800.9(e).

**How to Handle An Appeal Before New York's Fourth Department**

Published on June 28, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Fourth Department rules call for the appellant to perfect its appeal (that is, file the opening brief, record, and, if applicable, appendix) within 60 days of service of the notice of appeal on the

opposing party (N.Y. Ct. R. § 1000.2(b)). An appeal not perfected within the 60-day period is not automatically dismissed, but is subject to dismissal on a motion by the opposing party (N.Y. Ct. R. § 1000.12(a)).

If the appellant has not perfected the appeal within nine months, the court, without notice, dismisses the appeal (N.Y. Ct. R. § 1000.12(b)). Although opposing counsel may move to dismiss an appeal before then, the court typically denies a motion of this type on the condition that the appellant perfect its appeal by a certain date (N.Y. Ct. R. § 1000.13(e))..

Once the appellant perfects its appeal by filing the brief and record (see Serving and Filing the Briefs), the court issues a scheduling order noting the deadline for submission of the respondent's brief and scheduling a term of the court, although not a specific day, for oral argument. The respondent must serve and file its brief within 30 days of service of the appellant's brief, plus one day if the appellant serves by overnight delivery or five days if the appellant serves by mail. If the respondent declines to file a brief, it must notify the court in writing before the end of the 30-day period. (CPLR 2103(b); N.Y. Ct. R. § 1000.2(d).) The appellant may serve a reply brief within ten days of service of respondent's brief, plus one or five days if the respondent served by overnight delivery or mail, respectively (CPLR 2103(b); N.Y. Ct. R. § 1000.2(e)). Parties should note that the clerk of the Fourth Department must reject a partial or untimely filing (N.Y. Ct. R. § 1000.3(a)). A party's failure to timely submit a brief or notice may also result in sanctions under Fourth Department Rule § 1000.16(a) (N.Y. Ct. R. § 1000.2(d)). Please consult the following regulations for appellant brief submissions: N.Y. Ct. R. § 1000.4(f)(4)-(6); CPLR 2101(c), 5528; 22 NYCRR § 130-1.1a. Although not required by the rules, attorneys often include a preliminary statement and conclusion in their briefs as well. The content requirements of a respondent's brief are the same as an appellant's brief, except that the respondent must print the cover of the brief on red paper (N.Y. Ct. R. § 1000.4(f)(5).

In the Fourth Department, an appellant may submit a reply brief to address arguments presented in the respondent's brief. The content requirements are generally the same as those of the appellant's and respondent's briefs, except that the appellant must print the cover page of the brief on gray paper (N.Y. Ct. R. § 1000.4(f)(5)). The Fourth Department rules do not state specifically whether reply briefs must follow precisely the content requirements of the appellant's brief.

### How to Handle An Appeal Before New York's First Department

Published on June 28, 2018

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In the First Department, appellants generally may perfect their appeals (that is, serve and file the note of issue, appellant's brief, record, and any appendix) any time within nine months of the date of the notice of appeal or order granting leave to appeal. This means that the start of briefing is often uncertain. Once the appellant perfects, however, briefing normally follows a short, defined schedule.

The appellant normally has nine months after taking the appeal (that is, serving and filing a notice of appeal or having a court grant a motion for leave to appeal. In practice, attorneys who regularly practice before the Department comply with the rule that the First Department deems abandoned any appeal that is not perfected within nine months of the date of the notice of appeal or order granting leave to appeal (N.Y. Ct. R. § 600.11(a)(3)).

The First Department normally imposes no penalty for not meeting the deadlines. Absent an order requiring the appellant to perfect sooner, the court usually accepts as perfected any appeal where all of the necessary papers (that is, the note of issue, appellant's brief, record, and any appendix) are filed within the nine-month deadline. Respondents do not commonly make a motion contesting the appellant's failure to comply with the intermediate deadlines set by the CPLR and the First Department's local rules. If a respondent needs the appeal resolved quickly, that party normally moves at the start of the appeal to expedite it. If the appellant moves for a stay pending appeal, the respondent's opposition usually requests that the court condition any stay on perfection for a particular term. Otherwise, the respondent usually acquiesces to perfection at any time within nine months of the date of the notice of appeal or order granting leave to appeal.

In addition to complying with the nine-month deadline, appellants must also comply with the deadlines imposed by the First Department's term system. The First Department hears appeals during ten court terms each year, corresponding roughly to each month from September to June. Each term has its own briefing schedule. The First Department posts calendars of the terms and their filing deadlines on its website. The deadline for perfecting an appeal for a given term (that is, serving and filing the note of issue, appellant's brief, record, and any appendix) is usually 57 days before the first day of the term (N.Y. Ct. R. § 600.11(b)(1)(i)). If the appellant serves by mail within New York, it must serve five days before the otherwise applicable deadline (that is, 62 days before the first day of the term). If the appellant serves by mail anywhere in the US other than New York, it must serve six days before the otherwise applicable deadline (that is, 63 days before the first day of the term). If the appellant serves by overnight delivery, it must serve one day before

the otherwise applicable deadline (that is, 58 days before the first day of the term). (N.Y. Ct. R. § 600.11(e) and CPLR 2103(b)(2), (6)).

Once the appellant perfects, the respondent must serve and file its brief at least 27 days before the first day of the term (N.Y. Ct. R. § 600.11(c)). If the respondent serves by mail within New York, it must serve five days before the otherwise applicable deadline (that is, 32 days before the first day of the term). If the respondent serves by mail anywhere in the US other than New York, it must serve six days before the otherwise applicable deadline (that is, 33 days before the first day of the term). If the respondent serves by overnight delivery, it must serve one day before the otherwise applicable deadline (that is, 28 days before the first day of the term). (N.Y. Ct. R. § 600.11(e) and CPLR 2103(b)(2), (6)).

The appellant may serve and file a reply brief within nine days after the deadline for the respondent's brief (N.Y. Ct. R. § 600.11(c)). If there is a cross-appeal, the respondent may file a reply brief within nine days after the deadline for the appellant's reply brief (N.Y. Ct. R. § 600.11(d)(2)). The time to serve and file each brief is fixed by the court's calendar. Therefore, serving a brief before its deadline does not alter the deadline for the next brief. It just gives the other party extra time.

Given how short oral arguments are in the First Department, if there is argument at all, attorneys should include in the brief any facts or legal argument that they want the court to consider. Please consult the following regulations for appellant brief regulations CPLR 2101, 22 NYCRR § 130-1.1a, and N.Y. Ct. R. §§ 600.10(d)(1)-(2), (f) and 600.11(b)(2).

The appellant must serve and file a note of issue together with its brief (N.Y. Ct. R. § 600.11(b)). This is a one- or two-page document providing some basic information about the appeal. It is similar to the CPLR 5531 statement, but not identical. Please consult N.Y. Ct. R. § 600.11(b)(1) for notice issue regulations and CPLR 2101, 22 NYCRR § 130-1.1a, N.Y. Ct. R. §§ 600.10(d)(1), (d)(3), and (f) and 600.11(c) for respondent brief regulations.

Respondents normally include a preliminary statement after the table of authorities and a conclusion after the argument. The rules neither require nor forbid these sections. If there is a cross-appeal, the respondent's principal brief must address both the appeal and the cross-appeal (N.Y. Ct. R. § 600.11(d)(2)).

In the First Department, parties that want oral argument must make a joint request to the court during briefing. Counsel should check the filing calendar on the First Department's website for

the argument request deadline for each term. The deadline is usually the day after the deadline for the respondent's brief. Before the deadline for the request, counsel for all parties must confer about whether they want to argue the appeal or submit it on the papers (N.Y. Ct. R. § 600.11(f)(1)). If there are only two parties, their attorneys often speak by telephone. In cases with multiple parties it may be easier to confer by e-mail to all counsel than to have multiple calls or a conference call.

If the parties want argument, they should discuss how much time they want. The court normally schedules no more than 15 minutes for each side (and hears even less than it schedules). The parties should not request more than 15 minutes for each side unless they explain in their request the unusual features of their appeal that require more time. N.Y. Ct. R. § 600.11(f)(2). How much time to request is entirely subjective. Some attorneys always request 15 minutes because the court usually permits parties less time at oral argument than it grants in the schedule

The appellant has the option to reply to the respondent's brief. Given that parties in the First Department receive little, if any, argument, appellants commonly take that opportunity.

**Making Motions Before the New York Court of Appeals**

Published on June 28, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In the New York Court of Appeals, parties normally make a motion by serving and filing a notice of motion and supporting papers. The motion notice must: begin with a caption, which must include: the court; the title of the action or proceeding, including the parties' appellate designations; the Court of Appeals docket number, if assigned; and the document title The notice must also state that the motion is returnable on a Monday (or the first business day of the week if Monday is a holiday) at the State of New York Court of Appeals, 20 Eagle Street, Albany, New York. Court of Appeals motions are not returnable at a specific time. Moreover, the motion must list the papers being submitted in support of the motion, state the relief sought and the legal basis for it (commonly the statute or rule authorizing the motion and relief), and contain a signature block, including the attorney's: signature; typed name; address; and telephone number. (CPLR 2101 and 2214; 22 NYCRR § 130-1.1a; N.Y. Ct. R. § 500.21(a), (b).)

Attorneys may support motions with affidavits or affirmations setting out the relevant facts and memoranda of law presenting legal arguments for relief. Any relevant documents typically appear as exhibits to an affidavit or affirmation. Alternatively, attorneys may support a motion with a single document containing both fact and law. The court normally permits either format if all necessary information appears in the supporting papers. A corporate party must include with its motion a disclosure statement identifying its parents, subsidiaries, and affiliates, or stating that it has none (N.Y. Ct. R. §§ 500.1(f) and 500.21(f)). Motion papers must follow the court's general formatting requirements (N.Y. Ct. R. § 500.21(f)

The moving party must serve its motion papers at least: eight days before the return date if serving by hand delivery, nine days before the return date if serving by overnight delivery, thirteen days before the return date if serving by mail from within New York State, and fourteen days before the return date if serving by mail from anywhere in the US other than New York. (CPLR 2103(b); N.Y. Ct. R. § 500.21(b). The moving party must serve one copy of its papers on each party, except that it must serve two copies of its papers on each party if the motion seeks leave to appeal or reargument (N.Y. Ct. R § 500.21(d)).

The moving party must file its motion papers, with proof of service, by noon on the Friday before the return date. Other parties may serve and file papers responding to the motion. Response papers usually oppose a motion but that is not required. Response papers must follow the court's general formatting rules ((N.Y. Ct. R. § 500.21(f)).

A party responding to a motion must serve its papers two days before the return date (CPLR 2214(b)). There is no need to add additional days for service by overnight delivery or US mail. A responding party must serve each party with two copies of the papers responding to a motion for leave to appeal or re-argument, and one copy of the papers responding to any other kind of motion (N.Y. Ct. R. § 500.21(d)). A responding party must file its papers, with proof of service, on or before the return date.

## Oral Argument in New York's First Department

Published on June 28, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The parties may request oral argument as of right in any enumerated appeal (N.Y. Ct. R. § 600.11(f)). Enumerated appeals from the New York Supreme Court include: appeals from final orders or judgments, other than those dismissing an action or proceeding for failure to: prosecute; serve a complaint; or obey an order of disclosure or to stay or compel arbitration as well as appeals from orders granting or denying: motions for a new trial; motions for summary judgment; motions to dismiss a complaint, cause of action, counterclaim, or answer in point of law; or custody of a minor after a hearing.

Any appeal that does not qualify as enumerated is unenumerated (N.Y. Ct. R. § 600.4(b)). The parties may not argue an unenumerated appeal unless the First Department grants permission (N.Y. Ct. R. § 600.11(f)(3)). During the briefing process, the parties must jointly submit a written statement about whether any party wants oral argument (N.Y. Ct. R. § 600.11(f))..

Attorneys must check the First Department's website to determine the date for which the court has calendared a case. The First Department does not send the parties notice. About two weeks before the beginning of each court term, the First Department publishes the daily calendars for that term. Each daily calendar lists the starting time for the day's court session and the appeals scheduled for argument or submission that day. Appeals being argued appear on the calendar with the amount of time requested by each side. Appeals being submitted without argument appear on the calendar without time. Calendars typically have 15 to 17 cases for argument and another four to six for submission. Attorneys with an appeal noticed for a given term must review the posted calendars and look for their appeal. If a case: Appears on the calendar with argument time, counsel appear in court on the day in question. There is no need to send the court an acknowledgment. If a case appears on the calendar without argument time and the parties did not request argument, counsel should await a decision. There is no need to appear in court for a case being taken on submission. If a case appears on the calendar without argument time even though the parties timely filed an argument request, that often means that the court has determined that the appeal is unenumerated and so ineligible for argument as of right. Counsel should contact the First Department clerk's office to find out whether they may promptly submit a letter explaining why the court should hear

argument in the unenumerated appeal, or if there is some other issue preventing the court from hearing argument. If a case does not appear on any of the daily calendars for the term, that typically means that the court has adjourned the case to a later term. The court sometimes does this to manage its docket.

Attorneys should prepare a short opening statement highlighting the key points of their argument. The court typically allows counsel to speak briefly before interjecting with questions. Attorneys should not expect to deliver lengthy prepared remarks. Rather, attorneys should prepare to spend most of their argument time responding to questions from the justices.

The First Department traditionally sits in panels of five justices, although it uses four-justice panels if it is shorthanded or unusually busy. The court makes public the names of the justices sitting on a given day's panel after 3 p.m. on the preceding business day. The First Department normally hears oral argument in its courthouse at 27 Madison Avenue, New York, New York. The court hears oral argument during ten terms, which roughly correspond to the months from September through June. In July and August, unless there are extraordinary circumstances, the court hears oral argument only in election cases (which often concern September primaries). There are usually 11 or 12 argument days in each term. Oral argument sessions normally begin at 2 p.m., except on Fridays they normally begin at 10 a.m. (N.Y. Ct. R. § 600.1(a)). The court generally does not hear oral argument on Mondays, although it may if a term is short or particularly busy.

Attorneys should arrive far enough in advance of the session's beginning to go through security, place any coats or umbrellas in the coatroom (they are forbidden in the courtroom), and complete a notice of appearance form. The court's main entrance is on East 25th Street, just off Madison Avenue. There is one courtroom, located on the main floor, to the right of the entrance.

After hanging up any coats, counsel should take a notice of appearance form and updated daily calendar from the table between the courtroom and coatroom. The notice of appearance requires basic identifying information about the appeal and the attorney arguing it. Every attorney who is arguing must complete a notice of appearance. Depending on whether the courtroom has opened yet, counsel submit the notice to: the court officer at the lobby desk, before the courtroom opens or the calendar clerk (seated on the far side of the bench), after the courtroom opens.

When the court calls a case on the calendar, all of the attorneys in the case should stand up at their seats, and remain standing until the court assigns time to all of the parties in the case. The appellant's counsel should request time for opening argument and rebuttal if they want it. Then the respondent's counsel should request time. Attorneys should not identify themselves beyond saying that they represent appellant or respondent, or specifying their client if there are multiple

parties on a side. If the justice presiding thinks that an attorney asked for too much time, she often asks whether that amount is really necessary. At this point, counsel should generally reduce the request. An attorney who really believes that he needs the time originally requested should very briefly explain why, without arguing the appeal.

After all parties in a case request time, the justice presiding announces how much the court is granting, including for rebuttal. The announcement often is something like, "Six, two, and six," meaning six minutes for the appellant, two minutes for rebuttal and six minutes for the respondent. If the presiding justice just says something like "Thank you" or "OK," that means the parties' requests are granted. Counsel then sit down, and the court continues down the calendar. The time granted is typically less than the time requested by the parties during the briefing process or stated by the court on the daily calendar. If the opposing party is not present, an attorney, especially a respondent's attorney, should consider offering to submit the case if the court has no questions. The court typically prefers offers to submit to requests for one-sided argument.

On the lectern in the First Department courtroom are two lights, red and white. The white light means that counsel have two minutes left. The red light means that counsel should conclude their argument. The court keeps separate track of the time for the appellant's opening and rebuttal. An appellant therefore need not worry about using rebuttal time if the opening argument runs over because of active questioning by the court. Counsel should begin their argument by introducing themselves and their client. A formal "May it please the Court" is unnecessary. Attorneys commonly begin with something like, "Good afternoon, Your Honors. Jane Doe of Doe & Doe for appellant ABC Co."

Counsel should then highlight the key legal or factual points of their argument (for example, "The court should vacate the judgment below for three reasons: [REASON ONE], [REASON TWO] and [REASON THREE]" or "The supreme court's order is clearly erroneous under the Court of Appeals' decision in [PRECEDENT]"). Attorneys need not use all of their allotted time. If the court has few questions and counsel have made their points, counsel can offer to rest if the court has no further questions. The court almost always accepts this kind of offer happily.

**Iowa State Court Appeals - Part II**

Published on June 26, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

A decision of the Iowa Court of Appeals is final and cannot be reviewed by any other Iowa court unless the Iowa Supreme Court grants an application for further review. An appellant may seek further review of interlocutory orders and final judgments and orders. A party may file an application for further review of a Court of Appeals decision as of right, but whether the Supreme Court accepts the case for further review is a matter of judicial discretion. Iowa Code §§ 602.4102(4) and 602.5106(2); Iowa R. App. P. 6.1103(1)(b).

An appellant may seek further review of interlocutory orders and final judgments and orders. A party can appeal interlocutory rulings to the Supreme Court in advance of final judgment only by permission Iowa R. App. P. 6.103(3) and 6.104(1)(a). A party does not waive any error in an interlocutory order or in a final adjudication by proceeding to trial or repleading, and may challenge that order on appeal of the final judgment. Iowa R. App. P. 6.103(3). In deciding whether to accept a case decided by the Court of Appeals for further review, the Supreme Court will consider whether: the Court of Appeals has entered a decision in conflict with the decision by the Supreme Court or another Court of Appeals decision on an important matter; the Court of Appeals has decided a substantial question of constitutional law or an important question of law that has not been, but should be, settled by the Supreme Court; the Court of Appeals has decided a case where there is an important question of changing legal principle; and whether the case presents an issue of broad public importance that the Supreme Court ultimately should determine. Iowa R. App. P. 6.1103(1)(b).

There are no restrictions on the types of issues the Supreme Court can consider. All appeals are taken initially to the Iowa Supreme Court, Iowa's highest appellate court. Iowa Code § 602.4102(2). Following the submission of briefs, the Supreme Court may elect to retain the case or transfer it to the Court of Appeals (Iowa's intermediate appellate court). The Supreme Court ordinarily retains cases: presenting substantial constitutional questions as to the validity of a statute, ordinance, court rule, or administrative rule; presenting substantial issues in which there appears to be a conflict between a published decision of the Court of Appeals or Supreme Court; presenting substantial issues of first impression; presenting fundamental and urgent issues of broad public importance requiring prompt or ultimate determination by the Supreme Court as well as cases involving lawyer discipline and controversies presenting substantial questions of enunciating or changing legal principles. Iowa R. App. P. 6.1101(2).

A party must submit an application to the Supreme Court for further review of a Court of Appeals decision within 20 days after the Court of Appeals files its decision. Here, an appellant must pay the Supreme Court Clerk a filing fee or file a motion to waive or defer the fee under Rule 6.703 of the Iowa Rules of Appellate Procedure. The Supreme Court cannot extend the deadline for filing an application for further review of a Court of Appeals' decision unless the clerk of the district court failed to notify the appellant of the filing. Iowa R. App. P. 6.1003(1) and 6.101(5)).

An application to the Supreme Court for further review of a Court of Appeals decision must consist of a single document containing: the questions presented for review, a table of contents, a direct and concise statement supporting further review, a brief supporting the request for review, the Court of Appeals' decision, an evidentiary exhibit not exceeding ten pages and the District Court's order if the Court of Appeals: affirmed or enforced the order without issuing an opinion; issued a memorandum opinion; or affirmed by operation of law. Iowa R. App. P. 6.903(1) and 6.1103(1)(c).

The application must allege grounds for review, which may include that: the Court of Appeals rendered a decision that conflicts with a prior holding of a published Court of Appeals or Supreme Court opinion; the Court of Appeals decided a substantial question of constitutional law or an important question of law that has not been, but should be, settled by the Supreme Court; the Court of Appeals decided a case addressing an important question of changing legal principles; or that the case presents an issue of broad public importance that the Supreme Court should ultimately determine. See Iowa R. App. P. 6.1103(1)(b).

An application for further review or resistance cannot exceed two-fifths of the length limitations for a required brief specified in Rule 6.903(1)(g) of the Iowa Rule of Appellate Procedure, excluding: the Court of Appeals decision, the table of contents, the table of authorities, evidentiary exhibits, district court orders, and administrative agency decisions. Iowa R. App. P. 6.1103(4).

In Iowa, procedendo from a Court of Appeals action does not issue until 27 days after an opinion of the Court of Appeals is filed and will not issue while an application for further review by the Supreme Court is pending. Procedendo from a Court of Appeals action in termination of parental rights or child-in-need-of-assistance cases does not issue until 17 days after an opinion of the Court of Appeals is filed. Iowa R. App. P. 6.1208(2).

Procedendo from a Supreme Court action does not issue until 21 days after an opinion of the Supreme Court is filed, and does not issue while a petition for rehearing or an application for extension of time to file a petition for rehearing is pending. Iowa R. App. P. 6.1208(1). If an application for further review is denied, the Supreme Court clerk must immediately issue procedendo. Iowa R. App. P. 6.1103(6).

In Iowa, the only factual material submitted to the court on an application for further review is a single evidentiary exhibit not exceeding ten pages and the District Court's order. If an application for further review is granted, the Supreme Court may require the parties to file supplemental briefs on all or some of the issues to be reviewed. Iowa R. App. P. 6.1103(5). If supplemental briefing is required, the Supreme Court informs the parties of the required briefing schedule. Briefing deadlines are to be determined from the filing of the last transcript ordered for the appeal.

Appellate briefs can use proportionally spaced typeface, monotype typeface or be handwritten. If a brief uses a proportionally spaced typeface, it must not contain more than 14,000 words (Iowa R. App. P. 6.903(1)(g)(1)). If a brief uses a monotype typeface, it must not contain more than 1,300 lines of text (Iowa R. App. P. 6.903(1)(g)(2)). A handwritten brief cannot exceed 50 pages (Iowa R. App. P. 6.903(1)(g)(3)). A reply brief cannot contain more than half of the type volume specified for a required brief (Iowa R. App. P. 6.903(1)(g)). Parties must follow these limits if the

Supreme Court grants further review and orders briefing, unless the Supreme Court otherwise orders.

Headings, footnotes, and quotations count toward the word or line limitation, but the table of contents, table of authorities, statement of the issues, and certificates do not count toward the word or line limitation (Iowa R. App. P. 6.903(1)(g)). Briefs must include a certificate of compliance, using Rule 6.1401, Form 7 of Iowa Rule of Appellate Procedure, certifying compliance with the length limitations. Iowa R. App. P. 6.903(1)(g)(4). In the Iowa Supreme Court, Oral argument is not granted as a matter of right. Decisions concerning the necessity and scheduling of oral argument are made by the court hearing the appeal (Iowa Ct. R. 21.21). Time limitations are imposed at the discretion of the court hearing the appeal. If oral argument is granted by the court, the court will fix and notify the parties of the time allotted for the oral argument. Iowa R. App. P. 6.908(3). If oral argument is granted, 15 minutes is typically allotted to each side.

**Iowa State Court Appeals - Part I**

Published on June 26, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

A party can appeal as of right any final order or judgment from the District Court involving the merits or materially affecting the final decision (Iowa R. App. P. 6.103(1)). A judgment is final if it: finally adjudicates the rights of the parties and puts it beyond the power of the court which made it to place the parties in their original position. Helland v. Yellow Freight Sys., Inc., 204 N.W.2d 601, 604 (Iowa 1973).

Final orders and judgments include, but are not limited to, orders: granting or denying a new trial as well as orders setting aside a default judgment in an action for annulment or dissolution of marriage. Iowa R. App. P. 6.103(1). A judgment or order that disposes of less than the entire case

may still be considered final for purposes of appeal if it completely disposes of one or more claims that are distinct and separable from the undecided claims. Mason City Prod. Credit Ass'n v. Van Duzer, 376 N.W.2d 882, 884-85 (Iowa 1985). A final order that dismisses some, but not all, of the issues or parties in an action may be appealed from the final judgment disposing of the remainder of the case even if those issues and parties are severable. Iowa R. App. P. 6.101(1)(d).

In Iowa, a party can appeal by permission two types of rulings: interlocutory orders and orders subject to discretionary review. All interlocutory rulings may be appealed by permission in advance of final judgment. Iowa R. App. P. 6.104(1)(a). When seeking permission to appeal an interlocutory order, a party must demonstrate why: the order affects substantial rights, the order materially affects the final decision, and the interests of justice will be better served by a determination of the order's correctness before trial. Iowa R. App. P. 6.104(1)(d).

A party does not waive any error in an interlocutory order (or in a final adjudication under Rule 1.444 of the Iowa Rule of Civil Procedure) by proceeding to trial or pleading over and may challenge that order on appeal of the final judgment. Iowa R. App. P. 6.103(3). An appellant may file an application for discretionary review of certain orders specified by statute that are not subject to an appeal as a matter of right. Iowa R. App. P. 6.106(1). In addition, except for actions involving an interest in real estate, small claim judgments may only be appealed with permission. Iowa R. App. P. 6.105.

All appeals are taken initially to the Iowa Supreme Court, Iowa's highest appellate court. The Supreme Court may retain the case or transfer it to the Court of Appeals

An appellant generally must file a notice of appeal within 30 days after the filing of either: the final order or judgment. Or, barring that, a ruling on a timely motion for a new trial; for judgment

notwithstanding the verdict; or to reconsider, enlarge, or amend. Iowa R. App. P. 6.101(1); Iowa R. Civ. P. 1.904(2). By way of contrast, a notice to cross-appeal must be filed within the later of: the 30-day limit for filing a notice of appeal or ten days after the notice of appeal is filed. Iowa R. App. P. 6.101(2). If a party files a notice of appeal before the District Court clerk files the District Court order or judgment, the appeal will be considered timely if the District Court judgment is filed within 30 days after the notice of appeal is filed (Iowa R. App. P. 6.101(3)).

An appellant must file an application for interlocutory appeal within 30 days after entry of the challenged ruling or order. Iowa R. App. P. 6.104(1)(b)(2). An appellant must file an application for discretionary review within 30 days after entry of the challenged ruling, order, or judgment. Iowa R. App. P. 6.106(1)(b).

A party starts an appeal as of right by timely filing a notice of appeal with the District Court clerk where the original order or judgment was entered. Iowa R. App. P. 6.102(2). The notice must be signed by either the appellant or appellant's counsel and must specify: the parties taking the appeal as well as the judgment, decree, order, or part appealed from. Iowa R. App. P. 6.102(2)(a). The notice of appeal must be served on all parties and any required nonparty. Iowa R. App. P. 6.702(1). The notice of appeal must also be served on the court reporters who reported any proceedings that are subject of the appeal in the manner prescribed by Rule 6.702 of the Iowa Rules of Appellate Procedure; the Supreme Court clerk, and the Attorney General, if the state is a party to the case in the manner prescribed by Rule 1.442(4) of the Iowa Rules of Civil Procedure. Iowa R. App. P. 6.102.

Registered filers are electronically served but non-registered parties must be served with a paper copy. Iowa R. App. P. 6.702; Iowa R. Elec. P. 16.315(2). An informational copy of the notice must be filed electronically with the Iowa Supreme Court. Iowa R. App. P. 6.102(2)(b). The notice of appeal must include a certificate of service. Iowa R. App. P. 6.102(1)(a)(2) and 6.102(2)(b). The notice of appeal must also comply with Rule 6.1401, Form 1 of the Iowa Rules of Appellate Procedure. Iowa R. App. P. 6.102(2)(a).

A party starts an appeal from an interlocutory order by filing an application for interlocutory appeal stating the following with particularity: the substantial rights affected by the order or ruling, how the order or ruling will materially affect the final decision, and how the interests of justice will be better served by a determination of its correctness before trial. Iowa R. App. P. 6.104(1)(d). The party must electronically file the application Iowa R. App. P. 6.100; Iowa R. Elec. P. 16.302.

The application must comply with the general motion form and content requirements contained in Rules 6.1002(1) and 6.1007 of the Iowa Rules of Appellate Procedure. The appellant must file the original application with the Supreme Court clerk, and serve all parties and any required nonparty. Iowa R. App. P. 6.702(1). The application must also be served on the Attorney General, if the state is a party, in accordance with Rule 1.442(2) of the Iowa Rules of Civil Procedure. Iowa R. App. P. 6.104(1). The Supreme Court may grant the application "on finding that such ruling or order involves substantial rights and will materially affect the final decision and that a determination of its correctness before trial on the merits will better serve the interests of justice." Iowa R. App. P. 6.104(2).

An appellant starts a discretionary review appeal by filing an application in the form of and containing the requirements set out in Rules 6.1002(1) and 6.1007 of Iowa Rules of Appellate Procedure. The application must state the grounds on which the review should be granted. The application must be electronically filed. Iowa R. App. P. 6.100; Iowa R. Elec. P. 16.302. The appellant must file the original application and three copies with the Supreme Court clerk, and serve the application on all parties and any required nonparty. Iowa R. App. P. 6.702(1). The application must also be served on the Attorney General, if the state is a party, in accordance with Rule 1.442(2) of the Iowa Rules of Civil Procedure (Iowa R. App. P. 6.106(1)(c)).

An appeal does not vacate or affect the order or judgment on appeal. Except where the Supreme Court has so ordered under a rule, an appeal does not stay proceedings under an order or judgment unless the appellant provides a bond. When an appeal bond has been approved and filed, the clerk issues an order that requires the appellee to stay proceedings under the judgment or order appealed from. Iowa R. App. P. 6.601. A party aggrieved by the clerk's approval or refusal to approve a bond may apply to the District Court to review the clerk's decision. Iowa R. App. P. 6.602.

The filing of an interlocutory appeal application, discretionary review application, or petition for writ of certiorari does not stay the District Court proceedings. To obtain a stay, the appellant may file an application with either: the District Court requesting a stay of proceedings or a continuance or the state Supreme Court. Iowa R. App. P. 6.104(1)(f) and 6.106(1)(f). An application requesting a stay from the Supreme Court must indicate: the dates of the proceedings to be stayed and the reason a stay is necessary. Iowa R. App. P. 6.104(1)(f) and 6.106(1)(f).

A party may request oral argument subject to the appellate court's approval. Iowa R. App. P. 6.908(1) to (3). If oral argument is granted by the court, the court will fix and notify the parties of the time allotted for the oral argument. Iowa R. App. P. 6.908(3). The Iowa Court of Appeals typically grants the appellant and appellee ten minutes each and an additional five minutes to appellant for rebuttal.

**New Hampshire Supreme Court Procedure**

Published on June 26, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The New Hampshire Supreme Court is New Hampshire's only appellate court. A party is entitled to an appeal as of right in all mandatory appeals. N.H. Sup. Ct. R. 3 and 7. A mandatory appeal is an appeal in compliance with the New Hampshire Supreme Court Rules that is either: filed by the state pursuant to N.H. RSA § 606:10, an appeal from a final decision on the merits issued by a superior court, district court, probate court, or family division court, or an appeal ffrom an order that resolves a case on one or more, but fewer than all, claims or parties, as long as (1) the court

explicitly directs that the order be treated as a final decision on the merits as to those claims or parties, under N.H. Super. Ct. Civ. Rule 46(c)(1) and (2) a final decision on the merits of the entire case would qualify as a mandatory appeal. N.H. Sup. Ct. R. 3.

