parcel of land may be held in 'fee.' In the oil and gas industry, though, the term 'fee interest' is used to describe ownership of both surface and mineral rights.


II.


An owner of property rights can transfer her rights in whole or in part. Where an owner transfers less than the whole bundle of property rights she owns, her rights have been severed. In the United States, mineral rights are often severed from surface rights in land transactions either through a reservation in the deed transferring the surface or by a direct grant of the mineral interest out of the fee simple absolute. A typical mineral deed is included at the end of this practice note. A mineral interest, though, also includes an implied easement to use the land's surface in such ways and to such an extent as is reasonably necessary to obtain the minerals under the property – otherwise, mineral ownership would be valueless. Moreover, mineral interests include (1) the right to profits and the duty to pay costs incurred in using the land, (2) the right to transfer the rights the owner has to search, develop, and produce the minerals to another, and (3) the right to benefits under the oil and gas lease – i.e. the right to any payments made to induce the signing of the lease (bonus), any payments made for maintaining the lease without development (delay rentals), or production (shit-in royalty), and any share of production allocated to the lessor (royalty). Of course, the owner of a mineral interest can convey or reserve some but not all incidents of mineral ownership.


III.


A leasehold interest is the right to the mineral interest granted by an oil and gas lease. Whether a leasehold interest includes all the incidents of the mineral interest depends on the wording of the granting clause. Some oil and gas attorneys also refer to this interest as a working interest or operating interest.


IV.


The surface interest is what remains from the bundle of rights of land ownership after the mineral interest has been severed. The surface interest, though, encompasses more than just the rights to the land's surface; indeed, it also includes other rights such as rights to potable groundwater and the right to use geological formations for the storage of natural gas. In oil and gas development, a major cause of conflict is the lack of understanding by many surface owners of the nature of their interest. Often, severed surface owners are not aware that their rights to the surface are subservient

to the right of the mineral-interest owner or lessee, who does not need permission from the surface owner to use the land for drilling.

V.

Royalty interests are quite common in oil and gas law. Of course, a royalty is a share of production, or the value of the proceeds of sale of a part of production, free of the costs of production, when and if there is oil and gas production on the property. Oil and gas royalties are usually expressed as fractions or percentages and come in five forms. A landholder's royalty is the interest in production retained by the lessor in the royalty clause of the oil and gas lease. An overriding royalty is a royalty interest that the lessee carves out of the leasehold interest and are frequently used to compensate lawyers who have helped structure a drilling venture. A nonparticipating royalty is a royalty carved out of the mineral interest, entitling its holder to a stated share of production without regard to the terms of any lease. A term royalty is a royalty for a stated term, which may be fixed (e.g. for 25 years) or defeasible (e.g. for 25 years and so long thereafter as long as there is production from the premises). Finally, a perpetual royalty is a royalty that may extend forever. Royalties are distinguished from mineral interests in four respects (1) royalties do not include rights to surface use, (2) they are paid even if oil production is not a profitable venture, (3) royalty owners cannot grant oil and gas leases, and (4) royalty owners do not share in lease benefits.

VI.

A production payment, (sometimes referred to as an oil payment), is a share of production proceeds – free of production costs – that terminates when an agreed amount or sum has been paid. These payments often take the place of mortgages for producing property and are associated with lease financing.

###

Sample Mineral Deed

Form 128 – Burkhart Printing & Stationery Co.,

Houston, Tx.

MINERAL DEED

(APPROVED BY MID-CONTINENT ROYALTY OWNER'S ASSOCIATION)

KNOWN ALL WOMEN AND MEN BY THESE PRESENTS:

That --------------------------------------------------------

of---------------------------------------------------------

hereinafter called Grantor, for and in consideration of the sum of X Dollars, cash in hand paid and other good and valuable considerations, the receipt of which is hereby acknowledged, do X, hereby grant, bargain, sell, convey, transfer, assign, and deliver unto X of ADDRESS hereinafter called Grantee, an undivided X interest in and to all of the oil, gas, and other minerals in and under and that may be produced from the following described lands situated in Harris County, State of Texas, to wit: containing X acres, more or less together with the right of ingress and egress at all times for the purpose of mining, drilling, exploring, operating, and developing said lands for oil, gas, and other minerals, and storing, handling, transporting, and marketing the same therefrom with the right to remove from said land all of the Grantee's property and improvements.

This sale is made subject to any rights now existing to any lessee or assigns under any valid and subsisting oil and gas lease of record heretofore executed; it being understood and agreed that said Grantee shall have, receive, and enjoy the herein granted undivided interest in and to all bonuses, rents, royalties, and other benefits which may accrue under the terms of said lease insofar as it covers the above described land from and after the date hereof, precisely as if the Grantee herein had been at the date of the making of said lease the owner of a similar undivided interest in and to the lands described and Grnateee one of the lessors therein.

Grantor agrees to execute such further assurances as may be requisite for the full and complete enjoyment of the rights herein granted and likewise agrees that Grnatee herein shall have the right at any time to redeem for said Grantor by payment, any mortgage, taxes, or other liens on the above described land, upon default in payment by the Grantor, and be subrogated to the rights of the holder thereof.

TO HAVE AND HOLD The above described property and easements with all and singular rights, privileges, and appurtenances thereunto or in any wise belonging to said Grantee herein, X forever, and does hereby agree to defend all and singular the said property unto the said Grantee herein X against all and every person whomsoever lawfully claiming or to claim the same, or any part thereof.

WITNESS Grantor's hand this X day of 2018.

**An Introduction to the Sources of Senate Procedure**

Published on February 9, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The procedures of the U.S. Senate rest on four sources – each an exercise of the Senate's power to govern itself under Article I §5 of the U.S. Constitution: (1) the standing rules of the Senate, (2) special procedures found in rule-making statutes, (3) precedents that interpret the Standing Rules, provisions in rule-making statutes, and other precedents themselves, and (4) unanimous consent orders.

I.

There are 44 Standing Rules of the Senate – 10 of which relate to ethics. Some of these rules have constitutional derivation and can be traced to the original 20 rules that the Senate first adopted in 1789 (e.g. Rule VI which relates to quorums or Rule XXX which sets out procedures for the Senate's consideration of treaties). Unlike the House of Representatives, which adopts new rules at the beginning of each Congress, the rules of the Senate remain in force until amended. Indeed, the Standing Rules provide that "the rules of the Senate shall continue from one Congress to the next Congress unless they are changed as provided in these rules." Amendments to the Standing Rules have been infrequent because Rule V requires a one-day notice in writing for debate and, an affirmative vote of two-thirds of all senators present and voting is required to end debate on a rules-change resolution. It should be noted, though, that implementation of the rules is often

affected by unanimous consent orders. Under these procedural devices, Senators voluntarily agree to forgo or adjust some aspect of their rights under the Standing Rules. A single objection can bar agreement, though, and force fallback to Senate rules and precedents. An objection can be manifested on the floor by a senator exercising his own rights or by his party leadership acting on his behalf. Often the objection need not be made public because an oral or written notice of objection conveyed to one's party leader is enough to derail the unanimous consent order.

II.

A rule-making statute is a law that specifies procedures that must be followed during the consideration of subsequent legislation arising under its provisions. The Congressional Budget and Impoundment Control Act of 1974, for instance, limited debate on concurrent budget resolutions in the Senate to fifty hours. It is not uncommon for rule-making statutes to state that the special expedited provisions they contain have been adopted under Congress' Article I rule-making authority. Rule-making statutes that take the form of an enacted statute cannot be modified without another bill that clears the process outlined in Article I §7. On the other hand, rule-making procedures set out in concurrent resolutions can be changed with bicameral agreement and the Senate does not need the House to amend special rules that it has imposed upon itself through unicameral action. The use of expedited procedures tends to diminish the autonomy of Senate committees and neutralize the right to filibuster by limiting debate and restricting the right to amend.

III.

A Senate precedent is established when a presiding officer rules on a point of order. This ruling can be appealed to the entire Senate, which, if sustained, would create a precedent of the highest standing. Anytime that a point of order is made, and the Chair rules, if no appeal is taken from the decision of the Chair, that becomes the order of the day for the Senate, and remains just as binding on the Senate in future procedure as the rules themselves where they are specific. If an appeal is taken, and the decision of the Chair is s reversed, though, that decision is also binding on the Senate. The Senate's presiding officer may also issue advisory opinions in response to a parliamentary inquiry from the floor. These opinions can reflect prior precedent and are not binding on the entire Senate in the same way that a precedent is in part because they are not subject to appeal.

For a measure or matter to be open to a point of order, it must be pending on the floor. Anticipatory points of order cannot be asserted; nor can a point of order be raised during a quorum call, after a vote has commenced, or by a Senator who has not been recognized. Moreover, if the proposition

being debated is subject to a time limit imposed by a unanimous consent order, the Senator may not offer the point of order until all the time has been used or yielded back. Points of order are not debatable except at the sufferance of the presiding officer. Indeed, Senate Rule XX permits the presiding officer to decline to rule on any point of order and submit the question to the Senate for determination – although submission is required if the point of order involves an issue of constitutional interpretation. Once submitted, the point of order is fully debatable but may be tabled (which would effectively kill debate on the matter). Finally, Senate Rule XVI requires that all questions of germaneness on appropriations bills be submitted to the Senate without debate – although this mandate does not control where the language in the amendment is not legally binding (e.g. Sense of the Senate provisions).

**Complying with the Lobbying Disclosure Act**

Published on February 9, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Lobbying Disclosure Act of 1995 (LDA) as amended by the Honest Leadership and Open Government Act of 2007 contains an expansive definition of what constitutes 'lobbying' of federal government officials and creates a novel system for keeping track of lobbying activity. The statute covers all activities associated with communications made to any one of thousands of covered legislative or executive branch officials on virtually any federal subject – legislation as well as the formulation, adoption, or administration of Executive Orders and agency rules, regulations, programs, or policies. Under the LDA, any organization that employs at least one lobbyist, has lobbying expenses that are equal to, or greater than $13,500 (as off late 2017), and that is not otherwise exempt, must register with the Secretary of the Senate and the Clerk of the House of Representatives at least 45 days after the lobbyist makes a 'lobbying contact' or is retained to do so. In the initial registration and subsequently quarterly reports, the registrant must, among other things, identify the client (and whether it is a state or local government, department, agency, or instrumentality), the general issues and specific actions on which it lobbies, any organization that supports and controls its lobbying activities, the income received from each client, and the lobbyist(s). The quarterly reports are due 20 business days after the end of the following dates: April 20th, July 20th, October 20th, and January 20th or the next business day if the filing date occurs on a weekend or holiday. The reports must include (1) a list of the specific issues the lobbyist addressed, (2) a statement of the Houses of Congress and federal agencies contacted, (3) a list of the employees of the registrant who acted as lobbyists with respect to the general issue, and (4) a description of the interest, if any, of any foreign entity identified in the registrant's

registration statement. It should be noted that the statute requires not only prospective registration by companies that expect to engage in lobbying activities but also, retrospective quarterly reporting on the lobbying activities carried out by the company's employees.

I.

An individual is a lobbyist under the LDA if (1) she is employed to provide services to her employer that include more than one lobbying contact (see below) and (2) the amount of time that the employee spends in lobbying activities is at least 20% of the total time she spends for her employer during the quarterly reporting period – according to prospective employer estimates. Time spent on lobbying activities includes time spent on lobbying contacts, time spent preparing, researching, and planning activities for lobbying contacts, and coordination with the lobbying activities of others. For the purposes of this test, each separate communication to a covered legislative or executive branch official counts as a 'lobbying contact.' Although there might be situations were separate discussions with a covered officials would count as one contact (e.g. a lobbyist is speaking to a legislator through the phone and her call is broken up only to be re-initiated minutes later) these are quite rare.

The statute defines lobbying contact so broadly that virtually any substantive communication to a covered federal official on behalf of an employer or client relating to that official's duties comes within the act's ambit. Under the LDA, a lobbying contact is any oral or written communication (including electronic communication) to a covered executive or legislative branch official that is made on behalf of a client with regard to (1) the formulation, modification, or adoption of federal legislation, rules, regulations, Executive Orders, or any other program or policy of the U.S. government, (2) the administration or execution of a federal program or policy, or (3) the nomination or confirmation of a person subject to the Senate's advise and consent function. The statute, though, contains 19 exceptions to this broad definition. A communication is exempt if (1) it is made by a public official acting in the public official's official capacity, (2) it is made by the representative of a media organization for the purpose of gathering news and information for the public, (3) it is made in a speech, article, publication, or other material that is distributed and made available to the public through a medium of mass communication, (4) it is made on behalf of a government or political party of a foreign country and disclosed under the Foreign Agents Registration Act of 1938, (5) it is a request for a meeting with a covered official, (6) it is a communication made in the course of advisory committee subject to the Federal Advisory Committee Act, (7) it is testimony or material included in the public record before a congressional committee, subcommittee, or task force, (8) it is information provided in writing in response to an oral or written request by a covered legislative or executive branch official, (9) it is communication required by subpoena or civil investigative demand, (10) it is a communication made in response to a notice posted in the Federal Register, (11) it is a communication that cannot be reported without disclosing information that is otherwise prohibited from release by a separate statute or

federal regulation, (12) it is a communication made to an official in a federal agency regarding a civil or criminal judicial proceeding or a filing that the government is required to make on a confidential basis, (13) it is a filing made in compliance with written agency procedures under 5 U.S.C. § 554, (14) it is a written comment that is filed in the course of a public proceeding or any other communication that is made on the record in a public proceeding, (15) it is a petition for agency action made in writing and required to be a matter of public record under agency procedures, (16) it is a communication made by an individual regarding her benefits, employment, or personal matters that involve only that individual and that does not advocate the adoption of a private bill, (17) it is protected disclosure under the Whistleblower Protection Act of 1989 and the Inspector General Act of 1978, (18) it is a communication made by a tax exempt religious establishment, and (19) it is a communication between officials of a self-regulatory organization as that term is defined in 15 U.S.C.A. § 78c(a)(26). The LDA's definition of 'lobbying contact,' however, does not extend to grass-roots lobbying – efforts designed to influence federal law or policy indirectly by developing support for positions at the grass-roots level.

II.

 The LDA defines a covered legislative branch official as any member of Congress, any elected officer or employee of either House of Congress, and any employee of a member, committee, joint committee, working group, or caucus of the legislative branch. On the other hand, the following executive branch officials are covered under the statute (1) the President and the Vice President, (2) any officer or employee of the Executive Office of the President, (3) any officer or employee serving in Levels I though V of the Executive Schedule, (4) any member of the armed services whose pay grade is O-7 or above, and (5) any confidential officer or employee who falls within the description set out 5 U.S.C.A. § 7511(b)(2)(B).

**The Effect of a Presidential Pardon**

Published on February 8, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Article II § 2 of the U.S. Constitution authorizes the President "to grant Reprieves and Pardons for Offenses against the United States, except in cases of impeachment" (hereafter referred to as the

Pardon Clause). In Ex Parte Garland, the Supreme Court summarized the reach of a presidential pardon as follows:

"A pardon reaches both the punishment prescribed for the offence and the guilt of the offender; and when the pardon is full, it releases the punishment and blots out of existence the guilt, so that in the eye of the law the offender is as innocent as if he had never committed the offence. If granted before conviction, it prevents... the penalties and disabilities consequent upon conviction from attaching; if granted after conviction it removes the penalties and disabilities and restores him to all his civil rights. It gives him a new credit and capacity."

This broad interpretation of the effect of a pardon was reaffirmed in Knote v. United States, 95 U.S. 149 (1877), where the Court stated:

"A pardon is an act of grace by which an offender is released from the consequences of his offence, so far as such release is practicable and within control of the pardoning power, or of officers under its direction. It releases the offender from all disabilities imposed by the offence, and restores to him all his civil rights. In contemplation of law, it so far blots out the offence, that afterwards it cannot be imputed to him to prevent the assertion of his legal rights."

A presidential pardon relieves the offender of all punishment, penalties, and disabilities that flow from the conviction so long as no rights have vested in a third party as a consequence of the judgment. Thus, in Boyd v. United States, 142 U.S. 450 (1892), the defense counsel in that case objected to the testimony of a witness who had been convicted of larceny. In response, the prosecution presented a full and unconditional pardon issued by President Benjamin Harrison. The Court held that the pardon restored the competency of the witness to testify because "the disability to testify being a consequence, according to the principles of the common law, of the judgment of conviction, the pardon obliterated that effect."

This conclusion is supported by the English common law from which the framers drew their understanding of the Chief Executive's power to grant pardons. Indeed, the Pardon Clause of the Constitution was derived from the pardon power held by the King of England at the adoption of the Constitution. The Supreme Court, therefore, has looked to English cases for guidance in interpreting the effect of a pardon. See, e.g., Ex Parte Wells, 59 U.S. 307 (1855); 7 Matthew Bacon, A New Abridgment of the Law 416 (1852), Cuddington v. Wilkins, 80 Eng. Rep. 231 (K.B. 1614).

In interpreting the pardon power, several written opinions from former U.S. Attorneys General have also adopted a distinction between penalties that a pardon can remove and qualifications that

a pardon does not affect. For instance, in 1898, Attorney General John W. Griggs was asked to consider the effect of a presidential pardon on the administration of a statute that prohibited the reenlistment of any soldier whose service during the last preceding term of enlistment had not been honest and faithful. See, Army -Enlistment – Pardon 22 Op. Att'y Gen. 36 (1898). That opinion concluded that where a congressional statute sets a rule relating to qualifications for a position and does not impose a penalty as such on individual offenders, the incidental disabilities which the individual may suffer by reason of the statute are not removed by a pardon. By way of contrast, where a statute lays down qualifications as a pre-text for punishing an individual for a past act, a presidential pardon will abate that punishment. Cf, Affect of a Pardon on Statute Making Persons Convicted of Felonies Ineligible for Enlistment in the Army, 39 Op. Att'y Gen. 132 (1938).

Throughout the history of the United States, Presidents have asserted the power to issue pardons prior to conviction, and the consistent view of the Attorneys General has been that such pardons have as full an effect as pardons issued after conviction. See, e.g., Pardoning Power of the President, 6 Op. Att'y Gen. 20 (1853). What's more, in two of the best known exercises of the pardon power – President Johnson's pardon of former Confederate rebels and President Carter's pardon of Vietnam draft dodgers – the vast majority of those pardoned had not been convicted of a crime. This is so because a pardon is for the guilt of the offense, not just the conviction. To be sure, though, there may be instances where an individual's conduct constitutes a violation not only a federal offense, but also, a professional code. Here, discipline by a professional guild such as the American Bar Association or American Medical Association would not be barred by the grant of a pardon. Presidential pardons also relieve offenders of state disabilities that attach solely by virtue of a federal conviction. When the President issues a pardon pursuant to this constitutional authorization, the pardon preempts any inconsistent state laws, regulations, or actions. In this realm – offenses against the United States – the President's pardon power must be, and is, supreme over pronouncements from the states or co-ordinate branches of the national government that would limit the pardon's full legal effect.

