TO: Dean Heather Gerken

Yale Law School

P.O. Box 208215

New Haven, CT 06520-8215

FROM: Habib Olapade

16160 Keith Harrow Blvd. Apt. 108

Houston, TX 77084



Exhibit X

Hi Dean Gerken!

I hope this letter finds you swell and that you are having a delightful summer! I received your letter on spring semester about two weeks ago and was told by Monica that I could appeal the decision by writing a letter to you personally. I regret that in my two years at the law school that this is the first time we are communicating with one another – I heard nothing but great things about you from Nate Persily and Rob Weisberg while I was studying under them on the west coast. I've just been quite busy during the first two years of law school. I also apologize in advance for the length of this message and its informality, but I figured that if I explained myself fully, we could have a more productive exchange that resulted in an outcome where everyone involved can feel vindicated and heard. I also don't think y'all may have all the information I have, which is why this may all be a misunderstanding.

When I was admitted to Yale Law School in the winter of 2017, I was ecstatic not only because I had been working towards that goal for four years in college but also, because I sincerely felt that YLS would provide me with an opportunity to pursue my chosen career path as an appellate litigator and liberal-Republican politician. Indeed, during my two (not three) years at Yale I've been a member of six journals (Yale Journal on Regulation, Yale Journal of Law and Technology, Yale Journal of International Law, Yale Law & Policy Review, Yale Journal of Law & Humanities, and Yale Journal of Health Policy, Law, and Ethics); provided pro bono work to seventeen organizations (the Temporary Restraining Order Project, ACS, the New Civil Liberties Alliance, Upturn, the New Haven Book Bank, the Connecticut Food Bank, Legal Aid for Hurricane Florence Victims, the New York Bar Committee Against Revenge Porn, the BALSA Pre-Law Mentoring Pipeline, the Stanford Interview Program, the Asylum Seeker Project, the Capital assistance Project, the Marshall-Brennan Project, the Asian American Legal Defense Fund, the Lowenstein Human Rights Project, IRAP, and the Colorado Pro Bono Appeals Project); campaigned for two candidates of two different parties (Krish Vignarajah and Angel Cadena); worked for six professors affiliated with Yale (Akhil Amar, John Witt, Myles Minor, Karin Yefet, Noah Messing, and Pat Weil); been active with eleven outside organizations that promote various causes (the Federalist Society, Republican National Lawyers Association, the NAACP, the Texas Appellate Advocate, Texas Appellate Bar Association, Florida Appellate Bar Association, Virginia Appellate Bar Association, Connecticut Appellate Bar Association, New York City Bar Association, New York Country Lawyers Association, Stanford Club of Houston, and the Houston Bar Association); and participated in four competitions (the ABA Diversity Moot Court, Morris Tyler Moot Court, VIS Moot Court, and the Transactional Law Competition). During my third year,

I was planning of doing most, if not all of these activities once again, and joining the Law and Feminism Journal while competing in the Barrister's Union spring semester just to ensure that I did everything that was offered here at Yale. I mention all of this not to 'toot my own horn' as we say down here in Texas but to express why I was taken aback by the news from spring semester. As I understand it, an academic disqualification from y'all does not simply signify poor performance but "indicate[s] a lack of capacity to complete a program of legal education and" a lack of capacity to "be admitted to the bar." I guess you all were really mad about me not doing the trial competition and that last journal, huh? The ironic part about all this is that I was studying for the bar (and still am) during the second semester. For what its worth, I can show you my 180-page bar outline and the date on the document showing the different save dates. I know the outline may not relate directly to the two failing grades, but I reckon they do have some relevance as to whether I can pass the UBE, right! I have attached the outlines to this message.

I know what you are thinking – just because you are active outside the classroom does not necessarily mean that your performance in the classroom will be up to snuff. And, I completely understand. Professors Ackerman, Torres, Tierney, and Brann graded the papers, and I suppose that if I were in your shoes, I would have deferred to them as well. But, aside from the fact that Yale Law is known as a hard club to get into but a club that it is nearly impossible to get booted out of, there are other factors at work here, that make this decision a bit curious. First, without trying to engage in self-promotion, I'm not really an academic slouch. I published eight papers in seven different journals during college, took ten law classes at Stanford Law School during college while I was ages 19-22, and graduated with distinction after entering Camp Stanford once you all admitted me (Habeas Corpus, Taxation I, First Amendment: The Speech and Press Clauses, Fourteenth Amendment, Election Law, Legislation and Regulation, Creation of the Constitution, Law and Sociology, American Legal History, and Law, History, Literature, and Philosophy Seminar,).

