

Olapade                                                                                         DRAFT

*Heads Outside Counsel Wins, Tails In-House Attorneys Lose – How Corporate America Can*
*Reduce Multijurisdictional Litigation Costs*

I.    *Introduction*

The Du Pont Company's gradual acquisition of several departments within General Motors during the early twentieth century was the sort of "restraint of trade" that Ohio Senator John Sherman had in mind during 1890. By 1923, Du Pont had acquired twenty-three percent of GM's outstanding common stock as well as the conglomerate's fabrikoid, pyralin, paint, varnish, rubber cloth, and celluloid departments. The result was that several members of the Du Pont family had managed to procure valuable positions managing General Motors in route to acquiring over $1 billion over the next three decades during the Great Depression.

This castle in the air, however, came tumbling to the ground once the Justice Department's Antitrust Division and the Federal Trade Commission decided to charge the Du Pont company and members of the family itself with a conspiracy to restrict trade in tires and other automotive products in violation of §7 of the Clayton Act. John Marshall Harlan II, a newly minted antitrust partner at the New York firm of Ballantine, Harlan, Bushby, and Palmer, who had gained notoriety defending New York socialite Ella Wendell's estate from two thousand claimants, received the privilege of representing Pierre and Irènèe Du Pont in the suit. While Harlan would not remain with the firm throughout the entire Du Pont antitrust litigation after his friend, Herbert Brownell, recommended him for a position on the Second Circuit, the Du Pont Company's general practice of retaining one firm for all its legal needs without seeking competitive rates from other law firms was indicative of the fact that the Second Justice Harlan practiced antitrust and estates law in a simpler time.

In the words of Harvard Law School Professor Mary Ann Glendon, this was an era when "clients were like the hats of Beacon Hill matrons: one didn't get them, one had them." After law firm revenues rose twelve percent from 1977 to 1989, this all changed, however, once economic concerns became increasingly grave and the well-known firms Finley and Kumble, Gaston and Snow, and Herrick and Smith disappeared from the legal landscape. Firm competition for clients in tandem with cheaper legal services abroad rightly translated into the creation of in-house departments, increased demands for billing disclosure, demands for specialization among partners and newly hired attorneys, as well as a gradual reluctance to "spoon feed" associates earning prime salaries with training in procedural or substantive areas of their specialty practice area. While most of these changes are old news, as this article recounts, corporate counsel have neglected at least one other area of their relationship with outside firms that has not yet adapted to this new reality: choice of law rules in multijurisdictional litigation that add needless complexity to dispute settlement and serve no other function than to prompt corporate attorneys with limited resources to hire out full service litigation firms. This article offers a simple legislative solution and proceeds in four parts. Part II provides a brief diagnosis of the current choice of law regime and explains how the Supreme Court came to abandon strict supervision over State choice of law. Part III explores potential limits that the Privileges and Immunities and Dormant Commerce Clause could impose on State choice of law doctrine but concludes that judicial supervision would be imprudent. Part IV highlights legislative solutions that Congress could pursue under the Full Faith and Credit Clause and explains why this provision, contrary to claims of previous writers, provides an affirmative grant of power that permits Congress to pass a national choice of law statute. Finally, and perhaps, most importantly, Part V explains why a national choice of law statute would be

Olapade                                                                      DRAFT

entirely consistent with the current corporate law regime by highlighting the countless ways that the federal government regulates this ostensibly State-centric field.

II. *Choice of Law Primer*

Readers might find this introduction helpful because in the words of William Prosser, one of the Deans of Tort law, "the realm of conflict of laws is a dismal swamp, filled with quaking quagmires, and inhabited by learned but eccentric professors who theorize about mysterious matters in a strange but incomprehensible jargon." With the result that "the ordinary court, or lawyer, is quite lost when engulfed and entangled in it."[1] Choice-of-law matters ought to be of more interest to constitutional scholars because, as Justice Jackson once argued, the U.S. Constitution establishes a limited set of secondary rules that state actors must comply with and choice-of-law questions implicate the allocation of authority among the several states.[2]

"Choice of law" is necessary when a subject is committed to state (rather than federal) law, the parties' dispute arguably implicates the laws of more than one state, and the legal rules that would apply in resolving the dispute differ among the states.[3] Tort litigators often deal with matters that meet these conditions but choice of law problems are also common in contract and internal corporate affairs. In the absence of a federal statute, the law governing choice of law is state law generated almost entirely by state courts – although a vanishingly small number of state statutes, most which are from Louisiana, and have roots in that state's peculiar French civil law tradition, do prescribe choice of law in some matters.[4] By way of background, from the mid-eighteenth to the early twentieth centuries, the several states produced a rather inconsistent system of territorial choice-of-law rules.[5] These rules were summarized in Joseph Beale's famous tract, *A Treatise on The Conflict of Laws*, and the First Restatement despite vigorous academic criticism of Beale's central premise that a right vested under the law of the place where the last event necessary to assertion of the right transpired.[6] Despite the availability of alternative theories proffered by David

---

[1] William Posser, *Interstate Publication*, 51 MICH. L. REV. 959 (1953).

[2] Robert Jackson, *Full Faith and Credit – The Lawyer's Clause of the Constitution*, 45 COLUM. L. REV. 1 (1945).

[3] RESTATEMENT (SECOND) OF CONFLICT OF LAWS §1 (1971); see also Fioretti v. Massachusetts Gen. Life Ins. Co., 53 F.3d 1228 (11th Cir. 1995); Shannon-Vail Five Inc. v. Bunch, 270 F.3d 1207 (9th Cir. 2001); Elson v. Defren, 283 A.D.2d 109, 726 N.Y.S.2d 407 (2001); Gen. Acc. Ins. Co. v. Mortara, 314 Conn. 339, 101 A.3d 942 (2014); Elgar v. Elgar, 238 Conn. 839, 679 A.2d 937 (1996); Am. States Ins. Co. v. Allstate Ins. Co., 94 Conn. App. 79, 891 A.2d 75 (2006), aff'd, 282 Conn. 454, 922 A.2d 1043 (2007); William Morris Endeavor Entm't, LLC v. Cantor, No. 1:11-CV-24470-UU, 2012 WL 13014664 (S.D. Fla. Mar. 2, 2012); Cruz v. United States, 387 F. Supp. 2d 1057 (N.D. Cal. 2005).

[4] Robert Leflar, *Choice of Law Statutes*, 44 TENN. L. REV. 951 (1977); Symeon Symeonides, *Exploring the Dismal Swamp: The Revision of Louisiana's Conflicts Law on Successions*, 47 LA. L. REV. 1029 (1987); Symeon C. Symeonides, *Louisiana Conflicts Law: Two "Surprises"*, 54 La. L. Rev. 497, 498 (1994); Kenneth M. Murchison, *The Judicial Revival of Louisiana's Civilian Tradition: A Surprising Triumph for the American Influence*, 49 La. L. Rev. 1, 2 (1988); Nikolaos A. Davrados, *Louisiana My Home Sweet Home: Decodifying Domicile*, 64 Loy. L. Rev. 287, 332 (2018); Symeon C. Symeonides, *The Conflicts Book of the Louisiana Civil Code: Civilian, American, or Original?*, 83 Tul. L. Rev. 1041 (2009); Symeon C. Symeonides, *Louisiana's New Law of Choice of Law for Tort Conflicts: An Exegesis*, 66 Tul. L. Rev. 677, 680 (1992).

[5] See Lea Brilmayer, CONFLICT OF LAWS: FOUNDATIONS AND FUTURE DIRECTIONS 91 (1991).

[6] RESTATEMENT OF CONFLICT OF LAWS (1934); David Cavers, *A Critique of the Choice-of-Law Problem*, 47 HARV. L. REV. 173 (1933); Walter Cook, *The Logical and Legal Bases of the Conflict of Laws*, 33 YALE L.J. 457 (1924); Ernest Lorenzen, *Territoriality, Public Policy and the Conflict of Laws*, 33 YALE L.J. 736 (1924).

Olapade                                                                                                    DRAFT

Cavers,[7] Albert Ehrenzweig,[8] Robert Leflar,[9] Arthur Mehren and Donald Trautman,[10] and Russell Weintraub,[11] Professor Brainerd Currie's interest analysis which cautioned courts to consider each state's interest in applying its own law was the most influential theory of the time.[12] To make this determination, it was necessary to examine the substantive laws of the relevant states and assess whether the interests sought to be effectuated by those laws would be compromised were the laws not applied in the given case. Professor Currie assumed that state interests in regulation were not necessarily coincidental with the territory; thus, states might be interested in extraterritorial application of their laws to benefit their domiciliaries, and might decline to apply their laws even within their borders if the effect was to benefit an outsider at the expense of a domiciliary.[13] If interest analysis revealed that only one state had an interest in applying its law to a particular dispute, Professor Currie reasoned that there was a "false conflict," and that the law of the only state with an interest should apply.[14] A true conflict existed, however, if more than one state had an interest. In these matters, instead of attempting to "weigh" the relative interests of the interested states, Professor Currie recommend that the court in question apply its own law.[15] Other conflicts of law scholars applauded Currie's admonitions on false conflicts and the notion that state courts should dictate state choice of law but reject the claim that forum law ought to be adopted in all true conflicts cases. Two theories are relevant here; the first, a proposal from Stanford Law Professor William Baxter, that courts apply the law of the state whose interests would be impaired the most if its law were not applied (otherwise known as the "comparative impairment" thesis among conflict of laws scholars),[16] the second, Robert Leflar's cryptic caution that courts accept the "better law."[17] Professor Baxter's theory ultimately feel out of vogue because state courts, naturally, fell under the impression that their interests were most effected in the matters before them.[18] In a similar vein, the Leflar thesis while intuitively appealing also under-delivered because, unsurprisingly, each forum thought that that its own law was better than that of its sister states.[19]

The Second Restatement attempted to bridge the gap amongst all these theories by directing courts to apply the law of the state with the most significant relationship to the controversy after considering every other factor thought to be relevant under all the other extant theories.[20] Scholars

---

[7] David Cavers, THE CHOICE OF LAW PROCESS (1965).

[8] Albert Ehrenzweig, A TREATISE OF THE CONFLICT OF LAWS (1962).

[9] Robert Leflar, AMERICAN CONFLICTS LAW (1977).

[10] Arthur Mehren and Donald Trautman, THE LAW OF MULTISTATE PROBLEMS (1965)

[11] Russell Weintraub, COMMENTARY ON THE CONFLICT OF LAWS (1986).

[12] Brainerd Currie, SELECTED ESSAYS ON THE CONFLICT OF LAWS (1963).

[13] See, e.g., Lea Brilmayer, CONFLICT OF LAWS: FOUNDATIONS AND FUTURE DIRECTIONS 50-70 (1991).

[14] Brainerd Currie, SELECTED ESSAYS ON THE CONFLICT OF LAWS 183-84 (1963).

[15] Id.

[16] William Baxter, *Choice of Law and the Federal System*, 16 STAN. L. REV. 1 (1963).

[17] Robert LeFlar, *Conflicts Law: More Choice-Influencing Considerations*, 54 CAL. L. REV. 1584 (1966).

[18] See, e.g., *Bernhard v. Harrah's Club*, 546 P.2d 719 (Cal.1976).

[19] Wiliam Reppy, *Eclecticism in Choice of Law: Hybrid Method or Mishmash?* 34 MERCER L. REV. 645 (1983); see also Larry Kramer, *On the Need for a Uniform Choice of Law*, 89 MICH. L. REV. 2134 (1991).

[20] RESTATEMENT (SECOND) OF CONFLICT OF LAWS §6 (1971); *Fishback Nursery, Inc. v. PNC Bank, Nat'l Ass'n*, No. 18-10090, 2019 WL 1548823 (5th Cir. Apr. 10, 2019); *Asher v. Unarco Material Handling, Inc.*, 737 F. Supp. 2d 662 (E.D. Ky. 2010); *Daynard v. MRRM, P.A.*, 335 F. Supp. 2d 156 (D. Mass. 2004); *Perkinson v. Courson*, 2018 IL App (4th) 170364, 97 N.E.3d 574; *Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56 (Tex. App. 2004); *Cates v. Creamer*, 431 F.3d 456 (5th Cir. 2005); *Burleigh v. Alfa Laval, Inc.*, 313 F. Supp. 3d 343 (D. Mass. 2018); *Alifax Holding SpA v. Alcor Sci. Inc.*, 357 F. Supp. 3d 147 (D.R.I. 2019); *Smith v. Church Mut. Ins. Co.*, 254 So. 3d 57 (Miss. 2018), reh'g denied (Oct. 18, 2018); *Alarcon v. Velazquez*, 552 S.W.3d 354 (Tex. App. 2018), review denied (Sept. 28, 2018); *Vanderbilt Mortg. & Fin., Inc. v. Posey*, 146 S.W.3d 302 (Tex. App. 2004); *Howe v. Goldcorp*

3

Olapade                                                                                    DRAFT

who took a liking to the territorial and jurisdiction selecting qualities of the First Restatement but disliked some of the bizarre results produced in disputes where the events occurred in a random location unrelated to the parties' domicile, proposed that rules similar to the First Restatement be presumptively applicable but subject to a higher likelihood of displacement when it was clear that another state had substantially greater contacts with the dispute. The Second Restatement was also notable for two additional reasons. First, under the revised approach, it was no longer true that a single state's law governed a dispute regardless of where the matter was litigated. Second, and perhaps more importantly for government and corporate litigators, choice of law ceased to exist as a neutral process that impacted both of the parties equally. Instead, in the absence of strategic manipulation of 28 U.S.C. § 1404 or a choice of law provision in the relevant contract or merger agreement, the party that won the race-to-the-courthouse, in selecting the forum, could determine which state's law would apply in the process. The result was that the Second Restatement was a veritable hodgepodge directing courts to compare Gainsboroughs, Toulouse-Lautrecs, Stieglitzs, and Raphaels to determine which state's law to apply. The revised rule's ostensible virtue was that it provided courts with the opportunity to consider all the relevant factors and then tailor its choice to the case at bar. The problem? Discretion begot disability. Courts cherry-picked factors leading to a lack of certainty for the business community in tort, contract, and corporate cases – areas where, in the words of Justice Holmes, it is critical that the law "go on as before."[21]

In the 1980s, the academic discussion regained fervor as Lea Brilmayer,[22] John Hart Ely,[23] Michael McConnell,[24] Linda Silberman,[25] among others, all offered some criticism of the Second Restatement theory in favor of some modified version of territorialism that eschewed focus on vested rights. The judicial reaction to all this has been mixed as a majority of states have adopted one or more of the newer theories.[26] Given that any of the modern approaches would have produced indeterminacy and bias even if they had been adopted in identical terms by all fifty states, perhaps it is no surprise that the problem has been compounded as different states have adopted different choice of law theories.[27] Lack of consistency and coherence in many state court opinions has made tracking even more difficult.[28] Thus far, however, the First Restatement remains the law

---

*Investments, Ltd.*, 946 F.2d 944 (1st Cir. 1991); *Stephens v. Norwalk Hosp.*, 162 F. Supp. 2d 36 (D. Conn. 2001); *Lexecon, Inc. v. Haft*, 914 F. Supp. 4 (D.D.C. 1996); *Elliott v. The Marist Bros. of the Sch.*, 675 F. Supp. 2d 454 (D. Del. 2009); *Organ v. Byron*, 435 F. Supp. 2d 388 (D. Del. 2006); *Beals v. Kiewit Pac. Co.*, 825 F. Supp. 926 (D. Haw. 1993); *Northland Ins. Co. v. Truckstops Corp. of Am.*, 914 F. Supp. 216 (N.D. Ill. 1995); *Acuity Brands, Inc. v. Bickley*, 172 F. Supp. 3d 971 (E.D. Ky. 2016), on reconsideration in part, No. CV 13-366-DLB-REW, 2017 WL 1426800 (E.D. Ky. Mar. 31, 2017); *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304 (D. Mass. 2013); *Geshke v. Crocs, Inc.*, 889 F. Supp. 2d 253 (D. Mass. 2012), aff'd, 740 F.3d 74 (1st Cir. 2014); *Bergin v. Dartmouth Pharm. Inc.*, 326 F. Supp. 2d 179 (D. Mass. 2004); *Pennzoil-Quaker State Co. v. Am. Int'l Specialty Lines Ins. Co.*, 653 F. Supp. 2d 690 (S.D. Tex. 2009); *Festor v. Wolf*, 647 F. Supp. 2d 750 (W.D. Tex. 2009); *Reed v. Islamic Republic of Iran*, 439 F. Supp. 2d 53, 65 (D.D.C. 2006), on reconsideration in part, 242 F.R.D. 125 (D.D.C. 2007).
[21] *Johnson v. United States*, 163 F. 30 (1st Cir. 1908); see, e.g., Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. CHI. L. REV. 1175 (1989).
[22] Lea Brilmayer, *Shaping and Sharing in Democratic Theory: Towards a Political Philosophy of Interstate Equality*, 15 FLA. ST. U. L. REV. 389 (1987).
[23] John Hart Ely, *Choice of Law and the State's Interest in Protecting Its Own*, 23 WM. & MARY L. REV. 173 (1981).
[24] Michael McConnell, *A Choice-of-Law Approach to Products-Liability Reform* in NEW DIRECTIONS IN LIABILITY REFORM 90 (1988).
[25] Linda Silberman, *Can the State of Minnesota Bind the Nation?: Federal Choice-of-Law Constraints After Allstate Insurance Co. v. Hague*, 10 HOFSTRA L. REV. 103 (1981).
[26] Harma Kay, *Theory Into Practice: Choice of Law in the Courts*, 34 MERCER L. REV. 521 (1983).
[27] See, e.g., Michael Solimine, *An Economic and Empirical Analysis of Choice of Law*, 24 GA. L. REV. 49 (1989).
[28] Larry Kramer, *Return of the Renvoi*, 66 N.Y.U. L. Rev. 979 (1991).

in a few states, however, and a handful have clearly adopted Professor Currie's interest analysis.[29] On this matter, life in litigation concerning multi-state disputes involving state substantive law hasn't been better. A crafty counsel, before filing suit, can simply survey the choice of law rules in the state where service can be effected and sue in whichever jurisdiction whose choice of law rules are likely to result in application of the substantive law most favorable to the client's cause. To be sure, this incentive does not cut in one direction. There are natural disincentives for filing in a foreign jurisdiction or one that is in an unfamiliar region for the attorney: the cost of litigation is often higher, if the attorney does not work for a White Shoe firm, has not taken the Uniform Bar Exam (or an analogue), or for some reason is not admitted to practice in the jurisdiction and cannot work on the matter *pro hac vice*, outside counsel will have to retained to deal with less familiar trial court procedures. The menu of potential forums is also often lengthy because of long-arm statutes and broadened conceptions of *in personam* jurisdiction.[30] More than that, a not-insubstantial percentage of cases that call for choice of law can be litigated in federal court on the basis of the federal diversity statute, 28 U.S.C. § 1332 even though the cause of action is based on state law.[31]

The Supreme Court, though, has all but abandoned the field as it has never considered a Privileges and Immunities Clause challenge to a state choice-of-law rule and has gutted the Full Faith and Credit Clause such that a "court can lawfully apply either the law of one state or the contrary law of another" so long as it has a sufficient interest in doing so.[32] Some scholars have speculated that the Court's relegation of choice-of-law matters to state courts is due in large part to Justice Joseph Story who drew heavily on Dutch legal works such as Ulrich Huber's *De Conflictu Legum Diversarum in Diversis Imperiis* and analogized American states to European nations in his highly influential writings on the matter.[33] In any event, the death knell for enforcement rung in 1981 when in *Allstate Insurance Co. v. Hague*, the Court upheld Minnesota's application of its own law to invalidate a clause in an insurance policy in Wisconsin to a Wisconsin resident killed in a Wisconsin accident.[34] There, the Court implied that it would invalidate a state's choice of its own law only when the State had "no significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction."[35] The problem? It was manifestly clear from the Court's disposition of *Allstate* that the hypothetical case that would not involve any relevant contacts was a sport because Wisconsin was the clear locus of the accident.[36] The practical result is that with the exception of a few intervening cases, the Full Faith and Credit Clause imposes nary a limit on a state's power to apply its own law to benefit a

---

[29] Gregory Smith, *Choice of Law in the United States*, 38 HASTINGS L.J. 1041 (1987).

[30] See, e.g., Wendy Perdue, *Personal Jurisdiction and the Bettle in the Box*, 32 B.C. L. REV. 529 (1991).

[31] 28 U.S.C. § 1332.

[32] *Alaska Packers Assn. v. Industrial Accident Comm'n*, 294 U.S. 532 (1935); *Hughes v. Fetter*, 341 U.S. 609 (1951); *Order of United Commercial Travelers of America v. Wolfe*, 331 U.S. 586 (1947); *Sovereign Camp of Woodmen of the World v. Bolin*, 305 U.S. 66 (1938); *John Hancock Mut. Life Ins. Co. v. Yates*, 299 U.S. 178 (1936); *Nevada v. Hall*, 440 U.S. 410 (1979); *Clay v. Sun Ins. Office, Ltd.*, 377 U.S. 179 (1964); *Carroll v. Lanza*, 349 U.S. 408 (1955); *Watson v. Employers Liab. Assur. Corp., Ltd.*, 348 U.S. 66 (1954); *Pacific Employers Ins. Co. v. Industrial Accident Comm'n*, 306 U.S. 493 (1939).

[33] Geoffrey Hazard, *A General Theory of State-Court Jurisdiction*, 1965 SUP. CT. REV. 241.

[34] 449 U.S. 302 (1981).

[35] *Id.* at 308.

[36] Douglas Laycock, *Equal Citizens of Equal and Territorial States: The Constitutional Foundations of Choice of Law*, 92 COLUM. L. REV. 249 (1992).

Olapade                                                                            DRAFT

resident litigant.[37] This state of affairs is problematic for at least two reasons. First, as Justice O'Connor has argued, state courts of last resort can avoid federal review via writ of certiorari by offering a disingenuous ground for deciding the matter that nonetheless qualifies as an adequate and independent state ground under 28 U.S.C. §1257.[38] Second, and perhaps more importantly, the absence of a federal rule leaves fifty different jurisdictions that are not necessarily impartial on the matter to decide a matter implicating interstate relations.[39] The result, predictably, has been a brouhaha.[40]

### III. *The Promise of the Privileges and Immunities and Dormant Commerce Clauses*

This perilous state of affairs become all the more problematic once one considers that the current choice of law regime might violate the Privileges and Immunities Clause. That Clause reads that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."[41] In the words of Justice Thomas, "unlike the Equal Protection and Due Process Clauses, which have assumed near-talismanic status in modern constitutional law, the Court [has] all but read the Privileges or Immunities Clause out of the Constitution."[42] Of course, the *Slaughter-House Cases* are the source of this mischief. There, the Court reasoned that the privileges or immunities of citizens guaranteed under the Fourteenth Amendment were limited to those few liberties belonging to U.S. citizens as such as the right to petition Congress or travel to the national capitol. A closer reading of the constitution calls this conclusion into question. Indeed, as Justice Gorsuch,[43] Akhil Amar,[44] Bryan Wildenthal,[45] and Michael Curtis[46] have argued the words "privileges," "rights," "freedoms," and "immunities" all have meanings that are plainly synonymous.[47] This usage was the prevailing one during the eighteenth and nineteenth centuries.[48] In the North American colonies, the phrase appears to have stemmed from the 1606 Virginia Charter which provided that "all and every persons being our subjects, which shall dwell and inhabit within every or any of the said several Colonies…shall have and enjoy all liberties, franchises, and immunities…as if they had been abiding and born within this our Realme of England."[49]   The charters of Massachusetts Bay,[50] Maine,[51]

---

[37] *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985); but see *Sun Oil v. Wortman*, 486 U.S. 717 (1988).

