

Olapade                                                                                                      DRAFT

*Ol Too – Why the Time has Come to Close Criminal Jurisdiction Gaps on Native American Reservations*

I.    *Introduction*

Crime doesn't pay in the United States, unless you are on a Native American reservation. Just ask Michael Bryant. Between 1997 and 2007, the Northern Cheyenne Tribal Court convicted Bryant of more than 100 criminal offenses – including several misdemeanor convictions for domestic assault. More specifically, during this same time period, Bryant pled guilty on five different occasions to domestic abuse in violation of § 7-5-10 of Title Seven of the tribal code. In 1999, for instance, Bryant strangled his then-girlfriend and beat her with a beer bottle. Eight years later, he punched her in the face and broke her nose. Once his partner left him, Bryant found another acquittance who, he again, put his hands on by dragging her off her bed, pulling her hair, and punching her. When federal and tribal law enforcement finally decided to interview Bryant about his repeat offenses, he expressed no remorse over his actions. Indeed, in a May 9, 2011, meeting, Bryant admitted to assaulting his current girlfriend six times and proudly recounted how he "slapped her" and "knocked her to the ground" before authorities finally decided to take him off the streets.

Bryant's case is unique because if he had committed these exact acts in California, Texas, Florida, Maine, or another State, most readers would assume that State authorities would have the jurisdiction and staff capacity to arrest, charge, and incarcerate him. After all, one of the basic hallmarks of a developed State is the ability to remove its inhabitants from a state of nature and enforce laws protecting negative liberty. Most Americans, however, would be surprised to discover that it was not until 2013 that tribal authorities gained the ability to criminally punish non-reservation residents who come to reservations to abuse the weak and vulnerable among us and then flee to their homes immune from prosecution by reservation officials. What's more, several important jurisdictional and policy gaps are still present within the current regime that effectively permit abusers to commit crimes on reservations and terrorize their inhabitants with impunity. This paper provides a proscription for protecting law and order and proceeds in four steps. Part II provides scarce statistics on domestic violence in Native American reservations and concludes that the average Native American woman is at a substantially higher risk of suffering at the hands of an assaulter than a similarly situated woman of any ethnicity in the United States. Part III then examines existing tribal jurisdictional gaps that prevent reservations from responding effectively to domestic violence incidents and the historical reasons for this deficiency. This portion concludes that the current mishap is due in part to American colonial conceptions of Native American sovereignty that date back to the early nineteenth century. Part IV conducts an exhaustive survey of the various federal statutes and reservation practices that tribal, federal, and State authorities could use currently to improve their response to the situation and, concludes that the current set of solutions are incomplete because they do not permit tribes to handle all incidents of domestic violence that occur within their borders. Finally, Part V provides a list of steps that the federal government, tribes, and domestic violence victims could take to obtain justice from assaulters.

II.    *Statistics on Domestic Violence Within Native American Reservations*

1

In the words of Justice Sotomayor, within the United States, there are "more than a million acts of domestic violence, and hundreds of deaths from domestic violence, each year."[1] At the outset, it should be noted that it is difficult to obtain accurate and thorough data on sexual violence in Native American communities.[2] This is so because Native American women are rarely included as target populations in sexual violence research and are often fearful of disclosing violent crimes to individuals outside their tribe.[3] More than that, in practical terms, Native Americans make up such a small percentage of the populace that a valid random sample is often difficult to come by. In used to be common practice in national studies, for instance, to pool data from Native American survey responses where the sample size was not statistically significant with data from other groups that did not produce large enough sample sizes. This method was most common in criminology studies that classified survey respondents as "Caucasian, African-American, and Other."[4] The statistics that do exists, though, are harrowing. Violence against Native Americans residing on reservations far exceeds violence against any other ethnic population of women in the United States.[5] The National Violence Against Women Survey concluded that 34% of Native American women will be raped in their lifetime.[6] Nearly three out of every five Native American women have been assaulted by their spouses or intimate partners.[7] Several other state and local studies reveal similar high sexual victimization rates among Native American women.[8] More than that, rapes against Native Americans have been descried as "exceedingly violent" and three times more likely to involve weapons than all other reported rapes.[9] As Ronet Bachman, Heather Zaykowski, Rachel Kallmyer, Margarita Poteyeva, and Christina Lanier, have demonstrated, crime reports from the tribes themselves corroborate this narrative.[10]

---

[1] *United States v. Castleman*, 572 U.S. 157, 159–60 (2014); see also *Georgia v. Randolph*, 547 U.S. 103, 117–118, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006).

[2] Geraldine Malone, GENDER AND COLONIALISM 37 (1999).

[3] Sarah Deer, *Toward an Indigenous Jurisprudence of Rape*, 14 Kan. J.L. & Pub. Pol'Y 121, 124 (2004).

[4] Michael D. Dean, Marci N. Wease, *Understanding DNA Analysis & Interpretation*, CRIM. JUST., Spring 2015, at 10, 14.

[5] Michael Planty, BUREAU OF JUSTICE STATISTICS, UNITED STATES DEPARTMENT OF JUSTICE, FEMALE VICTIMS OF SEXUAL VIOLENCE, 1994-2010 (2013); Lawrence Greenfeld and Steven Smith, U.S. Dep't. of Justice, American Indians and Crime (1999); Callie Rennison, U.S. Dep't of Justice, Violent Victimization and Race, 1993-98 (March 2001).

[6] Patricia Tjaden and Nancy Thonennes, U.S. Dep't. of Justice, Full Report on the Prevalence, Incidence, and Consequences of Violence Against Women 22 (2000); Andrew Gilden, *Preserving the Seeds of Gender Fluidity: Tribal Courts and the Berdache Tradition*, 13 Mich. J. Gender & L. 237, 268 (2007); Jessica Allison, *Beyond Vawa: Protecting Native Women from Sexual Violence Within Existing Tribal Jurisdictional Structures*, 90 U. Colo. L. Rev. 225, 227 (2019)

[7] Ronet Bachman, VIOLENCE AGAINST AMERICAN INDIAN AND ALASKA NATIVE WOMEN AND THE CRIMINAL JUSTICE RESPONSE: WHAT IS KNOWN 47 (2008); Bethany R. Berger, *Race, Descent, and Tribal Citizenship*, 4 Cal. L. Rev. Circuit 23, 24 (2013); Bethany R. Berger, *Justice and the Outsider: Jurisdiction over Nonmembers in Tribal Legal Systems*, 37 Ariz. St. L.J. 1047, 1108 (2005); Gideon M. Hart, *A Crisis in Indian Country: An Analysis of the Tribal Law and Order Act of 2010*, 23 Regent U. L. Rev. 139, 142 (2011)

[8] Peter Hovmand, Michigan Violence and Intentional Injury Prevention Program, 2 SEXUAL ASSAULT SURVEILLANCE SYSTEM 3 (July 1999); Lucy Berliner, OFFICE OF CRIME VICTIM ADVOCACY, SEXUAL ASSAULT EXPERIENCES AND PERCEPTIONS OF COMMUNITY RESPONSE TO SEXUAL ASSAULT: A SURVEY OF WASHINGTON STATE WOMEN 16 (2001).

[9] N. Bruce Duthu, *Broken Justice in Indian Country*, N.Y. TIMES, Aug. 10, 2008.

[10] Ronet Bachman, Heather Zaykowski, Rachel Kallmyer, Margarita Poteyeva, and Christina Lanier, Violence Against American Indian and Alaska Native Women and the Criminal Justice Response: What is Known (August 2008).

Olapade                                                                         DRAFT

Table 1

| Native American Female Homicide Rates in Predominantly Native American Counties | | |
|---|---|---|
| State | County Name | Homicide Rate Per 100,000 Native American Women |
| AK | Aleutians East Borough | 43.57 |
| AK | Anchorage Municipality | 15.51 |
| AK | Bethel Census Area | 3.18 |
| AK | Bristol Bay Borough | 78.13 |
| AK | Fairbanks North Star Borough | 12.82 |
| AK | Valdez-Cordova Census Area | 29.24 |
| AK | Yukon-Koyukuk Census Area | 27.65 |
| AZ | Apache County | 6.63 |
| AZ | Coconino County | 3.59 |
| AZ | Gila County | 12.23 |
| AZ | Maricopa County | 12.47 |
| AZ | Mohave County | 29.94 |
| AZ | Navajo County | 3.31 |
| AZ | Pima County | 9.85 |
| AZ | Pinal County | 21.02 |
| AR | Sebastian County | 18.55 |
| CA | Fresno County | 3.1 |
| CA | Humboldt County | 10.96 |
| CA | Kern County | 4.19 |
| CA | Sacramento County | 2.79 |
| CA | San Bernardino County | 2.06 |
| CA | Sonoma County | 7.97 |
| CO | Denver County | 28.24 |
| CO | La Plata County | 33.56 |
| ID | Bingham County | 14.23 |
| IA | Woodbury County | 43.38 |
| KS | Labette County | 73.26 |
| KS | Sedgwick County | 8.4 |
| LA | Terrebonne Parish | 7.72 |
| MN | Beltrami County | 5.15 |
| MN | Mille Lacs County | 45.15 |
| MN | St. Louis County | 10.8 |
| MS | Neshoba County | 11.09 |
| MT | Hill County | 14.48 |
| MT | Missoula County | 16.58 |
| MT | Yellowstone County | 10.16 |
| NE | Dakota County | 92.17 |
| NE | Knox County | 62.11 |

Olapade

DRAFT

| NV | Humboldt County | 56.34 |
|----|-----------------|-------|
| NV | Washoe County | 6.25 |
| NM | Bernalillo County | 18.22 |
| NM | Dona Ana County | 16.5 |
| NM | McKinley County | 6.18 |
| NM | Sandoval County | 2.61 |
| NM | San Juan County | 3.76 |
| NM | San Fe County | 9.74 |
| NC | Bladen County | 57.97 |
| NC | Cumberland County | 9.06 |
| NC | Graham County | 70.18 |
| NC | Harnett County | 89.69 |
| NC | Hoke County | 9.89 |
| NC | Robeson County | 10.98 |
| NC | Scotland County | 12.52 |
| NC | Warren County | 39.6 |
| ND | Burleigh County | 38.54 |
| ND | Ward County | 30.4 |
| OK | Adair County | 4.42 |
| OK | Blaine County | 42.28 |
| OK | Cherokee County | 5.77 |
| OK | Cleveland County | 4.52 |
| OK | Coal County | 38.61 |
| OK | Craig County | 17.29 |
| OK | Custer County | 25.09 |
| OK | Garfield County | 30.63 |
| OK | Kay County | 21.53 |
| OK | Latimer County | 80.97 |
| OK | Muskogee County | 3.78 |
| OK | Oklahoma County | 16.7 |
| OK | Okmulgee County | 24.09 |
| OK | Osage County | 6.11 |
| OK | Payne County | 13.44 |
| OK | Pontotoc County | 7.16 |
| OK | Pottawatomie County | 5.23 |
| OK | Tulsa County | 8.04 |
| OR | Multnomah County | 5.96 |
| SD | Bennett County | 21.62 |
| SD | Bon Homme County | 555.56 |
| SD | Charles Mix County | 14.19 |
| SD | Minnehaha County | 25.96 |
| SD | Pennington County | 11.86 |
| SD | Todd County | 10.49 |
| UT | Iron County | 62.7 |
| UT | San Juan County | 9.67 |

Olapade                                                                                                    DRAFT

| | | |
|---|---|---|
| WA | Ferry County | 32.79 |
| WA | Okanogan County | 8.73 |
| WA | Pierce County | 19.32 |
| WA | Snohomish County | 4.89 |
| WA | Spokane County | 6.7 |
| WA | Yakima County | 20.72 |
| WI | Brown County | 14.09 |
| WI | Forest County | 39.14 |
| WI | Menominee County | 10.49 |
| WY | Fremont County | 11.47 |

For example, when asked whether aggressors physically hit them during the assault, over 90% of Native American women responded 'yes' compared with only 71% of Caucasian respondents.[11] In a related inquiry, 25% of Native American female assault victims reported that their assailant used a weapon compared with only 9% of Caucasian survey takers.[12] These figures become even more appalling once the focused is placed on rape in tandem with other sexual assault incidents (See Table 2).[13]

Table 2

| Average Annual Percentage of Rape and Sexual Assault Incidents Against Women of All Ethnicities from 1992-2005 | |
|---|---|
| Ethnicity | Percentage of Incidents Where the Victim was Hit |
| All Ethnicities | 72% |
| Native American | 91% |
| Asian American | 62% |
| Caucasian | 71% |
| African American | 78% |

Table 3

| Average Annual Percentage of Rape and Sexual Assault Incidents Against Women that Resulted in Injuries in Addition to Rape Injuries from 1992-2005 | | |
|---|---|---|
| Ethnicity | Percentage of Incidents Where the Victim was Injured | Percent of Injuries Requiring Medical Care |
| All Ethnicities | 17% | 34% |
| Native American | 20% | 47% |
| Asian American | 24% | 36% |
| Caucasian | 16% | 33% |

---

[11] Ronet Bachman, Heather Zaykowski, Rachel Kallmyer, Margarita Poteyeva, and Christina Lanier, Violence Against American Indian and Alaska Native Women and the Criminal Justice Response: What is Known (August 2008)
[12] Id.
[13] Id.; see also Maire Corcoran, *Rhetoric Versus Reality: The Jurisdiction of Rape, the Indian Child Welfare Act, and the Struggle for Tribal Self-Determination*, 15 WM. & MARY J. WOMEN & L. 415, 417 (2009).

Olapade

DRAFT

| African American | 16% | 35% |
|---|---|---|

Table 4

| Average Annual Percentage of Rape and Sexual Assault Incidents Against Women of All Ethnicities Where the Offender had a Weapon from 1992-2005 | |
|---|---|
| Ethnicity | Percentage of Incidents Where the Offender had a Weapon |
| All Ethnicities | 9% |
| Native American | 25% |
| Asian American | 6% |
| Caucasian | 9% |
| African American | 9% |

Table 5

| Domestic Violence Circumstances by Ethnicity (Percentage) | | | | | |
|---|---|---|---|---|---|
| Circumstances | Native American | Asian American | Caucasian | Hispanic | African American |
| Victim Experienced Violence in the Past Month | 16.7% | 12.9% | 10.8% | 15.6% | 9.9% |
| Precipitated by Another Crime | 8.9% | 11% | 10.7% | 11.3% | 12.2% |
| Crime in Progress | 70% | 53.8% | 52.5% | 56.5% | 56% |
| Argument Preceded Victim's Death | 32.1% | 35.6% | 27% | 39.9% | 30.9% |
| Lovers' Triangle | 18.8% | 11% | 10.7% | 19% | 10.5% |

Table 6

| Proportion of Stalking Victims By Tactic | | | | | | |
|---|---|---|---|---|---|---|
| Stalking Tactic | Lifetime Percentage | Lifetime 95% Confidence Interval | Estimated Number of Victims | 12 Month Percentage | 12 Month 95% Confidence Interval | Estimated Number of Victims |
| Watched or Spied on Victim | 49.7% | 45-54.4 | 9,109,000 | 25.9% | 17.4-36.8 | 1,322,000 |
| Undesired Approaching of Victim | 61.7% | 57.1-66.1 | 11,313,000 | 33.6% | 24.6-43.9 | 1,709,000 |

Olapade                                                                                    DRAFT

| Left Strange Items | 15% | 11.8-18.9 | 2,754,000 | N/A | N/A | N/A |
|---|---|---|---|---|---|---|
| Sneaked into Home or Car | 26.8% | 22.7-31.3 | 4,905,000 | 7.8% | 4.9-12.1 | 396,000 |
| Left Unwanted Messages | 55.3% | 50.5-59.9 | 10,132,000 | 52.7% | 42.6-62.6 | 2,686,000 |
| Made Unwanted Calls | 54.5% | 49.8-59.1 | 9,987,000 | 45.4% | 35.8-55.2 | 2,311,000 |
| Sent Unwanted Emails | 14.3% | 11.1-18.2 | 2,618,000 | 30% | 21.3-40.4 | 1,527,000 |
| Left Unwanted Cards | 24.7% | 20.6-29.3 | 4,524,000 | 17.8% | 10-29.9 | N/A |

Table 7

| Stalking Statistics by Ethnicity | | | |
|---|---|---|---|
| | Percentage | 95% Confidence Interval | Estimated Number of Victims |
| Native American | 24.5% | 14.2-38.8 | N/A |
| Asian American | N/A | N/A | N/A |
| Caucasian | 15.9% | 14.4-17.5 | 12,749,000 |
| Hispanic | 14.2% | 10.6-18.7 | 2,295,000 |
| African American | 13.9% | 10.7-17.9 | 2,020,000 |

Tribal experience confirms these inferences. The Navajo Nation, for instance, has estimated that their investigators spent almost 70% of their time on sex crimes overall.[14] These statistics become even more concerning once one considers that non-Native Americans are responsible for the highest number of violent crimes committed against Native American women. At least 70% of rapes of Native American women are interracial with some estimates placing the figure as high as 88%.[15] In another Justice Department study, nearly 80% of Native women reported their assailant was Caucasian while 10% reported that their rapist was African-American.[16] As a 2011 National Intimate Partner and Sexual Violence Survey also indicates,[17]

---

[14] Jim Maniaci, *Rape Cases Increasing on the Reservation: Expanded Sex Offenders Tribal Web Site Planned*, GALLUP INDEPENDENT.

[15] Brief for National Network to End Domestic Violence et al. as Amici Curiae Supporting Respondents at 5, *Plains Commerce Bank v. Long Family Land & Cattle Co.*, 128 S. Ct. 2709 (2008) (No. 07-411).

[16] Steven Perry, BUREAU OF JUSTICE STATISTICS, U.S. DEPARTMENT OF JUSTICE, AMERICAN INDIANS AND CRIME: A BJS STATISTICAL PROFILE, 1992-2002 (2004).

[17] Matthew J. Breiding, Sharon G. Smith, Kathleen C. Basile, Mikel L. Walters, Jieru Chen, and Melissa T. Merrick, Prevalence and Characteristics of Sexual Violence, Stalking, and Intimate Partner Violence Victimization, National Intimate Partner and Sexual Violence Survey 2011, available at https://www.cdc.gov/mmwr/preview/mmwrhtml/ss6308a1.htm

Olapade                                                                    DRAFT

these domestic violence offenders are particularly dangerous because domestic abusers exhibit high rates of recidivism and, assault incidents often escalate in severity over time.[18]

Table 8

| Number and Percentage of Adult Women with a Lifetime History of Intimate Partner Violence Victimization | | | |
|---|---|---|---|
| Characteristic | Number | Percentage | 95% Confidence Interval |
| Age Group | | | |
| 18-24 | 585 | 24.1% | 21.2-27.1 |
| 25-34 | 1941 | 30.2% | 28.3-32 |
| 35-44 | 2571 | 30.2% | 28.5-31.8 |
| 45-54 | 3054 | 31.2% | 29.6-32.7 |
| 55-64 | 2129 | 26.5% | 24.9-28.1 |
| ≥65 | 1272 | 12.9% | 11.8-14 |
| | | | |
| Ethnicity | | | |
| Native American | 319 | 39% | 32.3-45.8 |
| Asian-American | 156 | 9.7% | 6.5-12.9 |
| Caucasian | 8375 | 26.8% | 25.9-27.7 |
| Hispanic | 988 | 20.5% | 18.5-22.5 |
| African-American | 903 | 29.2% | 26.2-32.2 |
| | | | |
| Education Level | | | |
| High School Graduate | 3185 | 24.5% | 23.2-25.9 |
| Some College | 3894 | 31.7% | 30.2-33.2 |
| College Graduate | 3378 | 22.9% | 21.8-24.1 |

Table 9

| Number and Percentage of Adult Women with a History of Domestic Violence by Offense Type |
|---|

---

[18] See Ralph Richard Banks, Is Marriage for White People? XXX (2011); Statistics on Violence Against Native Women, Indian Health Service, available at http://www.ncai.org/attachments/PolicyPaper_tWAjznFslemhAftZgNGzHUqIWMRPkCDjpFtxeKEUVKjubxfpGYK_Policy%20Insights%20Brief_VAWA_020613.pdf; *United States v. Bryant*, 136 S. Ct. 1954, 1959 (2016), as revised (July 7, 2016); M Black et. al., *Centers for Disease Control and Prevention, National Center for Injury Prevention and Control*, National Intimate Partner and Sexual Violence Survey 2010 Summary Report 40 (2011) (Table 4.3), online at http://www.cdc.gov/ViolencePrevention/pdf/NISVS_report2010-a.pdf (all Internet materials as last visited June 9, 2016); Dept. of Justice, Attorney General's Advisory Committee on American Indian and Alaska Native Children Exposed to Violence, Ending Violence So Children Can Thrive 38 (Nov. 2014), online at https://www.justice.gov/sites/default/files/defendingchildhood/pages/attachments/2015/03/23/ending_violence_so_children_can_thrive.pdf.; See Perpetrators of Sexual Violence: Statistics, RAINN, https://www.rainn.org/statistics/perpetrators-sexual-violence.

8

Olapade                                                                                                    DRAFT

| Offense | Percentage | 95% Confidence Interval | Estimated Number of Victims |
|---------|-----------|-------------------------|------------------------------|
| Lifetime | | | |
| Rape | 19.3% | (17.9-20.8) | 23,305,000 |
| Completed Forced Penetration | 11.5% | (10.3-12.7) | 13,826,000 |
| Attempted Forced Penetration | 6.4% | (5.6-7.4) | 7,732,000 |
| Completed Alcohol- or Drug Facilitated Penetration | 9.3% | (8.3-10.5) | 11,276,000 |
| Other Sexual Violence | 43.9% | (42.1-45.6) | 52,958,000 |
| Forced to Penetrate | .6% | (.4-.8) | 703,000 |
| Sexual Coercion | 12.5% | (11.3-13.7) | 15,045,000 |
| Unwanted Sexual Conduct | 27.3% | (25.8-28.9) | 33,016,000 |
| Noncontact Unwanted Sexual Experiences | 32.1% | (30.5-33.8) | 38,813,000 |
| Twelve Month Period | | | |
| Rape | 1.6% | (1.1-2.2) | 1,929,000 |
| Completed Forced Penetration | N/A | N/A | N/A |
| Attempted Forced Penetration | N/A | N/A | N/A |
| Completed Alcohol- or Drug Facilitated Penetration | 1.0% | (.7-1.5) | 1,213,000 |
| Other Sexual Violence | 5.5% | (4.7-6.5) | 6,687,000 |
| Forced to Penetrate | N/A | N/A | N/A |
| Sexual Coercion | 2.0% | (1.5-2.6) | 2,389,000 |
| Unwanted Sexual Conduct | 2.2% | (1.7-2.9) | 2,687,000 |
| Noncontact Unwanted Sexual Experiences | 3.4% | (2.7-4.1) | 4,046,000 |

Table 10

| Lifetime Physical Violence by Intimate Partners Experienced by Native American | |
|---------|---------|
| Tactic | Female Victim Percentage |
| Slapped | 59.8 |
| Pushed or shoved | 83.2 |

Olapade                                                                      DRAFT

| | |
|---|---|
| Hit with a fist or something hard | 53.6 |
| Kicked | 28.3 |
| Hurt by having hair pulled | 27.3 |
| Slammed against something | 53.8 |
| Hurt by being choked or suffocated | 37.6 |
| Beaten | 45.9 |
| Burned on purpose | 9.1 |
| Had a knife or gun used on them | 27.1 |

Table 11

| Number and Percentage of Adult Women with a History of Domestic Violence by Ethnicity | | | |
|---|---|---|---|
| | Percentage | 95% Confidence Interval | Estimated Number of Victims |
| Native American – Rape | 27.5% | 16.1-42.7 | N/A |
| Native American – Other Sexual Violence | 55% | 41.5-67.9 | 452000 |
| Asian American – Rape | N/A | N/A | N/A |
| Asian American – Other Sexual Violence | 31.9% | 22.6-43 | 1924000 |
| Caucasian – Rape | 20.5% | 18.8-22.3 | 16475000 |
| Caucasian – Other Sexual Violence | 46.9% | 44.9-48.9 | 37661000 |
| Hispanic – Rape | 13.6% | 10.1-18.1 | 2204000 |
| Hispanic – Other Sexual Violence | 35.6% | 30.3-41.3 | 5771000 |
| African American – Rape | 21.2% | 17.2-25.9 | 3084000 |
| African American – Other Sexual Violence | 38.2% | 33.3-43.4 | 5555000 |

Indeed, as many as 53% of rapists have attempted or completed more than one rape.[19] The percentages here are particularly peculiar when compared with analogous figures documenting rapes of non-Native American women. For example, 69% of rapes of Caucasian victims are committed by Caucasian individuals while 81% of rapes of African-American victims are committed by African-American individuals.[20] The higher rate of interracial sexual violence on

[19] Shawn Fields, *Debunking the Stranger-In-The-Bushes Myth: The Case for Sexual Assault Protection Orders*, 429 WISC. L. REV. 429 (2017).
[20] Larry Cunningham, *Deputization of Indian Prosecutors: Protecting Indian Interests in Federal Court*, 88 GEO. L.J. 2187 (2000).

