# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

HABIB OLAPADE

               Plaintiff,

    v.

YALE LAW SCHOOL

               Defendant

Date: August 13, 2019

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER

Habib Olapade

16160 Keith Harrow Blvd. Apt. 108

Houston, Texas 77084

281-550-7786

habib3355@outlook.com

## INTRODUCTION

Habib Olapade (Mr. Olapade) brings this action against Yale Law School to enjoin its racially discriminatory decision to academically disqualify him from that institution and prevent him from continuing his studies there.  Mr. Olapade accordingly seeks a temporary restraining order, preliminary injunction, permanent injunction, compensatory damages, punitive damages, and attorneys' fees and costs from Yale Law School.

## STATEMENT OF FACTS

Mr. Olapade had prepared himself for his studies at Yale Law School far before he moved to New Haven. While Mr. Olapade was enrolled at Stanford University as a college student, he took Habeas Corpus, Taxation I, First Amendment: The Speech and Press Clauses, Fourteenth Amendment, Election Law, Legislation and Regulation, Creation of the Constitution, Law and Sociology, American Legal History, and Law, History, Literature, and Philosophy Seminar at Stanford Law School under Jonathan Mitchell, Joseph Bankman, Michael W. McConnell, Nate Persily, Lanhee Chen, Michelle Dauber, Lawrence Friedman, Bernadette Meyler, and Amalia Kessler. (See Complaint Exhibit B. Habib Olapade's Stanford Transcript). Mr. Olapade received grades signifying either exceptional or successful mastery of the course material for each of the ten classes he took at Stanford Law School during his undergraduate career.

Mr. Olapade's preparation for law school extended beyond the classroom as well. During his time in college, Mr. Olapade published seven papers in the Columbia, Chicago, Washington, Texas, Ohio State, and Williams College Undergraduate Law Reviews on the Fourteenth Amendment, Election Law, the Bill of Attainder Clause, Statutory Interpretation, Federal Indian Law, Federal Courts, the Alien Torts Claim Act, and Statutory Interpretation. Mr. Olapade also penned more than thirty-four blog posts for the University of Pennsylvania on the late Justice

Scalia's jurisprudential legacy; the current constitutionality of the Senate's cloture rules; reform in the Justice Department's Office of Legal Counsel; the White House Counsel's Office; tort claims brought by disabled children playing interactive 3D video games; the Foreign Agents Registration Act; Justice Department vacancies; sanctuary cities and the anti-commandeering doctrine; the Clayton Act; the 1963 Equal Pay Act; electronic service of process; the Indian Child Welfare Act; murder prosecutions in Yellowstone Park; the President's Article II power to conduct hostilities without congressional approval; public meaning originalism; the Gorsuch confirmation hearings; state libel laws; reverse discrimination lawsuits; Section 5 of the 1965 Voting Rights Act; and third party ballot access. (See Complaint Exhibit C. Mr. Olapade's Published Papers and Blog Posts From College).

Mr. Olapade did not stop writing once he entered Yale. Indeed, during two, not three, years in law school he has submitted more than 370 pages of written work on the Declare War Clause, Article V of the U.S. Constitution, the effect of State pardons in federal deportation proceedings, the abstention doctrine; the Sherman Act's application to professional sports league practices; access to justice for domestic violence victims on Native American reservations; a national choice of law statute; Texas constitutional law; and  sports patents for classes that counted towards completion of the Juris Doctor degree. (See Complaint Exhibit D. Habib Olapade's Submitted Yale Papers). Mr. Olapade has also published more than 300 pages of private practice blog posts on topics as diverse as New Hampshire Supreme Court procedure; Minnesota Supreme Court procedure; Delaware Supreme Court procedure; New Mexico state court appeals; Texas state court appeals; Alabama state court appeals; Mississippi state court appeals; South Carolina state court appeals; Kentucky state court appeals; Georgia state court appeals; Nebraska state court appeals; Arizona state court appeals; Massachusetts state court appeals; appeals before the New York Court