A party make take an appeal that does not qualify as a mandatory appeal at the discretion of the New Hampshire Supreme Court. N.H. Sup. Ct. R. 7(1)(B). The Supreme Court reviews each discretionary notice of appeal on its merits and may: accept the appeal as a whole or in part, deny the appeal as a whole or in part., or summarily dispose of the appeal as a whole or in part. N.H. Sup. Ct. R. 7(1)(B).

When deciding to accept or deny a discretionary appeal, the Supreme Court considers whether: the case raises: a question of first impression; a novel question of law; an issue of broad public interest; an important state or federal constitutional matter; or an issue on which there are conflicting decisions in New Hampshire courts. Whether the decision being appealed conflicts with a statute or with prior decisions of the Supreme Court and whether the decision below is: erroneous; illegal; unreasonable; or an unsustainable exercise of discretion.

A party may also seek appellate review of an interlocutory order, subject to the discretion of the Supreme Court. N.H. Sup. Ct. R. 8(1). The court may permit an interlocutory appeal where: a substantial basis exists for a difference of opinion on the controlling question of law that would be presented in the appeal. And the interlocutory appeal may: materially advance the termination or clarify further proceedings of the litigation; protect a party from substantial or irreparable injury; or present the opportunity to decide, modify, or clarify an issue of general importance in the administration of justice.

There are no restrictions on the types of issues the New Hampshire Supreme Court can consider. However, in all appeal notices, counsel must certify that each issue in the appeal has been properly raised and preserved (N.H. Sup. Ct. R. 26(4)).

The moving party must file a notice of appeal within 30 days of the clerk's written notice of the decision on the merits. N.H. Sup. Ct. R. 7(1)(A)-(B), (2). A timely filed motion to reconsider will toll the 30-day appeal period. N.H. Sup. Ct. R. 7(1)(C); see also In re Ellis, 636 A.2d 62, 64 (N.H. 1993). If a timely notice of appeal is filed by a party, any other party may file a notice of cross-appeal within ten days from the date on which the first notice of appeal was filed (N.H. Sup. Ct. R. 7(5)). If the last day of the appeal or cross-appeal period falls on a Saturday, Sunday, legal holiday, or other day on which the clerk's office is closed, the period extends until the next day that the clerk's office is open. N.H. Sup. Ct. R. 27(1).

To start a mandatory, automatic appeal, a party must file a Notice of Mandatory Appeal with the clerk of the Supreme Court. N.H. Sup. Ct. R. 7(1)(A), (2). The Notice of Mandatory Appeal form requires counsel to provide basic identifying information about the appeal and list the specific questions to be raised on appeal. The moving party must also attach: the decision being appealed; the clerk's written notice of the decision being appealed; any order disposing of a timely filed post-trial motion; and the clerk's written notice of any order disposing of a timely-filed post-trial motion.  N.H. Sup. Ct. R. 7(6)(A). If the appeal requires the production of a transcript, the moving party must complete the Supreme Court transcript order form, which is part of the Notice of Mandatory Appeal form.

To start an appeal by permission, a party must file a Notice of Discretionary Appeal. N.H. Sup. Ct. R. 7(1)(B). The notice form asks the appealing party to briefly describe the case and identify the basis for the court's review of each issue on appeal. The moving party must also attach: the order being appealed; the clerk's notice of the order; any order disposing of a timely-filed post-trial motion; the clerk's notice of any order disposing of a timely-filed post-trial motion. N.H. Sup. Ct. R. 7(6)(B). If the moving party believes the Supreme Court needs further documentation to decide whether to accept the discretionary appeal, this documentation must be filed in a separately bound appendix. N.H. Sup. Ct. R. 7(6)(B).

For interlocutory appeals, a party must file an interlocutory appeal statement, stating the basis for the appeal, with the trial court. If the trial court signs the interlocutory appeal statement, the trial court will provide written notice acknowledging the signature, and then the party must file it in the Supreme Court within ten days of the trial court's written notice. N.H. Super. Ct. Civ. Rule 46(a); N.H. Sup. Ct. R. 8.

All rulings from the New Hampshire Superior Court are automatically stayed when a timely appeal is filed unless the New Hampshire Supreme Court has ordered otherwise (N.H. Super. Ct. Civ. Rule 46(b)). Please see New Hampshire Supreme Court Rule 16 for brief format regulations.

As far as oral argument is concerned, the Supreme Court may: designate the case for resolution on the briefs, refer the case to the 3JX panel for oral argument, which is a panel of three Supreme Court Justices, or schedule the case for argument before the full Supreme Court. The New Hampshire Supreme Court will probably not order oral argument if: the questions of law are not novel, and the briefs adequately cover the arguments; the questions of law involve no more than an application of settled rules of law to a recurring fact situation, the briefs refer to the record, which will determine the outcome, and the sole question of law is: the sufficiency of the evidence;

the adequacy of instructions to the jury; or rulings on the admissibility of evidence. N.H. Sup. Ct. R. 18(1).

During 3JX arguments, the court allows each side five minutes for oral argument. N.H. Sup. Ct. R. 12-D(6)(b). The Supreme Court seeks to provide each side one minute of uninterrupted argument before questioning. Counsel has the right to waive the Supreme Court's uninterrupted argument policy.

On the other hand, during full bench arguments, the court allows each side up to 15 minutes for oral argument. However, the court may grant additional time if a party shows good cause for the additional time in the party's brief. N.H. Sup. Ct. R. 18(3). The court allows each side three minutes of uninterrupted argument. Counsel has the right to waive the Supreme Court's uninterrupted argument policy. The appellant may reserve rebuttal time if it provides advance notice to the court timer. The court does not encourage rebuttal.

**Initiating An Appeal Before the Second Circuit**

Published on June 22, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Second Circuit has jurisdiction over most appeals from the US District Courts for the: District of Connecticut, Eastern District of New York, Northern District of New York, Southern District of New York, Western District of New York, and District of Vermont. See 28 U.S.C. §§ 41, 86, 112, 126, and 1294.

An attorney registers for electronic filing in the Second Circuit by completing the online registration form at the federal Public Access to Court Electronic Records (PACER) Appellate Courts webpage. The Second Circuit permits attorneys to apply for electronic filing privileges before they obtain admission to the court's bar. An attorney must register for electronic filing in the Second Circuit even if the attorney already has a PACER account or electronic filing privileges in another circuit. Although the Second Circuit's implementation of NextGen CM/ECF allows attorneys to use a single login for both PACER research and electronic filing, each of those tasks requires a separate authorization.

To obtain admission to practice in the Second Circuit, an attorney must submit: the completed attorney admission application, the signed attorney admission oath, as provided by FRAP 46, the motion from an admitted attorney sponsoring the application, and the $221 attorney admission fee. 2nd Cir. R. 46.1(a), 2nd Cir. R. 46.1(c), and 2nd Cir. Fee Schedule (Dec. 1, 2016).

The Second Circuit requires attorneys to renew their admission every five years. To do so, an attorney must submit an attorney admission renewal application and the $25 attorney admission renewal fee. (2nd Cir. R. 46.1(a)(2), 2nd Cir. R. 46.1(c), and 2nd Cir. Fee Schedule (Dec. 1, 2016).) Attorneys may be admitted to the Second Circuit pro hac vice under limited circumstances. To obtain such admission, an attorney must: be a member in good standing of the bar of a state or the District of Columbia and make a motion to the Second Circuit demonstrating: that he is representing a party proceeding in forma pauperis; or that exceptional circumstances excusing an application for full admission. 2nd Cir. R. 46.1(d).

Any party aggrieved by a district court's order or judgment may appeal or seek permission to appeal. Generally a party is aggrieved if the district court awards any relief against it or denies some or all of the relief it requested. A party is not aggrieved merely because the district court makes adverse factual findings or employs an unfavorable legal analysis.

An aggrieved party generally has the right to appeal if the district court enters a final order or judgment. 28 U.S.C. § 1291. A final order or judgment is one that concludes the district court proceedings as a whole. An order or judgment that concludes the case for only some parties or claims is not final for purposes of appeal. US ex rel. Polansky v. Pfizer, Inc., 762 F.3d 160 (2nd Cir. 2014); Citizens Accord, Inc. v. Town of Rochester, 235 F.3d 126, 128 (2d Cir. 2000).

An order or judgment that resolves all claims for all parties generally is final even if there is an outstanding request for attorneys' fees and costs Ray Haluch Gravel Co. v. Central Pension Fund of the Int'l Union of Operating Engineers, 134 S. Ct. 773 (2014). Therefore, if a court awards attorneys' fees, the appellant should either: amend the notice of appeal to include the order awarding fees or file a second notice of appeal and request that the court consolidate the appeals.

An aggrieved party also has the right to appeal an interlocutory order that does any of the following: grants, denies, dissolves, modifies, or refuses to dissolve or modify injunctive relief, appoints a receiver or refuses to wind up a receivership, determines the rights and liabilities of the parties to an admiralty case or falls within the collateral order doctrine.

A party generally must appeal as of right within 30 days after entry of the order or judgment from which it is appealing (FRAP 4(a)(1)(A)). However, a party has 60 days after entry to file a notice of appeal where the US, a federal agency or a federal officer sued in connection with the officer's official duties is a party to the action (FRAP 4(a)(1)(B)). Entry generally occurs when the district court clerk lists the order or judgment on the district court docket (FRAP 4(a)(7)).

Within the applicable time period, the appellant must complete all steps required by the district court's filing process. Failure to do so may result in the notice of appeal being deemed non-compliant with the filing deadline. (Franklin v. McHugh, 804 F.3d 627 (2d Cir. 2015). If one party timely files a notice of appeal, the deadline for any other party to file a notice of appeal is the later of 14 days after the first filing or the end of the applicable 30- or 60-day period described above. FRAP 4(a)(3). The time limits for taking an appeal are jurisdictional. Failure to comply results in dismissal of the appeal. Johnson v. Univ. of Rochester Med. Ctr., 642 F.3d 121, 124 (2d Cir. 2011).

In calculating the time to file a notice of appeal, attorneys should consult FRCP 6 (FRAP 1(a)(2) (when FRAP require filing in district court, procedure must comply with district court practice) and FRAP 4 (1998 advisory committee notes)). Under that rule, when calculating a time period stated in days (as is the case for appealing as of right): exclude the day of the event that triggers the period, count every day, including intermediate Saturdays, Sundays, and legal holidays, and include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not Saturday, Sunday, or a legal holiday. FRCP 6(a)(1) and FRAP 26(a)(1) (same).

**Second Circuit Motions**

Published on June 22, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Second circuit appellate motion practice is usually much more limited than district court motion practice. Many appeals conclude without the parties making a single motion. Still, parties do sometimes make motions to the federal courts of appeals. Motions may seek either dispositive relief (for example, dismissal of the appeal) or non-dispositive relief (for example, an extension of

time to file a document). In addition to the general requirements for making and responding to motions set by the local and federal, certain types of motions have additional requirements.

When making an appellate motion, counsel must comply with rules governing a motion's: timing, contents, formatting, and notice, service, and filing. The Second Circuit does not have a set time for making all motions. A party must make certain types of motions within a specified time of a given event.

The Second Circuit's local rules require different contents than the corresponding federal rules. Every motion filed in the Second Circuit must contain: a Motion Information Statement, known as Form T-1080, a supporting affidavit or declaration, a corporate disclosure statement (for nongovernmental corporations). FRAP 26.1; 2nd Cir. R. 27.1(a).

A Second Circuit motion may include a memorandum of law. 2nd Cir. R. 27.1(a)(3). A memorandum of law prepared on a computer must include a certificate of compliance with the type-volume limitations. FRAP 32(g). Every Second Circuit motion must begin with Form T-1080. 2nd Cir. R. 27.1(a)(2). The form requires counsel to provide information about: the identity of the action, the parties, and the attorneys, the nature of the motion and the relief sought, whether the other parties oppose the motion or intend to file responsive papers.

Although Form T-1080 must precede the other motion papers, it is still good practice to include on the first page of any other motion paper the following identifying information: the name of the court (United States Court of Appeals for the Second Circuit). The short title of the appeal, the docket number of the appeal, and a short descriptive title identifying the filing party, the document, and the motion. Please consult Second Circuit Rules 25, 27, and 32 for formatting requirements.

Any party may respond to a motion. FRAP 27(a)(3)(A). A party responding to a motion must comply with rules governing the response's: timing, contents, formatting, and service and filing.

Any party may respond to a motion within ten days after service of the motion, unless the court sets a different time. FRAP 27(a)(3)(A). A party receiving a motion by mail or overnight delivery may add three days to the time otherwise available to respond. Counsel should respond to procedural motions as soon as reasonably possible, however, because the court may decide these motions without waiting ten days. FRAP 27(b).

The response must consist of an affidavit or declaration, and a corporate disclosure statement if applicable. A motion response also may include a memorandum of law. FRAP 26.1 and 27(a); 2nd Cir. R. 27.1(a)(3). A memorandum of law prepared on a computer must include a certificate of compliance with the type-volume limitations. FRAP 32(g). A responding party does not need to submit a Form T-1080. A responding party's affidavit or declaration must contain whatever facts are necessary for the response. The affidavit or declaration should contain only facts, not legal argument FRAP 27(a)(2)(b)(ii); 2nd Cir. R. 27.1(a)(3). The affidavit or declaration may include relevant documentary exhibits.

Of course, the Second Circuit permits a party to file a memorandum of law as part of its response. 2nd Cir. R. 27.1(a)(3). A memorandum of law should contain legal argument in response to the motion. Some motions, such as motions to extend the briefing schedule or to file an oversize brief, do not usually involve memoranda of law. Responses to these motions typically rely solely on the facts contained in the affidavits or declarations. Other motions, such as motions to dismiss an appeal, may require legal argument and citations to authority. Responses to these motions are more likely to include memoranda of law.

Counsel should include on the first page of any motion response document the following identifying information: the name of the court (United States Court of Appeals for the Second Circuit); the short title of the appeal; and the docket number of the appeal.

A movant has the option of submitting a reply in support of its motion. Any reply is due within seven days after service of the response unless the court sets another time. FRAP 27(a)(4). A party receiving a motion response by mail or overnight delivery may add three days to the time otherwise available to reply. For appeals filed on or after December 1, 2016, parties receiving a document by electronic service no longer may add three days to a response time calculated from the date of service. FRAP 26(c). For appeals filed before December 1, 2016, counsel should consider contacting the clerk's office to determine whether the three additional days still apply to electronic service. The Supreme Court order amending the FRAP as of December 1, 2016 states that the amendments apply "insofar as just and practicable" to appeals pending before that date. Counsel should submit any reply in support of a procedural motion as soon as reasonably possible, however, because the court may decide this type of motion without waiting for a reply FRAP 27(b).

Taking an appeal does not automatically stay the enforcement or execution of a district court's judgment or order. An appellant that wants a stay must request it by motion. A party should first move for a stay pending appeal in the district court. A party should move the Second Circuit for a stay only if the district court denies the stay or if unusual circumstances make a motion to the district court impracticable. FRAP 8(a)(1). For motions for stays or injunctions pending appeal, the Form T-1080 must include all of the information generally required for a motion and also state:

whether the movant sought the same relief from the district court, whether the movant previously sought the same relief in the Second Circuit, the date on which the movant would like the motion submitted to the court, known as the return date, and the nature of the emergency or other circumstances warranting a stay.

The affidavit or declaration in support of the motion must state either: that the movant sought a stay from the district court, that the district court did not grant the relief sought and any reasons the district court gave for not granting the motion. As well as the reasons why moving first in the district court is impracticable. FRAP 8(a)(2)(A). Counsel should attach as an exhibit to the affidavit or declaration any written order, or the transcript of any oral order, in which the district court denied a stay.

**Opposing Certiorari Petitions Before the U.S. Supreme Court**

Published on June 22, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Unless the Supreme Court directs otherwise, a respondent is not required to file a brief in opposition to a cert petition. U.S. Sup. Ct. R. 15.1. Attorneys who regularly appear before the Supreme Court take varying approaches when deciding whether to file an opposition but the most typical route is to not file an opposition brief (known as waiving a response) because the Court typically does not grant review without calling for a response (sometimes called the CFR).

If a respondent ultimately decides to waive response, counsel should file and serve a waiver form, indicating that the respondent does not intend to file a response unless the Supreme Court requests one. Doing so notifies the Court and the petitioner of how the respondent intends to proceed and may lead to a speedier denial of certiorari.

When deciding whether to file a brief in opposition, respondent's counsel always should consider whether the case is "certworthy," meaning that it presents a question that satisfies one or more factors governing the Supreme Court's exercise of its certiorari jurisdiction. U.S. Sup. Ct. R. 10.

If a petition arguably presents a certworthy issue, the respondent typically should file an opposition brief at the outset rather than waiving response. This ensures that the law clerk or Justice reading the petition does so with the benefit of the respondent's counterarguments, rather than allowing the petition alone to create the first impression of the case until the Court calls for a response. If a respondent waives response in a case involving a substantial question of law, the Court may view the respondent as lacking in candor or not reflecting an honest assessment of the merits.

However, certain cert petitions may appear meritless on their face, allowing the respondent to safely waive a response. For example, the Supreme Court rarely grants a writ of certiorari: where the decision below merely: consists of erroneous factual findings; addresses questions of state law, resolves conflicts among the federal district courts, or misapplies a properly stated rule of law. U.S. Sup. Ct. R. 10.

Because Supreme Court review is exceedingly rare, a respondent typically risks little by waiving response. In any given year, the Supreme Court denies the overwhelming majority of cert petitions, leaving the decisions below intact without further review. Moreover, the odds that the Court grants certiorari are even lower in cases that do not involve a government entity party on either side.

There may be some cases however where a focused brief in opposition can highlight why review is improper or unnecessary, even if the case arguably presents a certworthy question. For example, for cases involving circuit splits, a cert opposition may be able to demonstrate that: the split is so uneven that the outlier courts may change course, only a handful of courts have addressed the issue. The conflict relates to an isolated issue that may not arise again. If so, the respondent should consider filing an opposition brief to highlight these issues. An opposition brief also may be able to highlight critical obstacles to Supreme Court review, including: vehicle issues, mootness, alternative grounds for affirmance, waiver, and finality.

Although not required, the waiver form: notifies the Court and the petitioner of how the respondent intends to proceed, serves as an entry of appearance for respondent's counsel, should the Court call for a response and may lead to a speedier denial of certiorari, because the Supreme Court Clerk distributes a petition for the Court's consideration immediately after receiving a waiver form. If the respondent files a brief in opposition, by contrast, the Clerk typically does not distribute the petition until 14 days after the respondent files its brief. U.S. Sup. Ct. R. 15.5.

Counsel must serve and file a brief in opposition within 30 days after the Clerk places the case on the Supreme Court's docket. U.S. Sup. Ct. R. 15.3. When calculating the time to file a brief in

opposition, counsel should: exclude the day of the event that triggers the period (entry of the case on the Supreme Court's docket), count every day, including intermediate Saturdays, Sundays, and legal holidays, and include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not Saturday, Sunday, or a legal holiday. U.S. Sup. Ct. R. 30.1.

If the opposition is due on a day when the Supreme Court is closed, the time for filing is extended to the next regular business day. U.S. Sup. Ct. R. 30.1. A brief in opposition is timely filed if, on or before the last day for filing: the Supreme Court Clerk receives the opposition. A brief in opposition typically contains: cover, statement of the questions presented for review, list of parties to the proceedings, corporate disclosure statement, table of contents, table of authorities, list of citations to the decisions below, statement of jurisdiction, list of constitutional and statutory provisions, statement of the case, reasons for denying the petition, and conclusion. U.S. Sup. Ct. R. 15.3; U.S. Sup. Ct. R. 24; U.S. Sup. Ct. R. 29.6; U.S. Sup. Ct. R. 34.

**Oral Argument Before the Second Circuit**

Published on June 22, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Oral argument provides the parties with a final opportunity to advocate before the three-judge panel that will decide the appeal. It most importantly provides the parties with an opportunity to answer any questions or clear up any confusion that the judges may have after reading the briefs. The Second Circuit requires each party to tell it whether or not the party wants oral argument. 2nd Cir. R. 34.1(a).

A federal court of appeals must grant a request for oral argument unless a three-judge panel reviews the briefs and record and makes any one of the following findings: the appeal is frivolous, the dispositive issue on the appeal already has been authoritatively decided, or oral argument would not significantly aid decision of the appeal given the presentation of the facts and legal argument in the briefs and record. FRAP 34(a)(2) and 2nd Cir. R. 34.1(b).

Each party must serve and file an Oral Argument Statement within 14 days after the filing of the last appellee's brief. A party must submit an Oral Argument Statement even if it does not want oral argument. Any party that fails timely to submit an Oral Argument Statement may not be permitted to argue even if other parties request and receive oral argument. 2nd Cir. R. 34.1(a). The Oral Argument Statement requires counsel to state: the short title and docket number of the appeal, which party is submitting the form, whether the party wants oral argument; wants oral argument only if another party wants oral argument; or does not want oral argument, the name of the attorney presenting the argument, and any dates on which the person presenting oral argument is unavailable during the period from six to twenty weeks after the due date of the Oral Argument Statement.

If the Second Circuit decides to hear oral argument, it also determines how much time each side has to present its argument. 2nd Cir. R. 34.1(d). The Second Circuit commonly allots between five and fifteen minutes per side. Time allocations vary depending on which judge is presiding over a given calendar and on the particulars of the cases on that calendar. If there are multiple parties on a side (for example, two appellees), the court may split the time among them. 2nd Cir. R. 34.1(d).

The Second Circuit normally hears oral argument in the Thurgood Marshall US Courthouse, 40 Foley Square, New York, New York. However, due to space constraints at that courthouse, the court may continue to hold certain arguments in the ceremonial courtroom of the Daniel Patrick Moynihan US Courthouse, 500 Pearl Street, New York, New York. Moreover, the Circuit hears oral argument most weekdays from late August through June, and as needed in July and early August. Oral argument sessions usually begin at 10 a.m. and continue until the court has heard all scheduled arguments. The court sometimes has sessions in the afternoon, usually beginning at 2 p.m.

The Second Circuit sometimes begins an oral argument session by calling the calendar. If the court does so, when the presiding judge calls their case, counsel should stand and state that appellant or appellee is ready, present, or the like. Attorneys should not introduce themselves at this time or make other remarks. If all counsel have timely checked in with the deputy clerk, the court sometimes dispenses with the calendar and begins by calling the first case.

There is not necessarily a single customary opening for oral argument in the Second Circuit. While some attorneys begin with a formal "May it please the Court," others begin with a simple "Good morning, Your Honors." Counsel should then briefly identify themselves and the party they represent before proceeding to their contentions.

Counsel should expect a substantial number of questions during oral argument. Second Circuit panels are typically active during oral argument. The judges generally permit counsel some brief opening remarks without interruption, but questions, answers, and follow-up questions commonly take up the bulk of an argument. Counsel should not expect to deliver lengthy prepared statements.

If a losing party that believes the panel's opinion conflicts with controlling precedent or presents an extraordinarily important issue may request rehearing en banc. Rehearing en banc is available even if the court disposed of an appeal by order and did not enter judgment. 2nd Cir. R. 40.2. A party requests rehearing en banc by petitioning the full Second Circuit. Moreover, a party generally must petition for rehearing en banc within 14 days after entry of the Second Circuit's judgment. A party has 45 days to petition for rehearing en banc where the US, a federal agency, or a federal officer sued in connection with her official duties is a party to the action. FRAP 35(c) and 40(a)(1).

A petition for rehearing en banc must demonstrate one of the following. First, the panel decision conflicts with precedent from the Supreme Court or the Second Circuit, requiring consideration by the full Second Circuit "to secure and maintain uniformity of the court's decisions." FRAP 35(b)(1)(A). The petition must cite each conflicting precedent. FRAP 35(b)(1)(A). Or, second, the proceeding involves a question "of exceptional importance," such as a conflict between the panel decision and precedent from other federal courts of appeals (FRAP 35(b)(1)(B)). The petition must concisely state each question (FRAP 35(b)(1)(B)). Please refer to FRAP 32(c) for details on en banc rehearing petition requirements.

**Second Circuit Appeals Appellee Briefs**

Published on June 22, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In the Second Circuit, the appellee's brief needs only some of the sections required in the appellant's brief. The appellee's brief must include: a cover, a corporate disclosure statement, if the appellee is a non-governmental corporation, a table of contents, a table of authorities, a summary of the argument, an argument, a signature. FRAP 25(d), 28(a), (b), and 32(a), (d), and (g); 2nd Cir. R. 25.1(h).

The following sections, in contrast, are optional for the appellee's brief: a jurisdictional statement, a statement of the issues presented for review, a statement of the case, a statement of the standard of review. FRAP 28(b).

Every appellate brief begins with a cover identifying the case and the brief. The cover must contain: the docket number in type at least one inch in height and centered at the top of the page, the name of the court (United States Court of Appeals for the Second Circuit), the full official caption of the appeal, the nature of the proceeding and the name of the court below (for example, On Appeal from the United States District Court for the Eastern District of New York), the title of the brief, which must include the name of the party filing it, and lead counsel's name, address, and telephone number. FRAP 32(a)(2); 2nd Cir. R. 32.1(a)(1).

An appellee that is a non-governmental corporation must file a statement identifying any parent corporation or any publicly held corporation that owns 10% or more of its stock. If the appellee does not have a parent corporation and no publicly held corporation owns 10% or more of the appellee's stock, then the corporate disclosure statement must say so. FRAP 26.1(a).

The appellee's brief must include a table of authorities listing the cases, statutes, and other authorities cited in the brief along with the pages where the appellee has cited each authority. Cases must appear in the table in alphabetical order. FRAP 28(a)(3), (b).

The appellee's brief may include a jurisdictional statement after the table of authorities (FRAP 28(a)(4), (b)). An appellee should include a jurisdictional statement where it disagrees with the appellant about the existence of jurisdiction.

If the appellee includes a jurisdictional statement in the brief, it must state: the basis for the district court's subject matter jurisdiction, the basis for appellate jurisdiction with citations to the appropriate statutes and any relevant facts to determine jurisdiction, the filing dates necessary to determine the timeliness of the appeal. These typically include: the date the lower court entered the order or judgment appealed from; and the date the appellant filed the notice of appeal or petition for permission to appeal. And, finally, that the appeal is: from a final order or judgment disposing of all claims; or premised on some other proper basis for appellate jurisdiction. FRAP 28(a)(4).

The appellee's brief may include after the jurisdictional statement a statement of the issues presented for appellate review FRAP 28(a)(5), (b).

The appellee's brief may include a statement of the case after the statement of the issues presented for review. FRAP 28(a)(6), (b). An appellee may include a statement of the case to add events that the appellant omitted or to present its own narrative.

If the appellee includes a statement of the case, the beginning of the statement must: describe the nature of the case and the relevant procedural history, identify the judge who issued the rulings presented for review, indicate the disposition below, and provide the citation to the district court's order, judgment, decision, or supporting opinion, if reported. 2nd Cir. R. 28.1(b). The remainder of the statement must set out the facts relevant to the appeal FRAP 28(a)(6). The statement of the case should be written as a persuasive (but not argumentative) narrative.

After presenting a summary of its argument on appeal, the appellee's brief must set out in full its argument for affirming the order or judgment below. The argument section must include the appellee's contentions and the legal reasons supporting them as well as the citations to legal authorities and record materials that the appellee relied on. FRAP 28(a)(8), (b).

The appellee's brief must include a signature from one of the appellee's attorneys or a self-represented appellee (FRAP 32(d)). For electronically filed documents, the filing attorney's CM/ECF log-in and password constitute the required signature. A manual signature is unnecessary. 2nd Cir. R. 25.1(f).

It is common practice to include a signature block after the conclusion. Unlike in federal district courts, in the Second Circuit no rule specifies what information to include in a signature block (compare FRAP 32(d) with FRCP 11(a)). A signature block typically provides an attorney's contact information, including the attorney's: name, law office, if any, client, office address, telephone number, and email address, Some counsel also place an "s/" on the signature line above the signature block to show that they signed the brief. The information included in the signature block must include that of the attorney whose CM/ECF login and password is used to file the brief. That attorney must be admitted to practice in the Second Circuit and must have filed a notice of appearance in the appeal

An appellee's brief longer than 30 pages must contain a certificate by the appellee's attorney stating that the brief complies with the type-volume limitations under the FRAP (see Length or Type-Volume). When preparing the certificate, counsel may rely on the word or line count provided by the word processing software used when drafting the brief. (FRAP 28(a)(10), (b) and 32(a)(7), (g).) The certificate must state either: the number of words in the brief or the number of lines of monospaced type in the brief. FRAP 32(g).

If all parties receive service by CM/ECF, the appellee's counsel need only enter the service information in CM/ECF when filing the brief. Separate proof of service is unnecessary

The appellee normally must prepare its brief on 8.5" by 11" pages FRAP 32(a)(4). Brief pages must have margins at least one inch on all four sides of the page FRAP 32(a)(4); 2nd Cir. R. 32.1(a)(2). Except for page numbers (which are required under 2nd Cir. R. 32.1(a)(3)), the appellee's brief may not include any text in the margins FRAP 32(a)(4).

Briefs must use black type. FRAP 32(a)(1). An appellee's brief must use a plain, roman style font. However, appellees may occasionally use italics or boldface for emphasis. Case names must be italicized or underlined. FRAP 32(a)(6).

An appellee may write its brief in either a proportionally spaced font or a monospaced font. The required font size depends on which type of font the appellee uses. The text of the appellee's brief must be double-spaced. However, a brief may use single-spacing for quotations more than two lines long (which should be indented on both sides), headings, and footnotes. FRAP 32(a)(4). An appellee must sequentially number the pages of its brief. Page numbers in the PDF copy of the brief must correspond to the page numbers in the paper brief. The appellee's brief may not exceed 30 pages without prior approval from the court (obtained by motion), unless it either: contains no more than 14,000 words and uses a monospaced font and contains no more than 1,300 lines of text. FRAP 32(a)(7), (e); 2nd Cir. R. 32.1(a)(4)(A). In determining the word or line count of a brief, referred to as type-volume, counsel must include the headings, text, footnotes, and quotations. Counsel may, however, exclude: the cover, corporate disclosure statement, table of contents, table of authorities, signature block, certificate of compliance, proof of service, and any addendum containing statutes, rules, or other authorities. FRAP 32(f).

The appellant's reply brief must include: a cover, table of contents, table of authorities, argument, signature, certificate of compliance, and proof of service, if applicable. FRAP 25(d), 28(c), and 32(a), (d), and (g); 2nd Cir. R. 25.1(h).

Every appellate brief begins with a cover identifying the case and the brief. The cover must contain: the docket number in type at least one inch in height and centered at the top of the page, the name of the court (United States Court of Appeals for the Second Circuit), the full official caption of the appeal, the nature of the proceeding and the name of the court below, the title of the brief, which must include the name of the party filing it, and lead counsel's name, address, and telephone number. FRAP 32(a)(2); 2nd Cir. R. 32.1(a)(1).

If the full official caption does not fit on the cover, counsel may continue it on the inside of the cover. The reply brief must include a table of contents indicating the page on which each section of the brief begins. FRAP 28(a)(2), (c). The reply brief must include a table of authorities listing the cases, statutes, and other authorities cited in the brief along with the pages where the appellant has cited each authority. Cases must appear in the table in alphabetical order. FRAP 28(a)(3), (c). The reply brief does not need a conclusion (FRAP 28(c)). Still, appellants commonly include a short conclusion reiterating their request for relief.