Finally, it should be noted that there are two important limits on the pardon power. First, no president may pardon himself. See, Akhil Reed Amar, The Constitution Today (2016). Second, a pardon cannot interfere with vested rights. See, e.g., Hodges v. Snyder, 261 U.S. 600 (1923); Pennsylvania v. Wheeling & Belmont Bridge Co., 59 U.S. 421 (1855). Of course, a vested right is one the conferral of which is complete and consummated. See, Marbury v. Madison, 5 U.S. 137 (1803).

**The Rules Governing the Supreme Court's Final Disposition of Cases**

Published on February 8, 2018

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Justices announce their decisions in argued cases through oral statements of varying lengths from the bench. The written opinions are turned over immediately to the Clerk after the oral announcement. The opinions are in preliminary slip-sheet form, which the Clerk delivers to the parties and to the Reporter of Decisions for eventual publication under S. Ct. Rule 41. The Clerk customarily enters the Court's judgment on the day of decision. In cases that fall under the Court's original jurisdiction, though, the Court may direct the parties to submit a proposed decree before entry of the judgment. However, in cases falling within the Court's discretionary docket, the judgment typically recites that the case was reviewed on appeal or certiorari, states the ruling of the Court, and specifies whether further proceedings consistent with the opinion of the Court are required. Awards of costs are also set forth in the Court's judgment.

Under S. Ct. Rule 45.3, a formal mandate does not issue unless the Court specifically directs so in cases coming to the Court from lower federal courts. In most of these cases, the Clerk will forward a copy of the opinion or order together with a certified copy of the Court judgment to the lower federal court – which will include a provision for costs if any are awarded. Of course, the Court may stay the effective date of its judgment. See, Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982). On the other hand, in cases coming to the Supreme Court from state courts, a formal mandate is issued to the court from whose judgment a petition for certiorari was granted. Under S. Ct. Rule 45, the mandate issues 25 days after entry of the judgment unless the time is shorted by order or stipulation and all mandates are issued in the name of the President of the United States.

A timely petition for re-hearing operates as an automatic stay of the mandate (in a state case) or stay of sending down the judgment (in a federal case) until the Court disposes of the petition. However, when the Curt denies a petition for certiorari, the Clerk immediately enters an order to that effect and forwards a copy of the document to the lower court. Under S. Ct. Rule 16.3, a rehearing petition does not stay an order denying certiorari unless the Court or a Justice enters an order directing the stay. On rare occasions, the Court has granted motions to recall and amend an erroneous judgment despite the prior denial of a petition for re-hearing. See, Cahill v. New York, New Haven, & Hartford R.R. Co., 351 U.S. 183 (1956).  Moreover, the Court has shown little inclination to grant motions for clarification of its judgments following a decision on the merits. See, Vendo Co. v, Lenktro-Vend Corp., 434 U.S. 425 (1978).

S. Ct. Rule 42 provides that in civil cases where the Court affirms a money judgment, interest allowed under applicable law is payable from the date of the entry of the judgment under review. The rule also provides that when the Court modifies or reverses a judgment and orders that a money judgment be entered on remand, the Court's mandate must contain specific instructions on the allowance of interest, Under this scheme, the governing standard for federal cases appear in 28 U.S.C. §§ 1961, 2411, 2516, and 2674. Counsel is advised to file a concise motion for allowance of interest on 8.5 by 11-inch paper format, setting forth the applicable statutory provisions, the grounds for an award, and the time from which interest should run. An original and ten copies of the motion should be filed promptly after the Court's decision is handed down. S. Ct. Rule 42.2 and 28 U.S.C. §1912 also permit the Court to award damages as well as single or double costs to redress injuries stemming from meritless filings and delay. Since 1803, though, there have only been close to a dozen reported cases where the Court has invoked the rule. See, Gibbs v. Dikema, 131 U.S. (appendix) clxxxvi (1880); Deming v. Carlisle Packing Co., 226 U.S. 102 (1912), Southern Ry. Co. v. Gadd, 233 U.S. 572 (1914), Wagner Elec. Mfg. Co. v. Lyndon, 262 U.S. 226 (1923), Slaker v. Oklahoma, 278 U.S. 188 (1929). A Rule 42 motion should be filed with 8.5 by 11 inch paper – with an original and 10 copies for the Court. Of course, opposing counsel should be served and, such a motion should be filed at or near the time of filing of the brief in opposition, or the motion to dismiss or affirm, to permit the papers in the case to be considered simultaneously. Before taking action on the motion, the Court will give the petitioner or appellant additional time (usually 30 to 40 days) to respond to the motion, if that party has not otherwise responded.

Finally, S. Ct. Rule 43 governs the award of costs in the Supreme Court. When a judgment is affirmed, the rule provides that costs must be paid by the appellant or petitioner unless otherwise stated by the Court. In the event of a reversal or vacation of the judgment below, costs are allowed to the appellant or petitioner unless otherwise ordered.

**Executive Ownership Rights in Oil and Gas Law**

Published on February 4, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In oil and gas law, an executive right gives its holder the power to lease her land's minerals. It is not uncommon for an executive right to be severed from other incidents of mineral ownership. For instance, O might convey her land to A, reserving to herself ½ of the land's minerals and the exclusive right to lease all of the minerals as well. Under this scheme, O could maintain control

over the land's resource development by maintaining ½ of the mineral interest and the executive rights to A's ½ non-executive mineral interest. It follows from this arrangement, that if a third-party wanted to obtain a lease covering A's ½ mineral interest she or he would have to deal with O, not A.

Unsurprisingly, executive rights do not give their holders lease benefits accruing to non-executive mineral interests. However, in several southern states with robust oil production, it is unclear whether the executive right gives its holder the power to conduct operations on the land – as well as lease it. Fortunately, in Texas, French v. Chevron U.S.A. Inc., 896 S.W.2d 795 (Tex. 1995) controls on this issue and grants the owner those rights.

Another active area of dispute concerns the obligations that O would have to A in the hypothetical transaction posited above. Most courts have found an implied duty of good faith and fair dealing, which requires the executive to act with reasonable regard for the interests of the non-executive and to negotiate lease terms that a reasonably prudent landowner would seek out had there not been a non-executive interest. Fewer courts have found a fiduciary obligation, which requires the executive to subordinate his interests to those of her non-executive partner when their interests conflict. Thus, in Manges v. Guerra, 673 S.W.2d 180 (Tex. 1984), the Texas Supreme Court found that an executive interest owner had a duty of good faith to his non-executive partner to acquire every benefit that the executive holder exacted for himself and upheld a damages award against an executive who failed to satisfy this standard. The Court discussed the nature of the duty of the holder of the power to lease as follows:

"The duty of utmost good faith owed by an executive has been settled since Schlittler v. Smith, 128 Tex. 628, 101 S.W.2d 543, 545 (1937). That standard has been repeated in (citations omitted)…The fiduciary duty arises from the relationship of the parties and not from the contract. See English v. Fischer, 660 S.W.2d 521, 524–25 (Tex.1983) (Spears, J., concurring). While a contract or deed may create the relationship, the duty of the executive arises from the relationship and not from express or implied terms of the contract or deed. That duty requires the holder of the executive right, Manges in this case, to acquire for the non-executive every benefit that he exacts for himself. *184 R. Hemingway, The Law of Oil & Gas, § 2.2(D) (2d ed. 1983)."

Although, Texas law seemingly equates the duty of good faith with fiduciary obligations, subsequent decisions by Texas courts do not support the proposition that the executive rights holder must always subordinate her own interests to that of the non-executive. Texas courts have usually made a fact-specific inquiry into the matter evaluating (1) whether the lease would have been entered into in the absence of the non-executive right-holder and (2) whether the executive right-holder attempted to obtain economic benefits that would not have been available to the non-

executive right-holder. Thus, in the lone star state, liability appears to turn on whether the executive engages in self-dealing for his benefit or to the disadvantage of the non-executive rights holder.

There are at least three situations where owners of non-executive interests can argue that their executive has violated her duty by failing to execute a lease. The first is where there is resource drainage – there is a duty to lease within a reasonable time period after the executive discovers that the land is being drained by production from adjacent lands. See, Federal Land Bank of Houston v. United States, 168 F.Supp. 788 (Ct.Cl.1958). The second instance occurs when the executive has failed to lease or develop the land in a timely manner by arbitrarily rejecting reasonable offers to lease on terms that are the same as, or superior to, those offered other landowners in the area. See Hawkins v. Twin Montana, Inc., 810 S.W.2d 441 (Tex. App.1991). The last situation arises where the executive's failure or refusal to lease causes a time-limited, conditional, and nonparticipating interest holder to withdraw from the drilling venture. See Kimsey v. Fore, 593 S.W.2d 107 (Tex.Civ.App. 1979).

### A Few Thoughts on Presidential Signing Statements

Published on February 4, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

On appropriate occasions presidential signing statements perform seven useful functions: (1) informing Congress and the public that the Executive believes a particular provision would be unconstitutional in certain applications, that the Executive is adopting a saving construction of a potentially unconstitutional provision, or that a provision is unconstitutional on its face, and that the provision will not be given effect by the executive branch to the extent that such enforcement would create an unconstitutional condition, (2) directing subordinate officers within the executive branch on how to interpret and administer an enactment, (3) explaining to the public and interested constituencies what the president believes to be the likely effects of the bill's adoption and how the bill coheres or fails with the administration's views or programs, (4) to create legislative history that the Executive hopes courts will give some weight to when interpreting the document, (5) to applaud or criticize the policy behind the provision, (6) to advise the Congress on how the president will respond to future legislation, and (7) to congratulate members of Congress or the public who have assisted in the bill's passage. This short article will cover the first, second, and fourth points in varying detail.

The president may declare in a signing statement that a provision of a bill before her is flatly unconstitutional and that she will decline to enforce it. This practice is consistent with the view of the framers. Indeed, during the Pennsylvania Ratification debates, James Wilson, a prominent Philadelphia Convention delegate and later Associate Supreme Court Justice stated that:

"the power of the constitution was paramount to the power of the legislature acting under the constitution for it is possible that the legislation…may transgress the bounds assigned to it, and an act may pass in the usual mode, notwithstanding that transgression but when it comes to be discussed before the judges…it is their duty to pronounce it void…in the same manner the president could shield [her]self and refuse to carry into effect the act that violates the constitution."

Case law and past executive practice support Justice Wilson's position. In Fretag v. Comissioner, 501 U.S. 868, 906 (1991), a plurality composed of Justices Scalia, Souter, O'Connor, and Kennedy endorsed the proposition that the President may resist laws that encroach upon her constitutional powers by disregarding them when they are unconstitutional. And, during the Carter Administration, in a memo to White House Counsel Lloyd Cutler, former Attorney General Benjamin Civiletti noted that the President refused to comply with the statute at issue in Myers v. United States, 272 U.S. 5 (1926) and that the Solicitor General argued that the statute was unconstitutional. Yet, the Myers Court held that the President's action in defiance of the statute had been constitutional. See, 4A Op. O.L.C. at 59. It should also be noted that the executive has refused to defend statutes that transgressed other constitutional mandates outside Article II. See, United States v. Lovett, 328 U.S. 303 (1946) (arguing that the civil service pay modification at issue was a bill of attainder improperly directed to suspected communists and other subversives working within the federal government).

The opposite view – that the President has a constitutional duty not to sign legislation that she believes is unconstitutional – has been advanced on occasion. There is past executive branch practice, though, that cuts the other way. For example, in 1803, President Jefferson – with Secretary Madison's agreement – signed legislation appropriating funds for the Louisiana Purchase even though Jefferson thought the purchase was unconstitutional. In light of this history, the President certainly is not constitutionally compelled to veto legislation that he believes to be unconstitutional – although he may certainly do so if he wishes. See, Robert H. Jackson, A Presidential Legal Opinion, 66 Harv. L. Rev. 1353 (1953). Finally, if the President may properly decline to enforce a law when it unconstitutionally encroaches on her powers, then it arguably follows, a fortiori, that she may announce to Congress and the public that she will not enforce a provision of an enactment that he is signing.

On the second point, the president has the constitutional authority to supervise and control the activity of subordinate officials within the executive branch. See, Franklin v. Massachusetts, 505

U.S. 788 (1992). Of course, in the exercise of this authority the President may direct her subordinates on how to interpret and apply the statutes they administer – and such statements have the effect of binding the statutory interpretation of other executive branch officials.

This brief analysis leaves the use of presidential signing statements as legislative history as the final issue. The Justice Department first began to use signing statements as legislative history in its briefs during the Reagan and Bush (41) administrations. The practice was begun by Attorney General Edwin Meese, who arranged with the West Publishing Company to have the statements released in the U.S. Code Congressional and Administrative News. In support of the notion that signing statements can, and ought to be used, as legislative history, one can look to the fact that the President plays a critical role in the legislative process both as a matter of constitutional right and political necessity. The recommendations and presentment clauses buttress this claim. See, Art. II § 3, cl. 1 and Art. I § 7, cl. 2. Moreover, in the words of presidential historian, Clinton Rossiter, for much of American history, the president "has been a de facto third house of congress and is expected to make detailed recommendations in the form of messages and proposed bills, to watch the bills closely in their tortuous progress on the floor and in the committee of each house, and to use every honorable means within h[er] power to persuade." See, Clinton Rossiter, The American Presidency (1956). Therefore, it is appropriate when the president is signing legislation to explain what her intent was in making the new statute law, particularly if the administration has played a significant role in moving the bill through Congress. Indeed, several courts of appeals have accepted these statements as authoritative as well. See, United States v. Story, 891 F.2d 988 (2d Cir. 1989) and Berry v. Department of Justice, 733 F.2d 1343 (9th Cir. 1984).

**Lack of Jurisdiction to Review Judgments Based on Independent and Adequate State Grounds**

Published on February 3, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Supreme Court can encounter jurisdictional problems in cases where both state and federal questions are involved in a state proceeding and it is disputed as to whether the state court judgment rests on a state law ground or on a federal ground. If the judgment rests on a state ground, the Supreme Court has no jurisdiction to review the case. The primary rationale for the Court's inability to review these judgments was articulated in Herb v. Pitcairn, 324 U.S. 117, 125-26 (1945). The reason

"is found in the partitioning of power between the state and federal judicial systems and in the limitations of our own jurisdiction. Our only power over state judgments is to correct them to the extent that they incorrectly adjudge federal rights. And our power is to correct wrong judgments, not to revise opinions. We are not permitted to render an advisory opinion."

Here, the jurisdictional inquiry focuses on the independence and adequacy of the state law ground. For practitioners, it is important to note first, that the independent and adequate state ground rule is technically not jurisdictional in habeas corpus cases but that the Court applies the doctrine there for reasons of federalism and comity and second, that an independent state ground is not necessarily an adequate one (and vice versa). A classic instance of an adequate state ground is one that declares a state statute or state action invalid under the state constitution without reference or reliance on the federal constitution. Adequate state grounds must also be tenable – i.e. the Court's review cannot be evaded through reliance on a state ground such as a rule of state pleading or procedure that has been used unreasonably to avoid a decision relative to federal rights.

When the Court finds that it lacks jurisdiction before granting plenary review, it will normally deny a petition summarily either with or without a notation as to the absence of jurisdiction. When the jurisdictional defect is discovered after review has been granted and the case has been briefed and argued, the Court will usually enter a per curiam order dismissing the writ of certiorari for want of jurisdiction – in the alternative, the Court may dismiss the writ as improvidently granted even though that is a less accurate description of the jurisdictional fault. In determining whether a state court judgment is based on an independent and adequate state ground, the Supreme Court naturally turns first to the state court opinion, if any, that accompanies the judgment. Often an analysis of the opinion will provide the answers – and there is some authority for searching the record if the opinion does not settle the matter. This practice can lead to problems at the petition state because S. Ct. Rule 12.7 arguably disfavors the filing of the record during the certiorari stage. S. Ct. Rule 14.1, though, does abate this problem a bit, though, because it forces counsel to include record references in their petition.

Michigan v. Long, 463 U.S. 1032, 1037 (1983), governs in cases where state and federal grounds are present. Advocates should think of these cases as falling within one of four boxes. First, if a state court decides that a particular state action violates both federal and state law, the final state court judgment is not reviewable by the Supreme Court because a decision by the Court would be merely advisory. Second, if a state court upholds a particular state action on the ground that it offends neither federal nor state law, then the Court has the power to review the judgment – but only on the federal question. Third, if a state court holds that a particular action violates state law because it violates a parallel provision of federal law, the Supreme Court has the power to review the case because the state law decision is not independent of federal law. The fourth situation –

where the state court opinion is unclear as to whether the judgment rests on a state ground, federal ground, or both – presents closer questions. This problem is particularly acute where state and federal claims are made under identical provisions in state and federal constitutions and the state court concludes that both constitutional provisions have been violated. The Long Court also created a new presumption that jurisdiction exists "when it is not clear from the opinion itself that the state court relied on an adequate and independent state ground and when it fairly appears that the state court rested its decision on federal law." Footnote six of the Long opinion, though, does permit the Court to vacate and remand a case to a state court to clarify the basis for its opinion where the judgment appears to rest primarily on federal law, or to be interwoven with federal law. See, Bush v. Palm Beach County Canvassing Board, 531 U.S. 70 (2000).

Disposition and case enforcement procedures present a different set of problems. If the Court does assume jurisdiction of a case because of a federal question decided in state court, it will generally not proceed to consider separate questions of state law. Where a reversal of the state court judgment relative to the federal question is in order, the Court will customarily reverse and remand the case to the state court for further proceedings that are not inconsistent with the Court's mandate. On remand, the state court is free to take any action or decide any issue not foreclosed by the Court's mandate. If, however, the state court evades the mandate, the aggrieved party may have difficulty securing a second appeal to the Court – especially if the second state court judgment rests on a non-federal ground. Indeed, attempts to secure writs of mandamus from the Court have often been unsuccessful.

Finally, the Court will not exert its jurisdiction to review a decision of a state court on a factual question. There are two exceptions to this rule, however, First, the Supreme Court will review a state court's factual findings where a federal right has been denied as the result of a finding shown by the record to be without evidence to support it; or second, where a conclusion of law as to a federal right and a finding of fact are so intermingled as to make it necessary in order to pass upon the federal question, to analyze the facts.

**The Rule of Capture in Oil and Gas Law**

Published on February 2, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

States with large commercial oil and gas sectors are primarily divided into two groups. The first group of states recognizes ownership of oil and gas beneath the surface of the ground as if the fuels were a part of the land itself (hereafter referred to as the ownership-in-place states). The second group of states do not adhere to the ownership-in-place theory but recognize that one who owns land has an exclusive right to use that land to search for, and reduce, oil and gas to possession (hereafter referred to as the ownership states). Both ownership-in-place states and ownership states recognize that landowners must reduce oil and gas to possession to gain ownership of it. This is the 'rule of capture' – i.e. the owner of oil or natural gas rights in a tract of land acquires title to the oil and gas produced from wells drilled on the land, though part of the oil and gas may have migrated from adjoining lands. Regardless of the ownership theory at issue, production converts oil and gas from real property to the capturer's personal property.