While most Stanford undergrads visit Camp Stanford at least once, I don't know of any undergraduate in the school's nearly 150-year history who has taken that number of law school classes while they were classified as an undergraduate (some students were able to take their bachelor degree in three years and start at SLS but that was in the 1950s I think). More than that, I maintain a legal blog devoted to appellate litigation, political law, private equity law, international commercial arbitration, antitrust, and patent law that has at least 60 posts and have done this while managing to submit over 370 pages in written work to your faculty in the last two years alone. If one took a conservative estimate of my future output, I would have been on track to submit a total of 550 pages while more aggressive projections would have placed my output at 900 pages. As Dean of the Law School, I recognize that you probably have more information on student records, but I've asked my friends there, and no one seems to know of anyone who has reached that number. Is it common for a 2L to get that far?

I also have several books coming out that should be done by late August: a book on private equity law, another on federal appellate practice, and the last 16 on appellate practice in Alabama, Texas, Mississippi, Louisiana, Virginia, Hawaii, California, Tennessee, Idaho, Montana, North Carolina, South Carolina, Kentucky, Maryland, Delaware, and Arkansas (even though I'm probably moving out to the West Coast if I were re-instated). I only wrote the southern series because I grew up in Texas and call that area home for the moment. Indeed, believe it or not, I had not been to a State outside of Texas, Louisiana, or Alabama until after my eighteenth birthday. I can provide the book drafts upon your request and have attached five here for your convenience and trust that you will not disclose them to anyone else. I was also planning on starting on, and completing, appellate treatises on practice in the New England states and a ~35 state series on state election laws during my third year and there are some drafts of those books that I can provide as well. Indeed, the Texas book already has some political law entries.

But enough about me! I only mention all these facts to provide you all with all the information that I have so you guys can make an informed decision moving forward. The real reason I suppose I'm writing to you has to do with the three failing grades. When I found about the three grades, I had three thoughts and let me know whether, I'm on point or not. First, I thought okay, maybe the professors did not like the papers as a matter of substance. But, I wasn't all that sure about that explanation because Professors Brann, Tierney, and Torres never sent messages critiquing my papers. In fact, I only received a message from Professor Ackerman and while he seemed receptive towards the paper's quality, he told me he was downing me for participation (more on this later). To date, despite emailing both Professors Tierney, Brann, and Torres, I have yet to hear back with any explanation (I have attached the emails to this message). This silence is even more troublesome because my paper for Professor Torres (which I have attached) spanned 50 pages and argued that the U.S. government ought to provide more protection to domestic violence victims on Native American reservations. I'm not the most liberal guy but I don't think the GOP is particularly opposed to VAWA and, while I can only guess as to Professor Torres' personal opinions, I don't think he would be opposed to it either. So, what was wrong? He didn't tell me and I don't know if he told y'all. On the other hand, my paper for Professors Tierney and Brann, the two Maine State officers, was about 60 pages and dealt with Texas oil and gas law. I personally don't know if Professors Tierney or Brann have ever litigated down here or even been here. But there is a first time for everything, right? Also, the paper devoted at least one section – about 8 pages to arguing that *Williamson Cty. Planning v. Hamilton Bank*, 473 U.S. 172 (1985) ought to be overturned. And, as I'm sure you know, the Court followed suit about a month later. Usually, when students are able to predict something like that, they pass. I didn't, though. My eight ball is broken for the moment! But what was wrong? They didn't tell me and I don't know if they told y'all.

Second, I thought "okay, maybe I'm being accused of plagiarism." After all, the law school may have only a hand full of students in its 200-year history who have submitted more than 370 pages of work in its history, and if you didn't know anything about me, I suppose the work product would be suspicious. That decision, though, does not make sense because the university has pre-set procedures for handling plagiarizers and I was provided with no process. Also, outliers do things that are far from the bell curve: is it a coincidence that one of the few students who managed to take ten law school courses at a T-3 institution in college managed to break the paper record at a peer institution while maintaining an active life outside law school? These are the kind of questions that myself, my family, and other people in the public are going to ask if we can't resolve this in private.