[38] *Sun Oil v. Wortman*, 486 U.S. 717 (1988) (O'Connor, J., dissenting); *Michigan v. Long*, 463 U.S. 1032 (1983)

[39] John Hart Ely, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW (1980).

[40] *McCulloch v. Maryland*, 17 U.S. 316 (1819); but see John Hart Ely, *Choice of Law and the States Interest in Protecting Its Own*, 23 WM. & MARY L. REV. 173 (1981).

[41] U.S. Const. amend. 14 §1.

[42] *Saenz v. Roe*, 526 U.S. 489, 521 (1999) (Thomas, J., dissenting).

[43] *Timbs v. Indiana*, 139 S.Ct. 682 (2019) (Gorsuch, J., concurring).

[44] See generally Akhil Amar, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION (1998).

[45] Bryan Wildenthal, *Nationalizing the Bill of Rights: Revisiting the Original Understanding of the Fourteenth Amendment in 1866-67*, 68 OHIO ST. L. J. 1509 (2007).

[46] Michael Curtis, NO STATE SHALL ABRIDGE: THE FOURTEENTH AMENDMENT AND THE BILL OF RIGHTS (1986).

[47] 12 OXFORD ENGLISH DICTIONARY 522 (1989).

[48] Michael Curtis, NO STATE SHALL ABRIDGE: THE FOURTEENTH AMENDMENT AND THE BILL OF RIGHTS 64 (1986); Akhil Amar, *The Bill of Rights and the Fourteenth Amendment*, 101 YALE L. J. 1193 (1992).

[49] 7 FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS AND OTHER ORGANIC LAWS 3788 (1909).

[50] 3 Francis Newton Thorpe, THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 1839 (1909).

[51] *Id.* at 1635.

Connecticut,[52] Maryland,[53] Rhode Island,[54] and Georgia contained similar guarantees.[55] These repeated assertions concerning rights, privileges, and immunities of "persons born within the realm of England" were popularly understood to refer to fundamental rights and liberties enjoyed by English citizens.[56] Indeed, John Dickinson of Pennsylvania and the Second Continental Congress acted on just this assumption in crafting the Articles of Confederation which guaranteed that "the free inhabitants of each of these States, paupers, vagabonds, and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several States." Justice Bushrod Washington's notorious opinion in *Corfield v. Coryell* reflects this understanding.[57] That action involved a Pennsylvania citizen who challenged a New Jersey law that prohibited any individual who was not an "actual inhabitant and resident" of the Garden State from harvesting oysters from state waters. Justice Washington, sitting as Circuit Justice, rejected the claim that the statute violated the Article IV's Privileges and Immunities Clause reasoning that "the citizens of the several states" could not "be permitted to participate in all the rights which belong[ed]…to the citizens of any other particular state" through the Clause.[58]  Then, in a passage that has acquired infamy among Fourteenth Amendment scholars, Washington commented that:

> [w]e feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole. The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of

---

[52] 1 Francis Newton Thorpe, THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 553 (1909).

[53] 3 Francis Newton Thorpe, THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 1682 (1909).

[54] 6 Francis Newton Thorpe, THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3220 (1909).

[55] 2 Francis Newton Thorpe, THE FEDERAL AND STATE CONSTITUTIONS, COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 773 (1909).

[56] Chester Antieau, *Paul's Perverted Privileges or the True Meaning of the Privileges and Immunities Clause of Article Four*, 9 WM. & MARY L. REV. 1 (1967).

[57] 6 F. Cas. 546 (1823).

[58] 6 F. Cas. at 552.

DRAFT

> property, either real or personal; and an exemption from higher taxes
> or impositions than are paid by the other citizens of the state;… the
> elective franchise, as regulated and established by the laws or
> constitution of the state in which it is to be exercised. These, and
> many others which might be mentioned, are, strictly speaking,
> privileges and immunities."

Because the Privileges or Immunities Clause bore the same meaning in 1868 that it carries in 2019, the *Slaughter-House Cases* were incorrectly decided.[59] The primary effort to constrain the clause's reach, which has been associated with Raoul Berger, has been premised on the claim that the expression "Privileges and Immunities" was a term of art that is limited to the term's specific referents in the 1866 Civil Rights Act.[60] The central argument here is that when one encounters a vague term in a constitutional provision, which does not stand for two or more distinct meanings but whose application to a number of marginal cases is problematic, the Clause should be limited to those instances that are known to have been specifically cited by its users. This view, however, appears to have fallen out of mainstream American jurisprudential thought.[61] Indeed, in the words of Justice Scalia, "a [constitutional] text should not be construed strictly…it should be construed to contain all that it fairly means."[62] More than that, Professor Berger's repeated quotations of statements on the 1866 statute's coverage as if they applied equally to the Fourteenth Amendment is insufficient to establish identical coverage for the two provisions merely because the two "bore an extremely close relationship."[63] The end result is that Berger's quotations from federal lawmakers during debate on a *congressional statute* are interpreted as if the lawmakers were *only* concerned with combating the problems that were mentioned during that session – and this intent is then imported to determine the meaning of a *constitutional provision* that was subsequently passed during a separate debate and which also contains drastically different language from the federal statute.[64] There are at least three problems here. First, one cannot logically infer that an individual, much less a collective body, is unconcerned with a matter simply because it expresses concern about a separate, unrelated policy issue during a limited duration of time. This position accords with common sense as normal human beings do not speak this way. The mere fact, for instance, that Angela Harris has chosen to give a speech on pregnancy discrimination in 2006 or that the Thirty-Eight Congress decided to hold a debate on the organization of the Montana Territory in 1864 does not permit one to properly deduce that Harris is unconcerned with intersectional issues or that House Speaker Schuyler Colfax suddenly lost interest in Southern readmission. Second, we aren't before the Court of Queen's Bench anymore: constitutional provisions take priority over congressional statutes and with the exception of the Dormant Commerce Clause, Reconstruction Amendments, Nineteenth, Twenty-Third, Twenty-Fourth, and Twenty-Sixth Amendments, Congress' *ipse dixit* on one occasion alone a century

---

[59] Lea Brilmayer, *Shaping and Sharing in Democratic Theory: Towards a Political Philosophy of Interstate Equality*, 15 Fla. St. U. L. Rev. 389 (1987)

[60] Raoul Berger, GOVERNMENT BY JUDICIARY 370 (1977); see also Mark Gergen, *The Selfish State and the Market*, 66 TEX. L. REV. 1097, 1118-28 (1988).

[61] *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010); *Whole Woman's Health v. Hellerstedt*, 579 U.S. ___ (2016); *Kyllo v. United States*, 533 U.S. 27 (2001); *Katz v. United States*, 389 U.S. 347 (1976); *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2001); *United States v. Stevens*, 559 U.S. 460 (2010); *Crawford v. Washington*, 541 U.S. 36 (2004); *Sessions v. Morales-Santana*, 137 S. Ct. 1678 (2017).

[62] Antonin Scalia, A MATTER OF INTERPRETATION 23-24 (1997).

[63] Raoul Berger, GOVERNMENT BY JUDICIARY 370 (1977).

[64] See, e.g., Alexander Bickel, *The Original Understanding and the Segregation Decision*, 69 HARV. L. REV. 1 (1955).

removed from the founding or Fourteenth Amendment's ratification cannot control constitutional questions.[65] One might respond that it would not be inconceivable to presume that Congress could decide to enact a controversial statutory policy as a constitutional rule, as Yale Law School Professor Akhil Amar has persuasively demonstrated was the case with the Fourteenth Amendment and the Civil Rights Act of 1866. Close but no cigar. Even if one concedes that this response is true, and the author does, one would expect to hear references to the relevant statute during the debate on the *constitutional provision* not the *statute*, as Professor Berger limited his analysis to. An example from election law will demonstrate the odd results that acceptance of this thesis would carry. The Civil Rights Act of 1957 was concerned primarily with protecting voting rights for all southerners and prohibited intimidation or coercion of voters to protect the franchise despite strong filibuster efforts. The Twenty-Fourth Amendment, which prohibited state assessment of poll taxes for federal elections was arguably passed with the same purpose yet, while theories of dynamic statutory interpretation have won some acceptance,[66] nearly all have focused on the influence of a statute upon another statute and eschew any mention of constitutional provisions,  More than that, most scholars have not argued that the specific provisions or intent, that motivated a given statute's passage ought to control one's interpretation or construction of a constitutional amendment precisely because members of the bench and bar as well as the ivory tower have been taught that debates on constitutional provisions and statutes are analytically separate legal events.[67] Regardless of one's personal political feelings about this approach nearly all of the leading statutory construction treatises – from Jabez Sutherland's *Statutory Construction* to Henry Hart and Albert Sachs's *The Legal Process* have adopted this 'originalist' perspective – and the outlier, Yale Law School Professor William Eskridge's excellent tour de force, *Interpreting Law*, is concerned solely with statutes influencing other statutes.[68] Finally, and perhaps most importantly, even if one believes that an individual can infer the position of another through silence, a contention that most liberals and feminists have attacked relentlessly in the past decade, or that I have been uncharitable to Professor Berger with his contention that statutes that were passed close in time to constitutional provisions are relevant in interpretation of our fundamental law, the Thirty-Eighth Congress didn't exercise its Article I §7 powers to hold roll call votes on debate snippets in the Congressional Record, it voted to enact a text. One might retort that legislative history is still meaningful here because most politically sophisticated and law-trained actors recognize that courts may use debate statements to interpret statutory or constitutional provisions. The issue with this contention, however, is that it is in severe tension with political practice. A rather comical thought experiment will illustrate this point: if Bernie Sanders were to deliver a speech on the necessity of reenacting Glass-Stegall during debate on the 2017 Tax Cut and Jobs Act or John Barrasso were to insist that millions of voters in predominantly

---

[65] Saikrishna Prakash and John Yoo, *People ≠ Legislature*, 39 HARV. J. L. & PUB. POL'Y. 341 (2016); but see Nate Persily, Samuel Byker, William Evans, and Alon, Sachar, *When Is a Legislature Not a Legislature? When Voters Regulate Elections by Initiatives*, 77 Ohio. St. L. 689 (2016).

[66] William N. Eskridge Jr., DYNAMIC STATUTORY INTERPRETATION 48-81 (1994). Professor Eskridge's first introduction of his dynamic statutory interpretation model in the University of Pennsylvania Law Review gives a litany of examples on the application of the theory in practice yet none involves a prior statute that is then taken to influence the meaning of a constitutional provision.

[67] Edward Levi, AN INTRODUCTION TO LEGAL REASONING (1949).

[68] Jabez Sutherland, STATUTES AND STATUTORY CONSTRUCTION: INCLUDING A DISCUSSION OF LEGISLATIVE POWERS, CONSTITUTIONAL REGULATIONS RELATIVE TO THE FORMS OF LEGISLATION AND TO LEGISLATIVE PROCEDURE (1891); Henry Hart and Albert Sachs, THE LEGAL PROCESS: BASIC PROBLEMS IN THE MAKING AND APPLICATION OF LAW XXX (1958); William N. Eskridge Jr., INTERPRETING LAW (2016).

Olapade                                                                    DRAFT

Hispanic communities casted illegal ballots in the 2016 election, conservatives and liberals respectively would be annoyed, but, would not become fearful precisely because it is general knowledge that so long as Congress does not formally enact a statute codifying these policies, these speeches are simply soundbites. In a similar vein, once a landmark piece of legislation is passed, the general debate in the media and among the bench and bar usually, but not always, centers on the textual provisions of the law and compliance measures with the law's actual language – not the text as interpreted during a five-minute speech delivered by one member of a 535-member institution. "Can a court be blind to what must be necessarily known to every intelligent person in the State?"[69]   Because, generally, words and phrases are presumed to bear the same meaning, but a material variation suggests a variation in meaning,[70] it would be one thing if the text of Professor Berger's statutory provision mirrored or was almost identical to the wording of the Fourteenth Amendment – even though the presumption of consistent usage assumes the existence of one document rather than two. The problem? The language differs as §1 of the Fourteenth Amendment reads:

> [a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. *No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States*; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.[71]

The 1866 Civil Rights Act, however, appeared to be aimed at a more concrete set of negative rights as all U.S. citizens were:

> hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, *to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property*, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

This textual contrast provides at least two compelling reasons for American historians, political scientists, and law-trained readers of all jurisprudential persuasions to reject the Berger thesis. First, if one assumes that the Privileges and Immunities Clause protects a set of positive

---

[69] *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Sparrow v. Strong*, 70 U.S. 97, 99 (1865); *Ho Ah Kow v. Nunan*, 12 F. Cas. 252, 255 (C.C.D. Cal. 1879); *Del Monte Min. & Mill. Co. v. Last Chance Min. & Mill. Co.*, 171 U.S. 55, 62 (1898); *Woodruff v. N. Bloomfield Gravel Mining Co.*, 18 F. 753, 762 (C.C.D. Cal. 1884)

[70] William N. Eskridge Jr., Interpreting Law (2016); Antonin Scalia, Reading Law: The Interpretation of Legal Texts (2012).

[71] U.S. Const. amend. XIV.

government rights to certain goods or services, rather than simply negative rights, as many in the academy do,[72] Professor Berger's theory forecloses that possibility as a provision that was adopted to combat the "various crises of human affairs" is reduced to protecting one's right to enter contracts, participate in court proceedings, and hold property in fee simple. Second, and perhaps more importantly, if one is of a conservative orientation and believes either that the *Slaughterhouse Cases* were correctly decided or that Professor Amar, Justice Thomas, and Justice Gorsuch's critique of current Privileges and Immunities doctrine is correct, the Berger thesis is under-inclusive because it would extend the Clause to a class of cases that is not coterminous with the Bill of Rights or the few rights mentioned in *Slaughterhouse* itself.

The discussion thus far, however, has assumed that the primary concern here is with "citizens of the United States" as the Privileges and Immunities Clause does not apply to undocumented individuals or corporation.[73] With regard to the latter in particular, while both for-profit and non-profit corporations may exercise certain constitutional rights[74] and be treated as natural persons under federal law because of the Dictionary Act,[75] they cannot claim protection under the Privileges and Immunities Clause because they are not citizens.[76] This fact, however, does not mean that the Constitution provides no protection at all for firms seeking to enforce choice of law terms in their contracts. Indeed, Article I § 8, Clause 3, otherwise known as the Commerce Clause provides that "Congress shall have power…To regulate Commerce with foreign Nations,

---

[72] Charles Reich, *The New Property*, 73 YALE L.J. 733 (1964).

[73] *Bank of Augusta v. Earle*, 38 U.S. (13 Pet.) 519 (1839).

[74] *First National Bank of Boston v. Bellotti*, 435 U.S. 765, n.14 (1978); *Linmark Associates, Inc. v. Willingboro*, 431 U. S. 85 (1977); *Time, Inc. v. Firestone*, 424 U. S. 448 (1976); *Doran v. Salem Inn, Inc.*, 422 U. S. 922 (1975); *Southeastern Promotions, Ltd. v. Conrad*, 420 U. S. 546 (1975); *Cox Broadcasting Corp. v. Cohn*, 420 U. S. 469 (1975); *Miami Herald Publishing Co. v. Tornillo*, 418 U. S. 241 (1974); *New York Times Co. v. United States*, 403 U. S. 713 (1971) (per curiam); *Time, Inc. v. Hill*, 385 U. S. 374 (1967); *New York Times Co. v. Sullivan*, 376 U. S. 254; *Kingsley Int'l Pictures Corp. v. Regents of Univ. of N. Y.*, 360 U. S. 684 (1959*); Joseph Burstyn, Inc. v. Wilson*, 343 U. S. 495 (1952)); see, e.g., *Turner Broadcasting System, Inc. v. FCC*, 520 U. S. 180 (1997); *Denver Area Ed. Telecommunications Consortium, Inc. v. FCC*, 518 U. S. 727 (1996); *Sable Communications of Cal., Inc. v. FCC*, 492 U. S. 115 (1989); *Florida Star v. B. J. F.*, 491 U. S. 524 (1989); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U. S. 767 (1986); *Landmark Communications, Inc. v. Virginia*, 435 U. S. 829 (1978); *Young v. American Mini Theatres, Inc.*, 427 U. S. 50 (1976); *Gertz v. Robert Welch, Inc.*, 418 U. S. 323 (1974); *Greenbelt Cooperative Publishing Assn., Inc. v. Bresler*, 398 U. S. 6 (1970); *Santa Clara County v. Southern Pacific Railroad Company*, 118 U.S. 394 (1886); *Wilson v. United States*, 221 U.S. 361, 368 (1910); *United States v. Martin Linen Supply Co.*, 430 U.S. 564 (1976); *Am. Tradition P'ship, Inc. v. Bullock*, 567 U.S. 516, 517 (2012); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 10, 130 S. Ct. 2705, 2714, 177 L. Ed. 2d 355 (2010)

[75] *Burwell v. Hobby Lobby*, 573 U.S. ___ (2014); *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922); *Ross v. Bernhard*, 396 U.S. 531 (1970).

[76] *Tatem v. Wright*, 23 N.J.L. 429, 430 (Sup. Ct. 1852); *Paul v. State of Virginia*, 75 U.S. 168, 170, 19 L. Ed. 357 (1868); *Fairfield Cty. Tpk. Co. v. Thorp*, 13 Conn. 173, 179 (Conn. 1839); *D'Arcy v. Connecticut Mut. Life Ins. Co.*, 108 Tenn. 567, 69 S.W. 768 (1902). Despite this fact, corporations are treated as citizens of their state in diversity cases. See *Peacock, Hunt & W. Co. v. Williams*, 110 F. 915, 916 (C.C.D.S.C. 1901); *Ins. Co. v. City of New Orleans*, 13 F. Cas. 67 (C.C.D. La. 1870); *Stone v. Chicago, B. & Q.R. Co.*, 195 F. 832 (W.D. Mo. 1912); *Appeal Tax Court of Baltimore City v. Gill*, 50 Md. 377, 385 (1879); *Wheeden v. Camden & A.R. Co.*, 1856 WL 6998, at *3 (Pa. 1856); *Int'l & G.N. Ry. Co. v. Anderson Cty.*, 174 S.W. 305, 318 (Tex. Civ. App. 1915), writ refused (Apr. 5, 1916), aff'd, 246 U.S. 424, 38 S. Ct. 370, 62 L. Ed. 807 (1918); *Hall v. Bank of Virginia*, 14 W. Va. 584, 604 (1878); *Atl. Coast Line R. Co. v. Dunning*, 166 F. 850 (4th Cir. 1908); *Baumgarten v. All. Assur. Co., of London, England*, 153 F. 301 (C.C.N.D. Cal. 1907); *Ronson Art Metal Works v. Brown & Bigelow*, 104 F. Supp. 716 (S.D.N.Y. 1952); *Zambrino v. Galveston, H. & S.A. Ry. Co.*, 38 F. 449 (C.C.W.D. Tex. 1889); *Junk v. R.J. Reynolds Tobacco Co.*, 24 F. Supp. 716 (W.D. Va. 1938).

and among the several States, and with the Indian Tribes."[77] The Clause reflects a central concern
of the ratifiers "that was an immediate reason for calling the Constitutional Convention: the
conviction that in order to succeed, the new Union would have to avoid the tendencies toward
economic Balkanization that had plagued relations among the Colonies and later among the States
under the Articles of Confederation."[78] "Although the Commerce Clause is written as an
affirmative grant of authority to Congress, th[e Supreme] Court has long held that in some
instances it imposes limitations on the States absent congressional action."[79] "Viewed in terms of
the purpose of the [Commerce] Clause, this means that preferential state choice of law rules might
be problematic.[80] "And that fact may well operate as a check upon a State's ability to impose
[unfavorable choice of law decisions] that reflect an effort to take economic advantage of [outside
corporate litigants]. Indeed in the modified words of Justice Breyer, "the presence of other
businesses subject to [an unfavorable choice of law rule], particularly businesses owned and
operated by state residents, threatens political concern and a potential ballot-box issue, were [the
doctrine], say, to get out of hand."[81] Thus, when state action affecting interstate commerce "is of
such a character that its burden falls principally upon those without the state, legislative action is
not likely to be subjected to those political restraints which are normally exerted on legislation
where it affects adversely some interests within the state."[82] Under this representation-reinforcing
theory of the Commerce Clause,[83] preferential and parochial state choice of law rules that that
export costs to out of state corporations undermines pluralist interest group bargaining that would
otherwise cause corporate regulations to approach Kaldor-Hicks efficiency (i.e. a scenario where
the aggregate benefits exceed the aggregate harms).[84] Protecting corporate choice of law contract
clauses is appropriate here primarily because some state courts are likely to be perversely
motivated to invalidate choice of law clauses when doing so favors in-state interests.[85] This result
flows naturally from the well-accepted premise that "in all but the narrowest circumstances, state
laws violate the Commerce Clause if they mandate differential treatment of in-state and out-of-
state economic interests that benefits the former and burdens the latter."[86] This Dormant
Commerce Clause doctrine is particularly on-point here because after *Erie*, almost no one
questions that state judicial decisions, much like state statutes, constitute positive law. And even
if one thought that *Erie* only articulated an interpretation of the Rules of Decision Act as opposed
to a constitutional principle, even the most conservative jurists, so far as the common law is

---

[77] U.S. CONST. Art. I §8, cl. 3.

[78] *Hughes v. Oklahoma*, 441 U.S. 322, 325–326 (1979).

[79] *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2089 (2018); see also *Cooley v. Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299 (1852).

[80] *Polar Tankers, Inc. v. City of Valdez, Alaska*, 557 U.S. 1, 12 (2009).

[81] *Id.*

[82] *South Carolina Highway Dept. v. Barnwell Brothers, Inc.*, 303 U.S. 177, 185, n. 2 (1938).

[83] See John Hart Ely, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW (1980).

[84] Robert Dahl, WHO GOVERNS? (1961); John Hicks, The Foundation of Welfare Economics 49 THE ECONOMICS JOURNAL 696 (1939); Nicholas Kaldor, *Welfare Propositions in Economics and Interpersonal Comparisons of Utility*, 49 THE ECONOMICS JOURNAL 549 (1939).

[85] See, e.g., *Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128 (7th Cir. 1990); *Bush v. Nat'l Sch. Studios, Inc.*, 139 Wis. 2d 635, 407 N.W.2d 883 (1987); *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401 (9th Cir. 1992); *Elec. & Magneto Serv. Co. Inc. v. AMBAC Int'l Corp.*, 941 F.2d 660 (8th Cir. 1991); *Solman Distributors, Inc. v. Brown-Forman Corp.*, 888 F.2d 170 (1st Cir. 1989); *Midwest Enterprises, Inc. v. Generac Corp.*, No. 91 C 2229, 1991 WL 169059, at *1 (N.D. Ill. Aug. 27, 1991); *Rutter v. BX of Tri-Cities, Inc.*, 60 Wash. App. 743, 806 P.2d 1266 (1991).

[86] *Granholm v. Heald*, 544 U.S. 460, 472 (2005); *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, 511 U.S. 93, 99 (1994); *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 274 (1988).

concerned, no longer dabble in the naïve assumptions that characterized legal formalism in the nineteenth century.[87] After all, one would be hard pressed to coerce Clarence Thomas, Samuel Alito, or John Roberts to admit that there is something "transcendental" about the fellow-servant rule that places it beyond their reproach in federal admiralty cases that rely on common law tort doctrines.[88] The bottom line? It makes no if a state court as opposed to a state legislature is engaging in the prohibited action for, in the words of former Solicitor General, Chief Justice, and President,  William Howard Taft, "[s]hould [any instrumentality of the State], in the execution of its powers, adopt measures which are prohibited by the Constitution, or should [a state court as opposed to a state legislature], under the pretext of executing its powers, pass laws for the accomplishment of objects not intrusted to the government, it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say that such an act was" repugnant of the constitution.[89] An intra-textual reading of the Constitution supports this position as Article I §10's prohibition on States "enter[ing] into any Agreement or Compact with another State" implicitly assumes that States may not attempt, to negotiate with other States regarding their mutual economic interests and turn the Union back into a "house divided" of sectional trading zones.[90]

There is a rather large wrinkle here, however: the Dormant Commerce Clause does not square with the text of Article I §8. In the words of Justice Thomas, the theory "has no basis in the text of the Constitution, makes little sense, and has proved virtually unworkable in application."[91] Indeed, if one were to canvas the United States Reports she or he would find that several current and former Justices have all explicitly or implicitly recognized this fact.[92] Constitutional law

---

[87] See generally Laura Kalman, LEGAL REALISM AT YALE, 1927-1960 (1986).