Olapade                                                                          DRAFT

reservations can be attributed in part to the large number of non-Native Americans who reside on reservations or marry Native American women.[21] Indeed, over 50% of all married Native American women have a non-Native American husband.[22]

Figure 1 Percentage Rate of Intermarriage by Ethnicity and Sex – 2010 Census



Figure 2 Percentage of Interethnic Opposite-Sex Unmarried Partners – 2010 Census



---

[21] Judith Royster, *The Legacy of Allotment*, 27 ARIZ. ST. L.J. 1 12-15 (1995).
[22] Lauren Kelly, *The Human Rights Impacts of VAWA 2012: A True Victory for Native American Women?*, DUKE IMMERSE 1 (2013).

11

Olapade                                                                          DRAFT

III.     *Gaps in Tribal Criminal Jurisdiction*

The disparity is also a product of the sad fact that a substantial percentage of rapists, cognizant of the fact that the tribes are powerless to exercise criminal jurisdiction over them, actually go out of their way to travel to reservations to abuse victims.[23] The Supreme Court itself has taken judicial notice of these facts. In *United States v. Bryant*, for instance, Justice Ginsburg noted that "American Indian women experience battery at a rate of 23.2 per 1,000, compared with 8 per 1,000 among Caucasian women, and they "experience 7 sexual assaults per 1,000, compared with 4 per 1,000 among [African-Americans], 3 per 1,000 among Caucasians, 2 per 1,000 among Hispanic women, and 1 per 1,000 among Asian-American women."[24] The heartbreaking costs are real. Native American women play vital cultural and spiritual roles in tribal communities and often suffer from higher rates of depression, alcoholism, drug abuse, and suicidal ideation after being assaulted.[25] In referencing domestic violence, it is critical to recognize that the phenomenon does not necessarily involve strong or violent physical force, although it frequently does.[26] Rather, the term denotes a spectrum of physical, sexual, emotional, economic, or psychological behaviors or threats intended to intimidate, manipulate, humiliate, isolate, frighten, terrorize, coerce, blame or gain control of a spouse or intimate partner through intimidation, isolation, and control over an individual's sexuality, family relations, children, friends, or work. Accordingly, as between any given abuser and his or her victim, the reality of domestic violence may include conduct such as ridicule, name-calling, excessive monitoring (either in person or electronically) of the target's behavior, repeated accusations of infidelity, contact controls, verbal threats either at the target or that person's family, stalking (either in person or electronically), spitting, scratching, biting, grabbing, malicious restraining (physically, professionally, or otherwise), slapping, punching, kicking, choking, or rape.[27] While some actions may seem to inflict *de minimus* harm, each act assumes a special significance in the context of an abusive relationship as "all slaps, kicks, and other physical acts, are not the same...some are more frightening than others, especially if accompanied with a certain look on [the spouse's] face."[28] Others, are qualitatively different in the type of slap, the length of time the choke is held or other differences in an act" – the common denominator here, in the modified words of the National Network to End Domestic Violence, is an act that, regardless of intent, has the underlying effect of communicating directly to the victim, who receives the message without violating any federal or state privacy statutes, (in-person, electronically, or otherwise) and from her perspective, views the message as an attempt to establish control over her.[29] Indeed, one hallmark of domestic violence is that it grows out of, and serves to

---

[23] *Id.*

[24] *United States v. Bryant*, 136 S. Ct. 1954, 1959 (2016), as revised (July 7, 2016) (quoting VAWA Reauthorization Act, § 901, 119 Stat. 3077).

[25] Sarah Deer, *Toward an Indigenous Jurisprudence of Rape*, 14 Kan. J.L. & Pub. Pol'Y 121, 124 (2004); Hossein Dabiri, *Kiss the Ring, but Never Touch the Crown: How U.S. Policy Denies Indian Women Bodily Autonomy and the Save Native Women Act's Attempt to Reverse That Policy*, 36 Am. Indian L. Rev. 385, 386 (2012) see also *United States v. Deegan*, 605 F.3d 625, 663 (8th Cir. 2010) (Bright, J., dissenting).

[26] Brief for National Network to End Domestic Violence et al. as Amici Curiae Supporting Respondents at 5, *United States v. Castleman*, 572 US _ (2014) (No. 12-1371).

[27] *Id.*

[28] *Id.*

[29] *Id.*

DRAFT

perpetuate, a dynamic of power and control between intimate partners. Another related characteristic is that this underlying dynamic often drives the abusive partner or stalker into a series or pattern of escalating behaviors: the first incident of abuse is typically not the last, and when less abusive tactics no longer have the intended effect, they are replaced by more abusive acts.[30] Indeed, as the National Violence Against Women Survey demonstrated, close to 65.5% of women who are physically assaulted by an intimate partner are victimized multiple times by that same partner.[31] And nearly 20% of respondents to that survey recalled ten or more incidents of physical assault by the same partner occurring per year.[32] A related study by the National Crime Victimization Survey discloses a similar pattern. (See Table 12)

Table 12

| Average Annual Percentage of Rape and Sexual Assault Incidents Against Women Categorized by Assailant from 1992-2005 | | | | |
|---|---|---|---|---|
| Ethnicity | Intimate Partner | Family Member | Known Individual | Stranger |
| All Ethnicities | 24% | 5% | 45% | 26% |
| Native American | 38% | 0% | 33% | 29% |
| Asian American | 20% | 4% | 45% | 31% |
| Caucasian | 24% | 5% | 44% | 27% |
| African American | 23% | 6% | 47% | 25% |

Domestic violence then cannot be identified by any one discrete incident but rather is a "variety of abusive acts, occurring in multiple episodes over the course of the relationship" each of which is connected to the others and builds upon them.[33] Regardless of the precise contours of abuse, the result is cumulative: due to the ongoing and continuous nature of domestic violence one battering episode builds on past episodes and sets the stage for future incidents, instilling the fear of future assaults by a known assailant into the victim.[34]

Modem statutes prohibiting sexual assault were greatly influenced by contemporary property law.[35] The traditional American legal paradigm of rape (a stranger attacking a virgin) did not address the experience of most women.[36] Indeed, for most of American history, rape was framed as a property crime committed against men and as "an accusation easy to be made… [and] harder to be proved."[37] In 1825, for instance, most state laws required two eyewitnesses to convict a man for rape as a woman's word standing alone was never sufficient. This rule was simply one of many features that placed the victim on trial as much as the defendant as the focus was centered

---

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] see also Kristen A. Carpenter & Angela R. Riley, *Indigenous Peoples and the Jurisgenerative Moment in Human Rights*, 102 Cal. L. Rev. 173, 227 (2014)

[34] Sarah Deer and Carrie Martell, *Heeding the Voice of Native Women: Toward an Ethic of Decolonization*, 81 N.D. L. REV. 807 (2005)

[35] Roy Porter, *Rape -- Does it Have a Historical Meaning?*, in RAPE: AN HISTORICAL AND SOCIAL ENQUIRY 216, 217 (1986).

[36] Deborah Rhode, Katherine Bartlett, and Joanna Grossman, GENDER & LAW: THEORY DOCTRINE & COMMENTARY (2013).

[37] 1 Matthew Hale, THE HISTORY OF THE PLEAS OF THE CROWN 635 (1778).

on "the appropriateness of the woman's behavior according to male standards."[38] More than that, at least four more doctrinal barriers are readily apparent. First, traditional State requirements that victims demonstrate the use of force in connection with sexual intercourse provided an implicit shield to purely emotional, as opposed to physical abusers, and created a margin of error in matters where force was narrowly defined. Second, historically speaking, many State courts have required proof not only of male aggression, but also, partner resistance in threatening situations where physical opposition could not reasonably be expected and despite the fact that no analogous requirement is imposed upon individuals pressing many other criminal or tort claims such as trespass or battery.[39] One might retort that the presence or absence of opposition distinguishes consensual sex from rape. The problem with this retort, of course, is that it is not at all clear that an individual affirmatively consented to participate in an activity by declining to object to it. This is common sense: if a consumer provided her cell phone number to a grocery store, the store then sold that information to a third-party marketer without a waiver from the consumer, and the consumer then received targeted phone calls from other stores that she then ignored, no one would say that she consented to receive the calls. Any other position would either require a theory of consent at odds with the consensus position of contract law scholars across the ideological spectrum, or an insistence that stricter standards of consent apply to consumer contracts vis-à-vis forced intercourse. Third, some States have considered the victim's sexual history in matters where the victim's previous relationships were utterly irrelevant because the aggressor did not know about them.[40] Fourth, if one accepts Stanford Law Professor Lawrence Friedman's assertion that "law varies in time and space, according to the conditions of the culture in which it is embodied,[41] one cannot neglect the fact that many leading scholars in the middle of the Twentieth Century offered colored, and inaccurate sociological and scientific explanations to defense attorneys seeking to justify forcible rape on the grounds that the woman delighted in the physical struggle

---

[38] See, e.g, Sedelle Katz, Mary Ann Mazur, UNDERSTANDING THE RAPE VICTIM: A SYNTHESIS OF RESEARCH FINDINGS (1979); Josh Maggard, *Courting Disaster: Re-Evaluating Rape Shields in Light of People v. Bryant*, 66 Ohio St. L.J. 1341, 1347 (2005)

[39] See, e.g., *King v. Tennessee*, 210 Tenn. 150 (1962); *Moss v. Mississippi*, 208 Miss. 531 (1950); *Brown v. Wisconsin*, 127 Wis. 193 (1906); *New York v. Dohring*, 59 N.Y. 374 (1874); *State v. Jackson*, No. C.C.A 223, 1990 WL 118577 (Tenn. Crim. App. Aug. 17, 1990); *State v. Canales*, No. W201500359CCAR3CD, 2015 WL 12978641 (Tenn. Crim. App. Nov. 19, 2015); *State v. Hilton*, No. 278, 1991 WL 168608 (Tenn. Crim. App. Sept. 4, 1991); *White v. State*, 540 S.W.2d 287 (Tenn. Crim. App. 1976); *Haynes v. State*, 540 S.W.2d 277 (Tenn. Crim. App. 1976); *Christian v. State*, 456 So. 2d 729 (Miss. 1984); *State in Interest of M.T.S.*, 129 N.J. 422, 609 A.2d 1266 (1992); *Loescher v. State*, 142 Wis. 260, 125 N.W. 459 (1910); *B------ v. State*, 166 Wis. 525, 166 N.W. 32 (1918); *Vogel v. State*, 138 Wis. 315, 119 N.W. 190 (1909); *People v. Barnes*, 42 Cal. 3d 284, 297, 721 P.2d 110, 117 (1986); *State v. Cowing*, 99 Minn. 123, 108 N.W. 851 (1906); *State v. Blake*, 2002 UT 113, ¶ 13, 63 P.3d 56, 59; *Reidhead v. State*, 31 Ariz. 70, 72, 250 P. 366, 367 (1926); *Cascio v. State*, 147 Neb. 1075, 1079, 25 N.W.2d 897, 900 (1947); *State v. Risen*, 192 Or. 557, 560, 235 P.2d 764, 765 (1951); *State v. Forsyth*, 20 Or. App. 624, 632, 533 P.2d 176, 180 (1975); *Roundtree v. United States*, 581 A.2d 315, 335 (D.C. 1990) (Schwelb, J., concurring).
MODEL PENAL CODE § 221.2; MODEL PENAL CODE § 211.1(2). One judge infamously wondered, for instance, why one victim hesitated to physically attack her assailant as he had her pinned in a small restroom during the course of raping her.

[40] See, e.g., *Wynne v. Virginia*, 216 Va. 355 (1975); *Snyder v. Commonwealth*, 220 Va. 792, 263 S.E.2d 55 (1980); *Winfield v. Commonwealth*, 225 Va. 211, 301 S.E.2d 15 (1983); *Smith v. Commonwealth*, 219 Va. 455, 248 S.E.2d 135 (1978); *Gardner v. United States*, 698 A.2d 990, 1001 (D.C. 1997); *Brewer v. United States*, 559 A.2d 317 (D.C. 1989); *Sothern v. United States*, 756 A.2d 934, 938 (D.C. 2000); *Government of the Virgin Islands v. John*, 447 F.2d 69 (3d Cir. 1971); *Packineau v. United States*, 202 F.2d 681 (8th Cir. 1953).

[41] Lawrence Friedman, *The Law and Society Movement*, 38 STAN. L. REV. 763, 764 (1986); see also Sandi S. Varnado, *Avatars, Scarlet "A" s, And Adultery in the Technological Age*, 55 ARIZ. L. REV. 371, 403 (2013).

Olapade                                                                          DRAFT

as a sexual stimulant. Thus, in the words, of one former writer in a published edition of the most cited law journal in the United States, when a female partner's behavior:

> looks like resistance although her attitude is one of consent, injustice may be done the man by the woman's subsequent accusation. Many wom[e]n, for example, require as part of preliminary 'love play' aggressive overtures by the man. Often their erotic pleasure may be enhanced by, or even depend upon, an accompanying struggle. [It follows that] the 'love bite' is a common, if mild, sign of the aggressive component in the sex act. And the tangible signs of struggle may survive to support a subsequent accusation by the woman. [Thus, a] woman's need for sexual satisfaction may lead to the unconscious desire for forceful penetration, the coercion serving neatly to avoid the guilt feelings which might arise after willing participation…Where such an attitude of ambivalence exists, the woman may nonetheless, exhibit behavior which would lead the factfinder to conclude that she opposed the act.…[which would be] unjust to the man.[42]

Putting aside the aside the ancillary issues of whether a law student without an M.D. should be offering medical advice in academic journals or publishing anonymous notes, the primary point here is that American courts in the eighteenth, nineteenth, and early twentieth century were not hospital venues for women asserting intra-racial (and certain interracial) rape claims. As Brooklyn College President, Michelle Anderson has explained:

> "historically [Anglo-American] rape law raised unique procedural hurdles for rape victims that victims of other crimes did not have to surmount. Derived from English common law and applicable in most jurisdictions until the mid to late 1970s, these formal rues embodied clear presumptions against women who complained of having been raped. These rules included absolute exemptions from criminal liability for those men who raped their wives. They included requirements that the victim establish that she resisted her attacker to the utmost, freshly complained of having been raped and corroborated her testimony with other evidence. They included biased suppositions about victims who had previously engaged in sexual intercourse outside of marriage. Finally, they included special cautionary instructions read to the jury to warn them of the fallibility of the testimony of those who complain of having been raped."[43]

---

[42] Note, *Forcible and Statutory Rape: an Exploration of the Operation and Objectives of the Consent Standard*, 62 YALE L.J. 55 (1952).
[43] Michelle J. Anderson, *Women Do Not Report the Violence They Suffer: Violence Against Women and the State Action Doctrine*, 46 VILL. L. REV. 907 (2001).

Olapade                                                                                   DRAFT

The literature from this period is also unhelpful for present purposes because it focused almost exclusively on offenses committed against Caucasian women.[44] Indeed, some states actually went so far as to only criminalize sexual assault when the victim was Caucasian leaving Native American women, among women from other demographic groups, with little recourse.[45] Some political elites were not hesitant to articulate the supposed rationale for this disparity. During a debate on the floor of the House of Representatives on the appropriate punishments for individuals who raped Native American women, George Norris of Nebraska in advocating for lighter penalties, argued "the morals of [Native American] women are not always as high as those of a white woman and consequently the punishment should be lighter against her."[46] And as early as 1968, the Ninth Circuit rejected a constitutional challenge to a statute that maintained exactly such a discriminatory distinction against Native American women.[47]

Reform of state rape statutes, however, became a priority across the nation during the Equal Rights movement.[48] These reforms focused on three objectives.[49] First, lawmakers sought to redefine the offense by repealing spousal exemptions and abolishing specific gender roles for the accused and accuser.[50] Second, state legislatures eliminated certain evidentiary hurdles by enacting rape shield statutes and repealing corroboration requirements.[51] Third, states began grouping sexual assault offenses by the severity of the crime.[52] These reforms though were of limited effectiveness in the late twentieth century (and even today to a lesser extent) because old notions of gender roles particularly those related to consent have "died hard."[53] While most individuals – even those of tender years – can understand the difference between an affirmative 'yes' and a 'no' (or anything short of that), other actors in the legal system who have participated in sexual assault

---

[44] Kristin Bumiller, *Rape as a Legal Symbol: An Essay on Sexual Violence and Racism*, 42 U. MIAMI L. REV. 75 (1987).

[45] *Id.*

[46] Shirley Bysiewicz and Ruth Van De Mark, *The Legal Status of the Dakota Indian Women*, 3 AM. INDIAN L. REV. 255, 270 (1975); see also Aviva Orenstein, *Propensity or Stereotype?: A Misguided Evidence Experiment in Indian Country*, 19 Cornell J.L. & Pub. Pol'y 173, 204 (2009)

[47] *Gray v. United States*, 394 F.2d 96, 101 (9th Cir. 1968) *Henry v. United States*, 432 F.2d 114 (9th Cir. 1970), modified, 434 F.2d 1283 (9th Cir. 1971); Of course, these views are no longer in vogue. See United States v. Virginia, 518 U.S. 515, 116 S. Ct. 2264, 135 L. Ed. 2d 735 (1996); *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 198 L. Ed. 2d 150 (2017); *Stanton v. Stanton*, 429 U.S. 501, 97 S. Ct. 717, 50 L. Ed. 2d 723 (1977); *Califano v. Goldfarb*, 430 U.S. 199, 97 S. Ct. 1021, 51 L. Ed. 2d 270 (1977); Orr v. Orr, 440 U.S. 268, 99 S. Ct. 1102, 59 L. Ed. 2d 306 (1979); Caban v. Mohammed, 441 U.S. 380, 99 S. Ct. 1760, 60 L. Ed. 2d 297 (1979); Califano v. Westcott, 443 U.S. 76, 99 S. Ct. 2655, 61 L. Ed. 2d 382 (1979); Davis v. Passman, 442 U.S. 228, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979); Wengler v. Druggists Mut. Ins. Co., 446 U.S. 142, 100 S. Ct. 1540, 64 L. Ed. 2d 107 (1980); Kirchberg v. Feenstra, 450 U.S. 455, 101 S. Ct. 1195, 67 L. Ed. 2d 428 (1981); Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 102 S. Ct. 3331, 73 L. Ed. 2d 1090 (1982); Clark v. Jeter, 486 U.S. 456, 108 S. Ct. 1910, 100 L. Ed. 2d 465 (1988); J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994); Nevada Dep't of Human Res. v. Hibbs, 538 U.S. 721, 123 S. Ct. 1972, 155 L. Ed. 2d 953 (2003).

[48] Ilene Seidman and Susan Vickers, *The Second Wave: An Agenda for the Next Thirty Years of Rape Law Reform*, 38 SUFFOLK U.L. REV. 467 (2005).

[49] *Id.* at 470.

[50] *Id.*; While this change may have been prompted by the Court's equal protection cases in the 1970s, one hesitates to say that this was so because of the continued persistence of the 'natural differences' exception until as of late. See *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464 (1981); *Nguyen v. INS*, 533 U.S. 53 (2001); but see *United States v. Virginia*, 518 U.S. 515 (1996); *Sessions v. Morales-Santana*, 137 S.Ct. 1678 (2017).

[51] *Id.*

[52] *Id.*

[53] Ilene Seidman and Susan Vickers, *The Second Wave: An Agenda for the Next Thirty Years of Rape Law Reform*, 38 SUFFOLK U.L. REV. 467, 468 (2005).

cases have had a harder time. Indeed, in one matter involving a nineteenth year-old woman who was forcibly raped on top of a bathroom sink, the judge, asked the victim why she "couldn't just keep her knees together?" Another judge in Nebraska prohibited witnesses – including the victim herself – from using the words rape, victim, sexual assault kit, and assailant during the proceedings in favor of less descriptive terms such as intercourse and sex.[54] Indeed, as New England Law Professor Wendy Murphy,[55] UNC Law Professor Deborah Weissman,[56] Loyola Law Professor Andrea Giampetro-Meyer,[57] Amy Fiordalisi, and Anne Robinson[58] have concluded, an uncomfortably high number of State judges, explicitly or implicitly, often express bias on the motivations of female victims who have suffered sexual assault.[59] The result is that the difference between law-in-the-books and law-in-action couldn't be starker in this domain.[60]

This abuse has a long and unfortunate pedigree in Native communities – one that predates the formation of the union itself. Enslavement and sexual exploitation of Native Americans was commonplace from the earliest days of contact. Indeed, "the practice of kidnapping [Native Americans] to enslave as guides, informants, and interpreters continued as long as there were frontiers to explore."[61] Commercial human trafficking began just days after Christopher Columbus sailed the ocean blue during 1492. On October 12 of that year, the Spanish explorer noted that the Arawaks "ought to make good and skilled servants, for they repeat very quickly whatever we say to them…with 50 men [I] could subject everyone and make them do what [I] wish." While

---

[54] See, e.g., *King v. Knowles*, No. CIV S-03-1780, 2007 WL 1703679 (E.D. Cal. June 11, 2007); *Johnson v. Georgia*, 643 S.E.2d 556 (Ga. Ct. App. 2007); *Poynor v. Mississippi*, 962 So.2d 68 (Miss. Ct. App. 2007); Greene v. Tennessee, No. E2005-02769-CCA-R3-PC. 2007 WL 1215022 (Tenn. Crim. App. Apr. 25, 2007); *Tennessee v. Neese*, No. M2005-00752-CCA-R3-CD, 2006 WL 3831387 (Tenn. Crim. App. Dec. 15, 2006); *Webb v. Texas*, 232 S.W.3d 109 (Tex. Crim. App. 2007); *Hoover v. State*, No. 03-05-00641-CR, 2007 WL 619500 (Tex. App. Feb. 27, 2007); *Washington v. Wilson*, No. 57236-9-I, 2007 WL 2085333 (Wash. Ct. App. July 23, 2007); *Ohio v. Vanek*, No. 2002-L-130, 2003 WL 1398233 (Ohio Ct. App. Dec. 22, 2003); *California v. Hinton*, No. B146149, 2002 WL 1398233 (Cal. Ct. App. June 28, 2002); Maine v. Reed, 479 A.2d 1291 (Me. 1984); Massachusetts v. Sherry, 437 N.E.2d 224, 386 Mass. 682 (1982); Massachusetts v. Grant, 391 Mass. 645 (1984); South Dakota v. Houghton, 272 N.W.2d 788 (S.D. 1978); Kansas v. Cantrell, 234 Kan. 426 (1983); Michigan v. Hammack, 63 Mich. App. 87 (1975); Brown v. Wisconsin, 59 Wis. 2d 200, 207 N.W.2d 602 (1973);

[55] Wendy Murphy, *Minimizing the Likelihood of Discovery of Victims' Counseling Records and Other Personal Information in Criminal Cases: Massachusetts Gives A Nod to a Constitutional right to Confidentiality*, 32 NEW ENG. L. REV. 983 (1998).