of Appeals as well as the state's first, third, and fourth department; Iowa state court of appeals; appeals before the United State Court of Appeals for the Second Circuit; U.S. Supreme Court procedure; finality in federal appellate litigation; appeals under the Federal Arbitration Act; the 2001 Authorization for the Use of Military Force; the Lobbying Disclosure Act; Senate committee procedures; federal pay-to-play rules; anticipation defenses in federal patent law; the relevant geographic market in the hypothetical monopolist test; refusals to deal; the rule of reason; antitrust pleading standards in federal court; preliminary and permanent injunctions in copyright cases; §1 of the Sherman Act; §43(a) of the Lanham Act; the Robinson-Patman Act; the Foreign Trade Antitrust Improvements Act; the Hatch-Waxman Act; the filed rate doctrine; intrinsic evidence in patent claim construction; most favored nation contract clauses; hub-and-spoke agreements; tying arrangements; the prior art invalidity defense; answering complaints in patent infringement actions; the Investment company Act's registration requirements; ERISA private equity funds; mergers and acquisitions; proxy voting for publicly traded firms in M&A transactions; CFTC Registration Requirements; choice of law clauses in international trade law; commerce department investigations; bills of lading; the Buy American Act; and the U.N. Convention on Contracts for the International Sale of Goods. (Complaint Exhibit J. Corpus Juris Blog Entries).

Mr. Olapade's prior work with the Stanford Law Review in college proved useful when he elected to provide his editorial services to the Yale Journal on Regulation, Yale Journal of Law and Technology, Yale Journal of International Law, Yale Law & Policy Review, Yale Journal of Law & Humanities, and Yale Journal of Health Policy, Law, and Ethics. (See Complaint Exhibit F. Law School Journal Emails). During his two, not three, years in law school, Mr. Olapade competed in the ABA Diversity Moot Court, Yale Law School Morris Tyler Moot Court, VIS Moot Court, and Yale Law School Transactional Law Competition. Mr. Olapade and his partner,

Meenakshi Krishnan, won best team for the ABA diversity Moot in the spring of 2018. (See Complaint Exhibit N. Competition Entries and Yale Law School Bulletin Celebrating Mr. Olapade's Victory For The School). From 2017 to 2019, Mr. Olapade has provided research assistance to six professors at Yale Law School, Akhil Amar, John Witt, Myles Minor, Karin Yefet, Noah Messing, and Pat Weil. (See Complaint Exhibit M. Professor Correspondence).

Mr. Olapade was also unusually active with members of the bench and bar joining the Federalist Society, Republican National Lawyers Association, the NAACP, the Texas Appellate Advocate, Texas Appellate Bar Association, Florida Appellate Bar Association, Virginia Appellate Bar Association, Connecticut Appellate Bar Association, New York City Bar Association, New York Country Lawyers Association, and the Houston Bar Association before his second year in law school. During his time in law school, Mr. Olapade has also provided pro bono assistance to the Temporary Restraining Order Project, American Constitution Society, the New Civil Liberties Alliance, Upturn, the New Haven Book Bank, the Connecticut Food Bank, Legal Aid for Hurricane Florence Victims, the New York Bar Committee Against Revenge Porn, the Yale Black Law Students Association Pre-Law Mentoring Pipeline, the Stanford Undergraduate Interview Program, the Asylum Seeker Project, the Capital Assistance Project, the Yale Law School Marshall-Brennan Project, the Asian American Legal Defense Fund, the Lowenstein Human Rights Project, International Refugee Assistance Project, and the Colorado Pro Bono Appeals Project. (See Complaint Exhibit G. Pro Bono Emails).

Mr. Olapade handled this heavy workload while preparing for the Uniform Bar Exam in his second year. Beginning in February of 2019, Mr. Olapade began preparing and compiling a comprehensive bar exam outline spanning several hundred pages for admission to the bars of Alabama, Alaska, Arkansas, Arizona, Colorado, Connecticut, Idaho, Illinois, Iowa, Kansas,

Maine, Maryland, Massachusetts, Minnesota, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Washington, Washington DC, West Virginia, and Wyoming so he could maximize his value to employers, file amicus briefs in State and federal appellate courts in the aforementioned States, intervene on behalf of interest groups in cases pending before State and federal courts in the aforementioned States, provide pro bono services to moderate Democrats and moderate Republican candidates in those States upon graduation. Five years after his admission to the bars of the aforementioned states, Mr. Olapade hoped to apply for comity admission to the bars of Kentucky, Mississippi, Georgia, Michigan, Louisiana, and Wisconsin and to take the bar exams of California, Delaware, Nevada, and Florida to extend his activities to those states as well.