The reply brief must include a signature from one of the appellant's attorneys. FRAP 32(d). For electronically filed documents, the filing attorney's CM/ECF log-in and password constitute the required signature. A manual signature is unnecessary. 2nd Cir. R. 25.1(f). Attorneys commonly include a signature block after the conclusion. Unlike in federal district courts, there is no rule specifying what information to include in a signature block in the Second Circuit (compare FRAP 32(d) with FRCP 11(a)). A signature block typically provides an attorney's contact information, including the attorney's: name, law office, if any, client, office address, telephone number, and email address. Some counsel also place an "s/" on the signature line above the signature block to show that they signed the brief.

A reply brief longer than 15 pages must contain a certificate by the appellant's attorney stating that the brief complies with the type-volume limitations under the FRAP. When preparing the certificate, counsel may rely on the word or line count provided by the word processing software used when drafting the brief. FRAP 32(a)(7), (g). The certificate must state either:

Appellants normally must prepare the reply brief on 8.5" by 11" pages. FRAP 32(a)(4). Brief pages must have margins at least one inch on all four sides of the page. FRAP 32(a)(4); 2nd Cir. R. 32.1(a)(2). Except for page numbers which are required under 2nd Cir. R. 32.1(a)(3)), a reply brief may not include any text in the margins. FRAP 32(a)(4).

Briefs must use black type. FRAP 32(a)(1). A reply brief must use a plain, roman style font. However, appellants may occasionally use italics or boldface for emphasis. Case names must be italicized or underlined. FRAP 32(a)(6). An appellant may write a reply brief in either a proportionally spaced font (for example, Times New Roman) or a monospaced font (for example, Courier). The required font size depends on which type of font the appellant uses. The text of a reply brief must be double-spaced. However, a reply brief may use single-spacing for: quotations more than two lines long (which should be indented on both sides), headings, and footnotes. FRAP 32(a)(4).

An appellant must sequentially number the pages of its reply brief. Page numbers in the PDF copy of the brief must correspond to the page numbers in the paper brief. For example, page one of the PDF must correspond to page one of the paper brief, not to the paper cover. 2nd Cir. R. 32.1(a)(3). The reply brief may not exceed 15 pages without prior approval from the court (obtained by motion), unless it either: contains no more than 7,000 words and uses a monospaced font and contains no more than 650 lines of text. FRAP 32(a)(7), (e); 2nd Cir. R. 32.1(a)(4)(B).

If the reply brief exceeds 15 pages in length, the appellant's counsel must certify that they have satisfied these requirements by including in the brief a Certificate of Compliance. In determining the word or line count of a brief, referred to as type-volume, counsel must include the headings, text, footnotes, and quotations. Counsel may, however, exclude: the cover, table of contents, table of authorities, signature block, certificate of compliance, proof of service, and any addendum containing statutes, rules, or other authorities. FRAP 32(f).

Parties must print full size paper briefs single-sided but must print pamphlet briefs double-sided (FRAP 32(a)(1); 2nd Cir. R. 32.1(a)(2). Paper copies of the reply brief must have a gray cover and be bound in a way that: is secure, does not obscure the text, permits the brief to lie reasonably flat when open. FRAP 32(a)(2)-(3). Counsel commonly use tape binding or glue binding for paper copies of their appellate briefs.

**Petitioning for a Writ of Certiorari before the U.S. Supreme Court**

Published on June 22, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Supreme Court Rule 10 provides the starting point for analyzing the Court's certiorari jurisdiction. Before petitioning the Supreme Court for a writ of certiorari, counsel must consider whether the case is "certworthy," meaning that it presents a question that satisfies one or more factors governing the Supreme Court's exercise of its certiorari jurisdiction. The US Supreme Court generally has discretionary jurisdiction to hear appeals from: (1) the U.S. Courts of Appeals and (2) each state's court of last resort, to address questions of federal law. See 28 U.S.C. § 1254(1); 28 U.S.C. § 1257(a). Despite this broad jurisdictional grant, the Supreme Court typically exercises its jurisdiction sparingly. When deciding whether to exercise its certiorari jurisdiction, the Supreme Court considers whether the decision below (1) conflicts with a decision of a US court

of appeals "on an important federal question" (commonly called a circuit split), conflicts with a decision of a state court of last resort "on an important federal question," conflicts with a US Supreme Court decision "on an important question of federal law," involves an important federal question that the Supreme Court has not decided, or departs drastically from "the accepted and usual course of judicial proceedings." Microsoft Corp. v. Baker, 137 S. Ct. 1702, 1712 (2017); Hillman v. Maretta, 133 S. Ct. 1943, 1949 (2013); Kindred Nursing Ctrs. Ltd. P'ship v. Clark, 137 S. Ct. 1421, 1427 (2017);  Massachusetts v. Env't Prot. Agency, 549 U.S. 497, 505-06 (2007). However, the Supreme Court rarely grants a writ of certiorari: (1) where the decision below merely: consists of erroneous factual findings or misapplies a properly stated rule of law, (2) to address questions of state law, or (3) To resolve conflicts among the federal district courts. Michigan v. Long, 463 U.S. 1032 (1983); Murdock v. City of Memphis, 87 U.S. 590 (1874);

The chances of obtaining Supreme Court review are exceedingly small, even if the case otherwise presents a question that may satisfy the Supreme Court's guidelines for exercising its certiorari jurisdiction. For example, for cases involving circuit splits, counsel should consider whether (1) the split is so uneven that the outlier courts may change course, (2) only a handful of courts have addressed the issue, and (3) the conflict relates to an isolated issue that may not arise again. If so, the Supreme Court may be less likely to grant review. Other common obstacles to Supreme Court review include: vehicle issues, mootness, alternative grounds for affirmance such as an independent and adequate state legal conclusion, waiver, and finality.

In November 2017, the Supreme Court began requiring attorneys to submit cert petitions and other documents using its Electronic Filing System (in addition to serving and filing paper petitions). Before electronically submitting a petition, counsel must register to use the Supreme Court's Electronic Filing System. Because it may take several days for the Supreme Court to approve counsel's application, counsel should apply well before the petition's filing deadline.

To register for electronic filing, counsel must: (1) submit an application on the Supreme Court's website. The Supreme Court Clerk's Office notifies counsel via email once it approves an application (typically within one or two business days) and (2) activate the application with 48 hours after receiving the clerk's notification email. Once activated, counsel can immediately submit documents using the Electronic Filing System. Only Supreme Court Bar members are eligible to register for electronic filing.

Counsel must serve and file a petition for a writ of certiorari within 90 days (not three months) after entry of judgment in the court below. U.S. Sup. Ct. R. 13.1 and U.S. Sup. Ct. R. 13.3. The Supreme Court Clerk does not accept or file any untimely cert petition. U.S. Sup. Ct. R. 13.2.

The 90-day time period for filing a cert petition begins running on the date the court below enters judgment on the docket. This typically occurs when the court files the opinion. The time for filing a cert petition does not run from when the court below issues its mandate, a "writ of execution," remittitur, or other similar document. (U.S. Sup. Ct. R. 13.3.)

If any party timely petitions for rehearing in the court below, the time for filing a cert petition runs from either: (a) the date the court denies rehearing or (2) the entry of a new judgment, if the court grants rehearing. U.S. Sup. Ct. R. 13.3. If a petitioner seeks review of a judgment issued by a lower state court that is subject to discretionary review by the state court of last resort, the time for filing a cert petition runs from entry of an order denying discretionary review U.S. Sup. Ct. R. 13.1.

When calculating the time to file a petition, counsel should: (1) exclude the day of the event that triggers the period, (2) count every day, including intermediate Saturdays, Sundays, and legal holidays, and (3) include the last day of the period, but if the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not Saturday, Sunday, or a legal holiday. U.S. Sup. Ct. R. 30.1.

If the petition is due on a day when the Supreme Court is closed, the time for filing is extended to the next regular business day . U.S. Sup. Ct. R. 30.1. A cert petition must contain: a cover, statement of the questions presented for review, list of parties to the proceedings, corporate disclosure statement. table of contents, table of authorities, list of citations to the decisions below, statement of jurisdiction, list of constitutional and statutory provisions, statement of the case, reasons for granting the petition, a conclusion, and an appendix. U.S. Sup. Ct. R. 14.1 and U.S. Sup. Ct. R. 29.6.

**The U.N. Convention on Contracts for the International Sale of Goods**

Published on June 21, 2018

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The United Nations Convention on Contracts for the International Sale of Goods is akin to Article 2 of the UCC in that both codify default rules governing many (but not all) of the important issues concerning sale of goods contracts. Each, for instance, covers core issues such as formation and

performance but neither covers ancillary issues such as exclusivity and non-competition. The CISG and Article II, though, differ on certain matters such as the statute of frauds, parole evidence, and contract formation. Because the CISG is a ratified, self-executing treaty, it pre-empts state UCC law – which means that the parties must exclude the applicability of the CISG if they select a specified state law to apply or intend for a given state's adopted version of the UCC to control.

When it comes to which state law to apply, many jurisdictions have adopted the approach contained in the Second Restatement on the Conflict of Laws. Here, courts will enforce the parties' choice of law unless the selected state does not have a substantial relationship with the parties or the transaction. There should be at least a reasonable basis for the choice of law provision and courts consider factors such as the location of the parties or the subject property and where the parties will perform the contract.

New York and Delaware take different approaches to this matter. New York law permits the parties to chose its laws to govern their contracts if the contract is worth at least $250,000 even if the transaction has no connection or bears no reasonable relation to the state. However, the law does not apply to contracts for labor/personal services, contracts for personal/family/household services, or to special provisions in New York's adopted version of the UCC. Moreover, if the parties select New York law as the governing law of the contract, they can require New York courts to accept jurisdiction if the contract is worth at least $1 million. New York courts will honor the selection even if the parties have no connection to the state or the transaction has no connection to New York. Delaware is different. Here, the parties can choose the state's law if the contract is worth at least $100,000, the parties choose to adjudicate their dispute in Delaware courts or arbitrate their dispute in Delaware courts, and the parties choice of Delaware law is not contrary to the state's adopted version of the UCC.

**Tariff Regulation in U.S. History**

Published on June 21, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In the United States, countervailing duties were first established as a trade relief mechanism in 1897. Congress responded to the mounting pressure of imports and the 1916 antidumping Act's limits by passing the Antidumping Act of 1921 which was subsequently incorporated into the

Tariff Act. This statute was targeted not at all species of price discrimination on the international market – only predatory dumping. See Blaw Knox Const. Equipment Co., v. U.S., 8 Ct. Int'l Trade 210, 596 F. Supp. 476 (1984). Indeed, without commenting on the merits of using legislative history, Senator Augustus Stanley (D-KY), the bill's sponsor, repeatedly dismissed suggestions during floor debate that the statute would be used to combat either the sporadic sale of export goods in the U.S. to relieve a surplus in a home country or dumping that was motivated for the sole purpose of keeping factories running at peak capacity in a third world nation. The 1921 Antidumping Act, though, was superseded by the Trade Agreements Act of 1979. The latter statute improved upon the process laid out by the former by providing for more expeditious administrative processing, formalizing review proceedings, expanding the role of the international trade commission, promoting greater public participation in proceedings, and providing greater detail concerning the suspension of investigations.

Under the current countervailing duty regime, proceedings in which an injury finding is required proceed in a manner parallel to that provided for anti-dumping actions. The Commerce Department is responsible for reaching preliminary and final substantive determinations regarding the existence of any countervailing subsidy. By way of contrast, the International Trade Commission is responsible for determining whether a foreign trade practice materially injures a U.S. industry, threatens to injury that industry, or has slowed the growth of a domestic industry. In most cases, only if both an actionable subsidy and concomitant injury are found, can a countervailing duty in the amount of the net allocated subsidy be assessed against imports.

The Tariff and Trade Act of 1984 introduced several important substantive additions to the countervailing duty framework. The most significant was a provision providing for the inclusion in subsidy calculations of those benefits indirectly conferred on a final product as a result of a subsidy received 'upstream' by a producer of a component or input product. The 1984 amendments also forced the Commerce Department to account for pre-set public interest factors when considering whether to terminate or suspend investigations based on agreements with foreign governments to restrict exports.

**A Few Thoughts on the World Trade Organization**

Published on June 21, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

As the primarily vehicle for multilateral discipline of trade, the World Trade Organization and its preceding regime, the General Agreement on Tariffs and Trade has reflected considerable concern over the use of subsides in international commerce and the practice of dumping in world markets. Indeed, Article VI of GATT (1947) which was designed to loosely accommodate U.S. trade regulations stated:

"The contracting parties recognize that dumping, by which products of one country are introduced into the commerce of another country at less than the normal value of the products, is to be condemned if it causes or threatens material injury to an established industry in the territory of a contracting party or materially retards the establishment of a domestic industry."

As a countermeasure against dumping, GATT 1947 provided that contracting parties "may levy on any dumped product an antidumping duty," in an amount not to exceed the dumping margin for the product concerned." Moreover, for both anti-dumping and countervailing duty counter-measures, the GATT established a standard of material injury, stipulating:

"No contracting party shall levy any anti-dumping or countervailing duty on the importation of any product of the territory of another contracting party unless it determines that the effect of the dumping or subsidization, as the case may be, is such as to cause or threaten material injury to an established domestic industry, or is such as to retard materially the establishment of a domestic industry."

The Uruguay Round of the GATT negotiations created the World Trade Organization and built upon pre-existing codes to create a new multilateral antidumping and countervailing duty framework. Ratified by Congress in December 1994, the new antidumping agreement and agreement on subsidies and countervailing measures replaced the codes with a regime that included a dispute settlement procedure which strengthened the ability of governments to challenge illegitimate trade practices. The 1994 agreement also defined key terms such as subsidy and serious prejudice, prohibited export subsidies and subsidies contingent on the use of domestic instead of imported goods, created a presumption of serious prejudice for certain egregious subsidies, established strictly defined categories of non-actionable subsidies, and required most developing countries to phase out export subsidies and import substitution subsidies. For instance, under the agreement, a presumption of serious prejudice arises when the total ad valorem subsidization of a product exceeds 5% or when subsidies are provided for debt forgiveness, to cover operating losses in a specific industry or to cover the operating losses of a single firm when provided more than once.

In particular, the new framework included many elements of existing U.S. practice under the Commerce Department by granting workers standing to file petitions, excluding below-cost sales in fair value determinations, conferring high levels of due process and transparency, and including cumulation analysis in injury determinations.

The legal effect of WTO standards has been a recurring issue in U.S. import relief proceedings. Congress and various federal courts have made it clear, however, that WTO and GATT panel decisions do not constitute binding precedent upon U.S. courts. Because WTO agreements are not self-executing, they can only be given effect through implementing legislation. Foster & Elam v. Neilson, 27 U.S. 253 (1829). Of course, though, under the Charming Betsy canon, courts must account for these obligations to avoid placing the United States in violation of its international commitments when interpreting statutes. Murray v. The Charming Betsey, 6 U.S. 64 (1804).

**Bills of Lading in International Trade Law - Part II**

Published on June 21, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

A bill of lading can be either a negotiable instrument (which is generally called an order bill of lading) or a non-negotiable instrument (which is generally called a straight bill of lading). An order bill of lading is a negotiable document of title that is issued to the order of the consignor or consignee, who can then either receive delivery of the goods or tell the carrier to deliver the goods to another party. A bill of lading is considered negotiable under the Federal Bills of Lading Act if it states that the goods are to be delivered to the order of a consignee and does not contain on its face an agreement with the consignor that the bill is negotiable. 49 U.S.C. 80103(a)(1). The standard under Article 7 of the UCC is different. Here, the bill's terms must state that the covered goods are to be delivered to the bearer or to the order of a named person. UCC 7-104(a). Under a straight bill of lading, however, the carrier must deliver the goods only to the consignee named in the bill of lading. Straight bills of lading are generally used in transactions where either – someone has already paid for the goods or the goods do not require payment. Under the Federal Bills Act, a bill of lading is straight if it states that the goods are to be delivered to a named consignee. 49 U.S.C. 80103(b)(1). By way of contrast, under the UCC, a bill of lading is straight so long as its terms do not state that the goods are to be delivered to the bearer or when the bill has a conspicuous legend stating that it is non-negotiable when it is issued. UCC 7-104. When a common carrier issues a non-negotiable bill of lading for goods transported in interstate or foreign commerce, the

common carrier must include the words non-negotiable or not negotiable on the bill. 49 U.S.C. 80103(b)(2).

A new third party can gain title to the goods and to the bill of lading instead of the original consignee through either transfer or negotiation. The Federal Bills of Lading Act states that a new bill may be negotiated by either endorsement or delivery. 49 U.S.C. 80104(a). Article 7 of the UCC sets out similar requirements but provides that a document of title is not duly negotiated if the talks occur outside the regular course of business or financing or the new bill is received in settlement or payment of a monetary obligation. UCC 7-501(a); UCC 7-501(a)(5).

**The Buy American Act - An Introduction**

Published on June 21, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

As in other countries, the US federal government has a preference for awarding procurement contract dollars to domestic companies. The most important domestic preference statute is the Buy American Act (BAA), which restricts delivery of foreign ends products under federal government contracts by granting a price preference advantage to contractors proposing competing offers of domestic ends products. In particular, the BAA restricts the purchase of items that are not domestic end products through a price evaluation penalty applied to competing offers of foreign end products. This mechanism, though, is not an absolute prohibition on foreign ends products – if those goods are cheaper even after the application of the penalty, the contracting agency can purchase them. For civilian agency procurements, the price evaluation penalty depends on whether the lowest domestic offer is made by (1) a for-profit business entity with a place of business located inside the U.S. and which qualifies as a small business under the criteria and size standards in 13 C.F.R. Part 121 or (2) a contracting entity that does not fall under the first category. In the former case the penalty on the low foreign offer is 6% of the foreign offer's price and in the latter instance, it is 12%. For defense department procurements, the price evaluation penalty is 50% regardless of the contracting entity's status (this penalty is usually outcome-determinative).

The BAA applies to supply and construction contracts between $3,000 and the dollar threshold for TAA applicability. The TAA threshold is established twice every year by the U.S. Trade Representative and for fiscal year 2019 is currently $180,000 for supply contracts and $6,932,000

for construction contracts. Counsel should bear in mind, though, that the BAA is generally waived for contracts above the TAA threshold. The BAA also applies to certain procurements regardless of value such as arms, ammunition, war materials, sole-source acquisitions, small business set-aside contracts, and purchases indispensable for national security. 48 C.F.R. 255.401. The BAA does not apply, though, in cases where the domestic end product has an unreasonable cost, the government is purchasing information technology that is a commercial item, the contracting entity determines that the domestic preference is inconsistent with the public interest, commissary resale is at issue, or the government is seeking to obtain defense procurements from Australia, Austria, Belgium, Canada, the Czech Republic, Denmark, Egypt, Estonia, Finland, France, Germany, Greece, Israel, Italy, Japan, Luxembourg, the Netherlands, Norway, Poland, Portugal, Slovenia, Spain, Sweden, Switzerland, Turkey, or the United Kingdom. 48 CFR 25.103(b); 48 CFR 25.103(d).

**Bills of Lading in International Trade Law**

Published on June 21, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

A bill of lading is an agreement between a consignor of goods (or shipper) and the carrier (or bailee) transporting the goods. The bill of lading serves as a receipt that provides the consignor with evidence of the goods' delivery to the carrier and a contract that states the terms and conditions under which the carrier agrees to transport the goods. The carrier or its agent signs the bill of lading and issues it to the consignor. The consignor then sends the consignee (the party to whom the goods are delivered) or its agent the bill of landing through mail or another means. The bill of lading can be issued at the place of shipment, the destination point, or any other designated place that the consignor requests. The carrier then delivers the goods covered in the bill of lading to either the order of a consignor or consignee if the bill of lading is negotiable or a specifically named consignee if the bill of lading is non-negotiable.


Depending on where the goods are transported, a bill of lading is governed by either or both: the Federal Bills of Lading Act (49 U.S.C. §§80101 to 80116) or Article 7 of the Uniform Commercial Code (UCC §§7-101 to 7-603). Both provisions are generally consistent with one another; however, when the two sources conflict, the federal act controls. The Federal Bills of Lading Act covers bills of lading that are used in interstate or foreign commerce and applies to all bills that a common carrier issues for goods transported between a location in (1) Washington D.C., (2) a U.S.

territory or another location in the same territory, and (3) a U.S. state and a location in another U.S. state. See, 49 U.S.C. 80102. Although the federal act governs bills of lading that are issued in the U.S. for goods traveling to foreign countries, it does not govern bills of lading that are issued in foreign countries, even if the goods are destined for the United States. Article 7 of the UCC, on the other hand, governs bills of lading when the transaction or shipment relates to intrastate commerce. Per federal regulations, the bill of lading typically includes: the consignor's name, the consignee's name, the departure and destination ports, the departure and arrival dates, an itemized list of the goods and relevant packing information, the weight or volume of the cargo, the freight rate and amount, the name of the vessel transporting the goods, and whether the goods should be delivered to a specific person. See, 49 C.F.R. 1035.1-49.

**Commerce Department Investigations - Part II**

Published on June 21, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Before initiating an investigation on an antidumping or countervailing petition, the Commerce Department will determine, inter alia, whether the petition is filed on a sufficient percentage of the domestic industry. Here, the Department will focus on the volume or value of the domestic merchandise produced. The petition must contain the names and addresses of the producers for whom the petitioner is filing and other producers in the U.S. industry as well as information relating to the total volume and value of the U.S. production of the domestic product and the volume and value of U.S. production of the domestic product produced by the petitioner and each domestic producer identified in the petition. If either (1) the domestic producers or workers in the industry who support the petition account for at least 25% of the total production of the domestic product or (2) the petition supporters account for more than 50% of the production of the domestic product produced by the portion of the industry that has either expressed support for or opposition to the petition, the investigation proceeds. See, 19 U.S.C. 1673a(c)(4)(A)(i); 19 U.S.C. 1673a(c)(4)(A)(ii). The Commerce Department may conduct an industry poll or resort to a statistical sampling method to see if the petition meets the 50% test.

The Commerce Department does not have to take all industry members into account when calculating whether the petitioner has satisfied the 25% and 50% tests. Indeed, under section 732 of the Tariff Act, the Department (1) must disregard the opposing petitions of U.S. producers that are related to foreign producers, unless those domestic producers demonstrate that their interests

as domestic producers would be adversely affected if Commerce imposed an antidumping order and (2) may disregard the views of domestic producers who are also importers of the product under preliminary investigation. See, 19 U.S.C. 1673a(c)(4)(B)(i); 19 U.S.C. 1673a(c)(4)(B)(ii).

**Commerce Department Investigations**

Published on June 21, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Before the Commerce Department will initiate an investigation, the petitioner must adequately allege that (1) the good is being dumped in the United States and (2) the good's foreign producers or exporters receive a countervailable subsidy. The dumping allegation must contain all factual information that is relevant to calculating the imported good's export price (the price at which, before the date of importation, the good's producer or exporter sells or agrees to sell the good to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the U.S.), constructed export price (the price at which, before or after the date of importation, the producer or exporter of the good sells or agrees to sell the good in the United States to a purchaser that is not affiliated with the producer or exporter), and normal value (the good's price in either the country of exportation or a third country if the home market price is not available or the exporting country's market situation does not allow a proper comparison with the export price or the export construed price). See, 19 U.S.C. 1677(a); 19 U.S.C. 1677a(b); 19 U.S.C. 1677b(1).


The Commerce Department will review the application by ascertaining whether the alleged prices have adequate supporting documentation, whether the market research reports include affidavits referring to sources and how the information was obtained, whether the price and cost data is from contemporaneous time periods, whether the correct currency rate was used for all conversions to American Dollars, whether the values are consistent across calculations, and whether the price date used for the basis export price, construed export price, and normal value are contemporaneous with the investigation period.


On the other hand, countervailing duty petitions must adequately allege: (1) that there is a financial contribution to the producer or exporter (i.e. is a direct transfer of funds or is a potential direct transfer of funds or liabilities), (2) the subsidy benefits the recipient (i.e. the subsidy recipient pays less or receives more than she otherwise would have if she obtained the financial contribution in

the marketplace), and (3) that the subsidy is specific (i.e. is contingent on export performance alone or as part of a set of conditions, is contingent on the use of domestic goods over imported goods alone or as part of a set of conditions, or is a domestic subsidy that is expressly limited to an enterprise or industry or limited to designated geographic regions within the jurisdiction of the authority providing the subsidy. See 19 U.S.C. 1677(5)(D); 19 U.S.C. 1677(5)(E); 19 U.S.C. 1677(5A)(B); 19 U.S.C. 1677(5A)(D).

**Appealing Arbitration Orders Under Section 16 of the FAA**

Published on June 3, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The U.S. is a party to the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards. Chapter 2 of the Federal Arbitration Act (FAA) implements the New York Convention and provides federal courts with jurisdiction over proceedings where the enforcement of international agreements and arbitral awards is sought. Chapter 1 of the FAA applies to all domestic arbitrations involving a maritime transaction or a transaction involving interstate commerce and has residual application to New York Convention cases. 9 U.S.C. §2; 9 U.S.C. §208. Section 16, in particular, addresses appeals from district court orders for both domestic and international arbitration agreements. Section 205 of the FAA permits the respondent to remove any New York Convention-related proceedings to the federal district court for the district and division embracing the state venue of the proceedings. Section 16 has a pro-arbitration bias regarding appeals from interlocutory orders regarding the enforcement of or challenges to arbitration agreements. Generally, a party may appeal an interlocutory order that interferes with an arbitration but not an order that allows arbitration to proceed. Green Tree Fin. Corp. Ala. v. Randolph, 531 U.S. 79 (2000). Specifically, a party may appeal from an order denying an application under section 3 of the FAA to stay an action, section 4 of the FAA to order arbitration to proceed, and section 206 of the FAA to compel arbitration. On the other hand, a party may not appeal from an interlocutory order under section 3 of the FAA granting a stay of an action, section 4 of the FAA directing arbitration to proceed, or section 206 of the FAA compelling arbitration. Interlocutory appeals may, though, be taken where the district court certifies that the order at issue involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation. Moreover, in some instances, depending on the circuit in which the district court sits, counsel may move to dismiss a pending action when seeking to compel arbitration (the First, Fifth, and Ninth Circuits permit this practice). Petitions to compel arbitration

are sometimes filed as freestanding applications instead of in connection with pending litigation. In that case, an order granting the petition is likely to resolve the only issue in the case. The district court's order compelling arbitration is not an interlocutory order compelling arbitration under section 16(b)(3) of the FAA, but rather, a final decision appealable under section 16(a)(3). Adam Technologies Int'l v. Sutherland Global Services, 729 F.3d 443 (5th Cir. 2013). Similarly, a decision granting or denying a stand-alone petition for a court to appoint an arbitrator under section 5 of the FAA is a final decision. As a general matter, a court of appeals reviews de novo lower court decisions enforcing or refusing to enforce arbitration agreements. Except for orders refusing to enjoin arbitration, section 16 of the FAA does not address provision remedies. Therefore, appeals from orders granting and denying provisional relief are governed by the same rules as appeals from those orders in civil litigation. Orders granting or denying preliminary injunctive relief are generally appealable under a statutory exception to the final judgment rule found in section 1292(a)(1). When an appeal is taken from a judgment granting injunctive relief, including an interlocutory order, the adverse party may request that the district court take action under FRCP 65(c) to protect its rights. That rule permits the district court to suspend, modify, restore, or grant injunctions while an appeal under section 16 of the FAA is pending and is an exception to the general rule that a notice of appeal divests the district court of jurisdiction over the substance of the order appealed from.

**The Lobbying Disclosure Act - Part II**

Published on June 3, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The term lobbying activities is defined as lobbying contacts and efforts in support of such contacts, including preparation and planning activites, research and other background work that is intended, at the time it is performed, for use in contacts, and coordinating with the lobbying activities of others. It is important to note that lobbying activities encompasses more than just the lobbying contacts; it includes a variety of supporting, coordinating, and planning activities related to lobbying contacts. When the term lobbying activities is used, such as to determine the amount of money that must be disclosed in periodic lobbying reports, it describes a far wider range of actvities. Given the broader definition, it should be clear that some communications that do not amount to lobbying contacts may amount to lobbying activities. For instance, the congressional office that administers the LDA has advised that if the intent of the work is to support ongoing and future lobbying, then it would fall within the definition of lobbying activities. Moreover, registrants are advised that the timing of the work performed is pivotal as generally, if work such

as reporting or monitoring occurs at a time when future lobbying contacts are contemplated, such reporting and monitoring should be considered as part of the planning or coordinating of lobbying contacts, and therefore included as lobbying activity. A communication is not a lobbying contact, though, unless it is made to a covered official. But who falls within this cryptic category? In Congress, virtually all officials whom one might converse with a placed within the definition's reach as is the President, Vice President, and their Schedule C counterparts. Finally, it should be noted that because the LDA's definition of lobbying activities is rather expansive (and would otherwise pose severe First Amendment concerns as lobbying is a protected activity under the provision), the LDA contains nineteen exemptions to alleviate these concerns. Buckley v. Valeo, 424 U.S. 1, 20 (1976). These exemptions will be covered in a subsequent article.

**The Lobby Disclosure Act: An Introduction**

Published on June 3, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Lobby Disclosure Act of 1995 as amended by the Honest Leadership and Open Government Act of 2007 is the primary statute governing the regulation and reporting of federal lobbying activities. The LDA requires that organizations that employ individuals who qualify as lobbyists register and make periodic reports disclosing information on the lobbying activities of the lobbyists, on lobbying income and expenses, and on other related expenditures. These reports are filed with the Clerk of the House of Representatives and the Secretary of the Senate. Like recent predecessors, President Donald Trump has issued an executive order that imposes additional rules and restrictions on political appointees, including those who have served as lobbyists previously or who might engage in lobbying after leaving the federal government. Execu. Order No. 13,770, 82 Fed. Reg. 9333 (Feb. 3, 2017). The 2017 directive, similar in many but not all respects to comparable policies promulgated under the Obama and Clinton Administrations, requires senior political appointees in the Trump Administration to sign an ethics pledge that, among other things, limits their ability to accept gifts from lobbyists and lobbying registrants. The pledge also curtails the ability of former lobbyists to work on certain matters within the Administration, unless a wavier is issued, and limits the abillity of those departing the Administration to lobby the federal government or to serve as a foreign agent in the U.S. for overseas governments or political parties.