Texas is typical of the states embracing the ownership-in-place theory. In 1915, the Texas Supreme Court stated:

"It is no longer doubted that oil and gas within the ground are minerals. They have peculiar attributes not common to other minerals because of their fugitive nature or vagrant habit-the disposition to wander or percolate, and the possibility of their escape from beneath one part of the surface of the earth to another. Nevertheless, they are to be classed as minerals. In place, they lie within the strata of the earth, and necessarily are a part of the realty. Being a part of the realty while in place, it would seem to logically follow that, whenever they are conveyed while in that condition or possessing that status, a conveyance of an interest in the realty results….If the oil and gas, the subject of the conveyance, are in fact not beneath or within the land, and are therefore not capable of being reduced to possession, the conveyance is of no effect. But, if they have not departed and are beneath it, they are there as a part of the realty; and their conveyance while in place, if the instrument be given any effect, is consequently the conveyance of an interest in the realty. There could be no warrant for denying effect to such instruments as these, and, granting them effect, they are therefore to be considered as conveyances of such an interest."

Some courts that have applied the rule of capture have relied on the analogy to the common law of wild animals, which reasons that the only way to gain ownership of wild things, ferae naturae, is to capture them. Other tribunals such as the Ohio Supreme Court have treated the rule of capture as following from an owner's absolute right to use land reasoning that whatever gets into the well belongs to the owner of the well, no matter where it comes from." See, Kelly v. Ohio Oil Co., 49 N.E. 399 (Ohio 1897). Because the rule of capture departs significantly from the common law maximum cujus est solum, ejus est usque ad coelum et ad inferos (whoever owns the soil, it is theirs all the way to heaven and all the way to hell), the best way to understand the rule is as a judicial policy-making device to encourage the development of oil and gas resources.

The rule of capture is unusual because it gives the landowner the shield of a positive legal principle; so long as owner conducts operations without trespassing or interfering with the rights of neighboring owners to drill to the same formation under their lands, the resource owner will not be liable. Thus, in Coastal Oil & Gas Corp. v. Garza Energy Trust, 268 S.W.3d 1 (Tex.2008), Coastal Oil planned and executed a hydraulic fracture on adjacent property it owned but obtained oil from land that Garza Energy Trust owned. Here, because the Texas Supreme Court found that Garza held a non-possessory interest in the land at issue, it had to show that it had actually been damaged to receive compensatory and punitive damages – and that it was unable to demonstrate this damage because of the rule of capture.

The rule of capture, though, is limited by the correlative rights doctrine and state environmental statutes. For example, in Elliff v. Texon Drilling Co., 210 S.W.2d 558 (Tex.1948), Texon permitted one of its wells on property adjoining Elliff's land to blow out and burn causing large quantities of oil to drain from Ellif's property. The Texas Supreme Court rejected Texon's rule of capture defense on the grounds that an owner who exercises the right to capture oil and gas must do so without wasting the commodity. The correlative restriction has also been prominent in cases where the parties dispute an alleged owner's rights to capture oil or gas that was previously produced by another individual. For instance, in Champlin Exploration, Inc. v. Western Bridge & Steel Co., Inc., 597 P.2d 1215 (Okl. 1979), the Oklahoma Supreme Court found that the rule of capture did not protect a mineral-interest owner that dug trenches on its premises and pumped out and sold refined hydrocarbons that leaked from a nearby refinery and drained into the trenches. Similar results have been reached by courts that have considered situations in which natural gas produced and injected into storage reservoirs escapes and is recaptured by wells drilled on tracks not subject to storage rights. See, Texas American Energy Corporation v. Citizens Fidelity Bank and Trust Company, 736 S.W.2d 25 (Ky. 1987). Courts have also limited the rule of capture in cases where the oil has been obtained through secondary recovery operations – procedures that improve the productive capacity of the reservoir by injecting fluids to increase the pressure differential or to move oil and gas in place to the borehole.

It is important to distinguish cases where the rule of capture should, and should not be, applied. Edwards v. Lachman, 534 P.2d 670 (Okla. 1975), is illustrative. Lachman drilled and completed a producing well that bottomed out beneath Edwards' land. At first, Lachman did not realize that this trespass occurred; but when he did discover the trespass, he remained silent and continued to produce the well. Here, the Oklahoma Supreme Court rejected Lachman's argument that Edwards should not be entitled to compensation for the value of any hydrocarbons produced from the trespassing well but drained from Lachman's property citing the rule of capture. Since the well was producing from locations under Edwards' property, the production was attributable to Edward.

On the other hand, Wronski v. Sun Oil Co., 279 N.W.2d 564 (Mich. Ct. App. 1979), presents a case where application of the rule of capture was properly rejected. Here, the Michigan

conservation agency issued an order limiting production from each well within a field to seventy-five barrels of oil per day. Sun Oil Company, though, violated this conservation order and overproduced its wells by more than 150,000 barrels of oil. Evidence adduced at trial indicated that almost one-third of this oil was drained from the Wronskis' property. Under the common law rule of capture, Sun Oil would have been able to drain as much oil from neighboring properties as its well were able to. The Michigan Court of Appeals, though, correctly rejected the application of the rule of capture here because the state conservation statute superseded state judge-made property law.

**The Supreme Court's Original Jurisdiction - Part I**

Published on February 1, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Law suits that fall within the Supreme Court's original jurisdiction are cases that can be brought directly in the Supreme Court without having been litigated in a lower court first. The Supreme Court's original jurisdiction is defined by Article III §2 which states:


"The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority;--to all cases affecting ambassadors, other public ministers and consuls;--to all cases of admiralty and maritime jurisdiction;--to controversies to which the United States shall be a party;--to controversies between two or more states;--between a state and citizens of another state;--between citizens of different states;--between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects.


In all cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be a party, the Supreme Court shall have original jurisdiction."


The Supreme Court has held that Congress may not add to, nor subtract from, the Court's original jurisdiction. Congress has, though, enacted a statute – 28 U.S.C. §1251 – which states that "the Supreme Court shall have original and exclusive jurisdiction of all controversies between two or more states." And that the Court "shall have original but not exclusive jurisdiction of (1) all actions

or proceedings to which ambassadors, other public ministers, consuls, or vice consuls of foreign states are parties; (2) all controversies between the United States and a State; and (3) all actions or proceedings by a state against the citizens of another states or against" undocumented persons. Congress has also permitted inferior federal courts to exercise concurrent jurisdiction over some cases within the Supreme Court's original jurisdiction. Of course, these cases can then be reviewed under an exercise of the Court's appellate jurisdiction. In most cases, when multiple courts have concurrent jurisdiction, the litigants can select their ideal forum – subject to a party's ability to remove the case under 28 U.S.C. §1441, transfer the case under 28 U.S.C. §1404, or seek dismissal for forum non conveniens. However, in 1939, the Court began to decline to exercise its original jurisdiction in cases that the Court once felt obliged to hear. The result is that the gatekeeping rules the Court has developed for the exercise of its original jurisdiction makes its ability to hear or deny a case almost as discretionary as its certiorari jurisdiction over appellate cases – even for suits that fall within the congressional definition of exclusive jurisdiction. The Court typically considers three factors when deciding whether to hear a case falling within its original jurisdiction: (1) the parties to the suit, (2) the subject matter of the suit and its importance vel non, and (3) the existence or not of an alternative forum for the cause of action.

After Chisholm v. Georgia, 2 U.S. 419 (1793), though, where the Court held that Article III, Section 2's grant of federal jurisdiction over suits "between a State and Citizens of another State" abrogated Georgia and South Carolina's sovereign immunity and granted federal courts the affirmative power to hear disputes between private citizens and States, the Court's original jurisdiction was limited though the Eleventh Amendment which provides that the "Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Article III's grant of original jurisdiction in cases "in which a state shall be a party" is somewhat misleading, however, as there are numerous cases in which a state is a party but cannot invoke the federal judicial power. For instance, the Court lacks original jurisdiction over cases involving state law where a state and a citizen of that state are parties. Thus, under current practice, the Supreme Court's original jurisdiction in state party cases extends to controversies between two or more states, between a state and citizens of another state or aliens, and between a state and the United States – but not to federal question or admiralty cases.

The Supreme Court has original and exclusive jurisdiction over suits brought by one state against another. The bulk of the Court's original jurisdiction litigation comes from this category and most of the cases typically involve controversies concerning land boundaries, commerce clause issues, or interstate lakes and rivers. There are limits here as well. For instance, the Court will not permit a complaining state to proceed with a suit if it is a nominal party actually suing on behalf of private interests or individual citizens rather than a sovereign entity. See, Maryland v. Louisiana, 451 U.S. 725, 737 (1981). On the other hand, a state "may act as the representative of its citizens in original actions where the injury alleged affects the general population of a State in a substantial way." Id. The Court will also not permit a state to file a complaint if its believes that the issues raised in the

pleadings clearly lack merit. It should be noted that a suit by one state against a municipality or political subdivision of another state is not generally regarded as a suit against the latter state over which the Supreme Court has exclusive jurisdiction. This is true even if the latter state is charged with responsibility for the actions of its public entities and could be named as a defendant under appropriate pleadings. However, because political subdivisions are regarded as citizens of their respective states, suits by states against municipalities of other states fall within the Court's original but non-exclusive jurisdiction over suits by a state against citizens of another state. So long as at least one state is on each side of the controversy, the presence of non-state parties does not affect the Court's original jurisdiction.

The Supreme Court's original jurisdiction to hear "cases affecting ambassadors, other public ministers, and consuls," though, has rarely been invoked. Moreover, because the Court retains concurrent, but not exclusive, jurisdiction over these cases, most consuls, vice consuls, and mission members have filed their complaints in inferior federal courts. It bears mentioning, on this point, that the Court's original jurisdiction does not extend to cases affecting the diplomatic representatives of the United States in foreign countries. See, Ex Parte Gruber, 269 U.S. 302 (1925). The original jurisdiction of the Supreme Court also extends to suits by the United States against a state and to suits by a state against the United States without the latter's consent. As in cases between two or more states, the Court has also permitted the joinder of private parties to actions by the United States against a state – effectively exercising supplemental jurisdiction over the claims. Finally, the Court has original but nonexclusive jurisdiction over all actions or proceedings by a state against citizens of another state or undocumented persons. Because Congress has not given the lower federal courts jurisdiction over this class of cases and states are not considered "citizens of a state" for diversity jurisdiction purposes under 28 U.S.C. §1332, a state cannot bring an action against a citizen of another state in federal district court based solely on that alignment of parties. Here, the Court's original jurisdiction over actions by a state against citizens of another state is limited to civil, not criminal, suits.

**The Supreme Court's Jurisdiction to Review Decisions of Federal Courts - Part II**

Published on January 28, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

I.

The Federal Courts Improvement Act of 1982 (FCIA) repealed the Supreme Court's jurisdiction to review decisions of the, now-defunct, Court of Claims and Patent Appeals Court (PAC) by either writ of certiorari or certification. FCIA also transferred the appellate jurisdiction of both courts to the newly created United States Court of Appeals for the Federal Circuit. The Court of Appeals for the Federal Circuit is the thirteenth federal circuit with appellate jurisdiction in a special set of cases. Unlike other Article III circuits, its geographic jurisdiction extends to all federal district courts in the nation – as well as the Court of Appeals for Veterans Claims, the Court of Federal Claims, the Court of International Trade, the Board of Patent Appeals and Interferences of the Patent and Trademark Office, the International Trade Commission, the Merit Systems Protection Board, and various federal agency boards of contract appeals. Thus, in addition to handling cases arising under what used to be the PAC's and Court of Claim's appellate jurisdiction, the Federal Circuit also handles all patent appeals and appeals in federal contract cases brought against the United States that are heard in the regional court of appeals.

Moreover, the Federal Circuit deals with (1) appeals from final decisions of district courts and interlocutory orders that are appealable under 28 U.S.C. § 1292(c) in cases arising under § 211 of the Economic Stabilization Act of 1970, (2) emergency orders issued under § 211 of the Natural Gas Policy Act of 1978, and (3) appeals in cases arising under § 5 of the Emergency Petroleum Allocation Act of 1973 and § 523 of the Energy Policy and Conservation Act of 1975. The time for filing a certiorari petition in any case falling under these three categories is "90 days after entry of the judgment" rather than the old 30-day time limit that S. Ct. Rule 13.1 used to impose. Of course, because the Federal Circuit is an Article III court, the Supreme Court's appellate jurisdiction over cases in that tribunal is governed by 28 U.S.C. § 1254, which establishes procedures for the Court's review of cases in the circuit court of appeals.

II.

The District of Columbia Court Reform and Criminal Procedure Act of 1970 (DC-RCPA) comprehensively reformed Washington D.C.'s local court system and gave the Supreme Court exclusive appellate jurisdiction – through writ of certiorari – to review the decisions of D.C.'s highest local court, the District of Columbia Court of Appeals. This arrangement, though, was a stark departure from previous practice. Before 1970, the United States District Court for the District of Columbia and the United States Court of Appeals for the District of Columbia Circuit exercised original, concurrent, and appellate jurisdiction over civil and criminal matters arising under D.C. common law or congressional statutes regulating matters within the District. Gradually, however, the federal court system in D.C. was stripped of its jurisdiction over local civil and criminal cases and the Superior Court of the District of Columbia and the District of Columbia Court of Appeals were given jurisdiction over these cases instead. Indeed, the Court has held that the DC-RCPA even prohibits the United States District Court for the District of Columbia from ruling on post-conviction habeas corpus applications so long as local D.C. Courts remain open and

can give adequate and effective remedies. Finally, and perhaps most importantly, under 28 U.S.C. §§ 2101(c) and 1257, the District of Columbia Court of Appeals is considered to be "the highest court of a state" under those statutes. This fact is significant because S. Ct. Rule 13 allots the same amount of time for litigants seeking an appeal from a decision of the District of Columbia Court of Appeals as it does to those seeking to appeal a judgment from a state court of last resort.

III.

28 U.S.C. § 1259 gives the Supreme Court direct review – by writ of certiorari – over a pre-set range of cases decided by the United States Court of Appeals for the Armed Forces. This review, though, is only available if that Court decides a case on the merits under either its mandatory of discretionary jurisdiction. Thus, if the Court of Appeals for the Armed Forces does not grant a petition for review, the Supreme Court has no jurisdiction to review that decision with a writ of certiorari. This loophole is not troubling, though. For much of American history, the Supreme Court had no appellate jurisdiction over decisions issued by military tribunals. In 1775, the Continental Congress borrowed and passed the British Articles of War into law. What's more, as the plurality opinion in Burns v. Wilson, 346 U.S. 435, 448 (1987) demonstrates, the Court traditionally regarded military law as "a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment" and that civil or Article III courts were "not agencies which must determine the precise balance struck between the rights of those in the armed forces and the "overriding demands of discipline and duty." Under this scheme, Congress was understood to maintain exclusive responsibility to maintain a fair and just court-martial system pursuant to its Article I power "to make rules for the government and regulation of the land and naval forces." During this period, though, the Supreme Court did, and still does, maintain the ability to hear collateral attacks on the jurisdiction of military courts-martial – but the need to bring these attacks was significantly obviated with § 1259's passage. It should be noted, though, that the Supreme Court's appellate jurisdiction over the Court of Appeals for the Armed Forces is not complete – the Court cannot grant certiorari to review a nonfinal judgment of the Armed Forces Court.

Under S. Ct. Rule 13.1, a petition for a writ of certiorari to review a judgment entered by the Court of Appeals for the Armed Forces – just like a petition to review a judgment of one of the thirteen federal courts of appeals, or a judgment of a state supreme court – is timely when it is filed with the Court Clerk within 90 days after the entry of the judgment. Of course, the 90 day time requirement is not jurisdictional and the Court retains the ability to grant a certiorari petition if (1) there is an extraordinarily good excuse for the delay and (2) the petition presents an important question for plenary review. In any event, S. Ct. Rule 13 permits petitioners to avoid late filings by petitioning the Chief Justice for a 60 day extension so long as the extension petition is filed at least 10 days before the certiorari petition is due. Moreover, indigent petitioners seeking review of

a judgment issued by the Armed Forces Court of Appeals can waive the $300 filing fee and proceed in forma pauperis under S. Ct. Rules 40.3 and 39.

**The Supreme Court's Jurisdiction to Review Decisions of Federal Courts - Part I**

Published on January 27, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Article III § I of the U.S. Constitution provides that "the judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish." Section 2 of the same article then proceeds to specify the types of "cases and controversies" that fall within the "judicial power of the United States." Section 2 provides – with the sole exception of cases "affecting Ambassadors, other public Ministers and Counsels, and those in which a State [is] a party" – that the Supreme Court "shall have appellate jurisdiction, both as to Law and Fact," over a pre-set range of cases. The Supreme Court's appellate jurisdiction, though, is subject to "such exceptions, and…regulations as the Congress shall make." Thus, Congress, and not the Court itself, defines the precise metes and bounds of the Supreme Court's appellate jurisdiction – although the Court retains the ability to interpret the jurisdictional statutes that Congress passes.


Beginning with the Judiciary Act of 1789, Congress has provided for appellate review of two basic types of cases in the Supreme Court: (1) judgments of specified lower federal courts and (2) final judgments of state courts of last resort that implicate or involve claims under the U.S. Constitution, federal treaties, or federal statutes. Indeed, Congress has maintained this distinction in modern statutes that delineate the Court's appellate jurisdiction. The Court's appellate jurisdiction, though, has not always been as expansive as it is today. During the first 100 years of the Court's existence, for instance, Congress did not provide for appellate review of federal criminal convictions – and did not remedy this deficiency until 1889.


Congress also has the power to make "regulations" governing the Court's exercise of its appellate jurisdiction by designating the process and means through which appeals are handled. From 1789 to 1891, for instance, Congress provided for appellate review as a matter of right in the high Court through a "writ of error" or "appeal" process. Originally, the writ of error was the sole process used to remove a case from a state court to the Supreme Court. Under this procedure, if all the

jurisdictional requirements were satisfied, the Court was then obliged to review the state court judgment. On the other hand, the Court was authorized to review judgments in lower federal courts either by "appeal" in suits in equity or by "writ of error" in law cases. This mandatory jurisdiction, though, soon became too onerous and Congress made modifications. Beginning in 1891, Congress gave the Court a modicum of discretion over its docket by permitting the Court to use a writ of certiorari to decide whether it should a hear a limited number of cases in the newly structured federal court of appeals. At common law, the term certiorari meant an original writ commanding lower court judges to certify and transfer the record of lower court proceedings in a case under review by a higher court. The Court's current practice does not follow this archaic model. Under S. Ct. Rule 16.2, whenever the Court grants or denies a petition for certiorari, the Court Clerk prepares, signs, and enters an order notifying the Counsel of Record. If the Court needs a record of the lower court proceedings, under Rule 16.2, the Court Clerk will simply make a request to the lower court clerk to transfer the record. Congress finally gave the Court effective control over its docket with the Judiciary Act of 1925 (referred to by Court insiders as the 'Judges Bill'); and in 1988, Congress eliminated virtually all of the Court's mandatory jurisdiction.