Finally, I thought: "okay, maybe this is a participation issue?" That's where things get a bit more complicated. As an initial matter, I'm not quite sure why participation is suddenly being held up as an end-all be-all here. It's common knowledge around the law school that there are more than a few students who live in New York or Boston and do their work from home. These folks are open and honest about their lifestyle now, are willing to be open and honest in the future in front of others, and it's a tad odd why I'm being downed for participation while these guys and gals are not being disciplined. Second, the law school ironically prides itself as a place where students can engage with the community. Heck, arguably the law school's most famous alumnus, for better or worse, Bill Clinton, has a biography where he himself brags about how he skipped class during the 1970s. I know what you are thinking: the 1970s? Things have changed. And, you are right! The ABA Standards, though, have not. Indeed, Clinton was subject to the same attendance and academic disqualification standards and never was dismissed while you all are focusing on me. Again, I appreciate your fervor, but I can't help but notice that there are folks from more mainstream backgrounds doing the same thing but not receiving letters from you.

During the fall of 2017, I reported several unsavory incidents to your associate Ms. Cosgrove (I have printed out the email and attached it to this message). While one of the persons identified in the complaint was eventually given a formal punishment in a State court, the others were not. The incidents, however, did not stop and Ms. Cosgrove was not necessarily a beacon of southern hospitality. These incidents were in large part responsible for my absences because I came to believe that you all didn't really think it was a problem despite my messages. I understand that as the leader of the best law school in the U.S., you have to allocate resources and make judgment calls for public-relations purposes and, as a minority in a mainstream institution, I tried my hardest to negotiate YLS while keeping this problem from reaching your desk because I know you are busy. And, I would have been able to do it had this letter not been sent.

So why did I remain quiet? Two primary reasons. First, I wanted to take my degree because I've been working to be a lawyer since I was knee high, of course! Here was my plan: I came to Yale wanting to be an appellate attorney and a politician. Because I don't know if my professors will back me for a SCOTUS clerkship, I've more or less assumed that I ought to prepare for the political arena. Here was my plan of action: join every journal, participate in every club, write papers, publish my books now (as a heuristic that voters can use to assess intelligence), be active, campaign for others, and, just take the YLS degree after three years before heading off to Oxford for a BCL and taking the UBE for bar admission in the 38 states that accept the test. After the BCL, I was planning on joining a Wall Street investment bank to generate the funds for a political campaign while leveraging the appellate treatises and election law books I am set to release to provide pro bono services to candidates in other states, intervene in federal and state appellate courts across the nation, and file amicus briefs in those courts as well. That way, I would have had more than enough income, been able to practice appellate and election law, had a viable political career, and been able to live with my family and significant other in peace, all while imposing minimal costs on my professors. After all, I can completely understand why I might not be able to clerk from Yale but I don't think it would have been too much to ask Professors Amar or George Priest to send me off to Oxford and then help me get into a Wall Street bank, right?

Second, had I been more vocal with you and others about this problem earlier, no one would have won and the result would have arguably have been racist and sexist. Think about it. In the message I sent to Miss Cosgrove, close to 75% of the named individuals were Caucasian and nearly half were male. Yet, the only individual who was ultimately punished was a Latina from South Florida. It is impossible for me to believe that race had nothing to do with this and to be honest, I think the Caucasian students ratted on this woman admitting her conduct while protecting themselves. More than that, had I been more vocal, I would have ruined my budding career as a liberal-Republican in the GOP because no one on the right wants to be associated with an anti-discrimination suit or complaint. If anything, I would have had to become a bluedog and that species has been extinct down here since the 1990s! Finally, because, for better or worse, y'all did not do anything, you, the first female dean in the law school's history would have been implicated as well in a negative public relations move that you and I both want to avoid because I'm not trying to put a blot on your historic deanship. So, just to cap off: an African American male, a Latina, and the first female law dean in YLS' history would have suffered while the majority of the Caucasian males who caused the incidents in the attached email would have gotten off scotch free. If that is not a horror story co-written by Derrick Bell and Kat Mackinnon, I don't know what is.