[88] Frederic Cunningham, *The Extension to the Admiralty of the Fellow Servant Doctrine*, 18 HARV. L. REV. 294 (1905); Compare *The Osceola*, 189 U.S. 158 (1903) (applying the fellow servant rule) with 45 U.S.C. § 51 (abrogating the fellow servant doctrine).

[89] *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 40 (1922).

[90] Akhil Amar, *Intratextualism*, 112 HARV. L. REV. 747 (1999).

[91] See, e.g., *Tyler Pipe Industries, Inc. v. Washington State Dept. of Revenue*, 483 U.S. 232, 259-265 (1987) (SCALIA, J., dissenting); *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, 486 U.S. 888, 895-898 (1988) (SCALIA, J., concurring in judgment).

[92] See, e.g., *C & A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 401 (1994) (O'CONNOR, J., concurring in judgment) ("The scope of the dormant Commerce Clause is a judicial creation"); *Quill Corp. v. North Dakota*, 504 U.S. 298, 309, 112 S.Ct. 1904, 1911 (1992) (STEVENS, J., writing for a unanimous Court) (recognizing that the Commerce Clause "says nothing about the protection of interstate commerce in the absence of any action by Congress"); *Wyoming v. Oklahoma*, 502 U.S. 437, 461-462 (1992) (SCALIA, J., joined by REHNQUIST, C. J., and THOMAS, J., dissenting) (describing the "negative Commerce Clause" as "nontextual"); *Kassel v. Consolidated Freightways Corp. of Del.*, 450 U.S. 662, 706 (1981) (REHNQUIST, J., dissenting) ("[T]he jurisprudence of the 'negative side' of the Commerce Clause remains hopelessly confused"); cf. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 797, n. 12 (1995) (STEVENS, J., joined by KENNEDY, SOUTER, GINSBURG, and BREYER, JJ.) ("[T]he Constitution is clearly silent on the subject of state legislation that discriminates against interstate commerce"); *Wardair Canada Inc. v. Florida Dept. of Revenue*, 477 U.S. 1, 17 (1986) (Burger, C. J., concurring in part and concurring in judgment) (referring to "the cloudy waters of this Court's 'dormant Commerce Clause' doctrine"); *Philadelphia v. New Jersey*, 437 U.S. 617, 623 (1978) (Stewart, J.) ("The bounds of [the restraints imposed by the Commerce Clause itself, in the absence of federal legislation], appear nowhere in the words of the Commerce Clause"); *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 457, 458 (1959) (Clark, J.) (referring to our negative Commerce Clause jurisprudence as a "tangled underbrush" and a "quagmire" (internal quotation marks omitted)); *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 534-535 (1949) (Jackson, J.) (describing the negative Commerce Clause as filling in one of the "great silences of the Constitution"); *McCarroll v. Dixie Greyhound Lines, Inc.*, 309 U.S. 176, 189 (1940) (Black, J., joined by Frankfurter and Douglas, JJ., dissenting) (criticizing the negative Commerce Clause as arising

DRAFT

scholars have also been critical of the doctrine.[93] Two justifications have historically been offered to support the Court's Dormant Commerce jurisprudence.[94] The first theory relies upon the assumption that the Commerce Clause is an exclusive grant of power to Congress.[95] Since, the founding, however, and even during the antebellum period itself, "minds as pure and as intelligent as this country can boast" have doubted that the Clause did not leave some concurrent regulatory authority for the several states.[96] This understanding aligns well with current doctrine as "[e]ver since *Willson v. Black-Bird Creek Marsh Co.* and *Cooley v. Board of Wardens* it has been recognized that, in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it."[97] The result is that even Justice Breyer as conceded that "the strong…preemptive view of the Interstate Commerce Clause is no longer the law of the land."[98] The summary collapse of the Marshall Court's original Dormant Commerce Clause doctrine corroborates this claim. This is so because that Court's insistence that Congress itself could not undue the Court's Dormant Commerce Clause holdings quickly fell by the wayside.[99] The second justification equates congressional silence with action satisfying "finely

---

out of "[s]pasmodic and unrelated instances of litigation [that] cannot afford an adequate basis for the creation of integrated national rules" that "Congress alone" is positioned to develop).

[93] David Currie, THE CONSTITUTION IN THE SUPREME COURT: THE FIRST HUNDRED YEARS 1789-1888 234 (1985) (describing the negative Commerce Clause as "arbitrary, conclusory, and irreconcilable with the constitutional text"); see also, e.g., Lawrence Tribe, AMERICAN CONSTITUTIONAL LAW 439 (1988) ("The Supreme Court's approach to commerce clause issues ... often appears to turn more on ad hoc reactions to particular cases than on any consistent application of coherent principles"); Martin Redish & Nugent, *The Dormant Commerce Clause and the Constitutional Balance of Federalism*, 1987 Duke L.J. 569, 573 ("[N]ot only is there no textual basis [for it], the dormant Commerce Clause actually contradicts, and therefore directly undermines, the Constitution's carefully established textual structure for allocating power between federal and state sovereigns"); Bernard Gavit, THE COMMERCE CLAUSE OF THE UNITED STATES CONSTITUTION 22 (1932) (noting that the Court has set "no conscious standard" but has rather, "in an imperial way," decided whether each particular state action presented to it "was or was not an invalid regulation of interstate commerce").

[94] *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 610 (1997) (Thomas, J., dissenting).

[95] See, e.g., *Passenger Cases*, 7 How. 283, 393-400, 12 L.Ed. 702 (1849); see also *Mayor of New York v. Miln*, 11 Pet. 102, 157-159, 9 L.Ed. 648 (1837) (Story, J., dissenting); *Groves v. Slaughter*, 15 Pet. 449, 504, 506-508, 10 L.Ed. 800 (1841) (McLean, J., concurring); *Cooley v. Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299, 13 L.Ed. 996 (1852) (adopting a partial-exclusivity rationale for dormant Commerce Clause cases).

[96] *McCulloch v. Maryland*, 17 U.S. 316, 402 (1819); see, e.g., THE FEDERALIST NO. 32, p. 154 (M. Beloff ed. 1987) (A. Hamilton) ("[N]otwithstanding the affirmative grants of general authorities, there has been the most pointed care in those cases where it was deemed improper that the like authorities should reside in the states, to insert negative clauses prohibiting the exercise *613 of them by the states"); *License Cases*, 5 How. 504, 583 (1847) (four, and arguably five, of the seven participating Justices contending that the Commerce Clause was not exclusive); see also Felix Frankfurter, THE COMMERCE CLAUSE UNDER MARSHALL, TANEY AND WAITE 13 (1937) ("The conception that the mere grant of the commerce power to Congress dislodged state power finds no expression" in the records of the Philadelphia Convention nor the discussions preceding ratification).

[97] *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 766-767 (1945); see also *Freeman v. Hewit*, 329 U.S. 249, 259 (1946) (Rutledge, J., concurring).

[98] *James v. Watt*, 716 F.2d 71, 73 (1st Cir. 1983); Lawrence Tribe, AMERICAN CONSTITUTIONAL LAW §§ 6-4 to 6-26.

[99] 520 U.S. at 614; Compare *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 13 How. 518 (1852) (holding that construction of the Wheeling Bridge impeded commerce in violation of the Commerce Clause), with *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 18 How. 421, 426 (1856) (upholding Federal Act that declared the Wheeling Bridge to be "[a] lawful structur[e]"); see also *Transportation Co. v. Parkersburg*, 107 U.S. 691, 701 (1883) ("It is Congress, and not the Judicial Department, to which the Constitution has given the power to regulate commerce"); *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 769 (1945) (Congress has "undoubted" power to "permit the states to regulate the commerce in a manner which would otherwise not be permissible").

Olapade                                                                    DRAFT

wrought and exhaustively considered procedure[s]" of Article I §7.[100] The problem? The Court itself has also rejected the notion that Congress can legislate by sitting on its hands because silence could denote ignorance of the status quo, disagreement on altering the status quo, ambivalence towards the status quo, or orthodox inclinations to claim credit and avid political heat whenever feasible.[101] Thus, in *California Division of Labor Standards Enforcement v. Dillingham Construction*, the Court observed:

> "[a]s is always the case in [the Court's] pre-emption jurisprudence, where "federal law is said to bar state action in fields of traditional state regulation, ... [the Court has] worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"[102]

International law scholars might counter that this line of argument cannot be correct because it might arguably permit States to interfere with commerce with foreign nations. It is not quite clear, though, that the Constitution commands this result because a careful intratextual reading of the document that, in the words of D.C. Circuit Judge, James Buckley "takes the Tenth Amendment seriously" dictates against such a result.[103] Of course, the amendment reads that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."[104] While Article I, §8, Clause 3 gives Congress the power to, among other things, "regulate Commerce…among the several States," the Constitution can't plausibly be read to deny the several States this power for three reasons. First, Article I §10, which contains the list of powers the States are prohibited to exercise does not contain a statement banning state regulation of interstate, as opposed to foreign, commerce.[105] Second, the Constitution, with the exception of the Supremacy Clause, does not contain an implicit ban on state interstate commercial regulations that would operate even in matters involving congressional silence. And finally, but perhaps most importantly, if one subscribes to Chief Justice Marshall's opinion in *Gibbons v. Ogden* that commerce is "intercourse…between…parts of

---

[100] *INS v. Chadha*, 462 U.S. 919, 921 (1983).

[101] See, e.g., *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n.1 (1989) quoting *Johnson v. Transportation Agency*, 480 U.S. 616, 671-72 (Scalia, J., dissenting); *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 395-96 (1951) (Jackson, J., concurring); *Thompson v. Thompson*, 484 U.S. 174, 191 (1988) (Scalia, J., concurring); OFFICE OF LEGAL POLICY, U.S. DEP'T OF JUSTICE, REPORT TO THE ATTORNEY GENERAL: USING AND MISUSING LEGISLATIVE HISTORY: A RE-EVALUATION OF THE STATUS OF LEGISLATIVE HISTORY IN STATUTORY INTERPRETATION 26-33 (January 5, 1989); Frank Easterbrook, *The Role of Original Intent in Statutory Construction*, 11 HARV. J.L. & PUB. POL'Y 59, 61 (1988); but see *United States v. G. Falk & Brothers*, 204 U.S. 143 (1907); *United States v. Cerecedo Hermanos y Compania*, 209 U.S. 337 (1908); *Morgan v. Commissioner*, 309 U.S. 78 (1940); *Helvering v. R. J. Reynolds Tobacco Co.*, 306 U.S. 110 (1939); *Missouri v. Ross*, 299 U.S. 72 (1936); *United States v. Dakota-Montana Oil Co.*, 288 U.S. 459 (1933); *Massachusetts Mutual Life Ins. Co. v. United States*, 288 U.S. 269 (1933); *Herman & MacLean & Huddleston*, 459 U.S. 375 (1983); *Haig v. Agee*, 453 U.S. 280 (1981).

[101] Henry M. Hart Jr. and Albert Sachs, THE LEGAL PROCESS: BASIC PROBLEMS IN THE MAKING AND APPLICATION OF LAW 1395 (1957); Lawrence Tribe, *Toward a Syntax of the Unsaid: Construing the Sounds of Congressional and Constitutional Silence*, 57 IND. L.J. 515, 517 (1982).

[102] *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *California Div. of Labor Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325 (1997).

[103] James L. Buckley, *Reflections on Law & Public Life*, 1 Green Bag 2d 391 (1998); Akhil Amar, *Intratextualism*, 112 HARV. L. REV. 747 (1999).

[104] U.S. CONST. amend. X.

[105] U.S. CONST. art. I §10.

Olapade                                                                              DRAFT

nations, in all its branches," as most legal academics are wont to do, then it would follow that state police regulations would also be regulations of interstate commerce destroying the distinction between "what is truly national and what is truly local."[106] State regulations of foreign commerce must reckon with a completely different set of textual hurdles, however. More specifically, two provisions are relevant here. First, the Commerce Clause affirmatively grants Congress the capacity to "regulate Commerce…with foreign Nations."[107] Second, even if one assumes that this provision does not impose a prohibition on the several States, many a Clause in Article I §10 explicitly does. Thus, the States are, in no uncertain terms, categorically banned from entering "into any Treaty, Alliance, or Confederation," "grant[ing] Letters of Marque and Reprisal," "enter[ing] into any Agreement or Compact…with a foreign Power," or "lay[ing] any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws." More than that, lest one think that this final prohibition is an implicit grant to the States to raise revenue off international trade, "the net Produce of all Duties and Imposts, laid by any State on Imports or Exports," flows directly to the federal Treasury with Congress reserving the right to "[r]evis[e] and [c]ontroul" the measures.[108] As constitutional historians know, this type of "extraordinary," "unprecedented" "right to review and veto state enactments" is peculiar precisely because "a proposal to grant such authority to negative state laws was considered at the Constitutional Convention, but rejected in favor of allowing state laws to take effect, subject to later challenge under the Supremacy Clause."[109]   Previous practice confirms this reading as 600,000 women and men died in the mid-nineteenth century for the explicit purpose of stopping certain states from "assuming among the powers of the earth, the separate and equal station" of a nation-state and exercising the powers delineated in Article I §10. Indeed, in the words of Yale Law School Professor Akhil Reed Amar, "doctrine is following the document." The Supreme Court has not been bashful in enforcing this understanding of the national government's foreign affairs power. Thus, in the words of Justice Douglas, "even in absence of a treaty, a State's policy may disturb foreign relations and may well adversely affect the power of the central government to deal with those problems."[110] While this emphasis on the foreign affairs powers of Congress may be particularly appealing to left-of-center international or foreign relations scholars,[111] a similar result can also be reached for their conservative counterparts.[112] After Watergate, the ensuing legislative disabilities upon presidential power that the Reagan and Bush Administrations resisted,[113] and the Iran-Contra scandal, Justice Sutherland's dicta in *Curtiss-Wright* became an article of faith in Federalist Society circles as:

> [t]he broad statement that the federal government can exercise no
> powers except those specifically enumerated in the Constitution,
> and such implied powers as are necessary and proper to carry into

---

[106] *United States v. Lopez*, 514 U.S. 549, 568 (1995); *Gibbons v. Ogden*, 22 U.S. 1, 189-90 (1824).

[107] U.S. Const. art. I §8, cl. 3.

[108] U.S. CONST. art. I §10.

[109] See 1 Records of the Federal Convention of 1787, pp. 21, 164–168 (M. Farrand ed. 1911); 2 id., at 27–29, 390–392.

[110] *Zschernig v. Miller*, 389 U.S. 429, 441 (1968).

[111] Bruce Ackerman and Oona Hathaway, *Limited War and the Constitution: Iraq and the Crisis of Presidential Legality*, 109 MICH. L. REV. 447 (2011); Harold Hongju Koh, THE NATIONAL SECURITY CONSTITUTION (1990).

[112] Eric Posner & Jack Goldsmith, THE LIMITS OF INTERNATIONAL LAW (2005); John Yoo, *The Original Understanding of the War Powers* 84 CAL. L. REV. 167, 204-216 (1996).

[113] See, e.g., Stephen Calabresi, THE UNITARY EXECUTIVE: PRESIDENTIAL POWER FROM WASHINGTON TO BUSH (2008).

effect the enumerated powers, is categorically true only in respect of our internal affairs. In that field, the primary purpose of the Constitution was to carve from the general mass of legislative powers then possessed by the states such portions as it was thought desirable to vest in the federal government, leaving those not included in the enumeration still in the states. That this doctrine applies only to powers which the states had is self-evident. And since the states severally never possessed international powers, such powers could not have been carved from the mass of state powers, but obviously were transmitted to the United States from some other source.[114]

After all, given that both Democratic and Republican Office of Legal Counsel attorneys such as Walter Dellinger, Caroline Krass, Virginia Seitz, Jack Goldsmith, Steven Engel, and Ted Olson have all signed opinions validating expansive readings of executive power that cite to *Curtiss-Wright* and essentially assume that the President is "the sole organ" of the nation in foreign relations, it is not clear why the states could regulate a commercial activity that they never legitimately had charge of in the first instance even during the Critical Period. But assume that one does not subscribe to Justice Thomas or Scalia's opinion on the Dormant Commerce Clause. There is a further flaw with this preemption analysis: it proves too much. More specifically, in the words of Chief Justice Rehnquist, it assumes that the "constitution's enumeration of powers does not presuppose something not enumerated"[115] and that the long cherished "distinction between what is truly national and what is truly local" is no more.[116] In an age where behavioral economists have found ways to quantify the decisional process in matters implicating adoption,[117] procreation,[118] the privilege against self-incrimination,[119] the Search and Seizure Clause,[120] equal protection[121] and a bevy of other areas where the attainment of pareto-optimality is not necessarily the primary goal, under this export-cost prohibition theory, the Dormant Commerce Clause would preempt state regulation of "any activity…related to the economic productivity of individual citizens" that the several states begged to differ on including "family law," "education," or "criminal law enforcement."[122] Put differently, it is one thing to resort to an economic analysis of law to argue that the Federal Trade Commission has been mistakenly targeting mergers that actually bolster consumer welfare[123] or that a centralized environmental regulation regime stifles energy startups as well as small businesses owned by women or racial minorities.[124] It is quite another thing, however, to recast an intimate decision such as marriage or adoption as an affair that the participants undertook solely for monetary reasons, act as if the average person considers the

---

[114] *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 315-316 (1936).
[115] *Gibbons v. Ogden*, 22 U.S. 1, 195 (1824).
[116] *National Labor Relations Board v Jones & Laughlin Steel Corporation*, 301 U.S. 1, 30 (1937).
[117] Richard Posner, Economic Analysis of Law (2014).
[118] Indeed, inclinations to entertain economic analysis in this area of the law has harrowing parallels to a prior jurisprudential period that was not the nation's finest. See *Buck v. Bell*, 274 U.S. 200 (1927).
[119] Richard Posner, Economic Analysis of Law (2014).
[120] *Id.*
[121] *Id.*
[122] *United States v. Lopez*, 514 U.S. 549, 567 (1995).
[123] William F. Baxter, *Separation of Powers, Prosecutorial Discretion, and the "Common Law" Nature of Antitrust*, 60 Tex. L. Rev. 661 (1982)
[124] Bruce Ackerman & Richard B. Stewart, *Reforming Environmental Law*, 37 STAN. L. REV. 1333 (1985).

Olapade                                                                    DRAFT

family laws of other states and whatever disparate costs they produce when deciding when and where to have a child or tie the knot, and then pronounce that a constitutional doctrine with a tenuous textual basis prevents the several states from regulating a domain that they have managed since the union came into existence. The result is that to subscribe to the Dormant Commerce Clause contention here, one "would have to pile inference upon inference in a manner that would bid fair to convert…the [Dormant] Commerce Clause [in]to" an instrument abolishing the "general police power of the States."[125]

> "[a]s is always the case in [the Court's] pre-emption jurisprudence, where "federal law is said to bar state action in fields of traditional state regulation, … [the Court has] worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[126]

One might counter that the Dormant Commerce Clause really does not rework the balance of power between the national government and the states because under the express and field preemption doctrines, "state law[s that] directly conflict with a federal law" or regulate a domain that Congress has attempted to occupy exclusively are subject to invalidation.[127] This line of argument, though, ignores the fact that Congress has at least acted affirmatively in direct and field preemption cases. Indeed, "[c]onflict pre-emption only applies when there is a direct clash between an Act of Congress and a state statute, but the very premise of the negative Commerce Clause is the absence of congressional action."[128] "Field pre-emption likewise is of little use in areas where Congress has failed to enter the field, and certainly does not support the general proposition of pre-emption-by-silence that is used to provide a veneer of legitimacy."[129] Problems in this arena are further compounded by the fact that the Court has applied an unwieldy standard, rather than clean rule, in assessing actions brought under the provision requiring litigants to evaluate if the state law serves a legitimate local public interest; the effects of the statute on interstate commerce; the nature of the local interest; and whether there are alternative means of furthering the local interest that have a lesser impact on interstate commerce."[130] The result is that in the words of Richard Posner, "[i]n an age when all parts of the nation's economy are interconnected, so that a state can do hardly anything in the way of regulation or taxation without in a sense burdening interstate commerce, the application of this standard to particular cases is often problematic" precisely because it involves delicate economic questions that are usually reserved for the women and men in the Russell and Rayburn buildings "across the street."[131] A prominent example drawn from the Court's

---

[125] *Id.* at 567.

[126] *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *California Div. of Labor Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325 (1997).

[127] *Gade v. National Solid Wastes Management Assn.*, 505 U.S. 88, 98 (1992); *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95 (1983); *Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 152-153 (1982); *Chamber of Commerce of United States of America v. Whiting*, 563 U.S. 582, 592 (2011); *English v. General Elec. Co.*, 496 U.S. 72, 79 (1990)

[128] *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 610 (1997) (Thomas, J., dissenting).

[129] *Id.*

[130] See *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring).

[131] *W.C.M. Window Co. v. Bernardi*, 730 F.2d 486, 493 (7th Cir. 1984); see also Julian Eule, *Laying the Dormant Commerce Clause to Rest*, 91 YALE L.J. 425 (1982); *Kimble v. Marvel Ent., LLC*, 135 S. Ct. 2401, 2409 (2015) (Kagan, J.).

jurisprudence will suffice to illustrate the point. In *Bowman v. Chicago & Northwestern R. Co*. (1888), for instance, the Court found that the Dormant Commerce Clause permitted the states to ban the importation of "cattle or meat or other provisions that are diseased or decayed, or otherwise, from their condition and quality, unfit for human use or consumption" and adhered to this result in the ensuing century.[132] In a case presenting an analogous set of facts but involving garbage, however, *Philadelphia v. New Jersey*, the Dormant Commerce Clause magically compelled sovereign entities to accept waste from other states.[133] While this objection is one concerned with doctrinal consistency rather than legitimacy,[134] the general point is still problematic for the dormant commerce clause's proponents: what is it about an education at an elite law school that qualifies one to make the minute and careful economic decisions differentiating solid waste from bovine meat rather than the economists advising Congress who actually spent five to eight years studying the matter in a doctorate program?

Notwithstanding all this analysis, there are still peculiar circumstances in matters implicating choice of law clauses in corporate disputes that counsel for constitutional protection. Normally, of course, this would not be the case as, in the words of Justice Stevens, corporations "as a historical matter,…have not been subjected to discrimination;…do not exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group; and…are not a minority or politically powerless."[135] Indeed, the days of poor amicus curiae representation for corporate clients litigating in the Supreme Court that Lewis Powell decried in his 1971 memo to the Chamber of Commerce, if they ever existed, are no more.[136] Dormant Commerce Clause enforcement in this context bears an eerie resemblance to *Lochner* because the Court is invoking a doctrine with a tenuous textual basis and incredibly arbitrary baselines that if taken to their logical conclusion, assume a constitutional ban on implicit wealth transfers among competing units on behalf a set of litigants that generally are able to engage in the pluralist political process to silence "courageous State[s engaging in] novel social and economic experiments" with minimal risk to the rest of the country."[137] The problem? The discussion thus far has assumed effective access to responsive agents in legislative affairs and litigation. In the nineteenth century, this question was not all that complicated: one simply picked up a copy of John Wells' trusted guide, *Every Man His Own Lawyer Complete With Forms* and marched to the state house or state appellate court on circuit to plead his case (or her case if you were Myra Bradwell).[138] Because the interests of the lawyer and client were identical, the possibility of principal-agent difficulties were minimal. What happens, though, when nearly all the publicly traded corporations in a nation that could conceivably finance a challenge to an inefficient legal arrangement that costs them millions in legal fees every year are limited to hiring one of one hundred white shoe law firms staffed by lawyers who have a collective interest in making sure that the challenge is never brought nor succeeds because they profit from the status quo? Yet again, in the words of Laurence J. Peter, "ignorance of, or inability to influence the law, does not prevent the lawyer from collecting his

---

[132] *Bowman v. Chicago & Northwestern Ry. Co*., 125 U.S. 465 (1888); *Maine v. Taylor*, 477 U.S. 131 (1986); *Asbell v. Kansas*, 209 U.S. 251 (1908).