[56] Deborah Weissman, *Gender-Based Violence As Judicial Anomaly: Between "The Truly National and the Truly Local"*, 42 B.C. L. Rev. 1081, 1081 (2001).

[57] Andrea Giampetro-Meyer & Amy Fiordalisi, *Toward Gender Equality: The Promise of Paradoxes of Gender to Promote Structural Change*, 1 WM. & MARY J. WOMEN & L. 131 (1994).

[58] Anne W. Robinson, *Evidentiary Privileges and the Exclusionary Rule: Dual Justifications for an Absolute Rape Victim Counselor Privilege*, 31 New Eng. J. on Crim. & Civ. Confinement 331 (2005).

[59] See, e.g., Note, *Rape: The Paradigmatic Hate Crime*, 75 ST. JOHN'S L. REV. 315 (2001); Krista M. Anderson, Twelve Years Post Morrison: State Civil Remedies and A Proposed Government Subsidy to Incentivize Claims by Rape Survivors, 36 Harv. J. L. & Gender 223, 234 (2013); Aya Gruber, Righting Victim Wrongs: Responding to Philosophical Criticisms of the Nonspecific Victim Liability Defense, 52 Buff. L. Rev. 433, 478 (2004); Milli Kanani Hansen, Testing Justice: Prospects for Constitutional Claims by Victims Whose Rape Kits Remain Untested, 42 Colum. Hum. Rts. L. Rev. 943, 963 (2011).

[60] See, e.g., Lawrence M. Friedman, *A Dead Language: Divorce Law and Practice Before No-Fault*, 86 VA. L. REV. 1497, 1504 (2000).

[61] Barbra Olexer, THE ENSLAVEMENT OF THE AMERICAN INDIAN 36 (1982); Sarah Deer & Mary Kathryn Nagle, *Return to Worcester: Dollar General and the Restoration of Tribal Jurisdiction to Protect Native Women and Children*, 41 Harv. J. L. & Gender 179, 238 (2018); Kevin K. Washburn, *Federal Criminal Law and Tribal Self-Determination*, 84 N.C. L. Rev. 779, 855 (2006)

Columbus did carry back several Native American captives to Spain, all perished during the return trip.[62]  Columbus' sailing mates were more explicit in their exchanges (the following material is explicit).[63] To take just a few examples, Michele de Cuneo, one of the shipmates on the initial voyage, boasted of his depraved, sadistic, and creepy rape of a Carib woman commenting:

> [w]hen I was in the boat, I captured a very beautiful Carib woman…having brought her into my cabin, and she being naked as is their custom, I conceived desire to take my pleasure. I wanted to put desire to execution, but she was unwilling for me to do so, and treated me with her nails in such wise that I would have preferred never to have begun. But seeing this…I took a rope-end and thrashed her well, following which she produced such screaming and wailing as would cause you not to believe your ears. Finally we reached an agreement such that, I can tell you, she seemed to have been raised in a veritable school of harlots.[64]

Unfortunately, the perverted passages and fetishes don't stop here. During his journey through present-day South America, Amerigo Vespucci commented:

> [t]he women as I have said go about naked and are very libidinous; yet they have bodies which are tolerably beautiful and cleanly. Nor are they…unsightly…for inasmuch as they are plump…which…for the most part [is due] to the excellence of their bodily structure…When they have had the opportunity of copulating with Christians, urged by excessive lust, they defiled and prostituted themselves.[65]

---

[62] Peter Bakewell, 1512-1513, The Law of Burgos.

[63] While the author personally does not believe in 'trigger warnings' for speech in public forums because of natural constraints on unseemly or rude language, see *Terminiello v. City of Chicago*, 337 U.S. 1 (1949); *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942); common courtesy requires that social conservatives, paleoconservatives, and feminists be given fair notice. This perspective has a long pedigree within the American conservative movement. Indeed, as early as 1995, both Chief Justice Rehnquist and Scalia signed on to a dissent containing the following language: [b]ut [the usefulness of a campaign disclosure requirement lies] in promoting a civil and dignified level of campaign debate—which the State has no power to command, but ample power to encourage by such undemanding measures as a signature requirement. Observers of the past few national elections have expressed concern about the increase of character assassination—"mudslinging" is the colloquial term—engaged in by political candidates and their supporters to the detriment of the democratic process. Not all of this, in fact not much of it, consists of actionable untruth; most is innuendo, or demeaning characterization, or mere disclosure of items of personal life that have no bearing upon suitability for office. Imagine how much all of this would increase if it could be done anonymously. The principal impediment against it is the reluctance of most individuals and organizations to be publicly associated with uncharitable and uncivil expression. Consider, moreover, the increased potential for "dirty tricks." It is not unheard-of for campaign operatives to circulate material over the name of their opponents or their opponents' supporters (a violation of election laws) in order to attract or alienate certain interest groups. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 382–83 (1995) (Scalia, J., dissenting).

[64] Sarah Deer, *Sovereignty of the Soul: Exploring the Intersection of Rape Law Reform and Federal Indian Law*, 38 SUFFOLK U.L. REV. 455, 458 (2005).

[65] Amerigo Vespucci, *Mundus Novus*, in THE DISCOVERY OF AMERICA AND OTHER MYTHS: A NEW WORLD READERS 14 (1992).

Thus, in many instances where Native American men were killed in battle, their wives and children were taken captive for roles as concubines.

Because the Spanish legal code did not apply to the nation's Central and South American holdings during the initial years of colonization, King Ferdinand had to directly intervene to circumscribe the draconian treatment of Native Americans. The result was the '*Leyes de Burgos*' a code intended to prohibit mistreatment of Native Americans and support their conversion to Catholicism.[66] The statutes, though, were quite ineffective for at least three reasons. First, under the code, Native Americans were automatically presumed to have surrendered their lands to the Spanish colonies, referred to in Spanish as *enomiendas*.[67] Second, the statutes placed Native Americans into an initial state of vassalage under the *encomenderos*. Third, while the code mandated that Native Americans could not be verbally or physically abused for any reason, it also commanded colonists to burn Native American villages, towns, and cities and forcibly remove occupants – two directives that were diametrically opposed to one another.[68] If there was any doubt about which instruction the Spanish would decide to follow, continued calls for reform from theologians and missionaries made clear that Native American enslavement had not ceased.[69] The '*Leyes Nuevas*' and Spain's official abolition of the peculiar institution in the sixteenth century did little to modify this state of affairs.[70] Early Spanish *conquistadores* and *hidalgos*, for instance, were not above enslaving and sexually exploiting female Native American Aztecs and Incans.[71] A cursory overview of the early legal codes enacted after Hernan Cortez's murder of Quetzalcoatl and subsequent conquest of Teotihuacan reveal this obsession with regulating matters involving Native American women. Thus, the 1512 Laws of Burgos admonished that the Spanish crown would not permit "their wives and daughters to be taken from them, as now happens." Cortez, though, was not alone. On this score, Hernando de Soto, the first Spaniard to reach the Mississippi River, was particularly heinous as Francisco Pizarro had to impose orders on him and his subordinates to "restrain themselves from raping and pillaging" Native American women.[72] The "temptation," however, "of five hundred young women selected for their beauty, and cloistered right off the main" palace "apparently proved too much."[73] In short order, Soto and his troops were said to have "stormed into the virgins' cloisters, forced the women outside at the point of a sword, and then divided them up."[74] While it is certainly true that some colonial governments criminalized sexual abuse of Native American women, documented rape by Spanish soldiers continued unabated well into the eighteenth century.[75] Sexual enslavement took a particularly hard toll on Native American women from tribes in modern day Texas that eschewed domestic cultivation and relished peculiarly brutal yet effective method of warfare.[76] French naturalist, Jean-Louis Berlandier, for instance, recorded an instance of a Comanche woman captured in the early

---

[66] Richard Flint, NO SETTLEMENT, NO CONQUEST: A HISTORY OF THE CORNADO ENTRADA 238 (2008).
[67] Edwin Williamson, THE PENGUIN HISTORY OF LATIN AMERICA (2010).
[68] *Id.*
[69] Alan Gallay, The Indian Slave Trade 47 (2002).
[70] *Id.*
[71] Edwin Williamson, THE PENGUIN HISTORY OF LATIN AMERICA (2010).
[72] David Duncan, HERNANDO DE SOTO: A SAVAGE QUEST IN THE AMERICAS 136 (1997).
[73] *Id.*
[74] *Id.*
[75] See, e.g., John Chuchiak IV, The *Sins of the Fathers: Franciscan Friars, Parish Priests, and the Sexual Conquest of the Yucatec Maya, 1545-1808*, 54 ETHNOHISTORY 69 (2007).
[76] S.C. Gwynne, EMPIRE OF THE SUMMER MOON: QUANAH PARKER AND THE RISE AND FALL OF THE COMANCHES, THE MOST POWERFUL INDIAN TRIBE IN AMERICAN HISTORY (2010).

Olapade                                                                                    DRAFT

nineteenth century "who asked for a knife to remove a thorn" that was ostensibly bothering her foot.[77] Once the instrument was handed to her, though, she plunged the dagger into her heart.[78] French settlements also were not immune from mixing Native American labor exploitation and sexual assault. Quite the contrary, in most French posts, Native American female slaves outnumbered their male counterparts by a two-to-one ratio.[79] The result was the development of a brutal human trafficking trade that involved Native American warriors selling young women off to Frenchmen to work as domestic servants and concubines.[80] Indeed, sexual abuse of Native American women by French fur traders was apparently such a problem that Louis XIV himself revoked some charters on that basis alone.[81] After the wars for conquest ended, Native American women continued to experience high rates of abuse. Even Native American agents assigned for the protection of the tribes were themselves abusers of Native women.[82] Events such as the Oklahoma Land Rush and California Gold Rush brought huge influxes of non-Native residents onto tribal lands and resulted in sexual violence against Native women. Between the 1880s and 1960s, for instance, Native children were often sent forcibly to government run boarding schools with little oversight.[83]

These polices were part and parcel of a larger coordinated effort to acquire Native American lands. To take one prominent example, while individual treaties had authorized tribal members to allot reservation land,[84] the General Allotment Act of 1887, popularly known as the Dawes Act, went one step further as the first statute of general application to authorize individual allotments.[85] The act permitted the President to allot specified quantities of reservation land to tribal members "whenever in [her or his] opinion any reservation or any part thereof…is advantageous for agricultural or grazing purposes."[86] Upon approval of an allotment, a land patent was to issue:

> "declar[ing] that the United States does and will hold the land thus
> allotted, for the period of twenty-five years, in trust for the sole use
> and benefit of the Indian to whom such allotment shall have been
> made, or, in case of his decease, of his heirs according to the laws
> of the State or Territory where such land is located, and that at the

---

[77] Sarah Deer, *Relocation Revisited: Sex Trafficking of Native Women in the United States*, 36 Wm. Mitchell L. Rev. 621 (2010).

[78] Juliana Barr, *A Currency in Women: The Gendered Heart of an Infamous Flesh Trade in Indians* 2 (Mar. 3, 2004).

[79] *Id.* at 13-14.

[80] Almon Lauber, Indian Slavery In Colonial Times Within The Present Limits of the United States 57 (1913).

[81] Robert Bieder, Native American Communities in Wisconsin 1600-1960: A Study of Tradition And Change 62 (1995).

[82] Petition, Tehama County citizens to the Secretary of the Interior (1859), *in* Robert Heizer, The Destruction of California Indians 137-139 (1974).

[83] *Wyoming v. United States Envtl. Prot. Agency*, 875 F.3d 505, 510 (10th Cir. 2017); David Adams, Education For Extinction: American Indians and the Boarding School Experience 1875-1928 (1995); see also Andrea A. Curcio, *Civil Claims for Uncivilized Acts: Filing Suit Against the Government for American Indian Boarding School Abuses*, 4 Hastings Race & Poverty L. J. 45, 113 (2006)

[84] Treaty with Creek Tribe, Mar. 24, 1832, arts. II, V, Treaty with Cherokee Tribe, Dec. 29, 1835, art. 12.

[85] *Michigan Gambling Opposition v. Kempthorne*, 525 F.3d 23, 26 (D.C. Cir. 2008); Jessica A. Shoemaker, *Like Snow in the Spring Time: Allotment, Fractionation, and the Indian Land Tenure Problem*, 2003 Wis. L. Rev. 729 (2003); Kenneth Bobroff, *Retelling Allotment: Indian Property Rights and the Myth of Common Ownership*, 54 Vand. L. Rev. 1559 (2001)

[86] Act of Feb. 8, 1887 §1, 24 Stat. at 388.

expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever."[87]

Section six further promised U.S. citizenship to allottees upon issuance of trust patents and to an Native American who had "voluntarily taken up [her or] his residence separate and apart from any tribe of [Native Americans] had [had] adopted the habits of civilized life."[88] While the statute was intended to encourage economic development on Native American reservations, it certainly did not achieve that goal for at least three reasons. First, the Interior Secretary was given the power in 1891 to lease allotted lands whenever "by reason of age or other disability, any allottee…[could] not personally and with benefit to himself occupy or improve his allotment or any part thereof."[89] The result was that many Native Americans reasonably came to view their lands "as a source of revenue from the labor of a tenant, not as a homestead to be worked personally."[90] Second, the statute was modified in 1906 to grant the Interior Secretary greater discretion in issuing land patents which were then distributed, not on the basis of reservation membership or ties, but rather Native American "blood quantum."[91] Much of the fee-patented land then quickly passed into non-Native ownership.[92] Finally, in 1904, Congress began to label large swaths of tribal land as surplus parcels under the statute without tribal consent or consultation auctioning off the realty and purporting to retain the proceeds for the benefit of the tribes in trust.[93] In all, Native land ownership was reduced from 138 million acres in 1887 to approximately 34 million acres in 1934.[94]

This history is also noteworthy because it underscores the different perspectives that settlers and Native American tribes had on normative gender roles.[95] While it was not uncommon for a Native American woman to engage in coitus with a man she had only recently met, settlers might have interpreted this behavior as promiscuity (at best) or prostitution (at worst) leading to the development of ethnocentric attitudes.[96] Records also indicate that settlors – who themselves were accustomed to arranged marriages and dowry practices – may have misinterpreted Native American ceremonies as commercial business transactions.[97] These statements, however, should not be construed as arguing that sexual customs among all the Native American tribes were somehow uniform.[98] Not so. In some cultures, for instance, there was no taboo against extra-

---

[87] Act of Feb. 8, 1887, §5, 24 Stat. 388, 389.
[88] 24 Stat. 390.
[89] Act of Feb. 28, 1891, §3, 26 Stat. 794; *Two Shields v. United States*, 119 Fed. Cl. 762, 767 (2015), aff'd sub nom. *Ramona Two Shields v. United States*, 820 F.3d 1324 (Fed. Cir. 2016); see also Reid Chambers and Monroe Price, *Regulating Sovereignty: Secretarial Discretion and the Leasing of Indian Lands*, 26 STAN. L. REV. 1061 (1974).
[90] Francis Prucha, THE GREAT FATHER: THE UNITED STATES GOVERNMENT AND THE AMERICAN INDIANS 673 (1984).
[91] *Id.* at 879.
[92] *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 812, 134 S. Ct. 2024, 2044, 188 L. Ed. 2d 1071 (2014)
[93] *Id.* at 867.
[94] *Id.* at 896.
[95] Bethany Berger, Indian Policy and the Imagined Indian Women, 14 Kan. J.L. & Pub. Pol'y 103 (2004).
[96] Laura Woodworthy-Ney, CULTURES IN THE AMERICAN WEST: WOMEN IN THE AMERICAN WEST 52 (2008).
[97] Rebecca Kugel and Lucy Eldersveld Murphy, NATIVE WOMEN'S HISTORY IN EASTERN NORTH AMERICA BEFORE 1900 (2007).
[98] Emma LaRocque, *The Colonization of a Native Woman Scholar*, in WOMEN OF THE FIRST NATIONS: POWER, WISDOM, AND STRENGTH 11, 14 (1996).

Olapade                                                                    DRAFT

marital sex.[99] Others refused to embrace monogamy.[100] In the Creek culture, for instance, "the balance of male and female principles permeates all Creek thinking... [and] involve the division of various powers, functions, and privileges."[101] Indeed, in the words of Kansas Law Professor Sarah Deer, gender roles in traditional Native American societies can be described as embracing "non-binary complementary dualism."[102] Put differently, "gender lines are fluid and do not have fixed boundaries" as "both sexes have roles and duties to perform, which balance one another."[103] Indeed, several tribes were explicitly patterned on matriarchy.[104] To take just one prominent example, the Iroquois maintained a clan system where a child's membership was based on their mother's affiliation.[105] More than that, women chose tribal council leaders, conveyed property,[106] and could veto war decisions by declining to supply hawkish soldiers.[107] The result is that "women's positions and place were valued in Iroquois life because the system of gender roles between men and women, where women's work was just as important as men's."[108] Thus, most Native women generally exercised more power than their Eurasian counterparts in political, spiritual, and procreative matters.[109]

Children also enjoyed a privileged legal status in Native communities as they established the foundation of tribal communities. To take just one example, in Lakota the word for children translates into "sacred being."[110] Even as Eurasian nuclear family values were absent, tribes continued to place high values on the bond between mothers and children. As a matter of fact, because many tribes did not recognize a distinction between immediate and extended family members,[111] biological and marital relationships were interwoven in the community such that any given tribal member had hundreds of immediate family members.[112] Thus, children in tribal communities often had multiple mothers because the child's aunts and female relatives would assume that title.[113] More than that, as the Indian Child Welfare Act later recognized, in some instances, a child's biological parents might not even be the primary caregivers for the children – opting instead to delegate the tasks to the child's grandparents, aunts, on uncles on the theory that

---

[99] Sarah Deer, *Relocation Revisited: Sex Trafficking of Native Women in the United States*, 36 WM. MITCHELL L. REV. 621 (2010)
[100] *Id.*
[101] Jean Chaudhuri and Joyotpaul Chaudhuri, A SACRED PATH: THE WAY OF THE MUSCOGEE CREEKS (2001).
[102] See Ann Waters, *Language Matters: Nondiscrete Nonbinary Dualism* in AMERICAN INDIAN THOUGHT 97 (2003).
[103] Carrie A. Martell & Sarah Deer, *Heeding the Voice of Native Women: Toward an Ethic of Decolonization*, 81 N.D. L. REV. 807 (2005).
[104] Rebecca Rexroad, *Reshaping the Sentencing Circle: Striking A Balance Between Restoration of Harmony and Punishment of Offenders in Indigenous Domestic Violence Cases*, 13 Sw. J. L. & Trade Am. 403, 407 (2007)
[105] Robert A. Williams, Jr., *Gendered Checks and Balances: Understanding the Legacy of White Patriarchy in an American Indian Cultural Context*, 24 Ga. L. Rev. 1019 (1990).
[106] Abraham Bell & Gideon Parchomovsky, Property Lost in Translation, 80 U. Chi. L. Rev. 515, 524 (2013)
[107] *Id.*
[108] Carrie A. Martell & Sarah Deer, *Heeding the Voice of Native Women: Toward an Ethic of Decolonization*, 81 N.D. L. REV. 807 (2005).
[109] Mona Etienne and Eleanor Leacock, *Introduction* to WOMEN AND COLONIZATION: ANTHROPOLOGICAL PERSPECTIVES 1, 13 (1980); see also Heather Monasky, *Note: On Comprehensive Prostitution Reform: Criminalizing the Trafficker and the Trick, but Not the Victim-Sweden's Sexköpslagen in America*, 37 Wm. Mitchell L. Rev. 1989, 2037 (2011)
[110] Martin Brokenleg, *Native Wisdom on Belonging*, in 7 RECLAIMING CHILDREN & YOUTH 130 (1998).
[111] See Sarah Winnemucca Hopkins, LIFE AMONG THE PITUTES: THEIR WRONGS AND CLAIMS 45 (1883).
[112] Mark St. Pierre and Tilda Long Soldier, WALKING IN THE SACRED MANNER 64-65 (1995).
[113] Charles Horejsi, *Reactions by Native American Parents to Child Protection Agencies: Cultural and Community Factors*, 71 CHILD WELFARE 329 (1992).

prior observation would teach the required parenting skills. Colonists, however, struggled to see the value in these social arrangements. Corporal punishment provides a prominent example – for even the most humanitarian settlors, Christian missionaries, were critical of tribal reluctance to physically discipline young members. The French Jesuit missionary, Paul Le Juene, for instance, wrote that the Hurons "could not bear to have their children punished, nor even scolded, not being able to refuse anything to a crying child."[114] Another missionary wrote "the savages love their children above all things. They are like the Monkeys – they choke them by embracing them too closely."[115] The increasing insistence here to adopt foreign child rearing practices that were predicated on female subservience slowly eroded governance through matrilineal institutions.[116] This erosion continued in the nineteenth century as reformers began to suggest that Native children would benefit from family separation as Native women were ostensibly "unfit mothers whose children had to be removed from their homes and communities to be raised properly by…[other] women."[117] The result is that Native children were often kidnapped and removed from their homes by force, fraud, or deceit.[118] What's more, the boarding schools that subsequently housed these children were often the site of sexual abuse – so much so that surviving pupils have expressed difficulties in their own relationships with their children as a result.[119] This tradition was revitalized with child protection systems staffed by social workers who removed Native babies and children from their nuclear families on the assumption that they would be better off living with non-Native individuals and that kinship practices such as sibling care constituted 'neglect.'[120]

The history of the status of women and children in Native American communities is significant here because it makes the existing jurisdictional gaps that prevent tribes from remedying crimes against women and children all that more outrageous. Any discussion of tribal court jurisdiction must begin with an account of the Marshall Court trilogy. The trilogy, of course, begins with *Cherokee Nation v. Georgia*, where Chief Justice Marshall articulated a perspective on legal status of Native American tribes that has had a lasting impact on Federal Indian Law. There, the question was whether the Cherokee Nation was a "foreign state" within the meaning of Article III, §2 of the Constitution and was thus permitted to sue the Peach State in diversity to test

---

[114] Karen Anderson, CHAIN HER BY ONE FOOT: THE SUBJUGATION OF NATIVE WOMEN IN SEVENTEENTH CENTURY NEW FRANCE 160 (1991).

[115] Carol Devens, COUNTERING COLONIZATION: NATIVE AMERICAN WOMEN AND GREAT LAKES MISSIONS, 1630-1900 12 (1992).

[116] Wilma Mankiller and Michael Wallis, MANKILLER: A CHIEF AND HER PEOPLE 20 (1993); Denise Henning, *Yes, My Daughters, We Are Cherokee Women*, in MAKING SPACE FOR INDIGENOUS FEMINISM 194 (19XX).