Mr. Olapade is currently the preparing nineteen books on private equity law, MLB player representation and contract negotiations, Texas oil and gas law, federal appellate procedure, Alabama appellate procedure, Texas appellate procedure, Mississippi appellate procedure, Louisiana appellate procedure, Virginia appellate procedure, Hawaii appellate procedure, Tennessee appellate procedure, Idaho appellate procedure, Montana appellate procedure, North Carolina appellate procedure, South Carolina appellate procedure, Kentucky appellate procedure, Maryland appellate procedure, Delaware appellate procedure, and Arkansas appellate procedure. Mr. Olapade began preparing these books in January of 2019. More than that, during his third year, Mr. Olapade was planning on releasing forty-six additional books on appellate procedure in the six American New England states, appellate procedure in the five American Old Northwest states, and his thirty-five book series on the various election laws of the United States.

None of this, though, was enough. Mr. Olapade was academically disqualified from Yale Law School on May 31, 2019 for receiving two failing grades in 'The Role of the State Attorney General' and 'Federal Indian Law' in the spring semester of 2019 despite his submission of one sixty page paper and one fifty-seven page final paper to the professors of both courses. Mr. Olapade also did not receive law school credit for the Constitutional Crisis/Constitutional Reform course he took under Mr. Bruce Ackerman despite submitting a fifty-five page paper to Mr. Ackerman. The final paper Mr. Olapade submitted to Mr. Ackerman was entitled *Heads Outside Counsel Wins, Tails In-House Attorneys Lose – How Corporate America Can Reduce Multijurisdictional Litigation Costs*, was fifty-five pages, and was concerned primarily with the benefits of a uniform choice of law regime in the United States and federal securities regulations that impact American corporations and private equity funds, a topic that Mr. Olapade currently has a prospective book on. (See Complaint Exhibit Y. Mr. Olapade's Paper Submitted to Mr. Ackerman). The final paper Mr. Olapade submitted to Mr. Brann and Mr. Tierney was entitled *Don't Do As I Say Or As I Do – State Constitutional Law In The Texas Supreme Court*, was sixty pages, and was concerned primarily with Texas oil and gas law and the Office of the Texas Solicitor General, two topics that Mr. Olapade currently has two prospective books on. (See Complaint Exhibit A1 Mr. Olapade's Paper Submitted to Mr. Brann and Mr. Tierney).  That paper successfully predicted that the United States Supreme Court would overrule *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City* one month before the United States Supreme Court did so. Finally, the final paper Mr. Olapade submitted to Mr. Torres was entitled *Oী Too – Why the Time has Come to Close Criminal Jurisdiction Gaps on Native American Reservations*, was fifty-seven pages, and was concerned primarily with exploring pathways for access to justice for domestic violence victims on Native American reservations. (See Complaint Exhibit F1. Mr. Olapade's Paper

Submitted to Mr. Torres). None of these instructors were responsible in whole, or in part, for Mr.

Olapade's admission; provided Mr. Olapade with a second opportunity to improve his grade before

submitting their marks; bothered to provide substantive critiques of the papers Mr. Olapade

submitted to them; were supportive of Mr. Olapade; or have written letters of recommendation on

Mr. Olapade's behalf. Indeed, only one faculty member at Yale Law School has ever written a

letter on Mr. Olapade's behalf and that letter was for a volunteer position at the New Haven Book

Bank.

## LEGAL STANDARD

### A. The Temporary Restraining Order Standard

The standard for granting a preliminary injunction and a temporary restraining order

pursuant to Rule 65 of the Federal Rules of Civil Procedure is identical. *Spencer Trask Software

& Info. Servs., LLC v. RPost Int'l, Ltd*., 190 F.Supp.2d 577, 580 (S.D.N.Y. 2002). The fundamental

purpose in granting a temporary restraining order is to preserve the court's ability to later render a

meaningful final decision on the merits by preventing irreparable harm in the interim. See *United

States v. Adler's Creamery, Inc*., 107 F.2d 987, 990 (2d Cir. 1939). In general, to secure a

temporary restraining order, the moving party must show that: (1) in the absence of an order the

party will suffer irreparable harm; and (2) either "a likelihood of success on the merits" or

"sufficiently serious questions going to the merits of the case to make it a fair ground for litigation,

and a balance of hardships tipping decidedly in its favor." *D.D. v. N.Y. City Board of Education*,