**Civil Appeals in New York: Briefing an Appeal to the Second Department**

Published on June 2, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Although the New York Civil Practice Law and Rules set out the general framework for briefing, the local rules of each department of the appellate division vary the requirements. Appellants generally may perfect appeals (that is, serve and file the appellant's brief, record, and any appendix any time within six months of the date of the notice of appeal, order granting leave to appeal, or order transferring the proceeding. N.Y. Ct. R. 670.8(a). Once the appellant perfects, the respondent must serve and file its brief within 30 days after service of the appellant's brief. If the appellant chooses to submit a reply brief, it must serve and file that brief within ten days after service of the respondent's brief. N.Y. Ct. R. 670.8(b). A party served with the previous brief by overnight delivery may add one day to its time to serve and file. A party served with the previous brief by the USPS may add five days to its time to serve and file its response brief. Moreover, if the time to file and serve a briefs ends on a Saturday, Sunday, or legal holiday, a party may serve and file the brief by 5PM on the next business day N.Y. Ct. R. 670.2(b). A party taking multiple appeals in the same action or proceeding may consolidate them if each appeal is perfected in a timely manner. N.Y. Ct. R. 670.7(c)(1). A party cannot consolidate appeals from different actions or proceedings but may request that the court hear those appeals on the same day. N.Y. Ct. R. 670.7(c)(2). Briefing is subject to special timing considerations if there are concurrent appeals or cross-appeals. Concurrent appeals occur when multiple parties appeal from the same judgment or order but are not adverse to each other on appeal. N.Y. Ct. R. 670.2(a)(6). The appellants in concurrent appeals must serve and file their opening briefs on the same day. The six-month deadline for doing so is calculated from the date of the last concurrent notice of appeal. Cross-appeals occur when the appealing parties are adverse on appeal. N.Y. Ct. R. 670.2(a)(6). The appellant's opening brief in a cross-appeal is subject to the usual six-month deadline. The respondent cross-appellant must serve and file its principle brief within 30 days after service of the appellant's opening brief. The appellant must serve and file its brief replying in the appeal and opposing the cross-appeal within 30 days after service of the respondent cross-appellant's brief.

## Minnesota Supreme Court Procedure

Published on June 2, 2018

Edit article

View stats

 Habib OlapadeStatus is online

Habib Olapade

Student at Yale Law School

217 articles

In Minnesota, the court of last resort is the Minnesota Supreme Court. There are no appeals as of right from the Minnesota Court of Appeals, the state's intermediate appellate court, to the Minnesota Supreme Court. Minn. R. Civ. App. P. 17. Appeals, however, of state-wide election contests may be made as of right to the Court. Minn. Stat. 209.09. The Court considers the following criteria when determining whether to grant discretionary review in a case: the importance of the question presented, whether the lower court decision implicates the constitutionality of a statute, whether the lower court decision is a proper vehicle for the Court to exercise its supervisory powers, among other things. Minn. R. Civ. App. P. 117. Decisions by the Minnesota Workers' Compensation Court of Appeals and the Minnesota Tax Court are reviewable by certiorari. Minn. R. Civ. App. P. 116.01. Here, the petitioner has the burden of identifying and discussing all critical issues in the petition to apprise respondents of the issues and to make the Court aware of the scope of the review requested. Hapka v. Paquin Farms, 458 N.W.2d 683 (Minn. 1990). Unless review of an issue is necessary to the disposition of a case, the Court will not review issues that are not raised in the petition for review or not properly presented by a respondent. Any party seeking review of a decision of the Minnesota Court of Appeals must separately petition the Court for review within 30 days of the filing of the Court of Appeals' decision. Minn. R. Civ. App. P. 117. An opposing party may file a response to the petition within 20 days of service. Id. Moreover, unless Minnesota Law specifies otherwise, the Court cannot extend or limit the time for petitioning for review at the Minnesota Supreme Court. Minn. R. Civ. App. P. 126.02. Please consult Minnesota Rule of Civil Appellate Procedure 117 for more information on rules governing discretionary review in cases before the Court.

**Antitrust Pleading Standards - Part II**

Published on May 11, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Claims brought under Section 2 involve unilateral conduct such as monopolization or attempts to monopolize. 15 USC 2. Courts apply the Twombly standard to all elements of a section 2 claim, including a monopolist's exclusionary conduct to either willfully maintain its monopoly or attempt to monopolize a market. Here, courts will analyze the sufficiency of allegations for the particular type of exclusionary conduct the plaintiff is alleging. Exclusionary conduct includes: predatory pricing, deception of a standard-setting organization, exclusive dealing, and refusals to deal. This note will cover the first three types of conduct.

A plaintiff in a predatory pricing claim must adequately allege both below cost pricing and a dangerous probability of recoupment. Alleging that the defendant is pricing below market or below the plaintiff's cost is not adequate to successfully plead the first element of a predatory pricing claim. While noting that this information is difficult to come across without beginning discovery, some courts have still insisted that plaintiffs provide specific details about a defendant's actual costs or in some situations, costs that are standard in the industry. When pleading industry costs, courts also expect a plaintiff to take into account how possible economies of scale might allow a defendant to lower its costs below industry standards. Astra Media Grp., LLC v. Clear Channel Taxi Media, LLC, 414 F.App'x 334 (2d Cir. 2011). In pleading that a defendant has a dangerous probability of recouping losses from below-cost pricing, a successful plaintiff must allege that the defendant: had enough market power to raise prices and could maintain higher prices long enough to make up for any losses when it was pricing below cost. A plaintiff does not need to plead facts showing each factor a court might consider in evaluating the probability. However, a plaintiff must show facts supporting high barriers to entry that would likely keep competitors out of the market and allow the defendant to more easily recoup its losses.

A patent holder can violate Section 2 by abusing the process in a standard-setting organization (SSO). For example, courts have found Section 2 violations in private standard-setting scenarios where a party has agreed to license an essential patent to the industry on fair, reasonable, and nondiscriminatory terms but then refuses to license the patent on those terms once it has locked in its patent as the standard. Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297 (3d Cir. 2007).

Exclusive deals are typically vertical agreements between parties at different levels in a distribution chain that restrict one of the parties from purchasing from or selling to the other party's competitors. In assessing the legality of an exclusive dealing arrangement under Section 2, courts generally examine whether the monopolist has foreclosed its competitors from a substantial share of a relevant market. See, e.g., Digene Corp. v. Third Wave Techs., 323 F.App'x 902 (Fed. Cir. 2009).

**South Carolina State Issues and Appeals - Part II**

Published on May 11, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

There are no appeals as of right from the intermediate court, the South Carolina Court of Appeals, to the court of last resort, the South Carolina Supreme Court. S.C. Code Ann. 14-8-210(a). A party can appeal by permission any final decision of the South Carolina Court of Appeals by petitioning the South Carolina Supreme Court for a writ of certiorari. As is the case in Kentucky, a Court of Appeals decision is considered final for the purposes of review by the Supreme Court only when the Court of Appeals acts on a petition for rehearing. Rule 242a, SCACR. There are no restrictions on the types of issues the South Carolina Supreme Court may consider other than the general rule that in non-equity cases, the appellate courts cannot decide issues of fact. S.C. Const. art. V §5. However, the state Supreme Court will grant cert only where there are special reasons such as: a novel question of law, a dissent in the Court of Appeals' decision, conflict between the lower court opinion and that of the state Supreme Court, substantial constitutional issues, inter alia. Rule 242(b) SCACR.

On a petition for cert, the South Carolina Supreme Court considers only questions raised both in the Court of Appeals and in the petition for rehearing. Rule 242(d)(2), SCACR. While the Court's order granting the cert petition will specify the questions to be considered, there are no provisions or rules that prohibit the Court from reaching and deciding questions on which it did not grant cert. The petitioner must serve a writ of cert on opposing counsel and file it with proof of service with the clerk of the South Carolina Court of Appeals and the clerk of the South Carolina Supreme Court within 30 days after the Court of Appeals finally decides the petition for rehearing. Rule 242c, SCACR. A party may make a motion to the South Carolina Supreme Court for an order to extend the time to file the petition for cert. The parties may not extend the deadline by stipulation. Rule 262, SCACR. For cert petition filing and formatting requirements, see Rule 242 SCACR.

Generally, service of a notice of appeal acts as an automatic stay of the lower court's ruling pending appeal. This stay remains in effect until the appeal concludes, including if the appeal continues to the South Carolina Supreme Court unless an order modifies or lifts it. Only the matters affected by the appeal are subject to the automatic stay. The lower court retains authority and jurisdiction over any matters in the case that are not subject to the appeal. Rule 241a, SCACR.

**Labor Arbitration - Part I**

Published on May 10, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Employers and unions that have a collective bargaining relationship and are covered by the National Labor Relations Act (NLRA) and the Labor Management Relations Act (LMRA) typically agree on a grievance arbitration process in their collective bargaining agreements (CBAs). The grievance arbitration process governs how the parties may raise and reach final and binding resolutions of labor disputes about interpretations or applications of their CBAs. Most CBAs include a multi-step process for the parties to lodge and attempt to negotiate solutions to grievances about how the other has interpreted and applied their CBA. Arbitration is typically the last step in resolving a dispute that was properly raised in the grievance procedure. Unions generally agree not to strike about disputed CBA interpretations or application issues in return for the right to have their grievances resolved by a neutral labor arbitrator. Employers and unions bargain over grievance and arbitration procedures because they are mandatory subjects of bargaining. See, e.g., Barnard College, 340 NLRB 934 (2003). Generally, the union, but often the union and employer, have authority to demand arbitration over a grievance under the CBA's grievance procedure. Employees may file grievances with their unions to challenge their employers' actions under the CBA's grievance procedure. However, employees generally cannot demand arbitration because the union decides whether to pursue the grievance under the CBA's grievance process and ultimately to arbitration.

Employers and unions commonly set out the allocation of arbitration costs in the CBA's arbitration clause. The parties often split the cost of arbitration. Many arbitration clauses, though, do not explicitly set out how arbitration fees and costs are paid or shared, but provide that the parties agree to arbitration procedures and rules set by a selected arbitration tribunal, implicitly incorporating the tribunal's fee and cost protocols. Labor arbitrations are generally heard and decided by one individual. Some arbitration clauses designate a list of arbitrators which rotates based on case assignments. Parties generally specify in the CBA arbitration clause how the arbitrators will be selected. Most CBA arbitration clauses provide that a grieving party may demand arbitration if the parties cannot resolve the dispute after exhausting the CBA's grievance procedures. Often the parties agree that the following documents are incorporated in any demand for arbitration and can be used by the arbitrator to understand the issue presented and the arbitrator's authority in the matter: the written grievance, the statement by the party demanding arbitration identifying the relevant issues, CBA provisions in dispute, and relief sought – as well as the party's response to the grievance.

**Antitrust Pleading Standards - Part I**

Published on May 10, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Section 1 of the Sherman Act prohibits unreasonable restraints of trade. Frequently, Section 1 actions involve conspiracy claims. To survive a motion to dismiss when bringing a Section 1 conspiracy claim, a plaintiff must provide enough facts to suggest that the defendants entered into an illegal agreement. As Twombly made clear, allegations of parallel conduct that are merely consistent with an agreement without more are not enough to allow a claim to proceed. Because direct evidence of an agreement is rare, Section 1 claims often rely on circumstantial evidence of an agreement. In these cases, the plaintiff must plead facts that tend to suggest that the defendant's behavior was not independent. In re Ins. Brokerage Antitrust Litigation, 618 F.3d 300 (3d Cir. 2010). The facts can include: an industry structure that is conducive to conspiracy, defendants acting contrary to their self-interest, and the exchange of information among parties. See In re Flat Glass Antitrust Litigation, 385 F.3d 350 (3d Cir. 2004). Under Twombly, courts evaluate a plaintiff's complaint as a whole, as opposed to each allegation standing alone, to determine whether the plaintiff alleged a conspiracy. Courts, for instance, have permitted Section 1 claims to proceed when plaintiffs have alleged specific details concerning communications between defendant conspirators, competitor relationships that lead to a conspiracy, behavior by defendants that would not make economic sense but for conspiracy, and prior government investigations into cartel or conspiracy behavior. See, e.g., In re Flash Memory Antitrust Litigation, 643 F. Sup. 2d 1133 (N.D. Cal. 2009); Evergreen Partnering Grp., Inc. v. Pactiv Corp., 720 F.3d 33 (1st Cir. 2013); In re Travel Agent Comm'n Antitrust Litigation, 583 F.3d 896 (6th Cir. 2009); In re Pressure Sensitive Labelstock Antitrust Litigation, 566 F. Supp. 2d 363 (M.D. Pa. 2008)

**Georgia State Court Appeals - Part II**

Published on May 10, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

There is no appeal as of right from the Georgia Court of Appeals to the Georgia Supreme Court. A party may appeal certain types of cases directly from the trial court to the Georgia Supreme Court by filing a petition for certiorari. The Court grants these petitions only in cases of great concern, gravity, or importance to the public. Ga. Sup. Ct. R. 40. The Georgia Supreme Court may decide only questions of law and, like most appellate courts, applies an extremely deferential standard of review for lower court factual findings. Ga. Const. Art. VI, §VI, Para. IV; Reed v.

State, 727 S.E.2d 112 (Ga. 2012). While the Court is not limited to the questions on which certiorari was granted in disposing of the case, under the Court's rules, the parties must file briefs only in response to the question(s) posed by the Court in the order granting the cert petition. State v. Royal, 275 S.E.2d 646 (Ga. 1981); Ga. Sup. Ct. R. 45. As in Mississippi, the party seeking cert must file a notice of intention to apply for the petition with the clerk of the state Court of Appeals within 10 days after the entry of judgment or the disposition of a motion for reconsideration (the sole difference between the Georgia and Mississippi Appellate Rules on this count is that the Mississippi deadline is 14, not 10, days). The party must then file its petition for cert with the clerk of the Court within 20 days after the entry of judgment or the disposition of the motion for reconsideration along with payment of costs if required. Ga. Sup. Ct. R. 38(2). A party may request an extension of time with the Georgia Supreme Court before the time for filing the petition has expired. These requests are only granted in cases presenting the most unusual circumstances. Ga. Sup. Ct. R. 12.

The trial court's ruling normally remains stayed pending appeal from the Georgia Court of appeals to the state Supreme Court. Once a supersedeas bond has attached as a result of the initial appeal, the trial court does not have jurisdiction to act on the judgment being appealed until it receives the remittitur. Tavakolian v. Agio Corp., 711 S.E.2d 33 (Ga. Ct. App. 2011). The Georgia Court of Appeals stays remittitur to the trial court on the filing of a notice of intent to apply for cert. Ga. App. Ct. R. 39a. Please consult Georgia Supreme Court Rules 10, 20, 24, and 45 for information on briefing requirements.

**Kentucky State Court Appeals - Part II**

Published on May 10, 2018

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

A party may appeal as of right from the Court of Appeals to the Kentucky Supreme Court from cases that originated in the Court of Appeals as well as workers' compensation cases. Ky. R. Civ. P. 76.36(7) and 76.25(12). A party may move the Kentucky Supreme Court for discretionary review of any Court of Appeals' judgment not appealable as of right. These reviews are a matter of judicial discretion and will be granted only when there are special reasons present. Ky. R. Civ. P. 76.20(1). If a case is of great and immediate public importance, a party may seek to transfer an appeal from the Court of Appeals to the Supreme Court and thereby bypass the first level of appellate review. Ky. R. Civ. P. 74.02(2). The Kentucky Supreme Court is unusual in one respect

from its sister courts throughout the south in that it only grants motions for discretionary review without limiting the issues that can be presented.

A party generally must file a motion for discretionary review in the Kentucky Supreme Court within 30 days of the date of the order or opinion sought to be reviewed. Ky. R. Civ. P. 76.20(2)(b). The time for filing a motion for discretionary review is automatically extended if a party files in the Court of Appeals either a timely petition for rehearing of an opinion under Rule 76.32 or a timely motion for reconsideration of an order under Rule 76.38(2). In either case, a motion for discretionary review must be filed within 30 days of the date of either the order denying the petition or motion for reconsideration or the order disposing of the case in the Court of Appeals. Ky. R. Civ. P. 76.20(2)(b). In addition, a party may file a motion with the Kentucky Supreme Court seeking leave for an extension of time to file a motion for discretionary review. Ky. R. Civ. P. 76.20(2)(c). Within 30 days of the Court of Appeals' decision, a party may start an appeal as of right by filing a notice of appeal and paying the fee required by Rule 76.42(2)(a)(i) in the office of the clerk for the Court of Appeals. The motion for discretionary review must comply with the seven requirements set out in Kentucky Rule of Civil Procedure 76.20(1)-(4). The process of staying a judgment pending an appeal generally starts during the first appeal as of right. A supersedeas bond stays in effect during the entire appellate process. If a party won in circuit court but lost in the court of appeals and thinks a stay is necessary during the pendency of Supreme Court review, the party may seek either a stay from the Supreme Court if the proceeding was an appeal of a temporary or permanent injunction or intermediate relief from the Supreme Court. Ky. R. Civ. P. 65.09 and 76.33.

**Invitations to Collude in Antitrust Law**

Published on May 9, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

An invitation to collude is a unilateral proposal from one competition to another competitor to join together in a horizontal conspiracy such as price-fixing. Invitations to collude are unlawful and typically challenged by the FTC under Section 5 of the FTC Act. Invitations to collude can also be unlawful under Section 2 of the Sherman Act as monopolization or attempted monopolization. 15 USC 2. An invitation to collude must be a unilateral act. If the invitation is accepted, it is an agreement to collude or a conspiracy and can be prosecuted by the DOJ as a per se violation of Section 1 of the Sherman Act. 15 USC 1.

Section 5 authorizes the FTC to challenge unfair methods of competition. 15 USC 41-58. Section 5 of the FTC Act is broader than the Sherman Act in that it prohibits an unfair competitive practice even though that practice may not infringe other antitrust laws. The FTC Act supplements and bolsters the Sherman Act by enabling the FTC to stop in their incipiency practices which, when full blown, would violate the Sherman Act.

The FTC has noted that beyond proof of an invitation, it does not require much else to establish an invitation to collude violation. Specifically, an invitation to collude action under Section 5 does not require repeated misconduct, a defined market, a showing of market power, competitive harm, or precise communication of the terms of collusion. In Matter of U-Haul Int'l., 150 FTC July 14, 2010). When deciding to bring an invitation to collude action, the FTC analyzes whether there is an independent business justification for the communication – including a reporting obligation under the relevant securities laws that may require a company to publicly state its business strategy. Where conduct is justified by business considerations, the FTC will not find an implied invitation to collude. In Matter of Stone Container Corp., 125 FTC 853 (FTC May 18, 1998).

The traditional form of an invitation to collude is a private communication from one competitor inviting another to set prices or divide a market. When analyzing this conduct, the FTC has noted that such naked invitations to collude have no efficiency justification or pro-competitive benefits and therefore, there is no need to analyze market structure before condemning the behavior. In Matter of Precision Moulding Co., Inc., 1996 WL 342039 (FTC 1996). The FTC also challenges public collusion invitations to fix prices. These statements typically involve quarterly earnings calls with securities analysts, press releases, and trade association meetings. Here, the FTC will focus on whether the relevant industry is highly concentrated so that collusion would likely be successful but will only go after public collusion invitations that go beyond any disclosures previously made by the company on earning calls, exceeds disclosures needed for any legitimate business strategy, and present a substantial risk of competitive harm. In the Matter of Valassis Commc'ns, Inc., 2006 WL 6679058 (FTC April 19, 2006).

**Mississippi State Court Appeals - Part I**

Published on May 9, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In Mississippi, a party may not appeal as of right from the Court of Appeals to the state Supreme Court. A party may seek review of any decision of the Mississippi Court of Appeals by filing a petition of certiorari. Miss. R. App. P. 17. Certiorari is ordinarily granted only to resolve substantive questions involving: an intermediate appellate opinion that conflicts with a Mississippi Supreme Court decision; a decision where the Court of Appeals failed to consider a controlling constitutional provision or an issue of broad public importance. Miss. R. App. P. 17a. Although these factors provide some guidance, the Mississippi Supreme Court has the discretion to decline review even if one or more of these circumstances exist or grant certiorari in the absence of any of them. Miss. R. App. P. 17a. A party appealing a Court of Appeals decision must file a motion for rehearing in the Court of Appeals within 14 days after the Court of Appeals releases its decision on the merits. Miss. R. App. P. 17b. The petition for a writ of certiorari must be filed with the Mississippi Supreme Court within 14 days from the date the Court of Appeals releases its decision on the merits. Miss. R. App. P. 17b. A party can extend the time to file a petition for a writ of certiorari with the Mississippi Supreme Court to review a Court of Appeals decision by filing a motion to enlarge time before the prescribed time for filing the petition has expired. Miss. R. App. P. 17b. The cert petition cannot exceed ten pages and must include a concise statement of the grounds on which the petition is based, a copy of the opinion and judgment of the Court of Appeals, and a copy of the motion for rehearing filed with the Court of Appeals. Miss. R. App. P. 17b.

**Alabama State Court Appeals - Part II**

Published on May 9, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In Alabama, there is no appeal as of right to the Alabama Supreme Court from a determination by the Alabama Court of Civil Appeals. A party may petition the Alabama Supreme Court for a writ of certiorari seeking review of a decision of the Alabama Court of Civil Appeals. Certiorari review is a matter of judicial discretion and is granted only when there are special and important reasons for the issuance of the writ. Ala. R. App. P. 39a. The Alabama Supreme Court considers petitions for writs of certiorari only from decisions initially holding valid or invalid a city ordinance, a state statute, or a federal statute or treaty; decisions initially construing a controlling provision of the Alabama or U.S. Constitutions; decisions that affect a class of constitutional, state or county officers; decisions where a material question is one of first impression in the state; decisions in conflict with previous decisions of the U.S. Supreme Court, the Alabama Supreme Court, or the Alabama Court of Civil Appeals, inter alia. Ala. R. App. P. 39a1. Generally, certiorari review is

limited to the facts stated in the opinion of the Alabama Court of Civil Appeals unless the petitioner is attempting to enlarge or modify the statement of facts. Ala. R. App. P. 39k.

A party must file a petition for a writ of certiorari with the Supreme Court clerk within 14 days after either the Court of Civil Appeals releases a decision or a timely petition for rehearing is denied. Ala. R. App. P. 39b3. A party cannot extend the deadline for filing a petition for a writ of certiorari. Ala. R. App. P. 26b. A party starts an appeal by submitting to the Alabama Supreme Court: a petition, a docket fee, and proof of service. Ala. R. App. P. 25 and 39b2-3. The petition cannot exceed 15 pages and must contain: the case's procedural posture, the petitioner's name, the date of the decision sought to be reviewed, a statement of the grounds on which the petition is based (taken from Alabama Rule of Appellate Procedure 39a1.), a copy of the opinion of the Court of Civil Appeals, inter alia. Ala. R. App. P. 39d. Finally, in Alabama, the parties can file three briefs after the cert writ issues: a petitioner's brief which is due within 14 days after the writ is granted, a respondent's brief which is due 14 days after the petitioner files her brief, and the petitioner's reply brief which is due within 14 days after the respondent files its brief.

**Preliminary and Permanent Injunctions in Copyright Cases**

Published on May 9, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Injunctive relief is a key remedy for copyright owners in copyright infringement litigation – particularly since money damages usually cannot compensate for the harm caused by infringement. The Copyright Act authorizes federal courts to grant both temporary and permanent injunctive relief to prevent or restrain copyright infringement on terms the court finds reasonable. 17 USC 502. Courts have historically favored granting injunctive relief in copyright actions based on the view that a copyright owner's exclusive rights inherently include the right to exclude and that money damages are generally insufficient to compensate a copyright owner for harm caused by infringement.

In 2006, the Supreme Court decided eBay v. MercExchange, 547 U.S. 388 (2006), a unanimous decision where the Court held that a party seeking a permanent injunction must satisfy four requirements: demonstrate that it has suffered an irreparable injury, show that legal remedies such as monetary damages are inadequate to compensate for that injury, demonstrate that an equitable

remedy is warranted based on the balance of hardships between the plaintiff and defendant, and show that the public interest would not be disserved by a permanent injunction. In Winter v. Natural Resources Defense Council, 555 U.S. 7 (2008), the Court without expressly mentioning eBay, extended the permanent injunction standard in that case to preliminary injunctions. The First, Second, Fourth, Fifth, Seventh, Ninth, and Eleventh Circuits have applied the ebay-winter standard in slightly different ways. For a preview of Second Circuit cases, see: Esbin & Alter, LLP v. Sabharwal, Globus, & Lim, LLP, 403 F. App'x 591 (2d Cir. 2010); WPIX, Inc. v. ivi, Inc., 691 F.3d 275 (2d Cir. 2012). For a preview of the Fifth Circuit approach, see: Aspen Technology Inc. v. M3 Technology, Inc, 569 F. App'x 259 (5th Cir. 2014). Finally, for the Eleventh Circuit case preview, see: Peter Letterese & Assocs., Inc. v. World Inst. Of Scientology Enters., 533 F.3d 1287 (11th Cir. 2008).

**Establishing the Existence of an Agreement Under Section 1 of the Sherman Act**

Published on May 8, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Section 1 of the Sherman Act prohibits all contracts, combinations, or conspiracies that unreasonably restrain trade. But see Standard Oil Co. v. United States, 221 U.S. 1 (1911). Therefore, the first step in a Section 1 claim is to establish the existence of an agreement in the form of a contract, combination, or conspiracy. To establish the existence of an agreement, a plaintiff must prove (1) that the agreement is between at least two separate entities as well as (2) concerted action. Because agreements under Section 1 can be horizontal, vertical, or a combination of both (see this note on hub-and-spoke agreements), the distinction among the three is rather important because while horizontal agreements among competitors to divide markets or allocate customers are unlawful per se, a vertical agreement between a supplier and reseller to restrict the territories in which the reseller may sell is a vertical non-price restraint and only subject to the rule of reason.


All agreements under Section 1 must involve more than one entity because Section 1 does not prohibit unilateral conduct. This requirement is often not that difficult to meet – subject to certain exceptions. For instance, under the single entity doctrine, the test for whether parties are separate entities capable of conspiring is whether they are independent economic actors with separate economic interests and whether their agreement eliminates independent centers of decision-making from the marketplace. Cooperweld Corp. v. Independence Tube Corp., 467 U.S. 752

(1984). Where there is a unity of economic interests between the two parties and they are not separate decision-makers, they are a single entity incapable of conspiring under Section 1.

Joint ventures among competitors can also be subject to Section 1 scrutiny. American Needle Inc. v. NFL, 560 U.S. 183 (2010). Courts will consider a joint venture a single entity for purposes of the antitrust laws if there is sufficient integration such as financial risk and assets. See, e.g., Texaco v. Dagher, 547 U.S. 1 (2006). The conduct of sports leagues is also subject to Section 1 in general. But see Flood v. Kuhn, 407 U.S. 258 (1972). Thus, in American Needle, the Supreme Court held that the NFL's collective licensing of each team's IP was not the conduct of a single entity. The Court reasoned that the teams were each independent businesses with independent economic interests and that they competed in the sale of their IP (despite the existence of revenue sharing agreements in non IP matters). While the Court's holding in American Needle was limited to the issue of IP licensing, its opinion was broad enough to suggest that most conduct by sports leagues is concerted action and thus falls under Section 1.

In addition to establishing two or more parties, to prove the existence of an agreement under Section 1, a plaintiff must show concerted action by those parties. In cases where an actual, written contract exists, plaintiffs can easily satisfy this requirement. In a rule of reason case, for instance, concerted action is generally not difficult to prove as the challenged conduct at issue usually is, or stems from, a specific contract or agreement between the parties. However, a plaintiff does not need to produce an express agreement to satisfy Section 1's concerted action requirement. An agreement can be tacit, signified by a wonk or nod, or inferred from circumstantial evidence. See, e.g., Monsanto Co. v. Spray-Rite Serv Co., 465 U.S. 752 (1984). Concerted action can be shown through either direct or indirect evidence.

**Section 43(a) Lanham Act Actions - False Endorsement**

Published on May 8, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Section 43(a) of the Lanham Act does not expressly recognize a false endorsement cause of action. However, courts have interpreted the statute as the basis for a false endorsement claim when a defendant uses the celebrity's persona in a manner that falsely implies the celebrity's endorsement of a good or service. ETW Corp. v. Jireh Publ'g Inc., 332 F.3d 915 (6th Cir. 2003). The analysis

of a false endorsement claim is similar to the analysis of a trademark infringement claim, with the celebrity's persona as the trademark. The plaintiff must show that the defendant's use of the plaintiff's persona is likely to confuse consumers to think that the celebrity endorsed the defendant's good or service. Facenda v. NFL Films, 542 F.3d 1007 (3d Cir. 2008). To assess the likelihood of confusion, courts consider the relevant circuit's likelihood of confusion factors. However, some courts adjust the factors to account for the difference between a traditional trademark and a celebrity's persona.

False endorsement claims are not limited to the confusing use of a celebrity's name or likeness. Courts recognize a celebrity's right to prevent the use of any indicia that mislead consumers to think the celebrity endorses the defendants' goods or services including: a celebrity look-alike, a celebrity sound-alike, the celebrity's music in an ad, and even a robot dressed and placed in context to resemble the celebrity. Allen v. National Video, Inc., 610 F. Supp. 612 (S.D.N.Y. 1985); Waits v. Frito-Lay, Inc., 978 F.2d 1093 (9th Cir. 1992); White v. Samsung Electronics America, Inc.; 971 F.2d 1395 (9th Cir. 1992). Here, the court will consider the level of public recognition of the celebrity among the consumers targeted by the defendant's goods or services. Ji v. Bose Corp., 538 F.Supp.2d 354 (2008). Finally, it should be noted that defendants in false endorsement cases often assert fair use or other defenses based on the First Amendment such as nominative fair use, use in an expressive work, or parody. Counsel should assess the merits of these claims before bringing a false endorsement cause of action.

**South Carolina State Court Appeals - Part I**

Published on May 8, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In South Carolina, only the Supreme Court may hear certain types of appeals, including appeals from final judgments involving public debt, elections, or constitutional challenges to state law or local ordinances. S.C. Code Ann. 14-8-200b. Otherwise, the following trial court judgments and orders are appealable as of right to the South Carolina Court of Appeals: a final judgment, a final order affecting a substantial right in a special proceeding or summary proceeding after judgment, an order affecting a substantial right when the order discontinues the action, grants or refuses a new trial, strikes a party's answer or part of it, or determines the action and prevents a judgment which an appeal might be taken from. S.C. Code Ann. 14-3-330(1); S.C. Code Ann. 14-3-330(2);

S.C. Code Ann. 14-3-330(3). Certain interlocutory orders may also be appealed. S.C. Code Ann. 14-3-330(1); 14-3-330(4).

The South Carolina Supreme Court may certify a case for its review pending before the Court of Appeals at the Court's own motion, on a party's motion, or by request from the Court of Appeals. S.C. Code Ann. 14-8-210b. Certification is allowed when the case involves an issue of significant public interest or a legal principle of major importance or when the Supreme Court considers certification to be appropriate. S.C. Code Ann. 14-8-210b. South Carolina law does not provide for an appeal by permission of an interlocutory order or decree that is not appealable as a matter of right. In equity cases, the appellate court may decide questions of law and resolve issues of fact based on the preponderance of the evidence except when the facts are settled by a jury and the verdict is not set aside. S.C. Code Ann. 14-3-320. S.C. Const. art. V Section 5.

An appellant must serve notice of appeal on all respondents within 30 days after receipt of written notice of entry of the order or judgment from which the appeal is taken. Rule 203(b)(1), SCACR. If a party makes a motion for JNOV, a new trial, or a motion to alter or amend the judgment, the time for appeal is stayed until receipt of written notice of entry of the order granting or denying the motion. Rule 203(b)(1) SCACR. The appellant must file the notice of appeal with the clerk of the lower court and the clerk of the appellate court within ten days after serving the notice. Rule 203(d)(1)(B) SCACR. The time for serving the notice of appeal is jurisdictional and may not be extended by stipulation or by the appellate court. Rule 263b, SCACR. A party starts an appeal as of right by serving a notice of appeal on all the respondents and filing it with the clerk of the lower court or the appropriate appellate court. Rule 203(d)(1) SCACR. The notice of appeal must comply with Rule 203(e)(1) SCACR as well as Rule 203(d)(1).