28 U.S.C. § 1254, the primary statute governing appeals from lower federal courts, provides that the Supreme Court may review cases "in" the federal court of appeals by "writ of certiorari granted upon the petition of any party to any civil or criminal case, before or after rendition of judgment or decree." The Court's certiorari jurisdiction extends to all thirteen courts of appeals for the federal judicial circuits identified in 28 U.S.C. § 41. The Court's appellate jurisdiction, though, extends to Article I and state courts as well as Article III tribunals. Indeed, the Court can grant certiorari to review cases decided by the Court of Appeals for the Armed Forces and state courts of last resort. The Court can even grant certiorari to review interlocutory orders – although this practice is disfavored. The cases here present a mixed message. Thus, in Land v. Dollar, 330 U.S. 731, 734 n.2 (1947), the Court granted certiorari to review a nonfinal order of the court of appeals, reversing a district court's denial of a motion to dismiss a complaint, that involved an important issue fundamental to the further litigation of that case. But in Gillespie v. U.S. Steel Corp., 379 I.S. 148, 152-53 (1964), the Court warned that its review of a nonfinal order may induce inconvenience, increased litigation costs, or delay. A party aggrieved by an interlocutory ruling of an appellate court is entitled to wait until a final judgment is entered before seeking certiorari. During the course of its review of a final judgment, the Court can reach back and correct errors in previous interlocutory proceedings – even if there was no attempt to seek review at the time. Thus, in Mercer v. Theriot, 377 U.S. 152 (1964), the Court first denied certiorari after the court of appeals had set aside a jury verdict but latter granted the writ and held that this procedural move was improper. Indeed, in most instances, a prior denial of certiorari or dismissal of a writ as improvidently granted (referred to among Court insiders as a 'DIG') does not establish a law of the case or confer res judicata effect on the points raised.

Section 1254's language has been interpreted broadly. For instance, the word 'cases' has been read to include any motion or application made to a federal court of appeals that bears the imprimatur

of the court of appeals or a judge thereof. Thus, in Hohn v. United States, 524 U.S. 236 (1998), the Court held that it had jurisdiction under § 1254 to review a denial of a state prisoner's application for a certificate of appealability (COA) by a circuit judge or a court because the COA raised a claim alleging wrongful detention in violation of the Constitution and various federal statutes. Under § 1254, a case is 'in' the court of appeals at the moment it is docketed in that court. While the term 'party' in the same provision does not permit amici to appeal lower court decisions (although there is one notable exception), it does encompass successful as well as unsuccessful litigants and even non-parties vitally effected by the lower court decision. Thus, in Banks v. Chicago Grain Trimmers, 390 U.S. 459 (1968), the Court acquiesced to the views of the Solicitor General in permitting an individual, who was not a party to the proceedings in the court of appeals, to intervene in the Court to file a certiorari petition upon demonstrating (1) that he was the real party in interest who was adversely affected by the lower court decision and (2) that the named parties did not intend to file a certiorari petition. It should also be noted that the mere fact that a lower court has not published its opinion is not a bar to Supreme Court review.

**Extraordinary Writs - Part I**

Published on January 25, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Supreme Court is empowered via statute to grant a series of 'extraordinary writs.' 28 U.S.C. § 1651(a) permits the Supreme Court and inferior federal courts to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." The principle extraordinary writs are mandamus, prohibition, habeas corpus, and certiorari. The writ of certiorari described in § 1651(a), which is referred to as the common law writ of certiorari, is not the same jurisdictionally, as the statutory writ of certiorari that is provided for in 28 U.S.C. §§ 1254 and 1257, which govern the vast majority of cases coming to the Supreme Court in the ordinary course of appellate review.


In England, these devices were known as prerogative writs and were closely associated with the Court of King's Bench. The prerogative writs included the writ quo warranto – a procedural device that ran against an individual who claimed or usurped any office, franchise, or liberty to show cause as to why she or he rightfully owned the thing in question – but no quo warranto practice ever developed in the United States Supreme Court. In addition to the prerogative writs, the common law writ of coram nobis may also be available under the All Writs Act despite contrary

indications in 28 U.S.C. 2255, Federal Rule of Criminal Procedure 35, and Federal Rule of Civil Procedure 60.

There are some limits on the Court's ability to grant extraordinary writs. Marbury v. Madison established that the Supreme Court's original jurisdiction does not authorize the issuance of any extraordinary writs by the Court – at least outside the narrow range of cases allocated to the Court's original jurisdiction in Article III § 2. The Marbury Court also commented that, outside this narrow set of cases "to issue a [writ of] mandamus, [the case] must be shown to be an exercise of appellate jurisdiction, or…necessary to enable [the Court] to exercise appellate jurisdiction. Marbury, however, does not restrict Congress' power to authorize lower federal courts to issue extraordinary writs in the exercise of their original jurisdiction. It should be noted, though, that 28 U.S.C. § 1651, the All Writs Act, does not provide federal courts with an independent grant of jurisdiction. Moreover, when a litigant seeks an extraordinary writ in a lower federal court or state court, 28 U.S.C. §§ 1254, 1291, and 1257 permit the Supreme Court to review the decision rendered in that proceeding through a writ of certiorari. The substantive standards for granting extraordinary writs are the same in the Supreme Court, inferior federal courts, and state courts.

Shortly after Marbury, however, the Court did make it clear that it was not constitutionally foreclosed from issuing extraordinary writs so long as the writ was used in an exercise of the Court's appellate jurisdiction. Indeed, in Ex parte Bollman, the Court used the writ of habeas corpus to review a lower court decision and held that its jurisdiction in the case was "clearly appellate," because it involved the revision of a decision of an inferior court.

Applications for extraordinary writs can also be filled directly in the Supreme Court. While these applications could be classified as 'original' writs, this terminology is misleading because "writs of certiorari, habeas corpus, mandamus, [and] error are [all] simply mechanisms through which the Court's appellate jurisdiction can be implemented. The mere fact that some writs – certiorari, habeas, and mandamus – are used by a few courts in the exercise of their original jurisdiction does not mean that they should be dubbed 'original' writs." In the past, applications for these writs were covered by the same rules that applied to cases within the Court's original jurisdiction; now, the procedure is roughly the same as the one set for ordinary statutory certiorari petitions under S. Ct. Rule 20.

But how has the Court defined its appellate jurisdiction? Appellate jurisdiction lies in the review of "an exercise of judicial power" and must be an act rendered in a judicial, as opposed to legislative or administrative, capacity. The objective must be the review of some inferior officer or federal court. Exactly which tribunals count as courts under this scheme has been the subject of some dispute - especially in national security cases. Thus, in Everett v. Truman, 334 U.S. 824 (1948), the Court denied leave to file for a habeas petition for relief from the General Military

Government Court's sentences on the partial grounds that that tribunal was not a court; but in Solorio v. United States, 483 U.S. 435, 436 (1987), the Court exercised its jurisdiction to review a decision of the U.S. Court of Military Appeals without discussing jurisdictional issues.

The requirement that the writ be "in aid of" the Supreme Court's jurisdiction has been interpreted expansively. Indeed, the Court can issue extraordinary writs (1) in aid of its jurisdiction over a case pending before it, (2) in aid of its potential jurisdiction over a case pending before a court over which it has direct appellate power, and (3) even in aid of its potential jurisdiction over a case pending before a court over which it lacks direct appellate power but may ultimately be able to review after a decision by an intermediate appellate court. Therefore, in Ex parte Peru, 318 U.S. 578, 584 (1943), the Court held that it could issue an extraordinary writ to a federal district court – even though direct appellate jurisdiction was vested in the circuit court of appeals – because the Supreme Court had ultimate discretionary jurisdiction by certiorari. Nonetheless, the Court has rarely, if ever, heard oral argument in support of an extraordinary writ – much less issued one. This is so because these devices are regarded as exceptional remedies that can be invoked only upon exhaustion of other alternatives. S. Ct. Rule 20.1's text reflects this:

"Issuance by the Court of an extraordinary writ authorized by 28 U. S. C. §1651(a) is not a matter of right, but of discretion sparingly exercised. To justify the granting of any such writ, the petition must show that the writ will be in aid of the Court's appellate jurisdiction, that exceptional circumstances warrant the exercise of the Court's discretionary powers, and that adequate relief cannot be obtained in any other form or from any other court."

Thus, courts faced with petitions for these writs will review them carefully to prevent interlocutory review of an inferior court's orders on the mere ground that the lower court decision may have been erroneous. These concerns are particularly acute in petitions for mandamus, an order compelling a lower court to do something it has refused to do, or prohibition, an order prohibiting a lower court from doing something it will otherwise do, because these proceedings can render a district court judge a litigant.

However, because any issue can be framed in affirmative or negative terms, mandamus and prohibition writs are often referred to interchangeably and it is not uncommon for Supreme Court bar members to cover their bases by requesting both writs. The Court has indicated, though, that mandamus is the only proper remedy available to a party that has (1) prevailed in the Supreme Court but (2) been unable to persuade the lower court to properly execute the Supreme Court's mandate on remand. The Supreme Court has also issued this writ in cases where a state court of last resort has disobeyed one of the Court's mandates. If the Court finds that a request for extraordinary relief is unjustified or unnecessary, it retains the discretion to treat the petition for extraordinary relief as one for certiorari and grant or deny review on that basis. Indeed, counsel

seeking certiorari review of a denial of mandamus relief by a lower court may even benefit from petitioning for "certiorari and mandamus."

The writ of certiorari under §1651 nominally orders the lower court to certify the record to the Supreme Court; before this statutory certiorari mechanism for selecting lower court cases for review was created, though, the Court used certiorari only "to supply imperfections in the record of a case already before it, and not, like a writ of error, to review the judgment of an inferior court." The Court has also used certiorari to review non-appealable orders in exceptional circumstances.

The Supreme Court (and individual Justices) also have jurisdiction to grant writs of habeas corpus to release prisoners who are unlawfully confined. When an application is made to an individual Justice, though, she or he will usually refer it to the entire Court. Admittedly, this power is something of an anachronism. In the past seven decades, many habeas petitions have been filed directly with the Court and, without exception, all of these petitions have been summarily denied without opinion. The last direct habeas petition the Court granted was issued in 1925 and earlier cases provide no discussion of the jurisdictional and procedural requirements that the Court may examine in individual cases. Instead S. Ct. Rule 20 provides the governing standard. Rule 20.4(a) cautions that the habeas petitioner "must show that exceptional circumstances warrant the exercise of the Court's discretionary powers, and that adequate relief cannot be obtained in any other form or from any other court." Under this same rule, the petition must also comply with the requirements set out in 28 U.S.C. §§ 2241 and 2242, which, among other things, requires the applicant to state his "reasons for not making application to the [federal] district court of the district in which the applicant is held." On the other hand, 28 U.S.C. § 2254 requires that a prisoner seeking relief from a state court judgment show how and where he exhausted alternative state remedies. Similar exhaustion principles apply to military prisoners. With this said, in light of the availability of habeas in federal district courts and the exhaustion requirements applicable to military and state prisoners, there is rarely any reason to file a direct habeas petition with the Court.

**Disentangling Foreign Government Official Immunity**

Published on January 18, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In the past, foreign relations lawyers and federal courts have often struggled to cleanly differentiate the various forms of common law immunity accorded to foreign officials. This problem has become all the more significant as American courts have become fora for transnational litigation involving deposed leaders who have fled their counties with American assistance, been invited into the U.S., and sued by plaintiffs seeking to recover ill-gotten gains. These suits are particularly dangerous because they may handicap future American efforts to effect peaceful power transitions in nations that are central to U.S. national security interests. In general, these immunities fall under four categories: head of state immunity, official acts immunity, diplomatic and consular immunity, and special mission immunity.

I.

The first doctrine is head-of-state immunity. Under this immunity defense, heads-of-state recognized by the Executive Branch are absolutely immune from personal jurisdiction in United States courts unless that immunity has been waived by statute or by the foreign government recognized by the President. Indeed, visiting heads-of-state are generally immune from the jurisdiction of a foreign state's courts because heads-of-state must be able to freely perform their duties at home or abroad without the threat of civil or criminal liability in a foreign legal system. This form of functional immunity is absolute for sitting heads-of-state, heads of government, foreign ministers, and other high ranking officials. These officers enjoy immunity for all acts – public and private – undertaken during or before holding office. Head-of-state immunity attaches only while the official holds office, although former heads of state retain residual immunity and are given special consideration for official acts taken while in office.

Head-of-state immunity – like foreign sovereign immunity – is premised on three principles; first, that a state and its ruler are one for immunity purposes; second, that all states are equal and that no one state may degrade the dignity of another's head-of-state by exercising judicial authority over her or him; and third, that comity considerations caution countries to protect foreign heads of state so that their own premiers will receive protection when she or he travels abroad. As early as 1812, in The Schooner Exchange v. McFaddon, the Supreme Court embraced this principle of customary international law holding that a head-of-state was absolutely "exempted" from the jurisdiction of the receiving state courts. Schooner Exchange also introduced the practice of deferring to suggestions of immunity by the State Department in individuals cases; or in the absence of such determinations, deferring to State Department policies concerning foreign immunity generally.

Recognition of a government and its officers is the exclusive function of the President – whether the recognized head-of-state has de facto control is irrelevant as federal courts must defer to the Executive determination in part because immunity offers may be tied to American efforts to effect a peaceful political transition in a foreign state. Indeed, in United States v. Pink and United States

v. Belmont the Court upheld an independent executive agreement that effectively settled private claims against the new Soviet government as a constitutional exercise of the President's recognition power. The Courts have also recognized the President's plenary power to conduct foreign affairs, which has been drawn from the spirit of Article II. Thus, in United States v. Curtiss-Wright Export Corp., Justice Sutherland commented that the President was "the sole organ" of the nation in "international affairs;" and in keeping with this statement, federal courts have continued to accord presidential foreign policy decisions a considerable amount of deference. This is as it should be because the Constitution's text plainly vests the President with a range of foreign policy powers that are implicated in situations where foreign officials are hauled into federal court.

II.

The second doctrine, official acts immunity, applies to current and former foreign government officials and recognizes "the immunity of individuals from suits brought in foreign tribunals for acts done within their own states, in the exercise of governmental authority." Insofar as "individual defendants have acted on behalf of the state, their actions [are not to be] attributable to them in their personal capacity [but rather,] are attributable…to the state. Most cases implicating official acts immunity involved suits against consular officers, who by virtue of their position had a regular presence within the United States.

In 1952, the State Department issued the Tate Letter, which announced that the Department would no longer follow the absolute theory of sovereign immunity set forth in The Schooner Exchange. Instead, the letter explained that the Department would accord immunity to a foreign state for its public sovereign activities but not its private commercial activities. This policy change, though, did not alter the rule applicable to individual officials. Consistent with its pre-Tate Letter policy, the State Department continued to recognize the immunity of foreign officials for their official acts in suggestions of immunity made to the federal courts. Thus, the Restatement (Second) of Foreign Relations Law of the United States (1965), which was published during this time period, includes official-act immunity among the various dimensions of immunity belonging to foreign sovereigns.

III.

The third doctrine is diplomatic and consular immunity, which is based on the Vienna Convention on Diplomatic Relations and the Vienna Convention on Consular Relations, respectively, as well as customary international law and a litany of bilateral treaties.  While in office, diplomats are shielded from interference during their service with a grant of nearly absolute immunity from the criminal, civil, and administrative jurisdiction of the receiving state. Former diplomatic officers are entitled by treaty to residual immunity with respect to acts performed in the exercise of their

functions as members of their diplomatic mission and, former consular officials can also claim immunity with respect to acts performed in the exercise of their functions without a time limit. The State Department Legal Adviser's Office (L) does not necessarily play a role in cases involving the immunities of diplomatic and consular officials because sued officials are expected to retain private counsel; but the State Department – in conjunction with the Justice Department – will often file statements of interest addressing issues in the case. Immunity suggestions may be issued after the foreign official has been served and a request has been received from the official's home government. L usually asks that the request be conveyed through a diplomatic note – with all relevant information and documents including the summons and complaint. If L agrees that a suggestion of immunity should be filed, the Justice Department will typically submit a short one on the Executive's behalf and expect judicial deference on the matter. This advisory practice often reduces the need to litigate criminal immunity issues in court.

IV.

The final doctrine, special mission immunity, is often conflated with diplomatic immunity. Special mission immunity is based on the need to protect high level communication between government officials who are not necessarily accredited diplomats. Although this doctrine was codified in the Convention on Special Missions, only a small number of states have joined that treaty; thus, special mission immunity has largely been based on principles of customary international law. Federal courts, though, have recognized and applied this doctrine in cases where the State Department filed a statement of interest suggesting immunity for foreign government officials who travelled to the U.S. to conduct official business (but who were not assigned to a diplomatic or consular post).

**The Roman Law of Things**

Published on January 15, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The second classification in Justinian's Institutes relates to things (res). In its simplest sense, res denoted a physical object; but the term also encompassed assets of economic value that were capable of evaluation in monetary terms such as a debt or right of way. The Roman law of things governed the creation, transfer, and enjoyment of economic rights – property in its widest sense. Gaius, an influential Roman jurist, divided assets into two categories: obligations and property.

An individual's obligations consisted of assets that were owed to him; on the other hand, an individual's property was composed of the assets that he owned. This dichotomy carried over into Roman property law's distinction between in rem actions and in personam actions. In rem actions asserted a relationship between a person and a thing; thus, in the most common in rem action (rei vindicatio) plaintiffs sought to regain possession over a physical item. By way of contrast, in personam actions asserted a relationship between persons; in the simplest in personam action (condictio) the plaintiff asserted that the defendant owed him a physical thing or sum of money.

I.

In rem and in personam actions were similar in two respects. First, presiding magistrates lacked authority to issue decrees ordering restitution or specific performance. Second, both actions shared common procedures. The Roman pleading system used formalistic judicial instructions (formulae) that were drafted by a Praetor (in iure) and used at trial by a iudex or lay arbitrator (apud iudicem). The formula consisted of directions to the iudex to condemn the defendant if he found the plaintiff's case proved and to absolve him if he did not. Formulae could be quite complex because the Praetor had to identify the appropriate action (condictio certae pecuniae) and include all the parties' claims in the plea with conditional clauses (replicatio). The typical formula in a formal contract action (stipulatio), for example, would read "if it appears that the defendant ought to pay X sesterces to the plaintiff, let the iudex condemn the defendant to pay X sesterces to the plaintiff, unless" the counterclaim conditions are met. Once the issues were joined (litis contestatio), the iudex was chosen by agreement between the parties from a list of well-to-do volunteer laymen. The result in successful actions was simply an order to the defendant to pay the plaintiff a sum of money – although the plaintiff could levy an execution on the defendant's person or property to collect the amount. It should be noted, though, that in most in rem actions, the defendant did restore the claimed item. This was so because the formula of the action directed to the magistrate, if he found for the plaintiff, compelled the defendant to pay for the disputed item, but only if he failed to surrender it to the plaintiff. Indeed, the complete formula of the vindicatio ran as follows "if it appears that the thing in question belongs to the plaintiff at civil law (ex iure Quiritium) then, unless, at the direction of the judge the defendant restores the thing, let the judge condemn the defendant to pay the value of it to the plaintiff. If it does not so appear, let the judge absolve the defendant."