Finally, the last reason I'm sending this letter is because I can't quite figure out the logic behind the decision here because it might be illegal. Yale receives federal funding, right? As such, the school is subject to 42 U.S.C. 2000d, which provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance." To make out a prima facie showing under this statute, all I would have to show is that I am "a member of a protected class; (2)…[I] suffered an adverse action in pursuit of…[my] education; (3)…[I] was treated differently from similarly situated students who are not members of the protected class; and (4)…[I] was qualified to continue in…[my] educational pursuit." I meet this standard because I'm an African-American male, y'all disqualified me academically under ABA rules because, in your opinion, I lacked the capacity to receive a law degree from an ABA accredited institution, there are Caucasian students who engaged in the same conduct I did who have not been subject to similar treatment, and I'm qualified to continue my studies. I know what you might say. Well, one, you were not treated differently than other students in the class because they attended sessions and I'm not qualified to continue because I received two failing grades. Good. Two race neutral reasons. But, both are arguably pre-texts. First, I never received a decision on why the papers received the grades they did and if this case were to become public the papers the other students submitted would not be privileged from discovery. If anything, I might need to get the consent of the students under FERPA but that probably will not be a problem. Moreover, I sincerely doubt that any student turned in a paper in either course that was sixty single spaced pages long or that displayed the level of analysis on par with the paper I submitted. I don't know this but you might. Second, to the extent that the grades are a product of my lack of participation, the only reason I was absent was because I made several complaints to Miss. Cosgrove about unsavory racial incidents that occurred on campus. Not only did she not take action, not one student was disciplined by the law school despite the fact that at least one person was convicted in a State court for the offenses I described. It's usually the other way around, right? Schools have codes of conduct that render students eligible for discipline for violating school regulations even though the regulations themselves do not target conduct that a state or the federal government has labeled a crime. The point here, though, is that my lack of participation is a direct result of threats I received due to my ethnicity. I supposed you could say I never communicated this to you. But, would others outside this community find that it was objectively unreasonable for me to not voice my complaints to you when nothing was done by y'all in the first instance even after the police actually did act? It would have been akin to barking up the wrong tree.

We also can't ignore the context here – and this is important because these are the questions folks are going to ask you and me if we can't solve this internally. How is it that the sole African-American male on the most journals at the school has been academic disqualified by a majority-Caucasian faculty, while students who are on 1/6[th] that number are receiving clerkships and adamant backing? Why is this institution paying several faculty members who have only published articles six figures but academically disqualifying a student with three books when all he wants to do is take a degree and remain a part of the community? Why are most of these students who come from upper class backgrounds permitted to stay and treated as qualified pupils whilst this African American male is being asked to leave notwithstanding his history of service to New Haven and the communities beyond in seventeen pro bono organizations when there is not one student in the school's history has served on that same number of charity associations during their time in law school? How can it be that this African American male was able to handle the law school curriculum at Stanford while he was two years out of high school but is suddenly unable to do so now that he is three years older? Why is this African-American man being forced into another profession after turning in 370 pages of material in two years when, historically speaking, that may well be a record high for the law school and may never be done again? Why was the student not given a second chance to turn in the missing assignments and summarily expelled with six figures of debt? If this student is academically disqualified, what about all the professors who gained their degree from this institution without posting similar numbers?

I don't have answers to these questions, which is why I personally can't figure out why you all have sent this letter to me and upset my efforts to protect several members of this community that I care about

including some of the members of your staff. I'm even more confused because the lack of response here might also be actionable as a deliberate indifference claim under the same statute. Here, all I would have to show is that (1) y'all could have "control[led]" the students , (2) "the harassment was severe and discriminatory," (3) Miss. Cosgrove or Miss. Maldonado "had actual knowledge" of the events, and (4) y'all "responded inadequately to the harassment." Based on what I've told you thus far, I don't think I would have a problem demonstrating all this. What's more, when I asked Miss. Maldonado and Miss. Calvert to send a certification and my information over to HLS and Chicago for transfer consideration, both those offices reported that the documents from you all had never been received. I've attached the print screens from those offices to this letter. For your convenience I have sent along the Second Circuit and Connecticut District Court cases that I found on this issue and that speak to this problem.