[133] *Philadelphia v. New Jersey*, 437 U.S. 617 (1978).

[134] *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me*., 520 U.S. 564, 610 (1997) (Thomas, J., dissenting).

[135] *Lyng v. Castillo*, 477 U.S. 635 (1986); see also Bruce Ackerman, *Beyond Carolene Products*, 98 Harv. L. Rev. 713 (1985).

[136] Lewis F. Powell Jr., *Confidential Memorandum to the U.S. Chamber of Commerce*, Aug. 23, 1971.

[137] *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis J., dissenting).

[138] John Wells, EVERY MAN HIS OWN LAWYER AND BUSINESS FORM BOOK (1856).

Olapade                                                                                    DRAFT

fee."[139] Indeed, as Yale Law School Professor Jonathan Macey has argued, when it comes to the market for corporate law, lawyers are the most politically powerful interest group in town.[140] This is so because they are already organized into bar associations, stay up to date with relevant legal changes in the law, can communicate with one another at minimal cost, and, in the states that often have their law selected by corporate contracts – Delaware and New York – draft choice of law, corporate, and commercial legislation. Indeed, in a study conducted by Cornell Law Professor Theodore Eisenberg and NYU Law Professor Geoffrey Miller, the two concluded that among a representative sample of contracts held by publicly held companies, New York or Delaware were selected as the forum of choice in 27 percent of all instances – a clear majority among the States (See Table 1).[141] This pattern persists once the corporate contracts are divided into asset sale purchases, bond indentures, credit commitments, employment contracts, licensing, merger agreements, pooling service compacts, securities purchases, security agreements, settlements, trust agreements, and underwriting contracts (See Table 2).

Table 1

Choice of Forum

| Forum | Number of all Contracts | Percent of all contracts | Percent of those contracts specifying a forum |
|---|---|---|---|
| CA | 73 | 2.53 | 6.51 |
| CO | 19 | .66 | 1.69 |
| DE | 121 | 4.2 | 10.79 |
| FL | 44 | 1.53 | 3.93 |
| IL | 37 | 1.28 | 3.3 |
| MA | 26 | .9 | 2.32 |
| NV | 17 | .59 | 2.52 |
| NY | 462 | 16.03 | 41.21 |
| OH | 22 | .76 | 1.96 |
| TX | 48 | 1.67 | 4.28 |
| VA | 15 | .52 | 1.34 |
| Bankruptcy Court | 23 | .8 | 2.05 |
| No Forum Specified | 1761 | 61.1 | N/A |
| Other | 170 | 5.9 | 15.17 |
| Foreign Forum | 44 | 1.53 | 3.93 |

Table 2

Contract Type, Choice of Law, and Rate of Forum Specification

| Contract Type | DE | NY | CA | Other |
|---|---|---|---|---|

---

[139] SKID MARKS: COMMON JOKES ABOUT LAWYERS 84 (1988).
[140] John Macey and Geoffrey Miller, *Interest Group Analysis of Delaware Law*
[141] Theodore Eisenberg and Geoffrey Miller, *The Flight to New York: An Empirical Study of Choice of Law and Choice of Forum Clauses in Publicly-Held Companies' Contracts*, 30 CORNELL L. REV. 1476 (2009).

| | | | |
|---|---|---|---|
| Asset Sale Purchase | .41 | .51 | .4 | .41 |
| Bond Indentures | 0.0 | .09 | 0.0 | 0.0 |
| Credit Commitments | .5 | .7 | .44 | .73 |
| Employment Contracts | .17 | .67 | .21 | .28 |
| Licensing | 0.0 | .5 | .38 | .35 |
| Mergers | .53 | .65 | .53 | .43 |
| Pooling Services | .06 | .07 | N/A | .29 |
| Securities Purchase | .46 | .61 | .5 | .43 |
| Security Agreements | N/A | .45 | .67 | .67 |
| Settlements | .42 | .54 | .36 | .46 |
| Trust Agreements | .05 | .29 | N/A | 0.0 |
| Underwriting | N/A | .23 | 0.0 | 0.0 |

One might retort that simply because the casino house is moderating the blackjack game does not mean that the odds are with the dealer. After all, the mere fact that lawyers draft the relevant legislation and must be hired for a corporation to effectively participate in the process does not necessarily mean that they will benefit. But this assertion has been empirically refuted as Professor Macey has also concluded that lawyers benefit from the current choice of law regime precisely because it is designed to increase litigation, an activity that most private law scholars assume to be the de-facto inefficient outcome for both parties.[142] For the purposes of this article, this discussion is not intended to disparage litigators (of which the author is one) or suggest that the author would not engage in the same behavior if and when presented with the same incentive structure, it is only to suggest that the current choice of law arrangement, in the words of Chief Justice Stone, is one where the "political processes which can ordinarily be expected to bring about repeal of undesirable legislation" is restricted.[143] Nevertheless, there are still three complicating factors that suggest the normative undesirability of a judicial solution. First, it is far from clear that this representation reinforcement theory cuts in one direction. In an increasingly national economy where most state commercial regulations export costs, the line between the permissible and impermissible would an arbitrary one escaping settlement on a "neutral principle."[144] Former UCLA Law Professor, Julian Eule, once suggested that the conundrum could be resolved by determining the law's "outside impact percentage" but this too invites difficult factual inquiries.[145]

---

[142] Id; Marc Galanter, *The Vanishing Trial: An Examination of Trials and Related Matters in Federal and State Courts*, 1 J. EMPIRICAL LEGAL STUD. 459, 459 (2004); see also John Witt, TORTS, CASE, PRINCIPLES, AND INSTITUTIONS 23 (2017) (One of the most important institutional features of American tort law is that it is almost entirely party-driven. The parties to a lawsuit have virtually complete autonomy in deciding whether to bring claims, how to manage those claims, and whether to withdraw from prosecuting them. The result is that almost all parties settle their disputes before trial).

[143] *United States v. Carolene Products Company*, 304 U.S. 144 n.4 (1938).

[144] Herbert Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 Harv. L. Rev. 1 (1959).

[145] Julian Eule, *Laying the Dormant Commerce Clause to Rest*, 91 YALE L.J. 425 (1982).

Olapade                                                                                                    DRAFT

Second, and perhaps most importantly, it is not always clear that state lawmakers will have incentives to care for the concerns of in-state constituents rather than out-of-state residents. One could, for instance, easily conceive of a situation where out-of-state donors were able to successfully lobby for legislation benefiting their interests while politically disengaged voters within the state had their interests set to the wayside.[146] An example from professional football involving the late Paul Allen's expedited move to purchase the Seattle Seahawks will suffice to prove the point.  In 1997, Allen offered the Washington State legislature $4.2 million to expedite the consideration of a state-wide ballot initiative before his option to purchase the Seahawks expired. The legislature accepted the bargain and called a special referendum, which Allen agreed to finance. Because the special election was not held during November or during the primaries, the voting electorate was composed disproportionately of individuals who supported Allen's bid to keep the Seahawks in Seattle, which succeeded unsurprisingly. One could reasonably suspect that the outcome may have been different if more Washington residents had voted in the referendum because these individuals would have had to bear the costs of increased sales taxes, property taxes, event costs, and decreased tourism that likely would have accompanied the Seahawks' stay. In any event, the interests of in-state and out-of-state consumers may be linked together. A law that, for instance, limited the activities of out-of-state oil refineries, sports franchises, or private equity firms would have anti-competitive effects that would increase prices and harm consumers within the state.[147] Third, even if one assumes that a commercial regulation would not hurt in-state or out-of-state consumers, as the current trade wars that have been waged during the Trump Administration illustrate, the statutes would likely invite retaliation by other jurisdictions. In the event that costs become high enough, and the effected population is not susceptible to collective action problems, opposition will likely mobilize to effect repeal.[148] *Exxon Corp. v. Governor of Maryland*, a dormant commerce clause case in which the Court upheld a state regulation banning oil refiners from owning gas stations, illustrates the need for hair-line and, often untenable, distinctions in this area. There, as Harvard Law Professor Lawrence Tribe demonstrated, although the direct effect of the statute was on out-of-state firms, in-state consumers felt the anti-competitive effects, and the refineries themselves certainly did not lack political clout.[149] If one assumes that the refiners and service operations chose the contract form that minimized costs in prevailing business conditions, Maryland's regulatory change would have been likely to increase the parties' costs – a presumption that the Tribe study confirmed.[150] When one considers further that consumers usually suffer from collective action problems in resisting redistributive regulations and that the oil refiners, although immune from those difficulties, may have been unable to out-lobby Maryland gas station operators, it becomes apparent that a cost expropriation theory of the dormant commerce clause could open the door to complex questions of judicial review in other cases. Such a conclusion is unsurprising after all, "the life of the law has not been logic but experience."[151] And experience teaches that discretion is the better part of

---

[146] David Truman, THE GOVERNMENTAL PROCESS (1951)
[147] Edmund Kitch, Regulation and the American Common Market, in Regulation, Federalism, and Interstate Commerce 7-55 (1981).
[148] Saul Levmore, *Interstate Exploitation and Judicial Intervention*, 69 VA. L. REV. 563 (1983).
[149] Lawrence Tribe, AMERICAN CONSTITUTIONAL LAW 412 (1988).
[150] *Id.*
[151] Oliver Wendell Holmes Jr., THE COMMON LAW 1 (1881).

valor. The result is that in the words of Justice Holmes, because "hard cases make bad law," a legislative solution might be the only avenue.[152]

### IV. *Congress Correction of the Status Quo through the Full Faith and Credit Clause*

Enter Congress. While delicate matters of policy rarely divide themselves into "fields of black and white," in the interests of improving the administration of justice, members of the bench and bar alike ought to conclude that a federal choice of law statute is necessary for at least three reasons.[153] First, the current scheme is at loggerheads with the original reason for a choice-of-law regime among different jurisdictions -- bridging substantive differences of law across polities to facilitate multi-jurisdictional transactions and produce uniform outcomes in different courts. During the Early Modern Era in Northern Europe, for instance, private international law which encompassed admiralty and commercial law in addition to conflicts of law performed this function by providing stability to international commercial transactions.[154] More specifically, private international law purportedly ensured that the courts of all countries would come to the same conclusion in evaluating multi-step transnational transactions.[155] While it is absolutely true that "the basic premise...that American law should conform to the laws of the rest of the world"[156] is false, comparisons between our choice of law regime and those of somewhat similarly situated nations is still instructive because since the nineteenth century, prominent American scholars of all backgrounds such as Joseph Story have done the same in American conflicts treatises that have been read by American lawyers and cited by American courts.[157] To be clear, this discussion is only pertinent to choice of law within the United States as it would be a grave mistake to discuss domestic and international choice of law interchangeably without noting a legitimate reason for doing so for at least two reasons.[158] First, if one accepts the notion that choice of law in the United States is constitutional law, how the courts of Alabama or Mississippi treat the courts of Kentucky or Florida is no longer a matter that is left to their prerogative. By way of contrast, comity and diplomacy, not the nation's fundamental charter, are the primary factors that U.S. courts consider in handling foreign law.[159] There is nothing unorthodox about this; indeed, many constitutional

---

[152] *Northern Securities Co v United States*, 193 US 197,400 (1904) (Holmes dissenting).

[153] *Springer v. Government of the Philippine Islands*, 277 U.S. 189, 209 (Holmes J. dissenting).

[154] See Joseph Beale, A TREATISE ON THE CONFLICT OF LAWS 4 (1935); Ernest Lorenzen, HUBER'S DE CONFLICTU LEGUM, in SELECTED ARTICLES ON THE CONFLICT OF LAWS 136 (1947); William Burge, COMMENTARIES ON COLONIAL AND FOREIGN LAWS: GENERALLY, AND IN THEIR CONFLICT WITH EACH OTHER, AND WITH THE LAW OF ENGLAND (1838); Jean-Jacques Gaspard Foelix, *De Conflit Des Lois de Differentes Nations Ou Du Droit Internatcional*, 7 REVENUE RESTRANGE 81 (1840); Wilhelm Schaffner, ENTUEKLUNG DES INTERNATIONLEN PRIVATRECHTS (1841); Walther Hug, *The History of Comparative Law*, 45 HARV. L. REV. 1027 (1931).

[155] Mark Rosen, *Do Codification and Private International Law Leave Room for a New Law Merchant*, 5 CHI. J. INT'L L. 83 (2004); Randall Bridwell and Ralph Whitten, THE CONSTITUTION AND THE COMMON LAW: THE DECLINE OF THE DOCTRINES OF SEPARATION OF POWERS AND FEDERALISM 53 (1977).

[156] *Roper v. Simmons*, 543 U.S. 551, 608 (2005) (Scalia, J., dissenting).

[157] See, e.g., Joseph Story, COMMENTARIES ON THE CONFLICT OF LAWS 530 (1834); R. Kent Newmyer, SUPREME COURT JUSTICE JOSEPH STORY: STATESMAN OF THE OLD REPUBLIC (2004); James McClellan, JOSEPH STORY AND THE AMERICAN CONSTITUTION (1971); Gerald Dunne, JUSTICE JOSEPH STORY AND THE RISE OF THE SUPREME COURT (1970); Baker Blaine, *Interstate Choice of Law and Early-American Constitutional Nationalism. An Essay on Joseph Story and the Comity of Errors: A Case Study in Conflict of Laws*, 38 MCGILL L. J. 455 (1992); Kurt Nadleman, *Bicentennial Observations on the Second Edition of Joseph Story's Commentaries on the Conflict of Laws*, 28 AM. J. COMP. L. 67 (1980);

[158] William Baxter, *Choice of Law and the Federal System*, 16 STAN. L. REV. 1, 23 (1963).

[159] Robert Jackson, *Full Faith and Credit – The Lawyer's Clause of the Constitution*, 45 COLUM. L. REV. 1, 30 (1945).

DRAFT

clauses were crafted with an aim to abolish the impotent system created by the Articles of Confederation.[160] A cursory structural analysis of the document reveals many features that were intended to accomplish this end:[161] consider the Extradition Clause,[162] the Free Navigation Clause,[163] the Supreme Court's original jurisdiction over suits between states,[164] the prohibition on war and diplomacy between states,[165] the ban on state taxes of exports or imports.[166] Because a proper historiographical perspective requires recognition of the fact that the federal regime was conceived in an international order where it was commonplace to assume that women and men were "forever destined to depend for their political constitutions on accident and force" and questioned "whether societies…are really capable or not of establishing good government from reflection and choice," in the words of Virginia Law Professor, Douglas Laycock, "relations among American states were a new thing under the sun, and a choice of law system for those states [had to] come from the Constitution that created their relationships."[167] Second, and perhaps more importantly, there are more opportunities for intractable conflicts in a system with 195 nations with different cultures and political traditions than there are in a nation with fifty sovereign States that nonetheless share a common political tradition and civic religion.[168] Although states can (and should) disagree on close policy questions that, in the words of Justice Brandeis invite "experimentation in the fields of social and economic science," as Figure 3 in the appendix demonstrates, these disagreements are wholly removed from international choice of law's need to accommodate politically unstable states in need of short term humanitarian assistance, and aid with civilian administration, police monitoring and training, human rights monitoring and training, and economic reconstruction.[169]

Second, the current regime is incredibly wasteful for law firm clients. As Justice Jackson once argued litigation involving choice-of-law so frequently produces "delays, expense, and frustrations of our systems that it seldom occurs to us to inquire whether these are wise, or constitutionally necessary" even though lawyers arguably benefit from higher fees in the process.[170] In the states that have adopted one of the modern choice of law approaches, the parties may litigate at ludicrous length over the application of indeterminate criteria specified by the Second Restatement or the Draft Third Restatement. While lucrative, such an affair is often costly and time consuming. More than that, after the parties expend resources and convince the District Court or state trail court that the law of state X applies, the ensuing trial may prove useless if an appellate court later determines that the lower court selected rules from the incorrect jurisdiction. Costs are even higher if the plaintiff has chosen a distant and inconvenient forum simply because of the jurisdiction's favorable substantive law and it then turns out that the case cannot

---

[160] Max Farrand, THE FRAMING OF THE CONSTITUTION OF THE UNITED STATES (1913).
[161] Phillip Bobbitt, CONSTITUTIONAL FATE (1982).
[162] Art. IV §2.
[163] Art. I §9.
[164] SEE IF YOU CAN GET A LONG FOOTNOTE FROM YOUR TREATISE ON THE WEIRD STUFF THAT GOES ON HERE…
[165] Art. I §10.
[166] Id.
[167] Douglas Laycock, Equal Citizens of Equal and Territorial States: The Constitutional Foundations of Choice of Law, 92 COLUM. L. REV. 249 (1992).
[168] Sanford Levinson, CONSTITUTIONAL FAITH (2011).
[169] James Cockayne and David Malone, Peace Operations Then and Now, 11 GLOBAL GOVERNANCE 331 (2005); see also Harold Koh, How Is International Human Rights Law Enforced, 74 IND. L.J. 1397 (1998)
[170] Robert Jackson, Full Faith and Credit – The Lawyer's Clause of the Constitution, 45 COLUM. L. REV. 1 (1945).

subsequently be transferred to a more convenient venue. Second, the system frustrates rational planning for law firm clients. In the absence of a choice of law clause, when they act, parties will not know what law governs their behavior until they are hauled into the plaintiff's chosen forum. Of course, not every act that will give rise to a lawsuit is planned; some are, though. Institutional investors nonetheless still require information on how to reduce potential liability by making the activities they invest in safer. There is a difference of kind, not degree, between a legal regime where courts imperfectly apply determinate legal rules and a regime where courts deliberately embrace the notion that parties will act today and find out tomorrow what was expected of them. The results were captured by famed legal philosopher, Jeremy Bentham. Thus, it "is the Judges (as we have seen) that make the" rules governing choice of law."[171] "Do you know how they make it? Just as a [wo]man makes laws for h[er] dog. When your dog does anything you want to break him of, you wait till he does it, and then beat him for it. That is the way you make laws for your dog: and this is the way the Judges make laws for you and me." Fair enough. Should a nation with a twenty trillion dollar economy pattern its regulation of lawsuits involving internal corporate affairs on domestic pet discipline practices, though? One might retort that diversity delivers dividends in this context because some states, many of which are in New England or the Pacific Northwest, will naturally adopt choice of law rules that favor injured tort victims and contracting parties.[172] While there is some truth to this counter, it is not clear that the mere availability of a more liberal rule will produce the results that its proponents offer. Consider two problems. First, a traditional, wealthy, knowledgeable, repeat-player defendant could win the race to the courthouse of its choice and obtain a declaratory judgment. If a few states liberalized their standards for seeking a declaratory judgment, they could enlarge the range of cases where traditional defendants could evade tort regimes that favor plaintiffs. Second, outside of California, which itself has adopted overly expansive procedural and substantive unconscionability doctrines, liberal enforcement of forum selection clauses in click-rap contracts and contracts of adhesion could bind one-shotter claimants to litigation in distant courts or worse, arbitration, that they have to pay for in part or whole.[173]

Congress has the power to enter this domain. While questions of congressional capability have fallen out of vogue, choice of law matters present a peculiar conundrum because of previous original-drafter intent scholarship in the field. A brief foray into the public understanding of the meaning of the Clause's language in Early Modern England will provide some illumination. This inquiry is necessary in reasoning through this question because "minds as pure and as intelligent as this country can boast" consciously drew on this practice in crafting the U.S. constitution as well as their own colonial and state constitutions.[174] More than that, many ratifiers and framers, were either formally educated with these sources as they "read law" or became acquainted with them through formal legal education or temple membership in the United Kingdom.

In English law, the terms "faith" and "credit" were used to signify that some effect ought to be given to an item of evidence.[175] The terms could be used to describe evidence with a range

---

[171] 1 Jeremy Bentham, PRINCIPLES OF MORALS AND LEGISLATION, FRAGMENT ON GOVERNMENT, CIVIL CODE, PENAL LAW (1843),
[172] See, e.g., Louis Weinberg, *Against Comity*, 80 GEO. L.J. 53 (1991).
[173] Marc Galanter, *Why the "Haves" Come out Ahead: Speculations on the Limits of Legal Change*, 9 LAW & SOCIETY REVIEW 95 (1974).
[174] *McCulloch v. Maryland*, 17 U.S. 316, 402 (1819).
[175] Kurt Nadelmann, *Full Faith and Credit to Judgments and Public Acts: A Historical-Analytical Reappraisal*, 56 MICH. L. REV. 33 (1957).

Olapade                                                                                                    DRAFT

of weight such that an item that was accorded "faith and credit" might not be treated as conclusive evidence.[176] Sir Geoffrey Gilbert's treatise, *The Law of Evidence*, a text that appeared in wide use in the American colonies, aptly illustrates this treatment. References from Gilbert confirm that evidence accorded "faith" and "credit" would be treated as conclusive only if the modifier "full" was also included.[177] Of particular interest here was the text's treatment of judgments rendered by foreign courts that were entered into the record. English courts, as a matter of custom, typically refused to exercise jurisdiction over cases that required the administration of foreign law.[178] These courts, though, occasionally enforced foreign judgments on the theory that that the judgment created a "new cause of action, in the nature of a simple contract, suable upon in England."[179] By 1781, it had become well established that English courts were to treat foreign judgments as only providing prima facie evidence of a debt.[180] Thus, in the words of Sir Francis Buller of the Court of King's Bench, certain records were given "implicit faith…by the Courts of Westminster Hall."[181] English courts, however, could not give "more credit" to foreign judgments than to those of domestic courts of record with the exception of foreign judgments that were pleaded defensively and, as a result, were regarded as conclusive evidence of a matter.[182] Because late eighteenth century English tribunals overcame their aversion to applying foreign law during this time period, cases from this time period are also instructive on this matter.[183] Here, when it came to evidence of foreign law, after some equivocation on the question, statutory and customary law were eventually required to be introduced through parol evidence.[184] For the purposes of this article's focus on the Full Faith and Credit Clause, however, it should be noted that American courts in the early nineteenth century usually required authenticated copies of foreign laws to prove their content.[185] The result is that Justice Joseph Story's treatment of the matter in his famed treatise, *Commentaries on the Conflict of Laws* became the prevailing position of the period as "the usual modes of authenticating foreign [written] laws…[were] by an exemplification of a copy under the great seal of state; or by a copy proved to be a true copy; or by the certificate of an officer authorized by law, which certificate must be duly authenticated."[186] Justice Story, however, did acknowledge that "foreign unwritten laws, customs, and usages, may be proved, and indeed must ordinarily be proved by parol evidence…by the testimony of competent witnesses, instructed in the law under oath."[187]

The Full Faith and Credit Clause that appeared in the Articles of Confederation was framed against this backdrop. That Clause appears in the last paragraph of Article IV and reads "Full faith and credit shall be given in each of these States to the records, acts and judicial proceedings of the

---

[176] Ralph Whitten, *The Constitutional Limitations on State Court Jurisdiction: A Historical-Interpretive Reexamination of the Full Faith and Due Process Clauses*, 14 CREIGHTON L. REV. 499 (1981); *The Dutchess of Kingston's Case*, 168 Eng. Rep. 175 (H.L. 1776).