[117] Margaret Jacobs, *The Great Mother: Materialism and American Indian Child Removal in the American West, 1880-1940*, in ONE STEP OVER THE LINE: TOWARD A HISTORY OF WOMEN IN THE NORTH AMERICAN WESTS 191 (2008); see also Barbara Ann Atwood, *Flashpoints Under the Indian Child Welfare Act: Toward A New Understanding of State Court Resistance*, 51 Emory L.J. 587 (2002); Lorie M. Graham, *"The Past Never Vanishes": A Contextual Critique of the Existing Indian Family Doctrine*, 23 Am. Indian L. Rev. 1, 1 (1998); Ann Murray Haag, *The Indian Boarding School Era and Its Continuing Impact on Tribal Families and the Provision of Government Services*, 43 Tulsa L. Rev. 149 (2007); Ryan Seelau, *Regaining Control over the Children: Reversing the Legacy of Assimilative Policies in Education, Child Welfare, and Juvenile Justice That Targeted Native American Youth*, 37 Am. Indian L. Rev. 63, 63 (2013); Patrice H. Kunesh, *Transcending Frontiers: Indian Child Welfare in the United States*, 16 B.C. Third World L.J. 17, 17 (1996).

[118] Brenda Child, BOARDING SCHOOL SEASONS: AMERICAN INDIAN FAMILIES 1900-1940 13 (2000).

[119] Patrick Morrissette, *The Holocaust of First National People: Residual Effects on Parenting and Treatment Implications*, 16 CONTEMP. FAM. THERAPY 381 (1994); Karen Swift, MANUFACTURING 'BAD MOTHERS: A CRITICAL PERSPECTIVE ON CHILD NEGLECT 129 (1995).

[120] Karen Swift, MANUFACTURING 'BAD MOTHERS: A CRITICAL PERSPECTIVE ON CHILD NEGLECT 131-32 (1995).

Olapade                                                                                          DRAFT

its claim that state authorities had attempted to "directly annihilate the Cherokees as a political society, and…seize, for the use of Georgia, the lands of the nation which [had] been assured to them by the United States in solemn treaties."[121] The Court never met the merits as Chief Justice Marshall found that the Cherokee Nation was not a foreign state within the meaning of Article III.[122] Instead, "the condition of the [Native Americans] in relation to the United States" was found to be "unlike that of any other two people in existence:" a relationship "marked by peculiar and cardinal distinctions which exist nowhere else." As Marshall recounted in a passage that has achieved notoriety among Federal Indian Law scholars:

> Though the [Native Americans] are acknowledged to have an unquestionable, and heretofore unquestioned right to the lands they occupy, until that right shall be extinguished by a voluntary cession to our government, yet it may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. They may, more correctly, perhaps, be denominated domestic dependent nations. They occupy a territory to which we assert a title independent of their will, which must take effect in point of possession when their right of possession ceases. Meanwhile they are in a state of pupilage. Their relation to the United States resembles that of a ward to his guardian. They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the President as their Great Father. They and their country are considered by foreign nations, as well as by ourselves, as being so completely under the sovereignty and dominion of the United States that any attempt to acquire their lands, or to form a political connection with them, would be considered by all as an invasion of our territory and an act of hostility.[123]

[121] *Cherokee Nation v. Georgia*, 30 U.S. 1, 15 (1831); see also In re Greektown Holdings, LLC, 532 B.R. 680 (E.D. Mich. 2015); United States v. Holliday, 70 U.S. 407, 18 L. Ed. 182 (1865); Payne v. Mississippi Band of Choctaw Indians, 159 F. Supp. 3d 724 (S.D. Miss. 2015); Barnett v. Paskenta Gaming Grp., LLC, No. C15-1907RSL, 2016 WL 8504520 (W.D. Wash. Apr. 7, 2016); Wilmington Sav. Fund Soc'y v. Fryberg, No. C17-1196RSL, 2017 WL 6344185 (W.D. Wash. Dec. 12, 2017); Native Vill. of Venetie I.R.A. Council v. State of Alaska, 687 F. Supp. 1380 (D. Alaska 1988), rev'd, 918 F.2d 797 (9th Cir. 1990), opinion withdrawn and superseded on denial of reh'g, 944 F.2d 548 (9th Cir. 1991), and aff'd in part, rev'd in part, 944 F.2d 548 (9th Cir. 1991); State ex rel. May v. Seneca-Cayuga Tribe of Oklahoma, 1985 OK 54, 711 P.2d 77; Nelson v. Yurok Tribe, No. 96-006, 1999 WL 35015757 (Yurok C.A. May 10, 1999); Romanella v. Hayward, 114 F.3d 15 (2d Cir. 1997); Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians, 317 F.3d 840 (8th Cir. 2003); Stock W., Inc. v. Confederated Tribes of the Colville Reservation, 873 F.2d 1221 (9th Cir. 1989); Inglish Interests, LLC v. Seminole Tribe of Fla., Inc., No. 2:10-CV-367, 2011 WL 208289 (M.D. Fla. Jan. 21, 2011); *Sac & Fox Tribe of Mississippi in Iowa v. Bear*, 258 F. Supp. 2d 938 (N.D. Iowa), aff'd sub nom. *In re Sac & Fox Tribe of Mississippi in Iowa/Meskwaki Casino Litig.*, 340 F.3d 749 (8th Cir. 2003); *Ottawa Tribe of Oklahoma v. Ohio Dep't of Nat. Res.*, 541 F. Supp. 2d 971 (N.D. Ohio 2008), aff'd sub nom. *Ottawa Tribe of Oklahoma v. Logan*, 577 F.3d 634 (6th Cir. 2009); *Richardson v. Malone*, 762 F. Supp. 1463 (N.D. Okla. 1991); *Superior Oil Co. v. Merritt*, 619 F. Supp. 526 (D. Utah 1985); *Worrall v. Mashantucket Pequot Gaming Enter.*, 131 F. Supp. 2d 328 (D. Conn. 2001); *Miner v. Standing Rock Sioux Tribe*, 619 F. Supp. 2d 715 (D.N.D. 2009)
[122] Art. III, §2, cl. 1.
[123] 30 U.S. 17-18.

Olapade                                                                                          DRAFT

This "anomalous" status within the current constitutional structure of cooperative federalism has distinguished Native Americans from other ethnic groups prompting legal and policy problems a plenty.[124] *Cherokee Nation*'s assumption, though, that the tribes had "an unquestioned right…to the lands they occupy" would prove to be short lived. In *Johnson v. McIntosh*, a popular staple in law and literature as well as property courses, the Court, again, through Chief Justice Marshall invalidated a conveyance of tribal chiefs of lands occupied by their tribes to private individuals. The theory here was that under the public international legal principle of discovery, while the tribes were "the rightful occupants of the soil, with a legal as well as just claim to retain possession," "their rights to complete sovereignty, as independent nations, were necessarily diminished, and their power to dispose of the soil at their own will, to whosoever they pleased, was denied by the… fundamental principle that discovery gave exclusive title to those that made it."[125] If followed that the mere right of occupancy vested no ownership interest with the tribe that could be alienated.[126] While problematic on several levels, at the most, *Johnson*'s discovery doctrine provided a clean conceptual approach for thinking about tribal authority vis-à-vis the federal government.[127]

Enter Native New Englander and Native American missionary, Samuel Worcester. After Georgia passed a series of draconian statutes calculated to expel the Cherokees, who on several matters had adopted many 'civilized' practices from Anglo-American culture,[128] from the state, Worcester was convicted under the new provisions in state court for residing within the Cherokee Nation without procuring a state license or taking an oath to defend Georgia's laws and constitution.[129] In an opinion that one suspects had more to do with the Marshall Court's mission

---

[124] See, e.g., *United States v. Kagama*, 118 U.S. 375 (1886); *Morton v. Mancari*, 417 U.S. 535 (1974);  See also Matthew Fletcher, *Factbound and Splitless: The Certiorari Process as Barrier to Justice for Indian Tribes*, 51 ARIZ. L. REV. 933 (2009) (examining 163 preliminary memoranda prepared by Supreme Court law clerks concerning certiorari petitions during the 1986-19993 period, and concluding that the modern certiorari process with its dependence on law clerks applying Supreme Court Rule 10 essential guarantees that the cert pool will neglect petitions filed by tribal interests because tribal petitions often involve the interpretation of Indian treaties or complicated and narrow common law questions that the clerks do not comprehend as well as petitions from states or state agencies); Paige E. Hoster, *Understanding the Value of Judicial Diversity Through the Native American Lens*, 36 AM. INDIAN L. REV. 457, 458 (2012); Craig S. Lerner & Nelson Lund, *Judicial Duty and the Supreme Court's Cult of Celebrity*, 78 GEO. WASH. L. REV. 1255, 1289 (2010); Daniel Epps & William Ortman, *The Lottery Docket*, 116 MICH. L. REV. 705, 729 (2018); but see *Rice v. Cayetano*, 528 U.S. 495 (2000); *Adoptive Couple v. Baby Girl*, 570 U.S. 637 (2013).

[125] *Johnson v. McIntosh*, 21 U.S. 543, 574 (1823); Martin v. Waddell's Lessee, 41 U.S. 367, 10 L. Ed. 997 (1842); State of Rhode Island v. Com. of Massachusetts, 37 U.S. 657, 9 L. Ed. 1233 (1838); Shively v. Bowlby, 152 U.S. 1, 14 S. Ct. 548, 38 L. Ed. 331 (1894); Seneca Nation of Indians v. Christy, 162 U.S. 283, 16 S. Ct. 828, 40 L. Ed. 970 (1896); The Cherokee Tobacco, 78 U.S. 616, 20 L. Ed. 227 (1870); Mitchel v. United States, 40 U.S. 52, 10 L. Ed. 658 (1841); Pollard's Heirs v. Kibbe, 39 U.S. 353, 359, 10 L. Ed. 490 (1840); Mayor, Aldermen & Inhabitants of City of New Orleans v. United States, 35 U.S. 662, 9 L. Ed. 573 (1836); *Fletcher v. Peck*, 10 U.S. 87 (1810) (JOHNSON, J., dissenting); see also Felix Cohen, *The Spanish Origins of Indian rights In the Law of the United States*, 31 GEO. L.J. 1 (1942);

[126] Eric Kades, *The Dark Side of Efficiency: Johnson v. McIntosh and the Expropriation of American Indian Lands*, 148 U. PA. L. REV. 1065 (2000); see also Oneida Indian Nation of N.Y. State v. Oneida County, New York, 414 U.S. 661 (1974).

[127] See, e.g., Robert Miller, NATIVE AMERICA, DISCOVERED AND CONQUERED (2006); Vine Deloria Jr. and David Wilkins, TRIBES, TREATIES, AND CONSTITUTIONAL TRIBULATIONS 83 (1999);Tonya Kowalski, *The Forgotten Sovereigns*, 36 FLA. ST. U. L. REV. 765 (2009); see also Kirsten Matoy Carlson, *Priceless Property*, 29 GA. ST. U. L. REV. 685, 716 (2013).

[128] Grant Foreman, THE FIVE CIVILIZED TRIBES (1934).

[129] *Worcester v. Georgia*, 31 U.S. 515 (1832); Kathleen Sands, Territory, Wilderness, Property, and Reservation: Land and Religion in Native American Supreme Court Cases, 36 Am. Indian L. Rev. 253, 311 (2012); Matthew L.

to establish and maintain national supremacy in national affairs,[130] rather than protect Native American tribes, the Court found the Georgia statute preempted by the Supremacy Clause as "the whole intercourse between the United States and [the Cherokee Nation was] vested in the government of the United States."[131] In the words of former Solicitor General Robert Jackson, however, the Marshall Court was "overmastered by the violence of forces" in the Peach State "that [they themselves] had…turned away."[132] Thus, Old Hickory is rumored to have pronounced "John Marshall has made his decision, now let him enforce it!"[133] President Jackson's dereliction of duty in declining to enforce a Supreme Court order without an extended oral or written explanation of his decision, resulted in the forced, merciless removal of at least 13,000 individuals of Cherokee descent from their homes and, relocation to modern Oklahoma.[134]

The bottom line? There are three takeaways from the trilogy.[135] First, Native American tribes possess certain incidents of preexisting sovereignty by virtue of their aboriginal political status. Second, tribal sovereignty is subject to diminution or elimination by the United States but not the several states. And third, tribes limited sovereignty and ostensibly dependency upon the United States for protection imposes a trust responsibility on the national government.[136] These three principals have had a marked influence on contemporary readings of the Indian Commerce Clause and the modern plenary power doctrine.

Before the trilogy, however, Congress had adopted legislation regulating Native American tribes that already implicitly assumed some of the sovereignty theories that the Supreme Court announced in the trilogy. The General Crimes Act of 1817, for instance established federal jurisdiction over interracial crimes committed on tribal lands by Native Americans against non-Native Americans if a Native American perpetrator was not already punished by her or his tribe

---

Sundquist, Worcester v. Georgia: A Breakdown in the Separation of Powers, 35 Am. Indian L. Rev. 239, 240 (2011); Jennifer Butts, Victims in Waiting: How the Homeland Security Act Falls Short of Fully Protecting Tribal Lands, 28 Am. Indian L. Rev. 373, 377 (2004); John Thomas Bannon, Jr., The Legality of the Religious Use of Peyote by the Native American Church: A Commentary on the Free Exercise, Equal Protection, and Establishment Issues Raised by the Peyote Way Church of God Case, 22 Am. Indian L. Rev. 475, 489 (1998); Robert A. Williams, Jr., "The People of the States Where They Are Found Are Often Their Deadliest Enemies": The Indian Side of the Story of Indian Rights and Federalism, 38 Ariz. L. Rev. 981, 983 (1996); Franklin Ducheneaux, The Indian Gaming Regulatory Act: Background and Legislative History, 42 Ariz. St. L.J. 99, 103 (2010); Catherine T. Struve, Tribal Immunity and Tribal Courts, 36 Ariz. St. L.J. 137, 182 n.22 (2004); Cameron A. Reese, Tribal Immunity from California's Campaign Contribution Disclosure Requirements, 2004 B.Y.U. L. Rev. 793, 824 n.37 (2004); Jonathan Guss, Gaming Sovereignty? A Plea for Protecting Worker's Rights While Preserving Tribal Sovereignty, 102 Cal. L. Rev. 1623, 1628 (2014).

[130] R. Kent Newmyer, JOHN MARSHALL AND THE HEROIC AGE OF THE SUPREME COURT (2007).

[131] See, e.g., Alex Skibine, *Redefining the Status of Indian Tribes Within "Our Federalsim" : Beyond the Dependency Paradigm*, 38 CONN. L. REV. 667 (2006).

[132] Robert Jackson, THE STRUGGLE FOR JUDICIAL SUPREMACY: A STUDY OF A CRISIS IN AMERICAN POWER POLITICS 392 (1941).

[133] Paul Brest, Sanford Levinson, Jack M. Balkin, Akhil Reed Amar, and Reva B. Siegel, PROCESSES OF CONSTITUTIONAL DECISIONMAKING: CASES AND MATERIALS (2018).

[134] Russel Thornton, *Cherokee Population Losses during the Trail of Tears: A New Perspective and a New Estimate*, 31 Ethnohistory 289, 292 (Autumn 1984).

[135] See Felix Cohen, HANDBOOK OF FEDERAL INDIAN LAW (1941); see also Stephen Feldman, *Felix S. Cohen and His Jurisprudence: Reflections on Federal Indian Law*, 35 BUFF. L. REV. 479 (1986).

[136] Joshua Fershee, *From Self-Determination to Self-Domination: Native Americans, Western Culture, and the Promise of Constitutional-Based Reform*, 39 VAL. U. L. REV. 1 (2004).

Olapade                                                                                    DRAFT

and no treaty provision governed the matter.[137] The statute also established federal jurisdiction over interracial crimes committed by non-Native Americans against Native Americans.[138] Congress' action in 1817 was followed by the Major Crimes Act. The initial version of this statute was adopted in 1885 after the Supreme Court's decision in *Ex parte Crow Dog*.[139] There, the Court invalidated a murder conviction under the General Crimes Act where one Native American had ostensibly killed another on the grounds that the statute did not extend a territorial court's jurisdiction to crimes committed by one Native American against another.[140] The Forty-ninth Congress intended the statute to give federal courts jurisdiction over crimes "that might go unpunished under tribal criminal justice systems."[141] More specifically, the Major Crimes Act makes it illegal for a Native American to commit certain enumerated crimes on Native American reservations as

> "[a]ny Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, a felony assault…, an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary…of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."[142]

The identity of the victim has no bearing on whether a U.S. District court retains jurisdiction over an action brought under the statute – nor does it affect the tribes' ability to punish a Native American defendant, Tribes, though, retain concurrent jurisdiction regardless of the victim's ethnicity so long as the defendant is a Native American.[143] If, however, the crime is not covered within the Major Crimes Act, the tribe retains exclusive jurisdiction under the General Crimes Act and federal jurisdiction is precluded.[144] As Federal Indian Law scholar, Phillip

---

[137] Brent Leonhard, *Returning Washington P.L. 280 Jurisdiction to Its Original Consent-Based Grounds*, 47 GONZ. L. REV. 663 (2011).

[138] *Id.*

[139] Act of Mar. 3, 1885, § 9, 23 Stat. 362, 385; Ex parte Kan-gi-shun-ca, 109 U.S. 556 (1883).

[140] See, e.g., *Keeble v. United States*, 412 U.S. 205 (1973).

[141] *United States v. Other Medicine*, 596 F.3d 677 (9th Cir. 2010).

[142] 18 U.S.C. §1153; see also United States v. Jones, No. 18-2129, 2019 WL 1606317 (10th Cir. Apr. 16, 2019); United States v. Iu, 917 F.3d 1026 (8th Cir. 2019), reh'g denied (Apr. 17, 2019); United States v. Lasley, 917 F.3d 661 (8th Cir. 2019); United States v. Spotted Horse, 916 F.3d 686 (8th Cir. 2019); United States v. Pierre, 912 F.3d 1137 (8th Cir. 2019); United States v. Wisecarver, 911 F.3d 554 (8th Cir. 2018); United States v. Fool Bear, 903 F.3d 704 (8th Cir. 2018); United States v. Durham, 902 F.3d 1180 (10th Cir. 2018), cert. denied, 139 S. Ct. 849, 202 L. Ed. 2d 631 (2019); United States v. Steele, 899 F.3d 635 (8th Cir. 2018); United States v. Bravebull, 896 F.3d 897 (8th Cir.), cert. denied, 139 S. Ct. 287, 202 L. Ed. 2d 189 (2018); United States v. DeMarrias, 895 F.3d 570 (8th Cir. 2018); State v. Nobles, 818 S.E.2d 129 (N.C. Ct. App.), appeal dismissed, review allowed, 820 S.E.2d 813 (N.C. 2018), and appeal dismissed, review allowed, 820 S.E.2d 815 (N.C. 2018); United States v. Kootswatewa, 893 F.3d 1127 (9th Cir. 2018); United States v. Mandoka, 869 F.3d 448 (6th Cir. 2017); United States v. Jackson, 862 F.3d 365 (3d Cir. 2017); United States v. Tepiew, 859 F.3d 452 (7th Cir.), cert. denied, 138 S. Ct. 345, 199 L. Ed. 2d 230 (2017); In re Grand Jury Proceedings, 744 F.3d 211, 220 (1st Cir. 2014); United States v. Lespier, 725 F.3d 437 (4th Cir. 2013); Perez-Gonzalez v. Holder, 667 F.3d 622 (5th Cir. 2012); United States v. Amerson, 483 F.3d 73 (2d Cir. 2007); Muscogee (Creek) Nation v. Hodel, 851 F.2d 1439 (D.C. Cir. 1988).

[143] *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978).

[144] 18 U.S.C. §1152.

Olapade                                                                    DRAFT

Prygoski, has recounted the sentiment behind the statute was that Native American "tribes were not competent to deal with serious issues of crime and punishment."[145] Although most of the reported cases appear to indicate that tribes have concurrent jurisdiction over crimes enumerated in the Major Crimes Act,[146] Federal Indian Law scholars have noted that "the practical impact [of the enactment of the MCA]…is that fewer tribes pursue prosecution of crimes such as murder and rape."[147]

The General Crimes Act, though, contains an important proviso that has delighted lawyers practicing Federal Indian Law for quite some time:

> "[t]his section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."[148]

Thus, the law does not preempt tribal jurisdiction when the crime involves a Native American defendant who has committed an offense against another Native American, implicates a treaty that has reserved criminal jurisdiction to the tribe, or involves an offense for which the Native American defendant has already been punished under tribal law. More than that, as many a military justice scholar or judge advocate general knows,[149] this statute is supplemented still by the Assimilative Crimes Act of 1825, which provides that any individual who is "guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission,…[is] guilty of a like offense and subject to a like punishment."[150]

Finally, when a crime occurs on a Native American reservation and neither the accused nor the victim is Native American, neither the Major Crimes Act nor the General Crimes Act grant

---

[145] Philip Prygoski, *Front Marshall to Marshall: The Supreme Court's Changing Stance on Tribal Sovereignty*, 12 COMPLEAT L. 14, 16 (1995).

[146] *United States v. Antelope*, 430 U.S. 641, 643 n.2 (1977).

[147] Sarah Deer, *Sovereignty of the Soul: Exploring the Intersection of Rape Law Reform and Federal Indian Law*, 38 SUFFOLK U.L. REV. 455, 460 (2005).

[148] *Id.*

[149] Judge Advocate Generals often find that they must become acquainted with the Assimilative Crimes Act because "military personnel committing acts on an enclave subject to Federal jurisdiction which are not made an offense by Federal statutes other than the U.C.M.J. may…be prosecuted in district court for violations of state law assimilated by 18 U.S.C. § 13, even though they are also subject to court martial." Assimilative Crimes Act, Department of Justice Criminal Section, available at https://www.justice.gov/jm/criminal-resource-manual-667-assimilative-crimes-act-18-usc-13; see also *United States v. Walker*, 552 F.2d 566 (4th Cir. 1977), cert. denied, 434 U.S. 848 (1977)(drunk driving); *Franklin v. United States*, 216 U.S. 559 (1910).

[150] 18 U.S.C. §13; see also *United States v. Sharpnack*, 355 U.S. 286 (1957); *Williams v. United States*, 327 U.S. 711, 717 (1946); *Fields v. United States*, 438 F.2d 205 (2d Cir.), cert. denied, 403 U.S. 907 (1971); *Hockenberry v. United States*, 422 F.2d 171 (9th Cir. 1970); *United States v. Bowers*, 660 F.2d 527 (5th Cir. 1981) (child abuse); *United States v. Smith*, 574 F.2d 988 (9th Cir. 1978) (sodomy); *United States v. Johnson*, 967 F.2d 1431 (10th Cir. 1992)(aggravated assault); *United States v. Griffith*, 864 F.2d 421 (6th Cir. 1988)(reckless assault); *United States v. Kaufman*, 862 F.2d 236 (9th Cir. 1988) (assault); *Fesler v. United States*, 781 F.2d 384 (5th Cir.), cert. denied, 476 U.S. 1118 (1986)(child abuse).