465 F.3d 503, 510 (2d Cir. 2006).

## ARGUMENT

### A. Likelihood of Success on the Merits

Title VI of the 1964 Civil Rights Act provides that '[n]o person in the United States shall,

on the ground of race, color, or national origin, be excluded from participation in, be denied the

benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.' " *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir.2001) (quoting 42 U.S.C. § 2000d). To establish a claim based on Title VI, the plaintiff must show "that the defendant discriminated against him on the basis of race, ... that discrimination was intentional, ... and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions."  Id. (internal citations omitted). In the Second Circuit, Title VI claims under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See, e.g., *Koumantaros v. City Univ. of New York*, 2007 WL 840115, at *7 (S.D.N.Y. Mar. 19, 2007); *Bettis v. Safir*, 2000 WL 1336055, at *1 (S.D.N.Y. Sept. 15, 2000). Accordingly, the first inquiry is "whether the plaintiff has successfully asserted a prima facie case of [race] discrimination against these defendants."  *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir.2004) (alterations added). To meet the burden of establishing a prima facie case of discrimination under Title VI, a plaintiff must show, through direct or indirect evidence, that: "(1) he is a member of a protected class; (2) he suffered an adverse action in pursuit of her education by defendant; (3) he was treated differently from similarly situated students who are not members of the protected class; and (4) he was qualified to continue in his educational pursuit." *Koumantaros*, 2007 WL 840115, at *8 (citing Bell v. Ohio State Univ., 351 F.3d 240, 253 (6th Cir.2003)). If a plaintiff makes out a prima facie case of discrimination, "the defendants have the burden of showing a legitimate, nondiscriminatory reason for their actions."  *Id*. "A plaintiff then has the opportunity to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.' " Id. (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). In any event, the plaintiff "bears the ultimate burden of persuasion, and must

adduce enough evidence of discrimination so that a rational fact finder can conclude that the adverse job action was more probably than not caused by discrimination.

Mr. Olapade easily satisfies the first and second elements of a prima facie case. Mr. Olapade, as an African-American man, is a member of a protected class. See, e.g., *Peters v. Molloy Coll. of Rockville Ctr.*, 2013 WL 5652503, at *10 (E.D.N.Y. Oct. 16, 2013). And, he has suffered an adverse action in pursuit of his education: he received two failing grades on the final papers he submitted for 'The Role of the State Attorney General' which was taught by Mr. Peter Brann and Mr. James Tierney and Federal Indian Law' which was taught by Mr. Gerald Torres. He also received no credit for a fifty-five page final paper he submitted to Mr. Bruce Ackerman for Mr. Ackerman's Constitutional Crisis/Constitutional Reform class. See *Peters*, 2013 WL 5652503, at *10 (holding that plaintiff satisfied the second element of a prima facie case of discrimination because "she has suffered an adverse action in pursuit of her education as a result of receiving a failing grade ... being denied graduation and conferral of a Master's Degree"); *Jacques v. Adelphi Univ.*, 2011 WL 6709443, at *5 (E.D.N.Y. Dec. 19, 2011) (holding that plaintiff's dismissal from a nurse practitioner program "constitutes an adverse action in pursuit of her education").

More than that, before even one document has been provided by the Defendants to Mr. Olapade through discovery, Mr. Olapade has already provided the Court with almost 1,200 pages of documentary evidence demonstrating that he was treated differently than similar situated students, is qualified to continue his educational pursuit, and can rebut any race neutral justification proffered by Defendants for their actions. The suspicion surrounding Yale Law School's decision is strengthened by a close analysis of Mr. Olapade's entire law school record. Here, Mr. Olapade has provided the Court with statistics documenting the journal membership, clinic participation, prize, pro bono involvement, academic competition, professor research assistantship, and book

publication numbers of prominent Yale Law School alumni and currently enrolled students. The numbers are harrowing. (Class Sheet) In a sample composed of 197 observations that is unrepresentative because it contains a disproportionate number of alumni who have served in prestigious federal or State executive, legislative, and judicial branch positions, as well as attorneys currently representing, and being paid by, defendants, Mr. Olapade ranks first in terms of journal membership, pro bono involvement, academic competitions, professor research assistantship positions, and book publication numbers. Concern is not dispelled once the sample is reduced to the most relevant sub-set of observations: individuals who are currently enrolled at Yale Law School. While the sample entries are somewhat larger because Yale Law School has added additional journals and activities since the turn of the century, Mr. Olapade retains his lead position.