**Texas State Court Appeals - Part II**

Published on May 8, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In Texas, a party may generally take an appeal as of right only from a final judgment or order. An order or judgment is final if it disposes of all pending claims at issue in the litigation. Lehmann v. Har-Con Corp., 39 S.W.3d 191 (Tex. 2001). A party may take an interlocutory appeal as of right under certain statutory exceptions. For example, a party may appeal from an interlocutory order

deciding whether or not a plaintiff independently established proper venue. Tex. Civ. Prac. & Rem. Code Ann. 15.003b. Also, a party may appeal as of right from an interlocutory order that appoints a receiver/trustee, overrules a motion to vacate an order that appoints a receiver/trustee, certifies or refuses to certify a class, grants or refuses a temporary injunction, grants or denies a summary judgment motion based on an assertion of government immunity, or grants or denies a summary judgment motion relating to media conduct and the free speech or free press provisions of the U.S. Constitution, the Texas Constitution, or the Texas libel statute – inter alia. Tex. Civ. Prac. & Rem. Code Ann. 51.014a. In Texas, a party may appeal to the Court of Appeals by permission an order that is not appealable as of right if the order involves a controlling question of law as to which there is substantial ground for difference of opinion or an immediate appeal from the order may materially advance the ultimate termination of the litigation. Tex. Civ. Prac. & Rem. Code Ann 51.014d. These grounds for permissive appeal do not apply to appeals brought under the Texas Family Code. Tex. Civ. Prac. & Rem. Code Ann 15.014d-1. Also, a party may appeal directly to the Texas Supreme Court from an order of the trial court that, on the ground of the constitutionality of a state statute, grants or denies either an interlocutory injunction or permanent injunction. Tex. Gov't Code 22.001c.

In Texas, a party must generally file a notice of appeal within 30 days after the judgment is signed. Tex. R. App. P. 26.1. However, the notice of appeal must be filed within 90 days after the judgment is signed if any party timely files a motion for a new trial, a motion to modify the judgment, a motion to reinstate under Texas Rule of Civil Procedure 163a(3) or a request for findings of fact or conclusions of law if findings and conclusions are required by the Texas Rules of Civil Procedure. In an accelerated appeal, the notice of appeal must be filed within 20 days after the judgment or order is signed. Where the appeal is a direct appeal from the trial court to the Texas Supreme Court relating to a temporary injunction or permanent injunction, the appeal is governed by the rules for accelerated appeals. Tex. R. App. P. 57.1. The appellate court may grant a party an extension of time to take an appeal if, within 15 days after the deadline for filing a notice of appeal, the appellant files a notice of appeal in the trial court or files a motion to extend time complying with the Texas Rules of Appellate Procedure in the appellate court. Tex. R. App. P. 26.3d. A motion to extend time to file a notice of appeal must state facts reasonably explaining the need for an extension. Tex. R. App. P. 10.5b.

A party may start an appeal as of right by filing a written notice of appeal with the trial court clerk. Tex. R. App. P. 251. The notice of appeal must comply with the requirements of Texas Rule of Appellate Procedure 25.1.

**Georgia State Court Appeals - Part I**

Published on May 7, 2018

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In Georgia, a party may appeal as of right the following judgments: final judgments addressing discretionary appeals, judgments involving applications for discharge in bail trover and contempt cases, judgments directing that an accounting be taken, judgments granting or refusing applications for receivers or final/interlocutory injunctions, judgments granting or refusing applications for attachment against fraudulent debtors, judgments granting or refusing to grant mandamus or any other extraordinary writ, judgments refusing applications for the dissolution of corporations created by superior courts, judgments sustaining motions to dismiss a caveat to the probate of a will, judgments in child custody cases modifying or refusing to change timeshare arrangements, inter alia. See O.C.G.A. 5-6-34a. The Georgia Supreme Court has exclusive jurisdiction in cases involving the interpretation of a treaty, the state constitution, or the US Constitution as well as cases involving election contests and cases in which the constitutionality of a state law has been called into question. Ga. Const. Art. VI, Section VI, Para. II. Additionally, unless otherwise provided, the Supreme Court also has appellate jurisdiction over habeas cases, cases that have been certified to it from the Georgia Court of Appeals, and cases in which the death sentence was imposed. O.C.G.A. 15-3-3.1. The Georgia Court of Appeals has jurisdiction over all cases not reserved to the Georgia Supreme Court. O.C.G.A. 15-3-3.1. If a party starts an appeal in the wrong court, the case will be transferred to the appropriate appellate court rather than dismissed. O.C.G.A. 5-6-37.


In the state, certain appeals may be brought only on a discretionary basis. These include appeals from the decisions of superior courts reviewing the state workers' compensation board, state board of education, auditors, state and local administrative agencies, and sex offender registration review board, final judgments in family law matters, cases involving garnishment/attachment, inter alia. See O.C.G.A. 5-6-35a. A party may not appeal by permission any decisions of the superior courts reviewing decisions of the public service commission and probate courts or any case involving ad valorem taxes and condemnations. O.C.G.A. 5-6-35a. Courts generally grant discretionary review where only one or more of the following factors are present: reversible error exists and further development of the law in the area is sought. Ga. Sup. Ct. R. 34.


A party may seek review of an interlocutory order or similar decision if the trial court certifies the issue and the appellate court permits the appeal. O.C.G.A. 5-6-34b. Generally, courts grant permission to appeal an interlocutory order only when one or more of the following is true: the issue to be decided will likely be dispositive in the case, the establishment of precedent on the matter is deemed desirable, and the lower court order appears erroneous. Ga. Sup. Ct. R. 31. The deadline for direct appeals is 30 days from the trial court's entry of the judgment and 10 days from

the entry of judgment for interlocutory appeals. O.C.G.A. 5-6-38a; O.C.G.A. 5-6-35g. To start an appeal by permission, a party must file an application to appeal listing the errors to be considered, specify in the application the order being appealed, and serve on the opposing party or parties a copy of the application, inter alia. O.C.G.A. 5-6-35b-d. The opposing party or parties will have ten days from the date on which the application is filed to file a response. O.C.G.A. 5-6-35f.

**Kentucky State Court Appeals - Part I**

Published on May 7, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Kentucky law generally provides for an appeal as of right from any final judgment, order, or decree in any case in the Circuit Courts including a family court division of the Circuit Court. KRS 22A.020(1). A final judgment is any order adjudicating all the rights of all the parties in an action or proceeding. K. R. Civ. P. 54.01. However, a party may not appeal a final judgment, order, or decree of the Circuit Court if it was rendered on an appeal from a court inferior to the Circuit Court or dissolves a marriage. KRS 22A.020(3); Ky. R. Civ. P. 73.01. Generally, an order must be a final judgment to be appealable in Kentucky. However, a party in a civil case may bring an interlocutory appeal in a few select circumstances where a Circuit Court (1) enters an order appointing a receiver, (2) denies a substantial claim of absolute immunity, (3) sets aside a judgment that is more than one year old, (4) directs property to be sold in satisfaction of a judgment, (5) affirms a condemner's right to take property in an eminent domain case, (6) denies a party's motion to intervene as a matter of right, (7) denies an application to compel arbitration, or (8) grants, denies, modifies, or dissolves a temporary injunction.


An appeal from the Circuit Court is normally taken to the Court of Appeals; but, within ten days after noticing an appeal, a party may seek a transfer from the Court of Appeals to the Kentucky Supreme Court. The transfer is within the discretion of the Court and will be granted only upon a showing that the case is of great and immediate public importance. Ky. R. Civ. P. 74.02(2). Kentucky has no equivalent of 28 U.S.C. 1292(b), which permits federal district courts to certify interlocutory rulings for consideration by federal appellate courts, thus, when an appeal as of right is not available, the parties generally will be unable to obtain immediate review of non-final orders. Kentucky appellate courts do not consider issues raised for the first time in an appellate court or omitted from a party's appellate prehearing statement. Ky. R. Civ. P. 76.03(8).

A notice of appeal generally must be filed within 30 days after the date of notation of service of the judgment or order under Rule 77.04(2). The 30 day time period for filing a notice of appeal automatically stops running if a party timely files a post-judgment motion for JNOV, a new trial, or amended/additional factual findings. K. R. Civ. P. 73.02(1)(e). A new 30-day clock begins after the trial courts disposes of the last remaining post-judgment motion. Ky. R. Civ. P. 73.02(1)(e). The Circuit Court may extend the period for filing a notice of appeal by at most ten days on a showing of excusable neglect based on a failure of a party to learn of the entry of the judgment or an order which affects the running of the time for taking an appeal. Ky. R. Civ. P. 73.02(1)(d).

A party may start an appeal as of right by filing a notice of appeal with the clerk of the court whose order is being appealed. The required filing fee must be submitted along with the notice of appeal. Ky. R. Civ. P. 73.02(1)(a). The notice of appeal must specify the names of all the appellants and appellees and identify the judgment or order being appealed. Ky. R. Civ. P. 73.03.

**Lockouts Under the NLRA: Part I**

Published on May 7, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Under the NLRA, employers may generally lock out their employees unless the lockouts infringe on the employees' rights under the NLRA, does not comply with the notice and waiting period requirements of Section 8(d) of the NLRA, or the employer has agreed in a collective bargaining agreement (CBA) to not engage in a lockout. It should be noted that under the Norris La-Guardia Act (NLA), in cases arising from labor disputes, federal courts generally have no jurisdiction to restrain lockouts by issuing restraining orders, temporary injunctions, or permanent injunctions. 29 U.S.C. 104. The Supreme Court, however, has not resolved whether the NLA bars injunctions to stop an employer's lockout of employees to apply economic pressure during the collective bargaining process. The Eighth Circuit considered the issue after the NFL locked out its players after their CBA expired in 2011. After the players decertified their union, individual players sought an injunction to stop the NFL's lockout alleging that there was no longer a labor dispute (because a player's union was no longer in existence) and that the NLA did not preclude the court from hearing the player's claims. The Eighth Circuit, though, held that the lockout was indeed a labor dispute arising from a conflict between the league and players and that the NLA precluded both the circuit and lower courts from addressing the players' claims. Brady v. NFL, 644 F.3d 661 (8th Cir. 2011).

The Supreme Court has also found within the federal labor laws an implicit 'non-statutory' antitrust exemption that applies to agreements needed to make the collective bargaining process work effectively. Brown v. Pro Football, Inc., 518 U.S. 231 (1996) is instructive here. Brown recognized that multimember lockouts were lawful economic actions in collective bargaining under the NLRA and that an agreement among several employers bargaining together to implement, after a collective bargaining impasse, the terms of their last best good-faith wage offer did not violate federal antitrust laws because it was a part of the lawful operation of the collective bargaining process.

Turning to more conventional lockouts, the NLRB has traditionally sanctioned lockouts permitting employers to insulate themselves from peculiar economic losses they would suffer if their employees had sole control over the timing of threatened work stoppages such as strikes. For instance, the NLRB has sanctioned lockouts to protect equipment, products, or processes, and protect public health and safety. Boehringer Ingelheim Vetmedica, Inc., 350 NLRB 678 (2007); Deluth Bottling Ass'n, 48 NLRB 1335 (1943). The NLRB has also sanctioned lockouts by employers in multiemployer collective bargaining associations facing union whipsaw strikes. In a whipsaw strike, a union representing employees in a multiemployer bargaining unit strikes separately and successively each individual member of a multiemployer bargaining unit, but allows the other employers to continue operating to maximize the competitive pressure on the struck member to concede to the union's bargaining demands, minimize the burden of joblessness on the employee's resources, and force each employer individually to yield to the union's demands through a series of individual strikes.

The NLRA, though, bars employers from taking various actions including lockouts which have the purpose and effect of interfering with or discouraging: employees from exercising their rights under the NLRA to engage in concerted activity, forming and joining unions of their own choosing, or engaging in meaningful collective bargaining.

**Strikes Under the NLRA: Part I**

Published on May 7, 2018

Edit article

View stats

 Habib OlapadeStatus is online

Habib Olapade

Student at Yale Law School

217 articles

Under the NLRA, a labor dispute includes a controversy about any of the following: employment terms, tenure, or conditions or association or representation of persons in negotiating, setting, maintaining, changing, or seeking to arrange terms or conditions of employment. 29 USC 152(9). The NLRB defines strike as a work stoppage by a group of employees about either a labor dispute that concerns employees' or unions' unmet demands for higher wages, shorter hours, or other changes in employment terms and conditions or an employer's unfair labor practice. The Labor Management Relations Act of 1947, which in part amended the NLRA, adds to the definition of strikes to include situations when employees engage in concerted action to either slow down work or interrupt their employers' business operations. Section 7 of the NLRA provides employees with rights to engage in various activities including concerted activities for collective bargaining or other mutual aid or protection. 29 USC 157. Strikes are among the concerted activities that, with some limitations, Section 7 protects for both unionized and nonunionized workers. Employers, under this scheme, cannot retaliate against employees who engage in lawful strikes or unilaterally prohibit employees from striking. The NLRA primarily protects two different types of strikes: ULP strikes, which protest an employer's unfair labor practices and Economic strikes, which are intended to force employers to recognize unions as representatives of bargaining units or to obtain economic concessions from the employer. A work stoppage is a ULP strike if a ULP in part causes or motivates employees to either cease working or refuse to work. Federal courts have held that for a strike to be a ULP strike it must flow from a labor practice that is challenged by an employee or union in a timely filed ULP charge to the NLRB and ultimately found unlawful by the NLRB in formal ULP proceedings. Precision Concrete v. NLRB, 334 F.3d 99 (D.C. Cir. 2003). Employers may continue business operations during a strike by using one or a combination of several options to ensure performance of struck work including assigning struck work to supervisory employees, assigning struck work to non-supervisory employees who choose to cross the strikers' picket line and agree to perform struck work, hiring temporary workers to perform the struck work, and temporarily subcontracting the struck work to another company.

**Proving Price Discrimination under the Robinson-Patman Act**

Published on May 6, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Under the Robinson-Patman Act, to establish a price discrimination claim, the plaintiff must be able to establish a potential and substantial injury to competition. This is typically the most complex element of a price discrimination case. Injury to competition can occur on several different levels. Typically, it is found either at the seller's level (primary line injury) or at the level

of competition between favored and disfavored customers (secondary line injury). Tertiary injuries will be covered in a separate article.

Here, primary line injury may be established in this case if seller B can show that competition between it and seller A was injured as a result of seller A's discriminatory or favored price to Purchaser Y. To bring a price discrimination claim for a primary line injury, a competing seller must show that the defendant has engaged in predatory pricing. To establish a predatory pricing claim under the Robinson-Patman Act, the plaintiff must present evidence that the defendant seller priced below an appropriate measure of cost (usually marginal cost or average variable cost) and had a reasonable prospect of recouping its losses from below-cost pricing by eliminating competition and then raising prices. Here, the defendant must usually have at least a 60% market share for the action to succeed.

Secondary line injury refers to injury to competition between the favored purchaser (purchaser x) and disfavored purchaser (purchaser y) as a result of the discriminatory price. A plaintiff attempting to establish a secondary line injury must prove as a threshold requirement that it was engaged in actual competition with the favored purchaser at the time of the price differential. Here, FTC v. Morton Salt Co., 334 U.S. 37 (1948) controls and, a secondary line injury will be inferred where there is evidence of a substantial price difference over an extended period of time and actual competition among resellers. The inference has been used most often in cases involving sustained price discrimination between highly competitive customers operating with low-profit margins. The Morton Salt inference can be rebutted with evidence that the lost sales or profits were caused by something other than the price differential. Proof on this count could include evidence that the disfavored customers have prospered, that the seller was only one of many competing sellers, that the discounts were merely introductory offers to new customers, and that regulatory or other legitimate restrictions on resale prices prevented any pass-through of discriminatory discounts.

**A Brief Introduction to the Foreign Trade Antitrust Improvements Act**

Published on May 6, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Foreign Trade Antitrust Improvements Act (FTAIA) applies the Sherman Act's prohibitions on unreasonably restraining trade and unlawful monopolies to conduct involving import trade or commerce. The statute defines imports as any foreign product or service that is shipped or sold into the U.S. from abroad. United States v. Hui Hsiung, 778 F.3d 738 (9th Cir. 2015). For conduct involving non-import foreign trade or commerce, the Sherman Act only applies if there is a direct, substantial, and reasonably foreseeable effect on U.S. import trade or commerce, US domestic commerce, or export trade or commerce by a person based in the U.S. Courts have grappled with the extent to which the import commerce exception applies to foreign conduct, particularly where there are intermediaries in the import supply chain. Referencing the confusing drafting of the statute, and deferring to court's interpretation of the Sherman Act's application to import commerce before the FTAIA was enacted, the majority of courts have held that import commerce does not need to meet the FTAIA's direct, substantial, and reasonably foreseeable requirement and that any anticompetitive conduct involving import commerce triggers the Sherman Act. See, e.g., Hartford Fire Ins. Co. v. California, 509 U.S. 764 (1993); Carpet Grp. Int'l v. Oriental Rug Imps. Ass'n Inc., 227 F.3d 62 (3d Cir. 2000). Separately, some courts have specified that it is the defendant, not the plaintiff, who must engage in the importing to fall under the import exception to the FTAIA and trigger the application of the Sherman Act. See, e.g., Kruman v. Christie's Int'l PLC, 284 F.3d 384 (2d Cir. 2002).

**Mississippi State Court Appeals - Part II**

Published on May 6, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

A party may appeal as of right any final order or judgment of a trial court directly to the Mississippi Supreme Court. Miss. R. App. P. 16a. The Mississippi Supreme Court may assign cases to the Court of Appeals for consideration – except for cases involving utility rates, annexations, bond issues, election contests, a trial court's holding that a statute is unconstitutional, and cases of first impression. Miss R. App. P. 16b. A party may petition to appeal an interlocutory order if there is

a substantial basis for a difference of opinion on a question of law and appellate resolution may either materially advance the termination of the litigation and avoid exceptional expense, protect a party from substantial and irreparable injury, or resolve an issue of general importance. Miss. R. App. P. 5a. Of course, like its companion courts of last resort throughout the South, the Mississippi Supreme Court does not consider issues that were procedurally defaulted below or not raised in the lower court. Miss. R. App. P. 10(b) and 28(a)(3).

For an appeal as of right, a party must file a notice of appeal with the clerk of the trial court within 30 days of either entry of the order appealed from or entry of the order disposing of post-trial motions for judgment, to make additional factual findings, alter the judgment, request a new trial, or request relief from a judgment. Miss. R. App. P. 4a. The appellant must also pay a docket fee to the trial court clerk. Miss. R. App. P. 3e. The notice of appeal must specify the parties to the appeal and designate as a whole or in part the judgment or order appealed from. Miss. R. App. P. 3c. Any other party seeking an appeal may file a notice of appeal within 14 days after the date on which the first notice of appeal was filed. Miss. R. App. P. 4c. Generally, a party may not extend the time to start an appeal in civil cases except as provided in Rule 4 of the Mississippi Rules of Appellate Procedure. In appeals as of right, a party may move the trial court to extend the time to file a notice of appeal. If a party files a motion for extension of time after the deadline for filing a notice of appeal, the motion must be on notice and will be granted only on a showing of excusable neglect. Miss. R. App. P. 4g. The Court may only extend the time to file a notice of appeal to the later of 30 days after the deadline for filing a notice of appeal or ten days from the date of the order granting the time extension.

Finally, a party may start a discretionary appeal for an interlocutory order by filing a petition for permission to appeal with the state Supreme Court clerk within 21 days after the order is entered in the trial court. Miss. R. App. P. 5a. The petition to appeal must include a statement of facts, the question presented, the procedural posture, a statement on why the interlocutory appeal is timely, and a copy of the order from which the appeal is sought. Miss. R. App. P. 5b.

**Alabama State Court Appeals - Part I**

Published on May 6, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In Alabama, parties appeal decisions by the state circuit courts (Alabama's trial courts of general jurisdiction) to either the Court of Civil Appeals or the Supreme Court. Generally, parties may appeal the following orders and judgments of the Alabama circuit courts: final judgments, interlocutory orders (that grant or deny class certification, appoint or refuse to appoint a receiver, determine the right to public office or grant or deny a motion to compel arbitration), and judgments for fewer than all claims or all parties if the trial court makes express determination that there is no reason for delay. Ala. Code 1975 12-22-2; Ala. R. App. P. 4; Ala. R. Civ. P. 54b.

The Alabama Court of Civil Appeals has exclusive appellate jurisdiction over all final judgments and appealable interlocutory orders for cases in which the amount in controversy (exclusive of interests and costs) does not exceed $50,000, workers compensation cases, and cases involving domestic relations. Ala. Code 1975, 12-3-10. The Alabama Supreme Court has appellate jurisdiction over cases in which the amount in controversy also exceeds $50,000 – exclusive of interest and costs. The Court's Chief Justice may transfer any case from the Court of Civil Appeals to the Supreme Court except for those that involve novel questions of federal or state constitutional law or issues of significant statewide impact. Ala. Code 1975, 12-2-7.

Interlocutory orders may be appealed to the Supreme Court if the order is within the Court's original appellate jurisdiction, the trial judge states the controlling legal question in her certification, and the trial judge certifies that the order involves a legal question where there is substantial ground for difference of opinion where the interlocutory appeal would advance the litigation and avoid protracted expense. Ala. R. App. P. 5a. A party may seek review of other interlocutory orders by filing a petition for a writ of mandamus or another extraordinary writ. Ala. R. App. P. 21.

A party must file a notice of appeal within 42 days from the entry of a final judgment or order, an order granting or denying a motion to compel arbitration, or an order granting or denying class certification. Ala. R. App. P. 4a, 4d. On the other hand, a party must file a notice of appeal within 14 days from the date of entry for an order granting, continuing, modifying, refusing, or dissolving an injunction; an order appointing or refusing to appoint a receiver, an order determining the right to public office, or a judgment in an action for the validation of public obligations. Ala. R. App. P. 4a1. Filing a post-trial motion under any of the following Alabama Rules of Civil Procedure suspends the running of the time for filing a notice of appeal – Rule 50, Rule 52, Rule 55, Rule 59a, and Rule 59e. In these cases, the time fixed for filing a notice of appeal is computed from the date of the entry of the order granting or denying the post-judgment motion. Ala. R. App. P. 4a3.

A party starts an appeal as of right by filing a notice with the circuit court clerk. Ala. R. App. P. 3a1. The notice of appeal must specify the party taking the appeal, designate the judgment or order appealed from, and name the court to which the appeal is taken. Ala. R. App. P. 3c. There is an

automatic 30-day stay after the circuit court enters a judgment. Ala. R. Civ. P. 62a. By contrast, a party starts a discretionary appeal by filing a petition with the Supreme Court clerk. Ala. R. App. P. 5a. The petition must contain a statement of facts and the controlling question, among other things. See Ala. R. App. P. 5b.

**Direct Infringment Under The Hatch-Waxman Act**

Published on May 5, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Direct patent infringement typically occurs when any party makes, uses, sells, offers to sell, or imports a patented invention without the patent owner's authorization. 35 USC 271(a). Infringement under the Hatch-Waxman Act is unique because (1) generic drug manufacturers are exempt from infringement liability for certain acts that would otherwise constitute infringement under 35 U.S.C. 271(a) and (2) the submission of an Abbreviated New Drug Application (ANDA) is an artificial act of infringement creating case or controversy jurisdiction. The main difference between an infringement analysis under Section 271(e)(1) and a typical patent infringement case, is that the Hatch-Waxman infringement analysis is largely hypothetical because the ANDA filer has not marketed or sold any accused products at the time of the analysis. Thus, instead of comparing the asserted claims to an existing product, the court must consider whether the proposed generic drug product, if approved, would infringe the asserted patent.


The statute contains a safe harbor provision covering only those activities that are reasonably related to the regulatory drug approval process. Whether an activity is reasonably related to the drug approval process depends on the specific facts of the case. Merck KGaA v. Integra Lifesciences I, Ltd., 545 U.S. 193 (2005); Classen Immunotherapies, Inc. V. Shionogi Inc., 993 F. Supp. 2d 569 (D. Md. 2014); Isis Pharms., Inc. V. Santaris Pharma A/S Corp., 2012 WL 4111157 (S.D. Cal. Sept. 19, 2012). Momenta Phrams. V. Teva Pharms., 809 F.3d 610 (Fed. Cir. 2015).


The safe-harbor provisions available for generic drug manufacturers end once the manufacturer files an ANDA. 35 USC 271(e)(1). Under Section 271(e)(1), it is an act of infringement to submit an application under either 21 USC 355(j) or (b)(2) if the purpose of the submission is to obtain approval to commercially manufacture, use, or sell a patented drug before the patent's expiration. An ANDA filer must submit with its ANDA one of the following certifications regarding any

patents that the FDA has listed within the Orange Book: a paragraph 1 certification that patent information has not been filed for the branded drug, a paragraph 2 certification that the listed patents expired, a paragraph 3 certification that the ANDA filer will stay off the market until the patents expire, and a paragraph 4 certification that the listed patents are invalid or will not be infringed by the manufacture, use, or sale of the generic drug. An infringement claim is generally only available when the ANDA filer submits a paragraph 4 certification.

**The Filed Rate Doctrine in Antitrust Law**

Published on May 5, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The filed rate doctrine bars private plaintiffs from collecting damages in antitrust challenges involving prices that are properly filed with a regulatory authority and approved by said authority. The doctrine applies in challenges brought by private plaintiffs under federal or state antitrust law. It most commonly arises under price-fixing challenges brought under Section 1 of the Sherman Act. The relevant rates must be filed with a regulatory body with legal authority to review the rates. The relevant authority must also approve the rates at issue. In most courts, the agency actions needed to meet the approval requirement are minimal. Indeed, some courts have found that the requirement has been satisfied even when the agency did not investigate the filed rates, did not actively supervise the industry at issue, and passively approved the rates by permitting an objection deadline to pass. Dolan v. Fid. Nat'l Title Ins. Co., 365 F. App'x 271 (2d Cir. 2010). It should also be noted that (1) there is no exception to the filed rates doctrine for fraud relating to the rates filed with the regulatory agency and (2) and that the doctrine does not create immunity from antitrust liability but simply bars plaintiffs from collecting damages including alleged overpayments resulting from anticompetitive conduct and treble damages. Wegoland Ltd. V. NYNEX Corp., 27 F.3d 17, 20-22 (2d Cir. 1994

**Certiorari Petitions in the Texas Supreme Court**

Published on May 5, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Texas Supreme Court has the discretion to hear appeals from final judgments of the Texas Court of Appeals in civil matters, Tex. Gov't Code 22.001(a); Del Valle Indep. Sch. Dist. V. Lopez, 845 S.W.2d 808 (Tex. 1992). In particular, the Texas Supreme Court may hear appeals from final judgments of the Court of Appeals if the Justices of the Court of Appeals disagree on a question of law material to the Court of Appeals' decision, one of the Courts of Appeals holds differently on a question of law material to a prior decision of another Court of Appeals or the Texas Supreme Court, the construction or validity of a statute is necessary to a determination of the case, the case involves state revenues, the Texas Railroad Commission is a party to the case, or it appears that an error of law has been committed by the Court of Appeals and the error is of such importance to the jurisprudence of the state that it requires correction. Tex. R. App. P. 56.1(a). Interlocutory appeals may be granted in select circumstances. See Tex. Gov't Code 22.225.

In Texas, a party starts a discretionary appeal by filing a petition for review addressed to "The Supreme Court of Texas." Tex. R. App. P. 53.1. The petition for review must contain: the parties and counsel to the case, the trial court's final judgment, a table of contents, an index of authorities, a statement of the case (under one page) discussing the nature of the case, the judge who signed the appealed order, the trial court's designation and county, the disposition of the case in the trial court, the parties in the Court of Appeals, the district of the Court of Appeals, the justices who participated in the Court of Appeals' decision, the author of the opinion for the court, and the author of any separate opinion, the Court of Appeals' opinion citation, and the disposition of the case in the Court of Appeals including the disposition of any motions for rehearing or en banc consideration and whether any of these motions are pending in the Court of Appeals, a statement of the Supreme Court's jurisdiction, the issues presented for review, a statement of the facts, a summary of the argument, the argument, a prayer for relief, and an appendix.

A petition for review generally must be filed with the Texas Supreme Court within 45 days after the later of the date the Court of Appeals renders final judgment (if no motion for rehearing or en banc reconsideration is timely filed) or the date of the Court of Appeals' last ruling on all timely filed motions for rehearing or en banc reconsideration. Tex. R. App. P. 53.7(a). If a party files a petition for review, another party may file a petition for review within the later of 45 days after the last timely motion for rehearing is denied or 30 days after any preceding petition is filed. A party can extend the time to appeal by filing a motion to extend time within 15 days after the deadline for filing the petition for review with the Texas Supreme Court. Tex. R. App. P. 53.7(f). The motion must comply with the formatting requirements of the Texas Rule of Appellate Procedure 10.5(b).

**Picketing Under the NLRA - Part I**

Published on May 5, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The classic form of picketing involves individuals patrolling – i.e. marching back and forth or around on the street or sidewalks adjacent to the entrance to a business or worksite carrying sticks attached to placards with messages aimed to persuade others to take the picketers' side in a labor dispute, which the NLRA defines as a controversy concerning any of the following: employment terms, tenure, conditions, or association or representation of persons in negotiating, setting, maintaining, changing, or seeking to arrange employment terms or conditions. 29 USC 152(9). Picketing under the NLRA tends to be for one or more the following purposes: drawing attention to a labor dispute between a union and employer, attempting to persuade an employer to recognize a union, informing the public that an employer does not have a collective bargaining agreement (CBA) with a union, informing the public that an employer does not adhere to an existing CBA in providing wages or benefits in line with industry standards, discouraging employees or the public from entering the employer's facilities, or discouraging members of the public from doing business with the employer. Eliason & Knuth of Az., 355 N.L.R.B. 677 (2010) Mine Workers of Am. New Beckley Mining Corp., 304 N.L.R.B. 71 (1991).


Labor picketing can be protected under several sources of authority. First, the Free Speech Clause as applied to the states through the Fourteenth Amendment's Due Process Clause protects picketing rights in public forums such as streets, sidewalks, and parks. The NLRA, though, as amended by the Labor Management Relations Act of 1947 and the Labor Reporting and Disclosures Act of 1959 predominately regulate union picketing on private property. More specifically, Section 7 of the NLRA provides employees' with rights to engage in various activities including concerted activities for collective bargaining or mutual aid or protection. 29 USC 157. Under this provision, employers cannot retaliate against employees engaging in lawful strikes or unilaterally prohibit employees from striking. Union members, however, can violate section 8(b)(1) of the NLRA by engaging in or inciting violence, intimidation, or reprisal against employees for exercising their Section 7 rights to refrain from joining a picket line or crossing a picket line. Colorful examples of litigation under this provision abound. Tube Craft Inc., 287 NLRB 491 (1987); NLRB v. Moore Bus Forms Inc., 574 F.2d 835 (5th Cir. 1978).

**The NLRB's Remedial Authority - Part II**

Published on April 29, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Section 10(c) of the NLRA empowers the NLRB to order back pay as a remedy for an unfair labor practice. The Board's authority to impose a backpay order is remedial not punitive. The issuance of a backpay award is one of the Board's most important remedial powers because the longer that an employer is able to avoid bargaining with a union, the less likely it is that the union will be able to represent employees effectively once the NLRB issues its final order. Back pay orders deter employers from exploiting this negotiating option. Thus, in Section 10 cases where the Board seeks to enforce a preliminary injunction, the "adequate remedy at law" inquiry is focused on whether, in the absence of immediate relief, the harm flowing from the alleged violation cannot be prevented or fully rectified by the final Board order.