The actions also differed in several notable respects. An action that created a right in rem, could not create a right in personam and vice versa. Roman jurists seized on this principle when distinguishing contracts from sales conveyances. Thus, a contract that created rights that were enforceable in an in personam action could not create or transfer rights in rem because (1) in rem rights could be enforceable against anyone subject to the Praetor's jurisdiction and (2) contractual rights could be created or transferred in non-recorded, private dealings without any witnesses at all, which afforded the public no opportunity to confirm or refute the existence of the contractual

rights. On the other hand, conveyances, which could give rise to in rem rights, formally, required visible and public exchanges. Indeed, both methods of exchange in this category: mancipatio and in iure cessio required either an exchange in open court or six witnesses. While this verification system worked reasonably well during the early Republic, it became obsolete during the Principate because of the Empire's territorial expansion.

II.

Roman property law used three important res classifications: (1) res mobiles, res immobiles, (2) res mancipi, res nec mancipi, and (3) res corporales, res incorporales. Res immobiles encompassed land and buildings; res mobiles, however, referred to 'movable' property such as a table or chair. Res mancipi denoted a limited set of highly valued items in early Rome: slaves, beasts of draught and burden (oxen, horses, asses, and mules), Italic land, and rustic praedial servitudes (rights of way and of water) over land. All other things were res nec mancipi. This distinction was significant because, until the later Republic, res mancipi could only be conveyed through mancipatio or in iure cessio. Finally, res corporales referred to physical items; while res incorporales alluded to non-physical, abstract property such as a debt or right of way. Under Roman law, one could not possess abstract, incorporeal property because possession did not extend to non-physical items. Of course, no such limit applied to corporeal property.

III.

In the Common and Civil law, there is an obvious difference between having a thing and being entitled to have a thing. A thief, for example, is not entitled to what he has stolen, but he nonetheless has it. Roman concepts of possession (having a thing) and ownership (entitlement to a thing) tracked this distinction. Under Roman law, the possessor had remedies – possessory interdicts – by which he could restrain others from interfering with his possession and recover possession from a dispossessor. If, for example, X was disposed of his villa by Y, he could use a possessory interdict to compel Y to restore the house so long as (1) X's occupation amounted to possession in law and (2) X's possession was not obtained forcefully (vi), secretly (clam), or by grant of will (precario) from B. Here, the remedy laid only against the dispossessor; thus, if Y dispossessed X of his villa and he, in turn, was dispossessed by A, X could not bring an action against A. Moreover, in the possessory interdict, the ownership title of either party was irrelevant – the dispossessor could not plead that he owned the villa in his defense. Possession, not ownership, was the sole issue of concern. The possessory remedy's main advantage was its low proof burden relative to an action seeking to establish title (vindicatio).

There were select sets of holders capable of possessing property. Under Roman law no one who held property in pursuance of a contract with the property's owner could possess the item. This same restriction extended to individuals holding an in rem right that was less than ownership. Consequently, borrowers (commodatarius), depositees (depositarius), hirers, and land lessees could not obtain possession over the property that was the subject of their respective transactions. These holders had no remedy against third parties who interfered with their holding because they held the property on the owner's behalf. Indeed, the list of those who held property without acquiring possessory rights under Roman law was so expansive that it would not be unfair to say that 'possession' did not carry the same meaning in Latin as it does in English. By 'possession,' the Roman lawyer meant not simply the holding of a thing but rather, the holding of a thing in the manner of an owner.

Roman law required a minimum measure of physical control over an item to establish possession. This desideratum, however, also contained a mental component. Thus, according to the Apostle Paul, 'one acquired possession by an act of the mind and an act of the body' (animo et corpore). The corpus of possession required an effective amount of physical control – although, this standard's requirements varied with the object in question. Intent alone (animo solo) was insufficient to establish possession. Once possession was established, though, less onerous rules were used to determine retention of control over an object. The recurrent example involves a seaside cottage. During most of the year when the cottage is left unoccupied, the corpus of physical possession (one's physical presence in the residence) is lacking, but Roman law permitted the holder to retain possession on the grounds that anime solo was sufficient.

IV.

Roman jurists such as Gaius and Justinian also devoted a considerable amount of literature defining different modes of acquisition for res corporales. Derivative acquisition occurred when one obtained property from a previous owner; here, one proved his title by providing the title of the item's previous owner. There were five different methods of derivative acquisition: mancipatio, in iure cessio, traditio longu manu, traditio brevi manu, and constitutum possessorium, I have covered mancipatio elsewhere; however, this method was gutted once Justinian abolished the distinction between res mancipi and res nec mancipi. In iure cessio was confined to the conveyance of incorporeal things. Traditio longu manu involved simple delivery of land, buildings, or bulky personalty with a just cause (iusta causa) for the passing of ownership. The sole issue here was usually the execution of a valid 'long arm delivery.' For example, because physical control was a necessary condition to establish possession, a land owner could not transfer his parcel's title to a purchaser without making some effort to give the buyer a minimum amount of control. This requirement was often met by escorting the buyer to a tower and pointing to the parcel at an elevated height. Traditio brevi manu referred to loans and subsequent sales. If, for instance, I lent my Roman law textbook to you and then agreed to sell it to you, I would not be required to

take the textbook back from you before executing the sale because my physical delivery of the item preceded my intention to transfer its title to you. Finally, constitutum possessorium encompassed situations where possession and ownership passed by virtue of a definite transaction such as a loan without the item's physical transfer. Here, the transferor retained control over the property on the transferee's behalf.

On the other hand, original acquisition referred to cases where the property in question had never been owned before or one's ownership had to be proven without reference to a previous title. Occupatio, alluvio, insula nata, alveus derelictus, merger, and fruit acquisition were the six primary categories. In occupatio, an individual acquired ownership of a thing that lacked a previous owner (res nullis) by establishing possession over it. Some interesting examples will clarify this concept. According to Justinian's Institutes, if a new island appeared in the middle of the sea, one could acquire ownership of it by taking possession of the isle. Likewise, if one catches a wild starling and loses possession of the bird, ownership is lost once the bird escapes. By way of contrast, different rules governed in cases involving animals that frequently came to, and fled from, a fixed location. These animals were subject to the same rules as wild beasts; but, the owner never lost possession when the animal left his premises because the animal's intent to return (animus revertendi) was sufficient to establish the owner's continuing physical control over it.

Alluvio referred to cases where an owner's riparian land was extended by incremental sediment deposits. Here, the accumulated sediment belonged to the river's owner – with a few exceptions. Insula nata denoted a similar concept. This original acquisition method was primarily concerned with islands in the middle of rivers- the rules in this area, though, were not clear. Thus, if an island was wholly on one side of the river it belonged to the riparian owner of that portion of the stream. However, if there was more than one riparian owner, the island was divided by drawing a line from the river limits to the island itself. Alveus derelictus, in turn, applied insula nata's rules to river beds. If, for example, a river changed its course, the abandoned river bed became the riparian owner's property and the new river bed fell into the public domain.

Merger involved cases where one person's property was united or mixed with that of another; instances, where, for example I painted a fresco on your wall with my stucco or poured my heavy olive oil into your vase. If the merger was accomplished through an agreement of the parties, ownership rights were to be divided according to their stipulation – otherwise, the rights would be split proportionally. In cases, though, where there was no agreement and the resulting product was indissoluble, more tougher questions arose. The general rule was that if the identity of the accessory item was merged with the identity of the principle item, the owner of the principle item controlled the resulting product. But if there was no identity merger, ownership was joint.

Finally, the rules covering the acquisition of an object's natural fruits (fructus naturales) were rather simple. Prima facie, the products of the original item belonged to the original object's owner; therefore, if I sowed an apple seed in my neighbor's plot, the resulting tree and deciduous goods would belong to my compatriot. It should be noted that Roman law also maintained rules for the acquisition of civil fruits (fructus civiles) but this jurisprudential category was placed within contract, not property, law. Prescription, an original mode of acquisition under the ius civile, and rules covering hidden or lost treasure will be dealt with in a more advanced essay.

**The Roman Law of Persons**

Published on January 11, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Roman private law was quite formalistic and took four forms. The 'stipulatio,' an oral question and answer, was only used in the law of contract. The second source, the comita curiata's private bills were passed by an assembly of thirty 'lictors' but were not binding unless they were approved by a sitting magistrate. Mancipatio, the third form, was a form of conveyance on sale. In the presence of five witnesses and a sixth person (libripens) who held a pair of bronze scales, the transferee grasped the objected to be sold in one hand and a piece of bronze in the other. He then declared (in the case, for example, of a calf) 'I declare that this calf is mine by Quiritary (ancient) right, and be it purchased to me with this piece of bronze and these bronze scales.' The buyer would strike the scales with the bronze and then hand the metal over to the transferor. Mancipatio could be used to convey free persons in potestate, slaves, and certain other things (res mancipi) and all the participants had to be Roman citizens. The final form, in iure cessio, was a method of conveyance applicable to any form of property. The parties would go before the Praetor (in iure) and the transferee would grasp the item to be sold, utter the old vindicatio's formulaic words (which were identical to the mancipatio's first clause). The magistrate would ask the transferor whether he would prefer to enter an opposing claim (an contra vindicet) and finalize the transaction if the transferor remained silent or said 'no.'

I.

Justinian's Institutes declare that "the whole of our law relates either to persons or to things or to actions." The modern American or English lawyer for whom the 'elements' of which the law is

composed are rights and duties, sees the classification in those terms. Under this theory, 'persons' are those entities, whether human or artificial (such as corporations), which are capable of exercising rights and bearing duties; 'things' are the rights and duties themselves; and 'actions.' are the remedies by which the rights and duties are enforced. The Romans, however, never developed a coherent theory of legal personality. Roman lawyers understood the word 'persona' to denote a human being – free or slave – who may (or may not have) been capable of exercising rights and bearing duties. The Romans were more concerned with different 'status' categories – conditions under which a man's rights and duties differed from men of full capacity. Citizenship rights provided the primary baseline. Foreigners (peregrinus) had no rights under the Roman civil law (ius civile) – although the ius gentium (Roman universal law) did extend several important rights to non-citizens. These rights fell into three categories: commercium, conubium, and testament factio. Commercium was the right to be a party to a mancipatio (see below) and other property and contract transactions. Conubium gave one the right to enter into a state-recognized martial contract with a Roman citizen. And testament factio gave individuals the right to make, and take under, a Roman will. The distinction between citizen and non-citizen rights largely disappeared after citizenship was granted to an overwhelming majority of the polity in 212 A.D. – although Junian Latins were apparently excluded from this grant.

II.

Throughout Roman history, the family was the legal unit. The paterfamilias, the family head, was the only full-person within the unit that the law formally recognized; his children, regardless of age or citizenship status, could be placed to death or sold upon his command and their possessions were his alone. The paterfamilias was said to be sui iuris (in his own power) those in his power (children, slaves, persons in mancipio) were alien iuris (in the power of another). When making important decisions (such as whether to kill a child (ius vitae necisque)), the paterfamilias would consult an informal advisory council; but this practice was only a matter of custom and family executions were quite rare once the Dominate began. It was also quite uncommon for families to sell their children abroad (across the Tiber). If a sale was made within Roman territory, the child did not become a slave; but rather, acquired quasi-servile status (in mancipio) and could regain his rights if he was manumitted.

Under this familial arrangement (patria potestas), a Roman citizen was in the potestas of his oldest living ancestor and was referred to as a filiusfamilias. He became a paterfamilias with potestas over his descendants upon the death of his last surviving male ancestor. Therefore, a man whose father and grandfather were both living was in the potestas of his grandfather; and upon his grandfather's death, he would move into his father's potestas. In Roman society, as elsewhere, the 'law in the books' did not necessarily correspond to the 'law in action.' It was not uncommon for the paterfamilias to permit his son to acquire property through his own exertions (peculium profecticium), to refrain from appropriating the property, and to take account of its existence in

his will. This custom was gradually expanded: Augustus permitted the filiusfamilias to acquire legal title over the goods he obtained in war (peculium castrense); Constantine and subsequent Byzantine emperors extended this privilege to earnings in other non-military public service branches (peculium quasi-castrense) as well. Finally, while patria potestas was life-long in principle, paterfamiliae would often grant their sons emancipation.

Roman marriages (iustae nuptiae) during the Empire were social facts and the law had little to do with their creation or termination. There were usually three conditions that had to be satisfied: both parties needed the right to enter into a marriage (conbium), parental consent (if either party was in a patria potestas), and an intent to be married. This last requirement was rather nebulous – while extravagant ceremonies were sufficient to prove intent (and certainly occurred) they were not necessary. Divorce was equally free – all that was required was an intent from either party to terminate the union. Unlike the old English Common law coverture rule, Roman law (during the empire) gave the husband no rights over his wife's property separate from her dowry (dos). If she was sui iuris, she retained her independence and her property; if she was alieni iuris, she remained in potestas patriae. Until the later years of the Republic, this freedom was kept in check with public opinion and property assignment rules for dowry division; thus, in 307 B.C., Lucius Annius, a Senator, was deprived of his dignities for divorcing his wife without consulting his family council. Indeed, this freedom was apparently so fundamental that contractual agreements to not divorce one's partner were void because they were incompatible with Roman conceptions of marriage. Roman law also accorded formal status to casual liaisons (concubinage). A man, for instance, might enter into a permanent union with a freedwoman without wishing to give her the social recognition accorded a wife.

One could enter a patria potestas either through birth in an iustae nuptiae or adoption (abrogatio). Adoption took two forms: abrogatio of an individual sui iuris (in his own power) or adoption of an individual in another patria potestas (adoptio). The former occurred after the comita curiata passed a private bill and the head of the priestly college of pontifices (pontifex maximus) conducted an investigation. Abrogatio could occur only if the adopting party did not have children, was over the age of 60, and could not father children. Adoptio occurred through a series of three elaborate emancipation ceremonies that were plagued with liturgic and formalistic procedures of little significance here. Both procedures were manipulated to effect succession lines. Of course, patria potestas could be ended by abrogatio, adoptio, or death.

III.

Slaves were governed under different rules. No attempt was made to regulate the master's treatment of his servants until the first or second centuries A.D. Large scale-ownership of slaves, as was the case with other forms of capital, only began with the extension of Roman conquests to

the Eastern Mediterranean in the second century B.C. Until then, slaves were usually few in number, the same-race as their masters (although even in periods of large-scale ownership most were Caucasian), and lived in close proximity to their masters. Slavery could arise either through birth or capture in war. Under the ius gentium, an infant's status was determined by her or his mother's status. There were also a few slavery cases under the ius civile; for example, Claudius promulgated edicts that would subject a woman to slavery if she persisted in cohabitating with a man's slave after previous warnings. On one hand, some slaves were highly educated men, usually from Greece or the Near East, and served as doctors, teachers, or private secretaries. These servants were usually treated as freemen and engaged in commerce or estate management. On the other hand, the number of large estates driven with Northern Germanic slave labor increased greatly towards the end of the Republic. On a single occasion, Caesar was recorded selling 63,000 captives in Gaul. Likewise, Pliny the Younger wrote of a freed slave who himself came to own 4,116 captives at his death. Educated slaves were also permitted to amass a peculium through their efforts; this property was owned legally by the master but socially by the slave. In a similar vein, while a slave could not formally alienate property without his master's authority, many in fact did so as if they were independent persons. Contracts involving slaves, though, were on a less secure footing. The slave's contractual rights – like his property rights – passed to his master; but, at one-point, Roman law did not permit a man to incur another individual's contractual duties even if that individual was his slave. The Praetor (see below) soon eliminated this impediment.

Slaves could shake off their subordinate status through one of three manumission methods: manumissio vindicta, manumissio censu, and manumissio testamento. Under manumissio vindicta, one of the slave's associates (adsertor libertatis) would bring an action before the Praetor alleging that the man was free. The owner would acquiesce in the proceedings and the Praetor freed the slave. In manumissio censu proceedings, the master would add the slave to a citizens list maintained by the Censors, which effectively granted the slave his freedom. Finally, in manumissio testamento, the master freed the slave through his will. Manumission's consequences were varied. As a libertus, he owed his former patron respect (obsequium) and was forbidden to bring legal actions against the patron without the Praetor's permission; but in relation to society at large (libertinus), he had all the rights of a full citizen or Junian Latin. Manumission, for the most part, was not regulate by statute – with the exceptions of the lex Aelia Sentia (which required special approval for manumissions involving either slaves under 30 or masters under 20) and the lex fugia Caninia (which limited manumissio testamento but was later repealed by Justinian).

**Potential Legal Issues with the FCC's Net Neutrality Order**

Published on January 6, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Title II of the Communications Act of 1934, as amended in 1996, subjects all providers of telecommunication service to mandatory common carrier regulation. The Federal Communication Commission has recently concluded, though, that cable companies that sell broadband Internet service do not provide "telecommunications service" as the Communications Act defines that term, and hence are exempt from mandatory common-carrier regulation under Title II. Eleven State Attorneys General, however, have publicly suggested that the FCC's order is invalid because (1) it is not a lawful construction of the Communications Act and (2) the current order repealed a prior FCC policy directive for "arbitrary and capricious" reasons. Both claims lack merit.

I.

The central issue here is broadband cable Internet service's proper regulatory classification under the Communications Act. That statute defines two categories of regulated entities that are relevant here: telecommunication carriers and information-service providers. The Communications Act regulates telecommunications carriers, but not information-service providers, as common carriers. For instance, telecommunications carriers must charge just and reasonable nondiscriminatory rates to their customers, design their systems so that other carriers can interconnect with their communications networks, and contribute to a federal "universal service" fund. These provisions are mandatory but the Commission must decline to apply them in select cases if it determines that the public interest requires it. On the other hand, information-service providers are not subject to mandatory common-carrier regulation under Title II, though, the FCC retains the authority to impose additional regulatory obligations under its Title I ancillary jurisdiction to regulate interstate and foreign communications.

These two statutory classifications originated in the late 1970's as the FCC developed rules to regulate data processing services offered over telephone wires. These regulations (known among communications law scholars as the Computer II rules) distinguished between basic service such as telephone service and enhanced service such as computer-processing service offered over telephone lines. The FCC defined "basic service" as "a pure transmission capability over a communications path that is virtually transparent in terms of its interaction with customer supplied information." The FCC took "pure" or "transparent" transmission to denote a communications path that enabled the consumer to transmit an ordinary-language message to another point, with no computer processing or storage of the information, other than processing or storage needed to convert the message into electronic form and then back into ordinary language for purposes of transmitting it over the network. Basic service was subject to common carrier regulation.

Enhanced service, however, was defined as service in which "computer processing applications were used to act on the content, code, protocol, and other aspects of the subscriber's information." Protocol service – communication between networks that employ different data-transmission formats – also fell under this heading. The FCC explicitly declined to subject enhanced service to common-carrier regulation because of the fast moving and competitive market that providers were operating in.