To be clear, I don't want to sue because I want to take my degree and live happily ever after with my significant other after going to Oxford and working on Wall Street. I only mention all this for two quite comical reasons. First, did you talk to your GC about all this and did you have all the facts I have? I've never worked for a school legal counsel office before but even I was able to come up with this. And I know for a fact that there are licensed attorneys in Houston right now who couldn't do the same. This is why to be completely honest with you, I'm not really quite sure what defenses y'all could raise, which is why I can't figure out why you sent the letter in the first place. Marc Galanter may have been right about repeat players and one-shotters but there are limits even to this. Money can't make evidence demonstrating each element of a claim magically go away, make a summary judgment motion succeed when there are material facts in dispute, or make a preliminary injunction go away. Second, even you have to admit that it is a tad ironic that after academically disqualifying me for an inability complete the requirements for a juris doctor, that this was my response. Its as if Edward Munch was kicked out of art school for incapacity and responded to the ruling with a letter that had The Scream attached to it. Think of this as my John Oliver moment.

To be clear, I am not working against you. I was only silent because I thought I could handle this problem privately without placing a stain on your deanship. More than that, I'm willing to sign a claim waiver and a confidentiality agreement to make this problem go away if I can come back and you all can assist me in going off to Oxford and Wall Street or, send me to HLS so the folks there can do the same. I realize this request is a tad blunt but I don't think I'm being unreasonable: of the six hundred students you currently preside over and the school's countless alumni, I suspect that I'm on the most journals (6), the most pro bono groups (17), have participated in the most competitions (4), have published the most books (soon to be ~16), and hold the record for the most pages of written work submitted to your colleagues (370) and these numbers would have been higher had I been permitted to stay for the last year. Just in case you don't believe me, I have attached an excel spreadsheet that compares these statistics to comparable numbers posted by 150 YLS alumni who have worked for the OLC, OSG, V-50 firms, and top law schools, and held positions of influence in Congress, the Executive Branch, and Article III or State courts. I couldn't believe the numbers when I saw them and I think you might be shocked as well. Yes, the sample may not be representative because most YLS students never reach any of these points, but to the extent that it is unrepresentative, don't you think it highlights how messed up this situation might be? I don't have the numbers but none of this information would be privileged from discovery or alumni subpoena requests so you actually might have a better idea than I do. You may disagree with this and I suppose all this may come as a shock. But I really hope we can resolve this matter informally if for no other than reason than the fact that any law firm that is dragged into this mess, if it is staffed by Yalies, might ironically have to explain why it is also employing associates at a six figure rate who graduated from YLS when in all likelihood these individuals will have lower secondary journal numbers, article publication numbers, academic competition entries, professor research assistantships, pro bono involvement numbers, book publication numbers, etc. It sounds funny but could you imagine how Kafkaesque that would be? If y'all decide that

we have to resolve this in court and can't just reach an agreement where I'm allowed to go about my original strategy, no one is going to ignore the fact that the lawyers you hire to defend an academic disqualification suit will in all likelihood have inferior law school credentials to the very student you will be trying to dismiss. You might just say that I'm blowing hot air but the excel spreadsheet attached here includes entries from every YLS grad working at the D.C. offices of Williams & Connelly, Covington, and Kirkland and Ellis. I'm not going to summarize the figures because you can draw your own conclusions and I don't delight in comparing myself to others, but you can't honestly believe that a federal judge would look at this spreadsheet and take this seriously.

Make no doubt about it, though, Dean Gerken: I want to stay. I'm African-American, I'm a liberal Republican and I'm proud of that and I would have thought that you would have been too because in almost all instances the students at the top of the class at this school tend to be affluent Caucasian men or women. This is a sign of genuine progress and rather than expelling the African-American student who did all of this perhaps the response should be a bit warmer. After all, had you asked a YLS faculty member whether an African-American male could have pulled all this off as a student in say, 1980, I don't think the response would have been a lukewarm 'yes.' I'm not asking you to back me for the Supreme Court, I'm not asking you for your money, all I want is to be rendered what I am due at a minimum so I can carry on with my life abroad and provide for my family.