[177] Geoffrey Gilbert, THE LAW OF EVIDENCE 4 (1777).

[178] Albert Ehrenzweig, A TREATISE ON THE CONFLICT OF LAWS 4-5 (1962); Llewelyn Davies, *The Influence of Huber's De Conflictu Legum on English Private International Law*, 18 BRIT. Y.B. INT'L L. 49 (1937).

[179] See. e.g., *Hamilton v. Dutch East India Co*., 3 Eng. Rep. 573 (1732).

[180] See, e.g., *Galbraith v. Neville*, 99 Eng. Rep. 5 (K.B. 1789).

[181] *Walker v. Witter*, 99 Eng. Rep. 1 (K.B. 1778).

[182] *Phillips v. Hunter*, 126 Eng. Rep. 618 (C.P. 1795).

[183] See, e.g., *Boehtlink v. Schneider*, 170 Eng. Rep. 537 (C.P. 1799).

[184] See *Baron De Bode's Case*, 115 Eng. Rep. 854 (Q.B. 1845).

[185] *Livingston v. Maryland*, 10 U.S. 274 (1810); *Church v. Hubbert*, 6 U.S. 187 (1804); *Lincoln v. Battlelle*, 6 Wend. 475 (N.Y. 1831).

[186] Joseph Story, COMMENTARIES ON THE CONFLICT OF LAWS 530 (1834).

[187] *Id*.

courts and magistrates of every other State."[188] The Clause has a somewhat peculiar history as it was not included in the original draft of the Articles that was approved by the Continental Congress on August 20, 1776. Instead, the first draft was proposed by an amendment committee composed of Richard Henry Lee of Virginia, James Duane of New York, and Richard Law of Connecticut. The initial proposal read:

> That full faith and credit shall be given in each of these States to the Records, Acts, and Judicial Proceedings of the Courts and Magistrates of every other State, and that an Action of Debt may lie in the Court of Law in any State for the Recovery of a Debt due on Judgment of any Court in any other State; provided the Judgment Creditor gives sufficient Bond with Sureties before Said Court before whom Action is brought to respond in Damages to the Adverse Party in Case the original Judgment should be afterwards reversed and Set aside.[189]

The first independent clause was approved "without any change and, it would seem, without debate" on November 12, 1777.[190] A modification requiring notice, though, was proposed to the following clause introducing the debt action provision and bonding requirement. That amendment read "and provided the party against whom such judgment may have been obtained, had notice in fact of the service of the original writ upon which such judgment shall be founded."[191] The change was summarily rejected.[192] This vote is significant because it suggests that the Full Faith and Credit Clause in the Articles of Confederation was designed only to require sister States to admit state judgments into evidence as conclusive proof of the judgments' existence and contents. Indeed, this reading comports with the five reported decisions under the Clause from the Critical Period as well as several state court interpretations of similar charter or statutory language from the early and mid-eighteenth century.[193] Once one also considers that the Articles did not establish significant central control over state affairs, is becomes unlikely that the Clause was intended to establish a national rule preempting state regulations that refused to accord foreign judgments with the *res judicata* that their domestic counterparts enjoyed.[194]

The Framers naturally drew upon this experience in crafting the current Full Faith and Credit Clause. That provision provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."[195] While the phrase "Full Faith and Credit shall be given" was copied from the Articles; the two differ in that the Articles only required that full faith and credit be given to the records, acts, and judicial proceedings of the courts and magistrates of every other State while the Constitution commands that "public acts" also be accorded that status and omits the limiting phrase "of the courts and magistrates of every other state." As this textual modification and the subsequent history of its interpretation by Article

---

[188] ARTICLES OF CONFEDERATION art. IV.
[189] 9 JOURNALS OF THE CONTINENTAL CONGRESS 885 (1907).
[190] *Id.*
[191] *Id.*
[192] Merill Jensen, THE ARTICLES OF CONFEDERATION 182 (1940).
[193] *Kibbe v. Kibbe*, Kirby 119 (Conn. 1786); *Phelps v. Holker*, 1 Dall. 261 (Pa. 1788); *Miller v. Hall*, 1 Dall. 229 (Pa. 1788); *James v. Allen*, 1 Dall. 188 (Pa. 1786); *Jenkins v. Putnam*, 1 S.C.I. 3, 1 Bay 8 (1784).
[194] See, e.g., *Gage v. Bulkeley*, 27 Eng. Rep. 824 (Ch. 1744).
[195] U.S. CONST. art. IV, §1.

III courts and their State analogues will clarify, this provision is critical because it permits Congress to establish national choice of law rules in multijurisdictional corporate litigation.

While persuasive only for the purposes of proving a historical, as opposed to a legal, point, the evidence from the Constitutional Convention also supports this reading of the Full Faith and Credit Clause. Two of the four plans presented at the Convention contained Full Faith and Credit Clauses: the Pinckney Plan and the Hamilton Plan. The former was presented on May 29, 1787 and placed the provision in article 13 which read "full faith shall be given in each State to the acts of the Legislature & to the records & judicial Proceedings of the Courts & Magistrates of every State."[196] The latter placed the Clause in article IX, §5 and read "the citizens of each state shall be entitled to the rights privileges and immunities of citizens in every other state; and full faith and credit shall be given in each State to the public acts, records and judicial proceedings of another."[197] The matter then disappears from discussion until the Committee of Detail convened to prepare a draft of the Constitution between July 26 and August 6.[198] Once the Pinckney version was adopted, placed in Article XVI, and reported to the Convention, a modest debate ensued. Hugh Williamson of North Carolina readily threw up his hands and moved for a direction insertion of the Articles' Full Faith and Credit Clause as he could "not understand precisely the meaning of [article XVI]."[199] James Wilson of Pennsylvania and William Johnson of Connecticut ironically replied that the Clause would alter the status quo such that "judgments in one State should be the ground of actions in other States, & that acts of Legislatures should be included for the sake" of dealing with matters of "insolvency."[200] Charles Pinckney then attempted to accommodate dual creditor and interstate recognition concerns by committing article XVI along with a proposition that Congress be permitted to "establish uniform laws upon the subject of bankruptcies, and respecting the damages arising on the protest of foreign bills of exchange."[201] After Nathaniel Gorham of Massachusetts and James Madison seconded Pinckney's motion, Edmund Randolph sharply interjected that he knew of "no instance of one nation executing judgments of courts of another nation."[202] The result was a proposed amendment from Randolph that read:

> [w]henever the Act of any State, whether Legislative, Executive, or Judiciary shall be attested & exemplified under the seal thereof, such attestation and exemplification shall be deemed in other States as full proof of the existence of that act – and its operation shall be binding in every other State, in all cases to which it may relate, and which are within the cognizance and jurisdiction of the State, wherein the said act was done.[203]

This provision would have imposed a choice-of-law directive upon the several states because it was identical to §34 of the 1789 Judiciary Act, which required federal courts to make conflict-of-laws judgments independent of the state courts.[204] In any event, both Randolph's

[196] 3 Max Farrand, THE RECORDS OF THE FEDERAL CONVENTION OF 1787 601 (1911).
[197] Id. at 629.
[198] 2 Max Farrand, THE RECORDS OF THE FEDERAL CONVENTION OF 1787 135 (1911).
[199] Id. at 447.
[200] 2 Max Farrand, THE RECORDS OF THE FEDERAL CONVENTION OF 1787 447 (1911).
[201] Id.
[202] Id. at 448.
[203] Id.
[204] Indeed, the provision is still in effect and has been re-codified at 28 U.S.C. §1652.

amendment and Pinckney's motion were committed, eventually replaced, and reported to the Convention sitting as a Committee of the Whole on September 1, 1787 albeit in a substantially modified form. The new version read:

> [f]ull faith and credit ought to be given in each State to the public acts, records, and Judicial proceedings of every other State, and the Legislature shall by general laws prescribe the manner in which such acts, Records, & proceedings shall be proved, and the effect which Judgments obtained in one State, shall have in another.[205]

Upon the initial report, Nathaniel Gorham moved to strike the phrase "judgments obtained in one State shall have in another" from the final clause. This proposal was supported by George Mason of Virginia and Samuel Johnson of Connecticut ostensibly because both delegates were concerned that the Clause would grant Congress the ability to "declare the effect of Legislative acts of one State in [an]other State."[206] This motion passed on a 6-3 vote.[207] Any implication, however, that this modification gutted the Clause's force was soon put to rest by James Madison's successful proposal to replace the words "ought to" with shall and to insert the word "may" between the words "legislature" and "by general laws."[208] For the historian unconcerned with legal niceties, this drafting history ought to be sufficient to prove Congress' broad conflict-of-laws power over the states. Of course, though, the notion that drafter-intent originalism provides a legitimate interpretive methodology for constitutional questions has been thoroughly rebuked by the academy.

The consensus narrative for why this is so is a familiar fable in the halls of elite law schools. In 1971 an emerging conservative legal scholar named Robert Bork published a controversial article entitled *Neutral Principles and Some First Amendment Problems*.[209] The piece was an early articulation of Bork's originalist theory and gained more subscribers in the aftermath of the continuing backlash engendered by *Roe v. Wade*.[210] In this climate, conservative jurists and scholars increasingly sought to return to the lost principles of text, history, and structure and found refuge in Bork's celebration of the framers' original intent. By 1976, William Rehnquist was criticizing "The Notion of the Living Constitution" in the *Texas Law Review* in favor of "reading the record of the Founding Fathers' debates in Philadelphia" to determine the original intent behind constitutional provisions. This early effort was devoted to discovering drafter-intent as opposed to ratifier-intent and assigned a prized position to Max Farrand's *Records*. This soon changed, however, once the academy persuasively, systematically, and relentlessly began picking the notion of drafter-intent to pieces. For instance, how might one determine collective intent? Is not any such construct inherently artificial? At what level of abstraction should the collective intent be understood? What if the original intent of the Framers was that their own original intent should not be controlling, authoritative, or even persuasive evidence of the proper interpretation of a constitutional provision? Original-intent critiques, moreover, hailed from a wide array of ideological camps. Yale Law School Professor Bruce Ackerman, a noted liberal, for instance, has

---

[205] 2 Max Farrand, THE RECORDS OF THE FEDERAL CONVENTION OF 1787 485 (1911).
[206] *Id.* at 488-89.
[207] *Id.*
[208] *Id.*
[209] Robert H. Bork, *Neutral Principles and Some First Amendment Problems*, 47 IND. L. J. 1 (1971).
[210] Ruth Bader Ginsberg, *Some Thoughts on Autonomy and Equality in Relation to Roe v. Wade*, 63 N.C. L. REV. 375 (1984); John Hart Ely, *On the Wages of Crying Wolf: A Comment on Roe v. Wade*, 82 YALE L. J. 920 (1973).

Olapade                                                                      DRAFT

argued that "interpreters should place very little weight on the secret notes that Madison compiled during the constitutional convention."[211] Ackerman's conservative counterpart, Stephen Carter agrees writing that "it is difficult to see why…secret legislative history is entitled to probative value on the question of the original understanding of the lawgivers themselves."[212] Finally, a curious bipartisan duo including Professors Akhil Reed Amar and Steven Calabresi have both maintained that "Madison's *Notes* should be seen as accurate but indirect evidence of the way many leaders in 1787 thought, and of the things that many are likely to have said during the ratification process in speeches and conversations of which no reliable transcript exists today."[213] The result was that original-intent originalism was on the wane by the 1980s and replaced with theories of original-understanding. This shift was based on the recognition that it was the action of the Constitution's ratifiers that, in the words of Justice Holmes, "called the [Constitution] into life."[214]  Under this approach, the ratifiers' understandings of the words and phrases themselves assumed principle importance to the detriment of subjective intent. Because the *Records* at Philadelphia were kept secret until James Madison passed away, their contents, while piquing the perpetual interest of historians, became irrelevant in ascertaining constitutional meaning in legal disputes. Put in another way, if one conceives of the constitution as a compact, and believes in reliance based contract theories to uncover ratifier understandings from debates in conventions and the press, Jonathan Elliott brought more to the table than Max Farrand.

This approach is driven by the assumption that the Constitution – through the Supremacy Clause – holds itself out as authoritative, written law.[215] It follows that it would take quite a deal of maneuvering to posit that the text is not the touchstone purportedly because the Supremacy Clause may be subject to interpretation by principles extrinsic to it. Indeed, the self-referential nature of the document, and the absence of any reference by the text to extrinsic governing principles, reinforces the general "default rule" that the text must be treated as authoritative when interpreting legal materials.[216] Under this approach, textualism – the notion that the interpreter who applies the Constitution as law must be bound by the meaning of the words and phrases written down in the text – is the single, true method of constitutional interpretation.[217] The ascension of Antonin Scalia to the high bench in 1986 prompted further refinement of this theory first in a lecture that Justice Scalia gave at the University of Cincinnati Law School and subsequently in his controversial pamphlet: *A Matter of Interpretation.*[218] In the words of former Yale Law School Professor Ronald Dworkin, Scalia's brand of original public meaning originalism prioritized semantic meaning and understandings over original expected applications.[219] Scalia's followers,

---

[211] Bruce Ackerman, *The Storrs Lectures: Discovering the Constitution*, 93 YALE L.J. 1013, 1059 n.80 (1984).

[212] Stephen Carter, *The Independent Counsel Mess*, 102 HARV. L. REV. 105, 122-25 (1988).

[213] Akhil Amar, *Our Forgotten Constitution: A Bicentennial Comment*, 97 YALE L.J. 281, 288 (1987); Steven Calabresi and Saikrishna Prakash, *The President's Power to Execute the Laws*, 104 YALE L.J. 541, 576 (1994).

[214] *Missouri v. Holland*, 252 U.S. 416, 433 (1920).

[215] U.S. CONST. art. VI, cl. 2.

[216] Saikrishna Prakash, *Unoriginalism's Law Without Meaning*, 15 CONST. COMMENT. 529, 540-46 (1998).

[217] Vesan Kesevan and Michael Stokes Paulsen, *The Interpretive Force of the Constitution's Secret Drafting History*, 91 GEO. L.J. 1113, 1129 (2002).

[218] Antonin Scalia, Speech Before the Attorney General's Confrence on Economic Liberties (June 14, 1986), in OFFICE OF LEGAL POLICY, ORIGINAL MEANING JURISPRUDENCE: A SOURCEBOOK 106 (U.S. Dept. of Justice 1987); Antonin Scalia, *Originalism the Lesser Evil*, 81 U. CINN. L. REV. 849 (1995); Antonin Scalia, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW (1997).

[219] Ronald Dworkin, *Comment*, in Antonin Scalia, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW (1997).

Olapade                                                                    DRAFT

moreover, improved upon his insights. Michael McConnell, a law professor at Stanford, former judge on the U.S. Court of Appeals for the Tenth Circuit, and student of Justice Scalia, Seventh Circuit Judge Frank Easterbrook, a former colleague of Justice Scalia's at the University of Chicago, Northwestern University Law Professor Steven Calabresi, and Harvard Law Dean John Manning come to mind.[220] Regardless of whether one subscribes to the theory, and there is certainly not a shortage of prominent judicial conservatives who offer ample alternatives,[221] any discussion of jurisdiction stripping, or almost any other constitutional question, must offer some claims on originalist terms. Indeed, in the words of Justice Kagan, "we are all originalists now."[222]

On this matter, *The Federalist* provides instructive evidence of the original public understanding of the Full Faith and Credit Clause. While one ought to be hesitant to refer to the essays because as former Stanford Law School Dean Larry Kramer has shown, the pamphlet's circulation was far too small to influence the ratification convention,[223] in the words of Justice Scalia, *The Federalist* is a body of work that "like those of other intelligent and informed people of the time [that] display[s] how the text of the constitution was originally understood."[224] With this baseline, Federalist 42 provides a compelling example of the Full Faith and Credit Clause's meaning. In closing his cursory comments on Congress' foreign affairs powers Madison noted that:

> [t]he power of prescribing by general laws, the manner in which the public acts, records and judicial proceedings of each State shall be proved, and the effect they shall have in other States, is an evident and valuable improvement on the clause relating to this subject in the articles of Confederation. The meaning of the latter is extremely indeterminate, and can be of little importance under any interpretation which it will bear. The power here established may be rendered a very convenient instrument of justice, and be particularly beneficial on the borders of contiguous States, where the effects liable to justice may be suddenly and secretly translated, in any stage of the process, within a foreign jurisdiction.

The discussion in this passage is noteworthy primarily because it assumes that while Congress could intervene and specify a conflict-of-laws rule that would be binding upon the States,

---

[220] See, e.g., Michael McConnell, *Originalism and the Desegregation Decisions*, 81 VA. L. REV. 947 (1995); Frank Easterbrook, *Textualism and the Dead Hand*, 66 GEO. WASH. L. REV. 1119 (1998).
[221] J. Harvie Wilkinson, COSMIC CONSTITUTIONAL THEORY: WHY AMERICANS ARE LOSING THEIR INALIENABLE RIGHT TO SELF-GOVERNANCE (2012); Richard Posner, HOW JUDGES THINK (2008); see also Michael W. McConnell, *Four Faces of Conservative Legal Thought*, 34 L. Sch. Record 12 (1988).
[222] William Baude, *Is Originalism Our Law*, 115, COLUM. L. REV. 2349, 2352 (2015). I am indebted to Yale Law School Professor Akhil Amar for this analysis on original public meaning. Full disclosure requires that this portion previously appeared in a previous paper of mine.
[223] Larry Kramer, *Madison's Audience*, 112 HARV. L. REV. 611 (1999).
[224] Antonin Scalia, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 38 (1997) see also Gregory E. Maggs, *A Concise Guide to the Federalist Papers as a Source of the Original Meaning of the United States Constitution*, 87 B.U. L. REV. 801 (2007); William N. Eskridge, Jr., *Cycling Legislative Intent*, 12 INT'L REV. L. & ECON. 260, 261 (1992).

DRAFT

it was not required to do so. The result is the original public understanding of the Full Faith and Credit Clause confirms that Congress has the power to pass a national choice of law statute.

The Clause's interpretation becomes clearer once one considers the paradigmatic problem that it was drafted to confront: cases where the creditor was unable to enforce a judgment that was obtained against a debtor in one state because the debtor fled to a neighboring or distant jurisdiction.[225] More specifically, creditors confronted six problems. First, the creditor had to obtain an admissible copy of the law or judgement that she or he relied upon – a task that was rather difficult because federal statutes were not regularly published until several years after the founding.[226] To take just one example, while authenticated copies of the federal full faith and credit statute could be purchased from the State Department during the early nineteenth century, the law was apparently so difficult to obtain that case reporters began appending copies of the statute to their texts.[227] Second, assuming that copies of the relevant law or judgment were even available, facsimiles were often highly unreliable because of either mistaken, or in some cases, deliberate, typographic errors.[228] Third, creditor claims were also encumbered by the prevailing evidentiary rules of the time. More specifically, the 'best-evidence rule' dictated that when better evidence of proving a matter might be in the party's "own possession and power," second best evidence would be regarded as "insufficient" and "prove nothing."[229] The rule created a hierarchy of public records as the following records were received by state and federal courts in order of decreased credibility: original archival records, exemplifications or copies bearing an official seal, and exemplifications under the seal of a particular court. The problem? The hierarchy created by the best evidence rule did not provide criteria on how to assess the credibility of records produced in one state but presented before the courts of another jurisdiction. The result was that it was not uncommon for state courts to not accept sealed exemplifications or insist that a jury decide the authenticity of given record.[230] Fourth, creditors could encounter difficulty in obtaining sworn copies of a relevant document because the relevant witnesses might refuse to testify, the parties themselves were disqualified from testifying at least in common law proceedings, or the clerks and record keepers from the court that issued the original judgment were beyond the reach of the state courts' process in the debtor's new home. Fifth, some courts, following the trend in late eighteenth century England,[231] may have refused to directly enforce foreign judgments for procedural reasons. Here, creditors were forced to argue that the foreign money judgment was consideration for an implied promise to pay, which could be enforced through a debt or assumpsit action.[232] In these proceedings, however, the judgments could be reexamined where "the truth of the matters therein contained [would], if disputed, be tried and determined by a jury."[233] Sixth, a state court might refuse to enforce a creditor's judgment because it suspected that the foreign court had applied

---

[225] See, e.g., Jed Rubenfeld, REVOLUTION BY JUDICIARY (2005).
[226] Ralph Dwan and Ernest Feidler, *The Federal Statutes -- Their History and Use*, 22 MINN. L. REV. 1008 (1938).
[227] See, e.g., *Tarlton v. Briscoe*, 8 Ky. 67, 69 (1817).
[228] See, e.g., *United States v. Amedy*, 24 U.S. 392, 393 (1826).
[229] Geoffrey Gilbert, THE LAW OF EVIDENCE 16 (1777).
[230] See, e.g., *Frey v. Wells*, 4 Yeates 497 (Pa. 1808); *Delafield v. Hand*, 3 Johns. 310 (N.Y. 1808).
[231] See, e.g., *Walker v. Witter*, (1778) 99 Eng. Rep. 1, 4 (K.B.)
[232] *Id.*
[233] *Philips v. Hunter*, (1795) 126 Eng. Rep. 618 (Exch. Ch.).

substantively unconscionable rules – usually some perceived violation of the international law of personal jurisdiction[234] – in granting the creditor her or his award.[235]

In the words of the father of the Constitution, however, a Constitution can in some instances be but a "parchment barrier."[236] Instead, especially when it comes to positive grants of power, Congress' understanding of what a given Clause requires can be much more consequential. The same is true for the Full Faith and Credit Clause. The statute that Congress adopted in 1790 to implement this provision provided in full that:

> "the acts of the legislatures of the several states shall be authenticated by having the seal of their respective states affixed thereto: That the records and judicial proceedings of the courts of any state, shall be proved or admitted in any other court within the United States, by the attestation of the clerk, and the seal of the court annexed, if there be a seal, together with a certificate of the judge, chief justice, or presiding magistrate, as the case may be, that the said attestation is in due form. And the said records and judicial proceedings authenticated as aforesaid, shall have such faith and credit given to them in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."[237]

Confusion over the statute's meaning was manifest from the outset because it was unclear whether records produced in one state were to be given the same preclusive effect in other states or whether the documents were simply equally good evidence of certain public transactions as the original records in their home courts. While the statute does not differentiate between legislative acts and judgments, the Clause has been invoked almost exclusively in disputes involving the

---

[234] See, e.g., *Buchanan v. Rucker*, (1808) 103 Eng. Rep. 546 (K.B.).

[235] *Penhallow v. Doane's Adm'rs*, 3 U.S. 54 (1795); *Ludlow v. Dale*, 1 Johns. Cas. 16 (N.Y. 1799).

[236] Federalist 48 (Madison), in Clinton Rossiter, ed, The Federalist Papers at 308.