Olapade                                                                                    DRAFT

federal courts jurisdiction over the affair. Again, because the tribes may not assert criminal jurisdiction over non-Native offenders in criminal matters, the several states are left with the responsibility to prosecute culprits.[151] Matters are further complicated by the fact that tribes can experience difficulty in identifying just who is and is not a Native American for the purposes of this jurisdictional rule.[152] Indeed, the term "Indian" has multiple definitions under federal law.[153] While the Supreme Court articulated a general test for whether an individual could claim Native American ancestry in *United States v. Rogers*,[154] that standard requires both a sufficient level of Native American 'blood' and government recognition as a Native American which can take several months to obtain.[155] By way of background, in *Rogers*, the respondent William Rogers, a Caucasian male established his domicile in Cherokee country and was adopted and recognized by the tribe as a Native American.[156] Although Rogers exercised the same rights and privileges as any other Cherokee citizen, the Court found that the relevant statute – an earlier version of the Major Crimes Act – did not contemplate that a Caucasian man of mature age could be adopted into a Native American tribe – as the statute's use of the term 'Indian' did not extend to all "members of a tribe" but rather "the race generally."[157] The first element of the Native American status test has been quite unpopular with some conservative public interest organizations because of its link to race.[158] The thought here is that the equal protection component of the Fifth Amendment's Due Process Clause applies to members of Native American tribes with just as much force as it applies to every other person "subject to the jurisdiction" of the United States.[159] Under this line of reasoning, because tribal membership is typically, but not always, based on a specified degree of ancestry from an individual on a designated list[160] and in the "[a]bsen[ce of] searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of" ancestry, there is a moral and legal equivalence between federal measures designed to combat deprivation and domestic violence on Native American reservations and Jim Crow. While an intra-textual reading of the Constitution would suggest otherwise as Native Americans are exempted from the apportionment provisions of Article I §2 as well as the second section of the Fourteenth Amendment,[161] these critics stress that because our Constitution is

---

[151] *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978); see also *United States v. McBratney*, 104 U.S. 621 (1882).

[152] See, e.g., Hallie White, *Creative Civil Remedies Against Non-Indian Offenders in Indian Country*, 44 TULSA L. REV. 427 (2008).

[153] *Id.*

[154] *United States v. Rogers*, 45 U.S. 567 (1846).

[155] INDIAN LAW AND ORDER COMMISSION, A ROADMAP FOR MAKING NATIVE AMERICA SAFER: REPORT TO THE PRESIDENT AND CONGRESS OF THE UNITED STATES (2013).

[156] 45 U.S. 567-68.

[157] *Id.* at 572-573.

[158] John Snowden, *American Indian Sovereignty and Naturalization: It's a Race Thing*, 80 Neb. L. Rev. 171 (2000); Frank Shockley, *Invidious American Indian Tribal Sovereignty: Morton v. Mancari, Contra Adarand Constructors, Inc v. Pena, Rice v. Cayetano, and Other Recent Cases*, 25 Am. Indian L. Rev. 275 (2001). Gloria Valencia-Weber, *Racial Equality: Old and New Strains and American Indians*, 80 Notre Dame L. Rev. 333 (2004); Scott Gould, *Mixing Bodies and Beliefs: The Predicament of Tribes*, 101 COLUM. L. REV. 702 (2001); Scott Gould, *The Congressional Response to Duro v. Reina: Compromising Sovereignty and the Constitution*, 28 U.C. DAVIS L. REV. 53, 63 (1994); *United States v. Ragsdale*, 27 F. Cas. 684 (Cir. Ct. D. Ark. 1847).

[159] Lorelei Laird, *Lawsuits Dispute Whether the Indian Child Welfare Act is in the Best Interests of Children*, ABA JOURNAL, (October 1, 2016).

[160] Felix Cohen, HANDBOOK OF FEDERAL INDIAN LAW (2012).

[161] U.S. CONST. art. I §2; U.S. CONST. amend. XIV.

composed not only of the text, but also, super-statutes, unwritten political practices, and precedents,[162] and Congress extended U.S. citizenship to Native Americans in 1924 with the Snyder Act,[163] the Due Process Clause extends to Native Americans. While this theory is attractive in a limited number of contexts where recognition of ethnicity would interfere with vested rights of intimate association, adoption, and child-rearing "that society has historically protected, and continues to protect," the flaw with this contention is that it would render the federal government impotent to pass remedial legislation directed at Native American tribes as a discrete class and arguably eliminate all of Federal Indian Law in the process.[164] *Rogers* is also significant here because it provided the catalyst for Congress' initial extension of tribal criminal jurisdiction over non-members. More specifically, after the Supreme Court found that the tribes were divested of criminal jurisdiction over non-Native Americans in *Oliphant v. Suquamish Indian Tribe* but then reaffirmed tribal criminal jurisdiction over reservation members in *United States v. Wheeler*, the federal Courts of Appeals split over whether Native American tribes had been divested of criminal jurisdiction over Native Americans who resided on the reservation but were nonetheless not tribal members.[165] In a case that Federal Indian Scholars refer to as *Duro II*, the Supreme Court found that Native American tribes were prohibited from intruding on the personal liberties on non-member Native Americans who did not consent to tribal governance because the Bill of Rights would not apply to this class of defendants in cases tried on Native American reservations.[166] *Duro II*, however, created a jurisdictional void in the Indian Country Crimes Act, a statute that regulated tribal criminal jurisdiction. The relevant provision here read that "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to" Native American reservations.[167] This statutory provision, however, did not extend to "offenses committed by one [Native American] against the person or property of another" Native American regardless of whether the two parties were actually members of the tribe trying the case.[168] In response to intense tribal criticism of *Duro II*,[169] Congress enacted a temporary provision to close the jurisdictional gap in the 1991 Defense Department Appropriations Act.[170] This temporary fix became permanent once the Indian Civil Rights Act was amended to establish tribal criminal jurisdiction over non-

---

[162] See, e.g., Akhil Reed Amar, AMERICA'S UNWRITTEN CONSTITUTION (2012); Jonathan Gienapp, THE SECOND CREATION: FIXING THE AMERICAN CONSTITUTION IN THE FOUNDING ERA (2018); David Strauss, *Common Law Constitutional Interpretation*, 63 U. CHI. L. REV. 877 (1996); William Eskridge Jr. and John Ferejohn, *Super-Statutes*, 50 STAN. L. REV. 1214 (2001).

[163] Matthew L.M. Fletcher, *States and Their American Indian Citizens*, 41 AM. INDIAN L. REV. 319, 322 (2017).

[164] *Michael H. v. Gerald D.*, 491 U.S. 110, 121 (1989); see also Randall Kennedy, INTERRACIAL INTIMACIES: SEX, MARRIAGE, IDENTITY, AND ADOPTION 480 (2003); Brief of Amici Curiae Current and Former Members of Congress in Support of Respondents at 33, Adoptive Couple v. Baby Girl, No. 12-399.

[165] *Duro I*, 851 F.2d 1136 (9th Cir. 1988); *Greywater v. Joshua*, 846 F.2d 486 (8ᵗʰ Cir. 1988); see also Peter Tasso, *Greywater v. Joshua and Tribal Jurisdiction Over Nonmember Indians*, 75 Iowa L. Rev. 685 (1990); Patricia Owen, *Who is an Indian? Duro v. Reina's Examination of Tribal Sovereignty and Criminal Jurisdiction over Nonmember Indians*, 1988 B.Y.U. L. Rev. 161 (1988).

[166] *Duro v. Reina*, 495 U.S. 676 (1990).

[167] 18 U.S.C. 1152.

[168] Eric White, *Falling Through the Cracks After Duro v. Reina: A Close Look at a Jurisdictional Failure*, 15 U. Puget Sound L. Rev. 229 (1991).

[169] *Duro v. Reina*, 495 U.S. 676 (1990).

[170] Dep't of Defense Appropriations Act of 1991, Pub. L. No. 101-511, 8077, 104 Stat. 1856 (1990).

Olapade                                                                                           DRAFT

member Native Americans and the Supreme Court declined to invalidate the provision as unconstitutional in *United States v. Lara*.[171]

This arrangement creates horrifying incentives. As St. John's Law Professor Larry Cunningham has argued the tribes' inability to assert criminal jurisdiction over non-members has "handcuffed [Native American] law enforcement activities" and prevented tribes from "protect[ing] their own people."[172] These attitudes are not new as "non-native perpetrators have often [sought] out reservations…because they know they can inflict violence without much happening to them."[173] For individuals or entities interested in reducing crime in local communities,[174] this regime is clearly sub-optimal because offenders of violent crimes who are not arrested have been found to be more likely to commit additional attacks.[175]

IV.    *Potential Responses to the Jurisdictional Gap*

Public Law 280 complicates matters further. Starting in 1953, this statute transferred legal authority over Native American reservations from the federal government to certain states.[176] More specifically, Alaska, California, Minnesota, Nebraska, Oregon, and Wisconsin were asked to shoulder the additional responsibility.[177] While Public Law 280 originally permitted states to opt-in to assume additional jurisdiction without tribal consent, the statute was later amended to require consent from the in-state tribe before the state could assert jurisdiction and, permit the states to recede jurisdiction back to the federal government should they wish to do so for whatever reason.[178] The result is that the statute now effects law enforcement and criminal justice for 23%

---

[171] Pub. L. No. 102-137, §1 105 Stat. 646 (1991) (codified at 25 U.S.C. §1301); *United States v. Lara*, 541 U.S. 193 (2004); Lower courts have rejected equal protection and due process challenges to the amendment reasoning that that the non-member distinction is a political one that is rationally related to a legitimate government interest. See *Means v. Navajo Nation*, 432 F. 3d 924 (9th Cir.2005); *Morris v. Tanner*, 288 F. Supp. 2d 1133 (D. Mont. 2003), aff'd, 160 F. App'x 600 (9th Cir. 2005); Eric Wolpin, *Answering Lara's Call: May Congress Place Nonmember Indians Within Tribal Jurisdiction Without Running Afoul of Equal Protection or Due Process Requirements?*, 8 U. PA. J. CONST. L. 1071 (2006); Alex Tallchief Skibine, *United States v. Lara, Indian Tribes, and the Dialectic of Incorporation*, 40 TULSA L. REV. 47 (2004).

[172] Larry Cunningham, *Deputization of Indian Prosecutors: Protecting Indian Interests in Federal Court*, 88 GEO. L.J. 2187, 2194 (2000).

[173] Sierra Crane-Murdoch, *On Indian Land, Criminals Can Get Away with Almost Anything*, THE ATLANTIC (Feb. 22, 2013); see also Laura E. Pisarello, *Lawless by Design: Jurisdiction, Gender and Justice in Indian Country*, 59 Emory L.J. 1515, 1517 (2010); Angela R. Riley, *Indians and Guns*, 100 Geo. L.J. 1675, 1745 (2012); Ryan Dreveskracht, *Tribal Court Jurisdiction and Native Nation Economies: A Trip Down the Rabbit Hole*, 67 Nat'l Law. Guild Rev. 65, 83 (2010); Catherine M. Redlingshafer, *An Avoidable Conundrum: How American Indian Legislation Unnecessarily Forces Tribal Governments to Choose Between Cultural Preservation and Women's Vindication*, 93 Notre Dame L. Rev. 393, 402 (2017); Sarah Krakoff, *Undoing Indian Law One Case at A Time: Judicial Minimalism and Tribal Sovereignty*, 50 Am. U. L. Rev. 1177, 1180 (2001); Ezekiel J.N. Fletcher, *Trapped in the Spring of 1978: The Continuing Impact of the Supreme Court's Decisions in Oliphant, Wheeler, and Martinez*, Fed. Law., March/April 2008, at 36, 39

[174] Peter Schweizer and Wynton C. Hall, LANDMARK SPEECHES OF THE AMERICAN CONSERVATIVE MOVEMENT 41-55 (2007).

[175] Jodi Gillette and Charlie Galbraith, *2013 VAWA – Empowering Tribes to Protect Native Women* (Mar. 7, 2013).

[176] Ada Pecos Melton and Jerry Gardner, AMERICAN INDIAN DEVELOPMENT ASSOCIATES, PUBLIC LAW 280: ISSUES AND CONCERNS FOR VICTIMS OF CRIME IN INDIAN COUNTRY (2004).

[177] 18 U.S.C. §1162; 25 U.S.C. §1321; 28 U.S.C. §1360.

[178] 25 U.S.C. §1321.

DRAFT

of the reservation tribal population and 52% of all tribes in the continental United States.[179] But there is a boll weevil in the cotton batch: because Public Law 280 was passed to reduce federal law enforcement costs, no federal funds were provided to the designated states to help fulfill their expanded responsibilities.[180] The statute also does not permit the several states to tax reservation residents to raise policing funds.[181] Given that tribes often constitute a discrete and insular minority in the states where they are situated,[182] the predictable result is that state and local governments have elected not to provide police protection.[183] The average tribal police force has one to three officers patrolling a 500,000 acre area containing as many as 10,000 residents.[184] Reservations receive 20.2% fewer law enforcement funds per capita than similarly situated rural jurisdictions and only 25% of the police force staff assigned to those advantaged areas.[185] Navigation and responses times are worsened because of poor infrastructure.[186]

     Tension between state authorities and tribes is often exacerbated by cultural differences.[187] While the Federal Bureau of Indian Affairs (BIA) maintains a police force that contains a significant of Native American troopers who can more easily relate to reservation residents, the same cannot be said for some state units which may either be unfamiliar with, or contemptuous of, tribal practices.[188] As Kevin Washburn, former Assistant Secretary for Indian Affairs at the Interior Department has sadly recalled because of the federal government's less than stellar track record in tribal negotiations, "many [Native Americans] distrust the legal and social authorities that could be most helpful to them because of past experiences of unjust treatment."[189] Indeed, as many Federal Indian litigators know well, once a federal prosecutor becomes involved in a case, it is often common for the victim's family to side with the defendant and against the victim simply to spurn federal authorities.[190] Tribal officials may also be unresponsive because they do not want

---

[179] Carole Goldberg and Duane Champagne, *Is Public Law 280 Fit for the Twenty-First Century? Some Data at Last*, 38 CONN. L. REV. 697, 701 (2006); Timothy J. Droske, *The New Battleground for Public Law 280 Jurisdiction: Sex Offender Registration in Indian Country*, 101 NW. U. L. Rev. 897, 908 (2007)

[180] Carole Goldberg and Heather Singleton, FINAL REPORT: LAW ENFORCEMENT AND CRIMINAL JUSTICE UNDER PUBLIC LAW 280 5 (2007); Laura S. Johnson, *Frontier of Injustice: Alaska Native Victims of Domestic Violence*, 8 Mod. Am. 2, 6 (2012).

[181] 18 U.S.C. §1162(b); 28 U.S.C. §1360(b); Carole Goldberg, *Public Law 280 and the Problem of Lawlessness in California Indian Country*, 44 UCLA L. REV. 1405 (1997); Elise Helgesen, *Allotment of Justice: How U.S. Policy in Indian Country Perpetuates the Victimization of American Indians*, 22 U. FLA. J.L. & PUB. POL'Y 441 (2011).

[182] See John Hart Ely, DEMOCRACY AND DISTRUST (1980); but see Bruce Ackerman, *Beyond Carolene Products*, 98 HARV. L. REV. 713 (1985).

[183] Laurence French, *Policing American Indians: A Unique Chapter in American Jurisprudence*, 26 No. 2 INDIGENOUS POL'Y J. (2015).

[184] Stewart Wakeling, POLICING ON AMERICAN INDIAN RESERVATIONS 9 (2001).

[185] *Id.* at 27.

[186] Angela Riley, *Indians and Guns*, 100 GEO. L.J. 1731, 1732 (2012).

[187] Kathleen Finn, Erica Gajda, Thomas Perin, Carla Fredericks, *Responsible Resource Development and Prevention of Sex Trafficking: Safeguarding Native Women and Children on the Fort Berthold Reservation*, 40 Harv. J. L. & Gender 1, 31 (2017). For an argument urging the adoption of a cultural defense for Native American criminal defendants, see Megan H. Dearth, *Defending the "Indefensible": Replacing Ethnocentrism with A Native American Cultural Defense*, 35 AM. INDIAN L. REV. 621, 623 (2011)

[188] Carole Goldberg and Duane Champagne, *A Second Century of Dishonor: Federal Inequities and California Tribes*, (March 1996). Similar cultural disconnects have been credited with prompting Congress to enact the Indian Child Welfare Act of 1978.

[189] Kevin Washburn, *American Indians, Crime, and the Law*, 104 MICH. L. REV. 709, 736 (2006).

[190] *Id.*

their constituency to perceive them as cooperating with federal prosecutors.[191] This enforcement gap has caused some reservation residents to resort to rather unorthodox methods such as dumpsite blockading, roadblock construction, and retaliatory murder to defend themselves.[192]

Yet another provision, the Indian Civil Rights Act of 1968 (ICRA) is relevant in assessing this matter. That statute was enacted in response to Congress' desire to strike a balance between "protecting individuals from arbitrary and overly intrusive tribal actions" and "retaining tribes' legal capacity to act as self-governing entities."[193] ICRA provided federal habeas for prisoners challenging their detention on tribal reservations, extended several liberties in the Bill of Rights and Fourteenth Amendment to proceedings in tribal courts,[194] and limited the sentencing authority of tribal courts.[195] In 1986, Congress granted tribal courts more sentencing discretion permitting these tribunals to impose a sentence of imprisonment for a term of up to one year, a fine of $5000, or both, for conviction of any one offense.[196] Congress later enacted the Tribal Law and Order Act of 2010 to permit tribes covered under ICRA to impose a sentence of imprisonment up to three years and fines up to $15,000, or both, for a conviction of any one offense, if the defendant is a person accused of a criminal offense who has been previously convicted of the same or a comparable offense by any jurisdiction in the United States or is being prosecuted for any offense comparable to an offense that would be punishable by more than one year of imprisonment if prosecuted by the United States or any state.[197] Here, the tribes must "ensure certain individual rights to a [Native American] criminal defendant including the right to counsel as guaranteed by the U.S. Constitution."[198] More specifically, if a tribe imposes a sentence of more than one year, it must provide a right of effective assistance of counsel at least equal to that guaranteed by the U.S. Constitution, require that the judge presiding over the criminal proceeding has sufficient legal training to preside over criminal trials and be licensed to practice law by any jurisdiction in the United States, make publicly available the criminal laws, rules of evidence, and rules of criminal procedure of the tribal government prior to the charging of the defendant, and maintain a record of the criminal proceeding including an audio recording of the trial proceeding.[199] Here, the tribal court may require the the defendant to serve the sentence in a tribal correctional center that has been approved by the Bureau of Indian Affairs for long term incarceration; in the nearest appropriate federal facility at the expense of the federal government; in a state or local government approved detention or correctional center under an agreement between the tribe and the State or local government; or in an alternative rehabilitation center of the tribe assuming the tribal court judge does not impose an alternative form of punishment.[200]

---

[191] *Id.* at 739.

[192] Ada Pecos Melton and Jerry Gardner, AMERICAN INDIAN DEVELOPMENT ASSOCIATES, PUBLIC LAW 280: ISSUES AND CONCERNS FOR VICTIMS OF CRIME IN INDIAN COUNTRY (2004).

[193] Robert Berry, *Civil Liberties Constraints on Tribal Sovereignty After the Indian Civil Rights Act of 1968*, 1 J.L. & POL'Y 1 (1993).

[194] For a critique of the current regime for providing defense counsel to indigent litigants in tribal proceedings, see Barbara L. Creel, *The Right to Counsel for Indians Accused of Crime: A Tribal and Congressional Imperative*, 18 MICH. J. RACE & L. 317 (2013).

[195] 25 U.S.C. §1301.

[196] 25 U.S.C. 13029(a)(7)(B).

[197] 25 U.S.C. §1302(b).

[198] Barbara Creel, *The Right to Counsel for Indians Accused of Crime: A Tribal and Congressional Imperative*, 18 MICH. J. RACE & L. 317 (2013).

[199] 25 U.S.C. §1302(c).

[200] 25 U.S.C. 1302(d).

Olapade                                                                                    DRAFT

While tribes are limited in combating reservation violence on their lonesome because, among other things, the Indian Civil Rights Act places a cap on fine amounts and the length of imprisonment terms for offenders, laudable attempts have been made.[201] To take just a few examples, the Chickasaw National Tribe of Oklahoma's legal code protects battered residents by defining domestic abuse as "any act of physical harm, which is committed by an adult, emancipated minor, or child age sixteen or seventeen years against another adult, emancipated minor or child who is a family or household member."[202] More than that, the relevant provision identifies a broad class of persons protected from physical assault and reads like an early twentieth century statute regulating a common law subject but attempting to avoid strict construction:

> "spouses, ex-spouses, present spouses of ex-spouses, parents, Children, persons otherwise related by blood or marriage, persons living in the same household or who formerly lived in the same household, or persons who are the biological parents of the same Child, regardless of their marital status, or whether they have lived together at any time. This shall include the elderly and disabled."[203]

The code proceeds to spell out the mechanisms that victims can use to obtain protective orders against their abusers as well as the criteria that tribal police must adhere to before arresting suspected violators.[204] Thus, Chickasaw police officers "shall not discourage a victim of domestic abuse from pressing charges against the assailant of the victim."[205] And emergency *ex parte* orders may be issued by the tribal court if the court "finds [an *ex parte* order] necessary to protect the victim from immediate and present danger of domestic abuse, stalking, or harassment."[206] Finally, surrounding local and State law enforcement agencies are notified of a protective or *ex parte* order's issuance within twenty-four hours of the order's release.[207] This last provision often proves crucial as most abuse offenses on Native American reservations are committed by non-residents and both local and State government units are required via statute to give full faith and credit to tribal protective orders.[208] The penalty for violating an order is "a fine of not more than one thousand dollars or a term of imprisonment of not more than one year or both."[209]

Tribes have also made ample use of peacemaker courts to resolve domestic disputes. These tribunals are low-cost, non-adversarial forums that permit tribal authorities to incorporate traditional tribal values in the adjudicatory process.[210] This dispute resolution channel, though, is also limited as tribal courts are prohibited from exercising criminal jurisdiction over non-members

---

[201] 25 U.S.C. §1302(7).
[202] Chickasaw Nation Code tit. 5 §5-1201.1.
[203] *Id.*; see also Guido Calabresi, A COMMON LAW FOR THE AGE OF STATUTES (1982).
[204] *Id.* at 5-1201.2, 5-1201.9.
[205] 5-1201.9.
[206] 5-1201.3
[207] 5-1201.5.
[208] Melissa Tatum, A Jurisdictional Quandry: Challenges Facing Tribal Governments in Implementing the Full Faith and Credit Provisions of the Violence Against Women Acts, 90 Ky. L.J. 123 (2002)
[209] 5-1201.6.
[210] Robert Yazzie, *Life Comes From It: Navajo Justice Concepts*, 24 N.M. L. Rev. 175 (1994); Matthew L.M. Fletcher, *The Supreme Court's Legal Culture War Against Tribal Law*, 2 Intercultural Hum. Rts. L. Rev. 93 (2007)

– except in domestic violence matters where the victim is a Native American.[211] Commentators have argued that peacemaker courts can provide several advantages that their more formalized counterparts cannot because they strengthen conceptions of tribal sovereignty among members and provide immediate protection to Native American women. The Navajo Nation peacemaker courts provide an apt example of this trend because they have been widely studied by scholars of Federal Indian Law.[212] The judges of the Navajo Nation courts established the current peacemaking regime in 1982. More often than not, peacemakers are community leaders who encourage the parties to reach a resolution by engaging in a constructive dialogue. The peacemakers use traditional methods of mediation and arbitration which differ markedly from analogous practices before private and public arbitration panels. More specifically, Navajo Peacemaker courts do not follow a pre-set code of evidentiary rules nor do they operate under the Model Code of Professional Responsibility's premise that zealous advocacy will reveal the truth in all instances.[213] While the system's proponents are cautious of the fact that domestic violence existed within Navajo societies before the arrival of individuals from Eurasia and Africa, they nonetheless insist that "Navajos developed successful approaches to addressing" the matter and that "modern social violence is an…import" from those groups.[214] Other tribes have found some merit in the Navajo model and adapted it to their own needs. To take just one example, in 2003, the Chickasaw Nation passed the Peacemaking Court Act creating a set of tribunals "to operate in accordance with the provisions of the customary and traditional law of the Nation."[215] Under this statute, tribal peacemaker courts may use "tribal cultural teachings, customs," tribal religious teachings, and elder consultation in proceedings that may not use the tribal rules of civil or criminal procedure, *ex parte* meetings, or extensive use of counsel to resolve "any matter referred to it by the [tribal] District Court…upon the agreement of both parties" with agreements that would otherwise be enforceable by the tribal district court and that "contain sufficient information…so [that] a dispute as to the order is not likely to rise in the future."[216] More than that, non-Native Americans "who are injured, hurt or aggrieved may voluntarily agree to participate in and be bound by the peacemaking process."[217] Finally, cognizant of the fact that tribal peacemakers may still harbor explicit or implicit gender bias against participants even though peacemakers must satisfy