Mr. Olapade is objectively "qualified to continue in his educational pursuit." In spite of the fact that law is a field of study that is pursued almost exclusively at the graduate, rather than undergraduate, level in the United States, Mr. Olapade took Habeas Corpus, Taxation I, First Amendment: The Speech and Press Clauses, Fourteenth Amendment, Election Law, Legislation and Regulation, Creation of the Constitution, Law and Sociology, American Legal History, and Law, History, Literature, and Philosophy Seminar at Stanford Law School under Jonathan Mitchell, Joseph Bankman, Michael W. McConnell, Nate Persily, Lanhee Chen, Michelle Dauber, Lawrence Friedman, Bernadette Meyler, and Amalia Kessler while he was enrolled as an undergraduate at Stanford University from 2013 to 2017. Mr. Olapade received grades signifying either exceptional or successful mastery of the course material for each of the ten classes he took at Stanford Law School during his undergraduate career. Mr. Olapade has provided the Court with seventy-eight pages documenting the eight legal journal articles and thirty-four blog post he

published at Stanford before matriculating at Yale Law School on the Equal Protection Clause; federal campaign expenditure limits; customary international law; the Violence Against Women Act; the Bill of Attainder Clause,; Statutory Construction during the Early Republican Period; Federal Debt, Land, and Tax Jury Trials in Early Republican Virginia and Kentucky; the legality of secession; the late Justice Scalia's jurisprudential legacy; the current constitutionality of the Senate's cloture rules; reform in the Justice Department's Office of Legal Counsel; the White House Counsel's Office; tort claims brought by disabled children playing interactive 3D video games; the Foreign Agents Registration Act; Justice Department vacancies; sanctuary cities and the anti-commandeering doctrine; the Clayton Act; the 1963 Equal Pay Act; electronic service of process; the Indian Child Welfare Act; murder prosecutions in Yellowstone Park; the President's Article II power to conduct hostilities without congressional approval; public meaning originalism; the Gorsuch confirmation hearings; state libel laws; reverse discrimination lawsuits; Section 5 of the 1965 Voting Rights Act; and third party ballot access.

Mr. Olapade has also provided the Court with 370 pages of written work he has submitted to the Yale Law School faculty within two years on the Declare War Clause, Article V of the U.S. Constitution, the effect of State pardons in federal deportation proceedings, the abstention doctrine; the Sherman Act's application to professional sports league practices; access to justice for domestic violence victims on Native American reservations; a national choice of law statute; Texas constitutional law; and  sports patents. What's more, Mr. Olapade has provided this Court with book drafts on the United States and United Kingdom private equity practice; Texas oil and gas law; MLB contract negotiation and player representation; federal appellate procedure; Alabama appellate procedure; Mississippi appellate procedure; Florida appellate procedure; Hawaii appellate procedure; Montana appellate procedure; Idaho appellate procedure; Louisiana

appellate procedure; Texas appellate procedure; Arkansas appellate procedure; Tennessee appellate procedure; Kentucky appellate procedure; Virginia appellate procedure; Maryland appellate procedure; Delaware appellate procedure; North Carolina appellate procedure; and South Carolina appellate procedure that was working on and had set for release later this year before he was academically disqualified (Complaint Exhibit K. Mr. Olapade's Book Drafts).

As if Defendant's decision to academically disqualify an African-American law student with twenty books set for publication was not sufficient to raise suspicion standing alone, Mr. Olapade has furnished the Court with more than 300 pages of private practice blogs that he has written and released during his time at Yale Law School on New Hampshire Supreme Court procedure; Minnesota Supreme Court procedure; Delaware Supreme Court procedure; New Mexico state court appeals; Texas state court appeals; Alabama state court appeals; Mississippi state court appeals; South Carolina state court appeals; Kentucky state court appeals; Georgia state court appeals; Nebraska state court appeals; Arizona state court appeals; Massachusetts state court appeals; appeals before the New York Court of Appeals as well as the state's first, third, and fourth department; Iowa state court of appeals; appeals before the United State Court of Appeals for the Second Circuit; U.S. Supreme Court procedure; finality in federal appellate litigation; appeals under the Federal Arbitration Act; the 2001 Authorization for the Use of Military Force; the Lobbying Disclosure Act; Senate committee procedures; federal pay-to-play rules; anticipation defenses in federal patent law; the relevant geographic market in the hypothetical monopolist test; refusals to deal; the rule of reason; antitrust pleading standards in federal court; preliminary and permanent injunctions in copyright cases; §1 of the Sherman Act; §43(a) of the Lanham Act; the Robinson-Patman Act; the Foreign Trade Antitrust Improvements Act; the Hatch-Waxman Act; the filed rate doctrine; intrinsic evidence in patent claim construction; most favored nation contract

clauses; hub-and-spoke agreements; tying arrangements; the prior art invalidity defense; answering complaints in patent infringement actions; the Investment company Act's registration requirements; ERISA private equity funds; mergers and acquisitions; proxy voting for publicly traded firms in M&A transactions; CFTC Registration Requirements; choice of law clauses in international trade law; commerce department investigations; bills of lading; the Buy American Act; and the U.N. Convention on Contracts for the International Sale of Goods.