When the Board finds that an employer has engaged in an unfair labor practice, Section 10 of the NLRA compels it to take such affirmative action including reinstatement of employees with or without backpay as will effectuate the Act's policies. The purpose of backpay is to make whole the employee harmed by an unfair labor practice which generally means that such an employee is entitled to her normal earnings during the period at issue minus her earnings from other employment during that time. Requiring an employer to make an employee whole via back pay serves two purposes: (1) it reimburses the innocent employee for the actual losses she suffered as a result of the employer's improper conduct and (2) it furthers the public interest advanced by the deterrence of such illegal acts. The Board's remedial power to order back pay is a broad discretionary one subject to limited judicial review. Courts will accordingly not disturb the NLRB's back pay order unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the NLRA.

**Reviewing Intrinsic Evidence in Patent Claim Construction**

Published on April 29, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The accused infringer's counsel should develop claim construction positions based on a careful review of the intrinsic evidence which includes the patent claims, the specification, the prosecution history, and related patents and applications.

A.   The Patent Claims

The patent claims define the scope of the invention and generally include a preamble, a transitional phrase (such as 'comprising' or 'consisting of'), and one or more limitations. Counsel should consider claim terms in the context of the entire claim and other claims. Under the doctrine of claim differentiation, if the inventor used different terms to identify similar claim limitations, there is an inference that those terms should have different meanings. Moreover, much as the rule against surplusage cautions against reading a provision without giving every word therein effect, in patent law, different claims are presumed to have different meanings to avoid redundancy between claims. Courts presume that a dependent claim is narrower in scope than the independent claim from which it depends. If the patent owner relies on the claim differentiation doctrine to support a broad construction of an independent parent claim, the accused infringer may respond that the presumption of claim differentiation may not be used to alter the term's plain meaning in the specification, avoid a disclaimer in the specification or prosecution history, or expand the claim's scope beyond the scope supported by the specification.

B.   The Specification

In addition to the claims, a patent specification typically includes an abstract, a field and background of the invention, including a discussion of prior art, a summary of the invention, a detailed description of the invention, a disclosure of invention embodiments, and one or more figures. The Federal Circuit has emphasized that the specification is always highly relevant and is usually dispositive to claim construction.

C.   The Prosecution History

Courts also consider the asserted patent's prosecution history in claim construction. However, the Federal Circuit has held that prosecution history is not as instructive on claim construction as the specification because it is an ongoing negotiation between the inventor and the USPTO rather than a final disclosure of the invention. It should be noted that the prosecution history does not include prior art the examiner did not consider or correspondence between a lawyer and client. The accused infringer's counsel should examine the prosecution history to determine whether the inventor defined a term or disclaimed claim scope during prosecution.

D.   Statements in Related Patents and Applications

The patent owner's or named inventor's statements in related patents and applications may also affect claim scope. Statements made in or during the prosecution of a released US patent may result in disclaimer of claim scope in the asserted patent provided the same claim terms are at issue in both patents. Statements made in or during the prosecution of foreign patents also may be relevant to the construction of a US patent especially if the statement is both an admission by the patent owner concerning the invention and does not relate to a legal or procedural requirement that is unique to the foreign jurisdiction.

**A Few Thoughts on Statutory Interpretation - Part VII**

Published on April 29, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Under the general-terms canon, general terms are to be given their general meaning (generalia verba sunt generaliter intelligenda). The rule is based on the reality that it is possible and useful to formulate categories (e.g. 'combinations in restraint of trade,' '' or 'non-obvious invention') without knowing in advance all the fact patterns that may fit within the category. Many in the ivory tower have asserted that when courts confront generally worded provisions, they should infer exceptions for situations that the drafters never contemplated and did not intend to encompass. These scholars would have courts approach general words differently from how they approach words that are narrow and specific. Traditional principles of interpretation cast this position into some doubt because the presumed point of using general words is to produce general coverage – not to leave courts with the liberty to recognize ad hoc exceptions. Of course, one should always hesitate and ponder before deciding that a specific factual situation falls within the coverage of a general provision. In the end, though, general words are general words, and they must be given general effect.

Take an example: Brown v. Entertainment Merchants Association, 564 U.S. 786 (2011), a First Amendment case that involved a California state statute that "prohibit[ed] the sale or rental of "violent video games" to minors, and require[d] their packaging to be labeled 18. The Act covered games "in which the range of options available to a player include[d] killing, maiming,

dismembering, or sexually assaulting an image of a human being, if those acts are depicted" in a manner that "[a] reasonable person, considering the game as a whole, would find appeals to a deviant or morbid interest of minors," that is "patently offensive to prevailing standards in the community as to what is suitable for minors," and that "causes the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors. In rejecting California's submission that the video games were not protected under the First Amendment's free speech clause, which admittedly did not include video games (after all, no one knows what James Madison would have thought about Call of Duty anyway), the Court rightly concluded:

"the Free Speech Clause exists principally to protect discourse on public matters,…it is difficult to distinguish politics from entertainment, and dangerous to try. "Everyone is familiar with instances of propaganda through fiction. What is one [wo]man's amusement, teaches another's doctrine." Like the protected books, plays, and movies that preceded them, video games communicate ideas—and even social messages—through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player's interaction with the virtual world). That suffices to confer First Amendment protection. Under our Constitution, "esthetic and moral judgments about art and literature ... are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority."

The argument most frequently made against giving general terms their general meaning is that those who adopted the provision had in mind a particular narrow objective. For instance, in adopting the Fourteenth Amendment's Equal Protection Clause, the Reconstruction Congress was primarily concerned with protecting Freedman, not other groups. Does this mean, for instance, that women, children of immigrants that the legislature has singled out for invidious action, or LGBT individuals are not entitled to protection? Of course not. United States v. Virginia, 518 U.S. 515 (1996); Plyler v. Doe, 457 U.S. 202 (1982); Romer v. Evans, 517 U.S. 620 (1996). Here, one must be cognizant of the fact that "statutory evils often go beyond the principle target to cover reasonably comparable problems and that it is ultimately the provisions of our laws rather than the principle concerns of our legislators by which we are governed." Oncale v. Sundowner Offshore Services Inc., 523 U.S. 75, 79 (1998) (Scalia, J.).

**The Robinson-Patman Act - Part I**

Published on April 29, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Robinson-Patman Act was enacted to help smaller retailers compete against larger rivals who are likely in a better position to obtain price concessions from sellers. The statute prohibits sellers from treating their competing customers differently on matters relating to prices, terms of sale, or marketing support. A buyer may also be liable under the act if it induces a seller to discriminate among competing buyers or knowingly obtains a discriminatory price from a seller. This practice note will cover price discrimination claims under Section 2(a) in private enforcement litigation (the government no longer enforces the statute).

To prove a price discrimination claim, a plaintiff must prove a difference in price, two or more contemporaneous sales in interstate commerce, sales by the same seller to two or more different purchasers, sales of goods of like grade and quality, and a competitive injury. The last factor will be covered in a separate article.

A.   Discriminatory Prices

While the Robinson Act does not define prices, the term has been held to include the actual invoice paid by the buyer minus any discounts, offsets, or allowances that are not reflected in that invoice price. FTC v. Anheuser-Busch Inc, 363 U.S. 536 (1960). Shipping and credit terms are common elements of the price.

B.   Two or More Completed Sales

A valid price discrimination claim requires proof of two completed sales. Mere offers to sell are not sufficient to constitute a completed sale, but an enforceable contract can satisfy this requirement. It should be noted that the following business transactions are not considered sales: consignments, agency arrangements, leases, licenses, exchange agreements, transfers to a sales agent, and intra-enterprise transactions.

C.   Sales by the Same Seller

The sales must have been made by the same seller. And the seller must make a sale to two or more different purchasers.

D.   Sales in Interstate Commerce and Contemporaneous Sales

The sales must have been made in interstate commerce. To satisfy this requirement, at least one sale must cross a state line. Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186 (1974).The interstate commerce requirement typically does not play a significant role in establishing a Robson claim, though, because most commodities bought or sold are in interstate commerce. Also, intrastate price discrimination may be proscribed by state antitrust laws similar to the Robinson-Patman Act. The sales must also be for use, consumption, or resale within the U.S. Sales of products that are immediately exported do not satisfy the US sale requirement. General Chem. Inc v. Exxon Chem Co. USA, 625 F.2d 1231 (5th Cir. 1980). The sales need not occur at the same time but both sales must have happened within a reasonably short time period. This is a highly factual inquiry determined on a case by case basis. The Robinson Act, moreover, only applies to tangible products and not services. Mathew Enter Inc. v. Chrysler Group LLC, 2014 WL 3418545 (N.D. Cal. July 11, 2014). For transactions involving both tangible products and services, the courts will determine the dominate nature of the transaction.

E.   Goods of Like Grade and Quality

The goods sold at different prices must be of like grade and quality. This is another factual determination evaluated on a case-by-case basis. Actual physical differences affecting consumer use or marketability may be enough to differentiate the goods involved, These physical differences must go beyond differences in packaging. The grade and quality of a product is determined by the characteristics of the product itself. Brand names are not determinants of grade and quality. However, price differentials between branded and unbranded products may be defended under the cost justification defense, where the price difference only reflects the cost of advertising.

**The NLRB's Remedial Authority - Part I**

Published on April 28, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The NLRB has broad but not unlimited remedial authority under the NLRA. Performance Friction Corp. v. NLRB, 117 F.3d 763 (4th Cir. 1997). This remedial authority includes – but is not limited to – the right to issue cease and desist orders, the right to overturn such orders when issued by ALJs, the right to reinstate employees with or without backpay, the right to reimburse for lost benefits, and the right to issue bargaining orders – among other things. These powers stem from Section 10(j) of the NLRA. That same section directs District Courts to issue preliminary injunctions at the NLRB's request when the Board has no adequate remedy at law, the union will be irreparably harmed without interim relief, the potential harm to the union outweighs the potential harm to the employer, public harm would occur without the relief, and the NLRB has a reasonably likelihood of prevailing on the merits. The NLRB also has the authority to order the restoration of a department closed by the employer or the transfer back of a unit transferred out of state unless the company demonstrates that such an order would be highly burdensome. Ohr ex. rel. NLRB v. Latino Exp., Inc., 776 F.3d 469 7th Cir. 2015).

Where a respondent has shown a proclivity to violate the NLRA, or has engaged in such egregious behavior or widespread misconduct as to demonstrate a general disregard for the employees' fundamental statutory rights, a broad order or award may be warranted. In such cases, the Board may expand remedial measures beyond the actual locations at which unfair labor practices occurred. However, the Board's remedy must be truly remedial and not punitive. Thus, to avoid the risk of imposing essentially punitive liability on a union for allegedly breaching its duty of fair representation and granting an employer a windfall, the Board can require the General Counsel to establish the meritorious nature of the grievance before assessing back pay liability against the union and limit the union's liability to that portion of the employee's damages caused by the union's mishandling of the grievance. Iron Workers Local Union 377 v. International Association of Bridge, Structural, and Ornamental Iron Workers, AFL-CIO, 326 NLRB 375 (1998).

For the Board to issue a broad award, two requirements must be met: (1) there must be evidence that the disputed work has been a continuous source of controversy in the relevant geographic area and that similar disputes may recur and (2) there must be evidence demonstrating the offending union's proclivity to likely engage in further unlawful conduct in order to obtain work similar to that in dispute. When evaluating these requirements, the Board looks to the offending union's other conduct. Glaziers District Council 16 and Malv. Inc. D/B/A/ Service West and Carpenters 46 Northern California Counties Conference Board, 357 NLRB 580 (2011).

Finally, in appropriate cases, the Board may issue remedial relief by holding a parent corporation liable for its subsidiary's unfair labor practices or piercing the corporate veil to impose personal liability upon corporate owners for back pay obligations. The NLRB will pierce the corporate veil when the shareholder and corporation have failed to maintain separate identities and adherence to the corporate structure would sanction a fraud, promote injustice (whatever that means), or lead to an evasion of legal obligations. The corporate veil may also be pierced in cases where the parent

company dominates the subsidiary to the extent that the subsidiary functions solely to achieve the purposes of the parent corporation.

**Most Favored Nation Clauses in Antitrust Law**

Published on April 28, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Most favored nation clauses (MFNs), which are sometimes also referred to as most favored customer clauses, are agreements in which a supplier agrees to treat a particular customer no worse than all other customers. Under most MFNs, a seller agrees to provide a service or product to a buyer at a price no higher than the price it provides to any other buyer now or during the term of the agreement. Contracting parties commonly use MFN clauses to reduce uncertainty about potential price fluctuations, transfer risk of opportunism, and reduce the transaction costs of both initial and later bargaining.

No court analyzing the competitive merits of MFNs alone has found them to be illegal under any federal antitrust statute. Some courts, though, have approved antitrust enforcement agencies' negotiated settlements that enjoined the use of MFNs because of a risk of anticompetitive effects given the specific facts of the case. In theory, MFNs can raise issues under Section 1 of the Sherman Act, Section 2 of the Sherman Act, and the Robinson-Patman Act.

Under Section 1, a court considers the legality of an MFN under the rule of reason and weighs its potential pro-competitive and anti-competitive effects against each other. The most obvious procompetitive benefit of a MFN usually is some assurance of lower prices to the buyer. Blue Cross & Blue Shield United v. Marshfield Clinic, 6 F.3d 1406 (7th Cir. 1995). Other benefits include reducing uncertainty for the contracting parties in fluctuating markets, reducing uncertainty for new product offerings, and reducing the probability of post-contractual opportunistic behavior by sellers who have buyers make specific investments in the seller's product.

During the Clinton and Obama Administrations, though, the Department of Justice's Antitrust Division and the Federal Trade Commission developed theories of competitive harm for targeting

MFNs: collusion, price stickiness, and anticompetitive exclusion. MFNs can lead to tacit or explicit collusion on price among competitors in a few ways. When several sellers enter into MFNs with buyers, the competing sellers may agree with one another not to discount prices to any of their customers. Here, the antitrust enforcement agencies are more likely to allege collusion if a large percentage of the relevant competitors, either buyers or sellers, adopt similar MFNs. Starr v. Sony BMG, 592 F.3d 314 (2d Cir. 2010); U.S. v. Apple, 952 F. Supp. 2d 638 (S.D.N.Y. July 10, 2013). The price stickiness theory is different. The theory can be summarized as follows: a single seller entering into an MFN with one buyer is less likely to lower its price to other actual or potential buyers if that action may result in a need to lower its price to the first buyer. This reluctance by the seller to compete on price increases as it enters into more MFNs.

MFNs are more likely, though, to be challenged under Section 2 which deals with unilateral conduct. Here, a litigant must show that a defendant possessed monopoly power and unlawfully monopolized or took steps to unlawfully acquire or maintain the monopoly usually through exclusionary conduct. This theory has something to commend itself to commentators. Indeed, in some instances an MFN can effectively deny rivals inputs or distribution necessary to compete with the dominant manufacturer or supplier. See, e.g., United States v. Delta Dental of Rhode Island, 943 F.Supp. 172 (D.R.I. 1996). Finally, it should be noted that MFNs can give rise to price discrimination claims under the Robinson-Patman Act, which generally prohibits the sale of the same commodity to two competing buyers at different prices if the effect is injury to competition.

**A Very Short Review of the QPAM Exception in Private Equity Law**

Published on April 28, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Since parties who are parties in interest to a plan include any service provider to the plan, a fund manager could inadvertently cause prohibited transactions by transacting with counterparties that are parties in interest to plans that participate in the fund. While there is a patchwork of class exemptions covering various types of transactions, many hedge fund and private equity managers rely primarily on a broad-based exemption known as the QPAM exemption. This exemption, which is codified by the Labor Department as Prohibited Transaction Class Exemption 84-14, allows a qualified professional asset manager (QPAM) to conduct a broad range of transactions (including sales and purchases of securities and commodities, derivatives trades, and FX

transactions) on behalf of an ERISA fund with parties in interest to plans participating in the ERISA fund.

The QPAM exemption applies to transactions by registered investment advisors that meet specified requirements – including a requirement that the adviser have at least $85 million under management and at least $1 million in capitalization as of the end of the adviser's most recent fiscal year. Where the assets of one or more plans of a single plan sponsor constitute more than 20% of the total assets under the management of the advisor, the QPAM exemption will not exempt transactions to the extent they involve those plans.

**Claim Construction in Patent Litigation - Part II**

Published on April 28, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Accused infringers commonly identify one or more terms for construction to develop and support non-infringement and invalidity positions. The accused infringer's counsel should identify terms for construction by considering her litigation strategy, evaluating the parties' infringement and invalidity positions, and prioritizing claim terms that affect the parties' contentions.

The accused infringer's litigation strategy will likely affect which claim terms its identifies for construction. Since the patent owner bears the burden of proving infringement, accused infringers commonly begin by identifying terms that may be construed narrowly to support non-infringement defenses. In some cases, though, an accused infringer may instead identify terms that may be construed broadly to support invalidity defenses. Because patent claims are construed the same for infringement and invalidity determinations, a narrow claim construction may support the accused infringer's non-infringement defenses while limiting its invalidity defenses. Counsel should be mindful of this tension.

The accused infringer's counsel should identify terms for construction in view of the parties' infringement and invalidity positions. If one is litigating in a court with local rules on the matter, she should see what the rules have to say about disclosure requirements regarding the patent owner's infringement contentions, claim construction disclosures, responses to invalidity

contentions, asserted patent priority date, and documents related to the asserted patent's conception. If there are no rules on the matter, in the interest of making decisions with full information, counsel should serve discovery requests early in the case directing the patent owner to disclose its infringement and validity contentions, identify the priority date for each asserted patent claim, identify claim terms that require construction, disclose proposed constructions for the disputed terms, identify intrinsic and extrinsic evidence supporting its proposed constructions, and identify any expert witnesses.

Of course, not every term the parties dispute may ultimately matter to the case. Courts, therefore, often require counsel to work together to limit and prioritize the number of disputed claim terms to those whose construction may be case or issue dispositive. In particular, a court's local patent rules or a judge's own rules may limit the terms available for claim construction preventing a litigant from disputing every claim term in the patent.

Courts begin a claim construction analysis by looking at the words of the claim to give them their ordinary and customary meaning, which is the meaning a person of skill in the art (POSA) would give the terms at the time of invention. Phillips v. AWH Corp., 415 F.3d 1303 (Fed. Cir. 2005). To determine a claim's ordinary and customary meaning, courts consider the context of the entire patent (including the claims and the remainder of the specification), the prosecution history, and extrinsic evidence. A term's ordinary and customary meaning controls unless the inventor has acted as a lexicographer and deliberately defined the term with reasonable clarity in the specification or prosecution history. Teleflex Inc v. Ficosa N. Am. Corp., 299 F.3d 1313 (Fed. Cir. 2002). An article will be released within the week on how to develop proposed constructions in view of intrinsic and extrinsic evidence.

**The Importance of ERISA in Private Equity Law**

Published on April 27, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

U.S. private sector pension plans represent a critical source of capital for private investment funds. Participation, though, comes with a heavy price. The manager of a fund that accepts a pension plan investor will need to spend energy and resources ensuring that the fund either qualifies for an exemption from, or complies with, the U.S. Employee Retirement Income Security Act of 1974

(ERISA). 29 U.S.C. 1001. ERISA's requirements are onerous and the implications of failing to meet them are quite draconian. Unless there is significant pension demand for the fund, most managers prefer to operate under one of the statute's exemptions.

Private equity and venture capital funds typically cannot operate in compliance with ERISA because the statute disfavors fee structures that permit management to earn a fee based on its decision to realize an investment which is customary in the carried interest structure of most private equity funds. As a result, most funds opt for one of two exceptions: (1) the 25% exception, which exempts a fund from ERISA if benefit plan investors do not hold 25% or more of any class of equity interests in a fund or (2) the venture capital operating company exception (VCOC) which exempts funds that make private equity investments and maintain credit management rights with respect to a majority of their portfolio company investments. Real-estate funds also prefer these exceptions in addition to another loophole in the statute: the real estate operating company exception (REOC) which exempts funds with certain real estate investments in which the fund has the right to participate in management or development decisions.

Hedge funds generally make short-term investments in liquid securities and thus, cannot comply with the VCOC or REOC exceptions. Rather, these funds usually prefer to operate under the 25% exception by ensuring that no more than 25% of any class of equity in the fund is held by benefit plan investors. However, some funds opt to legally exceed the 25% threshold by trading solely in liquid market-quoted investments and charging fees based solely in liquid, market-quoted investments or allocations computed on net asset value.

**Patent Notice Letter Considerations**

Published on April 27, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Before sending a patent notice letter, counsel should assess the potential benefits and risks of sending the note. Notice letters can provide actual notice to the alleged infringer of the infringement claim so the patent owner may maximize its potential damages recovery and obtain evidentiary support for a finding of willfulness and enhanced damages if the alleged infringer ignores the letter or support for a claim of induced or contributory infringement. While sending a notice letter may have potential benefits, it also poses a risk that the alleged infringer will file a

declaratory judgment action in response. See, e.g., MedImmune, Inc. v. Genetech, Inc., 549 U.S. 118 (2007); Asia Vital Components Co. v. Asetek Danmark A/S, 837 F.3d 1249 (Fed. Cir. 2016). When evaluating the risk of a declaratory judgement, counsel should consider whether the court where the alleged infringer would bring the action has personal jurisdiction over the patent owner and whether the alleged infringer is willing to forego either inter partes review or past grant review of the patent.

Other risks that should be considered include: the possibility that the alleged infringer will be given a viable equitable defense if the patent owner fails to follow up on the letter, the risk that the infringer will retain key experts, the risk that the infringer will assert a tortious interference of contract claim, and the risk that the letter recipient will argue that the letter constitutes a bad faith patent infringement assertion in violation of state law.

At the initial fact gathering stage, counsel should identify the specific patent at issue, review the patent's prosecution history, determine if any patent owner products use the patent, identify potentially problematic claim construction issues, and interview the patent's inventors to identify any issues related to validity and enforceability. Moreover, if the patent action arises out of the breach of a commercial agreement, counsel should review the contracts for clauses requiring a certain form and timing for breach notification, arbitration clauses, choice of law provisions, forum selection clauses, and consent to personal jurisdiction.

Infringer investigations, on the other hand, should be conducted with care. The following factors should be accounted for:

1.    How long the alleged infringer has engaged in the infringing activity: this factor is important because the infringer may have a prior user rights defense, equitable defense, or defense under 35 U.S.C. 286.

2.    The nature and size of the alleged infringer's business: in general, the smaller the firm the less aggressive the letter must be

3.    The nature and location of the alleged infringer's assets: if the infringer does not have 'deep-pockets' a suit may be inefficient

4.    The relationship between the alleged infringer and other entities involved in the alleged infringement: a more aggressive approach may be warranted if the accused infringer is a

manufacturer or supplier of the accused product as opposed to a customer who purchased the infringing product from another entity.

5.     The alleged infringer's future plans for its infringing activity: if the infringer is planning on expanding its operations, a more aggressive approach (including the prospect of a preliminary injunction) may be warranted.

**Sports Antitrust Regulation - Part I**

Published on April 27, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In Brown v. Pro Football, Inc, 116 S.Ct. 2116 (1996) (Brown III), the Supreme Court held that when parties reach an impasse during collective bargaining, management may unilaterally implement its 'last offer' to the union without exposing itself to any antitrust liability. This non-statutory labor exception has provided NFL, MLB, and NBA owners with a seemingly inequitable advantage over the players' unions in the collective bargaining process. To understand the impact of Brown III, though, ideally, one needs a fairly sophisticated take on the history of antitrust sports regulation in the United States. This article and subsequent ones will attempt to fill that void.

In the sports industry, most of the friction between players and owners stems from disagreements over compensation and free agency. Generally, antitrust suits involving sports leagues are player-instituted challenges that assail a specific management practice as an unfair restraint on competition among teams for player services in violation of the Sherman Act. Over the last century, courts have constructed an elaborate framework to determine whether a monopoly's actions violate the Sherman Act. Initially, courts evaluated antitrust challenges facially declaring that assailed practices were per se violations when the conduct was so unjust that it was a naked restraint with no other purpose than to stifle competition. In Standard Oil Co. v. U.S., though, a famous 1911 case, the Court determined that some combinations and conspiracies in restraint of trade were not illegal restrictions of interstate commerce. Thereafter, two standards of analysis for antitrust liability developed: the per se standard and the rule of reason standard. In National Society of Professional Engineers v. U.S., the Court articulated a current version of the latter standard: an imposed restraint is unlawful if the anti-competitive injury it causes outweighs the pro-competitive benefits it generates.

Because Article I § 8, clause 3 of the U.S. Constitution only gives the national government the ability to regulate interstate, as opposed to intrastate, commerce, federal courts in the early twentieth century generally found that professional baseball was exempt from federal antitrust statutes. Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs, 259 U.S. 200 (1922). This made a good deal of sense - after all, how could one argue that a no-hitter pitched by Cy Young had palpable effects on interstate trade among the several states? The first antitrust challenges to sports league practices in the U.S., though, still involved reserve clauses in professional baseball contracts. Reserve clauses were necessary at the time because whenever a rival league was created such as the American League (1899), the Federal League (1913), and the Mexican League (1925), some MLB players would engage in 'efficient breaches' of their MLB deals and play elsewhere for a higher salary. Back in the 1910s, reserve clauses in professional baseball served the same function as the franchise tag in the NFL today by giving teams the exclusive dealing rights to their five most valuable players. Earlier challenges to reserve clauses, though, were unsuccessful. See American League Baseball Club of Chicago v. Chase, 149 N.Y.S. 6 (1914). A second installment on the history of antitrust law and sports regulation will be released within the week.

**Claim Construction in Patent Litigation - Part I**

Published on April 27, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Claim construction might well be the most important event in the course of a patent litigation. It is a challenging and case-specific process in which the court determines the meaning and scope of the asserted patent claims. As a result, claim construction often determines the outcome of the parties' infringement and invalidity claims and defenses. The accused infringer's counsel should, therefore, develop constructions to avoid liability for patent infringement and if possible, render the asserted patent invalid and unenforceable. More specifically, counsel should begin to consider claim construction issues after receiving either a patent notice letter or service of a patent infringement complaint. After notice occurs, three tasks should be undertaken: (1) evaluation of possible claim constructions, (2) identification and evaluation of any related claim construction proceedings concerning the asserted patent or a relatable patent, and (3) joint defense agreement negotiations.

Counsel should evaluate possible claim constructions by analyzing the asserted patent's claims, specification, and prosecution history; examining any related patents, applications, and prosecution histories including foreign patents and applications; collecting and analyzing relevant extrinsic evidence including dictionaries and treatises from the time of the asserted patent's priority date; assessing accused or potentially infringing products in view of the asserted patent's claims; collecting and reviewing prior art; and finally, discussing plausible constructions with the client and an expert consultant if possible.

Counsel should also consider any prior construction or ongoing claim construction proceedings concerning the asserted patent in another U.S. District Court, the Federal Circuit, the International Trade Commission, or the USPTO. First, if another court has construed a claim of the asserted patent, or if the patent owner has taken a claim construction position in another case, the patent owner may be bound by the prior construction or its previous position under either issue preclusion or estoppel. For issue preclusion, the patent owner may be bound by the earlier construction if the same patent term was construed in an earlier case, the earlier case's parties actually litigated the claim term's meaning through Markman proceedings, the patent owner had full and fair opportunity to litigate the term's meaning in the earlier case, and the earlier claim construction was essential to the judgment in the earlier case. For estoppel, a prior construction may be binding if the current party's position is clearly inconsistent with its earlier position, the party convinced the court in a prior case to adopt its position, and the party asserting the inconsistent position would be unfairly advantaged or its adversary would be unfairly disadvantaged.

Of course, counsel should also consider International Trade Commission claim constructions. Indeed, the ITC follows the same claim construction rules as district courts. Alloc Inc v. ITC, 342 F.3d 1361 (Fed. Cir. 2003). While ITC decisions, for good reason, do not have preclusive effect in U.S. District or Appellate Courts, they may be given deference in proportion to their persuasiveness. Texas Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558 (Fed. Cir. 1996). However, because the USPTO employs a different claim construction standard than both the ITC and District Courts, its constructions will not be accorded deference in most instances. 37 CFR 42.100(b). Here, counsel should still focus on the claim construction arguments that were raised in the proceedings, though.

Finally, if the patent owner has filed an infringement suit against more than one defendant, the accused infringer's counsel should consider forming or joining a joint defense group with the other defendants to avoid taking any inconsistent positions with other defendants on claim construction or non-infringement or invalidity, conducting claim construction discovery, preparing claim construction disclosures and Markman briefs, reviewing prior art, and challenging the asserted patent in a USPTO post-prosecution patentability challenge.

**Hub-and-Spoke Agreements in Antitrust Law**

Published on April 27, 2018

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Unlike traditional antitrust conspiracies, a hub-and-spoke conspiracy has both horizontal and vertical elements because it involves separate vertical agreements used to support a horizontal conspiracy. Here, the central figure is the hub, and the parties with which it enters the separate vertical agreements are the spokes. The hub is often a dominant or important supplier or purchaser. The spokes typically make up the hub's distribution or supply network. These arrangements are most often challenged under Section 1 of the Sherman Act, which, of course, prohibits agreements that unreasonably restrain trade.

As an initial matter, to establish a Section 1 violation, a plaintiff must prove there is an agreement with either direct or indirect evidence. Direct evidence is explicit and may involve a contract or another written document that includes or references an agreement. Because direct evidence is rather rare in antitrust litigation, most litigants rely on indirect indicia. To infer an antitrust agreement from these materials, there must be evidence that tends to exclude the possibility of independent action. Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752 (1983). In general, a court may not infer a conspiracy when the defendant's conduct is just as likely the result of its acting in its own best interests. Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

Vertical agreements come in different forms: resale price maintenance (a device that limits the price that retailers can charge customers for a manufacturer's product), minimum advertised price policies, group boycotts (an agreement among firms to refuse to do business with other firms), exclusive dealing (an agreement for a buyer to purchase all, or almost all, of its supply from a single supplier), and most favored nation clauses (a contract clause that requires a supplier to treat a particular customer no worse than any other customer).

Plaintiffs must show evidence of a horizontal agreement among the spokes to prove the existence of the rim. In determining whether there is sufficient evidence of an agreement to establish a rim, courts have considered direct/indirect evidence of agreement among the spokes, whether spokes have conditioned acceptance on acceptance by their competitions, vertical agreements that were not in the spokes' unilateral self-interest, and the role of the hub in the conspiracy. United States

v. Apple, 791 F.3d 290 (2d Cir. 2015); Toys "R" Us, Inc. v. FTC, 221 F.3d 928 (7th Cir. 2000). In re Insurance Brokerage Antitrust Litigation, 618 F.3d 300 (3d Cir. 2010); In re Musical Instruments & Equip. Antitrust Litigation, 798 F.3d 1186 (9th Cir. 2015).

A hub's coercion of its spokes to enter the vertical agreements, though, may be insufficient by itself to find the rim required in a hub-and-spoke conspiracy as a dominant retailer or manufacturer could extract similar advantageous terms from its suppliers or retailers without necessarily creating a hub-and-spoke conspiracy. Because hub-and-spoke conspiracies have a horizontal component, courts generally agree that they are subject to per se liability (although there is some uncertainty on this point. See Leegin Creative Leather Prods. Inc. v. PSKS Inc., 551 U.S. 877 (2007)). United States v. Parke, Davis & Co., 362 U.S. 29 (1960). If plaintiffs fail to prove the existence of the rim in an alleged hub-and-spoke conspiracy, the rule of reason applies because the alleged conspiracy is only a series of vertical agreements.