Congress passed the definitions in the Communications Act against the background of this regulatory history; and one could reasonably assume that the parallel terms "telecommunications service" and "information service" substantially incorporated their meaning as the FCC has repeatedly held. Indeed, the terms 'telecommunications service' and 'information service' in the Communication Act's 1996 amendments are eerily similar to the Computer II rules' distinction between basic and enhanced service. The Act defines telecommunications service – the analog to basic service – as "the offering of telecommunications for a fee directly to the public…regardless of facilities used;" telecommunications as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received;" telecommunications carriers – those subject to Title II common carrier regulation – as "providers of telecommunications services;" and information service – the analog to enhanced service – as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." It is within this context that the FCC's order must be examined.

II.

Congress has delegated to the FCC the authority to "execute and enforce" the Communications Act and to prescribe rules and regulations to carry out its provisions. Thus, Chevron U.S.A., Inc. v. Natural Resources Defense Council would control. In Chevron, the Supreme Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in a reasonable fashion so long as two conditions are met. First, the statute's plain terms must not "directly address the precise question at issue." Second, the construction must be based "on a reasonable policy choice." This practice has a compelling historical pedigree because federal courts seeking to exercise control over coordinate executive officers did so principally through issuing a prerogative writ of mandamus. Courts were generally prohibited from issuing prerogative writs unless the executive officer was acting plainly beyond her authority. Thus, statutory ambiguities were to be left to the Executive for resolution.

Chevron deference, though, does raise peculiar separation-of-powers concerns – notwithstanding historical evidence. The doctrine assumes that statutory ambiguities in legislation reserved for agency implementation should be resolved, first and foremost, by the agency. The Court has

vacillated between characterizing Chevron deference as either an allocation of interpretive authority or legislative power. Each theory, however, has troubling problems. Article III's vesting clause requires federal courts to exercise their independent judgment in interpreting and expounding upon the laws. Courts must exercise that independent judgment – even in cases where they are forced to interpret ambiguous federal statutes administered by agencies. Chevron deference is inconsistent with this scheme because it improperly compels judges to abandon what they believe is the best reading of an ambiguous statute in favor of the agency's construction. This scheme is constitutionally proscribed because it hands the Executive the ultimate authority "to say what the law is." Some administrative law scholars have asserted that these concerns are misplaced because agencies interpreting ambiguous statutes are not engaging in acts of interpretation at all. Instead, these commentators have argued that statutory ambiguities are implicit delegations of rule-making authority to fill in discrepancies based on policy judgments made by the agency rather than Congress. While this approach obviates Article III objections, it arguably violates Article I § I's command that "all legislative Powers herein granted" be vested in Congress because it permits a body other than Congress to perform functions that require an exercise of the legislative power. Moreover, as several academics have underscored, Chevron's demise might work limited, if no harm, because the Court has declined to apply the doctrine in a super-majority of cases where application was warranted; and in cases where it has applied the doctrine, it has done so inconsistently.

This issue is academic, though, because the FCC's construction is the correct interpretation of the Communications Act.

III.

The main question is whether cable companies providing broadband internet service are providing a "telecommunications service" as that term is used in the Communications Act. The statute defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public." "Telecommunications," in turn is defined as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." Certainly, all information service providers – including internet companies – provide consumers with service via high speed wire that transmits signals to and from an end user's computer. The question, however, whether broadband internet providers 'offer' telecommunications turns on the nature of the functions the end user is offered because the statutory definition of 'telecommunications service' does not rest on the facilities used. On one hand, it could be argued that cable companies providing broadband internet service necessarily offer the underlying telecommunications used to transmit that service. But on the other hand, "offering" could reasonably be read to mean a stand-alone offering of telecommunications. Thus, the provision is ambiguous – and this lack of clarity is significant for two reasons. First, because Congress did not contemplate, much less extend, Title II coverage to broadband internet

companies, to do so would upset the careful, sensitive, and democratic arrangement that Congress (and the pluralist interest groups that compose it) put in place. Second, in cases, such as this one, where conventional methods of interpretation lead to inconclusive results, several scholars have persuasively argued that the interpretation that promotes efficiency should be preferred. The FCC's deregulatory reading fits this bill.

IV.

Multiple studies focused on communications regulation have concluded that increased regulation deters investment and innovation. For example, one rigorous economic analysis examined the rate at which new communications services were introduced by regulated firms during a period when the FCC experimented with lighter regulation. The study found that the number of services created during the period of lighter regulation was 60-99 percent higher than the model predicted if stricter regulation had remained in place. Cross-national studies have also found that regulatory stringency has had the effect of decreasing investment, innovation and productivity growth. The OECD found, for example, that deregulatory decisions in the United States and Japan in the late 1980s and early 1990s were followed by faster growth in new communications patents relative to Germany, France, and the United Kingdom, which did not relax regulatory controls. And in a large cross-national study that included the United States, prominent economists found that regulatory stringency led to decreased investment both generally and specifically in the communication industry. This literature makes clear that increased regulatory stringency in the communications sector will likely dampen investment and innovation.

Turning specifically to the imposition of Title II regulation, past experience teaches that common carrier regulation should only be used as a last resort to correct market failures – assuming there are any deficiencies. For example, between 1996 and 2005, telephone companies providing Internet access using existing telephone network "last-mile" transmission facilities were subject to Title II for that aspect of their broadband Internet access service, while cable companies were not. Using modern econometric methods, one study demonstrated that the application of Title II slowed telephone company investment by roughly $1 billion per year, a 5.5 percent decline relative to the companies' 1996 capital expenditures. Additional research estimated the impact of Title II

obligations on core investment by categorizing ISP capital investment in two parts: the portion subject to Title II regulation and the portion unencumbered by Title II. Using econometric techniques to control for common factors among the two parts, the authors estimated that Title II rules could reduce the ISPs' future wireline investments by between 17.8 percent and 31.7 percent per year. Without disparaging the legitimate concerns that net neutrality's proponents have raised, these costs are quite real and could potentially curtail the growth and international competitiveness of one of America's most promising and lucrative industries. In the absence of statutory clarity, these are the types of decisions that the Constitution commits to Congress and the President not the Courts.

Three additional facts bolster this reading. First, this interpretation is consistent with the Communication Act's primary purpose. Congress intended the Telecommunications Act of 1996 to shift the nation's communication policy from monopsony regulation to market based competition and deregulation. Three factors point to this conclusion. First, the statute encouraged regional telephone operating companies to compete against one another. Second, the statute explicitly encouraged regulatory forbearance by removing restrictions on local telephone companies providing video services, implementing sunset provisions on cable television rate regulation, repealing cross-ownership rules between telephone and cable providers, and removing regulatory limits on cross-ownership between cable systems and network broadcast stations. Third, the statute itself declares that "the policy of the United States is to preserve the vibrant and competitive free market for the Internet and other interactive computer services unfettered by Federal or State regulation." Second, internet companies have no incentive to engage in data discrimination. The presence of competition compels internet service providers to offer high quality services at attractive prices to prospective consumers in the hope they become actual customers. In the presence of a competitive choice for consumers, a firm's actual customer base is not a collection of victims of monopoly but rather the manifestation of the firm's ability to provide economically attractive offerings. In this context, ex ante searchs by consumers and the quest by firms for new users compels competitors to offer attractive price-quality combinations in the absence of comprehensive public-utility regulation. This is unremarkable because data discrimination could, should, and would precipitate consumer defections. Economic reports confirm this. Since just the end of 2010, the U.S. has added over 110 million broadband subscriptions - subscriptions for which broadband providers had to compete. In the event that market forces reveal some collusion scheme, most consumers are also in a position to switch providers rather quickly; indeed, approximately ten million Americans changed wireless providers in the fourth quarter of 2014 alone. This is not a market ripe for common carrier regulation. Third, assuming that net neutrality's proponents are correct, and internet companies have been engaging in content discrimination, despite disincentives to do so, they have only been able to point to two incredibly isolated and brief instances of internet company conduct that would have violated the rescinded order within the last thirty years. While there are other instances on record, private

discovery and market forces eliminated the data discrimination before the FCC could initiate formal proceedings. This is as it should be.

**The Law and Economics of Labor Law**

Published on January 1, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

In the 1800s, antitrust policy was primarily concerned with whether labor unions should be suppressed as unlawful combinations in restraint of trade. Classical economists – believing that the labor unions' main purpose was to limit the labor supply and prevent employers from using competition among workers to control wages – were unable to distinguish them from employer combinations to lower wages or seller cartels that sought to raise prices. American judges, therefore, frequently refused to enforce agreements to join unions, enjoined picketing, and enforced yellow dog contracts (worker agreements to not join unions). This was as it should be. Workers ostensibly would demand compensation for surrendering their right to join a union – and even if this compensation were not granted, it would not result in inefficient social loss because compensation for abandoning union membership would itself be a monopoly gain. The Sherman Act was originally applied to labor union activities – including the 1894 Pullman Strike. But even after the Clayton Act exempted labor unions from the antitrust laws, some state courts continued to issue injunctions against strikes.

Employers may have had monopsony power because of low worker mobility levels, low education attainment, high levels of first-generation immigrant labor, and the lack of antitrust enforcement against conspiracies to depress wages. Even if this were the case, however, labor monopolies would not be an attractive solution.

Labor monopolies and cartels are self-destructing entities. Union wage premiums increase fixed costs for unionized businesses – causing these firms to lose business to more competitive, non-unionized firms. The ultimate result, as American policymakers have seen, is a steep decline in the percentage of the unionized workforce. In 2017, fewer than 7% of private employees in the U.S. are unionized (compared to 50% in 1950). This precipitous fall can be attributed to four factors: extensive government regulation of workplace safety and health (which has reduced the value of some union services), greater job mobility, the increasingly technical and individualized character

of many jobs (which makes it difficult for workers to agree on employment terms), the deregulation movement, and international competition, which has reduced union power to extract supra-competitive wages and benefits.

Unions work more havoc during depressions and recessions. Inflexible union wage premiums reduce employer output and increase costs. Instead of cutting wages across the board (which tends to demoralize the whole workforce), pressed employers usually lay individuals off in the hopes that retained workers will improve their performance to avoid termination. Deflation (a reduction in the amount of money in circulation) can intensify this cycle. The decrease in the ratio of fiat currency to goods and services causes prices to fall. As a result, ceteris paribus, the dollar's purchasing power increases. In this environment, pre-set union wage levels result in increased union wages (the same money wage buys more) – raising costs and spurring layoffs.

Notwithstanding these economic arguments, Congress passed the Norris-LaGuardia Act in 1932. This statute liberalized federal labor policy by eliminating the labor injunction. The National Labor Relations Act of 1935 (as amended in 1947) reinforced this change by encouraging labor market cartelization. In the absence of regulation, unionizers would encounter mild free-rider problems: workers facilitating unionization could be fired to deter other unionizers. Some market forces cut against this narrative. First, the company would incur costs for termination assuming the worker was satisfactory. These costs would be magnified if the company made significant firm-specific human capital investments in the employee. Second, the worker may have plum employment alternatives, which would deter the termination's punitive impact. The NLRA purports to solve this free rider problem with three devices: representative election, exclusive union representation, and mandatory union dues.

If an organizing campaign obtains signatures from 30% of a business' workforce, the National Labor Relations Board will conduct an election for a collective bargaining representative. Certified employee groups play a central part in this scheme. The Labor Board will certify any employee sub-group with homogenous employment conditions (work duties, fringe benefits, wages, etc.). Indeed, some board members prefer small employee groups because transaction costs in negotiations are lower among small groups. If the union wins a majority of the votes cast by certified employee groups, it becomes the workers' exclusive bargaining representative. Firm management is then required to bargain in good faith with the union over employment contract terms.

Exclusive bargaining, though, can encourage inefficient behavior. Strikes provide an illuminating example. Because an employer is the sole purchaser of the union's labor services, if the union demands higher wages or benefits despite employer refusal, the union must call a strike to maintain its credibility. Assuming credibility gains are minimal, strikes harm both parties because

employees lose wages and employers lose profits (assuming scab workers are not available). The NLRA facilitates this arrangement by forbidding employers to pay replacement workers wage premiums, forcing replacement workers to work along side strikers once the hold out is over (an unpleasant experience), and permitting picketing on the business' private property.

Pro-labor advocates may counter that unionization enhances productivity for four reasons. First, collective bargaining contracts establish a grievance machinery for arbitrating work complaints. These procedures are valuable because they enable management to identify malicious foremen and supervisors before job turnover becomes abnormal. Second, union contracts give workers job security because they ensure that union members cannot be fired without cause. Third, unions incentivize executives to invest in their employees (making them more valuable for the firm) and provide social amenities for workers. Finally, some non-adversarial unions work with management to obtain collective bargaining agreements that strike an appropriate balance between worker benefits and the business' competitive needs.

These contentions are unavailing. First, most unions are adversarial; they press for grievance machinery and job security not to promote productivity but rather, to protect and favor union supporters at all cost. Second, the wide spread prevalence of employment-at-will in the private sector undermines the notion that termination-for-cause is efficient. Market forces deter employers from abusing this privilege because an employer who gains a reputation for arbitrarily discharging or mistreating employees will have to pay new employees a premium. The same claim can be applied to unionization as a whole: if the practice were efficient, in the absence of market failure, private sector employers would facilitate union-formation without the NLRA.

**The Law and Economics of Intellectual Property**

Published on January 1, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

There are some compelling reasons to not regard intellectual property – inventions, trademarks, and trade secrets such as software code and novellas – as property but rather, as the unique product of one's thought requiring legal protection that is unlike that accorded tangible property. One difference between physical and intellectual property is that once the latter is abandoned, it can

never be re-appropriated. Upon entering the public domain it is confined there forever and, can be consumed by one woman without reducing another's consumption of it.

There are some similarities, though. There is, for instance, a parallel between intellectual property and restrictive covenants. Under the 'moral right' doctrine a painter can preserve the right to prevent the mutilation, destruction, and misattribution of her works even after she has sold them. This right survives the painter's death and owners who acquire the works in the secondary market have standing to assert the claim. The artist's right to the work's integrity runs with the portrait much in the same way that an easement runs with the land or an enforcement right runs with a patent.

Both patent grant schemes and abandoned property rules can also create inefficient discovery races. The early fixing of property rights encourages investment; but the inventor may follow a sub-optimal development path in reducing her invention to practice. Assuming the laws of thermodynamics do not apply, if the first inventor of a perpetual motion machine can exclude others from its use with a patent and procure $10 million dollars from selling the product with $2 million in production costs, a number of inventors will rush to be the first to discover and patent the invention – potentially wasting resources in the process. An analogy to common law property rules governing capture and possession of domestic and wild animals will illustrate this distinction. If your domesticated piglet runs off your land, it is still your piglet; but if a wild groundhog who maintains a burrow on your land wanders off, he is not your property and anyone who wants to can take possession by capturing or killing him (unless the animal habitually returns to your land on a frequent basis). If a given groundhog pelt is worth $500, the hunting cost is $125, and 4 hunters pursue the groundhog, the cost will be four times what it would have been if only one hunter went after the animal. The competition will result in a quicker groundhog capture but the savings in time may not be worth the additional expenditures. Some governments, for instance, have attempted to combat this problem by capping the returns from captured animals or goods with a pre-set award. An analogous solution has not appeared in the intellectual property context.

The denial of an intellectual property right can be just as much of an economizing force as the creation of one. Trademarks, for instance, may only be assigned for products or services that are sold in the marketplace. One is foreclosed from dreaming up names for non-existent products, filing applications with the Patent and Trademark Office (PTO), and excluding others from using the names. This is as it should be – otherwise, excess activity would be drawn into pondering new trademarks and cluttering the federal trademark registry with marks that serve no useful purpose.

Patents incentivize innovation, facilitate investment, and provide protection for inventions that can be easily replicated. For instance, imagine that it costs $5 million to invent a device; that the cost of producing and selling the device is $25, and that the demand is for 1 million devices at $30

each. If the manufacturer cannot charge a price higher than, or equal to, $30, she will be unable to recoup her investment. In a world without patents, the situation could be worse. If other manufacturers face the same marginal cost and bid the retail price down to $25 through competition, the manufacturers will be unable to recoup their investment and, anticipating this, will not bother to invent and patent the device in the first place. Patents solve this problem by permitting the patentee to exclude other competitors and avoid this race to the bottom. Second, patents can be granted before there is commercial production or even an invention prototype – one simply needs a diagram or description that would enable a knowledgeable person to create the patented product or process. Pre-production availability is advantageous because start-up financiers often view patents in the same way that mortgage lenders view deeds: proof of valuable collateral. Third, the optimal amount of patent protection is directly related to the ratio between invention costs and copying costs. The higher the ratio the greater the optimal amount of protection. Pharmaceutical drugs, for instance, have high invention-copying cost ratios because drug companies often spend hundreds of millions of dollars developing new drugs that can be copied at low cost once they are placed on the market.

Patents also pose problems: they encourage rent seeking, are biased toward inventive activity that yields patents, impede competing inventive activity, and grant temporary monopolies. The law attempts to solve these problems by limiting patent grants to a twenty-year duration, forcing disclosure of PTO applications (which may permit competitors to create a close but non-infringing substitute), and preventing applicants from patenting inventions that are obvious (discoverable at a low cost), non-novel, or fundamental ideas (such as $E=mc2$).

In some respects, these measures have failed. Defensive patents in the software industry provide the most glaring example. Software innovation is done in a piecemeal manner usually at modest cost. These patents tend not encompass entire devices but rather, components. The result is that a laptop computer or cell phone may contain tens of thousands (or even hundreds of thousands) of patented components. Non-practicing entitles (NPEs) (referred to as 'patent trolls' among Silicon Valley tech lawyers) have taken advantage of this arrangement. These businesses purchase latent patents with small or non-existent markets for the sole purpose of obtaining license fees and damages in future patent infringements suits. Patent troll executives drain innovation by waiting for promising inventions to cultivate a lucrative market and then filing suits against deep pocketed targets. The PTO could combat this problem by simply not granting patents for products that the inventor cannot market in the first instance or using administrative procedures such as inter partes review to deprive patent trolls of latent licenses that protect obvious or non-novel products. Moreover, because the PTO database contains over two million active patent records and firms must search these files to ensure that use of their proposed patent would not precipitate an infringement suit, these measures would also decrease search costs (assuming the costs are function of the PTO's patent database size).

Finally, in the alternative, technology companies may forgo patents and rely on trade secrecy. On one hand, there is no time limit on a trade secret and it need not comply with the novelty, non-obviousness, and other patentability criteria. On the other hand, trade secrets can only be protected with tort or contract actions that target wrongful appropriation; competitors can reverse engineer trade secrets or exploit inadvertent disclosure, and there is a one-year grace period for applying for a patent on an invention that the inventor has already begun to use. In the tech industry, relying on trade secrecy can be rather dangerous because the rate of simultaneous innovation among firms (and even individuals) can be quite high.