[237] 28 U.S.C. §1738; For interpretations of this statute in conformity with the position advanced in this article, see *Williamson v. Berry*, 49 U.S. 495, 12 L. Ed. 1170 (1850); *Bank of State of Alabama v. Dalton*, 50 U.S. 522, 13 L. Ed. 242 (1850); *Cage v. Cassidy*, 64 U.S. 109, 16 L. Ed. 430 (1859); *Hanley v. Donoghue*, 116 U.S. 1, 6 S. Ct. 242, 29 L. Ed. 535 (1885); *Adam v. Saenger*, 303 U.S. 59, 62, 58 S. Ct. 454, 456, 82 L. Ed. 649 (1938); *U S v. Wilson*, 28 F. Cas. 699 (C.C.E.D. Pa. 1830); *Hudson v. Green Hill Seminary Corp.*, 113 Ill. 618 (1885); *Henthorn v. Doe ex dem.* Shepherd, 1 Blackf. 157 (1822); *Bank of Missouri v. Merchants' Bank*, 10 Mo. 123 (1846); *Ray v. Stewart*, 105 N.C. 472, 11 S.E. 182 (1890); *Whitney v. Walsh*, 55 Mass. 29 (1848); *Caruthers v. Corbin*, 38 Ga. 75 (1868); *Shary v. Eszlinger*, 45 N.D. 133, 176 N.W. 938 (1920); *Frye-Bruhn Co v. Meyer*, 121 F. 533 (9th Cir. 1903); *Walker v. Sleight*, 30 Iowa 310 (1870); *Nw. Brewers Supply Co. v. Vorhees*, 356 Mo. 699, 203 S.W.2d 422 (1947); *Schmierer v. Tribal Tr.*, 2018-NMCA-058, 427 P.3d 143, cert. denied (Sept. 20, 2018); *De Vall v. De Vall*, 57 Or. 128, 109 P. 755 (1910); *Flake v. Day*, 22 Ala. 132 (1853); *Harlan v. Peck*, 33 Cal. 515 (1867); *Cook's Estate v. Brown*, 346 Mo. 281, 140 S.W.2d 42 (1940); *Leathe v. Thomas*, 109 Ill. App. 434, 453 (Ill. App. Ct. 1903), aff'd, 218 Ill. 246, 75 N.E. 810 (1905); *Tilt v. Kelsey*, 207 U.S. 43, 57, 28 S. Ct. 1, 6, 52 L. Ed. 95 (1907); *Moyer v. Van-Dye-Way Corp.*, 126 F.2d 339, 341 (3d Cir. 1942); *Allnut v. Lancaster*, 76 F. 131, 132 (C.C.D.S.C. 1896); *Keyser v. Lowell*, 117 F. 400, 402 (8th Cir. 1902); *Hieston v. Nat'l City Bank of Chicago*, 280 F. 525 (D.C. Cir. 1922); *Lewis v. Adams*, 70 Cal. 403, 11 P. 833 (1886); *Sammis v. Wightman*, 31 Fla. 10, 12 So. 526 (1893); *Holt v. Johnson*, 50 Mo. App. 373 (1892); *Gordon v. Hillman*, 47 Cal. App. 571, 191 P. 62 (Cal. Ct. App. 1920); *Ambler v. Whipple*, 139 Ill. 311, 28 N.E. 841 (1891); *Bleakley v. Barclay*, 75 Kan. 462, 89 P. 906 (1907); *Kincaid v. Storz*, 52 Mo. App. 564 (1893).

Olapade                                                                                    DRAFT

interstate enforcement of state judicial decisions, rather than statutes.[238] The result is that the Fourteenth Amendment's Due Process Clause has served as the locus for addressing interstate recognition of other states' laws. Aside from the fact that the Full Faith and Credit Clause only applies in proceedings where the competing jurisdiction is another state, and not a foreign country,[239] the primary difference between the two provisions lies in the fact that the Due Process Clause prohibits states from applying their adjudicative process or rules of decision to the exclusion of analogous processes in a sister state while the Full Faith and Credit Clause is targeted at parochial discrimination.[240] There is nothing deterministic about this arrangement because the Taney Court itself found that ambitious long-arm statutes could violate the Full Faith and Credit Clause before the Fourteenth Amendment was adopted[241] while the White and Hughes Courts once concluded that the Due Process Clause placed limits on choice of law since the Clause protected rights that had "vested" in another state.[242]

On this measure, resort to the original public understanding of the Clause, as its meaning was liquidated by the ratifiers,[243] is critical because it is well-established "that a contemporaneous…exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given [the Constitution's] provisions."[244] On this score, the evidence, while not unequivocal, demonstrates that a majority of federal District Court panels concluded that the 1790 statute mandated that "record[s] shall [be given] the same effect in [the] courts [where they were presented], as in the court from which [they were] taken."[245] These

---

[238] Lea Brilmayer and Stefan Underhill, *Congressional Obligation to Provide a Forum for Constitutional Claims: Discriminatory Jurisdictional Rules and the Conflict of Laws*, 69 VA. L. REV. 819 (1983); but see *Hughes v. Fetter*, 341 U.S. 609 (1951); *Broderick v. Rosner*, 294 U.S. 629 (1935); *Kenney v. Supreme Lodge*, 252 U.S. 411 (1920); *Canadian N. Ry. v. Eggen*, 252 U.S. 553 (1920);

[239] *Home Ins. Co. v. Dick*, 281 U.S. 397, 410-11 (1930).

[240] *International Shoe Co. v. Washington*, 326 U. S. 310 (1945); *World-Wide Volkswagen Corp v. Woodson*, 444 U.S. 286 (1980); *Burger King v. Rudzewicz*, 471 U.S. 462 (1985); *Asahi Metal Indus. v. Superior Court*, 480 U.S. 102 (1987); *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017); *Daimler AG v. Bauman*, 571 U.S. 117 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011); *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873 (2011); *Burnham v. Superior Court of California, Cty. of Marin*, 495 U.S. 604 (1990); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984); A*Shaffer v. Heitner*, 433 U.S. 186 (1977); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985); *Calder v. Jones*, 465 U.S. 783 (1984); *Hanson v. Denckla*, 357 U.S. 235 (1958); *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987); *Saenz v. Roe*, 526 U.S. 489, 503 (1999).

[241] *D'Arcy v. Ketchum*, 52 U.S. 165 (1850).

[242] See, e.g., *Hartford Accident & Indem. Co. v. Delta & Pine Land Co.*, 292 U.S. 143 (1934); *New York Life Ins. Co. v. Dodge*, 246 U.S. 357 (1918); see also *Home Ins. Co. v. Dick*, 281 U.S. 397, 50 S. Ct. 338, 74 L. Ed. 926 (1930); *Connecticut Gen. Life Ins. Co. v. Johnson*, 303 U.S. 77, 58 S. Ct. 436, 82 L. Ed. 673 (1938).

[243] William Baude, *Constitutional Liquidation*, 71 STAN. L. REV. 1 (2019); Adam Griffin, *First Amendment Originalism: The Original Law and A Theory of Legal Change As Applied to the Freedom of Speech and of the Press*, 17 FIRST AMEND. L. REV. 91, 95 (2018);

[244] *Myers v. United States*, 272 U.S. 52, 175 (1926); *J. W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 412 (1928); *Eldred v. Ashcroft*, 537 U.S. 186, 213 (2003); *Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997); *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) *Bauer v. Marmara*, 942 F. Supp. 2d 31 (D.D.C. 2013), aff'd on other grounds, 774 F.3d 1026 (D.C. Cir. 2014)

[245] *Armstrong v. Carson*, 1 F. Cas. 1140 (C.C.D. Pa. 1794); see also *Green v. Sarmiento*, 10 F. Cas. 1117 (C.C.D. Pa. 1810); *Bissell v. Briggs*, 9 Mass. 462 (1813); For cases subsequently adopting this influential position, see *Christmas v. Russell*, 72 U.S. 290, 18 L. Ed. 475 (1866) *Harding v. Alden*, 9 Me. 140, 140 (1832); *Sewall v. Sewall*, 122 Mass. 156, 156 (1877); *Lucas v. Bank of Darien*, 2 Stew. 280 (1830); *Rangely v. Webster*, 11 N.H. 299, 299 (1840); *Nat'l Bank of St. Johnsbury v. R.E. Peabody & Co.*, 55 Vt. 492 (1883); *Kane v. Cook*, 8 Cal. 449 (1857); *Pritchett v. Clark*,

DRAFT

decisions constitute significant probative evidence of the statute's original public meaning because two of the three were authored by James Wilson and Bushrod Washington two "leading jurists of the day." In any event, even if one disagrees with the notion that statutes ought to have meanings with some discernable connection to the problems they were originally intended to combat, the Supreme Court settled the matter in 1813 by adopting this interpretation of the 1790 Full Faith and Credit statute.[246]

A skeptic might retort that even if Congress could impose a uniform choice of law system on the states, a regime with a national choice of law statute would be sub-optimal because it could prevent private firms from opting out from the coverage of inefficient state laws. As Florida State Law Dean Erin O'Hara and Larry Ribstein have argued, the theory here is that if a law is ill-suited for some parties or transactions, social costs will rise as the number of these parties and transactions increase.[247] Inefficiency arises from four sources. First, even sophisticated repeat player firms incur agency costs in monitoring the behavior of legislators in jurisdictions where they maintain business operations.[248] Second, as is the case in Congress,[249] and even more so at the State level, lawmakers may lack knowledge and foresight on the effects of bills that are voted on.[250] Third, lawmakers may be unable to craft an efficient regulation because a statute may impose net costs on some individuals even if it yields a net benefit in its application to others. To take an example from California trusts and estates law, a proposed statute of general application that permitted a guardian to manage the property of an individual who wastes or reduces her or his estate through excessive drinking, gambling, idleness, or debauchery in a manner that exposes that individual or her or his family to indigence or suffering would likely operate efficiently in Needles, California and the hundreds of small villages in the arid, rugged southeastern region of the Golden State because of close community ties while also producing inefficient outcomes in large cities such as Los Angeles and San Francisco where residents who engage in countless "simplex" transactions every day may not know that they are dealing with an individual with questionable

3 Del. 241 (1840); *Davis v. Smith*, 5 Ga. 274 (1848); *Zepp v. Hager*, 70 Ill. 223 (1873); *Holt v. Alloway*, 2 Blackf. 108 (1827); *Hindman v. Mackall*, 3 Greene 170 (1851); *Wilcox v. Kassick*, 2 Mich. 165 (1851); *Morey v. Morey*, 27 Minn. 265, 6 N.W. 783 (1880); *Finney v. The Fayette*, 10 Mo. 612 (1847); *Steere v. Tenney*, 50 N.H. 461 (1871); *Reynolds v. Stansbury*, 1851 WL 35 (Ohio Dec. 1851); *Noble v. Thompson Oil Co.*, 79 Pa. 354 (1875); *Barrett v. Oppenheimer*, 59 Tenn. 298 (1873); *Tennell v. Breedlove*, 54 Tex. 540 (1881); *Rootes' Ex'x v. Tompkins' Trustees*, 44 Va. 98 (1846); *Rape v. Heaton*, 9 Wis. 328 (1859); *Ellis v. Clarke*, 19 Ark. 420 (1858); *Hoxie v. Wright*, 2 Vt. 263, 263 (1828); *Hall v. Williams*, 23 Mass. 232, 232 (1828); *Gleason v. Dodd*, 45 Mass. 333, 333 (1842); *Warren Mfg. Co. v. Etna Ins. Co.*, 29 F. Cas. 294 (C.C.D. Conn. 1800); *Moulin v. Trenton Mut. Life & Fire Ins. Co.*, 24 N.J.L. 222, 222 (Sup. Ct. 1853); *Starbuck v. Murray*, 1830 WL 2980 (N.Y. Sup. Ct. 1830); *Borden v. Fitch*, 1818 WL 1789 (N.Y. Sup. Ct. 1818); *Carleton v. Bickford*, 79 Mass. 591, 591 (1859); *Gillespie v. Commercial Mut. Marine Ins. Co.*, 78 Mass. 201, 201 (1858); *Barringer v. King*, 71 Mass. 9, 9 (1855); *Colt v. Partridge*, 48 Mass. 570, 570 (1844); *Dawes v. Head*, 20 Mass. 128, 128 (1825); *Tolmie's Lessee v. Thompson*, 24 F. Cas. 8 (C.C.D.D.C. 1827); *Miller's Ex'rs v. Miller*, 17 S.C.L. 242 (S.C. App. L. & Eq. 1829);

[246] *Mills v. Duryee*, 11 U.S. 481 (1813).

[247] Erin O'Hara and Larry Ribstein, *From Politics to Efficiency in Choice of Law*, 67 U. CHI. L. REV. 1151 (2000); see also *Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045, 1054 (Del. 2015).

[248] Robert Tollison, *Public Choice and Legislation*, 74 VA. L. REV. 339 (1988).

[249] See generally Terry Moe and William Howell, RELIC: HOW OUR CONSTITUTION UNDERMINES EFFECTIVE GOVERNMENT--AND WHY WE NEED A MORE POWERFUL PRESIDENCY (2016).

[250] See, e.g., *INS v. Chadha*, 462 U.S. 919 (1983); see also Richard Lau and David Redlawsk, *Advantages and Disadvantages of Using Cognitive Heuristics in Political Decision Making*, AMERICAN JOURNAL OF POLITICAL SCIENCE (2001).

Olapade                                                                                    DRAFT

judgment.[251] Fourth, corporate firms may be unable to count on state courts to decline to enforce legislator bargains because of the latter group's control over judicial salaries and electoral districts and the fact that many members of the State bench depend on political contributions from trial lawyer associations, which often seek to attract litigation to their State regardless of whether the disputes will produce efficient incentives.[252] Fair enough. But, the response to all of this must be that the mere fact that Congress sets out a uniform set of rules for selecting the laws of one State to govern the affairs of a contract does not mean that firms will be unable to opt-out of regulation by overzealous States. Quite the opposite, a uniform choice of law statute presupposes that the parties have an option to choose which jurisdiction's laws will regulate their affairs.

V. *Why a National Choice of Law Statute is Consistent with Other Features of the Current Corporate Regulatory Regime*

These conclusions have significant implications for corporate law litigators. This is so because the several States could be said to be competing for the business of corporate firms exploring the possibility of a merger or acquisition in what famed corporate law scholar Larry Ribstein has referred to as the "general market for law."[253] Parties contract for law to ensure that their disputes will be resolved according to the law that ostensibly best fits their relationship. Because the parties' contract embodies the basic terms of their relationship, the quest for fit, assuming one party is not anticipating to shirk the deal to avoid sandbagging or the acquirer is not planning to exercise its right to terminate the deal in the event of a competing bid favored by the target's board, implies that the parties would prefer to select a jurisdiction that will enforce the contract. Without choice-of-law clauses, parties to interstate contracts, or even international

---

[251] See, e.g., *Carmack v. Reynolds*, 2 Cal. 5th 844, 391 P.3d 625 (2017); see also *Diversified Funding Grp., LLC v. Hendon*, No. CV1700189VAPAFMX, 2017 WL 3014492, at *6 (C.D. Cal. June 12, 2017), report and recommendation adopted, No. 217CV00189VAPAFMX, 2017 WL 3014494 (C.D. Cal. July 12, 2017), aff'd, No. 17-56242, 2019 WL 1492576 (9th Cir. Apr. 3, 2019) (applying California trust law).

[252] See, e.g., Jonathan Macey, *Judicial Preferences, Public Choice, and the Rules of Procedure*, 23 J. LEGAL STUDIES 627 (1994).

[253] See, e.g., *CTS Corp. v. Dynaisc Corp. of Am.*, 481 U.S. 69 (1987); *VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108 (Del. 2005); *Country Classic Dairies, Inc. v. State of Mont., Dep't of Commerce Milk Control Bureau*, 847 F.2d 593 (9th Cir. 1988); *Freedman v. Redstone*, 753 F.3d 416 (3d Cir. 2014); *Domanus v. Locke Lord LLP*, 847 F.3d 469 (7th Cir. 2017); *Bus. Roundtable v. S.E.C.*, 905 F.2d 406 (D.C. Cir. 1990); *Anderson v. Sea/Sue Inc.*, No. CV1304228GAFVBKX, 2013 WL 12139143 (C.D. Cal. July 23, 2013); *Freedman v. Redstone*, No. CV 12-1052-SLR, 2013 WL 3753426 (D. Del. July 16, 2013), aff'd, 753 F.3d 416 (3d Cir. 2014); *Robinson v. 1st Am. Steel, LLC*, No. 2:11-CV-309, 2013 WL 2456264 (N.D. Ind. June 6, 2013); *Shepard v. Humke*, No. IP 01-1103-C H/G, 2002 WL 1800311 (S.D. Ind. July 9, 2002); *Shepard v. Meridian Ins. Grp., Inc.*, 137 F. Supp. 2d 1096 (S.D. Ind. 2001); *Zloop, Inc. v. E Recycling Sys.*, LLC, No. 5:14-CV-87, 2014 WL 6977791 (W.D.N.C. Dec. 9, 2014); *Volvo Trademark Holding Aktiebolaget v. AIS Const. Equip. Corp.*, 416 F. Supp. 2d 404 (W.D.N.C. 2006), aff'd sub nom. Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co., 510 F.3d 474 (4th Cir. 2007); *Bank of New York v. Yugoimport SDPR J.P.*, 780 F. Supp. 2d 344 (S.D.N.Y. 2011), aff'd sub nom. Bank of New York v. Yugoimport, 745 F.3d 599 (2d Cir. 2014); *Canal Ins. Co. v. Montello, Inc.*, 822 F. Supp. 2d 1177 (N.D. Okla. 2011); *Montague v. Dixie Nat. Life Ins. Co.*, No. C/A 3:09-687-JFA, 2010 WL 753342 (D.S.C. Feb. 26, 2010); *In re Joseph Walker & Co., Inc.*, 522 B.R. 165 (Bankr. D.S.C. 2014); *Lidow v. Superior Court*, 206 Cal. App. 4th 351, 141 Cal. Rptr. 3d 729 (2012); *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934 (Del. Ch.), judgment entered sub nom. Boilermakers Local 154 Ret. Fund & Key W. Police & Fire Pension Fund v. Chevron Corp. (Del. Ch. 2013); *In re Topps Co. Shareholders Litig.*, 924 A.2d 951 (Del. Ch. 2007); *Rosenmiller v. Bordes*, 607 A.2d 465 (Del. Ch. 1991); *Hart v. Gen. Motors Corp.*, 129 A.D.2d 179, 517 N.Y.S.2d 490 (1987); *In re All Cases Against Sager Corp.*, 2012-Ohio-1444, 132 Ohio St. 3d 5, 967 N.E.2d 1203; *Roberts v. TriQuint Semiconductor, Inc.*, 358 Or. 413, 364 P.3d 328 (2015); *Lilliquist v. Copes-Vulcan, Inc.*, 2011 PA Super 102, 21 A.3d 1233 (2011); *Rein v. ESS Grp., Inc.*, 184 A.3d 695 (R.I. 2018); *VIZIO, Inc. v. Klee*, 886 F.3d 249 (2d Cir. 2018)

arbitration agreements for that matter, cannot confidently predict what law a court or arbitral body will apply to the dispute. Thus, as Part II explained, the dominant rule for choice of law in contract cases in the United States is that courts will apply the law of the state with "the most significant relationship to the transaction and the parties."[254]  This market is crucial because during contracting or merger negotiations, the parties would ideally prefer to know what default rules will apply, may prefer to standardize arrangements with a motley collection of entities that it enters the same relationship with, and would like to determine whether the contract or merger agreement's language will be interpreted rigidly or flexibly.[255]  Firm mobility, though, poses significant problems for state regulators as some parties will opt-out of a state's regulatory structure to avoid substantive rules that are perceived to be unfavorable. Avoidance arrives from different directions. Firms can attempt to prevent courts from exercising personal jurisdiction over them by limiting contacts with a state to those that are non-extensive.[256]  This same strategy is often helpful for influencing a court's choice of law analysis as well because (1) of course, the likelihood of a state's law applying to a dispute is positively correlated with the party's connection to the jurisdiction and (2) the Second Restatement conditions enforcement of a choice of law provision on the parties' connection with the designated state.

The Internal Affairs Doctrine, a staple of many introductory corporate law courses that enables corporations to organize under the law of any state regardless of where they are physically located,[257] provides an apt example of this phenomenon. Moreover, unlike other contracts summarized in §187 of the Second Conflicts Restatement which conditions the enforceability of choice of law provisions on the presence of a substantial connection between the chosen law and the parties or the regulatory interest of the state with the mandatory rule,[258] there is no public policy exception to the internal affairs doctrine.[259]

This exception for corporations in the context of the internal affairs doctrine is a curious one because one could conceive of a corporation as a set of contracts among shareholders, managers, creditors, employees, and other parties.[260] The terms of the agency contract include the provisions of state law, which are regarded as a standard form that can be accepted by the parties or rejected either by drafting around the provision or incorporating in another state.[261] The

[254] RESTATEMENT (SECOND) OF CONFLICT OF LAWS 188(1) (1971); see also *Rungee v. Allied Van Lines, Inc.*, 92 Idaho 718, 449 P.2d 378 (1968); See generally *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 161-162 (1946); *Rutas Aereas Nacionales, S.A. v. Robinson*, 339 F.2d 265 (5th Cir.1964); Whitman v. Green, 289 F.2d 566 (9th Cir.1961); *Perrin v. Pearlstein*, 314 F.2d 863 (2d Cir.1963); *Teas v. Kimball*, 257 F.2d 817, 824 (5th Cir.1958); *Global Commerce Corp. v. Clark-Babbitt Industries*, 239 F.2d 716 (2d Cir.1956); *Alaska Airlines, Inc. v. Stephenson*, 217 F.2d 295 (9th Cir.1954); *Grace v. Livingstone*, 195 F.Supp. 933, 935 (D.Mass.1961), aff'd per curiam 297 F.2d 836 (1962), cert. den. sub. nom. 369 U.S. 871 (1962); *Metzenbaum v. Golwynne Chemicals Corp.*, 159 F.Supp. 648 (S.D.N.Y.1958); *Mutual Life Ins. Co. v. Simon*, 151 F.Supp. 408 (S.D.N.Y.1957); *Fricke v. Isbrandtsen Co., Inc.*, 151 F.Supp. 465, 467 (S.D.N.Y.1957).
[255] Theodore Eisenberg and Geoffrey Miller, *Ex Ante Choice of Law and Forum: an Empirical Analysis of Corporate Merger Agreements*, 59 VAND. L. REV. 1975 (2006); Larry Ribstein, *From Efficiency to Politics in Contractual Choice of Law*, 37 GA. L. REV. 363 (2003).
[256] Russell Weintraub, COMMENTARY ON THE CONFLICT OF LAWS § 4.9C (2001).
[257] RESTATEMENT (SECOND) ON THE CONFLICT OF LAWS §§304, 307 (1971).
[258] RESTATEMENT (SECOND) ON THE CONFLICT OF LAWS §187 (1971).
[259] Erin O'Hara O'Connor and Larry Ribstein, THE LAW MARKET 107 (2009).
[260] Henry N. Butler, *The Contractual Theory of the Corporation*, 11 GEO. MASON U. L. REV. 99 (Summer 1989)
[261] Henry N. Butler and Larry Ribstein, *Opting Out of Fiduciary Duties: A Response to the Anti-Contractarians*, 65 University of Washington (1990).