---

[211] *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978); 25 U.S.C. §1304. See also *Bullington v. Hendrickson*, No. TUL-CV-AP-2018-0148, 2019 WL 1005974 (Tulalip C.A. Jan. 29, 2019); *E. Band of Cherokee Indians v. Martinez*, No. 16 CR 1745-47, 2018 WL 1515036 (Eastern Cherokee Sup. Ct. Mar. 23, 2018); *Smith v. United States*, No. CR 13-08043-PCT-GMS, 2018 WL 1181085 (D. Ariz. Mar. 7, 2018); *United States v. Smith*, No. CR 13-08043-PCT-GMS, 2017 WL 9605121 (D. Ariz. Aug. 16, 2017), report and recommendation adopted, No. CR 13-08043-PCT-GMS, 2018 WL 1181085 (D. Ariz. Mar. 7, 2018); *Norton v. Ute Indian Tribe of the Uintah & Ouray Reservation*, 862 F.3d 1236 (10th Cir. 2017), cert. denied sub nom. *Norton v. Ute Indian Tribe of Uintah & Ouray Reservation*, 138 S. Ct. 1001, 200 L. Ed. 2d 301 (2018); *Window Rock Unified Sch. Dist. v. Reeves*, 861 F.3d 894 (9th Cir. 2017), as amended (Aug. 3, 2017), cert. denied, 138 S. Ct. 648, 199 L. Ed. 2d 586 (2018); *United States v. Peters*, No. 3:16-CR-30150-RAL, 2017 WL 9292244 (D.S.D. Mar. 16, 2017), report and recommendation adopted, No. 3:16-CR-30150-RAL, 2017 WL 1383676 (D.S.D. Apr. 13, 2017); *Steward v. Mescalero Apache Tribal Court*, No. CV 15-1178 JB/SCY, 2016 WL 546840 (D.N.M. Jan. 30, 2016); *Enos v. Marathon Oil Co.*, No. CV-12-2015, 2015 WL 4581638 (S and A Tribal Ct. July 14, 2015).
[212] See, e.g., Howard Brown, *The Navajo Nation's Peacemaker Division An Integrated, Community-Based Dispute Resolution Forum*, 24 AM. INDIAN L. REV. 297 (2000).
[213] See MODEL CODE OF PROF'L RESPONSIBILITY Canon 7 (AM. BAR ASS'N 1980).
[214] James Zion and Elsie Zion, *Hozho' Sokee' – Stay Together Nicely: Domestic Violence Under Navajo Common Law*, 25 ARIZ. ST. L.J. 407 (1993).
[215] Chickasaw Nation Code tit. 5 §5-1401.4.
[216] Chickasaw Nation Code tit. 5 §5-1401.11.
[217] Chickasaw Nation Code tit. 5 §5-1401.9.

an independent set of requirements for service, litigants may request a protective order from the peacemaker if she or he is harassed by the peacemaker; has their personal privacy invaded to an unreasonable extent by the adjudicator; is the recipient of "degrading, inhumane, [or] dangerous" conduct from the peacemaker; seeks to restrain the peacemaker from deciding the matter because she or he has a monetary interest in the case, was a material witness, or is related by blood to one of the parties; raises a valid privilege that is not recognized by the peacemaker; or asserts a valid right under tribal or federal law that is not recognized by the adjudicator. Nonetheless, there is always room for improvement. While many tribal codes include criminal statutes that target rape and sexual assault,[218] prosecutions in tribal courts for sexual assault are quite rare.[219] The reason for this is apparent: many tribal rape laws are modeled on statue statutes that pre-date the 1970s and second-wave feminism.[220]

Federal authorities also have ample tools at their disposal to address domestic violence on Native American reservations. First, 18 U.S.C. §117 provides that if a Native American has two prior tribal court convictions for domestic violence and commits a third domestic violence offense, the federal government can then prosecute that individual as a habitual domestic violence offender in federal court.[221] While some convictions under the statute have garnered attention from the general public,[222] 18 U.S.C. §117 is flawed in at least four different ways. First, the statute only tends to be effective in combating the most egregious habitual offenders because it can only be triggered after three infractions which is arguably two too many. Second, the statute is under-inclusive because it does not extend to non-Native American offenders, a demographic group that constitutes the majority of domestic violence perpetrators on reservations. Third, federal courts often have difficulty trying the few cases that are brought under the statute because the offender, victim, and witnesses may face language barriers with courtroom participants or live at an inordinate distance from the venue.[223] To take just one example, domestic violence victims who are assaulted on the Red Lake Band of Ojibwe reservation in northern Minnesota often have to travel 250 miles or more – a distance equivalent to a trip from Houston to Dallas or New Haven to Dover – to arrive at a federal courthouse in St. Paul or Minneapolis.[224] Because a large percentage of Native Americans live below the federal poverty line or may lack access to reliable means of transportation,[225] such a trip is that much more difficult. Finally, 18 U.S.C. §117 does not proscribe a program to attend to the post-adjudicative needs of domestic violence victims.

Sparse access to adequate reproductive healthcare services for women who do not desire to carry their rapists' child to term further complicates matters. This service deficiency is particularly confounding given that every Republican presidential candidate in the twentieth and twenty-first century has whole heartedly supported a rape exception for state abortion bans – even while refusing to provide funds for the procedure. Indeed, in 1976, Congress passed an amendment proposed by Representative Henry Hyde of Illinois that prohibited the use of federal funds for

---

[218] See, e.g., Bruce Miller, *Contemporary Tribal Codes and Gender Issues*, 18 AM. INDIAN CULTURE & RES. J. 43 (1994).

[219] Sarah Deer, *Toward an Indigenous Jurisprudence of Rape*, 14 Kan. J.L. & Pub. Pol'Y 121, 124 (2004).

[220] Lisa Bond-Maupin, *Who Made the Code in the First Place?: Delinquency and Justice in an American Indian Community*, 25 CRIME L. & SOCIAL CHANGE 133, 136 (1996).

[221] 18 U.S.C. §117.

[222] *United States v. Cavanaugh*, 643 F.3d 592 (8th Cir.2011).

[223] Kevin Washburn, *American Indians, Crime, and the Law*, 104 MICH. L. REV. 709, 710 (2006).

[224] *Id.* at 771.

[225] Robert Anderson, AMERICAN INDIAN LAW 12 (2010).

abortions outside a very limited set of circumstances.[226] The provision originally stated that no federal funds could "be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term."[227] The amendment has been renewed every year since its passage in the late 1970s and its language has evolved over time. The provision currently states that no federal funds will be used for abortions except in the case of pregnancy resulting from rape, incest or

> [i]n the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed.[228]

The amendment directly impacts the Indian Health Service because it denies the agency funding for abortions in matters that do not involve rape, incest, or a health risk to the mother's life. More specifically, the Indian Health Care Improvement Act references the Hyde Amendment's limitations on abortions in appropriating funding for Indian Health Service facilities as:

> [a]ny limitation on the use of funds contained in an Act providing appropriations for the Department of Health and Human Services (HHS) for a period with respect to the performance of abortions shall apply for that period with respect to the performance of abortions using funds contained in an Act providing appropriations for the Indian Health Service.[229]

The IHS, accordingly, has amended the *Indian Health Manual* and promulgated regulations placing the agency in compliance with the statute.[230] More than that, the agency has determined that a pregnancy satisfies the rape or incest exception so long as a service station receives either (1) "signed documentation from a law enforcement agency, a health care facility, or a health care program stating that the woman requesting the abortion was a victim of rape or incest," the date on which the assault occurred, the date on which the report was made (which must be within 60 days of the date on which the episode of rape or incest occurred), the name and address of the victim, and the name and address of the reporter or (2) the incident satisfies the definition of rape or incest as that offense is defined by the law of the State or tribe where the event occurred.[231] IHS has also approved the drug mifepristone as a therapeutic alternative to surgical abortions as well as emergency contraceptives that can prevent pregnancy if administered with 120 hours of the rape

---

[226] Act of Sept. 30, 1976, Pub. L. No. 94-439 § 209, 90 Stat. 1418, 1434.

[227] *Id.*

[228] 42 U.S.C. § 300a–6.

[229] 25 U.S.C. §1676.

[230] 42 C.F.R. §136.51; Indian Health Serv., INDIAN HEALTH MANUAL §3-13.14.

[231] Memorandum from HIS Director Michael Trujillo, M.D., M.P.H., Assistant Surgeon General, on Current Restrictions in Use of Indian Health Service Funds for Abortions for HIS Area Directors and Associate Directors (Aug. 26, 1996).

or incestuous activity.[232] In any event, the United States government has recognized its statutory obligation to provide adequate women's health services to the tribes under the Indian Health Care Improvement Act of 1976.[233] That statute commands the national government "to provide the quantity and quality of health services which will permit the health status of [Native Americans] to be raised to the highest possible level…and to provide…all resources necessary to effect that policy."[234] The Indian Health Service – a department within HHS – attempts to fulfill this duty by providing an estimated 1.9 million tribal members in thirty-five different states with medical services. While the statute has provided funding for 29 hospitals, 59 health centers, 28 health stations, and 34 service units, and was reauthorized during every year of the Reagan and first Bush Administration, even the second Bush Administration (which admittedly refused to support the statute's reauthorization) concluded that unacceptable gaps remain as "Native Americans [continue to] suffer significantly lower health status and disproportionate rates of disease compared with all other American" demographic groups.[235] Indeed, there is currently no standard policy for treating sexual assault victims at IHS facilities even though three in ten Native American women will be assaulted in their lifetime. In the event, moreover, that a Native American woman is raped and becomes pregnant, the limited research available on the matter suggests that it is extremely difficult to either obtain emergency contraception or an abortion to avoid carrying their rapist's child to term at IHS facilities given that only 5% of IHS facilities can perform the latter procedure.[236] On this matter, the Office of Violence Against Women in the Department of Justice has provided ample guidance in protocols that describe the best medical practices for treatment of sexual assault victims.[237] More specifically, the protocols recommend discussing the likelihood of pregnancy with a victim, administering "a pregnancy test for all patients with reproductive capacity and, finally, discussing options if the victim is pregnant," "including reproductive health services."[238] The result is that women who turn to IHS for healthcare services after being raped are not offered consistent treatment for sexually transmitted diseases, physical trauma, emotional trauma, or potential pregnancy.[239] IHS facility officials often claim that restricted access is much ado about nothing because a Native American woman could ostensibly enroll in Medicaid and receive an abortion through that program. This response, however, is very misleading for three

---

[232] Rebecca A. Hart, *No Exceptions Made: Sexual Assault Against Native American Women and the Denial of Reproductive Healthcare Services*, 25 WIS. J.L. GENDER & SOC'Y 209 (2010)

[233] 25 U.S.C. §1601 et seq.

[234] 25 U.S.C. §1601; *Quechan Tribe of Ft. Yuma Indian Reservation v. United States*, 599 F. App'x 698 (9th Cir. 2015); *Blatchford v. Alaska Native Tribal Health Consortium*, 645 F.3d 1089 (9th Cir. 2011); *Arizona Health Care Cost Containment Sys. v. McClellan*, 508 F.3d 1243 (9th Cir. 2007); *Tsosie v. United States*, 452 F.3d 1161 (10th Cir. 2006); *Justice v. Oklahoma Dep't of Human Servs. Child Welfare*, 122 F. App'x 938 (10th Cir. 2004); *U.S. ex rel. Norton Sound Health Corp. v. Bering Strait Sch. Dist.*, 138 F.3d 1281 (9th Cir. 1998); *Tunica-Biloxi Tribe v. State of La.*, 964 F.2d 1536 (5th Cir. 1992); *Williams v. United States*, 242 F.3d 169 (4th Cir. 2001); *Aviles v. Lutz*, 887 F.2d 1046 (10th Cir. 1989); *Dep't of Health & Human Servs., Indian Health Serv., Oklahoma City v. Fed. Labor Relations Auth.*, 885 F.2d 911 (D.C. Cir. 1989); *Blue Legs v. U.S. Bureau of Indian Affairs*, 867 F.2d 1094 (8th Cir. 1989); *McNabb for McNabb v. Bowen*, 829 F.2d 787 (9th Cir. 1987); *Rincon Band of Mission Indians v. Harris*, 618 F.2d 569 (9th Cir. 1980).

[235] Rebecca A. Hart, *No Exceptions Made: Sexual Assault Against Native American Women and the Denial of Reproductive Healthcare Services*, 25 WIS. J.L. GENDER & SOC'Y 209 (2010).

[236] *Id.*

[237] OFFICE ON VIOLENCE AGAINST WOMEN, U.S. DEP'T OF JUSTICE, A NATIONAL PROTOCOL FOR SEXUAL ASSAULT MEDICAL FORENSIC EXAMINATIONS (2004).

[238] *Id.* at 73-115.

[239] OFFICE ON VIOLENCE AGAINST WOMEN, U.S. DEP'T OF JUSTICE, A NATIONAL PROTOCOL FOR SEXUAL ASSAULT MEDICAL FORENSIC EXAMINATIONS 3 (2004).

DRAFT

reasons. First, the mere fact that a Native American woman is eligible to receive IHS healthcare services does not necessarily mean that she will qualify for Medicaid. In the event the coverage is not available, the patient must often pay somewhere between $350 and $900 for an abortion in the first trimester – assuming she can afford it.[240] Second, the state in question, exercising its Tenth Amendment rights, may only fund abortions in cases of rape, incest, or where the life, as opposed to the health, of the mother is endangered. The mere fact that a political entity can do something, though, doesn't mean that it should. Consider just some potential public health risks that such a policy actually precipitated in the progressive haven that is Connecticut (the following quote contains sensitive material):

> [t]he [peculiarity] of the regulation is demonstrated by a sampling of the medically necessary abortions which would not have been eligible for funding under a life-endangerment standard but were funded by the state pursuant to the temporary mandatory injunction ordered by the court. For example: a thirteen year old girl who began vomiting five times a day, and developed an acute state of depression which was characterized by frequent crying spells and which interfered with her progress at school; a woman whose pregnancy was the result of rape and who was acutely depressed; a woman who was at risk of septic abortion because she became pregnant with an intrauterine contraceptive device in place which could not be removed; a woman with a reaction of anxiety and stress who also had hepatitis; a woman with an anxiety reaction who also had hypertension; a woman who had lupus erythematosus; a woman with pancreatitis; a woman with serious threats to her health from a failed prior attempt at an abortion with subsequent pain, bleeding and probably severe infection; a woman at risk because of a cardiac valve lesion who is also on medication known to have ill effects on pregnancy; a woman whose fetus could not survive outside of the womb because it had anencephaly; a woman who was at risk because she was both hypertensive and asthmatic; a woman who was at risk and whose fetus was also at risk because she had a history of drug abuse and was currently on a methadone program; a woman with a history of psychiatric illness who became emotionally unstable during pregnancy and needed medication for her mental health; and a woman who was at risk because she had sickle-cell anemia which is associated with a high rate of complication during pregnancy.[241]

In the alternative, the Tribal Law and Order Act of 2010 could also serve as a potential source for federal intervention.[242] That statute is noteworthy in two respects. First, it requires both federal law enforcement officers to coordinate with tribal authorities and federal prosecutors to

---

[240] Rebecca A. Hart, *No Exceptions Made: Sexual Assault Against Native American Women and the Denial of Reproductive Healthcare Services*, 25 WIS. J.L. GENDER & SOC'Y 209 (2010)
[241] *Doe v. Maher*, 515 A.2d 134, 154-155 (Conn. Super. Ct. 1986).
[242] 25 U.S.C. §2801.

Olapade                                                                                               DRAFT

coordinate criminal prosecutions with tribal authorities.[243] Under this scheme the Federal Bureau of Investigation must compile date about the types of crimes committed on Native American reservations and the status of the investigated cases.[244] Moreover, at least one Assistant United States Attorney must be appointed as a tribal liaison for each district that includes a Native American reservation.[245] Second, the statute provides law enforcement with training on how to respond appropriately to domestic violence incidents, interview victims, and perhaps most importantly, collect, preserve, and present evidence to federal and tribal prosecutors to secure convictions.[246] The Tribal Law and Order Act also attempts to give employees in the Bureau of Indian Affairs more authority to arrest prospective offenders in domestic violence cases.[247] More specifically, BIA officers may make warrantless arrests so long as "the offense is a misdemeanor crime of domestic violence, dating violence, stalking, or violation of a protection order and has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon" and is committed by a domestic partner or relative on a Native American reservation.[248]

As a third source of relief, some tribes have chosen to participate in the Tribal SAUSA Pilot Project, an initiative designed to train tribal prosecutors in federal law and investigative techniques.[249] The purpose of the program is to equip tribal prosecutors with the means to pursue cases with greater independence and a larger capacity for input from multiple sources.[250] Thus far, four tribes have elected to participate in the pilot program: the Fort Belknap Tribe in Montana, the Winnebago Tribe in Nebraska, the Standing Rock Sioux Tribe in North Dakota, and the Pueblo Tribe of Laguna in New Mexico.[251] The Justice Department's Office of Violence Against Women funds salaries, travel, and training costs for qualified attorneys selected by the four tribes.[252] Selected applicants act as special AUSAs collaborating with U.S. Attorneys' Offices in Nebraska, New Mexico, Montana, North Dakota, and South Dakota maintaining an active case load in tribal and federal courts and conducting investigations.[253]

Fourth, the Violence Against Women Act provides the most overarching warrant for federal prosecutors attempting to reduce domestic violence on Native American reservations. Congress initially implemented the statute as part of the Violent Crime Control and Law Enforcement Act of 1994. Of course, the purpose of the statute was to criminalize as well as provide funding for investigating and prosecuting violent crimes committed against women in particularly vulnerable populations – with a particular focus on Native American women and children. The 1994 VAWA allocated four percent of its funding to grants for Services and Training for Officers and Prosecutors (STOP) to Native American tribes.[254] VAWA also provided funding

---

[243] 25 U.S.C. §2809.
[244] 25 U.S.C. §2809(2).
[245] 25 U.S.C. §2810.
[246] 25 U.S.C. §2802(c)(9).
[247] 25 U.S.C. §2803(3)(c).
[248] *Id.*
[249] Cheryl Cedar Face, *Justice Department Announces New Program to Combat Violence Against Women*, AmericanIndianReport.com (June 7, 2012).
[250] *Id.*
[251] *Id.*
[252] *OVW Announces Agreements to Cross-Designate Tribal Prosecutors in NE, NM, MT, ND, and SD*, INDIAN L. & ORD. COMMISSION (May 3, 2013).
[253] *Id.*
[254] April Paredes, Donalene Roberts, Lauren Ruvo, Taylor Stuart, *Domestic Violence*, 19 GEO. J. GENDER & L. 265 (2018).

Olapade                                                                                    DRAFT

for education, training, and shelter.[255] Under the revised 2013 statute, Native American tribes have the ability to concurrently investigate, prosecute, convict, and sentence Native Americans and non-Native Americans who commit a domestic violence offense against a Native American spouse or dating partner.[256] More than that, tribal courts are given civil jurisdiction to provide protective orders to Native American applicants.[257] Finally, the statute includes more robust federal sentences for acts of assault as well as a bevy of provisions that distinguish among different acts of domestic violence.[258] For visual learners, the following diagram provides a quick summary of the current criminal jurisdictional scheme governing offenders on Native American reservations (See Figure 3):

Figure 3

---

[255] *Id.*

[256] The Facts on Violence Against American Indian/Alaska Native Women, FUTURESWITHOUTVIOLENCE.ORG

[257] Jodi Gillette and Charlie Galbraith, *2013 VAWA – Empowering Tribes to Protect Native Women* (Mar. 7, 2013).

[258] April Paredes, Donalene Roberts, Lauren Ruvo, Taylor Stuart, Domestic Violence, 19 GEO. J. GENDER & L. 265 (2018).

Olapade                                                                                  DRAFT





More specifically, three tribes have elected to participate in the 2013 VAWA pilot project: the Pascua Yaqui Tribe, the Tulalip Tribe, and the Confederated Tribes of the Umatilla Indian Reservations. The Pascua Yaqui tribe reservation is located near Tucson, Arizona and has close to 19,000 members – 4,000 of whom live on the reservation.[259] Ninety percent of the reservations residents are actually Native American – and forty-three percent of this group are single-mothers. The tribal court system was a particularly suitable candidate for the VAWA pilot program because its structure is modeled closely on the federal court system.[260] The Special Domestic Violence Criminal Jurisdiction program was rather successful during its thirteen month duration as the tribe processed eighteen cases involving fifteen separate defendants who "had more than 80 documented tribal police contacts, arrests, or reports attributed to them" on the reservation in the

---

[259] Peter Yucupicio, NATIONAL CONGRESS OF INDIAN AMERICANS, PASCUA YAQUI TRIBE VAWA IMPLEMENTATION, 2 (2015).
[260] *Id.* at 3.

last four years.[261] The Tulalip tribe enjoyed a similar pilot program experience. This tribe is located in western Washington and has about 4,500 members – 2,500 of which live on the reservation.[262] Ten percent of the reservation residents, though, do not identify as Native American.[263] Much like the Pascua Yaqui tribe, the Tulalip criminal justice system bears an uncanny resemblance to the federal model as law trained judges are employed, indigents are provided with defense attorneys, non-Native Americans are permitted to participate in jury pools, and formal court proceedings are recorded.[264] The tribe prosecuted six Special Domestic Violence Criminal Jurisdiction cases and obtained four guilty pleas in the process. Indeed, the six "non-Indian defendants had over 88 documented tribal police contacts, arrests, or reports attributed to them in the past."[265] VAWA's enhancements, however, clearly were not enough to provide a serious response to these repeat offenders – each was sentenced to probation and only required to attend a batterer intervention program.[266] Finally, the Confederated Tribes of Umatilla Indian Reservation's response to the pilot program is arguably the most instructive. The tribe is located in Oregon and has adopted many of the adjudicatory features of the federal model, but unlike the Tulalip or Pascua Yaqui tribes, it contains a very high percentage of non-Native Americans – 46% on the reservation.[267] Tribal authorities have welcomed VAWA's enhancements with open arms because almost sixty percent of the cases brought before the Umatilla Family Violence unit annually involve non-Native Americans.[268] Umatilla police prosecuted four cases during the program and obtain guilty pleas in each matter which resulted in every defendant serving probation or participating in batterer intervention treatment.[269] One wonders, though, whether VAWA could have improved matters even further. More specifically, the Umatilla tribes may have been prohibited from imposing enhanced sentences because of their previous implementation of the Tribal Law and Order Act in 2011.[270] This is so because the statute only permits tribes to grant enhanced sentences when the accused has already been convicted of the same or a comparable offense or is under prosecution for a felony.[271] The result is an ironic and rather Kafkaesque state of affairs where one statute that was intended to improve tribal responses to domestic violence undercuts another.

V.    *How to Improve Tribal, Federal, and State Responses to Domestic Violence on Native American Reservations*

It follows that despite the 2013 VAWA's commendable additions, the statute still suffers from three flaws. First, crimes between two non-Native Americans or two strangers fall outside the statute's reach. Second, individuals who lack sufficient ties to a Native American tribe may not be tried under the statute. Third, a Native American tribe can only exercise "special domestic

---

[261] *Id.* at 6.