Mr. Olapade published these pieces with the intention of taking the Uniform Bar Exam and gaining admission to the bars of the thirty-three states that currently accept the exam. Indeed, he has provided both the Court and the Defendants with a two hundred-page copy of his bar outline that he began compiling in his second rather than, third year in law school. Mr. Olapade, moreover, has provided editorial services for the Yale Journal on Regulation, Yale Journal of Law and Technology, Yale Journal of International Law, Yale Law & Policy Review, Yale Journal of Law & Humanities, and Yale Journal of Health Policy, Law, and Ethics and, served as a research assistant for Akhil Amar, John Witt, Myles Minor, Karin Yefet, Noah Messing, and Pat Weil. Notwithstanding his efforts at bar preparation and his membership in the Federalist Society, Republican National Lawyers Association, the NAACP, the Texas Appellate Advocate, Texas Appellate Bar Association, Florida Appellate Bar Association, Virginia Appellate Bar Association, Connecticut Appellate Bar Association, New York City Bar Association, New York Country Lawyers Association, and the Houston Bar Association, Defendants academically disqualified  Mr. Olapade for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

Defendants lack a defense. While the question of "whether two…[students] are similarly situated ordinarily presents a question of fact for the jury," *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir.2000), and education "is an individualized experience-like snowflakes, no two students are exactly identical." *Koumantaros*, 2007 U.S. Dist. LEXIS 19530, 2007 WL 840115 *10, Defendants ask this Court to find and pronounce publicly not only that it is possible that a "reasonable jury could not conclude that other [Yale Law School] students" – none of whom the University can identify with undergraduate credentials anywhere mirroring Mr. Olapade's – who were "similarly situated to [Mr. Olapade] were treated differently by Yale Law School faculty," but also, that there is either a fifty-fifty chance or that it is more likely than not that a jury could conclude that a student who was taking advanced law school courses at a top law school in the United States two years out of high school and who leads his peers in journal membership, pro bono involvement, academic competitions, professor research assistantship positions, and book publication numbers suddenly lacks the capacity to complete the requirements for a Juris Doctor degree and gain admission to a federal or State bar association now that he is four years older. *Williams v. Pace University*, 192 F.Supp.3d 415 (S.D.N.Y. 2016). This Court should decline that ill-advised and reversible invitation.

The record in this action also already contains evidence of discrimination or racial animus because there is material demonstrating that both Defendants and the particular faculty members implicated in this action were in no way supportive of, or professional with, Mr. Olapade while he was enrolled in their courses. For example, Mr. Ackerman, Mr. Torres, Mr. Brann, nor Mr. Tierney personally reviewed Mr. Olapade's application and decided to admit him. See *Figueroa v. New York Health & Hosps. Corp.*, 500 F.Supp.2d 224, 236 (S.D.N.Y.2007) (quoting *Watt v. New York Botanical Garden*, 2000 WL 193626, at *7 (S.D.N.Y. Feb. 16, 2000)) ("The 'underlying rationale

for the [same-actor] inference is simple: it is suspect to claim that the same manager who hired a person in the protected class would suddenly develop an aversion to members of that class.' "). More than that, while Mr. Olapade leads all currently enrolled Yale Law students when it comes to journal membership, pro bono involvement, academic competitions, professor research assistantship positions, and book publication numbers, only one faculty member has ever written a letter of recommendation on his behalf. That letter was for a non-legal volunteer position at a New Haven Book Bank. The responses of Mr. Olapade's professors, Mr. Ackerman, Mr. Torres, Mr. Brann, and Mr. Tierney do nothing to dispel the notion that there is smoke near this fire. When Mr. Olapade contacted Mr. Ackerman, Mr. Torres, Mr. Brann, nor Mr. Tierney for "advice on how…he could improve h[is] grade" on June 16, 2019, only one instructor, Mr. Brann ultimately replied – nearly one month later on July 17, 2019. Mr. Brann indicated, however, that he could not provide any feedback to Mr. Olapade on that date because Mr. Olapade initiated an appeal of his academic disqualification with Mrs. Gerken two days earlier on July 14, 2019. Because Defendants have yet to articulate any reason for the three disputed grades that Mr. Olapade received and District Courts within the Second Circuit have concluded that no deference is due on the question of "whether the challenged academic decision was substantially motivated by race" this Court need not exercise restraint when "considering whether to interfere with [Defendant's]…decision." *Jacques v. Adelphi Univ.*, 2011 WL 6709443, at *15 (E.D.N.Y. Dec. 19, 2011).