So, what is the bottom line for clients? Well, when advising potential hubs, bear in mind that during contract negotiations with suppliers or distributors, a company should limit discussions regarding the contract terms or the status of negotiations with other supplies or distributors; should not act as a conduit for the exchange of information between its suppliers or its distributors; and should exercise caution before entering into similar vertical agreements with their suppliers at the request of the supplier. The advice for spokes is different. These firms should not discuss contract terms or the status of contracts with their competitors, should not condition the acceptance of a particular contract or term on the acceptance of that contract by their competitions; and should ensure that supplier agreements are in the firm's unilateral self-interest.

**Damages for Non-Performance of Oil and Gas Leases**

Published on April 26, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Where there has been a breach of duty, express or implied, by a lessee or assignee of an oil and gas lease to drill test wells, additional wells, or offset protection wells, to market the oil or gas produced, or to exercise proper case or skill in drilling and operating wells, the lessor or a grantee may recover in an action for damages for the breach. As a general rule, the measure of damages for breach of the express and implied development covenants in an oil and gas lease is the same

as it is for other contracts. Thus, a party injured by breach of an oil and gas lease is entitled to recover all damages, including the gains denied as well as the losses sustained, provided they are reasonably certain and follow from the breach. When the precise amount of damages for non-performance of an oil and gas lease is difficult to determine, sampling is an acceptable method of calculating the damages. The plaintiff will not be barred from recovery for failing to prove the amount of loss with mathematical certainty. Martin v. Darcy, 357 S.W.2d 457 (Tex. Civ. App. San Antonio 1962); Basic Energy Service Inc. v. D-S-B Properties Inc, 367 S.W.3d 254 (Tex. App. Tyler 2011).

Where, in an oil and gas lease or assignment, the lessee or assignee expressly agrees to drill a well on the land within a stipulated time, it is not uncommon for the parties to expressly stipulate that a particular sum shall be regarded as liquidated damages for breach of the agreement to drill. The agreement may go farther and provide that a bond be secured for the payment of the stipulated damages. When an action is brought to recover the amount named in the contract or the bond for breach of the agreement to drill, the principal question is whether the amount agreed upon is to be regarded as a penalty or as liquidated damages. This is a question of law for the court to be determined from the intention of the parties as gathered from the contract itself and surrounding circumstances. If the intention of the parties is clear, the actual damages are uncertain and difficult to prove, and the amount agreed on is not so large as to indicate that compensation was not the purpose, the amounts stipulated are held recoverable as liquidated damages. Presnal v. TLL Energy ·Corp., 788 S.W.2d 123 (Tex. App. Houston 1st Dist. 1990).

Where compensatory damages have been recovered for breach of the duty to drill an oil and gas test well, four different rules for their measure have been adopted

1.    The cost of drilling the test well

2.    The value of the rents and royalties which would have been received by the plaintiff if the test well had been drilled

3.    The loss in the market value of a lease for oil and gas on the plaintiff's land resulting from a failure to drill a test well

4.    The amount that a reasonably prudent person in the same position as the plaintiff would have contributed to the cost of the test well in return for the geological information which the drilling would have disclosed

In those decisions where the courts have measured damages for breach of a covenant to drill a test well by the reasonable cost of drilling it, they have relied on the principle that if A employs B to do an act on A's land and pays him for it, B cannot escape the payment of damages for non-performance of the act by showing that performance of the act would not have resulted in a benefit to A or that it might have been detrimental to A. These decisions have been extended to the field of energy law.

**The NLRB's Unfair Labor Practice Function**

Published on April 26, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The second distinct function of the NLRB is the prevention and remedying of unfair labor practices. Under Section 10 of the NLRA, the Board decides whether or not particular conduct violates the unfair labor practices prohibitions of Section 8. With its prosecutorial powers, the General Counsel on behalf of the Board is the final authority with respect to determining whether or not to file an unfair labor practice complaint. Through its adjudicative powers, the Board enforces the Act's prohibitions by conducting administrative hearings and issuing decisions and orders, either dismissing complaints or requiring a party to cease and desist from the unfair labor practice. The Board's unfair labor practice jurisdiction is invoked by the filing of a charge. A charge may be filed by any person – either an individual or organization. Any party required to be served must be notified by telephone of the substance of the transmitted document nd a copy of the document must be served by personal service no later than the next day, by overnight delivery service, or, with the permission of the party receiving the document, through fax. See 29 USC 160; 29 USC 159; 29 USC 153 (d); Liberty University Inc v. Geithner, 671 F.3d 391 (4th Cir. 2011).


The Board's investigation and complaint are not limited to those unfair labor practices alleged in the charge. Rather, an unfair labor practice charge may include practices of the same class as or related to the practices alleged in the charge and which grew out of them during the pendency of the Board proceeding. Indeed, as the Supreme Court explained in N.L.R.B. v. Fant Milling Company, 360 U.S. 301 (1959):

"A charge filed with the Labor Board is not to be measured by the standards applicable to a pleading in a private lawsuit. Its purpose is merely to set in motion the machinery of an inquiry … . The responsibility of making that inquiry, and of framing the issues in the case is one that Congress has imposed upon the Board, not the charging party. To confine the Board in its inquiry and in framing the complaint to the specific matters alleged in the charge would reduce the statutory machinery to a vehicle for the vindication of private rights. This would be alien to the basic purpose of the Act. The Board was created not to adjudicate private controversies but to advance the public interest in eliminating obstructions to interstate commerce … . Once its jurisdiction is invoked the Board must be left free to make full inquiry under its broad investigatory power in order properly to discharge the duty of protecting public rights which Congress has imposed upon it. There can be no justification for confining such an inquiry to the precise particularization of a charge."

The NLRB looks at three factors in determining whether a complaint is factually related to the allegations of the underlying charge: (1) whether the allegations involve the same legal theory as the allegations in the charge, (2) whether the allegations arise from the same factual circumstances or sequence of events as the charge, and (3) whether a respondent would raise a similar defense to both allegations." A complaint may be amended "at any time prior to the issuance of an order based thereon so long as the newly alleged violation occurred within six months of the filing of the charge and is closely related to the violations alleged in the charge. The respondent must within fourteen days from the service of the complaint, file an answer, specifically admitting, denying, or explaining each of the facts alleged in the complaint unless the respondent has no knowledge, in which case the respondent must so state. The allegations in the complaint will be deemed admitted if the answer is not filed within the 14 day window. Brockton Hospital v. NLRB, 294 F.3d 100 (D.C. Cir. 2002); 29 C.F.R. 102.20

**A Brief Overview of ERISA Regulations on Hedge Funds**

Published on April 26, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The nature of hedge fund investing and trading is such that it is impossible for these funds to satisfy the VCOC ERISA exception (for more on the exception, see this article). Thus, a hedge fund will either qualify for the 25% exception or the fund will have to comply with the fiduciary and prohibited transaction rules of ERISA (for a brief overview on the 25% exception, see this article).

A hedge fund manager can indicate in the fund's offering documents that for an initial period it will use commercially reasonable efforts to qualify for the 25% exception but that it retains discretion, in the event of significant benefit plan investor demand, to exceed the 25% limitation and operate the fund as an ERISA fund. ERISA permits a named fiduciary of a plan to appoint an 'investment manager' to manage the assets of the plan – provided that certain requirements are met:

1.    The fund manager or entity who will make discretionary investment decisions with respect to plan assets invested in the fund should be registered as an investment advisor under the Advisers Act

2.    The investment manager should acknowledge in writing that it is a fiduciary with respect to investing plans

3.    The investment manager should have a fidelity bond generally equal to 10% of plan assets

Where the general partner of the hedge fund will serve as the investment manager, the subscription documents should include representations with respect to each ERISA plan investor that (1) the plan's investment in the fund was made by the general partner and investment manager of the plan, (2) the general partner acknowledges that it is a fiduciary with respect to investments held on behalf of the plan, (3) the appointment is being made in accordance with the plan's governing documents, and (4) the party signing on behalf of the plan is a named fiduciary of the plan or is otherwise empowered to appoint the general partner as investment manager. Where a hedge fund is managed by a separate investment adviser entity, that entity must meet the requirements of, and be appropriately appointed as, an investment manager. If the entity will not be a party to the subscription agreement, the entity should enter into a written asset management agreement with the fund, the agreement should be available for review by each plan investor, and the terms of the agreement should be approved by each plan investor under the provisions of the subscription agreement.

An ERISA fiduciary that hires an investment manager for a plan has an ongoing fiduciary duty to monitor the performance of the investment manager and, where prudent, terminate the relationship. Under Labor Department regulations, advance notice of 60 to 90 days is usually required. For a hedge fund with liquid assets and short-term trading strategies at least quarterly penalty-free withdrawal rights should be acceptable under ERISA. For a hedge fund with a longer term, less liquid portfolio, semiannual and perhaps annual withdrawal rights may be adequate.

**Tying Arrangements in Antitrust Law**

Published on April 26, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

A tying arrangement is one in which a party conditions the sale of one product (the tying product) on the purchase of a different product (the tied product). Tying may also involve the sale of a product or service on the condition that the buyer does not buy a different product or service from another supplier. Coercion is essential to an illegal tying arrangement. The seller must be leveraging its control over one product to force a buyer to purchase a second product that the buyer either does not want or would otherwise purchase elsewhere. Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2 (1984), abrogated on other grounds by Ill. Tool Works v. Indep. Ink, Inc., 547 U.S. 28 (2006). Tying is not unlawful if the buyer can turn down the tied product, the tied product is free, the seller persuaded (but did not force) the buyers to purchase both items, or the buyer can freely purchase the two products separately. It's My Party, Inc. v. Live Nation Inc., 811 F.3d 676 (4th Cir. 2016); Paladin Assoc., Inc. v. Montana Power Co., 328 F.3d 1145 (9th Cir. 2003). While tying can reduce consumer choice, impede competition in the tied market, and increase entry barriers, in some instances, tying can also lower transaction costs, lower distribution costs, and increase quality control. U.S. v. Microsoft, 253 F.3d 34 (D.C. Cir. 2001). This practice note will cover tying claims brought under section 1 of the Sherman Act and section 3 of the Clayton Act.


Here, courts use the same analysis and each claim contains four elements (1) the tying and tied goods are two separate products or services, (2) the defendant has conditioned the sale of the tying product on the purchase of the tied product, (3) the defendant has market power (i.e. the ability to force the buyer to do something it would not do in a competitive market) in the market for the tying product that allows it to restrain trade in the market for the tied product, and (4) there is an effect on interstate commerce that is not insubstantial (this last element is assessed in absolute dollar figures and is usually met with a low threshold). Fortner Enterprises, Inc. v. U.S. Steel Corp., 394 U.S. 495 (1969). To determine whether the products are separate, courts adopt the buyer's perspective and look to whether there is separate consumer demand for the two products, whether consumers prefer to purchase the products separately, whether it is more efficient to offer the products as a group or separately, and whether there are separate charges for the two products. Eastman Kodak Co. v. Image Technical Servc., Inc., 504 U.S. 451 (1992).

**Interscholastic Athletics and Religious Freedom**

Published on April 26, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Unlike in other nations, athletic competition and religious observance are complementary, if not convergent endeavors in the United States. Ordinarily, these two endeavors – the athletic and the religious can be honored without serious conflict. NBA Hall-of Fame Center, Hakeem Olajuwon, for instance, would play his full share of minutes on the Court even while fasting for Ramadan. Other conflicts, though, such as Dodger legend Sandy Koufax's understandable refusal to pitch during Yom Kippur during the 1965 World Series were irreconcilable. What happens, though, when interscholastic athletes seek to vindicate their religious beliefs in state sponsored sports competitions?

Our Constitution's answer to this question is clear: in the absence of a state statute or regulation that facially discriminates on the basis of religion, the challenged law will prevail over the individual's religious claim. Here, free exercise challenges to facially neutral laws will succeed only if the claimant can demonstrate a "disparate impact" and "intent [to] discriminate" "because of, not merely in spite of, its adverse effects upon an identifiable religious group." Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990); Personnel Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979). "Once religious discrimination is shown to have been a 'substantial' or motivating factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor." If the Court accepts the government's justification and rejects the claim of discriminatory purpose, only rational basis review is used. Discriminatory intent may be inferred from (1) whether the official action "bears more heavily on one religion than another," (2) a clear pattern, unexplainable on grounds other than religion," that "emerges from…state action," (3) the historical background of the decision…particularly if it reveals a series of official actions taken for invidious purposes, (4) the specific sequence of events leading up the challenged decision, (5) procedural or substantive departures from the normal sequence, and (6) the legislative or administrative history. Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266-68 (1977). Church of the Lukumi Babalu Aye, Inc. v. Hialeah, 508 U.S. 520 (1993); If these two criteria are satisfied, the law "must…be narrowly tailored" to achieve a "compelling government interest." Because state action is required to trigger the First and Fourteenth Amendment's protection, athletes in private sports leagues cannot bring these claims.  See, e.g., Moose Lodge No. 107 v. Irvis, 407 U.S. 163 (1972). These same requirements apply to section 1983 suits brought to vindicate free exercise claims.

So, is all hope lost for potential claimants? Not quite. Some states have passed 'mini-RFRAs' based on the Federal Religious Freedom Restoration Act. See, e.g., City of Boerne v. Flores, 521 U.S. 507 (1997). These statutes have re-imposed the Supreme Court's old heightened scrutiny test which originated in Sherbert v. Verner for disparate impact free exercise claims. Litigation under these provisions, though, has been sparse. Scot Idelman, Religious Freedom and the Interscholastic Athlete, 12 Marquette Sports L. Rev. 295 (2001).

**A Few Thoughts on Statutory Interpretation - Part VI**

Published on April 26, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Under the omitted-case canon, nothing is to be added to what the text states or reasonably implies (casus omissus pro omisso habendus est). For in the words of Justice Frankfurter, "whatever temptations the statesmanship of policymaking might wisely suggest, construction must eschew interpolation and evisceration." Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 COLUM. L. Rev. 527, 533 (1947). Judges should not assume that a statute answers every question on the topic it regulates. Indeed, as noted lawyer and statesman, Elihu Root, stated "it is not the [judge's] function or within [her] power to enlarge or improve or change the law." Elihu Root, The Importance of an Independent Judiciary, 72 Independent 704 (1912). "To supply omissions transcends the judicial function" and if the legislature did not make provide for a matter, that puts the controversy to a close. Iselin v. United States, 270 U.S. 245, 251 (1926) (Brandeis, J.).


Montgomery County Volunteer Fire-Rescue Association v. Montgomery County Board of Elections, 15 A.3d 798 (Md. 2011), illustrates the point. There, Maryland Election Law (Md. Code Ann., Elec. Law 6-203(a)(1)) required that a referendum petition contain the signer's address, her printed name, and the date of signing, and that the signer sign her name "as it appears on the statewide voter registration list." That law also provided that a signature must be validated and counted. In reviewing the signature list, however, the Montgomery County board of elections refused to validate many of the signatures on the grounds that they were not legible. In the ensuing lawsuit, though, the Maryland Supreme Court refused to add signature legibility to the petition certification requirements because the state statute itself did not impose that requirement.

This sweeping rule, though, is not absolute. Two exceptions come to mind. First, of course, courts can continue to exercise their common law powers in jurisdictions where those are retained. The fact, for instance, that a state legislature changes one rule of judge-made contract or tort law does not suggest that the courts' power over the remainder of contract or tort law has been eliminated. For instance, in the absence of legislative direction to the contrary, courts can continue to apply the cy pres doctrine which permits courts to find a substitute objective for a charitable gift when the original objective can no longer be served. Second, a statute can leave a matter to future common law development by the courts. Indeed, the Sherman Act and Federal Tort Claims Act arguably fall within this latter category.

**The NLRB's Representation Election Function**

Published on April 25, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The National Labor Relations Board (NLRB) performs two distinct functions in furthering its purported objective to foster industrial peace and provide for the orderly resolution of labor disputes between workers and employers. The first function is to establish and oversee a process for the election of employee representatives authorized to negotiate with employers. The second function is to prevent and remedy unfair labor practices.


Under Section 9(a) of the National Labor Relations Act, a representative selected by a majority of employees in an appropriate unit is the exclusive bargaining representative of all unit employees for collective bargaining purposes. One of the board's primary functions is the determination of questions concerning such employee representation (which usually requires secret ballot elections). Under Section 9, whenever a representation petition is filed, the Board investigates the petition and if it has reasonable cause to believe that a question of representation affecting interstate commerce exists, the Board sets the matter for a hearing. Petitions can be filed by an employee or union alleging that a substantial number of employees desire collective bargaining representation, that a currently certified or recognized bargaining representative is no longer the representative, or that an individual or labor organization has made a recognitional claim as a representative. Electronic filing is permitted, and forms are available on the NLRB's website.

A pre-election hearing is conducted by a regional officer or employee who does not make any recommendations. If the Board finds upon the hearing that a representation questions exists, it will direct a secret ballot election and certify the results. A party seeking to overturn a secret ballot election has the burden of showing by preponderance of the evidence both that the alleged conduct occurred and that the conduct warrants a new election.

The Board may not direct an election in any unit in which a valid election was held during the preceding 12-month period. Strikers not entitled to re-instatement may vote, in accordance with Board regulations, in any election conducted within 12 months after strike commencement. Where none of the choices on the election ballot receives a majority, the Board is to conduct a runoff election, with the ballot providing for a selection between the two choices receiving the largest and second largest number of valid runoff votes cast in the election.

The Board has delegated to its Regional Directors its powers under Section 9 to determine the appropriate bargaining unit, to investigate and provide for hearings to determine whether a question of representation exits, and to direct elections under Section 9(c) or (e). The Board, moreover, will only grant requests to review a Regional Director's decision where compelling reasons for doing so exist. Here, for review to be granted, a substantial question of law or policy must be raised because of the absence of or departure from an official Board precedent, a clearly erroneous factual finding prejudicing the rights of a party was made, or the conduct of the hearing or any ruling made in connection with the proceeding resulted in prejudicial error. UC HEALTH AND UC HEALTH PUBLIC SAFETY UNION, 360 N.L.R.B. 608, 198 L.R.R.M. (BNA) 1936, 2014 WL 1289447 (2014); SSC Mystic Operating Co., LLC v. N.L.R.B., 801 F.3d 302, 204 L.R.R.M. (BNA) 3277, 166 Lab. Cas. (CCH) P 10812 (D.C. Cir. 2015).

**Tying Arrangements in Patent Law**

Published on April 25, 2018

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

One might suspect that U.S. antitrust and intellectual property law are at war with one another. On one hand, the antitrust laws seek to promote a competitive marketplace in which rivals compete for the sale of goods or services to the benefit of consumers. On the other hand, a patent gives an

inventor the right to exclude rivals from making, using, or selling an invention in the U.S. for a limited time. One area where these two overlap occurs in the tying context.

Under federal antitrust laws, a tying arrangement is an agreement by a party to sell (or lease) one product or service (the tying product) to a buyer only on the condition that the buyer also purchases a different product or service (the tied product) from the seller, or at least agrees that she will not purchase that product or service from any other supplier. Tying has two theoretical harms: it denies competitive rivals access to the market for the tied product and forces consumers to forgo their free choice. Tying arrangements can be challenged under the following statutes: Section 1 of the Sherman Act, Section 2 of the Sherman Act, Section 3 of the Clayton Act, or Section 5 of the FTC Act.

Generally, courts will treat a tying arrangement as per se unlawful under Section 1 of the Sherman Act and Section 3 of the Clayton Act, and find it illegal without proof of an unreasonable anti-competitive effect, if the following elements are present: the tying and tied goods are two separate products or services (which depends on the demand for the two items and whether customers distinguish the two), the seller conditions the sale of one product or service on the purchase of another product or service, the seller has sufficient market power in the market for the tying product to enable it to restrain trade in the market for the tied product, and a non-insubstantial amount of interstate commerce in the tied product is affected. A separate practice note that covers tying in depth will be released within the week. Cf, Cascade Health Solutions v. PeaceHealth, 515 F.3d 883 (9th Cir. 2007); Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2 (1984); Eastman Kodak Co. v. Image Technical Services Inc. 504 U.S. 451 (1992); Datagate Inc. v. Hewlett-Packard Co., 60 F.3d 1421 (1995). A plaintiff who fails to prove that the defendant has market power in the tying product may still try to challenge the tying arrangement under the rule of reason. For more on that test, see this article.

Traditional patent tying occurs when the tying product is patented, the tied product is an unpatented commodity used as an input for the tying product, and the sale of the tying product is conditioned on the purchase of the unpatented product. Manufacturers usually resort to these arrangements to ensure quality control, to monitor a licensee's usage of a patent, to facilitate market acceptance of a new product, to advance distribution of a newly innovated product, or to enable the seller to achieve scale economies. When it comes to advising clients, though, counsel should bear the following in mind: patents do not create a presumption of market power in the tying product market, a low market share (typically below 30%) provides a limited buffer from antitrust liability, patent infringement suits can trigger an antitrust counterclaim, and that a seller with a low market share can still have its tying arrangement challenged under the rule of reason.

**A Brief Overview of Proxy Voting for Publicly Traded Firms in M&A Transactions**

Published on April 25, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In most M&A transactions, approval of the stockholders of the buyer, the target, or both, will be required to complete the transaction. Stockholders of publicly traded companies will often vote through proxies. Exchange Act Regulation 14A regulates proxy solicitation. The rules regulate the content, timing, and manner of delivery of proxy statements to stockholders and are applicable to any solicitation of proxies with respect to voting on securities registered under Section 12 of the Exchange Act. More specifically, disclosures are required here if stockholders are asked to vote on any of the following: a merger or consolidation, an acquisition of securities of another company, an acquisition of any other going business or the assets of a going business, a liquidation or dissolution, or a sale or other transfer of all or any substantial part of the company's assets. This usually entails the filing of a summary term sheet, the transaction terms, and separate reports, opinions, and appraisals. See also Exchange Act Rule 10b-5.


Rule 14a-3 under the Exchange Act prohibits the solicitation of proxies unless the person solicited is concurrently furnished with, or has previously received, a publicly filed preliminary or definitive proxy statement. The word 'solicitation' here is interpreted broadly to include any communication to security holders under circumstances reasonably calculated to result in the procurement, withholding, or revocation of a proxy. Consequently, buyers and target companies must take care to ensure that any communications comply with Regulation 14A. This often means filing and distributing a proxy statement, and ensuring that all communications made before the proxy statement is filed comply with the safe harbor provided under Rule 14a-12 under the Exchange Act.


The information required by Schedule 14A varies depending on the nature of the matter to be acted upon by stockholders. The following items will be required, though, regardless of the transaction at issue: basic information about the issuer from the time, date, and place of the meeting; whether proxies are revocable, and how they may be revoked, a summary of the dissenters' rights of appraisal under state law, information concerning the persons making the solicitation, a description of voting procedures at the meeting, a description of the voting rights of the stockholders entitled to vote at the meeting, and a description of any interest of each participant in the solicitation in the matter to be voted on.

**Applying the Lumley Rule to Player Holdouts**

Published on April 25, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

As Pittsburgh Steelers Running Back LaVeon Bell's salary dispute with the Rooney's last year demonstrated, the contract holdout problem has become pervasive in American sports – and in the NFL in particular. Hold-outs can be particularly annoying for fans because the loss of a star player can alter the value of season tickets and demoralize a fanbase. Another reason a player's holdout threat can be so powerful is because the team can only pursue a limited range of legal remedies against her or him. The most effective in this arena is usually the 'negative injunction' which teams can use to prevent a player from playing professionally for another franchise. Because owners in professional sports, though, often engage in collusive behavior, negative injunctions are only useful in those rare instances where a rival league in the same market can compete for the player's services. Injunctions can also force the parties to the table to reach a welfare-maximizing solution. When the San Diego Chargers, for instance, drafted Eli Manning out of Ole Miss in 2004, Manning and his father Archie refused to sign a contract with the Chargers and following intensive negotiations, Eli was subsequently traded to the Giants for Phillip Rivers and a few draft picks. The rest, to Tom Brady's chagrin, is history.


While contract damages are also theoretically available, and teams can structure contracts to dis-incentivize holdouts by indexing a player's salary to training camp participation and regular season starts, the Lumley doctrine prohibits courts from ordering specific performance on the contract. The rule originated in Lumley v. Wagner, 42 Eng. Re. 687. That case involved German soprano Johanna Wagner, "cantatrice of the Court of His Majesty the King of Prussia, who signed a contract to perform at the opera house owned by plaintiff Benjamin Lumley. Wagner was subsequently hired away by a rival theatre, the Royal Italian Opera Covent Garden, by a higher offer of pay. This prompted Lumley to sue both Wagner and the rival theatre. There, the Court in refusing to order Ms. Wagner to perform her contract reasoned: "beyond all doubt this Court could not interfere to enforce the specific performance of the whole of this contract" but that policy reasons dictated that a negative injunction be available as the court should not "suffer [parties] to depart from their contracts at their pleasure, leaving the party with whom they have contracted to the mere chance of any damages which a jury may give." This rule soon made its may across the Atlantic and is now as American as apple pie. Am. Ass'n Base-Ball Club v. Pickett, 8 Pa. C. 232 (C.P. 1890); Central New York Baseball Inc. v. Barnett, 181 N.E.2d 506 (Ohio C.P. Cuyahoga County 1961); Boston Celtics Ltd. P'ship v. Shaw, 908 F.2d 1041 (1st Cir. 1990).

**A Few Thoughts on Statutory Interpretation - Part V**

Published on April 25, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The ordinary meaning rule is the most fundamental semantic rule of interpretation. See, e.g., James Kent, Commentaries on American Law (1826). The rule governs constitutions, statutes, rules, and private instruments. Indeed, Justice Joseph Story's comments on the matter are as true today as they were in the mid-nineteenth century:

"Every word employed in the constitution is to be expounded in its plain, obvious, and common-sense meaning, unless the context furnishes some ground to control, qualify, or enlarge it. Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adopted to common wants, designed for common use, and fitted for common understandings."

Joseph Story, Commentaries on the Constitution of the United States 17 (1833). This is not to suggest that interpretation will always be easy – just that one should not create more legwork for herself. Most English words have a number of dictionary definitions, some of them quite abstruse and rarely intended. The fact is that the more common the term is, the more meanings it will often bear (the more 'polysemous' it is as linguists put the matter). Readers should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise. Of course, the ordinary meaning rule assumes that a thoroughly fluent reader can reliably tell in the vast majority of instances from contextual and idiomatic clues, which of several possible senses a word or phrase bears. Common experience proves this: in everyday life, the people to whom rules are addressed continually understand and apply them relying on their own sense of language or sprachgefuhl as the Germans put it. Take an example: Commonwealth of Pennsylvania v. McCoy, 962 A.2d 1160 (Pa. 2009). That case involved a state statute that made it an offense to "knowingly, intentionally, or recklessly discharge a firearm from any location into an occupied structure." While he was inside an Old Country Buffet, James McCoy fired his pistol and was later convicted for violating the statute. On appeal, however, the Pennsylvania Supreme Court concluded that McCoy's

conviction was not valid because the law he was charged with violating did not prohibit individuals from firing their weapon while they were already inside the building.

Rules, though, are made to be broken and the ordinary meaning canon is no exception. In cases where terms of art are at issue, a specialized meaning is to be expected. As Justice Frankfurter expressed the rule some time ago "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527 (1947). Perhaps the most famous example of the technical meaning exception - albeit a conservative one that nonetheless pervades legal drafting in private law offices – is the presumption that person in legal instruments also includes corporations. Emily Barnet, Hobby Lobby and the Dictionary Act 124 Yale L. J. Forum 11 (2014); Amy Sepinwall, Citizens United and the Ineluctable Question of Corporate Citizenship, 44 Conn. L. Rev. 575 (2012).

**Disclosure Duties in the Collective Bargaining Process**

Published on April 24, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The duty to bargain in good faith embodied in Section 8(a)(5) of the National Labor Relations Act includes the obligation to furnish to the other party pertinent and relevant bargaining information without unreasonable delay including any information which is relevant and necessary to the intelligent performance of that party's collective bargaining duties. Torrington Extend-A-Care Employee Ass'n v. NLRB, 17 F.3d 580 (2d Cir. 1994). The burden to show relevancy is not exceptionally heavy, requiring only that a showing be made of a probability that the desired information is relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities. CHAPIN HILL AT RED BANK AND LOCAL 707 HEALTH EMPLOYEES ALLIANCE RIGHTS & TRADE (HEART), 360 NLRB 116 (2014). Whether the information is relevant and whether there is a duty to furnish it, is a fact-specific inquiry.

The NLRB has consistently held that the duty of an employer to provide relevant requested information in its possession is not excused by the fact that the union could obtain the information elsewhere. Moreover, because a union's duties include the duty to see to it that an employer meets its collective bargaining agreement obligations, the employer's duty to furnish information extends

to data requested to administer and police the agreement such as information on wages, hours, and working conditions. Employer information which pertains to an issue that is a mandatory subject of bargaining is presumptively relevant to the union's representation duties. As such, the failure of management to meet its demands on those matters constitutes a Section 8(a)(5) violation. Here, the NLRB applies a broad discovery-type standard for determining relevance. While unions are typically the information requesting parties in these matters, the duty to disclose is not a one way street and management also has rights to demand information from unions if the sources will better enable the employer to discuss the issues intelligently and bargain in a meaningful manner. Ozark Automotive Distributors, Inc. v. NLRB, 779 F.3d 576 (D.C. Cir. 2015); NLRB v. Truitt Mfg. Co., 351 U.S. 149 (1956); United Steelworkers of America, AFL-CIO-CLC, Local Union 14534 v. NLRB, 983 F.2d 240 (D.C. Cir. 1993); Nielsen Lithographing Co. and Graphic Communications Intern Union Local 508 O-K-I, AFL-CIO, 305 NLRB 697.

**A Few Thoughts on Statutory Interpretation - Part IV**

Published on April 24, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The presumption of validity dictates that courts disfavor interpretations that would nullify a provision or an entire instrument – an interpretation, for instance, that would cause an arbitration clause to be unenforceable or invalidate a federal statute as unconstitutional. Ashwander v. Tennessee Valley Auth., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); but see Armendariz v. Foundation Health Pyschcare Services, 24 Cal.4th 83 (2000).


Justice Cardozo provided a classic statement of the principle in the famous 'hot oil' case: "when a statute is reasonably susceptible of two interpretations, by one of which it is unconstitutional and by the other valid, the court prefers the meaning that preserves to the meaning that destroys." Panama Refining Co. v. Ryan, 293 U.S. 388 (1935) (Cardozo, J., dissenting).


United States v. Cornell, 255 F. Cas. 646 (C.C.D.R.I. 1819), a case in which Justice Story sat on circuit (the practice was formally abolished in 1911), provides an apt illustration of the rule. Cornell involved one of the federal government's recent land purchases from the state of Rhode Island under a state statute. The authorizing legislation, though, contained a proviso: "that all civil and criminal processes issued under the authority of the state…may be executed on the lands so

ceded, and within the fortifications which may be erected thereon, in the same way and manner as if such lands had not been ceded as aforesaid." The defendant, a soldier stationed in Newport Harbor, had killed another soldier on the post and was tried for murder under a 1790 federal statute that provided the death penalty for any individual who committed a murder in any area within the sole or exclusive jurisdiction of the United States. Cornell's lawyer, though, argued that the murder statute did not apply to his client because the U.S. did not have sole jurisdiction over the area as the Rhode Island authorizing statute had preserved the state's ability to execute civil and criminal process on individuals located on federal lands. Justice Story rejected this claim on the theory that Congress' Article I Section 8 power to regulate forts, magazines, arsenals, dock-years, and other needful buildings meant that congressional land purchases for military installations granted the federal government exclusive jurisdiction over the area.