**The Solicitor General to beat all Solicitors General**

Published on January 1, 2018

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

Before he was appointed to the United States Supreme Court in 1941, Robert H. Jackson had obtained national prominence as a government lawyer and confidant to Franklin Roosevelt. This was a remarkable feat given that Jackson was a solo practitioner in Jamestown, New York just seven years before his ascension to the High Court. Jackson's rise is a quintessential American success story. In many respects, he had more in common with nineteenth century self-educated leaders than with his Ivy League educated contemporaries.


Jackson came of age with a hard-working family on a Pennsylvania farm. After graduating from high school, he passed up an opportunity to obtain a college education so he could study classical Greek and Roman literature instead. A few years later, he 'read law' (the modern equivalent of an apprenticeship) at his cousin's law office in Jamestown and, borrowed money from his uncle to enroll at Albany Law School. In 1913, Jackson was admitted to the New York Bar at the tender age of twenty-one.


During his time in Albany, Jackson attended oral arguments at the New York Court of Appeals (the state's highest court) and watched the New York State Legislature's sessions, which sparked his interest in local Democratic Party politics. Jackson met Franklin Roosevelt, who was then a state legislator from Dutchess County, through his work for the Empire State's liberal party machine. After Roosevelt became Assistant Secretary of the Navy in Woodrow Wilson's administration, Jackson traveled to Washington to request Roosevelt's help in scheduling meetings

with the U.S. Postal Service and other federal agencies that had employment opportunities for Upstate New Yorkers.

After practicing law for twenty years, Jackson acquired keen analytical and oral advocacy skills. In 1934, President Roosevelt invited Jackson to become General Counsel of the Bureau of Internal Revenue (the predecessor to the Internal Revenue Service). Jackson rose to prominence after bringing tax evasion charges against Former Treasury Secretary Andrew Mellon. He then moved to the Justice Department's Antitrust Division after a brief stint heading the Tax Division. In the Antitrust Division, Jackson argued ten cases before the Supreme Court defending the Social Security system and federal regulation of public utilities. His value to the New Deal agenda was undeniable. When Solicitor General Stanley Reed was appointed to the Court I 1938, Roosevelt chose Jackson to be Reed's successor.

As U.S. Solicitor General, Robert Jackson cemented his reputation as one the nation's most skilled appellate attorneys. Supreme Court Justices, bar members, and law clerks all agreed that Jackson's legal prose was masterful. Indeed, Louis Brandeis, the first Jew to sit on the bench, is supposedly commented that Jackson should have remained "Solicitor General for life." Jackson was surprisingly idiosyncratic – he worked on his appeals in solitude, did not seek input from other lawyers on his staff, and reviewed amicus curiae requests and litigation tracking reports without much assistance. His performance, however, was certainly not the worse for his habits. Jackson loved to simply complex concepts and highlight dispositive issues. Indeed, over the course of ten days in 1939, he argued seven appeals before the Supreme Court. On other occasions, Jackson would argue two or three cases a week or on a single day. The words of United States D.C. Circuit Judge E. Barret Prettyman during the time remain true to this day: "if ever the job sought out the man and the man found his proper niche so it was with the Solicitor Generalship and Robert Jackson."

### Preserving Departmentalism: The Solicitor General's Duty Not To Defend

Published on December 31, 2017

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Solicitor General of the United States has assumed a complex set of duties that implicate the interests of all three branches of government. As Clinton Solicitor General Drew Days III explains,

this tension can provide the occupant "with some of the loneliest and most difficult moments of his tenure." Although the Justice Department has accepted a general duty of defend congressional statutes, the legal academy has neglected to explore and comment on this duty and the role it plays in modern separation of powers disputes.

The Solicitor General's Office was created because of the slowly recognized difficulties encountered by the nation's earliest Attorneys General. The Judiciary Act of 1789 provided that the Attorney General was to "prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned and to give [her] advice and opinion upon questions of law when required by the President of the United States." The Attorney General, though, was not accorded the same treatment as his peers in the State, War, and Treasury Departments. He was given no clerical staff, no centralized power to coordinate government litigation, and only received half the others' salary because Congress expected him to make up the deficit through private practice. Congress exacerbated this problem by appointing numerous solicitors "who served as specialists in the various departments" "leading to confusion over just what the law was and who was responsible for directing the legal affairs of the executive branch." The 1870 Judiciary Act ended this confusion. This statute created the Justice Department and the Office of the Solicitor General. Congress empowered the Solicitor General to argue, in the Attorney General's discretion, "any case in which the government is interested." He was also tasked with the Attorney General's opinion rendering functions (this function was delegated to the Office of Legal Counsel in 1953). The Solicitor was to be a woman or man "of sufficient learning, ability, and experience" so that he could be sent "to New Orleans or New York and present the case of the United States as it should be presented."

The job requires its occupants to grapple with conflicting interests. After all, "the goal is for the United States to speak with one voice – a voice that reflects the interests of all three branches of government and the people. But how is that to be done? It is like asking a millipede how it knows which foot to put first." The Solicitor General also performs different duties for each coordinate branch. The Supreme Court relies on the Solicitor General to screen out unmeritorious and non-critical litigation by exercising good judgment in its amicus curiae brief and certiorari filing decisions. The Court also expects the Solicitor General to carefully consider the implications of her legal arguments and look beyond her administration's short term political interests. However, the Solicitor General owes conflicting duties to the political branches. On one hand, the Solicitor General must also represent the President's views and help her fulfill her duty to "take Care that the laws be faithfully executed." On the other hand, the Solicitor General is expected to defend the constitutionality of congressional statutes. This is so despite the fact that the Office of Senate Legal Counsel and the House General Counsel's Office each are tasked with defending Congress's handiwork in those rare instances when the executive declines to defend a statute against constitutional attack.

When, though, can the President decline to defend acts of Congress? Several Attorney General opinions speak to this question. In responding to a request from Carter Glass for an opinion on whether the President and federal judges were subject to a tax imposed by the Revenue At of 1918, Attorney General A. Mitchell Palmer opinioned that "it was not the province of the Attorney General to declare an Act of Congress unconstitutional – at least where it does not involve any conflict between" Congress and the President. Franklin Roosevelt's first Attorney General, Homer Cummings, went even further insisting that the President should only assert constitutional concerns during the legislative process. Signed legislation, according to Cummings, could not be dispensed with. This approach was in marked contrast to previous opinions from the nineteenth century that provided a stronger, bipartisan endorsement for independent executive branch legal interpretation, judicial review – as opposed to judicial supremacy, and departmentalism. The prevailing standard was articulated in its current form by Ronald Reagan's first Attorney General, William French Smith. In a letter to then Senate Judiciary Chairman Strom Thurmond, Smith wrote that the Justice Department "had a duty to defend the constitutionality of an act of congress whenever a reasonable argument could be made" to defend the statute.

This position was based on two interrelated premises. First from a formalist perspective, the President's duty to execute the laws implies that her executive actions cannot change the substantive rights and duties that formally passed statutes protect. Of course, developments in the modern administrative state – including the increased promulgation of Executive Orders during periods of divided government – have cast doubt on this premise. At a bare minimum, though, the President cannot neglect to enforce a law because she disagrees with the policy positions it furthers. Second, Attorney General Smith's reasonable argument position could be based on separation of powers concerns and respect for Congress' constitutional judgments. After all, Senators and Representatives take an oath to uphold the Constitution. A substantial plurality, however, do not have legal training. Moreover, many lawmakers do not raise constitutional arguments during floor debate for a variety of reasons – lack of interest, time constraints, acceptance of judicial supremacy, or inability to engage in sophisticated constitutional discourse. To the extent that lawmakers trust their staffs to raise and resolve constitutional problems with pending legislation in committee reports or closed-door staff meetings, this approach raises damning non-delegation doctrine problems.

Perhaps Smith's position can be best justified not as an obvious conclusion that follows logically from an intra-textual reading of the Constitution's provisions but rather, as a "special tradition and accommodation" that preserves stable expectations in routine interbranch dealings. The Solicitor General is not hermetically sealed off from the judiciary and Congress. Given that the branches are repeat players constantly interacting with one another, this arrangement would lower transaction costs permitting lawmakers to turn their attention to more pressing matters. Due deference is needed for good governance.

**A Few Thoughts on CVSG Meetings**

Published on December 31, 2017

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Supreme Court receives between 7,000 and 8,000 petitions for certiorari a year, and it grants review in only about 80 of them. On most occasions, the Court only grants review when a petition presents a question of national importance or involves a circuit split – a situation in which two or more different circuit courts of appeals provide conflicting rulings on the same legal issue. The Justices have concluded with increasing frequency that they should hear from the United States government before granting or denying certiorari. Accordingly, in about 25 petitions every term, the Court has invited the Solicitor General to file an amicus brief explaining the United States' views on whether a case warrants the Court's review. This practice among Justice Department insiders has been dubbed 'CVSG' – an acronym short for 'Calling for the Views of the Solicitor General.' When the Court issues a CVSG request it releases an order that states "The Solicitor General is invited to file a brief in this case expressing the views of the United States." The Solicitor General's Office always treats the invitation as a command and files a brief in response.


The Court issues CVSG requests in part because the government's perspectives can educate the Justices on how the United States' interests are affected by a lower court decision and whether a case is important enough to warrant review. Under the Chevron doctrine, for instance, federal courts usually defer to an agency's interpretation of the statutes it administers because these agencies have acquired specialized expertise in their respective regulatory fiefdoms. Because CVSG amicus briefs are often compiled with extensive input, memoranda, and meetings from the concerned agencies' General Counsels and organizations have an incentive to preserve and expand their regulatory jurisdiction, the briefs assist the Court in identifying important government interests affected by lower court decisions. CVSG requests are quite common in cases in which the federal government has a strong interest such as environmental protection, patent law, foreign relations cases, or federal Indian law. The Solicitor General is also able to identify 'vehicle problems' with the petition – aspects of the case that would prevent the Court from addressing the petition's question on the merits. For instance, the question may not have been properly preserved on appeal, the decision could rest on an adequate and independent state law ground, or events subsequent to the lower court judgment could have rendered the case moot.

Litigants must take advantage of CVSG preparation meetings. After the Court has issued such a request, the Solicitor General will often schedule back-to-back meetings with the parties to assess the petition's importance, the extent of an existing circuit split (if there is any), and the government's likelihood of winning the case at the merits stage if it decides to intervene. In many ways, the meetings are reminiscent of moot courts, as government lawyers will ask tough questions to make sure they fully understand the case before committing the United States to an official position. As a general rule of thumb, concentrate on the aspects of your case that the government would be most receptive to. If, for instance, you believe that the government is unlikely to agree with you on the petition's importance for certiorari, focus on the merits (and vice versa). The government's questioning and the CVSG will almost always be helpful as each side refines its arguments for its primary briefs.

**The Solicitor General's Strongest Tool: Error Confession**

Published on December 31, 2017

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The confession-of-error practice is one of the more cogent tools in the Solicitor General's repertoire. When the Solicitor General confesses error – typically before the Supreme Court, but sometimes a lower court – she is asking that court to reverse a lower court judgment in the government's favor because, in her opinion, it has the weaker argument in that case. This practice is quite astonishing given that the Model Rules of Profession Legal Conduct, which purports to bind government attorneys and private practitioners alike, directs advocates to argue "zealously" for their client's cause.


Error confession has a long history – dating back to the beginning of the Office of the Solicitor General. In 1891, for instance, then-Solicitor General William H. Taft admitted error in a criminal case from the Eastern District of Texas. According to Taft, inadmissible hearsay evidence had been admitted at trial warranting reversal of the defendant's conviction. The first Justice Harlan noted the error confession in his opinion for the Court. Lower court judges, though, are not fond of the government confessing that their opinions were erroneous. Second Circuit Judge Learned Hand, one of the most distinguished jurists to ever sit in the court of appeals, once commented that "it's bad enough to have the Supreme Court reverse you, but I will be damned if I will be reversed by some Solicitor General."

Since Taft, all Solicitors General, regardless of partisan affiliation, have confessed error at least two to three times per Supreme Court term. This pattern is due in part to the fact that each Solicitor General has one client: The United States of America, which includes all of its citizens and agencies. In the words of Frederick Lehmann, "the United States wins its point whenever justice is done its citizens in the courts."

The federal government's Japanese internment program gave rise to one of the most famous error confessions in American history. During February 1942, President Roosevelt asked his military commanders to declare exclusion zones in the Western United States. The next month, Lieutenant General John DeWitt issued a public proclamation stating that the Pacific Coast was subject to "attack" and that "all persons of Japanese ancestry, whether they were American citizens or not" would have to abide by new restrictions – including curfew orders. The order did not place similar restrictions on German and Italian residents – despite the fact that both nations were fighting the United States at the time.

Gordon Hirabayashi challenged this scheme by voluntarily violating a curfew order and turning himself into the FBI. Roosevelt's Solicitor General, Charles Fahy, refused to dismiss the test case and was uncandid with the Court during the merits briefing stage. According to Fahy, a blanket curfew on Japanese residents was necessary because the government was unable to separate "those Japanese who might aid the enemy" from loyal citizens. The government's brief also asserted that Japanese Americans were particularly dangerous because racist habits among the populace would prompt them to lack "a feeling of loyalty toward the United States…and…feel…a heightened sense of racial solidarity" with Japan.

This was a lie. Justice Department officials had disclosed a classified Navy Report to Fahy revealing that military intelligence officers could find no national security justification for Japanese internment. The report stated that only a tiny percentage of Japanese residents were disloyal. And of this population, almost all the dissidents were known to the government and could be handled on an individual basis. FBI head, J. Edgar Hoover, not the most strident civil libertarian, also agreed that internment was legally unjustified. Herbert Wechsler, the Assistant Attorney General charged with heading the Justice Department's Criminal Division, did manage to include a footnote casting doubt on the government's ability to rely on the DeWitt's decision by threatening to withhold his signature from the government's merits brief. The footnote, though, was not assertive and refrained from explicitly casting doubt on the government's national security justification for the curfew. When the Court asked Solicitor General Fahy what the footnote meant and why its contents were so cryptic, Fahy responded by assuring the Justices that the government's curfew order was unanimously backed by the nation's military and intelligence agencies. Charles Fahy won the day and Hirabayashi's conviction was affirmed. While the winner from this grave miscarriage of justice was unclear, the loser was obvious: Fahy's client – the United States and more broadly, the rule of law.

In 1987, the Ninth Circuit Court of Appeals granted Hirabayashi a writ of coram nobis – an order reversing a conviction on the basis of a prior error when there are no other remedies available to the petitioner. The judges on the Ninth Circuit panel refused to believe that the Court would have affirmed Hirbayashi's conviction had it known about the Navy Report that Charles Fahy withheld from them. Unfortunately, Hirabayashi v. United States still stands as the law of the case. The important takeaway, though, from this disaster is courage is a necessary condition for public service and virtuous living. Every case has consequences and the government attorneys litigating these disputes should never be afraid to say "wait a minute, we can't say that. That's wrong."

### The Solicitor General: Speaking With One Voice Before the Court

Published on December 31, 2017

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The fourth ranking member of the Department of Justice, the Solicitor General, occupies a relatively inconspicuous role in American politics. The Solicitor General's impact on the law, though, is not insignificant. One scholar has opined that "as a policymaker the Solicitor General's influence and decisions can have dramatic effects on the development of the law, and, at times, the course of history." The Solicitor General (1) decides which cases warrant a petition for certiorari before the Supreme Court, (2) writes and revises briefs in support of, or in opposition to, certiorari, (3) presents oral argument in the Supreme Court (or delegates that task to a deputy), (4) appears as amicus curiae in cases where the United States has an interest, but is not a party, (5) authorizes other parties to intervene when the United States is a party, (6) decides on intervention in cases where the United States has a right to intervene, and (7) serves as a mediator for interdepartmental disputes.

The Office of the Solicitor General (OSG) has a special relationship with independent agencies. Most department heads must obtain the Solicitor General's approval before pursuing their claims in the Supreme Court. The result? Most of the federal government's litigation decision-making is centralized within the Solicitor General's Office. Because the Solicitor General is an executive appointee beholden to the President, many academics believe that partisan politics could affect the Solicitor General's litigation decisions and consequently undermine the independent agencies' regulatory autonomy.

This is a policy question; not a constitutional one. The Supreme Court's 1988 decision in United States v. Providence Journal Co. indicates that Congress has the power to delegate appellate litigation authority to federal agencies. And in the Hobbes Act of 1950 Congress did just this by creating solicitor positions within the now-defunct Interstate Commerce Commission and the Federal Maritime Board. However, the mere fact that Congress can do something does not mean that it should. Entrusting independent litigation authority to independent agencies would undermine the purpose behind the OSG's 1870 organic statute and would also be impractical.

In 1870, Congress created the OSG and expanded the Attorney General's civil rights and criminal enforcement apparatus. Two justifications prompted this change. First, increased violence throughout the south in tandem with the reluctance of state prosecutors and local grant and petit juries to indict and convict defendants accused of racially motivated crimes convinced the 41st Congress that the executive needed more resources to qualm the chaos below the Mason-Dixon line. Second, during the antebellum period, Congress had granted independent litigating authority to several executive departments. The government had also hired private practitioners to handle its cases – which was quite expensive. The House Judiciary Committee found that the government's litigation practices were inefficient and costly because several attorneys were presenting inconsistent legal positions on the government's behalf in state and federal courts. Moreover, a not insubstantial percentage of privately retained counsel were less than able. This historical background is significant because a decision to grant independent agencies autonomy over their appellate litigation would re-create the exact mess that Congress sought to clean up in 1870.

One might retort that this analogy is inapposite because the 1870 congressional decision dealt with 'pure' executive agencies such as the Department of Defense or Agriculture rather than independent agencies such as the Federal Communications Commission or the Securities and Exchange Commission. Four responses. First, as a preliminary matter, it is unclear why independent agency General Counsels would be less prone to asserting positions that contradicted the OSG's arguments. If pure executive branch agencies, which are controlled by attorneys subject to presidential removal, were prone to submitting contradictory arguments and have an incentive to do so when it will further their agency's objectives, it follows, a fortiori, that independent agencies, which are controlled by attorneys who cannot be fired by the president at will pose the same risk – assuming the lawyers in both groups are prodded by the same set of carrots and sticks. Second, agencies that are interested in having the Court grant certiorari in its cases and winning on the merits have an interest in cooperating with the OSG. The Solicitor General is very successful in petitioning the Court for certiorari. Long term trends demonstrate that the Court agrees to review close to 75% of the government's certiorari submissions – the rate is 6% for other litigant's claims. OSG's staff of 5 Deputy Solicitors General and 17 Assistant Solicitors General are also expert at identifying the criteria that the Justices and their law clerks look for when evaluating certiorari

petitions: case timeliness, sufficient academic discussion in law journals and lower courts, national importance, and circuit splits. Agency General Counsels have not internalized these norms and have no incentive to adhere to certiorari criteria rigorously because they are not 'repeat players' before the Court. The government is also successful at winning cases once they reach the Court. The OSG wins about 2 out of every 3 cases it brings and 3 out of every 4 cases in which it participates as amicus curiae. Third, this issue is of low salience as agencies rarely request the Solicitor General to seek certiorari in cases that the agencies lost in circuit court. Finally, the Solicitor General and independent agencies have means at their disposal to accommodate General Counsel who insist on litigating against the odds – and without the OSG's approval – in the Supreme Court. The Solicitor General can allow an agency to argue before the Court and submit a separate brief on the government's behalf in support of, or against, the agency's position. While this technique is less than effective for the agency, it does alert the Court to divisions of opinion within the government. On balance, permitting the OSG to speak with one voice does more good than harm.