Olapade                                                                                      DRAFT

corporate contract also specifies the extent to which the parties rely on the competitive pressures from capital, product, and managerial labor markets as well as internal incentive structures such as corporate hierarchy, boards of directors, and managerial compensation contracts to force agents to act in their shareholders' best interests.[262]   From this standpoint, the contractual theory holds that the state's apparent involvement in creating and restricting corporations is qualitatively no different from the state's involvement in other types of contracts.[263]   The policy implication is that private parties to the corporate contract should be free to order their affairs in whatever manner they find appropriate. Assuming, without definitively asserting that this perspective is the correct one (and there are many scholars who doubt that it is),[264] there are at least three practical reasons for the public policy exception. First, there are ready advantages to ensuring that only one lawmaking entity can determine a firm's basic governance and financial rights. Imagine the headache, for instance, that BB&T's transactional attorneys would contract if a board election had to comply with regulations in both Kentucky and Virginia. Second, in the words of Chief Justice Marshall in the celebrated *Dartmouth College Case*, corporations were viewed as:

> an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it either expressly or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which [they were] created

during the eighteenth and nineteenth centuries.[265] This description was consistent with the practices of the time. Indeed, during the early history of American corporate law, those who wished to establish corporations applied to state legislatures for charters that granted them permission to incorporate.[266] It follows that the state in which the firm is incorporated should provide the regulations governing that entity's internal affairs.[267] Second, even assuming that the contract theory of the corporation has replaced this perspective (and the author is sympathetic to this view), there are still some aspects of the contemporary regulatory regime that grant corporations special immunities that other contracting parties cannot acquire at least nominally. To take just one example, a law firm partnership in Biloxi, Austin, Tallahassee, Sacramento, Honolulu or Columbia cannot insulate itself from partnership tort-liability simply by contracting with their creditors. But, oddly enough, if the same group of individuals decides to convert their practice into an oil drilling company or technology start-up and file for articles of incorporation with the relevant Secretary of State, their assets are suddenly immune from company creditor claims unless the creditors are able to pierce the corporate veil.[268] While the limited liability example, however, does provide some

---

[262] *Id.*
[263] Larry Ribstein, *The Constitutional Conception of the Corporation*, 4 SUP. CT. ECON. REV. 100 (1995).
[264] John C. Coffee, *No Exit?: Opting Out. The Contractual Theory of the Corporation, and the Special Case of Remedies*, 53 BROOK. L. REV. 919, 939 (1988); Victor Brudney, *Corporate Governance, Agency Costs, and the Rhetoric of Contract*, 85 COLM. L. REV. 1403, 1406 (1985); Melvin Eisenberg, *Golden Parachutes and the Myth of the Web*, in KNIGHTS, RAIDERS, AND TARGETS 155, 158 (1988).
[265] *Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 636 (1819).
[266] See, e.g., Henry N. Butler, *Nineteenth Century Jurisdictional Competition in the Granting of Corporate Privileges*, 14 J. LEG. STUD. 129 (1985).
[267] Erin O'Hara O'Connor and Larry Ribstein, THE LAW MARKET 107 (2009).
[268] Roberta Romano, FOUNDATIONS OF CORPORATE LAW (1993); Thomas K. Cheng, *Form and Substance of the Doctrine of Piercing the Corporate Veil*, 80 MISS. L.J. 497 (2010).

support for the public policy exemption, it does not definitively refute the corporate contract theory. This is so because mandatory rules are subject to inherent limits in states where a multitude of jurisdictions exist and contracts are generally enforced.[269] Indeed, even in a hypothetical doomsday scenario where states imposed personal liability on corporate shareholders, clever investors could contract for limited liability by contributing capital to a partnership as a non-partner creditor. But assume still, that this option was not available. As Stanford Law Professor and former Reagan Securities and Exchange Commission Chairman, Joe Grundfest has shown, investors could hedge against the risk of legal liability by directly or indirectly purchasing derivative securities.[270] More than that, several States have recognized limited liability without incorporation in a variety of different contexts: consider non-recourse contracts – agreements limiting lenders from collecting loan repayments from certain assets,[271] cases preventing lenders from collecting against debtors that the lender believed were limited liability corporations at the time of contract formation even if the debtor is not in fact a limited liability company,[272] decisions that have found that a venture promoter who contracts on behalf a corporation to-be-formed is not personally liable if the creditor agrees to collect only from the prospective corporation at the time of contract formation or the time that the corporation is formed,[273] and the fact that several states have permitted prospective corporations to claim limited liability through estoppel if agents of the potential business represent that the firm enjoys that privilege and then enter into contracts on its behalf.[274] Third, one might retort that this analysis misses the mark because limited tort liability and other state created limits on enforceability would still apply to corporations even if they were thought of as contracts. Of course, the flaw with this contention is that even if one assumes that the limits are applicable, their presence does not alter the fact that various commercial commitments among the corporate actors are still contracts. A short thought experiment will demonstrate this fact. If one enters into a contract with the state of Florida, for instance, to provide services that are discretionary or operational, is injured by another state worker during the commission of those activities, and then has her or his claim barred from recovery under the State's Government Tort Claims Act, notwithstanding this limit on enforceability, no one would say that the worker suddenly was never in privity of contract with the State nor that the contract never existed.[275] The result is that there is quite a bit of force behind the notion that a corporation, at bottom, really is simply an aggregation of many contracts.

---

[269] See Larry Ribstein, *Limited Liability and Theories of the Corporation*, 50 MD. L. REV. 80 (1991).

[270] Joseph Grundfest, *The Limited Future of Unlimited Liability: A Capital Markets Perspective*, 102 YALE L.J. 387 (1992).

[271] See, e.g., *Fisheries Co. v. McCoy*, 202 S.W. 343 (Tex. Civ. App. 1918).

[272] See *East River Sav. Bank v. Samuels*, 284 470, 478 (1940).

[273] See, e.g., *Aloe Ltd. v.. Koch*, 733 S.W.2d 364 (Tex. Ct. App. 1987).

[274] *Ratner v. Central National Bank of Miami*, 414 So. 2d 210 (Fla. Dis. Ct. App. 1982), *review denied*, 424 So. 2d 762 (1982).

[275] *Fla. Fish & Wildlife Conservation Comm'n v. Daws*, 256 So. 3d 907 (Fla. Dist. Ct. App. 2018), review denied, No. SC18-1565, 2018 WL 6605838 (Fla. Dec. 17, 2018); *Barnes v. Dist. Bd. of Trustees of St. Johns River State Coll.*, 147 So. 3d 102 (Fla. Dist. Ct. App. 2014); *Alexander v. Sheriff of Indian River Cty.*, Fla., 724 F. App'x 744 (11th Cir. 2018); *Ermini v. Scott*, 249 F. Supp. 3d 1253 (M.D. Fla. 2017); *Johnson v. Dixon*, No. 3:14-CV-579-J-39PDB, 2015 WL 12851563 (M.D. Fla. Nov. 20, 2015), aff'd, 666 F. App'x 828 (11th Cir. 2016); *Novoferreiro v. Israel*, No. 14-CIV-62674, 2015 WL 2152682 (S.D. Fla. May 6, 2015); *Holder v. Gualtieri*, No. 8:14-CV-3052-T-33TGW, 2015 WL 1880782 (M.D. Fla. Apr. 24, 2015); *Whitaker v. Miami-Dade Cty.*, 126 F. Supp. 3d 1313 (S.D. Fla. 2015); *Thomas v. City of Jacksonville*, No. 3:13-CV-776-J-39PDB, 2015 WL 13284967 (M.D. Fla. Feb. 17, 2015); *Otto v. Blair*, No. 5:13-CV-311-OC-10, 2014 WL 5093888 (M.D. Fla. Oct. 9, 2014); *Young v. Borders*, No. 5:13-CV-113-OC-22PRL, 2013 WL 12180597 (M.D. Fla. May 14, 2013); *Pierre v. City of Miramar, Fla., Inc.*, No. 12-CV-60682, 2012 WL

Regardless of whether one prefers to think of a corporation as a set of contracts or a special privilege conferred by the State, however, the imposition of a national choice of law regime would be far from unprecedented because the federal government already regulates a large subset of firm activity that these same skeptics maintain in print and elsewhere is reserved exclusively for state regulation. Until the 1890s, corporate mobility produced state competition for investments rather than charters because incorporation at the time could only be obtained if the firm had substantial contacts in the designated state.[276] States initially attempted to lure corporate investment by loosening charter requirements and creating a business-friendly tax and regulatory environment. A general incorporation option that permitted any entity to form a corporation in the jurisdiction without special permission gradually replaced the old charter system.[277] Change was most pronounced in those matters such as share pricing for sales in dynamic capital markets where firms had incentives to avoid regulatory compliance.[278]

Of course, today, Delaware is easily winning the competition for corporate charters. More than 40% of all corporations listed on the New York Stock Exchange are incorporated there and close to 80% of all firms that relocate reincorporate in the Constitution State.[279] The primary reasons for this exodus are not elusive – the state offers an attractive mix of corporate law rules and assurances that it will maintain them into the indefinite future. Consider first the highly developed case law on corporate concerns that the Chancery Court has created. As one corporation has pointed out "the Delaware courts have developed considerable expertise in dealing with corporate issues…thereby providing greater predictability with respect to corporate legal affairs."[280] Predictability manifests itself in a myriad of ways here. Delaware judges and state officials are more acquainted with corporate matters than officials holding analogous positions in other states. To take just one example, state legislative committee staffers are often disproportionally drawn from corporate firms – even more so than is the practice in Congress and other states[281] (see Figures 1 and 2).[282]

Figure 1

| Delaware's Chartering Business | | | |
| Year | Estimated Cost | Franchise Tax Revenues | Franchise Tax Revenues as a Percentage of Total Tax Revenue |
|---|---|---|---|
| 1960 | 353,870 | 9,864,000 | 13.7% |
| 1961 | 336,870 | 12,621,000 | 16.3% |
| 1962 | 418,430 | 13,579,000 | 14.9% |

12895245 (S.D. Fla. Aug. 14, 2012); *Peguero v. Delaurentos*, No. 11-20069-CIV, 2012 WL 13012772 (S.D. Fla. Feb. 14, 2012); *Hazleton v. City of Orlando*, No. 610CV342ORL35DAB, 2011 WL 13175527 (M.D. Fla. Oct. 19, 2011), aff'd sub nom. *Hazleton v. Trinidad*, 488 F. App'x 349 (11th Cir. 2012); Schoen v. Dean, No. 5:10-CV-652-OC-37TBS, 2011 WL 13295821 (M.D. Fla. Aug. 17, 2011).
[276] Frederick Tung, *Before Competition: Origins of the Internal Affairs Doctrine*, 32 J. CORP. L. 33, 62 (2006).
[277] Lawrence Friedman, AMERICAN LAW IN THE TWENTIETH CENTURY (2004).
[278] Lawrence Mitchell, THE SPECULATION ECONOMY: HOW FINANCE TRIUMPHED OVER INDUSTRY 30-56 (2007).
[279] Roberta Romano, *Law as a Product: Some Pieces of the Incorporation Puzzle*, 1 J.L. Econ & Org. 225, 244 (1985).
[280] Robert Hamilton, CASES AND MATERIALS ON CORPORATIONS 150 (2012); see also Oliver Williamson, *Credible Commitments: Using Hostages to Support Exchange*, 73 AM. ECON. REV. 519 (1983).
[281] William Cary, *Federalism and Corporate Law: Reflections Upon Delaware*, 83 YALE L.J. 663, 690 (1974).
[282] Del. Const. art. IX §1.

Olapade                                                                                          DRAFT

| 1963 | 440,325 | 13,977,000 | 14.3% |
|---|---|---|---|
| 1964 | 479,080 | 15,635,000 | 15.5% |
| 1965 | 476,380 | 15,790,000 | 13.1% |
| 1966 | 492,400 | 14,091,000 | 10.9% |
| 1967 | 516,700 | 17,615,000 | 12.6% |
| 1968 | 606,322 | 21,414,000 | 14.8% |
| 1969 | 644,470 | 20,572,000 | 13.1% |
| 1970 | 721,500 | 43,924,000 | 22.5% |
| 1971 | 835,900 | 55,212,000 | 24.9% |
| 1972 | 696,879 | 49,129,000 | 19.1% |
| 1973 | 698,840 | 50,777,000 | 17.7% |
| 1974 | 983,504 | 57,073,000 | 18.5% |
| 1975 | 1,050,527 | 55,030,000 | 16.4% |
| 1976 | 1,208,165 | 67,887,000 | 18.9% |
| 1977 | 1,255,265 | 57,949,000 | 14.8% |
| 1978 | 1,385,014 | 60,509,000 | 13.5% |
| 1979 | 1,482,000 | 63,046,000 | 12.8% |
| 1980 | 1,899,300 | 66,738,000 | 12.9% |
| 1981 | 2,229,600 | 70,942,000 | 12.9% |
| 1982 | 2,447,800 | 76,591,000 | 12.9% |
| 1983 | 2,846,900 | 80,031,000 | 12.5% |
| 1984 | 2,721,000 | 92,270,000 | 12.9% |
| 1985 | 3,242,100 | 121,057,000 | 14.8% |
| 1986 | 3,808,600 | 132,816,000 | 15% |
| 1987 | 4,746,200 | 152,152,000 | 15.4% |
| 1988 | 4,719,000 | 180,583,000 | 17.7% |
| 1989 | 4,873,200 | 195,862,000 | 17.3% |
| 1990 | 6,398,400 | 200,201,000 | 17.7% |

Figure 2

| Franchise Revenue as a Proportion of Texas Collected | | | | |
|---|---|---|---|---|
| State | 1960s | 1970s | 1980s | 1990s |
| Alabama | 3.1% | 2.3% | 2.4% | 2.7% |
| Alaska | .4% | .5% | .1% | .1% |
| Arizona | .5% | .2% | .1% | .1% |
| Arkansas | .5% | .4% | .3% | .3% |
| California | .1% | .1% | .02% | .1% |
| Colorado | .5% | .3% | .2% | .1% |
| Connecticut | .5% | .2% | .2% | .2% |
| Delaware | 13.7% | 22.5% | 12.9% | 17.7% |
| Florida | .4% | .4% | .2% | .3% |
| Georgia | .5% | .4% | .3% | .3% |
| Hawaii | .1% | .1% | .1% | .1% |
| Idaho | .6% | .5% | .3% | .02% |

Olapade                                                                                    DRAFT

| Illinois | .7% | .9% | .5% | .7% |
| Indiana | .3% | .1% | .1% | .1% |
| Iowa | .1% | .1% | 1% | .9% |
| Kansas | .4% | .3% | .5% | .5% |
| Kentucky | .8% | .6% | .6% | 1.8% |
| Louisiana | 3.2% | 3.1% | 2.8% | 6.3% |
| Maine | .5% | .2% | .1% | .2% |
| Maryland | .2% | .1% | .1% | .1% |
| Massachusetts | N/A | .2% | .1% | .2% |
| Michigan | 7.6% | 5.3% | .1% | .1% |
| Minnesota | .1% | .1% | .04% | .04% |
| Mississippi | 1.8% | 1.9% | 2% | 1.8% |
| Missouri | 1.9% | 2.5% | 1.3% | 1.2% |
| Montana | .2% | .1% | .1% | .1% |
| Nebraska | .6% | .5% | .3% | .3% |
| Nevada | 1.1% | .6% | .5% | .4% |
| New Hampshire | .6% | .9% | 1% | .1% |
| New Jersey | 8.7% | N/A | 3.7% | 1.3% |
| New Mexico | .9% | .6% | .6% | .1% |
| New York | .2% | .1% | .1% | .1% |
| North Carolina | 1.8% | 1.7% | 1.5% | 1.7% |
| North Dakota | .1% | .1% | .1% | .1% |
| Ohio | 5.4% | 6.7% | 1.7% | 2% |
| Oklahoma | 1.2% | 1.2% | 1% | .9% |
| Oregon | .3% | .3% | .2% | .2% |
| Pennsylvania | 5.4% | 4.5% | 3.9% | 4.6% |
| Rhode Island | .2% | .3% | .3% | .3% |
| South Carolina | .4% | .3% | .3% | .6% |
| South Dakota | .2% | .1% | .1% | .1% |
| Tennessee | 2.7% | 2.6% | 2.4% | 4.6% |
| Texas | 7.6% | 5.7% | 5.2% | 4.1% |
| Utah | .2% | N/A | N/A | N/A |
| Vermont | .1% | .1% | .1% | .1% |
| Virginia | .4% | .2% | .2% | .3% |
| Washington | .3% | .2% | .1% | .1% |
| West Virginia | .5% | .4% | .3% | .2% |
| Wisconsin | .1% | .1% | .1% | .1% |
| Wyoming | .4% | .3% | .2% | .3% |

The Delaware Constitution also requires a two-thirds vote to change corporate laws. Predictability, though, is of little use in a regime with unfavorable substantive rules. On this score, however, Delaware corporate law provides plenty of carrots incentivizing shareholders, managers, attorneys, and investment bankers to favor re-chartering within the state. The state permits firms to contract around the statutory incorporation scheme by amending their bylaws as most of the

sections of the Delaware Corporate Code are default provisions.[283] These default rules reduce error and transaction costs by eliminating the need for the firm to anticipate and stipulate for all future contingencies when organizing the firm.[284] More than that, because management income is often tied directly or indirectly to firm performance, and the Delaware regime enhances firm value while also increasing shareholder wealth, relocation can be utility-maximizing.[285] Other benefits management boards may find appealing include regulations that are among the least restrictive in the union in second guessing board compensation;[286] the State's rejection of insider contracts on grounds of self-dealing;[287] or the State's willingness to permit corporations to indemnify officers and directors for liability incurred in connection with their services to the corporation.[288] Lawyers in White Shoe firms advising corporations to re-charter and investment bankers as well also benefit because the costs of business decrease once their expertise can be centered on one jurisdiction that provides fairly predictable results. More specifically, these lawyers serve as "gatekeepers" for corporate law.[289] To take just a few examples, counsel, through their membership on local, state, and national bar association committees often assist their clients in drafting and proposing new corporate laws and appropriating economic rents from incorporation through strategic litigation.[290] Nor is it difficult to see why state bars have been unable to collectively band together to stop corporate migration to Delaware. Because the losses that local lawyers in North Carolina, West Virginia, or Arizona, for instance, suffer from re-incorporation in Delaware are relatively small once divided, members of the state bar have little incentive to propose corporate law reforms.[291] More than that, those who do take the time to forgo that extra billable assignment or appellate pro bono project to work on reforms with bar associations often go uncompensated.[292] True, many states have attempted to short-circuit this problem by relying on the ABA Corporate and Business Law Section's Model Business Corporation Act; but even so, the net result has been the creation of a severe free-rider problem for local bars that has failed to alter the status quo.

The several states, though, are not alone in the current regulatory market because the federal government also plays an active role in policing corporate activity. To take just a few prominent examples, the FDIC Improvements Act of 1991 requires state charted banks to comply with federal policies;[293] the Security and Exchange Act regulates corporate voting and proxy solicitation; the SEC has the ability to preempt state laws on selective stock buybacks through its "all holders rule;"[294] and the New York Stock Exchange, a private organization that is nonetheless under pressure from the SEC to introduce more stringent regulations on publicly traded firms as

---

[283] Frank Easterbrook, *Manager's Discretion and Investor's Welfare: Theories and Evidence*, 9 DEL. L. CORP. L. 540 (1984).

[284] Charles J. Goetz and Robert E. Scott, *The Limits of Expanded Choice: An Analysis of the Interactions between Express and Implied Contract Terms*, 73 CALIF. L. REV. 261 (1985).

[285] Wilbur Lewellen, THE OWNERSHIP INCOME OF MANAGEMENT (1971).

[286] DEL. CODE ANN. Tit. 8. §141(h).

[287] DEL. CODE ANN. Tit. 8. §144.

[288] DEL. CODE ANN. Tit. 8. §145.

[289] John Macey and Geoffrey Miller, *Towards an Interest Group Theory of American Corporate Law*, 65 TEX. L. REV. 469, 504-05 (1987).

[290] *Id.*

[291] Mancur Olson, THE LOGIC OF COLLECTIVE ACTION (1965).

[292] Erin O'Hara O'Connor and Larry Ribstein, THE LAW MARKET 90-120 (2009).

[293] 18 U.S.C. §1831a.

[294] 17 C.F.R. 240.14d-10.

done so.[295] For a colorful illustration of this last point, consider first the SEC's response to NYSE regulations that required shareholder approval for broad based compensation plans but oddly enough exempted management compensation plans from the voting requirement.[296] In the words of Bush SEC Chairman, Harvey Pitt, once the conservative agency determined that the rules went too far, they entered a request with the NYSE which they "expected to be implemented…with alacrity."[297] There are at least six more examples of this phenomenon. First, although it ought not to be consulted for adjudicative purposes,[298] the legislative history of the 1934 SEC Act also highlights the interplay between state corporate and federal securities law regulation. Congress' first report on the matter recommended full federal incorporation for large firms in interstate commerce.[299] While Congress declined to adopt this recommendation in full, several aspects of the plan did find their way into the 1934 Act.[300] Again consider voting – perhaps the most important internal corporate affair. SEC proxy regulation determines what goes into the proxy request for shareholders, which items are placed on the ballot, and how proxy fights are even waged in the first place.[301] Similar claims could be made for SEC regulation of corporate officers' purchase of stock from the corporation's own shareholders on insider information. In many states, at common law, such transactions were historically permissible until the federal securities laws took that prerogative away.[302] Second, disclosure rules provide yet another example. Because many states including Delaware often declined to impose disclosure rules on the theory that incumbent board members of their own volition would provide the relevant facts during annual elections, the stock exchanges had to impose their own requirements. Thus, the first major disclosure effort in the United States for publicly traded firms was initiated by the New York Stock Exchange in 1907.[303] This regulatory scheme was ultimately laid to rest in the 1934 Act and, since that time, the Financial Accounting Standards Board has standardized corporate accounting through General Accepted Accounting Principles (GAAP).[304] Indeed, as many who remember the Enron scandal can recall,[305] the initial outrage and subsequent passage of the Sarbanes-Oxley Act, which admittedly contains some dubious provisions,[306] emphasizes the degree to which regulation of internal firm bookkeeping has become a matter of federal concern.[307] This is not to suggest, however, that pervasive federal regulation of corporate attorney, accountant, or underwriter activity was absent before the turn of the century as they most certainly were not.[308] Indeed, SEC

---

[295] See, e.g., New York Stock Exchange, Inc., Order Approving Proposed Rate Change, 42 Fed. Reg. 14,793, 14,794 & n.11 (Mar. 16, 1977).

[296] See, e.g., Robert Thompson, *Collaborative Corporate Governance: Listing Standards, State Law, and Federal Regulation*, 38 Wake Forest L. Rev. 961, 979 (2003).

[297] *Id.*

[298] Antonin Scalia, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 196 (2012).

[299] Mark J. Roe, *Delaware's Competition*, 117 HARV. L. REV. 588 (2003).

[300] See, e.g., Louis Loss, SECURITIES REGULATION 109 (1961).

[301] William Bratton, CORPORATE FINANCE (2007).

[302] See, e.g., *Freeman v. Decio*, 584 F.2d 186 (7th Cir. 1978); *United States v. Bryan*, 58 F.3d 933 (4th Cir. 1995).

[303] Paul Mahoney, *The Exchange as Regulator*, 83 VA. L. REV. 1453 (1997); see also Jonathan Baskin, A HISTORY OF CORPORATE FINANCE (1997).

[304] John Previts and Barbara Merino, A HISTORY OF ACCOUNTANCY IN THE UNITED STATES 366 (1998).

[305] *Looking Back at the Rise and Fall of Enron*, HOUSTON CHRONICLE (Nov. 28, 2018).

[306] Stephen Bainbridge, *Sarbanes-Oxley: Legislating in Haste, Repenting in Leisure*, 2 CORPORATE GOVERNANCE L. REV. 69 (2006).

[307] Jonathan Macey, *A Pox on Both Your Houses: Enron, Sarbanes-Oxley and the Debate Concerning the Relative Efficiency of Mandatory Versus Enabling Rules*, 81 WASH. U. L. Q. 329 (2003).

[308] See, e.g., *SEC v. National Student Marketing Corp.*, 457 F. Supp. 682 (D.D.C. 1978); *In re Carter, Exchange Act Release No. 17,597*, 22 SEC Docket 297 (Feb. 28, 1981).