[262] *Id.* at 9.

[263] Alison Burton, *What About the Children? Extending Tribal Criminal Jurisdiction to Crimes Against Children*, 52 HARV. C.R.-C.L. L. REV. 193 (2017).

[264] Peter Yucupicio, NATIONAL CONGRESS OF INDIAN AMERICANS, PASCUA YAQUI TRIBE VAWA IMPLEMENTATION, 9 (2015).

[265] *Id.* at 10.

[266] *Id.*

[267] *Id.* at 11.

[268] *Id.*

[269] *Id.*

[270] *Id.*

[271] Alison Burton, *What About the Children? Extending Tribal Criminal Jurisdiction to Crimes Against Children*, 52 HARV. C.R.-C.L. L. REV. 193 (2017).

Olapade                                                                              DRAFT

violence criminal jurisdiction over a defendant" if the accused "resides in the [Native American reservation] of the participating tribe; is employed in the [Native American reservation] of the participating tribe; or is a spouse, intimate partner, or dating partner of a member of the participating tribe."[272]  While the separate flaws in each of these abaci may appear harmless in isolation, once combined, the Corinthian columns collapse. This is so because tribal authorities are powerless to prosecute non-Native Americans under the statute who, as the lion's share of offenders do, visit tribal lands for a brief period of time, commit crimes against some women, and then flee to their homes off the reservation.[273] Fourth, the statute does not have a separate provision protecting abused children on Native American reservations. Indeed, for many children living on Native American reservations, violence is sadly a part of everyday life.[274] In 2013, for instance, the U.S. Attorney General's Task Force on American Indian and Alaska Native Children Exposed to Violence was created to examine the scope and impact of this phenomenon and recommend solutions to the Justice Department.[275] Based on testimony at four public hearings and research and input from specialists as well as impacted communities, the Advisory Committee of the Task Force issued a final report in 2014 detailing its policy recommendations.[276] Among other things, the report details that "American Indian and Alaska Native (AI/AN) children suffer exposure to violence at rates higher than any other [group of children] in the United States" and that this is so because of the prevalence of risk factors that contribute to higher rates of sexual abuse such as poverty, unemployment, geographic and social isolation, familial stresses, violence, and weakened family structure.[277]

Table 13

| Victims by Race and Ethnicity (absolute count) | | | | | |
|---|---|---|---|---|---|
| State | African-American | Native American | Asian American | Hispanic | Caucasian |
| Alabama | 2310 | 8 | 14 | 358 | 5172 |
| Alaska | 20 | 1275 | 16 | 77 | 442 |
| Arizona | 1107 | 564 | 41 | 5235 | 4940 |
| California | 1562 | 498 | 1734 | 41175 | 16560 |
| Colorado | 801 | 89 | 75 | 3841 | 4779 |
| Connecticut | 1583 | 9 | 48 | 2218 | 2827 |
| Delaware | 820 | 1 | 7 | 221 | 812 |
| District of Columbia | 1184 | 0 | 1 | 218 | 4 |
| Florida | 15016 | 95 | 153 | 8471 | 21545 |
| Georgia | 7644 | 18 | 78 | 1361 | 9108 |
| Hawaii | 33 | 6 | 139 | 43 | 172 |
| Idaho | 16 | 71 | 1 | 223 | 1294 |

[272] 25 U.S.C. §1304.

[273] Sarah Deer, *Sovereignty of the Soul: Exploring the Intersection of Rape Law Reform and Federal Indian Law*, 38 Suffolk U. L. Rev. 455, 461 (2005)

[274] Alison Burton, *What About the Children? Extending Tribal Criminal Jurisdiction to Crimes Against Children*, 52 HARV. C.R.-C.L. L. REV. 193 (2017).

[275] *Id.*

[276] *Id.*

[277] *Id.*

Olapade                                                                    DRAFT

| | | | | |
|---|---|---|---|---|
| Illinois | 9875 | 18 | 220 | 4020 | 14889 |
| Indiana | 3909 | 12 | 42 | 1768 | 14516 |
| Iowa | 1285 | 95 | 85 | 1117 | 7588 |
| Kansas | 192 | 12 | 12 | 294 | 1407 |
| Kentucky | 1845 | 3 | 21 | 619 | 11624 |
| Louisiana | 4523 | 35 | 22 | 214 | 4897 |
| Maine | 63 | 18 | 9 | 146 | 2344 |
| Maryland | 5485 | 12 | 102 | 937 | 4151 |
| Massachusetts | 2720 | 33 | 303 | 5311 | 7835 |
| Michigan | 8312 | 146 | 72 | 1697 | 20261 |
| Minnesota | 925 | 341 | 120 | 447 | 1719 |
| Mississippi | 3020 | 15 | 9 | 159 | 3912 |
| Missouri | 212 | 8 | 3 | 50 | 1474 |
| Montana | 25 | 275 | 6 | 72 | 865 |
| Nebraska | 570 | 177 | 24 | 534 | 2190 |
| Nevada | 1120 | 45 | 42 | 1587 | 2076 |
| New Hampshire | 20 | 3 | 2 | 55 | 653 |
| New Jersey | 2821 | 10 | 84 | 2016 | 3177 |
| New Mexico | 198 | 496 | 3 | 3985 | 1543 |
| New York | 18241 | 207 | 1192 | 16230 | 20794 |
| North Carolina | 5926 | 611 | 74 | 1972 | 10079 |
| North Dakota | 46 | 285 | 0 | 98 | 906 |
| Ohio | 6118 | 23 | 32 | 1194 | 15616 |
| Oklahoma | 988 | 756 | 27 | 1903 | 4983 |
| Oregon | 478 | 225 | 81 | 1530 | 5946 |
| Pennsylvania | Data Undisclosed | | | | |
| Puerto Rico | Data Undisclosed | | | | |
| Rhode Island | 396 | 16 | 31 | 686 | 1500 |
| South Carolina | 3622 | 26 | 8 | 371 | 5527 |
| South Dakota | 29 | 378 | 2 | 61 | 389 |
| Tennessee | Data Undisclosed | | | | |
| Texas | 10596 | 64 | 268 | 29855 | 20369 |
| Utah | 229 | 166 | 77 | 1912 | 6558 |
| Vermont | 10 | 0 | 2 | 4 | 708 |
| Virginia | 1578 | 1 | 36 | 650 | 3028 |
| Washington | 485 | 409 | 127 | 1090 | 3844 |
| West Virginia | 115 | 0 | 2 | 77 | 4014 |
| Wisconsin | 961 | 231 | 69 | 441 | 2169 |
| Wyoming | 22 | 10 | 3 | 105 | 567 |

Olapade

DRAFT

Table 14

| State | African-American | Native American | Asian American | Hispanic | Caucasian |
|---|---|---|---|---|---|
| Alabama | 7 | 1.4 | 1 | 4.8 | 7.9 |
| Alaska | 3.2 | 38.2 | 1.6 | 4.6 | 4.6 |
| Arizona | 15.7 | 7 | 1 | 7.5 | 7.5 |
| California | 20.1 | 14 | 1.7 | 8.6 | 6.8 |
| Colorado | 15.8 | 12.1 | 2.1 | 10 | 6.7 |
| Connecticut | 18.1 | 4.5 | 1.3 | 13 | 6.1 |
| Delaware | 16.1 | 1.8 | .9 | 7.6 | 7.7 |
| District of Columbia | 18 | 0 | 0.4 | 13.8 | .2 |
| Florida | 18.3 | 9.7 | 1.5 | 7.3 | 12.1 |
| Georgia | 9.2 | 3.6 | .9 | 4 | 8 |
| Hawaii | 5.3 | 9.4 | 1.8 | .8 | 4.1 |
| Idaho | 4.2 | 14.6 | .2 | 2.9 | 4 |
| Illinois | 20.8 | 4.1 | 1.6 | 5.5 | 9.4 |
| Indiana | 22.4 | 3.9 | 1.4 | 10.9 | 12.5 |
| Iowa | 40.8 | 37.8 | 5.6 | 16.3 | 13.1 |
| Kansas | 4.1 | 2.1 | .7 | 2.3 | 2.9 |
| Kentucky | 19.8 | 1.9 | 1.4 | 11.1 | 14.3 |
| Louisiana | 10.9 | 4.5 | 1.3 | 3.4 | 8.5 |
| Maine | 9.6 | 8.8 | 2.4 | 21.7 | 10 |
| Maryland | 13 | 4.1 | 1.3 | 5.5 | 6.9 |
| Massachusetts | 24.4 | 12.5 | 3.5 | 23.3 | 8.6 |
| Michigan | 23 | 10.7 | 1.1 | 9.6 | 13.3 |
| Minnesota | 9.1 | 19.2 | 1.7 | 4.2 | 1.9 |
| Mississippi | 9.5 | 3.4 | 1.4 | 5.5 | 10.7 |
| Missouri | 1.1 | 1.4 | .1 | .6 | 1.4 |
| Montana | 15.9 | 13 | 3.7 | 5.8 | 4.9 |
| Nebraska | 21.5 | 34.7 | 2.5 | 7.1 | 6.6 |
| Nevada | 19.7 | 8.1 | 1.1 | 6 | 8.3 |
| New Hampshire | 4.4 | 5.8 | .3 | 3.8 | 2.8 |
| New Jersey | 10.1 | 3 | .4 | 4.1 | 3.2 |
| New Mexico | 23.6 | 9.6 | .5 | 13.3 | 12 |
| New York | 27.2 | 14.6 | 3.8 | 16.2 | 9.9 |
| North Carolina | 11.2 | 21.3 | 1.2 | 5.8 | 8.2 |
| North Dakota | 11.9 | 21.4 | 0 | 12.6 | 7 |
| Ohio | 15.9 | 5.6 | .6 | 8.2 | 8 |
| Oklahoma | 12.8 | 7.8 | 1.6 | 13 | 9.6 |

46

Olapade                                                                                    DRAFT

| Oregon | 26.7 | 21.4 | 2.4 | 8.3 | 10.7 |
|---|---|---|---|---|---|
| Pennsylvania | Data Undisclosed | N/A | N/A | N/A | N/A |
| Puerto Rico | Data Undisclosed | N/A | N/A | N/A | N/A |
| Rhode Island | 26.2 | 14.1 | 4.4 | 14.2 | 11.3 |
| South Carolina | 10.7 | 6.8 | .5 | 4.1 | 9.3 |
| South Dakota | 6.4 | 13.9 | .8 | 5.4 | 2.5 |
| Tennessee | Data Undisclosed | N/A | N/A | N/A | N/A |
| Texas | 12.8 | 3.4 | 1 | 8.7 | 8.8 |
| Utah | 21.9 | 19.7 | 5.3 | 12.6 | 9.8 |
| Vermont | 4.5 | 0 | 1 | 1.4 | 6.4 |
| Virginia | 4.1 | .2 | .3 | 2.8 | 2.9 |
| Washington | 7.5 | 17.3 | 1.1 | 3.4 | 4.1 |
| West Virginia | 8 | 0 | .7 | 9.6 | 11.7 |
| Wisconsin | 8.5 | 16.6 | 1.6 | 3.1 | 2.3 |
| Wyoming | 14 | 2.4 | 3.2 | 5.4 | 5.3 |

 To complicate matters, child abuse victims are often forced to rely on federal or state authorities to prosecute their assailants because the tribes are divested of jurisdiction over these crimes.[278] The federal government, however, oddly enough often declines to prosecute most child abuse cases that are referred to it by tribal governments.[279] Indeed, between 2004 and 2007, federal authorities declined to prosecute 72% of child sex crime cases on Native American reservations.[280] In 2006, for instance, "only 2% of the serious child abuse cases on [Native American reservations] were prosecuted federally, and only 3% of child abuse offenders risk[ed] conviction."[281] While prosecution refusal rates declined from 2010 to 2018,[282] the declination rate for crimes committed on Native American reservations is still larger than the general declination rate.[283] To take just one example, in 2013, 34% of Native American submissions for prosecution were declined, while only 14.9% of all criminal cases referred to the U.S. Attorneys' Offices were declined.[284] The primary reason federal prosecutors give for this discrepancy appears to center on institutional competency. In the words of one investigator, "the FBI and [USAOs] work slowly and methodologically to investigate and prosecute complex interstate crimes, but crimes like…child molestation…require a swift response. The police need to be there on the ground [and] the investigation needs to move

---

[278] Id.
[279] Id.
[280] Id.
[281] Id.
[282] Id.
[283] Andrea L. Johnson, *A Perfect Storm: The U.S. Anti-Trafficking Regime's Failure to Stop the Sex Trafficking of American Indian Women and Girls*, 43 COLUM. HUM. RTS. L. REV. 617, 688 (2012); Marie Quasius, *Native American Rape Victims: Desperately Seeking an Oliphant-Fix*, 93 Minn. L. Rev. 1902, 1904 (2009)
[284] Andrea L. Johnson, *A Perfect Storm: The U.S. Anti-Trafficking Regime's Failure to Stop the Sex Trafficking of American Indian Women and Girls*, 43 COLUM. HUM. RTS. L. REV. 617, 688 (2012).

Olapade                                                                                   DRAFT

quickly" to ensure the children are safe so time-sensitive evidence can be collected.[285] As police officers and line prosecutors know, moreover, rape offenses are notoriously difficult to prosecute.[286] Rape is also historically the least likely of crimes to result in conviction.[287] Indeed, U.S. Attorneys are quick to point out that many of their reservation sexual assault declinations are not related to the veracity of the rape claim or lack of concern about sexual violence, but rather, evidentiary issues that interfere with the capacity to put together a provable case.[288] Other common hurdles include jurisdictional issues, lack of evidence of criminal intent, and the unfortunate fact that many government security officers often refuse to believe victims. Indeed, a study by the Department of Justice concluded that officers with less than seven years of experience believe that more than half of rape accusations are false.[289] The result is that only 34% of all sexual assaults are ever reported to the authorities, 17% of these cases ever result in an arrest, and of those cases that proceed to trial, only 54% result in a conviction such that only .6% of all sexual assault perpetrators ever spend a day behind bars.[290] More than that, even if tribal prosecutors can proceed with a sexual assault case against a Native defendant, they are still faced with the lack of a clear protocol for sharing evidence between their offices and the federal government.[291] As one tribal judge explained:

> [t]he FBI is a black hole...The [Bureau of Indian Affairs] police get the evidence and they submit it to the FBI lab and we never see it again. We had a homicide, it was a hit-and-run where the front bumper of the car was in an FBI laboratory and eighteen months had gone by and they still hadn't returned it, nor had they prosecuted. We had DUIs where the toxicology report has been gone over a year. And it never comes back.[292]

These are not isolated incidents. As one tribal public defender has complained "the rape kits never come back. They will not prosecute, yet they won't send the information down so the tribe can prosecute. We never, ever see the results of a rape kit."[293] The General Accounting Office itself acknowledged the widespread prevalence of these practices in a 2011 report finding that

> [w]hen criminal matters are declined, federal entities generally do not share evidence and other pertinent information that will allow the tribe to build its case for prosecution in tribal court. This can be

---

[285] *Id.*

[286] Teresa Scalzo, Prosecuting Rape Cases: Trial Preparation and Trial Tactic Issues, in Practical Aspects of Rape Investigation 287 (2016).

[287] Morrison Torrey, *When Will We Be Believed? Rape Myths and the Idea of a Fair Trial in Rape Prosecutions*, 24 U.C. Davis L. Rev. 1013 (1991).

[288] U.S. Gov't Accounting Office, GAO-11-167R, U.S. Department of Justice Declinations of Indian Country Criminal Matters 6-7 (2010).

[289] Soraya Chemaly, *How Police Still Fail Rape Victims*, Rolling Stone (Aug. 16, 2016).

[290] Richard E. Miller and Austin Sarat, *Grievances, Claims, and Disputes: Assessing the Adversary Culture*, 15 Law & Society Review 525 (1981); see also Elizabeth Mertz, Lawrence M. Friedman, and Stewart Macaulay, Law in Action: A Socio-Legal Reader (2007); The Criminal Justice System: Statistics, RAINN, https://www.rainn.org/statstics/criminal-justice-system.

[291] U.S. Gov't Accounting Office, GAO-11-252, U.S. Department of Justice Declinations of Indian Country Criminal Matters 17 (2011).

[292] Kathy Dobie, *Tiny Little Laws: A Plague of Sexual Violence in Indian Country*, Harper's Mag., Feb. 2011, at 55, 64.

[293] *Id.*

> especially challenging for prosecuting offenses such as sexual assault where DNA evidence collected cannot be replicated should the tribe conduct its own investigation following notification of a declination.[294]

While these reports a troubling, one way the federal government could effectively respond to them is by ensuring that survivors of sexual assault on tribal reservations can turn to formalized local Sexual Assault Response Teams after an incident. A Sexual Assault Response Team is a multi-disciplinary team of professionals and advocates who respond in a coordinated fashion to sexual assault cases in a particular community.[295] The model first appeared in the United States during the late 1960s in response to the lack of coordination between law enforcement and health care professionals and gradually spread to other nations in the ensuing four decades.[296] Nearly half a century later, five states – Kentucky, Virginia, Indiana, Pennsylvania, and New Jersey – have endorsed the model.[297] As a matter of federal policy, the U.S. government has also endorsed the Sexual Assault Response Team model primarily through the initiative of two Justice Department agencies – the Office for Victims of Crime and the Office on Violence Against Women. More specifically, the department has released four publications in the last seventeen years that provide direct guidance to responding to sexual assault incidents with the Sexual Assault Response Team model – the *SANE Operation Guide* (1999), *SAFE Protocol* (2004), SAFE Training Guidelines (2006), and *SART Toolkit: Resources for Sexual Assault Response Teams* (2011).[298] In addition, the federal government has provided grants to local organizations to develop SANE-SART models, that require jurisdictions receiving federal dollars under the 2005 Violence Against Women Act to comply with revised forensic medical examination standards.[299] The practice provides two primary benefits for individuals interested in strict criminal law enforcement. First, studies indicate that the Sexual Assault Response Team model enhances the victim's psychological well-being.[300] Because the victim's testimony is often at the heart of the prosecutor's case, those who feel empowered by the system are more likely to remain engaged. Second, and perhaps more importantly, the Sexual Assault Response Team model has the potential to increase conviction rates. Indeed, the existing data on the matter confirms that the model strengthens prosecutorial efforts against offenders by preserving physical evidence.[301] Sexual Assault Response Teams decrease the amount of trauma that victims experience in the aftermath of an assault by stressing continuity of care and minimizing the number of times that a victim has to relive her experience.[302]

---

[294] U.S. Gov't Accounting Office, GAO-11-252, U.S. Department of Justice Declinations of Indian Country Criminal Matters 17 (2011).

[295] Jennifer Cole, Structural, Organizational, and Interpersonal Factors Influencing Interprofessional Collaboration on Sexual Assault Response Teams, 31 J. Interpers. Violence 1-2 (2016).

[296] *Id.*; Myrna Raeder, *Litigating Sex Crimes in the United States: Has the Last Decade Made Any Difference?*, 6 Int'l. Comment on Evid. 37 (2009); Judith Smith, *Battered Non-Wives and Unequal Protection-Order Coverage: A Call for Reform*, 23 Yale L. & Pol'y Rev. 93 (2005).

[297] Sarah Deer, *Bystander No More? Improving the Federal Response to Sexual Violence in Indian Country*, 2017 Utah L. Rev. 771 (2017)

[298] *Id.*

[299] *Id.*

[300] Rebecca Campbell, Debra Patterson, and Lauren Lichty, *The Effectiveness of Sexual assault Nurse Examiner (SANE) Programs: A Review of Psychological, Medical, Legal, and Community Outcomes*, 6 Trauma Violence Abuse 313 (2005).

[301] See, e.g., Margaret Harrell, A Compendium of Sexual Assault Research (2009).

[302] See, e.g., Stacey Plichta, *The Emergency Department and Victims of Sexual Violence: An Assessment of Preparedness to Help*, 29 J. Health Hum. Serv. Admin. 285 (2006).

Olapade                                                                    DRAFT

The team typically includes representatives from law enforcement, the local District Attorneys office, health care, and victim advocacy organizations and, if the unit is serving a highly metropolitan area, clergy, defense attorneys, psychologists, and crime lab technicians. Most teams operate under a written protocol outlining the roles and responsibilities of each constituent agency and develop the rules through a series of collaborative meetings where all parties discuss the best way to respond to sexual assault matters. After the protocol is completed, the team meets on a regular basis to discuss its efficacy and make necessary adjustments. For the purposes of this article, however, the Sexual Assault Nurse Examiner or the Sexual Assault Forensic Examiner, provides some of the most valued services to the group because she or he will provide physical care to the victim and collect evidence from the body after the incident. The medical evidence these officials gather can provide powerful indications of identity, force used during the incident, and even consent.[303] While Sexual Assault Response Teams have been implemented in many American communities, there is still no clear, coordinated federal interagency mandate for them on Native American reservations.[304] A study of Sexual Assault Response Teams on reservations has found that only 30% of Native American lands were within a one-hour driving distance of a trained nurse examiner or response team.[305] More than that, more than two-thirds of reservations – 381 – had no team staff or examiner.[306] The result is that as the Native American Women's Health Education Resource Center has found, 44% of Indian Health Services facilities do not have anyone trained to preform forensic exams.[307]

As a last ditch effort, victims could also sue their assailants civilly to obtain redress.[308] Indeed, the rate of civil suits for sexual assault has increased since the 1970s and accelerated at ever higher rates since the turn of the millennium.[309] This trend can be explained in part by eleven factors. First, one must consider the fact that plaintiff's attorneys have begun targeting third-party defendants such as landlords, hotel owners, security companies, universities, hospitals, nursing homes, schools, employers, and government agencies – especially in matters where the alleged rapist may be "judgment proof" because his or her insurance will often refuse to cover damages in intentional torts suits.[310] Second, the victims' bar has also placed an increased emphasis on sharing litigation strategies for discovery and theories of liability, compiling databases on settlement to

---

[303] Rebecca Campbell, Debra Patterson, and Giannina Fehler-Cabral, *Using Ecological Theory to Evaluate the Effectiveness of an Indigenous Community Intervention: A Study of Sexual Assault Nurse Examiner Programs*, 46 AM. J. COMMUNITY PSCHOL. 263 (2010).

[304] Jeana Petillo, *Domestic Violence in Indian Country: Improving the Federal Government's Response to This Grave Epidemic*, 45 Conn. L. Rev. 1841, 1850 (2013)

[305] Ashley Juraska, *Sexual Assault Services Coverage on Native American Land*, 10 J. FORENSIC NURS. 92 (2014).

[306] *Id.*

[307] Julie Andrews, Bryony Heise, and Charon Asetoyer, INDIGENOUS WOMEN'S REPRODUCTIVE JUSTICE: A SURVEY OF SEXUAL ASSAULT POLICIES AND PROTOCOLS WITHIN INDIAN HEALTH SERVICE EMERGENCY ROOMS (2004).

[308] See Tom Lininger, *Is It Wrong to Sue for Rape?*, 57 DUKE L. J. 1557 (2008).

[309] See Gail Ballou, *Recourse for Rape Victims: Third Party Liability*, 4 HARV. WOMEN's L.J. 105 (1981); *New Directions from the Field: Victims' Rights and Services for the 21st Century*, OVC BULLETIN (Office for Victims of Crime. U.S. Dep't of Justice, Washington, D.C.), Aug. 1998, at 2, available at http://www.ojp.usdoj.gov/ovc/new/directions/pdftxt/bulletins/bltn17.pdf; Ellen Bublick, Tort Suits Filed by Rape and Sexual Assault Victims in civil courts: Lessons for Courts, Classrooms and Constituencies, 59 S.M.U. L. REV. 55 (2006).