**B. Irreparable Harm**

Mr. Olapade will suffer irreparable harm if Defendant's actions are not immediately enjoined. Indeed, the Second Circuit has found that the "interruption or termination of attendance already in progress,…[suffices] to warrant an injunction in the absence of other circumstances militating in favor of such relief." *Doe v. New York Univ.*, 666 F.2d 761, 773 (2d Cir. 1981)

*superseded by rule as recognized in Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2d Cir. 2001) (holding standard of review of a district court's decision on a motion for preliminary injunction is abuse of discretion regardless of whether the district court heard live testimony); *King v. DePauw Univ.*, No. 14-70, 2014 WL 4197507 (S.D. Ind. Aug. 22, 2014) (finding that a rising college senior would likely suffer irreparable harm if his suspension were not enjoined because it would cause "either a gap or a senior-year transfer on his record"); see, e.g., *Donnelly v. Boston College*, 401 F.Supp. 1, 4 (D.Mass.1975), aff'd per curiam, 558 F.2d 634 (1st Cir.), cert. denied, 434 U.S. 987, 98 S.Ct. 618, 64 L.Ed.2d 483 (1977); *Timmerman v. University of Toledo*, 421 F.Supp. 464, 466-67 (N.D.Ohio 1976). As it was in *Doe*, so it is here. Mr. Olapade matriculated at Yale Law School in the fall of 2017, was enrolled at that institution for two years without controversy, and now has been given seven weeks' notice that he must switch professions after training to be an appellate, political law, private equity, sports, and oil and gas attorney for the past sixteen years.

## C. Balance of Hardships

The balance of hardships also tilts decidedly in Mr. Olapade's favor. This is so because Defendant's decision preventing Mr. Olapade from publishing his books on private equity law, MLB player representation and contract negotiations, Texas oil and gas law, federal appellate procedure, Alabama appellate procedure, Texas appellate procedure, Mississippi appellate procedure, Louisiana appellate procedure, Virginia appellate procedure, Hawaii appellate procedure, Tennessee appellate procedure, Idaho appellate procedure, Montana appellate procedure, North Carolina appellate procedure, South Carolina appellate procedure, Kentucky appellate procedure, Maryland, appellate procedure Delaware appellate procedure, Arkansas appellate procedure, appellate procedure in the six American New England states, appellate procedure in the five American Old Northwest states, and his thirty-five book series on the various

election laws of the United States as a newly minted lawyer; preventing Mr. Olapade from taking the Uniform Bar Exam after graduation to gain admission to the bars of Alabama, Alaska, Arkansas, Arizona, Colorado, Connecticut, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Minnesota, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Washington, Washington DC, West Virginia, Wyoming so he can maximize his value to employers, file amicus briefs in State and federal appellate courts in the aforementioned States, intervene on behalf of interest groups in cases pending before State and federal courts in the aforementioned States, provide pro bono services to moderate Democrats and moderate Republican candidates in those States upon graduation, and rise in the ranks of the American legal profession; preventing Mr. Olapade from applying for comity admission to the bars of Kentucky, Mississippi, Delaware, Georgia, Michigan, Louisiana, and Wisconsin four to five years after his anticipated graduation from law school and maximizing his value to employers, filing amicus briefs in State and federal appellate courts in the aforementioned States, intervening on behalf of interest groups in cases pending before State and federal courts in the aforementioned States, and providing pro bono services to moderate Democrats and moderate Republican candidates in those States upon graduation; preventing him from positioning himself for an associate or analyst position at an Investment Banking firm after studying abroad in the United Kingdom at Oxford; and saddling Mr. Olapade with close to $125,000 in student debt that he incurred to attend Yale Law School without any degree to procure employment in the legal sector that would assist him in paying the federal loans off far outweighs any administrative injury Defendants could plausibly claim to suffer by retaining the student who currently leads the

currently enrolled class in journal membership, pro bono involvement, academic competitions, professor research assistantship positions, and book publication numbers.