**A Few Thoughts on Statutory Interpretation - Part III**

Published on April 24, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

There is popular anecdote among statutory interpretation nerds: an undisclosed jurisdiction was rumored to have passed an ordinance stating that "no drinking saloon may exist within a mile of any schoolhouse." Misinterpreting the provision, though, a court held that a schoolhouse had to be moved from its current location after a speakeasy was set up within a few blocks of the schoolgrounds. Of course, this result strikes many of us as exactly backwards because the clear purpose of the statute was to protect schoolhouses not bars or pubs.


The morale of this cheesy story is that a textually permissible interpretation that furthers rather than obstructs the purpose of a document should be favored. This canon follows from three non-controversial facts: interpretation is always dependent on context, context always includes evident purpose, and evident purpose always includes effectiveness.  One sees this presumption in several areas of the law: the California Civil Code, for example, states that a contract must receive such an interpretation that will make it lawful, operative, definite, reasonable, and capable of being carried into effect. Cal. Civ. Code §1643. Likewise, in Citizens Bank of Bryan v. First, State Bank, 580 S.W.2d 344 (Tex. 1979), a case involving a Texas Banking Code regulation covering a state administrative agency, the Texas Supreme Court stated that if the "language is susceptible of two constructions, one of which will carry out and the other defeat [its] manifest object, [the statute] should receive the former construction."

Perhaps another example is in order – City of Philadelphia v. Ridge Ave. Passenger Ry. Co., 102 Pa. 190 (1883) provides a good illustration. There, a Pennsylvania state statute provided that the Ridge Avenue Passenger Railroad Company would pay an annual 6% tax on the declared dividends that exceeded 6% of the company's capital stock. The dispute centered on the meaning of capital stock. The railroad argued that the term referred only to authorized capital stock; while the city contended that it referred to issued capital stock. In siding with the city, the Pennsylvania Supreme Court reasoned that as the object and purpose of the statute was to raise revenue and that given that the company's interpretation would permit the railroad to evade taxes, it felt compelled to adopt the city's legal theory instead.

**Regulating Spectator Injuries in Sports Law**

Published on April 24, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

While incidents implicating stadium liability for spectator injuries are by no means restricted to Major League Baseball alone, most liability rules stem from baseball because it was one of the first major spectator based sports in the United States. In general, there are four elements to a negligence claim – the spectator must prove that the stadium owner owed her a duty of care, that the duty was breached, that the tortfeasor's actions caused the injury, and that actual damages flowed from the injury as well. Many jurisdictions have used a variety of standards in assessing stadium owner duties with most opting to adopt some version of the assumption of risk standard.


The primary assumption of risk doctrine involves "instances in which the assumption of risk doctrine embodies a legal conclusion that there is no duty on the part of the defendant to protect the plaintiff from a particular risk." Knight v. Jewett, 834 P.2d 696, 701 (Cal. 1992). "The doctrine requires…knowledge of the injury-causing defect, appreciation of the resultant risk, and…awareness of risk is assessed against the background of the skill and experience of the particular plaintiff, and in that assessment a higher degree of awareness will be imputed to a professional than to one with less than professional experience in the particular" venture. Maddox v. City of New York, 487 N.E.2d 553 (N.Y. 1985). Of course, these principles have peculiar application in the context of professional baseball games as "so long as seats directly behind home plate are protected, the team owes no duty to spectators outside that area who are injured by a ball or bat while watching a baseball game." Coomer v. Kansas City Royals Baseball Corp., 437

S.W.3d 184 (Mo. 2014). Here, the words of Justice Holmes more than one century ago have never rung truer as "the general principle of [this area of the] law is that loss from accident must lie where it falls. See generally Oliver Wendell Holmes Jr., The Common Law (1881).

But is this rule the right one? Probably not for two reasons. First, the rule assumes that spectators, rather than stadium owners, are the least cost avoiders for injuries at the ballpark, hockey rink, or racetrack. However, stadium owners easily possess the ability to take measures insulating fans from injury. Stephen Sugarman, Judges as Tort Law Un-Makers: Recent California Experience With "New" Torts, 49 DePaul L.Rev. 455, 458-59 (1999). A second, and related point, focuses on the fact that fans do not easily possess the ability to select out of potential danger. At MLB games, for instance, only the seats directly behind homeplate are protected from exposure to fly-balls. It just so happens, though, that these same seats are among the most expensive at the ballpark and are only available to season ticket holders on most occasions. Rudnick v. Golden W. Broadcasters, 202 Cal. Rptr. 900 (Cal. Ct. App. 1984).

How do we fix this dilemma? At the risk of voicing a cliché response, the solution appears to be the adoption of a reasonable care standard. David Horton, Rethinking Assumption of Risk and Sports Spectators, 1 UCLA L. Rev. 339 (2003). Under this regime, owners would be induced to take safety measures to protect all sports spectators lest they be liable for not taking "that kind and degree of care, which prudent and cautious women and men would use" in the circumstances.

**A Few Thoughts on Antitrust law and Robust Competition in Professional Sports**

Published on April 23, 2018

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Professional sports leagues such as Major League Baseball (MLB), the National Football League (NFL), and the National Basketball Association (NBA) present peculiar antitrust challenges because they engage in a variety of exploitive actions that consumers cannot avoid by substituting rival products. As the Supreme Court has recognized, though, the leagues operate in an industry where some agreements among competitions – perhaps even all competitors – is necessary for there to be a product at all. NCAA v. Board of Regents of Oklahoma, 468 U.S. 85 (1984). In addition to the need for joint action to produce a product, sports leagues also have a unique interest in maintaining a significant degree of competitive balance among their squads and courts have

recognized that this interest is to be respected. Mackey v. NFL, 543 F.2d 606, 621 (8th Cir. 1976); McNeil v. NFL, 1992-2 Trade Case. (CCH) (D. Minn. 1992). Don't take my two cents for it, though. Sports law news often springs from this interest: Formula 1, for instance, (unlike NASCAR) caps the number of engines teams can furnish cars in a season to prevent richer manufacturers such as Mercedes and McLaren from consistently outgunning upstarts such as Haas. Likewise, the NBA owners' veto of the New Orleans Pelicans' (which were called the Hornets at the time) proposed trade of current Rockets Point Guard Chris Paul to the Los Angeles Lakers in 2011 (because the owners were rightly scared of Paul's potential team up with Kobe Bryant) reflected similar concerns.

These market obstructions are particularly costly here for two reasons. First, because of the artificial scarcity of franchises, communities often have to furnish team owners with favorable tax treatment or municipal bond stadium funding to expand or persuade an owner to relocate or stay in a jurisdiction. Indeed, one could argue that this factor was determinative in Oakland Raiders owner Mark Davis' (who just like his pa, Al, is hoping that the silver and black will go back to just winning baby with its) recent decision to move the team to Las Vegas and the same could be said for the St. Louis Rams' decision to bail to the City of Angeles. Second, entry restraints prevent teams from competing for lucrative broadcasting contracts in huge markets that are currently being underserved by mediocre teams. For example, only Chicagoans, after all, must suffer with the Bears (who haven't hoisted a Lombardi since Mike Ditka, Sweetness, Ron Rivera, and Mike Singletary won the chip back in 1985) and one wonders if the fans of the Midway would remain as loyal to the team if there were two NFL franchises in the city as there are in New York and LA. So, what is the solution? While this problem is endemic in MLB, the NBA, the NFL, and the NHL (and separate articles will be released proposing solutions for each league), as it pertains specifically to professional football, the NFL should expand revenue sharing to include income from lucrative stadium deals. Currently, club owners divide revenue from league-wide tv contracts on a per team basis. On balance, sharing has positive benefits because it (along with team salary caps) permits teams in smaller media markets to contend for the championship (anyone else wonder how a franchise restricted to a small town on the Fox River in Wisconsin could furnish a team that competes for the NFC championship almost every year?). But more importantly, expanded revenue sharing would eliminate any individual owner incentives to exploit local taxpayers for favorable treatment because any income from the re-location deal would be dispersed among the thirty-two owners. The only downside to this arrangement is that grandiose stadiums such as the ones in Arlington and Minneapolis may not be built in the future unless the league offers independent incentives of its own or, that the owners could overcome the collective action problem that increased revenue sharing would present.

**ERISA Regulation of Private Equity and Venture Capital Funds**

Published on April 23, 2018

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Generally, venture capital operating companies (VCOCs) are funds in which at least half of the portfolio company investments are comprised of interests in operating companies as to which the fund has contractual management rights. In order for a fund to qualify as a VCOC, at least 50% of the fund's assets valued at cost must be invested in 'venture capital investments' or 'derivative investments' at the following times: (1) on the initial valuation date of the fund and (2) at any time during each annual valuation period of the fund. In addition, the fund must actually exercise its 'management rights' with respect to one or more of its venture capital investments each year. Here, Department of Labor regulations define an 'operating company' as an entity that is primarily engaged, directly or through its majority owned subsidiary or subsidiaries, in the production or sale of a product or service other than the investment of capital.

The initial valuation date for a fund is the date on which the fund makes its first investment other than a short-term investment pending a long-term commitment of capital. The annual valuation period of the fund is a preset period of up to 90 days that begins no later than the anniversary of the fund's initial valuation date. Finally, a fund need only exercise management rights with respect to one of the operating companies in which it invests. Management rights are contractual rights directly between the fund and the operating company that give the fund the right to substantially participate in or substantially influence the conduct of the management of the operating company. The rights need to be exercised in the ordinary course of business during each 12-month period beginning the day following the last day of the proceeding annual valuation period.

Because hedge funds do not ordinarily obtain management rights with respect to their investments, this exception is typically available only to private equity and venture capital funds. In contrast to investment funds where an investing plan is relying on the investment expertise of the fund manager and therefore the application of ERISA is appropriate, the look-through rule does not apply to private sector pension plan investments in operating companies. A private sector plan that invests in an operating company is acquiring a stake in a business enterprise and such investment neither requires nor could operate effectively under ERISA's fiduciary duties and obligations.

In the event that a VCOC fund disposes of its investments, it will obviously have trouble continuing to meet the 50% asset requirement. Recognizing this, Labor Department regulations permit a fund to wind down its investment activity by using distribution periods during which the fund does not need to satisfy the 50% test. The fund can establish a distribution period at any period at any time after the date on which its has distributed to investors the proceeds of at least

50% of the highest amount of its investments outstanding at any time from the date it began business.

**A Brief Overview of Trespass Actions in Oil and Gas Law**

Published on April 23, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Subject to state-specific statutory restrictions, an owner of an interest in oil and gas or an oil and gas lease is privileged to drill oil and gas wells underneath land to any depth and to take oil and gas as long as the well bottom is vertically beneath the surface of the land, even though some of the oil or gas flows from beneath the lands of adjacent owners. However, if a well deviates from the vertical and produces oil or gas from under the surface of another landowner, that is a trespass.

Moreover, the common law principle of confusion of goods – that if a person fraudulently intermixes her goods with those of another person, so that they cannot be separated or the amounts are not known, then she loses all of her goods – has been applied in a few trespass cases involving oil an gas wells. Stone v. Marshall Oil Co., 188 Pa. St. 614 (1898).

When a mineral owner's rights in oil and gas are breached in trespass, the damages do not necessarily depend on the nature of the action but rather, on whether the trespass was willful and intentional or mistaken and inadvertent. Here, one who takes oil and gas from the land of another wrongfully is presumed to be a willful trespasser. This presumption, though, is rebuttable, and can be overcome by evidence showing that the defendant acted in good faith, honestly believing that her or his actions were privileged. United States v. Homestake Mining Co., 117 Fed. 481 (1902).

Most courts, though, have adhered to the view that an intentional trespasser cannot acquire title to oil and gas wrongfully taken under the doctrine of accession – which, apparently adopting an acquisition theory from John Locke's Second Treatise on Government, permits one to acquire property by adding value to it through the addition of her or his labor – because one cannot acquire a benefit from a wrongful act. Ronald Dworkin, Law's Empire 176-276. Riggs v. Palmer, 115 N.Y. 506 (1889). In the innocent trespasser cases, though, the rule has been to give damages for

the value of the oil and gas in situ (in its original place) or to give the value of the commodity as it was in the tank or pipeline minus production costs.

**A Few Thoughts on Statutory Interpretation - Part I**

Published on April 20, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Any meaning derived from the written word involves interpretation even if the interpreter finds the task straightforward. See Cass Sunstein, The Partial Constitution 104 (1993). Interpretation or construction is "the ascertainment of the thought or meaning of the author or, of the parties to, a legal document, as expressed therein, according to the rules of language and subject to the rules of law." H.T. Tiffany, "Interpretation and Construction," in 17 American and English Encyclopedia of Law.

An objection calls, though: "if the language were clear, one would not be arguing about it with her colleagues, would she?" Not so. Lawyers quibble about plain and unambiguous language all the time because it is their job to inject ambiguity into clarity when it is in their client's interests. But, the language is not often clear, so interpretation must be resorted to. That process consists of the following:

"Given a rule of law that those conditions generically described as A produce a certain legal liability or other consequence X, does the specific fact or group of facts, n, fall within the genus A?"

Frederick Pollack, A First Book of Jurisprudence for Students of the Common Law 226 (1896). One reads a legal text to discover A (the major premise). You find facts to discover n (the minor premise). Then she or he draws her conclusions on the matter. Although, it may seem at first easy to pronounce that some acts are within or without the law's prohibition, there will, and must, be borderline cases.

A thought experiment will clarify this principle. In Minneapolis, Minnesota imagine that a Tex-Mex restaurant leases space in a shopping center under a written agreement that forbids the center to lease space to any establishment whose annual sale of sandwiches might be expected to exceed 10% of the business' gross income. The shopping center then leases space to a Taco Cabana, which only sells tacos, burritos, and quesadillas. The Tex-Mex shop sues.

The major premise that produces the legal consequence here – a restaurant that derives more than 10% of its sales from sandwiches is not met because, of course, tacos, burritos, and quesadillas items that typically consist of a single tortilla stuffed with meat, rice, beans, and cheese are not sandwiches – i.e. two thin slices of bread with a thin layer of meat, cheese, or savor mixture spread between them.

**A Few Thoughts on Statutory Interpretation - Part II**

Published on April 20, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In questions of statutory interpretation, the text, if it can, controls. For in the words of Justice Cardozo, lawyers are not to "travel, in [their] search for the meaning of the lawmakers, beyond the borders of the statute." United States v. Great Northern Railroad, 287 U.S. 144, 154 (1932). When deciding an issue governed by the text of a legal instrument, the careful lawyer trusts neither memory nor paraphrase but examines the very words of the instrument. Indeed, as Justinian's Digest put the matter: a vebis legis est recedendem (do not depart from the words of the law).

Words are undoubtedly given meaning by their context – including the text's purpose. The subject matter of the document is the context that helps give the words meaning and a resolution of an ambiguity or vagueness that achieves a statute's purpose should be favored over a resolution that frustrates provision's purpose. This rule, though, ought to be subject to four limits. First, purpose should be discerned from the text alone not from extrinsic sources such as legislative history or an assumption about the drafter's desires. Second, the purpose should be defined at as low a level of generality as possible to prevent judges from provoking separation of powers concerns and assuming what is to be proved in a given case. John Manning, Textualism and Equity of the Statute, 101 Colum. L. Rev. 1 (2001); But see William Eskridge Jr., 101 All About Words: Early Understandings of the Judicial Power, Colum. L. Rev. 990 (2001). For example, the purpose of

the equitable doctrine of latches is not to "promote justice" but rather, to incentive potential litigants to press their claims in a timely manner lest they forgo their right to sue in toto. Fourth, except in rare cases involving an obvious scrivener's error, purpose cannot be used to contradict the statute's plain text. But see, Holy Trinity v. United States, 143 U.S. 457 (1892). Purpose can only be used to shed light on which range of textually permissible meanings should be adopted.

**Finality in Federal Appellate Litigation**

Published on April 20, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Yogi Berra may have been too young to make Justice Blackmun's long list of MLB greats in Flood v. Kuhn, 407 U.S. 258 (1972), a case that rightly upheld Major League Baseball's antitrust exemption, but for appellate advocates, one of Berra's adages rings true: "it ain't over, till it's over." Generally, federal courts may only review "final decisions." 28 U.S.C. 1291. A decision is final when "it ends litigation on the merits and leaves nothing more for the court to do but execute the judgment." Catlin v. United States, 324 U.S. 229, 233 (1945). The doctrine traces it roots to Sections 21, 22, and 25 of the Judiciary Act of 1789. Carleton Crick, The Final Judgment as a Basis for Appeal, 41 Yale. L.J. 539 (1932). And was cited with approval by the Marshall and Taney Courts early in the days of our republic. Canter v. American Insurance Co., 28 U.S. 307 (1830); Forgay v. Conrad, 47 U.S. 201 (1848).


Of course, there are exceptions to this rule. Various federal statutes may authorize interlocutory appeals as a matter of right or when certain conditions precedent are met. For instance, plaintiffs in multidistrict litigation may appeal from the dismissal of their complaint even though other consolidated cases are still pending and interlocutory appeals can be taken from orders granting or denying class certification under Federal Rule of Civil Procedure 23. Gelboim v. Bank of America Corp., 135 S.Ct. 897 (2015); FRCP 23(f). It should be noted that when a district court issues a final decision, the losing party may appeal not only that result but also, earlier interlocutory rulings as long as the error was properly preserved (orders denying summary judgment are excepted and pro arbitration decisions are also barred from appeal under 9 U.S.C. 16). The importance of properly preserving issues for appeal cannot be stressed enough. For instance, if one believes that the jury was given improper instructions and wishes to appeal the point, she will be unable to if she does not file a prior request under Federal Rule of Civil Procedure 59. Likewise, if the judge makes an error in documenting the judgment, no appeal can be had if the appellant does not file a motion

under FRCP 59(e) in district court. In some areas of the law, moreover, - such as choice of accounting method in a patent infringement action or the details of a divestiture ordered in an antitrust action – a judgment entered on the core issues in dispute can be appealed even if other matters are still pending.  Most of the statutes authorizing interlocutory review reflect the fact that in some cases, the matter may be won or lost at the preliminary injunction stage.

**Contract Law Issues with the NIL Program**

Published on April 20, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The National Letter of Intent (NIL) program furnishes contracts for agreements between collegiate institutions and prospects, which specify that the latter will attend the institution for one year and be provided with a financial aid award letter by the former in exchange. The college begins the process by making an offer to the prospect in the form of a scholarship. The NIL, however, explicitly states that the document alone – without a financial aid offer – does not constitute a complete contract. Athletes and their families convey acceptance of the aid offer by signing the NIL during the proscribed period and sending the documents to the institution. Jackson v. Drake Univ., 778 F. Supp. 1490 (S.D. Iowa 1992); Ross v. Creighton Univ., 957 F.2d 410 (7th Cir. 1992); Michael Cozzillio, The Athletic Scholarship and the College Letter of Intent: A Contract by Any Other Name, 35 Wayne L. Rev. 1275 (1989).


Not infrequently, though, athletes have signed the document under the impression that oral promises from their recruiters are also a part of the contract. This, however, is not often true. Indeed, the unfortunate case of Brian Fortay comes to mind. Fortay v. University of Miami, 1994 WL 62319 (D.N.J. 1994). In 1993, Fortay sued the University of Miami (referred to affectionately by NFL greats Ray Lewis, Michael Irvin, Ed Reed, and others as 'The-U') for breach of contract claiming that he signed his NIL with the impression that he would be named the starting quarterback for the team and that the coaching staff would recruit offensive players in subsequent seasons to build a team around him. Fortay was wrong. Shortly after he signed, the coach who recruited him, Jimmy Johnson (not to be confused with the seven-time NASCAR cup series champion) was hired away by Dallas Cowboys owner Jerry Jones. Johnson's replacement, Dennis Erickson, attempted to keep Fortay at Miami by assuring him that his new offense would better prepare him to be a starter in the NFL. Not only was Erickson wrong about this (Johnson went on to win two Superbowls with Troy Aikman and Emmit Smith during the 1990s running almost the

same offense he did in college before he was fired and replaced by Barry Switzer), but Fortay ended up transferring to Rutgers after two red-shirt seasons.

Federal courts (and the non-sports savvy judges who staff them), however, have been unwilling to read any protected interests into agreements other than the athlete's financial interest in a one-year scholarship. There are some decent reasons for this move. Oral promises – unaccompanied by a smoking gun the likes of which that could get a coach sanctioned by the NCAA – are hard to prove. Moreover, these arrangements are governed by the parol evidence rule, which discharges all prior written and oral agreements that are inconsistent with the final contract. Restatement (Second) of Contracts Sections 211, 212, 213 (1981). Because the NIL is a contract of adhesion, and no additions or deletions may be made, athletes are powerless to bargain with colleges for terms that their services would otherwise command in a professional sports league. There are several reasons to suspect that the market may be self-correcting on this matter as ex post, coaches who gain a reputation for luring recruits with false oral promises may gain a bad name in a school district or region (which can be damaging for state universities in particular). See generally, Lawrence Friedman, Law in Action: A Socio-Legal Reader (2007); Richard Posner, Economic Analysis of Law (2011). However, to the extent that the parol evidence rule reflects a policy judgment that paternalistic concern for the parties or negative externalities on fans of college sports do not justify accounting for outside oral promises, federal courts ought to honor these oral compacts in cases where the athlete clearly is using her or his time in college sports as a platform to transition to professional sports (and has the capability of doing so).

**Mergers & Acquisitions - Part Two**

Published on April 19, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The parties will usually begin negotiating the merger agreement as the due diligence process progress. This practice note will provide an overview of key provisions in standard merger agreements – with more specific notes on indemnification clauses, representations, warranties, and guaranty provisions to be forthcoming.

I.

THE PARTIES

The merger agreement is typically between the buyer, the target company and, in forward triangular mergers and reverse triangular mergers, the merger subsidiary. If the merger agreement provides for the buyer to be indemnified for any breach of representations, warranties, or pre-closing covenants of the target company, the buyer will want as many of the target company's stockholders to be parties to the merger agreement to provide this indemnification. If there are one or two controlling stockholders, these indemnification obligations may be limited to them. If there is a large number of stockholders, a portion of the merger consideration may be placed in a escrow account to pay for indemnification claims by the buyer and a stockholder representative appointed to act as agent for the stockholders on indemnification matters. Here, the stockholder representative is a party to the merger agreement and contractually bound to act in good faith and exercise reasonable judgment.

II.

GUARANTY

These provisions permit third-parties to guarantee the obligations of the contracting parties. Guaranties, for instance, should be sought where the buyer is a new corporation set up solely to acquire the target company or where a stockholder providing indemnification is a subsidiary of a parent company.

III.

THE MERGER

This section sets out: the merging parties and the surviving company, when the parties will file the Certificate of Merger (or Articles of Merger) with the Secretaries of State where they are formed, which organizational documents (such as certificates of incorporation or by-laws) will be the organizational documents of the surviving company (and the need for any amendments to these), who will be the directors and the officers of the surviving company, how the stock of the target company and the buyer will be converted, and how payment for the stock of the target company will be disbursed to its stockholders. This is done on occasion through a disbursement or exchange agent. If there are any dissenting stockholders electing to exercise their appraisal rights, the

agreement may also set out the procedures for handling their shares of stock pending resolution of the proceedings.


IV.


REPRESENTATIONS, WARRANTIES, AND INDEMNITIES


The target company's representation and warranties tend to be more extensive than that of the buyer and cover important issues such as: capitalization, condition of assets, material contracts, liabilities, financial statements, tax matters, and regulatory compliance. The buyer's representations and warranties are usually limited to its ability to consummate the transaction and obtain financing. As the target company's obligations are assumed by the buyer in a merger, an indemnity from the target company becomes useless to the buyer after the closing. Here, if the buyer wants protection against breaches by the target company of its representations, warranties, and pre-closing covenants, it will need to require indemnites from the target company's stockholders – including in many cases from stockholders who may not have supported or consented to the merger. If the target company has a few significant stockholders, the buyer may simply require those few individuals to be parties to the merger agreement and thus liable for all indemnification obligations.


V.


CONDITIONS    PRECEDENT,    RESTRICTIVE    COVENANTS,    AND    PRE-CLOSING COVENANTS


Conditions precedent are conditions which must occur before the parties are obligated to consummate the transaction. On the other hand, restrictive covenants can prevent customer solicitation, employee solicitation, and competition in certain areas. Finally, if closing is to occur sometime after signing, the merger agreement will include covenants to protect the business and operations of the target company – as well as to limit the amount of new liabilities the target company may assume during this time. These provisions are dubbed pre-closing covenants.

**Answering Complaints in Patent Infringement Actions - Part III**

Published on April 19, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

After responding to the patent owner's allegations, the accused infringer will normally plead defenses. Indeed, an accused infringer must plead any affirmative defenses that it wants to assert in the action in its answer and should consider pleading any other defenses it wants to use. FRCP 8(c); FRCP 8(b)(1)(A); 35 USC 282(b); 35 USC 282(b)(4). Common affirmative defenses in patent infringement actions include:

· · Non-infringement based on:

o  No direct infringement

o  No induced infringement

o  No contributory infringement and

o  "safe harbor" activity in a Hatch-Waxman action 35 U.S.C. 271(e)(1)

· Invalidity based on:

o  Claiming patent-ineligible subject matter 35 USC 101

o  Anticipation 35 USC 102

o  Obviousness 35 USC 103

o  Lack of enablement 35 USC 112 and

o Inadequate written description 35 USC 112

· Unenforceability based on:

o Unclean hands

o Patent misuse and

o Inequitable conduct

· Equitable defenses of actual or implied license or estoppel and

· Patent exhaustion

An affirmative defense that the defendant does not plead in the answer generally is waived. Kapche v. Holder, 677 F.3d 454 (D.C. Cir. 2012). Moreover, FRCP 12 requires defendants to raise the following non-affirmative defenses at the pleading stage or waive them: lack of personal jurisdiction, improper venue, insufficient process, and insufficient service of process. In addition to the common affirmative defenses to patent infringement complaints identified above, an accused infringer may also plead other affirmative defenses identified in the FRCP 8(c).

**Answering Complaints in Patent Infringement Actions - Part II**

Published on April 19, 2018

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The body of the accused infringer's answer follows the caption. The answer must respond to the allegations of the complaint and assert any defenses that the defendant wants to use in the action. FRCP 8(b); 35 U.S.C. 282(b). The body of the answer may also contain counterclaims, crossclaims, and third-party claims. The answer's body must consist of consecutively numbered paragraphs that are limited as far as practical to a single set of circumstances. FRCP 10(b). The body should contain appropriate headings for its component parts and the paragraphs can incorporate by reference statements from elsewhere in the answer or from any other pleading or motion in the action. FRCP 10(c). It is common for counsel for an accused infringer to arrange the body of her answer as follows: responses to the complaint's allegations, defenses, counterclaims, crossclaims, third-party claims, and prayer for relief. Counsel should remember that when drafting the body of the answer she should redact confidential information of her own or the patent owner. The answer must respond to each allegation in the complaint with one or more of the following responses: an admission, a denial, a statement that the defendant lacks knowledge or information sufficient to form a belief about the truth of the allegation. FRCP 8(b).

An allegation, other than one relating to the amount of the patent owner's damages, is deemed admitted if the defendant does not respond to it with either a denial or a lack of knowledge or information sufficient to form a belief about its truth. FRCP 8(b)(6). If the accused infringer wants to deny all of the allegations of the complaint, including those relating to jurisdiction, it may plead a general denial. Otherwise, the accused infringer must deny specific allegations or deny the entire complaint for those allegations specifically admitted in the answer. FRCP 8(b)(3). Similarly, an accused infringer that cannot deny an entire allegation must deny only the part that it believes in good faith to be false or respond to the remainder with an admission or a statement that it lacks knowledge or information sufficient to form a belief about the truth of the allegation. Counsel should bear in mind that once the defendant admits an allegation in the answer, the allegation is accepted as true for the entire case. Gibbs ex rel. Estate of Gibbs v. CIGNA Corp., 440 F.3d 571 (2d Cir. 2006). Facts related to patent number, issue date, and named inventor are often admitted.

On the other hand, accused infringers often deny facts relating to direct infringement, induced infringement, contributory infringement, willful infringement, actual or threatened harm, enhanced damages, and attorneys' fees. 35 U.S.C. 271(a); 35 U.S.C. 271(b); 35 U.S.C. 271(c); 35 U.S.C. 284; 35 U.S.C. 285; FRCP 8(b)(2). Finally, under FRCP 8(b)(5), accused infringers often plead lack of knowledge in matters pertaining to alleged inventors, alleged invention and inventive activity, disclosure of the assessed patent, nature and scope of the claims of the asserted patent, and ownership rights in the asserted patent.

**Answering Complaints in Patent Infringement Actions - Part I**

Published on April 19, 2018

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The time to answer a complaint in a patent infringement action is the same as in other federal actions. The accused infringer must serve an answer within 21 days of being served with the summons and complaint. FRCP 12(a)(1)(A)(i). However, if the accused infringer has waived service timely, she has 60 days after the patent owner sent the request (if she is located in a judicial district of the U.S.) or 90 days (if she is located in a foreign country). FRCP 4(d)(3). When computing the time for the accused infringer to answer the complaint, counsel must exclude the day of service but count every day afterward – including Saturdays, Sundays, and legal holidays. FRCP 6(a)(1)(A)-(B). If the last day of the response period, though, falls on a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday. FRCP 6(a)(1)(C).

When it comes to extending the time to answer, a motion to dismiss the complaint under FRCP 12(b) or for a more definite statement under FRCP 12(e) automatically extends the otherwise applicable deadline. If the court denies the motion, the answer is due 14 days after notice of the court's decision unless the court orders otherwise. FRCP 12(a)(4)(A). If the court grants a motion under FRCP 12(e), the answer is due 14 days after the patent owner serves the more definite statement. FRCP 12(a)(4)(B). An accused infringer can also extend the time to answer by either moving for an extension of time under FRCP 6(b)(1) or stipulating to an extension with the patent owner if the local rules so permit. If the accused infringer fails either to answer the complaint in a timely manner or obtain an extension, it faces the risk of a default judgment. FRCP 55.

An answer like any other pleading or court document, must begin with an appropriate caption placed on top of the first page. The caption must contain the following: the court's name, the docket number, the case's title, and the document's title. FRCP 10(a). Of course, the section naming the parties can refer only to the first party on each side and then reference the remaining parties with an 'et. al' designation. FRCP 10(a). The document title, on the other hand, should permit the reader to identify the filing at a glance. Thus, if there are multiple defendants, the document title should identify the answering party. If the plaintiff has amended the complaint, the document title should indicate which complaint the defendant is answering (e.g. DEFENDANT'S NAME'S ANSWER TO THE SECOND AMENDED COMPLAINT).

In general, a defendant that wants a jury trial may demand one in its answer. FRCP 38(b). If the patent owner demands a jury trial on all issues before the accused infringer answers, the accused infringer does not need to make its own demand. Once a party has demanded a jury trial, it may