**Burning both Sides of the Stick: How Horizontal Precedent Practices in Circuit Courts Undercut Appeals that are a Matter of Right**

Published on December 31, 2017

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The status of precedent in modern courts of appeals is in constant flux. I understand the term 'precedent' to refer to appellate opinions that confront and resolve a perceived gap in the law by setting forth a rule or standard that is novel. Precedents provide a social good because they reduce uncertainty about the law by permitting private individuals to structure their social and economic choices in reliance on judicial enforcement of previously declared legal rules or standards.

Precedent-based judicial systems only work when judges accord deference to previous decisions (that were published – when a panel publishes an opinion it usually intends for the case to serve as a precedent). There are also two other necessary, but insufficient, conditions. First, courts empowered to make precedent must write well-reasoned, persuasive opinions grounded in prior law and present circumstances whose novelty is carefully described and properly explained. Mushy opinions give future courts discretion to distinguish it away. Second, there must be a general judicial commitment to stare decisis that will prompt appellate judges in inferior courts to

follow precedent even if the panel would have decided that case differently had it been one of first impression.

Rising caseloads have had the largest effect on precedent in federal appellate courts. In order to keep the judicial process from grinding to a halt, judges have been forced to make painful compromises in how cases are decided. Courts rely heavily on staff attorneys and clerks to track case disposition for disputes that are decided 'on the briefs' alone (without oral argument and/or a published opinion). Case tracking frees up more time for extensive and personal judicial involvement in the small percentage of cases that receive oral argument. Consideration of other variables leaves less cause for concern. On average, five thousand new opinions are published every year – so there is not a drought of precedent. And vertical stare decisis is well and alive – District Courts give binding effect to circuit law; circuit courts follow Supreme Court decisions. Horizontal stare decision between circuit courts has never applied – indeed, the Supreme Court discourages this practice by granting a disproportionate amount of certiorari petitions in cases where there is a 'circuit split.' There is a tendency, though, for panels to follow previous panel decisions decided in the same circuit – lest they risk an en banc reversal. This phenomenon is a weaker version of horizontal stare decisis as it operates within a circuit court. Unfortunately, intra-circuit, horizontal stare decisis has its downsides because it (1) encourages panels to decide issues prematurely so that it can bind the rest of the circuit, (2) prevents panels from airing out conflicting views and providing the Supreme Court with a fuller exposition of the issues than it could have otherwise, and (3) encourages panel disagreements to persist below the surface.

There is legitimate concern, however, that modern appellate courts have prioritized their precedent-setting duties over their error-correction duties. After all, appeal to a circuit court is a matter of right and the case tracking system allows judges to dispose of disputes summarily without prolonged consideration. This trend is reflected in that fact that reversal rates for District Courts have fallen precipitously since the 1960s. While correlation does not equate to causation, there is certainly no reason to think that District Courts have become more accurate on legal issues as their caseloads have risen to unanticipated levels. Modern appellate courts have responded by producing over-written opinions and seeking out novel cases that can bind future panels in their circuits. There is only one solution to this problem: Congress must take action to ensure that every appeal that comes to a circuit court as a matter of right receives the full consideration that litigants are statutorily entitled to.

**A Short History on Property Qualifications for the Suffrage in the U.S.**

Published on December 31, 2017

Edit article

View stats

Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

By the end of the nineteenth century, fourteen states had excluded either "paupers" generally or inmates of poorhouses from the suffrage. [1] The term pauper in these clauses ordinarily referred to persons in receipt of poor relief. Most pauper exclusions were adopted as states replaced property qualifications with taxpaying qualifications. There are two ways to explain this shift from real property based voting qualifications to qualified white manhood suffrage for wage earners.

The first explanation treats pauper exclusions as an anachronism. While the American Revolution introduced new principles for organizing political life such as the notion that all women and men were equally free, independent, and entitled to the franchise, older precepts died hard over the next two centuries.[2] In the words of Barnard Historian, Chilton Williamson, the United States went from "property to democracy." First, taxpaying qualifications began to replace property qualifications. Then, white manhood suffrage was introduced. After the Civil War, African-American men were enfranchised. In the twentieth century, women were given the vote and by the 1960s, the Twenty Fourth Amendment and the Voting Rights Act of 1965 permitted universal adult suffrage to win the day. Under this theory, pauper exclusions were institutional expressions of traditional ways of thinking that the Revolution failed to eliminate. Paupers, after all, had been excluded from the colonial franchise under the general property qualifications of that era.

This narrative, however, has two problems that detract from its explanatory power. First, in the decades after the American Revolution, most did not argue that the Revolution's principles demanded the introduction of universal suffrage. And second, for nineteenth century Americans, pauper exclusions were part of new conceptions about republican citizenship as well as the franchise and who should – and should not – exercise it.

By the middle of the eighteenth century, all the American colonies except one had adopted property qualifications for the suffrage. This development took more than a century to complete as property qualifications were not the norm in the seventeenth century. Colonists explained the disenfranchisement of the property-less by noting that such people had "no wills of their own." Those who owned no real property were powerless and dependent; subject to the will of those who commanded resources. Indeed, in the early modern era, adult relationships centered on dependence (master and servant, husband and wife, parent and child) were considered normal and Americans were not embarrassed to admit that property ownership could give someone power over others. For the poor, women, and children, the situation was even worse. It was a matter of legal doctrine that the state could demand a pauper's loyalty and services in exchange for providing maintenance, care, and protection. Paupers were not self-governing because they were legally obligated to obey

the reasonable commands of their providers; their labor was the property of the state. As late as the 1880s, in some locales, paupers continued to be legally bound to serve the town that was supporting them. Under these circumstances, the political community could not trust paupers to select magistrates and legislative representatives because they would always be compelled to do their provider's bidding. Ironically, nineteenth century Americans viewed property franchise qualifications as a progressive election measure designed to stem corruption in politics.

After the Revolution, as many states began to enfranchise wage earners, leaseholders, and others who did not own real property, Americans needed a new justification for enfranchising these citizens and excluding others. This distinction was complicated by competing premises in American political culture. On one hand, most Americans continued to believe that only property ownership could confer independence on a man. On the other hand, these same individuals also believed that the government should secure "equal rights for all and special privileges for none." The challenge for white males without freeholds was devising a theory of virile independence that did not turn on property ownership but also, recognized property ownership's ability to confer power upon its holders. Suffragists combated this problem by deconstructing eighteenth century stigmas associated with wage labor. Egalitarian impulses first appeared in nineteenth century abolitionist movements such as the Free-Soil Party, were read into the Fourteenth Amendment's Due Process Clause, and reached their intellectual heyday during the Locher Era.

Indeed, employment became a purely contractual agreement between juridical equals, which made most state health, safety, and labor regulations, that were not supported by extensive and convincing legislative findings, arbitrary and capricious. If each man commanded the same bargaining power as his compatriots, then each man governed his own private affairs, was independent in the public sphere, and thus was able to exercise the suffrage. Increasingly, in American political and legal culture, the test for separating the self-governing from the dependent was whether a person supported himself by earning wages or was dependent on poor relief. The Massachusetts, Pennsylvania, and Maine Supreme Courts endorsed this distinction as the long nineteenth century dragged on. During this period, Americans began to associate political rights with self-ownership rather than property ownership. The property-less who supported themselves by selling their labor were their own masters in a legal and political sense. Wage owners and leaseholders were no longer legally analogous to other groups in dependent relationships – wives, children, and paupers. Rather, wage owners and leaseholders were legally autonomous and their agency was defined by contrasting their situation with women, children, and the poor. Moreover, the realities of cyclical and seasonal unemployment made the wage earner's legal right to come and go as he wished seem as if it were genuine freedom when others were visibly struggling in the poorhouse or grappling with racial discrimination in post-reconstruction America. In this new world, propertylessness made no white, wage holder dependent.

There is a sad coda to this narrative, though. Soon, the formalistic, negative freedom to enter employment contracts became a cruel legal fiction. As the nineteenth century wore on and small firms gave way to vertically and horizontally integrated conglomerates, wage earners began to insist that their employer's power over property made them slaves to their bosses. This argument was difficult to make, however, because these same workers had insisted that they merited the vote because they disposed of their own labor and their property-lessness was irrelevant. Having won the franchise because of their independence, it became difficult for these wage-earners to concede their vulnerability. The populist tiger was proved a paper product.

**The First Amendment and Public Sector Unions**

Published on December 31, 2017

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The Illinois Public Labor Relations Act (PLRA) states that "it is the public policy [of that state] to grant public employees full freedom of association, self-organization, and designation of representatives of their own choosing for the purpose of negotiating wages, hours, and other conditions of employment or other mutual aid or protection. The PLRA also provides that state employees may select a labor union to serve as their exclusive representative in bargaining with state employers over the terms and conditions of employment and compels the state to bargain with unions selected as exclusive representatives.  Serving as an exclusive representative vests a union with significant power extinguishing the individual employee's ability to order her relations with her employer. Public employees are required to pay their union state-coerced, agency fees covering a proportionate share of collective bargaining and contract administration costs. And unions can wield powers comparable to those possessed by state legislative bodies because an employee is bound by its decisions – even if she vehemently disagrees with them. Many public school teachers, for example, strongly disagree with their union's positions on teacher tenure, merit pay, classroom size, and other issues of broad public concern. Mark Janus, a child support specialist who lives in Illinois, objects to many of the positions that his union advocates for in collective bargaining.


Current First Amendment doctrine, unfortunately, supports this scheme. In Abood v. Detroit Board of Education, the Supreme Court held that public employers may compel their employees to pay agency fees to unions. Abood, involved a First Amendment challenge brought by public school teachers to mandatory agency fees authorized by Michigan law. While the Court acknowledged

"that compelling employees to [financially] support a union's collective-bargaining activities had an impact on their First Amendment interests" and "that decision-making by a public employer [implicated participation] in a political process," it resolved the case based on two precedents involving agency fees charged by private railroads under the Railway Labor Act.

This was erroneous. The First Amendment establishes "a bedrock principle that except in the rarest of circumstances, no person in this country can be compelled to subsidize speech by a third party that she does not wish to support. The guarantee of free speech "protects the decision of both what to say and [by implication] what not to say." The same principle forbids "compelling certain individuals to pay subsidies for speech to which they object." Abood seriously erred when it imported private-sector principles into public-sector bargaining overlooking the distinction between the core union speech involuntarily subsidized by dissenting public-sector employees and the core union speech involuntarily funded by their counter-parts in the private sector.

When the government is on one side of the bargaining table, topics such as wages, pensions, and healthcare are important political issues because the money to fund these programs come from the public fisc and these benefits constitute a substantial percentage of state and local government budgets. As of 2013, states reported $968 billion in unfunded pension costs, and $587 billion in unfunded health care liabilities. PEW estimates that the pension shortfall alone, when combined with local shortfalls was $1.5 trillion in 2015 – a historically high level as a percentage of U.S. Gross Domestic Product. And Moody's has predicted that it will be closer to $1.75 trillion for state plans through the fiscal year.

Decisions on these matters have a direct impact on the level of public services, bond indebtness, and tax rates within a jurisdiction. The structure of negotiations in the public sector also implicate political and public policy concerns. In the private sector, unions negotiate with management representatives who are guided by the profit motive and constrained by the normal operation of the market. By way of contrast, public sector union negotiators have little concern with the product market because they are immune from competition. Indeed, the government has an incentive to accommodate public sector union requests because public sector employees are constituents and potential voters. Candidates for public office thus frequently seek and obtain the endorsements of public sector unions. Moreover, collective bargaining agreements in the public sector must often be ratified by high level government officials and funded by the legislature.

Detroit provides a typical albeit extreme example. For many years, the city's workers enjoyed steady rates on return on their Annuity Savings Plan investments paying out returns from city funds even in years when the investments actually lost money. Under the Plan's terms, unions arranged for city workers to invest a percentage of their salaries in a contribution plan that earned interest based on pre-set 7.9% return rate. This was unsustainable. In 2009, for instance, the fund lost

24.1% of its assets but still payed union members the 7.9% rate by diverting hundreds of millions of dollars from funds set aside for traditional pension benefits. On the flip side, when the fund actually outperformed expectations, the city continued to make payments instead of re-investing its capital gains. Alarmed, Mayor Dennis Archer tried to amend the program through the political process in 2009. But the unions – fully cognizant of the program's insolvency – obtained an injunction on the grounds that the modifications were a unilateral change in the collective bargaining agreement. During bankruptcy proceedings, Judge Steven Rhodes found that the union's decision caused 700,000 residents to suffer and diminished the provision of essential public services even though municipal taxes were at their highest legal limit.

Therefore, charitably assuming that compelled payment of union dues is commercial, rather than, political, speech, at a bare minimum, the PLRA must directly advance a substantial government interest. Illinois' statute could conceivably prevent collective action 'free-rider' problems within public sector unions or preserve peaceful labor-management relations. Neither interest is substantial. First, free rider problems are generally insufficient to overcome First Amendment objections. A plethora of groups provide benefits for individuals who are not members; yet, it does not follow that the government may coerce the beneficiaries to subsidize the group's activities. The government, for instance, may not force horse racers to fund The Jockey Club, businesses to fund the Chamber of Commerce, or lawyers to fund the American Bar Association though they might well benefit from these organization's activities. Second, strong labor unions can, and do, exist in right-to-work jurisdictions that do not compel due payments. In the federal government, for example, employees can refrain from joining unions and are not compelled to pay agency dues. Despite the absence of agency fees, nearly one million federal employees – more than twenty-seven percent of the federal workforce – are union members. Public employee unions likewise exist in states that do not allow compulsory agency fees. Nor is it likely that rival unions will arise in the process. Indeed, this argument is a non-sequitur. The state's interest in avoiding negotiations with rival unions justifies at the most, the proposition that there should be only one union – but it does not follow that objectors should be force to subsidize that union's speech.

Abood's precedential authority has been compromised as well. Stare decisis concerns are at their nadir here because errors in constitutional interpretation can be altered only by constitutional amendment or by overruling prior decisions. Subsequent cases have also undermined its doctrinal basis; indeed, in the past five terms the Supreme Court has considered overruling the decision on three separate occasions. Finally, public sector unions have not materially relied on Abood: it is common knowledge among union general counsels that there is no constitutional entitlement to compelled member dues and they have been on notice that the case could be overruled since 2010.

Critics may respond that the PLRA scheme is unexceptional because Americans operating in the private sector are routinely compelled to fund speech with which they disagree. This fact is significant because the Court has often looked to the rights of corporate shareholders in

determining union member privileges. Several corporate law professors have underscored that most minority shareholders have no authority to direct a corporation's political expenditures or its board of directors; that these shareholders would, in any event, be unable to find liquid markets to dispose of securities without a discount if they sought to retaliate, would lack access to advance notice of corporate political expenditures, and that contemporary needs for diverse portfolios and institutional management prevent investors from withdrawing funds from firms that voice unpopular viewpoints.

The First Amendment's text forecloses this claim. That provision (and the Fourteenth Amendment's Due Process Clause which applies its terms to the states) limits "Congress" not Comcast, Conoco, or other going concerns. The Constitution – with two exceptions – regulates state, not private, action. Abood did not account for this distinction and should be laid to rest.

**Does the AUMF Permit the President to Target ISIL?**

Published on December 31, 2017

Edit article

View stats

 Habib Olapade Status is online

Habib Olapade

Student at Yale Law School

217 articles

The 2001 Authorization for Use of Military Force (AUMF) authorizes the President "to use all necessary and appropriate force against…those organizations…she determines planned, authorized, committed, or aided" the 9/11 attacks "to prevent any future acts of international terrorism against the United States by such organizations." The AUMF obviously applies to the terrorist organizations known as al Qaeda and the Taliban, since these groups were directly responsible for the 9/11 attacks. This means Congress has authorized the President to attack and/or detain all members of al Qaeda, including members who had nothing to do with the 9/11 attacks and even new members who joined al Qaeda after 9/11. By its terms, the AUMF also applies to organizations that aided al Qaeda in relation to the 9/11 attacks, harbored its members, or "associated, co-belligerent forces" that are affiliated with al Qaeda in its conflict with the U.S. This last class of organizations forms a key component of the war on terrorism because of changes in al Qaeda since 9/11. Before 9/11, al Qaeda was a relatively hierarchical and centralized, though geographically dispersed, organization that operated through small, autonomous clusters around the globe. Since 9/11, al Qaeda has become the leader of a more loosely connected, global

terrorism movement against the U.S. and other nations. Today, al Qaeda acts less through its own cells than through a confederacy of affiliated terrorist organizations around the world that it inspires, leads, and supports.

Standard delegation principles support the AUMF's extension to these organizations. In situations where constitutionally protected liberty interests do not mandate a clear statement requirement, delegations in the war context should be construed broadly to give the President flexibility to achieve the purposes for which the delegation was made. Consistent with this position, presidents in prior armed conflicts authorized by war declarations have exercised significant discretion in using force against entities other than those identified by Congress when those entities had a nexus to the named enemy. Moreover, the U.S has not historically limited the use of military force to conflicts with nation states: the executive branch has used force against slave traders, pirates, and Native American tribes; and non-state actors during the Mexican-American, Civil, and Spanish-American Wars.

This interpretation is consistent with longstanding Supreme Court precedent that statutes should be construed as consistent with international law; and most courts which have considered the question have deferred to the executive's perspective on this matter. It cannot be stressed enough, though, that while the executive is free to adopt combat restraints that comply with international law and, that the federal courts are bound to apply customary international law in the absence of other positive law, despite the fact that there is no general federal common law, the political branches can nonetheless supersede international law constraints through Article I § 7 procedures.

Nothing in this analysis thus far, however, has indicated how close the affiliation between a terrorist group and al Qaeda must be to make the group part of the same organization as al Qaeda. This factor is significant because the connections between al Qaeda and related non-state armed groups (NSAGs) – including the Islamic State of Iraq and the Levant (ISIL) can be tenuous at times even though the president claims that he has the authority to engage it in a single non-international armed conflict (NIAC). ISIL emerged from the remnants of al Qaeda in Iraq (AQI), an al Qaeda affiliate led by Abu Mu'sab al-Zarqawi that the U.S. fought in Iraq during the Sunni insurgency. In 2013, AQI changed its name to ISIL, and in 2014, after a power struggle with al Qaeda and some of its associates, ISIL cut all ties with al Qaeda. ISIL fought in the Syrian civil war, occupied significant territory in Iraq and Syria in the spring and summer of 2014, and declared a caliphate (a form of Islamic government) in June 2014. As part of its operations, it has committed a variety of atrocities including beheadings of a number of individuals – some of whom were American citizens.