Rule 13e-3, which regulates going private transactions, also provides an apt example of this phenomenon.[309] This regulation was released in response to a popular corporate transaction during the 1960s and 1970s that permitted firms with a controlling shareholder and a small amount of outstanding public stock to go private by eliminating the shareholders' equity.[310] While there were often laudable business justifications for these moves, they were controversial at the time even though Delaware courts approved them without hesitation.[311] The theory, then as now, was that appraisal rights were sufficient to protect the interests of dissenting shareholders – even though securities law scholars criticized the remedy's efficacy.[312] Nixon SEC Chairman A.A. Sommers Jr. responded swiftly. Indeed, in his press statement following Rule 13e-3's release Sommer commented that "applicable state law [had] not always provided an adequate remedy to the potentially deleterious effects of going private transactions."[313] Fourth, as seasoned private equity litigators have often learned the hard way, the confusing enigma that is the Earned Retirement Income Security Income Act of 1974 (ERISA) has taken many run-of-the-mill corporate law decisions from state lawmakers.[314] To take just a few examples, ERISA forces pension fund, mutual fund, and some private equity managers who are unable to claim an exemption to treat the

---

[309] 17 C.F.R. §240.13e-3; see also *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312 (4th Cir. 2019); *Japan Press Serv., Inc. v. Japan Press Serv.*, Inc., No. 11 CV 5875 SJF ETB, 2013 WL 80181 (E.D.N.Y. Jan. 2, 2013); *Corre Opportunities Fund, LP v. Emmis Commc'ns Corp.*, 892 F. Supp. 2d 1076 (S.D. Ind. 2012); Gantler v. Stephens, 965 A.2d 695 (Del. 2009); *Telenor E. Invest AS v. Altimo Holdings & Investments Ltd.*, 567 F. Supp. 2d 432 (S.D.N.Y. 2008); *Brewer v. Lincoln Int'l Corp.*, 148 F. Supp. 2d 792 (W.D. Ky. 2000); *Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225 (S.D.N.Y. 2000); *In re Unocal Expl. Corp. Shareholders Litig.*, 793 A.2d 329 (Del. Ch. 2000), aff'd sub nom. *Glassman v. Unocal Expl. Corp.*, 777 A.2d 242 (Del. 2001); *Pittiglio v. Michigan Nat. Corp.*, 906 F. Supp. 1145 (E.D. Mich. 1995); *Schwarzschild v. Tse*, No. C-90-20052-RMW (PVT), 1992 WL 448796, at *4 (N.D. Cal. Dec. 9, 1992); *Howing Co. v. Nationwide Corp.*, 972 F.2d 700, 701 (6th Cir. 1992); *Nobles v. First Carolina Commc'ns, Inc.*, 929 F.2d 141 (4th Cir. 1991); *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846 (10th Cir. 1990); *Dowling v. Narragansett Capital Corp.*, 735 F. Supp. 1105 (D.R.I. 1990); *Fulco, Inc. v. Am. Cable Sys. of Fla.*, No. CIV. A. 89-1342-S, 1989 WL 205356 (D. Mass. Oct. 4, 1989); *Kahn v. Lynden Inc.*, 705 F. Supp. 1458 (W.D. Wash. 1989); *Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614 (S.D.N.Y. 1987); *Plaza Sec. Co. v. Fruehauf Corp.*, 643 F. Supp. 1535 (E.D. Mich. 1986); *Berg v. First Am. Bankshares, Inc.*, 796 F.2d 489 (D.C. Cir. 1986); *Shamrock Assocs. v. Horizon Corp.*, 632 F. Supp. 566 (S.D.N.Y. 1986); *Starkman v. Marathon Oil Co.*, 772 F.2d 231 (6th Cir. 1985); *Radol v. Thomas*, 772 F.2d 244 (6th Cir. 1985); *Woodward & Lothrop, Inc. v. Schnabel*, No. 84-1716, 1984 WL 2464 (D.D.C. Sept. 10, 1984); *Woodward & Lothrop, Inc. v. Schnabel*, 593 F. Supp. 1385 (D.D.C. 1984); *Fisher v. Plessey Co.*, 559 F. Supp. 442 (S.D.N.Y. 1983).

[310] Edward Greene's 1976 article in the Stanford Law Review contains an excellent discussion of this phenomenon and the related cases. Edward F. Greene, Corporate Freeze-Out Mergers: A Proposed Analysis, 28 Stan. L. Rev. 487, 495 (1976); see also *Greenberg v. Institutional Investor Systems, Inc.* [1975-1976 Transfer Binder] CCH FED. SEC. L. REP. ¶95,231 (S.D.N.Y. 1975); *Universal Capital Corp. v. Barbara Lynn Shoes, Inc.* [1975-1976 Transfer Binder] CCH FED. SEC. L. REP. ¶ 94,949 (S.D.N.Y. 1975); *Albright v. Bergendahl*, 391 F. Supp. 754 (D. Utah 1974); *Dreier v. Music Makers Groups, Inc.* [1973-1974 Transfer Binder] CCH FED. SEC. L. REP. ¶ 94,406 (S.D.N.Y. 1974); *Berkowitz v. Power/Mate Corp.*, 342 A.2d 566 (N.J. Super. 1975); *People v. Concord Fabrics, Inc.*, 371 N.Y.S.2d 550 (Sup. Ct. 1975); Note, *Going Private*, 84 YALE L.J. 903, 904 (1975); Edward F. Greene, *Corporate Freeze-Out Mergers: A Proposed Analysis*, 28 STAN. L. REV. 487, 495 (1976); Victor Brudney & Marvin A. Chirelstein, *A Restatement of Corporate Freezeouts*, 87 YALE L.J. 1354 (1978); Paul Dykstra, *The Reverse Stock Split – That Other Means of Going Private*, 53 CHI.-KENT L. REV. 1 (1976); Arthur Borden, *Going Private – Old Tort, New Tort or No Tort?*, 49 N.Y.U. L. REV. 987 (1974).

[311] See *Stauffer v. Standard Brands, Inc.*, 187 A.2d 78 (Del. 1962).

[312] A.A. Sommer, Jr., *Further Thoughts on Going Private*, Sec. Reg. & L. Rep. (BNA) No. 294 (Mar. 19, 1975).

[313] *Going Private Transactions by Public Companies of Their Affiliates*, Exchange Act Release No. 14,185, 42 Fed. Reg. 60,090, 60,091 (Nov. 23, 1977).

[314] Mark J. Roe, *Delaware's Competition*, 117 HARV. L. REV. 588 (2003).

Olapade                                                                                    DRAFT

corporate proxy in the stock they own as an asset that must be continually evaluated.[315]  What's more, federal authorities have even instructed mutual funds to publicly announce how they will vote on proxy initiatives.[316] Even though this mandate may not appear to work a substantial change in the federal state balance, because institutional investors own almost 20% of the total capitalization of the American stock market, the American pension system has become rather complex since the 1970s, as more Americans are drawing income from public and private pensions that ever before (See Figures 3, 4, 5, and 6), the effect is that ERISA governs shareholder actions for almost half of the American economy.[317]

Figure 3

| Private Sector Pension Income | | | | | | |
|---|---|---|---|---|---|---|
| Year | Per Capital % of Retirees | Per Capita Median Pension | Individual % of Retirees | Individual Median Pension | Household % of Retirees | Household Median Pension |
| 1975 | 21.3 | 5038 | 15.8 | 7328 | 19.1 | 7814 |
| 1980 | 24.8 | 4484 | 17.9 | 6637 | 21.8 | 6925 |
| 1985 | 27.9 | 4258 | 20.6 | 6141 | 25 | 6540 |
| 1990 | 33.9 | 4960 | 25.7 | 6790 | 30.7 | 7385 |
| 1995 | 34.6 | 5164 | 26.3 | 7042 | 31.4 | 7661 |
| 2000 | 33 | 6312 | 25.5 | 8305 | 30.5 | 9020 |
| 2005 | 34.3 | 6260 | 26.6 | 8098 | 32 | 8834 |
| 2010 | 32.1 | 6569 | 24.9 | 8921 | 30.2 | 9381 |
| 2013 | 34 | 6886 | 26 | 8707 | 31.3 | 9811 |
| 2014 | 43.6 | 7509 | 35.2 | 9031 | 40.4 | 10813 |
| 2015 | 41.9 | 7800 | 34 | 9600 | 39.4 | 10800 |

Figure 4

| Pension Income 1975-2015 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Private Sector Pension Only | | | Government Pension Only | | | Private Sector and Government Pension | | |
| Year | Per Capital % of Retirees | Per Capita Median Pension | Per Capita Median Pension Plus Social Security | Per Capital % of Retirees | Per Capita Median Pension | Per Capita Median Pension Plus Social Security | Per Capital % of Retirees | Per Capita Median Pension | Per Capita Median Pension Plus Social Security |
| 1975 | 20 | 5076 | 15845 | 12.9 | 11006 | 17226 | 1.3 | 15409 | 21640 |
| 1980 | 22.7 | 4496 | 15761 | 13.7 | 9869 | 17314 | 2 | 13370 | 23474 |
| 1985 | 25.5 | 4325 | 16773 | 14.7 | 10690 | 18595 | 2.5 | 11738 | 22200 |

---

[315] Letter from Alan Lebowitz, Deputy Assistant Secretary, U.S. Dep't of Labor, to Helmuth Fandl, Chairman of Retirement Board, Avon Products, Inc. 2-3 (Feb. 23, 1988).
[316] See *Disclosure of Proxy Voting Policies*, Exchange Act Release No. 47,304, 79 SEC Docket 1577 (Jan. 31, 2003).
[317] These figures were provided with the courtesy of ICI Research. See A Look at Private Sector Retirement Plan After ERISA, 2015, ICI Research, available at https://www.ici.org/pdf/per22-08.pdf

Olapade                                                                            DRAFT

| 1990 | 30.3 | 5081 | 17329 | 14.5 | 12309 | 20722 | 3.6 | 11083 | 22738 |
| 1995 | 30.8 | 5371 | 18585 | 12.8 | 12067 | 21576 | 3.7 | 13332 | 24764 |
| 2000 | 30.1 | 6445 | 19858 | 13.4 | 13288 | 23532 | 3 | 16292 | 27706 |
| 2005 | 31.4 | 6463 | 20362 | 14.1 | 14723 | 25459 | 2.9 | 15621 | 27725 |
| 2010 | 28.9 | 6714 | 22236 | 14.6 | 16265 | 27123 | 3.1 | 15985 | 28857 |
| 2013 | 30.9 | 7052 | 22831 | 13.3 | 17518 | 28267 | 3.1 | 18304 | 32866 |
| 2014 | 33 | 7209 | 23379 | 8.3 | 18022 | 29737 | 10.5 | 20125 | 34902 |
| 2015 | 32.2 | 7356 | 24012 | 9.2 | 19000 | 31138 | 9.7 | 21450 | 36162 |

Figure 5

ERISA Framework 1974



47

Figure 6

ERISA Post-2000



Fifth, SEC Rule 14a-8 – a regulation governing the inclusion of shareholder proposals in company proxy solicitations – provides yet another example of federal interference in an ostensibly state prerogative.[318] Many corporate law students learn that under §141 of the Delaware Code, it is axiomatic that the board, rather than the shareholders, manage the corporation's business.[319] While the original rule permitted management to exclude large categories of proposals,[320] beginning in the 1990s with the first Bush Administration, the SEC began to force managers to include proxy statement access in non-binding shareholder proposals.[321] Sixth, previous Congresses, including even those with Republican majorities, have become more cavalier in

---

[318] 17 C.F.R. §240.14a-8.
[319] Del. Code Ann. Tit. 8, §141.
[320] See *Med. Comm. For Human Rights v. SEC*, 432 F.2d 659 (D.C. Cir. 1970); *Nike, Inc., SEC No-Action Letter*, 1997 WL 384740 (July 10, 1997).
[321] *Waste Management, Inc., SEC No-Action Letter*, 1991 WL 178585 (Mar. 8, 1991).

preempting state corporate regulations. Before the Gingrich Revolution, for instance, it was customary for federal securities laws to include savings clauses that permitted accommodated supplementary rules and remedies. In the late 1990s, however, several new federal securities statutes – particularly the National Securities Markets Improvements Act of 1996 and the Securities Litigation Uniform Standards Act of 1998 – not only omitted the provisions but also expressly endorsed field preemption in the area.[322]

The specter of federal regulation has also hung over the several states like a Damocles' Sword. As Securities Law scholars Louis Loss and Joel Seligman have documented, Presidents Roosevelt, Taft, and Wilson, for instance, each sought mandatory federal incorporation during their tenure's in office.[323] Indeed, in the 1930s, both Congress and the Temporary National Economic Committee all pushed the idea and the SEC studied the matter extensively eventually passing the Securities Acts of 1933 and 1934 to remedy perceived deficiencies in state regulation.[324] Seasoned securities litigators who came of age in the 1960s or 1970s can also recall that federal abstention from the core of common law corporate regulation was not always a fact that could be taken for granted.[325] During this time period, the Second Circuit began to transform what had previously been state fiduciary duty issues into Rule 10b-5 fraud claims and other Courts of Appeals were following suit.[326] While the Supreme Court rightfully placed these implied rights of action to rest in *Santa Fe v. Green*,[327] a great deal of contemporary federal securities litigation still deals with internal corporate governance matters and has a depth that matches its state court analogue.[328] The failed promulgation of SEC Rule 19c-4 also provides a cautionary tale of potential federal regulation. In the 1980s many firms re-organized their capital structures with dual-class stock. The result is that a small percentage of parties received stock with voting rights while most shareholders were left with non-voting equity certificates. These maneuvers garnered ready assent from state courts.[329] Prominent corporate law scholars such as Ronald Gilson and Jeffery Gordon, though, subsequently took highly critical public positions on the practice reasoning that the regulatory regime for the transactions did not provide sufficient protection for shareholders.[330] While the SEC promulgated Rule 19c-4 to address these concerns, thankfully the D.C. Circuit later invalidated the regulation finding that the 1934 Securities Act did not empower the agency to create substantive corporate governance rules that ran afoul of the internal affairs doctrine.[331] The primary takeaway here is that those who claim that a national choice of law regime

---

[322] 15 U.S.C. §77r(a).

[323] Louis Loss and Joel Seligman, SECURITIES REGULATION 152 (1989).

[324] *Id.*; Allen Boyer, *Federalism and Corporation Law: Drawing the Line in State Takeover Regulation*, 47 OHIO ST. L.J. 1037 (1986).

[325] Mark J. Roe, *Delaware's Competition*, 117 HARV. L. REV. 588 (2003).

[326] Richard Jennings, *Federalization of Corporate Law: Part Way or All the Way*, 31 BUS. LAW 991 (1976); See, e.g., *Drachman v. Harvey*, 453 F.2d 722 (2d Cir. 1972); *Schoenbaum v. Firstbrook*, 405 F. 2d 215 (2d Cir. 1968); *Vine v. Beneficial Finance Company*, 374 F. 2d 627 (2d Cir. 1967).

[327] *Santa Fe Indus. Inc. v. Green*, 430 U.S. 462 (1977).

[328] Robert Thompson and Hillary Sale, *Securities Fraud as Corporate Governance: Reflections upon Federalism*, 56 VAND. L. REV. 859 (2003).

[329] See, e.g., *Providence & Worcester Co. v. Baker*, 378 A.2d 121 (Del. 1977); *Hampton v. Tri-State Fin. Corp.*, 495 P.2d 566 (Colo. Ct. App. 1972); *Stroh v. Blackhawk Holding Corp.*, 272 N.E.2d 1 (Ill. 1971); *Groves v. Rosemound Improvement Ass'n*, 413 So.2d 925 (La. Ct. App. 1982); *Shapiro v. Tropicana Lanes Inc.*, 371 S.W.2d 237 (Mo. 1963).

[330] See, e.g., Ronald Gilson, *Evaluating Dual Class Common Stock: The Relevance of Substitutes*, 73 VA. L. REV. 807 (1987); Jeffrey N. Gordon, *Ties That Bond: Dual Class Common Stock and the Problem of Shareholder Choice*, 76 CAL. L. REV. 1 (1988).

[331] *Business Roundtable, Petitioner, v. Securities and Exchange Commission*, 905 F.2d 406 (D.C. Cir. 1990)

would be inappropriate because it would upset the State-federal balance are either willing to turn a blind eye to these federal regulations or, ignorant of them.

Skeptics might retort that this conundrum is much ado about nothing because most corporate contracts now provide for arbitration between the parties and forgo the excessive costs of litigation. Indeed, as Giles Cuniberti demonstrated in his random sample of 4,400 corporate contracts, international arbitration has also provide a ready substitute for transnational litigation.[332] (See Figures 7, 8, and 9). Section 2 of the Federal Arbitration Act, however, provides the governing rule here. That provision states

> [a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.[333]

Section 2 creates an arbitration right on the basis of the parties' agreement where admiralty or commerce is involved.[334] While the rule at common law was that an agreement to arbitrate could be revoked at any time before the award was made, even though it was otherwise recognized as creating a contractual obligation, the Federal Arbitration Act was enacted to revere this traditional hostility towards arbitration.[335] Thus, in the words of Arbitration Society of America Vice President, Moses Grossman, the purpose of the statute was to "relieve the increasing congestion of the calendars in our courts of law, and to divert the flow into [arbitration], so that especially those issues of fact, which have no place in a court of law, which can be better determined elsewhere, may not" overburden judges "whose time should be devoted to the considerations of questions of law."[336] Section 2, however, does not describe how issues concerning the validity, enforcement, or formation of arbitration agreements should be decided. The statute, though, does contain a savings clause that subjects the enforcement of arbitration agreements to "such grounds as exist at law or equity for the revocation of any contract" which could be read to ensure that arbitration agreements are "still open to all defenses, equitable, and legal that would have existed at law."[337] While at the time of the bill's passage, federal courts were applying federal general common law to determine commercial and contract disputes except in matters of a "local nature,"[338] rules covering contract existence, validity, and revocability issues are usually governed by state rules.[339] Sections 3 and 4 of the FAA, though, provide the primary mechanism for

[332] See also Harold Koh, *Transnational Legal Process*, 75 NEB. L. REV. 181 (1994).
[333] 9 U.S.C. § 2.
[334] See, e.g., *Southland Corp. v. Keating*, 465 U.S. 1, 11-15 (1984).
[335] See Paul Sayer, *Development of Commercial Arbitration Law*, 37 YALE L.J. 595 (1927); Wesley Sturges, COMMERCIAL ARBITRATION AND AWARDS 83 (1930).
[336] Hon. Moses H. Grossman, *The Need of Arbitration to Relieve the Congestion in the Courts*, 10 Acad. Of Pol. Sci. Proc. 517 (1923).
[337] 9 U.S.C. § 2.
[338] Charles Wright and Alan Miller, FEDERAL PRACTICE & PROCEDURE §4502 (2d ed.1988)
[339] Ian Ayres and Gregory Klass, STUDIES IN CONTRACT LAW (2012); George Triantis, CONTRACT LAW READER (2012).

Olapade                                                                                    DRAFT

enforcement of arbitration agreements in a pending lawsuit and court orders mandating arbitration through the petition of one party when the other has refused to submit to arbitration respectively.[340]

Figure 7

| International Contract Choice of Law Section for Arbitration Proceedings Among US Firms | | | | | | |
|---|---|---|---|---|---|---|
| Year | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
| Weighted Number U.S. of Parties | 4.98% | 6.56% | 4.84% | 5.25% | 3.86% | 4.51% |
| Number of Choices of U.S. laws | 7.1% | 6.7% | 7.1% | 10.1% | 10.6% | 9.78% |
| International Attractiveness of U.S. laws Index | 2.12 | .14 | 2.25 | 4.85 | 6.74 | 5.26 |

Figure 8

| International Contract Choice of Law Section for Arbitration Proceedings | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2007-2012 |
| UK Law | 9.37 | 10.98 | 11.91 | 11 | 8.5 | 15.43 | 11.2 |
| Swiss Law | 8.77 | 7.62 | 11.06 | 10.16 | 10.28 | 11.59 | 9.91 |
| U.S. Law | 2.12 | .14 | 2.25 | 4.85 | 6.74 | 5.26 | 3.56 |
| French Law | 3.33 | 3.08 | 2.62 | 2.90 | 3.61 | 3.31 | 3.14 |
| German Law | 1.78 | .08 | 1.72 | 3.71 | 3.66 | 1.24 | 2.03 |

Figure 9

| International Contract Choice of Law Section for Arbitration Proceedings Among US Firms | | | | | | |
|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |

---

[340] Section 3 which is codified at 9 U.S.C. 3 provides:

> "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."

By way of contrast, section 4, which is placed at 9 U.S.C. 4 states:

Olapade                                                                                      DRAFT

| Number of U.S. Parties | 8.44% | 10.35% | 7.78% | 8.67% | 6.67% | 7.12% |
|---|---|---|---|---|---|---|
| Percentage of Contracts Including a Choice of Law Provision | .79 | .84 | .87 | .82 | .82 | .85 |
| Weighted Number of U.S. parties | 6.67% | 8.69% | 6.77% | 7.11% | 5.54% | 6.05% |

There are at least two responses, however, to this suggestion that the current choice-of-law crisis isn't what it appears to be because of alternative dispute resolution. First, in California and many other liberal jurisdictions corporate firms are hard pressed to compel state courts to enforce arbitration agreements against parties who contest that they must resolve their disputes in informal venues – even within the bounds of the FAA because "§ 2's saving clause preserves generally applicable [state] contract defenses" in these jurisdictions, which are less hospitable to arbitration contract enforcement than analogous rules in other states.[341]

"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order

One might counter that this peculiar iteration of the procedural and substantive unconscionability doctrines is unique only to the Golden State. Even if this were so, given that the California Supreme Court has stood at the forefront of progressive reform in the areas of tort, contact, property, and other admittedly less common private law fields such as restitution and agency under the stewardship of jurists such as Roger Traynor, Rose Bird, Matt Tobriner, and Stanley Mosk in the past, one could never discount the possibility that other states would follow in the Court's footsteps again.[342] Second, and perhaps more importantly, even if one thought that *AT&T Mobility LLC v. Concepcion* neutered the potential for state resistance to application of the FAA, which is fair, as is often the case in international arbitration,[343] the parties could pre-select the law to be applied before the arbitrator essentially reintroducing all the problems and potential for abuse that this article has documented, with the sole exception that the parties are now stripped of any nominal protection that the Federal Rules of Civil Procedure and Evidence would have afforded them in a federal or state forum.[344] The result is that even if our skeptic is telling the truth, there will still be a segment of cases where the state of affairs under his scenario is even worse for one-shot litigants.

CONCLUSION

In the words of President Calvin Coolidge, "the business of American is business." To the extent, however, that the international competitiveness of service oriented economies is dependent upon appellate litigators, investment bankers, and other members of the learned professions creating value for their clients rather than rent-seeking and passing on these charges to their clients, the current choice of law regime places both American business and the United States as a whole at a competitive disadvantage vis-à-vis the United Kingdom, China, Japan, India, Europe, Brazil, and the rest of the world. This arrangement is all the more perilous because Wall Street law firms work for their clients – not the other way around. When globalization in the 1970s and 1980s prompted corporate general counsel to discontinue blind referrals to large law firms, refuse to accept legal bills without line descriptions of six-minute time entries, and shop around for competitive rates for services, these changes were accepted because corporate boards needed to compete with their peers abroad operating in regimes with lower legal costs. The current predicament presents this exact dilemma. To be sure, this position is not in the interests of litigators such as myself, but in the paraphrased words of Adlai Stevenson II, patriotism consists in part of placing one's "country ahead of [one's] self." If the choice is between a marginally higher fee for a vanishingly small fraction of this republic's citizens and the retained hope that the twenty-first century will be another American century, there can be only one correct answer if this nation is to retain "government of the people, by the people, and for the people."

Appendix

Figure 3

---

summarily directing the parties to proceed with the arbitration in accordance with the terms thereof."

[341] See, e.g., Myriam Gilles and Gary Friedman, *After Class: Aggregate Litigation in the Wake of AT & T Mobility v. Concepcion*, 79 U. CHI. L.REV. 623, 651 (2012).

[342]

[343] Gary B. Born, INTERNATIONAL COMMERCIAL ARBITRATION (2009).

[344] Marc Galanter, *Why the "Haves" Come out Ahead: Speculations on the Limits of Legal Change*, 9 LAW & SOCIETY REVIEW 95 (1974);

Olapade                                                                  DRAFT