[310] Lois Kanter, *Invisible Clients: Exploring Our Failure to Provide Civil Legal Services to Rape Victims*, 38 SUFFOLK U. L. REV. 253, 258 (2005); Jennifer Wriggins, *Domestic Violence Torts*, 75 S. CAL. L. REV. 121, 138 n.76 (2001); Mari Matsuda, *On Causation*, 100 COLM. L. REV. 2195, 2204 n.39 (2000).

maximize recoveries in every case, and marketing over the internet.[311] Third, advocacy groups have also made increased civil suits a *cause célèbre* of sorts as the Justice Department's Office for Victims of Crime and the National Crime Victim Law Institute, among other associations, have dedicated more resources to training attorneys representing crime victims in civil actions.[312] Fourth, potential third parties in rape civil suits have purchased negligence liability insurance at increasingly higher rates to cover damages payments in prospective suits – ironically encouraging the very lawsuits the are seeking to avoid.[313]  One obvious advantage of this option for victims with a substantial modicum of evidence, is that it permits them to collect monetary damages under the less stringent preponderance-of-the-evidence standard even if the same materials would be insufficient to procure a criminal conviction.[314] Fifth, victims can exercise more control over civil proceedings by selecting their attorney, making the call on who to sue, what theory of recovery to assert, which evidence to present, and whether to settle. By way of contrast, of course, in criminal proceedings, the victim is not a party to the prosecution, cannot choose the prosecuting attorney (at least directly), does not make the selection on which charges are filed, does not direct the presentation of evidence, or choose between settlement and trial.  Sixth, rape victims have a higher chance of recovering compensation for medical bills, lost wages, and professional service fees from civil suits rather than restitution in some jurisdictions.[315] More than that, not only is financial compensation critical for making the victim whole, it also further deters offenders in jurisdictions outside the South who may be eligible for lighter sentences because of a lack of criminal history.[316] Seventh, civil litigation can combat abusers, who for one reason or another, are immune from criminal prosecution. Plaintiffs, for instance, can sue offenders who were acquitted in criminal proceedings as well as those who successfully concealed their misconduct for prolonged periods of time to avoid the criminal statute of limitations.[317] Eighth, the prospect of civil suits can prompt insured third-parties to adopt precautions such as security system installment or night private officer patrols that deter future abusers.[318] Ninth, aside from the standard of proof differential, civil trials contain other features that are unfavorable to offenders as non-unanimous verdicts are possible,[319] abusers need not be provided with counsel,[320] confrontation is unnecessary for the defendant,[321] and plaintiffs can rely on a broader range of evidence so long as it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more or

---

[311] *New Directions from the Field: Victims' Rights and Services for the 21st Century*, OVC BULLETIN (Office for Victims of Crime. U.S. Dep't of Justice, Washington, D.C.), Aug. 1998, at 2, available at http://www.ojp.usdoj.gov/ovc/new/directions/pdftxt/bulletins/bltn17.pdf;

[312] See Tom Lininger, *Is It Wrong to Sue for Rape?*, 57 DUKE L. J. 1557 (2008).

[313] George Williams, *Programs Flourish as Insurers Push Revenue Growth*, AM. AGENT & BROKER, June 1, 2007, at 52.

[314] *Id.*; Sara Khorasani, *Harvey of Hollywood: The Face That Launched A Thousand Stories*, 41 HASTINGS COMM. & ENT L.J. 103 (2019);

[315] Mari Matsuda, *On Causation*, 100 COLM. L. REV. 2195, 2205 n.39 (2000); New Mexico v. Mercer, 106 P.3d 1283 (N.M. Ct. App. 2004); Washington v. Michaels, No. 39339-1-I, 1997 WL 785646 (Wash. Ct. App. Dec. 22, 1997) (per curiam).

[316] David Bryden and Sonja Lengnick, *Rape in the Criminal Justice System*, 87 J. CRIM. L. & CRIMINOLOGY 1194, 1244 (1997).

[317] Comment, *Civil Compensation for the Victim of Rape*, 7 T.M. COOLEY L. REV. 193 (1990).

[318] Joel Epstein and Stacia Langenbahn, THE CRIMINAL JUSTICE AND COMMUNITY RESPONSE TO RAPE 74 (1994).

[319] Linda J. Silberman, Allan R. Stein, Tobias Barrington Wolff, CIVIL PROCEDURE: THEORY AND PRACTICE XXX (2017).

[320] *Id.*

[321] *Id.*

Olapade                                                                                                           DRAFT

less probable than it would be without the evidence."[322] Tenth, under the doctrine of collateral estoppel, the small percentage of victims who manage to procure a successful criminal conviction may be able to prevent their accusers from denying guilt in the event that the elements of the tort claim for assault or battery are co-extensive with the elements of the criminal offense as they are in many states.[323] Eleventh, criminal trials in rape cases can often be postponed for prolonged periods of time because of the need for DNA testing, the need to locate material witnesses or physically evaluate the defendant or complainant. This time lag is particularly harmful here because witnesses may move or become forgetful and physical evidence may be misplaced as third parties that could be found liable often destroy records at fixed intervals.

Civil suits, though, are not without their downsides. At least five considerations are relevant here. First, rape survivors may not know that they can hire an attorney on a contingency fee basis, must reveal their identities in filing their claims,[324] often wait longer than victims in criminal cases for their matter to be resolved,[325] are not protected by rape shield laws that keep their history of intimate relations, which is their personal business, confidential,[326] are more vulnerable to abusive discovery practices under Rule 26 and its state analogs, and may have their awards limited because of the recent wave of states that have adopted comparative fault tort regimes.[327] Second, a defendant who wishes to obtain discovery through parallel proceedings or impeach the victim with evidence from civil litigation, may try to postpone criminal proceedings long enough to force the victim's hand in civil proceedings. Third, line prosecutors, who are interested in securing a conviction, for good or ill, often prefer that rape victims refrain from filing civil claims because prosecutions depend heavily on the credibility of accusers and civil litigation exposes victims to extensive cross-examination that may inflame a jury's prejudice against greedy complainants.[328] Indeed, ethical rules for state prosecutors and Supreme Court precedent have exacerbated this dilemma as state officials are often technically bound to ensure that victims do not use criminal proceedings to achieve tactical advantages in parallel civil litigation[329] and are forced to keep track of all exculpatory evidence (including inconsistent witness statements) – a task that becomes all that more difficult when she or he does not exercise sole control over trial preparation and investigation.[330] More than that, prosecutors can be reversed on direct appeal (and to a lesser extent on collateral review) if they mischaracterize victim civil proceedings that they are not even in charge of directing.[331] Fourth, accusers in rape prosecutions may be subject to impeachment based on evidence of their civil claims under Evidence Rule 401, which, of course,

---

[322] FED. R. EVID. 401; George Fisher, EVIDENCE (2013).

[323] Note, *The Collateral Estoppel Effect of Criminal Judgments in Subsequent Civil Litigation: New Law in Arkansas and the Questions Unanswered*, 54 ARK. L. REV. 127 (2001).

[324] Tom Lininger, *Is It Wrong to Sue for Rape?*, 57 DUKE L. J. 1557 (2008).

[325] *Id.*

[326] *Id.*

[327] See Ellen Bublick, *Citizen No-Duty Rules: Rape Victims and Comparative Fault*, 99 COLM. L. REV. 1413 (1999).

[328] See generally Susan Estrich, *Rape*, 95 YALE L.J. 1087 (1986); For actual reported cases where prosecutors have discouraged victims from filing civil suits, see *Webb v. State of Texas*, 232 S.W.3d 109 (Tex. Crim. App. 2007); *State of Ohio v. Ahmed*, 2005 WL 1406282, at 12 (Ohio Ct. App. June 16, 2005); *Louisiana v. Bowens*, 871 So. 2d 1178 (La. Ct. App. 2004); Martha Chamallas, *Lucky: The Sequel*, 80 IND. L.J. 441 (2005).

[329] Tom Lininger, *Is It Wrong to Sue for Rape?*, 57 DUKE L. J. 1557 (2008).

[330] See *Brady v. Maryland*, 373 U.S. 83 (1963); *Cone v. Bell*, 556 U.S. 449 (2009); *Banks v. Dretke*, 540 U.S. 668 (2004); *Williams v. Taylor*, 529 U.S. 420 (2000); *Strickler v. Greene*, 527 U.S. 263 (1999); *Arizona v. Youngblood*, 488 U.S. 51 (1988); *Turner v. United States*, 137 S. Ct. 1885 (2017); *Wearry v. Cain*, 136 S. Ct. 1002 (2016);

[331] See, e.g., *Ramirez v. State of Texas*, 96 S.W.3d 386 (Tex. App. 2002).

sets the definition of relevant evidence,[332] Rule 611(b), which permits cross-examination on matters affecting the credibility of the witness,[333] and Rule 403, which permits the exclusion of relevant evidence when the judge determines that its prejudicial effect outweighs its probative value.[334] Some State evidence codes are also quite hostile on this matter as they permit "thorough and sifting" cross-examination and ensure that "evidence of bias, prejudice, or interest of the witness for or against a party to the case is admissible" "for the purpose of attacking the credibility of the witness."[335] One might retort that this slew of evidentiary rules is not quite as negative as it appears on first glance because Federal Evidence Rule 408, which has been adopted by nearly all the States, excludes evidence of settlement offers and statements made in the course of settlement negotiations.[336] A closer reading of the provision, however, reveals that the rule does not preclude introduction of settlement offers to prove "a witness's bias or prejudice." More than that, the 2006 amendments to the rule actually highlight the unfair treatment of rape accusers under it as "an offer or acceptance of a compromise of a civil claim is excluded from all criminal cases if offered against the defendant as an admission of fault because a defendant may offer or agree to settle a litigation for reasons other than a recognition of fault."[337] The accuser, however, enjoys no such privilege as she or he may be vulnerable to impeachment because the defendant is trying to prove her or his bias rather than fault. One might respond still that ethical rules for lawyers would constrain unsavory cross-examination of accusers in trial proceedings. The ABA's Model Rules of Professional Conduct, for instance, instruct attorneys that in their representation of their clients, she or he "shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person."[338] More than that, subpart 5 of the Model rules preamble provides that a lawyer "should use the law's procedures only for legitimate purposes and not to harass or intimidate others."[339] Finally, the ABA's Standards Relating to the Administration of Criminal Justice cautions that "the interrogation of all witnesses should be conducted fairly, objectively, and with due regard for the dignity and legitimate privacy of the witness, and without seeking to intimidate or humiliate the witness unnecessarily."[340] The flaw with this retort, however, is that bar disciplinary panels rarely enforce ethics restrictions on cross-examination because proof of a violation requires evidence of an illegitimate purpose in questioning.[341] Problems are compounded further by the fact that public defenders and defense council often feel that they have an ethical obligation to cross-examine accusers as vigorously as possible.[342]

Temporary or permanent restraining orders also offer a potential avenue for relief for Native women and children.[343] To be sure, there some advantages to this approach: civil protection

---

[332] FED. R. EVID. 401.

[333] FED. R. EVID. 611.

[334] FED. R. EVID. 403.

[335] Tom Lininger, *Is It Wrong to Sue for Rape?*, 57 DUKE L. J. 1557 (2008).

[336] FED. R. EVID. 408.

[337] *Id.*

[338] ABA MODEL RULES OF PROF'L CONDUCT R. 4.4(a).

[339] ABA MODEL RULES OF PROF'L CONDUCT PMBL.

[340] ABA Criminal Justice Section Standards §4-7.6(a).

[341] Tom Lininger, *Bearing the Cross*, 74 FORDHAM L. REV. 1354 (2005).

[342] Tom Lininger, *Is It Wrong to Sue for Rape?*, 57 DUKE L. J. 1557 (2008).

[343] See ABA COMM'N ON DOMESTIC & SEXUAL VIOLENCE, SEXUAL ASSAULT CIVIL PROTECTION ORDERS (CPOS) BY STATE (2015),

Olapade                                                                          DRAFT

orders provide victims of criminal violence with an alternative to the criminal justice system where the slow nature of the proceedings, higher burden of proof, lack of available victim-centered remedies, and requirement that victims confront their assailants often makes criminal prosecution an impractical and unappealing option for victims.[344] Civil protection orders also offer victim centered options for relief that are usually more comprehensive than those available from criminal protection orders. Civil protection orders, for instance, can require the assailant to stay away from the victim, grant the victim restitution or other economic relief, and require the assailant to turn over firearms, seek counseling, or undergo drug and alcohol treatment.[345] There are at least two critical downsides with this approach, though. First, most domestic violence restraining orders are only available to individuals who were abused by their partners – which only covers about one-third of all potential cases.[346] While a victim could apply for a civil harassment restraining order, these requests may only be granted if the applicant meets a stricter burden of proof by showing through clear and convincing evidence that several harassment incidents have taken place and that there is a real danger that the unwanted attention will continue.[347] Second, many states not only require the victim to prove that she or he was assaulted in the past, but also, that the same individual is likely to attack them again in the future. This latter requirement, though, is arguably onerous and unnecessary because it is not uncommon for sexual assault victims to feel an ever-present sense of insecurity after being violated on an intimate level – such that the mere presence of the assailant triggers and re-traumatizes her.[348]

      Feminist lawyering theories also could provide a potential solution. Distinctions between different strands of feminist thought will partly illustrate why this is so.[349] Feminism in its early stages of litigation and theory focused on the ideal of "sameness" – the thought that women and men are the same and should have equal rights.[350] Equality feminism, the first school of thought, focused on legally facilitated female oppression with the goal of eliminating preferences or biases that favored men over women.[351] While this theory was helpful for eliminating first-generation barriers that openly distinguished between men and women, as was the case for anti-classification claims in the Civil Rights Movement, the limits of this theory quickly became apparent.[352] The first divide among feminist theorists occurred once scholars such as Catherine MacKinnon began

---

http://www.americanbar.org/content/dam/aba/administrative/domestic_violence1/Charts/SA%20CPO%20Final%20 2015.authcheckdam.pdf.

[344] Judith Smith, *Battered Non-Wives and Unequal Protection-Order Coverage: A Call for Reform*, 23 YALE L. & POL'Y REV. 93, 97 (2005).

[345] See ABA COMM'N ON DOMESTIC & SEXUAL VIOLENCE, SEXUAL ASSAULT CIVIL PROTECTION ORDERS (CPOS) BY STATE                                                                                           (2014), http://www.americanbar.org/content/dam/aba/administrative/domestic_violence1/Resources/statutorysummarycharts /2014%20CPO%20Availability%20Chart.authcheckdam.pdf.

[346] See 21 AMAZING SPOUSAL RAPE STATISTICS, HEALTH RES. FUNDING (Oct. 9, 2014), Http://healthresearchfunding.org/21-spousal-rape-statistics.

[347] See, e.g., Cal. Civ. Proc. Code 527.6 (2014).

[348] Hayley Jodin, *Closing the Loophole in Massachusetts Protection Order Legislation to Provide Greater Security for Victims of Sexual Assault: Has Massachusetts General Laws Chapter 258E Closed It Enough?*, 17 SUFFOLK J. TRIAL & APP. ADVOC. 102, 128 (2012).

[349] Carrie Menkel-Meadow, *Mainstream Feminist Legal Theory*, 23 PAC. L.J. 1493 (1991).

[350] *Id.* at 1497.

[351] Judith Greenberg, FRUG'S WOMEN AND THE LAW (1998).

[352] Verna St. Denis, *Feminism Is For Everybody: Aboriginal Women, Feminism and Diversity*, in MAKING SPACE FOR INDIGENOUS FEMINISM; Bell Hooks, FEMINIST THEORY FROM MARGIN TO CENTER 26 (1984).

to call out and question how conventional legal categories reinforced patriarchy.[353] The claim here was that legal categories created by men defined rules that limited women's rights.[354] The result was a focus on cultural and biological difference based feminism which sought to improve the position of women "through legal and social strategies [that] validate women's differences from men."[355] Some feminists, though, such as Angela Harris and Kimberle Crenshaw objected to MacKinnon's theories of difference because they paid insufficient attention to issues of class and ethnicity.[356] With input from the writings from very committed progressive scholars,[357] feminists have been able to consider both gender and ethnicity to bring attention to the injustices that women of color have faced in the American legal system.[358]

These feminist legal theories provide multiple proscriptions for practicing lawyers representing battered Native American women or children. Indeed, 'holistic lawyering' can take many forms. The term generally refers to a practice that is client centered and not limited by the specificity of a case.[359] Holistic lawyering practices originated in response to the unique challenges confronting less privileged clients who were often forced to grapple with health complications, addiction, loss of housing, pending child protection services cases, and other collateral consequences of their involvement with the legal system. Advocacy through interdisciplinary work and a presence in the client community are two fundamental components of this practice model.[360] The result is that the improvement of both the client's legal and non-legal position is the goal of the attorney.[361] More specifically, a holistic representation model for attorneys working on behalf of Native American women and children ought to prioritize an awareness of historical trauma and a sensitivity to the impact of certain public policies on individuals and their families.[362] In the words of former Harvard Law School Dean and Nixon Solicitor General, Erwin Griswold:

> [t]here is some tendency, with the case method, for the study of law
> to be something like the study of chess or the analysis of a bridge
> hand. When analyzing the law in intricate detail, it may be hard to
> keep in mind the vital fact that the problems really relate to people,

[353] See, e.g., Catherine MacKinnon, *Difference and Dominance: On Sex Discrimination*, in THE MORAL FOUNDATIONS OF CIVIL RIGHTS 88 (1986); Martha Chamallas, INTRODUCTION TO FEMINIST LEGAL THEORY 386 (2012); Jenna Basiliere, *Political Is Personal: Scholarly Manifestations of the Feminist Sex Wars*, 22 MICH. FEMINIST STUD. 1 (2009).
[354] *Id.*
[355] Judith Greenberg, FRUG'S WOMEN AND THE LAW 57 (1998).
[356] See, e.g., Angela Harris, *Race and Essentialism in Feminist Legal Theory*, 42 Stan. L. Rev. 581 (1990); see also Francine Skenandore, *Revisiting Santa Clara Pueblo v. Martinez: Feminist Perspectives on Tribal Sovereignty*, 17 WIS. WOMEN'S L.J. 347 (2002); Eve M. Grina, *Mainstreaming Gender in Rule of Law Initiatives in Post-Conflict Settings*, 17 Wm. & Mary J. Women & L. 435, 437 (2011)
[357] Jean Stefancic and Richard Delgado, Critical Race Theory (Second Edition): An Introduction XXX (20XX).
[358] See, e.g., Kimberle Crenshaw, *Mapping the Margins: Intersectionality, Identity, Politics, and Violence Against Women of Color*, 43 STAN. L. REV. 1241 (1991).
[359] Robin Steinberg, *Beyond Lawyering: How Holistic Representation Makes for Good Policy, Better Lawyers, and More Satisfied Clients*, 30 N.Y.U. REV. L. & SOC. CHANGE 625 (2006).
[360] *Id.*
[361] See, e.g., Michael Pinard, *Broadening the Holistic Mindset: Incorporating Collateral Consequences and Reentry into Criminal Defense Lawyering*, 31 FORDHAM URB. L.J. 067 (2004); Erik Luna, *The Practice of Restorative Justice: Punishment Theory, Holism and the Procedural Conception of Restorative Justice*, 2003 UTAH L. REV. 205.
[362] See, e.g., Christine Zuni Cruz, *On the Road Back in: Community Lawyering in Indigenous Communities*, 24 Am. Indian L. Rev. 229 (2000).

> either the people who are parties to the case, or the people who will
> be affected by the law established once the case is decided.[363]

While certain areas of the legal profession such as appellate litigation or academia naturally involve more time for quiet thinking in solitude or less client contact, lawyers working directly with clients on Native American reservations wouldn't be harmed if they tailored their practice with an awareness of psychological studies on client perception. On this matter, one must usually be circumspect in assuming that other individuals will draw identical conclusions from the same event.[364] Indeed, as UC San Diego Psychology Professor Harold Pashler has argued, "the mind is continually assigning priority to some sensory information over others, and this selection process makes a profound difference for both conscious experience and behavior." To take just a few examples, Professor Pashler, has shown that it is difficult for witnesses to "attend to and take in information from multiple sources simultaneously." Even though this conclusion may seem obvious, most lawyers would likely underestimate the degree to which these phenomena apply. In a study conducted by University of Illinois and Vanderbilt Psychology Professors Daniel Simons and Daniel Levin respectively, for instance, participants were asked to watch two teams of three basketball players perform a simple task – pass a ball amongst themselves.[365] Most sports spectators would assume that they could do so while performing other tasks. After all, almost every American with a television set or radio has listened to a program while cooking, paying bills, attending to children, holding another conservation, or multi-tasking. Yet, the participants in the Levin and Simons study, a normal cross sample of the American population, were unable to watch the passes and also notice a giant animal mascot walking through the game at the same time. Similar problems occur in the area of causal attribution. More specifically, a study by Maryland Professors Arie W. Kruglanski and Donna Webster concluded that individuals tend to prefer simple causal explanations to more complex theories of causation.[366] Again, most individuals would assume that even if this were so, one would still be able to hold domestic violence criminals legally responsible for their actions and that the average juror could conceptually separate an individual who engaged in an action that truly represented their political beliefs from an individual who performed an act that went against their convictions for ulterior reasons whether it was due to party loyalty, logrolling, or some other reason. This latter presumption, however, is not all that clear. Thus, in a study conducted by Lee Ross and Richard Nisbett where an audience to a political debate was instructed beforehand that the participants were preassigned to their positions *ex ante*, a scenario no different than the thousands of college debates and appellate oral arguments that occur in the nation every year, the listeners were still unable to recognize that the advocate may not have believed in the normative desirability of her position. This discussion is not to suggest that the vast majority of domestic violence victims are not telling the truth, assuming the goal is to catch as many deviant criminals as possible. Rather, it is only to imply that law enforcement officers seeking to rightfully take dangerous offenders of the streets will often have to tailor their witness questioning with these studies in mind lest rapists and pedophiles be permitted to stay on the streets and harm other innocent residents. After all, what good does it do to reject these psychological studies during pre-trial procedures and the trial itself, even if they might cast

---

[363] Erwin Griswold, *Law Schools and Human Relations* 37 CHI. B. REC. 199 (1956).

[364] Jean Sternlight and Jennifer Robbennolt, *Good Lawyers Should Be Good Psychologists: Insights for Interviewing and Counseling Clients*, 23 OHIO ST. J. ON DISP. RESOL. 437 (2008).

[365] See Daniel Simons and Daniel Levin, *Change Blindness*, 1 TRENDS IN COGNITIVE SCIENCE 261 (1997).

[366] Arie Kruglanski and Donna Webster, *Motivated Closing of the Mind: Seizing and Freezing*, 103 PSYCHOL. INQUIRY 1 (1991).

Olapade                                                                                          DRAFT

aspersions on the participants, if the end result of this inattention will be no conviction and a less safe reservation?

## CONCLUSION

Every individual within the United States, regardless of creed or color, possess inherent worth and dignity that the government "cannot take away." Because every life is a gift that matters, the brave women and men who place their lives on the line to defend their neighbors from sunrise to sunset must be given the power to protect the most vulnerable among us from those who would prey upon them. Nor need we choose between police protection and other priorities; for in the words of Louisiana Senator John Kennedy "Congress spent $400 million to study whether life can ever exist on Jupiter's moons, Congress appropriated $370,000 to study whether mothers love dogs as much as they love their kids,…[and] Congress appropriated $750 million to themselves to remodel one of their buildings," does anyone doubt that the several States couldn't provide police protection to defenseless women and children with those funds?