Finally, Mr. Olapade respectfully requests that this Court take notice of the fact that Defendants are currently avoiding service of process for this suit. Three separate instances support this finding. First, Yale University's registered agent for service of process in Texas, Mr. Carl B. Lee, has been unavailable for service by Mr. Olapade in Dallas, Texas (See Motion Exhibit G). This is so despite the fact that Mr. Lee service address is his workplace, Akin Gump Strauss Hauer & Feld LLP, and that he is a partner at Akin Gump. Indeed, Mr. Lee was served successfully with a demand letter as Yale University's registered agent at his work address in late July and forwarded the documents to Susan Sawyer for further examination (See Motion Exhibit H and I). Yet, on the second service attempt, Easy-Serve LLC, a Houston process server relied upon by many of the largest corporate law firms in the Bayou City, reported that his office unit was vacant upon the second attempt.

Second, in an effort to comply with Federal Rule of Civil Procedure 4, Mr. Olapade attempted to service process on Defendants through a Connecticut State Marshal. Indeed, Mr. Olapade paid almost $200 in postage and service fees to State Marshal Brian Mezick to walk less than half a mile from his work address and serve the documents on Defendants after speaking with several of Mr. Mezick's assistants on August 7, 2019 via telephone twice. Mr. Olapade paid the UPS private postage for overnight delivery and printed the documents out for Mr. Mezick to reduce Mr. Mezick's operating costs (See Motion Exhibit C). Mr. Mezick, however, stated that he could not serve the documents on Defendants once he received them on August 8, 2019 because the Federal Rules of Civil Procedure required that he be furnished with two copies of the motions and exhibits and that the motions and exhibits be in a particular order. Mr. Olapade did not receive

similar requests from other process servers in New York, New Jersey, and Texas and is unaware of any requirement in the Federal Rules of Civil Procedure that Mr. Mezick has referred to that mandate that he be provided with two copies of documents that must be served.

Third, although Mr. Olapade is not required under Rule 4 to personally notify Defendants of the current suit because he cannot effect service of process alone, he mailed the motions and complaint to Yale University's General Counsel Office and sent a follow up email to Ms. Denise Gilmore on August 5, 2019 (See Motion Exhibit G). Defendants have declined to respond. Mr. Olapade is in the process of attempting to serve Peter Salovey and has also sent Defendants a letter requesting waiver of service of process rights under Rule 4 as of August 15, 2019. Defendant's efforts to avoid service further tip the balance of equities in Mr. Olapade's favor because he has already substantially completed his books on private equity, investment banking, banking practices and regulatory compliance; Kentucky appellate procedure; and Arkansas appellate procedure yet will be unable to market them to their fullest extent if he is not permitted to take his Juris Doctor degree (See Motion Exhibits D, E,  and F). Indeed, four of the five most recent Private Equity law books that are currently available deal exclusively, or for the most part, with transactions in the United Kingdom rather than the United States. More than that, despite the fact that Arkansas and Kentucky were admitted to the union in 1836 and 1792 respectively, there is no current copy of a treatise on Arkansas appellate procedure and only three modern copies of different treatises on Kentucky appellate procedure currently in circulation. Defendants, at the very least, currently know that Mr. Olapade has copies of treatises on Texas, Kentucky, and Florida appellate procedure that were to be set for release later this year (See Complaint Exhibit X). Mr. Olapade, however, may be unable to enter the market and participate if his request for a

Temporary Restraining Order is not granted. For these reasons, Mr. Olapade ought not be required to serve or provide notice to Defendants of this motion for a Temporary Restraining Order.

## **CONCLUSION**

Mr. Olapade has demonstrated that he is likely to succeed on the merits of his claim, and that he is suffering immensely—and will continue to suffer irreparable harm—if he will not be permitted to continue his graduate studies. Mr. Olapade has also established that the balance of the equities strongly support the issuance of a temporary restraining order or preliminary injunctive relief. For the reasons set forth above, this Court should enjoin Defendants from enforcing their academic disqualification decision.


Dated: August 13, 2019

Houston, Texas


Respectfully submitted,

/s/ Habib Olapade

16160 Keith Harrow Blvd. Apt. 108

Houston, Texas 77084

281-550-7786

habib3355@outlook.com