## Appealable Judgments And Orders

Arkansas Rule of Appellate Procedure 2 sets out the class of appealable civil and criminal judgments and orders that make be taken from Arkansas Circuit Courts to the State Supreme Court. In civil cases, counsel may appeal "final judgment[s]" and orders; orders that discontinue "the action;" orders that "determine…the action and prevent…a judgment from which an appeal might be taken; orders that "strike" an "answer" or "pleading" in whole or part;[1] attorney disqualification orders;[2] orders "granting or denying" a class action certification;[3] orders that deny a motion to compel arbitration  or grant a motion to stay arbitration;[4] orders "denying" a dismissal or "summary judgment" motion based on a "sovereign immunity" defense;[5] final "civil or criminal contempt order[s]" that impose sanctions;[6] "orders that do not adjudicate all the claims in a dispute involving "multiple parties" or "multiple claims" if the Circuit Court has directed judgment for at least one claim and not provided reasons for not adjudicating the other claims in the action;"[7] orders in "probate" cases that do not involve fiduciary removal for failure to provide "a new

---

[1] Nameloc, Inc. v. Jack, Lyon & Jones, P.A., 362 Ark. 175 (2005); Allen v. Greenland, 347 Ark. 465 (2002); Arnold Fireworks Display, Inc. v. Schmidt, 307 Ark. 316 (1991).

[2] Sturdivant v. Sturdivant, 367 Ark. 514 (2006); Valley v. Phillips County Election Commission, 357 Ark. 494 (2004); International Resource Ventures, Inc. v. Diamond Min. Co. of America, Inc., 326 Ark. 765 (1996); Price v. State, 313 Ark. 96 (1993); Helena Country Club v. Brocato, 2018 Ark. 16 (2018).

[3] Carson v. Weiss, 972 SW 2d 933 (1998); Mega Life and Health Ins. Co. v. Jacola, 954 SW 2d 898 (1997); CARQUEST OF HOT SPRINGS v. GENERAL PARTS, 204 SW 3d 53 (2005); US BANK, NA v. Milburn, 100 SW 3d 674 (2003); Meadors v. Still, 40 SW 3d 294 (2001).

[4] Tyson Foods, Inc. v. Archer, 147 SW 3d 681 (2004); IGF Ins. Co. v. Hat Creek Partnership, 76 SW 3d 859 (2002); England v. Dean Witter Reynolds, Inc., 811 SW 2d 313 (1991); Chem-Ash, Inc. v. Ark. Power & Light Co., 751 SW 2d 353 (1988); Carmody v. Raymond James Financial Services, Inc., 281 SW 3d 721 (2008).

[5] ARK. STATE CLAIMS COM'N v. DUIT CONST. CO., 445 SW 3d 496 (2014); City of Fayetteville v. Romine, 284 SW 3d 10 (2008); UNIVERSITY OF ARK. FOR MED. SCIEN. v. Adams, 117 SW 3d 588 (2003); Newton v. Etoch, 965 SW 2d 96 (1998); Arkansas Lottery Com'n v. Alpha Marketing, 386 SW 3d 400 (2012).

[6] DEAN BANKS v. Riddle, 2013 Ark. App. 334 (2013).

[7] Franklin v. Osca, Inc., 825 SW 2d 812 (1992); Tulio v. Ark. Blue Cross & Blue Shield, Inc., 675 SW 2d 369 (1984); Martin v. National Bank of Commerce of El Dorado, 870 SW 2d 738 (1994); Tullock v. Eck, 845 SW 2d 517 (1993); MODLEY MACHINERY CO. v. Gray Supply Co., 833 SW 2d 772 (1992); Roe v. Arkansas Dept. of Correction, 240 SW 3d 127 (2006); Moses v. Hanna's Candle Co., 110 SW 3d 725 (2003); Shackelford v. Arkansas Power & Light Co., 976 SW 2d 950 (1998); Van DeVeer v. George's Flowers, Inc., 65 SW 3d 488; McKibben v. Mullis, 90 SW 3d 442 (2002); Bulsara v. Watkins, 2010 Ark. 453 (2010); CARQUEST OF HOT SPRINGS v. GENERAL PARTS, 204 SW 3d 53 (2005); City of Corning v. Cochran, 84 SW 3d 439 (2002); Barnhart v. City of Fayetteville, 875 SW 2d 79 (1994); FIRST FEDERAL SAV. & LOAN v. Drake, 766 SW 2d 617 (1989); Weatherford v. ARKANSAS RECLAMATION COMPANY, LLC, 2017 Ark. App. 192 (2017); Schroeder v. TOWMATE, LLC, 2017 Ark. App. 83 (2017); Price v. Carver, 513 SW 3d 877 (2017); Austin v. First Nat. Bank, 808 SW 2d 773 (1991).

bond;"[8] "special administrator" appointment, or failed "accounting" disclosure." Counsel may also appeal interlocutory orders granting, continuing, modifying, refusing, or dissolving an "injunction;" interlocutory orders vacating or sustaining an attachment or garnishment;[9] interlocutory orders denying "an application" "to dissolve or modify an injunction;" and interlocutory orders "appointing a receiver, or refusing to wind up a pending receivership."[10] The State Supreme Court will treat an appeal from a final order as also permitting it to adjudicate "any intermediate order involving the merits." Appeals from orders "disposing of a post-judgment motion" also permit the Court to adjudicate "any intermediate order involving the merits and necessarily affecting the judgment."[11] If an intermediate order may be appealed immediately, a party must do so lest the issue be waived during appellate review.[12]

It "is the duty of counsel, not the judge, the clerk, or court reporter to perfect an appeal."[13] Counsel here should also ensure that the appellant has standing to appeal. This requirement is normally satisfied if the appellant was a party to the action in the trial court and aggrieved by the judgment.[14] Parties normally do not have standing to raise a point on appeal on behalf of another party, challenge a trial court's ruling in her favor, or appeal a judgment granting full relief.[15] A party also lacks standing to appeal a decision if she agrees to a remittitur on that case.[16] If a potential appellant was not a party to the action in the lower court, she may still have standing to appeal if her pecuniary interests are affected by the judgment.[17] A lower court judgment is final once it dismisses the parties from the court, discharges them from the action, or reaches a

---

[8] Helena Regional Medical Center v. Wilson, 207 SW 3d 541 (2005); Pickens v. Black, 872 SW 2d 405 (1994); Taylor v. Hamilton, 205 SW 3d 149 (2005); Matter of Guardianship of Vesa, 892 SW 2d 491 (1995); MATTER OF ESTATE OF McLAUGHLIN, 815 SW 2d 937 (1991).

[9] *Denney v. Denney*, 464 SW 3d 920 (2015).

[10] Gammill v. Provident Life & Acc. Ins. Co., 346 Ark. 161 (2001); Gipson v. Brown, 288 Ark. 422 (1986); Doe v. Union Pacific R. Co., 323 Ark. 237 (1996); Duffield v. Benton County Stone Co., Inc., 369 Ark. 314 (2007), order aff'd, 374 Ark. 519 (2008); Ballesteros v. Roney, 2014 Ark. 412 (2014); White River Health System, Inc. v. Long, 2018 Ark. App. 284 (2018).

[11]

[12] In re Estate of Stinnett, 2011 Ark. 278 (2011).

[13] Poole v. Poole, 298 Ark. 550, 551, 768 S.W.2d 544, 545 (1989) (Hickman, J., concurring); Leon Holmes, Pitfalls of Appellate Practice: Avoiding the Serbonian Bog, 35 Ark. Lawyer 10 (Summer 2009);

[14] Springdale School Dist. No. 50 v. The Evans Law Firm, P.A., 360 Ark. 279 (2005); Forrest Const., Inc. v. Milam, 345 Ark. 1 (2001); Sebastian Lake Public Utility Co., Inc. v. Sebastian Lake Realty, 325 Ark. 85 (1996); Guffey v. Counts, 2009 Ark. App. 178 (2009), aff'd 2009 Ark. 410 (2009); Harley Dempster, 2017 Ark. App. 159 (2017).

[15] Junkin v. Northeast Arkansas Internal Medicine Clinc, P.A., 344 Ark. 544 (2001); Arkansas Dept. of Finance and Admin. V. Pharmacy Associates, Inc., 333 Ark. 451 (1998); Ball v. Foehner, 326 Ark. 409 (1996); Smith v. Hansen, 323 Ark. 188 (1996); Walker v. Kazi, 316 Ark. 616 (1994); Bynum v. Savage, 312 Ark. 137 (1993); Dunbar v. Bell, 90 Ark. 316 (1909); Sumpter v. Buchanan, 88 Ark. 118 (1908); Watkins v. Martin, 24 Ark. 14 (1862); Gazaway v. Pugh, 69 Ark. App. 297 (2000); Boyle v. A.W.A., Inc., 319 Ark. 390 (1995); Insurance from CAN v. Keene Corp., 310 Ark. 605 (1992).

[16] Kroger Co. v. Standard, 283 Ark. 44 (1984).

[17] Swindle v. Benton County Circuit Court, 363 Ark. 118 (2005); Fewell v. Pickens, 344 Ark. 368 (2001); McCoy v. Moore, 338 Ark. 740 (1999); In re $3,166,199, 337 Ark. 74 (1999); Matter of Allen, 304 Ark. 222 (1990); In re Estate of Reimer, 2010 Ark. 74 (1999).

conclusion on the parties' rights to the subject matter in controversy.[18] For the most part, conditional judgments or orders that depend on contingencies are not final for the purposes of Arkansas Rule of Appellate Procedure 2.[19] As is the case in Texas, Minnesota, California, and New York, the finality requirement is jurisdictional.[20] A judgment or order is normally not appealable unless it cover[s] all of the parties and all of the claims."[21] A named defendant who has not been served is still covered by a Circuit Court judgment or decree resolving the case because that order resolves all claims against that party.[22] If counsel is appealing a Circuit Court judgment under Arkansas Rule of Civil Procedure 54(b), she should keep in mind that a penalty may not be separated from liability to produce more than one claim for relief under the rule.[23] Neither a motion for costs nor a motion for sanctions is a "claim for relief: under Rule 54(b).[24] Here, the Circuit Court will determine that "a single claimant presents multiple claims for relief…when [her] possible recoveries are more than one in number and not mutually exclusive or, stated another way, when the facts give rise to more than one legal right or cause of action…However, when a claimant presents a number of legal theories, but will be permitted to recovery on only one of them, [her] bases for recovery are mutually exclusive, or simply presented in the alternative, and [she] has only a single claim for relief" under Rule 54(b).[25] This decision must be supported by factual findings set for in the Court's Rule 54(b) certificate.[26] The judge's Rule 54(b) decision is reviewable on appeal on an abuse of discretion standard.[27] In considering whether there is a reason for the case delay, the Circuit Court will weight "the overall policy against" premature appeals

---

[18] John Cheesman Trucking, Inc. v. Dougan, 305 Ark. 49 (1991); Robinson v. Villines, 2012 Ark. 211 (2012); Thomas v. City of Fayetteville, 2012 Ark. 120 (2012); Blackman v. Glidewell, 2011 Ark. 23 (2011); Villines v. Harris, 362 Ark. 393 (2005); Arkansas Ins. Dept. v. Baker, 358 Ark. 289 (2004); Ford Motor Co. v. Harper, 353 Ark. 328 (2003); Fisher v. Chavers, 351 Ark. 318 (2002); Haase v. Starnes, 337 Ark. 193 (1999); General Motors Acceptance Corp. v. Eubanks, 318 Ark. 640 (1994).

[19] Coleman v. Regions Bank, 364 Ark. 85 (2005); Corbit v. State, 334 Ark. 592 (1998); Delancey v. Qualls, 2012 Ark. App. 328 (2012); Eaton and Moery Farms v. Estate of Lescher, 2012 Ark. App. 67 (2012); Murphy v. Murphy, 2011 Ark. App. 205 (2011); Dobbs v. Dobbs, 99 Ark. App. 156 (2007); Mid-State Homes, Inc. v. Beverly, 20 Ark. App. 213 (1987).

[20] Hambay v. Williams, 335 Ark. 352 (1998); Alberty v. Wideman, 312 Ark. 434 (1993); Mueller v. Killam, 295 Ark. 270 (1988).

[21] Maroney v. City of Malvern, 876 SW 2d 585 (1994); Ellis v. AGRILIANCE, LLC, 2012 Ark. App. 549 (2012); Talley v. Peedin, 2015 Ark. App. 261 (2015).  Despain v. Bradburn, 2008 WL 324356 (Ark. 2008).

[22] Jackson v. Sparks Regional Medical Center, 294 SW 3d 1 (2009); GLOBAL ECONOMIC RESOURCES v. Swaminathan, 389 SW 3d 631 (2011).

[23] Austin v. First Nat. Bank, 808 SW 2d 773 (1991) (Newbern, J., concurring).

[24] Norman v. Norman, 30 SW 3d 83 (2000); Warren v. Kelso, 3 SW 3d 302 (1999); Spring Creek Living Center v. Sarrett, 883 SW 2d 820 (1994).

[25] 10 C. Wright, A. Miller & M. Kane, Federal Practice & Procedure 2657 (1998).

[26] Dowty v. Riggs, 385 SW 3d 117 (2010); Kowalski v. Rose Drugs of Dardanelle, Inc., 357 SW 3d 432 (2009); Davis v. Wausau Ins. Companies, 867 SW 2d 444 (1993); Kowalski v. Rose Drugs of Dardanelle, Inc., 357 SW 3d 432 (2009); Dunn v. AMERICAN MORTGAGE ASSOCIATES, INC., 2015 Ark. App. 358 (2015); Stouffer v. Kralicek Realty Co., 98 SW 3d 475 (2003).

[27] Curtiss-Wright Corp. v. General Elec. Co., 446 US 1 (1980); Bayird v. Floyd, 344 SW 3d 80 (2009).

against the current case exigencies.[28] Counsel should include evidence supporting the Circuit Court's factual findings in the record on appeal and abstract that evidence as well.[29] It is normally good practice to refrain from appealing a matter under Rule 54(b) when Appellate Procedure Rule 2 otherwise permits an appeal.[30] A judgment may also not be appealed through Rule 54(b) if the plaintiff non-suits the remaining defendants after entry of a judgment in favor of one of the defendants in the action in a case arising out of a single incident.[31] Nor can a plaintiff appeal an adverse judgment on one of several related claims against a single defendant by voluntarily dismissing the unresolved claims.[32] If a compulsory counterclaim is non-suited, though, the judgment is no longer final and may not be appealed via Rule 54(b) unless the nonsuited claim is adjudicated.[33]

Appeals in "juvenile cases" are subject to these same time limits. Arkansas Circuit Courts retain "jurisdiction" in cases involving "juvenile out-of-home placement" while they are on appeal. More than that, if an order is released after an "adjudication…[or disposition hearing;" "parental rights" termination hearing; or "review and permanency planning hearing" where judgment is entered one of several claims and no explanation has been provided "for not adjudicating the other claims in the action," the order may be appalled to the State Supreme Court. "All final orders awarding custody are final appealable orders." The Arkansas Supreme Court will assign priority to criminal cases, appeals involving interlocutory orders, appeals implicating attorney disqualification orders, "out-of-home placement" juvenile cases, and "final orders awarding custody."

Arkansas Appellate Court Rule 1-2 further specifies the State Supreme Court's jurisdiction. Review here is not a matter of right. More specifically, the Arkansas Supreme Court has exclusive jurisdiction over matters implicating State constitutional questions; "criminal appeals" in capital cases or where a life sentence has been handed down; petitions for writs of "quo warranto,

[28] Arkhola Sand & Gravel Co. v. Hutchinson, 726 SW 2d 674 (1987); COLEMAN'S SERV. CTR., INC. v. Southern Inns Mgt., Inc., 866 SW 2d 427 (1993).

[29] Bank of Arkansas v. First Union Nat. Bank, 30 SW 3d 110 (2000); Wormald US, Inc. v. Cedar Chem. Corp., 873 SW 2d 152 (1994); Fisher v. Citizens Bank of Lavaca, 819 SW 2d 8 (1991); Arkhola Sand & Gravel Co. v. Hutchinson, 726 SW 2d 674 (1987); Stratton v. ARKANSAS STATE HIGHWAY COM'N, 917 SW 3d 538 (1995);

[30] Allen v. Greenland, 65 SW 3d 424 (2002); Arnold Fireworks Display, Inc. v. Schmidt, 820 SW 2d 444 (1991); Crain v. Burns, 112 SW 3d 371 (2003); EAST POINSETT COUNTY SCHOOL D. NO. 14 v. Massey, 876 SW 2d 573 (1994); Wilson v. Weiss, 245 SW 3d 144 (2006); Ford v. Ford, 65 SW 3d 432 (2002); Harwell-Williams v. AR DEPT. OF HUMAN SERV., 243 SW 3d 898 (2006); Larscheid v. ARKANSAS DEPT. OF HUMAN SERV., 36 SW 3d 308 (2001); General Motors Acceptance Corp. v. Eubanks, 887 SW 2d 292 (1994); State Office of Child Support Enforcement v. Willis, 59 SW 3d 438 (2001).

[31] State Office of Child Support Enforcement v. Willis, 59 SW 3d 438 (2001).

[32] CONVENT CORPORATION v. City of North Little Rock, 2018 Ark. 45 (2018); DEER/MT. JUDEA SCHOOL DISTRICT v. Beebe, 2012 Ark. 93 (2012); Haile v. Arkansas Power and Light Co., 907 SW 2d 122 (1995); Ratzlaff v. Franz Foods of Arkansas, 500 SW 2d 379 (1973).

[33] Crockett v. CAG Investments, Inc., 361 SW 3d 262 (2010); Bevans v. DEUTSCHE BANK NAT. TRUST CO., 281 SW 3d 740 (2008); Midkiff v. Crain Ford Jacksonville, LLC, 2012 Ark. App. 185 (2012); Killian v. RA" REGGIE" GIBSON, 2011 Ark. App. 245 (2011).

prohibition, injunction, or mandamus directed to the state, county, or municipal officials or…circuit courts;" election law appeals; attorney discipline appeals; judiciary discipline appeals; and "second" or successive appeals from cases that the State Supreme Court has already decided; among other matters. The Arkansas Supreme Court, much like the Mississippi Supreme Court can also reassign cases from the Court of Appeals particularly if the matter is one "of first impression;" implicates the "public interest;" presents a legal issue in need of "clarification;" involves a federal "constitutional" question or State constitutional challenge to a State statute, regulation , or ordinance; a split among the State "Court of Appeals;" or a conflict with controlling State Supreme Court precedent.

**Permissive Appeals**

Arkansas Rule of Appellate Procedure 2, in general, permits the State Supreme Court to grant permissive appeals in cases where a protective order motion,[34] discovery production motion,[35] or production quash motion has been denied. The discretionary review petition must be filed with the State Supreme Court clerk within fourteen days of the disputed order's entry. The petition cannot exceed ten pages, not counting "supportive materials" and must be accompanied by "sufficient supporting documentation from the circuit court record" for the State Supreme Court to understand the dispute." The petition should explain why the appeal will "prevent irreparable injury;" the claim is likely to be sustained and will not "delay a scheduled trial date" as well as "the circuit court's…reasons…supporting or opposing immediate review;" "any conflict with precedent or other controlling authority as to which there is substantial ground for difference of opinion;" and the parties' diligence "in seeking or resisting an order compelling the discovery in the circuit court." Once the petition is served, opposing counsel has ten days to file a response. Replies are not permitted. If the petition is granted, the appellant must file the appeal notice with the Circuit Court clerk within ten days of the grant date and the record within thirty days "from the entry of the order allowing the appeal."[36]

---

[34] In Re Amendments to Rules of Civil Procedure, 2014 Ark. 119 (2014).

[35] Gerber Products Co. v. CECO CONCRETE CONST., 533 SW 3d 139 (2017); ENTERGY ARKANSAS, INC. v. Francis, 549 SW 3d 362 (2018).

[36] Arkansas Game & Fish Comm'n v. Heslep, 2019 Ark. 226, 2 n.2 (2019); McHughes v. Wayland, 2019 Ark. 143, 3, 572 S.W.3d 861, 862 (2019); Koppers, Inc. v. Trotter, 2019 Ark. 134, 4, 572 S.W.3d 372, 375 (2019); Betts v. USAA Gen. Indem. Co., 2019 Ark. App. 250, 4 (2019); Smith v. Brown, 2019 Ark. App. 204, 3, 575 S.W.3d 174, 175 (2019); Gibbons v. Anderson, 2019 Ark. App. 193, 8, 575 S.W.3d 144, 148 (2019); Lakeside Nursing & Rehab. Ctr., Inc. v. Rufkahr, 2019 Ark. App. 142, 2, 572 S.W.3d 461, 462 n.3 (2019); Bamburg v. Zumwalt, 2019 Ark. App. 125, 3, 571 S.W.3d 927, 929 (2019); Loving v. Loving, 2019 Ark. App. 42, 2, 569 S.W.3d 346, 348 (2019); Roach v. Roach, 2019 Ark. App. 34, 5, 571 S.W.3d 487, 490 (2019); Matter of Guardianship of Howard, 2019 Ark. App. 15, 3, 568 S.W.3d 771, 774 (2019), reh'g denied (Feb. 20, 2019); Neal v. Vaughn, 2018 Ark. App. 548, 5, 565 S.W.3d 103, 106 (2018); Thomas v. Robinson, 2018 Ark. App. 550, 3, 562 S.W.3d 905, 908 n.1 (2018); Washington Reg'l Med. Ctr. v. Nw. Physicians, LLC, 2018 Ark. App. 497, 5, 562 S.W.3d 239, 243 (2018); Prescott Sch. Dist. v. Steed, 2018 Ark. App. 424, 2, 559 S.W.3d 759, 761 (2018); Trask v. Trask, 2018 Ark. App. 400, 9, 559 S.W.3d 277, 282 (2018); Arkansas Dep't of Veterans Affairs v. Mallett, 2018 Ark. 217, 2, 549 S.W.3d 351, 352 (2018); Harris v. Parrish, 2018 Ark. App. 348, 2, 552 S.W.3d 475, 477 (2018); Stipanuk v. Williams, 2018 Ark. App. 319, 5, 552 S.W.3d 34, 37 (2018); Park Apartments at Fayetteville, LP v. Plants, 2018 Ark. 172, 3, 545 S.W.3d

## Rules For Time Deadlines

In Arkansas, as is the case in Mississippi, if a filing deadline falls on a "Saturday, Sunday,…a legal holiday" or a "day when the clerk's office is…closed," it extends to the next day that is not a "Saturday, Sunday,…a legal holiday" or day when the office is not closed.[37]

## Document Specifications and Motions Practice

All filed appeal and cross appeal notices, "motions, orders, records, transcripts, and other papers" must be written, submitted on 8 x 11 inch paper, accompanied with an authorities memo, cover sheet,[38] and service certificate, and served on opposing counsel via the electronic filing system established by Arkansas' "Administrative Office of the Courts." "No paper copies are required for electronic filings" and a service certificate must be provided with each filed document. Responses to motions are due within ten days of the motion's filing and must also be accompanied with an authorities memo.[39] Under Arkansas Appellate Court Rule 5-2, "[p]arallel citations to the regional reporter, if available, are required" and, parentheticals containing the date or year of the decision should not be included in the citation.

Every appeal notice "petition, motion, brief and" filing submitted to the Idaho or Arkansas Supreme Court or Court of Appeals must be signed by a lawyer "licensed" in the State in that individual's name. The signature certifies that the signer has read the filing and can confirm that the document "is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law," is not being submitted "for any improper purpose" to harass a litigant or delay the proceedings, and has redacted sensitive information.[40] Arkansas appellate courts, *sua sponte*,[41] or on the motion of a party can dismiss the appeal, strike a filing, and impose other monetary and non-monetary sanctions for violations of this warranty, delayed appeal prosecution, or the filing of frivolous appeals.[42] If a sanctions motion is filed, Arkansas Appellate Court Rule 6-2 provides that opposing counsel has twenty-one days to file a response. Given the inherent authority of both the Arkansas Supreme Court and the

755, 757 (2018); Flowers v. State, 2018 Ark. 163, 2, 544 S.W.3d 553, 554 (2018); US Bank Nat'l, Ass'n v. Unknown Heirs of Greenwood, 2018 Ark. App. 290, 8, 550 S.W.3d 874, 878 n.11 (2018); White River Health Sys., Inc. v. Long, 2018 Ark. App. 284, 3, 551 S.W.3d 389, 391 (2018)
Banks v. Jones, 2019 Ark. 204, 11, 575 S.W.3d 111, 119 (2019) (Hart, J., concurring); Davis Nursing Ass'n v. Neal, 2019 Ark. 91, 8, 570 S.W.3d 457, 462 (2019) (Baker, J., dissenting);

[37] Ar. R. App. P. 9; Anderson v. Citimortgage, Inc., 2013 Ark. App. 545, 4 n.1 (2013); Mancia v. Arkansas Dep't of Human Servs., No. CA12-947, 2013 WL 1776703, at *1 (Ark. Ct. App. Apr. 24, 2013); Loggins v. State, 2010 Ark. 56, 1 n.1 (2010); Ramsey v. State, 2010 Ark. 13, 1 n.1 (2010); Larscheid v. ARKANSAS DEPT. OF HUMAN SERV., 36 SW 3d 308 (2001).
[38] Ar. Sup. Ct. R. 3-7.
[39] Ar. R. App. P. 10.
[40] Ark. R. Civ. P. 5(c)(2); Ark. R. App. P. – Civ. 11(a)-(c).
[41] Ark. R. App. P. – Civ. 11(d).
[42] Bunch v. State, 2018 Ark. 379, 3, 563 S.W.3d 552, 555 (2018); Bambico v. Ouachita Indus., Inc., 2018 Ark. App. 537, 4, 564 S.W.3d 534, 536 (2018); Kuelbs v. Hill, 2011 Ark. App. 628, 6 (2011); Anderson v. State, 2010 Ark. 375 (2010) (Brown, J., concurring); Williams v. Martin, 980 SW 2d 248 (1996); Whaley v. Kroger Co., 98 SW 3d 824 (2003); Stilley v. Hubbs, 40 SW 3d 209 (2001); Eads v. Hall, 10 SW 3d 441 (2000); Financial Benefit Life Ins. Co. v. Weedman, 968 SW 2d 624 (1998).

Arkansas court of Appeals to impose sanctions, counsel can even suggest that sanctions be assessed during oral argument.[43]

The clerk's office for both the Arkansas Supreme Court and Court of Appeals is open on "business days" from eight in the morning to five in the afternoon. The Arkansas Supreme Court convenes in Little Rock "each Thursday at" nine in the morning and, the Court of Appeals convenes in the capitol as well on "Wednesday" at nine. If counsel needs to request the recusal or disqualification of an official on her or his panel, she or he can file a disqualification motion with the Court setting out the reasons for the request. "The motion," though, should "be filed" at "a reasonable time" before the case is submitted to the Court. Brief cover pages in Arkansas must display the case number and style, the name of the lower court or agency, if any; the individual who presided over the lower court proceedings, if any; the filing title; and the names, mailing addresses, telephone, fax numbers, bar numbers, and email address of all counsel of record. Each brief cover should indicate whether the filing is redacted or unredacted.

**Filing the Notice of Appeal**

Counsel litigating in Arkansas, normally, can take an appeal by filing an appeal notice and the required fee with the State Supreme Court clerk within thirty days of the appealed judgment's or order's entry and serving the notice on the lower court clerk as well as the other parties to the case.[44] This thirty-day time limit also applies to cross appeal notices.[45] A judgment is entered when it is filed in compliance with Arkansas Administrative Order 2(b) or, in other words when the clerk stamps the judgment with the entry date.[46] Cross appeal notices are required where the appellee seeks some affirmative relief that she failed to obtain in the Circuit Court – not when the appellee simply requests that the judgment be affirmed on a different basis.[47]

As is the case in Texas, Hawaii, and Idaho, failure to file appeal notices and cross appeal notices on time will be treated as a jurisdictional default.[48] If counsel fails to pay the required fee, the Arkansas Supreme Court, just like the Mississippi Supreme Court, will not accept the appeal or cross appeal notice. The Court, however, will accept faxed appeal and cross appeal notices without the fee so long as the clerk is paid within five days of the notice's submission. Cross appeal notices must be filed within ten days of the appeal notice's service. If, however, a timely motion

---

[43] US BANK, NA v. Milburn, 100 SW 3d 674 (2003).

[44] Ark. R. App. P. – Civ. 3(f); SKYRIDGE ESTATES, LLC v. Ellis, 2018 Ark. App. 182 (2018).

[45] Grayson & Grayson, PA v. Couch, 388 SW 3d 96 (2012);

[46] Ark. R. App. P.-Civ. 4(d).

[47] Aycock Pontiac, Inc. v. Aycock, 983 SW 2d 915 (1998); Moose v. Gregory, 590 SW 2d 662 (1979); Simpson Housing Solutions, LLC v. Hernandez, 347 SW 3d 1 (2009); Larscheid v. ARKANSAS DEPT. OF HUMAN SERV., 36 SW 3d 308 (2001).

[48] Wandrey v. Etchison, 210 SW 3d 892 (2005); Helena Regional Medical Center v. Wilson, 207 SW 3d 541 (2005); Stacks v. Marks, 127 SW 3d 483 (2003);  US BANK, NA v. Milburn, 100 SW 3d 674 (2003); Larscheid v. ARKANSAS DEPT. OF HUMAN SERV., 36 SW 3d 308 (2001); Harold Ives Trucking Co. v. Pro Transp., 19 SW 3d 600 (2000); Jones v. Abraham, 15 SW 3d 310 (2000).

is filed in the State Circuit Court for JNOV, a new trial,[49] reconsideration;[50] judgment alteration, vacation, or amendment, or additional or amended factual findings within ten days of the judgment's entry, the filing time period for the appeal notice runs from the date that the last motion is disposed of.[51] If the Circuit Court does not rule on the motion within thirty days after the motion's filing, the motion will be treated as if it was denied on the thirtieth day and the appeal notice should be filed within thirty days of the deadline date.[52] If the post-trial motion is denied and counsel wants to appeal that ruling, she should include a statement to that effect in the appeal notice.[53] The time for filing the appeal notice here is extended for all parties. This rule does not extend to motions for attorney's fees, costs, and interest made after entry of summary judgment did not extend the time for filing an appeal notice;[54] motions for stays pending appeal;[55] Rule 52(a) motions;[56] and motions for a new trial that do not allege a valid basis for the new trial.[57] If the motion is made before the judgment is entered, it is treated as filed on the day after the judgment is entered.[58] On the other hand, if the court never enters a judgment and grants a premature motion for JNOV, the order is not appealable.[59]

In the event that the Circuit Court does not rule on the motion within thirty days of its filing, the motion will be "deemed denied" on "the thirtieth day" and the appeal period will run from that date. Counsel can request an extension of up to fourteen days for filing the appeal notice by filing a motion within 180 days of the final judgment's or order's entry so long as she or he can demonstrate that she or he did not "receive notice" of the appealed judgment or order,[60] exercised "diligence" in prosecuting the appeal,[61] and that no prejudice that would result from the extension.[62] The last element here focuses on whether "some adverse consequences other than the cost of having to oppose the appeal and encounter the risk of reversal" will be incurred.[63] If the

---

[49] Diamond State Towing Co., Inc. v. Cash, 919 SW 2d 510 (1996); Eisner v. Fields, 998 SW 2d 421 (1999); FARM BUREAU MUT. OF AR. v. Running M Farms, 72 SW 3d 502 (2002).

[50] Reporter's Notes to Ark. R. App. P. – Civ. 4 (2001 amendment); Davidson Properties, LLC v. Summers, 244 SW 3d 674 (2006); Murchison v. Safeco Ins. Co. of Illinois, 238 SW 3d 11 (2006); Seay v. CAR Transp. Brokerage Co., Inc., 237 SW 3d 48 (2006); Centennial Bank v. TRIBUILT CONST. GROUP, 388 SW 3d 897 (2011); Whitmer v. Sullivent, 284 SW 3d 6 (2008).

[51] Helena Regional Medical Center v. Wilson, 207 SW 3d 541 (2005).

[52] O'DONOGHUE v. ALOYSIUS O'DONOGHUE, 2016 Ark. App. 29 (2016).

[53] Tate-Smith v. Cupples, 134 SW 3d 535 (2003); Wilson v. Powers, 415 SW 3d 599 (2012).

[54] Stacks v. Marks, 127 SW 3d 483 (2003).

[55] McCraw v. McCraw, 878 SW 2d 3 (1994).

[56] ARKANSAS DEPT. OF HUMAN SERVICES v. Dix, 227 SW 3d 456 (2006).

[57] Virgil v. KEITH MORGAN AND EVERGREEN PACKAGING, INC., 2013 Ark. App. 675 (2013).

[58] Benedict v. National Bank of Commerce, 951 SW 2d 562 (1997).

[59] AIR MASTERS MECHANICAL, INC. v. GOODMAN DISTRIBUTION, INC., 2015 Ark. App. 607 (2015).

[60] ARK. STATE HWY. COM'N v. PHILRITE DEV., 782 SW 2d 595 (1990).

[61] Arkco Corp. v. Askew, 200 SW 3d 444 (2004); Tissing v. ARKANSAS DEPT. OF HUMAN SERVICES, 303 SW 3d 446 (2009); Sloan v. ARK. RURAL MED. PRAC. SCHOLAR. BD., 255 SW 3d 834 (2007).

[62] RIVER VALLEY HOMES, INC. v. FREELAND-KAUFFMAN & FREDEEN, INC., 2010 Ark. App. 682 (2010).

[63] Reporter's Notes to Ark. R. App. P. – Civ. 4 (1999 amendment).

180 day period has passed, counsel must petition the State Circuit Court for recourse under Rule 60.[64]

Notice of this extension should request should be provided to opposing counsel via personal delivery, mail, or commercial delivery. An amended appeal notice can be filed with the Circuit Court clerk for free and will be treated as if it were filed on the date of the original appeal notice filing so long as the latter notice was filed on time. These time limits do not apply to election law cases where a state statute sets out a different filing period.[65]

Counsel need not fear if she or he submits a premature appeal notice before the disputed judgment or order is entered as the State Supreme Court clerk will mark the filing date as the date the attacked judgment or order is finally entered.[66] The appellate court clerks will also transfer cases that are filed in the incorrect court to the proper tribunal.

In matters involving two or more parties appealing from the same judgment or order, the Arkansas, Montana, Texas and Kentucky Supreme Courts permit multiple parties to file a joint notice of appeal or cross-appeal or a joinder motion "after filing separate…notices." State courts may also consolidate appeals *sua sponte* or on a party's motion. The appeal or cross appeal notice must identify the appealed judgment or order; "designate" the appellate record "contents;" whether the State District Court has certified the final judgment as one involving multiple parties or claims; confirm that the appellant has "ordered the transcript" and paid the court reporter; clarify whether the appeal runs to the Arkansas Supreme Court or Court of Appeals; contain a jurisdictional statement; bear certificates confirming service to the lower court as well as the other parties to the dispute below; identify the appellant; state whether the appellant has abandoned "any pending but unresolved claim."[67] This last requirement does not apply to appeals from interlocutory orders or appeals from "orders that do not adjudicate all the claims in a dispute involving "multiple parties" or "multiple claims" if the Circuit Court has directed judgment for at least one claim and not provided reasons for not adjudicating the other claims in the action. The appellate court will treat abandoned claims as if the final judgment or order disposing of them dismissed them with "prejudice." Some defects in the appeal notice such as failure to name the appellee, failure to

---

[64] Reporter's Notes to Ark. R. App. P. – Civ. 4 (2004 amendment).
[65] CITIZENS FOR A SAFER CARROLL CTY. v. Epley, 991 SW 2d 562 (1999); Weems v. Garth, 993 SW 2d 926 (1999).
[66] Worsham v. Day, 2017 Ark. 192 (2017).
[67] Rogers v. Tudor Ins. Co., 925 SW 2d 395 (1996); Helton v. Jacobs, 57 SW 3d 180 (2001); Eggestein v. Eggestein, 308 SW 3d 144 (2009); Evins v. Carvin, 426 SW 3d 549 (2013); Mann v. Pierce, 505 SW 3d 150 (2016); Emis v. Emis, 508 SW 3d 886 (2017).

designate the appealed judgment, and failure to lawyer perfect a pro se appeal are fatal.[68] Scrivener's errors, though, are not fatal.[69]

If counsel does not request the complete record from the Circuit Court clerk or court reporter, she or he should include the claims she or he "intends to rely on" during the appeal.[70] Finally, if the clerk refuses to docket the case after the record has been transmitted from either the Circuit Court or Court of Appeals, counsel can pay the filing fee for a provisional docketing and then file a motion to ensure a spot for the case on the Court calendar. If the Court clerk grants the request, the case will be docketed. If the request is denied, the case will "be stricken from the docket." Appeals by aggrieved civil servants or their employers should be filed with the Court of Appeals rather than the State Supreme Court.[71] If the appellee wishes to argue that the appeal was not filed on time, she must file a partial record and a motion to dismiss the appeal.[72]

**The Record On Appeal**

Before filing her or his appeal notice, the appellant must order a "transcript" from the court reporter and pay for the item.[73] If counsel intends to make an evidence insufficiency claim on appeal, all the evidence that is relevant to the "finding or conclusion" must be include in the record. If the appellant designates less than the entire record in her or his appeal notice, she or he has ten days from the service of the notice to designate additional portions of the record for preparation by the Court reporter and serve this document on the appellant.[74] The appellant must "direct the reporter to include" the designated portions in the record. While counsel, as is the case in Kentucky and Mississippi, is permitted to include "narrative statement[s]" for portions of the record that cannot be reported,[75] both the Arkansas Supreme Court and Court of Appeals retain the discretion to impose sanctions on litigants who abuse this privilege or include unnecessary excerpts in the record. More than that, when the parties stipulate to an agreed record, the Court cannot "affirm or dismiss the appeal" for a record deficiency "without [providing] notice to appellant and reasonable

---

[68] Binns v. Heck, 908 SW 2d 328 (1995); FARMERS & MERCHANTS BANK v. Deason, 775 SW 2d 909 (1989); Matthews v. Dodrill, 763 SW 2d 93 (1989); Finney v. Meyer, 2010 Ark. App. 403 (2010); BRUCHHAGEN v. Acord, 2015 Ark. App. 286 (2015); Callaway v. Abshure, 2013 Ark. App. 21 (2013); Bayer CropScience LP v. Schafer, 385 SW 3d 822 (2011); Conlee v. Conlee, 235 SW 3d 899 (2006); Wright v. State, 198 SW 3d 537 (2004); In re Estate of Reimer, 2010 Ark. App. 41 (2010); Rose Care, Inc. v. Ross, 209 SW 3d 393 (2005); ARKANSAS DEPT. OF HUMAN SERV. v. Shipman, 756 SW 2d 930 (1988); Davidson Properties, LLC v. Summers, 244 SW 3d 674 (2006); Martin v. Blankenship, 2010 Ark. App. 579 (2010);

[69] Duncan v. Duncan, 2009 Ark. 565, 2009 WL 3786850 (2009).

[70] Johnson v. Simes, 204 SW 3d 58 (2005); Rawles v. Arkansas Department of Human Services, 202 SW 3d 547 (2005).

[71] Bales v. City of Fort Smith, 2017 Ark. 161 (2017).

[72] Ark. R. App. P. – Civ. 5(c).

[73] Howell v. Arkansas Dep't of Human Servs., 2017 Ark. App. 154, 517 S.W.3d 431 (2017) (Court's consideration of litigant's evidence insufficiency claim was barred by litigant's failure to file a timely appeal notice);

[74] Doughty v. Douglas, 2016 Ark. App. 461, 5, 503 S.W.3d 848, 850 (2016)

[75] Neumann v. Smith, 2016 Ark. App. 14, 9, 480 S.W.3d 197, 203 (2016); State v. Rainer, 2014 Ark. 306, 13, 440 S.W.3d 315, 323 (2014)

opportunity to supply the deficiency."[76] Arkansas appellate courts just like their counterparts in Texas will assume that the partial record constitutes the entire record for the case.[77] The timely filing of the appellate record is a jurisdictional requirement.[78] Here, the record should be filed within ninety days of the appeal notice's submission or, if the matter is an interlocutory appeal from an order either granting or denying an injunction or an order refusing to appoint or appointing a receiver, thirty days from the entry of the order.[79]

In the event that the parties need to correct or modify an item in the record and cannot agree on the substance of the modification or correction, the Circuit Court will resolve the dispute on a party's motion. On the other hand, if material matter is "omitted" from the record or "misstated," the defect can be cured by party "stipulation," the Circuit Court before record transmission, "or the appellate court [either] on [a] motion" that is filed within thirty days of the appellee brief's filing or," *sua sponte*. "All other questions as to the form and content of the record shall be presented to the appellate court."[80] The appellate record should be filed with the State Supreme Court clerk within ninety days of the appeal notice's filing unless the Circuit Court clerk extends the deadline. It is the appellant's responsibility to transmit the record to the State Supreme Court clerk once the document has been certified by the Circuit Court clerk.[81]

If, however, counsel is litigating an interlocutory appeal, the record must be filed within thirty days of the appeal notice's filing. A time extension request of up to seven months for filing records that contain "stenographically reported material" can be requested if the original record filing deadline "has not yet expired;"[82] the record was originally ordered on time; the court reporter was paid for the record; all parties can respond to the request at a "hearing" or in "writing;" the extension is necessary "to include the stenographically reported material in the record" or "compile the record;" and the appellant has filed a motion with the Circuit Court disclosing the reasons for the request.[83] This motion must be served on the other parties to the action. The extension must be entered before the expiration of the original filing deadline or a previous order granting an

---

[76] Schernikau v. Williamson, 2018 Ark. App. 34, 540 S.W.3d 710 (2018) (remanding case for the purpose of bolstering the record); Kines v. McBride, 2017 Ark. App. 40, 3 n.1, 511 S.W.3d 352, 354 (2017) (noting that Court would have remanded the case to supplement the record had it reached the merits);

[77] Thrower v. State, 2018 Ark. 256, 554 S.W.3d 825 (2018) (lack of entire record in the lower court does not preclude appellate review);

[78] Hickson v. ARKANSAS DEPT. OF HUMAN SERVICES, 182 SW 3d 483 (2004); Coggins v. Coggins, 108 SW 3d 588 (2003); Seay v. Wildlife Farms, Inc., 29 SW 3d 711 (2000).

[79] US BANK, NA v. Milburn, 100 SW 3d 674 (2003); Johnson v. Langley, 218 SW 3d 363 (2005).

[80] Gore v. Heartland Community Bank, 158 SW 3d 123 (2004).

[81] Ar. R. App. P. 7.

[82] Seay v. Wildlife Farms, Inc., 29 SW 3d 711 (2000); Jordan v. White River Medical Center, 783 SW 2d 836 (1990).

[83] Ashley v. Ashley, 2016 Ark. 161, 489 S.W.3d 660 (2016) (record successfully amended on time); Little Rock v. HERMITAGE DEV. CORP., 476 SW 3d 788 (2015); Granger v. FARM BUREAU MUTUAL INSURANCE COMPANY OF ARKANSAS, INC., 2016 Ark. 25 (2016); Hairgrove v. Oden, 223 SW 3d 827 (2006); Hickson v. ARKANSAS DEPT. OF HUMAN SERVICES, 182 SW 3d 483 (2004); See Reporter's Notes to Ark. R. App. P. – Civ. 5 (2012 amendment).

extension.[84] Counsel should bear in mind that if an extension is granted and the appellate record is later found to not be in compliance with the State rules of appellate procedure, the matter will be remanded to the Circuit Court.[85]

If an extension is granted and more time is needed after the seven-month period ends or, there is not enough time to request the seven-month extension in the first place, counsel can file a certiorari request with either the Arkansas Supreme Court or Court of Appeals.[86] While the Circuit Court can grant more than one extension, it cannot extend the filing period past the later of seven months from the date the judgment or order was entered or the date that a timely filed post-trial motion was denied.[87] As is the case in Hawaii, "any party" can file a motion to dismiss or request "any other intermediate order" "by filing a partial record with the clerk." Here, it is the movant's responsibility "to transmit the certified partial record to the" Arkansas Supreme Court clerk.[88]

In civil appeals before either the Arkansas Supreme Court or Court of Appeals the record by default includes the "complaint;" the plaintiff's "exhibits;" a "summons" statement; the "answer;" the "exhibits" the defendant attached to her or his answer; the subsequent "pleadings;" the appealed judgment or order; all "post-judgment decree[s];" the orders "granting or denying post-judgment motions;" the appeal notice and record designation; the prospective claims statement; time extension requests for filing the appellate record; "[s]tipulations to abbreviated records;" stipulated testimony narratives; "introduced" "depositions;" the reporter's transcript; the "supersedeas bond;" and the cost and rule compliance certificate. On the other hand, in criminal cases, the default record is composed of "the indictment or information" return; the "[d]efendant's pleadings;" the "[s]ubsequent pleadings and orders;" the appealed judgment or order; "[v]erdict forms and written jury instructions;" post-judgment motions for a "new trial," judgment vacation or amendment; orders on post-judgment motions; the appeal notice and record designation; time extension requests for filing the appellate record; the reporter's transcript; and the "appeal bond." If counsel is raising a jury selection claim, she or he should note that both the Natural and Magnolia States do not include jury selection records in the civil or criminal record by default but rather, require counsel to designate the disputed materials in their appeal notice. Copies of pleadings that have been amended are also not included. Per longstanding custom in the clerk's office for both the State Supreme Court and the Arkansas Court of Appeals, records that are filed on time will be accepted in spite of any technical defects so long as the errors are later corrected, and the filing fee is paid.[89] On the other hand, if the clerk refuses to take the record, counsel will have to file a motion with the clerk. While these motions are often granted in criminal appeals, they are rarely, if ever,

---

[84] Davis v. Williamson, 114 SW 3d 216 (2003); Voyles v. Voyles, 842 SW 2d 21 (1992); Sullivan v. Wickliffe, 678 SW 2d 771 (1984); Osburn v. DEPT. OF HUMAN SERVICES, 15 SW 3d 673 (2000); Hickson v. ARKANSAS DEPT. OF HUMAN SERVICES, 182 SW 3d 483 (2004); Conlee v. Conlee, 235 SW 3d 899 (2006).

[85] Lancaster v. Carter, 271 SW 3d 522 (2008).

[86] Reporter's Notes to Ark. R. App. P. – Civ. 5 (2006 amendment).

[87] Pennington v. Harvest Foods, Inc., 913 SW 2d 758 (1995); MATTER OF ESTATE OF WILKINSON, 843 SW 2d 316 (1992).

[88] Ar. R. App. P. 5.

[89] DB GRIFFIN WAREHOUSES, INC. v. Sanders, 986 SW 2d 835 (1999).

granted in civil appeals unless counsel can demonstrate that the late filing was due to "an unavoidable casualty productive of the most extraordinary circumstances."[90]

The State appellate court will assume jurisdiction over the matter once the appellate record is filed.[91] The Circuit Court, though retains jurisdiction over matters that are independent of, collateral, or supplemental to, the appealed issues.[92] If a stay of the appealed order is not granted, the circuit Court retains jurisdiction to enforce the order even after the appellate record is filed.[93]

**Stays Pending Appeal**

Counsel can request a stay on appeal by filing a motion for a supersedeas bond with the Circuit Court clerk or, if the record has already been transmitted to the appellate court, the relevant appellate court clerk.[94] The instrument must cover any "costs and damages" "affirmed against appellant on appeal" including accrued interest as well as the full amount of the lower court judgment if the appeal is dismissed but may not exceed $25 million.[95] The Court will set out the number of guarantors for the bond.[96] As is the case in the Magnolia State, if a litigant "proves by a preponderance of the evidence" that a bond issuer is intentionally "dissipating or diverting assets outside of the ordinary course of its business for the purpose of evading ultimate payment of the judgment," the Court can increase the bond amount and issue the necessary orders to halt the practice.[97] In Arkansas, Montana, and Hawaii, if an individual elects to provide "security" "in the form of a bond or stipulation" or guarantor assertion, the guarantor is deemed to have submitted to the appellate court's jurisdiction and appoint the appellate court clerk as her or his agent to receive service of documents relevant to the guarantee. "Liability" here can "be enforced on motion" "without the necessity of an independent action."[98] Litigants seeking appeal of a class certification order cannot be required to post a bond.[99]

**Original Actions in the Arkansas Supreme Court**

Under Arkansas Appellate Court Rule 6-5, the State Supreme Court has "original jurisdiction" over some "extraordinary" writ requests, cases implicating the Court's "contempt"

---

[90] Thomas v. Committee "A", Arkansas State Plant Bd., 254 Ark. 997-A (1973).

[91] Barclay v. Farm Credit Services, 8 SW 3d 517 (2000); Parkerson v. Arthur, 125 SW 3d 825 (2003); Ballard v. Clark County Circuit Court, 61 SW 3d 175 (2001); Vanderpool v. Fidelity & Cas. Ins. Co., 939 SW 2d 280 (1997); McElroy v. American Medical Intern., Inc., 763 SW 2d 89.

[92] Nameloc, Inc. v. Jack, Lyon & Jones, P.A., 362 Ark. 175 (2005); Bleidt v. 555, INC., 485 SW 2d 721 (1972); Vanderpool v. Fidelity & Cas. Ins. Co., 939 SW 2d 280 (1997); McElroy v. American Medical Intern., Inc., 763 SW 2d 89 (1989).

[93] Albarran v. Liberty Healthcare Management, 431 SW 3d 310 (2013).

[94] Ark. R. Civ. P. 62(d); Ark. R. App. P. – Civ. 8(c).

[95] IN RE SPECIAL TASK FORCE ON PRACTICE AND PROCEDURE IN CIVIL CASES, 2014 Ark. 340 (2014); Bailey v. Delta Trust & Bank, 198 SW 3d 506 (2004); Jameson v. Johnson, 33 SW 3d 140 (2000); Schramm v. Piazza, 918 SW 2d 733 (1996); Ark. Code Ann. 16-55-214(a).

[96] Ryder Truck Rental, Inc. v. Sutton, 807 SW 2d 909 (1991); Home Mut. Fire Ins. Co. v. Jones, 969 SW 2d 675 (1998).

[97] Ark. Code Ann. 16-55-214(b).

[98] Ar. R. App. P. 8.

[99] BEVERLY ENTERPRISES-ARKANSAS v. Circuit Ct., 238 SW 3d 108 (2006).

powers, and appeals implicating ballot initiatives. Once the "original pleading" and "filing fee" is paid, the Court clerk will issue the appropriate "summons or other process." The Arkansas Supreme Court, however, just like the U.S. Supreme Court, will usually appoint a special master to make factual findings and refer the case to the Court for final disposition. On the other hand, if the case does not require any fact finding, the Court receive briefs on the matter as it does in regular merits cases. See this treatise's section on merits briefs for more information.

**Extraordinary Writs**

Arkansas Appellate Court Rule 6-1 governs extraordinary writ requests before the State Supreme Court and Court of Appeals. As is the case in the treasure state, these petitions can only be filed with the Supreme Court clerk when the conventional appellate process does not provide "an adequate remedy." The petition, record, and service certificate must be filed with the clerk of the State court of last resort. If the petition includes a copy of the Circuit Court record, the copy must be served on opposing counsel. On the other hand, if counsel is requesting a prohibition writ, the record copy must also be delivered to the Circuit Court judge. Counsel can request accelerated consideration of the writ request by filing a request with the Court clerk who will then approve or deny the request and, issue a modified case disposition schedule. Finally, lawyers litigating extraordinary writ cases can apply for "temporary relief" from the Court so long as notice of the application is provided to opposing counsel in the Circuit Court proceedings. Once the application is filed, opposing counsel has ten days to enter a response and request a time extension of up to ten days to file the document. If the Circuit Court proceedings are "stayed," merits briefs will normally be received on writ requests. Please see this treatise's section on merits briefs for more on the required briefing contents. Both the petition and response cannot exceed fifteen pages unless the Court orders otherwise. This page limit does not include the appendix.

**Discretionary Review Petitions**

Arkansas Appellate Court Rule 2-4 governs discretionary review petitions in the State Supreme Court. Here, the petition must be filed within eighteen days of the entrance of the appealed judgment or order and contain counsel's claims as to why "the case should be reviewed" either because of a "tie-vote" in the Court of Appeals or a conflict with a prior Arkansas Supreme Court or Court of Appeals opinion. The mere fact that a rehearing petition is filed in the Court of Appeals does not stay the time deadline for seeking certiorari. While a copy of the rearing petition filed in the Court of Appeals can be appended to the petition, the Arkansas Supreme Court will not accept any briefs on a discretionary review petition nor will it hold argument on whether to grant certiorari. Once the petition is filed, opposing counsel has ten days to file a response.  As is the case in Mississippi, if the petition is granted, the State Supreme Court clerk will issue a notice to the parties to file the merits briefs they entered in the Court of Appeals with the clerk's office along with six copies within fourteen days of the notice's service. Counsel also has the option of filing a supplemental brief of not more than "ten" pages within twenty days of the order granting the petition. A response to this filing, which, also cannot exceed "ten" pages, must be submitted within ten days of the opening supplemental brief's filing. Replies are due within five days of the response's filing date.

**Merits Briefs**

Arkansas Appellate Court Rule 4-2 governs merits briefs. The appellant's brief should contain the following sections in chronological order: (1) table of contents that should display page references to where the materials are cited in the brief, a list of the "cases arranged alphabetically" "as well as statutes, and other authorities; (2) a "jurisdictional" and "informational" statement; (3) an outline of the appellant's arguments for reversal; (4) an authorities table with page references that lists the pertinent "cases," "statutes," "rules," and "treatises;" (5) an abstract of the material in the record that is "essential for the appellate court to confirm its jurisdiction,…understand the case,…[or] decide the issues on appeal; (6) a case statement of not more than five pages; (7) argument section "not to exceed thirty pages;" (8) short prayer for relief; (9) a signature and service certificate; and (9) an appendix. The table of contents should include the abstract and appendix contents as well as "[t]he name of each witness, and the abstract page number on which his or her testimony begins." The jurisdictional statement should be included in both appellant and cross appellant briefs and is composed of two numbered paragraphs. The first numbered paragraph should identify all the issues "raised on appeal." The second paragraph should contain the following phrase "I express a belief, based on a reasoned and studied professional judgment, that this appeal raises (no) (the following) question(s) of legal significance for jurisdictional purposes." For cases where counsel is litigating a matter that is a second or successive appeal to the State Supreme Court, "material information" from "transcripts" in "prior appeals" must be included in the abstract. More than that, if the abstract is over 250 pages, "the appellant may bind it separately from…other parts of the brief." Finally, the appendix must include the pleadings that the Circuit Court used to decide each issue on appeal; all "motions… responses, replies, exhibits, and related briefs" relevant to the appealed judgment or order with the exception of exhibited "hearing[s], deposition[s], or testimony" that must be included in the abstract; "the jury's verdict forms;" jury trial waivers; any court factual findings, legal conclusions, and memo opinions; "any order adjudicating any claim against any party with or without prejudice;" Circuit Court orders permitting interlocutory appeals; all appeal notices; any post judgment motion that tolled the time period for filing an appeal notice; time extension motions for filing the appellate record; all "responses" and "replies" to the time extension motion; the lower court orders on time extension motions; and all documents that are "essential for the appellate court to confirm its jurisdiction, to understand the case, and to decide the issues on appeal." The default presumption is that the appellant's brief should be filed within forty days of the record's filing unless the case is on certiorari to the State Unemployment Compensation Board, in which case, the brief can be filed as soon as the court reporter's transcript is delivered.

The appellee's brief must comply with these same requirements with four exceptions. First, the appellee has the option of filing a response to the appellant's jurisdictional statement. Counsel, however, must append the following statement to the section "I express a belief, based on a reasoned and studied professional judgment, that the statements made by the appellant in the appellant's Jurisdictional Statement to which I have taken exception are material to understanding correctly the nature of this appeal and its disposition in the appropriate appellate court." Second, the appellee's brief must follow the same argument outline provided by the appellant. Third, as is the case in Texas, while counsel need not include any document that is featured in the appellant's

brief appendix, she or he can append a "supplemental appendix" to her or his brief that includes any document that the appellant did not include in her or his appendix. Fourth, the appellee brief is due within thirty days from the date of the filing of the appellant's brief.

Appellants may file reply briefs of up to fifteen pages within fifteen days of the date when the appellee's brief is filed. Cross-appellant briefs are also due within thirty days of the date when the appellant's brief is filed. The cross appellant may combine her or his opening and responding brief but the argument section for both filings may not "exceed thirty pages" each. Briefs, ideally, should be filed through the electronic filing system established by Arkansas' "Administrative Office of the Courts." Once the brief is filed electronically, counsel has five days to provide six copies to the appellate court clerk. In the alternative, if counsel elects to file the brief "conventionally" she or he should provide six brief copies to the clerk. The brief should be "bound on the left-hand margin," "double-spaced," and paginated with one-inch margins on each side and "proportionally spaced" fourteen-point font "with serifs." If the brief contains information that must be redacted, counsel must file six copies of the unredacted brief and one copy of the redacted brief with the clerk. Counsel can request a seven-day tme extension to file her or his merits brief by sending a letter to the clerk and opposing counsel. Compliance with these rules is critical as the Court clerk is empowered to refuse to accept a brief that does not comply with these requirements.

Arkansas Appellate Court Rule 4-5 also permits either the State Supreme Court or Court of Appeals to "dismiss" the case or "affirm the judgment or decree" while taxing the appellant if she or he fails to file a brief in a civil case after being given one opportunity to correct the deficency.[100] The Court may also dismiss misdemeanor criminal appeals if the appellant fails to file his or her brief.

**Amicus Curiae**

Under Arkansas Appellate Court Rule 4-6, any party seeking to file an amicus curiae brief in a matter pending before the Arkansas Supreme Court or Court of Appeals must obtain the consent of the Court either through a request or filed motion. These latter motions cannot exceed "five double-spaced pages," cannot include an authorities memo, must state the litigant the amicus is supporting, if any, and must be filed once the appellee's brief has been filed but cannot be submitted after the appellant has filed her or his reply brief. More than that, the motion must contain the following language: "[t]he movant has read the briefs of the appellant and appellee, and the amicus brief is necessary to address the following issue(s): _____ [list issue(s).]" The motion must be accompanied with a brief that discloses the attorney who authored the brief as well as any individual or entity who made a financial contribution to fund the brief's preparation in an unnumbered footnote on the first brief page. As is the case in Texas and Alabama, the brief must comply with the regular formatting rules (or at least the analogous appellate rules in Mississippi) set out in Chapter XX. Amici will not be permitted to file rehearing petitions or participate in oral argument.

**Oral Argument**

---

[100] Howard v. C & L USED CAR LOT, 2014 Ark. App. 339 (2014).

Under Arkansas Appellate Court Rule 5-1, counsel can request oral argument by filing a letter with the Court or inserting a request statement in any of her or his merits briefs and, serving the letter or brief on the other parties to the action. As is the case in Kentucky and Hawaii, the default presumption is that argument will be granted unless the "appeal is frivolous;" the issues have been "decided authoritatively" or the argument would not aid the decisional process. If the Court grants argument, the clerk will notify the parties of the pertinent date "may be changed only upon written motion to the court and upon a showing of good cause. If attempts to schedule oral argument may result in undue delay, the court may decide the case without oral argument." If counsel did "not request…oral argument," she or he need not appear, but, must provide notice of this non-appearance to the Court clerk five days before the argument. Normally, only two attorneys will be permitted to argue – one for each side – and each lawyer will be allotted twenty minutes unless the Court orders otherwise. If counsel needs to request more time, she or he can do so by filing a "written motion" with the Court disclosing the reasons for the request. The appellant may reserve time for rebuttal.

**Rehearing Petitions**

Rehearing motions must be filed with the Arkansas Supreme Court or Court of Appeals clerk along with the supporting brief, service certificate, merits brief, statement confirming that the motion is not being filed to "delay" the proceedings, and the required fee within eighteen days of the date that the appellate enters its judgment or order. If counsel needs to request a time extension, she or he must submit a motion to the Court disclosing any "illness" or "unavoidable casualty." Of course, the motion must contain the reasons for the rehearing by disclosing the factual or legal points the Court "overlooked," record and transcript citations to the forgotten case aspect, as well as the other arguments counseling reconsideration of the case.

Once the petition is filed, opposing counsel can enter a response on Monday, if the petition was filed in the State Supreme Court; Wednesday, if the petition was filed in the Court of Appeals; or seven days from the petition filing date. Here, the Court will grant an extension of up to one week to submit the filing. Both the petition and response cannot exceed ten pages. Neither the Arkansas Supreme Court or Court of Appeals will hold oral argument on rehearing petitions. Each party may submit only one rehearing petition. Criminal defendants are not required to file rehearing petitions to "exhaust" available State remedies under Arkansas law. Instead, once a claim has been presented to both the Arkansas Court of Appeals and State Supreme Court, the defendant's available State remedies will be exhausted.

**Certified Questions From Federal Courts**

Arkansas Appellate Court Rule 6-8 governs certification from the federal courts and may be invoked by those courts either *sua sponte* or on the motion of one of the parties with the approval of the federal court. In deciding whether to answer the certified question, the Arkansas Supreme Court, will assess whether "there is no controlling precedent" on the matter and whether the answer to the question would be "determinative" for the appeal. Once the certification order is filed, the Court has thirty days to accept or reject the case unless the Court is in recess in which case the thirty day limit will run from the day the Court reconvenes. If the order is granted, the Court clerk will provide notice to counsel of the oral argument date, briefing schedule, and Court requests for

additional portions of the record. Orders that have not been approved within thirty days will be deemed denied. As is the case in the treasure state, the certified question must be contained in the form of a certificate order addressed to the Arkansas Supreme Court and disclose "[t]he names and addresses of counsel of record," a statement of facts showing the nature of the cause and the circumstances out of which the questions or propositions of law arise, "a statement acknowledging" that the Arkansas Supreme Court can "reformulate the question" and, of course, "the question of law to be answered." "Fees and costs" for certification orders "are the same as in civil appeals" and will be "equally divided between the parties" unless the certifying court orders otherwise. The petitioning party in the federal court must "file and serve" is brief on opposing counsel in accordance with the rules set out in this treatise's section on merits briefs covering appellant briefs. Finally, in the natural state, the State court of last resort may also certify matters to other State Supreme Courts provided that there is "no controlling precedent" on the question and the answer would be "determinative" on appeal.

### Judgment Finality, Citation to Unpublished Opinions, and Other Dispositions

In Arkansas, appellate opinions issued after July 1, 2009 are "precedent and may be relied upon and cited by any party in any proceeding." On the other hand, unpublished opinions released before this date may "not be cited, quoted, or referred to by any court or in any argument, brief, or other materials presented to any court" except to establish a "res judicata, collateral estoppel or law of the case" claim." Counsel is entitled to receive a copy of every released opinion in a matter she or he litigates before either the State Supreme Court or Court of Appeals. The decision is final once the time period for filing a rehearing petition expires, the rehearing petition is denied, or, if the matter is in the Court of Appeals, once the time period for seeking a discretionary review petition has expired or, if a petition has been filed, the date the petition is disposed of.

Finally, the Arkansas Supreme Court and Court of Appeals has the right to summarily affirm unemployment compensation board cases where the appealed decision is "supported by substantial evidence," there is not "fraud" or legal error, and "an opinion would have no precedential value."

### Cost Taxation

Arkansas, unlike Mississippi, Alabama and Texas, places rather stringent limits on costs recovery on appeal. More specifically, under Arkansas Supreme Court Rule 6-7, the prevailing party can recover brief preparation costs, record and transcript preparation and transmission costs, and appeal filing fees. If the judgment is affirmed, the appellee can recover a maximum of $500 for brief preparation or $3 for every brief page prepared. On the other hand if the judgment is reversed, the appellant can recover $1000 for brief preparation or $3 for every brief page prepared and $150 in filing fees. Finally, if the judgment is affirmed in part and reversed in part, the Court will issue a mandate providing instructions on costs.

### Mandates

Arkansas Appellate Court Rule 4-3 governs mandates. Here, the appellate court clerk will "issue a mandate" once a decision is final, which usually takes at least eighteen days after the

judgment has been entered. Counsel can request a mandate stay of up to ninety days if she or he decides to seek a writ of certiorari in the U.S. Supreme Court. As is the case in the Magnolia State, albeit with some modification, the mandate stay will issue only if counsel can demonstrate "good cause," a "substantial [federal] question," and, pay a $50 fee. The Arkansas Supreme Court can "condition" the stay on the appellant's filing of a bond. If the Supreme Court rejects the certiorari petition, the State Supreme Court will issue its mandate once a copy of the denial is filed. Finally, counsel can file a motion to recall the mandate. After opposing counsel files a response, if the motion is granted, the movant will "pay all costs accrued after the" mandate's filing. The State Supreme Court will issue its mandate – the judgment, opinion, and directions on costs – twenty-one days after it enters its judgment unless it orders otherwise. The mandate's issuance, though, is stayed while the Court is considering a rehearing motion. If the rehearing motion is denied, the mandate will issue seven days after the "order denying the motion" is entered. The Circuit Court is reinvested with jurisdiction when it receives the mandate from the appellate court at the end of the appeal process.

# Federal Rules of Appellate Procedure

## Filing The Notice Of Appeal

A party can take an appeal as of right to a federal appellate court by filing an appeal notice along with the filing fee with the lower court clerk within "thirty days" of the disputed final judgment's or order's entrance.[101] This rule applies not only to final judgments and orders entered by federal

---

[101] Fed. R. App. P. 3; Fed. R. App. P. 4; Gonzalez-Rivera v. Centro Medico Del Turabo, Inc., No. 18-1991, 2019 WL 3242701, at *1 n.2 (1st Cir. July 19, 2019); PHL Variable Ins. Co. v. Town of Oyster Bay, No. 18-0575-CV, 2019 WL 2932442, at *6 (2d Cir. July 9, 2019); Johnson v. Leonard, No. 18-1833, 2019 WL 2864374, at *4 (8th Cir. July 3, 2019); Clervrain v. Scott, No. 18-3143, 2019 WL 2537621, at *1 (10th Cir. June 20, 2019); Comite Fiestas De La Calle San Sebastian, Inc. v. Soto, 925 F.3d 528, 531 (1st Cir. 2019); Ortiz-Santiago v. Barr, 924 F.3d 956, 965 (7th Cir. 2019); Vermont Ry., Inc. v. Town of Shelburne, 918 F.3d 82, 86 (2d Cir. 2019); United States v. Padgett, 917 F.3d 1312, 1314 (11th Cir. 2019); United States v. Santiago-Colon, 917 F.3d 43, 52 (1st Cir. 2019); Gilbert v. City of Chicopee, 915 F.3d 74, 81 n.6 (1st Cir. 2019); United States v. Roe, 913 F.3d 1285, 1293 (10th Cir. 2019); Torres v. Bella Vista Hosp., Inc., 914 F.3d 15, 19 (1st Cir. 2019); Husky Ventures, Inc. v. B55 Investments, Ltd., 911 F.3d 1000, 1008 (10th Cir. 2018); Barnett v. Roper, 904 F.3d 623, 630 (8th Cir. 2018); Havensight Capital LLC v. Nike, Inc., 891 F.3d 1167, 1171 (9th Cir. 2018); United States v. Melendez-Gonzalez, 892 F.3d 9, 14 n.1 (1st Cir. 2018); Akassy v. Hardy, 887 F.3d 91, 96 (2d Cir. 2018); Orr v. Plumb, 884 F.3d 923, 931 (9th Cir. 2018); United States v. Hyman, 884 F.3d 496, 498 (4th Cir.), cert. denied, 139 S. Ct. 261, 202 L. Ed. 2d 175 (2018); Bedford v. Doe, 880 F.3d 993, 995 (8th Cir. 2018); Mathias v. Superintendent Frackville SCI, 876 F.3d 462, 471 (3d Cir. 2017), cert. denied sub nom. Mathias v. Brittain, 138 S. Ct. 1707, 200 L. Ed. 2d 961 (2018); Hancock v. Cape, 875 F.3d 1079, 1086 (11th Cir. 2017); United States v. Caltabiano, 871 F.3d 210, 215 (2d Cir. 2017); Seized From v. $525,695.24, Seized From JPMorgan Chase Bank Inv. Account #xxxxxxxx, 869 F.3d 429, 434 (6th Cir. 2017), cert. denied sub nom. Salouha v. United States, 138 S. Ct. 978, 200 L. Ed. 2d 247 (2018); Sheet Metal Workers' Int'l Ass'n Local 19 v. Herre Bros., 198 F.3d 391, 394 (3d Cir. 1999) (noting that the filing of the appeal notice confers jurisdiction on the appellate court); Ayuda, Inc. v. Thornburgh, 919 F.2d 153, 156 (D.C. Cir. 1990) (Wald J., concurring in part); Venen v. Sweet, 758 F.2d 117, 121 (3d Cir. 1985) (District Court retains jurisdiction to issue orders with reference to the appellate record even after the appeal notice has been filed); Fed. R. App. P. 25; Price v. Philpot, 420 F.3d 1158, 1164 (10th Cir. 2005) (noting that Rule 25 incorporates the mailbox rule); Brown v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor, 864 F.2d 120, 121 (11th Cir. 1989) (filing is not timely unless the clerk receives the documents by the deadline); Rich v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor, 798 F.2d 432, 433 (11th Cir. 1986) (same); Shearson Lehman Bros. v. M & L Investments, 10 F.3d 1510, 1511 (10th Cir. 1993) (same); Mesa Airlines v. United States, 951 F.2d 1186, 1187 (10th Cir. 1991) (same); Long v. U.S. Dep't of Air Force, 751 F.2d 339, 342 (10th Cir. 1984) (same); United States v. Solly, 545 F.2d 874, 876 (3d Cir. 1976); Wisniewski v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor, 929 F.2d 952, 955 (3d Cir. 1991); A.G. ex rel. Maddox v. v. Elsevier, Inc., 732 F.3d 77, 79 n.1 (1st Cir. 2013); Chao Lin v. U.S. Atty. Gen., 677 F.3d 1043, 1045 (11th Cir. 2012) (petition for review is filed when it is received by the Court clerk); Carroll v. United States, 661 F.3d 87, 92 (1st Cir. 2011) (referring to minor by initials); Casanova v. Dubois, 304 F.3d 75, 79 (1st Cir. 2002) (mailbox rules applies in determining whether an inmate's 1983 claim was filed on time); Porchia v. Norris, 251 F.3d 1196, 1198 (8th Cir. 2001) ("In order to receive the benefit of the mailbox rule, prisoners must demonstrate that they timely presented their submissions to prison authorities for mailing."); Moore v. United States, 173 F.3d 1131, 1135 (8th Cir. 1999) (mailbox rules apply to 2254 motions filed by prisoners); White v. I.N.S., 6 F.3d 1312, 1318 (8th Cir. 1993); Thompson v. E.I. DuPont de Nemours & Co., 76 F.3d 530, 532 n.1 (4th Cir. 1996); Huntington Alloys, Inc. v. United Steelworkers of Am., 623 F.2d 335, 337 n.2 (4th Cir. 1980); Archdiocese of Washington v. Washington Metro. Area Transit Auth., 877 F.3d 1066, 1068 (D.C. Cir. 2017) (mailed filings must be sent through first class mail or a carrier that is at least as expeditious); Nat'l Ass'n of Manufacturers v. NLRB, No. 12-5068, 2012 WL 1521549, at *1 (D.C. Cir.

District Courts but magistrates as well. As is the case in appeals before the Minnesota, Wisconsin, Illinois, and Iowa Supreme Courts, federal appellate courts can "consolidate" two or more cases where separate appeal notices have been filed or permit two or more parties to file a "joint" appeal notice.  The filing period is extended to "sixty days" for U.S. government, its agencies, and employees. The appeal notice should name the parties, identify the disputed judgment or order, and the lower court. In class actions, only the class representative need file the appeal notice. In litigation before the Florida Supreme Court, Texas Supreme Court, New York Court of Appeals, and the thirteen federal appellate courts, if the appeal notice is filed in a civil or criminal case before the disputed judgment or order has been entered, the appeal notice will be treated as if it were filed on the day the disputed judgment or order is actually entered. More than that, the filing of a motion for JNOV, judgment amendment or alteration, attorneys' fees, additional factual findings of factual finding amendments, a new trial, or relief from the judgment stays the filing period for submitting the appeal notice until the District Court disposes of the post-trial motion. If one party files an appeal notice, the other litigants in the case can submit appeal notices of their own within the later of either the regular "thirty day" period or "fourteen days" after the first appeal notice has been filed. Counsel need not pay an additional filing fee for submitting an amended notice. While the trial court can extend the appeal notice filing period, it can only so do if counsel files a motion within "thirty days" after the expiration of the original "thirty day" filing period and the motion demonstrates "excusable neglect or good cause" for the failure to file on time. If this time extension motion is filed before the expiration of the original "thirty day" filing period, it can be ex parte. If not, opposing counsel must be provided with notice of the extension request. The extension cannot be for a time period longer than the "later" of either "thirty days" after the original filing deadline has expired or "fourteen days" after the extension is granted. If a motion for "acquittal," a new trial, or judgment "arrest" is filed, the "fourteen day" filing period runs from the date the post-trial motion is disposed of. In criminal appeals, the District Court can also extend the filing deadline for "thirty days" after the expiration of the original filing period "with or without motion and notice" so long as the requestor can show "excusable neglect or good cause."

 The District Court can also "reopen" the filing period for submitting an appeal notice if "no party would be prejudiced;" "the motion is filed within [the earlier of either] 180 days after the judgment or order is entered or within 14 days after the moving party receives notice" of the judgment; and the potential appellant did not receive notice of the judgment's entry within "twenty-one days after [its] entry." The filing period is different for criminal appeals. Here, the appeal notice should be submitted within "fourteen days" of the later of either the U.S. government's submission of its appeal notice or the entry of the disputed judgment or order. Once the appeal notice is filed, the lower court clerk will notify the other parties in the case. After the appeal notice is filed, the filer has "fourteen days" from the submission date to file a "statement" naming the parties she or he

---

Apr. 17, 2012) (same); In re Williams, 759 F.3d 66, 69 (D.C. Cir. 2014) (finding that inmate filing was submitted on time); N.L.R.B. v. Imperial House Condo., Inc., 831 F.2d 999, 1003 (11th Cir. 1987) (service is complete upon mailing); Mallick v. Int'l Bhd. of Elec. Workers, 814 F.2d 674, 675 n.3 (D.C. Cir. 1987);

represents on the appeal with the Court of Appeals clerk.[102] If a motion is filed in the lower court after the appeal is docketed in the Court of Appeals, "the movant must…notify the circuit clerk if the district court states either that it would grant the motion or that the motion raises a substantial issue."[103] Here, the Court of Appeals can either "remand" the matter "for further proceedings" even as it "retains jurisdiction" over the dispute.

The rules are slightly different for permissive appeals that the Court of Appeals can, but need not, accept.[104] Here, counsel should file a discretionary review petition with the Court of Appeals clerk

---

[102] Fed. R. App. P. 12; In re Andrews, 636 F.2d 233, 235 n.3 (8th Cir. 1980); Williams v. Bolger, 633 F.2d 410, 413 n.2 (5th Cir. 1980); Walker v. Mathews, 546 F.2d 814, 817 (9th Cir. 1976); Mayes v. Pickett, 537 F.2d 1080, 1081 (9th Cir. 1976); Pyramid Mobile Homes, Inc. v. Speake, 531 F.2d 743, 745 (5th Cir. 1976); In re Gordon, 534 F.2d 197, 198 (9th Cir. 1976); United States v. Dunham Concrete Prod., Inc., 475 F.2d 1241, 1243 (5th Cir. 1973); Olympic Ins. Co. v. H. D. Harrison, Inc., 463 F.2d 1049, 1052 n.4 (5th Cir. 1972); In re Chandler, 450 F.2d 813, 817 (9th Cir. 1971); Bus. Forms Finishing Serv., Inc. v. Carson, 463 F.2d 966, 966 (7th Cir. 1971); Louie v. Carnevale, 443 F.2d 912, 912 n.1 (9th Cir. 1971); King v. Laborers Int'l Union of N. Am., Union Local No. 818, 443 F.2d 273, 276 (6th Cir. 1971); Gilroy v. Erie Lackawanna R. Co., 421 F.2d 1321, 1322 (2d Cir. 1970); Grantham v. Morgan Linen Serv. Inc., 426 F.2d 237, 237 (7th Cir. 1970); Waterman S. S. Corp. v. Gay Cottons, 419 F.2d 372, 374 (9th Cir. 1969); Olympic Ins. Co. v. H. D. Harrison, Inc., 418 F.2d 669, 669 (5th Cir. 1969).

[103] Fed. R. App. P. 12.1; United States v. Spectrum Brands, Inc., 924 F.3d 337, 347 (7th Cir. 2019); Dobyns v. United States, 915 F.3d 733, 737 (Fed. Cir. 2019); United States v. Chin, 913 F.3d 251, 255 (1st Cir. 2019); United States v. Bolton, 908 F.3d 75, 87 (5th Cir. 2018); United States v. Naphaeng, 906 F.3d 173, 177 (1st Cir. 2018), cert. denied, 139 S. Ct. 1233, 203 L. Ed. 2d 246 (2019); United States v. Caguana, 884 F.3d 681, 683 (7th Cir. 2018); Mendia v. Garcia, 874 F.3d 1118, 1119 (9th Cir. 2017); Moore v. Tangipahoa Par. Sch. Bd., 864 F.3d 401, 404 (5th Cir. 2017); Darnell v. Pineiro, 849 F.3d 17, 28 n.7 (2d Cir. 2017); In re Cent. Illinois Energy Coop., 847 F.3d 873, 874 (7th Cir. 2017); United States v. George, 841 F.3d 55, 72 (1st Cir. 2016); Moore v. Tangipahoa Par. Sch. Bd., 836 F.3d 503, 504 (5th Cir. 2016); Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion, 832 F.3d 92, 102 n.6 (2d Cir. 2016); United States v. Rodriguez-Milian, 820 F.3d 26, 35 (1st Cir. 2016); United States v. Cardoza, 790 F.3d 247, 248 (1st Cir. 2015); United States v. Maldonado-Rios, 790 F.3d 62, 63 (1st Cir. 2015); In re Checking Account Overdraft Litig., 754 F.3d 1290, 1297 (11th Cir. 2014); Mendez v. Republic Bank, 725 F.3d 651, 656 (7th Cir. 2013); United States v. Renteria, 720 F.3d 1245, 1252 (10th Cir. 2013); Binta B. ex rel. S.A. v. Gordon, 710 F.3d 608, 616 (6th Cir. 2013); Mosley v. Atchison, 689 F.3d 838, 843 (7th Cir. 2012); Gilbert v. Residential Funding LLC, 678 F.3d 271, 275 (4th Cir. 2012); Copar Pumice Co. v. Morris, 639 F.3d 1025, 1029 (10th Cir. 2011); United States v. Madrid, 633 F.3d 1222, 1227 (10th Cir. 2011); Ohio Willow Wood Co. v. Thermo-Ply, Inc., 629 F.3d 1374, 1375 (Fed. Cir. 2011); Lopez Dominguez v. Gulf Coast Marine & Assocs., Inc., 607 F.3d 1066, 1074 n.5 (5th Cir. 2010).

[104] Fed. R. App. P. 5; J & L Brown Family, LLC v. Bradshaw, No. 18-3176, 2019 WL 3027589, at *3 (10th Cir. July 11, 2019); In re Wade, 926 F.3d 447, 449 (7th Cir. 2019); Los Lobos Renewable Power, LLC v. Americulture, Inc, 885 F.3d 659, 663 (10th Cir.), cert. denied sub nom. AmeriCulture, Inc. v. Los Lobos Renewable Power, LLC, 139 S. Ct. 591, 202 L. Ed. 2d 427 (2018); Roberts v. AT&T Mobility LLC, 877 F.3d 833, 837 (9th Cir. 2017), cert. denied, 138 S. Ct. 2653, 201 L. Ed. 2d 1051 (2018); Waggoner v. Barclays PLC, 875 F.3d 79, 92 (2d Cir. 2017), cert. denied, 138 S. Ct. 1702, 200 L. Ed. 2d 954 (2018); Mei Xing Yu v. Hasaki Rest., Inc., 874 F.3d 94, 96 (2d Cir. 2017); LVNV Funding, LLC v. Harling, 852 F.3d 367, 370 (4th Cir. 2017), as amended (Apr. 6, 2017); Sheet Metal Employers Indus. v. Absolut Balancing Co., 830 F.3d 358, 361 (6th Cir. 2016); Little v. Louisville Gas & Elec. Co., 805 F.3d 695, 699 (6th Cir. 2015); Bank of New York Mellon Corp. v. Comm'r, 801 F.3d 104, 110 (2d Cir. 2015); Briggs v. Merck Sharp & Dohme, 796 F.3d 1038, 1046 (9th Cir. 2015); Arbogast v. Kansas, Dep't of Labor, 789 F.3d 1174, 1179 n.2 (10th Cir. 2015); Stockwell v. City & Cty. of San Francisco, 749 F.3d 1107, 1111 (9th Cir. 2014);

along with "proof of service" within the "thirty day" deadline if a federal statute does not provide otherwise. If a party cannot file the petition unless the District Court "enters an order granting permission," the trial court can "amend" its order *sua sponte* or on a party's motion. Once the order is amended, the time period for filing the appeal runs from the date the amended order is entered and the appellant has "fourteen days" to either pay the lower court clerk the filing fee or provide collateral for costs on appeal. The petition should include a statement of facts; "the "question[s] presented;" the "relief sought;" an argument section and a jurisdictional statement as well as appended copies of the disputed District Court judgment or order and the District Court order granting permission to appeal. Opposing counsel may submit a "response" "within ten days" of the petition's service. The petition and response each cannot "exceed 5,200 words" and must be

---

Cutrone v. Mortg. Elec. Registration Sys., Inc., 749 F.3d 137, 141 (2d Cir. 2014); In re DEEPWATER HORIZON, 753 F.3d 516, 518 (5th Cir. 2014); Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians, 746 F.3d 588, 589 (5th Cir. 2014); In re BP RE, L.P., 744 F.3d 1371 (5th Cir. 2014); Sepulvado v. Jindal, 739 F.3d 716 (5th Cir. 2013); Eastman v. First Data Corp., 736 F.3d 675, 676 (3d Cir. 2013); Munroe v. Cont'l W. Ins. Co., 735 F.3d 783, 789 (8th Cir. 2013); Peterson v. Somers Dublin Ltd., 729 F.3d 741, 746 (7th Cir. 2013); Lonatro v. United States, 714 F.3d 866, 869 (5th Cir. 2013); Pashby v. Delia, 709 F.3d 307, 318 (4th Cir. 2013); Gelder v. Coxcom Inc., 696 F.3d 966, 967 (10th Cir. 2012); Rural Water Sewer & Solid Waste Mgmt., Dist. No. 1, Logan Cty., Oklahoma v. City of Guthrie, 654 F.3d 1058, 1062 (10th Cir. 2011); Reese v. BP Expl. (Alaska) Inc., 643 F.3d 681, 689 (9th Cir. 2011); In re Zarnel, 619 F.3d 156, 160 (2d Cir. 2010); New York SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 103 (2d Cir. 2010); Froud v. Anadarko E & P Co. P'ship, 607 F.3d 520, 522 (8th Cir. 2010); Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc., 585 F.3d 236, 237 (5th Cir. 2009); In re Ames Dep't Stores, Inc., 582 F.3d 422, 426 (2d Cir. 2009); In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 34 (2d Cir. 2009); Vallario v. Vandehey, 554 F.3d 1259, 1262 (10th Cir. 2009); Blausey v. U.S. Tr., 552 F.3d 1124, 1129 (9th Cir. 2009); Estate of Storm v. Nw. Iowa Hosp. Corp., 548 F.3d 686, 688 (8th Cir. 2008); In re Coleman, 539 F.3d 1168, 1169 (9th Cir. 2008); Spivey v. Vertrue, Inc., 528 F.3d 982, 986 (7th Cir. 2008); Gutierrez v. Johnson & Johnson, 523 F.3d 187, 195 (3d Cir. 2008); In re Davis, 512 F.3d 856, 857 (6th Cir. 2008); Tuepker v. State Farm Fire & Cas. Co., 507 F.3d 346, 350 (5th Cir. 2007); Serrano v. 180 Connect, Inc., 478 F.3d 1018, 1020 n.2 (9th Cir. 2007); Main Drug, Inc. v. Aetna U.S. Healthcare, Inc., 475 F.3d 1228, 1229 (11th Cir. 2007); DiTolla v. Doral Dental IPA of New York, 469 F.3d 271, 274 (2d Cir. 2006); Halliburton Co. Benefits Comm. v. Graves, 463 F.3d 360, 369 (5th Cir. 2006), decision clarified on denial of reh'g, 479 F.3d 360 (5th Cir. 2007); Gamboa v. Velez, 457 F.3d 703, 705 (7th Cir. 2006); Hart v. FedEx Ground Package Sys. Inc., 457 F.3d 675, 679 (7th Cir. 2006); Roth v. King, 449 F.3d 1272, 1282 (D.C. Cir. 2006); Evans v. Walter Indus., Inc., 449 F.3d 1159, 1162 (11th Cir. 2006); Patterson v. Dean Morris, L.L.P., 444 F.3d 365, 368 (5th Cir. 2006); Roberto v. Dep't of Navy, 440 F.3d 1341, 1351 (Fed. Cir. 2006); Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 314 (4th Cir. 2006); Rodriguez v. Puerto Rico Fed. Affairs Admin., 435 F.3d 378, 381 (D.C. Cir. 2006); Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Servs., Inc., 435 F.3d 1140, 1142 (9th Cir. 2006); Schorsch v. Hewlett-Packard Co., 417 F.3d 748, 750 (7th Cir. 2005); Pfizer, Inc. v. Lott, 417 F.3d 725, 726 (7th Cir. 2005); Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co., 415 F.3d 1171, 1175 (10th Cir. 2005); Casey v. Long Island R. Co., 406 F.3d 142, 146 (2d Cir. 2005); Chamberlan v. Ford Motor Co., 402 F.3d 952, 957 (9th Cir. 2005); Manion v. Am. Airlines, Inc., 395 F.3d 428, 431 (D.C. Cir. 2004); Delta Airlines v. Butler, 383 F.3d 1143, 1144 (10th Cir. 2004); James v. Circuit City Stores, Inc., 370 F.3d 417, 419 (4th Cir. 2004); Millsap v. McDonnell Douglas Corp., 368 F.3d 1246, 1247 (10th Cir. 2004); Simon v. United States, 341 F.3d 193, 199 (3d Cir.), certified question accepted, 794 N.E.2d 1087 (Ind. 2003), and certified question answered, 805 N.E.2d 798 (Ind. 2004); Plata v. Davis, 329 F.3d 1101, 1107 (9th Cir. 2003)

submitted to the clerk in copies of four. The matter will be considered on the papers "unless the Court of Appeals orders otherwise."

## The Record On Appeal

In litigation before the thirteen federal Courts of appeal, the appellate record consists of "the original papers and exhibits filed in the district court;…the transcript of proceedings, if any; and…a certified copy of the docket entries prepared by the district clerk."[105] Within "fourteen days" after the appellant has filed her or his appeal notice or the trial court has disposed of a motion for JNOV, judgment amendment or alteration, attorneys' fees, additional factual findings of factual finding amendments, a new trial, relief from the judgment, "acquittal," a new trial, or judgment "arrest," the appellant must either confirm "that no transcript will be ordered" or submit a written

---

[105] United States v. Alvarez, 351 F.3d 126, 131 (4th Cir. 2003); United States v. Schreiber, 191 F.3d 103, 105 (2d Cir. 1999); Shell Petroleum, Inc. v. United States, 182 F.3d 212, 218 (3d Cir. 1999); Willhauck v. Halpin, 953 F.2d 689, 704 n.13 (1st Cir. 1991); Littlejohn v. Bic Corp., 851 F.2d 673, 681 (3d Cir. 1988); Schindel v. Cummings, No. 80-2718, 1981 WL 704507, at *2 (3d Cir. May 8, 1981); Horsey v. Mack Trucks, Inc., 882 F.2d 844, 849 (3d Cir. 1989); Falu v. Sec'y of Health & Human Servs., 703 F.2d 24, 27 (1st Cir. 1983); United States v. Molinares Charris, 822 F.2d 1213, 1218 (1st Cir. 1987); Petit v. Fessenden, 80 F.3d 29, 32 (1st Cir. 1996) (declining to consider claim where the litigant did not direct the lower court to forward a record); United States v. Mottolo, 26 F.3d 261, 264 (1st Cir. 1994) (same); United States v. Pion, 25 F.3d 18, 21 (1st Cir. 1994) (same); Matias v. Sessions, 871 F.3d 65, 70 n.4 (1st Cir. 2017) (noting litigant's lack of compliance with Rule 11); Byrd v. Ronayne, 61 F.3d 1026, 1029 n.4 (1st Cir. 1995) (same); Silva v. Witschen, 19 F.3d 725, 728 n. 4, 731 n. 9 (1st Cir.1994); In re All Maine Asbestos Litig. (PNS Cases), 772 F.2d 1023, 1026 (1st Cir. 1985) (Rule 11 applies to interlocutory appeal); United States v. Noall, 587 F.2d 123, 125 (2d Cir. 1978) )noting lower court legal memorandums should not be transmitted as part of the record); Roman-Cancel v. United States, 613 F.3d 37, 42 (1st Cir. 2010); United States v. Graham, 711 F.3d 445, 2013 U.S. App. LEXIS 6334, 2013 WL 1277296; Boze v. Branstetter, 912 F.2d 801, 1990 U.S. App. LEXIS 16782, 53 Fair Empl. Prac. Cas. (BNA) 1630, 54 Empl. Prac. Dec. (CCH) P40,259; Cmty. Commerce Bank v. O'Brien (in Re O'Brien), 312 F.3d 1135, 2002 U.S. App. LEXIS 25161, 2002 Cal. Daily Op. Service 11852, 2002 Daily Journal DAR 13916, 54 Fed. R. Serv. 3d (Callaghan) 607; Badami v. Flood, 214 F.3d 994, 2000 U.S. App. LEXIS 12161, 54 Fed. R. Evid. Serv. (Callaghan) 1047; United States v. Parisi, 674 F.2d 126, 1982 U.S. App. LEXIS 20592; United States v. Davis, 52 F.3d 781, 1995 U.S. App. LEXIS 9039, 95-1 U.S. Tax Cas. (CCH) P60,193, 75 A.F.T.R.2d (RIA) 95-1817; Hallquist v. United Home Loans, Inc., 715 F.3d 1040, 2013 U.S. App. LEXIS 9891, 85 Fed. R. Serv. 3d (Callaghan) 1074, 2013 WL 2120760; Duffield v. Aetna Life Ins. Co., 473 F.2d 1221, 1973 U.S. App. LEXIS 12039; Hotaling v. Chubb Sovereign Life Ins. Co., 241 F.3d 572, 2001 U.S. App. LEXIS 2550; United States v. Muriel-Cruz, 412 F.3d 9, 2005 U.S. App. LEXIS 11253; Perry v. Pogemiller, 16 F.3d 138, 1993 U.S. App. LEXIS 33562, 28 Fed. R. Serv. 3d (Callaghan) 211; United States v. Alcantar, 83 F.3d 185, 1996 U.S. App. LEXIS 10468; United States v. Noall, 587 F.2d 123, 1978 U.S. App. LEXIS 7613, 78-2 U.S. Tax Cas. (CCH) P9822, 42 A.F.T.R.2d (RIA) 6241; Brady v. NFL, 779 F. Supp. 2d 1043, 2011 U.S. Dist. LEXIS 45511, 190 L.R.R.M. 2952, 2011-1 Trade Cas. (CCH) P77,428; Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76, LLC), 465 B.R. 525, 2012 Bankr. LEXIS 876, Bankr. L. Rep. (CCH) P82,200; Huff v. Brooks (In re Brooks), 175 B.R. 409, 1994 Bankr. LEXIS 2150; Kirshner v. Uniden Corp. of America, 842 F.2d 1074, 1988 U.S. App. LEXIS 3478, 10 Fed. R. Serv. 3d (Callaghan) 441, 10 Fed. R. Serv. 3d (Callaghan) 921; United States v. Silverman, 430 F.2d 106, 1970 U.S. App. LEXIS 8366, 74 L.R.R.M. 2689, 63 Lab. Cas. (CCH) P11,019; United States v. Sussman, 709 F.3d 155, 2013 U.S. App. LEXIS 4562, 90 Fed. R. Evid. Serv. (Callaghan) 1138, 2013 WL 811870; Marshall v. Neptune Maritime, Inc., 838 F.2d 737, 1987 U.S. App. LEXIS 17652; Coca-Cola Co. v. Stewart, 1980 U.S. App. LEXIS 15248, 29 Fed. R. Serv. 2d (Callaghan) 1562;

order for the entire transcript or pertinent portions of the transcript to the court reporter along with the preparation fee and file a copy of the order with the trial court clerk. If the appeal involves an evidence sufficiency claim, counsel should ensure that the record contains "all evidence relevant to…[the disputed] finding or conclusion."[106] If the appellant elects to order only a portion of the transcript, she or he must provide opposing counsel with a statement of the "issues" that she or he intends to raise on appeal within the original "fourteen day" period mentioned above for ordering the record. Once this statement has been served, opposing counsel has "fourteen days" to designate additional portions of the transcript for inclusion in the record and serve her or his counterstatement on the appellant. If the appellant fails to order the requested excerpts within "fourteen days" of receiving the counterstatement, opposing counsel can request the District Court to order the appellant to include the excerpts. As is the case with record preparation in Kentucky, Idaho, Montana, and Florida, if a portion of the included proceedings were not recorded or cannot be transcribed, counsel can prepare a narrative statement of the omitted material with "best available means, including" her or his own memory. This statement must "be served on the appellee, who may serve objections or proposed amendments" to the statement within "fourteen days" of receiving the document. The statement will then be submitted to the trial court for "approval" and inclusion in the record. In the alternative, the parties, under Federal Rule of Appellate Procedure 10, may stipulate the parts of the proceedings and evidence to be included in the record on appeal after preparing, signing, and submitting a statement. "The statement must set forth only those facts averred and proved or sought to be proved that are essential to the court's resolution of the issues."

---

[106] Fed. R. App. P. 10; Smith v. SEECO, Inc., 922 F.3d 406, 411 (8th Cir. 2019); Natofsky v. City of New York, 921 F.3d 337, 344 (2d Cir. 2019) (Appellate Rule 10 is not a device for presenting evidence to this Court that was not before the trial judge); Flores-Panameno v. U.S. Attorney Gen., 913 F.3d 1036, 1041 (11th Cir. 2019); Feminist Majority Found. v. Hurley, 911 F.3d 674, 697 (4th Cir. 2018) (Providing that the record on appeal includes, inter alia, "the original papers and exhibits filed in the district court"); United States v. Barton, 909 F.3d 1323, 1335 (11th Cir. 2018); United States v. Reyes-Rivas, 909 F.3d 466, 469 (1st Cir. 2018); Gallo v. Mayo Clinic Health Sys.-Franciscan Med. Ctr., Inc., 907 F.3d 961, 964 (7th Cir. 2018); Pakootas v. Teck Cominco Metals, Ltd., 905 F.3d 565, 582 n.12 (9th Cir. 2018), cert. denied sub nom. Teck Metals Ltd. v. Confederated Tribes of the Colville Reservation (U.S. June 10, 2019); Campbell v. Ackerman, 903 F.3d 14, 18 n.5 (1st Cir. 2018); Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1177 (10th Cir. 2018); Carmody v. Bd. of Trustees of Univ. of Illinois, 893 F.3d 397, 402 (7th Cir. 2018), cert. denied sub nom. Carmody v. Bd. of Trustees of the Univ. of Illinois, 139 S. Ct. 798, 202 L. Ed. 2d 588 (2019), reh'g denied sub nom. Carmody v. Bd. of Trustees of Univ. of Illinois, 139 S. Ct. 1288, 203 L. Ed. 2d 299 (2019); Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC, 887 F.3d 1003, 1015 (10th Cir. 2018), as revised (Apr. 13, 2018); Rana v. Islam, 887 F.3d 118, 122 (2d Cir. 2018) (declining to consider extra-record assertions and documents); Demaree v. Pederson, 887 F.3d 870, 878 (9th Cir. 2018); United States v. Green, 886 F.3d 1300, 1307 (10th Cir. 2018); United States v. Jereb, 882 F.3d 1325, 1338 n.7 (10th Cir. 2018); Teixeira v. Town of Coventry by & through Przybyla, 882 F.3d 13, 19 n.4 (1st Cir. 2018); Durant v. D.C. Gov't, 875 F.3d 685, 701 (D.C. Cir. 2017), cert. denied sub nom. Durant v. D.C., 138 S. Ct. 2608, 201 L. Ed. 2d 1004 (2018); HCG Platinum, LLC v. Preferred Prod. Placement Corp., 873 F.3d 1191, 1196 n.3 (10th Cir. 2017); United States v. Walter-Eze, 869 F.3d 891, 907 n.3 (9th Cir. 2017), cert. denied, 139 S. Ct. 1196, 203 L. Ed. 2d 226 (2019); Burch v. P.J. Cheese, Inc., 861 F.3d 1338, 1345 n.11 (11th Cir. 2017); Leatherwood v. Allbaugh, 861 F.3d 1034, 1051 (10th Cir. 2017); Herron v. Fannie Mae, 861 F.3d 160, 173 (D.C. Cir. 2017); Simpson v. Brown Cty., 860 F.3d 1001, 1004 n.1 (7th Cir. 2017); Dupree v. Hardy, 859 F.3d 458, 463 (7th Cir. 2017); United States v. Gonzalez-Rodriguez, 859 F.3d 134, 137 n.1 (1st Cir. 2017)

While the Court of Appeals retains jurisdiction over most questions related to the appellate record's form and content, the District Court can resolve record disputes before the document is transmitted to the appellate court. The parties can also enter a stipulation to correct or modify the appellate record.

The clerk will notify all the parties once the appellate record is filed.[107]

## Document Specification

---

[107] Fed. R. App. P. 12; Young v. Smith, 905 F.3d 229 (3d Cir. 2018); Carroll v. E One Inc, 893 F.3d 139, 139 (3d Cir. 2018); Commonwealth of Pennsylvania v. President United States of Am., 888 F.3d 52, 52 (3d Cir. 2018); Fed. Ins. Co. v. United States, 882 F.3d 348, 362 (2d Cir. 2018) ("Providing that an appeal must be docketed "under the title of the district-court action"); Ransmeier v. Mariani, 718 F.3d 64, 70 n.2 (2d Cir. 2013); Gilda Indus., Inc. v. United States, 511 F.3d 1348, 1351 (Fed. Cir. 2008) ; ("Upon receiving the copy of the notice of appeal and the docket entries from the district clerk under Rule 3(d), the circuit clerk must docket the appeal"); Subsalve USA Corp. v. Watson Mfg., Inc., 462 F.3d 41, 44 (1st Cir. 2006); Liberty Mut. Ins. Co. v. Treesdale, Inc., 419 F.3d 216, 230 (3d Cir. 2005); Laird v. Horn, 414 F.3d 419, 430 (3d Cir. 2005); Bronshtein v. Horn, 404 F.3d 700, 733 (3d Cir. 2005); In re Diet Drugs (Phentermine/Fenfluramine/Dexfenflurammine) Prod. Liab. Litig., 401 F.3d 143, 174 (3d Cir. 2005); IPSCO Steel (Alabama), Inc. v. Blaine Const. Corp., 371 F.3d 150, 156 (3d Cir. 2004); Coleman v. Home Depot, Inc., 306 F.3d 1333, 1347 (3d Cir. 2002); In re Hechinger Inv. Co. of Delaware, 298 F.3d 219, 221 (3d Cir. 2002); LaSalle Nat. Bank v. First Connecticut Holding Grp., LLC., 287 F.3d 279, 280 (3d Cir. 2002); United States v. Scarfo, 263 F.3d 80, 95 (3d Cir. 2001); Saldana v. Kmart Corp., 260 F.3d 228, 238 (3d Cir. 2001); Brytus v. Spang & Co., 203 F.3d 238, 239 (3d Cir. 2000); In re Cont'l Airlines, 203 F.3d 203, 218 (3d Cir. 2000); Pennsylvania Mines Corp. v. Holland, 197 F.3d 114, 115 (3d Cir. 1999); United States v. State of New Jersey, 194 F.3d 426, 434 (3d Cir. 1999); Klein v. Gen. Nutrition Companies, Inc., 186 F.3d 338, 346 (3d Cir. 1999); Northview Motors, Inc. v. Chrysler Motors Corp., 186 F.3d 346, 352 (3d Cir. 1999); Cella v. Togum Constructeur Ensembleier en Industrie Alimentaire, 173 F.3d 909, 909 (3d Cir. 1999); Gulla v. N. Strabane Twp., 146 F.3d 168, 169 (3d Cir. 1998); Gen. Ins. Co. of Am. v. E. Consol. Utilities, Inc., 126 F.3d 215, 215 (3d Cir. 1997); Ferguson Elec. Co. v. Foley, 115 F.3d 237, 241 (3d Cir. 1997); Smith v. Magras, 124 F.3d 457, 471 (3d Cir. 1997); Shareholders v. Sound Radio, Inc., 109 F.3d 873, 882 (3d Cir. 1997); Elliott v. Kiesewetter, 98 F.3d 47, 61 (3d Cir. 1996); United States v. Kones, 77 F.3d 66, 71 (3d Cir. 1996); Sani-Dairy, a Div. of Penn Traffic Co. v. Yeutter, 91 F.3d 15, 16 (3d Cir. 1996), amended (Aug. 29, 1996); United States v. 30.54 Acres of Land, More or Less, Situated in Greene Cty., Com. of Pa., 90 F.3d 790, 796 (3d Cir. 1996); Georgine v. Amchem Prod., Inc., 83 F.3d 610, 611 (3d Cir. 1996), aff'd sub nom. Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997); In re Unisys Corp. Retiree Med. Ben. ERISA Litig., 58 F.3d 896, 908 (3d Cir. 1995); In re Corestates Tr. Fee Litig., 39 F.3d 61, 69 (3d Cir. 1994); United States v. A.D., 28 F.3d 1353, 1362 (3d Cir. 1994); Phar-Mor, Inc. v. Coopers & Lybrand, 22 F.3d 1228, 1241 (3d Cir. 1994); In re Busy Beaver Bldg. Centers, Inc., 19 F.3d 833, 856 (3d Cir. 1994); Burt v. Ware, 14 F.3d 256, 259 (5th Cir. 1994); Melo v. Hafer, 13 F.3d 736, 748 (3d Cir. 1994); Carlough v. Amchem Prod., Inc., 10 F.3d 189, 191 (3d Cir. 1993); Jewelcor Inc. v. Asia Commercial Co., 11 F.3d 394, 398 (3d Cir. 1993); Univ. of Maryland at Baltimore v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1541 (3d Cir. 1993); Bridge v. U.S. Parole Comm'n, 981 F.2d 97, 107 (3d Cir. 1992); United States v. Schular, 907 F.2d 294, 295 n.1 (2d Cir. 1990); Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., 761 F.2d 198, 201 n.3 (5th Cir. 1985); Thorton v. Schweiker, 663 F.2d 1312, 1313 n.1 (5th Cir. 1981); Williams v. Gen. Motors Corp., 656 F.2d 120, 125 (5th Cir. 1981); Ashcraft v. Conoco, Inc., 218 F.3d 288, 306 (4th Cir. 2000) (Widener, J., concurring);

For the purposes of the Federal rules of Appellate Procedure, a judgment is entered when it is "noted on the docket."[108] Filings should be produced on white 8.5 x 11 inch paper with "double spaced text" "one inch margins." "Headings and footnotes" may contain text that is single spaced.[109] "Every brief, motion, or other paper filed with the court must be signed by the" filing attorney. Filing word limits do not include the "cover page;" disclosure statement;" "table of contents;" citations table; oral argument statement; "addendum containing statutes, rules, or regulations;" counsel certificate; "signature block;" and "proof of service."

## Opinion Citation

The various federal Courts of Appeal – like the Hawaii and South Carolina Supreme Courts – also restrict citations to unpublished opinions that have been released after a certain date. More specifically, in federal appellate litigation, counsel can cite "unpublished" "federal judicial opinions" that were released on or after "January 1, 2007."[110] "If a party cites a federal judicial

---

[108] Fed. R. App. P. 36; Adamson v. Port of Bellingham, 907 F.3d 1122, 1135 (9th Cir. 2018); Prison Legal News v. Sec'y, Fla. Dep't of Corr., 890 F.3d 954, 958 n.3 (11th Cir. 2018), cert. denied sub nom. Prison Legal News v. Jones, 139 S. Ct. 795, 202 L. Ed. 2d 571 (2019); United States v. Vann, 660 F.3d 771, 784 n.5 (4th Cir. 2011); Hegel v. First Liberty Ins. Corp., 778 F.3d 1214, 1221 n.1 (11th Cir. 2015); United States v. Colon, 707 F.3d 1255, 1261 n.2 (11th Cir. 2013); Estate of McCall ex rel. McCall v. United States, 642 F.3d 944, 951 n.3 (11th Cir. 2011), certified question answered sub nom. Estate of McCall v. United States, 134 So. 3d 894 (Fla. 2014); Leal v. Sec'y, U.S. Dep't of Health & Human Servs., 620 F.3d 1280, 1286 n.2 (11th Cir. 2010); United States v. Alfaro-Moncada, 607 F.3d 720, 724 n.3 (11th Cir. 2010); Gatimi v. Holder, 606 F.3d 344, 350 (7th Cir. 2010); United States v. Petty, 530 F.3d 361, 366 (5th Cir. 2008); Dia v. Ashcroft, 353 F.3d 228, 241 n.7 (3d Cir. 2003); United States v. Muro-Inclan, 249 F.3d 1180, 1183 n.2 (9th Cir. 2001); Feliciano v. Selsky, 205 F.3d 568, 572 (2d Cir. 2000); United States v. Cobb, 185 F.3d 1193, 1196 n.2 (11th Cir. 1999); Bianchi v. Perry, 154 F.3d 1023, 1024 (9th Cir. 1998); Bd. of Trustees of Hotel & Rest. Employees Local 25 v. JPR, Inc., 136 F.3d 794, 808 n.15 (D.C. Cir. 1998); Kelly v. Serna, 87 F.3d 1235, 1240 n.2 (11th Cir. 1996); United States v. Barona, 56 F.3d 1087, 1090 (9th Cir. 1995); O'Connor v. Shalala, 23 F.3d 1232, 1234 (7th Cir. 1994); United States v. Rivera, 844 F.2d 916, 921 (2d Cir. 1988); Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc., 806 F.3d 162, 184 (3d Cir. 2015) (Ambro, J., concurring);

[109] Fed. R. App. P. 27; United States v. Noel, 905 F.3d 258, 263 (3d Cir. 2018); In re Horne, 876 F.3d 1076, 1083 (11th Cir. 2017); Harrington v. Berryhill, 876 F.3d 889, 890 (7th Cir. 2017); Concerned Pastors for Soc. Action v. Khouri, 844 F.3d 546, 548 (6th Cir. 2016); Villarreal v. R.J. Reynolds Tobacco Co., 839 F.3d 958, 963 (11th Cir. 2016); Daker v. Comm'r, Georgia Dep't of Corr., 820 F.3d 1278, 1281 (11th Cir. 2016); United States v. Mujica-Aranda, 806 F.3d 999 (8th Cir. 2015); United States v. Reyes-Santiago, 804 F.3d 453, 460 (1st Cir. 2015); United States v. Burch, 781 F.3d 342, 343 (6th Cir. 2015); Warner v. Gross, 776 F.3d 721, 727 (10th Cir.), aff'd sub nom. Glossip v. Gross, 135 S. Ct. 2726, 192 L. Ed. 2d 761 (2015); Massey v. Ojaniit, 759 F.3d 343, 354 n.4 (4th Cir. 2014); United States v. Manning, 755 F.3d 455 (7th Cir. 2014); Ligon v. City of New York, 736 F.3d 166, 170 n.8 (2d Cir. 2013); Brown v. Fifth Third Bank, 730 F.3d 698, 701 (7th Cir. 2013); Maus v. Baker, 729 F.3d 708, 709 (7th Cir. 2013); United States v. Moskowitz, 702 F.3d 731, 732 (2d Cir. 2012); Sacramento Mun. Util. Dist. v. F.E.R.C., 683 F.3d 769, 770 (7th Cir. 2012); Molina Jerez v. Holder, 625 F.3d 1058, 1067 (8th Cir. 2010); Jones v. Sec'y, Dep't of Corr., 607 F.3d 1346, 1354 (11th Cir. 2010); Durr v. Strickland, 602 F.3d 789, 790 n.1 (6th Cir. 2010); RMA Ventures California v. SunAmerica Life Ins. Co., 576 F.3d 1070, 1073 (10th Cir. 2009); Trinidad y Garcia v. Thomas, 683 F.3d 952, 999 (9th Cir. 2012) (Berzon, J., concurring);

[110] Fed. R. App. P. 32.1. Evans v. Greenfield Banking Co., 774 F.3d 1117, 1123 (7th Cir. 2014); Fisk Elec. Co. v. DQSI, L.L.C., 894 F.3d 645, 651 n.7 (5th Cir. 2018); United States v. Alvarez, 880 F.3d 236, 240

opinion, order, judgment, or other written disposition that is not available in a publicly accessible electronic database, the party must file and serve a copy of that opinion, order, judgment, or disposition with the brief or other paper in which it is cited

**Corporate Disclosure Statement**

In litigation before both the federal Courts of Appeal and the Delaware Supreme Court, nongovernmental corporate part[ies] to a proceeding must file a statement that identifies any parent corporation and any publicly held corporation that owns 10% or more of its stock or states that there is no such corporation. This requirement applies to intervenors as well. Unless the local rules stipulate otherwise, this disclosure statement must appear in the first "motion, response, petition, answer," or principal merits brief that is filed in the Court of Appeals before the filing's table of contents. If the statement does not appear in a principal merits brief, three copies of the filing with the disclosure statement should be submitted. [111] Appellate litigators for the government must "identify…any organizational victim of the alleged criminal activity" in criminal appeals.

**Time Computation Rules**

In measuring appellate time deadlines under the Federal Rules of Appellate Procedure, as is the case in Hawaii, South Carolina, and Arkansas, the date of the event that triggers the start of the time period is not counted in assessing whether that deadline has passed. Thus, if counsel has three days to file a notice of appeal and the time period for filing begins on January 1, the filing deadline is January 4. More than that, if the deadline falls on a Saturday, Sunday, or a legal holiday, it extends to the next day that is not a Saturday, Sunday, or a legal holiday. Counsel should count "intermediate Saturdays, Sundays, and legal holidays" in computing the filing period. The Federal Rules of Appellate Procedure just like the Tennessee Rules of Appellate Procedure make provision for situations where the clerk's office is closed as the filing deadline is extended to the next day

---

n.1 (5th Cir. 2018); Alexander v. Verizon Wireless Servs., L.L.C., 875 F.3d 243, 249 n.11 (5th Cir. 2017); Hernandez-Castillo v. Sessions, 875 F.3d 199, 208 n.4 (5th Cir. 2017); Smith v. City of Wyoming, 821 F.3d 697, 714 n.14 (6th Cir. 2016), as amended (May 18, 2016); United States v. Ryan, 806 F.3d 691, 694 n.4 (2d Cir. 2015); Mowlana v. Lynch, 803 F.3d 923, 930 n.5 (8th Cir. 2015); Flint v. City of Belvidere, 791 F.3d 764, 771 n.1 (7th Cir. 2015); Kuperman v. Wrenn, 645 F.3d 69, 77 n.11 (1st Cir. 2011); United States v. Ahmadzai, 723 F.3d 1089, 1094 (9th Cir. 2013) (The Sixth Circuit permits citation to unpublished opinions); Swanson v. Bank of Am., N.A., 563 F.3d 634, 635 (7th Cir. 2009); United States v. Stepanian, 570 F.3d 51, 57 n.10 (1st Cir. 2009); In re Grant, 635 F.3d 1227, 1231 (D.C. Cir. 2011); Elgin v. U.S. Dep't of Treasury, 641 F.3d 6, 11 n.3 (1st Cir. 2011), aff'd sub nom. Elgin v. Dep't of Treasury, 567 U.S. 1, 132 S. Ct. 2126, 183 L. Ed. 2d 1 (2012); Alimi v. Gonzales, 489 F.3d 829, 836 n.8 (7th Cir. 2007); United States v. Tejeda, 476 F.3d 471, 474 (7th Cir. 2007).

[111] Fed. R. App. P. 26.1; Dutcher v. Matheson, 840 F.3d 1183, 1187 n.1 (10th Cir. 2016); Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 5 n.1 (1st Cir. 2007); Yung v. Lee, 432 F.3d 142, 145 n.1 (2d Cir. 2005); Kruse v. Wells Fargo Home Mortg., Inc., 383 F.3d 49, 52 n.1 (2d Cir. 2004); USX Corp. v. Adriatic Ins. Co., 345 F.3d 190, 195 n.1 (3d Cir. 2003); Delta Air Lines, Inc. v. Sasser, 127 F.3d 1296, 1298 n.2 (11th Cir. 1997); S.E.C. v. Dunlap, 253 F.3d 768, 773 (4th Cir. 2001) (noting denial of waiver request on compliance with Rule 26.1); In re Bernard, 31 F.3d 842, 843 (9th Cir. 1994) (noting that one of the purposes for Rule 26.1 is to assist judges in assessing bias); M2 Software Inc. v. Madacy Entm't, 463 F.3d 870, 871 (9th Cir. 2006) (Pregerson J., concurring); In re Sandoval, 541 F.3d 997, 1001 (10th Cir. 2008); Feldman v. Olin Corp., 692 F.3d 748, 758 (7th Cir. 2012) (noting failure to adhere to Rule 26.1);

that is not a Saturday, Sunday, or legal holiday if the clerk's office is closed on the day of the filing deadline. Counsel should note that for filings in the Court of Appeals the deadline on the last day runs to "midnight" in the "time zone of the circuit clerk's principal office." The Court of Appeals can grant time extensions for all filings except appeal notices, petitions for "permission to appeal," and "petition to enjoin, set aside, suspend, modify, enforce, or otherwise review an" administrative order. As is the case in Florida, if a litigant must perform a certain act after receiving service of an item, three days are added to the filing period "unless the paper [is served electronically or] is delivered on the date of service stated in the proof of service." Electronically served documents are "treated as delivered on the date of service stated in the proof of service.[112]

## Stays and Injunctions Pending Appeal

In civil cases, a federal district Court can require the appellant to post collateral to cover costs on appeal.[113] The thirteen federal Courts of Appeals – just like the New York Court of Appeals and California Supreme Court – generally require that counsel petition the trial court first for a stay or injunction during the duration of the appeal. In federal appellate litigation, counsel should petition

---

[112] Fed. R. App. P. 26; United States v. Galindo-Serrano, 925 F.3d 40, 45 (1st Cir. 2019); Chamblee v. Fla., 905 F.3d 1192, 1198 n.12 (11th Cir. 2018); Newman v. Lehman Bros. Holdings Inc., 901 F.3d 19, 26 (1st Cir. 2018); May v. Mahone, 876 F.3d 896, 897 (7th Cir. 2017); Fedora v. Merit Sys. Prot. Bd., 848 F.3d 1013, 1014 n.1 (Fed. Cir. 2017), cert. denied, 138 S. Ct. 755, 199 L. Ed. 2d 605 (2018); United States v. Smotherman, 838 F.3d 736, 737 (6th Cir. 2016); Armstrong v. Louden, 834 F.3d 767, 770 (7th Cir. 2016); Jones v. Dep't of Health & Human Servs., 834 F.3d 1361, 1366 (Fed. Cir. 2016); Ramos–Lopez v. Lynch, 823 F.3d 1024, 1027 (5th Cir. 2016); Legg v. Ulster Cty., 820 F.3d 67, 78 n.3 (2d Cir. 2016); Lebahn v. Owens, 813 F.3d 1300, 1305 n.3 (10th Cir. 2016); Lorenzo v. Prime Commc'ns, L.P., 806 F.3d 777, 783 (4th Cir. 2015); Mobley v. C.I.A., 806 F.3d 568, 579 (D.C. Cir. 2015); In re Gonzalez, 795 F.3d 288, 290 n.1 (1st Cir. 2015); Carranza v. United States, 794 F.3d 237, 239 n.1 (2d Cir. 2015); Gyorgy v. Comm'r, 779 F.3d 466, 471 n.1 (7th Cir. 2015); United States v. Gonzalez-Rodriguez, 777 F.3d 37, 40 (1st Cir. 2015); United States v. Reves, 774 F.3d 562, 565 (9th Cir. 2014); United States v. Myers, 772 F.3d 213, 217 (5th Cir. 2014); Dandino, Inc. v. U.S. Dep't of Transp., 729 F.3d 917, 921 (9th Cir. 2013); Hoffler v. Bezio, 726 F.3d 144, 155 (2d Cir. 2013); Carter v. Hodge, 726 F.3d 917, 920 (7th Cir. 2013); Ragguette v. Premier Wines & Spirits, 691 F.3d 315, 323 (3d Cir. 2012);

[113] Fed. R. App. P. 7; Horowitz v. 148 S. Emerson Assocs. LLC, 888 F.3d 13, 25 (2d Cir. 2018); Small Justice LLC v. Xcentric Ventures LLC, 873 F.3d 313, 321 (1st Cir. 2017); Hines v. City of Albany, 862 F.3d 215, 220 (2d Cir. 2017); In re Target Corp. Customer Data Sec. Breach Litig., 847 F.3d 608, 614 (8th Cir.), amended, 855 F.3d 913 (8th Cir. 2017); Hill v. State St. Corp., 794 F.3d 227, 229 (1st Cir. 2015); Tennille v. W. Union Co., 774 F.3d 1249, 1253 (10th Cir. 2014); Family PAC v. Ferguson, 745 F.3d 1261, 1265 (9th Cir. 2014); Noatex Corp. v. King Const. of Houston, L.L.C., 732 F.3d 479, 488 (5th Cir. 2013); In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig., 716 F.3d 1057, 1062 (8th Cir. 2013); In re Sealed Case (Bowles), 624 F.3d 482, 486 n.3 (D.C. Cir. 2010); Vaughn v. Am. Honda Motor Co., 507 F.3d 295, 298 (5th Cir. 2007) (In a civil case, the district court may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal); Azizian v. Federated Dep't Stores, Inc., 499 F.3d 950, 953 (9th Cir. 2007); In re Cardizem CD Antitrust Litig., 481 F.3d 355, 357 (6th Cir. 2007); Young v. New Process Steel, LP, 419 F.3d 1201, 1202 (11th Cir. 2005); Pedraza v. United Guar. Corp., 313 F.3d 1323, 1325 (11th Cir. 2002); Baynham v. PMI Mortg. Ins. Co., 313 F.3d 1337, 1338 (11th Cir. 2002); Downey v. Mortg. Guar. Ins. Corp., 313 F.3d 1341, 1342 (11th Cir. 2002); Corley v. Rosewood Care Ctr., Inc., 142 F.3d 1041, 1057 n.16 (7th Cir. 1998); Adsani v. Miller, 139 F.3d 67, 69 (2d Cir. 1998); Perry v. Pogemiller, 16 F.3d 138, 140 n.1 (7th Cir. 1993); Zebrowski v. Hanna, 973 F.2d 1001, 1006 (1st Cir. 1992);

the District Court in the first instance for a "stay" of a District Court judgment or order "pending appeal;" "approval of a bond or other" collateral provided for a judgment "stay;" and "an order suspending, modifying, restoring, or granting an injunction while an appeal is pending."[114] While a party can petition the Court of Appeals clerk for the aforementioned relief, the motion must include the pertinent portions of the record necessary for ruling on the motion; supporting affidavits for facts that are in dispute; a statement of facts; and an argument section and, disclose either why it was "impractical" to petition the District Court or the reasons why the District Court "denied the motion or failed to afford the relief requested." The Court can condition relief on counsel's provision of adequate collateral. In matters before both the Hawaii Supreme Court and the various federal Courts of Appeal, if a litigant elects to provide "security" "in the form of a bond or stipulation" or guarantor assertion, counsel should note that the guarantor is deemed to have submitted to the appellate court's jurisdiction and appoint the appellate court clerk as her or his agent to receive service of documents relevant to the guarantee. A party can file a motion in a federal District Court to enforce the guarantor's liability "without the necessity of an independent action."

## Appeal Conferences

As is the case with the Hawaii Intermediate Court of Appeals and State Supreme Court, the thirteen federal Courts of Appeal retain the option of holding a conference with the parties in person or via "telephone" to simplify the questions presented in the case or consider case settlement.[115] Here, counsel is advised to obtain prior consent for her or his client before entering the settlement

---

[114] Fed. R. App. P. 8.

[115] Fed. R. App. P. 33; In re Redacted, 815 F.3d 957 (2d Cir. 2016); Ameritech Corp. v. Int'l Bhd. of Elec. Workers, Local 21, 543 F.3d 414, 416 (7th Cir. 2008); Keck Garrett & Assocs., Inc. v. Nextel Commc'ns, Inc., 517 F.3d 476, 487 (7th Cir. 2008); Custom Vehicles, Inc. v. Forest River, Inc., 464 F.3d 725, 727 (7th Cir. 2006); Beazer E., Inc. v. Mead Corp., 412 F.3d 429, 434 (3d Cir. 2005) ("The court may, as a result of the [mediation], enter an order controlling the course of the proceedings or implementing any settlement agreement."); Herrnreiter v. Chicago Housing Auth., 281 F.3d 634, 637 (7th Cir.2002); Goss Graphics Sys., Inc. v. DEV Indus., Inc., 267 F.3d 624, 627 (7th Cir. 2001); In re Young, 253 F.3d 926, 927 (7th Cir. 2001); Page v. Bartels, 248 F.3d 175, 184 n.3 (3d Cir. 2001), as amended (June 25, 2001); United States v. Zendeli, 195 F.3d 314, 315 (7th Cir. 1999); United States v. Torres, 170 F.3d 749, 750 (7th Cir. 1999); Pueblo of San Ildefonso v. Ridlon, 90 F.3d 423, 425 (10th Cir. 1996); Hoffman Homes, Inc. v. Adm'r, U.S. E.P.A., 999 F.2d 256, 259 (7th Cir. 1993); Bell v. A-Leet Leasing Corp., 863 F.2d 257, 259 (2d Cir. 1988); In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig. M.D.L. No. 150, 788 F.2d 1571, 1575 (Temp. Emer. Ct. App. 1986); Washington Urban League v. F.E.R.C., 743 F.2d 166, 169 (3d Cir. 1984); Motorola, Inc. v. Computer Displays Int'l, Inc., 739 F.2d 1149, 1153 n.6 (7th Cir. 1984); United States v. Texas Educ. Agency, 679 F.2d 1104, 1108 (5th Cir. 1982); United States v. Guerrero-Herrera, 590 F.2d 238, 241 (7th Cir. 1978); Ross v. Houston Indep. Sch. Dist., 559 F.2d 937, 941 (5th Cir. 1977); In re Jan. 1976 Grand Jury, 534 F.2d 719, 730 n.11 (7th Cir. 1976); Reserve Mining Co. v. Envtl. Prot. Agency, 514 F.2d 492, 504 (8th Cir. 1975), modified sub nom. Reserve Min. Co. v. Lord, 529 F.2d 181 (8th Cir. 1976); State of Tex. v. E.P.A., 499 F.2d 289, 297 n.8 (5th Cir. 1974);

Sarei v. Rio Tinto, PLC, 625 F.3d 561 (9th Cir. 2010) (Kleinfeld, J., dissenting);

negotiations. Upon termination of the conference, the relevant appellate court will enter an order that will "control the subsequent course of the proceedings.

**Motion Practice**

As is the case in Virginia and South Carolina, motions before the various federal Courts of Appeal must be "in writing unless the court permits otherwise." The filing should state the "relief" sought, the grounds for relief, and "the legal argument necessary to support it." Counsel should append the lower court or agency order to the motion as well as any supporting "affidavits" for factual information that is not contained in the appellate record. The filer has the option of not submitting a motion notice nor a supporting brief for the motion.   More than that, unlike the Montana, Delaware, and Idaho Supreme Courts, the Courts of Appeals also do not require counsel to file a "proposed order" with the motion. Opposing counsel may file a response that may but need not request "affirmative relief" within "ten days" of the motion's filing and, replies are due within "seven days" of the response's service. Federal appellate judges – just like Justices of the Florida Supreme Court – can act on a motion "alone" so long as the resulting order does "not dismiss or otherwise determine an appeal."[116] These orders are appealable to the entire panel. In the alterative, if the motion is procedural, federal appellate court clerks – just like their counterparts on the Mississippi Supreme Court and Court of Appeals – can dispose of the motion. If counsel is dissatisfied with the clerk's disposition of the motion, she or he can file "a motion to reconsider, vacate, or modify that action." Motions are limited to "5,200 words," responses are limited to "2,600 words," and in both instances counsel should provide the Court clerk with one "original and three copies." The motion caption should include the case docket "number," case title, filing title, and disclose the party on whose behalf the motion is submitted. If counsel does include a cover page, it must be "white."

**Habeas Proceedings**

Under the Antiterrorism and Effective Death Penalty Act, habeas applications for federal inmates must be directed to a federal District Court rather than a judge on the Court of Appeals. More than that, those applications that are initially submitted to a Circuit Judge will be forwarded to a District Court. If the application is denied in a lower court, it may not be "renewed" before the Court of Appeals. Habeas petitioners, however, may appeal a District Court's denial of a habeas application to the Court of Appeals under 28 U.S. 2253. Private counsel must obtain a certificate of appealability from the District or Circuit Judge before she or he can appeal a District Court's disposition of a habeas proceeding in a matter where the disputed "dentition" results "from process issued by a state court" "or in a 28 U.S.C. § 2255 proceeding." If a certificate of appealability has not issued, though, the appeal notice will be treated as a request for a certificate of appealability by the Court of Appeals.[117] While the habeas proceeding is pending, the habeas court retains the

---

[116] Fed. R. App. P. 27.

[117] Fed. R. App. P. 22; United States v. Carthorne, 878 F.3d 458, 463 (4th Cir. 2017); Rivera-Rivera v. United States, 827 F.3d 184, 186 (1st Cir. 2016); Guzman-Ortiz v. United States, 849 F.3d 708, 713 (8th Cir. 2017), cert. denied, 138 S. Ct. 2004, 201 L. Ed. 2d 262 (2018); Rivera-Rivera v. United States, 844 F.3d 367, 372 (1st Cir. 2016); Dawkins v. United States, 829 F.3d 549, 551 (7th Cir. 2016); Washington v. Ryan, 833 F.3d 1087, 1100 (9th Cir. 2016); Smith v. Davis, No. 18-70015, 2019 WL 2455734, at *2 (5th

discretion to direct" the prisoner's transfer at the custodian's request.[118] If a habeas court is considering a decision "not to release a prisoner," that court can order continued detention, transfer to another facility, or release. On the other hand, if the habeas court is considering a decision ordering release of a prisoner, the prisoner must "be released on personal recognizance, with or without." Initial custody entered by the District Court orders remain in effect unless the appellate court orders otherwise.

### Releases in Criminal Cases

Private criminal appellate counsel can request a release for her or his client before conviction by filing a motion with the District Court." Once the filing is submitted, the trial court judge will issue an oral or written decision. If counsel needs to appeal that decision, she or he should file the lower court "order" and proceeding "transcript," with the appeal notice. While the appeal is pending, the Court of Appeals can order a temporary release before issuing a decision based on the "papers, affidavits, and parts of the record that the parties present or the court requires." For release requests after conviction, counsel should either file an appeal notice from the District Court order denying release or submit a motion to the Court of Appeals.[119]

### Party Substitution

Federal Rule of Appellate Procedure 43 governs party substitution and bears a sharp resemblance to the analogous procedural rule covering substitution in Tennessee and Mississippi. Here, the State permits counsel or any other party to substitute a deceased party for her or his "personal representative" "after a notice of appeal is filed or while" an appeal is pending with a motion. If

---

Cir. June 13, 2019) (certificate of appealability is not required when a state or its representative appeals); Weaver v. United States, 793 F.3d 857, 860 (8th Cir. 2015) (same); Han Tak Lee v. Houtzdale SCI, 798 F.3d 159, 163 (3d Cir. 2015) (same); LaMar v. Houk, 798 F.3d 405, 414 (6th Cir. 2015) (same); Sutton v. Pfister, 834 F.3d 816, 820 (7th Cir. 2016); Hernandez v. Chappell, 923 F.3d 544, 549 (9th Cir. 2019) (treating appeal from District Court as a request for a certificate of appealability); Dufresne v. Palmer, 876 F.3d 248, 252 (6th Cir. 2017) (same); United States v. Springer, 875 F.3d 968, 980 (10th Cir. 2017), cert. denied, 138 S. Ct. 2002, 201 L. Ed. 2d 270 (2018) (same); Clark v. Cartledge, 829 F.3d 303, 307 n.3 (4th Cir. 2016) (same); Dean-Mitchell v. Reese, 837 F.3d 1107, 1112 (11th Cir. 2016) (same); Berry v. Warden, S. Ohio Corr. Facility, 872 F.3d 329, 331 (6th Cir. 2017) (same); Flores-Ramirez v. Foster, 811 F.3d 861, 865 (7th Cir. 2016) (same); Sanchez-Rengifo v. Caraway, 798 F.3d 532, 535 (7th Cir. 2015) (same); Bennett v. Superintendent Graterford SCI, 886 F.3d 268, 280 (3d Cir. 2018) (limiting discussion to those claims that were certified in the appealability certificate); Poyson v. Ryan, 879 F.3d 875, 878 (9th Cir.), cert. denied, 138 S. Ct. 2652, 201 L. Ed. 2d 1063 (2018) (same); Goodrum v. Busby, 824 F.3d 1188, 1195 (9th Cir. 2016) (noting ability to transfer petition to the District Court);

[118] Fed. R. App. P. 23.

[119] Fed. R. App. P. 9; United States v. Meister, 744 F.3d 1236, 1239 n.4 (11th Cir. 2013); United States v. Nwokoro, 651 F.3d 108, 109 (D.C. Cir. 2011); United States v. Ingle, 454 F.3d 1082, 1083 (10th Cir. 2006); United States v. Johnson, 399 F.3d 1297, 1298 (11th Cir. 2005); United States v. Cisneros, 328 F.3d 610, 617 (10th Cir. 2003); United States v. Taubman, 297 F.3d 161, 167 (2d Cir. 2002); United States v. Lane, 252 F.3d 905, 906 (7th Cir. 2001); United States v. Hochevar, 214 F.3d 342, 342 (2d Cir. 2000); United States v. Lane, 252 F.3d 905, 906 (7th Cir. 2001); United States v. O'Keefe, 169 F.3d 281 (5th Cir. 1999); United States v. Blasini-Lluberas, 144 F.3d 881, 881 (1st Cir. 1998); United States v. Swanquist, 125 F.3d 573, 574 (7th Cir. 1997);

the motion is not from the personal representative, it must be "served" on him or her. In the event that the decedent does not have a personal representative, the appeal will proceed, nonetheless. On the other hand, if a party that had a right to appeal a judgment dies before she or he can direct that an appeal notice be filed, her or his "personal representative" or "counsel of record," if a personal representative is not on hand, may file the notice of appeal.[120] If the appellee in a potential appeal passes away after the final judgment has been rendered but before the appeal notice has been filed, the appellant can proceed with the appeal "as if the death had not occurred." These same rules apply to "substitution" resulting from "marriage, bankruptcy, assignment, or any reason other than death."[121] Substitution orders can "be entered at anytime" and, parties may be "added or dropped" from a case by an appellate court, sua sponte, or the party's motion.

---

[120] Fed. R. App. P. 43; Arrazabal v. Barr, No. 17-2969, 2019 WL 2864754, at *9 (7th Cir. July 3, 2019); Moore v. Thurston, No. 18-1382, 2019 WL 2719940, at *1 n.3 (8th Cir. July 1, 2019); Silberman v. Miami Dade Transit, No. 17-15092, 2019 WL 2498231, at *3 (11th Cir. June 17, 2019) (Rule 43 only applies to cases that had the correct parties named originally); Despain v. Berryhill, 926 F.3d 1024, 1024 n.1 (8th Cir. 2019); Al-Turki v. Tomsic, 926 F.3d 610, 610 (10th Cir. 2019); Fowler v. Benson, 924 F.3d 247, 253 n.2 (6th Cir. 2019); Juarez-Coronado v. Barr, 919 F.3d 1085, 1085 n.1 (8th Cir. 2019); Harden v. Norman, 919 F.3d 1097, 1097 (8th Cir. 2019); Johnson v. Carpenter, 918 F.3d 895, 895 (10th Cir. 2019); Barikyan v. Barr, 917 F.3d 142, 142 n.1 (2d Cir. 2019); Dolic v. Barr, 916 F.3d 680, 680 (8th Cir. 2019); Hobdy v. Raemisch, 916 F.3d 863, 863 (10th Cir. 2019); Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1312 n.1 (11th Cir. 2019); Bekkem v. Wilkie, 915 F.3d 1258, 1258 (10th Cir. 2019); Maralex Res., Inc. v. Barnhardt, 913 F.3d 1189, 1189 (10th Cir. 2019); sODonnell v. Salgado, 913 F.3d 479, 482 (5th Cir. 2019) (Rule 43 was designed in part to prevent suits involving public officers from becoming moot once the officials left office); Church v. Missouri, 913 F.3d 736, 736 n.1 (8th Cir. 2019); Njong v. Whitaker, 911 F.3d 919, 919 n.1 (8th Cir. 2018); Simpson v. Carpenter, 912 F.3d 542, 542 n.1 (10th Cir. 2018); Ruiz-Guerrero v. Whitaker, 910 F.3d 572, 572 n.1 (1st Cir. 2018); Molina v. Whitaker, 910 F.3d 1056, 1056 n.1 (8th Cir. 2018);

[121] Fabian-Soriano v. Barr, No. 18-2052, 2019 WL 2314383, at *4 n.1 (1st Cir. May 31, 2019) (substituting William Barr for Jeff Sessions as the Attorney General in an INA proceeding); O'Riordan v. Barr, 925 F.3d 6, 6 n.1 (1st Cir. 2019); Wanjiku v. Barr, 918 F.3d 215, 215 n.1 (1st Cir. 2019) (same); Franco-Ardon v. Barr, 922 F.3d 23, 23 n.1 (1st Cir. 2019) (substituting Acting Attorney General Matt Whitaker with William Barr as the respondent); Tay-Chan v. Barr, 918 F.3d 209, 209 n.1 (1st Cir. 2019) (same); *Agustin v. Whitaker*, 914 F.3d 43, 43 n.1 (1st Cir. 2019) (substituting Attorney General Jeff Sessions with Acting Attorney General Matt Whitaker); Alvarado v. Whitaker, 914 F.3d 8, 8 n.1 (1st Cir. 2019) (same); Medina v. Whitaker, 913 F.3d 263, 263 n.1 (1st Cir. 2019) (same); Garcia-Aguilar v. Whitaker, 913 F.3d 215, 215 n.1 (1st Cir. 2019) (same); Gyamfi v. Whitaker, 913 F.3d 168, 168 n.1 (1st Cir. 2019) (same); Urgilez Mendez v. Whitaker, 910 F.3d 566, 566 n.1 (1st Cir. 2018) (same); Pineda v. Whitaker, 908 F.3d 836, 836 n.1 (1st Cir. 2018) (same); Santos-Guaman v. Sessions, 891 F.3d 12, 12 n.1 (1st Cir. 2018) (substituting Attorney General Loretta Lynch with Jeff Sessions); Aguilar-Escoto v. Sessions, 874 F.3d 334, 334 n.1 (1st Cir. 2017) (same); Marroquin-Rivera v. Sessions, 861 F.3d 7, 7 n.1 (1st Cir. 2017) (same); Sanchez-Romero v. Sessions, 865 F.3d 43, 43 (1st Cir. 2017) (same); Holder v. Sessions, 848 F.3d 500, 500 (1st Cir. 2017) (same); New Hampshire Hosp. Ass'n v. Azar, 887 F.3d 62, 62 n.1 (1st Cir. 2018) (substituting acting HHS Secretary Eric Hargan with Alex Azar); Sasen v. Spencer, 879 F.3d 354, 354 n.1 (1st Cir. 2018) (substituting Navy Secretary Sean Stackley with Richard Spencer); Thomas G. Gallagher, Inc. v. Occupational Safety & Health Review Comm'n, 877 F.3d 1, 1 n.1 (1st Cir. 2017) (substituting acting Labor Secretary Edward Hulger with Alex Acosta); Justiniano v. Soc. Sec. Admin., 876 F.3d 14, 14 n.1 (1st Cir. 2017) (substituting acting SSA Commissioner Nancy Berryhill with Carolyn Colvin); Walker-Butler v. Berryhill, 857 F.3d 1, 1 (1st Cir. 2017) (same); Goethel v. U.S. Dep't of Commerce, 854 F.3d 106,

## Extraordinary Writs

Under Federal Rule of Appellate Procedure 21, petitions for "mandamus" and "prohibition" must be filed with the appellate court clerk along with the filing fee and served on all parties to the lower court proceeding as well as the "trial court judge."[122] The provisions governing the extraordinary writs contents bear a sharp resemblance to the analogous rules covering mandamus and prohibition writs in Mississippi. Here, the filing should be entitled *In re: Petitioner*; and, contain a statement of facts; a statement of issues; an argument section; "the relief sought;" and a copy of the disputed order or judgment as well as the pertinent record excerpts needed for resolving the appeal.[123] If the

[106] (1st Cir.), cert. denied sub nom. Goethel v. Dep't of Commerce, 138 S. Ct. 221, 199 L. Ed. 2d 120 (2017) (substituting Wilbur Ross, U.S. Secretary of Commerce, for former Secretary Penny Pritzker; Benjamin Friedman, Acting Administrator, National Oceanic and Atmospheric Administration, for former Administrator Kathryn Sullivan; and Samuel D. Rauch III, Assistant Administrator for Fisheries (Acting) for the National Marine Fisheries Service, for former Assistant Administrator Eileen Sobeck); *Ali v. United States*, 849 F.3d 510, 510 (1st Cir. 2017) (substituting Jefferson B. Sessions, III, Attorney General of the United States, for former Attorney General Loretta E. Lynch; John F. Kelly, Secretary of the U.S. Department of Homeland Security, for former Secretary Jeh Charles Johnson; Lori Scialabba, Acting Director of U.S. Citizenship and Immigration Services, for former Director Leon Rodriguez; and Andrea Rogers, Field Office Director of the U.S. Citizenship and Immigration Services Manchester Field Office, for former Director Anthony Violanti); Igartua v. Trump, 868 F.3d 24, 24 n.1 (1st Cir. 2017) (substituting President Donald Trump for Barack Obama and Commerce Secretary Wilbur Ross for Penny Pritzker); Cruz v. Mattis, 861 F.3d 22, 22 n.1 (1st Cir. 2017) (substituting Defense Secretary James Mattis for Ashton Carter);

[122] United States v. Shalhoub, 855 F.3d 1255, 1263 (11th Cir.), cert. denied, 138 S. Ct. 381, 199 L. Ed. 2d 279 (2017); In re Atl. Pipe Corp., 304 F.3d 135, 139 (1st Cir. 2002); In re Boston's Children First, 244 F.3d 164, 171 (1st Cir. 2001), as amended on denial of reh'g and reh'g en banc (Mar. 2, 2001); In re U.S., 60 F.3d 729, 732 (11th Cir. 1995) (granting writ of mandamus); In re Bieter Co., 16 F.3d 929, 932 (8th Cir. 1994); Freeman v. Cavazos, 923 F.2d 1434, 1435 (11th Cir. 1991) (denying writ of mandamus); In re Bushkin Assocs., Inc., 864 F.2d 241, 247 (1st Cir. 1989) (mandamus practice neither contemplates nor permits the filing of counterclaims); Ramirez v. Rivera-Dueno, 861 F.2d 328, 335 (1st Cir. 1988) (suggesting that litigant could seek a writ of mandamus to enforce the decision); United States v. Lord, 542 F.2d 719, 720 n.1 (8th Cir. 1976); Gen. Motors Corp. v. Lord, 488 F.2d 1096 (8th Cir. 1973) (denying mandamus where a new trial was ordered after inadmissible evidence was introduced); Technitrol, Inc. v. McManus, 405 F.2d 84, 85 (8th Cir. 1968); Pfizer Inc. v. Lord, 456 F.2d 545 (8th Cir. 1972) (mandamus is the appropriate remedy to review whether documents were protected under the attorney-client privilege); Pfizer Inc. v. Lord, 456 F.2d 532 (8th Cir. 1972) (mandamus is an appropriate remedy to evaluate whether trial judge should have disqualified herself or himself).

[123] Fed. R. App. P. 21; United States v. Shalhoub, 855 F.3d 1255, 1263 (11th Cir.), cert. denied, 138 S. Ct. 381, 199 L. Ed. 2d 279 (2017) (denying mandamus writ); Matter of Bankers Tr. Co., 775 F.2d 545, 545 (3d Cir. 1985)(same); Freeman v. Cavazos, 923 F.2d 1434, 1437 (11th Cir. 1991); In re Atl. Pipe Corp., 304 F.3d 135, 139 (1st Cir. 2002) (noting the ability of the Court to solicit responses); In re Chambers Dev. Co., Inc., 148 F.3d 214, 223 n.7 (3d Cir. 1998) (same); In re Braxton, 258 F.3d 250, 255 (4th Cir. 2001) (same); e

Tights, Inc. v. Stanley, 441 F.2d 336, 337 (4th Cir. 1971) (same); In re Urohealth Sys., Inc., 252 F.3d 504, 506 (1st Cir. 2001); In re Nwanze, 242 F.3d 521, 525 n.1 (3d Cir. 2001); Hahnemann Univ. Hosp. v. Edgar, 74 F.3d 456, 462 (3d Cir. 1996) (certification is not needed to file a mandamus writ); In re U.S., 60 F.3d 729, 732 (11th Cir. 1995); In re Charlotte Observer (Div. of Knight Pub. Co.), 882 F.2d 850, 852 (4th Cir. 1989); Gov't of Virgin Islands v. Douglas, 812 F.2d 822, 832 (3d Cir. 1987); Cent. S.C. Chapter, Soc. of

Court does not "deny" the petition, it will call for opposing counsel or the "trial court judge" to submit an answer. The clerk will provide a notice to the parties of the date, time, and location for "oral argument" if any hearing is scheduled. Extraordinary writ petitions will be given "priority" over "ordinary civil cases." Requests for other extraordinary writs must be filed with the clerk in copies of "four" and served on opposing counsel. These petitions may not "exceed 7,800 words."[124]

**Voluntary Dismissal**

As is the case in Hawaii, Mississippi and Alabama, albeit with minor modification, under Federal Rule of Appellate Procedure 42, both the appellant acting alone as well as all the parties acting in concert may upon motion and notice or the filing of an agreement that is signed by all the parties respectively request the dismissal of a docketed matter pending before any of the various Courts of Appeal. In the latter instance, the agreement must specify how costs will and fees will be allocated amongst the parties.[125] A federal appellate court can also dismiss an appeal for failure to prosecute even if a timely appeal notice has been filed.[126]

**Merits Briefs**

---

Prof'l Journalists, Sigma Delta Chi v. Martin, 556 F.2d 706 (4th Cir. 1977) (petitioner had standing to seek a writ of mandamus); In re Asbestos Sch. Litig., 46 F.3d 1284, 1289 n.3 (3d Cir. 1994); Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 165 (3d Cir. 1993); In re Washington Post Co., 807 F.2d 383, 388 (4th Cir. 1986) (treating petition for appeal as a mandamus petition); Gold v. Johns-Manville Sales Corp., 723 F.2d 1068, 1074 n.8 (3d Cir. 1983); Frederick L. v. Thomas, 578 F.2d 513, 516 (3d Cir. 1978) (electing to exercise jurisdiction over litigant's mandamus petition even after abstaining); Brace v. O'Neill, 567 F.2d 237, 250 (3d Cir. 1977) (finding that stay order is reviewable by mandamus);

[124] Fed. R. App. P. 21.

[125] Fed. R. App. P. 42; D.C. v. Trump, No. 18-2488, 2019 WL 2998602, at *3 (4th Cir. July 10, 2019); J.B. v. United States, 916 F.3d 1161, 1165 n.5 (9th Cir. 2019); Pearson v. Target Corp., 893 F.3d 980, 985 (7th Cir. 2018); Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc., 892 F.3d 719, 724 n.1 (5th Cir. 2018); Dubuisson v. Stonebridge Life Ins. Co., 887 F.3d 567, 570 n.2 (2d Cir. 2018); Amparan v. Lake Powell Car Rental Companies, 882 F.3d 943, 945 n.1 (10th Cir. 2018); Parker v. Montgomery Cty. Corr. Facility/Bus. Office Manager, 870 F.3d 144, 154 (3d Cir. 2017); Enerplus Res. (USA) Corp. v. Wilkinson, 865 F.3d 1094, 1096 n.4 (8th Cir. 2017); Planned Parenthood Great Plains v. Williams, 863 F.3d 1008, 1010 (8th Cir. 2017); San Luis & Delta-Mendota Water Auth. v. Haugrud, 848 F.3d 1216, 1217 (9th Cir. 2017), as corrected (Mar. 23, 2017); Dynamic 3D Geosolutions LLC v. Schlumberger Ltd. (Schlumberger N.V.), 837 F.3d 1280, 1284 (Fed. Cir. 2016); Ramara, Inc. v. Westfield Ins. Co., 814 F.3d 660, 672 n.7 (3d Cir. 2016); TransAm Trucking, Inc. v. Fed. Motor Carrier Safety Admin., 808 F.3d 1205, 1209 (10th Cir. 2015); Philos Techs., Inc. v. Philos & D, Inc., 802 F.3d 905, 911 (7th Cir. 2015); ASARCO, LLC v. Celanese Chem. Co., 792 F.3d 1203, 1206 n.2 (9th Cir. 2015); In re Lehman Bros., Inc., 791 F.3d 277, 289 (2d Cir. 2015); Animal Legal Def. Fund v. U.S. Dep't of Agric., 789 F.3d 1206, 1209 n.1 (11th Cir. 2015); United States v. Ramer, 787 F.3d 837, 838 (7th Cir. 2015); Miller v. City of Monona, 784 F.3d 1113, 1118 (7th Cir. 2015); Alvarado v. Corp. Cleaning Servs., Inc., 782 F.3d 365, 373 (7th Cir. 2015); In re Nexium Antitrust Litig., 778 F.3d 1, 1 (1st Cir. 2015); AngioDynamics, Inc. v. Biolitec, Inc., 775 F.3d 550, 550 (2d Cir. 2015); Floyd v. City of New York, 770 F.3d 1051, 1056 (2d Cir. 2014); Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc., 769 F.3d 1004 (9th Cir. 2014); Davis v. Abington Mem'l Hosp., 765 F.3d 236, 238 n.1 (3d Cir. 2014);

[126] Fed. R. App. P. 3.

Federal Rule of Appellate Procedure 28 dictates the content of merits briefs before the thirteen circuits and bears a sharp resemblance to the analogous rule covering brief content in matters before the Texas Supreme Court.[127] More specifically, opening briefs filed before the various federal Courts of Appeals must contain a corporate "disclosure" statement;  "a table of contents with [page] references" providing a very short description of each point; "an index of authorities arranged alphabetically" with page references; a jurisdictional statement that recites the "relevant facts [and dates] establishing jurisdiction" over a "final order or judgment" with "citations to applicable statutory provisions";  a questions presented section; a statement of the case disclosing the course and disposition of proceedings in the lower court or state agency and the relevant facts supported by "record references;" an argument summary; an argument section with the standard of review set out for each issue; a "short conclusion" with a a prayer for relief; a rules compliance certificate; and an optional appendix with the "statutes, rules, [and] regulations" at issue in the appeal. This brief is due within "forty days" of the record's filing. As is the case in Massachusetts, the rules certificate must include a word count for the brief which counsel can rely on her or his word processor for providing.

In litigation before the Virginia Supreme Court, Maryland Court of Appeals, and the thirteen federal circuits, the contents of the opening and answering brief, for the most part, mirror one another with the exception that in the third instance, the appellee need not include a "jurisdictional statement," case statement, questions presented section, and statement outlining the "standard of review" in the argument section unless she or he is dissatisfied with the appellant's statements in those sections of her or his opening brief.[128] This brief is due within "thirty days" of the date that the opening brief is served. One reply can be filed after the answering brief is submitted. This filing should contain "a table of contents with [page] references" providing a very short description of each point and an authorities index. This brief must be summitted within "twenty-one days" after the answering brief has been served but cannot be summitted later than "seven days" before oral argument in the appeal. [129] Counsel must provide "twenty-five copies" of each brief to the Court clerk. These rules apply even if the appellee is raising a matter on cross appeal. If the appellant fails to file her or his brief by the applicable deadline, the appellee can move to "dismiss"

---

[127] E. D. v. Sharkey, No. 18-1688, 2019 WL 2723370, at *6 n.5 (3d Cir. July 1, 2019) (noting waiver of arguments that are not included in the brief); United States v. Bishop, 926 F.3d 621, 628 (10th Cir. 2019) (noting Rule 28's requirement for including arguments in a party's filed brief lest the claims be waived); Marshall's Locksmith Serv. Inc. v. Google, LLC, 925 F.3d 1263, 1271 (D.C. Cir. 2019) (same); Singh v. Barr, 920 F.3d 255, 258 (5th Cir. 2019)  (same); Wal-Mart Stores E., LP v. Acosta, 919 F.3d 1073, 1078 (8th Cir. 2019) (same); United States v. Zavala, 427 F.3d 562, 564–65 & n.1 (8th Cir. 2005) (same); Steinle v. City & Cty. of San Francisco, 919 F.3d 1154, 1165 (9th Cir. 2019) (same); United States v. Isabella, 918 F.3d 816, 845 (10th Cir. 2019) (same); Monteon-Camargo v. Barr, 918 F.3d 423, 428 (5th Cir. 2019), as revised (Apr. 26, 2019) (same); Bozzuto's Inc. v. Nat'l Labor Relations Bd., No. 18-125, 2019 WL 2571628, at *7 (2d Cir. June 24, 2019); Sierra Club v. Envtl. Prot. Agency, 925 F.3d 490, 496 (D.C. Cir. 2019); Naylor Farms, Inc. v. Chaparral Energy, LLC, 923 F.3d 779, 797 (10th Cir. 2019) (noting that argument section must contain headings);
[128] Fed. R. App. P. 28.
[129] Fed. R. App. P. 31.

the appeal. By way of contrast, the appellee does not submit a merits brief, she or he may not be heard at "oral argument" unless the Court directs otherwise.

As is the case in Alabama, Mississippi, Florida, Virginia and Louisiana, albeit with minor exception, if counsel discovers a "pertinent and significant authority" after filing her or his brief or after oral argument (but before the Court delivers its opinion), Federal Rule of Appellate Procedure 28 permits them to submit a double-spaced letter of no more than "350 words." The letter must include citations to the new authority and references to the brief claim or oral argument contention that the new authority supports. A response must be promptly filed and cannot exceed "350 words."[130]

---

[130] Blair v. Rent-A-Ctr., Inc., No. 17-17221, 2019 WL 2701333, at *4 n.2 (9th Cir. June 28, 2019); Regents of the Univ. of Minnesota v. LSI Corp., No. 2018-1559, 2019 WL 2479596, at *10 n.20 (Fed. Cir. June 14, 2019); Weil v. Metal Techs., Inc., 925 F.3d 352, 356 (7th Cir. 2019); United States v. Delva, 922 F.3d 1228, 1245 (11th Cir. 2019); Worman v. Healey, 922 F.3d 26, 38 n.6 (1st Cir. 2019); Ragbir v. Homan, 923 F.3d 53, 74 n.27 (2d Cir. 2019); Gonzalez Ruano v. Barr, 922 F.3d 346, 356 (7th Cir. 2019); In re Al-Nashiri, 921 F.3d 224, 233 (D.C. Cir. 2019); WildEarth Guardians v. Conner, 920 F.3d 1245, 1253 (10th Cir. 2019); United States v. Thompson, 921 F.3d 82, 85 n.4 (2d Cir. 2019); Omega Patents, LLC v. CalAmp Corp., 920 F.3d 1337, 1350 (Fed. Cir. 2019); United States v. Jackson, 918 F.3d 467, 493 (6th Cir. 2019); Feinberg v. Comm'r of Internal Revenue, 916 F.3d 1330, 1336 n.1 (10th Cir. 2019); United States v. Sayer, 916 F.3d 32, 40 (1st Cir. 2019), cert. denied, No. 18-9306, 2019 WL 2163889 n.11 (U.S. June 17, 2019); United States v. Caniff, 916 F.3d 929, 935 n.11 (11th Cir. 2019); Momenta Pharm., Inc. v. Bristol-Myers Squibb Co., 915 F.3d 764, 766 (Fed. Cir. 2019); Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc., 916 F.3d 116, 127 n.14 (2d Cir. 2019); Dimond Rigging Co., LLC v. BDP Int'l, Inc., 914 F.3d 435, 449 (6th Cir. 2019); United States v. Fattah, 914 F.3d 112, 146 n.9 (3d Cir. 2019); WesternGeco L.L.C. v. ION Geophysical Corp., 913 F.3d 1067, 1075 n.3 (Fed. Cir. 2019); United States v. Rios-Rivera, 913 F.3d 38, 42 (1st Cir.), cert. denied, 139 S. Ct. 2647 (2019); United States v. Aybar-Ulloa, 913 F.3d 47, 57 (1st Cir. 2019); Cortez-Mendez v. Whitaker, 912 F.3d 205, 208 (4th Cir. 2019); Williamson v. Stirling, 912 F.3d 154, 168 n.10 (4th Cir. 2018); Baxter v. Comm'r of Internal Revenue Serv., 910 F.3d 150, 169 n.3 (4th Cir. 2018); Curtis Inv. Co., LLC v. Comm'r of Internal Revenue, 909 F.3d 1339, 1346 (11th Cir. 2018); Brodsky v. HumanaDental Ins. Co., 910 F.3d 285, 292 n.1 (7th Cir. 2018); Griffin v. TeamCare, 909 F.3d 842, 846 (7th Cir. 2018); United States v. Rodriguez-Rosado, 909 F.3d 472, 482 (1st Cir. 2018); E. R. by E. R. v. Spring Branch Indep. Sch. Dist., 909 F.3d 754, 763 (5th Cir. 2018); United States v. Baroni, 909 F.3d 550, 567 n.9 (3d Cir. 2018), cert. granted sub nom. Kelly v. United States, No. 18-1059, 2019 WL 588845 (U.S. June 28, 2019); AirFacts, Inc. v. de Amezaga, 909 F.3d 84, 93 n.6 (4th Cir. 2018); Regents of the Univ. of California v. U.S. Dep't of Homeland Sec., 908 F.3d 476, 510 (9th Cir. 2018), cert. granted sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California, No. 18-587, 2019 WL 2649834 (U.S. June 28, 2019); Audubon Soc'y of Greater Denver v. United States Army Corps of Engineers, 908 F.3d 593, 603 n.3 (10th Cir. 2018); Angelex, Ltd. v. United States, 907 F.3d 612, 620 (D.C. Cir. 2018), cert. denied, 139 S. Ct. 2013 (2019); Worldcall Interconnect, Inc. v. Fed. Commc'ns Comm'n, 907 F.3d 810, 825 n.7 (5th Cir. 2018), as revised (Nov. 15, 2018); Masias v. Envtl. Prot. Agency, 906 F.3d 1069, 1080 (D.C. Cir. 2018), order clarified, No. 16-1314, 2019 WL 1096761 (D.C. Cir. Feb. 22, 2019); John M. O'Quinn, P.C. v. Lexington Ins. Co., 906 F.3d 363, 373 n.12 (5th Cir. 2018); Vreeland v. Zupan, 906 F.3d 866, 881 n.4 (10th Cir. 2018), cert. denied, 139 S. Ct. 1586, 203 L. Ed. 2d 742 (2019); Funches v. Progressive Tractor & Implement Co., L.L.C., 905 F.3d 846, 849 n.2 (5th Cir. 2018), as revised (Oct. 8, 2018); Woodward v. United States, 905 F.3d 40, 48 (1st Cir. 2018); Sindhi v. Raina, 905 F.3d 327, 334 (5th Cir. 2018); Westfall v. Luna, 903 F.3d 534, 545 n.4 (5th Cir. 2018); United States v. Kirsch, 903 F.3d 213, 233 n.22 (2d Cir. 2018), cert. denied, 139 S. Ct. 1272, 203 L. Ed. 2d

**Appeal And Cross Appeal Brief Cover Designations**

| Brief Name | Color |
|---|---|
| Opening Brief | Blue |
| Answering Brief | Red |
| Reply Brief | Gray |
| Amicus or Intervenor Brief | Green |

| Brief Name | Color |
|---|---|
| Appellant's Opening Brief | Blue |
| Appellee's Opening and Response Brief | Red |
| Appellant's Response and Reply Brief | Yellow |
| Appellee's Reply Brief | Gray |
| Amicus or Intervenor Brief | Green |

The appellant's opening brief is limited to "thirty pages;" the appellee's opening and response brief is limited to "thirty-five pages;" the appellant's response and reply brief may not exceed "thirty pages;" and the appellee's reply is limited to "fifteen pages." There is a "13,000 word" limit for each of the appellant's two filings on cross appeal, a "15,300 word limit" for the appellee's principal and reply brief, and a "6,500 word" limit for the appellee's reply brief. The appellant's opening brief is due "within forty days" after the appellate record is filed; the appellee's opening and response brief must be delivered "within thirty days" of service of the appellant's initial brief; the appellant's response and reply must be submitted, again, "within thirty days" after the appellee's opening and response brief has been filed; and the "appellee's reply brief" is due within "twenty-one days" of service of the appellant's response and reply brief but no later than "seven days" before oral argument is scheduled for the case, assuming a hearing has been set at all.[131]

Every brief and appendix should display a cover page that discloses the docket number; lower court name; case name; "the nature of the proceeding;" submission title; and counsel's "name, office address, and telephone number."[132] Filings should be produced on white 8.5 x 11 inch paper with "double spaced [proportionally spaced] text" "one inch margins." "Headings and footnotes" may contain text that is single spaced.[133] While the brief should be in a "plain" "Roman" style,

---

279 (2019); Reyes v. Waples Mobile Home Park Ltd. P'ship, 903 F.3d 415, 433 n.13 (4th Cir. 2018), cert. denied sub nom. Waples Mobile Home Park Ltd. P'ship v. de Reyes, 139 S. Ct. 2026 (2019);

[131] Fed. R. App. P. 28.1.

[132] Fed. R. App. P. 32; Vermillion v. Corizon Health, Inc., 906 F.3d 696 (7th Cir. 2018); Rodriguez v. Jennings, 887 F.3d 954, 956 (9th Cir. 2018); Pecher v. Owens-Illinois, Inc., 859 F.3d 396, 402 (7th Cir. 2017); In re Target Corp. Customer Data Sec. Breach Litig., 855 F.3d 913, 917 (8th Cir. 2017); Lu Junhong v. Boeing Co., 792 F.3d 805, 808 (7th Cir. 2015); Wheeler v. Talbot, 770 F.3d 550, 556 (7th Cir. 2014); DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245, 1252 n.2 (Fed. Cir. 2014); Centerpoint Energy Servs., Inc. v. Halim, 743 F.3d 503, 507 (7th Cir. 2014); A.D. v. Markgraf, 676 F.3d 868, 869 (9th Cir. 2012); Robinson v. Beard, 762 F.3d 316, 323 n.1 (3d Cir. 2014); Landrith v. Schmidt, 732 F.3d 1171, 1175 (10th Cir. 2013);

[133] Fed. R. App. P. 27.

"[c]ase names must be italicized or underlined."[134] Both briefs and appendices should be securely "bound."

## Brief Appendices

Under the Federal Rules of Appellate Procedure, the appellant is obliged to prepare an appendix containing "the relevant docket entries in the" lower court; "the relevant portions of the pleadings, charge, findings, or opinion;" the disputed final judgment or order; and any other portions of the "record" that the parties wish to direct the appellate court's attention to. Legal memos that were released by the District Court will be "excluded" "unless they have independent relevance." Ten copies of the appendix must be submitted to the clerk and one copy must be served on opposing counsel. If the parties cannot agree on the appendix's contents, as is the case with ligation before Utah's and Nevada's appellate courts,  the appellant must submit a statement to opposing counsel within "fourteen days" of the record's filing with the portions of the record that she or he would prefer to include in the addendum along with the "issues" that she or he intends to raise on review. The appellee can then submit a response with the record excerpts that she or he would prefer to designate for inclusion "within fourteen days" of the original designation statement's service.[135] In both Virginia and the various Court of Appeal, the appellant pays the preparation costs for the appendix unless she or he finds that the appellee has requested that she or he include material that is "unnecessary for the disposition of the appeal, in which case, the appellee will pay the costs for the preparation of the disputed material. The document must start off with a "table of contents," the "relevant docket entries," and the other portions of the record in "chronological order" in which the documents were filed in the lower court. If pages from the proceeding transcript "are placed in the appendix, the transcript page numbers must be shown in brackets immediately before the included pages." "Immaterial formal matters…should be omitted." Exhibits, on the other hand, must be "reproduced" "in a separate [indexed] volume" that is submitted in copies of four with the appellate clerk. Only one copy of the exhibit volume need be provided to opposing counsel.[136]

---

[134] Fed. R. App. P. 32.

[135] Vazquez v. Borrero, 636 F.2d 4, 4 (1st Cir. 1980)

[136] Fed. R. App. P. 30; Sweet Life v. Dole, 876 F.2d 402, 408 (5th Cir. 1989); Morgan v. O'Bryant, 687 F.2d 510, 515 n.7 (1st Cir. 1982); Weber v. Garza, 570 F.2d 511, 514 n.6 (5th Cir. 1978); Gammill Co. v. Asher, 423 F.2d 627, 628 (5th Cir. 1970); Esso Standard Oil Co. v. Secatore's, Inc., 246 F.2d 17 (1st Cir. 1957)

Diaz-Colon v. Fuentes-Agostini, 786 F.3d 144, 147 n.4 (1st Cir. 2015) (denying motion to file supplemental appendix because of moot claim); Barry v. Moran, 661 F.3d 696, 699 n.3 (1st Cir. 2011) (noting failure to comply with requirement to paginate appellee's exhibits in appendix); Fryar v. Curtis, 485 F.3d 179, 182 n.1 (1st Cir. 2007) (noting failure to prepare appendix); Papas v. Hanlon, 849 F.2d 702, 703 (1st Cir. 1988) (same);

Gonzalez-Rios v. Hewlett Packard PR Co., 749 F.3d 15, 19 (1st Cir. 2014) (noting failure to file a complete appendix); Reyes-Garcia v. Rodriguez & Del Valle, Inc., 82 F.3d 11, 14 (1st Cir. 1996) (same); United States v. Brown, 49 F.3d 135, 137 n.4 (5th Cir. 1995) (same); Com. of Mass., Dep't of Pub. Welfare v. Sec'y of Agric., 984 F.2d 514, 523 n.7 (1st Cir. 1993) (same);

## Amicus Curiae Briefs

Federal Rule of Appellate Procedure 29 governs amicus curiae briefs in the federal appellate courts and bears a sharp resemblance to the procedures for these filings in Arkansas and Florida.[137] Here, a private party seeking to file an amicus curiae brief in a matter pending before one of the thirteen federal Courts of Appeal must obtain the consent of the Court or file a motion after all the adverse

---

Credit Francais Int'l, S.A. v. Bio-Vita, Ltd., 78 F.3d 698, 700 (1st Cir. 1996) (noting that appendix was poorly paginated and not in chronological order); United States v. Wilkes, 20 F.3d 651, 653 (5th Cir. 1994) (noting that pro se merits briefs are governed by the Federal Rules of Appellate Procedure's regulations on brief appendices); Toucet v. Mar. Overseas Corp., 991 F.2d 5, 8 (1st Cir. 1993) (noting that First Circuit can rely on portions of the record that are not included in the appellate record but are still a part of the lower court record); Mungin v. Fla. E. Coast Ry. Co., 416 F.2d 1169, 1171 n.6 (5th Cir. 1969) (same); Bus. Credit Leasing v. City of Biddeford, 978 F.2d 767, 769 n.5 (1st Cir. 1992) (noting misstatements in the record); United States v. Giorgi, 840 F.2d 1022, 1031 (1st Cir. 1988) (failure to include appendix may result in Court disregarding materials in the appendix); Calo v. United States, 338 F.2d 793, 794 (1st Cir. 1964) (same); a

Shankman v. Aspinook Corp., 215 F.2d 902 (1st Cir. 1954) (same); In re GHR Energy Corp., 791 F.2d 1200, 1202 (5th Cir. 1986) (noting failure to include appeal notice in record); Drewett v. Aetna Cas. & Sur. Co., 539 F.2d 496, 500 (5th Cir. 1976) (noting inclusion of unnecessary material in the record); Weinberger v. Grp., 339 F.2d 34 (1st Cir. 1964) (denying extension for appendix filing); Pioneer Credit Corp. v. Bloomberg, 323 F.2d 992 (1st Cir. 1963) (considering exhibit sent by the lower court clerk even though t was not included in the record); Killian v. Eyerly Aircraft Co., 454 F.2d 1173 (5th Cir. 1972) (noting inclusion of unnecessarily material and assessing costs); Burnside v. E. Airlines, Inc., 519 F.2d 1127, 1128 n.3 (5th Cir. 1975) (noting Circuit Court's ability to dispense with the appendix requirement)

[137] Dine Citizens Against Ruining Our Env't v. Bernhardt, 923 F.3d 831, 859 (10th Cir. 2019) (denying leave to file amicus brief); Spaho v. United States Attorney Gen., 837 F.3d 1172, 1175 (11th Cir. 2016) (same); Procopio v. Wilkie, 899 F.3d 1382 (Fed. Cir. 2018) (soliciting amicus curiae briefs); NantKwest, Inc. v. Matal, 869 F.3d 1327, 1328 (Fed. Cir. 2017) (same); Wi-Fi One, LLC v. Broadcom Corp., 851 F.3d 1241, 1242 (Fed. Cir. 2017) (same); In re Aqua Prod., Inc., 833 F.3d 1335, 1336 (Fed. Cir. 2016) (same); The Medicines Co. v. Hospira, Inc., 805 F.3d 1357, 1358 (Fed. Cir. 2015) (same); Gucci Am., Inc. v. Weixing Li, 768 F.3d 122, 129 (2d Cir. 2014) (same); Lexmark Int'l, Inc. v. Impression Prod., Inc., 785 F.3d 565, 566 (Fed. Cir. 2015) (same); United States v. Volpendesto, 755 F.3d 448, 452 (7th Cir. 2014) (same);  Nat. Res. Def. Council v. Envtl. Prot. Agency, 896 F.3d 459, 463 (D.C. Cir.), judgment entered, 735 F. App'x 737 (D.C. Cir. 2018) (allowing a party that lacked standing as an intervenor to file an amicus curiae brief); United States v. Brookdale Senior Living Communities, Inc., 892 F.3d 822, 833 n.6 (6th Cir. 2018), cert. denied sub nom. Brookdale Senior Living Communities, Inc. v. U.S. ex rel. Prather, 139 S. Ct. 1323, 203 L. Ed. 2d 565 (2019); Myun-Uk Choi v. Tower Research Capital LLC, 890 F.3d 60, 63 n.1 (2d Cir. 2018) (denying an amicus' motion to file a brief in support of rehearing); Friedman v. Bloomberg L.P., 884 F.3d 83, 88 (2d Cir. 2017) (same); Fed. Educ. Ass'n-Stateside Region v. Dep't of Def., Domestic Dependents Elementary & Secondary Sch., 884 F.3d 1349, 1350 (Fed. Cir. 2018); Gunderson v. BNSF Ry. Co., 850 F.3d 962, 964 (8th Cir. 2017) (granting motion for leave to file amicus curiae brief); Kaur v. Things Remembered, Inc., 829 F.3d 1117 (9th Cir. 2016) (same); Ermini v. Vittori, 758 F.3d 153, 156 (2d Cir. 2014) (same); Garcia v. Google, Inc., 749 F.3d 1093, 1094 (9th Cir. 2014) (same); Scheick v. Tecumseh Pub. Sch., 766 F.3d 523, 526 (6th Cir. 2014); Laguna v. Coverall N. Am., Inc., 762 F.3d 902, 903 (9th Cir. 2014); Ligon v. City of New York, 743 F.3d 362, 364 (2d Cir. 2014); NML Capital, Ltd. v. Republic of Argentina, 727 F.3d 230, 240 (2d Cir. 2013); Haskell v. Harris, 727 F.3d 916, 917 (9th Cir. 2013)

parties in the appeal have consented to the filing. As is the case in Texas, the amicus brief must be attached to the motion. The motion must identify the applicant's "interest" in the case and disclose how the brief will aid the decision process, the issues the filing will address. The brief should include a "disclosure statement;" "a table of contents with [page] references" providing a very short description of each point; "an index of authorities arranged alphabetically" with page references; a statement identifying the amicus; a statement confirming whether "a party's counsel authored the brief in whole or in part contributed money towards the brief's preparation, or whether another individual or entity "contributed money" for the brief's preparation; an argument summary; an argument section setting out the applicable standard of review; and a rules compliance certificate. If the amicus is supporting a party in the appeal, her or his brief is due "within seven days" after the deadline for "principal brief" of the party she or he is supporting. On the other hand, if the amicus is not supporting an adverse party, her or his brief is due within "seven days" after the appellant's brief is filed. If the amicus is filing a brief in support of, or against, a rehearing petition, the filing is due within "seven days" after the deadline for submitting the rehearing petition. All amicus briefs are limited to 6,500 words. Any Court of Appeals can "strike an amicus brief that would result in a judge's disqualification."[138]

**Oral Argument**

The various Court of Appeals usually require counsel to file a "statement explaining why oral argument should, or need not, be permitted."[139] While the default presumption is that oral argument "must be allowed in every case," the panel can decline to hear a matter after examining the briefs if it concludes that "the appeal is frivolous;…the dispositive issue or issues have been authoritatively decided; or…the facts and legal arguments are adequately presented in the briefs

---

[138] Fed. R. App. P. 29; Stuart v. Huff, 706 F.3d 345, 355 (4th Cir. 2013); Palomar Med. Ctr. v. Sebelius, 693 F.3d 1151, 1159 n.14 (9th Cir. 2012); In re Halo Wireless, Inc., 684 F.3d 581, 595 (5th Cir. 2012); Hui Lin Huang v. Holder, 677 F.3d 130, 133 (2d Cir. 2012); Palomar Med. Ctr. v. Sebelius, 672 F.3d 1152 (9th Cir. 2012); In re Bellingham Ins. Agency, Inc., 661 F.3d 476, 477 (9th Cir. 2011); Chubb Ins. Co. of Europe S.A. v. Menlo Worldwider Forwarding, Inc., 622 F.3d 1260, 1261 (9th Cir. 2010); Hydro Res., Inc. v. U.S. E.P.A., 608 F.3d 1131, 1143 n.7 (10th Cir. 2010); Fred Beverages, Inc. v. Fred's Capital Mgmt. Co., 605 F.3d 963, 966 (Fed. Cir. 2010); Rutti v. Lojack Corp., 596 F.3d 1046, 1051 n.5 (9th Cir. 2010); Avalos v. Baca, 596 F.3d 583, 587 n.3 (9th Cir. 2010); Princo Corp. v. Int'l Trade Comm'n, 583 F.3d 1380, 1381 (Fed. Cir. 2009); ARIAD Pharm., Inc. v. Eli Lilly & Co., 595 F.3d 1329, 1330 (Fed. Cir. 2009); Fry v. Exelon Corp. Cash Balance Pension Plan, 576 F.3d 723, 724 (7th Cir. 2009); Duron v. Albertson's LLC, 560 F.3d 288, 290 (5th Cir. 2009); Carolina Cas. Ins. Co. v. Yeates, 545 F.3d 915, 916 (10th Cir. 2008); In re Ferrell, 539 F.3d 1186, 1188 n.1 (9th Cir. 2008); Denmark v. Liberty Life Assur. Co. of Bos., 530 F.3d 1020 (1st Cir. 2008); Cascade Health Sols. v. Peacehealth, 479 F.3d 726, 727 (9th Cir. 2007); United States v. Yida, 478 F.3d 1068 (9th Cir. 2007); Boumediene v. Bush, 476 F.3d 934, 935 (D.C. Cir. 2006); United States v. Carty, 465 F.3d 976, 977 (9th Cir. 2006); LaRue v. DeWolff, Boberg & Assocs., Inc., 458 F.3d 359, 361 (4th Cir. 2006); Garcia v. Dep't of Homeland Sec., 412 F.3d 1330, 1331 (Fed. Cir. 2005); Igartua-De La Rosa v. United States, 404 F.3d 1 (1st Cir. 2005); Phillips v. AWH Corp., 376 F.3d 1382, 1384 (Fed. Cir. 2004), on reh'g en banc, 415 F.3d 1303 (Fed. Cir. 2005); Voices for Choices v. Illinois Bell Tel. Co., 339 F.3d 542, 543 (7th Cir. 2003);
[139] Fed. R. App. P. 34.

and record, and the decisional process would not be significantly aided by oral argument."[140] As is the case with the Virginia Supreme Court, when counsel is litigating a matter before one of the thirteen circuits the clerk will usually provide the parties with a notice on  the argument "date, time, and" location. And in matters before both the Florida Supreme Court and the various US. Court of Appeals, motions to either "postpone the argument" or extend one's share of allotted time "must be filed reasonably in advance of the hearing date." The Alabama and Mississippi supreme Courts in tandem with the thirteen Court of Appeals also follow the same practice for party nonappearances. Here, if the appellee fails to appear to present argument, the court may hear argument on behalf of the appellant, if present. If the appellant fails to appear, the court may hear argument on behalf of the appellee. If neither party appears, the case will be decided on the briefs unless the court" orders otherwise. Finally, while both the Maryland Court of Appeals and the various U.S. Circuits permit the parties to submit an appeal on the papers, the Court can "direct that the case be argued." The appellee may reserve time for rebuttal. Counsel is entitled to receive the copy of any written opinion or order in a case she or he litigates before the Court.[141]

## Rehearing Petitions

Under the Federal Rules of Appellate Procedure, unless one's local circuit has promulgated a contrary rule, if private counsel wants to file a rehearing petition she or he must submit the petition within "fourteen days" of the entry of the disputed final judgment or order.[142] As is the case in

---

[140] United States v. Williams, 630 F.3d 44, 47 n.2 (1st Cir. 2010); Evancho v. Fisher, 423 F.3d 347, 349 (3d Cir. 2005); United States v. Riggs, 347 F.3d 17, 18 n.1 (1st Cir. 2003); United States v. Ball, 90 F.3d 260, 264 (8th Cir. 1996); Nagle v. Alspach, 8 F.3d 141, 144 (3d Cir. 1993); Fragoso v. Lopez, 991 F.2d 878, 882 (1st Cir. 1993); N.L.R.B. v. Local No. 42, Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers, 476 F.2d 275, 276 (3d Cir. 1973); United States v. Lewis, 904 F.3d 867, 869 n.1 (10th Cir. 2018); United States v. Wells, 873 F.3d 1241, 1247 (10th Cir. 2017); Qiu v. Sessions, 870 F.3d 1200, 1202 (10th Cir. 2017); United States v. Pam, 867 F.3d 1191, 1195 (10th Cir. 2017); United States v. Valdez-Aguirre, 861 F.3d 1164, 1165 (10th Cir. 2017); United States v. Gutierrez, 859 F.3d 1261, 1263 (10th Cir. 2017); United States v. Morgan, 855 F.3d 1122, 1123 (10th Cir. 2017); United States v. Theis, 853 F.3d 1178, 1180 (10th Cir. 2017).

[141] Fed. R. App. P. 36; Chem. Eng'g Corp. v. Essef Indus., Inc., 795 F.2d 1565, 1570 (Fed. Cir. 1986); Knoblauch v. Comm'r, 752 F.2d 125, 127 (5th Cir. 1985), holding modified by Sims v. Great-W. Life Assur. Co., 941 F.2d 368 (5th Cir. 1991); Abatino v. United States, 750 F.2d 1442, 1444 (9th Cir. 1985); Laffey v. Nw. Airlines, Inc., 587 F.2d 1223, 1224 (D.C. Cir. 1978); Denofre v. Transportation Ins. Rating Bureau, 560 F.2d 859, 861 n.3 (7th Cir. 1977); United States v. Baynes, 548 F.2d 481, 482 (3d Cir. 1977); United States v. Gardner, 464 F.2d 614, 615 (9th Cir. 1972); Fid. Commercial Co. v. Comm'r, No. 71-1204, 1971 WL 2655, at *1 (4th Cir. Sept. 1, 1971); Harper & Row Publishers, Inc. v. Decker, 423 F.2d 487, 493 (7th Cir. 1970), aff'd, 400 U.S. 348, 91 S. Ct. 479, 27 L. Ed. 2d 433 (1971).

[142] Fed. R. App. P. 40; M. D. by Stukenberg v. Abbott, No. 18-40057, 2019 WL 2911358, at *8 n.8 (5th Cir. July 8, 2019); Meders v. Warden, Georgia Diagnostic Prison, 911 F.3d 1335, 1337 (11th Cir. 2019); Doe by & through Doe v. Boyertown Area Sch. Dist., 897 F.3d 515 (3d Cir. 2018); Uranga v. Davis, 893 F.3d 282, 287 n.20 (5th Cir. 2018), cert. denied, 139 S. Ct. 1179, 203 L. Ed. 2d 216 (2019); Aldous v. Darwin Nat'l Assurance Co., 889 F.3d 798, 799 (5th Cir. 2018); State v. Trump, 871 F.3d 646, 664 (9th Cir. 2017); Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Georgia, 868 F.3d 1248, 1254 n.2 (11th Cir. 2017), cert. denied sub nom. Davenport v. City of Sandy Springs, Ga., 138 S. Ct. 1326, 200 L. Ed. 2d 513 (2018); Andres v. Marshall, 867 F.3d 1076, 1077 (9th Cir. 2017); United States v. Autobee, 870 F.3d 1184 (10th Cir. 2017); In re Nexium (Esomeprazole) Antitrust Litig., 845 F.3d 470, 475 (1st Cir.

Florida, the rehearing petition must disclose the legal points "the court has overlooked or misapprehended and…argue in support of the petition." More than that, the various Court of Appeals – like State courts of last resort in California, Colorado and Wyoming – will not hold oral argument on rehearing petitions. Opposing counsel may not file a response unless the Court of Appeals requests one. If the petition is granted, the Court of Appeals can hear "oral argument" in the case once more or "make a final disposition" "without reargument." The petition may not "exceed 3,900 words."

**En Banc Hearings And Rehearings**

Federal Rule of Appellate Procedure 35 governs en banc hearings and rehearings. Here, a "majority of the circuit judges who are in regular active service and who are not disqualified" can call for a case to be heard or reheard en banc. While these motions are generally disfavored, the Court of Appeals will technically consider two factors when deciding to hear a matter en banc. First, just like the North Carolina Court of Appeals and the Texas Court of Appeals, the Court will consider whether an en banc hearing is needed "to secure or maintain uniformity of the court's decisions or decisions of the U.S. Supreme Court. Second, like the Florida District Courts of Appeal, the Court will examine whether the case "involves a question of exceptional importance." The petition must explain how counsel's case satisfies at least one of these two criteria and is limited to "3,900 words." If the petition is for an en banc hearing, it is due by the filing deadline for the answering brief. On the other hand, if the petition is for an en banc rehearing, the petition must be filed "within fourteen days" of the judgment's entry. No response may be field without the Court's leave.

**Judgment Interest**

Federal Rule of Appellate Procedure 37 governs judgment interest and bears a sharp resemblance to the State rules governing the same topic in Hawaii, Tennessee, Alabama, and Mississippi. More specifically, the default presumption is that for interest concerning lower court, civil case monetary judgments that is affirmed, interest is "payable from the date the judgment was rendered in the trial court." On the other hand, if the "judgment is modified or reversed with…direction[s] that a" monetary judgment "be entered in the trial court" interest is calculated according to the instructions on the judgment certificate.[143]

---

2017); United States v. Godinez-Perez, 864 F.3d 1060 (10th Cir. 2016); In re Clark, 837 F.3d 1080, 1083 (10th Cir. 2016); Taylor v. United States, 822 F.3d 84, 87 (2d Cir. 2016); Hernandez v. Garcia Pena, 820 F.3d 782, 790 (5th Cir. 2016); United States v. Mageno, 786 F.3d 768, 770 (9th Cir. 2015); Fezzani v. Bear, Stearns & Co. Inc., 777 F.3d 566, 570 (2d Cir. 2015); United States v. Lagrone, 773 F.3d 673, 674 n.2 (5th Cir. 2014); Lai v. Holder, 773 F.3d 966, 968 (9th Cir. 2014); Wallace v. FedEx Corp., 764 F.3d 571, 583 (6th Cir. 2014); United States v. Dharni, 757 F.3d 1002, 1003 (9th Cir. 2014); New York Times Co. v. U.S. Dep't of Justice, 756 F.3d 93, 94 (2d Cir. 2014)

Planned Parenthood Ass'n of Utah v. Herbert, 839 F.3d 1301, 1302 (10th Cir. 2016) (Briscoe, J., concurring in denial of rehearing en banc); Cook v. Rockwell Int'l Corp., 790 F.3d 1088, 1111 (10th Cir. 2015) (Moritz, J., concurring);

[143] Fed. R. App. P. 37; Van Asdale v. Int'l Game Tech., 763 F.3d 1089, 1091 (9th Cir. 2014); Lagstein v. Certain Underwriters at Lloyd's of London, 725 F.3d 1050, 1056 (9th Cir. 2013); Braunstein v. McCabe, 571 F.3d 108, 128 (1st Cir. 2009); Lampkin v. Int'l Union, United Auto., Aerospace & Agr. Implement

## Sanctions

As is the case with State appellate courts in Minnesota, Illinois, Wisconsin, and Iowa, the various thirteen Courts of Appeal can sanction litigants for pressing a "frivolous" appeal, *sua sponte* or on a party's motion after providing the party with a "reasonable opportunity to respond."[144] The Court can "award just damages and single or double costs to the appellee."[145]

## Costs

Federal Rule of Appellate Procedure 39 governs costs on appeal and bears a sharp resemblance to the analogous rules covering costs in Hawaii, Tennessee, and Idaho. If an appeal is dismissed, the costs will be taxed to the appellant unless the parties agree otherwise or the Court orders a separate arrangement. Likewise, if a judgment is affirmed or a petition is denied, the costs will also be taxed to the appellant unless the Court orders otherwise. By way of contrast, if a judgment is reversed or a petition is granted, the costs will be taxed to the appellee. Finally, the Court will issue an order governing costs if a judgment is affirmed in part and reversed in part, or is vacated, or a petition is granted in part and denied in part. Like Mississippi, but unlike Hawaii, Tennessee appellate courts

---

Workers of Am. (UAW), 154 F.3d 1136, 1148 (10th Cir. 1998); J & R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259, 1275 (3d Cir. 1994); Coal Res., Inc. v. Gulf & W. Indus., Inc., 954 F.2d 1263 (6th Cir. 1992), opinion clarified (Apr. 22, 1992); Bell, Boyd & Lloyd v. Tapy, 896 F.2d 1101, 1104 (7th Cir. 1990); Clifford v. M/V Islander, 882 F.2d 12, 15 n.3 (1st Cir. 1989); Institutionalized Juveniles v. Sec'y of Pub. Welfare, 758 F.2d 897, 927 (3d Cir. 1985); Graefenhain v. Pabst Brewing Co., 870 F.2d 1198, 1211 (7th Cir. 1989) (Rule 37 codifies Briggs v. Pennsylvania Railroad rule that a district court is without jurisdiction to award post-judgment interest when the court of appeals reinstates a jury verdict); Elias v. Ford Motor Co., 734 F.2d 463, 465 (1st Cir. 1984) (same); Stewart v. Donges, 20 F.3d 380, 382 (10th Cir. 1994) (refusing to apply Rule 37 to an amended judgment where the mandate and judgment on a separate issue was released and not later amended); Malloy v. WM Specialty Mortg. LLC, 512 F.3d 23, 27 n.2 (1st Cir. 2008) (authorizing sanctions against counsel); BankAtlantic v. Blythe Eastman Paine Webber, Inc., 12 F.3d 1045, 1053 (11th Cir. 1994) (rights under Rule 37 were not waived); Dunn v. HOVIC, 13 F.3d 58, 60 (3d Cir. 1993) (recall of mandate was appropriate to answer the question of post-judgment interest); Loughman v. Consol-Pennsylvania Coal Co., 6 F.3d 88, 96 n.5 (3d Cir. 1993); DeLong Equipment Co. v. Washington Mills Electro Minerals Corp., 997 F.2d 1340 (C.A.11 (Ga.),1993) (when the court reinstates a vacated judgment interest accrues from the judgment date on remand); Cordero v. De Jesus-Mendez, 922 F.2d 11 (1st Cir. 1990) (when the first judgment is modified or vacated on appeal, postjudgment interest accrues from date of the second judgment if the first judgment lacks evidentiary legal basis. If the original judgment is sound but is modified on remand, postjudgment interest accrues from date of first judgment); SEB S.A. v. Sunbeam Corp., 476 F.3d 1317, 1319 (11th Cir. 2007) (post judgment interest begins to accrue on the day that the amended judgment is rendered); Bancamerica Commercial Corp. v. Mosher Steel of Kansas, Inc., 103 F.3d 80 (10th Cir. 1996) (same); Art Midwest, Inc. v. Clapper, 805 F.3d 611, 616 (5th Cir. 2015) (where the court of appeals expressly or implicitly directs the entry of a money judgment on remand without mentioning interest, post-judgment interest accrues from the date of the later judgment on remand); Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc., 532 F.3d 1063, 1085 (10th Cir. 2008) (Tenth Circuit has authority to remand to the district court to fix any clerical errors found in the award of post-judgment interest).

[144] In re 60 E. 80th St. Equities, Inc., 218 F.3d 109, 118 (2d Cir. 2000); Matter of Emergency Beacon Corp., 790 F.2d 285, 288 (2d Cir. 1986)

[145] Fed. R. App. P. 38.

permit private litigants to collect costs against the State if a statute permits collection.[146] While brief and appendix production and copying costs can be collected as costs, this rate cannot exceed the rate "generally charged for such work in the area where the clerk's office is located." If a litigant "wants costs taxed," as is the case in South Carolina with minor exception, she or he must submit "an itemized and verified bill of costs" within "fourteen days" of the rendition of the disputed judgment or order. "Objections" can be filed within "fourteen days" of the bill's submission. Record and transcript "preparation and transmission" costs, supersedeas bond costs, and the costs for filing the appeal notice can be recovered as "taxable costs" in a federal District Court.

## Mandates

Federal Rule of Appellate Procedure 41 governs mandates and bears a sharp resemblance to the analogous rule covering mandates in Tennessee. In matters before the Tennessee Supreme Court and the thirteen Courts of Appeal, the mandate consists of the "judgment," cost order, instructions on interest, if any, and the "opinion." The appellate clerk will release the mandate within "seven days" of either the deadline expiration for filing a rehearing petition or the Court's denial of a rehearing petition.[147] The mandate takes effect from the moment it is issued. As is the case in Kansas, Nebraska, and Florida, if counsel is seeking a writ of certiorari before the U.S. Supreme Court and needs to stay the mandate's release, she or he can file a motion with the appellate clerk after serving the document on the other parties to the case. The motion must explain why the certiorari petition "would present a substantial question and" demonstrate "that there is good cause for a stay." The default presumption here is that no stay may "exceed ninety days" unless an extension is warranted for "good cause," one of the Justices extends the time for filing a certiorari petition, or the "ninety day" stay expires before the U.S. Supreme Court acts on the certiorari petition. The Court of Appeals can condition the stay on the petitioner's delivery of collateral.[148]

---

[146] Fed. R. App. P. 39.

[147] Fed. R. App. P. 41; Keo v. Ashcroft, 348 F.3d 271 (1st Cir. 2003); Pub. Serv. Co. of New Hampshire v. Patch, 167 F.3d 29, 36 (1st Cir. 1998);

[148] IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO Debtors AURELIUS INVESTMENT, LLC; AURELIUS OPPORTUNITIES FUND, LLC; LEX CLAIMS, LLC Movants - Appellants AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS Creditor v. IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; FINANCIAL OVERSIGHT AND MANAGEMENT BOARD Debtors - Appellees UNITED STATES; AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES; OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF PUERTO RICO; OFFICIAL COMMITTEE OF UNSECURED CREDITORS; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY

If the certiorari petition is denied, the Court of Appeals will release the mandate immediately" after it receives a copy of the "Supreme Court order." Federal appellate courts have the "inherent power" to recall mandates.[149]

## Notice Required In Constitutional Cases

As is the case in matters before the Hawaii and Alabama Supreme Courts, albeit with minor exception, under Federal Rule of Appellate Procedure 44, any party that draws into question the "constitutionality of any Act of Congress" in a proceeding where a U.S. "agency, officer, or employee is not a party in an official capacity," must provide immediate notice to the  appellate court clerk who will then in turn notify the Attorney General. Notice must also be provided to the

---

AUTHORITY; CYRUS CAPITAL PARTNERS, L.P.; TACONIC CAPITAL ADVISORS, L.P.; WHITEBOX ADVISORS LLC; SCOGGIN MANAGEMENT LP; TILDEN PARK CAPITAL MANAGEMENT LP; ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; DECAGON HOLDINGS 1, LLC; DECAGON HOLDINGS 2, LLC; DECAGON HOLDINGS 3, LLC; DECAGON HOLDINGS 4, LLC; DECAGON HOLDINGS 5, LLC; DECAGON HOLDINGS 6, LLC; DECAGON HOLDINGS 7, LLC; DECAGON HOLDINGS 8, LLC; DECAGON HOLDINGS 9, LLC; DECAGON HOLDINGS 10, LLC; FIDEICOMISO PLAZA; JOSE F. RODRIGUEZ-PEREZ; CYRUS OPPORTUNITIES MASTER FUND II, LTD.; CYRUS SELECT OPPORTUNITIES MASTER FUND, LTD.; CYRUS SPECIAL STRATEGIES MASTER FUND, L.P.; TACONIC MASTER FUND 1.5 LP; TACONIC OPPORTUNITY MASTER FUND LP; WHITEBOX ASYMMETRIC PARTNERS, L.P.; WHITEBOX INSTITUTIONAL PARTNERS, L.P.; WHITEBOX MULTI-STRATEGY PARTNERS, L.P.; WHITEBOX TERM CREDIT FUND I L.P.; SCOGGIN INTERNATIONAL FUND, LTD.; SCOGGIN WORLDWIDE FUND LTD.; TILDEN PARK INVESTMENT MASTER FUND LP; VARDE CREDIT PARTNERS MASTER, LP; VARDE INVESTMENT PARTNERS, LP; VARDE INVESTMENT PARTNERS OFFSHORE MASTER, LP; THE VARDE SKYWAY MASTER FUND, LP; PANDORA SELECT PARTNERS, L.P.; SB SPECIAL SITUATION MASTER FUND SPC; SEGREGATED PORTFOLIO D; CRS MASTER FUND, L.P.; CRESCENT 1, L.P.; CANERY SC MASTER FUND, L.P.; MERCED PARTNERS LIMITED PARTNERSHIP; MERCED PARTNERS IV, L.P.; MERCED PARTNERS V, L.P.; MERCED CAPITAL, L.P.; ARISTEIA HORIZONS, LP; GOLDEN TREE ASSET MANAGEMENT LP; OLD BELLOWS PARTNERS LLP; RIVER CANYON FUND MANAGEMENT, LLC Creditors - Appellees IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO Debtors ASSURED GUARANTY CORPORATION; ASSURED GUARANTY MUNICIPAL CORPORATION Plaintiffs - Appellants, No. 18-1671, 2019 WL 2529351, at *1 (1st Cir. May 6, 2019) (staying issuance of mandate to permit the Senate to consider Presidential nominees); United States v. Pleau, 680 F.3d 1 (1st Cir. 2012) (denying stay of mandate ordering inmate transfer for lack of good cause); United States v. Fraser, 407 F.3d 9 (1st Cir. 2005) (denying motion for a mandate stay after the deadline for filing a rehearing petition had passed);
[149] *Powers v. Bethlehem Steel Corp*., 483 F.2d 963 (1st Cir. 1973);

clerk in cases where consul is contesting the constitutionality of a State statute in a proceeding where an "agency, officer, or employee [of the State] is not a party in an official capacity."[150]

## Attorney Admissions

Any individual licensed to practice before the "Supreme Court of the United States, the highest court of a [S]tate, another United States [C]ourt of [A]ppeals, or a United States district court" can apply for admission to one of the thirteen U.S. Court of Appeals after completing an application, an "oral or written motion" initiated by a member of the Court bar, and signing the following affirmation:

> "I, _____, do solemnly swear [or affirm] that I will conduct myself as an attorney and counselor of this court, uprightly and according to law; and that I will support the Constitution of the United States."[151]

---

[150] Fed. R. App. P. 44; *Noonan v. Staples, Inc.*, 561 F.3d 4, 6 (1st Cir. 2009) (noting the appellee failed to file the required notice and waiving the underlying issue); Buchanan v. Maine, 469 F.3d 158, 162 n.1 (1st Cir. 2006); In re Gosselin, 276 F.3d 70, 72 (1st Cir. 2002) (noting that the Court provided the required notice once the parties failed to do so); United States v. Cox, 906 F.3d 1170, 1178 (10th Cir. 2018), cert. denied, (U.S. June 10, 2019), and cert. denied sub nom. Kettler v. United States (U.S. June 10, 2019) (commenting on intervention); Means v. Navajo Nation, 432 F.3d 924, 925 (9th Cir. 2005); Guzman v. Local 32B-32J, Serv. Employees Int'l Union, AFL-CIO, 151 F.3d 86, 93 (2d Cir. 1998) (enforcing waiver of claim on appeal in part because Rule 44 notice was not provided to the United States); Gibson v. Am. Cyanamid Co., 760 F.3d 600, 608 n.4 (7th Cir. 2014) (noting that Rule 44 notice is not required when a State constitutional challenge is raised in a federal court); Lors v. Dean, 746 F.3d 857, 859 (8th Cir. 2014); In re Carter, 553 F.3d 979, 983 (6th Cir. 2009); McIntosh v. Partridge, 540 F.3d 315, 319 (5th Cir. 2008); Schwier v. Cox, 340 F.3d 1284, 1286 (11th Cir. 2003); In re Walters, 868 F.2d 665, 671 (4th Cir. 1989) (noting that Rule 44 was not complied with).

[151] Fed. R. App. P. 46; Lamb v. Norwood, 899 F.3d 1159, 1160 (10th Cir. 2018); Klein v. O'Brien, 884 F.3d 754, 757 (7th Cir.), cert. denied, 139 S. Ct. 239, 202 L. Ed. 2d 130 (2018), reh'g denied, 139 S. Ct. 867, 202 L. Ed. 2d 634 (2019); Barrientos v. Lynch, 829 F.3d 1064, 1067 (9th Cir. 2016); Rodriguez v. Robbins, 797 F.3d 758, 759 (9th Cir. 2015); Blixseth v. Yellowstone Mountain Club, LLC, 796 F.3d 1004, 1009 (9th Cir. 2015); In re Reines, 771 F.3d 1326, 1329 (Fed. Cir. 2014); United States v. Marks, 768 F.3d 1215, 1218 (8th Cir. 2014); Richardson v. Koch Law Firm, P.C., 768 F.3d 732, 735 (7th Cir. 2014); In re DeMarco, 733 F.3d 457, 467 (2d Cir. 2013); ("A court of appeals may discipline an attorney who practices before it for conduct unbecoming a member of the bar or for failure to comply with any court rule."); Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1366 (2d Cir.1991) In re Payne, 707 F.3d 195, 206 (2d Cir. 2013) ("Parties and counsel have no absolute entitlement to be 'warned' that they disobey court orders at their peril."); Maness v. Meyers, 419 U.S. 449, 458, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975) ("We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect."); In re Boyle-Saxton, 668 F.3d 471, 472 (7th Cir. 2012); In re Liotti, 667 F.3d 419, 423 (4th Cir. 2011); In re Fengling Liu, 664 F.3d 367, 368 (2d Cir. 2011); Sambrano v. Mabus, 663 F.3d 879, 882 (7th Cir. 2011); Stanard v. Nygren, 658 F.3d 792, 794 (7th Cir. 2011); In re Violation of Rule 28(D), 635 F.3d 1352, 1360 (Fed. Cir. 2011); In re Warburgh, 644 F.3d 173, 185 (2d Cir. 2011); In re Zdravkovich, 634 F.3d 574, 577 (D.C. Cir. 2011); United States v. Kieffer, 621 F.3d 825, 828 (8th Cir. 2010); In re Girardi,

After admission, however, an attorney can be "subject to suspension[, discipline,] or disbarment" if she or he "has been suspended or disbarred from practice in any other court; or…is guilty of conduct unbecoming a member of the court's bar" after a "show cause" order has been issued to the ostensibly offending attorney.

**Special Masters**

Under Federal Rule of Appellate Procedure 48, the U.S. Supreme Court and the various Court of Appeals – just like the Virginia Supreme Court in habeas appeals – can "recommend factual findings and disposition[s] in matters ancillary to" court proceedings.[152] Unless the Court of Appeals orders otherwise, the default presumption is that the official is permitted to regulate "all aspects of" the hearing; administer oaths and examine witnesses and parties; require "the production of evidence on all matters embraced in the reference;"[153] and take "appropriate action" "for the efficient performance" of her or his duties. The referring Court will determine the official's compensation if she or he is not "a judge or court employee."[154]

---

611 F.3d 1027, 1035 (9th Cir. 2010); In re Roman, 601 F.3d 189, 191 (2d Cir. 2010); In re Saghir, 595 F.3d 472, 474 (2d Cir. 2010); In re Koenig, 592 F.3d 376, 378 (2d Cir. 2010); In re DeMell, 589 F.3d 569, 570 (2d Cir. 2009); In re Jaffe, 585 F.3d 118, 119 (2d Cir. 2009); Lucas v. Duncan, 574 F.3d 772, 778 n.8 (D.C. Cir. 2009); In re Sibley, 564 F.3d 1335, 1337 (D.C. Cir. 2009); Priestley v. Astrue, 651 F.3d 410, 423 (4th Cir. 2011) (Davis, J., concurring);

[152] Gallop v. Cheney, 667 F.3d 226, 231 (2d Cir. 2012), as amended (Feb. 3, 2012); Alabama Power Co. v. F.C.C., 311 F.3d 1357, 1364 n.9 (11th Cir. 2002).

[153] Reich v. Sea Sprite Boat Co., 50 F.3d 413, 414 (7th Cir. 1995).

[154] Fed. R. App. P. 48; United States v. Scrushy, 721 F.3d 1288, 1296 (11th Cir. 2013); In re Bagdade, 334 F.3d 568, 575 (7th Cir. 2003); Gulf Power Co. v. United States, 187 F.3d 1324, 1335 (11th Cir. 1999); Matter of Maurice, 73 F.3d 124, 127 (7th Cir. 1995), on reconsideration (Jan. 5, 1996).

# Forms

## A. The Kentucky Supreme Court

Section 110(1) of the Kentucky Constitution provides that "[t]he Supreme Court shall consist of the Chief Justice of the Commonwealth and six associate Justices."[1] The Justices are selected for eight year terms via non-partisan elections.[2] There is one Justice elected from each "Court of Appeals district" which must be as "nearly equal in population and as compact in form as possible."[3] The Associate Justice elect the Chief Justice from amongst themselves "for a term of four years."[4] Biographies of the current Justices are provided in appendix one. The Court – like every other state court of last resort in the United States – hears matters *en banc*.[5] "A majority of the Justices of the Supreme Court…constitute a quorum for the transaction of business. If as many as two Justices decline or are unable to sit in the trial of any cause,"[6] the Governor is then constitutionally compelled to appoint "a sufficient number of Justices to constitute a full court for the trial of the cause."[7] The Kentucky Supreme Court sits in twelve monthly cycles every year.[8] With the exception of January, July, and November, the Court sets aside one week in each month for conferencing,[9] consideration of discretionary review petitions,[10] and other matters. Per Kentucky Rule of Civil Procedure 76.28(2), on the Thursday immediately following this week the Court will announce opinions in cases from the prior week's conference.[11] The rest of the month is then reserved for oral arguments[12] and work on draft opinions.[13] While an appeal may be taken as of right to the Court "from a judgment or final order in any proceeding originating in the Court of Appeals"[14] or Workers' Compensation Board decisions that are appealed to the Court of Appeals,[15] the majority of the Court's docket is discretionary.[16] After the Court hears oral argument on a matter, it casts tentative votes at conference – at which point the Chief Justice (or the most senior Associate Justice in the majority) will assign an opinion writer.[17] Appellate court orders may be announced orally but must also be reduced to writing.[18] Orders must also be

---

[1] Ky. Const. §110;  *Fletcher v. Graham*, 192 S.W.3d 350 (Ky. 2006)

[2] Ky. Const. §119.

[3] Ky. Const. §110(4); KRS 21A.010; KRS 21A.020.

[4] Ky. Const. §110(5)(a).

[5]

[6] Ky. Const. §110(3); Ky. Sup. Ct. 1.020(1)(a); KRS 21A.060.

[7] *Id*; *Fletcher v. Graham*, 192 S.W.3d 350 (Ky. 2006)

[8] https://courts.ky.gov/courts/supreme/Pages/OralArgumentscalendar.aspx.

[9]

[10]

[11] Ky. R. Civ. P. 76.28(2).

[12] See, e.g., http://apps.courts.ky.gov/Supreme/CALENDAR/SCOMAR19.pdf; http://apps.courts.ky.gov/Supreme/CALENDAR/SCOMAR19.pdf

[13]

[14] Ky. R. Civ. P. 76.36(7)(a).

[15] *Vessels by Vessels v. Brown-Forman Distillers Corp*., 793 S.W.2d 795, 798 (Ky. 1990).

[16] Ky. R. Civ. P. 76.20(2)(b). Coverage of the Court's discretionary jurisdiction begins on PAGE XXX.

[17]

[18] Ky. R. Civ. P. 76.28(1)(a)-(b); KRS 21A.070; Ky. R. Civ. P. 76.28(1)(a).

signed.[19] If a member of the State Supreme Court is disqualified or does not sit on the case, the appealed judgment or order will be affirmed.[20] Judge bios can be found at http://courts.ky.gov

While all the Kentucky Supreme Court's opinions are published, the Court determines which opinions are published from the State's lower courts.[21]

## Appellate Jurisdiction Over Criminal Cases

FILLER. Indeed, § 115 of the Kentucky Constitution provides that "in all cases, civil and criminal, there shall be allowed as a matter of right at least one appeal to another court."[22] More than that, he Kentucky Constitution makes special provision for appeals in serious criminal matters as "[a]ppeals from a judgment of the Circuit Court imposing a sentence of death or life imprisonment or imprisonment for twenty years or more" are taken "directly to the Supreme Court"[23] Kentucky Rule of Criminal Procedure 12.04 governs the initial steps of the criminal appellate process in Kentucky state courts. Here, "[a]n appeal is taken by filing a notice…in the trial court" "after the date of entry of the judgment or order from which it is taken" and that contains the names "of the appellants and appellees" and the appealed judgment. If a timely motion has been made for a new trial, however, the thirty-day limit runs from "the date of entry of the order denying the motion."[24] Moreover, if the motion for a new trial is made within five days of the "return of the verdict, the appeal must be from the order overruling or denying the motion, and the review on appeal [will] limited to the" grounds that were raised in a timely manner. The timely filing of a notice of appeal "stay[s] proceedings on the judgment as long as the case remains on appeal, except for" bail requirements.

### B. The Kentucky Court of Appeals

The Kentucky "Court of Appeals…consist[s]…of fourteen judges," with two judges selected from each Court of Appeals district "for terms of eight years" on a non-partisan basis.[25] "The judges of the Court of Appeals" "elect one of their number to serve as Chief Judge for a term of four years."[26] The Court sits in "panels of three judges each to conduct hearings at the times and in the places necessary to discharge the business before the court."[27] The Kentucky Supreme Court's Rules require that the appeals judges sit on panels that are "rotated in such manner that

---

[19] Allen v. Walter, 534 SW 453 (1976); KRS 21A.070(1)(3)-((4).

[20] Ky. Sup. Ct. R. 1.020(1)(a); KRS 21A.060.

[21] KRS 21A.070(1)-(2); Ky. R. Civ. P. 76.28.

[22] See also Ky. Const. §115; *Stephens v. Goodenough*, 560 S.W.2d 556 (Ky. 1977); Varney v. Varney, 609 SW 2d 704 (1980); Ratliff v. Fiscal Court of Caldwell Cty., Ky., 617 SW 2d 36 (1981);
Ballard v. Com., 320 S.W.3d 69, 72 (Ky. 2010) (sustaining as constitutional a statute creating an appeal as of right from interlocutory orders);

[23] Ky. Const. §110; Jackson v. Com., 319 S.W.3d 343 (Ky. 2010) (finding that probation revocation order that had the practical effect of requiring an individual to serve 20 years in prison was not a judgment failing within the expedited appeal provision)

[24] CR 73.02(1)(e); If a new trial is sought because of errors that are not in the record, a new trial motion must be made before the appeal notice can be filed. More than that, affidavits or other evidence sustaining the claimed error must be served within ten days of the judgment's entry. Ky. R. Civ. P. 59.02; Ligon Specialized Hauler, Inc. v. Smith, 691 SW 2d 902 (1985). A new trial motion should be granted if the verdict is so against the evidence that it indicates that it was reached as a result of passion or prejudice or in disregard of the instructions. Humana of Kentucky, Inc. v. McKee, 834 SW 2d 711 (1992).

[25] Ky. Const. §§111, 117, and 119.

[26] Ky. Const. §117(3).

[27] Ky. Sup. Ct. R. 1.030(7)(a); Ky. Sup. Ct. R. 1.030(7)(d); Ky. Sup. Ct. R. 1.030(8)(a).

over the course of each year so that each judge sits with each of the other members of the court, other than the chief judge, with substantially the same frequency and each judge other than the chief judge sits in each appellate district with substantially the same frequency as each of the other judges."[28] If the three-judge panel cannot reach a decision, the case can be re-assigned to a larger or different panel or to the entire Court.[29] While panels sit in courthouses across the state, the Court most frequently hears matters in either Louisville or Frankfort.[30] The Court of Appeals is not a court of first resort.[31] The State Supreme Court, though, can authorize the Court of Appeals to review state administrative decisions.[32] An appeal may be taken as a matter of right from Circuit Court convictions, final judgments, orders, and decrees unless the Circuit Court's decision was an appeal from a District Court.[33]

Litigants who file an original action in the Court of Appeals are entitled to an appeal as a matter of right to the State Supreme Court.[34] The Court holds a prehearing conference for "all civil actions appealed to the Court of Appeals, except prisoner applications seeking relief relating to confinement or conditions of confinement and appeals from Circuit Court orders determining paternity, dependency, abuse, neglect, domestic violence, juvenile status offense, or involuntary termination of parental rights."[35] "The purpose of the conference" is "to consider the possibility of settlement, the simplification of issues, the contents of the record, the time for filing the record and briefs, and any other matters which the judge or conference attorney determines may aid in the handling or disposition of the proceedings."[36] A judge who participates in the pre-hearing conference cannot sit as a member of the panel assigned to hear the appeal.[37] Except as disclosed in a prehearing order, all matters discussed during the pre-hearing conference must be kept confidential and cannot be disclosed by counsel in briefs or during oral argument.[38] Parties found to be in default of a pre-hearing order may be assed with reasonable expenses, costs, and lawyer's fees.[39]

After the notice of appeal or notice of cross appeal has been filed with the Appeals Court, "[w]ithin twenty days," "each appellant and cross-appellant" must file and serve on all other parties, "a prehearing statement" that includes "[t]he style of the case and circuit court docket number;" "[t]he name, mailing address, and telephone number of each attorney whose appearance is entered in the case, together with the name of the party represented by the attorney;" "[t]he name of the judge who presided over the matter being appealed;" "[t]he date on which the notice of appeal and the date on which any notice of cross-appeal was filed;" "a statement as to whether the matter has been before the Court of Appeals, on a previous occasion;" "[t]he type of litigation;" "a brief description of the claims, defenses, and issues litigated;" "[a] brief statement of the facts and issues proposed to be raised on appeal, including jurisdictional challenges;" "[a] statement,

---

[28] Ky. Sup. Ct. R. 1.030(7)(b).
[29] Ky. Sup. Ct. R. 1.030(7)(d).
[30] See, e.g., https://courts.ky.gov/courts/coa/Pages/oralargumentscalendar.aspx
[31] Courier-Journal v. Peers, 747 SW 125 (1988).
[32] Ky. R. Civ. P. 76.25.
[33] KRS 22A.020(1).
[34] Russell Hosp. Dist. v. Ephraim McDowell, 152 SW 3d 230 (2004).
[35] Ky. R. Civ. P. 76.03(1).
[36] Ky. R. Civ. P. 76.03(10).
[37] Ky. R. Civ. P. 76.03(15).
[38] Ky. R. Civ. P. 76.03(12).
[39] Ky. R. Civ. P. 76.03(14).

based on counsel's present knowledge, as to whether the appeal involves a question of first impression;" "[a] statement as to whether the determination of the appeal will turn on the interpretation or application of a particular case or statute and, if so, the name of the case or the number of the statute;" and "[a] statement, based upon counsel's present knowledge, as to whether there is pending before the Court of Appeals or the Supreme Court another case arising from substantially the same case or controversy or involving an issue which is substantially the same, similar or related to an issue in th[e] appeal."[40] Issues that are not raised in the prehearing statement cannot later be raised except upon a timely motion and after a showing of good cause.[41] The filing of the appeal notice stays the time deadline for other filings in the appeal with the exception of the deadlines for filing a transfer motion, pre-hearing statement, or cross appeal notice.[42] This stay, however, is only temporary and expires once the clerk announces that a pre-hearing conference will not be held or the Court releases an order summarizing the contents of any pre-hearing conferences that was held with the parties to the appeal.

"Upon failure of a party or attorney to comply with the provisions of this rule or the provisions of the prehearing conference order, the Court of Appeals may assess reasonable expenses caused by the failure, including attorney's fees; assess all or a portion of the appellate costs; or dismiss the appeal."[43] It should be noted, though, that automatic dismissal may not be warranted in all circumstances.[44] Indeed, in *Crossley v. Anheuser-Busch, Inc.*, the state Supreme Court found that "the appropriate sanction" had to be determined "on a case-by-case basis" where the <mark>district court</mark> "exercise[d] its discretion only after considering the seriousness of the defect" and considered these three factors: [a]chieving an orderly appellate process, deciding cases on the merits, and seeing to it that litigants do not needlessly suffer the loss of their constitutional right to appeal."[45]

After the pre-hearing statement has been filed, within ten days, either party may file with the Court Clerk, and serve on all parties to the action, "a supplemental statement containing any other information needed to clarify the issues on appeal and on cross-appeal,"[46] and request that the matter be designated as a special appeal (if the constitutionality of statute has been challenged) so that the Attorney General may decide whether she or he desires to intervene.[47] "At the conclusion of the prehearing conference, the judge or conference attorney" will "enter an order reciting the actions taken and the agreements reached by the parties and that order shall govern the subsequent course of the proceedings."[48] This order is critical for appellate counsel because the time frame for complying with the applicable filing and compliance deadlines begins once the order is released.[49]

---

[40] Ky. R. Civ. P. 76.03(4).

[41] American General Home Equity v. Kestel, 253 SW 3d 543 (2008); Best v. West American Ins. Co., 270 SW 3d 398 (2008).

[42] Ky. R. Civ. P. 76.03(3).

[43] Ky. R. Civ. P. 76.03(14); see also *PB & S Chem. Co. v. Eastwood*, 736 S.W.2d 359, 361 (Ky. Ct. App. 1987).

[44] See, e.g., *Ready v. Jamison, Ky.*, 705 S.W.2d 479 (1986).

[45] *Crossley v. Anheuser-Busch, Inc.*, 747 S.W.2d 600, 601 (Ky. 1988); PB & S CHEMICAL CO. v. Eastwood, 736 SW 2d 359 (1987) (clerk's failure to provide a prehearing form is not grounds for failing to file the prehearing statement).

[46] Ky. R. Civ. P. 76.03(6).

[47] Ky. R. Civ. P. 76.03(5).

[48] Ky. R. Civ. P. 76.03(11).

[49]

If a case is selected for oral argument, an order scheduling the argument will be entered (usually about two months before the actual affair).[50] Oral arguments are heard from all cases appealed from Circuit Court unless specifically dispensed with in a case. If the Court disposes with oral arguments on its own motion, a lawyer has ten days to file a reconsideration motion.[51] The Court delivers its opinions every Friday at 10:00a.m. and copies are then mailed to the counsel of record and the trial judge who originally heard the case on Thursday afternoon.[52]

**Transfer of Appeals from the Kentucky Court of Appeals to the State Supreme Court**

Under Kentucky Rule of Civil Procedure 74.02, a party seeking to transfer a case from the State Court of Appeals to the Kentucky Supreme Court has ten days from the filing of the notice of appeal in the former court to file and serve a transfer motion "in the Supreme Court" along with "[a] copy of the notice of appeal."[53] The filing of this motion "suspends" running time deadlines in the Court of Appeals until the Supreme Court grants or denies "the transfer." In assessing the motion, the Court will evaluate whether the matter "is of great and immediate public importance" or is a bifurcated appeal involving two separate yet simultaneous criminal proceedings in the Court of Appeals and State Supreme Court stemming from the same trial court proceeding." Capital cases in the Court of Appeals are automatically transferred to the Kentucky Supreme Court once the notice of appeal is filed in the former tribunal. If the appeal is granted, counsel should refer to Chapter XX for the procedures governing "appeals as a matter of right." Refer to Chapter XX for the costs of the transfer motion. Finally, counsel should note that the Court of Appeals may also transfer cases to the Supreme Court *sua sponte*.

**Initiating Appeals in Kentucky**

In the Bluegrass State, counsel may ordinarily appeal a matter by "filing a notice of appeal in the [C]ourt" that issued the disputed judgment or order with the exception that appeal from family courts run to the State Court of Appeals.[54] In general, an appealable order is one that operates to divest an individual of some right in such a manner as to put it out of power of the court making the order to place the parties in their original condition.[55] Interlocutory appeals in

---

[50] See, e.g., https://courts.ky.gov/courts/coa/Pages/oralargumentscalendar.aspx

[51] Ky. R. Civ. P. 76.16.

[52] *Id*.

[53] Bevin v. Commonwealth ex rel. Beshear, 563 S.W.3d 74, 81 (Ky. 2018) (accepting transfer); Bd. of Trustees of Kentucky Sch. Boards Ins. Tr. v. Pope, 528 S.W.3d 901, 903 (Ky. 2017) (same); Commonwealth v. Guernsey, 501 S.W.3d 884, 885 (Ky. 2016) (same); Greater Cincinnati/N. Kentucky Apartment Ass'n, Inc. v. Campbell Cty. Fiscal Court, 479 S.W.3d 603, 604 (Ky. 2015) (same); Beshear v. Haydon Bridge Co., 416 S.W.3d 280, 284 (Ky. 2013) (same); Legislative Research Comm'n v. Fischer, 366 S.W.3d 905, 910 (Ky. 2012) (same); Univ. of Cumberlands v. Pennybacker, 308 S.W.3d 668, 671 (Ky. 2010) (same); Arnold v. Com. ex rel. Chandler, 62 S.W.3d 366, 368 (Ky. 2001) (same); Com. v. Harris, 59 S.W.3d 896, 898 (Ky. 2001) (same); Colwell v. Com., 37 S.W.3d 721, 723 (Ky. 2000) (same); Neal v. Fiscal Court, Jefferson Cty., 986 S.W.2d 907, 907 (Ky. 1999) (same); Kentucky Sheriffs Ass'n Inc. v. Fischer, 986 S.W.2d 444, 447 (Ky. 1999), as amended (May 12, 1999) (same); Yeoman v. Com., Health Policy Bd., 983 S.W.2d 459, 464 (Ky. 1998) (same); Democratic Party of Kentucky v. Graham, 976 S.W.2d 423, 425 (Ky. 1998), as modified (Oct. 15, 1998) (same); Jensen v. Kentucky State Bd. of Elections, 959 S.W.2d 771, 773 (Ky. 1997), as amended (May 29, 1997), as modified (Sept. 4, 1997) (same); Fischer v. State Bd. of Elections, 879 S.W.2d 475, 475 (Ky. 1994) (same); Jones v. Forgy, 750 S.W.2d 434, 434 (Ky. 1988) (same); Sheets v. Commonwealth, 495 S.W.3d 654, 673 (Ky. 2016) (commenting that case transfer was possible); Skaggs v. Com., 803 S.W.2d 573, 577 (Ky. 1990) (commenting that transfer was mandatory in a capital case).

[54] Ky. R. Civ. P. 73.01(1)-(2).

[55] Ky. R. Civ. P. 54.01; Murty Bros. Sales, Inc. v. Preston, 716 SW 2d 239 (1986);  Security Federal Sav. & Loan Ass'n v. Nesler, 697 SW 2d 136 (1985).

eminent domain cases can be taken as a matter of right.[56] Normally, interlocutory orders are reviewed as part of the final judgment. This is so because a final judgment resolving all issues between the parties has the effect of re-adjudicating the finality of all prior interlocutory orders or judgments.[57] Inquiries into finality are important here because Kentucky courts are courts of limited subject matter jurisdiction.[58] As is the case with litigation before the Mississippi appellate courts, the appeal will not be docketed until the filing fee is paid.[59] Here, two parties may also file a joint notice of appeal or a joinder motion to proceed "as a single appellant" "after filing separate notices of appeal."[60] Counsel should note that if she or he is litigating an appeal where the District Court rejected a personal jurisdiction, "improper venue," insufficient process, or insufficient process service defense, the mere fact that she or he has taken the appeal does not constitute an appearance entry waiving the claim. The notice of appeal must be filed thirty days after the date notation on the "service of the judgment or order."[61] Counsel may request a ten-day extension if she or he shows "excusable neglect" in failing to take note of the day the Court's final judgment or order triggering the appeal deadline was entered. Because the appeal deadline is tolled once any party files a motion sanctioned by the State Rules of Civil Procedure, in the event that a notice of appeal is filed while a JNOV, judgment alteration, or new trial motion is pending and the deadline is tolled, the notice will be deemed to have been filed on the day when the order disposing of the motion is entered.[62] The Court can extend the filing deadline by ten days for excusable neglect.[63] Counsel should note that, as is the case in Texas and Hawaii, the failure to file a timely notice of appeal, notice of cross-appeal, or motion for discretionary review with the State Supreme Court will "result in a dismissal or denial" of the case.[64] Additional filing fees are not required to enter an amended notice. Special statutory appeals adhere to these guidelines.[65]

   The notice of appeal here must specify all appellants and appellees by name, identify the appealed judgment or order, and bear a certificate confirming that the notice has been served on counsel to all parties in the case.[66] The naming requirement for the parties to the appeal as well as the judgment designation requirement is jurisdictional.[67] More than that, if an appeal is submitted

---

[56] BOARD OF REG. OF W. KENTUCKY UNIV. v. Clark, 276 SW 3d 819 (2009); Leathers, Civil Procedure, 72 Ky. L.J. 315 (1983).

[57] EMPLOYERS'LIABILITY ASSUR. CORP. v. Home Indem. Co., 452 SW 2d 620 (1970).

[58] Jacoby v. Carrollton Federal Savings & Loan Ass'n, 246 SW 2d 1000 (1952); KENTUCKY HIGH SCHOOL ATHLETIC v. Edwards, 256 SW 3d 1 (2008); Huff v. WOOD-MOSAIC CORPORATION, 454 SW 2d 705 (1970).

[59] Ky. R. Civ. P. 73.02(1)(c).

[60] Ky. R. Civ. P. 73.01(3).

[61] Ky. R. Civ. P. 73.02(1)(a).

[62] If the post-trial motion in question is for JNOV, the same standard applicable to motions for directed verdicts apply to the filing. See *Cassinelli v. Begley*, 433 SW 2d 651 (1968); Here, Kentucky appellate courts can mandate the entry of JNOV instead of granting a new trial if it concludes that the appellant was entitled to a directed verdict. Ingram v. Galliher, 309 SW 2d 763 (1958).

[63] Ky. R. Civ. P. 73.02(1)(d).

[64] Excel v. COM. INSTITUTIONAL SECURITIES, 37 SW 3d 713 (2000).

[65] Ky. Rev. Stat. Ann. § 446.190.

[66] Ky. R. Civ. P. 73.03.

[67] City of Devondale v. Stallings, 795 SW 2d 954 (1990); Clark Equipment Co., Inc. v. Bowman, 762 SW 2d 417 (1988); Hopkins v. Hilliard, 444 SW 2d 130 (1969); Rose Bowl Lanes, Inc. v. City of Louisville, 373 SW 2d 157 (1963); Bumpus v. Drinkard's Adm'x, 279 SW 2d 4 (1955);  Anderson v. NATIONAL SEC. FIRE AND CAS., 870 SW 2d 432 (1993); The Beyt, Rish, Robbins Group v. ARH, 854 SW 2d 784 (1993); Burchell v. Burchell, 684 SW 2d 296 (1984) (appellate court jurisdiction cannot be conferred by party consent or waiver); Hundley v. Hundley, 291 SW 2d 544 (1956) (the right of appeal is favored by law and will not be held to have been waived except on clear and decisive grounds).

without joining necessary parties, it will be dismissed.[68] If opposing counsel has been awarded fees below, she or he should be named as a party if counsel wishes to contest the award.[69] Indeed, in cases where the issue on appeal is excessive or inadequate damages, a new trial motion must be made for the matter to be appealable.[70] Because a Kentucky appeals court cannot reduce an excessive monetary award rendered in a trial court, remitter issues are rarely raised after oral argument but before the decision is rendered.[71] The only recourse here is to remand the matter to the trial court.

While the normal period for filing the appeal is thirty days after the disputed judgment or order is entered and becomes final, for appeals from the small claims division of a State District Court, the period is shortened to ten days.[72] Once the document is filed, the clerk in the court that issued the disputed judgment or order will send a "notice of…[the document's] filing" to each "attorney of record." This rule is not jurisdiction, however,[73]

## Sanctions For Failure to Comply with State Rules Governing Appellate Procedure

While Kentucky Rule of Civil Procedure 73.02(2) provides that counsel's failure to comply with the rules of appeal or discretionary review motions "does not affect the validity of the appeal or motion," Kentucky appellate courts are still permitted to sanction counsel for these missteps by dismissing the appeal; denying a discretionary review motion; striking the "pleadings, briefs, record" in whole or part; imposing fines of up to $500;" among other things.[74] A similar rule governs frivolous appeals that are meritless and indicative of "bad faith" as Courts here can "award… damages…[as well as] single or double costs to the appellee or respondent."[75] In declining to reconsider an order of dismissal for violation of appellate rules of procedure, the appellate court must specify the grounds for the sanction.[76]

## Appeals and Cross-Appeals from Kentucky Circuit Courts

If an appeal or cross-appeal is from a Circuit Court judgement or order, the applicable filing fee must be paid to the Circuit Court clerk once "the notice of appeal or cross-appeal" is filed.[77] And, if an appeal or cross-appeal is from a District Court judgement or order, the applicable filing fee, again, must be paid to the District Court clerk once "the notice of appeal or cross-appeal" is filed. Unlike appeal from Circuit Courts, however, Kentucky Rule of Civil Procedure 73.02(c) makes clear that the case will not be docketed until the fee is paid. To perfect the appeal, counsel

---

[68] Energy Regulatory Commission v. Kentucky Power, 605 SW 2d 46 (1980); Slone v. Casey, 194 SW 3d 336 (2006); see also Ky. R. Civ. P. 19.02.

[69] Louisville Label, Inc. v. Hildesheim, 843 SW 2d 321 (1992).

[70] Wooten v. Compton, 322 SW 2d 473 (1959).

[71] Louisville & NR Co. v. Complete Auto Transit, 259 SW 2d 483 (1953); Allen Co. v. Thoroughbred Motor Court, 272 SW 2d 343 (1954).

[72] KRS 24A.340; Miller v. Jones, 658 SW 2d 888 (1983).

[73] Id.

[74] Ready v. Jamison, 705 SW 2d 479 (1986).

[75] Ky. R. Prof. Cond. 3.1, 3.3' Ky. Sup. Ct. R. 3.130; Rule 1.3 of the ABA Code of Professional Responsibility.

[76] See, e.g., Crossley v. Anheuser-Busch, Inc., 747 SW 2d 600 (1988).

[77] Ky. R. Civ. P. 73.02(1)(b); Ky. R. civ. P. 76.02(1)-(3); Ky. R. Civ. P. 76.12; see also Personnel Bd. v. Heck, 725 SW 2d 13 (1986).

need only cause the Circuit Court clerk to transmit a notice to the Court of Appeals confirming that the record has been prepared and file her or his brief.[78]

**Perfecting Appeals from District Courts to Circuit Courts**

Under Kentucky Rule of Civil Procedure 72.02, counsel can initiate an appeal from the State district court to the State circuit court by "filing a notice of appeal in the district court and paying the required filing fee."[79] If opposing counsel submits a counter-claim or cross-claim that exceeds the jurisdictional amount for District Court actions, she or he must submit a $60 fee to the District Court clerk to have the matter transferred to the proper venue: the Kentucky Circuit Court.[80] Here, two parties may also file a joint notice of appeal or a joinder motion to proceed "as a single appellant" "after filing separate notices of appeal." The "statement of appeal from [the] district court" is an abbreviated version of the merits brief and has a ten page limit.[81] There is no provision for the appellant to file a reply brief. There are special rules, however, for filing notices of appeal in small claims, paternity, and forced entry or detainer cases as the deadlines for filing the notices are ten, sixty, and seven days respectively for the entry of the District Court's judgment.[82] The appeal in turn can be perfected "within thirty days" of the first notice of appeal's filing by filing an appeal statement with the Circuit Court clerk.[83] Or, in the alternative, if the party seeks to perfect a cross-appeal from the District Court, filing the required counterstatement with the Circuit Court clerk.[84]

The appeal statement must disclose "[t]he style of the case and district court docket number;" "[t]he name, mailing address, and telephone number of each attorney whose appearance is entered in the case, together with the name of the party represented by the attorney;" "[t]he name of the district judge who presided over the matter being appealed;" "[t]he date on which the notice of appeal and the date on which any notice of cross-appeal was filed;" "a statement as to whether the matter has been before the Circuit Court, on a previous occasion;" "[t]he type of litigation;" a statement on whether "the appellant wants an oral argument;" a "summary of the evidence heard by the district court" or whether the appeal requires consideration of any evidence; the questions presented; an argument section; and a short prayer for relief. In criminal appeals, counsel should note that this statement must be served on "both the county attorney and the" lawyer for the State.[85]

Once the appellant's appeal statement from the district court is filed, the appellee has thirty days to file a counterstatement that cannot exceed ten pages and must be signed by her or his counsel, include all the items that were set out above for the appellant's appeal statement; a statement on whether the appellee accepts the appellant's evidence summary "and, if not, a fair and accurate" evidence summary; and a response to the arguments made in the initial appeal statement.[86] The record is not required to be certified unless and until the Court of Appeals grants

---

[78] Ky. R. Civ. P. 75.07; Ky. R. Civ. P. 76.12.
[79] KRS 23A.210; Ky. R. Civ. P. 72.02(1).
[80] Ky. R. Civ. P. 3.03(2).
[81] Ky. R. Civ. P. 72.10(i).
[82] Ky. R. Civ. P. 73.02; Hibberd v. Neil Huffman Datsun, Inc., 791 SW 2d 726 (`990).
[83] Ky. R. Civ. P. 72.08.
[84] Ky. R. Civ. P. 72.06.
[85] Ky. R. Civ. P. 72.10 and 72.12.
[86] Ky. R. Civ. P. 72.12.

a motion for review of the final action of the Circuit Court disposing of the appeal.[87] The appellate jurisdiction of Kentucky Circuit Courts is limited.[88] Indeed, in administrative appeals, statutory review by a Circuit Court of administrative decisions will not constitute an appeal but rather, is an original action in the tribunal.[89]

## Perfecting Appeals from the Circuit Court to the Court of Appeals and Kentucky Supreme Court

In appeals from the Kentucky Circuit Court to the Court of Appeals or State Supreme Court, the appellant must request that the Circuit Court clerk transmit the written or recorded record to the appellate court and file her or his brief.[90] Once the appeal is perfected, the appellate clerk will mail  a notice to all the parties in the case. Parties can perfect cross-appeals by simply filing the required brief.[91]

## Costs for Appeals from District Courts to Circuit Courts

Kentucky Rule of Civil Procedure 72.13 entitles each party to an appeal that is disposed in a Circuit Court to a statement of the filing fees to be reimbursed by the unsuccessful party with one exception as the Commonwealth or city or town within Kentucky need not reimburse private counsel for fees in criminal cases. Cost reimbursement liability can be enforced with a motion.

## Cross-Appeals Generally

In Kentucky, "[a]ny party properly named as an appellee or cross-appellee" can take a cross appeal from a trial court judgment by filing a cross appeal notice at least ten days after the appellant's notice of appeal was due.[92]   Here, the mere fact that the appellant's appeal was

---

[87] Ky. R. Civ. P. 72.04.

[88] KRS 23A.010(2).

[89] KRS 23A.080(2); Smith v. O'DEA, 939 SW 2d 353 (1997).

[90] Ky. R. Civ. P. 76.02.

[91] *Id.*

[92] Ky. R. Civ. P. 74.01; Welch v. Velten, 185 S.W.3d 163, 164 (Ky. 2006); *Empire Coal Co. v. Empire Coal Mining Co.*, 188 Ky. 516, 222 S.W. 947 (1920); *Sowards' Guardian v. Ratliff*, 152 Ky. 105, 153 S.W. 29, 29 (1913); Com., Revenue Cabinet v. Smith, 875 S.W.2d 873, 878 (Ky. 1994) (adjudicating an issue that was not included in the cross appeal notice but that was included in the litigant's statement of issues set for discussion at oral argument); *Jackson v. Mackin*, 277 S.W.3d 626, 630 (Ky. Ct. App. 2009) (refusing to adjudicate an issue on cross appeal that was not properly preserved); Yocom v. Franklin Cty. Fiscal Court, 545 S.W.2d 296, 297 (Ky. Ct. App. 1976); Carrico v. City of Owensboro, 511 S.W.2d 677, 679 (Ky. 1974) (adjudicating a jurisdictional procedural question that was not raised on cross appeal); Reed v. Reed, 457 S.W.2d 4 (Ky. 1969) (dismissing cross appeal for failure to comply with appeal perfection rules); *Standard Farm Stores v. Dixon*, 339 S.W.2d 440 (Ky. 1960) (same); *Wright v. Thomas*, 306 Ky. 763, 209 S.W.2d 315 (1948) (refusing to consider appellee's claim for reversal of the lower judgment where the appellee did not request a cross appeal and was not granted a cross appeal); *Miller v. Richards*, 305 Ky. 624, 205 S.W.2d 308 (1947) (same); *Com. ex rel. Howard v. Imperial Oil Co.*, 304 Ky. 705, 202 S.W.2d 413 (1947) (refusing to consider an error asserted by the appellee on cross appeal when the appellee did not file a cross appeal notice); *Cyphers v. Runyon*, 218 Ky. 5, 290 S.W. 671 (1927) (refusing to consider an error asserted by the appellee on cross appeal when the appellee submitted that the latter portion of its merits brief constituted a sufficient cross appeal notice); *Crook v. Schumann*, 293 Ky. 334, 168 S.W.2d 1004 (1943) (limiting cross appeals for the appellee to the final judgment in the underlying action and excluding interlocutory or other unappealable non-final orders issued by the trial court from the class of appealable orders that the appellee may assail on cross appeal); *Patrick v. Fletcher*, 149 Ky. 730, 149 S.W. 1008, 1008 (1912) (refusing to consider a cross appeal after the original appeal was adjudicated); Vanhoose v. Wheeler, 141 Ky. 746, 133 S.W. 779 (1911) (refusing to consider an error assignment that was not raised by an adverse party); Daviess Cty. Court v. Howard, 76 Ky. 101 (1877) (same).

dismissed or that the appellant has failed to adequately prosecute his or her appeal does not prevent an appellee or cross-appellee from filing a cross-appeal. On cross-appeal, cross-appellants can name any party to the Circuit Court case below as a "cross-appellee." Errors that the appellee believes are prejudicial must be raised on cross-appeal lest they become the law of the case.[93] The same is true for cross appeals concerning discretionary review motions.[94] Finally for cross-appellees who have not filed an appeal or cross appeal notice over the judgment below, these individuals or entities may "file an additional cross-appeal within" ten days of the filing of the cross appeal notice naming them as a party to the action. Cross appeals must be perfected within the earlier of either thirty days after the mailing of the clerk's notice of the date the appeal was perfected or thirty days from the date the appellant would have perfected her or his appeal. Cross-appellant's must also file a pre-hearing statement.[95]

**Record**

For appeals from District Courts to the Circuit Court, the appellate record is composed "of the entire original record of proceedings in the district court including…[all] electronic recordings" and does not need to be certified "until the Court of Appeals grants a motion for review of the final action of the circuit court disposing of the appeal."[96] FILLER.

**Designating Evidence in the Court Reporter's Record**

Kentucky Rule of Appellate Procedure 75.01 provides yet a different set of rules for designating evidence in the court reporter's records. Only a few of these rules, however, are relevant for appellate counsel. Here, assuming that the parties have not elected to file a certified "agreed statement of the case," that the proceedings were not recorded exclusively by video, or that "there are no proceedings to transcribe, the appellant…[must] file a designation of untranscribed material" with the trial court clerk within ten days of the notice of appeal's filing and serve this document on "the appellee,…court reporter," and appellate court clerk. If the appellate court holds a prehearing conference, the designation must be filed with the clerk within ten days of the end of the conference. The filing must name all the untranscribed portions of the "stenographically or electronically recorded" proceeding that the designee wishes to include in the record as well as all deposition portions that were "filed with the clerk but…not read into evidence."[97] This document is due ten days after the appeal notice has been filed. Within ten days after the designation is served and filed or ten days after the deadline for the filing other parties can designate additional untranscribed portions to include in the record.[98] If the appellant elects not to file an evidence designation, the appellee may still submit a statement designating untranscribed portions of the record. If neither party elects to designate additional material for the record here, a statement setting out the depositions to be "excluded from" the record must be filed with the trial court clerk and served on the "appellee" and appellate court clerk.

Counsel should note that if any part of the proceedings must be transcribed by the court reporter, the document with the transcription must be signed by her or him and disclose the transcript request date; the number of pages for the report; the [e]stimated completion date; and

---

[93] Perry v. Williamson, 824 SW 2d 869 (1992).
[94] Nelson Steel Corp. v. McDaniel, 898 SW 2d 66 (1995).
[95] Ky. R. Civ. P. 76.03(4)(a)-(k).
[96] Ky. R. Civ. P. 72.04.
[97] Ky. R. Civ. P. 75.01(1).
[98] *Id*.; Burberry v. Bridges, 427 S.W.2d 583 (Ky. 1968)

confirmation of transcript payment. In the event that the transcript cannot be completed within the fifty-day deadline, designating counsel must file a time extension with "the appropriate appellate court."[99] If the transcript is not completed after 110 days, counsel must send yet another time extension request but is permitted to reduce her or his original payment of the transcript fee by ten percent for every thirty days over the 110 day limit that the item is not prepared. The same rules apply to transcript preparation in capital cases with the exception that the initial deadline is 170 days "from the date of the service of the designation of record" and the second deadline is 230 days from the record service designation date. Witness testimony included in the record can be in either "question and answer form or" take the form of a narrative. While a party can designate a condensed narrative of witness testimony to be included in the record, if "any other party to the appeal" objects to the summary, the testimony must be included in question and answer format.[100] If a portion of the included proceedings were not recorded or cannot be transcribed, counsel can prepare a narrative statement of the omitted material with "best available means, including" her or his own memory. This statement must "be served on the appellee, who may serve objections or proposed amendments" to the statement within ten days of receiving the document. The statement will then be submitted to the trial court for "approval" and inclusion in the record. The parties by mutual agreement may also elect to submit a narrative statement in place of a "stenographic transcript or…electronic recording" under Kentucky Rule of Civil Procedure 75.13.[101]

---

[99] Ky. R. Civ. P. 75.01; *Porter v. Harper*, 477 S.W.2d 778, 778 (Ky. 1972); Montfort v. Archer, 477 S.W.2d 143 (Ky. 1970) (refusing to dismiss an appeal for failure to meet the original record designation deadline where a time extension had been granted); Motorists Mut. Ins. Co. v. Mercer, 462 S.W.2d 188 (Ky. 1970) (dismissing appeal for failure to file a timely record designation statement); Timmons v. Allen, 449 S.W.2d 27 (Ky. 1969) (record designation is not jurisdictional); Springfield Coal Co. v. Meade, 430 S.W.2d 652 (Ky. 1968) (depositions are not a de facto part of the clerk's record); Brown v. Smiley, 428 S.W.2d 217 (Ky. 1968) (accepting material that was not a part of the record designated by one of the litigants); Bone v. Shadoan, 746 S.W.2d 68 (Ky. 1988) (Rule 75.01 applies to adoption cases); Lucas v. Lucas, 720 S.W.2d 352 (Ky. Ct. App. 1986) (parties cannot designate evidence that was not introduced at trial in the record); Smith v. Com., Dep't of Justice, 686 S.W.2d 831 (Ky. Ct. App. 1985) (same); Richman v. First Sec. Nat. Bank & Tr. Co., 652 S.W.2d 671 (Ky. Ct. App. 1983) (same); Oldfield v. Oldfield, 663 S.W.2d 211 (Ky. 1983) (dismissal may be warranted in matters where the court reporter transfers the record but the appellant does not file a designation statement); Smith v. Smith, 450 S.W.3d 729, 731 (Ky. Ct. App. 2014) (noting that a litigant must designate the portions of an electronically recorded proceeding for inclusion in the record); Williams v. Wal-Mart Stores, Inc., 184 S.W.3d 492, 501 (Ky. 2005) (finding that a State court may sanction non-compliance with Rule 75.01 with dismissal on a discretionary case by case basis); Huddleston v. Murley, 757 S.W.2d 216, 217 (Ky. Ct. App. 1988) (burden is on the appellant to designate those portions of the record that she or he wishes to include in the record); Fanelli v. Com., 423 S.W.2d 255 (Ky. 1968) (same); Croley v. Alsip, 602 S.W.2d 418 (Ky. 1980) (it is improper practice to include exhibits appended to a brief that are not in the case record); Dep't of Transp. v. Kemper, 574 S.W.2d 932 (Ky. Ct. App. 1978) (refusing to include newly prepared portions of the record in the original record); Johnson v. Maloney's of Olive Hill, Inc., 569 S.W.2d 704 (Ky. Ct. App. 1978) (cautioning that dismissal of an appeal where the record has not be transmitted is not appropriate only in those instances where the case can be decided without reference to a lower court record); Beaver v. Beaver, 551 S.W.2d 23 (Ky. Ct. App. 1977) (litigant waived untimely record designation claim); Webb v. Webb, 547 S.W.2d 448 (Ky. Ct. App. 1976) (refusing to dismiss appeal for failure to designate a record in a case that was originally before the State Worker's Compensation Board); City Supply Co. v. Munday, 421 S.W.2d 569 (Ky. 1967) (dismissing appeal for failure to comply with the applicable time deadlines).
[100] Ky. R. Civ. P. 75.03.
[101] Ky. R. Civ. P. 75.13(2); Hammond v. Commonwealth, 569 S.W.3d 404, 409 (Ky. 2019); Early v. Commonwealth, 470 S.W.3d 729, 734 (Ky. 2015); Abbott v. Abbott, 673 S.W.2d 723, 725 (Ky. Ct. App. 1983); Hinton v. Byerly, 483 S.W.2d 138, 139 (Ky. 1972); Richardson v. Eaton, 402 S.W.2d 857, 857 (Ky. 1966); Frederick v. Hall, 375 S.W.2d 400, 401 (Ky. 1964); KL & JL Investments, Inc. v. Lynch, 472 S.W.3d 540, 545 (Ky. Ct. App. 2015), as modified (Apr. 17, 2015) (arguing that reliance on Rule 75.13 is particularly appropriate in situations where there is no lower court record ); Goncalves v. Com., 404 S.W.3d 180, 207 (Ky. 2013), as corrected (Mar. 14, 2013) (litigant failed to

These designation rues are significant because Kentucky Rule of Civil Procedure 75.02 provides that the default presumption in non-capital cases ins that the record will include only "those portions of the voir dire or opening statements and closing arguments by counsel which were properly objected to in the" trial court proceedings and included by counsel in the record in a designation statement. As is the case in the Lone Star State, albeit with minor modification, either of the parties can request a supplementation of the record by filing a motion with the trial court. In designating portions of the record, though, attorneys should be cognizant of the fact that preparation costs for portions that are subsequently determined to be unnecessary to the appeal may be charged to the designator along with sanctions to discourage future conduct.[102] Appellees may also be required to pay record preparation costs up front and in advance if they designate additional portions of the record for inclusion when it does not appear as if the included portions are necessary for a proper disposition of the appeal.[103] In the alternative, the parties, under Kentucky Rule of Civil Procedure 75.06, may stipulate "the parts of the proceedings and evidence to be included in the record on appeal."[104] Transcript costs will be borne by the designating party.[105]

If "the trial judge refuses or is unable" to approve a record or signs off on a record over "a party's objection," the adversely affected party may file an objection corroborated by the affidavits of two "bystanders" to the matter within five days of the trial court's decision.[106] The other party may file up to five affidavits from individuals controverting the objection within ten days of the objection's filing.

## Clerk Records

Under Kentucky Rule of Civil Procedure 75.07, the record on appeal consists of "stenographically recorded" transcripts of the proceedings that have been included by default or counsel designation; evidence included by counsel either through designation or stipulation; all filed exhibits; every included pleading, order, judgment, instruction, and paper…"together with the name of each witness and the pages on which [her or his] examination and cross-examination appear;" "and juror strike sheets." It is counsel's responsibility to ensure that the clerk prepares

---

take advantage of Rule 75.13); Harper v. Com., 371 S.W.3d 763, 769 (Ky. Ct. App. 2011) (same); Nat'l Dairy Prod. Corp. v. Rittle, 487 S.W.2d 894, 896 (Ky. 1972) (commenting that the litigant had the primary obligation to correct a faulty narrative statement in the trial court ).

[102] Ky. R. Civ. P. 75.05; *McCreary Cty. Bd. of Ed. v. Stephens*, 454 S.W.2d 687, 688 (Ky. 1968) (noting that the Court could not consider a claim premised on Rule 75.05); Dukes v. City of Louisville, 415 S.W.2d 110, 112 (Ky. 1967) (overruling motion to apply Rule 75.05); Travelers Indem. Co. v. Patrick, 386 S.W.2d 256, 257 (Ky. 1964) (noting that only those materials that were necessary for understanding the record should be included in the record); Gunn v. Robinson, 330 S.W.2d 399, 400 (Ky. 1959) (noting that Rule 75.05 was designed to encourage selectivity in designating material for inclusion in the record); Foushee v. Foushee, 163 Ky. 524, 173 S.W. 1115 (1915) (striking material from the record at cost to the appellee); Sanders v. Standard Wheel Co., 152 Ky. 238, 153 S.W. 211 (1913) (assessing costs against the appellant for including immaterial evidence in the record); Forest Hill Bldg. & Loan Ass'n v. McEvoy's Ex'r, 66 S.W. 1031 (Ky. 1902) (same); Sandy River Cannel Coal Co. v. White House Cannel Coal Co., 125 Ky. 278, 102 S.W. 320 (1907) (refusing to assess costs against an appellant who had included a transcript that had already been paid for in the record of a second appeal).

[103] *Id*.

[104] Ky. R. Civ. P. 75.06; For a helpful index of court reporter rules for the several States, see Major Ryan A. Little, *Appendix b: Survey of Civilian Post-Trial Systems Taming the Military's Post-Trial Leviathan: Reforms That Could Save the Military Up to $170 Million Each Year*, 25 CORNELL J.L. & PUB. POL'Y 383 (2015).

[105] Ky. R. Civ. P. 75.02.

[106] Ky. R. Civ. P. 75.14.

the record within the prescribed ten-day limit after the court reporter files her transcript. Counsel is entitled to receive written notice from the Circuit Court or Court of Appeals Court clerk when "when the record has been completed and certified."[107] The ten day limit is extended to thirty days for appeals from the Circuit Court involving paternity, dependency, abuse, neglect, domestic violence, or juvenile status.[108] The clerk will enter the date when the notice was served and this date will govern the time allowed for perfecting the appeal. If an appellant wants to be allotted more time for docketing the appeal, she or he must file a motion with the appellate court which has the discretion of extending the time with a showing of good cause.[109] Although strict compliance with Kentucky Rule of Civil Procedure 73.08 is mandatory, the filing of the appellate record is not a jurisdictional requirement and can be excused with a showing of special circumstances.[110] A movant requesting a time extension for record certification in the Court of Appeals must demonstrate that the time for filing the record has not expired. If a time extension was granted in the trial court, a certified copy of that court's order extending the deadline for filing the record must accompany the motion and demonstrate that the time for filing the appeal has not yet run. Otherwise, the extension will not be granted.[111] If necessary, the record will be made available to appellant's counsel first and then appellee's counsel to prepare briefs – with the exception that the record must be returned to the clerk before counsel files her or his brief. Counsel, however, may not remove an original electronic recording in the record or the original court reporter transcript from the clerk's office.

Finally, appellate court records need not "be approved by the trial court" unless the disputed record is a narrative statement or the matter is being appealed to the Kentucky Court of Appeals or State Supreme Court. Moreover, the trial court may settle differences among the parties on whether the record "truly discloses what occurred in…[that] court." The appellate court acting, *sua sponte*, or any of the parties, through a motion, may also request or direct respectively that a material omission or misstatement in the record be corrected "either before or after the record is transmitted to the appellate court."[112]

"at or before" the appeal is perfect, the appellant must send a written request to the reporter for the record designating "the exhibits" and "portions" to be included. This request must be filed with "the trial court clerk." If the appellant does not want the entire reporter's record, she or he must send over a partial request that includes the "the points or issues" that will "be presented on appeal." The other parties also have a right to "designate additional exhibits and portions" to be included in the reporter's record. In designating portions of the record, though, attorneys should be cognizant of the fact that preparation costs for portions that are subsequently determined to be "unnecessary to the appeal" may be charged to the designator. Counsel should also note that the appellate court will assume that the partial record constitutes the entre record for the case even if one of the claims concerns "legal or factual insufficiency of [some] evidence."

## Records in Cases with Multiple Appeals From the Lower Court Judgment

---

[107] Ky. R. Civ. P. 75.07 and 75.08.
[108] Ky. R. Civ. P. 73.08.
[109] Ky. R. Civ. P. 73.08.
[110] Bardill v. Bird Well Surveys, 310 SW 2d 265 (1958).
[111] Evans v. Commonwealth, 450 SW 2d 509 (1968).
[112] Ky. R. Civ. P. 75.08

Under Kentucky Rule of Civil Procedure 75.11, if "more than one appeal is taken" "from the same judgment," a single record for the case will be prepared.[113] In criminal cases with "several appeals" "to the Supreme Court and Court of Appeals," "a copy of the original record" will be made and certified as the appellate record to the Court of Appeals.

**Intermediate Relief in Kentucky Appellate Courts and Records in the Kentucky Court of Appeals and State Supreme Court For Motions Before the Record Has Been Filed**

In the event that counsel is litigating an appeal before either the Kentucky Court of Appeals or State Supreme Court, the record has not yet been transmitted to the relevant Court, and she or he needs to file a motion to dismiss, a motion for a stay on appeal, or request "any other intermediate order," she or he can ask the trial court clerk to send the appellate court a copy of the appealed judgment or order, "the notice of appeal," and the other portions of the record that are necessary to dispose of the motion. More than that, under Kentucky Rule of Civil Procedure 76.33, counsel may petition an appellate court for intermediate relief once she or he demonstrates that her or his client "will suffer immediate and irreparable injury before a hearing" can be held on the motion. The same record rules for motions that are filed before the record is transmitted to the Court apply to these proceedings as well.

**Motion Practice in the Kentucky Supreme Court and Court of Appeals**

==FILLER==. Once the motions is "served," opposing counsel has ten days to enter a "response" along with a "certificate of service." The default presumption is that five copies of both the motion and response must be filed in the Kentucky Court of Appeals and State Supreme Court and that oral argument will not be heard on the filing unless otherwise ordered by the Court.[114] Any member designated by the Chief Justice of the Kentucky Supreme Court or Chief Judge of the State Court of Appeals may "hear and dispose of any motion" that does not call for the "final disposition of an appeal or original action." Designation from either of these two individuals, however, is not required from a member of the Kentucky Supreme Court or Court of Appeals to issue an intermediate procedural order "pending final disposition of a proceeding" in either appellate court. If counsel wishes to file a motion to dismiss the appeal either because the court lacks subject matter jurisdiction over the matter or one of the parties has not adequately prosecuted the appeal, once the motion is filed, the other filing deadlines are tolled until "an order is entered" denying or granting the motion. Motions should include the names and addresses of movants, respondents, and counsel; the date the disputed judgment or order was entered; a statement on whether a supersedeas bond has been executed; a statement of material facts; a statement of legal issues; a statement of reasons why the decision should be reviewed; a statement demonstrating whether any other party to the proceeding has a rehearing petition pending before the Court of Appeals. Ten copies of the motion must be filed in the State Supreme Court and five copies must be filed in the Court of Appeals.[115] Motions for interlocutory relief in the State Court of Appeals should also have the complaint and other pleadings; the disputed circuit Court order; the lower court record; and the original or certified copies of the factual findings and legal conclusions made by the lower court attached.[116]

---

[113] Ky. R. Civ. P. 75.11;
[114] Ky. R. Civ. P. 76.34(3).
[115] Ky. R. Civ. P. 76.20(6).
[116] LOCAL 1336, ETC. v. INTERN. HARVESTER CO., 597 SW 2d 157 (1980).

**Agreed Statements on Appeal**

Under Kentucky Rule of Appellate Procedure 75.15, the parties to an appeal can "prepare and sign a" a case statement disclosing "how the questions arose and were decided" by the lower court; an agreed statement of facts; a copy of the appealed judgment; the "notice of appeal;" "and a concise statement of the points to be relied on by the appellant." Once the statement is approved by the trial court, subject to modifications made by her or him, the abbreviated record will be sent to the appellate court.

**Party and Counsel Substitution**

Kentucky Rule of Civil Procedure 76.24 permits counsel or any other party to substitute a deceased party for her or his "personal representative" "after a notice of appeal is filed or while" an appeal is pending with a motion. If the motion is not from the personal representative, it must be "served" on him or her. In the event that the decedent does not have a personal representative, the appeal will proceed, nonetheless. This same rule applies if a party passes away after the relevant court enters its judgment or order but before the notice of appeal is filed. On the other hand, if a party that had a right to appeal a judgment dies before she or he can direct that an appeal notice be filed, her or his "personal representative" or "attorney of record," if a personal representative is not on hand, may file the notice of appeal. If counsel is substituted between trial and appeal, the new lawyer should enter an appearance on, or before, the filing of the appeal notice to permit the substitution. If there is not enough time to enter an appearance before the appeal notice is filed, the appearance should be made at the same time the appeal notice is filed.

**Intervention**

In the Bluegrass State, a litigant may intervene as a matter of right if "a statute confers an unconditional right to intervene" or she or he has "an interest" in the underlying "property or transaction" at issue and would be impaired or impeded from protecting "that interest" from the "disposition of the action." If a party has a "statutory" intervention right, she or he may be permitted to participate in the litigation after filing a motion so long as the no party objects to the motion ten days after it is filed.[117]

**Supersedeas Bonds**

Appellants seeking "a stay on appeal" must petition the District Court clerk or the Court directly for an "executed supersedeas bond" "conditioned for" judgment or cost modifications and "the satisfaction of the judgment in full together with costs, interest and damages for delay, if the appeal is dismissed or if the judgment is affirmed."[118] The bond must also be for "a fixed amount," and disclose "[a] good and sufficient" guarantor. The appellant must include the guarantor's address. If the appealed judgment is for unsecured money, the bond must be fixed at a "sum" that will cover the unsatisfied judgment, appeal costs, interest, and delay damages unless the trial court fixes another amount for good cause "after notice and [a] hearing."[119] On the other hand, if the judgment "determines the disposition of the [disputed] property," the bond must be set at an amount that  "will secure the amount recovered for the use and detention of the property," the

---

[117] Ky. R. Civ. P. 24.01.
[118] Sotak v. Sotak, 438 SW 490 (1969).
[119] Ky. R. Civ. P. 73.04(1)-(2).

action costs, appeal costs, interest, and delay damages.[120] The bond is a covenant to pay all costs and damages associated with the appeal and must display the guarantor's address.[121] "The sufficiency of the bond or the…[guarantor c]ay be determined by the trial court" after a "motion and hearing."[122] Trial court actions on a supersedeas bond can be challenged in a State appellate court on an interlocutory appeal with an abuse of discretion standard of review.[123] A motion that challenges the sufficiency of a supersedeas bond should be accompanied by a supporting affidavit.[124]

Finally, under Kentucky Rule of Civil Procedure 73.06, the District Court retains "original jurisdiction" over "all matters relating to the right to file a supersedeas bond, the amount and sufficiency" of the bond, and the guarantor even on appeal.[125] Guarantors should note that by entering into the matter, they submit "to the jurisdiction of the [C]ourt" where the bond is filed and may be compelled to provide the promised collateral on a party's motion after notice has been provided twenty days in advance of a hearing.[126] The bond can be enforced on motion so long as notice is provided to the guarantor at least twenty days before the enforcement hearing.[127] A supersedeas bond from a trial court continues to stay the judgment pending a motion for reconsideration, rehearing petition, or discretionary review motion. Motions for discretionary review are treated differently. Here, even if one has a supersedeas bond and a discretionary review motion is granted, counsel is subject to a damages penalty of ten percent of the amount superseded if she or he is not victorious on the second appeal.[128]

**Pre-Hearing Conferences**

Twenty days after the notice of appeal or cross-appeal notice is filed "in the Circuit Court," every "appellant and cross-appellant" must file (and serve on the other parties) a prehearing statement (see Appendix XX). The statement requests disclosure of the "circuit court docket number;" "style of the case;" "[t]he name, mailing address, and telephone number of each attorney whose appearance is entered in the case;" "party name;" lower court "presiding judge name;" notice of appeal/cross-appeal filing date; litigation type; claim and defense description; a description of the issues litigated; statement of facts; and a statement of the "issues proposed to be raised on appeal." Counsel must also certify whether the matter is one of first impression for the Kentucky appellate courts; identify the cases and statutes that the matter turns on (if any); and, as is the case in Hawaii, identify pending cases before the Kentucky Court of Appeals or State Supreme Court that implicate the same, or substantially the same, issue.

**Appealing Kentucky District Court Judgments**

---

[120] Ky. R. Civ. P. 73.04(3).
[121] Sotak v. Sotak, 438 SW 490 (1969); Ky. R. Civ. P. 73.04(1).
[122] INDUSTRIAL REDISTRIBUTION CENTER, INC., v. Plastipak Packaging, Div. of Beatrice Foods Co., 706 SW 2d 2 (1986).
[123] INDUSTRIAL REDISTRIBUTION CENTER, INC., v. Plastipak Packaging, Div. of Beatrice Foods Co., 706 SW 2d 2 (1986).
[124] Id.
[125] Ky. R. Civ. P. 73.06(2).
[126] Ky. R. Civ. P. 73.07.
[127] Ky. R. Civ. P. 73.07.
[128] KRS 26A.300; Wells v. Southern Ry. Co., 633 SW 2d 406 (1982); Coomer v. Gray, 750 SW 2d 424 (1988).

==FILLER==. Under Kentucky Rule of Civil Procedure 72.08, appeals from District Courts "must be perfected" at least thirty days "after" the "first notice of appeal" has been filed.[129] More than that, motions for discretionary review of a Circuit Court decision that originated in a Kentucky District Court must be filed within thirty days of the clerk's docket notation of the Circuit Court judgment.[130] A judgment does not become final here until all post-trial motions for judgment vacation, alteration, or amendment have been disposed with.[131]

**Appellee Counterstatement – District Court Appeals**

Once the appellant's appeal statement from the district court is filed, the appellee has thirty days to file a counterstatement that must be signed by her or his counsel, include responses to the appellant's claims, dispute or accept the appellant's "summary of the evidence," indicate whether oral argument is requested, specify the names of all the parties; and name the judgment or order that is being appealed.

**Appeals From the Kentucky Court of Appeals to the Kentucky Supreme Court**

Motions for discretionary review of a decision of the Court of Appeals by the State Supreme Court are "a matter of judicial discretion[,]…will be granted only when there are special reasons for it and should be "filed within 30 days after the date on which the judgment [or opinion] of the [Court of Appeals] was entered."[132] The same time requirement applies to motions seeking "discretionary review by the Court of Appeals of a circuit court judgment in a case appealed from the district court."[133] However, in the event that a timely petition for rehearing or reconsideration has been filed or a time extension has been granted, the discretionary review motion should be filed "within 30 days after the date of the order denying the petition or motion for reconsideration or, if it was granted, within 30 days after the date of the opinion or order finally disposing of the case in the Court of Appeals."[134] Time extensions are usually granted so long as they are filed before the original deadline for the discretionary review motion.

The motion must be served on all parties as well as the clerk of the court that rendered the disputed decision, be signed by the parties and their counsel, not exceed fifteen pages in length, and must contain: "[t]he name of each movant and each respondent;" "the names and addresses of their counsel;" the date of final disposition by the appeals court or the date the disputed judgment was entered; a "statement of whether a supersedeas bond, or bail on appeal, has been executed;" a statement of facts; the question(s) presented; an argument section; and a statement certifying whether "any other party to the proceeding has a petition for rehearing or motion for reconsideration pending in the Court of Appeals." Additionally, if the motion is addressed to the Kentucky Supreme Court, the petition should contain a statement that she or he "does not have a petition for rehearing or motion for reconsideration pending in the Court of Appeals." "Each respondent may file a response to the motion" not to exceed fifteen pages. Ten copies of the motion and response must be filed with the State Supreme Court while only five need be left with the Court of Appeals. New issues may not be raised in a discretionary review motion. Thus, an issue that is not raised before the Kentucky Court of Appeals will be deemed waived and cannot be

---

[129] Ky. R. Civ. P. 72.08; Ky. R. Civ. P. 72.
[130] Ky. R. Civ. P. 76.20(2)(a); Ky. R. Civ. P. 77.04(2).
[131] Bates v. Connelly, 892 SW 586 (1995).
[132] Ky. Const. §110(b); Crain v. Dean, 741 SW 2d 655 n.2 (1987).
[133]
[134] See, e.g., *Knott v. Crown Colony Farm, Inc.*, 865 S.W.2d 326, 329 (Ky. 1993).

raised in litigation before the State Supreme Court.[135] The same is true for errors that are not called to the attention of a trial court or administrative body before a final appealable judgment has been rendered and an appeal notice has been filed.[136] And, an issue that was raised only after filing an appeal notice is not properly before the appellate court.[137] More than that, a litigant can waiver her or his right to appeal a judgment through certain conduct such as acquiescence in the judgment and acceptance of its benefits.[138] Any error on jury instructions is not preserved for appellate review in the absence of an objection and a request to instruct the jury. Here, the error must be preserved by requesting the instruction before the case is submitted.[139] By way of contrast, if the objection is to exclusion of certain evidence, a party must object to both exclusion of testimony at trial and place the excluded evidence into the record by offering proof or avowal by the witness.[140]

Counsel should be careful to note that the record here should consist of "photocopies of the final order or judgment, any findings of fact, conclusions of law and opinion of the trial court, and any opinion or final order of the appellate court, including any decision on any petition for rehearing or motion for reconsideration." "In administrative agency cases," however, the record should be composed of "copies of the findings of fact, conclusions of law and award or order of the administrative agency."[141]

If the motion is granted by the Kentucky Supreme Court, counsel should refer to Chapter XX which governs the applicable briefing requirements and time deadlines. The briefing timeline here begins from the date of entry of the order granting the motion.[142] On the other hand, "[i]f the motion is [filled] in the Court of Appeals and is granted," the appeal [will be] be perfected in the same time and manner as if it were an appeal as a matter of right."[143] While the "denial of a motion for discretionary review" affirms the decision, denial "does not indicate approval of the opinion or order sought to be reviewed and [can]not be cited as connoting…approval." A decision of the Court of Appeals "granting or denying a motion for discretionary review" cannot be reconsidered by that Court.[144] Likewise, the Kentucky Supreme Court will not reconsider decisions granting or

---

[135] Personnel Bd. v. Heck, 725 SW 2d 13 (1986); see also Regional Jail Authority v. Tackett, 770 SW 2d 225 (1989) (matters not brought to the attention of the trial court ordinarily cannot be relied on by the appellant); Salisbury v. Com., 556 SW 2d 922 (1977); Smith v. Wright, 512 SW 2d 943 (1974); Commonwealth v. Stamper, 345 SW 2d 640 (1961).

[136] Com. v. Lavit, 882 SW 2d 678 (1994); Akers v. Floyd County Fiscal Court, 556 SW 2d 146 (1977); Personnel Bd. v. Heck, 725 SW 2d 13 (1986).

[137] Kentucky Milk Marketing v. Kroger Co., 691 SW 2d 893 (1985); Stuart v. Capital Enterprise Ins. Co., 743 SW 2d 856 (1987); University of Louisville v. Isert, 742 SW 2d 571 (1987).

[138] Commonwealth Life Ins. Co. v. Combs, 65 SW 2d 696 (1934); Mercer v. Federal Land Bank of Louisville, 188 SW 2d 489 (1945);  Massie v. Persson, 729 SW 2d 448 (1987) overruled on other grounds Conner v. George W. Whitesides Co., 834 SW 2d 652 (1992).

[139] Skaggs v. Assad, By and Through Assad, 712 SW 2d 947 (1986).

[140] KRE 103(b).

[141] There are limits on the General assembly's authority to restrict remedies on appeal from administrative agencies. More specifically in *Smothers v. Lewis*, the Kentucky Supreme Court held that once a State court has "obtained jurisdiction of a cause of action, has, as an incidental to its constitutional grant of power, inherent power to do all things reasonably necessary to the administration of justice in the case before it. In the exercise of this power, a court, when necessary in order to protect or preserve the subject matter of the litigation, to protect its jurisdiction and to make its judgment effective, may grant or issue a temporary injunction in aid of or ancillary to the principal action." *Smothers v. Lewis*, 672 SW 2d 62 (1984).

[142] Ky. R. Civ. P. 76.20(9)(b)

[143] Ky. R. Civ. P. 76.20(9)(c).

[144] Ky. R. Civ. P. 76.20(9)(e).

denying motions for discretionary review. While "a petition for rehearing or [a] motion for reconsideration in the Court of Appeals" is pending, the State Supreme Court will not consider "a motion for discretionary review" in that matter.[145] The Court can, though, remand matters that it believes were improperly granted a discretionary review motion.[146] The court clerk must send "[c]opies of the order…to counsel for each party and to the clerk of the court whose decision is sought to be reviewed." Please turn to Chapter XX to find the applicable filling fees for the motion. Finally, "if a supersedeas bond has been executed, damages for delay" are recoverable under the police courts section of Title IV of the Kentucky Revised Statutes.[147] Counsel should not use a discretionary review motion for a mandamus action that originated in the Court of appeals. Instead, the proper remedy is to seek review by direct appeal.[148] Counsel must provide ten copies of her or his brief to the Kentucky Supreme Court but need only furnish five copies to the Kentucky Court of Appeals.[149]

COVER FINALITY + HABEAS NEXT SESSION.

**Cross Motions for Discretionary Review in the Court of Appeals and State Supreme Court**

Under Kentucky Rule of Civil Procedure 76.21, once the State Supreme Court grants a discretionary review motion, the respondent has the option of filing a cross-motion for discretionary review designating additional issues for review. When the cross-motion is filed, the appellant then has ten days to file a response. The briefing deadline is suspended while cross motions for review are pending and begins again once the Court releases an order "granting or denying" the cross motion. If the cross motion is granted, the appellant must address the additional issues in her or his opening brief. Ten copies of each motion must be provided to the Kentucky Supreme Court while only five copies need be provided to the Court of Appeals.

**Workers Compensation Appeals**

Workers Compensation Board decisions are review directly by the Kentucky Court of Appeals. Here, counsel has thirty days from the Board's entrance of its final decision to file four copies of the review petition with the appellate court. The petition should disclose the names of the parties; "the names and addresses of their…counsel;" the date of final disposition by the ALJ and Board; "a table of points and authorities" with the issues on appeal; a statement of facts; the question(s) presented; an argument section; and, as is the case in Hawaii, a statement on whether there is pending action before a federal or State court involving the same injury. Counsel should attach the ALJ decision, Board decision, and the briefs that were filed before the Board to the petition and provide a filing fee.[150] The thirty day filing period is jurisdictional.[151] If a party is seeking review of a decision on a reopen motion, "copies of the motion, responses," and the relevant decision on the motion should "be attached." The record in Workers Compensation appeals consists of a transcript of the proceedings before the Board. Once the opening petition is filed with the Court of Appeals, opposing counsel has twenty days to file four copies of her or his

---

[145] Ky. R. Civ. P. 76.28(4)(a).
[146] GOLDEN FARLEY OF HOPKINSVILLE v. Mendell, 573 SW 2d 61 (1978).
[147] Anderson v. Zurich Insurance Company, 614 SW 2d 246 (1980).
[148] Robinson v. Karem, 675 SW 2d 385 (1984).
[149] Ky. R. Civ. P. 76.20(6).
[150] Foxworthy v. Norstam Veneers, Inc., 816 SW 2d 907 (1991).
[151] Ky. R. Civ. P. 73.02(2).

response.[152] The petition may not file "a reply" unless otherwise ordered by the Court. Appellees also have the right to file cross petitions that must adhere to the same requirements set out above for opening petitions with the exception that four copies of the cross-appeal petition are due within twenty days after the opening petition is filed. The appellant can then file a response, again, in copies of four, within twenty days after the cross petition is filed. All filings in Workers Compensation Appeals must be served on opposing counsel as well as the Board itself before filing and contain a "certification" that the claims made in the documents are made in "good faith." If the constitutionality of a State statute is implicated on the appeal, "a copy of the petition and response" must also be served on the State Attorney General. The Court can then decide the case on the basis of the petition and response alone or order further briefing. Counsel is entitled to receive a copy of the appellate court decision from the court clerk and if necessary, may pursue a discretionary appeal to the State Supreme Court.

**Brief Format**

Kentucky Rule of Civil Procedure 76.12 contains the requirements for appellate briefs before both the State Supreme Court and the Court of Appeals. In the State Supreme Court and Court of Appeals, each party must file ten or four briefs with the Court respectively. "[A]ll briefs may be printed or typewritten" and a "brief produced on a computer printer is considered to be typewritten." Printed briefs must "be in black ink on unglazed opaque white paper 6 1/8 by 9 1/4 inches in dimension, in type no smaller than 11-point." By way of contrast, typewritten briefs must "be on unglazed white paper 8 1/2 by 11 inches in dimension in black type no smaller than 12 point set at standard width." The type must "be double spaced and clearly readable and, "[t]he brief [must] have a 1 1/2 inch margin on the left side[,]…a 1 inch margin on all other edges," and "be securely bound at the left side." The Kentucky Rules of Civil Procedure do not specify a particular font type.[153] Covers must be color coded as follows:

| Appellant | Red |
|---|---|
| Appellee | Blue |
| Appellant Reply Brief | Yellow |
| Amicus Curiae | Brown |
| Petition for Rehearing | Green |
| Response | Gray |
| Other | White |

In the Kentucky Supreme Court, "the appellant's brief and the appellee's brief in response…[are] limited to 50 pages each, excluding the introduction, statement of points and authorities, exhibits and appendices" while the "reply briefs…[are] limited to 10 pages each." Parties may obtain an extension by court order. PROCEDURES. The applicable limits are somewhat different in the Court of Appeals. There, "the appellant's brief and the appellee's brief in response… [are] limited to 25 pages each, excluding the introduction, statement of points and authorities, exhibits and appendices while reply "briefs…[are] limited to five pages each." "[W]hen an appellant is called upon to respond to more than one appellee brief the appellant is permitted up to five additional pages for each additional appellee brief" and extensions for all

---

[152] Ky. R. Civ. P. 76.25(3).
[153] Ky. R. Civ. P. 76.12(4).

briefs may also be granted through an order of the court. For electronically filed briefs, the documents must "be formatted in Microsoft Word, WordPerfect, or" PDF and disclose the case "style and docket" number; the document name; and the document "language format." If the appellant does not file a brief, the appellee need not as well. Every brief front cover must contain a signed statement confirming that the filing has been served on opposing counsel,[154] the judge whose decision is under review, and the other required parties. The counsel certificate must also contain a statement that the appellate record has been returned to the trial court clerk or was not withdrawn by the party submitting the brief. Criminal appellate counsel should note that her or his brief must also be served on the State DA who tried the case. An appeal is submitted to the Court of Appeals or Kentucky Supreme Court under Rule 76.26 when all merits briefs are filed with the appellate court.[155] Of course, the parties may not "dismiss an appeal and have an opinion withdrawn" after the opinion has been released.[156]

## Appellant Brief Contents

The appellant's brief must contain an introduction "indicating the nature of the case" within "two simple sentences;" a statement on oral argument "indicating whether the appellant desires oral argument and why appellant believes that oral argument would or would not be helpful to the Court in deciding the issues presented;"[157] a table of points and authorities disclosing "the appellant's contentions with respect to each issue of law relied upon for a reversal"[158] "the order in which they are discussed in the body of the argument" and "listing under each the authorities cited on that point and the respective pages of the brief on which the argument appears;" a statement of facts;[159] argument; conclusion with the request relief;[160] and an appendix "with appropriate extruding tabs containing copies of the findings of fact, conclusions of law, and judgment of the trial court, any written opinions filed by the trial court in support of the judgment, the opinion or opinions of the court from which the appeal is taken, and any pleadings or exhibits to which ready reference may be considered by the appellant as helpful to the appellate court."[161] The first item should be a listing of all documents in the appendix followed by "the judgment, opinion, or order under review." Each argument section should contain a record reference to where the issue was preserved for appellate review[162]. The appellee's brief must be filed within 60 days "after the date of the notation on the docket" that the appellate court clerk has received the record from the lower tribunal.[163] There is an exception to this general rule for matters involving paternity, dependency, abuse, neglect, domestic violence, juvenile status offense, or involuntary termination of parental rights where the appellant's brief must be filed "with the clerk of the appellate court within 30 days after the date of the notation" by the clerk to the parties that the record has been

---

[154] Ky. R. Civ. P. 76.12(5).

[155] Ky. R. Civ. P. 76.26;  Jackson v. Nickell, No. 2013-SC-000748-OA, 2014 WL 703733, at *1 n.4 (Ky. Feb. 20, 2014); *Combs v. Kentucky Court of Appeals*, 312 S.W.3d 363 (Ky. 2010), as corrected (Apr. 13, 2010) (rejecting State constitutional challenge to Rule 76.26).

[156] Ky. R. Civ. P. 76.26(5).

[157] Failure to include this portion "will be treated as indicating that appellant does not desire oral argument in the appeal" but "does not preclude a party's right to file a motion to reconsider the Court's ruling that oral argument will be dispensed with."

[158] This requirement does not apply to briefs that are five pages or less.

[159] Ky. R. Civ. P. 76.12(4)(c)(iv).

[160] Ky. R. Civ. P. 76.12(4)(c)(vi).

[161] Ky. R. Civ. P. 76.12(c); Miller, *On Legal Style*, 43 KY. L. J. 235 (1954-55).

[162] Ky. R. Civ. P. 76.12(4)(c)(v); Elwell v. Stone, 799 SW 2d 46 (1990).

[163] Ky. R. civ. P. 75.07(6); Ky. R. Civ. P. 76.12(20(a).

received. In the event that counsel needs to request expedited review of the matter, she or he may file a request under Kentucky Rule of Civil Procedure 76.22 "for good cause shown."[164] This limit is extended to sixty-five pages for briefs combining arguments on appeal and cross-appeal. The brief may not exceed fifty pages. In capital cases, counsel may request a brief page limit extension of 150 pages for appellant briefs twenty days before the filing deadline. For cases in the Court of Appeals, both the appellant and appellee's are limited to filing merits briefs that are twenty-five pages. Counsel must provide ten copies of her or his brief to the Kentucky Supreme Court but need only furnish five copies to the Kentucky Court of Appeals.[165] Page limits for briefs do not include the introduction, statement of points and authorities, exhibits, or appendices.

## Appellee Brief Contents

There are less requirements for appellee briefs. These documents should contain a portion responding to the appellant's statements on the propriety of holding oral argument; a table of points and authorities disclosing "the appellant's contentions with respect to each issue of law relied upon for a reversal"  "the order in which they are discussed in the body of the argument" and "listing under each the authorities cited on that point and the respective pages of the brief on which the argument appears; a "counterstatement of facts that either adopts the appellant's statement or sets forth the facts the appellee deems necessary for a fair resolution of the matter; an argument section; and an appendix with "extruding tabs containing copies of any papers or exhibits, not included in the appellant's brief to which ready reference may be considered by the appellee as helpful to the appellate court."[166] The appellee's brief must be filed within 60 days "after the date on which the appellant's brief was filed" with one exception.[167] In matters involving paternity, dependency, abuse, neglect, domestic violence, juvenile status offense, or involuntary termination of parental rights, the filing deadline is reduced to 30 days "after the date on which the appellant's brief was filed." The rule is the same for the most part in criminal cases except that in matters where counsel is not a public defender or working on behalf of the state, "the appellee's brief shall be filed within 60 days after the date on which the appellant's brief was filed or within 60 days after the date on which the record on appeal was received by the clerk of the appellate court, whichever is the later." In the event that counsel needs to request expedited review of the matter, she or he may file a request under Kentucky Rule of Civil Procedure 76.22 "for good cause shown." In capital cases, counsel may request a brief page limit extension of 150 pages for appellee briefs twenty days before the filing deadline.

## Amicus Curiae Briefs

Potential amici to either the Kentucky Court of Appeals or the Kentucky Supreme Court may not file a brief in a matter without an "order…of the court" released after "a motion specifying…the nature of the movant's interest, the points to be presented, and their relevance to the disposition of the case" has been filed. The motion as well as the applicable filing fee is due fifteen days after the appellant's brief has been filed. The brief must "be tendered with the motion," may not exceed 15 pages, and cannot "contain appendices." An additional five pages is added to

---

[164] Rogers v. Lexington-Fayette Urban Cty. Gov't, 175 S.W.3d 569, 570 (Ky. 2005). Rule 76.22 appears to be a codification of Kentucky Rule of Court 1.185, which was in force during the 1970s. See Hollenbach v. Carter, 516 S.W.2d 336, 337 (Ky. 1974); Campbell v. Campbell, 452 S.W.2d 412, 413 (Ky. 1970)
[165] Ky. R. Civ. P. 76.12(d).
[166] The first item in the appendix should be "a listing or index of all documents included in the appendix."
[167] Ky. R. Civ. P. 76.12(2)(a).

the fifteen page brief limit for every additional appellee. Counsel must pay a $150 filing fee for the brief.[168] Counsel can request a page limit extension for the brief setting the limit at twenty-five pages so long as a motion for good cause is made within five days of the filing deadline.[169] The brief should be filed within fifteen days of the filing of the appellant's brief.

**Reply Briefs**

Kentucky Rule of Civil Procedure 76.12 permits the "appellant" to file a reply brief of no more than "five pages" before the Court of Appeals within fifteen days after "the last appellee's brief was filed or due to be filed."[170] This time deadline, however, is shortened to ten days for filings in "[c]ivil appeals from [c]ircuit [c]ourt orders determining [p]aternity, [d]ependency, [a]buse, [n]eglect, [d]omestic [v]iolence, [j]uvenile [s]tatus [o]ffense, or [i]nvoluntary [t]ermination of [p]arental [r]ights" that are taken to the Court of Appeals. The five page limit is extended by another five pages for each "appellee brief" the appellant is responding to while briefs combining "the appellant's reply and a cross-appellee brief" are limited to thirty pages. Luckily, these briefs need not have a statement of point and authorities but must have an argument and conclusion.[171] A brief that combines the appellant brief and a response to a cross-appeal is limited to forty pages. The limits are modified yet again for reply briefs filed in the State Supreme Court as the default presumption is that a reply may not exceed ten pages and that briefs combining "a reply and a response to a cross-appeal…[may] not exceed 25 pages."[172] Finally, for counsel litigating death penalty cases before the State Supreme Court, a brief page limit extension, "for good cause," may be obtained by filing a motion at least five days before "the filing deadline." These filings may not exceed twenty-five pages. A similar privilege is extended to appellees who have "cross-appealed" and wish to respond to the "appellant" on "issues" pertinent to the cross-appeal. In capital cases, counsel may request a brief page limit extension of twenty-five pages for reply briefs five days before the filing deadline.

**Penalties For Failure to Comply With Briefing Requirements**

Kentucky Rule of Civil Procedure 76.12(8) permits both the State Supreme Court and Court of Appeals to strike briefs that do not comply with the Rules of Civil Procedure and dismiss an appeal if the appellant has failed to file its brief in a timely manner. If, however, the appellee has neglected to file a brief, both Courts may accept the statement of facts in the appellant's brief "as correct," "reserve the judgment" on the basis of the appellant's brief alone, or "reverse the judgment without considering the merits of the case" at all.

**Filing Fees and Required Filing Numbers**

| | |
|---|---|
| Appeal, cross appeal or certification of law | $150 |
| Appeals or cross appeals from Circuit Court, Family Division, to the Court of Appeals, from orders determining paternity, dependency, neglect or abuse, domestic violence, or a juvenile status offense | $75 |

---

[168] Ky. R. Civ. P. 76.42(2)(a)(vi).
[169] Ky. R. Civ. P. 76.12(4)(b)(iii).
[170] Ky. R. Civ. P. 12(2)(a).
[171] Ky. R. Civ. P. 76.12(4)(e).
[172] Ky. R. Civ. P. 76.12(4)(b)(ii).

| | |
|---|---|
| Appeal Notice for Final Judgment in a Kentucky District Court Civil Case | $60 |
| Motion for Transfer | $150 |
| Motion or Cross-Motion for Discretionary Review | $150 |
| Petition for Rehearing, Modification, or Extension of Opinion | $150 |
| Motion for Leave to File Amicus Curiae Brief | $150 |
| Motion for Extension of Time for Certification of Record, for Intermediate Relief, or for Dismissal of an Adversary Party's Appeal | $150 |
| Motion for Relief Under Rules 65.07 or 65.09 | $150 |
| Original Proceeding | $150 |
| Motion for Consideration of a Final Order or 'Opinion and Order' under Rule 76.38 | $150 |
| Petition or Cross-Petition for Review of a Decision by the Workers' Compensation Board | $150 |
| Criminal Appeals and Cross-Appeals from Kentucky Circuit Courts | $100 |

| Filing Name | Kentucky Supreme Court | Kentucky Court of Appeals |
|---|---|---|
| Interlocutory Relief Motion | 10 | 5 |
| Briefs | 10 | 5 |
| Rehearing Petitions and Responses | 10 | 5 |
| Prehearing Conference Statement | | 1 |
| Special Appeal Position Statements | | 5 |
| Transfer Motions and Responses | 10 | |
| Discretionary Review Motions and Responses | 10 | 5 |
| Workers Compensation Review Petitions | | 5 |
| Original Proceeding Petitions and Responses | 10 | 5 |
| Certification | 10 | 5 |

However, no further filing fee is required "to perfect or make any other motion pertaining to" an appeal that has been "docketed" for intermediate relief, for "dismissal of an adversary party's

appeal," or as part of "a motion for extension of time for certification of the record on appeal." Public defenders in criminal matters as well as government agencies working for the State need not pay the fees. As is the case in Texas, Kentucky has adopted the mailbox rule for filings. Indeed, Kentucky Rule of Civil Procedure 76.40 provides that a document is timely filed if it has been transmitted by USPS or a commercial carrier and is postmarked with a date that is "within the time allowed for filing."[173] Kentucky Courts – unlike their counterparts in Alabama and Mississippi – do not tax appellate proceedings in the [State] Supreme Court and Court of Appeals." The sole exception is for original actions where a "deposition…[is]…taken." Here, the losing party must bear "the reporter's fees." Counsel can enforce cost collection with a motion and need not initiate a separate proceeding.[174]

Rule 76.42(2)(a)

**Oral Argument**

Under Kentucky Rule of Civil Procedure 76.16, both the State Supreme Court and Court of Appeals operate under the presumption that appeals will be heard from matters taken from the circuit court unless the matter is submitted on the briefs[175] "the appellate court directs otherwise [*sua sponte*]…or on motion of one or more of the parties to the appeal." If either Court determines that it will decline to hear argument in a cause, the parties will then "have ten days from the date of the order…to object and ask for reconsideration." In cases before the Supreme Court and capital matters where the appellant has received permission from the Court to file a brief exceeding 50 pages, the appellant or cross-appellant must file and serve on opposing counsel "a notice of issues in the order…[that they will] be argued…with specific reference to the argument number and page numbers of each issue in the [relevant] brief" fourteen days before oral argument.[176] In all other cases, counsel has ten days before oral argument to file the statement of issues that she or he will present on appeal "with specific reference to the argument number and page numbers of each issue in the [relevant] brief." Failure to file this notice will result in the appellant being restricted to answering questions from the Court during oral argument." Cases cited in counsel's brief should be Shepardized before oral argument and the record should be reviewed.[177] Because the State Supreme Court bench is not one of the hottest in the South, counsel can expect to have close to one-half and three-fourth of her or his time for respectfully presenting her or his case. The Court, however, prefers unrehearsed arguments. In the Kentucky Supreme Court at least, the appellant should sit on the left side of the courtroom facing the bench and the appellee should sit on the right side. It is customary for advocates to address the Court with the phrase "May it please the Court. Ms./Mr. (last name of opposing counsel). My name is (counsel name). I represent (client name), who is the Appellant/Appellee." I would like to reserve X minutes of my time for rebuttal. Other advocates prefer the phrase "if your honors please" when addressing the entire court. Individual judges expect to be addressed as "Your Honor" rather than through their last name – e.g. Judge

---

[173] Ky. R. Civ. P. 76.40(2).

[174] Ky. R. Civ. P. 76.42(3).

[175] *Combs v. Kentucky Court of Appeals*, 312 S.W.3d 363 (Ky. 2010), as corrected (Apr. 13, 2010); *Stephenson v. Woodward*, 190 S.W.3d 317, 318 (Ky. 2005); *Nelson v. Norys*, No. 2004-CA-001725-ME, 2005 WL 1792116, at *4 (Ky. Ct. App. July 29, 2005); *Sanborn v. Com*., 975 S.W.2d 905, 914 (Ky. 1998), as modified on denial of reh'g (Oct. 15, 1998), and overruled by *Leonard v. Com*., 279 S.W.3d 151 (Ky. 2009). As is the case in Hawaii, even if the parties agree to submit a matter on the briefs, the Court may still request oral argument.

[176] *Bowling v. Com*., 981 S.W.2d 545, 553 (Ky. 1998)

[177] Skaggs v. Assad, By and Through Assad, 712 SW 2d 947 (1986).

Brown. The latter title, though, is appropriate when addressing judges in the third person. If counsel is litigating a products liability or real property case and feels that a visual aid would be necessary, she or he can use the aid so long as a record reference is supplied.[178] It goes without saying that advocates should be respectful to opposing counsel. It is generally good practice to not have one's client attend oral argument.[179]

The appellant may reserve time for response via rebuttal. As is the case in litigation before both the Alabama and Mississippi Supreme Courts, counsel can submit a motion with additional authority supporting a point she or he raised in her or his merits brief or during oral argument if a pertinent decision is released after oral argument.[180] In Bluegrass State, however, authority supplement letters can also be submitted after the merits briefs have been sent in but before oral argument as well. Counsel is entitled to receive a copy of the Court's decision.[181]

**Opinion Finality and Citation to Unpublished Opinions and Other Dispositions**

As is the case in Hawaii, Mississippi, and North Carolina, albeit with different deadlines, unpublished opinions normally may not be cited and are not controlling authority for Kentucky Courts. There is one exception to this rule, however, as unpublished opinions entered after January 1, 2003, may be cited if there is not a published opinion that "would adequately address the issue before the court." Appellate counsel should note that if she or he elects to cite an unpublished opinion, a full copy of the document must be appended to the relevant filing. Once an opinion is handed down by the Kentucky Court of Appeals or Supreme Court, counsel is entitled to receive a copy of the draft from the Court clerk. Opinions of the Kentucky Supreme Court become final on the twenty-first day after they have been handed down unless a rehearing petition has been filed.[182] If the Court denies the rehearing motion, its opinion then becomes final. If the Court grants the rehearing request and then issues a "new or revised opinion," the opinion becomes final on the twenty-first day after it has been issued unless yet another rehearing petition for motion for a time extension to file a rehearing petition has been filed. A similar rule for opinions of the Court of Appeals prevails as these documents do not become final until the thirty-first day after they have been handed down unless a rehearing petition or motion for discretionary review has been filed. Once the Supreme Court denies a motion for discretionary review, the Court of Appeals opinion is final.  If the Court of Appeals grants the rehearing request and then issues a "new or revised opinion," the opinion becomes final on the thirty-first day after it has been issued unless yet another rehearing petition for motion for a time extension to file a rehearing petition has been filed.[183] Luckily, the rules for orders is simpler as all orders "are effective upon entry and filing with the [court] clerk."[184] When it comes to lower court decisions, an order is final for appeal purposes if the order adjudicated all of the claims of all the parties before the court at the time the order was entered.[185]  Counsel, however, can petition both the State Court of Appeals and Supreme Court to reconsider orders that do not deal with case transfers, interlocutory review, discretionary review,

---

[178] Ky. R. Civ. P. 76.16(2).
[179] Robert Jackson, *Advocacy before the Supreme Court: Suggestions for Effective Case Presentation*, 37 A.B.A. J. 801 (1951).
[180] Davis v. Home Indem. Co., 659 SW 185 (1983).
[181] Ky. R. Civ. P. 76.28(3).
[182] Ky. R. Civ. P. 76.32(2).
[183] Ky. R. Civ. P. 76.30.
[184] Ky. R. Civ. P. 76.38.
[185] Security Federal Sav. & Loan Ass'n v. Nesler, 697 SW 136 (1985).

or rehearing within ten days of its entrance and, file an "*ex parte* motion" to suspend the order's finality while the reconsideration motion is pending.[186] Trial court orders granting, denying, modifying, or dissolving a temporary injunction are appealable under Kentucky Rule of Civil Procedure 65.07.[187] A party must file the original and four copies of a CR 65.07 motion in the office of the appellate court clerk within twenty days of the entry of the Circuit Court's order.[188] Opposing counsel has ten days to file a response.[189] The motion should be served on the judge whose decision is under review. On appeal, the standard of review for the injunction order is abuse of discretion.[190] As with other requests for injunctive relief, if the Court of Appeals determines that a temporary injunction which was denied should have been issued, a temporary injunction will not take effect until the Circuit Court sets an appropriate bond and the bond is posted.[191] Here, oral argument wll not be held unless ordered by the Court, *sua sponte*, or on a party's motion.[192]

Counsel must provide ten copies of her or his rehearing petition to the Kentucky Supreme Court but need only furnish five copies to the Kentucky Court of Appeals.[193] The petition must be filed within ten days of the entry of the Court's decision.[194] New facts or legal authorities that were not mentioned during the appeal itself may be introduced in a rehearing petition only for "extraordinary cases."[195] If a rehearing petition is granted, the adversely affected party can also petition for a petition for rehearing, modification,, or extension under the same rules governing the original petition. No response can be filed on this second petition or any successive petition without the Court's leave.[196] If counsel is litigating in the State Court of Appeals and the petition is denied, she or he has thirty days to file a discretionary review motion.[197]

This is so even if the issue was raised in the trial court. In State administrative appeals, a final order is "the whole or part of the final disposition of an administrative hearing, wherever made effective by an agency head, whether affirmative, negative, injunctive, declaratory, agreed, or imperative in form."[198] More than that, because §§ 2 and 14 of the Kentucky Constitution guarantees an inherent right of review, an original action in Kentucky Circuit Courts is always available to challenge a State administrative agency decision when no express statutory appeal right is granted.[199]

---

[186] Middlekamp v. Willis, 253 SW 2d 631 (1952); Inter-County RE Coop. Corp. v. PUBLIC SERVICE COM'N, 407 SW 2d 127 (1966); Reisinger v. Grayhawk Corp., 860 SW 2d 788 (1993); Blair v. City of Winchester, 743 SW 2d 28 (1987); Adkins v. Com., 614 SW 2d 950 (1981); TRANSIT AUTHORITY OF RIVER CITY v. Saling, 774 SW 2d 468 (1989);

[187] Ky. R. Civ. P. 65.07-65.09.

[188] Ky. R. Civ. P. 65.07(2).

[189] Ky. R. Civ. P. 65.07(4).

[190] Maupin v. Stansbury, 575 SW 2d 695 (1978); Brandon v. Combs, 666 SW 2d 755 (1983).

[191] Ky. R. Civ. P. 65.05.

[192] Ky. R. Civ. P. 65.07(5)(a).

[193] Ky. R. Civ. P. 76.32(4).

[194] Ky. R. Civ. P. 76.38(2).

[195] Ky. R. Civ. P. 76.32(1)(b); Herrick v. Wills, 333 SW 2d 275 (1959).

[196] Ky. R. Civ. P. 76.32(1)(d).

[197] Ky. R. Civ. P. 76.20(2)(b).

[198] KRS 13B.010(6).

[199] City of Covington v. Tranter, 673 SW 2d 744 (1984); Palmore v. Swiney, 807 SW 2d 950 (1990); Kendall v. Beiling, 175 SW 2d 489 (1943); Baker v. Commonwealth, 2007 WL 3037718 (2007); Rosary Catholic Parish v. Whitfield, 729 SW 2d 27 (1987).

Orders granting or denying a motion to alter, amend, or vacate a judgment under Kentucky Rule of Civil Procedure 59.05 is not an appealable order.[200] If the motion is denied, the appeal is from the judgment. On the other hand, if the motion is granted, the appeal is from the amended judgment. If the trial court altered the judgment by making different or additional factual findings, that decision will be assessed under the clearly erroneous standard of review. If the judgment is modified because of a prior legal error, on review, the appellate court will look to whether there was prejudicial error.

**Modification and Extension Petitions**

Kentucky Rule of Civil Procedure 76.32 permits counsel to file a petition for modification or extension. The appellate court can issue the motion to correct inaccurate legal or factual statements in a court opinion; extend the opinion to cover matters in issue but not discussed by the opinion; or in extraordinary cases where justice demands.[201]

**Review by the U.S. Supreme Court**

The mere fact that an individual has filed a petition for a writ of certiorari with the U.S. Supreme Court "does not affect the finality of an opinion or final order." Once an appeal is taken, though, a party may present a motion for a stay not to exceed ninety days to "any judge of the appellate court from which the appeal is taken."[202] If the matter is a death penalty case, the judge must grant the stay, otherwise the decision is committed to her discretion as she may condition the order on the provision of collateral or "a supersedeas bond."

**Original Proceedings in the Kentucky Supreme Court and Court of Appeals**

Original proceedings in the Kentucky Supreme Court of Court of Appeals can only be initiated "against a judge or agency whose decisions may be reviewed as a matter of right by that appellate court" and must be accompanied by the applicable filing fees (See Chapter XX). The petition should disclose the name of the respondent, the type of action, the file number, a statement of facts, "the relief sought," and a "memorandum of authorities in support of the petition" served on each real party in interest. The real party in interest here "is any party in the circuit court action from which the original action arises who may be adversely affected by the relief sought." Each real party in interest then has twenty days from the date the petition is filed to enter and serve a response "accompanied by a memorandum of authorities in support of his defense." Four copies of the initial petition and response must be filed with the appellate court. If the petitioner, "will suffer immediate and irreparable injury before a hearing" on the petition and needs any relief before a period of 20 days elapses after the petition has been filed, she may file a "notice for a temporary order." The Kentucky Rules of Civil Procedure set out special rules for intermediate relief requests and evidence admission in these proceedings. For the former requests, counsel has twenty days from the filing of her petition to "move" for a "temporary order" to prevent "immediate and irreparable injury." For non-oral evidence admission, of items not attached to the petition or response "in the form of exhibits, affidavits, and counter-affidavits," the Bluegrass State's trial court evidence rules apply.

---

[200] Mingey v. Cline Leasing Service, Inc., 707 SW 2d 794 (1986).
[201] Ky. R. Civ. P. 76.32.
[202] Ky. R. Civ. P. 76.44(b).

<mark>Parties may appeal orders from original proceedings in the Kentucky Court of Appeals to the Supreme Court as a matter of right. The notice of appeal (see Chapter) XX and filing fee (see Chapter XX)</mark> must "filed with the Clerk of the Court of Appeals" at least 30 days after the disputed judgment or order was entered. The appeal is not perfected until the appellant files ten copies of her or his brief with the Supreme Court clerk within 30 days of filing the appeal notice (See Chapter XX).[203] The same is true for cross appeals with the exception that the 30 day deadline runs from either the sooner of the expiration of the appellant's deadline or the moment the Supreme Court clerk mails notice that the appellant's appeal has been perfected. "Where an appeal is taken against a judge…and concerns performance of an official act, the" appealing party must "serve notice on the real party in interest" who [will] then be required to file a brief on behalf of the judge against whom the appeal or cross-appeal is taken." Counsel litigating an administrative appeal should also be weary of the primary jurisdiction doctrine. Under the primary jurisdiction doctrine, a court of competent jurisdiction will defer agency action until an administrative agency considers the matter.[204] The thought here is that the agency is more likely to have expertise in the matters in which it deals exclusively.[205]

### Habeas Appeals in the Court of Appeals

The writ of habeas corpus is guaranteed by 16 of the Kentucky Constitution as "[a]ll prisoners shall be bailable by sufficient securities, unless for capital offenses when the proof is evident or the presumption great; and the privilege of the writ of habeas corpus shall not be suspended unless when, in case of rebellion or invasion, the public safety may require it." The Kentucky l;egislature has implemented this provision in § 419.130 of the Kentucky Code, which provides for habeas appeals from the circuit court to the Court of Appeals as any party may have a judgment ordering the release of a detained person "stayed until the appeal is filed by notifying the judge rendering the judgment that [s]he intends to appeal" and "complying with" the bond terms.[206] The Kentucky Supreme Court has emphasized that "the primary purpose of habeas corpus relief is to determine the legality of the restraint under which a person is held."[207] "In doing so, th[e] Court has afforded habeas relief to individuals whose underlying judgment is perfectly valid."[208]

### Certified Questions From Federal Courts

Kentucky Rule of Civil Procedure 76.37 governs certification from Article III courts and State courts of last resort and, may be invoked by those courts either *sua sponte* or on the motion of one of the parties with the approval of the relevant court. The certified question must be contained in the form of a certificate addressed to the Kentucky Supreme Court and disclose the question

---

[203] See Chapter XX for brief guidelines in worker compensation cases; Palpable errors by the trial court need not be preserved. CR 61.02.

[204] Daleure v. Kentucky, 119 F. Supp. 2d 683 (W.D. Ky. 2000).

[205] Goodwin v. City of Louisville, 215 SW 2d 557 (1948); Preston v. Meigs, 464 SW 2d 271 (1971); Board of Regents of Murray State University v. Curris, 620 SW 2d 322 (1981); Smith v. Southern Bell Teleph. & Teleg. Co., 104 SW 2d 961 (1937).

[206] Ky. Rev. Stat. Ann. § 419.130 (West)

[207] *Vickery v. Lady*, 264 S.W.2d 683 (Ky. 1953).

[208] *Murrell v. Bottom*, 523 S.W.3d 405, 407 (Ky. 2017), reh'g denied (Aug. 24, 2017); see also *Brock v. Sowders*, 610 S.W.2d 591 (Ky. 1980) (habeas relief is appropriate where petitioner is serving sentence in the wrong jurisdiction); *Hardy v. Howard*, 458 S.W.2d 764 (Ky. 1970) (petitioner was entitled to release after being held beyond the satisfaction of his sentence).

presented, the names of every "appellant and appellee" (as well as the names and addresses of their counsel); a sufficient statement of facts to decide the stated question. Unlike analogous certification procedures in Alabama and Hawaii, litigants may petition for certification "after judgment in the District Court upon petition of any party to the proceeding." However, as is the case in Mississippi, the State Supreme Court reserves the right to require the relevant clerk to forward the portions of the record required to properly answer the certified question. Thirty days after the Kentucky Supreme Court accepts the certification application, any party that wishes "to be heard" on the matter must file 10 copies of the brief with the Supreme Court. Oral argument will not be permitted unless it is ordered. Please see Chapter XX for the applicable filing fees.

## Standards of Review

Kentucky Rule of Civil Procedure's clearly erroneous standard applies to review of factual findings.[209] More than that, due regard shall be given to the opportunity of the trial court to judge" witness credibility. If the claimed erroneous factual finding occurred in a hearing that was not transcribed, the evidence will be presumed to sustain the factual finding.[210] Mixed questions of law and fact, though, do not require the same deference to the trial court as pure factual questions.[211] The Kentucky Supreme Court's decision in *Mason v. Stengell* provides the controlling standard for reversible error connected with counsel arguments. Thus, "[a]s a general rule, improper argument of counsel requires reversal only when it is prejudicial and results in injustice or deprives a party of a fair and impartial trial….As another general rule, if the attention of the court is called to an improper argument and if the jury is admonished in regard to it, a reversal will not be had unless it appears that the argument was so prejudicial under the circumstances that the admonition of the court would not cure it."[212] If counsel makes a prejudicial statement and an objection is sustained, a motion to admonish the jury or to declare a mistrial must be made and denied before the issue is preserved for review.[213]

Facts found by a jury are conclusive if the instructions are correct and there is evidence to support the jury's findings. The evidence here will be reviewed in the light most favorable to the prevailing party.[214] The jury verdict need not take a particular form so long as it permits the court to enter an appropriate judgment.[215] On the other hand, errors committed in connection with a judge's jury instructions are assumed to be prejudicial unless the record demonstrates that the verdict was not influenced by an improper instruction.[216] The standard of review for evidentiary hearings is different. Here, the admission of improper evidence will rarely result in reversal because the trial judge will be presumed to have disregarded any incompetent evidence. If, though, it can be demonstrated that the trial court relied on incompetent evidence, the error will be prejudicial.[217] For evidence admission rulings, venue changes, pretrial orders, orders granting or denying a

---

[209] CR 52.01.
[210] *Tucker v. Tucker*, 398 SW 2d 238 (1965).
[211] UNINSURED EMPLOYERS'FUND v. Garland, 805 SW 2d 116 (1991).
[212] *Mason v. Stengell*, 441 SW 2d 412 (1969).
[213] *Ramey v. Ruth*, 376 SW 2d 292 (1964).
[214] *Horton v. Union Light, Heat & Power Co.*, 690 SW 2d 382 (1985).
[215] *Simmons v. Atteberry*, 310 SW 2d 543 (1958); *Oldham v. Adkisson*, 448 SW 2d 55 (1969); Lewis v. Bledsoe Surface Min. Co., 798 SW 2d 459 (1990) (providing the standard of review for direct verdicts).
[216] *Barrett v. Stephany*, 510 SW 2d 524 (1974).
[217] *GEY v. Cabinet for Human Resources*, 701 SW 2d 713 (1985).

motion for a continuance,[218]orders granting a temporary injunction,[219]  decisions arising during voir dire, default judgments and pleading amendments, discovery,  discovery sanction orders, motions to compel discovery, protective orders, the standard of review is abuse of discretion.[220] Because trial courts orders on discovery are not final appealable orders,[221] most appeals in the Bluegrass State that concern themselves with discovery arise through a request for a writ of prohibition or mandamus.[222] Where it comes to pleading amendments, if leave to amend is granted, the order may be appealed only after the entry of a final order or judgment.[223] The error here must be prejudicial.[224]

In reviewing lower courts orders on a motion to dismiss, Kentucky appellate courts will take the allegations in the complaint as true and dismiss the matter only if it appears hat the plaintiff would not be entitled to relief under any set of facts that could be proven to support the claim.[225] These orders, though, are rarely reviewed because most motions to dismiss are accompanied by leave to amend the complaint. By way of contrast, Kentucky Rule of Civil Procedure 12.03 governs review for judgments as a matter of law. Here, the Kentucky Supreme Court's 1962 decision in *Archer v. Citizens Fidelity Bank & Trust Co*. governs as Rule 12.03 has been "construed as meaning that a judgment on the pleadings can be granted only if, on the admitted material facts, the movant is clearly entitled to a judgment…Relief must be denied if there is a material issue of fact…Such motion is to be determined solely on the pleadings and is equivalent to a demurrer to the pleading…When a party moves for judgment on the pleadings, he admits for the purposes of his motion not only the truth of all of his adversary's well-pleaded allegations of fact and fair inferences therefrom, but also the untruth of all of his own allegations which have been denied by his adversary…The question thus presented is one of law and requires an examination of the pleadings."[226] The standard of review for default judgments is more rigorous as the appellant must show that one of the standards in Kentucky Rule of Civil Procedure 60.02 is present and that thee is a meritorious defense that might result in judgment for the movant.[227] Finally, in reviewing lower court orders granting summary judgment, the appellate court will look to Kentucky Rule of Civil Procedure 56.03 which provides that summary judgment must be granted so long as "pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[228] For the movant to show that there is no issue of material fact, the record must demonstrate that the complaint's allegations are true and that there are no facts that can establish an affirmative defenses. If the movant meets her burden,

---

[218] If the ground for the continuance is witness or evidence unavailability, the litigant must comply with Kentucky Rule of Civil Procedure 43.03.

[219] Maupin v. Stansbury, 575 SW 695 (1978).

[220] *Kroger Co. v. Willgruber*, 920 SW 2d 61 (1996); *Hayes v. Com*., 175 SW 3d 574 (2005); Miller v. Watts, 436 SW 2d 515 (1969); Lambert v. Franklin Real Estate Co., 37 SW 3d 770 (2000); Howard v. Fountain, 749 SW 2d 690 (1988); Newsome By and Through Newsome v. Lowe, 699 SW 2d 748 (1985); Hall v. Commonwealth, 511 SW 2d 204 (1974); Petersen v. Petersen, 479 SW 2d 892 (1972);

[221] *The Lexington Herald-Leader Co. v. Beard*, 690 SW 2d 374 (1984).

[222] Rehm v. Clayton, 132 SW 3d 864 (2004).

[223] Shah v. American Synthetic Rubber Corp., 655 SW 2d 489 (1983).

[224] Ky. R. Evi. 103(a).

[225] PARI-MUTUEL CLERKS'UNION v. Ky. Jockey Club, 551 SW 2d 801 (1977).

[226] Archer v. Citizens Fidelity Bank & Trust Company, 365 SW 2d 727 (1962).

[227] Jacobs v. Bell, 441 SW 2d 448 (1969).

[228] CR 56.03.

the opposing party must then produce evidence that a genuine issue of material fact exists.[229] Of course, legal conclusions receive de novo review on appeal.[230] Here, if the trial court incorrectly applies the law to the facts it has found, an appellate court should correct any errors that are prejudicial to the appellant.

Errors that cannot be reversed on appeal are considered harmless errors.[231] In Kentucky, when it comes to summary judgment and directed verdict motions, the harmless error rule has peculiar application because, for summary judgments, the party making the motion still has the right to establish her or his case at trial and, for orders refusing to grant a directed verdict motion, a similar avenue is available.[232] An order denying a summary judgment motion will be reviewed on appeal where "the only basis of the ruling is a matter of law."[233]

## Residency

Under Kentucky law, as is the case in Hawaii and Texas, albeit with minor modifications, residency is determined by looking to the "home and fixed place of habitation" that the individual intends to return to after any temporary absence. While this definition confirms that an individual does not lose her or his residency by merely leaving their home to go to another place for temporary purposes only, they also do not acquire a residence by temporarily traveling to a location within the State without the intention of making that place the person's home as both physical presence and an intent to remain are necessary conditions for establishing domicile. An individual, though, does lose her or his residency for election purposes if they cast an in-person or absentee ballot in another state or if they leave the State with an intent to remain in their new home for "an indefinite time." In the event that an individual maintains a separate place of residency and business, the former location is deemed to be the relevant place of residence. The home of a married couple is considered their domicile unless the couple resides there "for a temporary purpose."

## Political Parties

The Kentucky Election Code defines a political party entitled to listing on the general election ballot as any organization "whose candidates received ten percent…or more of the vote for Governor and Lieutenant Governor in the" the preceding gubernatorial election or is the claimed party for at least ten percent of the "registered voters in the Commonwealth."[234]

## Primary Winner Certification After Judicial Contest

For officers that require nomination certificates to be filed with either the Secretary of State or county clerk, primary election final results that are issued by a reviewing Court after an election contest must be certified to the Secretary of State. She, in turn, will then transfer the names of the relevant officials to the county clerks who will place the names "upon the ballots for the regular election."[235]

---

[229] Hallahan v. The Courier Journal, 138 SW 3d 699 (2004).

[230] Gosney v. Glenn, 163 SW 3d 894 (2005).

[231] Ky. R. Civ. P. 61.01; Montgomery Elevator Co. v. McCullough, 676 SW 2d 776 (1984).

[232] Bell v. Harmon, 284 SW 2d 812 (1955); Montgomery Elevator Co. v. McCullough, 676 SW 2d 776 (1984).

[233] Gumm v. Combs, 302 SW 2d 616 (1957); Transportation Cabinet v. Leneave, 751 SW 2d 36 (1988).

[234] Ky. Rev. Stat. Ann. § 118.551.

[235] Ky. Rev. Stat. Ann. § 120.085.

**Voter Registration Form Forgery, Alteration, or Destruction**

Under Kentucky Revised Statutes § 116.047, a third-party who forges, "fraudulently alters," willingly destroys, or fails to return a completed voter registration form completed by another is guilty of a Class D felony.

**Armed Services Overseas Ballots**

FILLER. The absentee ballot must "include" "a [voter signed] declaration" stating that the service member understands that "a material" factual misstatement may be grounds for a "perjury" conviction under the laws of the Commonwealth.[236]

**Absentee Ballots for Injured Voters**

Registered voters who suffer "a medical emergency" at least "fourteen days" before an election are permitted to "apply for an absentee ballot" under Kentucky Revised Statute §117.077. The application must disclose the "emergency condition," and "be notarized." The "spouse, parents, or children of the voter" may request the absentee ballot or, if one of these individuals is not available, the ballot may be procured by the voter's "brother, sister, niece, nephew, or designee."

**Candidate Registration**

The Kentucky Election Code prohibits individuals from filing primary election notifications and declarations for "pretended [or] fictitious" candidates with the ultimate aim of "influencing or controlling" election officer, inspector, or challenger "selection." This ban extends to acts that seek to influence another individual to file a prohibited notification or declaration with the same proscribed purpose.[237]

**Voting Machine Purchases and Leases**

The Kentucky County Courts have the prerogative to purchase and lease voting machines with "available funds" or bond proceeds for "regular, special and primary elections" and, before the relevant election, may authorize the use "of additional voting machines in any particular precinct."

KRS § 117.105

**County Board of Elections and Precinct Election Sheriff Reports**

After a primary or general election, the "precinct election sheriff" has three days to file an election report with the County Board of Elections and local grand jury documenting any "irregularities" she or he "observed" during the election "and any recommendations for improving the election process." The County Board of Elections must also submit an election report to the State Board of Elections and local grand jury within ten days after a "primary or general election" including the same information in the sheriff's report, additional irregularities that is observed along with election administration recommendations, and a precinct-by-precinct breakdown "of the number of voters requiring assistance to vote" (the reasons for assistance); and "the number of special ballots cast by category."[238]

---

[236] Ky. Rev. Stat. Ann. § 117A.120 (West)
[237] Ky. Rev. Stat. Ann. § 118.136.
[238] Ky. Rev. Stat. Ann. § 117.355 (West)

**Criminal Prosecution Limits**

Under Kentucky Revised Statute § 119.355, the Commonwealth is prohibited from prosecuting an individual for an election law related offense "where the penalty is less than confinement in" jail or prison "unless the prosecution is" begun "within two…years from the time" the offense was committed.

**Prohibited Contributions**

Kentucky Revised Statute § 121.045 bans any individual or agent from directly or indirectly contributing anything of value "towards the nomination or election of any state, county, city, or district officer who, in…[her] official capacity" is legally required to perform uncommon and peculiar duties or "supervise, regulate, or control" the donor's "affairs" or assess her property for taxes. This prohibition extends to loan activities intended to benefit the aforementioned class of officials as well as direct or indirect "employment and compensation" offers that are made "with the understanding" that a prohibited contribution will be made.

**Election Notices**

Once the Governor, House Speaker, or Senate President issues a writ of election to fill a vacancy in the State legislature, the Chief Justice issues a writ for a gubernatorial election, or the Governor issues a writ for a special congressional election, the document must be sent to the sheriff of each county where an election will be held at least fifty-six days before the contest. After this initial forward, the sheriff must provide notice of the election forty-nine days before the matter. In the event that a writ for a state legislative seat is issued, only one candidate has been nominated, and no candidate has filed a declaration of intent for write in status, the document must also disclose the location for the election.

**Presidential Primaries**

Candidates running in a State presidential primary must pay a "nonrefundable" $1,000 filing fee to the State Secretary  before her or his name will be placed on the ballot.[239]

**Gubernatorial and Lieutenant Gubernatorial Candidate Slating**

Under Kentucky Revised Statutes § 118.127, during Kentucky party primaries, gubernatorial and lieutenant gubernatorial candidates, who have filed the required notice and declaration with the Secretary of State or county clerk, must run as a team and have their names "appear [jointly] on the ballot" as neither candidate's name can "appear individually on the ballot for the nomination [s]he is seeking."[240] Primary voters accordingly vote for two-candidate slates during the contest "a single vote applicable to both offices."

**Presidential and Vice Presidential Elector Meeting**

After the general election, the selected Presidential and Vice-Presidential electors must "meet" in Frankfort "on the first Monday after the second Wednesday in December" at 11:45 AM EST or the congressionally selected day to cast their ballots for the President and Vice President. The

---

[239]

[240] Ky. Rev. Stat. Ann. § 118.127 (West).

electors who are present at the meeting at noon will also select replacements for absent electors.[241] More than that, presidential electors are also "state officers, within [the meaning of]…§ 152 [of the Kentucky Constitution which provides that if the unexpired term of an elective officer does not end at the next succeeding annual election at which…city or state officers…are elected, and three months…[pass by] before…[the] election, the office shall be filled by appointment until…[an] election, and then…[the] vacancy…[will] be filled by election."

**Expenditure Reporting Requirements**

Whenever an individual makes a single or set of independent expenditures that exceeds $500, she or he must report that expenditure on the form disclosed in <mark>Appendix XX</mark> and declare under penalty of perjury "that there was no prior communication with the campaign on whose behalf it was made."

**Appeals to the Kentucky Court of Appeals in Primary Contests**

After a primary contest trial, any party to the proceeding may appeal the matter to the State Court of Appeals by filing an appeal notice and supersedes bond with the Circuit Court (<mark>See Chapter XX</mark>). The record must then be filed with the Court of Appeals within ten days after the trial court has entered its judgment. Of course, after the Court of Appeals issues its mandate in the case, the mandate does not "prejudice" a losing party's right to file a petition for discretionary review with the State Supreme Court.[242]

---

[241] Todd v. Johnson, 99 Ky. 548, 36 S.W. 987 (1896); Smith v. Ruth, 308 Ky. 60, 212 S.W.2d 532 (1948)
[242] Ky. Rev. Stat. Ann. § 118.611 (West)

**Sample Brief**

Kentucky Court of Appeals

No.18-CA-2448-P

Sotomayor & Cabranes Investment Partners LLP

Appellant

vs.

Cruz & Romney Venture Capital Advisors

Appellee

<u>Brief for Appellee</u>

Clarence Darrow

789 John Parker Street

Louisville, KY 40018

ATTORNEY FOR APPELLEE

COUNTERSTATEMENT OF POINTS AND AUTHORITIES

COUNTERSTATEMENT OF FACTS

COUNTERSTATEMENT OF THE CASE

ARGUMENT

CONCLUSION

<u>CERTIFICATE</u>

I hereby certify that a true and correct copy of the foregoing brief for Appellee was served on the Clerk, Kenton Circuit Court, city-County Building, Third & Courts Street Louisville Kentucky 40018 and upon Hon. Myra Bradwell Attorney for Appellant, 345 Henry Clay Blvd. Whitesville, KY 42378 and upon the Hon. Marsha E. Jones, Judge, Kenton Circuit Court, Kenton County Courthouse, 3rd and Court Streets, Kentucky 40018 by U.S. Mail, prepaid postage, this 7th day of February 2020.

## Filing The Notice Of Appeal

A party can take an appeal as of right to a federal appellate court by filing an appeal notice along with the filing fee with the lower court clerk within "thirty days" of the disputed final judgment's or order's entrance.[243] This rule applies not only to final judgments and orders entered by federal

---

[243] Fed. R. App. P. 3; Fed. R. App. P. 4; Gonzalez-Rivera v. Centro Medico Del Turabo, Inc., No. 18-1991, 2019 WL 3242701, at *1 n.2 (1st Cir. July 19, 2019); PHL Variable Ins. Co. v. Town of Oyster Bay, No. 18-0575-CV, 2019 WL 2932442, at *6 (2d Cir. July 9, 2019); Johnson v. Leonard, No. 18-1833, 2019 WL 2864374, at *4 (8th Cir. July 3, 2019); Clervrain v. Scott, No. 18-3143, 2019 WL 2537621, at *1 (10th Cir. June 20, 2019); Comite Fiestas De La Calle San Sebastian, Inc. v. Soto, 925 F.3d 528, 531 (1st Cir. 2019); Ortiz-Santiago v. Barr, 924 F.3d 956, 965 (7th Cir. 2019); Vermont Ry., Inc. v. Town of Shelburne, 918 F.3d 82, 86 (2d Cir. 2019); United States v. Padgett, 917 F.3d 1312, 1314 (11th Cir. 2019); United States v. Santiago-Colon, 917 F.3d 43, 52 (1st Cir. 2019); Gilbert v. City of Chicopee, 915 F.3d 74, 81 n.6 (1st Cir. 2019); United States v. Roe, 913 F.3d 1285, 1293 (10th Cir. 2019); Torres v. Bella Vista Hosp., Inc., 914 F.3d 15, 19 (1st Cir. 2019); Husky Ventures, Inc. v. B55 Investments, Ltd., 911 F.3d 1000, 1008 (10th Cir. 2018); Barnett v. Roper, 904 F.3d 623, 630 (8th Cir. 2018); Havensight Capital LLC v. Nike, Inc., 891 F.3d 1167, 1171 (9th Cir. 2018); United States v. Melendez-Gonzalez, 892 F.3d 9, 14 n.1 (1st Cir. 2018); Akassy v. Hardy, 887 F.3d 91, 96 (2d Cir. 2018); Orr v. Plumb, 884 F.3d 923, 931 (9th Cir. 2018); United States v. Hyman, 884 F.3d 496, 498 (4th Cir.), cert. denied, 139 S. Ct. 261, 202 L. Ed. 2d 175 (2018); Bedford v. Doe, 880 F.3d 993, 995 (8th Cir. 2018); Mathias v. Superintendent Frackville SCI, 876 F.3d 462, 471 (3d Cir. 2017), cert. denied sub nom. Mathias v. Brittain, 138 S. Ct. 1707, 200 L. Ed. 2d 961 (2018); Hancock v. Cape, 875 F.3d 1079, 1086 (11th Cir. 2017); United States v. Caltabiano, 871 F.3d 210, 215 (2d Cir. 2017); Seized From v. $525,695.24, Seized From JPMorgan Chase Bank Inv. Account #xxxxxxxx, 869 F.3d 429, 434 (6th Cir. 2017), cert. denied sub nom. Salouha v. United States, 138 S. Ct. 978, 200 L. Ed. 2d 247 (2018); Sheet Metal Workers' Int'l Ass'n Local 19 v. Herre Bros., 198 F.3d 391, 394 (3d Cir. 1999) (noting that the filing of the appeal notice confers jurisdiction on the appellate court); Ayuda, Inc. v. Thornburgh, 919 F.2d 153, 156 (D.C. Cir. 1990) (Wald J., concurring in part); Venen v. Sweet, 758 F.2d 117, 121 (3d Cir. 1985) (District Court retains jurisdiction to issue orders with reference to the appellate record even after the appeal notice has been filed); Fed. R. App. P. 25; Price v. Philpot, 420 F.3d 1158, 1164 (10th Cir. 2005) (noting that Rule 25 incorporates the mailbox rule); Brown v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor, 864 F.2d 120, 121 (11th Cir. 1989) (filing is not timely unless the clerk receives the documents by the deadline); Rich v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor, 798 F.2d 432, 433 (11th Cir. 1986) (same); Shearson Lehman Bros. v. M & L Investments, 10 F.3d 1510, 1511 (10th Cir. 1993) (same); Mesa Airlines v. United States, 951 F.2d 1186, 1187 (10th Cir. 1991) (same); Long v. U.S. Dep't of Air Force, 751 F.2d 339, 342 (10th Cir. 1984) (same); United States v. Solly, 545 F.2d 874, 876 (3d Cir. 1976); Wisniewski v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor, 929 F.2d 952, 955 (3d Cir. 1991); A.G. ex rel. Maddox v. v. Elsevier, Inc., 732 F.3d 77, 79 n.1 (1st Cir. 2013); Chao Lin v. U.S. Atty. Gen., 677 F.3d 1043, 1045 (11th Cir. 2012) (petition for review is filed when it is received by the Court clerk); Carroll v. United States, 661 F.3d 87, 92 (1st Cir. 2011) (referring to minor by initials); Casanova v. Dubois, 304 F.3d 75, 79 (1st Cir. 2002) (mailbox rules applies in determining whether an inmate's 1983 claim was filed on time); Porchia v. Norris, 251 F.3d 1196, 1198 (8th Cir. 2001) ("In order to receive the benefit of the mailbox rule, prisoners must demonstrate that they timely presented their submissions to prison authorities for mailing."); Moore v. United States, 173 F.3d 1131, 1135 (8th Cir. 1999) (mailbox rules apply to 2254 motions filed by prisoners); White v. I.N.S., 6 F.3d 1312, 1318 (8th Cir. 1993); Thompson v. E.I. DuPont de Nemours & Co., 76 F.3d 530, 532 n.1 (4th Cir. 1996); Huntington Alloys, Inc. v. United Steelworkers of Am., 623 F.2d 335, 337 n.2 (4th Cir. 1980); Archdiocese of Washington v. Washington Metro. Area Transit Auth., 877 F.3d 1066, 1068 (D.C. Cir. 2017) (mailed filings must be sent through first class mail or a carrier that is at least as expeditious); Nat'l Ass'n of Manufacturers v. NLRB, No. 12-5068, 2012 WL 1521549, at *1 (D.C. Cir.

District Courts but magistrates as well. As is the case in appeals before the Minnesota, Wisconsin, Illinois, and Iowa Supreme Courts, federal appellate courts can "consolidate" two or more cases where separate appeal notices have been filed or permit two or more parties to file a "joint" appeal notice.  The filing period is extended to "sixty days" for U.S. government, its agencies, and employees. The appeal notice should name the parties, identify the disputed judgment or order, and the lower court. In class actions, only the class representative need file the appeal notice. In litigation before the Florida Supreme Court, Texas Supreme Court, New York Court of Appeals, and the thirteen federal appellate courts, if the appeal notice is filed in a civil or criminal case before the disputed judgment or order has been entered, the appeal notice will be treated as if it were filed on the day the disputed judgment or order is actually entered. More than that, the filing of a motion for JNOV, judgment amendment or alteration, attorneys' fees, additional factual findings of factual finding amendments, a new trial, or relief from the judgment stays the filing period for submitting the appeal notice until the District Court disposes of the post-trial motion. If one party files an appeal notice, the other litigants in the case can submit appeal notices of their own within the later of either the regular "thirty day" period or "fourteen days" after the first appeal notice has been filed. Counsel need not pay an additional filing fee for submitting an amended notice. While the trial court can extend the appeal notice filing period, it can only so do if counsel files a motion within "thirty days" after the expiration of the original "thirty day" filing period and the motion demonstrates "excusable neglect or good cause" for the failure to file on time. If this time extension motion is filed before the expiration of the original "thirty day" filing period, it can be ex parte. If not, opposing counsel must be provided with notice of the extension request. The extension cannot be for a time period longer than the "later" of either "thirty days" after the original filing deadline has expired or "fourteen days" after the extension is granted. If a motion for "acquittal," a new trial, or judgment "arrest" is filed, the "fourteen day" filing period runs from the date the post-trial motion is disposed of. In criminal appeals, the District Court can also extend the filing deadline for "thirty days" after the expiration of the original filing period "with or without motion and notice" so long as the requestor can show "excusable neglect or good cause."

 The District Court can also "reopen" the filing period for submitting an appeal notice if "no party would be prejudiced;" "the motion is filed within [the earlier of either] 180 days after the judgment or order is entered or within 14 days after the moving party receives notice" of the judgment; and the potential appellant did not receive notice of the judgment's entry within "twenty-one days after [its] entry." The filing period is different for criminal appeals. Here, the appeal notice should be submitted within "fourteen days" of the later of either the U.S. government's submission of its appeal notice or the entry of the disputed judgment or order. Once the appeal notice is filed, the lower court clerk will notify the other parties in the case. After the appeal notice is filed, the filer has "fourteen days" from the submission date to file a "statement" naming the parties she or he

---

Apr. 17, 2012) (same); In re Williams, 759 F.3d 66, 69 (D.C. Cir. 2014) (finding that inmate filing was submitted on time); N.L.R.B. v. Imperial House Condo., Inc., 831 F.2d 999, 1003 (11th Cir. 1987) (service is complete upon mailing); Mallick v. Int'l Bhd. of Elec. Workers, 814 F.2d 674, 675 n.3 (D.C. Cir. 1987);

represents on the appeal with the Court of Appeals clerk.[244] If a motion is filed in the lower court after the appeal is docketed in the Court of Appeals, "the movant must…notify the circuit clerk if the district court states either that it would grant the motion or that the motion raises a substantial issue."[245] Here, the Court of Appeals can either "remand" the matter "for further proceedings" even as it "retains jurisdiction" over the dispute.

The rules are slightly different for permissive appeals that the Court of Appeals can, but need not, accept.[246] Here, counsel should file a discretionary review petition with the Court of Appeals clerk

---

[244] Fed. R. App. P. 12; In re Andrews, 636 F.2d 233, 235 n.3 (8th Cir. 1980); Williams v. Bolger, 633 F.2d 410, 413 n.2 (5th Cir. 1980); Walker v. Mathews, 546 F.2d 814, 817 (9th Cir. 1976); Mayes v. Pickett, 537 F.2d 1080, 1081 (9th Cir. 1976); Pyramid Mobile Homes, Inc. v. Speake, 531 F.2d 743, 745 (5th Cir. 1976); In re Gordon, 534 F.2d 197, 198 (9th Cir. 1976); United States v. Dunham Concrete Prod., Inc., 475 F.2d 1241, 1243 (5th Cir. 1973); Olympic Ins. Co. v. H. D. Harrison, Inc., 463 F.2d 1049, 1052 n.4 (5th Cir. 1972); In re Chandler, 450 F.2d 813, 817 (9th Cir. 1971); Bus. Forms Finishing Serv., Inc. v. Carson, 463 F.2d 966, 966 (7th Cir. 1971); Louie v. Carnevale, 443 F.2d 912, 912 n.1 (9th Cir. 1971); King v. Laborers Int'l Union of N. Am., Union Local No. 818, 443 F.2d 273, 276 (6th Cir. 1971); Gilroy v. Erie Lackawanna R. Co., 421 F.2d 1321, 1322 (2d Cir. 1970); Grantham v. Morgan Linen Serv. Inc., 426 F.2d 237, 237 (7th Cir. 1970); Waterman S. S. Corp. v. Gay Cottons, 419 F.2d 372, 374 (9th Cir. 1969); Olympic Ins. Co. v. H. D. Harrison, Inc., 418 F.2d 669, 669 (5th Cir. 1969).

[245] Fed. R. App. P. 12.1; United States v. Spectrum Brands, Inc., 924 F.3d 337, 347 (7th Cir. 2019); Dobyns v. United States, 915 F.3d 733, 737 (Fed. Cir. 2019); United States v. Chin, 913 F.3d 251, 255 (1st Cir. 2019); United States v. Bolton, 908 F.3d 75, 87 (5th Cir. 2018); United States v. Naphaeng, 906 F.3d 173, 177 (1st Cir. 2018), cert. denied, 139 S. Ct. 1233, 203 L. Ed. 2d 246 (2019); United States v. Caguana, 884 F.3d 681, 683 (7th Cir. 2018); Mendia v. Garcia, 874 F.3d 1118, 1119 (9th Cir. 2017); Moore v. Tangipahoa Par. Sch. Bd., 864 F.3d 401, 404 (5th Cir. 2017); Darnell v. Pineiro, 849 F.3d 17, 28 n.7 (2d Cir. 2017); In re Cent. Illinois Energy Coop., 847 F.3d 873, 874 (7th Cir. 2017); United States v. George, 841 F.3d 55, 72 (1st Cir. 2016); Moore v. Tangipahoa Par. Sch. Bd., 836 F.3d 503, 504 (5th Cir. 2016); Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion, 832 F.3d 92, 102 n.6 (2d Cir. 2016); United States v. Rodriguez-Milian, 820 F.3d 26, 35 (1st Cir. 2016); United States v. Cardoza, 790 F.3d 247, 248 (1st Cir. 2015); United States v. Maldonado-Rios, 790 F.3d 62, 63 (1st Cir. 2015); In re Checking Account Overdraft Litig., 754 F.3d 1290, 1297 (11th Cir. 2014); Mendez v. Republic Bank, 725 F.3d 651, 656 (7th Cir. 2013); United States v. Renteria, 720 F.3d 1245, 1252 (10th Cir. 2013); Binta B. ex rel. S.A. v. Gordon, 710 F.3d 608, 616 (6th Cir. 2013); Mosley v. Atchison, 689 F.3d 838, 843 (7th Cir. 2012); Gilbert v. Residential Funding LLC, 678 F.3d 271, 275 (4th Cir. 2012); Copar Pumice Co. v. Morris, 639 F.3d 1025, 1029 (10th Cir. 2011); United States v. Madrid, 633 F.3d 1222, 1227 (10th Cir. 2011); Ohio Willow Wood Co. v. Thermo-Ply, Inc., 629 F.3d 1374, 1375 (Fed. Cir. 2011); Lopez Dominguez v. Gulf Coast Marine & Assocs., Inc., 607 F.3d 1066, 1074 n.5 (5th Cir. 2010).

[246] Fed. R. App. P. 5; J & L Brown Family, LLC v. Bradshaw, No. 18-3176, 2019 WL 3027589, at *3 (10th Cir. July 11, 2019); In re Wade, 926 F.3d 447, 449 (7th Cir. 2019); Los Lobos Renewable Power, LLC v. Americulture, Inc, 885 F.3d 659, 663 (10th Cir.), cert. denied sub nom. AmeriCulture, Inc. v. Los Lobos Renewable Power, LLC, 139 S. Ct. 591, 202 L. Ed. 2d 427 (2018); Roberts v. AT&T Mobility LLC, 877 F.3d 833, 837 (9th Cir. 2017), cert. denied, 138 S. Ct. 2653, 201 L. Ed. 2d 1051 (2018); Waggoner v. Barclays PLC, 875 F.3d 79, 92 (2d Cir. 2017), cert. denied, 138 S. Ct. 1702, 200 L. Ed. 2d 954 (2018); Mei Xing Yu v. Hasaki Rest., Inc., 874 F.3d 94, 96 (2d Cir. 2017); LVNV Funding, LLC v. Harling, 852 F.3d 367, 370 (4th Cir. 2017), as amended (Apr. 6, 2017); Sheet Metal Employers Indus. v. Absolut Balancing Co., 830 F.3d 358, 361 (6th Cir. 2016); Little v. Louisville Gas & Elec. Co., 805 F.3d 695, 699 (6th Cir. 2015); Bank of New York Mellon Corp. v. Comm'r, 801 F.3d 104, 110 (2d Cir. 2015); Briggs v. Merck Sharp & Dohme, 796 F.3d 1038, 1046 (9th Cir. 2015); Arbogast v. Kansas, Dep't of Labor, 789 F.3d 1174, 1179 n.2 (10th Cir. 2015); Stockwell v. City & Cty. of San Francisco, 749 F.3d 1107, 1111 (9th Cir. 2014);

along with "proof of service" within the "thirty day" deadline if a federal statute does not provide otherwise. If a party cannot file the petition unless the District Court "enters an order granting permission," the trial court can "amend" its order *sua sponte* or on a party's motion. Once the order is amended, the time period for filing the appeal runs from the date the amended order is entered and the appellant has "fourteen days" to either pay the lower court clerk the filing fee or provide collateral for costs on appeal. The petition should include a statement of facts; "the "question[s] presented;" the "relief sought;" an argument section and a jurisdictional statement as well as appended copies of the disputed District Court judgment or order and the District Court order granting permission to appeal. Opposing counsel may submit a "response" "within ten days" of the petition's service. The petition and response each cannot "exceed 5,200 words" and must be

---

Cutrone v. Mortg. Elec. Registration Sys., Inc., 749 F.3d 137, 141 (2d Cir. 2014); In re DEEPWATER HORIZON, 753 F.3d 516, 518 (5th Cir. 2014); Dolgencorp, Inc. v. Mississippi Band of Choctaw Indians, 746 F.3d 588, 589 (5th Cir. 2014); In re BP RE, L.P., 744 F.3d 1371 (5th Cir. 2014); Sepulvado v. Jindal, 739 F.3d 716 (5th Cir. 2013); Eastman v. First Data Corp., 736 F.3d 675, 676 (3d Cir. 2013); Munroe v. Cont'l W. Ins. Co., 735 F.3d 783, 789 (8th Cir. 2013); Peterson v. Somers Dublin Ltd., 729 F.3d 741, 746 (7th Cir. 2013); Lonatro v. United States, 714 F.3d 866, 869 (5th Cir. 2013); Pashby v. Delia, 709 F.3d 307, 318 (4th Cir. 2013); Gelder v. Coxcom Inc., 696 F.3d 966, 967 (10th Cir. 2012); Rural Water Sewer & Solid Waste Mgmt., Dist. No. 1, Logan Cty., Oklahoma v. City of Guthrie, 654 F.3d 1058, 1062 (10th Cir. 2011); Reese v. BP Expl. (Alaska) Inc., 643 F.3d 681, 689 (9th Cir. 2011); In re Zarnel, 619 F.3d 156, 160 (2d Cir. 2010); New York SMSA Ltd. P'ship v. Town of Clarkstown, 612 F.3d 97, 103 (2d Cir. 2010); Froud v. Anadarko E & P Co. P'ship, 607 F.3d 520, 522 (8th Cir. 2010); Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc., 585 F.3d 236, 237 (5th Cir. 2009); In re Ames Dep't Stores, Inc., 582 F.3d 422, 426 (2d Cir. 2009); In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 34 (2d Cir. 2009); Vallario v. Vandehey, 554 F.3d 1259, 1262 (10th Cir. 2009); Blausey v. U.S. Tr., 552 F.3d 1124, 1129 (9th Cir. 2009); Estate of Storm v. Nw. Iowa Hosp. Corp., 548 F.3d 686, 688 (8th Cir. 2008); In re Coleman, 539 F.3d 1168, 1169 (9th Cir. 2008); Spivey v. Vertrue, Inc., 528 F.3d 982, 986 (7th Cir. 2008); Gutierrez v. Johnson & Johnson, 523 F.3d 187, 195 (3d Cir. 2008); In re Davis, 512 F.3d 856, 857 (6th Cir. 2008); Tuepker v. State Farm Fire & Cas. Co., 507 F.3d 346, 350 (5th Cir. 2007); Serrano v. 180 Connect, Inc., 478 F.3d 1018, 1020 n.2 (9th Cir. 2007); Main Drug, Inc. v. Aetna U.S. Healthcare, Inc., 475 F.3d 1228, 1229 (11th Cir. 2007); DiTolla v. Doral Dental IPA of New York, 469 F.3d 271, 274 (2d Cir. 2006); Halliburton Co. Benefits Comm. v. Graves, 463 F.3d 360, 369 (5th Cir. 2006), decision clarified on denial of reh'g, 479 F.3d 360 (5th Cir. 2007); Gamboa v. Velez, 457 F.3d 703, 705 (7th Cir. 2006); Hart v. FedEx Ground Package Sys. Inc., 457 F.3d 675, 679 (7th Cir. 2006); Roth v. King, 449 F.3d 1272, 1282 (D.C. Cir. 2006); Evans v. Walter Indus., Inc., 449 F.3d 1159, 1162 (11th Cir. 2006); Patterson v. Dean Morris, L.L.P., 444 F.3d 365, 368 (5th Cir. 2006); Roberto v. Dep't of Navy, 440 F.3d 1341, 1351 (Fed. Cir. 2006); Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 314 (4th Cir. 2006); Rodriguez v. Puerto Rico Fed. Affairs Admin., 435 F.3d 378, 381 (D.C. Cir. 2006); Amalgamated Transit Union Local 1309, AFL-CIO v. Laidlaw Transit Servs., Inc., 435 F.3d 1140, 1142 (9th Cir. 2006); Schorsch v. Hewlett-Packard Co., 417 F.3d 748, 750 (7th Cir. 2005); Pfizer, Inc. v. Lott, 417 F.3d 725, 726 (7th Cir. 2005); Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co., 415 F.3d 1171, 1175 (10th Cir. 2005); Casey v. Long Island R. Co., 406 F.3d 142, 146 (2d Cir. 2005); Chamberlan v. Ford Motor Co., 402 F.3d 952, 957 (9th Cir. 2005); Manion v. Am. Airlines, Inc., 395 F.3d 428, 431 (D.C. Cir. 2004); Delta Airlines v. Butler, 383 F.3d 1143, 1144 (10th Cir. 2004); James v. Circuit City Stores, Inc., 370 F.3d 417, 419 (4th Cir. 2004); Millsap v. McDonnell Douglas Corp., 368 F.3d 1246, 1247 (10th Cir. 2004); Simon v. United States, 341 F.3d 193, 199 (3d Cir.), certified question accepted, 794 N.E.2d 1087 (Ind. 2003), and certified question answered, 805 N.E.2d 798 (Ind. 2004); Plata v. Davis, 329 F.3d 1101, 1107 (9th Cir. 2003)

submitted to the clerk in copies of four. The matter will be considered on the papers "unless the Court of Appeals orders otherwise."

**The Record On Appeal**

In litigation before the thirteen federal Courts of appeal, the appellate record consists of "the original papers and exhibits filed in the district court;…the transcript of proceedings, if any; and…a certified copy of the docket entries prepared by the district clerk."[247] Within "fourteen days" after the appellant has filed her or his appeal notice or the trial court has disposed of a motion for JNOV, judgment amendment or alteration, attorneys' fees, additional factual findings of factual finding amendments, a new trial, relief from the judgment, "acquittal," a new trial, or judgment "arrest," the appellant must either confirm "that no transcript will be ordered" or submit a written

---

[247] United States v. Alvarez, 351 F.3d 126, 131 (4th Cir. 2003); United States v. Schreiber, 191 F.3d 103, 105 (2d Cir. 1999); Shell Petroleum, Inc. v. United States, 182 F.3d 212, 218 (3d Cir. 1999); Willhauck v. Halpin, 953 F.2d 689, 704 n.13 (1st Cir. 1991); Littlejohn v. Bic Corp., 851 F.2d 673, 681 (3d Cir. 1988); Schindel v. Cummings, No. 80-2718, 1981 WL 704507, at *2 (3d Cir. May 8, 1981); Horsey v. Mack Trucks, Inc., 882 F.2d 844, 849 (3d Cir. 1989); Falu v. Sec'y of Health & Human Servs., 703 F.2d 24, 27 (1st Cir. 1983); United States v. Molinares Charris, 822 F.2d 1213, 1218 (1st Cir. 1987); Petit v. Fessenden, 80 F.3d 29, 32 (1st Cir. 1996) (declining to consider claim where the litigant did not direct the lower court to forward a record); United States v. Mottolo, 26 F.3d 261, 264 (1st Cir. 1994) (same); United States v. Pion, 25 F.3d 18, 21 (1st Cir. 1994) (same); Matias v. Sessions, 871 F.3d 65, 70 n.4 (1st Cir. 2017) (noting litigant's lack of compliance with Rule 11); Byrd v. Ronayne, 61 F.3d 1026, 1029 n.4 (1st Cir. 1995) (same); Silva v. Witschen, 19 F.3d 725, 728 n. 4, 731 n. 9 (1st Cir.1994); In re All Maine Asbestos Litig. (PNS Cases), 772 F.2d 1023, 1026 (1st Cir. 1985) (Rule 11 applies to interlocutory appeal); United States v. Noall, 587 F.2d 123, 125 (2d Cir. 1978) )noting lower court legal memorandums should not be transmitted as part of the record); Roman-Cancel v. United States, 613 F.3d 37, 42 (1st Cir. 2010); United States v. Graham, 711 F.3d 445, 2013 U.S. App. LEXIS 6334, 2013 WL 1277296; Boze v. Branstetter, 912 F.2d 801, 1990 U.S. App. LEXIS 16782, 53 Fair Empl. Prac. Cas. (BNA) 1630, 54 Empl. Prac. Dec. (CCH) P40,259; Cmty. Commerce Bank v. O'Brien (in Re O'Brien), 312 F.3d 1135, 2002 U.S. App. LEXIS 25161, 2002 Cal. Daily Op. Service 11852, 2002 Daily Journal DAR 13916, 54 Fed. R. Serv. 3d (Callaghan) 607; Badami v. Flood, 214 F.3d 994, 2000 U.S. App. LEXIS 12161, 54 Fed. R. Evid. Serv. (Callaghan) 1047; United States v. Parisi, 674 F.2d 126, 1982 U.S. App. LEXIS 20592; United States v. Davis, 52 F.3d 781, 1995 U.S. App. LEXIS 9039, 95-1 U.S. Tax Cas. (CCH) P60,193, 75 A.F.T.R.2d (RIA) 95-1817; Hallquist v. United Home Loans, Inc., 715 F.3d 1040, 2013 U.S. App. LEXIS 9891, 85 Fed. R. Serv. 3d (Callaghan) 1074, 2013 WL 2120760; Duffield v. Aetna Life Ins. Co., 473 F.2d 1221, 1973 U.S. App. LEXIS 12039; Hotaling v. Chubb Sovereign Life Ins. Co., 241 F.3d 572, 2001 U.S. App. LEXIS 2550; United States v. Muriel-Cruz, 412 F.3d 9, 2005 U.S. App. LEXIS 11253; Perry v. Pogemiller, 16 F.3d 138, 1993 U.S. App. LEXIS 33562, 28 Fed. R. Serv. 3d (Callaghan) 211; United States v. Alcantar, 83 F.3d 185, 1996 U.S. App. LEXIS 10468; United States v. Noall, 587 F.2d 123, 1978 U.S. App. LEXIS 7613, 78-2 U.S. Tax Cas. (CCH) P9822, 42 A.F.T.R.2d (RIA) 6241; Brady v. NFL, 779 F. Supp. 2d 1043, 2011 U.S. Dist. LEXIS 45511, 190 L.R.R.M. 2952, 2011-1 Trade Cas. (CCH) P77,428; Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76, LLC), 465 B.R. 525, 2012 Bankr. LEXIS 876, Bankr. L. Rep. (CCH) P82,200; Huff v. Brooks (In re Brooks), 175 B.R. 409, 1994 Bankr. LEXIS 2150; Kirshner v. Uniden Corp. of America, 842 F.2d 1074, 1988 U.S. App. LEXIS 3478, 10 Fed. R. Serv. 3d (Callaghan) 441, 10 Fed. R. Serv. 3d (Callaghan) 921; United States v. Silverman, 430 F.2d 106, 1970 U.S. App. LEXIS 8366, 74 L.R.R.M. 2689, 63 Lab. Cas. (CCH) P11,019; United States v. Sussman, 709 F.3d 155, 2013 U.S. App. LEXIS 4562, 90 Fed. R. Evid. Serv. (Callaghan) 1138, 2013 WL 811870; Marshall v. Neptune Maritime, Inc., 838 F.2d 737, 1987 U.S. App. LEXIS 17652; Coca-Cola Co. v. Stewart, 1980 U.S. App. LEXIS 15248, 29 Fed. R. Serv. 2d (Callaghan) 1562;

order for the entire transcript or pertinent portions of the transcript to the court reporter along with the preparation fee and file a copy of the order with the trial court clerk. If the appeal involves an evidence sufficiency claim, counsel should ensure that the record contains "all evidence relevant to…[the disputed] finding or conclusion."[248] If the appellant elects to order only a portion of the transcript, she or he must provide opposing counsel with a statement of the "issues" that she or he intends to raise on appeal within the original "fourteen day" period mentioned above for ordering the record. Once this statement has been served, opposing counsel has "fourteen days" to designate additional portions of the transcript for inclusion in the record and serve her or his counterstatement on the appellant. If the appellant fails to order the requested excerpts within "fourteen days" of receiving the counterstatement, opposing counsel can request the District Court to order the appellant to include the excerpts. As is the case with record preparation in Kentucky, Idaho, Montana, and Florida, if a portion of the included proceedings were not recorded or cannot be transcribed, counsel can prepare a narrative statement of the omitted material with "best available means, including" her or his own memory. This statement must "be served on the appellee, who may serve objections or proposed amendments" to the statement within "fourteen days" of receiving the document. The statement will then be submitted to the trial court for "approval" and inclusion in the record. In the alternative, the parties, under Federal Rule of Appellate Procedure 10, may stipulate the parts of the proceedings and evidence to be included in the record on appeal after preparing, signing, and submitting a statement. "The statement must set forth only those facts averred and proved or sought to be proved that are essential to the court's resolution of the issues."

---

[248] Fed. R. App. P. 10; Smith v. SEECO, Inc., 922 F.3d 406, 411 (8th Cir. 2019); Natofsky v. City of New York, 921 F.3d 337, 344 (2d Cir. 2019) (Appellate Rule 10 is not a device for presenting evidence to this Court that was not before the trial judge); Flores-Panameno v. U.S. Attorney Gen., 913 F.3d 1036, 1041 (11th Cir. 2019); Feminist Majority Found. v. Hurley, 911 F.3d 674, 697 (4th Cir. 2018) (Providing that the record on appeal includes, inter alia, "the original papers and exhibits filed in the district court"); United States v. Barton, 909 F.3d 1323, 1335 (11th Cir. 2018); United States v. Reyes-Rivas, 909 F.3d 466, 469 (1st Cir. 2018); Gallo v. Mayo Clinic Health Sys.-Franciscan Med. Ctr., Inc., 907 F.3d 961, 964 (7th Cir. 2018); Pakootas v. Teck Cominco Metals, Ltd., 905 F.3d 565, 582 n.12 (9th Cir. 2018), cert. denied sub nom. Teck Metals Ltd. v. Confederated Tribes of the Colville Reservation (U.S. June 10, 2019); Campbell v. Ackerman, 903 F.3d 14, 18 n.5 (1st Cir. 2018); Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1177 (10th Cir. 2018); Carmody v. Bd. of Trustees of Univ. of Illinois, 893 F.3d 397, 402 (7th Cir. 2018), cert. denied sub nom. Carmody v. Bd. of Trustees of the Univ. of Illinois, 139 S. Ct. 798, 202 L. Ed. 2d 588 (2019), reh'g denied sub nom. Carmody v. Bd. of Trustees of Univ. of Illinois, 139 S. Ct. 1288, 203 L. Ed. 2d 299 (2019); Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC, 887 F.3d 1003, 1015 (10th Cir. 2018), as revised (Apr. 13, 2018); Rana v. Islam, 887 F.3d 118, 122 (2d Cir. 2018) (declining to consider extra-record assertions and documents); Demaree v. Pederson, 887 F.3d 870, 878 (9th Cir. 2018); United States v. Green, 886 F.3d 1300, 1307 (10th Cir. 2018); United States v. Jereb, 882 F.3d 1325, 1338 n.7 (10th Cir. 2018); Teixeira v. Town of Coventry by & through Przybyla, 882 F.3d 13, 19 n.4 (1st Cir. 2018); Durant v. D.C. Gov't, 875 F.3d 685, 701 (D.C. Cir. 2017), cert. denied sub nom. Durant v. D.C., 138 S. Ct. 2608, 201 L. Ed. 2d 1004 (2018); HCG Platinum, LLC v. Preferred Prod. Placement Corp., 873 F.3d 1191, 1196 n.3 (10th Cir. 2017); United States v. Walter-Eze, 869 F.3d 891, 907 n.3 (9th Cir. 2017), cert. denied, 139 S. Ct. 1196, 203 L. Ed. 2d 226 (2019); Burch v. P.J. Cheese, Inc., 861 F.3d 1338, 1345 n.11 (11th Cir. 2017); Leatherwood v. Allbaugh, 861 F.3d 1034, 1051 (10th Cir. 2017); Herron v. Fannie Mae, 861 F.3d 160, 173 (D.C. Cir. 2017); Simpson v. Brown Cty., 860 F.3d 1001, 1004 n.1 (7th Cir. 2017); Dupree v. Hardy, 859 F.3d 458, 463 (7th Cir. 2017); United States v. Gonzalez-Rodriguez, 859 F.3d 134, 137 n.1 (1st Cir. 2017)

While the Court of Appeals retains jurisdiction over most questions related to the appellate record's form and content, the District Court can resolve record disputes before the document is transmitted to the appellate court. The parties can also enter a stipulation to correct or modify the appellate record.

The clerk will notify all the parties once the appellate record is filed.[249]

**Document Specification**

---

[249] Fed. R. App. P. 12; Young v. Smith, 905 F.3d 229 (3d Cir. 2018); Carroll v. E One Inc, 893 F.3d 139, 139 (3d Cir. 2018); Commonwealth of Pennsylvania v. President United States of Am., 888 F.3d 52, 52 (3d Cir. 2018); Fed. Ins. Co. v. United States, 882 F.3d 348, 362 (2d Cir. 2018) ("Providing that an appeal must be docketed "under the title of the district-court action"); Ransmeier v. Mariani, 718 F.3d 64, 70 n.2 (2d Cir. 2013); Gilda Indus., Inc. v. United States, 511 F.3d 1348, 1351 (Fed. Cir. 2008) ; ("Upon receiving the copy of the notice of appeal and the docket entries from the district clerk under Rule 3(d), the circuit clerk must docket the appeal"); Subsalve USA Corp. v. Watson Mfg., Inc., 462 F.3d 41, 44 (1st Cir. 2006); Liberty Mut. Ins. Co. v. Treesdale, Inc., 419 F.3d 216, 230 (3d Cir. 2005); Laird v. Horn, 414 F.3d 419, 430 (3d Cir. 2005); Bronshtein v. Horn, 404 F.3d 700, 733 (3d Cir. 2005); In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig., 401 F.3d 143, 174 (3d Cir. 2005); IPSCO Steel (Alabama), Inc. v. Blaine Const. Corp., 371 F.3d 150, 156 (3d Cir. 2004); Coleman v. Home Depot, Inc., 306 F.3d 1333, 1347 (3d Cir. 2002); In re Hechinger Inv. Co. of Delaware, 298 F.3d 219, 221 (3d Cir. 2002); LaSalle Nat. Bank v. First Connecticut Holding Grp., LLC., 287 F.3d 279, 280 (3d Cir. 2002); United States v. Scarfo, 263 F.3d 80, 95 (3d Cir. 2001); Saldana v. Kmart Corp., 260 F.3d 228, 238 (3d Cir. 2001); Brytus v. Spang & Co., 203 F.3d 238, 239 (3d Cir. 2000); In re Cont'l Airlines, 203 F.3d 203, 218 (3d Cir. 2000); Pennsylvania Mines Corp. v. Holland, 197 F.3d 114, 115 (3d Cir. 1999); United States v. State of New Jersey, 194 F.3d 426, 434 (3d Cir. 1999); Klein v. Gen. Nutrition Companies, Inc., 186 F.3d 338, 346 (3d Cir. 1999); Northview Motors, Inc. v. Chrysler Motors Corp., 186 F.3d 346, 352 (3d Cir. 1999); Cella v. Togum Constructeur Ensembleier en Industrie Alimentaire, 173 F.3d 909, 909 (3d Cir. 1999); Gulla v. N. Strabane Twp., 146 F.3d 168, 169 (3d Cir. 1998); Gen. Ins. Co. of Am. v. E. Consol. Utilities, Inc., 126 F.3d 215, 215 (3d Cir. 1997); Ferguson Elec. Co. v. Foley, 115 F.3d 237, 241 (3d Cir. 1997); Smith v. Magras, 124 F.3d 457, 471 (3d Cir. 1997); Shareholders v. Sound Radio, Inc., 109 F.3d 873, 882 (3d Cir. 1997); Elliott v. Kiesewetter, 98 F.3d 47, 61 (3d Cir. 1996); United States v. Kones, 77 F.3d 66, 71 (3d Cir. 1996); Sani-Dairy, a Div. of Penn Traffic Co. v. Yeutter, 91 F.3d 15, 16 (3d Cir. 1996), amended (Aug. 29, 1996); United States v. 30.54 Acres of Land, More or Less, Situated in Greene Cty., Com. of Pa., 90 F.3d 790, 796 (3d Cir. 1996); Georgine v. Amchem Prod., Inc., 83 F.3d 610, 611 (3d Cir. 1996), aff'd sub nom. Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997); In re Unisys Corp. Retiree Med. Ben. ERISA Litig., 58 F.3d 896, 908 (3d Cir. 1995); In re Corestates Tr. Fee Litig., 39 F.3d 61, 69 (3d Cir. 1994); United States v. A.D., 28 F.3d 1353, 1362 (3d Cir. 1994); Phar-Mor, Inc. v. Coopers & Lybrand, 22 F.3d 1228, 1241 (3d Cir. 1994); In re Busy Beaver Bldg. Centers, Inc., 19 F.3d 833, 856 (3d Cir. 1994); Burt v. Ware, 14 F.3d 256, 259 (5th Cir. 1994); Melo v. Hafer, 13 F.3d 736, 748 (3d Cir. 1994); Carlough v. Amchem Prod., Inc., 10 F.3d 189, 191 (3d Cir. 1993); Jewelcor Inc. v. Asia Commercial Co., 11 F.3d 394, 398 (3d Cir. 1993); Univ. of Maryland at Baltimore v. Peat, Marwick, Main & Co., 996 F.2d 1534, 1541 (3d Cir. 1993); Bridge v. U.S. Parole Comm'n, 981 F.2d 97, 107 (3d Cir. 1992); United States v. Schular, 907 F.2d 294, 295 n.1 (2d Cir. 1990); Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., 761 F.2d 198, 201 n.3 (5th Cir. 1985); Thorton v. Schweiker, 663 F.2d 1312, 1313 n.1 (5th Cir. 1981); Williams v. Gen. Motors Corp., 656 F.2d 120, 125 (5th Cir. 1981); Ashcraft v. Conoco, Inc., 218 F.3d 288, 306 (4th Cir. 2000) (Widener, J., concurring);

For the purposes of the Federal rules of Appellate Procedure, a judgment is entered when it is "noted on the docket."[250] Filings should be produced on white 8.5 x 11 inch paper with "double spaced text" "one inch margins." "Headings and footnotes" may contain text that is single spaced.[251] "Every brief, motion, or other paper filed with the court must be signed by the" filing attorney. Filing word limits do not include the "cover page;" disclosure statement;" "table of contents;" citations table; oral argument statement; "addendum containing statutes, rules, or regulations;" counsel certificate; "signature block;" and "proof of service."

## Opinion Citation

The various federal Courts of Appeal – like the Hawaii and South Carolina Supreme Courts – also restrict citations to unpublished opinions that have been released after a certain date. More specifically, in federal appellate litigation, counsel can cite "unpublished" "federal judicial opinions" that were released on or after "January 1, 2007."[252] "If a party cites a federal judicial

---

[250] Fed. R. App. P. 36; Adamson v. Port of Bellingham, 907 F.3d 1122, 1135 (9th Cir. 2018); Prison Legal News v. Sec'y, Fla. Dep't of Corr., 890 F.3d 954, 958 n.3 (11th Cir. 2018), cert. denied sub nom. Prison Legal News v. Jones, 139 S. Ct. 795, 202 L. Ed. 2d 571 (2019); United States v. Vann, 660 F.3d 771, 784 n.5 (4th Cir. 2011); Hegel v. First Liberty Ins. Corp., 778 F.3d 1214, 1221 n.1 (11th Cir. 2015); United States v. Colon, 707 F.3d 1255, 1261 n.2 (11th Cir. 2013); Estate of McCall ex rel. McCall v. United States, 642 F.3d 944, 951 n.3 (11th Cir. 2011), certified question answered sub nom. Estate of McCall v. United States, 134 So. 3d 894 (Fla. 2014); Leal v. Sec'y, U.S. Dep't of Health & Human Servs., 620 F.3d 1280, 1286 n.2 (11th Cir. 2010); United States v. Alfaro-Moncada, 607 F.3d 720, 724 n.3 (11th Cir. 2010); Gatimi v. Holder, 606 F.3d 344, 350 (7th Cir. 2010); United States v. Petty, 530 F.3d 361, 366 (5th Cir. 2008); Dia v. Ashcroft, 353 F.3d 228, 241 n.7 (3d Cir. 2003); United States v. Muro-Inclan, 249 F.3d 1180, 1183 n.2 (9th Cir. 2001); Feliciano v. Selsky, 205 F.3d 568, 572 (2d Cir. 2000); United States v. Cobb, 185 F.3d 1193, 1196 n.2 (11th Cir. 1999); Bianchi v. Perry, 154 F.3d 1023, 1024 (9th Cir. 1998); Bd. of Trustees of Hotel & Rest. Employees Local 25 v. JPR, Inc., 136 F.3d 794, 808 n.15 (D.C. Cir. 1998); Kelly v. Serna, 87 F.3d 1235, 1240 n.2 (11th Cir. 1996); United States v. Barona, 56 F.3d 1087, 1090 (9th Cir. 1995); O'Connor v. Shalala, 23 F.3d 1232, 1234 (7th Cir. 1994); United States v. Rivera, 844 F.2d 916, 921 (2d Cir. 1988); Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc., 806 F.3d 162, 184 (3d Cir. 2015) (Ambro, J., concurring);

[251] Fed. R. App. P. 27; United States v. Noel, 905 F.3d 258, 263 (3d Cir. 2018); In re Horne, 876 F.3d 1076, 1083 (11th Cir. 2017); Harrington v. Berryhill, 876 F.3d 889, 890 (7th Cir. 2017); Concerned Pastors for Soc. Action v. Khouri, 844 F.3d 546, 548 (6th Cir. 2016); Villarreal v. R.J. Reynolds Tobacco Co., 839 F.3d 958, 963 (11th Cir. 2016); Daker v. Comm'r, Georgia Dep't of Corr., 820 F.3d 1278, 1281 (11th Cir. 2016); United States v. Mujica-Aranda, 806 F.3d 999 (8th Cir. 2015); United States v. Reyes-Santiago, 804 F.3d 453, 460 (1st Cir. 2015); United States v. Burch, 781 F.3d 342, 343 (6th Cir. 2015); Warner v. Gross, 776 F.3d 721, 727 (10th Cir.), aff'd sub nom. Glossip v. Gross, 135 S. Ct. 2726, 192 L. Ed. 2d 761 (2015); Massey v. Ojaniit, 759 F.3d 343, 354 n.4 (4th Cir. 2014); United States v. Manning, 755 F.3d 455 (7th Cir. 2014); Ligon v. City of New York, 736 F.3d 166, 170 n.8 (2d Cir. 2013); Brown v. Fifth Third Bank, 730 F.3d 698, 701 (7th Cir. 2013); Maus v. Baker, 729 F.3d 708, 709 (7th Cir. 2013); United States v. Moskowitz, 702 F.3d 731, 732 (2d Cir. 2012); Sacramento Mun. Util. Dist. v. F.E.R.C., 683 F.3d 769, 770 (7th Cir. 2012); Molina Jerez v. Holder, 625 F.3d 1058, 1067 (8th Cir. 2010); Jones v. Sec'y, Dep't of Corr., 607 F.3d 1346, 1354 (11th Cir. 2010); Durr v. Strickland, 602 F.3d 789, 790 n.1 (6th Cir. 2010); RMA Ventures California v. SunAmerica Life Ins. Co., 576 F.3d 1070, 1073 (10th Cir. 2009); Trinidad y Garcia v. Thomas, 683 F.3d 952, 999 (9th Cir. 2012) (Berzon, J., concurring);

[252] Fed. R. App. P. 32.1. Evans v. Greenfield Banking Co., 774 F.3d 1117, 1123 (7th Cir. 2014); Fisk Elec. Co. v. DQSI, L.L.C., 894 F.3d 645, 651 n.7 (5th Cir. 2018); United States v. Alvarez, 880 F.3d 236, 240

opinion, order, judgment, or other written disposition that is not available in a publicly accessible electronic database, the party must file and serve a copy of that opinion, order, judgment, or disposition with the brief or other paper in which it is cited

**Corporate Disclosure Statement**

In litigation before both the federal Courts of Appeal and the Delaware Supreme Court, nongovernmental corporate part[ies] to a proceeding must file a statement that identifies any parent corporation and any publicly held corporation that owns 10% or more of its stock or states that there is no such corporation. This requirement applies to intervenors as well. Unless the local rules stipulate otherwise, this disclosure statement must appear in the first "motion, response, petition, answer," or principal merits brief that is filed in the Court of Appeals before the filing's table of contents. If the statement does not appear in a principal merits brief, three copies of the filing with the disclosure statement should be submitted. [253] Appellate litigators for the government must "identify…any organizational victim of the alleged criminal activity" in criminal appeals.

**Time Computation Rules**

In measuring appellate time deadlines under the Federal Rules of Appellate Procedure, as is the case in Hawaii, South Carolina, and Arkansas, the date of the event that triggers the start of the time period is not counted in assessing whether that deadline has passed. Thus, if counsel has three days to file a notice of appeal and the time period for filing begins on January 1, the filing deadline is January 4. More than that, if the deadline falls on a Saturday, Sunday, or a legal holiday, it extends to the next day that is not a Saturday, Sunday, or a legal holiday. Counsel should count "intermediate Saturdays, Sundays, and legal holidays" in computing the filing period. The Federal Rules of Appellate Procedure just like the Tennessee Rules of Appellate Procedure make provision for situations where the clerk's office is closed as the filing deadline is extended to the next day

---

n.1 (5th Cir. 2018); Alexander v. Verizon Wireless Servs., L.L.C., 875 F.3d 243, 249 n.11 (5th Cir. 2017); Hernandez-Castillo v. Sessions, 875 F.3d 199, 208 n.4 (5th Cir. 2017); Smith v. City of Wyoming, 821 F.3d 697, 714 n.14 (6th Cir. 2016), as amended (May 18, 2016); United States v. Ryan, 806 F.3d 691, 694 n.4 (2d Cir. 2015); Mowlana v. Lynch, 803 F.3d 923, 930 n.5 (8th Cir. 2015); Flint v. City of Belvidere, 791 F.3d 764, 771 n.1 (7th Cir. 2015); Kuperman v. Wrenn, 645 F.3d 69, 77 n.11 (1st Cir. 2011); United States v. Ahmadzai, 723 F.3d 1089, 1094 (9th Cir. 2013) (The Sixth Circuit permits citation to unpublished opinions); Swanson v. Bank of Am., N.A., 563 F.3d 634, 635 (7th Cir. 2009); United States v. Stepanian, 570 F.3d 51, 57 n.10 (1st Cir. 2009); In re Grant, 635 F.3d 1227, 1231 (D.C. Cir. 2011); Elgin v. U.S. Dep't of Treasury, 641 F.3d 6, 11 n.3 (1st Cir. 2011), aff'd sub nom. Elgin v. Dep't of Treasury, 567 U.S. 1, 132 S. Ct. 2126, 183 L. Ed. 2d 1 (2012); Alimi v. Gonzales, 489 F.3d 829, 836 n.8 (7th Cir. 2007); United States v. Tejeda, 476 F.3d 471, 474 (7th Cir. 2007).

[253] Fed. R. App. P. 26.1; Dutcher v. Matheson, 840 F.3d 1183, 1187 n.1 (10th Cir. 2016); Caban Hernandez v. Philip Morris USA, Inc., 486 F.3d 1, 5 n.1 (1st Cir. 2007); Yung v. Lee, 432 F.3d 142, 145 n.1 (2d Cir. 2005); Kruse v. Wells Fargo Home Mortg., Inc., 383 F.3d 49, 52 n.1 (2d Cir. 2004); USX Corp. v. Adriatic Ins. Co., 345 F.3d 190, 195 n.1 (3d Cir. 2003); Delta Air Lines, Inc. v. Sasser, 127 F.3d 1296, 1298 n.2 (11th Cir. 1997); S.E.C. v. Dunlap, 253 F.3d 768, 773 (4th Cir. 2001) (noting denial of waiver request on compliance with Rule 26.1); In re Bernard, 31 F.3d 842, 843 (9th Cir. 1994) (noting that one of the purposes for Rule 26.1 is to assist judges in assessing bias); M2 Software Inc. v. Madacy Entm't, 463 F.3d 870, 871 (9th Cir. 2006) (Pregerson J., concurring); In re Sandoval, 541 F.3d 997, 1001 (10th Cir. 2008); Feldman v. Olin Corp., 692 F.3d 748, 758 (7th Cir. 2012) (noting failure to adhere to Rule 26.1);

that is not a Saturday, Sunday, or legal holiday if the clerk's office is closed on the day of the filing deadline. Counsel should note that for filings in the Court of Appeals the deadline on the last day runs to "midnight" in the "time zone of the circuit clerk's principal office." The Court of Appeals can grant time extensions for all filings except appeal notices, petitions for "permission to appeal," and "petition to enjoin, set aside, suspend, modify, enforce, or otherwise review an" administrative order. As is the case in Florida, if a litigant must perform a certain act after receiving service of an item, three days are added to the filing period "unless the paper [is served electronically or] is delivered on the date of service stated in the proof of service." Electronically served documents are "treated as delivered on the date of service stated in the proof of service.[254]

**Stays and Injunctions Pending Appeal**

In civil cases, a federal district Court can require the appellant to post collateral to cover costs on appeal.[255] The thirteen federal Courts of Appeals – just like the New York Court of Appeals and California Supreme Court – generally require that counsel petition the trial court first for a stay or injunction during the duration of the appeal. In federal appellate litigation, counsel should petition

[254] Fed. R. App. P. 26; United States v. Galindo-Serrano, 925 F.3d 40, 45 (1st Cir. 2019); Chamblee v. Fla., 905 F.3d 1192, 1198 n.12 (11th Cir. 2018); Newman v. Lehman Bros. Holdings Inc., 901 F.3d 19, 26 (1st Cir. 2018); May v. Mahone, 876 F.3d 896, 897 (7th Cir. 2017); Fedora v. Merit Sys. Prot. Bd., 848 F.3d 1013, 1014 n.1 (Fed. Cir. 2017), cert. denied, 138 S. Ct. 755, 199 L. Ed. 2d 605 (2018); United States v. Smotherman, 838 F.3d 736, 737 (6th Cir. 2016); Armstrong v. Louden, 834 F.3d 767, 770 (7th Cir. 2016); Jones v. Dep't of Health & Human Servs., 834 F.3d 1361, 1366 (Fed. Cir. 2016); Ramos–Lopez v. Lynch, 823 F.3d 1024, 1027 (5th Cir. 2016); Legg v. Ulster Cty., 820 F.3d 67, 78 n.3 (2d Cir. 2016); Lebahn v. Owens, 813 F.3d 1300, 1305 n.3 (10th Cir. 2016); Lorenzo v. Prime Commc'ns, L.P., 806 F.3d 777, 783 (4th Cir. 2015); Mobley v. C.I.A., 806 F.3d 568, 579 (D.C. Cir. 2015); In re Gonzalez, 795 F.3d 288, 290 n.1 (1st Cir. 2015); Carranza v. United States, 794 F.3d 237, 239 n.1 (2d Cir. 2015); Gyorgy v. Comm'r, 779 F.3d 466, 471 n.1 (7th Cir. 2015); United States v. Gonzalez-Rodriguez, 777 F.3d 37, 40 (1st Cir. 2015); United States v. Reves, 774 F.3d 562, 565 (9th Cir. 2014); United States v. Myers, 772 F.3d 213, 217 (5th Cir. 2014); Dandino, Inc. v. U.S. Dep't of Transp., 729 F.3d 917, 921 (9th Cir. 2013); Hoffler v. Bezio, 726 F.3d 144, 155 (2d Cir. 2013); Carter v. Hodge, 726 F.3d 917, 920 (7th Cir. 2013); Ragguette v. Premier Wines & Spirits, 691 F.3d 315, 323 (3d Cir. 2012);

[255] Fed. R. App. P. 7; Horowitz v. 148 S. Emerson Assocs. LLC, 888 F.3d 13, 25 (2d Cir. 2018); Small Justice LLC v. Xcentric Ventures LLC, 873 F.3d 313, 321 (1st Cir. 2017); Hines v. City of Albany, 862 F.3d 215, 220 (2d Cir. 2017); In re Target Corp. Customer Data Sec. Breach Litig., 847 F.3d 608, 614 (8th Cir.), amended, 855 F.3d 913 (8th Cir. 2017); Hill v. State St. Corp., 794 F.3d 227, 229 (1st Cir. 2015); Tennille v. W. Union Co., 774 F.3d 1249, 1253 (10th Cir. 2014); Family PAC v. Ferguson, 745 F.3d 1261, 1265 (9th Cir. 2014); Noatex Corp. v. King Const. of Houston, L.L.C., 732 F.3d 479, 488 (5th Cir. 2013); In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig., 716 F.3d 1057, 1062 (8th Cir. 2013); In re Sealed Case (Bowles), 624 F.3d 482, 486 n.3 (D.C. Cir. 2010); Vaughn v. Am. Honda Motor Co., 507 F.3d 295, 298 (5th Cir. 2007) (In a civil case, the district court may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal); Azizian v. Federated Dep't Stores, Inc., 499 F.3d 950, 953 (9th Cir. 2007); In re Cardizem CD Antitrust Litig., 481 F.3d 355, 357 (6th Cir. 2007); Young v. New Process Steel, LP, 419 F.3d 1201, 1202 (11th Cir. 2005); Pedraza v. United Guar. Corp., 313 F.3d 1323, 1325 (11th Cir. 2002); Baynham v. PMI Mortg. Ins. Co., 313 F.3d 1337, 1338 (11th Cir. 2002); Downey v. Mortg. Guar. Ins. Corp., 313 F.3d 1341, 1342 (11th Cir. 2002); Corley v. Rosewood Care Ctr., Inc., 142 F.3d 1041, 1057 n.16 (7th Cir. 1998); Adsani v. Miller, 139 F.3d 67, 69 (2d Cir. 1998); Perry v. Pogemiller, 16 F.3d 138, 140 n.1 (7th Cir. 1993); Zebrowski v. Hanna, 973 F.2d 1001, 1006 (1st Cir. 1992);

the District Court in the first instance for a "stay" of a District Court judgment or order "pending appeal;" "approval of a bond or other" collateral provided for a judgment "stay;" and "an order suspending, modifying, restoring, or granting an injunction while an appeal is pending."[256] While a party can petition the Court of Appeals clerk for the aforementioned relief, the motion must include the pertinent portions of the record necessary for ruling on the motion; supporting affidavits for facts that are in dispute; a statement of facts; and an argument section and, disclose either why it was "impractical" to petition the District Court or the reasons why the District Court "denied the motion or failed to afford the relief requested." The Court can condition relief on counsel's provision of adequate collateral. In matters before both the Hawaii Supreme Court and the various federal Courts of Appeal, if a litigant elects to provide "security" "in the form of a bond or stipulation" or guarantor assertion, counsel should note that the guarantor is deemed to have submitted to the appellate court's jurisdiction and appoint the appellate court clerk as her or his agent to receive service of documents relevant to the guarantee. A party can file a motion in a federal District Court to enforce the guarantor's liability "without the necessity of an independent action."

## Appeal Conferences

As is the case with the Hawaii Intermediate Court of Appeals and State Supreme Court, the thirteen federal Courts of Appeal retain the option of holding a conference with the parties in person or via "telephone" to simplify the questions presented in the case or consider case settlement.[257] Here, counsel is advised to obtain prior consent for her or his client before entering the settlement

---

[256] Fed. R. App. P. 8.

[257] Fed. R. App. P. 33; In re Redacted, 815 F.3d 957 (2d Cir. 2016); Ameritech Corp. v. Int'l Bhd. of Elec. Workers, Local 21, 543 F.3d 414, 416 (7th Cir. 2008); Keck Garrett & Assocs., Inc. v. Nextel Commc'ns, Inc., 517 F.3d 476, 487 (7th Cir. 2008); Custom Vehicles, Inc. v. Forest River, Inc., 464 F.3d 725, 727 (7th Cir. 2006); Beazer E., Inc. v. Mead Corp., 412 F.3d 429, 434 (3d Cir. 2005) ("The court may, as a result of the [mediation], enter an order controlling the course of the proceedings or implementing any settlement agreement."); Herrnreiter v. Chicago Housing Auth., 281 F.3d 634, 637 (7th Cir.2002); Goss Graphics Sys., Inc. v. DEV Indus., Inc., 267 F.3d 624, 627 (7th Cir. 2001); In re Young, 253 F.3d 926, 927 (7th Cir. 2001); Page v. Bartels, 248 F.3d 175, 184 n.3 (3d Cir. 2001), as amended (June 25, 2001); United States v. Zendeli, 195 F.3d 314, 315 (7th Cir. 1999); United States v. Torres, 170 F.3d 749, 750 (7th Cir. 1999); Pueblo of San Ildefonso v. Ridlon, 90 F.3d 423, 425 (10th Cir. 1996); Hoffman Homes, Inc. v. Adm'r, U.S. E.P.A., 999 F.2d 256, 259 (7th Cir. 1993); Bell v. A-Leet Leasing Corp., 863 F.2d 257, 259 (2d Cir. 1988); In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig. M.D.L. No. 150, 788 F.2d 1571, 1575 (Temp. Emer. Ct. App. 1986); Washington Urban League v. F.E.R.C., 743 F.2d 166, 169 (3d Cir. 1984); Motorola, Inc. v. Computer Displays Int'l, Inc., 739 F.2d 1149, 1153 n.6 (7th Cir. 1984); United States v. Texas Educ. Agency, 679 F.2d 1104, 1108 (5th Cir. 1982); United States v. Guerrero-Herrera, 590 F.2d 238, 241 (7th Cir. 1978); Ross v. Houston Indep. Sch. Dist., 559 F.2d 937, 941 (5th Cir. 1977); In re Jan. 1976 Grand Jury, 534 F.2d 719, 730 n.11 (7th Cir. 1976); Reserve Mining Co. v. Envtl. Prot. Agency, 514 F.2d 492, 504 (8th Cir. 1975), modified sub nom. Reserve Min. Co. v. Lord, 529 F.2d 181 (8th Cir. 1976); State of Tex. v. E.P.A., 499 F.2d 289, 297 n.8 (5th Cir. 1974);

Sarei v. Rio Tinto, PLC, 625 F.3d 561 (9th Cir. 2010) (Kleinfeld, J., dissenting);

negotiations. Upon termination of the conference, the relevant appellate court will enter an order that will "control the subsequent course of the proceedings.

**Motion Practice**

As is the case in Virginia and South Carolina, motions before the various federal Courts of Appeal must be "in writing unless the court permits otherwise." The filing should state the "relief" sought, the grounds for relief, and "the legal argument necessary to support it." Counsel should append the lower court or agency order to the motion as well as any supporting "affidavits" for factual information that is not contained in the appellate record. The filer has the option of not submitting a motion notice nor a supporting brief for the motion.  More than that, unlike the Montana, Delaware, and Idaho Supreme Courts, the Courts of Appeals also do not require counsel to file a "proposed order" with the motion. Opposing counsel may file a response that may but need not request "affirmative relief" within "ten days" of the motion's filing and, replies are due within "seven days" of the response's service. Federal appellate judges – just like Justices of the Florida Supreme Court – can act on a motion "alone" so long as the resulting order does "not dismiss or otherwise determine an appeal."[258] These orders are appealable to the entire panel. In the alterative, if the motion is procedural, federal appellate court clerks – just like their counterparts on the Mississippi Supreme Court and Court of Appeals – can dispose of the motion. If counsel is dissatisfied with the clerk's disposition of the motion, she or he can file "a motion to reconsider, vacate, or modify that action." Motions are limited to "5,200 words," responses are limited to "2,600 words," and in both instances counsel should provide the Court clerk with one "original and three copies." The motion caption should include the case docket "number," case title, filing title, and disclose the party on whose behalf the motion is submitted. If counsel does include a cover page, it must be "white."

**Habeas Proceedings**

Under the Antiterrorism and Effective Death Penalty Act, habeas applications for federal inmates must be directed to a federal District Court rather than a judge on the Court of Appeals. More than that, those applications that are initially submitted to a Circuit Judge will be forwarded to a District Court. If the application is denied in a lower court, it may not be "renewed" before the Court of Appeals. Habeas petitioners, however, may appeal a District Court's denial of a habeas application to the Court of Appeals under 28 U.S. 2253. Private counsel must obtain a certificate of appealability from the District or Circuit Judge before she or he can appeal a District Court's disposition of a habeas proceeding in a matter where the disputed "dentition" results "from process issued by a state court" "or in a 28 U.S.C. § 2255 proceeding." If a certificate of appealability has not issued, though, the appeal notice will be treated as a request for a certificate of appealability by the Court of Appeals.[259] While the habeas proceeding is pending, the habeas court retains the

---

[258] Fed. R. App. P. 27.

[259] Fed. R. App. P. 22; United States v. Carthorne, 878 F.3d 458, 463 (4th Cir. 2017); Rivera-Rivera v. United States, 827 F.3d 184, 186 (1st Cir. 2016); Guzman-Ortiz v. United States, 849 F.3d 708, 713 (8th Cir. 2017), cert. denied, 138 S. Ct. 2004, 201 L. Ed. 2d 262 (2018); Rivera-Rivera v. United States, 844 F.3d 367, 372 (1st Cir. 2016); Dawkins v. United States, 829 F.3d 549, 551 (7th Cir. 2016); Washington v. Ryan, 833 F.3d 1087, 1100 (9th Cir. 2016); Smith v. Davis, No. 18-70015, 2019 WL 2455734, at *2 (5th

discretion to direct" the prisoner's transfer at the custodian's request.[260] If a habeas court is considering a decision "not to release a prisoner," that court can order continued detention, transfer to another facility, or release. On the other hand, if the habeas court is considering a decision ordering release of a prisoner, the prisoner must "be released on personal recognizance, with or without." Initial custody entered by the District Court orders remain in effect unless the appellate court orders otherwise.

**Releases in Criminal Cases**

Private criminal appellate counsel can request a release for her or his client before conviction by filing a motion with the District Court." Once the filing is submitted, the trial court judge will issue an oral or written decision. If counsel needs to appeal that decision, she or he should file the lower court "order" and proceeding "transcript," with the appeal notice. While the appeal is pending, the Court of Appeals can order a temporary release before issuing a decision based on the "papers, affidavits, and parts of the record that the parties present or the court requires." For release requests after conviction, counsel should either file an appeal notice from the District Court order denying release or submit a motion to the Court of Appeals.[261]

**Party Substitution**

Federal Rule of Appellate Procedure 43 governs party substitution and bears a sharp resemblance to the analogous procedural rule covering substitution in Tennessee and Mississippi. Here, the State permits counsel or any other party to substitute a deceased party for her or his "personal representative" "after a notice of appeal is filed or while" an appeal is pending with a motion. If

---

Cir. June 13, 2019) (certificate of appealability is not required when a state or its representative appeals); Weaver v. United States, 793 F.3d 857, 860 (8th Cir. 2015) (same); Han Tak Lee v. Houtzdale SCI, 798 F.3d 159, 163 (3d Cir. 2015) (same); LaMar v. Houk, 798 F.3d 405, 414 (6th Cir. 2015) (same); Sutton v. Pfister, 834 F.3d 816, 820 (7th Cir. 2016); Hernandez v. Chappell, 923 F.3d 544, 549 (9th Cir. 2019) (treating appeal from District Court as a request for a certificate of appealability); Dufresne v. Palmer, 876 F.3d 248, 252 (6th Cir. 2017) (same); United States v. Springer, 875 F.3d 968, 980 (10th Cir. 2017), cert. denied, 138 S. Ct. 2002, 201 L. Ed. 2d 270 (2018) (same); Clark v. Cartledge, 829 F.3d 303, 307 n.3 (4th Cir. 2016) (same); Dean-Mitchell v. Reese, 837 F.3d 1107, 1112 (11th Cir. 2016) (same); Berry v. Warden, S. Ohio Corr. Facility, 872 F.3d 329, 331 (6th Cir. 2017) (same); Flores-Ramirez v. Foster, 811 F.3d 861, 865 (7th Cir. 2016) (same); Sanchez-Rengifo v. Caraway, 798 F.3d 532, 535 (7th Cir. 2015) (same); Bennett v. Superintendent Graterford SCI, 886 F.3d 268, 280 (3d Cir. 2018) (limiting discussion to those claims that were certified in the appealability certificate); Poyson v. Ryan, 879 F.3d 875, 878 (9th Cir.), cert. denied, 138 S. Ct. 2652, 201 L. Ed. 2d 1063 (2018) (same); Goodrum v. Busby, 824 F.3d 1188, 1195 (9th Cir. 2016) (noting ability to transfer petition to the District Court);

[260] Fed. R. App. P. 23.

[261] Fed. R. App. P. 9; United States v. Meister, 744 F.3d 1236, 1239 n.4 (11th Cir. 2013); United States v. Nwokoro, 651 F.3d 108, 109 (D.C. Cir. 2011); United States v. Ingle, 454 F.3d 1082, 1083 (10th Cir. 2006); United States v. Johnson, 399 F.3d 1297, 1298 (11th Cir. 2005); United States v. Cisneros, 328 F.3d 610, 617 (10th Cir. 2003); United States v. Taubman, 297 F.3d 161, 167 (2d Cir. 2002); United States v. Lane, 252 F.3d 905, 906 (7th Cir. 2001); United States v. Hochevar, 214 F.3d 342, 342 (2d Cir. 2000); United States v. Lane, 252 F.3d 905, 906 (7th Cir. 2001); United States v. O'Keefe, 169 F.3d 281 (5th Cir. 1999); United States v. Blasini-Lluberas, 144 F.3d 881, 881 (1st Cir. 1998); United States v. Swanquist, 125 F.3d 573, 574 (7th Cir. 1997);

the motion is not from the personal representative, it must be "served" on him or her. In the event that the decedent does not have a personal representative, the appeal will proceed, nonetheless. On the other hand, if a party that had a right to appeal a judgment dies before she or he can direct that an appeal notice be filed, her or his "personal representative" or "counsel of record," if a personal representative is not on hand, may file the notice of appeal.[262] If the appellee in a potential appeal passes away after the final judgment has been rendered but before the appeal notice has been filed, the appellant can proceed with the appeal "as if the death had not occurred." These same rules apply to "substitution" resulting from "marriage, bankruptcy, assignment, or any reason other than death."[263] Substitution orders can "be entered at anytime" and, parties may be "added or dropped" from a case by an appellate court, sua sponte, or the party's motion.

---

[262] Fed. R. App. P. 43; Arrazabal v. Barr, No. 17-2969, 2019 WL 2864754, at *9 (7th Cir. July 3, 2019); Moore v. Thurston, No. 18-1382, 2019 WL 2719940, at *1 n.3 (8th Cir. July 1, 2019); Silberman v. Miami Dade Transit, No. 17-15092, 2019 WL 2498231, at *3 (11th Cir. June 17, 2019) (Rule 43 only applies to cases that had the correct parties named originally); Despain v. Berryhill, 926 F.3d 1024, 1024 n.1 (8th Cir. 2019); Al-Turki v. Tomsic, 926 F.3d 610, 610 (10th Cir. 2019); Fowler v. Benson, 924 F.3d 247, 253 n.2 (6th Cir. 2019); Juarez-Coronado v. Barr, 919 F.3d 1085, 1085 n.1 (8th Cir. 2019); Harden v. Norman, 919 F.3d 1097, 1097 (8th Cir. 2019); Johnson v. Carpenter, 918 F.3d 895, 895 (10th Cir. 2019); Barikyan v. Barr, 917 F.3d 142, 142 n.1 (2d Cir. 2019); Dolic v. Barr, 916 F.3d 680, 680 (8th Cir. 2019); Hobdy v. Raemisch, 916 F.3d 863, 863 (10th Cir. 2019); Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1312 n.1 (11th Cir. 2019); Bekkem v. Wilkie, 915 F.3d 1258, 1258 (10th Cir. 2019); Maralex Res., Inc. v. Barnhardt, 913 F.3d 1189, 1189 (10th Cir. 2019); sODonnell v. Salgado, 913 F.3d 479, 482 (5th Cir. 2019) (Rule 43 was designed in part to prevent suits involving public officers from becoming moot once the officials left office); Church v. Missouri, 913 F.3d 736, 736 n.1 (8th Cir. 2019); Njong v. Whitaker, 911 F.3d 919, 919 n.1 (8th Cir. 2018); Simpson v. Carpenter, 912 F.3d 542, 542 n.1 (10th Cir. 2018); Ruiz-Guerrero v. Whitaker, 910 F.3d 572, 572 n.1 (1st Cir. 2018); Molina v. Whitaker, 910 F.3d 1056, 1056 n.1 (8th Cir. 2018);

[263] Fabian-Soriano v. Barr, No. 18-2052, 2019 WL 2314383, at *4 n.1 (1st Cir. May 31, 2019) (substituting William Barr for Jeff Sessions as the Attorney General in an INA proceeding); O'Riordan v. Barr, 925 F.3d 6, 6 n.1 (1st Cir. 2019) (same); Wanjiku v. Barr, 918 F.3d 215, 215 n.1 (1st Cir. 2019) (same); Franco-Ardon v. Barr, 922 F.3d 23, 23 n.1 (1st Cir. 2019) (substituting Acting Attorney General Matt Whitaker with William Barr as the respondent); Tay-Chan v. Barr, 918 F.3d 209, 209 n.1 (1st Cir. 2019) (same); *Agustin v. Whitaker*, 914 F.3d 43, 43 n.1 (1st Cir. 2019) (substituting Attorney General Jeff Sessions with Acting Attorney General Matt Whitaker); Alvarado v. Whitaker, 914 F.3d 8, 8 n.1 (1st Cir. 2019) (same); Medina v. Whitaker, 913 F.3d 263, 263 n.1 (1st Cir. 2019) (same); Garcia-Aguilar v. Whitaker, 913 F.3d 215, 215 n.1 (1st Cir. 2019) (same); Gyamfi v. Whitaker, 913 F.3d 168, 168 n.1 (1st Cir. 2019) (same); Urgilez Mendez v. Whitaker, 910 F.3d 566, 566 n.1 (1st Cir. 2018) (same); Pineda v. Whitaker, 908 F.3d 836, 836 n.1 (1st Cir. 2018) (same); Santos-Guaman v. Sessions, 891 F.3d 12, 12 n.1 (1st Cir. 2018) (substituting Attorney General Loretta Lynch with Jeff Sessions); Aguilar-Escoto v. Sessions, 874 F.3d 334, 334 n.1 (1st Cir. 2017) (same); Marroquin-Rivera v. Sessions, 861 F.3d 7, 7 n.1 (1st Cir. 2017) (same); Sanchez-Romero v. Sessions, 865 F.3d 43, 43 (1st Cir. 2017) (same); Holder v. Sessions, 848 F.3d 500, 500 (1st Cir. 2017) (same); New Hampshire Hosp. Ass'n v. Azar, 887 F.3d 62, 62 n.1 (1st Cir. 2018) (substituting acting HHS Secretary Eric Hargan with Alex Azar); Sasen v. Spencer, 879 F.3d 354, 354 n.1 (1st Cir. 2018) (substituting Navy Secretary Sean Stackley with Richard Spencer); Thomas G. Gallagher, Inc. v. Occupational Safety & Health Review Comm'n, 877 F.3d 1, 1 n.1 (1st Cir. 2017) (substituting acting Labor Secretary Edward Hulger with Alex Acosta); Justiniano v. Soc. Sec. Admin., 876 F.3d 14, 14 n.1 (1st Cir. 2017) (substituting acting SSA Commissioner Nancy Berryhill with Carolyn Colvin); Walker-Butler v. Berryhill, 857 F.3d 1, 1 (1st Cir. 2017) (same); Goethel v. U.S. Dep't of Commerce, 854 F.3d 106,

**Extraordinary Writs**

Under Federal Rule of Appellate Procedure 21, petitions for "mandamus" and "prohibition" must be filed with the appellate court clerk along with the filing fee and served on all parties to the lower court proceeding as well as the "trial court judge."[264] The provisions governing the extraordinary writs contents bear a sharp resemblance to the analogous rules covering mandamus and prohibition writs in Mississippi. Here, the filing should be entitled *In re: Petitioner*; and, contain a statement of facts; a statement of issues; an argument section; "the relief sought;" and a copy of the disputed order or judgment as well as the pertinent record excerpts needed for resolving the appeal.[265] If the

---

106 (1st Cir.), cert. denied sub nom. Goethel v. Dep't of Commerce, 138 S. Ct. 221, 199 L. Ed. 2d 120 (2017) (substituting Wilbur Ross, U.S. Secretary of Commerce, for former Secretary Penny Pritzker; Benjamin Friedman, Acting Administrator, National Oceanic and Atmospheric Administration, for former Administrator Kathryn Sullivan; and Samuel D. Rauch III, Assistant Administrator for Fisheries (Acting) for the National Marine Fisheries Service, for former Assistant Administrator Eileen Sobeck); *Ali v. United States*, 849 F.3d 510, 510 (1st Cir. 2017) (substituting Jefferson B. Sessions, III, Attorney General of the United States, for former Attorney General Loretta E. Lynch; John F. Kelly, Secretary of the U.S. Department of Homeland Security, for former Secretary Jeh Charles Johnson; Lori Scialabba, Acting Director of U.S. Citizenship and Immigration Services, for former Director Leon Rodriguez; and Andrea Rogers, Field Office Director of the U.S. Citizenship and Immigration Services Manchester Field Office, for former Director Anthony Violanti); Igartua v. Trump, 868 F.3d 24, 24 n.1 (1st Cir. 2017) (substituting President Donald Trump for Barack Obama and Commerce Secretary Wilbur Ross for Penny Pritzker); Cruz v. Mattis, 861 F.3d 22, 22 n.1 (1st Cir. 2017) (substituting Defense Secretary James Mattis for Ashton Carter);

264 United States v. Shalhoub, 855 F.3d 1255, 1263 (11th Cir.), cert. denied, 138 S. Ct. 381, 199 L. Ed. 2d 279 (2017); In re Atl. Pipe Corp., 304 F.3d 135, 139 (1st Cir. 2002); In re Boston's Children First, 244 F.3d 164, 171 (1st Cir. 2001), as amended on denial of reh'g and reh'g en banc (Mar. 2, 2001); In re U.S., 60 F.3d 729, 732 (11th Cir. 1995) (granting writ of mandamus); In re Bieter Co., 16 F.3d 929, 932 (8th Cir. 1994); Freeman v. Cavazos, 923 F.2d 1434, 1435 (11th Cir. 1991) (denying writ of mandamus); In re Bushkin Assocs., Inc., 864 F.2d 241, 247 (1st Cir. 1989) (mandamus practice neither contemplates nor permits the filing of counterclaims); Ramirez v. Rivera-Dueno, 861 F.2d 328, 335 (1st Cir. 1988) (suggesting that litigant could seek a writ of mandamus to enforce the decision); United States v. Lord, 542 F.2d 719, 720 n.1 (8th Cir. 1976); Gen. Motors Corp. v. Lord, 488 F.2d 1096 (8th Cir. 1973) (denying mandamus where a new trial was ordered after inadmissible evidence was introduced); Technitrol, Inc. v. McManus, 405 F.2d 84, 85 (8th Cir. 1968); Pfizer Inc. v. Lord, 456 F.2d 545 (8th Cir. 1972) (mandamus is the appropriate remedy to review whether documents were protected under the attorney-client privilege); Pfizer Inc. v. Lord, 456 F.2d 532 (8th Cir. 1972) (mandamus is an appropriate remedy to evaluate whether trial judge should have disqualified herself or himself).

265 Fed. R. App. P. 21; United States v. Shalhoub, 855 F.3d 1255, 1263 (11th Cir.), cert. denied, 138 S. Ct. 381, 199 L. Ed. 2d 279 (2017) (denying mandamus writ); Matter of Bankers Tr. Co., 775 F.2d 545, 545 (3d Cir. 1985)(same); Freeman v. Cavazos, 923 F.2d 1434, 1437 (11th Cir. 1991); In re Atl. Pipe Corp., 304 F.3d 135, 139 (1st Cir. 2002) (noting the ability of the Court to solicit responses); In re Chambers Dev. Co., Inc., 148 F.3d 214, 223 n.7 (3d Cir. 1998) (same); In re Braxton, 258 F.3d 250, 255 (4th Cir. 2001) (same); e

Tights, Inc. v. Stanley, 441 F.2d 336, 337 (4th Cir. 1971) (same); In re Urohealth Sys., Inc., 252 F.3d 504, 506 (1st Cir. 2001); In re Nwanze, 242 F.3d 521, 525 n.1 (3d Cir. 2001); Hahnemann Univ. Hosp. v. Edgar, 74 F.3d 456, 462 (3d Cir. 1996) (certification is not needed to file a mandamus writ); In re U.S., 60 F.3d 729, 732 (11th Cir. 1995); In re Charlotte Observer (Div. of Knight Pub. Co.), 882 F.2d 850, 852 (4th Cir. 1989); Gov't of Virgin Islands v. Douglas, 812 F.2d 822, 832 (3d Cir. 1987); Cent. S.C. Chapter, Soc. of

Court does not "deny" the petition, it will call for opposing counsel or the "trial court judge" to submit an answer. The clerk will provide a notice to the parties of the date, time, and location for "oral argument" if any hearing is scheduled. Extraordinary writ petitions will be given "priority" over "ordinary civil cases." Requests for other extraordinary writs must be filed with the clerk in copies of "four" and served on opposing counsel. These petitions may not "exceed 7,800 words."[266]

## Voluntary Dismissal

As is the case in Hawaii, Mississippi and Alabama, albeit with minor modification, under Federal Rule of Appellate Procedure 42, both the appellant acting alone as well as all the parties acting in concert may upon motion and notice or the filing of an agreement that is signed by all the parties respectively request the dismissal of a docketed matter pending before any of the various Courts of Appeal. In the latter instance, the agreement must specify how costs will be and fees will be allocated amongst the parties.[267] A federal appellate court can also dismiss an appeal for failure to prosecute even if a timely appeal notice has been filed.[268]

## Merits Briefs

---

Prof'l Journalists, Sigma Delta Chi v. Martin, 556 F.2d 706 (4th Cir. 1977) (petitioner had standing to seek a writ of mandamus); In re Asbestos Sch. Litig., 46 F.3d 1284, 1289 n.3 (3d Cir. 1994); Alexander v. Primerica Holdings, Inc., 10 F.3d 155, 165 (3d Cir. 1993); In re Washington Post Co., 807 F.2d 383, 388 (4th Cir. 1986) (treating petition for appeal as a mandamus petition); Gold v. Johns-Manville Sales Corp., 723 F.2d 1068, 1074 n.8 (3d Cir. 1983); Frederick L. v. Thomas, 578 F.2d 513, 516 (3d Cir. 1978) (electing to exercise jurisdiction over litigant's mandamus petition even after abstaining); Brace v. O'Neill, 567 F.2d 237, 250 (3d Cir. 1977) (finding that stay order is reviewable by mandamus);

[266] Fed. R. App. P. 21.

[267] Fed. R. App. P. 42; D.C. v. Trump, No. 18-2488, 2019 WL 2998602, at *3 (4th Cir. July 10, 2019); J.B. v. United States, 916 F.3d 1161, 1165 n.5 (9th Cir. 2019); Pearson v. Target Corp., 893 F.3d 980, 985 (7th Cir. 2018); Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc., 892 F.3d 719, 724 n.1 (5th Cir. 2018); Dubuisson v. Stonebridge Life Ins. Co., 887 F.3d 567, 570 n.2 (2d Cir. 2018); Amparan v. Lake Powell Car Rental Companies, 882 F.3d 943, 945 n.1 (10th Cir. 2018); Parker v. Montgomery Cty. Corr. Facility/Bus. Office Manager, 870 F.3d 144, 154 (3d Cir. 2017); Enerplus Res. (USA) Corp. v. Wilkinson, 865 F.3d 1094, 1096 n.4 (8th Cir. 2017); Planned Parenthood Great Plains v. Williams, 863 F.3d 1008, 1010 (8th Cir. 2017); San Luis & Delta-Mendota Water Auth. v. Haugrud, 848 F.3d 1216, 1217 (9th Cir. 2017), as corrected (Mar. 23, 2017); Dynamic 3D Geosolutions LLC v. Schlumberger Ltd. (Schlumberger N.V.), 837 F.3d 1280, 1284 (Fed. Cir. 2016); Ramara, Inc. v. Westfield Ins. Co., 814 F.3d 660, 672 n.7 (3d Cir. 2016); TransAm Trucking, Inc. v. Fed. Motor Carrier Safety Admin., 808 F.3d 1205, 1209 (10th Cir. 2015); Philos Techs., Inc. v. Philos & D, Inc., 802 F.3d 905, 911 (7th Cir. 2015); ASARCO, LLC v. Celanese Chem. Co., 792 F.3d 1203, 1206 n.2 (9th Cir. 2015); In re Lehman Bros., Inc., 791 F.3d 277, 289 (2d Cir. 2015); Animal Legal Def. Fund v. U.S. Dep't of Agric., 789 F.3d 1206, 1209 n.1 (11th Cir. 2015); United States v. Ramer, 787 F.3d 837, 838 (7th Cir. 2015); Miller v. City of Monona, 784 F.3d 1113, 1118 (7th Cir. 2015); Alvarado v. Corp. Cleaning Servs., Inc., 782 F.3d 365, 373 (7th Cir. 2015); In re Nexium Antitrust Litig., 778 F.3d 1, 1 (1st Cir. 2015); AngioDynamics, Inc. v. Biolitec, Inc., 775 F.3d 550, 550 (2d Cir. 2015); Floyd v. City of New York, 770 F.3d 1051, 1056 (2d Cir. 2014); Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc., 769 F.3d 1004 (9th Cir. 2014); Davis v. Abington Mem'l Hosp., 765 F.3d 236, 238 n.1 (3d Cir. 2014);

[268] Fed. R. App. P. 3.

Federal Rule of Appellate Procedure 28 dictates the content of merits briefs before the thirteen circuits and bears a sharp resemblance to the analogous rule covering brief content in matters before the Texas Supreme Court.[269] More specifically, opening briefs filed before the various federal Courts of Appeals must contain a corporate "disclosure" statement;  "a table of contents with [page] references" providing a very short description of each point; "an index of authorities arranged alphabetically" with page references; a jurisdictional statement that recites the "relevant facts [and dates] establishing jurisdiction" over a "final order or judgment" with "citations to applicable statutory provisions";  a questions presented section; a statement of the case disclosing the course and disposition of proceedings in the lower court or state agency and the relevant facts supported by "record references;" an argument summary; an argument section with the standard of review set out for each issue; a "short conclusion" with a a prayer for relief; a rules compliance certificate; and an optional appendix with the "statutes, rules, [and] regulations" at issue in the appeal. This brief is due within "forty days" of the record's filing. As is the case in Massachusetts, the rules certificate must include a word count for the brief which counsel can rely on her or his word processor for providing.

In litigation before the Virginia Supreme Court, Maryland Court of Appeals, and the thirteen federal circuits, the contents of the opening and answering brief, for the most part, mirror one another with the exception that in the third instance, the appellee need not include a "jurisdictional statement," case statement, questions presented section, and statement outlining the "standard of review" in the argument section unless she or he is dissatisfied with the appellant's statements in those sections of her or his opening brief.[270] This brief is due within "thirty days" of the date that the opening brief is served. One reply can be filed after the answering brief is submitted. This filing should contain "a table of contents with [page] references" providing a very short description of each point and an authorities index. This brief must be summitted within "twenty-one days" after the answering brief has been served but cannot be summitted later than "seven days" before oral argument in the appeal. [271] Counsel must provide "twenty-five copies" of each brief to the Court clerk. These rules apply even if the appellee is raising a matter on cross appeal. If the appellant fails to file her or his brief by the applicable deadline, the appellee can move to "dismiss"

[269] E. D. v. Sharkey, No. 18-1688, 2019 WL 2723370, at *6 n.5 (3d Cir. July 1, 2019) (noting waiver of arguments that are not included in the brief); United States v. Bishop, 926 F.3d 621, 628 (10th Cir. 2019) (noting Rule 28's requirement for including arguments in a party's filed brief lest the claims be waived); Marshall's Locksmith Serv. Inc. v. Google, LLC, 925 F.3d 1263, 1271 (D.C. Cir. 2019) (same); Singh v. Barr, 920 F.3d 255, 258 (5th Cir. 2019)  (same); Wal-Mart Stores E., LP v. Acosta, 919 F.3d 1073, 1078 (8th Cir. 2019) (same); United States v. Zavala, 427 F.3d 562, 564–65 & n.1 (8th Cir. 2005) (same); Steinle v. City & Cty. of San Francisco, 919 F.3d 1154, 1165 (9th Cir. 2019) (same); United States v. Isabella, 918 F.3d 816, 845 (10th Cir. 2019) (same); Monteon-Camargo v. Barr, 918 F.3d 423, 428 (5th Cir. 2019), as revised (Apr. 26, 2019) (same); Bozzuto's Inc. v. Nat'l Labor Relations Bd., No. 18-125, 2019 WL 2571628, at *7 (2d Cir. June 24, 2019); Sierra Club v. Envtl. Prot. Agency, 925 F.3d 490, 496 (D.C. Cir. 2019); Naylor Farms, Inc. v. Chaparral Energy, LLC, 923 F.3d 779, 797 (10th Cir. 2019) (noting that argument section must contain headings);

[270] Fed. R. App. P. 28.

[271] Fed. R. App. P. 31.

the appeal. By way of contrast, the appellee does not submit a merits brief, she or he may not be heard at "oral argument" unless the Court directs otherwise.

As is the case in Alabama, Mississippi, Florida, Virginia and Louisiana, albeit with minor exception, if counsel discovers a "pertinent and significant authority" after filing her or his brief or after oral argument (but before the Court delivers its opinion), Federal Rule of Appellate Procedure 28 permits them to submit a double-spaced letter of no more than "350 words." The letter must include citations to the new authority and references to the brief claim or oral argument contention that the new authority supports. A response must be promptly filed and cannot exceed "350 words."[272]

---

[272] Blair v. Rent-A-Ctr., Inc., No. 17-17221, 2019 WL 2701333, at *4 n.2 (9th Cir. June 28, 2019); Regents of the Univ. of Minnesota v. LSI Corp., No. 2018-1559, 2019 WL 2479596, at *10 n.20 (Fed. Cir. June 14, 2019); Weil v. Metal Techs., Inc., 925 F.3d 352, 356 (7th Cir. 2019); United States v. Delva, 922 F.3d 1228, 1245 (11th Cir. 2019); Worman v. Healey, 922 F.3d 26, 38 n.6 (1st Cir. 2019); Ragbir v. Homan, 923 F.3d 53, 74 n.27 (2d Cir. 2019); Gonzalez Ruano v. Barr, 922 F.3d 346, 356 (7th Cir. 2019); In re Al-Nashiri, 921 F.3d 224, 233 (D.C. Cir. 2019); WildEarth Guardians v. Conner, 920 F.3d 1245, 1253 (10th Cir. 2019); United States v. Thompson, 921 F.3d 82, 85 n.4 (2d Cir. 2019); Omega Patents, LLC v. CalAmp Corp., 920 F.3d 1337, 1350 (Fed. Cir. 2019); United States v. Jackson, 918 F.3d 467, 493 (6th Cir. 2019); Feinberg v. Comm'r of Internal Revenue, 916 F.3d 1330, 1336 n.1 (10th Cir. 2019); United States v. Sayer, 916 F.3d 32, 40 (1st Cir. 2019), cert. denied, No. 18-9306, 2019 WL 2163889 n.11 (U.S. June 17, 2019); United States v. Caniff, 916 F.3d 929, 935 n.11 (11th Cir. 2019); Momenta Pharm., Inc. v. Bristol-Myers Squibb Co., 915 F.3d 764, 766 (Fed. Cir. 2019); Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc., 916 F.3d 116, 127 n.14 (2d Cir. 2019); Dimond Rigging Co., LLC v. BDP Int'l, Inc., 914 F.3d 435, 449 (6th Cir. 2019); United States v. Fattah, 914 F.3d 112, 146 n.9 (3d Cir. 2019); WesternGeco L.L.C. v. ION Geophysical Corp., 913 F.3d 1067, 1075 n.3 (Fed. Cir. 2019); United States v. Rios-Rivera, 913 F.3d 38, 42 (1st Cir.), cert. denied, 139 S. Ct. 2647 (2019); United States v. Aybar-Ulloa, 913 F.3d 47, 57 (1st Cir. 2019); Cortez-Mendez v. Whitaker, 912 F.3d 205, 208 (4th Cir. 2019); Williamson v. Stirling, 912 F.3d 154, 168 n.10 (4th Cir. 2018); Baxter v. Comm'r of Internal Revenue Serv., 910 F.3d 150, 169 n.3 (4th Cir. 2018); Curtis Inv. Co., LLC v. Comm'r of Internal Revenue, 909 F.3d 1339, 1346 (11th Cir. 2018); Brodsky v. HumanaDental Ins. Co., 910 F.3d 285, 292 n.1 (7th Cir. 2018); Griffin v. TeamCare, 909 F.3d 842, 846 (7th Cir. 2018); United States v. Rodriguez-Rosado, 909 F.3d 472, 482 (1st Cir. 2018); E. R. by E. R. v. Spring Branch Indep. Sch. Dist., 909 F.3d 754, 763 (5th Cir. 2018); United States v. Baroni, 909 F.3d 550, 567 n.9 (3d Cir. 2018), cert. granted sub nom. Kelly v. United States, No. 18-1059, 2019 WL 588845 (U.S. June 28, 2019); AirFacts, Inc. v. de Amezaga, 909 F.3d 84, 93 n.6 (4th Cir. 2018); Regents of the Univ. of California v. U.S. Dep't of Homeland Sec., 908 F.3d 476, 510 (9th Cir. 2018), cert. granted sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of California, No. 18-587, 2019 WL 2649834 (U.S. June 28, 2019); Audubon Soc'y of Greater Denver v. United States Army Corps of Engineers, 908 F.3d 593, 603 n.3 (10th Cir. 2018); Angelex, Ltd. v. United States, 907 F.3d 612, 620 (D.C. Cir. 2018), cert. denied, 139 S. Ct. 2013 (2019); Worldcall Interconnect, Inc. v. Fed. Commc'ns Comm'n, 907 F.3d 810, 825 n.7 (5th Cir. 2018), as revised (Nov. 15, 2018); Masias v. Envtl. Prot. Agency, 906 F.3d 1069, 1080 (D.C. Cir. 2018), order clarified, No. 16-1314, 2019 WL 1096761 (D.C. Cir. Feb. 22, 2019); John M. O'Quinn, P.C. v. Lexington Ins. Co., 906 F.3d 363, 373 n.12 (5th Cir. 2018); Vreeland v. Zupan, 906 F.3d 866, 881 n.4 (10th Cir. 2018), cert. denied, 139 S. Ct. 1586, 203 L. Ed. 2d 742 (2019); Funches v. Progressive Tractor & Implement Co., L.L.C., 905 F.3d 846, 849 n.2 (5th Cir. 2018), as revised (Oct. 8, 2018); Woodward v. United States, 905 F.3d 40, 48 (1st Cir. 2018); Sindhi v. Raina, 905 F.3d 327, 334 (5th Cir. 2018); Westfall v. Luna, 903 F.3d 534, 545 n.4 (5th Cir. 2018); United States v. Kirsch, 903 F.3d 213, 233 n.22 (2d Cir. 2018), cert. denied, 139 S. Ct. 1272, 203 L. Ed. 2d

**Appeal And Cross Appeal Brief Cover Designations**

| Brief Name | Color |
|---|---|
| Opening Brief | Blue |
| Answering Brief | Red |
| Reply Brief | Gray |
| Amicus or Intervenor Brief | Green |

| Brief Name | Color |
|---|---|
| Appellant's Opening Brief | Blue |
| Appellee's Opening and Response Brief | Red |
| Appellant's Response and Reply Brief | Yellow |
| Appellee's Reply Brief | Gray |
| Amicus or Intervenor Brief | Green |

The appellant's opening brief is limited to "thirty pages;" the appellee's opening and response brief is limited to "thirty-five pages;" the appellant's response and reply brief may not exceed "thirty pages;" and the appellee's reply is limited to "fifteen pages." There is a "13,000 word" limit for each of the appellant's two filings on cross appeal, a "15,300 word limit" for the appellee's principal and reply brief, and a "6,500 word" limit for the appellee's reply brief. The appellant's opening brief is due "within forty days" after the appellate record is filed; the appellee's opening and response brief must be delivered "within thirty days" of service of the appellant's initial brief; the appellant's response and reply must be submitted, again, "within thirty days" after the appellee's opening and response brief has been filed; and the "appellee's reply brief" is due within "twenty-one days" of service of the appellant's response and reply brief but no later than "seven days" before oral argument is scheduled for the case, assuming a hearing has been set at all.[273]

Every brief and appendix should display a cover page that discloses the docket number; lower court name; case name; "the nature of the proceeding;" submission title; and counsel's "name, office address, and telephone number."[274] Filings should be produced on white 8.5 x 11 inch paper with "double spaced [proportionally spaced] text" "one inch margins." "Headings and footnotes" may contain text that is single spaced.[275] While the brief should be in a "plain" "Roman" style,

---

279 (2019); Reyes v. Waples Mobile Home Park Ltd. P'ship, 903 F.3d 415, 433 n.13 (4th Cir. 2018), cert. denied sub nom. Waples Mobile Home Park Ltd. P'ship v. de Reyes, 139 S. Ct. 2026 (2019);

[273] Fed. R. App. P. 28.1.

[274] Fed. R. App. P. 32; Vermillion v. Corizon Health, Inc., 906 F.3d 696 (7th Cir. 2018); Rodriguez v. Jennings, 887 F.3d 954, 956 (9th Cir. 2018); Pecher v. Owens-Illinois, Inc., 859 F.3d 396, 402 (7th Cir. 2017); In re Target Corp. Customer Data Sec. Breach Litig., 855 F.3d 913, 917 (8th Cir. 2017); Lu Junhong v. Boeing Co., 792 F.3d 805, 808 (7th Cir. 2015); Wheeler v. Talbot, 770 F.3d 550, 556 (7th Cir. 2014); DDR Holdings, LLC v. Hotels.com, L.P., 773 F.3d 1245, 1252 n.2 (Fed. Cir. 2014); Centerpoint Energy Servs., Inc. v. Halim, 743 F.3d 503, 507 (7th Cir. 2014); A.D. v. Markgraf, 676 F.3d 868, 869 (9th Cir. 2012); Robinson v. Beard, 762 F.3d 316, 323 n.1 (3d Cir. 2014); Landrith v. Schmidt, 732 F.3d 1171, 1175 (10th Cir. 2013);

[275] Fed. R. App. P. 27.

"[c]ase names must be italicized or underlined."[276] Both briefs and appendices should be securely "bound."

## Brief Appendices

Under the Federal Rules of Appellate Procedure, the appellant is obliged to prepare an appendix containing "the relevant docket entries in the" lower court; "the relevant portions of the pleadings, charge, findings, or opinion;" the disputed final judgment or order; and any other portions of the "record" that the parties wish to direct the appellate court's attention to. Legal memos that were released by the District Court will be "excluded" "unless they have independent relevance." Ten copies of the appendix must be submitted to the clerk and one copy must be served on opposing counsel. If the parties cannot agree on the appendix's contents, as is the case with ligation before Utah's and Nevada's appellate courts,  the appellant must submit a statement to opposing counsel within "fourteen days" of the record's filing with the portions of the record that she or he would prefer to include in the addendum along with the "issues" that she or he intends to raise on review. The appellee can then submit a response with the record excerpts that she or he would prefer to designate for inclusion "within fourteen days" of the original designation statement's service.[277] In both Virginia and the various Court of Appeal, the appellant pays the preparation costs for the appendix unless she or he finds that the appellee has requested that she or he include material that is "unnecessary for the disposition of the appeal, in which case, the appellee will pay the costs for the preparation of the disputed material. The document must start off with a "table of contents," the "relevant docket entries," and the other portions of the record in "chronological order" in which the documents were filed in the lower court. If pages from the proceeding transcript "are placed in the appendix, the transcript page numbers must be shown in brackets immediately before the included pages." "Immaterial formal matters…should be omitted." Exhibits, on the other hand, must be "reproduced" "in a separate [indexed] volume" that is submitted in copies of four with the appellate clerk. Only one copy of the exhibit volume need be provided to opposing counsel.[278]

---

[276] Fed. R. App. P. 32.

[277] Vazquez v. Borrero, 636 F.2d 4, 4 (1st Cir. 1980)

[278] Fed. R. App. P. 30; Sweet Life v. Dole, 876 F.2d 402, 408 (5th Cir. 1989); Morgan v. O'Bryant, 687 F.2d 510, 515 n.7 (1st Cir. 1982); Weber v. Garza, 570 F.2d 511, 514 n.6 (5th Cir. 1978); Gammill Co. v. Asher, 423 F.2d 627, 628 (5th Cir. 1970); Esso Standard Oil Co. v. Secatore's, Inc., 246 F.2d 17 (1st Cir. 1957)

Diaz-Colon v. Fuentes-Agostini, 786 F.3d 144, 147 n.4 (1st Cir. 2015) (denying motion to file supplemental appendix because of moot claim); Barry v. Moran, 661 F.3d 696, 699 n.3 (1st Cir. 2011) (noting failure to comply with requirement to paginate appellee's exhibits in appendix); Fryar v. Curtis, 485 F.3d 179, 182 n.1 (1st Cir. 2007) (noting failure to prepare appendix); Papas v. Hanlon, 849 F.2d 702, 703 (1st Cir. 1988) (same);

Gonzalez-Rios v. Hewlett Packard PR Co., 749 F.3d 15, 19 (1st Cir. 2014) (noting failure to file a complete appendix); Reyes-Garcia v. Rodriguez & Del Valle, Inc., 82 F.3d 11, 14 (1st Cir. 1996) (same); United States v. Brown, 49 F.3d 135, 137 n.4 (5th Cir. 1995) (same); Com. of Mass., Dep't of Pub. Welfare v. Sec'y of Agric., 984 F.2d 514, 523 n.7 (1st Cir. 1993) (same);

## Amicus Curiae Briefs

Federal Rule of Appellate Procedure 29 governs amicus curiae briefs in the federal appellate courts and bears a sharp resemblance to the procedures for these filings in Arkansas and Florida.[279] Here, a private party seeking to file an amicus curiae brief in a matter pending before one of the thirteen federal Courts of Appeal must obtain the consent of the Court or file a motion

---

Credit Francais Int'l, S.A. v. Bio-Vita, Ltd., 78 F.3d 698, 700 (1st Cir. 1996) (noting that appendix was poorly paginated and not in chronological order); United States v. Wilkes, 20 F.3d 651, 653 (5th Cir. 1994) (noting that pro se merits briefs are governed by the Federal Rules of Appellate Procedure's regulations on brief appendices); Toucet v. Mar. Overseas Corp., 991 F.2d 5, 8 (1st Cir. 1993) (noting that First Circuit can rely on portions of the record that are not included in the appellate record but are still a part of the lower court record); Mungin v. Fla. E. Coast Ry. Co., 416 F.2d 1169, 1171 n.6 (5th Cir. 1969) (same); Bus. Credit Leasing v. City of Biddeford, 978 F.2d 767, 769 n.5 (1st Cir. 1992) (noting misstatements in the record); United States v. Giorgi, 840 F.2d 1022, 1031 (1st Cir. 1988) (failure to include appendix may result in Court disregarding materials in the appendix); Calo v. United States, 338 F.2d 793, 794 (1st Cir. 1964) (same); a

Shankman v. Aspinook Corp., 215 F.2d 902 (1st Cir. 1954) (same); In re GHR Energy Corp., 791 F.2d 1200, 1202 (5th Cir. 1986) (noting failure to include appeal notice in record); Drewett v. Aetna Cas. & Sur. Co., 539 F.2d 496, 500 (5th Cir. 1976) (noting inclusion of unnecessary material in the record); Weinberger v. Grp., 339 F.2d 34 (1st Cir. 1964) (denying extension for appendix filing); Pioneer Credit Corp. v. Bloomberg, 323 F.2d 992 (1st Cir. 1963) (considering exhibit sent by the lower court clerk even though t was not included in the record); Killian v. Eyerly Aircraft Co., 454 F.2d 1173 (5th Cir. 1972) (noting inclusion of unnecessarily material and assessing costs); Burnside v. E. Airlines, Inc., 519 F.2d 1127, 1128 n.3 (5th Cir. 1975) (noting Circuit Court's ability to dispense with the appendix requirement);

[279] Dine Citizens Against Ruining Our Env't v. Bernhardt, 923 F.3d 831, 859 (10th Cir. 2019) (denying leave to file amicus brief); Spaho v. United States Attorney Gen., 837 F.3d 1172, 1175 (11th Cir. 2016) (same); Procopio v. Wilkie, 899 F.3d 1382 (Fed. Cir. 2018) (soliciting amicus curiae briefs); NantKwest, Inc. v. Matal, 869 F.3d 1327, 1328 (Fed. Cir. 2017) (same); Wi-Fi One, LLC v. Broadcom Corp., 851 F.3d 1241, 1242 (Fed. Cir. 2017) (same); In re Aqua Prod., Inc., 833 F.3d 1335, 1336 (Fed. Cir. 2016) (same); The Medicines Co. v. Hospira, Inc., 805 F.3d 1357, 1358 (Fed. Cir. 2015) (same); Gucci Am., Inc. v. Weixing Li, 768 F.3d 122, 129 (2d Cir. 2014) (same); Lexmark Int'l, Inc. v. Impression Prod., Inc., 785 F.3d 565, 566 (Fed. Cir. 2015) (same); United States v. Volpendesto, 755 F.3d 448, 452 (7th Cir. 2014) (same);  Nat. Res. Def. Council v. Envtl. Prot. Agency, 896 F.3d 459, 463 (D.C. Cir.), judgment entered, 735 F. App'x 737 (D.C. Cir. 2018) (allowing a party that lacked standing as an intervenor to file an amicus curiae brief); United States v. Brookdale Senior Living Communities, Inc., 892 F.3d 822, 833 n.6 (6th Cir. 2018), cert. denied sub nom. Brookdale Senior Living Communities, Inc. v. U.S. ex rel. Prather, 139 S. Ct. 1323, 203 L. Ed. 2d 565 (2019); Myun-Uk Choi v. Tower Research Capital LLC, 890 F.3d 60, 63 n.1 (2d Cir. 2018) (denying an amicus' motion to file a brief in support of rehearing); Friedman v. Bloomberg L.P., 884 F.3d 83, 88 (2d Cir. 2017) (same); Fed. Educ. Ass'n-Stateside Region v. Dep't of Def., Domestic Dependents Elementary & Secondary Sch., 884 F.3d 1349, 1350 (Fed. Cir. 2018); Gunderson v. BNSF Ry. Co., 850 F.3d 962, 964 (8th Cir. 2017) (granting motion for leave to file amicus curiae brief); Kaur v. Things Remembered, Inc., 829 F.3d 1117 (9th Cir. 2016) (same); Ermini v. Vittori, 758 F.3d 153, 156 (2d Cir. 2014) (same); Garcia v. Google, Inc., 749 F.3d 1093, 1094 (9th Cir. 2014) (same); Scheick v. Tecumseh Pub. Sch., 766 F.3d 523, 526 (6th Cir. 2014); Laguna v. Coverall N. Am., Inc., 762 F.3d 902, 903 (9th Cir. 2014); Ligon v. City of New York, 743 F.3d 362, 364 (2d Cir. 2014); NML Capital, Ltd. v. Republic of Argentina, 727 F.3d 230, 240 (2d Cir. 2013); Haskell v. Harris, 727 F.3d 916, 917 (9th Cir. 2013)

after all the adverse parties in the appeal have consented to the filing. As is the case in Texas, the amicus brief must be attached to the motion. The motion must identify the applicant's "interest" in the case and disclose how the brief will aid the decision process, the issues the filing will address. The brief should include a "disclosure statement;" "a table of contents with [page] references" providing a very short description of each point; "an index of authorities arranged alphabetically" with page references; a statement identifying the amicus; a statement confirming whether "a party's counsel authored the brief in whole or in part contributed money towards the brief's preparation, or  whether another individual or entity "contributed money" for the brief's preparation; an argument summary; an argument section setting out the applicable standard of review; and a rules compliance certificate. If the amicus is supporting a party in the appeal, her or his brief is due "within seven days" after the deadline for "principal brief" of the party she or he is supporting. On the other hand, if the amicus is not supporting an adverse party, her or his brief is due within "seven days" after the appellant's brief is filed. If the amicus is filing a brief in support of, or against, a rehearing petition, the filing is due within "seven days" after the deadline for submitting the rehearing petition. All amicus briefs are limited to 6,500 words. Any Court of Appeals can "strike an amicus brief that would result in a judge's disqualification."[280]

**Oral Argument**

The various Court of Appeals usually require counsel to file a "statement explaining why oral argument should, or need not, be permitted."[281] While the default presumption is that oral argument "must be allowed in every case," the panel can decline to hear a matter after examining the briefs if it concludes that "the appeal is frivolous;…the dispositive issue or issues have been authoritatively decided; or…the facts and legal arguments are adequately presented in the briefs

---

[280] Fed. R. App. P. 29; Stuart v. Huff, 706 F.3d 345, 355 (4th Cir. 2013); Palomar Med. Ctr. v. Sebelius, 693 F.3d 1151, 1159 n.14 (9th Cir. 2012); In re Halo Wireless, Inc., 684 F.3d 581, 595 (5th Cir. 2012); Hui Lin Huang v. Holder, 677 F.3d 130, 133 (2d Cir. 2012); Palomar Med. Ctr. v. Sebelius, 672 F.3d 1152 (9th Cir. 2012); In re Bellingham Ins. Agency, Inc., 661 F.3d 476, 477 (9th Cir. 2011); Chubb Ins. Co. of Europe S.A. v. Menlo Worldwider Forwarding, Inc., 622 F.3d 1260, 1261 (9th Cir. 2010); Hydro Res., Inc. v. U.S. E.P.A., 608 F.3d 1131, 1143 n.7 (10th Cir. 2010); Fred Beverages, Inc. v. Fred's Capital Mgmt. Co., 605 F.3d 963, 966 (Fed. Cir. 2010); Rutti v. Lojack Corp., 596 F.3d 1046, 1051 n.5 (9th Cir. 2010); Avalos v. Baca, 596 F.3d 583, 587 n.3 (9th Cir. 2010); Princo Corp. v. Int'l Trade Comm'n, 583 F.3d 1380, 1381 (Fed. Cir. 2009); ARIAD Pharm., Inc. v. Eli Lilly & Co., 595 F.3d 1329, 1330 (Fed. Cir. 2009); Fry v. Exelon Corp. Cash Balance Pension Plan, 576 F.3d 723, 724 (7th Cir. 2009); Duron v. Albertson's LLC, 560 F.3d 288, 290 (5th Cir. 2009); Carolina Cas. Ins. Co. v. Yeates, 545 F.3d 915, 916 (10th Cir. 2008); In re Ferrell, 539 F.3d 1186, 1188 n.1 (9th Cir. 2008); Denmark v. Liberty Life Assur. Co. of Bos., 530 F.3d 1020 (1st Cir. 2008); Cascade Health Sols. v. Peacehealth, 479 F.3d 726, 727 (9th Cir. 2007); United States v. Yida, 478 F.3d 1068 (9th Cir. 2007); Boumediene v. Bush, 476 F.3d 934, 935 (D.C. Cir. 2006); United States v. Carty, 465 F.3d 976, 977 (9th Cir. 2006); LaRue v. DeWolff, Boberg & Assocs., Inc., 458 F.3d 359, 361 (4th Cir. 2006); Garcia v. Dep't of Homeland Sec., 412 F.3d 1330, 1331 (Fed. Cir. 2005); Igartua-De La Rosa v. United States, 404 F.3d 1 (1st Cir. 2005); Phillips v. AWH Corp., 376 F.3d 1382, 1384 (Fed. Cir. 2004), on reh'g en banc, 415 F.3d 1303 (Fed. Cir. 2005); Voices for Choices v. Illinois Bell Tel. Co., 339 F.3d 542, 543 (7th Cir. 2003);

[281] Fed. R. App. P. 34.

and record, and the decisional process would not be significantly aided by oral argument."[282] As is the case with the Virginia Supreme Court, when counsel is litigating a matter before one of the thirteen circuits the clerk will usually provide the parties with a notice on the argument "date, time, and" location. And in matters before both the Florida Supreme Court and the various US. Court of Appeals, motions to either "postpone the argument" or extend one's share of allotted time "must be filed reasonably in advance of the hearing date." The Alabama and Mississippi Supreme Courts in tandem with the thirteen Court of Appeals also follow the same practice for party nonappearances. Here, if the appellee fails to appear to present argument, the court may hear argument on behalf of the appellant, if present. If the appellant fails to appear, the court may hear argument on behalf of the appellee. If neither party appears, the case will be decided on the briefs unless the court" orders otherwise. Finally, while both the Maryland Court of Appeals and the various U.S. Circuits permit the parties to submit an appeal on the papers, the Court can "direct that the case be argued." The appellee may reserve time for rebuttal. Counsel is entitled to receive the copy of any written opinion or order in a case she or he litigates before the Court.[283]

**Rehearing Petitions**

Under the Federal Rules of Appellate Procedure, unless one's local circuit has promulgated a contrary rule, if private counsel wants to file a rehearing petition she or he must submit the petition within "fourteen days" of the entry of the disputed final judgment or order.[284] As is the

---

[282] United States v. Williams, 630 F.3d 44, 47 n.2 (1st Cir. 2010); Evancho v. Fisher, 423 F.3d 347, 349 (3d Cir. 2005); United States v. Riggs, 347 F.3d 17, 18 n.1 (1st Cir. 2003); United States v. Ball, 90 F.3d 260, 264 (8th Cir. 1996); Nagle v. Alspach, 8 F.3d 141, 144 (3d Cir. 1993); Fragoso v. Lopez, 991 F.2d 878, 882 (1st Cir. 1993); N.L.R.B. v. Local No. 42, Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers, 476 F.2d 275, 276 (3d Cir. 1973); United States v. Lewis, 904 F.3d 867, 869 n.1 (10th Cir. 2018); United States v. Wells, 873 F.3d 1241, 1247 (10th Cir. 2017); Qiu v. Sessions, 870 F.3d 1200, 1202 (10th Cir. 2017); United States v. Pam, 867 F.3d 1191, 1195 (10th Cir. 2017); United States v. Valdez-Aguirre, 861 F.3d 1164, 1165 (10th Cir. 2017); United States v. Gutierrez, 859 F.3d 1261, 1263 (10th Cir. 2017); United States v. Morgan, 855 F.3d 1122, 1123 (10th Cir. 2017); United States v. Theis, 853 F.3d 1178, 1180 (10th Cir. 2017).

[283] Fed. R. App. P. 36; Chem. Eng'g Corp. v. Essef Indus., Inc., 795 F.2d 1565, 1570 (Fed. Cir. 1986); Knoblauch v. Comm'r, 752 F.2d 125, 127 (5th Cir. 1985), holding modified by Sims v. Great-W. Life Assur. Co., 941 F.2d 368 (5th Cir. 1991); Abatino v. United States, 750 F.2d 1442, 1444 (9th Cir. 1985); Laffey v. Nw. Airlines, Inc., 587 F.2d 1223, 1224 (D.C. Cir. 1978); Denofre v. Transportation Ins. Rating Bureau, 560 F.2d 859, 861 n.3 (7th Cir. 1977); United States v. Baynes, 548 F.2d 481, 482 (3d Cir. 1977); United States v. Gardner, 464 F.2d 614, 615 (9th Cir. 1972); Fid. Commercial Co. v. Comm'r, No. 71-1204, 1971 WL 2655, at *1 (4th Cir. Sept. 1, 1971); Harper & Row Publishers, Inc. v. Decker, 423 F.2d 487, 493 (7th Cir. 1970), aff'd, 400 U.S. 348, 91 S. Ct. 479, 27 L. Ed. 2d 433 (1971).

[284] Fed. R. App. P. 40; M. D. by Stukenberg v. Abbott, No. 18-40057, 2019 WL 2911358, at *8 n.8 (5th Cir. July 8, 2019); Meders v. Warden, Georgia Diagnostic Prison, 911 F.3d 1335, 1337 (11th Cir. 2019); Doe by & through Doe v. Boyertown Area Sch. Dist., 897 F.3d 515 (3d Cir. 2018); Uranga v. Davis, 893 F.3d 282, 287 n.20 (5th Cir. 2018), cert. denied, 139 S. Ct. 1179, 203 L. Ed. 2d 216 (2019); Aldous v. Darwin Nat'l Assurance Co., 889 F.3d 798, 799 (5th Cir. 2018); State v. Trump, 871 F.3d 646, 664 (9th Cir. 2017); Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Georgia, 868 F.3d 1248, 1254 n.2 (11th Cir. 2017), cert. denied sub nom. Davenport v. City of Sandy Springs, Ga., 138 S. Ct. 1326, 200 L. Ed. 2d 513 (2018); Andres v. Marshall, 867 F.3d 1076, 1077 (9th Cir. 2017); United States v. Autobee, 870 F.3d 1184 (10th Cir. 2017); In re Nexium (Esomeprazole) Antitrust Litig., 845 F.3d 470, 475 (1st Cir.

case in Florida, the rehearing petition must disclose the legal points "the court has overlooked or misapprehended and…argue in support of the petition." More than that, the various Court of Appeals – like State courts of last resort in California, Colorado and Wyoming – will not hold oral argument on rehearing petitions. Opposing counsel may not file a response unless the Court of Appeals requests one. If the petition is granted, the Court of Appeals can hear "oral argument" in the case once more or "make a final disposition" "without reargument." The petition may not "exceed 3,900 words."

### En Banc Hearings And Rehearings

Federal Rule of Appellate Procedure 35 governs en banc hearings and rehearings. Here, a "majority of the circuit judges who are in regular active service and who are not disqualified" can call for a case to be heard or reheard en banc. While these motions are generally disfavored, the Court of Appeals will technically consider two factors when deciding to hear a matter en banc. First, just like the North Carolina Court of Appeals and the Texas Court of Appeals, the Court will consider whether an en banc hearing is needed "to secure or maintain uniformity of the court's decisions or decisions of the U.S. Supreme Court. Second, like the Florida District Courts of Appeal, the Court will examine whether the case "involves a question of exceptional importance." The petition must explain how counsel's case satisfies at least one of these two criteria and is limited to "3,900 words." If the petition is for an en banc hearing, it is due by the filing deadline for the answering brief. On the other hand, if the petition is for an en banc rehearing, the petition must be filed "within fourteen days" of the judgment's entry. No response may be field without the Court's leave.

### Judgment Interest

Federal Rule of Appellate Procedure 37 governs judgment interest and bears a sharp resemblance to the State rules governing the same topic in Hawaii, Tennessee, Alabama, and Mississippi. More specifically, the default presumption is that for interest concerning lower court, civil case monetary judgments that is affirmed, interest is "payable from the date the judgment was rendered in the trial court." On the other hand, if the "judgment is modified or reversed

---

2017); United States v. Godinez-Perez, 864 F.3d 1060 (10th Cir. 2016); In re Clark, 837 F.3d 1080, 1083 (10th Cir. 2016); Taylor v. United States, 822 F.3d 84, 87 (2d Cir. 2016); Hernandez v. Garcia Pena, 820 F.3d 782, 790 (5th Cir. 2016); United States v. Mageno, 786 F.3d 768, 770 (9th Cir. 2015); Fezzani v. Bear, Stearns & Co. Inc., 777 F.3d 566, 570 (2d Cir. 2015); United States v. Lagrone, 773 F.3d 673, 674 n.2 (5th Cir. 2014); Lai v. Holder, 773 F.3d 966, 968 (9th Cir. 2014); Wallace v. FedEx Corp., 764 F.3d 571, 583 (6th Cir. 2014); United States v. Dharni, 757 F.3d 1002, 1003 (9th Cir. 2014); New York Times Co. v. U.S. Dep't of Justice, 756 F.3d 93, 94 (2d Cir. 2014)

Planned Parenthood Ass'n of Utah v. Herbert, 839 F.3d 1301, 1302 (10th Cir. 2016) (Briscoe, J., concurring in denial of rehearing en banc); Cook v. Rockwell Int'l Corp., 790 F.3d 1088, 1111 (10th Cir. 2015) (Moritz, J., concurring);

with…direction[s] that a" monetary judgment "be entered in the trial court" interest is calculated according to the instructions on the judgment certificate.[285]

## Sanctions

As is the case with State appellate courts in Minnesota, Illinois, Wisconsin, and Iowa, the various thirteen Courts of Appeal can sanction litigants for pressing a "frivolous" appeal, *sua sponte* or on a party's motion after providing the party with a "reasonable opportunity to respond."[286] The Court can "award just damages and single or double costs to the appellee."[287]

## Costs

Federal Rule of Appellate Procedure 39 governs costs on appeal and bears a sharp resemblance to the analogous rules covering costs in Hawaii, Tennessee, and Idaho. If an appeal is dismissed, the costs will be taxed to the appellant unless the parties agree otherwise or the Court orders a separate arrangement. Likewise, if a judgment is affirmed or a petition is denied, the costs

---

[285] Fed. R. App. P. 37; Van Asdale v. Int'l Game Tech., 763 F.3d 1089, 1091 (9th Cir. 2014); Lagstein v. Certain Underwriters at Lloyd's of London, 725 F.3d 1050, 1056 (9th Cir. 2013); Braunstein v. McCabe, 571 F.3d 108, 128 (1st Cir. 2009); Lampkin v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW), 154 F.3d 1136, 1148 (10th Cir. 1998); J & R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259, 1275 (3d Cir. 1994); Coal Res., Inc. v. Gulf & W. Indus., Inc., 954 F.2d 1263 (6th Cir. 1992), opinion clarified (Apr. 22, 1992); Bell, Boyd & Lloyd v. Tapy, 896 F.2d 1101, 1104 (7th Cir. 1990); Clifford v. M/V Islander, 882 F.2d 12, 15 n.3 (1st Cir. 1989); Institutionalized Juveniles v. Sec'y of Pub. Welfare, 758 F.2d 897, 927 (3d Cir. 1985); Graefenhain v. Pabst Brewing Co., 870 F.2d 1198, 1211 (7th Cir. 1989) (Rule 37 codifies Briggs v. Pennsylvania Railroad rule that a district court is without jurisdiction to award post-judgment interest when the court of appeals reinstates a jury verdict); Elias v. Ford Motor Co., 734 F.2d 463, 465 (1st Cir. 1984) (same); Stewart v. Donges, 20 F.3d 380, 382 (10th Cir. 1994) (refusing to apply Rule 37 to an amended judgment where the mandate and judgment on a separate issue was released and not later amended); Malloy v. WM Specialty Mortg. LLC, 512 F.3d 23, 27 n.2 (1st Cir. 2008) (authorizing sanctions against counsel); BankAtlantic v. Blythe Eastman Paine Webber, Inc., 12 F.3d 1045, 1053 (11th Cir. 1994) (rights under Rule 37 were not waived); Dunn v. HOVIC, 13 F.3d 58, 60 (3d Cir. 1993) (recall of mandate was appropriate to answer the question of post-judgment interest); Loughman v. Consol-Pennsylvania Coal Co., 6 F.3d 88, 96 n.5 (3d Cir. 1993); DeLong Equipment Co. v. Washington Mills Electro Minerals Corp., 997 F.2d 1340 (C.A.11 (Ga.),1993) (when the court reinstates a vacated judgment interest accrues from the judgment date on remand); Cordero v. De Jesus-Mendez, 922 F.2d 11 (1st Cir. 1990) (when the first judgment is modified or vacated on appeal, postjudgment interest accrues from date of the second judgment if the first judgment lacks evidentiary legal basis. If the original judgment is sound but is modified on remand, postjudgment interest accrues from date of first judgment); SEB S.A. v. Sunbeam Corp., 476 F.3d 1317, 1319 (11th Cir. 2007) (post judgment interest begins to accrue on the day that the amended judgment is rendered); Bancamerica Commercial Corp. v. Mosher Steel of Kansas, Inc., 103 F.3d 80 (10th Cir. 1996) (same); Art Midwest, Inc. v. Clapper, 805 F.3d 611, 616 (5th Cir. 2015) (where the court of appeals expressly or implicitly directs the entry of a money judgment on remand without mentioning interest, post-judgment interest accrues from the date of the later judgment on remand); Morrison Knudsen Corp. v. Ground Improvement Techniques, Inc., 532 F.3d 1063, 1085 (10th Cir. 2008) (Tenth Circuit has authority to remand to the district court to fix any clerical errors found in the award of post-judgment interest).

[286] In re 60 E. 80th St. Equities, Inc., 218 F.3d 109, 118 (2d Cir. 2000); Matter of Emergency Beacon Corp., 790 F.2d 285, 288 (2d Cir. 1986)

[287] Fed. R. App. P. 38.

will also be taxed to the appellant unless the Court orders otherwise. By way of contrast, if a judgment is reversed or a petition is granted, the costs will be taxed to the appellee. Finally, the Court will issue an order governing costs if a judgment is affirmed in part and reversed in part, or is vacated, or a petition is granted in part and denied in part. Like Mississippi, but unlike Hawaii, Tennessee appellate courts permit private litigants to collect costs against the State if a statute permits collection.[288] While brief and appendix production and copying costs can be collected as costs, this rate cannot exceed the rate "generally charged for such work in the area where the clerk's office is located." If a litigant "wants costs taxed," as is the case in South Carolina with minor exception, she or he must submit "an itemized and verified bill of costs" within "fourteen days" of the rendition of the disputed judgment or order. "Objections" can be filed within "fourteen days" of the bill's submission. Record and transcript "preparation and transmission" costs, supersedeas bond costs, and the costs for filing the appeal notice can be recovered as "taxable costs" in a federal District Court.

**Mandates**

Federal Rule of Appellate Procedure 41 governs mandates and bears a sharp resemblance to the analogous rule covering mandates in Tennessee. In matters before the Tennessee Supreme Court and the thirteen Courts of Appeal, the mandate consists of the "judgment," cost order, instructions on interest, if any, and the "opinion." The appellate clerk will release the mandate within "seven days" of either the deadline expiration for filing a rehearing petition or the Court's denial of a rehearing petition.[289] The mandate takes effect from the moment it is issued. As is the case in Kansas, Nebraska, and Florida, if counsel is seeking a writ of certiorari before the U.S. Supreme Court and needs to stay the mandate's release, she or he can file a motion with the appellate clerk after serving the document on the other parties to the case. The motion must explain why the certiorari petition "would present a substantial question and" demonstrate "that there is good cause for a stay." The default presumption here is that no stay may "exceed ninety days" unless an extension is warranted for "good cause,"  one of the Justices extends the time for filing a certiorari petition, or the "ninety day" stay expires before the U.S. Supreme Court acts on the certiorari petition. The Court of Appeals can condition the stay on the petitioner's delivery of collateral.[290] If the certiorari petition is denied, the Court of Appeals will release the mandate

---

[288] Fed. R. App. P. 39.

[289] Fed. R. App. P. 41; Keo v. Ashcroft, 348 F.3d 271 (1st Cir. 2003); Pub. Serv. Co. of New Hampshire v. Patch, 167 F.3d 29, 36 (1st Cir. 1998);

[290] IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO Debtors AURELIUS INVESTMENT, LLC; AURELIUS OPPORTUNITIES FUND, LLC; LEX CLAIMS,

immediately" after it receives a copy of the "Supreme Court order." Federal appellate courts have the "inherent power" to recall mandates.[291]

**Notice Required In Constitutional Cases**

---

LLC Movants - Appellants AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS Creditor v. IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; FINANCIAL OVERSIGHT AND MANAGEMENT BOARD Debtors - Appellees UNITED STATES; AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES; OFFICIAL COMMITTEE OF RETIRED EMPLOYEES OF THE COMMONWEALTH OF PUERTO RICO; OFFICIAL COMMITTEE OF UNSECURED CREDITORS; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY; CYRUS CAPITAL PARTNERS, L.P.; TACONIC CAPITAL ADVISORS, L.P.; WHITEBOX ADVISORS LLC; SCOGGIN MANAGEMENT LP; TILDEN PARK CAPITAL MANAGEMENT LP; ARISTEIA CAPITAL, LLC; CANYON CAPITAL ADVISORS, LLC; DECAGON HOLDINGS 1, LLC; DECAGON HOLDINGS 2, LLC; DECAGON HOLDINGS 3, LLC; DECAGON HOLDINGS 4, LLC; DECAGON HOLDINGS 5, LLC; DECAGON HOLDINGS 6, LLC; DECAGON HOLDINGS 7, LLC; DECAGON HOLDINGS 8, LLC; DECAGON HOLDINGS 9, LLC; DECAGON HOLDINGS 10, LLC; FIDEICOMISO PLAZA; JOSE F. RODRIGUEZ-PEREZ; CYRUS OPPORTUNITIES MASTER FUND II, LTD.; CYRUS SELECT OPPORTUNITIES MASTER FUND, LTD.; CYRUS SPECIAL STRATEGIES MASTER FUND, L.P.; TACONIC MASTER FUND 1.5 LP; TACONIC OPPORTUNITY MASTER FUND LP; WHITEBOX ASYMMETRIC PARTNERS, L.P.; WHITEBOX INSTITUTIONAL PARTNERS, L.P.; WHITEBOX MULTI-STRATEGY PARTNERS, L.P.; WHITEBOX TERM CREDIT FUND I L.P.; SCOGGIN INTERNATIONAL FUND, LTD.; SCOGGIN WORLDWIDE FUND LTD.; TILDEN PARK INVESTMENT MASTER FUND LP; VARDE CREDIT PARTNERS MASTER, LP; VARDE INVESTMENT PARTNERS, LP; VARDE INVESTMENT PARTNERS OFFSHORE MASTER, LP; THE VARDE SKYWAY MASTER FUND, LP; PANDORA SELECT PARTNERS, L.P.; SB SPECIAL SITUATION MASTER FUND SPC; SEGREGATED PORTFOLIO D; CRS MASTER FUND, L.P.; CRESCENT 1, L.P.; CANERY SC MASTER FUND, L.P.; MERCED PARTNERS LIMITED PARTNERSHIP; MERCED PARTNERS IV, L.P.; MERCED PARTNERS V, L.P.; MERCED CAPITAL, L.P.; ARISTEIA HORIZONS, LP; GOLDEN TREE ASSET MANAGEMENT LP; OLD BELLOWS PARTNERS LLP; RIVER CANYON FUND MANAGEMENT, LLC Creditors - Appellees IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO HIGHWAYS AND TRANSPORTATION AUTHORITY; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA); THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE PUERTO RICO SALES TAX FINANCING CORPORATION, a/k/a Cofina; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, AS REPRESENTATIVE FOR THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO Debtors ASSURED GUARANTY CORPORATION; ASSURED GUARANTY MUNICIPAL CORPORATION Plaintiffs - Appellants, No. 18-1671, 2019 WL 2529351, at *1 (1st Cir. May 6, 2019) (staying issuance of mandate to permit the Senate to consider Presidential nominees); United States v. Pleau, 680 F.3d 1 (1st Cir. 2012) (denying stay of mandate ordering inmate transfer for lack of good cause); United States v. Fraser, 407 F.3d 9 (1st Cir. 2005) (denying motion for a mandate stay after the deadline for filing a rehearing petition had passed);
[291] *Powers v. Bethlehem Steel Corp.*, 483 F.2d 963 (1st Cir. 1973);

As is the case in matters before the Hawaii and Alabama Supreme Courts, albeit with minor exception, under Federal Rule of Appellate Procedure 44, any party that draws into question the "constitutionality of any Act of Congress" in a proceeding where a U.S. "agency, officer, or employee is not a party in an official capacity," must provide immediate notice to the appellate court clerk who will then in turn notify the Attorney General. Notice must also be provided to the clerk in cases where consul is contesting the constitutionality of a State statute in a proceeding where an "agency, officer, or employee [of the State] is not a party in an official capacity."[292]

**Attorney Admissions**

Any individual licensed to practice before the "Supreme Court of the United States, the highest court of a [S]tate, another United States [C]ourt of [A]ppeals, or a United States district court" can apply for admission to one of the thirteen U.S. Court of Appeals after completing an application, an "oral or written motion" initiated by a member of the Court bar, and signing the following affirmation:

"I, _____, do solemnly swear [or affirm] that I will conduct myself as an attorney and counselor of this court, uprightly and according to law; and that I will support the Constitution of the United States."[293]

---

[292] Fed. R. App. P. 44; *Noonan v. Staples, Inc.*, 561 F.3d 4, 6 (1st Cir. 2009) (noting the appellee failed to file the required notice and waiving the underlying issue); Buchanan v. Maine, 469 F.3d 158, 162 n.1 (1st Cir. 2006); In re Gosselin, 276 F.3d 70, 72 (1st Cir. 2002) (noting that the Court provided the required notice once the parties failed to do so); United States v. Cox, 906 F.3d 1170, 1178 (10th Cir. 2018), cert. denied, (U.S. June 10, 2019), and cert. denied sub nom. Kettler v. United States (U.S. June 10, 2019) (commenting on intervention); Means v. Navajo Nation, 432 F.3d 924, 925 (9th Cir. 2005); Guzman v. Local 32B-32J, Serv. Employees Int'l Union, AFL-CIO, 151 F.3d 86, 93 (2d Cir. 1998) (enforcing waiver of claim on appeal in part because Rule 44 notice was not provided to the United States); Gibson v. Am. Cyanamid Co., 760 F.3d 600, 608 n.4 (7th Cir. 2014) (noting that Rule 44 notice is not required when a State constitutional challenge is raised in a federal court); Lors v. Dean, 746 F.3d 857, 859 (8th Cir. 2014); In re Carter, 553 F.3d 979, 983 (6th Cir. 2009); McIntosh v. Partridge, 540 F.3d 315, 319 (5th Cir. 2008); Schwier v. Cox, 340 F.3d 1284, 1286 (11th Cir. 2003); In re Walters, 868 F.2d 665, 671 (4th Cir. 1989) (noting that Rule 44 was not complied with).

[293] Fed. R. App. P. 46; Lamb v. Norwood, 899 F.3d 1159, 1160 (10th Cir. 2018); Klein v. O'Brien, 884 F.3d 754, 757 (7th Cir.), cert. denied, 139 S. Ct. 239, 202 L. Ed. 2d 130 (2018), reh'g denied, 139 S. Ct. 867, 202 L. Ed. 2d 634 (2019); Barrientos v. Lynch, 829 F.3d 1064, 1067 (9th Cir. 2016); Rodriguez v. Robbins, 797 F.3d 758, 759 (9th Cir. 2015); Blixseth v. Yellowstone Mountain Club, LLC, 796 F.3d 1004, 1009 (9th Cir. 2015); In re Reines, 771 F.3d 1326, 1329 (Fed. Cir. 2014); United States v. Marks, 768 F.3d 1215, 1218 (8th Cir. 2014); Richardson v. Koch Law Firm, P.C., 768 F.3d 732, 735 (7th Cir. 2014); In re DeMarco, 733 F.3d 457, 467 (2d Cir. 2013); ("A court of appeals may discipline an attorney who practices before it for conduct unbecoming a member of the bar or for failure to comply with any court rule."); Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1366 (2d Cir.1991) In re Payne, 707 F.3d 195, 206 (2d Cir. 2013) ("Parties and counsel have no absolute entitlement to be 'warned' that they disobey court orders at their peril."); Maness v. Meyers, 419 U.S. 449, 458, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975) ("We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal. Persons who make private determinations of the

After admission, however, an attorney can be "subject to suspension[, discipline,] or disbarment" if she or he "has been suspended or disbarred from practice in any other court; or…is guilty of conduct unbecoming a member of the court's bar" after a "show cause" order has been issued to the ostensibly offending attorney.

## Special Masters

Under Federal Rule of Appellate Procedure 48, the U.S. Supreme Court and the various Court of Appeals – just like the Virginia Supreme Court in habeas appeals – can "recommend factual findings and disposition[s] in matters ancillary to" court proceedings.[294] Unless the Court of Appeals orders otherwise, the default presumption is that the official is permitted to regulate "all aspects of" the hearing; administer oaths and examine witnesses and parties; require "the production of evidence on all matters embraced in the reference;"[295] and take "appropriate action" "for the efficient performance" of her or his duties. The referring Court will determine the official's compensation if she or he is not "a judge or court employee."[296]

---

law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect."); In re Boyle-Saxton, 668 F.3d 471, 472 (7th Cir. 2012); In re Liotti, 667 F.3d 419, 423 (4th Cir. 2011); In re Fengling Liu, 664 F.3d 367, 368 (2d Cir. 2011); Sambrano v. Mabus, 663 F.3d 879, 882 (7th Cir. 2011); Stanard v. Nygren, 658 F.3d 792, 794 (7th Cir. 2011); In re Violation of Rule 28(D), 635 F.3d 1352, 1360 (Fed. Cir. 2011); In re Warburgh, 644 F.3d 173, 185 (2d Cir. 2011); In re Zdravkovich, 634 F.3d 574, 577 (D.C. Cir. 2011); United States v. Kieffer, 621 F.3d 825, 828 (8th Cir. 2010); In re Girardi, 611 F.3d 1027, 1035 (9th Cir. 2010); In re Roman, 601 F.3d 189, 191 (2d Cir. 2010); In re Saghir, 595 F.3d 472, 474 (2d Cir. 2010); In re Koenig, 592 F.3d 376, 378 (2d Cir. 2010); In re DeMell, 589 F.3d 569, 570 (2d Cir. 2009); In re Jaffe, 585 F.3d 118, 119 (2d Cir. 2009); Lucas v. Duncan, 574 F.3d 772, 778 n.8 (D.C. Cir. 2009); In re Sibley, 564 F.3d 1335, 1337 (D.C. Cir. 2009); Priestley v. Astrue, 651 F.3d 410, 423 (4th Cir. 2011) (Davis, J., concurring);

[294] Gallop v. Cheney, 667 F.3d 226, 231 (2d Cir. 2012), as amended (Feb. 3, 2012); Alabama Power Co. v. F.C.C., 311 F.3d 1357, 1364 n.9 (11th Cir. 2002).

[295] Reich v. Sea Sprite Boat Co., 50 F.3d 413, 414 (7th Cir. 1995).

[296] Fed. R. App. P. 48; United States v. Scrushy, 721 F.3d 1288, 1296 (11th Cir. 2013); In re Bagdade, 334 F.3d 568, 575 (7th Cir. 2003); Gulf Power Co. v. United States, 187 F.3d 1324, 1335 (11th Cir. 1999); Matter of Maurice, 73 F.3d 124, 127 (7th Cir. 1995), on reconsideration (Jan. 5, 1996).

**Tax Consequences In U.S. Debt Offerings**

A U.S. holder can qualify as a beneficial owner of U.S. debt securities if she, he, or it is a U.S. citizen or resident, a U.S. corporation, an estate whose income is subject to U.S. federal income tax, or a trust if a U.S. court can exercise primary supervision over the trust's administration and one or more U.S. persons are authorized to control all the trust's substantial decisions. Holders that use an accrual as opposed to a cash accounting method may be required to include income from debt securities no later than the time those amounts are reflected on the holder's financial statements under §451(b) of the Internal Revenue Code. A domestic issuer can release a debt offering in the United States through an SEC registered offering, an unregistered Rule 144A offering (see below XXX), or an offering that falls within other SEC exemptions. During the release of the securities, a domestic issuer can also sell debt securities in the U.S. using a registered offering or exempt private placement. On the other hand, if the offeror wants to sell debt securities outside of the United States during its release of debt securities, it must comply with Regulation S.

Domestic issuers can also issue debt using a registered or medium-term note program under rule 144A. The medium-term note program permits issuers to issue debt quickly to suit the firm's needs or to take advantage of favorable market conditions. Here, the issuer will file a self registration statement with the SEC or prepare a base offering memo for unregistered issues. This latter filing permits the issuer to release a range of debt instruments with maturities between nine months and thirty years. While debt that is released under the medium term note program is often fixed rate with maturities between two and five years, the firm can also use this method to release floating rate, zero coupon, and dual or multi-currency debt.

The U.S. tax code imposes some restrictions on offshore debt offerings that implicate – bearer debt – or debt instruments that transfer ownership through physical delivery to reduce tax avoidance. These restrictions do not apply to registered notes or, instruments where ownership is transferred by recording the transfer and the name of the new holder in a register. Under the Hiring Incentives to Restore Employment Act, U.S. issuers are effectively prohibited from issuing debt that is in bearer form after March 2012. If a U.S. issuer releases debt in bearer form after this cutoff date, interest payments made by the U.S issuer are not deductible and interest payments made to non-U.S. holders by a U.S. issuer of bearer debt are subject to a 30% U.S. withholding tax. If, however, counsel's client has no option but to issue bearer debt it could potentially avoid sanctions by selling the debt in accordance with the TEFRA D rules. Bearer debt that is in bearer form will also be treated as registered form debt if either the debt is held in a dematerialized book entry system or the bearer debt takes the form a single document representing the total debt issued, is held by a depository on behalf of the holders, is cleared and settled using a book entry system, and investors generally cannot obtain a physical certificate in bearer form.[1]

For U.S. holders, interest from debt will be taxed differently depending on whether the debt is issued without an original issue discount, with an original issue discount, or with one or more contingent payments of either interest or principal. An original issue discount is the difference a

---

[1] See IRS Notice 2012-20, Prop. Treas. Reg. 1.163-5(b).

debt instrument's stated redemption price at maturity and the debt instrument's issue price. For debt instruments issued for money, the issue price is the first price at which a substantial amount of the debt instruments are sold to parties that are not bond houses, brokers or other persons acting in the capacity of underwriters, placement agents, or wholesalers.

If the debt returns a fixed rate or a floating rate and was issued without an original issue discount, interest is generally taxable to the U.S. holder as ordinary interest income at the time the interest is paid if the holder is using a cash accounting method or accrued if the holder is using an accrual based accounting method. For floating rate debt, this tax treatment applies even where the debt qualifies as a "variable rate debt instrument" and the debt pays interest at a single qualified floating rate or "objective rate" at least once every year. Here, floating rate debt that varies with the London Inter Bank Offering Rate is generally treated as "variable rate debt instrument" as are commercial paper rate notes, primate rate notes, treasury rate notes, CD rate notes, and federal fund rate notes.

On the other hand, payment in kind debt securities, zero coupon bonds, and debt that is issued with more than a *de minimis* amount of original issue discount are subject to special original issue discount rules. An original issue discount is de minimis if it is less than .25% of the debt's stated redemption price at maturity multiplied by the years to maturity. All payments on a debt security other than "qualified stated interest" are treated as part of the debt's stated redemption price at maturity. Qualified stated interest is stated interest that is unconditionally payable at least annually in cash or property at a single fixed rate or at a single qualified floating rate or objective rate. Any interest payments that are qualified stated interest are taxable to a U.S. holder as ordinary interest income at the time the interest is paid if the holder is on a cash accounting method or, at the time the interest is accrued, if the holder is an accrual accounting method. If a U.S. holder's debt securities fall under this category, she, he, or it must include the original issue discount in income over the term of the note on a constant yield basis based on a compounded yield to maturity.[2] Put simply, if counsel's client is on a cash accounting method, she, he, or it must include the original issue discount in income before receiving the cash attributable to that income. The holder will also increase its adjusted basis in the debt to reflect the amount of the original issue discount included in income. Issuers of publicly issued original issue discount instruments must file IRS Form 8281 with the IRS (See Appendix XXX).

Special rules apply to the accrual of interest income on contingent payment debt instruments. In general, contingent payment debt instruments rules apply to debt securities that provide for one or more contingent payments of interest or principal. If a debt instrument is a contingent payment debt instrument, regardless of whether the U.S. holder is on the cash or accrual accounting method, the holder accrues interest income and must include it in income based on a projected payment schedule. The projected payment schedule is based on the issuer's comparable yield – the rate at which the issuer could issue a fixed rate debt instrument with similar terms ignoring the contingencies. In other words, the U.S. holder will include an estimated yield on the debt which may exceed the cash payments that are actually received the holder will then make positive or negative adjustments to previous interest income inclusions if actual contingent payments differ from projected payments.

The tax due from the gain or loss on any sale, exchange, or retirement od a debt instrument will generally depend on whether the debt is subject to contingent payment debt instruments rules and

---

[2] Treas. Reg. 1.1272-1(b).

whether the instrument was purchased at a discount or premium in the secondary market. If the contingent payment debt instrument rules do not apply, on the sale, exchange, or retirement of a debt instrument, a U.S. holder will recognize a gain or loss equal to the difference between the amount realized on the sale, exchange, or retirement and the U.S. holder's adjusted basis in the debt. Here, it is critical that counsel subtract any accrued interest from the amount realized on the sale, exchange, or retirement before taking the latter figure and subtracting the adjusted basis. The adjusted basis is equal to the original debt cost plus any amount included in income as original issue discount and the market discount and minus any payments that are not qualified stated interest payments and any amortizable bond premium applied to reduce interest. If the debt was held for more than one year, a non-corporate U.S. holder recognizes long-term capital gain or loss, which fortunately, at the time of this writing for individuals is taxed at a preferential rate.[3]  On the other hand, if the contingent payment debt instrument rules do apply, any gain realized on the sale, exchange, or retirement of a debt instrument will be treated as ordinary income. Here, if a loss is realized, it will be treated as an ordinary loss after, of course, accounting for the net interest income inclusions that the debt instrument produced and any loss in excess of that amount will be treated as a capital loss. If the U.S. holder held the instrument for more than one year, the capital loss is a long-term capital loss. In tax transactions where the contingent payment debt instrument rules apply, a U.S. holder's adjusted basis equals the original cost of the debt plus any amounts previously included as interest income under the projected payment schedule minus the amount of any non-contingent payments and the projected amount of any contingent payments that were made on the instrument.[4]

A separate set of rules applies for debt instruments that are acquired at a market discount. More specifically, if a U.S. holder acquires a debt instrument that is not a contingent payment debt instrument in the secondary market for a price that is less than the debt's remaining principal amount, any positive difference between the remaining principal amount and the U.S. holder's purchase price is a market discount. This rule also applies to original issue discount debt with the sole exception that the debt's remaining principal amount is the debt's revised issue price. Here, generally, a U.S. holder will not include her, his, or its market discount in income over the term of the debt unless the debt is original issue discount debt. Any gain on the sale, exchange, or retirement of debt that was purchased at a market discount will be treated as ordinary income that will be applied against the accrued market discount but will not be included in the filer's income. The U.S. holder can elect to include the market discount currently in income as it accrues – either under a ratable method or under a constant yield method – and increase its adjusted basis in the debt by the amount of the market discount accruals.

On the other hand, if the issuer purchases a debt instrument that is not a contingent payment debt instrument in the secondary market for an amount exceeding the remaining principal on the debt, she he or it has purchased the debt at a premium. In this situation the U.S. holder has two options. First, the holder can elect to amortize or spread out the tax payments on the premium over the duration of the debt instrument's active life by paying extra taxes on the bond interest income. Second, the holder can include the premium in the bond's basis which may result in the recognition of a deductible capital loss once the debt matures. If the U.S. holder has purchased original issue discount debt for an amount greater than the debt's adjusted price but less than the debt's stated redemption price at maturity, she, he, or it has acquired a premium in the amount of the difference

[3] 26 U.S.C. 1(h)(1); 26 U.S.C. 1411.
[4] Treas. Reg. 1.275-4(b)(7).

3

between the debt's adjusted price and the debt's stated redemption price at maturity. The holder here must reduce the original issue discount includible in income every year by the amount of the premium that is allocated to that year.

While most non-U.S. holders that purchase debt securities sold by U.S. holders qualify for a portfolio interest exemption that exempts the non-U.S. holder from paying U.S. withholding tax after the purchaser completes IRS Form W-8 (See Appendix XXX), the exemption is not available to a controlled foreign corporation that is directly or indirectly related to the issuer through stock ownership; a person that actually or constructively owns ten percent or more of the total combined voting power of all stock classes with voting rights; and a bank that has invested in the debt security as a credit extension in the ordinary course of its trade or business. If the non-U.S. holder is not eligible for the exemption, she, he, or it must pay a withholding tax on the interest payments unless the rate has been reduced by an applicable income tax treaty or the interest is effectively connected with the non-U.S. holder's U.S. trade or business and the holder has filed out IRS Form W-8ECI (See Appendix XXX). In the former instance, however, even if the non-U.S. holder is eligible for a lower treaty rate, the issuer must withhold the 30% tax unless the non-U.S. holder has filed IRS Form W-8BEN or W-8BEN-E (See Appendix XXX and XXX). In the latter instance, the non-U.S. holder must pay federal income tax on a net income basis on income, interest, and capital gains that are effectively connected with the conduct of that U.S. trade or business. Non-U.S. holders eligible for a lower treaty tax rate can claim an IRS refund of the amounts withheld in excess of the 30% rate by filing a claim with the IRS. Generally, a non-U.S. holder will have to submit IRS Forms W-8BEN, W-8BEN-E, or W-8ECI to the person through which the non-U.S. holders holds the security.

The U.S. issuer may also have to pay tax on interest it pays to a foreign person or institution. More specifically, under the Foreign Account Tax Compliance Act (FATCA), a 30% withholding tax applies to interest paid by a U.S. issuer if the interest is paid to either a foreign financial institution that does not meet the FATCA information reporting requirements and is not an excepted foreign financial institution, a foreign financial institution that has been deemed compliant, or an exempt beneficial owner or a non-financial foreign entity that is not exempt from the FATCA requirements and does not meet the FATCA's reporting requirements. Luckily, any amount that is withheld under the FATCA can generally be credited against the general withholding tax.[5]

In general, non-U.S. debt holders are not subject to U.S. federal income tax on gain recognized on the sale, exchange, or retirement of debt unless either the gain is effectively connected with a U.S. trade or business or the non-U.S. holder is an individual present in the U.S. for 183 days or more in the taxable year of the sale, exchange, or retirement. Different reporting requirements also apply to U.S. and non-U.S. holders. For the former class of taxpayers, the client may have to file and submit IRS Form 1099 (See Appendix XXX) for payments of principal, interest, the original issue discount, and sale proceeds unless the U.S. holder establishes that it is a corporation or another exempt recipient. Non-corporate U.S. holders are also generally exempt from paying the 30% withholding tax if they provide an accurate taxpayer ID number on IRS Form W-9 and certify that they are not subject to backup withholding (See Appendix XXX). If any amount is withheld as backup withholding, it can be credited against a holder's U.S. federal income tax liability and is refundable upon a timely request. For issuers, the amount of interest and the tax withheld must generally be reported every year to the IRS and non-U.S. holders. For the most part, backup

---

[5] Treas. Reg. 1.1474-6.

withholding requirements do not apply to payments of principal, interest, or the original issue discount on a debt instrument if the non-U.S. holder provides the issuer with documentation confirming its non-U.S. status. Issuers must also report the payment of proceeds from the sale of a debt instrument outside the U.S. if the sale is through a foreign office with a U.S. broker, derives 50% or more of its gross income in specified periods from the conduct of trade or business in the U.S., is a controlled foreign corporation, or is a foreign partnership that at any time during the taxable year either was engaged in a U.S. trade or business or was staffed by one or more partners who were U.S. persons who in the aggregate hold more than 50% of the partnership's income or capital interests.

Dividends are taxed differently than debt. A U.S. holder must pay taxes on the gross amount of any dividend paid out the issuer's current and accumulated earnings and profits. These holders, however, as mentioned above, will only pay a preferred rate if the dividends are qualifying dividends. Qualifying dividends are dividends that are paid by a U.S. corporation and certain foreign corporations. To take advantage of the preferred rate for dividends on common stock, the U.S. individual must have held the security for at least 61 days out of the 121 days period that begins 60 days before the ex-dividend date.[6] If the dividend is not a qualifying dividend, the dividend is subject to tax at ordinary income tax rates. On the other hand, a corporate U.S. holder can deduct half of the dividends that it receives from other unrelated U.S. corporations.[7] This deduction, however, may not be available to the U.S. corporation if the entity hedged its tock investment or the firm does not meet applicable holding period requirements.[8] If the dividend deduction does not apply, the entire dividend is subject to tax as ordinary income at the 21% rate. For distributions in excess of current and accumulated earnings and profits, any return up to the amount of the basis will not be taxed and any remaining amount will be treated as a capital gain. A different set of rules applies to non-U.S. holders. Here, non-U.S. holders are generally subject to a 30% general federal withholding tax on dividends paid by a U.S. issuer. While there are several treaties that reduce or eliminate this tax for non-U.S. holders, the issuer must still withhold the 30% unless the non-U.S holders fills out and submits IRS form W-8BEN or Form W-8BEN-E. Non-U.S. holders can also claim a refund of any amount that is withheld in excess of the treaty rate by filing a refund claim with the IRS. If, however, the non-U.S. holder is carrying on a U.S. business or trade, it is not subject to the general federal withholding dividend tax so long as the payments are effectively connected with the conduct of the U.S trade or business and the filer has filed out and submitted IRS form W-8ECI.  The holder will still, though, have to pay federal income tax on a net income basis on income, dividends, and capital gains that, again, are effectively connected with the conduct of the U.S. trade or business. If a treaty does apply, private equity practitioners should note that non-U.S. holders carrying on a U.S. trade or business through a permanent establishment will be taxed on a net income basis on income attributable to that permanent establishment rather than effectively connected income.

The U.S. issuer may also have to pay tax on dividends it pays to a foreign person or institution. More specifically, under the Foreign Account Tax Compliance Act (FATCA), a 30% withholding tax applies to dividends paid by a U.S. issuer if the dividends is paid to either a foreign financial institution that does not meet the FATCA information reporting requirements and is not an excepted foreign financial institution, a foreign financial institution that has been deemed

---

[6] 26 U.S.C. 1(h)(11); 26 U.S.C. 246(c).
[7] 26 U.S.C. 243.
[8] 26 U.S.C. 246.

compliant, or an exempt beneficial owner or a non-financial foreign entity that is not exempt from the FATCA requirements and does not meet the FATCA's reporting requirements. Luckily, any amount that is withheld under the FATCA can generally be credited against the general withholding tax.[9]

The U.S. tax code also accords different treatment to capital gains derived from the sale of common stock depending on whether the filer is a U.S. holder or non-U.S. holder. Here, the amount of the gain or loss recognized on the sale or disposition of common stock is equal to the difference between the amount realized on the sale of the stock and the holder's basis in the shares. As was the case with the above treatment on debt instruments, if the shares were held for more than one year, the non-corporate U.S. holder will recognize a long-term capital gain or loss that, thankfully, is taxed at a preferential rate.[10] However, because corporate capital gains are not taxed at a preferential rate, the tax rate that applies to ordinary corporate income and capital gains will be assessed.[11] When it comes to taxes on dividends, non-U.S. holders receive more preferential treatment as they generally do not have to pay federal income tax on gain realized on the sale or disposition of common stock with three exceptions. First, if the non-U.S. holder is an individual present in the country for 183 days or more in the taxable year of the stock sale, she or he may have to pay federal income tax. Second, if the non-U.S. holder's gain is effectively connected with a U.S. trade or business or a tax treaty applies, the gain will be attributed to a permanent U.S. establishment. Finally, if half or more of the issuer's assets are U.S. real property-related assets and the non-U.S. holder owns more than 5% of the shares at any time during a five year period, the holder will not be eligible for a tax treaty exemption.

**Counseling Start-Ups**

As of June 2019, sections 301.7701-2 and 301.7701-3 of the federal treasury regulations permit a business entity to be classified as either a per se C corporation or an entity that can choose its own tax classification. For federal income tax purposes, a business entity is treated as a sole proprietorship, C-corporation, S-corporation, or partnership. The federal income tax code does not contain a distinct category for limited liability corporations as such as these firms are treated as a sole proprietorship if they are a single member entity or partnership if they are a multi-member entity unless the limited liability corporation elects to be treated as a C corporation or an S corporation. A substantial number of multi-member limited liability corporations in the private equity, non-renewable energy, and sports fields elect to be treated as a partnership because the firm's earnings are taxed at one level and there are no restrictions on owner residency or number. For firms that are eligible to elect their tax status, though, if the firm is a U.S. business with a single member, the entity will be classified as a sole proprietorship unless it elects to be treated as a C-corporation or S-corporation (See IRS Form 8832 in Appendix XXX). On the other hand, if the eligible entity is a U.S. business with multiple members, it will be treated as a partnership for tax purposes, unless it also chooses to be treated as a C-corporation or S-corporation (See IRS Form 8832 in Appendix XXX). Counsel should bear in mind that if a single member firm acquires even just one additional member or if a multi-member firm is reduced to featuring only on member

---

[9] Treas. Reg. 1.1474-6.
[10] 26 U.S.C. 1(h)(11); 26 U.S.C. 1411.
[11] 26 U.S.C. 11.

the tax status of the sole proprietorship or partnership will switch to that of partnership or sole proprietorship respectively.[12]

Sole proprietorships are entities with a single owner that is generally ignored for federal income tax purposes even though it is a separate legal entity for state law purposes. Of course, the owner of the sole proprietorship will be treated as the owner of the firm's assets and liabilities for tax purposes and will report the firm's income and expenses on her or his own federal income tax return. On one hand, this business form permits the owner to avoid worrisome administrative costs. On the other hand, the proprietor will be forced to pay a self-employment tax on any net earnings.

S-corporations do not pay an entity level tax. Instead, the firm's profits and losses will ass through to its stockholders, who will report their portion of the profit or loss on their federal income tax return. For technology, non-renewable energy, private equity, and sports start ups, this tax form is relatively uncommon, because S-corporations can only have one class of stock, no more than 100 shareholders, and generally limit stock ownership to U.S. citizens or residents.[13] A start up, however, may consider organizing as an S-corporation if it has not secured venture capital yet. If a corporation is not an S-corporation, it is a C-corporation for federal income tax purposes. In the United States, unfortunately, income from these firms are still taxed twice – first, at the level where the income is earned and second, once the earnings have been distributed to shareholders. Private equity start ups generally prefer to organize their firm as a C-corporation because of the ability to structure equity ownership and have multiple classes of stock. While the default presumption is that a firm that is organized as a corporation under the laws of any State is a C corporation, the corporation at issue may be able to elect for S-corporation status **ideally within 75 days of its formation or two months and fifteen days after the beginning of the tax year the election will take effect**.[14] Compliance with this deadline is critical as a firm that elects to be treated as a C-corporation after formation will be unable to change its tax status to that of a partnership or sole proprietorship for five years unless more than 50% of the ownership changes hands and the IRS then grants permission for the change.[15] If the S election terminates, the firm will be treated as a C-corporation for tax purposes and will not be able to reacquire S-corporation tax status for five years.

Counsel should also keep in mind that if the client is ambivalent between organizing as either a partnership or a C-corporation, it is far easier to transfer the firm's status from the former to the latter than vice versa. For partnerships, the profit and loss is computed and allocated among the partners every year and passed through to the partners, who will then include their share of the profits or loss on their federal income tax return. This is a relatively popular firm organization form for start ups even though the partners are subject to self-employment tax. Entities that are organized as a partnership under State law may also be eligible for treatment as a 'publicly traded partnership,' or a partnership with interests that are traded on an established securities market or readily tradeable secondary market.[16] Publicly traded partnerships are treated as C-corporations for tax purposes unless more than 90% of the firm's gross income consists of passive investment income.[17] Most private fund entities have no direct operations as investors make their capital

---

[12] Treas. Regs. 301.7701-3(f)(2); Rev. Rule 99-6.
[13] 26 U.S.C. 1361; Treas. Reg. 1.1361-1(c).
[14] 26 U.S.C. 1361; 26 U.S.C. 1362; Treas. Regs. §§ 301.7701-3(c)(1)(iii) and 301.7701-3(g).
[15] Treas. Reg. 301.7701-3(c)(1)(iv).
[16] 26 U.S.C. 7704.
[17] Id.

contributions to the private fund which in turn makes the actual investments for the investors' benefit. Here, the general partner will typically exercise control and authority over the fund's operation subject to the terms and conditions of the private equity fund's limited partnership of or limited liability company agreement.

Start-ups generally compensate employees with one of the following packages in isolation or combination: restricted stock, restricted stock units, stock options, stock appreciation rights, or phantom stock. Restricted stock is a stock grant to employees that is non-transferrable and subject to forfeiture until the restrictions lapse and, is usually reserved for the firm's founders at the initial stages of the business. Restrictions typically lapse once  a specific time based employment service requirement is met or the firm, employee, or both achieve a performance based condition. On the grant date, employees become the owners of the shares and have voting, dividend, and other shareholder rights. Because restricted stock is considered a transfer of restricted property at the time the award is made, the holder can elect to be taxed on the grant date under 26 U.S.C. 83(b). If the holder does not exercise her or his option to be taxed under 26 U.S.C. 83(b), she or he is taxed when the shares vest. By way of contrast, restricted stock units are promises to transfer shares of the firm's stock to the holder if certain criteria are met. These instruments have no purchase or exercise price and do not represent actual ownership interests in the underlying shares. It follows that the holders may not exercise a right to dividends, voting, or other shareholder rights unless the instrument vests and the shares are transferred to the holder. Some start-ups, however, permit dividends to accrue on restricted stock units so that if the instrument is ever converted into shares, the startup employee receives all the dividends that she or he would have earned had she or he held the underlying shares. Because restricted stock units are technically promises, the holder does not pay federal income tax on the instrument unless the shares are actually delivered. Counsel for both the employee, employer, and the union, if any, should note, however, that once the shares are set for transfer, they should be delivered promptly lest the holder be subject to negative tax consequences under 26 U.S.C. 409A. For this reason and the fact that restricted stock units often come with hefty administrative costs, these instruments are usually reserved for more mature firms.

Stock options are either treated as non-qualified stock options or incentive stock options for tax purposes. Non-qualified stock options can be offered to both firm employees and individuals who provide services to the firm, are not subject tot a monetary issue limit, and can be granted in tandem with an incentive stock option. In terms of tax treatment, non-qualified stock options are generally not treated as favorably as incentive stock options in part because they can be granted with an exercise price that is less than the fair market value of the shares on the grant date. This generally causes adverse consequences for the instrument holder under 26 U.S.C. 409A. Non-qualified stock options are taxed either on the date the option is granted or the date the option is exercised but not on both dates. If the option has a readily ascertainable fair market value on the date of the grant, it will be taxed at the ordinary income tax rate. An option has a readily ascertainable fair market value if the option is traded on an established secondary market or if the fair market value can be measured with a generally accepted fundamental valuation method. On the other hand, if the option – like most stock options – does not have a readily ascertainable fair market value at the time of the grant, it will be taxed at the ordinary income tax rate once it is exercised. Here, the taxed amount will be equal to the difference between the exercise price and the fair market value of the shares on the date the option is exercised. Luckily for the firm, it will also be able to deduct the income the option holder recognizes in the year that she or he exercises her or his right.

Incentive stock options are subject to different – yet more favorable – rules. Incentive stock options are not subject to 26 U.S.C. 409A and are preferentially taxed on a capital gains basis. Incentive stock options also receive additional favorable tax treatment if the option is held one year from the date of exercise or two years from the grant date. If the holding period requirement is met, an option holder will not recognize income when the Incentive stock option is granted or when the option is exercised. Instead, federal income tax will be assessed once the shares are sold. To qualify for favorable tax treatment, the option must also be granted to an employee, be exercised while the option holder is an employee or within three months of the last employment date; be non-transferrable except under the laws of descent and distribution; not exceed a ten year term;[18] be granted under an approved stockholder plan that states how many shares can be issued under the plan and which employees can participate in the plan; and be limited to $100,000. Because of high administrative costs associated with incentive stock options, most non-renewable energy, private equity, and sports startups grant the instruments to their employees as the price of its common stock is rising but before the firm becomes profitable. Firms, however, may not deduct the income the option holder recognizes from the incentive stock option.

Stock appreciation rights are somewhat similar to options but differ in two important ways. First stock appreciation rights permit an employee to receive cash or stock equal to the amount that a share of employer stock has appreciated from the grant date to the date the right is exercised. Second, stock appreciation rights – just like restricted stock and restricted stock units – cannot be exercised until a restriction – typically a time restriction – passes. Stock appreciation rights are taxable to the holder so long as the stock appreciation right's exercise price is not less than the fair market value of the underlying stock on the grant date and the stock appreciation right does not include any additional deferral features. If the appreciation right meets these requirements, it will be exempt under 26 U.S.C. 409A.

Phantom stock is the last form of peculiar compensation that is typically provided to non-renewable energy, sports, and private equity start-up employees. Phantom stock is equity compensation that is linked to employer stock. Here, the recipient is given an account that is credited with virtual shares that increase or decrease in value based on the performance of the employer's stock. If the account vests, the employee will then receive the actual underlying stock or the cash value of the equity instruments. The holder must be federal income tax on the account once it vests or, if payment is deferred, on actual payment. In the latter instance the holder may also be subject to negative tax consequences under 26 U.S.C. 409A.

As a final point, startups can often save substantial wage, tax, and other costs by hiring independent contractors rather than employees. In determining whether an individual has been properly classified as an independent contractor will look at three primary factors: which party has the right to control the manner in which work is performed, which party has the right to control economic aspects of a worker's activities, and the relationship between the parties. For the first factor, the IRS will focus on the type and degree of instructions that the startup gives to the contractor, whether the contractor is required to use company equipment, the performance assessment system for the contractor, how employee policies and procedures are applied to contractors, and how contractors are trained if at all. For the second factor, the IRS will examine the employer's right to control economic aspects of the contractor's activities, the contractor's degree of investment, the employer's reimbursement of business expenses incurred by contractors, the contractor's

---

[18] This ten year term is reduced to five years if the employee holds more than 10% of the firm's stock

opportunity for profit or loss, the contractor's ability to service multiple clients at the same time, and the method of payment that the employer uses to compensate the contractor. Finally, for the third factor, the IRS will scrutinize written contracts between the contractor and employer, employee benefits that are provided to the contractor, the permanency of the relationship, whether the contractor's services are provided through a corporate entity or through an individual service provider, and whether the contractor provided services to key aspects of the business. The contractors should complete IRS Form 1099-MISC (See Appendix XXX). While this multi-factor test is admittedly unwieldy, compliance is critical as failure to properly classify contractors can result in newly founded businesses owing back wages, overtime pay, back taxes, insurance obligations, and other employee benefits.

## Section 363 Distressed Private Equity Sales

To participate effectively in a §363 bankruptcy sale, a prospective buyer must work towards ensuring that the transaction closes and maximize the estate's recovery. The first goal can be achieved by exercising restraint when annotating transaction documents and terms that will be forwarded to the other parties. Since every edit creates a potential negotiation issue and uncertainty for the debtor and other shareholders, a real advantage can be secured by using as little red ink as possible, working through the document as it has been presented, and refraining from re-writing or replacing provision in their entirety unless they are beyond repair. This is especially true for edits to working capital adjustment provisions, closing conditions clauses, and the representations and warranties in the purchase agreement. The working capital provisions need not be amended too drastically because by the time outside counsel has obtained them, the clauses have been approved by the debtor's board of directors, the secured lenders, the unsecured creditors' committee, and counsel for each of these three parties. Here, any amendments would also require the approval of each of these four parties. The addition of closing conditions in the purchase agreement is counterproductive because it can decrease closing certainty. Finally, while the inclusion of a representation and warranties section in a purchase agreement is standard fair, in the context of §363 sales, most private equity firms forego these clauses and rely on their due diligence and the liability cleansing effects of the §363 transaction. On the other hand, to maximize the estate's recovery, the buyer's counsel should eliminate purchase price holdbacks and escrows and eliminate purchase price adjustments. Purchase price holdback elimination is helpful because buyers often include these holdbacks to secure payment of post-closing debtor obligations. However, in valuing the buyer's bid, the debtor may simply assume that the estate will never receive the holdback. The result is that buyers can enhance the value of their bid by eliminating the holdback altogether. Finally, assuming the buyer is comfortable with its valuation method and the firm's working capital provision, the buyer can add certainty to the purchase price by eliminating any purchase price adjustments.

## Anti-Dilution Clauses in Private Equity Transactions

Anti-dilution provisions are investment protection devices that are common in private equity transactions. Because private equity investments can be long term, illiquid, and  not provide voting rights in the underlying firm, investors often request that the target provide them with convertible preferred stock, convertible debt securities, or common stock warrants and include an anti-dilution provision in the purchase agreement. Anti-dilution provisions protect investors by adjusting the conversion or exercise price for the convertible securities and modifying the securities that can be returned for the convertible instruments and are triggered most often either when a dividend is paid

on the firm's common stock or when a merger occurs. Because stock dividends and stock splits can increase or reduce the economic value of all outstanding common stock as well as unissued common stock underlying common stock-equivalent securities on a per-share basis, anti-dilution provisions are designed in part to protect investors from these effects by proportionally adjusting the number of shares underlying an investor's stock option, warrant, or convertible securities to match the adjustment made to outstanding shares at the time the dividend is released. If the anti-dilution provisions is designed to protect investors from adjustments that occur after a merger, the clause will protect investors against changes the in the firm's capital structure that impact its common stock. Here, counsel for one of the firm's minority investors often want to ensure that her or his client has enough flexibility to exercise redemption rights; can convert common stock equivalent securities into common shares ahead of the merger and can receive the securities and other consideration being paid in the transaction; can treat convertible preferred stock as a liquidation transaction where the client can receive payment of the liquidation preference; or, at the very least, can keep the common stock equivalent securities outstanding. There are three more types of special anti-dilution clauses that warrant discussion here: price protection clauses, weighted average clauses, and full ratchet clauses. The first clause is designed to guarantee that the investor's equity provision is not excessively diluted by the future direct or indirect issuance of common stock by the company by reducing the conversion or exercise price in the investor's common stock equivalent securities. In effect, the number of shares the investor is permitted to receive is increased in proportion to the reduction in the conversion or exercise price. Firms often resist the inclusion of price protection clauses because they can prevent the company from attracting investment capital and unfairly dilute the common stock of shareholders who do not have the protections given to the private equity fund. The thought here among many in house practitioners and law trained managers is that the private equity fund investors can protect themselves from price changes by exercising a pre-emptive right to convert its convertible securities and participate in the merger at a lower price to maintain its relative percentage ownership interest in the firm. The second clause, the weighted average clause, in general, reduces the conversion price for the convertible securities to the weighted average price per common share at which the firm has sold its securities. The weighted average price pers common share, in turn, is based on the number of shares of the firm's common stock that are currently outstanding – valued at the price used in the investor's original financing after this price has been adjusted by the anti-dilution clause. The formula for the weighted average clause here can either account for all shares that the firm currently has outstanding as well as the shares that it would have to release if all options, warrants, and convertible securities were exercised or, the number of shares that are currently outstanding alone. The former formula tends to benefit the firm while private equity investors benefit more from the latter formula. Finally, the last clause, the full ratchet clause, reduces the convertible security's conversion or exercise price to the price per share for stock that the firm has recently decided to release. Full ratchet clauses tend to be even more beneficial for private equity investors than weighted average clauses that account for only the number of shares that are currently outstanding because it reduces the conversion price to the lowest price used in the new security offering even if a *de minimus* number of shares are issued at that price. For this reason perhaps, these clauses tend not to appear in private equity contracts unless the investors have a quite a bit of bargaining power *vis-à-vis* the firm.  Most contracts, though, will contain exceptions to all anti-dilution provisions that will prevent the clause from being triggered on the future conversion of the common stock equivalent securities purchase by the investor; after the date of the current investment under any of the company's management incentive equity plans to

directors, officers, employees, or consultants of the company in connection with the company's services; or on the future conversion or exercise of common stock equivalent securities issued under any other prior financing round or under any management equity incentive plan that is outstanding at the time the investor's investment is made so long as the securities are not amended after the investment date to increase the number of common stock shares that can issued under those securities or to lower the securities' or options' exercise price. In house counsel here will often seek to add as many qualifications as it can to extend the exceptions to strategic acquisitions, equity kickers, underwritten yet registered public offerings, and joint ventures. Counsel for the private equity fund, on the other hand, will try to limit these exceptions – most commonly, by adding a cap to the number of shares that can be issued in the aggregate in connection with each exception or requiring each of the strategic initiatives that are included in the original exception to be approved by the company's reconstituted board of directors.

**Tax Consequences For Stock Acquisitions**

A stock acquisition that is taxed can be structured as a direct acquisition of all the target firm's outstanding stock where the target, more often than not, becomes a subsidiary of the buyer, a reverse merger, or a reverse triangular merger. A reverse triangular merger occurs when the buyer's newly formed or existing subsidiary merges with the target firm. After the event, the target firm survives and becomes the buyer's subsidiary. If the target is a S-corporation or C-corporation, purchasers can also elect to buy the target firm's stock and obtain a cost basis in the target's assets by electing to treat the transaction as an asset acquisition or asset sale under 26 U.S.C. 338(h)(10) or 26 U.S.C. 338(g) by completing IRS Form 8023 (See Appendix XXX). If this choice is selected, the stock sale is ignored for tax purposes and the target is treated as if it was making a taxable asset sale and then liquidating into the seller. This selection can be made in general if the purchaser is a C-corporation that owns at least 80% of the target or S-corporation, seller is not related to the buyer, and at least 80% of the target is purchased in a 12 month period.

If the target is a C-corporation, the firm's shareholders will inherit the target's pre-acquisition tax attributes resulting in a single level tax at the entity level.[19] Counsel should keep in mind, however, that this selection can result in higher state taxes, convert gains into ordinary income, increase the amount of any gain recognized by the seller if the seller's basis in the target firm's stock is over the target's asset basis, and prevent non-selling stockholders from recognizing any income, gain, or loss in the transaction.[20] For the buyer, she, he, or it will own all of the target's shares and acquire a cost basis in the target's assets. More than that, before 2023, counsel may be entitled to immediately deduct the entire property purchase price. Finally, the target firm will generally recognize taxable income, gain, or loss on the asset sale and can use net operating losses to reduce or eliminate the entity level gain recognized on the asset sale. The firm, however, will not recognize taxable gain or loss on a liquidating distribution to the seller because the seller owns 80% of the target firm.[21]

If the target is a S-corporation, any income, gain, or loss recognized on the asset sale will pass through to the target's shareholders who will report those items on their income tax returns and non-selling stockholders will recognize income, gain, or loss on the asset sale and liquidation.[22]

---

[19] 26 U.S.C. 381.
[20] Treas. Reg. 1.338(h)(10)-1(d)(6).
[21] 26 U.S.C. 337.
[22] 26 U.S.C. 1366; Treas. Reg. 1.338(h)(1)-1(d)(5).

The target's shareholders, however, will not recognize any additional income, gain, or loss because the shareholder's basis was increased or decreased by the amount of any income, gain, or loss recognized in the asset sale. Counsel should keep in mind, however, that this selection can result in higher state taxes, convert gains into ordinary income, and impose a tax on non-selling stockholders.  For the buyer, she, he, or it will own all of the target's shares and acquire a cost basis in the target's assets. More than that, before 2023, counsel may be entitled to immediately deduct the entire property purchase price. Finally, for the target, any income, gain, or loss on the asset sale will pass through and be taxed to the stockholder.

If the target is an S-corporation, before electing for treatment under 26 U.S.C. 338(h)(10), however, counsel should ensure that the transaction is not a multiple step qualified stock purchase, all the shareholders consent to the 338(h)(10) election, and that S-corporation one class stock requirement by providing payments of different consideration, that are not negotiated at arm's length with the buyer, to the shareholders.[23]

Assuming a 338(h)(10) election is not made and the stock acquisition is made, if the target is a C-corporation, in general, the target stockholders will recognize a taxable gain or loss on the sale of its stock equal to the difference between the amount realized on the sale and the stockholder's basis. These stockholders may also be subject to a 3.8% tax on net investment income.[24] On the other hand, the buyer will receive a basis in the stock equal to the instrument's purchase price. If the purchaser is a C-corporation or S-corporation and 80% of the target is owned by a corporation, both the buyer and seller may be able to treat the transaction as an asset acquisition under 26 U.S.C. 338(h)(10). Here, the target, in general, will not recognize a gain or loss on the sale or will retain the same basis in its assets.

On the other hand, if the target is a C-corporation, in general, the target stockholders will recognize a taxable gain or loss on the sale of its stock equal to the difference between the amount realized on the sale and the stockholder's basis. These stockholders, though, will likely not be subject to the 3.8% tax on net investment income. If the purchaser is a C-corporation or S-corporation and 80% of the target is owned by a corporation, both the buyer and seller may be able to treat the transaction as an asset acquisition under 26 U.S.C. 338(h)(10). Here, the target, in general, will not recognize a gain or loss on the sale or will retain the same basis in its assets. Corporate counsel, however, should be careful here because the S-corporation may lose its tax status if its stock is sold to an ineligible buyer or the target has too many shareholders after the transaction, *inter alia*.

Asset acquisitions are taxed under an alternative arrangement. These transactions typically occur in one of four forms. The transaction can be a direct acquisition where the buyer obtains the specific assets and liabilities of the target. The transaction can be a direct acquisition where the buyer obtains substantially all of the target's assets. The transaction can be a forward merger where the buyer assumes all of the target's assets, rights, and liabilities. Or, finally, the transaction can be one where the target merges into a buyer subsidiary where the subsidiary assumes all of the target's rights, assets, and liabilities.

If the target is a C-corporation, in general, the target stockholders will recognize a taxable gain or loss on the sale of its stock. The target will then distribute any sales proceeds as either a non-liquidating distribution or a liquidating distribution. Under 26 U.S.C. 301, non-liquidating sales

---

[23] Treas. Reg. 1.338(h)(10)-1(c)(3); 1.1361-1(l)(2)(v).
[24] 26 U.S.C. 1411.

distributions are treated as taxable dividends up to the amount of the target firm's current or accumulated earnings.[25] If the distributions exceed the target firm's current and accumulated earnings and profits, the remainder is treated as a non-taxable capital return up to the amount of the target company stockholder's basis in its shares. If the distributions exceed the amount of the target company stockholder's basis in its shares, the remaining portion is treated as a capital gain. Liquidating distributions, on the other hand, are treated as if they were a sale of the target firm's stock. Here, the target will recognize a capital gain or loss under 26 U.S.C. 331 unless the shareholder is a C-corporation that owns at least 80% of the target. The buyer will obtain a basis in the acquired assets equal to the purchase price for the items plus any assumed liabilities. While a cost basis is often higher than the basis that the target firm had in those assets, the basis will decrease if the target firm's basis in its assets exceed their fair market value. If the purchaser is a C-corporation or S-corporation and 80% of the target is owned by a corporation, both the buyer may be able to treat the transaction as an asset acquisition under 26 U.S.C. 338(h)(10).  Finally, the target firm, in general, will recognize a taxable gain or loss on the sale of its assets equal to the difference between the amount realized on the sale and the firm's basis in the items. Any net operating loss that is left over can then be used to reduce or eliminate gain that is recognized on the asset sale or offset any future taxable income in future tax years.[26]

On the other hand, if the target is a S-corporation, any income, gain, or loss recognized on the asset sale passes through to the target firm's shareholders who will then adjust their basis in the stock accordingly.[27] Here, the calculation of any income, gain, or loss on the asset acquisition is done by the firm on an asset by asset basis. If the target liquidates after the asset sale, the firm's shareholders will not recognize any additional income, gain, or loss because the shareholders' basis in their stock was increased or decreased by the proper amount in the asset sale. If the purchaser is a C-corporation or S-corporation, the buyer may be able to treat the transaction as an asset acquisition under 26 U.S.C. 338(h)(10). While one of the benefits of S-corporation tax status is that it permits the gain or loss to be taxed at the shareholder level, if the target used to be a C-corporation or acquired the assets of a C-corporation in a tax-free transaction, there may be a tax that is assed at the firm level. More specifically, an S-corporation will be subject to a 21% tax on any built-in gains if the gains were recognized during a specified recognition period.[28] The period here starts after the S election takes effect or the date of the tax-free acquisition.

Tax free stock acquisitions are covered by a separate set of rules. Here, both the buyer and seller each must be either a C-corporation or S-corporation, the buyer's stock or the stock of a buyer affiliate must be used as consideration for the deal, and the transaction must qualify as a tax-free reorganization. To qualify as a tax free reorganization, generally the buyer's stock or the stock of the buyer's affiliate must be between 40% and 100% of the consideration and have voting rights. If the selling stockholder receives consideration other than qualifying stock – referred to tax attorneys as boot – the stockholder may be taxed on the receipt of the boot. The firms must also have a reorganization plan, business purpose, and a continuity of business enterprise. If the buyer acquires the target's stock solely in exchange for target's voting stock and then has control of the target;[29] a parent's subsidiary obtains the target's stock solely in exchange for the parent's voting

---

[25] 26 U.S.C. 316.
[26] 26 U.S.C. 172.
[27] 26 U.S.C. 1366.
[28] 26 U.S.C. 1374.
[29] 26 U.S.C. 368(a)(1)(B)

stock and then the subsidiary controls the target;[30] or the parent's subsidiary merges into the target in exchange for the parent's voting stock and other permissible consideration,[31] the reorganization will be treated as a stock acquisition for tax purposes. No boot is permitted in the first two of the three transactions described above.

For tax free stock acquisitions, if the target is a C-corporation, the target's shareholders will not recognize a taxable gain or loss on the stock exchange and can take a carryover stock basis received in the transaction.[32] If the parent's subsidiary merges into the target in exchange for the parent's voting stock and other permissible consideration, the shareholders will be taxed on their boot if the boot is either a capital gain or dividend.[33] These stockholders may also be subject to a 3.8% tax on net investment income.[34] For the buyer, she, he, or it will generally not recognize any gain or loss on the transaction.[35] For the seller, she, he, or it will also not recognize any gain or loss in the transaction and will have an unchanged asset basis.[36] If the target is an S-corporation, the tax treatment for the target's shareholders depends on whether 26 U.S.C. 356 or 26 U.S.C. 1368 applies. If the former applies and the parent's subsidiary merges into the target in exchange for the parent's voting stock and other permissible consideration, the shareholders will be taxed on their boot if the boot is either a capital gain or dividend. On the other hand, if 26 U.S.C. 1368 applies, any boot the S-corporation shareholder receives may be tax-free. For the buyer, she, he, or it will generally not recognize any gain or loss on the transaction.[37] For the seller, she, he, or it will also not recognize any gain or loss in the transaction and will have an unchanged asset basis.[38]

In the alternative, the client may elect to treat the transaction as a tax-free asset acquisition. Here, both the buyer and seller each must be either a C-corporation or S-corporation, the buyer's stock or the stock of a buyer affiliate must be used as consideration for the deal, and the transaction must qualify as a tax-free reorganization. To qualify as a tax free reorganization, generally the buyer's stock or the stock of the buyer's affiliate must be between 40% and 100% of the consideration and have voting rights. If a merger is executed with stock that has voting rights, continuity of business enterprise, and a business purpose;[39] the buyer obtains "substantially all" the assets of the seller in exchange for the target's voting stock and the target then liquidates; a parent's subsidiary obtains "substantially all" of the target's assets in exchange for the parent's voting stock and the target then liquidates; the target merges into the subsidiary in exchange for the parent's stock and other permissible consideration, the subsidiary assumes the target's assets and liabilities, and the target ceases to exist; or the buyer acquires "substantially all" of the target's assets, the firms have a continuity of business enterprise and a baseness purpose, the target has control of the acquiring firm immediately after the asset transfer, and the target must liquidate and distribute the acquiring firm stock and any other consideration received by the target, the transaction can be treated as a stock acquisition for tax purposes.

---

[30] Id.
[31] 26 U.S.C. 368(a)(2)(E).
[32] 26 U.S.C. 354 and 358.
[33] 26 U.S.C. 356.
[34] 26 U.S.C. 1411.
[35] 26 U.S.C. 1032.
[36] 26 U.S.C. 361.
[37] 26 U.S.C. 1032.
[38] 26 U.S.C. 361.
[39] 26 U.S.C. 368(a)(1).

For tax free asset acquisitions, if the target is a C-corporation, the firm's shareholders will not recognize a gain or loss on the receipt of the acquiring firm's stock.[40] The shareholders will be taxed on their boot if the boot is either a capital gain or dividend. The amount taxed here will be equal to the lesser of either the boot or the total gain on the transaction. These stockholders may also be subject to a 3.8% tax on net investment income.[41] For the buyer, she, he, or it will not recognize gain or loss in the transaction and will obtain a carryover basis in the target's assets.[42] Finally, the target will not recognize a gain or loss in the reorganization.[43] If the target is an S-corporation, the tax treatment for the target's shareholders depends on whether 26 U.S.C. 356 or 26 U.S.C. 1368 applies. If the former applies and the parent's subsidiary merges into the target in exchange for the parent's voting stock and other permissible consideration, the shareholders will be taxed on their boot if the boot is either a capital gain or dividend. On the other hand, if 26 U.S.C. 1368 applies, any boot the S-corporation shareholder receives may be tax-free. For the buyer, she, he, or it will generally not recognize any gain or loss on the transaction.[44] For the seller, she, he, or it will also not recognize any gain or loss in the transaction and will have an unchanged asset basis.[45]

**Exclusivity Agreement**

In private equity acquisitions and auctions, an exclusivity agreement (for law trained readers this contract is sometimes referred to as a 'no-shop' agreement by transactional attorneys) is an agreement by one party not to negotiate with anyone other than the other party to the exclusivity agreement for a set period of time. Much like a term sheet or confidentiality agreement, the exclusivity agreement is entered into before the main acquisition agreement is signed. Auction exclusivity agreements typically last from two to thirty days. If counsel or a private equity analysis is participating in an auction process, the signing of the exclusivity agreement signifies the end of the initial bidding stage. Exclusivity agreements tend to benefit buyers more than sellers because these contracts permit the buyer to conduct and complete due diligence and negotiate the transaction without worrying about competing buyers, obtain financing and shift leverage in the negotiations. For law trained readers, exclusivity agreements usually include clauses covering the contract's duration, a covenant clause to ensure ongoing exclusivity after the signing of the acquisition agreement, a negative covenant restricting the seller from 'shopping' the target to other buyers during the exclusivity period, a clause covering consideration of the time and expense the buyer incurs with the transaction, provisions for extensions, and a fiduciary out. Finally, because many American States impose a requirement on incorporated firm board's to exercise a duty of care before entering into an acquisition agreement or merger, counsel for the fund may have to ensure that the board can consider other superior offers after signing the no-shop covenant.

**Confidentiality Agreements in Private Equity Mergers and Acquisitions**

In private equity transactions, a confidentiality agreement places the parties on notice that certain matters are confidential and clears misunderstandings as to what actions the parties can engage in during the initial stages of the deal. If the transaction is a joint venture or M&A deal where the

---

[40] 26 U.S.C. 354.
[41] 26 U.S.C. 1411.
[42] 26 U.S.C. 362.
[43] 26 U.S.C. 361.
[44] 26 U.S.C. 1032.
[45] 26 U.S.C. 361.

buyers will issue equity as consideration, it is more common for the parties to use a mutual confidentiality agreement. By way of contrast, if the private equity transaction is using cash consideration, chances are that a unilateral confidentiality agreement will be used because only the seller has to disclose confidential information. Management should note, though, that even in matters where counsel is included to provide a unilateral confidentiality agreement, a mutual agreement may be more fitting because each party may provide information to the other at some point during the deal; mutual confidentiality agreements are more balanced than unilateral forms; and there are matters besides actual business information that both parties want to keep confidential. Any confidentiality agreement should be signed ideally before disclosures are made and, if disclosures made prior to the agreement's signature, the agreement should relate back to those disclosures. It is good practice to separate a confidentiality agreement from a term sheet because a party may need to conduct due diligence on non-public information before disclosing the term sheet; term sheets often take a long period of time to negotiate; confidentiality agreement clauses can be quite lengthy, and if the parties decide to forego a term sheet and do not have a separate non-disclosure agreement in place, information may be disclosed without any contractual protection. In any event, if the parties do include a confidentiality agreement in the term sheet, the confidentiality agreement should be binding because many term sheets are not binding. On the other hand, if the term sheet is negotiated after the confidentiality agreement has been signed, the term sheet should declare that it does not supersede the non-disclosure agreement. If private equity counsel is drafting the non-disclosure agreement for a publicly listed firm, she or he should consider adding a standstill agreement restricting the buyer from making unsolicited bids on the firm and ensure that the terms of the agreement comply with the confidentiality exception to Regulation FD under the 1934 Securities Exchange Act. Counsel should keep in mind, though, that while non-disclosure agreements can be helpful, they cannot prevent wrongfully disclosed information from being undisclosed and generally only provide monetary damages in actions where a party successfully provides that a confidentiality agreement has been breached unless a clause providing for injunctive relief has been included in the contract. Agreements are typically drafted to include the seller's business information; the seller's trade secrets; derivatives of the seller's business information; the fact that the parties are discussing a transaction and the status of the negotiations; and the actual terms of any potential transaction while excluding information that was already in the recipient's possession; information that was independently developed by the recipient without the use of the confidential information; information that was or became available to the recipient through a third party not bound by a confidentiality agreement or other fiduciary obligation; information that was or became available without a breach of the non-disclosure agreement; information that must be provided to a bank or other lending source to secure financing; and disclosures that are required by state, federal, or international law. Non-disclosure agreements can also extend to third party representatives of a contracting party. Here, the recipient will typically be responsible for unauthorized disclosures by its representatives. A special set of disclosure rules ought to apply in matters where the buyer and the target are direct competitions. Here, if there is certain information among the parties that is rather sensitive, the parties may consider signing a separate non-disclosure agreement with much more specific provisions and controls on the disclosure of that information. Among those non-disclosure agreements that are limited to a set term of years, the contract usually last one to two years. Disclosing parties also need to guarantee that they have rights to the return of their confidential information on the termination of negotiations among the parties, at the end of the agreement term, or at any time upon the disclosing party's request. In the alternative, the parties can stipulate to the destruction,

rather than return of, the confidential information to prevent the buyer from disclosing its own confidential information. Document recipients also have a penchant for including clauses that permit them to hold on to disclosed documents to satisfy the firm's document retention policy. Of course, counsel must also include an entire agreement clause; assignment clause; choice of law, jurisdiction, and venue clause; a notice provision; and an amendment and waiver clause. In addition to the aforementioned provisions, the parties may also included clauses stipulating that no representations or warranties are made with respect to the disclosed information until a definitive agreement is signed;  preventing the buyer from hiring the seller's employees for a certain period of time; if the target is publicly traded, a clause preventing the buyer and its representatives from buying or selling the firm's securities if they have material, non-public information; preventing the buyer from forming a group of bidders who participate in an acquisition collectively; preventing deal announcements unless the press release is agreed to by both parties; clarifying that no licenses are being granted in the disclosed information; and a clause requiring all the contracting parties to notify the other contracting parties if there is an unauthorized disclosure under the confidentiality agreement;

**Private Equity Issues in Mergers and Acquisitions**

Because the previous section provided a brief foray into the tax consequences of stock and asset acquisitions, and both of these transactions often occur in the context of private mergers, this section will provide a cursory overview of a few mechanisms that are common in private mergers that involve private equity funds. One of these devices is the so-called 'earn out' or a device that indexes the target's purchase price in part to the target's performance over a period of time after closing – usually one to three years. The earn out will typically be paid once certain specified targets – such as minimum earnings before interest deduction, taxes, depreciation, and amortization (a metric known as EBITDA among accounting nerds and investment banking analysts), gross revenue, net income, earnings per share, net equity, or a minimum number of new customers – are met within a specified period. The earn out itself will typically be a flat amount, a multiple of an amount that the target exceeds, a percentage of the earn out target specified, or a figure based on an agreed upon formula that the buyer can pay in either cash or stock. If the earn out is based on a formula, the buyer will want to place a cap on the amount while the seller will want to set a minimum amount. If the buyer pays the earn out in stock, the parties will have to agree on whether the securities will be registered under the 1933 Securities Act; whether the target will get registration rights, tag-along rights, rights of first refusal, rights of first offer, or preemptive rights; and whether the stock will be valued at the closing date, the date that the target's performance is measured, or the date the earn out payment is made.

While targets prefer revenue-based measures that do not account for costs and expenses and longer earn out periods, most buyers opt for metrics that are linked to net income and express a preference for a shorter earn out period.[46] If the target does not meet these benchmarks, the buyer is relieved of its obligation to make the incentive payment. Earn outs are quite common where the parties cannot agree on the target's value because the target has little operating history but a high growth potential, the target is predicated solely or for the most part on a new product or technology, the target has experienced a temporary earnings drop, or the target is operating in a volatile industry. The target may opt for an earn out because it obtains a chance to obtain a higher purchase price

---

[46] See, e.g., Sonran Scanners, Inc. v. PerkinElmer, Inc., 585 F.3d 535 (1st Cir. 2009); Horizon Holdings LLC v. Genmar holdings, Inc., 387 F.3d 1188 (10th Cir. 2004).

while taking advantage of whatever economies of scale or synergies that may be achieved by merging with the buyer. On the other hand, the target's management will likely remain invested in the firm after closing, will be vulnerable to the buyer's actions, and can be used by the buyer to offset clever indemnification claims that is has to defend in the purchase agreement. The calculus for the buyer, expectedly, is somewhat different. Here, the buyer may prefer an earn out because the device apportions risk, motivates some seller's to remain with the firm, defers payment on part of the purchase price (which can be helpful if credit markets are tight and debt financing is limited), protects the buyer from overpayment, and, as mentioned earlier, can be used to offset indemnification claims. Buyers, however, may be wary of earn outs because they can restrict the firm's control over the target and be detrimental to the target in the long term as the retained management seeks to accomplish the benchmarks at the long-term expense of the company. In structuring the earn out, the parties must determine the targets and ensure that they are clearly defined, objective, easy to measure, compatible with the target's operations, and adaptable in case the target encounters a foreseeable contingency. The parties should also specify who will prepare the financial statements and calculations, whether Generally Accepted Accounting Principles (GAAP) will be used in preparing the statements, whether the other party will have the opportunity to review the buyer's financial statements and calculations, the procedures that will cover dispute resolution, the scope of any independent accountant review (if any), and how the parties' accountants will treat post-closing acquisitions and costs and expenses shared between the target and buyer. Counsel for the target in particular should strongly consider including a liquidated damages clause in the purchase agreement contract as most federal courts as well as State courts in New York and Delaware are often hesitant to speculate as to what the earn our payment would have been if the buyer had not breached the agreement. Indeed, even if the buyer is found to have breached the agreement, the target may not be able to recover any damages unless it can prove that it would have been entitled to an earn out payment.[47] Targets may also request that the buyer post collateral for future earn out payments in the form of an escrow account, a security interest in the target's assets or stock, or a guaranty insured by the buyer's parent corporation and that any form of collateral be free of negative covenants that could prohibit earn out payments or a contract clause that could subordinate earn out payments to any lender rights. If the earn out is paid, the seller will also have to concern itself with the funds' tax treatment. Tax treatment here is critical because if the payout is classified as a deferred purchase price, assuming the payout is made in stock, the funds will be taxed at the preferential capital gains tax rate.[48] The sellers are generally able to select this option if they are not performing services for the buyer or target after the stock acquisition. Here, the income will be recognized once the earn out payments are made so long as at least one payment is received in a tax year after the sale year, the target's stock is not traded on an established securities market, and gain is recognized on the sale.[49] However, if the firm does not want to recognize the payment at the time it is made, it must express that wish to the IRS[50] and recognize a gain equal to the amount realized on the sale and its stock basis. The amount realize includes the fair market value of the right to receive the future earn out payments. On the other hand, if the aforementioned conditions do not apply, the payments will be classified as compensation income and taxed at ordinary income tax rates. If the buyer and seller do not include a clause in their purchase agreement covering interest on the earn out payments, a sliver of each

---

[47] See, e.g., LaPoint v. AmeriSourceBergen Corporation, 2007 WL 2565709 (Del. Ch. Sept. 4, 2007).
[48] 26 U.S.C. 1(h)(1); 26 U.S.C. 1411.
[49] 26 U.S.C. 453.
[50] 26 U.S.C> 453(d).

payment will be treated as interest for tax purposes and taxed at ordinary income tax rates to the seller. The buyer will be able to deduct these amounts on its federal income tax return. Finally, counsel for both parties should be aware of the possibility that the Securities and Exchange Commission may seek to classify any earn out payment as a 'security' subject to the reporting and disclosure requirements of the 1933 Securities Act. While registration exemptions are often available, even the process of applying for an exemption can be burdensome and avoided at the outset by ensuring that the earn out right is an integral part of the consideration received in the transaction, does not take the form a certificate or instrument, odes not bear a state interest rate, does not grant the holder voting or divided rights shared by owners of the firm's common or preferred stock, does not represent an equity or ownership interest in the buyer or target, and is generally not assignable or transferrable.

**Growth Equity Investments**

A growth equity investment is a private equity transaction that involves a sponsor's investment in illiquid, non-publicly traded securities issued by a privately held growth company usually, but not always, for a minority interest in the firm. The sponsor in most transactions is a late-stage venture capital investor, traditional institutional venture capital investor, specialist growth equity private equity firm, a traditional buyout firm, or a corporate strategic investor.

Growth equity investments differ from venture capital investments in that the former involves large and diverse groups of existing stockholders such as seed investors, angel investors, early stage institutional venture capital investors, founders, former and current management members, and other service providers; extensive due diligence; complex investment pricing; sophisticated investment structures; favorable equity terms; full sets of stockholder rights and protections; less risk; and diverse exit strategies. These investments can also be more complicated than other types of minority-control investments because they involve firms with longer firm operating histories, larger and more complex balance sheets, different classes of existing shareholders, liquidity structures for existing stockholders, and investor leverage. The investment typically finances a recapitalization, existing stockholder liquidity, or the expansion or accelerated growth of the firm's business. The target here will typically have an established business model, revenues, operating profits, but not enough operating cash to fund its business objectives or enable it to borrow the funds or raise capital in public debt or equity markets. While the buyer will provide strategic and operation support to the acquired target after closing, because growth equity sponsors rely on the existing management team to oversee strategy and operations, both the quality of the management team and sufficiency of management equity ownership to align investor and management incentives are important considerations during deal negotiations.

Because targets in growth equity transactions tend to have longer operating histories and larger and more complex balance sheets than early stage start-ups, growth equity investments usually require more due diligence on the firm's current equity capitalization and its issued and outstanding securities; existing shareholder rights; company liabilities; and Hart-Scott-Rodino compliance. When it comes to existing equity capitalization, junior associates will typically be tasked with compiling tables displaying the number of issued and outstanding shares in existing common stock classes; the common stock classes issuable under management or employee equity incentive plans; convertible preferred stock series with senior liquidation preferences; and warrants or other stock equivalents exercisable for common stock or preferred stock issued to lenders or investors as equity kickers or third-party strategic partners, customers, suppliers, or other parties

with whom the target has had a commercial relationship. Here, counsel should review the firm's stock ledger, stock certificate copies, board minutes regarding stock issuance, corporate charter, certificate of designation, stockholder agreements, warrant agreements, equity plan documents, and award agreements and copies of all documents and agreements relating to the issuance of equity by the firm. In reviewing this information private equity counsel should verify all issued and outstanding convertible securities including all series of preferred stock, convertible debt, and warrants and the number of common stock shares underlying these securities based on the applicable conversion or exercise prices; any stock splits, reverse stock splits, recapitalizations, or similar firm events affecting the number of outstanding shares; all issued and outstanding common stock shares including voting and non-voting classes of stock; the proper authorization and issuance of all capital stock shares; all management and employee equity incentives including all shares underlying outstanding equity incentive awards as well as all reserved but unissued shares under stock option plans and similar incentive plans; and all anti-dilution provisions in ant convertible securities or warrants. This information is needed to properly price the buyer's investment, determine how much equity ownership it should receive for its investment, structure the securities it will purchase in the investment; and requests its required preferences, privileges, and contractual rights and protections. The thought here is hat the more shares of common stock that are determined to be outstanding and that are included in the calculation of pricing the sponsor's shares, the lower the price per share and the more shares issued to the sponsor for the investment. In any event, the firm should be required to make representations and warranties in the securities purchase agreement for its equity capitalization.

Due diligence into the relative liquidation preference of the securities is important because it assists the buyer in calculating the value for the investment and structuring the transaction. Here, private equity counsel should ensure that she or he is reviewing the most recent charter documents of the firm including all amendments to the incorporation certificate and designation certificate for preferred stock; verify all outstanding shares of each series of preferred stock; calculate the total dollar amount of any liquidation preference for each series including accrued and accumulated dividends; and identify the relative liquidation preference per share of all outstanding series of preferred stock including accrued and unpaid dividends that are accumulated to the liquidation preference. When it comes to due diligence on existing stockholder rights, counsel should be particularly attentive to registration rights giving existing shareholders the right to participate in or require a public offering of the firm's equity securities; drag along rights giving the existing shareholders the right to force the sale of the entire firm; redemption rights permitting existing investors to sell their securities back to the firm under certain conditions; stock transfer rights that can be triggered for certain growth equity investment structures involving stock transfers by existing stockholders; anti-dilution provisions that can require the issuance of more company securities to existing investors if the growth equity investment is a down round investment; pre-emptive rights or pay-to-play provisions giving existing investors the right to purchase their pro-rate portion of the new securities being purchased by the buyer; board designation rights that can make it more difficult for the sponsor to negotiate the percentage of board seats it desires; and negative covenants or veto rights that can give existing investors the right to block company issuance of additional debt or equity instruments.

Due diligence into the target's debt offerings involves different concerns. Here, counsel should be concerned with any limits under the firm's debt documents on the use of proceeds from the growth equity investment and covenant restrictions that the firm must operate under that could limit the

target's ability to implement or change it business strategy. In most transactions, the firm is required to make representations and warranties in the securities purchase agreement about its existing indebtedness. Because the buyer typically bases its price on a calculation of the common equity value of firm before the investment, the fund will calculate the target's enterprise value, subtract outstanding preferred stock and funded debt from the enterprise value, and then adds the target's cash and cash equivalents. This figure is then used to calculate the price per share that it should pay for the investment and an estimate of the common ownership percentage the fund should receive for the investment. The price per share is calculated with equation one:

(1) Price per share = Pre-money valuation/Issued and Outstanding Shares of Common Stock (Accounting for all common stock equivalents, convertible debt, preferred stock, warrants, and equity incentives)

This figure is then used to determine the total number of stock shares hat will be issued to the fund for the investment. This figure is calculated by diving the total investment amount by the price per share. Because the fund's payout turns in large part on the number of shares the parties conclude that the target has outstanding, there are multiple ways to arrive at an outstanding share figure. Four methods in particular are prominent. The first method focuses on the number of issued and outstanding shares only. This option only includes issued and outstanding common stock and preferred stock but excludes all shares underlying other outstanding common stock equivalents such as outstanding convertible debt, warrants, and stock options. The second method focuses on a fully diluted measure of outstanding shares and includes outstanding equity incentives. This option includes all underlying shares that were issued and outstanding common stock equivalents as if the instruments had been converted or exercised. The third method focuses on a fully diluted measure of outstanding shares and includes all of the target's equity incentive plans. This option includes all common stock shares that are reserved under management or equity incentive plans that are not subject to outstanding awards and dilutes existing stockholders for the entire reserved equity incentive pool. The fourth method focuses on a fully diluted measure of outstanding shares and includes increases to all of the target's equity incentive plans. This option dilutes existing shareholders not only for the entire equity incentive plan but also, for the sponsor's proposed increase to the equity incentive pool. This option results in the lowest price per share for the fund and the highest percentage ownership for the sponsor's investment.

While many growth equity transactions are structured as direct purchases, other deals take the form of full or partial redemption recapitalizations; security exchange recapitalizations; or cross purchase exchange recapitalizations to increase the relative equity ownership of management, incentive future performance, increase the fund's relative ownership percentage and potential upside from the investment, and provide full or partial liquidity for founders who no longer active in the business. A redemption occurs when a firm – in connection with a growth equity investment – redeems outstanding securities from certain existing shareholders to affect a certain post-investment equity capitalization or provide liquidity to certain shareholders. Redemptions can either be full – where all an existing shareholder's securities are redeemed – or partial – where a portion of a stockholder's securities are redeemed. Redemptions are funded either with cash from the target or new debt securities released by the company. A leveraged recapitalization allows proceeds from the growth equity investment to be used for other purposes. In most cash redemption transactions, the fund will purchase convertible preferred stock or debt securities from the firm and the firm and the firm will use the investment proceeds to redeem all or part of non-management equity securities. On the other hand, if the redemption is for debt securities, the transaction will

occur at the same time as the growth equity investment. No equity rights, though, will attach to the issued debt instruments. The proceeds from the redemption can be used for other company purposes, the common equity ownership of the redeeming stockholders is reduced, and the percentage of fund and management shareholders in increased. Here, the fund and the target will focus on negotiating the interest terms on the debt; payment frequency; whether interest is paid in cash or payment-in-kind; whether the debt is secured; which assets will serve as collateral, if any; any covenant protections and default remedies; the liquidity priority of the debt relative to any other debt of the company; principal payments; and the final maturity date. A different set of rules applies to security exchange recapitalizations. A security exchange recapitalization can be a full exchange where all of a shareholder's existing securities are exchanged  or a partial exchange. This structure is usually used to readjust the target's post-investment equity capitalization so the sponsor and management own more of the target. This structure also allows the target to use the cash proceeds from the growth equity investment for other purposes. The fund and the target will focus on negotiating the dividend rate; payment frequency; whether the dividend is cumulative if not paid; mandatory redemptions, if any; potential put and call rights; the liquidation value of the preferred stock; the liquidation of the preferred stock relative to the securities purchased by the sponsor as well as any other outstanding series of preferred stock from the target; and covenant protections and remedies for non-compliance. Finally, a growth equity transaction can be structured as a cross purchase. Here, the fund will purchase equity securities directly from certain existing shareholders rather than making a direct investment in the target. The transaction here can be packaged as a full cross purchase where all of the fund's investment is made by purchasing other shareholders' existing securities or as a combination cross purchase and direct investment in the company. Both transactions usually involve the purchase a common stock or common stock equivalents to readjust the post-investment equity capitalization of the target so the fund and management own more of the firm.

When negotiating the investment deal, management will focus on securing a high return on invested capital; solidifying liquidation preferences; ensuring broad management oversight; incentivizing management; and guaranteeing control over liquidity. As with other minority investments, a fund entering a growth equity investment will often structure the transaction with convertible preferred stock or convertible debt securities. If the fund is purchasing convertible preferred stock, these instruments will often have peculiar liquidation preferences and dividends terms that distinguish them from securities that are purchased in other early stage private equity investments. On the former matter, the securities will usually have a liquidation preference senior to all other preferred stock or equity security series. On most occasions, the liquidation preference will include all accrued and accumulated dividends on the liquidation value. Less often the preference will be structured on a *pari passu* basis with an existing series of preferred stock especially if the investment is priced as a flat or up round. The liquidation preference can either be participating or non-participating. If the preference is participating, the investor is entitled to the liquidation value of the preferred stock and a pro rata share in the balance of the liquidation proceeds with the holders of the target's common stock and other common stock equivalents based on their respective ownership interests in the company. The participating preference can either be capped or non-capped at a set dollar amount or return multiple on the investment. If the preference is not participating, the investor will be entitled to the liquidation value of the preferred stock. Once the fund is paid, the balance of the liquidation proceeds will then be paid to the holders of the common stock and other junior securities according to their terms. When it comes to dividend structure, the private equity fund's investment will usually accrue a dividend on the preferred

stock's liquidation value. More than that, the dividend for a growth equity investment payable in current cash (or cumulative and compounded to the liquidation value of the preferred stock on a quarterly, semiannual or annual basis); and convertible into common stock; participating with the right to share on a pro rate as-converted basis in any dividends declared and paid on the target's common stock. In most growth equity transactions, the private equity investor will also structure its investment with broader shareholders rights and protections that other minority venture capital investments. There are five common shareholder rights that the fund will seek to acquire during negotiations. The first right focuses on price-based anti-dilution protection. Here, the fund will seek to secure the use of a broad based weighted average anti-dilution formula to protect its equity ownership position in the firm. The second right focuses on pre-emptive rights and pay-to-play rights. While pre-emptive rights are almost always included in a growth equity investment deal, pay-to-play provisions are less common. The third set of privileges concerns board rights. In growth equity investments, the investor typically receives a board designation right or, at the very least, a board observer right. Fourth, private equity funds making growth equity investments often request extensive negative covenants and affirmative covenants that include financial information delivery requirements. Finally, the fund will seek remedies for on-compliance.

**Due Diligence in Private Equity Transactions Generally**

In almost all transactions due diligence is conducted to minimize and allocate risk while creating value for the shareholders. With due diligence, the sponsor can confirm the target's business plan, operational capacity, workforce depth and abilities, customer lists, and product line; identify issues that may impact valuation currently or in the future, identify any pre-closing liabilities or other issues that should be counted for in structuring the transaction, the ability of the target's existing management to implement the fund's strategic vision for the target; and discover potential areas for growth. When evaluating customer lists, analysts should be attentive to comparisons between the target's vendor agreements and those of the target's competitors, the target's reliance on any one set of customers, the target's reliance on any one set of suppliers, the ability of suppliers and customers to terminate their agreements or modify their performance under the target's existing policy, and whether there are any news reports of health or safety concerns raised by consumers or patrons of the firm's goods or services. On the regulations side, counsel should inquire into whether the target is subject to any specific U.S. or U.K. regulations, whether the target is in compliance with these regulatory requirements, which regulatory filings the firm must submit, and the information that must be included in the filings.

Due diligence for private equity transactions is different from due diligence for most transactions that involve strategic buyers because the buyer usually has not operated in the target firm's industry for a prolonger period of time and is entering the transaction, most likely, to make a rather quick profit on an the investment that satisfies the fund's criteria. Most private equity transactions consist of an acquisition, equity financing, and debt financing. While the target will often provide the fund's counsel with a written report of her or his staff's due diligence (see below), the fund's counsel should also review third-party industry research reports, industry of company focused blog posts, acquisition agreements and related documents from prior transactions in the industry, trade association publications and websites, all available SEC filings from the target including the 10-K, and the target's pitchbook and confidential information memo. Because the buyer's investment decisions will be driven first and foremost by the expected financial returns that can be realized over the investment's course, most due diligence should be devoted towards focusing on the quality of the target's earnings. Here, reviewers should separate earnings that are attributable to

repeat events from income that is the product of a one-off event. With this information in hand a private equity analyst should be able to assist the fund in preparing a realistic business plan, setting the best purchase price, and the determining the best course of action for the deal. On the other hand, counsel for the fund should pay particular attention to change of control provisions in the target's contract, whether the private equity transaction would qualify as a control change under any outstanding contracts, assignment clauses in outstanding contracts, and whether any of the outstanding contracts automatically renew themselves upon the arrival of the termination date. Management documents must also be reviewed. These documents include purchase agreements, agreements on rolled over equity, incentive equity plans, compensation award agreements, change-of-control agreements, severance agreements, offer letters, bonus guarantees, employment contracts, and employment agreements. As it pertains specifically to employment related contracts, counsel should verify whether the contracts have to remain in place or be assumed by the fund once the transaction is consummated, whether the contracts require any consents or ancillary documents to be assigned to the fund, or whether the fund wants to modify any contracts as a part of the transaction. Finally, if the fund is considering the use a high amount of debt to finance the transaction, management should weigh the potential for higher returns against the risk associated with servicing high levels of debt and the likelihood that the target will not have a sufficient flow of cash to deal with the debt or will be unable to service the debt given current liabilities.

**Seller Due Diligence for Private Equity Firms**

In any merger or acquisition, counsel for the buyer will have to conduct due diligence on the target before signing a commitment letter. Through this due diligence process, the buyer will focus on factors that are relevant to the current transaction and issues that may arise after purchase. The process also allows the buyer to investigate potential liabilities and risks, confirm the target's value, prepare an business integration plan, learn about the target, identify potential impediments to the deal, and confirm that the seller has good title to the assets. For readers practicing in the United Kingdom, while this process is less formalized in the United States, most European merger and acquisition transactions feature a target who undergoes a formal due diligence that leads to a delivery od a report to the buyer. This process is particularly valuable for private equity firms compared to their peers in the non-renewable energy and sports sectors because private equity sponsors typically obtain a portfolio company to hold it for five to seven years before exiting from the investment. While the private equity firm may not be intimately acquainted with the portfolio firm's day to day operations or have a detailed understanding of the firm's history, potential buyers do value this information. Here, the private equity firm can use the due diligence process to identify the appropriate members of its internal and external deal team, make a positive impression on buyers, isolate opportunities to improve the portfolio firm's profitability in both the short term and long term, form an objective view about the firm, determine the best tax and legal structure for the deal whether it be an asset deal, stock deal, or merger by reviewing commercial issues, tax issues, and process and third-party consents, prepare question and document requests for negotiation, prepare a data room to streamline the process, provide the same information to the parties, and, perhaps most importantly for young associates avoid competing or conflicting diligence requests from different advisors, assist third parties in the transaction, prepare management for the sale process, and identify and address potential issues and areas. Counsel should review and summarize issues discovered during the due diligence process and identify the cost of not resolving the discovered problem, proposed solutions for the issue and the costs of the proposed solutions. During negotiation preparation, counsel should also attempt to anticipate the buyer's questions,

prepare responses, suggest compromises for particularly difficult issues. On the tax side, counsel should consider the cost basis of the acquired stock, if any, the holding period for the acquired stock, if any, any opportunities to carry forward net operating losses, and whether the transaction can be a tax-free re-organization. When evaluating third-party consents, especially in asset sales, counsel should look for whether consents are required for the proposed transaction, whether there are certain contracts that are important than others, and the best structure to convey those contracts.

**Management Compensation**

**Structuring Waterfall Provisions**

Waterfall provisions are included in partnership and limited liability company agreements and specify how a business entity distributes cash and other assets to partners and members. If the partnership of limited liability company does not adopt a waterfall provision, state partnership law will govern how distributions are made to partners. The Constitution State, for instance, permits partners to take home distributions in proportion to the value of their unreturned capital contributions unless the partnership or limited liability company agreement state otherwise. While the several States have adopted different rules for partnership compensation, most jurisdictions do permit firms to contract out of this default arrangement. Private equity fund partnership agreements typically negotiate waterfall provisions by addressing carried interest terms for the general partner, potential returns of all capital contributions made by the limited partners and the preferred return, catch-up distributions to the general partner, the general partner's obligation to return excess cash disbursements, *inter alia*. Most funds outside the real estate industry set the carried interest rate at 20% of the profits that would have been paid to the limited partners after the limited partners receive their invested capital and preferred return. A carried interest is an interest in the future profits of a private equity or investment fund that is granted to the general partner in exchange for managing the fund's assets. The thought here is that by providing the general partner with a share of the funds that would otherwise be payable to the fund's investors, the partner is given an inventive to maximize profits. Money flows into the private fund from capital contributions from the fund's investors. The money is then used by the private equity fund to make investments in portfolio companies and pay fees to the investment advisor. Once the private equity fund disposes of the assets, the funds are then distributed to the group's partners in accordance with the applicable waterfall provision. While waterfall provisions differ, in general most contracts provide that the capital contributions made by the fund's investors be returned to them with a small preferred minimum return on those contributions and that the remaining profits be divided among the investors and general partner on an 80%-20% ratio respectively,

Carried interest can come in three forms. First, deal-by-deal carried interest without loss carryforwards permit a general partner to receive her or his carry-on profitable deals without regard to losses from other deals inside the fund. Second, deal-by-deal carried interest with loss carryforward takes into consideration previously realized losses on deals that have been disposed of and write downs on investments that have not been sold as well as losses on deals that have transpired after the carry has been sent out. Here, the general partner must return excessive disbursements through clawback payments. Finally, a back end carry waterfall provision requires that investors receive their full invested capital back plus their full preferred return before the general partner receives any carried interest deduction. These clauses are quite common in venture capital agreements. Under this arrangement, because private equity funds make multiple investments and hold most or all of them for years, the general partner may not receive any interest

26

until the end of the fund's life. General partners are also more likely to recognize taxable income without receiving funds to pay these taxes under this arrangement. Under back end carry waterfall provisions, it is also possible for a general partner to receive excess carry when the fund returns committed capital that was previously drawn into the fund, distributes a carry to the general partner, and subsequently draws in the balance of committed capital but then suffers investment losses with those later capital contributions.

Regardless, all three of these private equity fund waterfall provisions generally provide for a priority return of all the limited partners' capital contributions and any of the general partner's capital contributions as well as a stated return for investors on their capital contribution before the general partner receives any carried interest disbursement. Outside of the real estate industry, this last rate is usually set at 8% and compounds every year.

There are some instances where a general partner of a private equity fund can receive profit distributions in excess of its stated carried interest percentage for those profits if the fund incurs unexpected liabilities, greater expenses as it matures, an early sale of profitable investments followed by losses generated by unprofitable investments, or a slowdown in the fund's profitability in later years. Clawback clauses, or contract clauses that require the general partner to return excess disbursements address this problem. These clauses are common with funds that have a deal-by-deal carry waterfall but are less common with funds that have a back-ended carry waterfall. In general, under a clawback clause, if the private equity fund investors have not received all of their capital plus their preferred return, the general partner must return the full carry unless this amount is lesser than the difference between the profits that the general partner has received and the amount the general partner should have received as carried interest. Because clawback obligations are due after the general partner's own partners have already paid taxes on the carried interest, clawback clauses account for tax liabilities in one of three ways. First, the clause can limit the clawback obligation to the difference between the total amount of carried interest distributed to the general partner minus the general partner's tax liabilities. Second, the clause can limit the clawback to the difference between the clawback obligation and the tax paid on that amount. Finally, the clause can limit the clawback to the clawback obligation minus taxes paid on that amount plus the amount of tax benefits received by the general partner's partners for paying the clawback obligation. While it is more common for the clawback to be calculated and paid once the fund is liquidated, some funds requirement the payment of an interim clawback.

Because the private equity fund's general partner is often a shell entity that does not have any material assets in excess of its right to receive the fund's carry, investors typically expect security for the general partner's obligation to pay any clawback obligation. Most funds provide this security by relying on personal guaranties from the general partner's owners because this mechanism covers 100% of the aggregate clawback obligation. Here, the general partner's owners usually guarantee clawback repayment on a several basis and the amount of each owner's personal guarantee is based on her or his share of the carried interest delivered to the fund's general partner. If the general partner's owner assigns a portion of her or his carried interest share to an estate planning vehicle, that owner remains responsible for the estate planning vehicle's obligation to contribute to the clawback. Likewise, if an owner transfers her or his right to receive carried interest distributions, the owner is nonetheless responsible for clawback contribution obligations. In the event that senior investment professionals or the institution sponsor is asked to assume clawback liability for all the individual carried interest recipients, which is not uncommon, the institution's individual non-guarantors are still required to contribute to the clawback fund if they

27

received clawback interest. Other private equity funds may use escrow accounts that hold a portion of the general partner's carried interest and permit the general partner to withdraw escrowed carried interest distributions if the value of the rest of the portfolio can cover any clawback liability.

Waterfall provisions, though, do not specify how the partnership allocates profits and losses for accounting and tax purposes into book entry capital accounts. For each partner, capital accounts reflect the capital contributions made by the partner, profits or losses allocated to the partner under the allocation provisions, or distributions to the partner from contributed capital and earnings according to the waterfall provisions. Firms can avoid IRS penalties and audits here by ensuring that the allocation of profits and losses to a partner either has substantial economic effect or is done according to the partners' interests in the partnership. For an allocation to have substantial economic effect, the partnership must maintain accounts in accordance with Treasury Regulations and make liquidating distributions according to positive capital accounts. Most firms attempt to satisfy these criteria by including forced allocation provisions in the organizational documents. These contract clauses allocate profits and losses to partners' capital accounts so that each partners' capital account is equal to the distributions that would have been made to the partner under the waterfall provisions had the partnership sold all of its assets at their current book value and then liquidated. More than that, when these contract clauses are included, liquidating distributions are not based on the partners' respective capital account balances, but rather, the amounts to be distributed among the partners.

Waterfall provisions are particularly valuable for private equity, non-renewable energy, and sports firms because they permit organizations to reward their general partners, managers, and other executives with special profits distributions for generating business. More specifically, private equity funds will often provide carried interest to the general partner if the fund's investments are profitable. And, in the mergers and acquisitions context, the target's management team will often collect profit interest distributions if the firm is successful. There are different tax implications for the fund depending on which compensation package the managers adopt. If the fund is a partnership, the income passes through the entity and is taxed to each of the partners individually. Here, counsel should pay particular attention to illiquid partnership interests that a partner must nonetheless pay taxes on even if she or he does not receive sufficient cash distributions from the organization to pay the tax liability. Partnership interests come in two categories. The first category is a capital interest, or an interest that gives the owner a right to a share of the funds' proceeds if the partnership assets were sold at their fair market value and the proceeds were distributed in a complete liquidation of the partnership. The second category is a profit interest, or an interest that gives the owner the right to receive a percentage of the funds' future profits. Carried interests are often structured as profit interests. Profit interest owners have no capital currently at risk in the venture and generally are free of obligations to contribute funds in the future. Here, all the owner can lose are the profits earned after the profits interest has been granted. Funds distributing profit interests may have the opportunity to permit a partner to contribute services to the fund in exchange for a tax free profit interest to the partner. On the other hand, if the profit interest is a carried interest, the owner will invest a small percentage of capital in the investment and receive a profit share that is disproportionate to the capital investment. If a partner elects to receive a profits interest instead of cash compensation, she or he can defer income until income or gain is realized by the partnership or convert compensation income into preferentially taxed long term capital gains so long as the filer satisfies a three year holding period.

28

Many waterfall provisions include a specific tax distribution provision ensuring that enough income will be distributed each year to cover the partners' expected federal and state income tax obligations. Indeed, most private equity funds provide disbursements to cover tax obligations to the general partner. For both these funds and limited liability companies that are used for buyout vehicles or joint ventures, these distributions are treated as an advance against future cash disbursements under the waterfall provisions and reduce those future disbursements.

If the general partner distributes the fund's assets in kind to investors, the fund will value the assets to be distributed and then provide each investor with the number of shares that she, he, or it would have received if all the securities and assets been sold for cash and the proceeds distributed to he partners.

When negotiating the waterfall provision, fund management usually concentrates on three issues: the priority return for the capital contributions, the nature of the preferred return, and the terms of the carried interest payments. On the first question, management must decide whether all capital contributions will be returned first or distributed on a deal-by-deal basis, how expenses will be allocated across investments for waterfall purposes if deal by deal distributions, whether investors will recover their share of all fund expenses or expenses will be allocated across fund investments, and how write downs will be treated. On the second issue, fund leaders must determine if the preferred return will be compounded and at what rate, whether the preferred return will be payable on all the amounts spent by the investors or only the invested amounts, the structure of the general partner's catch up, and the time period for determining how long capital has been outstanding for the purposes of calculating the preferred return. On the last question, the fund must decide whether there will be separate waterfalls that provide for the distribution of current income, whether there will be carry charged on short term investment proceeds, and the required coverage ratios.

By way of contrast, if the waterfall provision is negotiated for a private equity buyout in a limited liability company agreement, the parties will likely focus on the priority return for the invested capital and any preferred return, whether the securities are participating or non-participating, and the management profit interest terms. In a limited liability company structured buyout, the sponsor will obtain both preferred and common stock and, management will be warded common equity incentives in the limited liability company equal in the form of profit interests. Oftentimes, buyout waterfall provisions will entitle the preferred units to a liquidation preference before any payments are made to common stock holders. This preference guarantees that the sponsor will receive the lion's share, if not all, of its invested capital back in addition to any preferred yield before any remaining vale is shared with management. The issue of whether the securities are participating or non-participating is also consequential. A participating waterfall provision does not include a management catch up but a non-participating provision does. A management catch up clause provides for priority distributions to the profits interests held by management after the sponsor's liquidation preference has been satisfied. A profits interest gives the owner the right to receive a percentage of the partnership's future profits but not existing capital or accumulated profits. The award agreement for each profits interest grant usually includes a strike price that is based on the market value of the limited liability company's common equity on the grant date. The strike price ensures that any profits interest has no immediate liquidation value to qualify as a profits interest. It is common for profits interests issued to management to not pass to the recipient until the profits interest 'vests' or certain pre-conditions are met.

29

These catch up disbursements are made until the aggregate distributions to management relative to all distributions made to the sponsor and management equals the agreed ownership split between the sponsor and management.

Because a participating waterfall provision entitles a sponsor to its liquidation preference and a pro rate share of the remaining equity value, a participating waterfall provision is more favorable to a sponsor because it receives both the preferred return and its share of any upside value in the company with no discount. On the other hand, non-participating waterfall provisions, permit the sponsor to receive the greater of either is preferred return or its pro rata share of the remaining residual value of the company.

**Employee Compensation**

If a fund elects to provide its employees with stock or stock options as compensation, assuming the firm has not gone public, the company need not register the instruments with the SEC so long as the securities collectively do not exceed $10 million in value over any consecutive 12 month period. Compliance with the $10 million threshold is critical because if the fund exceeds that amount its lawyers must disclose a copy of the fund's summary plan (if the fund is covered by ERISA), a summary of the pan's material terms (if the fund is not covered by ERISA), information on the risks associated with the fund's investments in the benefit plan, as well as balance sheets, income statements, cash flow statements, a stockholder equity statements for the firm's last two fiscal years to all investors. The financial statements should comply with U.S. Generally Accepted Accounting Principles – known among accounting nerds as GAAP (not the store)! Here, the issuer should deliver the required materials to each investor once the options vest through either mail or email and continue to provide these individuals with up to date financial statements until the issuer receives the participant's exercise notice.

The exempt securities can only be issued to firm employees, insurance agents, directors, general partners, trustees, or officers. The securities can be offered to consultants, or advisors if the recipients are natural persons; provide bona fide services to the issuer, its parents, its majority-owned subsidiaries, or majority owned subsidiaries of the issuer's parent ; and the consulting services are not rendered in connection with an offer or securities sale in a capital raising transaction, and the consulting services do not directly or indirectly promote or maintain a market for the issuer's securities. If, however, the firm is required to file reports with the federal government under the 1934 Exchange Act, it must fill out Form S-8 and submit that document to the Treasury Department (See Appendix XXX).More than that, if an issuer, the issuer's parent, a majority-owned subsidiary of the issuer's parent, or the issuer's majority owned subsidiary offers or sells securities under a written compensatory benefit plan, written compensatory contract, the instruments are also exempt from registration so long as the issuer is not an Investment Company as that term is defined in the Investment Company Act of 1940 (see Chapter XXX below) and is not required to file reports under the 1934 Exchange Company Act. This exemption, though, only extends to the issuer not its affiliates – regardless of whether the issuer is a foreign private issuer. In the event that the issuer, is later required to file reports with the SEC under the 1933 Securities Act after it has claimed this employee compensation exemption, it can continue to rely on the exemption to sell the previously offered securities. And, if a firm with reporting obligations under the Securities Act acquires a target that does not have that obligation and then assumes responsibility for the target's issued stock options, if the stock options relied on the employee compensation exemption, the reporting firm can also rely on the exemption. Likewise, if a

reporting firm is simply guaranteeing the payment of a subsidiary's securities and the securities relied on the employee compensation exemption, the reporting company can also rely on the exemption. Corporate counsel should ensure that every employee is provided with a copy of the benefit plan or contract.

The employee compensation exemption, though, does not apply to security resales. If a firm has reporting obligations under the 1933 Securities Act and relies on the employee compensation exemption, ninety days after the firm has been covered the 1933 act, the securities can be resold by persons who are not affiliated with the firm and firm affiliates.

### Determining The Fair Market Value Of Stock Options And Stock Appreciation Rights That Qualify As Deferred Compensation Under Federal Law

In general, if fund counsel wants to determine whether stock options or stock appreciation rights issued to management or employees count as deferred compensation she or he should look to whether the award's exercise price is less than the fair market value of the underlying stock on the date the award is granted. If the price is equal to or grater than the underlying stock's market value, the securities count as deferred compensation. If not, the options or appreciation rights must comply with 26 U.S.C. 409A. Most private equity funds simply decide to save time and avoid the statute by requiring the award exercise price to equal the fair market value of the underlying stock on the grant date. If the firm's stock is publicly traded, the market value can be determined by looking to the price of the last sale before the grant; the price of the first sale r the grant; the closing price on the trading day before the grant date; the closing price on the grant date; the average of the high and low prices on the trading day before the grant date; the average of the high and low prices on the grant date; the average price during a specified period within 30 days before or 30 days after the grant date.[51] Readers in the United Kingdom should note that the definition of fair market value set out by the IRS will not always be synonymous with analogous definitions set out by the Financial Control Authority. On the other hand, if the firm's stock is not publicly traded, counsel must use a reasonable valuation method to determine the stock's fair market value. This method must account for all available information that is material to the firm's value. The use of a value previously calculated under a valuation method is unreasonable as of a later date if the calculation fails to reflect information that has become available after the date of the previous calculation. The federal code, though, has provided at least three valuation methods that the IRS will accept as a safe harbor. The first method consists of independent appraisal – based on the firm's balance sheet, discounted cash flow numbers, or a market comparison – that is determined not more than twelve months before the relevant transaction.[52] The second valuation method uses a formula. Under this method, though, once the firm's stock is valued under the equation the stock must be valued in the same manner for the purposes of all compensatory transfers and all non-compensatory purposes where the stock must be valued. The formula must also be used as part of a non-lapse restriction.[53] The final valuation method is available solely for start-ups that have been around for less than ten years and that have no class of equity securities that are traded on an established stock exchange. Here, the start-ups stock cannot be subject to any put or call options and at the date of valuation of the assessor cannot reasonably anticipate that firm leadership will

---

[51] 26 C.F.R. 1.409A-1(b)(5)(iv)(A).
[52] 2C.F.R. 1.409A-1(b)(5)(iv)(B)(2)(i).
[53] 26 C.F.R. 1.83-3(h).

undergo a change or that ownership of a substantial portion of the firm's assets will change hands within ninety days after the valuation event.

**How Private Equity Counsel Can Prevent Fraudulent Conveyances in LBOs, Intercorporate Guaranties in Loans to Corporate Groups, and Dividend Recapitalizations**

A fraudulent conveyance is a voluntary or involuntary transfer of a debtor's interest in property within two years before a bankruptcy filing that a bankruptcy trustee can revoke.[54] Counsel should be particularly wary of the possibility of a fraudulent conveyance because a creditor can be liable for violating the Bankruptcy Code's prohibition on these transactions under a constructive fraud theory even if the creditor never knew that the firm was insolvent. In successful fraudulent conveyance actions, the trustee can void the lender's liens and claims against the debtor, lower the priority of the lender's claims, or obtain a return of loan repayments or any other property received by the lender from the debtor.

Banks and other lenders can be liable for fraudulent conveyances when they provide financing for leveraged buyouts, rely on intercorporate guaranties, or take too much collateral for a loan. A leveraged buyout occurs when a buyer acquires the stock or assets of its target with loan financing that is guaranteed by the target and secured by its assets. Here, in general, the buyer will first form a shell company to receive the loan proceeds, the acquisition will be consummated, and then the target will be named the loan borrower after merging with the shell firm. In the alternative, the target can contract for the loan, lend the proceeds to the buyer, and then allow the buyer to purchase the target with the loaned funds. If the target was insolvent at the time of the levered buyout, rendered insolvent by the leveraged buyout, or the target did not receive adequate consideration, the bankruptcy code's fraudulent transfer provision, 11 U.S.C. 548, might apply. In the event that the bankruptcy trustee or debtor in possession contests the transfer in the Court, the leveraged buyout will not be analyzed in the same way that a non-law trained private equity executive or analyst would look at the transaction. Instead, the Court will likely collapse the transactions and view them as a single set when it appears that each transaction is one step in a general plan.[55] While the commission of a loan by either the target or the buyer in isolation does not constitute a fraudulent transfer because either entity simply receives loan proceeds in exchange for an obligation to pay the loan back, if the leveraged buyout fails because the target is only able to pay its shareholders and never receives any benefit from the loan proceeds, all three discrete transactions will be treated as one transaction. In deciding whether to collapse transactions, federal courts will consider whether all the parties has knowledge of the multi-step transaction and whether each transaction would have occurred on its own or was dependent or conditioned on the other transactions.[56] Transaction collapsing is particularly determinantal here because the private equity fund cannot take advantage of defenses that are available to good faith purchasers under the Bankruptcy Code.  On the other hand, the transactions may not be collapsed when the buyer invests a high level of new equity in the target or the funds for the leveraged buyout are eventually used for legitimate business reasons – repaying debt, financing working capital needs, *inter alia*.[57] While counterintuitive, corporate guarantees can also trigger the fraudulent conveyance provisions of the Bankruptcy Code because a party is incurring an obligation. Here, it is critical that counsel

---

[54] 11 U.S.C. 548.
[55] *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 795 (7th Cir. 2009).
[56] In re Tribune Co., 464 B.R. 126, 165 (Bankr. D. Del. 2011).
[57] In re Sunbeam Corp., 284 B.R. 355, 372 (Bankr. S.D.N.Y. 2002).

evaluate when the guarantee was incurred, the date when the two-year period under the Bankruptcy Code begins to run, and the value of the consideration received by the guarantor. Fraudulent conveyance actions can also be brought under different statutes. If the action is brought under the Bankruptcy Code itself or the Uniform Fraudulent Conveyances Act, the guarantor's obligation is incurred when the funds are initially advanced to the borrower and guarantor insolvency questions, if any, are determined by discounting the face value of the guaranteed amount by the likelihood that the guarantor will have to fulfill the obligation.[58] If the action is brought under the Uniform Fraudulent Transfer Act, guaranty obligations are incurred from the date the guaranty agreement is executed. There are three types of corporate guaranties that are common in the private equity context. The first guaranty, a downstream guaranty, involves a parent firm guaranteeing the debt of its subsidiary. In the lion share of instances, federal courts have found that these exchanges have involved bargains for items of reasonably equivalent value. However, if the subsidiary is insolvent and the result is that the parent firm's net worth is not enhanced by the guaranty, it is close to impossible to show exchange for equivalent value and thus to avoid fraudulent conveyance liability. In determining whether a firm received reasonably equivalent value for a guaranty, federal courts will focus on whether the guaranty is the product of an arm's length transaction, the group was a viable enterprise when the guaranty was made, and whether the group's financial condition was enhanced.  The second type of guaranty, an upstream guaranty, involves a subsidiary of a firm guaranteeing its parent's debt. These transactions are usually more liable to fraudulent conveyance actions because it is not common for a subsidiary to receive much in return for securing its parent's loan. Finally, the last guaranty, a cross-stream guaranty, involves a corporation securing the debt of an affiliate. If anything, these transactions are even more vulnerable to attack under fraudulent conveyance laws than transactions involving upstream guaranties because the guarantor's lack of ownership over the affiliate all but ensures that none of the increase in the affiliate's net worth will redound to guarantor's benefit. The last most common way that a bank or private equity fund could find itself on the wrong side of fraudulent conveyance laws involves loan over-collateralization under the Uniform Fraudulent Conveyances Act. A leveraged buyout loan is over-collateralized when a guarantor secures a loan but the lenders take a security interest in the debtor's assets the exceeds the debt amount. In this context, though, good faith lenders rarely have their liens invalidated in these actions, can retain their lien rights to the extent that they secure repayment of amounts that are already owed under the loan, and only lose their rights to collateral securing a future interest that accrues on the loan or any other future obligations.

**Due Diligence That Can Help Avoid Fraudulent Conveyance Actions**

The easiest way that a lender can guard themselves against a fraudulent conveyance action is to ensure that the transferor will be solvent after the lending transaction closes. On the legal side, counsel can provide this security by analyzing the firm's internal cash flow and balance sheets; coming up with reasonable estimates of the transferor's assets and liabilities; having independent appraisers value the firm's assets; hiring accounts prepare pro forma financial statements dated as close to the transaction date as possible, asking the transferor's management to confirm that the firm is adequately capitalized, will not incur debts beyond its ability pay them back, and will have positive cash flow after making all scheduled repayments; asking the transferor's chief financial

---

[58] In re Xonics Photochemical, Inc., 841 F.2d 198 (7th Cir. 1988); but see Chase Manhattan Bank, N.A. v. Oppenhein, 440 N.Y.S.2d 829 (N.Y. Sup. Ct. 1981) (Finding that the contingent liability represented by the guaranty in an action brought under the Uniform Fraudulent Conveyance Act was the full amount of the underlying loan).

officer or an independent management consulting or investment banking firm to prepare to a solvency certificate based on the firm's balance sheet; and requesting that the transferor's general counsel prepare a legal opinion providing her or his opinion of the transaction's enforceability. On the business side, management itself can minimize the risk of incurring a bankruptcy trustee's ire by providing the loan funds to the entity whose assets are offered as collateral in the transaction. In the context of a leveraged buyout, this means that funds should be lent directly to the target and its asset rich subsidiaries and that a revolving loan or debt service reserve should be included to permit the firm to meet its working capital needs.

While the above guidance applies to both banks and private equity funds, there are some fraudulent conveyance actions that involve financing packages that are used more often, if not exclusively, by private equity funds. More specifically, private equity funds often use dividend recapitalizations to recover a large portion of their equity investment in a venture while retaining their ownership interests. In a divided recapitalization, a private equity firm acquires a target and then "asks" the target to issue debt instruments. This debt is then used to pay the firm large dividends. If the firm, however, does not remain solvent after paying out all these dividends, the private equity firm can be the target of a fraudulent conveyance action because the target essentially took out loans to paid out dividends while receiving nothing in return. On the legal side, private equity counsel can guard against this risk by asking the target's general counsel to provide her or his opinion on compliance with State corporate governance laws, hiring an investment bank to provide a solvency opinion, and asking the target's board of directors to ensure that the target can pay out the dividends and take on the extra debt without going  under. On the business side, management can prevent future liability by completing the transaction in a State that is located in the Third, Sixth, Ninth, or Tenth Circuit (these federal appellate courts have interpreted the settlement payment defense broadly); including a financial institution in the transaction; or  paying out the dividends in the form of stock repayments or derivatives.

**ERISA Precautions For Private Equity Funds**

While a private equity or hedge fund may not be a covered employee benefit plan under the Employee Retirement Income Security Act of 1974 and the Pension Protection Act of 2006, the fund itself may be treated as holding the assets of the employee benefit plans that invest in it if it appears that primary purpose for the fund placement was to invest retirement plan assets. For non-lawyers looking for a translation, the federal securities laws will disregard the formal structure of a private equity fund that invests in equity instruments and treat the fund's management as a fiduciary that must comply with ERISA. While ERISA, unfortunately, does not define the invested assets that trigger the statute's labyrinthian, draconian, and job-killing requirements, it does mention assets and investments that are exempt from coverage. This category includes securities issued by registered investment companies under the Investment Company Act (see below), publicly offered securities, and a guaranteed benefit policy issued by an insurer.[59] On the other hand, ERISA does apply to all employee benefit plans, retirement plans, annuity plans, or IRAs that fall under §§401, 403, or 408 respectively of the federal tax code. ERISA coverage is undesirable because once a private equity fund is covered, there are countless transactions and compensation arrangements that it may not engage in (See IRS Form 5500).[60] The look through rule, though, does not apply to Ventral Capital Operating Companies, Real Estate Operating

---

[59] 29 C.F.R. 2510.3-101.
[60] 26 U.S.C. 4975

Companies, and firms where less than a quarter of the value of any equity interest class is held by benefit plan investors.

A private equity fund can claim the venture capital operating company exception if, by the date it makes its first investment, at least half of the fund's assets, valued at cost, are invested in an operating company, derivative investments, companies in which the fund has lost its management rights due to an initial public offering, or a firm whose securities the private equity fund has obtained in exchange for an operating company that it has management rights in. An operating company is a company that is primarily engaged in, directly, or through majority-owned subsidiaries, in the production or sale of goods or services other than capital investment. By way of contrast, a private equity fund has management rights if it has direct contractual rights with an operating company to substantially participate in, or substantially influence the management of, the operating company. While management rights shared with other investors and management rights held by the entity's holding company do not count as management rights for the purposes of the venture capital operating company exception, the Labor Department has concluded that contractual rights to appoint one or more directors to the board of the operating company, consult or approve of operating budgets or capital budgets, appoint a representative who serves as one of the operating firm's corporate officers, routinely consult and advise the operating firm's management, and examine the books and operating records of a non-public company do constitute management rights for the purposes of the exception. The best practice for counsel for a private equity fund claiming the venture capital operating company exception is to obtain a management rights letter for all the fund's portfolio investments. Derivative investments only count towards the 50% asset test mentioned above for the later of either ten years after the fund has made its initial investment or thirty months after the fund has lost its management rights in the derivative investment. The second exception, the real estate operating company exception, imposes requirements that are similar to the venture capital operating company exception. Here, the fund must invest at least half of its assets, valued at cost, in qualifying real estate that is managed or developed and that is not a short term investment pending a long term commitment. The private equity fund must have the right to substantially participate directly in the management or development of the property and, in the ordinary course of business, must be engaged directly in real estate management or development activities. The third exception, however, the 25% test is by far the most well-known among law students and private equity practitioners in part because many a hedge fund has relied upon it. For a hedge fund to comply with the 25% test, benefit plan investors must hold less than 25% of the value of each class of equity interests issued by the hedge fund excluding interests held by controlling persons which includes non-benefit plan investors with discretionary control over the fund or the fund's assets, mon-benefit plan investors who provide direct or indirect investment advice for a fee, and any affiliate of the two aforementioned groups. Equity interests of non-U.S. employee benefit plans, government plans, and church plans do not count towards the 25% cap. Fund managers – even those without legal training – have been known (and well-advised) to constantly monitor the level of plan assets held by the fund if the fund is claiming the 25% exception because non-compliance can trigger ERISA's draconian requirements.

**Buy And Build Strategies In Private Equity Transactions**

Under a buy and build strategy, a private equity fund will purchase a stand alone portfolio company and then acquire a smaller related or complementary firm – usually through a leveraged buyout that can take the form of a stock acquisition, asset acquisition, or merger – to grow the original

portfolio investment and the turn the second firm into the original firm's subsidiary. The second firm that is acquired typically will produce the same product or service as the first acquired firm but distribute the goods or services to a different geographic market. The firm that is acquired first must also have departments for human resources, information technology, accounting and payroll department, finance, sales and marketing, customer service. The firm ideally will also have strong growth potential, fail to achieve maximum profits for reasons other than poor management but also have consistent and predictable earnings as well as a significant market share. Assuming the target's management is not to blame for poor performance and has acquisition experience, the fund will typically seek to retain staff by negotiating new employment agreements if need be. The quality of this management team is critical because these individuals can assist the fund in evaluating potential targets, conduct due diligence on targets, participate in acquisition negotiations, and plan for post-closing integration. It is also customary for the fund to run its buy and build strategy by the retained management team before pursuing additional targets and put an integration team in concert with the portfolio firm's management with realistic deadlines to plan for business after the transaction is closed. The team here will often focus on synchronizing employment practices, human resources policies and procedures, and information technology with the target because these three areas tend to be the spots where integration is often the hardest.

On the other hand, the firm that is acquired second typically will be a fast growing company that can use the fund's resources to expand, a financially troubled firm with a good product or service that is in need of rescue, or a smaller business with a niche product or service in a growing market or fragmented industry where there is potential for consolidation. The fund typically will value this firm by looking to anticipated synergies or projected post-closing cash flows. Because this firm will be supervised by the management for the firm that was acquired first, fund management will be more likely to overlook a weak or departing management base or factor in the performance benefits of replacing poor management. The managers will also care less about the consistency and predictability of the second firm's profits because the acquisition is more likely to be made for the purpose of taking advantage of specific company assets, the acquisitions are accretive to the overall platform earnings after closing and integration, and the target can eliminate costs or expenses that are unnecessary after the transaction has closed. The thought here is that the two transactions permit the fund to put unused capital to work, eliminating overlapping functions and duplicative third-party contracts, hedge against risk that is specific to one of the two targets, and enhance supply chain performance. Before acquiring a target, though, the fund management should evaluate the strengths and weakness of, opportunities for, and threats to the target to ensure that is analysis is accurate, dispose of unwanted target assets, and plan for effective integration. Fund management may also want to consider any legal impediments to the transaction, whether the target can be accretive to the fund's portfolio company, whether the target's good or service is value-additive for the fund, and whether the target complements the fund's portfolio company. Counsel for the fund, of course, should conduct due diligence on the target's potential liabilities and risks, its economic and operational value, third party consents, required stockholder action for the transaction, or equity transfer prohibitions. On the business side, focus here should be on ensuring that the target's operations will mush with the portfolio firm's business as closely as possible. On the legal side, the target's liabilities, obligations, and contracts should be reviewed to guarantee that there are no successor liabilities or multi-employer plan liabilities that can directly harm or negatively impact the platform company after it assumes them, whether licensed assets can be used by the portfolio company under the terms of the target's agreement with the third party, neither the Federal Trade Commission or Department of Justice's Antitrust Division will

intervene to stop the transaction, and that there are no restraints on the planned future growth of the portfolio company in the form of say non-compete provisions in any contracts or exclusive dealing agreements. When the actual acquisition agreement is drafted, it is not uncommon for the buyer to be given responsibility for obtaining approval from the Justice Department under the Hart-Scott-Rodino Act lest it be forced to pay a termination fee. Finally, fund management should be careful not to streamline back office functions at the expense of consumer service if the good or service has a ready substitute, not to consummate mergers where the two portfolio firms will not be compatible because they service consumers with tastes that are too divergent, and to prevent investing too much costs during the diligence process so that is no longer financially feasible to walk away if unsavory facts are discovered during the due diligence process.

**The Investment Company Act of 1940**

Section 3(a)(1)(A) of the 1940 Investment Company Act defines an investment company as any issuer which "is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities" (hereinafter referred to as the general investment company test).[61] The second definition of an investment company under the statute focuses on the entity's assets. Here an investment company is any issuer that "is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 [percent] of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis" (hereinafter referred to as the asset test).[62] Many a going concern is swept under the statute's purview through the second asset test which does not require the issuer to be "primarily engaged" in the investment business. Private equity funds that fall under one of these definitions must either satisfy an exemption under the statute or comply with the act's registration requirements. Indeed, in a few instances, the Securities and Exchange Commission has brought enforcement proceedings against firms that exceeded the 40% threshold.[63] It is also standard fare for the SEC to comment on a registration statement filed under the Securities Act or periodic report filed under the Exchange Act if the issuer has a substantial amount of securities under its consolidated balance sheet but has not registered under the Investment Company Act.[64]

For firms that that either hold subsidiary companies or are a subsidiary themselves, in-house counsel seeking to determine whether her firm is an investment company under the asset test should conduct a detailed analysis of the company's balance sheet considering each subsidiary (and the parent) separately. This is so because companies whose consolidated balance sheets do not appear to satisfy the asset test are not infrequently brought under the statute's coverage when their unconsolidated balance sheets are considered. Here, only the parent corporation's ownership equity is included as part of its total assets. The stock of a subsidiary that is engaged in a non-investment business, however, is treated as a non-investment security under the asset test.

---

[61] 15 U.S.C. 80a-3(a)(1)(A).

[62] 15 U.S.C. 80a-3(a)(1)(C).

[63] See, e.g., *SEC v. National Presto Industries, Inc.*, 486 F.3d 305 (7th Cir. 2007); *In the Matter of Daxor Corporation*, SEC Release No. IC-29417 (September 17, 2010).

[64] See, e.g., Xilinx, Inc., Securities Act file No. 000-18548 (October 27, 2014).

The value of the investment instruments on a company's balance sheet is determined under the formula set out in § 2(a)(41).[65] For instruments owned at the end of the last fiscal quarter and which have readily accessible market quotations, value means market value at the end of that quarter. For other instruments owned at the end of the last fiscal quarter, value is fair value at the end of that quarter as determined by the issuer's board of directors in good faith. For all other securities and assets acquired since the end of the last fiscal quarter, value is equivalent to cost. FILLER.

### Statutory Exceptions of Initial Resort

Section 3(b)(1) of the Investment Company Act provides the most common exception for service and manufacturing firms seeking to avoid the statute's draconian requirements.[66] This provision states that an entity is not an investment company if

> "[a]ny issuer *primarily engaged*, directly or through a wholly-owned subsidiary or subsidiaries, in a *business* or businesses *other than* that of *investing*, reinvesting, owning, holding, or trading in securities" (hereinafter referred to as the non-engagement exception).[67]

The non-engagement exception is not available to a firm that conducts a substantial portion of its activities through subsidiaries that are not wholly owned.[68] Under the Investment Company Act, a wholly owned subsidiary is a firm where 95% or more of the outstanding voting securities are owned by the person or by a company which is a wholly-owned subsidiary of that person.[69] A voting security is any security presently entitling the owner or holder thereof to vote for the election of directors of a company.[70] In analyzing firms that are not corporations and do not have stock that hits within this voting security definition, the SEC has looked at whether the investment securities permit the holder to exercise control over how the entity is managed. More specifically, in matters involving Limited Partnerships, the Commission has asked whether the instruments permit the investor to remove or replace the general partner, vote for election or removal of a general partner in the event of death, terminate the partnership if one or more general partners no longer wish to serve the business, or take part in the conduct or control of the business of the limited partnership.[71] Counsel should take note, however, that the SEC no-actions letters that were issued to support this multi-factor test were issued before the enactment of the modern voting securities definition in 15 U.S.C. 80a-3(c)(7) are should only relied on with caution.[72]

While as a pure matter of statutory language, compliance with the non-engagement exception only confers immunity from statutory coverage that results from §3(a)(1)(C) and does not provide an exemption from §3(a)(1)(A), the Securities and Exchange Commission has long taken the position

---

[65] See, e.g., *SEC v. Fifth Avenue Coach Lines*, 289 F. Supp. 3, 27 n.13 (S.D.N.Y. 1968).
[66] 15 U.S.C. 80a-3(b)(1).
[67] 15 U.S.C. 80a-3(b)(1).
[68]
[69] 15 U.S.C. 80a-2(a)(43).
[70] 15 U.S.C. 80a-2(a)(42).
[71] Standish Equity Investments, Inc., SEC No-Action Letter, 1993 WL 544113 (December 15, 1993), Willkie Farr & Gallagher, SEC No-Action Letter (June 11, 1996), Weiss, Peck & Greer and KKR, SEC No-Action Letter, 1985 WL 54301 (September 9, 1985).
[72]

that the non-engagement exception provides a haven from coverage under both provisions.[73] There are five factors that the Commission will consider in determining whether a going concern is primarily engaged in a non-investment business under the non-engagement test: the historical development of the firm's business, public representations of policy, officer and director activities, the nature of the assets, and the sources of the income. The asset and income factors are accorded the most weight. This standard is the same that the Commission applies in matters involving Rule 3a-1.[74] Under the 3a-1 standard, a company is not primarily engaged in an investment company business if the company has 45% or less of its assets invested in investment securities and derives 45% or less of its income from investment securities.[75] The relevant measurement period here is the period from the end of the last fiscal quarter for assets and the last four fiscal quarters combined for income. In matters where the firm reports a net loss, counsel should not automatically assume that the SEC will decline to apply the Rule 3a-1 income test or that Rule 3a-1 abrogates the multi-factor circumstantial inquiry under the non-engagement test.[76]

The "historical development" and "public representation" prongs look to whether a company has historically been engaged in or held itself out as being engaged in investing. The focus here has been on the company's published representations of the businesses that it is engaged in.[77] Relevant publications include: registration statements, private placement documents, disclosures filed with the SEC, proxy statements, press releases, the company's charter, the company's purpose statement, and on a few select matters, characterizations from the Fourth Estate.[78] When considering officer and director activities, the primary concern is with the time and effort that the management board devoted to business operations or the firm's investments.[79] A firm that cannot satisfy the non-engagement standard is not yet automatically subject to the Investment Company Act's draconian requirements because it may petition the Securities and Exchange Commission under 15 U.S.C. 80a-3(b)(2) for an order that it is

> "[p]rimarily engaged in a business or businesses other than that of investing, reinvesting, owning, holding, or trading in securities either directly or (A) through majority-owned subsidiaries, or (B) through controlled companies conducting similar types of businesses"[80] (exemption order test).

Of course, an issuer that obtains such an order will not be subject to any of the provisions of the Investment Company Act. A §(b)(2) order may be required in instances where the company has a significant investment in an operating entity that it does not clearly control under the non-engagement test.[81] The Investment Company defines control as the power to exercise a controlling

---

[73] SEC Release No. IC-26077 n.9 (June 16, 2003); SEC Release No. IC-25835 n.14 (November 26, 2002); SEC Release No. IC-19566 n.10 (July 9, 1993).

[74] 17 C.F.R. 270.3a-1.

[75] SEC Release No. IC-10937 (November 13, 1979).

[76] DRX, Inc., SEC No-Action Letter, 1988 WL 234516 (June 28, 1988).

[77] *Moses v. Black*, 1981 WL 1599, at 90, 366-67 (SDNY 1981).

[78] SEC Release No. IC-24494 (June 13, 2000); SEC Release No. IC-17418 (April 10, 1990); SEC Release No. IC-17902 (December 11, 1990); see also *Bankers Sec. Corp. v. SEC*, 146 F.2d 88 (3d Cir. 1944).

[79] *Moses v. Black*, 1981 WL 1599, at 90, 366-67 (SDNY 1981).

[80]

[81] See, e.g., SEC Release No. IC-29206 (April 9, 2010) (order); SEC Release No. 29176 (March 24, 2010) (application); SEC Release No. IC-25298 (November 26, 2001) (order); SEC Release No. 25249 (October 31, 2001) (application); SEC Release No. IC-24494 (June 13, 2000) (order); SEC Release No. 24459 (May 18, 2000)

influence over the management or policies of a company. A person who owns beneficially either directly or through one or more controlled companies, more than 25% of the voting securities of a company is presumed to control that company, though this presumption is rebuttable by evidence to the contrary.[82] Here, if control is the primary concern that business can file a §2(a)(9) application for an SEC determination that it does in fact control the other entity.[83] This option, though ought not to be exercised if the petitioning firm can obtain a §(b)(2) order because a §2(a)(9) establishes only one of the elements needed to qualify for the non-engagement exception.

Transient Investment Companies also have alternative options available to them. This potential out often applies to firms that are about to complete a large equity offering and receive an influx of cash that will categorize them as an investment company under the asset test unless they limit the temporary investment of the offering proceeds to U.S. government securities. SEC Rule 3a-2 permits these firms to invest their offering proceeds in a broader class of assets for a one year period so long as the firm is engaged in a business other than investing in securities. The one year period starts to run on the earlier of the date when a company owns securities and/or cash having a value exceeding 50% of its total assets (either on a consolidated or unconsolidated basis) or investment securities exceeding 40% of total assets (not including government securities and cash items) on an unconsolidated basis.[84] For companies created to buy and possess the shares of other companies, which it then controls, the 50% assert threshold is not triggered until the occurrence of an extraordinary event such as the sale of a large operating divisions and the investment of the resulting proceeds in securities pending the acquisition of another subsidiary or the placement of a tender offer to stockholders of a non-investment company that fails to secure a majority of the target's voting stock.[85]

**Exemptions For Subsidiaries of Non-Investment Company Parents**

The Investment Company Act also exempts from the asset test "any issuer all the outstanding securities of which (other than short-term paper and directors' qualifying shares) are directly or indirectly owned by a company excepted from the" non-engagement test and the exemption order test (subsidiary exemption).[86] This exemption was intended to provide relief for investment company subsidiaries of a non-investment company parent so long as all the securities of the subsidiary are held by the parent. The subsidiary exemption, however, does not provide an exemption for firms that must comply with the Investment Company Act because they meet the requirements of the general investment company act and, in any event cannot be claimed unless the firm at issue satisfies the non-engagement exception or the exemption order test. Securities and Exchange Commission Rule 3a-3 also provides an exemption for subsidiaries where all the outstanding securities were directly or indirectly owned by a parent company that satisfies the conditions of Rule 3a-1 and is not an investment company under the general investment company act test or the asset test; an investment company that satisfies the asset test but qualifies for the

---

(application); SEC Release No. IC-23399 (August 25, 1998) (order); SEC Release No. 23367 (July 30, 1998) (application).
[82] 15 U.S.C. 80a-2(a)(9).
[83] *Id.*
[84] 17 C.F.R. 270.3a-2.
[85] IM Guidance Update No. 2017-03; see also SEC No-Action Letter, 1998 WL 312813 (June 12, 1998).
[86] 15 U.S.C. 80a-3(b)(3).

non-engagement exception or the exemption order test; or are not an investment company under Rule 3a-1.[87]

While intercompany loans are treated as securities for the purposes of the Investment Company Act, SEC Rule 3a-5 provides subsidiary companies that have borrowed funds and lent the proceeds to its parent to fund the parent's operations with an exemption from registration under the statute.[88] If the parent company is a non-US bank, the guarantee requirement can be satisfied with the guarantee of a U.S. branch or agency so long as the holders of the securities can proceed directly against the guarantor.[89] In this situation, the parent company may also issue an irrevocable letter of credit sufficient to fund all amounts required to be guaranteed instead of an actual guarantee.[90] Rule 3a-5(a)(5) also requires that a finance subsidiary invest in or loan to its parent company or a company controlled by its parent at least 85% of any cash or cash equivalents raised by the finance subsidiary through offerings of its debt securities, nonvoting preferred stock, or other borrowings. This investment or loan cannot occur later than six months after the finance subsidiary's receipt of the cash or cash equivalent.[91] More than that, under Rule 3a-5(a)(5), a finance subsidiary is not permitted to invest in, reinvest in, own, hold, or trade in securities other than: U.S. government securities, securities of its parent company (or the securities of partners or participants in a joint venture), or debt securities and repurchase agreements that are exempted from the 1933 Securities Act under 15 U.S.C. 77c(a)(3) (short term money market instruments and money market mutual funds). There is no limit to the percentage that can be placed in these three categories of investments.[92] The SEC has often permitted finance subsidiaries to provide their parent firms with funds that did not satisfy the 85% requirement and allowed financial subsidiaries to invest temporarily in bank deposits, certificates of deposit and similar money market instruments that have a maturity of up to six months.[93]

Private equity and hedge funds rely most often, however, on either 15 U.S.C. 80a-3(c)(1) or 15 U.S.C. 80a-3(c)(7)'s exemption for private investment companies. More specifically, that provision exempts any issuer "whose outstanding securities (other than short-term paper) are beneficially owned by not more than one hundred persons (or, in the case of a qualifying venture capital fund with less than $10 million in aggregate capital contributions and uncalled commitments, 250 persons) and which is not making and does not presently propose to make a public offering of its securities" (hereinafter referred to as the 100 persons exception).[94] By way of contrast, 15 U.S.C. 80a-3(c)(7) exempts "[a]ny issuer, [whose] outstanding securities are owned exclusively by persons who, at the time of acquisition of such securities, are qualified purchasers, and which is not making and does not at that time propose to make a public offering of such

---

[87] 17 C.F.R. 270.3a-3.
[88] 17 C.F.R. 270.3a-5.
[89] SEC Release No. IC-18381 (November 4, 1991).
[90] 17 C.F.R. 270.3a-5(a)(7).
[91] 17 C.F.R. 270.3a-5(a)(6).
[92] SEC No-Action Letter, 1996 WL 429029 (July 17, 1996).
[93] SEC Release No. IC-19602 (July 28, 1993) (order); SEC Release No. IC-19548 (June 29, 1993) (application); SEC Release No. IC-17498 (May 18, 1990) (order); SEC 1940 Act Release No. IC-17450 (April 18, 1990) (notice of application); SEC No-Action Letter, 1992 WL 335320 (October 7, 1992); SEC Release No. IC-19602 (July 28, 1993) (order); SEC Release No. IC-19548 (June 29, 1993) (application); SEC Release No. IC-16642 (November 18, 1988) (order); SEC Release No. IC-16605 (October 21, 1988) (application).
[94] 15 U.S.C. 80a-3(c)(1).

securities" (hereinafter referred to as the qualified purchaser exception).[95] Of the two the latter has been relied on the most – at least since the beginning of the second Bush Administration. Counsel should take note, however, that companies that obtain an exemption from the Investment Company Act under either mechanism are still limited with regard to the percentage of the outstanding voting stock of another investment company that they may acquire under 15 U.S.C. 80a-12(d)(1)(A)(i) and 15 U.S.C. 80a-12(d)(1)(B)(i).[96] Both of these exemptions, moreover, impose restrictions on investor security placement in both the primary and secondary markets.

Under the former exemption, for instance, the entity can have no more than 100 beneficial owners of its outstanding securities. While this criterion may seem obvious, the Securities and Exchange Commission has actually adopted detailed and complex attribution rules to determine beneficial ownership of securities under this section. Counsel should be aware of BLANK regulations. First, 15 U.S.C. 80a-3(c)(1) requires a 'look-though' to the ownership of any entity that is relying on either the 100 persons exception or the qualified purchaser exception and owns 10% or more of the voting securities of an issuer relying on the 100 persons test. Second, SEC Rule 3c-5 excludes knowledgeable employees of a private investment company (or a company exclusively owned by them) from the 100-person limit. The theory here is that these individuals do not need to protection of the Investment Company Act because of their financial knowledge, sophistication, and relationship with the firm. More specifically, knowledgeable employees include (1) executive officers, directors, or persons serving in a similar capacity with a private investment company or its investment manager; (2) an employee of the private investment company or its investment manager who as part of her regular duties participates in investment activities and has been performing these functions and duties for or on behalf of the private investment company or its investment manager, or substantially similar duties for another company for at least 12 months. This seemingly straightforward requirement is rendered more complex by Rule 3c-5(a)'s definition of executive officer as "the president, any vice president in charge of a principal business unit, division or function, any officer who performs a policy-making function, or any other person who performs similar policy-making functions. In SEC No-Action Letter, 2014 WL 508021, the agency provided further guidance on Rule 3c-5's requirements clarifying that there may be several principal business units, divisions, or functions within an investment manager; that non-investment units, divisions, or functions could be principal business units; and that policy-making individuals need not have a specific title or even be officers to be knowledgeable employees either individually or as members of a group. Whether an employee is participating in investment activities and could thus be classified as a knowledgeable employee is a factual determination that must be made on a case-by-case basis.[97] Third, entities relying on the 100-person test are technically prohibited from making or proposing to make a "public offering" of its securities. In accordance with Securities and Exchange Commission Rule 506,[98] Rule 144A,[99] and §4(a)(2) of the Securities Act,[100] this requirement would have prohibited general solicitation or advertising in private offerings. This framework, however, changed in 2012 with the enactment of §201(a) of the Jumpstart Our Business Startups Act which required the SEC to eliminate the prohibitions against general solicitation and general advertising in Rules 506 and 144A. Counsel should note, though, that

---

[95]

[96] FILLER.

[97] See ABA Section of Business Law, SEC No-Action Letter, 1999 WL 235450 (April 22, 1999).

[98] 17 C.F.R. § 230.506.

[99] 17 C.F.R. § 230.144A.

[100] 15 U.S.C. § 77d(a)(2).

§201(a) did not affect private offerings that rely solely on §4(a)(2) of the Securities Act. Under the amended version of Rule 506, issuers relying upon the provision are permitted to offer and sell securities as well as engage in general solicitation if they (1) take reasonable steps to verify that the purchasers in the offering are accredited investors and (2) all purchasers of securities are indeed accredited investors under Rule 501(a).[101] That provision in turn defines an accredited investor "FILLER." Of particular note, the SEC also requires entities conducting offerings under Rule 506(c) to indicate this fact by checking the box in item six of Form D (Form D is provided for the reader in Appendix X).

For domestic secondary market transfers of U.S. issuer debt, fixed income securities of issuers relying on the qualified purchaser exception may be sold and delivered in trades through The Depository Trust Company. The participants, however, must implement certain procedures to ensure that only qualified purchasers become the beneficial owners. While a summary of the procedures appear below, counsel should thoroughly read appendix X which contains a highly referenced publicly article from Cleary, Gottleib, Steen & Hamilton, Davis Polk & Wardell, Shearmen & Sterling, Sidley Austin, and Sullivan & Cromwell describing the procedures in fuller detail.

The initiating entity must represent to the Depository Trust Company that the receipt of the shares is a qualified purchaser.  To retain the qualified purchaser exemption, the issuer must have a 'reasonable belief' that the secondary market purchasers are indeed qualified purchasers and place the correct notation on the applicable securities. Procedures to protect issuers from unintentional sales of their securities to non-qualified purchasers such as specific disclosure and purchaser representations in the offering document, minimum denominations, legends at the book-entry depositary, and issuer, underwriter, placement agent distribution agreement representations should be used. More specifically, the representations are designed to place purchasers and transferees on notice that only qualified purchasers may acquire the securities. When it comes to equity trade settlements through the Depository Trust Company for private equity firms relying on the qualified purchaser exception, however, counsel should take note that it is more difficult for issuers to represent a reasonable belief that all transferees are qualified purchasers precisely because these securities are more difficult to trace and tend to be more appealing to investors. Indeed, the 2003 qualified purchaser exception procedures does not contain a provision for these equity transfers. Non-American issuing companies need not be concerned with this requirement because secondary market transfers of these securities in non-US markets are not restricted. Indeed, the Securities and Exchange Commission has long permitted non-US firms to rely on the 100 persons exception while conducting public offerings abroad so long as the U.S. portion of the offering represents a limited portion of the total.[102] As a matter of fact, investment vehicles relying on either the 100 persons or qualifying purchasers exception need not limit their offerings or restrict transfers of their securities if they are organized and domiciled abroad.[103]

Foreign investment vehicles generally can reference Rule 902(k) of Regulation S under the Securities Act to determine if an investor must be treated as a qualified purchaser or be counted against the 100-investor limit. Under Regulation S, a US Person is any natural person residing in the US (regardless of whether they have US citizenship; a Green Card holder; any agency or branch

---

[101] 17 C.F.R. § 230.501(a).

[102] Touche Remnant & Co., SEC No-Action Letter, 1984 WL 45636 (August 27, 1984).

[103] Goodwin, Procter & Hoar, SEC No-Action Letter, 1997 WL 86002 (Feburary 28, 1997).

of a foreign entity located in the US, any non-discretionary account held by a dealer or other fiduciary for the benefit or account of a US person; any discretionary account held by a dealer or other fiduciary organized, incorporated, or resident in the US; any partnership or corporation organized under US laws; non-US partnerships formed by US persons principally to invest in unregistered securities that are not that are accredited investors under SEC Rule 501 (otherwise known as Regulation D) but not natural persons, estates, or trusts; and any other individual without permanent resident status who the issuer deems to be a resident of the US with consistently applied criteria such as tax residency, nationality, mailing address, physical presence, the location of a significant portion of the individual's financial and legal relationships, or immigration status. When it comes to entities that are not US persons, however, an employee benefit plan set up and administered under the law of a country other than the US, foreign branches of US banks or insurance companies regulated in the jurisdiction of their location; international organizations such as the IMF, UN, and their agencies, affiliates, and pension plans;  any discretionary account held by a dealer or other fiduciary for the benefit or account of a non-US person ; or any trust or estate with a trustee, executor, or administrator who is a US person unless the trust or estate gives sole or shared investment power to a non-US trustee, executor, or administrator, as applicable and no beneficiary and no settlor of a revocable trust is a US person or the estate is governed by the laws of a foreign jurisdiction is included within this category.


15 U.S.C. 80a-3(c)(3) exempts domestic banks, insurance companies, savings and loan associations, building and loan associations, cooperative banks, homestead associations, among other entities from the statutory definition of an investment company (hereinafter referred to as the bank and insurance company exception). More specifically, the exemption applies to entities that are not engaged in the business of issuing redeemable securities, installment type face-value certificates, or periodic payment plan certificates and, are primarily engaged in the business of purchasing or otherwise acquiring notes, drafts, acceptances, open accounts receivable, and other obligations representing part or all of the sales price of merchandise, insurance, and services; the business of making loans to manufacturers, wholesalers, and retailers of, or prospective purchasers of, specified merchandise, insurance, and services; or the business of purchasing or otherwise acquiring mortgages and other liens on and interests in real estate. SEC Rule 3a-6, however, provides limited Investment Company Act coverage relief for foreign banks and insurance companies. More specifically, under Rule 3a-6, a foreign bank is "a banking institution incorporated or organized under the laws of a country other than the United States, or a political subdivision of a country other than the United States, that is: [r]egulated as such by that country's or subdivision's government; [e]ngaged substantially in commercial banking activity; and [n]ot operated for the purpose of evading the provisions of the" Investment Company Act. Canadian "trust…or loan compan[ies] that" are regulated as such by Canada (or a political subdivision thereof) and "[n]ot operated for the purpose of evading the provisions of the" Investment Company Act as well as UK building societies that are regulated as such by the British Government and not operated for purposes of evading the ICA are also included within Rule 3a-6's definition of a foreign bank. For the purposes of this regulation,  an entity is engaged substantially in commercial banking activity if it is "engaged regularly in, and deriv[es] a substantial portion of its business from, extending commercial and other types of credit, and accepting demand and other types of deposits, that are customary for commercial banks in the country in which the head office of the banking institution is located." Foreign insurance companies are also granted an exemption. Here,

those entities have been defined as "insurance company[ies] incorporated or organized under the laws of a country other than the United States, or a political subdivision of a country other than the United States, that is regulated as an insurance company by the country of origin, "[e]ngaged primarily and predominantly in: [t]he writing of insurance agreements of the type specified in section 3(a)(8) of the Securities Act of 1933 (15 U.S.C. 77c(a)(8)), except for the substitution of supervision by foreign government insurance regulators for the regulators referred to in that section; or [t]he reinsurance of risks on such agreements underwritten by insurance companies; and not operated for the purposes of evading the Investment Company Act.

**Oil and Gas Fund Exemption**

15 U.S.C. 80a-3(c)(9) also exempts a small number of oil and gas investment funds as "[a]ny person substantially all of whose business consists of owning or holding oil, gas, or other mineral royalties or leases, or fractional interests therein, or certificates of interest or participation in or investment contracts relative to such royalties, leases, or fractional interests" need not comply with the 1940 Investment Company Act's requirements While the Securities and Exchange Commission has not provided extensive guidance on the meaning of "substantially all" within this exemption, it has issued no-action letters permitting firms engaged in mineral exploration, holds interests in oil and gas development ventures,[104] or predominantly holding interests in oil and gas royalties or leases to take advantage of the exemption.[105] While these investment funds may make temporary purchases of CDs or other short term instruments,[106] the fund cannot trade eligible oil and gas assets.[107] The exemption does not extend to firms that have simply lent funds to oil and gas companies.[108]

**Acquiring Mortgage and Qualifying Interest Exception**

15 U.S.C. 80a-3(c)(5) also exempts issuers primarily engaged in purchasing or otherwise acquiring mortgages and other liens on, and interests in, real estate from coverage by the 1940 Investment Company Act (hereinafter referred to the acquiring mortgage and qualifying interest exception). Qualifying interests must be held directly, and holdings of mortgage backed securities – except where the issuer holds all of the instruments that represent ownership interests in a pool of mortgages – or shares of an entity that invests in real estate mortgages or equity interests do not satisfy requirement.[109]

**Section 3(c)(4) Small Loan Activities and Real Estate Investing**

For firms seeking to avoid coverage under the Investment Company Act and that offer small loans, engage in industrial banking, or engage in "similar businesses," management personnel will often find it easier to avoid ICA coverage by satisfying the local licensing requirements through a separate entity in each jurisdiction in which the firm operates. Companies, though, that engage in any one of these three activities direct or through subsidiaries will have to rely on the coverage exception contained in 15 U.S.C. §80a-3(c)(6). Entities that invest in real estate through complex organizational structures may also be eligible for an Investment Company Act exemption under

---

[104] Professional Consultants, Inc., SEC No-Action Letter (December 19, 1980).
[105] Pantepec Int'l Inc., SEC Release No. IC-17908 (December 20, 1990);
[106] McCulloch Oil & Gas Corp., SEC No-Action Letter (July 14, 1979).
[107] The Energy Group Inc., SEC No-Action Letter (December 13, 1972).
[108] Damson Oil Corp., SEC No-Action Letter (January 11, 1974).
[109] SEC Release No. IC-3140 (Nov. 29, 1960).

15 U.S.C. 80a-3(c)(6).[110] The SEC has taken the position that issuers engaged in the business of "purchasing or otherwise acquiring mortgages and other liens on and interests in real estate" must demonstrate that they are "primarily engaged" in this line of business on both a consolidated basis and subsidiary-by-subsidiary basis.[111] Finally, 15 U.S.C. §80a-3(c)(6) also provides an exemption from ICA coverage for diversified financial or real estate holding companies – as well as other firms – that are involved directly, or through majority owned subsidiaries in "an additional business other than investing, reinvesting, owning, holding, or trading in securities" and derive at least 25% of their gross income from any of the lines of business protected in 15 U.S.C. §§80a-3(c)(3), 15 U.S.C. §80a-3(c)(4), and 15 U.S.C. §80a-3(c)(5). Counsel should note, though, that firms that rely on this exemption and then acquire additional assets must take care that at least 25% of gross income continues to be derived from an eligible trade in the three aforementioned categories.[112]

### Research and Development Companies

For firms with long development periods requiring equity offerings to pay operational expenses in anticipation of a product line, 17 C.F.R. 270.3a-8 provides a non-exclusive safe harbor to exempt these business from compliance with the 1940 Investment Company Act.[113] To claim this exemption, a company must have research and development expenses representing a substantial percentage of its total expenses for the same period, net income from investments in securities not in excess of twice the amount of its research and development expenses for the same period, and expenses for investment advisory and management activities, investment research, and custody below 5% of its total expenses for the last four fiscal quarters combined; limit its investments in securities to capital preservation investments; be primarily engaged (directly or indirectly) in a business other than investing, reinvesting, owning, holding or trading in securities; adopt a written investment policy coving capital preservation; and with certain exceptions; not be a special situation investment company; and refrain from holding itself out as a firm engaged in the business of investing, reinvesting, or trading in securities.

### Custody Receipt Programs

The Securities and Exchange Commission has granted no action relief to entities that have sought exemptions for the Investment Company Act after issuing securities that the agency determined did not alter the nature of the underlying investment held by the firm.[114]

### Exemption Orders

Finally, the SEC retains the authority under 15 U.S.C. 80a-6(c) to conditionally or unconditionally exempt any person, security, transaction, or class or classes of persons, securities, or transactions

---

[110] SEC No-Action Letter, 1989 WL 246071 (May 1, 1989).

[111] Comment Letter on SEC Release No. IC-29778 from American Bar Association, Business Law Section, Federal Regulation of Securities Committee and Securitization and Structured Finance Committee, November 14, 2011.

[112] See SEC No-Action Letter, 1985 WL 55603 (August 14, 1985).

[113] See SEC Release No. IC-19274 (February 25, 1993); SEC Release No. IC-19334 (March 22, 1993)

[114] Linn Energy, LLC, SEC No-Action Letter, August 30, 2012 (granting no action relief to an entity that issued limited liability interests designed to allow certain investors to invest indirectly in units in another entity while avoiding the unfavorable tax treatment that would apply to those investors if they owned the underlying units directly); HOLDRs, SEC No-Action Letter (September 3, 1999) (granting no action relief where an entity implemented a custody receipt program without registering the trust issuing the custody receipts under the Investment Company Act).

from any provision of the 1940 Investment Company Act provision or rule to the extent that the exemption is necessary or appropriate to further the public interest and protect investors. The application typically explains why the exemption is necessary and how granting relief would meet the statutory standard. For a sample application, see Appendix XXX. Unlike no-action letters, issuers cannot rely on an exemption order issued to another party. Orders do, though, provide guidance to counsel on the likelihood that the SEC will grant an order in a case. For a listing of orders grouped by relevant category, see Appendix XXX.

**Regulation S**

Regulation S under the 1933 Securities Act provides two non-exclusive safe harbors for firms to conduct offerings outside the U.S. without violating the registration requirements in §5 of the statute: Rule 903 and Rule 904. The former is available to issuers; underwriters, dealers, or other persons who must contractually participate in the distribution of Regulation S securities (other practitioners may refer to this last group as distributors); their respective affiliates and persons acting on their behalf who must contractually participate in the distribution of Regulation S securities. The latter, on the other hand, applies to resales abroad by anyone who is not affiliated with the issuer or other underwriters, dealers, or other persons who must contractually participate in the distribution of Regulation S securities. Of course, however, entities may not use Regulation S to evade the registration requirements of the Securities Act nor may open-ended investment companies or unit investment trusts registered or required to be registered under the Investment Company Act or closed-end investment companies that are required to be registered under the ICA yet are not.

The two most important conditions that any offering by an issuer or a resale under Regulation S require that the offer and sale of the securities must be made in an offshore transaction and that there are no direct selling efforts made in or into the US of the securities offered under Regulation S. More specifically, an offshore transaction is one in which the offer to buy securities is not made to a person in the US <u>and</u> the buyer is or is reasonably believed to be physically located outside the U.S. when the buy order is originated, <u>or</u> the authorized employee of a corporation or partnership places the buy order outside the US <u>or</u> the authorized employee of a company or investment adviser that is an investment company places the buy order outside the US <u>or</u> the transaction is executed in an offshore market.[115] On this last criterion, the requirements are slightly different for both rule 903 and 904. For 903, the transaction must be executed in, on, or through a physical trading floor of an established foreign securities market outside the United States. Rule 403, on the other hand, requires that the transactions be carried out with the facilities of a designated offshore securities market and that the seller as well as her agents not know that the transaction has been prearranged with a buyer in the U.S.

The following markets are designated offshore markets: "[t]he Eurobond market, as regulated by the International Securities Market Association; the Alberta Stock Exchange; the Amsterdam Stock Exchange; the Australian Stock Exchange Limited; the Bermuda Stock Exchange; the Bourse de Bruxelles; the Copenhagen Stock Exchange; the European Association of Securities Dealers Automated Quotation; the Frankfurt Stock Exchange; the Helsinki Stock Exchange; The Stock Exchange of Hong Kong Limited; the Irish Stock Exchange; the Istanbul Stock Exchange; the Johannesburg Stock Exchange; the London Stock Exchange; the Bourse de Luxembourg; the

---

[115] See SEC Release No. 33-6863 (Apr. 24, 1990).

Mexico Stock Exchange; the Borsa Valori di Milan; the Montreal Stock Exchange; the Oslo Stock Exchange; the Bourse de Paris; the Stock Exchange of Singapore Ltd.; the Stockholm Stock Exchange; the Tokyo Stock Exchange; the Toronto Stock Exchange; the Vancouver Stock Exchange; the Warsaw Stock Exchange and the Zurich Stock Exchange." 17 CFR § 230.902, moreover, also provides that the Commission may designate "[a]ny [other] foreign securities exchange" as a designated offshore market. "Offers and sales of securities to persons excluded from the definition of U.S. person[116]…or persons holding accounts excluded from the definition of U.S. person will be "deemed to be made in offshore transactions."[117]

Regulation S also prohibits the offers relying upon its provisions from making directed selling efforts in, or into, the U.S. to condition "the market in the United States for any of the securities being offered in reliance on" the regulation. The Securities and Exchange Commission considers the following activities, among others, as directed selling: the placement of ads, articles, notices, or other publications in any print or digital American newspaper, magazine, or related venue;[118] broadcasting advertisements over American television stations, radio, or internet websites; mailing U.S. investors offering materials; holding seminars or meetings in the U.S. that are not limited to Qualified Institutional Buyers in connection with a concurrent U.S. private placement. On the other hand, in general, issuers can engage in the following activities without fear of violating Regulation S: providing legal notices or advertisements that must be published under the laws, rules, or regulations of the United States or a foreign State if they contain no more information that is legally required and include a restricted legend disclosing that the securities have not been registered under the 1933 Securities Act and cannot be offered or sold in the U.S. to, or for the account or benefit of, US persons without registration or an applicable registration exemption; releasing press notices announcing offshore offerings made in compliance with Securities Act rule 135 or 135c;[119] furnishing advertisements of publicly offered securities that list the underwriters involved in the offering; posting offering documents and other marketing materials on the internet that cover a proposed Regulation S offering or hosting web-based road shows if sufficient steps such as the placement of a prominent disclaimer and procedures for collecting buyer residences before the sale are taken to prevent U.S. persons for participating

For foreign issuers, press activities made under Rule 135e, which governs offshore press conferences, offshore meetings, and distributed materials covering a proposed offering of unregistered securities are permitted so long as the press activity is conducted outside the U.S.; press access is given to both international and U.S. journalists; any written materials provided at the offshore press activity contain a legend and do not include a buy order or other similar document to indicate interest in participating in the unregistered offering; and all or a portion of the offering is conducted offshore.[120]

---

[116] See page XXX above for the definition of this term in the text.

[117]

[118] The SEC is particularly concerned here with publications aimed at the US or those that have an average yearly circulation of at least 15,000 copies per year. In the event that a publication has separate US and non-US editions of their materials, the US edition is not considered in determining whether the non-US edition meets the general circulation requirements.

[119] These ads are permitted in any publication that has less than 20% of its general circulation in the United States. In making the 20% calculation, all editions are aggregated for a publication that prints separate US and non-US editions of their materials.

[120] For this last requirement, the issuer must have a bona fide intent to make an offshore offering.

## Convertible Securities

If convertible securities are being issued under Regulation S, substantial U.S. market interest is determined with reference to both the convertible security and the underlying security. If a substantial U.S. market interest exists for either financial instrument, there is a substantial U.S. market interest for the convertible security.

Finally, because convertible bonds are treated as if they are equity securities under Rule 405, all the applicable equity security restrictions apply to them as well. When determining the distribution compliance period, if the convertible securities cannot be converted into the underlying security for a period of time that is longer than the applicable distribution compliance period for the underlying security, the distribution compliance period for the offering is determined by reference to the convertible security rather than the underlying security. Because § 3(a)(9) of the Securities Act exempts from registration the conversion of debt into equity securities of the same issuer if no consideration is payable, there is no separate distribution compliance period for the underlying securities in these transactions. In the event that the conversion is made during the distribution compliance period, the securities issued after the conversion are only restricted for the rest of the initial distribution compliance period. On the other hand, if the conversion is not exempt under § 3(a)(9), the convertible securities offering is treated as if it were a continuous offering of the underlying security and the warrant offering requirements apply. If the warrant offering requirements are met, the distribution compliance periods on the convertible and underlying security run as one, if they are not met, the underlying securities will have a distribution compliance period that is separate from that of the convertible securities.

Regulation S provides a safe harbor under Rule 903 for issuers, distributors, their affiliates, and persons acting on their behalf. The provision divided the covered securities into three categories in order of their increasing likelihood to flow into the hands of U.S. persons.

## Rule 903

| Offering Category | Debt | Equity | Regulation S Requirement |
|---|---|---|---|
| Category 1 | | | No offshore transaction or directed selling efforts prohibition compliance are required. |
| Category 2 | Debt securities of reporting US issuers as well as the debt securities of reporting and non-reporting foreign issuers. | Equity securities of reporting foreign issuers | No offshore transaction or directed selling efforts prohibition compliance are required. |
| Category 3 | Debt securities of non-reporting US issuers. | Equity securities of reporting and non-reporting US issuers as well as well as | |

| | | non-reporting foreign issuers with a Substantial US Market Interest | |
|---|---|---|---|

## Category 1 Offerings

To qualify as a Category One offering, the issuer must be a foreign government or foreign private issuer for the purposes of Regulation S and reasonably believe that there is not substantial U.S. market interest in the security being offered at the start of the offering. A substantial U.S. market interest exists if either American securities exchanges and inter-dealer quotation systems – including Over the Counter Markets – taken together represent the single largest market for the equity securities in the shorter of the issuer's previous fiscal year of the period since the firm's incorporation or during either of the two aforementioned time periods, 20% or more of all trading in the equity security class was conducted on an American securities exchange or inter-dealer quotation system and less than 55% of the trading was conducted on a foreign country's securities market. For non-convertible debt securities, a substantial U.S. market interest exists if U.S. persons hold at least $1 billion of the issuer's aggregated debt securities; U.S. persons hold at least 20% of the principal amount of the issuer's aggregated debt securities; or at least 300 persons hold the issuer's debt, FILLER, and FILLER.

Here, U.S. officials can only sell debt securities in an overseas directed offering. An overseas offering is an event where a U.S. or foreign issuer offers and sells securities into a single non-U.S. State in accordance with that country's laws. To qualify as an overseas directed offering, US issuers can only offer and sell non-convertible debt that is denominated in a foreign currency, not convertible into securities denominated with U.S. dollars, and not linked to the dollar in a fashion that effectively converts the securities into U.S. dollar denominated instruments.

## Category 2 Offerings

Category 2 offerings include debt securities of reporting and non-reporting foreign issuers and equity securities of reporting foreign issuers. This subset also includes debt securities of U.S. reporting issuers. Under Regulation S, a reporting issuer is a company that is not an investment company under the 1940 Investment company Act; is registered under either §§ 12 or 15 of the 1934 Securities Exchange Act; and has filed all the periodic reporting required to be filed under §§ 13 or 15 of the Exchange Act for at least twelve months before the Regulation S offering. Counsel or investment banking advisors to foreign issuers should note that those foreign issuers whose equity securities trade only or predominantly in the United States may want to rely on Category 3 rather than Category 2.

Regulation S, unfortunately, also imposes transactional restrictions on securities included with Category 2. More specifically, these securities cannot be offered to or sold to, or held for the benefit or account of, a US person for 40 days from the later of the date. Refer to chapter XX above for a definition of US person. If a distributor sells the Regulation S securities to another distributor, dealer, or a person receiving a selling concession, fee, or another form of compensation before the distribution compliance period expires, it must send a notice to the buyer stating that the buyer is subject to the same restrictions on offers and sales that applied to the distributor. Once the distribution compliance period ends, these Category 2 transactional restrictions no longer apply.

Distributors that fail to comply with these transactional restrictions, it, its affiliates, and those acting on their behalf, will be banned from relying on the safe harbor.

**Category 3 Offerings**

Category 3 offerings include the securities that do not fall into either of the two proceeding groups and, more often than not, are filled with non-reporting U.S. issuer debt securities, reporting and non-reporting U.S. issuer equity securities, and non-reporting foreign issuer equity securities that have a substantial U.S. market interest. These financial instruments are subject to three primary requirements. First, the securities must adhere to a distribution compliance period that that prohibits offers and sales to U.S. persons for 40 days, six months, or a year for straight debt securities, reporting issuer equity securities, and non-reporting issuer equity securities respectively. Second, if a distributor sells the Regulation S securities to another distributor, dealer, or a person receiving a selling concession, fee, or other form of compensation before the applicable distribution compliance periods mentioned above expires, that distributor must send notice to the buyer stating that it is subject to the same restrictions on offers and sales that apply to the distributor. More than that, for equity securities, each buyer must agree to resell the Regulation S securities  in accordance with Regulation S or a registration statement that covers the securities or an available registration exemption; agree not to hedge those securities in ma manner that does not comply with the Securities Act; attach a legend to the securities stating that the transfers of the instrument that do not comply with Regulation S are prohibited; and if the buyer is not a distributor, it must certify that it is either not a U.S. person and is not acquiring the securities for the account or benefit of a U.S. person or that it is a U.S. person who bought the securities in a transaction that was exempt from registration.

**Warrants**

 If an issuer is offering warrants under Regulation S, substantial U.S. market interest is determined by analyzing the interest in the underlying financial instrument that will be acquired once the warrants are exercised. More than that, Regulation S imposes additional requirements on warrants that are released under Category 2 or 3 – namely: (1) each warrant must contain a legend stating that the warrant and the securities that may be issued if the instrument is exercised have not been registered under the 1933 Securities Act and that the warrant cannot be exercised by (or on behalf of) any U.S. person without registration or a registration exemption,[121] (2) each person exercising a warrant must either certify to the issuer that it is not a US person and the warrant is not being exercised on behalf of a US person or deliver to the issuer a written legal opinion that the warrant and the underlying securities that will be delivered upon its exercise have been registered or are exempt from registration, and (3) that the issuer, distributors, their affiliates, and persons acting on their behalf have implemented procedures to ensure that the applicable warrants cannot be exercised in, nor delivered to, the United States without registration or a registration exemption.

Assuming these three requirements are met, the distribution compliance period for the warrants begins on the completion of their distribution as determined by the relevant underwriter and is the same as the compliance period for the underlying securities. In the event that the three prerequisites are not satisfied, the distribution compliance period for the warrants begins once they are exercised.

**Conditions to Use to Resale Safe Harbor Under Securities Act Rule 904**

---

[121] See chapter XX for the applicable definition of U.S. person.

A seller must ensure that (1) the offer and sale of their securities were made in an offshore transaction and that (2) that there were no directed selling efforts in or into the US of the securities offered under Regulation S to claim Rule 094's resale safe harbor. On the latter point, a directed selling effort by any of the seller's affiliates or any person acting on behalf of the seller or its affiliates will preclude reliance on the rule. This rule is arguably more generous than the analogous requirement under Rule 903 which precludes reliance once any directed selling effort by any participant is made. For offshore resales by dealers and other persons receiving selling concessions or fees and that occur before the end of the applicable distribution period , the seller must not know that the offeree or buyer of the securities is a U.S. person (see Chapter XX for the definition of this term) and the seller must send the buyer a notice stating that the securities can only be offered and sold during the distribution compliance period in compliance with Regulation S or a registration statement covering the securities or an available registration exemption *if the seller knows that the buyer is a dealer or other market person receiving a selling concession or fee.*

**Resales under Rule 144**

Section 5 of the 1933 Securities Act requires all offers and sales of debt or equity securities to be registered with the Securities and Exchange Commission unless there is an available registration exemption. Resales under Rule 144 are secondary distributions or trading transactions by persons other than the issuer of the securities. Although most resales are unregistered under the 1933 statute, resales can be registered if the issuer has granted registration rights to the holders of the securities. Unregistered resales usually involve the issuer selling unregistered securities to one or more initial purchasers or investors in a private placement under §4(a)(2) or Regulation D or the initial purchasers or other initial investors – followed by any investors who buy directly from the initial purchasers and any subsequent investors – reselling the restricted securities on an unregistered basis under a different available registration exemption.

Section 4(a)(1) cannot be claimed by broker-dealers – an exemption that includes most securities firms. A broker is any person engaged in the business of effecting transactions in securities for the account of others.[122] By way of contrast, a dealer is any person regularly engaged in the business of buying or selling securities either for her own account or for the accounts of others.[123] Unlike a broker, who only acts as an agent for a customer in exchange for a commission, a dealer may also act as a principal by dealing in securities for her own inventory as part of her regular business. If an investor relying on §4(a)(1) uses a broker-dealer to resell her securities either voluntarily or because she is required to do so, the broker-dealer can rely on a registration exemption under §4(a)(3) or §4(a)(4) of the Securities Act for executing the resale (see Chapter XX).

Rule 144 provides a safe harbor under §4(a)(1). A seller cannot rely on §4(a)(1), however, if the seller is an underwriter or her sale otherwise involves a distribution of securities. A sale that complies with the provisions of Rule 144 is not considered a distribution. Thus, a person who complies with all the provisions of Rule 144 for her resales is not a statutory underwriter and can rely on §4(a)(1) for the unregistered resale of her securities. More than that, purchasers in a sale that complies with rule 144 receive unrestricted securities.

**Volume Limitations on Affiliate Sales**

---

[122] 15 U.S. Code § 78c(4).

[123]

Regardless of whether a transaction involves restricted or unrestricted securities, the amount of securities that affiliates can resell under Rule 144(e) is limited. The amount of securities sold by an affiliate together with any security sales of the same class by the affiliate during the three months before the Rule 144 sale cannot exceed the greater of 1% of the issuer's outstanding shares or other units of the same class of securities sold; the average weekly trading volume of the class of securities reported according to an "effective transaction reporting plan" or an effective national market system plan;"[124] the average weekly reported trading volume of the class of securities on all national securities exchanges and automated quotation systems for the four calendar weeks before either the Form 144 notice is filed, or, if a Form 144 is not required, four weeks before the affiliate's broker receives the order to sell; and if the transaction involves only debt securities, 10% of the principal amount of the particular class of debt securities.

**Rule 144 Requirements**

| Requirement | Affiliates for Preceding Three Months | Non-Affiliates for Preceding Three Months |
|---|---|---|
| Current public information about the issuer. | Required for reporting and non-reporting issuers. | Required for reporting issuers only, if and when the seller satisfies the minimum holding period |
| Holding period for restricted securities. | Six months for reporting issuer.<br><br>One year for non-reporting issuer. | Six months for reporting issuer.<br><br>One year for non-reporting issuer. |
| Volume limitations for the three months prior to the Rule 144 sale | Must not exceed the greater of:<br><br>1% of the issuer's outstanding class of securities<br><br>Four-week average weekly reported trading volume of such class of securities<br><br>For debt securities only, 10% of the principal amount of such class or tranche of debt securities. | None |
| Manner of sale limitations for equity securities | Can only resell equity securities through:<br><br>A §4(a)(4) broker transaction | None |

---

[124] Under National Market System Regulation 600, "the effective transaction reporting plan" is defined as . By way of contrast, Regulation 600 defines an "effective national market system plan" as

| | Transactions with a market maker as defined by §3(a)(38) of the Exchange Act<br><br>Riskless principal transactions | |
|---|---|---|
| Form 144 notice | Required, if the amount of the Rule 144 sale exceeds 5,000 shares or $50,000 in any three month period. | Not required |

## Notice of Affiliate Sales

If a proposed Rule 144 resale by an affiliate involves more than 5,000 shares of securities or has an aggregate sale price of more than $50,000 in any three month period, the seller must file a Form 144 providing notice to SEC via the agency's EDGAR website (or on paper via courier service or USPS) and the securities exchange where the securities are listed (see appendix XX for a copy). If a paper Form 144 is submitted, the seller must file three copies with the SEC and an additional copy with the relevant exchange. If the form is filed on EDGAR, the securities exchanges generally will coordinate with the SEC and treat the filing as if it were addressed to them as well. Form 144 must be filed at the same time the affiliate places the broker or market maker order to sell the securities and, the broker must have a bona fide intention to sell the securities within a reasonable time after filing the Form 144 notice and signing it. Form 144 requires the provider to disclose basic issuer identification (such as its name and address); the seller's name, address, and relationship to the issuer; the name and address of each broker selling the securities or each market maker acquiring the securities; information about all securities of the issuer that the seller sold during the 3 months before the Rule 144 sale; the aggregate market value, the amount of the securities that will be sold and, the amount of outstanding securities in the issuer's most recent public statement, *inter alia*; and information on when, how, and from whom the seller obtained the securities that will be sold.

## Sales to Qualified Institutional Buyers

Rule 144A(d)(1) requires that the covered securities are sold to a qualified institutional buyer or a purchaser that the seller reasonably believes is a qualified institutional buyer by any means. Generally, qualified institutional buyers are institutions – not individuals – that own or invest at least $100 million of securities on a discretionary basis. FILLER WITH COMPLICATED DEFINITION. To establish that a prospective buyer meets the $100 million requirement, a seller can rely on any of the following publicly available documents: the firm's financial statements, SEC filings, or information appearing in a recognized securities manual that was released within 16 months of the Rule 144A sale to a US buyer or within 18 months of a covered sale to a non-US buyer. Sellers can also rely on a third-party prepared list of qualified institutional buyers as long as the information that resulted in the preparation of the list was provided within 16 or 18 months

of the Rule 144A sale, as applicable or the seller had no reason to question the validity of the qualified institutional buyer certification.[125]

## Rule 144 and Shell Companies

The Shell companies issuing restricted securities may not claim Rule 144's protection. In the event, though, that a firm that used to be shell company attempts to issue restricted securities, it will be able to claim coverage so long as it is subject to the Exchange Act's reporting requirements, has filed all reports required for disclosure under the Exchange Act for the past 12 months, and has filed the required information set out in SEC Form 10 or 20-F to register the securities class under the Exchange Act. This last requirement can be satisfied by filing a Form 8-K with the information required by Form 10 or 20-F.

## Information Requirement

Every holder of the Rule 144A securities as well as prospective buyers have the right to obtain a select set of "reasonably current" information about the issuer unless the issuer is a: a reporting company required to file periodic reports under § §13 or 15(d) of the 1934 Exchange Act; a foreign issuer releasing disclosure documents on its website in compliance with Rule 12g3-2(b) exemption from registration and reporting under the Exchange Act; or a non-U.S. government issuer eligible to register securities under Schedule B of the 1933 Securities Act. This information typically includes the most recent balance sheet, income statement, and a statement of retained earnings; similarly audited financial statements for the previous two years; and a brief description of the issuer's business, products, and services. The aforementioned information is assumed to be "reasonably current" if the balance sheet reflects the positions of the firm 16 or less months before the sale; the income statement and statement of retained earnings are for the 12 months before the date of the disclosed balance sheet; and the issuer business description was produced 12 months before the sale respectively. If the balance sheet reflects the position of the firm six months or more before the sale, interim income statements and retained earnings statements from the date of the balance sheet to a date within 6 months of the sale will need to be provided.

## Complying With U.S. Federal Securities Laws in International Private Equity Transactions

Fund counsel must ensure that the parties comply with U.S. federal securities laws in an international private equity transaction if the transaction is conducted as a 'tender offer;' the subject firm's securities are registered under the Exchange Act; or the transaction involves a business combination in which the consideration consists in whole or part of securities. A tender offer involves a broad solicitation to purchase a substantial percentage of a firm's securities over a limited period of time. These buy offers are regulated by § § 14(d) and 14(e) of the 1934 Exchange Act as well as Regulation 14D and Regulation 14E. Section 14(e) and Regulation 14E contain procedural rules covering tender offers and also set out anti-fraud and anti-manipulation rules for international private equity transactions. These provisions apply to any tender offer for any security that is directly or indirectly made using U.S. mail or another mode of communication through interstate commerce.[126] Section 10(b) of the 1934 Exchange Act in tandem with SEC rule 10b-5 may also apply to an international private equity transaction. These regulations prohibit the use of an instrumentality of interstate commerce to defraud, engage in any act that operates as

---

[125] SEC No-Action Letter, 1999 WL 46707 (Feb. 3, 1999); SEC Release No. 33-6862 (Apr. 23, 1990).
[126] SEC Release No. 33-6866 (June 6, 1990).

fraud or deceit, or make a material misstatement or omission in a securities transaction. If the international private equity transaction would result in the offeror 'going private' – i.e. the firm's securities will be held by less than 300 persons or the firm will no longer be listed on a U.S> stock exchange, the 1934 Exchange Act's Rule 13e-3 may also apply.[127]

To determine whether an offer is a tender offer within the meaning of the 1934 Securities Act, counsel should apply the South District of New York's eight factor Wellman test and look to whether the offer involves: the active and widespread solicitation of security holders for the firm's securities; whether the solicitation is made for a substantial percentage of the firm's securities; whether the offer was made at a premium over the prevailing market price; whether the offer's terms are firm rather than negotiable; whether the offer is an exploding one; whether the securities holders are being subjected to pressure to sell their securities; whether the offer is contingent on the tender of a fixed number of securities; and whether the press release announcing the purchase precedes or accompanies a rapid accumulation of large amounts of the firm's securities.[128] If readers in the United Kingdom, unsurprisingly are distraught by the prospect of complying with U.S. securities laws, these regulations might be able to be avoided by structuring the private equity transaction as a scheme under part 26 of the 2006 UK Companies Act or structuring the transaction as a statutory merger, corporate amalgamation, or synthetic merger.

The U.S. Securities and Exchange Commission, though, has provided exemptions for certain international transactions.[129] If the subject firm is a foreign private issuer, the next question is to ask what percent of the firm is held by U.S. holders. If less than 10% of the company is held by U.S. holders and the consideration for the transaction consists of cash, the Securities Act does not apply, the transaction is exempt from much of Regulation 14E, and the transaction is exempt from all of Regulation 14D. If less than 10% of the company is held by U.S. holders, the consideration for the transaction does not consist of cash, and the firm's securities are registered, Rule 802 provides an exemption from the Securities Act, the transaction is exempt from much of Regulation 14E, and the transaction is exempt from all of Regulation 14D.


If U.S. holders hold more than 10% of the firm but less than 40%, consideration for the transaction does not consists of cash, and the firm's securities are registered, the default presumption is that the securities must be registered under the Securities Act and that limited relief will be provided under Regulations 14D and 14E. If U.S. holders hold more than 10% of the firm but less than 40%, consideration for the transaction consists only of cash, and the firm's securities are not registered, the default presumption is that the securities must be registered under the Securities Act, limited relief will be provided under Regulations 14E, and that Regulation D will not apply. If U.S. holders hold more than 10% of the firm but less than 40%, consideration for the transaction does not consists of cash, and the firm's securities are registered, the Securities Act does not apply and limited exemptions are available under Regulations 14D and Regulations 14E. If U.S. holders hold more than 10% of the firm but less than 40%, consideration for the transaction does not consists of cash, and the firm's securities are not registered, the Securities Act does not apply, Regulation 14D does not apply, and limited exemptions are available under Regulation E. If the subject firm

---

[127] SEC Release No. 34-17719 (Aug. 13, 1981).

[128] *Wellman v. Dickinson*, 475 F. Supp. 783 (S.D.N.Y. 1979).

[129] SEC Release No. 33-8957 (Oct. 9, 2008); SEC Release No. 33-7759 (Oct. 22, 1999).

is a foreign private issuer or U.S. holders hold more than 40% of the firm, cross border tender offer exemptions are not available.

**Private Equity Interim Consortium Agreements**

In the private equity context, a consortium deal occurs when a fund teams up with one or more additional funds – usually a competitor – to purchase a target or the target' assets. In LBOs, the funds will form an acquisition vehicle to obtain the target with a combination of equity financing from the funds and debt financing from banks and other sources. Consortium deals allow funds to increase the amount of available capital while taking on less risk and achieving enhanced access to debt financing. Consortium deals are usually entered into after a bid has been placed on a target or after the winner of the auction process has been announced. Funds enter consortium agreements to outline the terms of definitive post-closing investor agreements, ensure legal compliance by all members, regulate publicity and ensure confidentiality, agree on the details of fee and expense sharing, set out the responsibilities of the financial, legal, and accounting consultants of each party, provide for exclusivity to facilitate information sharing, confirm the transaction's structure and relative equity contribution, and determine governance and decision-making between the signing and closing of the acquisition. The interim consortium agreement will set out the terms that the investors agree to work together on, include term sheets outlining how the investors will manage and sell the target or initiate an IPO for the target, and will expire once the target acquisition is completed. Once the interim consortium agreement expires, the terms of the definitive investor agreement will being to apply. The agreement, typically, will also address how decisions affecting the purchase price, acquisition agreement terms, consent and waiver grant process, closing condition satisfaction, debt financing terms, management equity incentive program, and equity commitment letter enforcement will be made. This decision-making framework should prove functional not only for interim p between singing and closing but also, the firm after closing because, at the very least, the decision making framework established in the consortium deal will be replicated once a permanent consortium agreement is adopted. Here, it is common for investors to be given rights that are proportional to the amount of equity that they commit to the transaction, for each fund to invest an equal amount in the consortium deal, and for a super-majority to be required to make decisions affecting the acquisition vehicle. In most instances, the contract will also provide minority investors with limited consent rights regarding purchase price changes, waivers of a closing condition, or actions that have a disproportionate adverse impact on a particular investor. The majority-investor, though, often has a contractual right to proceed with an action over a minority investor's veto by removing the minority investor from the transaction and refunding its equity contribution. Here, the investors to the project will be given an opportunity to take the removed investor's share and any remaining deficit will be filled with funds from outside investors who are brought into the deal. The consortium agreement's contract covenants will typically be relevant to minority-majority investor disputes. These clauses typically will prohibit deal members from contacting or joining another group or making an independent bid; restrict deal members' use of confidential information covering transaction structure alternatives, financing terms, bidding strategy, and business plans to achieve operational efficiencies; provide member recourse against non-consortium members for any liability caused by a member's failure to provide complete or accurate information; allocate liability under SEC rules for misstatements or omissions included in the disclosure document based on information provided by a consortium member; provide for legal, accounting, and consultant expense pooling; allocate expenses among consortium members; require certain actions and efforts from deal members if regulatory issues

arise; set out voting obligations for deal members; cover termination fee contributions; ensure coordination on public communications and the accuracy of released information. Interim consortium contracts also prevent deal members from contacting or joining another group of private equity funds to bid on the target; continue to apply to non-consenting investors after an future removal from the deal, require deal members to meet the 'best efforts' standard and take the actions that the acquisition vehicle is required to meet; require deal members to take action on regulatory issues specific to a given dear to prevent the matter from jeopardizing the entire transaction; have investors agree that they will modify or eliminate governance rights either at the request of a regulator or the request of other investors; and permit the deal members to remove a party from the transaction if the members conclude that removal may resolve a regulator's objections to a transaction. When it comes to debt financing it is more common than not for the consortium contract to specify the obligations of the lead investor, the rights of other investors to withdraw from the deal if the final financing terms are not acceptable to them; and the fact that the acquisition vehicle will obtain the financing set out in a debt commitment letter according to the terms of the debt commitment letter itself or on modified terms. After the interim consortium agreement is complete, fund management will turn to negotiations on the investor agreement and management equity incentive programs. The former will usually take the form of a stockholder agreement and a registration rights agreement or a limited liability company operating agreement. Here, the negotiated terms will be summarized in a term sheet attached to the consortium agreement along with contract covenant requiring the fund members to negotiate definitive agreements consistent with the term sheet. Th terms for the management equity incentive program will be set out in the term sheet attached to the consortium agreement. The equity program is usually discussed in broad terms because the target's board will usually restrict or simply refuse to discuss post-closing equity participation until an acquisition has been signed.

Equity contributions in interim consortium agreements are handled under a different set of rules. Here, because acquisition vehicles are typically newly formed shell companies without any assets, targets generally require consortium members to guarantee the payment of a termination fee in proportion to the amount of their equity commitments. If the consortium members own shares of the target before the acquisition agreement is signed and a founder or large shareholder is included in the deal, it is also common for the investors to include a clause in the contract requiring the members to vote in favor of the transaction. These voting agreements, though, just like management equity incentive programs, are typically concluded after the acquisition agreement is signed in part because the shareholder deal members may incur reporting requirements under the 1934 Exchange Act. Finally, if the deal is a large LBO, one of the buyers may agree to fund equity for the transaction while also requesting the option of selling a portion of their equity to one or more affiliated or unaffiliated third parties to reduce investment risk. This device is referred to as equity syndication. The negotiations here will center on the acquisition vehicle's obligations to assist in equity syndication; the procedural aspects of the equity syndication; transferee governance rights; the equity syndication timing; the identity and nature of the transferee; the maximum amount of equity that can be sold; and whether a party can force other deal members to engage in an equity syndication.

**Exchange Act Registration Requirements**

Certain private equity, hedge fund, and venture capital funds may be required to comply with §15(a) of the Exchange Act when soliciting investors. The statute covers both brokers and dealers. The former is a person engaged in the business of effecting securities transactions for other

individuals' accounts. On the other hand, the latter is a person engaged in the business of buying and selling securities for that person's own account as part of a regular business.[130] When considering whether registration may be necessary, investment professionals should look to whether the individual is actively soliciting fund investors; whether she or he receives compensation related to transactions including fees based on the amount invested or the securities that are placed; whether the individual has duties for marketing the fund's interests; or whether the individual regularly places the fund's securities. Engaging in one or more of these activities may require a person associated with a private equity or venture capital fund to register with the SEC as a broker-dealer. More than that, the SEC has even taken the position that the receipt of a commission for referring an investor is sufficient to require registration even if the associate was not active in soliciting or negotiating the investment. Fortunately, the Exchange Act provides an exemption from broker-dealer registration for private equity and venture capital associates. Here, the exempt party must be a partner, officer, director, or employee of the issuer; a company or partnership that controls is controlled by or is under common control with the issuer; or, if the employer is a limited partnership, a corporate general partner of the partnership. If the issue here is an investment company that is registered under the 1940 Investment Company Act, the partner, officer, director, or employee of the issuer must be a registered investment advisor acting as an advisor to the issuer. To take advantage of the exemption, the investor cannot be compensated directly or indirectly through commissions; be an associated person of a broker-dealer; be subject to statutory disqualification under §3(a)(39) of the Exchange Act. Finally, the investor seeking the exemption must satisfy at least one of three criteria. First, she or he must limit her or his security placement activities to certain categories of regulated investors including registered broker dealers, banks, investment companies registered under the ICA, or state regulated insurance companies. Second, she or he must perform substantial duties on behalf of the issuer at the end of an offering; not be associated with a broker-dealer or been associated with a broker-dealer for a twelve month period; and not have participated in more than one offering for the issuer in a twelve month period. Finally, she or he has the option of restricting her or his activities to preparing written materials to be approved by a partner, officer, or director of the private equity fund, venture capital fund, or the investment advisor; responding to investor inquiries with a registration statement under the Securities Act or another offering document; or performing ministerial or clerical work only. There federal securities laws also provide a limited exception for individuals co-investing in the private equity fund or venture capital fund's securities; providing due diligence and standardization documentation services related to the fund's securities; or maintain a platform or mechanism permitting offers, sales, purchases, negotiations, or general solicitation so long as the individual engaging in these activities would not have to register under the Exchange Act but-for her or his engagement in these activities. This exemption is available only if the individual relying on the exemption is not in possession of investor funds or of the securities in the purchase and sale process; the individual is not disqualified under §3(a)(39) of the Exchange Act ; and neither the individual claiming the exemption nor any of associated person of her's or his receives compensation in connection with the purchase or sale of the securities.

Placing the SEC aside for the moment, FINRA also imposes limits on broker-dealer conduct. Here, <mark>XXX</mark> may not contain any false, exaggerated, unwarranted, promissory, or misleading statement or claim in any communication; may not predict or project performance, imply that past performance will recur or make any exaggerated or unwarranted claim, opinion, or forecast. For

---

[130] SEC guidance to Broker-Dealer Registration, division of Trading and Markets (Apr. 2008).

the most part, FINRA also prevents broker-dealers from using related performance information when marketing a private equity or venture capital fund's interests. This regulation codified as FINRA Rule 2210 applies to information published or distributed by broker-dealers regardless of whether the broker-dealer prepared the information herself or had a third-party prepare the information. The term related performance in formation here includes performance information on investment companies, funds, portfolios, accounts, or composites that are managed by the same investment advisor or portfolio manager that manages the marketed fund.[131] FINRA, however, does permit the use of related performance information for marketing a private fund that is excluded from registration under §3(c)(7) of the 1940 Investment Company Act.[132] Securities dealers should beware of the fact that FINRA has brought several enforcement actions in the past against broker-dealers who have used targeted returns in their private equity or venture capital fund's marketing materials.[133] Rule 2210 is also relevant when it comes to broker-dealer social media activity. The rule extends to three communications: institutional communications distributed or made available only to institutional investors that does not include a firm's internal communications, retail communications that are distributed or made available to more than 25 retail investors regardless of whether the person has an account with the firm within any thirty day calendar period; and correspondence that includes communications that are distributed or made available to 25 or fewer retail investors within any 30 day calendar period. Under Rule 2210, an institutional investor is any bank, S&L, insurance company or investment company registered under the 1940 ICA; an investment adviser registered with the SEC under the Investment Advisors Act of 1940 or a State securities commission; any other person with total assets of at least $50 million; a government entity or subdivision; an employee benefit plan; a qualified plan as defined in §3(a)(12)(C) of the 1934 Securities and Exchange Act; multiple qualified plans offered to employees of the same employer that have an aggregate membership of 100 individuals (not including any participant of the plans); a FINRA broker dealer or registered person if a broker-dealer; or a person acting solely on behalf of an institutional investor. A retail investor, by way of contrast, is any individual or entity that is not an institutional investor. Rule 2210 requires investment management firms to conduct prior reviews of all retail communications except research reports on debt and equity securities and other retail communications that are approved by a NYSE Series 16 Supervisory Analyst; FINRA approved retail communications previously filed with FINRA by another member; and communications made during an online interactive forum and communications that do not make recommendations or otherwise promote the products and services of the firm. Rule 2210 contains an exemption from the pre-approval requirement for retail communications posted in online interactive forums including chat rooms or online seminars that do not make any financial or investment recommendation or otherwise promote a product or service of the firm.

Prior review is not required for institutional communications but may be conducted. As for correspondence, specific review is not required but, is subject to the firm's supervisory oversight under FINRA Rule 3110. FINRA also imposes requirements on some content displays for investment management firm websites. More specifically, FINRA Rule 2210(d)(8)(A) requires firms to include readily apparent references and hyperlinks to FINRA's BrokerCheck service on

---

[131] FINRA Interpretive Letter to Michael Udoff, Securities Industry Association (Oct. 2, 2003).
[132] FINRA Interpretive Letter to Yukako Kawata, Davis Polk & Wardell (Dec. 30, 2003).
[133] NASD Fines Citigroup Global Markets, Inc. $250,000 In Largest Hedge Fund Sales Sanction To Date, NASD Press Release (Oct. 25, 2004); NASD Fines Altegris Investments for Hedge Fund Sales Violations, NASD Press Release (Apr. 22, 2003).

the initial web page that the firm intends to be viewed by retail investors and any other web page that includes a professional profile of one or more of the firm's registered persons who conduct business with retail investors. To satisfy the rule's requirements, a firm can add a link on its website to take customers directly to the BrokerCheck homepage. The firm can also provide a direct link to its or the specific registered representative's BrokerCheck profile.[134] FINRA also expects firms using social media for business purposes to have supervisory policies and procedures to monitor all electronic communications technology used by the firm and its associated persons to conduct the firm's business; consider whether the adoption of new electronic communications technologies requires any updates or changes to the firm's supervisory policies and procedures before implementing new or different communications methods; and ensure that its use of electronic communications media enables it to make and keep records as required by SEC Rules.[135]

Under a supervisory system established by a broker dealer under FINRA Rule 3110, a registered principal must also review any social media site than an associated person intends to use for a business purpose. The registered principal must also review an associated person's proposed social media site in the form that it will first be made available to customers and the public. Investment management firms also have the option of adopting risk-based supervisory procedures for unscripted participation in electronic forums. The procedures must be designed to ensure that the communications are based on principals of fair dealing and good faith, are fair and balanced, and provide a sound basis for evaluating facts; the communications do not omit any material fact or qualification; there is not any false, exaggerated, or unwarranted promissory or misleading statements or claims in any communication; the nature of the audience is relevant to the content of the communication; and the communications do not predict or project performance, imply that past performance is expected to recur, or make exaggerated or unwarranted claims, opinions, or forecasts.[136] The investment management principal should also take account of whether the communication is static or interactive. Static content is a planned communication to a target audience that cannot be altered or that does not provide for interaction with the author once it is published. This includes websites, advertisements, banners, sales literature, profiles, videos, background information, and other material that remains posted until removed. Static content that is made widely available to retail investors must be approved by a registered principal before it is posted and when it is subsequently edited. A non-password protected website is considered to be available to anyone so the investment firm principal must review it as a retail communication. However, an investment management firm linking its own website to third party sites may not establish a link to any site that the firm knows or has reason to know contains false or misleading content or a site that has red flags that indicate that the linked site contains false or misleading content. An investment management firm is responsible under Rule 2210 for content on a linked third-party site if the firm has adopted or has become entangled with its content by either indicating on its site that it endorses the content on the third-party site or participating in the development of the content on the third party site. Here, a firm that co-brands any part of a third-party site by placing its logo prominently on the website is responsible for the content on the site. Under these

---

[134] FINRA Regulatory Notice 15-50, BrokerCheck: SEC Approves Rule Requiring Members' Websites to Include a Readily Apparent Reference and Hyperlink to BrokerCheck (Dec. 2015).

[135] FINRA Regulatory Notice 07-59, Supervision of electronic Communications (Dec. 2007).

[136] FINRA Regulatory Notice 11-39 Social Media Websites and the Use of Personal Devices for Business Communications (Aug. 2011).

circumstances, FINRA considers the firm to have adopted the content on that site.[137] Investment management firms also have to adopt procedures to manage data feeds on their own websites. Under these procedures, the firm should be familiar with the proficiency of the vendor of the data; the vendor's ability to provide data that is accurate as of the time that it is presented on the firm's website; and the criteria the vendors follow in gathering or calculating the types of data that the firm intends to feed into its website to determine whether the vendor is performing this function in a reasonable manner.

In establishing policies and procedures for business use of social media, investment management firms should determine the specific social media sites that associated persons are allowed to use; who is allowed to use the site and in what manner; who is reviewing social media communications and how often the review is performed; and whether personal electronic devices are allowed. Investment management firms should also consider who required approval of social media use is granted; the types of records required to evidence approval; education and training programs for associated persons; annual certifications of compliance by associated persons; whether associated persons will be permitted to use personal communications devices providing a secure portal into the firm's communication system; and the ongoing review process for registered principals including random spot-checking and lexicon searches, monthly inventory checks and quarterly audits, red flag follow ups, and due diligence sing internet and social media searches of the names of associated persons to ensure proper use of approved sites.

By way of contrast, a password protected website that is limited to institutional investors is an institutional communication that need not be approved by the investment principal beforehand. The other type of communication, interactive communications, includes non-static, real-time communications such as tweets, status updates on Twitter, LinkedIn or Facebook, and blogs that are used to engage in real-time interactive communications with a target audience. Interactive content does not need prior approval by a registered principal regardless of whether it involves retail or institutional investors. Interactive content that becomes static and that is distributed to retail investors must be approved by a principal.[138] The treatment of blogs under FINRA Rule 2210 turns on the manner and purposes for which the blog was written. Blogs can be considered static content that requires principal approval if it is posted on a social media website that is widely distributed to retail customers or a blog can engage a user in an interactive communication that does not require approval regardless of whether the blog is directed to retail or institutional investors.[139]

The rules do not apply to unscripted participation in an interactive forum. Associated persons can also use personal communication devices and other equipment to access firm business applications and perform firm business activities only if the firm uses technology that enables it to retain records of communications conveyed using the device and supervise the activity. To ensure that the business communications are readily obtainable without capturing personal communication sent using the same device, firms should have the ability to separate business and

---

[137] FINRA Regulatory Notice 11-39 Social Media Websites and the Use of Personal Devices for Business Communications (Aug. 2011).
[138] FINRA notice 10-06 Social Media Web Sites: Guidance on Blogs and Social Networking Web Sites (Jan. 2010); FINRA Regulatory Notice 11-39 Social Media Websites and the Use of Personal Devices for Business Communications (Aug. 2011).
[139] FINRA Regulatory Notice 10-06 Social Media Web Sites: Guidance on Blogs and Social Networking Web Sites (Jan. 2010).

personal communications. This may mean that associated persons use a separately identifiable application on their devices for their business communications.

FINRA also requires broker-dealers and associated persons to have reasonable basis to believe that a recommended transaction or investment strategy involving securities is suitable for the investor or investors in question based on information obtained on the investor's investment profile through the broker-dealer's reasonable due diligence or the reasonable due diligence of her or his associated person. The investor's profile includes but is not limited to the investor's age; the investor's financial situation and needs; tax status; investment objectives; investment experience; investment time horizon; liquidity needs; risk tolerance; and information disclosed by the investor. This requirement can be broken down into three different regulations. Firm management must exercise reasonable diligence to ascertain the customer's investment profile. Here, asking the customer for the information required under FINRA Rule 2111.04 generally constitutes reasonable diligence. When customer information is not provided despite a firm's reasonable diligence, the firm must consider whether it has a sufficient understanding of the customer to properly evaluate the recommendation suitability.[140]

First, before determining whether a security will be suitable for a particular investor, the broker-dealer, at the very least, must be able to conclude that the investment is suitable for at least some investors. The existence of reasonable diligence here turns on the risk and complexity of the securities and investment strategy and the broker-dealer's familiarity with the investment strategy. FINRA has taken the position that with investments involving hedge funds the broker-dealer should review the fund manager's background; the offering memo; the subscription agreement; references for the fund manager; and the performance of the private fund and its fund manager. If a broker-dealer recommends a fund of funds, she or he must extend her or his diligence to the underlying funds.[141] More than that, broker-dealers engaged in Regulation D private placements have a specific affirmative obligation to conduct a reasonable investigation of issuers providing these offerings. Here, the broker-dealer should conduct a reasonable investigation of the issuer and its management; the issuer's business prospects; the assets held by the issuer; the assets acquired by the issuer; the issuer's claims; and the intended use of the proceeds from the offering. For complex financial instruments, brokers and dealers should base their analysis on likely product performance in a wide range of normal and extreme market conditions. As a precaution investment management firms should also have format written procedures that require broker-dealers to disclose who the complex financial instrument is for, whether the instrument is approved for limited or general retail distribution, the parties who should not be offered the product, the product's investment objective, the reasonableness of the product's investment objective, the product's ability to improve the firm's current offerings, whether less complex products can achieve the complex product's investment objectives; the assumptions that underly the complex product, the reasonableness of the assumptions underlying the complex product; the factors that determine the complex product's return; scenarios where the complex product does not provide principal protection or enhanced yield; how the firm and its associated persons are compensated for the complex product offering; any conflicts of interest for the firm in offering the complex

---

[140] FINRA Regulatory Notice 11-25 Know Your Customer and Suitability: New Implementation Date for and Additional Guidance on the Consolidated FINRA Rules Governing Know-Your-Customer and Suitability Obligations (May 2011).
[141] NASD Reminds Members of Obligations When Selling Hedge Funds NASD Notice to Members 03-07 (Jan. 23, 2003).

product; legal, tax, market, investment, and credit risks associated with the complex product; the product's liquidity; and whether there is an active secondary market for the product.[142]

Second, the broker-dealer must have a reasonable basis to believe that the recommendation is suitable for a particular investor based on the investor's investment profile. FINRA has refused to take the position that an investment is suitable for an investor simply because the investor is qualified to invest in it because of a registration exemption.[143] Finally, the broker-dealer who has actual or de facto control over the investor's account must have a reasonable basis for believing that a series of recommendation transactions – when taken as a whole – are not excessive in size or number or unsuitable for the investor. FINRA, however, has offered exemptions from the second requirement on customer suitability where the broker-dealer or an associated person has a reasonable basis for believing that the institutional investor is capable of evaluating investment risks independently and the institutional investor affirmatively indicates for all potential transactions for its account that it is exercising independent judgment on a trade-by-trade basis, on an asset class by asset class basis or in terms of all potential transactions for its account. The phrase institutional account here means that the institution is a bank, an S&L, an insurance company; a firm that is registered under the 1940 Investment Company Act; an investment advisor registered with either the SEC or a State securities commission; or any other person with at least $50 million in assets. When evaluating whether a broker-dealer has breached her or his suitability obligation by engaging in excessive consumer activity, investment management firms should look to the turnover rate, cost-to-equity ratio, and use of in-and-out trading in a customer's account. For the purposes of the suitability rule, the term customer generally includes a person who is not a broker or dealer and who opens a brokerage account at a broker-dealer or purchases a security for which the broker-dealer receives or may receive compensation even though the security is held at an issuer, issuer affiliate, or a custodial agent. The suitability rules applies when a broker-dealer or is associated person makes a recommendation to a potential investor who then becomes a customer by executing a recommended transaction through the broker-dealer that made the recommendation. A potential customer that a receives a recommendation from a broker-dealer but executes a transaction in the recommended security at a different broker-dealer, is not customer of the recommending broker-dealer.[144] FINRA has issued guidance under which a particular communication's content, context, and presentation are important aspects of the determination.[145] A broker-dealer or associated person may also make a recommendation where a particular communication from a firm or associated person to a customer suggests that the customer take action or refrain from taking action regarding a security or investment strategy; a communication is individually tailored to a particular customer or customers about a specific security or investment strategy; or a series of actions that may not constitute recommendations when viewed individually may amount to a recommendation when considered in the aggregate.[146] When it comes to online recommendations, FINRA has provided four examples of messages that are covered under its rules: customer-specific electronic communication to a target customer or targeted group of

---

[142] FINRA Notice 12-03 Complex Products: Heightened Supervision of Complex Products (January 2012); see also FINRA Rules 2330 (deferred variable annuities); 2353 (index warrants, currency index warrants, and currency warrants); 2360 (options); 2370 (security futures).

[143] NASD Reminds Members of Obligations When Selling Hedge Funds NASD notice to Members 03-07 (Jan. 23, 2003).

[144] FINRA Regulatory Notice 12-55 Suitability: Guidance on FIRA's Suitability Rule (December 2012).

[145] FINRA Regulatory Notice 11-02 Know Your Customer and Suitability (October 2011).

[146] *Id*.

customers encouraging the particular customers to purchase a security; an email stating that customers should be invested in stocks from a particular sector and urging customers to purchase one or more stocks from a list with 'buy' recommendations; sending a portfolio analysis tool that allows a customer to indicate an investment goal and input personalized information such as age, financial condition, and risk tolerance and a list of specific securities the customer could buy or sell to meet investment goals that the customer has indicated; and specific investment suggestions that a customer buy or sell a security resulting from the use of data-mining technology to analyze a customer's financial activity. On the other hand, FINRA has also provided four examples of messages that are **not** covered under its rules: a website that is available to customers or groups of customers that includes research pages or e-libraries that contain research reports, news, quotes, and charts that customers can obtain on request; a website search engine that does not favor the firm's buy recommendation or stocks for which the firm makes a market and enables customers to sort through data available on the performance of a broad range of stocks and mutual funds, company fundamentals, and industry sectors; subscription emails that alert customers to news affecting the securities in the customer's portfolio or on the customer's watch list; and research tools on a website that allows customers to screen through a wide range of securities or an externally recognized group of securities and to request list of securities that meet broad, objective criteria without favoring the firm's buy recommendations or stocks for which the firm makes a market.[147]

A different set of rules applies to implicit and hold recommendations. For the former, both FINRA and the SEC have found that implicit recommendations can trigger suitability obligations where associated persons effect a transaction on a customer's behalf without informing her or him.[148] For the latter set of recommendations, an explicit recommendation to hold a security or securities or to continue to use an investment strategy involving a security or securities constitutes a recommendation under the suitability rule. This rule, though, does not cover an implicit recommendation to hold securities because a recommendation to hold securities, maintain an investment strategy involving securities, or to use another investment strategy involving securities normally does not create an ongoing duty to monitor and make further recommendations.[149] FINRA has interpreted the term 'investment strategy involving a securities' broadly to include, among other things, an explicit recommendation to hold a security or securities and recommendations involving both a security and non-security investment. Of course, where a broker-dealer's or its associated person's recommendation does not refer to a security or securities, the suitability rule is not applicable. The suitability rule also does not apply if an associated person recommends a non-security investment as part of an outside business activity and the customer separately decides to liquidate securities positions and apply the proceeds toward the recommended non-security investment and does not apply to a decision by a customer to purchase a non-security investment.[150]

FINRA Rule 2111.03, though, excludes certain communications from coverage – namely, those that do not contain either alone or in conjunction with other communications – a recommendation of a particular security or securities. This exemption includes general financial

---

[147] NASD Notice to Members 01-23 Online Suitability (April 2001).

[148] In the Matter of the Application of Rafael Pinchas for Review of Disciplinary Action Taken by the National Association of Securities Dealers, Inc., 70 S.E.C. Docket 1108, 1999 WL 6800441, n.22 (1999).

[149] FINRA Regulatory Notice 12-55 Suitability: Guidance on FINRA's Suitability Rule (December 2012).

[150] FINRA Regulatory Notice 12-55 Suitability: Guidance on FINRA's Suitability Rule (December 2012).

and investment information including basic investment concepts such as risk and return, diversification, dollar cost averaging, compounded return and tax deferred investment; historic differences in the return of asset classes based on standard market indices; the effects of inflation; estimates of future retirement income needs; an assessment of a customer's investment profile; descriptive information about an employer-sponsored retirement or benefit plan including specifics for participating in the plan, the benefits of plan participation, and the investment options available under the plan; asset allocation models that are based on generally accepted investment theory, accompanied by disclosures of all material facts and assumptions that may affect a reasonable investor's assessment of the asset allocation model or any report generated by such model, and models that are in compliance with FINRA Rule 2214 if the asset allocation model is an investment analysis tool; and interactive investment materials that incorporate any or all of the above.

Thankfully, traders are not subject to registration because in general, they do not quote two-way markets; do not hold themselves out as making markets by buying or selling securities; do not handle investor funds or securities; do not provide independent investment advice; and do not extend or arrange for the extension of credit in connection with security purchases.[151] Firms providing advice on mergers and acquisitions can also receive transaction-based compensation without being required to register as a broker-dealer.[152]

**Broker-Dealer Record Preservation**

Under SEC Rule 17a-4, certain broker-dealer records must be preserved for a specific period of time in a readily accessible location where the records can be easily identified and retrieved. Most of these records must be maintained for either the life of the firm; six years (with two years placement in an easily accessible place), or three years (with two years placement in an easily accessible place). While most retention records under SEC rule 17a-4 are measured from the time of the creation of the record, the time period for customer and personnel records is measured from the date of the termination of the employee or customer relationship. Rule 17a-4 extends to seven general areas of records. First, Rule 17a-4(d) requires a broker-dealer to maintain all corporate records prepared by the firm including its articles of incorporation; by-laws; minute books; stock certificate books or other records of ownership; SEC Form BD; and state licensing certificates. Second Rule 17a-3(a)(11) requires broker-dealers to create a record in the form of trial balances for the proof of money balances of all ledger accounts; a record of the measures of aggregate indebtness and net capital as of the trial balance date under the SEC net capital rule; and copies of all quarterly FOCUS filings on SEC form X-17A-5 (See Appendix XXX). The investment firm must also retain copies of annual reports and audit statements; checkbooks; bank statements; cancelled checks; cash reconciliations; and bills received or payable. Third, the firm must retain employee questionnaires; Form U4 (See Appendix XXX); fingerprint card information; and information on compensation arrangements. For every associated person, the questionnaire must include that person's name, date of birth, 10 year employment history, address, Social Security number, and the starting date for her or his employment; any internal identification numbers and assigned Central Registration Depository number; a record of any membership or

---

[151] See also AngelList LLC, SEC no-Action Letter, 2013 WL 1279194 (Mar. 28, 2013) (providing registration exemption for a platform providing angel investing); FundersClub Inc. & FundersClub Mgm't, SEC No-Action Letter, 2013 WL 1229456 (Mar. 26, 2013).
[152] M&A Brokers, SEC No-Action Letter, 2014 WL 356983 (Jan. 31, 2014).

registration denial and disciplinary actions taken or sanctions imposed on the person by any federal or state agency or by any national securities exchange or FINRA; a record of any denial, suspension, expulsion, or revocation of membership or registration of any broker-dealer with which the person was associated n any capacity when the action was taken; a record of any permanent or temporary injunction entered against the associated person or any broker-dealer with which the associated person was associated in any capacity at the time the injunction was entered; a record of any arrest or indictment for any felony or any misdemeanor of a financial nature; and any record of any other name or names by which the person has been known or which the person has used. Each registered person's U-4 form must be maintained by the firm and filed with FINRA's CRD system. The firm is also required to obtain a processed fingerprint card for each of its partners, directors, officers, and employees unless an exemption applies under SEC Rule 17f-2. If the investment company claims an exemption from the fingerprinting requirement, it must retain a current statement entitled Notice Under Rule 17f-2 containing the name of the organization; its status as a broker-dealer; the identity of all persons who have satisfied the fingerprinting requirements of §17(f)(2) of the Exchange Act; the identity of all persons claimed to be exempt from § 17(f)(2)'s fingerprinting requirements; a generic description of the duties of described persons and the nature of their departments and divisions; the names of persons who claim an exemption because of the Attorney General's rejection of a properly prepared fingerprint card under Rule 17f-2(a)(1)(iv); and a description of security measures used to ensure that only those persons who have complied with the fingerprinting requirements, or who are exempt, have access to the maintenance, handling, or processing of monies, securities, or original books and records relating to the monies or securities. The investment firm is also required to make a record of all written and oral agreements relating to the employment or contractual relationship between the firm and each of its associated persons – including a summary of that individual's compensation arrangement. The file must also include commission schedules a record that describes the method for awarding the compensation amount; and a record listing of all purchases and securities sales attributable to the person including the compensation amount; all commissions, concessions, overrides, and other compensation; and a description of any non-monetary compensation along with an estimate of its value.

Fourth, under FINRA rule 3110, broker-dealers must implement a supervisory system reasonably designed to detect and prevent violations of federal and state securities laws and the self-regulatory organizations that the firm belongs to. This requires retention of records documenting supervisory responsibilities on supervisory procedures, exception reports and other surveillance tools, transaction supervision records, and copies of customer complaints. Investment firms here are required to maintain record listing of associated persons showing every office where each person regularly conducts the business of handling funds or securities or soliciting or effecting any securities transactions; internal identification numbers and the CRD number assigned to each associated person of the broker-dealer; each broker-dealer principal responsible for establishing policies and procedures to ensure compliance with any applicable federal law, state law, or self-regulatory organization regulation that requires acceptance of approval of a record by a principal; and all individuals in charge of designing the broker-dealer's compliance policies and procedures. Under SEC Rule 14a-4(e)(7), investment management firms are also obliged to retain copies of all compliance, supervisory, and procedure manuals describing its policies and practices on regulatory compliance and supervision of associated persons. Unfortunately, earlier versions of the aforementioned manuals must be maintained as well. Customer complaint records must include the complainant's name, address and account number; the day the complaint was received; the

name of any other associated person identified in the complaint; a description of the complaint's nature; and the disposition of the complaint. The firm must also provide each customer with a notice containing the address and phone number of the department receiving customer complaints on customer account activity. More than that, FINRA Rule 4513 requires firms to maintain a file on all written customer complaints and the action taken by the firm (if any) and a record of all written complaints and a reference to the files containing the correspondence connected with each complaint which must be maintained in each office of supervisory jurisdiction. In addition this this, FINRA requires firms to maintain a record on all reports of violations, complaints, arbitrations, judicial proceedings, and other events that are reportable under FINRA 4530(a) and statistical information reported under FINRA Rule 4530(d).

Fifth, firms are required to maintain communications with the public on file. These communications, again, can be broken down into three categories: retail communications, institutional communications, and correspondence. The retail information retention requirements are contained in SEC Rule 17a-4. The records here must include copies of the communication and dates of the first and last use of the communication; the name of any registered principal who approved the communication and the date the approval was given; if the communication was not approved by a registered principal, the name of the person who prepared or distributed the communication; information on the source of any statistical table, chart, graph, or other illustration used in the communication; and if the communication did not require principal approval, the name of the firm that filed the retail communication with FINRA and a copy of the corresponding review letter from the FINRA advertising department. Evidence of correspondence review must be maintained either electronically or on paper and clearly identify the reviewer and the internal communication or correspondence that was reviewed; indicate the date of review; and describe the actions taken as a result of any significant regulatory issues identified during the review. Finally, SEC Rule 17a-4 also applies to retail and institutional communications sent using social media or an interactive electronic forum. More specifically, the rule extends to websites, website documents, emails, instant messages, chat room communications, social media sites, and all other electronic communications and notices.

Sixth, the broker-dealer must create and retain certain records that apply to customer accounts. This information can be grouped into two categories: account profile information and account statements. On this first category, SEC Rule 17a-3(a)(9) requires broker-dealers to create a record for each customer cash and margin account that includes the name and address of the account's beneficial owner and a record of whether or not the beneficial owner registered in the name of either the investment firm or it's clearing agent objects to disclosure of the owner's name, address, and positions to the issuers of the securities. More than that, each broker-dealer is also required to create a record for each natural person's account containing that individual's name; tax identification number; address; phone number; date of birth; employment status; annual income; net worth; and investment objectives. The record must also include the signature of the associated person responsible for the account, a record demonstrating that each customer account owner was provided with copes of all written account agreements, a record demonstrating that the account owner was provided with a fully executed copy of the agreements at the customer's request, and an indication of approval or acceptance of the account record by a firm principal. For discretionary accounts, the investment firm must include the dated signature of each customer granting discretionary authority and the natural person to whom discretionary authority was granted. Finally, broker-dealers must maintain account statements provided to customers under NASD Rule

2340 on a quarterly or monthly basis describing the account's securities positions money balances; purchases; sales; interest credits or debits; credits or charges; dividend payments; transfer activity; journal entities of securities or funds; or the receipt or delivery of securities.

Seventh, broker dealers are required to maintain certain records of the firm's daily trading activities; customer brokerage orders; dealer transactions done for the firm's own accounts, customer transaction confirmations. This broad category can be divided into three groups: information on trade blotters and ledgers, information on brokerage order tickets; and information on dealer trade blotters. When it comes to the first group, trade blotters and ledgers, broker-dealers must create transaction records reflecting the firm's daily trading activity that include records of original entry containing an itemized daily record of all purchases and sales, receipts, and securities deliveries including the account of which each transaction was effected; the name of the securities and the amount; the unit price and aggregate purchase or sale price; the trade date; and the name or other designation of the individual from whom the securities were purchased or received or the name or other designation of the purchaser of the securities. The broker-dealer must also maintain records reflecting all assets and liabilities; income and expenses; and capital accounts; ledger accounts that separately itemize all purchases, sales, receipts, and security and commodity deliveries for the account; and other account debits and credits for each customer and proprietary cash and margin account; ledgers reflecting securities in transfer; dividends and interest received; borrowed and loaned securities; borrowed and loaned monies with collateral descriptions; securities that the broker-dealer failed to deliver; securities that the broker-dealer failed to send to the designated recipient; all long and short securities record difference; all repurchase and reverse repurchase agreements; a securities ledger reflecting all long or short positions carried by the firm for its own account, its customers, or others; the location of all long securities and he offsetting position to all short securities including long and short security count differences; and the name or account designation in which each position is carried. When it comes to the second category, brokerage order tickets, the broker-dealer must make a trade ticket for each brokerage order for the purchase or sale of securities that includes the order terms and conditions; internal instructions for handling the order, modification, or cancellation of the order; the account for which the order was entered; the time the order was entered; the price at which the order was executed; the time of execution or order cancellation; any order modifications; the identity of the person associated with the firm responsible for the account; the name of any other person who entered or accepted the order on behalf of the customer; the time the order was received; and whether the order was subject to any discretionary authority. Finally, for the third category, dealer trade tickets, broker dealers are required to prepare a trade ticket for each purchase or sale for the firm's own account showing the price and time of execution. If the transaction is for a customer, the trade ticket must disclose the time of the order receipt; the terms and conditions of the order; the account in which the order was entered; order modifications; the identity of the associated person responsible for the account; and the person who entered or accepted the order on the customer's behalf.

More recordkeeping is required. More specifically, FINRA Rule 4511 obliges broker dealers to make and preserve books and records as required under FINRA rules, the Exchange Act, and the applicable Exchange Act rules; preserved FINRA books and records for which there is no specified period under FINRA rules of the analogous Exchange Act rules for six years; and preserve all books and records required under the FINRA rules in a format and media that complies with Rule 17a-4. FINRA has attempted to ease this burden with Rule 17a-4(f). That provision permits records to be immediately produced or reproduced on micrographic media or by means of

electronic storage media that meet the conditions in the rule. Here, micrographic media is defined as microfilm or microfiche or any similar medium and electronic storage media is defined as any digital storage medium that can preserve the records exclusively in a non-rewritable, non-erasable format; automatically verify the quality and accuracy of the storage media recording process; serialize the original and duplicate units of storage media and time-date the information placed on the electronic storage media for the required retention period; and have the capacity to download indexes and records preserved on the electronic storage media to any medium acceptable under the rule as required by either the SEC or a self-regulated organization that the broker-dealer is a member of. To be able to store records in micrographic media or electronic media format, the broker-dealer must notify FINRA at least 90 days before using the media; provides its own representation or one from the storage medium vendor or other third party with appropriate expertise that the selected storage media meets the rules conditions; make the records available for examination at all times by SEC and self-regulated organization staff of which the broker dealer is a member for immediate, easily readable projection or production; be ready to immediately provide any fax enlargement upon the request of either the SEC or a self-regulated organization that the broker-dealer is a member of; store a duplicate copy of any electronically stored record; organize and index all information maintained on an electronic medium; duplicate each index and store the duplicate index separately from the original index; preserve the original and duplicate indexes for the time required for the indexed records; install an audit system for the original and duplicate records; provide the audit system is available for inspection by either the SEC or any self-regulated organization that the broker-dealer is a member of; preserve the audit results for the time required for the audited records; provide all information necessary to access records and indexes stored on electronic media to either the SEC or any self-regulated organization that the broker-dealer is a member of; maintain current copies of the electronic media's physical and logical file format; maintain current field formatting for all different types of information written on the micrographic or electronic storage media; and maintain current source code along with the appropriate documents and information needed to access the records and indexes. If the broker-dealer uses electronic storage media for the preservation of records, she or he must also have at least one third party who has access to and the ability to download information from the firm's electronic storage media to an acceptable medium under Rule 17a-4 when requested by the SEC and, be able to provide a legible, true, complete and current copy of any record that the broker-dealer must preserve under §17(b) of the Exchange Act upon the request of an SEC representative.

**Broker-Dealer Duty of Best Execution**

The broker-dealer's obligation to obtain the best execution of a customer's order in any security is based partially on the common law duty of loyalty which mandates that an agent act exclusively in the customer's best interest. Best execution duties also apply where a broker-dealer is trading in a principal capacity with a customer. These duties have been incorporated explicitly in FINRA Rule 5310. That Rule provides in part that:

> [i]n any transaction for or with a customer or a customer of another broker-dealer, a member and persons associated with a member shall use reasonable diligence to ascertain the best market for the subject security and buy or sell in such market so that the resultant price to the customer is as favorable as possible under prevailing market conditions.

70

The Rule governs both transactions where the firm acts as an agent for the account of its customer or executes transaction as principal with a customer. In assessing reasonable diligence, firm management should look to the character of the market for the security including its price, volatility, relative liquidity, and the pressure on available communications; the size and type of the transaction; the number of markets checked; the accessibility of the quotation; and the terms and conditions of the order which result in the transaction as communicated to the firm and its associated persons of the firm by the customer. While the reasonable diligence inquiry, of necessity, is fact intensive, both FINRA and the SEC have clarified that investment management firms at the least must make every effort to execute a marketable customer order that it receives fully and promptly. For non-marketable orders, firms should regularly review their routing decisions as well as their policies and procedures for non-marketable orders. While broker-dealers cannot transfer their best execution obligations, a firm can acquire a best execution obligation for the order. Indeed, when an investment management firm receives a customer order from a routing firm for the purposes of order handling and execution, both the routing firm and the executing firm have best execution obligations. Here, a broker-dealer that routes customer orders to other broker-dealers for execution on an automated, non-discretionary basis as well as a firm that internalizes customer order flow must either conduct an order-by-order review or have procedures in place to ensure the members periodically conduct regular and rigorous reviews of the quality of the executions of its customers' orders. More than that, a broker-dealer that routes its order flow to a clearing broker or other executing broker-dealer that has agreed to handle that order flow as an agent for the customer can rely on that firm's regular and rigorous review if the statistical results and rationale of the review are fully disclosed to the introducing broker-dealer.

The review must be conducted on a security-by-security, type-of-order basis. While most reviews, at a minimum, should be conducted on a quarterly basis, management may consider imposing more frequent reviews. In conducting regular reviews, a broker-dealer must determine whether any material differences in execution quality exist among the markets trading the security and, if so, must either modify its routing arrangements or justify why it is not modifying its routing arrangements. To ensure that order flow is directed to markets that have the most beneficial terms for their customers' orders, the broker-dealer must compare the quality of the executions the member is obtaining through the current order routing and execution arrangements to the quality of the executions that the firm may obtain from competing markets. In reviewing and comparing the execution quality of its current order routing and execution arrangements to the execution quality of other markets, a broker-dealers should consider price improvement opportunities; the speed of execution; the size of the execution; transaction costs; customer needs and expectations; internalization practices; payment for order flow arrangements; the likelihood of execution limit orders; and differences in price disimprovement. Price disimprovement denotes a situation where a customer receives a worse price at execution than the best quotes prevailing at the time the order is received by the market.

FINRA Rule 5310.06 outlines an investment management firm's best execution obligations when handling an order involving any equity or debt security for which there are limited quotations or pricing information available. Here, the firm must implement written policies and procedures to address the steps the firm must take to determine the best market for the security in the absence of multiple quotations or pricing information and document whether it has complied with those policies and procedures. When handling orders for these securities, an investment management firm should seek out other sources of pricing information or potential liquidity. This process may

include obtaining quotations from other sources including other firms that the firm previously has traded with for the security. A different set of regulations applies to foreign securities with no U.S. market. Here, FINRA regulations applies to foreign securities with no U.S. market. Here, FINRA rule 5310.07 governs. In assessing whether the reasonable diligence standard has been met for these securities, investment management firms must examine the character of the market for the security and the accessibility of the quotation. The investment management firm must also have specific written policies and procedures in place for handling customer orders involving foreign securities with no U.S. market that are reasonably designed to obtain the most favorable terms available for the customer by taking account of differences that exist between U.S. markets and foreign markets and, regularly review its policies and procedures to assess the quality of its executions and update or revise its policies and procedures.

Director orders are treated differently. An investment management firm receives a directed order when it is instructed to route a customer's order to a particular market. Under FINRA rule 5310.08, a firm that is handling an unsolicited directed order is not required to undertake a best execution determination for the execution market beyond the customer's specific instructions. The firm, though, must process the customer's order promptly and according to the order's terms. If a customer has directed that an order be routed to another specific broker-dealer that is also a FINRA member, the receiving broker-dealer must comply with FINRA rule 5130. While investment management firms are not required to handle direct orders, if it does accept a direct order and has access to the a trading center that the customer wants to enter, it must act according to the customer's instructions. In the event that the firm cannot route the order to the customer's request market, the customer must be informed of that fact and be provided with the chance to revise or cancel the order. Investment management firms have an obligation to periodically assess whether they should establish connectivity to certain trading centers or terminate connectivity when handling customer orders. Readers might notice that the discussion this far has centered almost exclusively on equity securities. This is so because the amount of information available for fixed income markets is still relatively limited when compared to equity markets and is not readily accessible by the investing public. Indeed, much of the trading here still occurs among individual dealers. For investment management firms that decide to implement electronic trading systems for fixed income securities, they must also decide whether the system provides benefits to their customer order flow or retail order flow and whether the system helps ensure that they are meeting their obligations under Rule 5310. Electronic trading systems including auto-execution systems can display prices and provide execution functionality; display prices but provide no execution functionality; or provide indications of interest but not display prices or provide execution functionality. An investment management firm that uses an auto-execution system should routinely analyze pricing information from other systems that offer bona fide and executable prices and determine whether those systems should be incorporated into the firm's best execution policies and procedures. Fixed income security brokers should be aware of the fact that prices displayed on an electronic trading platform may not be the presumptive best price for that security for best execution purposes because the instrument may be traded infrequently or be illiquid. Although an investment management firm should consider using this information as part of its reasonable diligence in determining the best market for a security, executing a customer order at the displayed price may not fulfill the firm's best execution obligations particularly if other sources of information indicate the displayed price may not be the best price available. Because fixed income securities such as T-bills and junk bonds vary greatly, FINRA has recognized that the due diligence inquiry in the fixed income context will, of necessity, be fact intensive and require that a firm use

reasonable diligence to ascertain the best market for the security and buy or sell in the market so that the resulting price for the customer is as favorable as possible under prevailing market conditions. In assessing whether the firm has met is due diligence standard, management should look to the security's price, volatility, and relative liquidity. Because arguably all three of these metrics turn in some way on quotation availability, FINRA Rule 5310.03 in instructive here. In short, that provision provides that when price quotations are available, FINRA will consider the accessibility of those quotations when determining whether a firm has used reasonable diligence. In the absence of quotation accessibility, though, investment management firms are not relieved from taking reasonable steps and using their market expertise to achieve the best execution of a customer order.

Investment management firms should also have policies and procedures for determining whether it should access a trading platform or engage in further to execute a customer order.

Finally, payment for order flow is subject to yet a different set of rules. Exchange Act Rule 10b-10 defines payment for order flow as:

> "discounts, rebates, or any other reductions of or credits against any fee to, or expense or other financial obligation of, the broker or dealer routing a customer order that exceeds that fee, expense or financial obligation."[153]

The SEC has taken the position that an order routing inducement including receipt of payment for order flow cannot be allowed to interfere with a broker-dealer's duty of best execution. The SEC has also emphasized that, for options and equity securities, payment for order flow may "raise concerns about whether a firm is meeting its obligations of best execution to its customer."[154] In a similar vein, investment management firms should not allow access fees charged by particular venues to inappropriately affect their routing decisions nor should a firm's routing decisions be unduly influenced by a particular venue's fee or rebate structure.

The Securities and Exchange Commission has devised a non-exhaustive list of factors that broker-dealers should consider as part of their determination of whether they have met their best execution obligations including the size of the order; trading characteristics of the security involved; cost and difficulty associated with achieving an execution in a particular market center; and the availability of accurate information on the most favorite market center for execution including the availability of technological aids to process the information.

**Determining Who Is A Broker-Dealer**

Section 15(a) of the 1934 Exchange Act requires individuals and entities that act either as brokers or dealers to register with the Securities and Exchange Commission as broker-dealers under §15(b) of the statute.  Here, a broker is an individual who is in the business of effecting transactions in securities for others' accounts. Thus, an individual who is involved in the key points of distribution for a security's sale is a broker.[155] The SEC has also advised that an entity that engages in structuring securities transactions; soliciting or identifying potential investors;

---

[153] 17 CFR § 240.10b-10(9).

[154] Securities Exchange Act Release No. 34902 Payment for Order Flow WL 587790 (Oct. 27, 1994) 59 FR 55006 at 55009 n.28.

[155] MASS. FINANCIAL SERV., INC. v. SEC. INV. PROTECT. CORP., 411 F. Supp. 411 (D. Mass. 1976).

screening investors for creditworthiness; evaluating the merits of a transaction; negotiating the terms of a transaction; taking, routing, matching, or executing orders for transactions; holding customer funds or securities; or issuing confirmations and creating transaction records may be deemed to be effecting transactions in securities. Individuals who only perform clerical or ministerial functions are generally regarded as not effecting transactions within the meaning of the Exchange Act. The regularity with which a person engages in securities transactions – including the frequency, volume, and size of the deal – is a critical component in determining whether a person is considered to be in the business of effecting transactions. The SEC looks to the individual or entity's receipt of transaction related-compensation, whether the target holds itself out as willing to act as a broker, and whether the target solicits potential investors in deciding whether she, he, or it is in the business of effecting securities transactions.[156] Traditionally, the SEC has taken the position that receipt of transaction related compensation can be sufficient to require broker-dealer registration even where the person receiving the compensation is not actively involved in the transaction.[157]

There is a different definition for dealers. Under §3(a)(5)(A) of the 1934 Exchange Act, a dealer is a person engaged in the business of buying and selling securities for their own account. This does not include individuals who do not engage in the aforementioned activity as part of a regular business. Here, the SEC looks to whether the target holds itself out to the public as making markets in securities; carries a dealer inventory in securities; purchases securities as a principal from or to customers; quotes a two-way market in any security; extends or arranges for extensions of credit on securities transactions; or provides investment advice in determining whether the target is a dealer.[158] There is an exemption from broker-dealer coverage for intra-state broker-dealers, issuers, brokers or dealer dealing only in exempted securities, foreign broker-dealers complying with Rule 15a-6 of the Exchange Act, and banks engaging in limited securities-related activities. Intrastate broker-dealers can qualify for an exemption so long as all aspects of the transaction are done within a single state. Issuers can qualify for an exemption if they deal only in their own securities. Brokers or dealers dealing only in commercial paper exempt from registration under the 1933 Securities Act, bankers' acceptances, other short-term obligations, and government securities can take advantage of the exemption because these securities need not be registered with the SEC. Foreign broker-dealers that only engage in unsolicited transactions; distributing research to major US institutional investors (institutions that have $100 million in assets or assets under management); effecting transactions with U.S. institutional investors through a U.S. registered broker-dealer; or dealing directly with certain categories of U.S. investors are free of the registration requirement. Finally, banks can engage in third-party brokerage arrangements; trust activities; permissible securities transactions; certain stock purchase plans; sweep account transactions; affiliate transactions; securities distributions not involving a public offering; safekeeping and custody activities; transactions in identified bank products; transactions in municipal securities are cleared to not comply with the registration mandate. Banks are also exempt when they engage in transactions in commercial paper, bankers acceptances; commercial bills; qualified Canadian government or North American Development Bank obligations, or standardized, credit-enhanced debt securities issued by a foreign government; securities transactions for investment purposes for the bank or for accounts for which the bank acts as a

---

[156] BondGlobe, Inc., SEC No-Action Letter, 2011 WL 103418 (Feb. 6, 2001).

[157] But see SEC v. Kramer, 778 F. Supp. 2d 1320 (M.D. Fla. 2011).

[158] Luis Dreyfus Corp., SEC no-Action Letter, 1987 WL 108160 (July 23, 1987).

trustee or fiduciary; and transactions involving deposit accounts, saving accounts, CDs, other deposit instruments issued by the bank, bankers' acceptances, bank issued letters of credit, nd debit accounts and loan syndications to 'qualified investors' including other banks, broker-dealers, and saving associations.

A bank, however, may not engage in more than 500 transactions in any calendar year in securities – other than the aforementioned transactions so long as the transaction is not effected by a bank employee who is also an employee of a broker or dealer. There are four exceptions, though, to this exception. First, banks are permitted to enter into arrangements with registered broker dealers to offer brokerage services on or off the bank premises if unregistered bank employees do not relieve incentive compensation for brokerage transactions except for a nominal one-time cash referral fee of a fixed dollar amount that is not contingent on whether the referral results in a transaction. Second, the trust exemption allows a bank to engage in a securities transaction in a trust or fiduciary capacity if the bank is chiefly compensated for the transactions consistent with fiduciary principals. Rules 721 and 722 of Regulation R, which were adopted by both the SEC and the Federal Reserve Board require banks to calculate its relationship compensation to determine whether it satisfies the chiefly compensated test. The calculation may be done on either an account-by-account basis where the relationship compensation must be greater than 50% or on a bank-wide bass where the relationship compensation percentage must be 70% or greater. Fees under Rule 12b-1 of the 1940 Investment Company Act can be included in the amount of relationship compensation. Third, under the sweep account transaction exemption, banks can sweep deposits into no-load money market mutual funds. A no-load money market mutual fund has an annual fee that does not exceed .25% under Rule 740 of Regulation R. In certain instances, however, this exemption can apply yo loan mutual funds that have annual fees over.25% if the bank provides the customer with a banking product or service as an alternative, does not describe the money market fund as no load, and provides the customer with a prospectus no later than at the time the customer authorizes the transaction. Finally, under the safekeeping and custody activities exemption, banks can engage in securities transactions for employee benefit plans accounts, individual retirement accounts and accommodation trades for other accounts for which the bank maintains custody. There is also a limited exemption for associated persons of broker-dealers. To claim the exemption, the associated person must be subject to the firm's supervision, successfully qualify for the applicable registration categories by passing one or more qualification exams; and register through the firm under the applicable registration category with a self-regulatory organization – usually FINRA.

The SEC has also provided guidance on this question through various no-action letters. In particular, ten types of letters are relevant here. First, finders, or persons who refer potential investors to issuers in non-public offerings, have been found to be subject to broker-dealer registration requirements.[159] Second, when it comes to private placement agents, the mere fact that a securities offering is exempt under the 1933 Securities Act does not mean that a broker or dealer in that offering is exempt from registration. Third, while advisers to firms on mergers, acquisitions, and other corporate transactions cn be subject to registration as broker-dealers if the transaction involves the issuing, exchange, or sale of securities, the SEC has granted limited registration relief where the adviser has a limited role in negotiations, does not have the authority to bind the parties to the transaction, does not engage in any securities transaction, and does not assist purchasers

---

[159] But see Paul Anka, SEC No-Action Letter, 1991 WL 176891 (July 24, 1991).

with obtaining financing.[160] Fourth, an individual who provides merger or acquisition advice to private firms is not subject to broker-dealer registration even if the broker-dealer receives transaction related compensation in connection with that advice so long as the broker does not have the ability to bind any party to the transaction, does not directly or indirectly provide financing for the transaction, or does not have custody, control, or possession of, or otherwise handle funds or securities; the transaction does not involve a public offering; the broker will close the transaction with a group of buyers only if the group is formed without the broker's assistance; the buyer controls or actively operates the firm conducted with the assets of the business; the transaction does not result in the transfer of interests to a passive buyer or group of passive buyers; and the broker provides clear and written disclosure on the parties it represents and obtains written consent from both parties to the joint representation if the broker represents both buyers and sellers.[161] Fifth, foreign persons engaged in advisory activities on potential mergers or acquisitions may be able to claim an exemption if the target is using internal or group level personnel with relevant merger experience; the persons making contact with the U.S. target firm on behalf of the foreign person providing advice satisfy the requirements in Exchange Act Rule 15a-6; the target is suing the services of an external adviser wit relevant experience; the foreign adviser does not receive, acquire, or hold funds or securities related to the transaction; the foreign adviser does not represent or advise the U.S. target on a proposed transaction; and the foreign adviser remains subject to the antifraud provisions of the U.S. securities laws.[162] ?Sixth, insurance agents can claim exemptions in limited circumstances. Here, the agent must be registered with and supervised by the registered broker-dealer and the broker-dealer must take responsibility for the securities related activities. Seventh, electronic bulletin boards that list the availability of securities for purchase or sale are exempt if the system does not have execution capabilities, the system operator is not involved in effecting transactions, and the transactions can only be affected between the participants themselves. On the other hand, bulletin boards are required to register if they publish buy or sell quotes; solicit investors; are involved in negotiating security transactions; providing offering material or investment advice on specific securities; are involved in the execution, clearing, or settlement of any transaction; spend confirmations; match buyers and sellers; handle investor funds or securities; screen participants for creditworthiness; receive transaction-related compensation; exercise discretion on the system; or display the name of the sponsor or site operator.[163] Eighth, alternative trading systems have the option of registering as either broker-dealers or exchanges. An alternative trading system is any organization, association, person, group of persons, or system that constitutes, maintains, or provides a marketplace or facility for bringing purchasers or securities seller together or performing the functions commonly performed by a stock exchange within the meaning of Rule 3b-16 of the Exchange Act and, that does not set rules governing subscriber conduct with the exception of conduct on the trading system. If an alternative trading system, however, routes orders in securities to an exchange for broker-dealer execution or allows persons to enter orders for execution against the bids and offers of a single dealer and then engages in certain order matching or market-making activities it is not acting as an exchange so far as the SEC is concerned. In part for this reason, most alternative trading systems elect to register as broker-dealers. Ninth, the SEC has allowed registered representatives of broker-dealers to be directly employed by payroll and employee service firms without requiring the service companies

---

[160] Country Bus., Inc., SEC no-Action Letter, 2006 WL 3289777 (Nov. 8, 2006).

[161] M&A brokers, SEC No-Action Letter, 2014 WL 356983 (Jan. 31, 2014).

[162] Roland Berger Strategy Consualtnats, SEC n-Action Letter, 2013 WL 2325187 (May 28, 2013).

[163] GlobalTec Solutions, LLP, SEC No-Action Letter, 2005 WL 3695276 (Dec. 28, 2005).

to register as broker-dealers themselves if they process payroll and provide employee benefits and human resource services. Here, the SEC looks to whether the service company does not have discretion on the amount of salaries, commission, or bonuses paid to the broker-dealers' associated persons and whether the broker-dealer retains control and supervision over the securities activities of its associated persons.[164]  Finally, forms that provide communications services to broker-dealers to assist in the execution of transactions in securities are not required to register as broker-dealers so long as they do not hold customer funds or securities; recommend specific securities; display quotations for securities; allow commission sharing or splitting among participants; bring together orders for securities of multiple buyers and sellers; provide services involving setting up or maintain customer accounts; participate in the negotiation of securities transactions; endorse any broker-dealer participant; receive compensation on the size, volume, or occurrence of any securities transaction; or hold themselves out as providing transactional services.[165]  While a firm may provide operational services and send confirmation without registering as a broker-dealer, the broker-dealer on whose behalf the confirmations are sent must supervise the sending and ensure that they comply with Rule 10b-10 of the Exchange Act  and the record keeping requirements of Rules 17a-3 and 17a-4 of the same statute.

**Associated Person Registration and Licensing**

Broker-dealer registration is governed by Article III of the FINRA By-laws and NASD Rules 1021, 1022, 1031, 1032, 1041, 1042, 1050, and 1060. Registration is required if a person engages in an investment banking or securities business; accepts customer orders; or directly or indirectly receives commission income on the sale of securities. Under FINRA Rules, firms are prohibited from maintain any license that is inconsistent with the registration requirements set out in FINRA Rule 1210. Generally, though, registration is not required for persons performing soley and exclusively ministerial or clerical functions; intrastate broker-dealers who are not municipal securities dealers or government securities brokers or dealers; broker-dealers whose business sis limited to certain excluded and exempted securities defined by §3(a)(12) of the 1934 Exchange Act; foreign broker-dealers who are not physically located in the U.S. and who do not induce or attempt to induce securities transactions in the U.S; persons effecting transactions in only municipal securities. Commodities, securities futures (if the person is registered with a registered futures association), or on the floor of a national securities exchange if the person is registered with the exchange. Cold callers also need not register if the cold caller is limited to inviting potential customers to firm sponsored events where registered representative present and solicit accounts; is limited to inquiring whether a prospective customer would like to speak with a registered representative about their investments; is limited to inquiring whether a prospective customer would like to receive literature; does not discuss investment products or service; does not prequalify prospective customers; or does not solicit new accounts or orders. Managers should also note that under certain limited circumstances, persons need not register with FINRA if they are associated with a bank, thrift, individual involved in a financial institution networking arrangement, real estate broker or agent, insurance agent, or foreign broker-dealer.[166]

---

[164] eEmployers Solutions, Inc., SEC no-Action Letter, 2007 WL 4373976 (Dec. 3, 2007).

[165] S3 Matching Technologies LP, SEC No-Action Letter, 2012 WL 2948910 (July 19, 2012).

[166] Exchange Act Release No. 39799 (March 23, 1998); SEC Staff Compliance Guide to Banks on Dealer Statutory Exceptions and Rule (November 2007); Exchange Act Release No. 34-56501 (September 24, 2007); Exchange Act Release No. 56502 (September 24, 2007).

Prospective broker-dealers must fill out six registration forms with the Central Registration Depository. Forms U4 (used to register a representative and amend the Central Registration Depository or Investment Advisor Registration Depository record when information changes or reportable events occur), U5 (used to terminate a representative's registration after separating from a member firm), U6 (used to disclose disciplinary actions against firms or representatives), BD (used for registration with FINRA, SEC, self-regulated organizations, and state jurisdictions), BDW (used for registration or withdrawal with the SEC, a self-regulated organization, or particular jurisdictions), and BR (used for registration or withdrawal from branch offices). Before engaging in an investment banking or securities related business, an individual must be sponsored by a firm with S FINRA membership and obtain a license in the relevant practice area by taking an exam. There are usually four stages in the registration process: initial registration, amendment, termination, and renewal. To register as a securities agent, aside from the U4 and employment requirements which have already been covered, an applicant must provide her social security number, provide her fingerprint card, and not be statutorily disqualified. The social security number and fingerprint request are required under Rule 17f-2 of the Securities Exchange Act of 1934. This information is submitted to the FBI for processing and if a criminal history record is brought up, the applicant has the opportunity to challenge the report. The statutory disqualification criterion references Article III, Section 3 of FINRA and §3(a)(39) of the Exchange Act. The latter defines "statutory disqualification" to include the procurement of certain misdemeanors and all felony convictions for ten years from the date of conviction; the imposition of an injunction of any kind involving unlawful investment activities; an expulsion, bar, or membership suspension in a self-regulated organization, the SEC, the Commodities Futures Trading Commission, or a similar regulatory agency or authority regardless of whether the bar contemplates a right to re-apply; registration denial or revocation by the SEC, CFTC, or a similar regulatory agency or authority, a finding by the SEC. CFTC, or a self-regulated organization that an individually willfully violated industry rules, or laws, aided, abetted, counseled, commanded, induced, or procured the violations; or a final order by a State securities, banking, or insurance agency or authority, the National Credit Union Administration, or a federal banking agency that bars a person from association with an entity regulated by the agency or authority, or that is a final order for violations of laws or regulation that prohibit fraudulent, manipulative, or deceptive conduct .

The U4 Form is provided in Appendix XXX. The US form asks for the applicant's name; residential history; employment address and history; outside business activities; criminal convictions; regulatory proceeds or sanctions that the applicant has been involved in; administrative proceedings the applicant has been involved in; civil actions the applicant has been involved in; financial disclosures; customer complaints against the applicant; and arbitration awards against the applicant. Failure to completely and accurately disclose information on the U4 Form can result in fines and sanctions including an industry ban. A member must notify FINRA within ten days of learning that an associated person has become disqualified by filing either a Form U5 (if an associated person is terminated) (See Appendix XXX) or a Form MC-400 (if the firm wants to continue to sponsor the associated person) (See Appendix XXX). If a member firm files a Form MC-400 to dispute a disqualification, the firm and the disqualified person are entitled to a hearing under FINRA Rule 9254. The person subject to disqualification is not allowed to associate with a member in any capacity unless and until FINRA has approved that activity in an eligibility hearing. A firm's failure to terminate the disqualified individual, submit an MC-400 application, or respond to a notice issued by FINRA for a hearing is grounds for cancellation of the firm's FINRA membership.

Before engaging in the securities industry, a candidate must obtain a series of licenses by qualifying through an exam. Here, a representative may not solicit customer accounts or transact securities business until after she or he has obtained the relevant licenses and registration. Under FINRA rules new candidates must pass the Securities Industry Essentials exam; investment management firms will be permitted to retain associated persons who are permissively registered as representatives or principals regardless of their day-to-day activities; and FINRA will consider waiver requests for individuals who terminate their registrations to go work for a foreign or domestic financial services industry affiliate or member firm. The Securities Industry Essentials exam tests basic industry information, industry concepts, products and risks, market structure, and knowledge of regulatory agencies and prohibited practices; is open to anyone age eighteen or older regardless of affiliation with a FINRA firm; and is valid for four years. Broker-dealers associated with exams that will be retired from October 1, 2019 will be permitted to hold their registrations in those categories unless the terminate their registrations for a period of two or more years.

FINRA also imposes amendment requirements for U4 forms. More specifically, representatives and their investment management employers must maintain information accuracy on their Form U4. If administrative or disclosure information is or becomes inaccurate or incomplete, a representative must notify their firm. Only an investment management firm can amend Forms U4 and U5 and, the firms must do so within thirty days of learning of the new information. Failure to comply with this obligation can result in the assessment of a late fee against the investment management firm. Firms often pass on these fees to representatives if she or he is cause of the delay. Registration is effective for the period of time in which the representative maintains her employment with the investment management firm, completes continuing education requirements, and maintains the accuracy and completeness of registration records. When a representative is no longer employed with a member firm, her or his registration is terminated until the registration is renewed with another member firm within the time permitted by FINRA rules. Investment management principals should note that termination here refers to the representatives affiliation with the firm. Thus, an individual can be terminated for the purposes of FINRA rules and still be employed by the investment management firm.

**Municipal Advisor Registration**

The Dodd Frank Wall Street Reform and Consumer Protection Act of 2010 requires 'municipal advisors' to register with the SEC. Under the statute, a municipal advisor is a person – who is not a municipal entity or an employee of a municipal entity – that solicits a municipal entity or provides advice to or on behalf of a municipal entity or obligated person about municipal financial products or the issuance of municipal securities, including advice on the structure, timing, and terms of financial products or issuers. This definition includes third-party marketers and solicitors; advisors to municipal entities on the investment of public money; financial advisers such as brokers and dealers; and municipal security dealers who are already registered with the Sec and who provide advice to municipal entities on their issuance of municipal securities and their use of municipal financial products. The statutory definition, though, does not extend to engineers who provide engineering advice; lawyers offering legal advice or providing legal services; a commodity trading advisor registered under the Commodity Exchange Act or persons associated with a commodity trading advisor who are providing advice related to swamps; or an investment advisor registered under the 1940 Investment Company Act (or persons associated with the investment advisers who are providing investment advice). Here, underwriters are exempt even if they are acting as a private placement agent; provide ancillary advice about the structure, timing,

and terms on the issuance of municipal securities, retail order periods, and institutional marketing; or structure refunds of escrow cash flow requirements that are necessary to provide for the refunding and defeasance of an issuance of municipal securities. Underwriters, though, are not exempt if they assist issuers with competitive sales, bid verification, true interest cost calculations and reconciliations, bid platform calculation verification, or sale notice preparation; engage in budget planning and analysis or budget implementation issues covering debt issuance and collateral budget impact; provide advice on investment strategies or a related municipal derivative; provide advice that is not specific to a particular issuance of municipal securities on which a person is serving as an underwriter; prepare financial feasibility analysis on new projects; or provide advice on the terms of a Request for Proposals or Request for Qualification for the selection of underwriters or other professionals for a project financing. More than that, there are four more categories of exempt parties that are relevant here. First, banks engaging in traditional banking activities (tendering loans, holding investments in deposit, etc.) need not register as municipal advisers. Second, registered swamp dealers are exempt from registration so long as they are not acting as an advisor to a municipal entity or obligated person on a municipal derivative or trading strategy. Third, persons responding to requests for proposals or qualifications who do not receive separate direct or indirect compensation for advice that was provided as part of the response are free from the registration requirement. Finally, persons providing advice to a municipal entity or obligated person represented by an independent registered municipal adviser, subject to receipt of representations from, and provision of disclosures to, the municipal entity or obligated person need not register as municipal advisers so long as the independent registered municipal adviser is a person that is registered as a municipal advisor under the Exchange Act and is, and within at least the last two years was not, associated with the person seeking to rely on this exemption; the person seeking to rely on the exemption provides written disclosures to the municipal entity or obligated person with a copy to the independent registered municipal advisor stating that the person is not a municipal advisor and is not subject to the fiduciary duty to municipal entities that the Exchange Act imposes on municipal advisors; and the person seeking to rely on the exemption receives a written representation from the municipal entity or obligated person that the municipal entity or obligated person is represented by, and will  rely on the advice of, the independent registered municipal advisor.

In deciding whether an individual is providing advice as a municipal advisor, management must first decide whether that individual made a recommendation. The SEC has taken the position that a recommendation is tailored to the specific needs, objectives, or circumstances of a municipal entity or obligated person. General information hat is not tailored to the client's needs due in part to its wide dissemination does not constitute advice.[167] Thus, information about an individual's professional qualifications and prior experience; general market and financial information; information concerning a financial institution's currently available investments or price quotes for investment available for purchase or sale in the market that meet criteria specified by a municipal entity; factual information describing various types of debt financing structures including a comparison of the general characteristics, risks, advantages, and disadvantages of debt financing structures; and factual or educational information on various government financing programs does not constitute covered advice.[168]

---

[167] SEC Release No. 34-70462 (Sept. 20, 2013).
[168] SEC Office of Municipal Securities: Registration of Municipal Advisors (May 19, 2014).

Individuals or entities register as municipal advisors by using SEC Form MA (See Appendix XXX). Once registered municipal advisory firms must file annual updates to the Form MA, file an amendment whenever a material event has occurred that changes the information provided in the form, complete and file a Form MA-I for each natural person associated with the firm who engages in municipal advisory activities on the firm's behalf (See Appendix XXX). The Form MA-I must be promptly amended whenever any information that was previously provided in the report becomes inaccurate. Non-resident municipal advisory firms must also complete and execute a Form MA-NR (See Appendix XXX). This form must be amended whenever any information that was previously provided on it becomes inaccurate. A firm must file a separate Form MA-NR for every general partner and managing agent of the firm that is a non-resident and non-resident natural person associated with the firm and engaged in municipal advisory activities on the firm's behalf. These firms are also required to file an amendment to their Form MA when changes in the legal or regulatory framework impact the firm's ability to provide the SEC with access to its books and records or to inspect and examine the firm.   A business entity that is registered as a municipal advisor – but that is no longer required to be registered – must file a Form MA-W. Each form in the Form MA Series must be filed electronically on EDGAR.

Form MA is considered filed upon submission of a completed form together with all additional required documents including a Form MA-I for each natural associated person. When an applicant transmits a Form MA, EDGAR will perform an initial check to detect unanswered questions or doubtful responses. If the form passes this initial screening, the applicant will be provided with an SEC file number to check the document's status; SEC staff will review the form for deficiencies; with forty-five days of the submission of a complete Form MA, the SEC will either grant registration or institute proceedings to deny registration; and if registration is granted, the SEC  will issue a formal order of approval. Managers should note that the information supplied on Form MA – with the exception of social security numbers, foreign identity numbers, dates of birth, and private residential addresses – is not confidential unless otherwise indicated.

Municipal advisers must also register with the MSRB by filing MSRB Form A-12 electronically (See Appendix XXX). Form A-12 is used to initiate registration as a municipal advisor before engaging in municipal advisory activities; update registration information within thirty days after a change to any information contained in the form; affirm registration information during the annual affirmation period beginning on January 1 and ending after seventeen business days; and notify the MSRB of a withdrawal of registration. After Form A-12 is submitted, and the payment fee is processed, MSRB staff will review the document and approve the form. If there are questions about the information submitted on the form, an MSRB staff member will contact the applicant. Failure to respond to MSRB inquiries within thirty days will be valid grounds for rejection of the A-12 application. Once the form is approved, registration with the MSRB becomes effective and a confirmation email is sent to the person identified by the firm as its Master Account Administrator, Primary Regulatory Contact, Optional Regulatory Contact, and Compliance Contact. These contacts will also receive an additional email with MSRB Gateway account information including User IDs and access instructions for future electronic filings and amendments. A Municipal Advisor Representative is a natural person associated with a municipal advisor who engages in municipal advisory activities on the municipal advisor's behalf and taken a qualifying exam. A municipal advisor representative who is directly engaged in the management, direction, or supervision of the municipal advisory activities of the municipal advisor and that of its associated persons must taken an exam to qualify as a municipal advisor principal. Each

municipal advisor must designate at least one individual as a municipal advisor principal. More than that, municipal advisors must develop, use, and maintain a supervisory system that is reasonably capable of ensuring that their advisory activities comply with federal and state regulations and, perform at least one annual compliance review of their supervisory systems and written policies. A Chief Compliance Officer should be designated to oversee and implement the supervisory process. This individual can hold any other position in the municipal advisor's business including a management position – or she or he can be external to the firm. Every year, the municipal advisor's CEO must certify in writing that she or he has implemented and monitored systems and processes to ensure compliance with state and federal securities laws. Federally regulated banks that engage in municipal advisor activities are exempt from this supervision and compliance requirements if they submit an annual certification in writing that they are subject to parallel federal regulations on supervisory system and compliance requirements.

When it comes to recordkeeping municipal advisors must maintain: originals or copies of all written communications received, and originals and copies of all written communications sent, by the municipal advisor relating to municipal advisory activities; all checks books, bank statements, general ledgers, cancelled checks, and cash conciliations of the municipal advisor; a copy of any document created by the municipal advisor that was material to making a recommendation to a municipal entity or obligated person or that memorializes the basis for that recommendation; all written agreements (or copies) entered into by the municipal advisor with any municipal entity, employee of a municipal entity, or an obligated person or otherwise relating to the business of the municipal advisor; a record of the names of persons who are currently, or within the past five years were, associated with the municipal advisor; written consents to service of process for each natural person who is a person associated with the municipal advisor and engages in municipal advisory activities solely on behalf of the municipal advisor; and a copy of each version of the municipal advisor's policies and procedures that are in effect or at any time within the last five years were in effect. The advisers must also retain books and records containing a list or other record of the names, titles, and business sand residence addresses of all persons associated with the municipal advisor; all municipal entities or obligated persons with which the municipal advisor is engaged or has engaged in municipal advisory activities in the past five years; the name and business address of each person to whom the municipal advisor provides or agrees to provide directly or indirectly payment to solicit a municipal entity, an employee of an municipal entity, or an obligated person on its behalf; and the name and business address of each person that provides or agrees to provide directly or indirectly payment to the municipal advisor to solicit a municipal entity, an employee of a municipal entity, or an obligated person on its behalf.  These records must be preserved for a total of five years – two years of which the records must be kept in an easily accessible place. By way of contrast, corporate governance documents must be maintained in the principal office of the adviser and preserved until at least three years after termination of the business or withdrawal from registration as a municipal advisor. These records include general business records; records of gifts and gratuities; records of political contributions and prohibitions and compliance records.

Municipal advisers are also required to comply with their statutory duty of care. This duty takes the form of a duty of loyalty and care when the adviser is counseling municipal entities.[169] Advisers are required to provide the municipal entity or obligated person with full and fair

---

[169] MSRB Rule 42(a).

disclosure of any affiliate to the adviser that provides advice, service, or product to or on behalf of the client that is directly related to the advisors activities; payments made by the advisor directly or indirectly to obtain or retain an engagement to perform municipal advisory activities for the client; fee-splitting arrangements involving the advisor and any provider of investments or service to the client; conflicts of interest arising from compensation for municipal advisory activities to be performed that is contingent on the size or closing of any transaction as to which the municipal advisor is providing advice; payments received by the advisor from a third party to enlist the municipal advisor's recommendation to the client of its services, any municipal securities transaction, or any financial product; and other or potential conflicts of interest, of which the municipal advisor is aware after reasonable inquiry, that could reasonably be anticipated to impair the municipal advisor's ability to provide advice to or on behalf of the client. If the advisor concludes that she or he has no know material conflicts of interest based on her or his exercise of reasonable diligence by the municipal advisor, the advisor must provide a written statement to that effect.

Under MSRB Rule 42(c), municipal advisors are also required to evidence each of its municipal advisory relationships in writing and deliver this text to the municipal entity or obligated person before, or promptly after, creating an advisor-client relationship. The writing should be dated and include the form and basis of direct or indirect compensation for the municipal advisory activities to be performed; the information that must be disclosed under FINRA rule 42(b); any terms relating to withdrawal from the municipal advisory relationship; the date, triggering event, or means for the termination of the advisor-client relationship; the scope of the municipal advisor's activities and any limits on the scope of the engagement; the date of the last material change or addition to the legal or disciplinary event disclosures on any Form MA or Form MA-I by the advisor and a brief explanation of the basis for the materiality of the change or addition; and a description of legal or disciplinary events that must be disclosed on the firm's SEC Form MA and MA-I. If an advisor makes a recommendation of a municipal securities transaction or municipal financial product to a municipal entity or obligated person, it must have a reasonable basis to believe that the recommended municipal securities transaction or financial product is suitable for the client based on the information obtained through reasonable due diligence. Here, the advisor must inform the client of her or his evaluation of the material risks, potential benefits, structure, and other characteristics of the recommended municipal securities transaction or financial product; the basis on which the advisor reasonably believes that the recommended municipal securities transaction or product is or is not suitable for the client; and whether the advisor has investigated or considered other reasonably feasible alternatives to the recommended municipal securities transaction or financial product that might also serve the client's objectives.

Advisor's, though, are specifically prohibited from receiving compensation that is excessive in relation to the municipal advisory activities that she or he performed; delivering an invoice for fees or expenses for municipal advisory services that is materially inaccurate in its reflection of the activities that were actually performed or the personnel that actually performed those activities; making any representation or information submission that the advisor knows or should know is either materially false or materially misleading due to the omission of a materially fact about the capacity, resources, or knowledge of the municipal advisor in response to requests for proposals or qualifications or in oral presentations to a client or prospective client for the purpose of obtaining or retaining an engagement to perform municipal advisory services; or making payments for the purpose of obtaining or retaining an engagement to perform municipal advisory activities other

than payments that are permissible normal business dealings under MSRB Rule G-20 or payments to an affiliate of the municipal advisor for a direct or indirect communication with a municipal entity or obligated person on behalf of the municipal advisor where such communication is made for the purpose of obtaining or retaining an engagement to perform municipal advisory activities.

The red tape doesn't stop there, though! Advisers are also banned from engaging in with a municipal entity client that is the same, or directly related to the, issue of municipal securities or financial products that the advisor has advised the client on. This ban, however does not apply if the advisor is a registered broker-dealer (and each account is effected in a brokerage account); neither the advisor or an affiliate of the advisor is providing or has provided advice to the municipal entity on an issue of municipal securities or financial products that is directly related to the principal transaction; the principal transaction is a sale to or a purchase from the municipal entity of any U.S. Treasury security, agency, debt security, or corporate debt security; and the municipal advisor either discloses to the municipal entity in writing before the completion of the transaction the capacity in which the municipal advisor is acting and obtains the consent of the municipal entity client to the transaction or the advisor execute the transaction where neither the advisor nor any of its affiliates are the issuer of or at the time of the sale an underwriter of the security; the municipal entity client has executed a written, revocable consent prospectively authorizing the municipal advisor directly or indirectly to act as principal for its own account in selling any security to or purchasing any security from the municipal entity client so long as the written consent is obtained after written disclosure to the municipal entity client explaining the circumstances under which the advisor directly or indirectly may engage in principal transactions, the nature and significance of conflicts with its municipal entity client's interests as a result of the transactions, and how the advisor addresses those conflicts; before the execution of each principal transaction the advisor informs the municipal entity client orally or in writing of the capacity in which it may act with respect to the transaction and obtains consent from the municipal from the municipal entity client orally or in writing to act as a principal for its own account for the transaction; the advisor sends a written confirmation at or before the completion of each transaction that includes a statement informing the municipal entity client that the municipal advisor disclosed to the client before the transaction's execution that the advisor may be acting in a principal capacity in connection with the transaction, the municipal entity client authorized the transaction, and the advisor sold the security to, or bought the security from, the municipal entity client for its own account; the advisor sends to the municipal entity client at least once every year a written disclosure containing a list of all transactions that were executed in the client's account in reliance upon this exception and the date ad price of the transactions; and each written disclosure includes a statement indicating that the municipal entity client may revoke the written consent without penalty at any time by written notice to the advisor.

**Business Continuity Plans of Broker-Dealers**

A business disruption is any event or condition caused by external forces such as a hurricane, flood, winter storm, wildfire, tornado, earthquake, or other natural disaster; pandemic; act of terrorism; or infrastructure failure that prevents a broker-dealer from conducting business normally. A business disruption that impacts a broker-dealer can have severe consequences for its customers – especially if they lose access to their funds and securities. Customers can also incur losses and opportunity costs due to their inability to complete securities transactions during business disruptions. The effects of a disruption can extend beyond the broker-dealer, its customers, and the geographic area where it occurs. These events can represent a systemic risk to

the financial system – particularly when the business of a large broker-dealer is disrupted or a group of broker-dealers is impacted by the same event. FINRA Rule 4370 is relevant here. That provision requires an investment management firm's business continuity plan to identify procedures relating to "emergencies or significant business disruptions." The business continuity plan should be tailored to the size, location, complexity, and nature of the business. Broker dealers should prepare for events that are both reasonably likely to occur and that could prevent the firm from meeting its obligations to customers and counterparties. Business continuity plans should cover data access and recovery; mission critical systems; financial and operational assessments; communications; alternate locations; critical constituent impact; regulatory reporting; and customer fund accessibility. For data access and recovery, the plan should address how the broker-dealer would access her or his books and records in the event of a business disruption. This requirement applies to all books and records that the broker-dealer must create and maintain under the recordkeeping requirements. More specifically, the plan should include a description of location where the broker-dealer's books and records are stored; the contact information of the individual responsible for maintaining the books and records; a description of where back-up books ad records are stored; and a description of how the books and records would be accessed during a disruption. The preferred way for ensuring access to books and records is by maintaining records in an electronic format. This method offers more flexibility and options for access, back-up, storage, and recovery. Electronic records can also be stored on systems that are located remotely or away from main office locations or accessed from different points. A broker-dealer, though, should note that if she or he elects to maintain documents exclusively in an electronic format, she or he must comply with Rule 17a-4(f) of the 1934 Securities and Exchange Act. If the broker-dealer wishes to maintain physical books and records, the copies should be stored in various locations. START.

If one of the aforementioned functions is performed by a third-party, the business continuity plan should include a description of the outsourced function; a description of the entity that performs it; and list the relationship to the broker-dealer of the entity who performs the function.[170] Introducing broker-dealers rely on a clearing broker-dealer to perform many of the functions that Rule 4370 requires. Generally speaking, the clearing broker-dealer will provide trade execution, clearance, settlement, and custody services to the introducing broker dealer. The business continuity plan of an introducing broker-dealer must explain which functions are performed by the clearing broker-dealer and how the services would be impacted by business disruptions. A sample business continuity plan is provided in Appendix XXX.

**Capital Acquisition Brokers**

Capital Acquisition Broker Rule 016 defines a Capital Acquisition Broker as a broker that engages solely in one or more of the following activities: advising an issuer or a private fund on its securities offerings or other capital raising activities; advising a company on its purchase or sale of a business or assets or corporate restricting including going private transactions, divestiture, or mergers; advising a company on its selection of an investment bank; assisting in the preparation of offering materials on the issuer's behalf; providing fairness opinions, valuation services, expert testimony, litigation support, and negotiation and structuring services; qualifying, identifying, soliciting, or acting as a placement agent or finder for an issuer regarding an unregistered sale of newly issued securities to institutional investors or on behalf of a control person regarding a change

---

[170] FINRA Regulatory Notice 05-48.

in control of a privately held company; or effecting securities transactions solely on the transfer of ownership and control of a privately held company through purchase, sale, exchange, issuance, repurchase, or redemption of, or a business combination involving, company securities or assets to a buyer that will actively operate the company or the business conducted with the company assets and in accordance with the terms and conditions of an SEC rule, release, interpretation, or no-action letter that permits a person to engage in these activities without having to register as a broker or dealer under §15(b) of the Exchange Act. The definition of Capital Acquisition Broker here specifically excludes any firm that carries or acts as an introducing broker for customer accounts; holds or handles customer funds or securities; accepts orders from customers to purchase or sell securities either as a principal or agent for the customer; has investment discretion on behalf of any customer; engages in proprietary securities trading or market-making activity; participates in or maintains an online platform for unregistered offerings of securities under Regulation Crowdfunding or Regulation A under the Securities Act; or effects securities transactions that will require the firm to report the transaction under FINRA reporting rules, Rules 6300 Series, 6400 Series, 6500 Series, 6700 Series, 7300 Series, or 7400 Series.

Luckily, Capital Acquisition Broker Rule 116(b) includes procedures for existing FINRA firms to change their status to a Capital Acquisition Broker. If an existing firm is already approved to engage in Capital Acquisition Broker activities and the firm does not intend to change its existing ownership, control, or business operations, the firm is not required to file a new member application or a continuing member application. The firm must, however, file a request to amend its membership agreement or obtain a membership agreement to provide that both the firm's activities will be limited to those permitted for Capital Acquisition Brokers under Capital Acquisition Broker Rule 016(c and that the firm agrees to comply with Capital Acquisition Broker Rules. On the other hand, if a firm that is a Capital Acquisition Broker wants to terminate its status as such and continue as a FINRA firm, it must file a continuing membership application with the FINRA Member Regulation Department and amend its membership agreement to provide that the firm agrees to comply with all FINRA rules. If the firm wants to under this transaction within one year of its consummation is has the option of notifying the FINRA Membership Application Program group of the change without having to file an application for approval of a material change in business operations under FINRA rule 1017 or filing a request to amend its membership agreement to provide that the member firm agrees to comply with all FINRA rules. Capital Acquisition Broker firm principals and representatives are subject to the same registration, qualification, examination, and continuing education requirements as principals and representatives of full FINRA firms.[171]

Because Capital Acquisition Brokers cannot engage in principal transactions, they are not subject to FINRA Rule 2121 (which governs fair prices and commissions), FINRA Rule 2122 (which governs charges for services performed), or. FINRA Rule 2124 (which governs net transactions with customers). Capital Acquisition Brokers, though, are subject to FINRA Rule 2010 which requires a member, in the conduct of its business, to observe high standards of commercial honor and just and equitable principles of trade. With regard to supervision, Capital Acquisition Brokers are subject to FINRA Rule 3220 (which governs influencing or rewarding employees of others), FINRA Rule 3240 (which governs borrowing or lending to customers), and FINRA Rule 3270 (which governs outside business activities of registered persons). While Capital Acquisition

---

[171] See CAB Rule 100 Series; FINRA Rule 1210; FINRA Rule 1220; FINRA Rule 1230; and FINRA Rule 1240.

Broker Rule 311 provides that Capital Acquisition Brokers are also subject to FINRA Rule 3110 which deals with supervision over offices, personnel, customer complaints, correspondence, and internal communications Capital Acquisition Brokers are not subject to FINRA Rule 3310 regulations that require annual compliance meetings, transaction review and investigation, specific documentation and supervisory procedures for supervisory personnel, or internal inspections of branch offices and the businesses where they are engaged. Chief Compliance Officers are subject to different requirements. Here, Capital Acquisition Broker Rule 313 requires a Capital Acquisition Broker to designate and identify one or more principals to serve as the firm's chief compliance officer. A Capital Acquisition Broker, however, is not required to have its chief executive officer certify that it has in place processes to establish, maintain, review, test, or modify written compliance policies and written supervisory procedures reasonably designated to achieve compliance with applicable federal securities laws and regulations

Capital Acquisition Brokers are also subject to FINRA Rule 4140 (which governs audits), FINRA Rule 4150 (which governs guarantees by, or flow through benefits for, members), FINRA Rule 4160 (which governs asset verification), FINRA Rule 4511 (which governs books and records), FINRA Rule 4513 (which governs records of written customer complaints), FINRA Rule 4517 (which governs member filing and contact information requirements), FINRA Rule 4524 (which governs supplemental FOCUS information), FINRA Rule 4530 (which governs reporting requirements), and FINRA Rule 4570 (which governs custodians of books and records). Capital Acquisition Broker Rule 411 requires Capital Acquisition Brokers to suspend business operations during any period where a firm is not incompliance with the SEC net capital rule.[172] Furthermore, Capital Acquisition Broker Rules also set out requirements for capital withdrawal, subordinated loans, notes collateralized by securities, and capital borrowings. Capital Acquisition Brokers, though, have more limited customer information requirements than their counterparts who must comply with FINRA Rule 4512.25. Under Capital Acquisition Broker 451, Capital Acquisition Brokers must maintain each customer's name and residence, whether the customer is of legal age, and the names of any persons authorized to transact business on behalf of the customer. Capital Acquisition Brokers must make and preserve all books and records required under Exchange Act Rules 17a-3 and 17a-4. Capital Acquisition Brokers, though, are not subject to FINRA Rule 4370 (which governs business continuity plans and emergency contact information) or FINRA Rule 4380 (which governs mandatory participation in FINRA business continuity/disaster recovery testing under SEC Regulation SCI). When it comes to securities offerings, investigations and sanctions, procedure codes, and arbitration and mediation, Capital Acquisition Brokers must comply with FINRA Rule 5122 (which governs private placement of securities issued by members), FINRA Rule 5150 (which governs fairness opinions), FINRA Rule 8110 (which governs manual availability to customers), FINRA Rule 8211 (which governs automated submission of trading data requested by FINRA), FINRA Rule 8213 (which governs automated submission of trading data for non-exchange listed securities requested by FINRA), FINRA Rule 12000 Series (which contains the arbitration procedure code for customer disputes), FINRA Rule 13000 Series (which contains the arbitration procedure code for industry disputes), and FINRA Rule 14000 Series (which contains the mediation code procedure).

Any person associated with a Capital Acquisition Broker may not participate in any manner in a private securities transaction as defined in FINRA Rule 3280(e). The Capital Acquisition Broker

---

[172] 17 CFR § 240.15c3-1.

Rules also prohibit Capital Acquisition Brokers from soliciting persons who are accredited investors but are not also institutional investors. Here, Capital Acquisition Brokers cannot solicit investors in funds excluded from registration as investment companies under §3(c)(7) of the 1940 Investment Company Act More than that, Capital Acquisition Broker Rule 331 requires each Capital Acquisition Broker to implement a written anti-money laundering program.

**Crowdfunding Intermediaries: Funding Portals and Brokers**

Title III of the Jumpstart Our Business Startups Act amended the 1933 Securities Act by adding a new registration exemption for crowdfunding offerings. The intent here was to facilitate crowdfunding and efforts to raise capital from a large number of individuals – including non-accredited investors – through the internet and social media. A crowdfunding intermediary must register as either a broker under §15(b) of the 1934 Securities Exchange Act or as a funding portal under Securities Act §4A(a)(1) and Rule 400 of Regulation Crowdfunding. As defined in §3(a)(80) of the 1934 Exchange Act, a funding portal is an internet-based platform or intermediary promoting crowdfunding offerings. These activities are partially exempt under §3(b) of the Exchange Act. To qualify as a funding portal under §3(a)(80) of the 1934 Exchange Act, a funding portal may not offer investment advice or recommendations; solicit purchases, sales or offers to buy securities displayed on the platform, compensate employees, agents, or other persons for solicitation or sales; or hold, manage, possess, or otherwise handle investor funds or securities. Funding portals and their associated persons are subject to these limits. More than that, firms claiming a §3(b) exemption can retain this privilege even if they: determine whether and under what terms to allow issuers to offer and sell securities on their platform; apply objective criteria to highlight specific offerings displayed on their platforms; provide objective search functions and similar tools to allow investors to search and sort offerings available on their platforms; provide communication channels by which investors can communicate with one another and issuer representatives on their platforms about the offering; advise issuers on the structure or content of an offering or assist in preparing offering documentation; compensate third parties for referrals; pay or offer to pay compensation registered broker-dealers for services or referrals; receive compensation from registered broker-dealers for services provided by the funding portals in connection with the offer or sale of securities; advertise the existence of the funding portal and objectively identify issuers or available offerings; deny access to the platform or cancel offerings if the funding portal has a reasonable basis for believing the issuer or offering presents potential for fraud or otherwise raises concerns on investor protection; accepts investment commitments for securities on behalf of issuers; directs investors where to transmit funds or remit payment in connection with their securities purchases; or directs qualified third parties to release proceeds to issuers on completion of their offerings. Under Regulation Crowdfunding funding portals must also make and preserve all organizational documents during their operation or that of any successor; establish written policies aimed at achieving and maintaining compliance with applicable federal securities laws; comply with the consumer financial information and personal information privacy requirements of Regulation S-P covering brokers; and allow SEC and FINRA representatives to examine and inspect all facets of its operation as they relate to funding portal activities such as platforms, systems, premises, and records. Funding portals must also preserve records related to investors purchasing or attempting to purchase securities using the funding portal; records related to issuers offering and selling or attempting to offer and sell securities using the funding portal; records of all communications occurring on or using the platform; records related to individuals using the communication channels provided by the platform; records

required to demonstrate compliance with Regulation Crowdfunding; notices provided by funding portals to issuers and investors; written agreements entered into by the funding portal relating to its business; and daily, monthly, and quarterly summaries of transactions conducted using the portal towards meeting target offering amounts.  Here, records required to be made and preserved under Rule 404 may be maintained by a third party if the third party does do according to the standards set forth in the rules and, funding portals using the services of third parties must file a written undertaking with FINRA stating that the records are the property of the funding portal and not the third party.

Funding portals must register with the SEC by filing out a form Funding Portal that is publicly available (See Appendix XXX). The Form Funding Portal requires information that, for the most part, is also required from broker-dealers on SEC Form BD (See Appendix XXX). The Form Funding Portal requires a funding portal to provide its principal place of business; address; contact information; fiscal year; prior SEC registrations; prior foreign registrations; the firm's form of organization; the firm's control relationships;  the firm's criminal, regulatory, and civil actions; the firm's financial disclosures; the firm's qualified third-party arrangements, and the firm's direct owners and executive officers. Funding portal registration is effective the later of thirty calendar days after receipt of the form by the SEC or approval for membership in FINRA.[173] The crowdfunding rules also govern amendments to Form Funding Portals and withdrawals from registration. Here Rule 400(b) of Regulation Crowdfunding requires that all amendments be filed within thirty days of any information previously submitted that has later become accurate and, that if a portal ceases to operate in its funding portal capacity, it must promptly file a withdrawal or registration on the Form Funding Portal. Withdrawal here is effective on the later of thirty days after receipt by the SEC once the portal is no longer operational or a longer period of time to which the portal may consent or the SEC by order may determine as necessary in the public interest or for the protection of investors. International funding portals are also subject to Rule 400(f) of Regulation Crowdfunding. Under this provision, a non-resident funding portal must obtain a written consent and power of attorney appointing an agent for service of process in the U.S., furnish the SEC with he name and address of its agent for service of process on Schedule C of the Form Funding Portal, and certify on Schedule C of the Form Funding Portal that is is providing a legal opinion, providing the SEC and FINRA with prompt access to its books and records, and submits to onsite inspection and examination by the SEC and FINRA.

Unfortunately, there are limits on ownership for funding portals. More specifically, under Rule 300(b) of Regulation Crowdfunding, an intermediary's directors, officers, and owners are banned from having any financial interest in any issuer using its services or receiving compensation for services provided to the issuer related to a crowdfunding offering. A financial interest in an issuer means a direct or indirect ownership of, or economic interest in any class of the issuer's securities. There are some exceptions to this rule, though. Thus , an intermediary may have a financial interest in an issuer using its services so long as it receives both the financial interest for services it provides to the issuer related to the offering and securities of the same class, terms, conditions, and rights as the securities sold on the intermediary's platform.

---

[173] Securities and Exchange Commission, Registration of Funding Portals: A Small Entity Compliance Guide; Securities and Exchange Commission, Regulation Crowdfunding: A Small Entity Compliance Guide for Crowdfunding Intermediaries.

The federal government also requires funding portals to take limited measures to protect investors.  Here, the intermediary must conduct background and securities enforcement regulatory checks on issuers and certain related parties and deny access to an issuer or offering that the intermediary believes presents a potential fraud risk. Intermediaries must also have a reasonable basis to believe a crowdfunding issuer is in compliance with crowdfunding regulations and has set up a means to keep accurate records of the holders of its securities. An intermediary is deemed to have satisfied the requirements that its issuers have adequate recordkeeping systems if the issuers engage the services of a transfer agent that is registered under §17A of the 1934 Exchange Act. As part of its effort to protect investors, Regulation Crowdfunding also mandates that intermediaries provide investors with educational materials once they establish an account. The materials must contain information on the process for the offer, purchase, and issuance of securities using the intermediary; the risks associated with investing in securities offered and sold under §4(a)(6); the types of securities that may be offered on the intermediary's platform and the risks associated with each type of security; the restrictions on the resale of securities offered and sold under §4(a)(6); the types of information that an issuer must provide in annual reports, the frequency of the delivery of that information, and the possibility that the issuer's obligation to file annual reports may terminate in the future; the limitations on the amounts investors may invest; the circumstances in which the issuer may cancel an investment commitment; the manner in which the intermediary is to be compensated in connection with offerings and sales of securities under §4(a)(6); the limitations on an investor's right to cancel an investment commitment; the need for the investor to consider whether investing in a security offered and sold under §4(a)(6); is appropriate for that investor; following competition of an offering, that there may or may not be any ongoing relationship between the issuer and the intermediary; and that any person promoting an issuer's offering for compensation – past or prospective – must clearly disclose in all communications on the platform the receipt of the compensation and the fact that that person is engaging in promotional activities on behalf of the issuer. More than that, funding intermediaries must make information about the issuer available and the offering no later than 21 days before the first day securities are sold to any investor. This information must be publicly available on the intermediary's platform for a minimum of twenty-one days before any securities are sold in the offering, during which time the intermediary may accept investment commitments and, must remain publicly available on the intermediary's platform until the offering is completed or cancelled. This information requirement can be satisfied by making the issuer's Form C – and related amendments and updates – publicly available on the intermediary's platform (See Appendix XXX).


Crowdfunding Rule 303 also requires intermediaries to obtain two acknowledgments from investors. First, the intermediary must secure a representation form the investor that she, he, or it has reviewed the intermediary's educational materials, understands that the entire amount of the investment may be lost, and is in a financial condition to bear the loss of the investment. Second the intermediary must have the investor complete a questionnaire demonstrating the investor's understanding that there are restrictions on the investor's ability to cancel an investment commitment and obtain a return of investment; that it may be difficult for the investor to resell securities acquired in crowdfunding offerings; and that investing in crowdfunding securities involves risk. Intermediaries must provide communication channels to permit discussions among investors and between investors and the issuer about offerings on the platform. Unlike brokers,

funding portals may not participate in these communications for a purpose other than to establish guidelines for communication and remove abusive or potentially fraudulent communications. Intermediaries must also permit public access to view the discussions and restrict the posting of comments to those persons opening an account and, require that any person posting a comment clearly and prominently disclose with each posting whether that person is a founder or an employee of an issuer engaging in promotional activities on behalf of the issuer or is otherwise compensated to effect the issuer's offering. Intermediaries, though, must have a reasonable basis for believing that no investor exceeds the investment limits. Intermediaries can rely on an investor's representations about her, his, or its income, net worth, and total crowdfunding investments made in the last twelve months using any crowdfunding intermediary unless the intermediary has reason to question the reliability of the representation.

Once the investor has provided a commitment, intermediaries must promptly provide the investor a notification disclosing the dollar amount of the investment commitment, the security price, the issuer name, and the date and time by which the investor may cancel the investment commitment. Under Rule 302 of Regulation Crowdfunding, no intermediary or associated person of an intermediary can accept an investment commitment until the investor has opened an account with the intermediary and the intermediary has obtained consent to electronic delivery of the materials. If the intermediary is a registered broker-dealer, it must comply with established requirements in the Exchange Act Rule 15c2-4 for the maintenance and transmission of investor funds. Here, investor funds must be held in escrow until the specified contingency occurs. The funds will then be transmitted to the bank to be held in escrow for the investors and transmitted or returned to the investors or to the issuer. Because funding portals cannot posses or handle investor funds or securities, they must direct investors to transmit money or other consideration directly to a qualified third party that has agreed in writing to act as an escrow agent. Funding portals must promptly direct the qualified third party to return funds to an investor when an investment commitment has been cancelled; return funds to investors when an issuer does not complete the offering; or transmit funds to the issuer when the aggregate amount of investment commitments from all investors is equal to or greater than the target amount of the offering and the cancellation period has expired- but no earlier than twenty-one days after the date on which the intermediary makes the required issuer information publicly available on its platform. At or before the crowdfunding offering completion date, the intermediaries must provide each investor with a notification disclosing the transaction date; the type of security the investor is purchasing; the identity, price, and number of securities purchased by the investor; the number of securities sold by the issuer in the transaction and the prices at which the securities were sold; if the instrument is a debt security, the interest rate and yield to maturity calculated from the paid price and the maturity date; if the instrument is a callable security, the first date that the security can be called by the issuer; and the source, form, and amount of any renumeration received or to be received by the intermediary in connection with the transaction. Moreover, crowdfunding intermediaries are obliged to given investors an unconditional right to cancel their commitment for any reason until 48 hours before the deadline identified in the issuer's offering materials. During this 48-hour period, an investment commitment may not be cancelled unless there is a material change to the offering or disclosure under Crowdfunding Rule 304(c). On the other hand, if the issuer reaches the target offering before the deadline, she or he can close the offering early so long as the offering remains open for a minimum of 21 days; the intermediary provides notice to potential and existing investors of the offering's new anticipated deadline; the investor's right to cancel investment commitments for any reason until 48 hours before the new offering deadline; and whether the

issuer is continuing to accept investment commitments during the 48 hour period before the new offering deadline. The new offering deadline must also be scheduled for, and occur, at least five business days after notice of the new deadline is provided and, at the time of the new offering deadline, the issuer must continue to meet or exceed the target offering amount. If there is a material change to the terms of an offering or to the information the issuer provides, the intermediary must provide any investor making an investment commitment with notice of the material change and notice that the investor's investment commitment will be cancelled unless the investor reconfirms the investor's investment commitment within five days of receipt of the notice. If the investor fails to reconfirm the investor's investment within those five business days, the intermediary has five business days to provide the investor with a notification that the commitment was canceled, the reason for the cancellation, and the refund amount that the investor is due and, direct the refund of investor funds. Readers should note that if the material change occurs within five business days of the offering deadline, the offering must be extended to allow for five more business days for the investor to reconfirm the investment. If an issuer does not complete an offering, the intermediary has five business days to provide each investor with a notification of the cancellation, disclosing the reason for the cancellation, and the refund amount that the investor is expected to receive; direct the refund of investor funds; and prevent investors from making investment commitments regarding that offering on its platform.

A few FINRA rules also apply to funding portals. More specifically, Rules 100 (General Standards), 110 (which governs the Funding Portal Application), 200 (which governs Funding Portal Conduct), 300 (which governs Funding Portal Compliance), 800 (which governs Investigations and Sanctions), 900 (which contains the Procedure Code), and 1200 (which contains the procedures for Arbitration and Mediation. are relevant here. Investment management firms must also complete FINRA Forms FP-NMA, FP-CMA, Funding Portal Rule 300(c), and Form FP-Statement of Revenue (See Appendices XXX, XXX, XXX, XXX). Rule 100 provides that all funding portal members and associated persons are subject to FINRA's by-laws unless the situation requires otherwise and the funding portal rules. Here, an associated person is a sole proprietor, partner, officer, director, or manager of a funding portal, r another natural person occupying a similar status or performing similar functions; a partnership, corporation, association, or other legal entity controlled by or controlling the funding portal; a natural person directly or indirectly controlling or controlled by a funding portal or any employee of a funding portal – with the exception of persons whose funding portal functions are solely clerical or ministerial.

Funding portal applications are governed by a different set of rules. Here, Funding Poral Rule 110 sets out the membership application process for funding portals. The regulations are based on the current NASD membership rules for broker-dealers. Funding portals must apply for membership using Form FP-NMA (See Appendix XXX). Under the rules, a funding portal applicant must prove that it is capable of complying with applicable federal securities laws and observing high standards of commercial honor and just and equitable trade; is not subject to a statutory disqualification under the 1934 Exchange Act; does not have a pending, adjudicated, or settled regulatory action or investigation that is pending, adjudicated or that has resulted in a guilty or no contest plea; has established all contractual or other arrangements with banks, broker-dealers, clearing corporations, service bureaus, escrow agents, transfer agents, and technology service providers to initiate the operations described in the application process; has a supervisory system that is reasonably capable of achieving compliance with the applicable securities law and the Funding Portal rules; has fully disclosed all direct and indirect funding sources; and has a record

keeping system that enables compliance with federal, state, and self-regulatory organization recordkeeping requirements. Funding portal rules also prohibit applicants from effecting any transaction in or inducing the purchase or sale of any security by means of or by aiding or abetting any manipulative, deceptive, or other fraudulent device or contrivance and, prohibit applicants from making any false and misleading statements. On the other hand, funding portals are required to establish and maintain a system to supervise the activities of all associated persons of the funding portal member; report to FINRA regulatory and disciplinary proceedings and other events of the funding portal member; and report and promptly update all contact information required by FINRA using means specified by FINRA. Before FINRA issues its decision on an application for new membership, the Membership Department must conduct one or more membership interviews with the applicant's representatives. The interview can be conducted by video conference. The FINRA membership department must provide a decision within sixty days after the applicant's filing or at a time agreed to in writing. Portals are also required to complete Form 300(c). That form asks portals to disclose: whether it or an associated person has been named as a defendant or respondent in certain regulatory proceedings or has been found to have violated the federal securities laws by a regulatory body or self-regulatory organization; the subject of a written complaint involving allegations of fraudulent misconduct or misuse of funds or assets; denied registration or membership or is otherwise disciplined by certain regulatory bodies or self-regulatory organizations or is barred from becoming associated with any member of any self-regulatory organization; has been indicted or convicted of, or plead guilty or no contest to any felony or misdemeanor that involves certain fiancé related offenses; the name of any director, controlling stockholder, partner, officer, of sole proprietor of, or an associated person with, a broker, dealer, investment company, investment adviser, funding portal, underwriter, or insurance company that was suspended, expelled or had its registration denied or revoked by any regulatory body, jurisdiction, or organization or is associate with a financial institution that was convicted of or pleaded no contest to any felony or misdemeanor; whether the fund was involved in the sale of any financial instrument, the provision of any investment advice or the financing of any similar activities with any person subject to a statutory disqualification; whether the portal was a defendant or respondent in any securities or commodities related civil litigation or arbitration; whether the fund was a defendant or respondent in any financial-related insurance civil litigation or arbitration; and whether the fund was the subject of any claim for damages by an investor, broker, dealer, or funding portal member that relates to the provision of financial services or relates to a financial transaction, and any civil litigation, arbitration, or claim for damages against the fund that has a been disposed of by judgment, award, or settlement for an amount over $15,000. The fund must also disclose whether any of its associated persons have been subject to a disciplinary action involving the suspension, termination, withholding of compensation, or any renumeration over $2,500; the imposition of fees over $2,500, or a significant limit on the individual's activities on a temporary or permanent basis.

When it comes to recordkeeping, funds are subject to Rule 300(f), which is based on Exchange Act Rule 17a-3(a)(12)(ii). This provision requires funds to make and maintain a record listing every associated person, the funding portal office or offices where the associated person regularly conducts any business for the funding portal member; and any FINRA-prescribed registration number, identification number, or code assigned to the associated person by the funding portal member. The records must be kept for five years and be in an accessible lace for the first two years. In addition to the aforementioned requirements, each funding portal member

must also report its gross revenue on Form FP-Statement of Revenue within sixty days after the end of its fiscal year.

## Equity Research Analysts and Equity Research Reports

Broker-dealers involved in the preparation and distribution of equity research reports must maintain policies and procedures under FINRA Rule 2241 by prohibiting or restricting: pre-publication review of equity research reports by non-research personnel; input into research coverage decisions by investment banking personnel; supervision of research analysts by investment banking personnel; determination of the research department budget by persons providing investment banking services; compensation of research analysts based on specific investment banking services transactions or contributions made to a firm's investment banking services activities; review, pressure, or oversight by investment banking personnel or other persons over research analysts by implementing information barriers or other institutional safeguards to protect research analysts; direct or indirect retaliation against research analysts by investment banking personnel or other employees as the result of an unfavorable research report or public appearance; the publication or distribution of research reports and public appearances by research analysts during quiet periods after IPOs or secondary offerings that the broker-dealer participated in; activities by research analysts that can reasonably be expected to compromise their objectivity including participation in investment banking pitches and solicitations, road shows, and other marketing on behalf of issuers related to the transaction; joint due diligence and other interactions with investment banking personnel; promises of favorable research; issuer pre-publication review of research reports with the exception of fact verifications; and research analyst account trading in securities, derivatives, and funds whose performance is materially dependent on the performance of securities covered by the research analyst. Broker-dealers must also create, maintain, and enforce written policies and procedures that are reasonably designed to ensure that purported facts in its research reports are based on reliable information; that any recommendation, rating, or price target has a reasonable basis and is accompanied by a clear explanation of any valuation method used and a fair presentation of the risks that may impede achievement of the recommendation, rating, or price target; that certain conflicts of interest are disclosed in a research report or in a public appearance by a research analyst. This last obligation is embodied in FINRA rule 2241(b)(2), which requires that a broker-dealer's written policies and procedures must be reasonably designed to promote objective and reliable research that reflects the true opinions of the research analysts of compiled the report and, prevent the use of research reports or research analysts to manipulate or condition the market or favor the interests of the firm or a current or prospective customer or customer class. More specifically, firms are required to prohibit pre-publication review, clearance, or research report approval by persons engaged in investment banking service activities and other persons not directly responsible for the preparation, content, and distribution of research reports other than legal and compliance personnel. Draft sections of a research report, though, can be provided to non-investment banking personnel or to the subject company for factual review if the sections of the submitted report do not contain the research summary, the research rating, or the target price; a complete draft of the report is provided to legal or compliance personnel before sections of the report are submitted to non-investment banking personnel or the subject firm; and the research department provides written justification to, and receives written authorization from, the legal or compliance personnel for the change and retains copies of any draft and the final version of the report for three years after publication if the department wants to change the proposed rating or purchase price.

94

As it pertains specifically to equity research analysts, FINRA Rule 2241(b)(2)(G) requires that their compensation be reviewed and approved at least annually by a committee with no investment banking members that reports to either the firm's board of directors or senior executive officer. In setting compensation, the committee must consider: the analyst's individual performance, productivity, and research quality; the correlation between the analyst's recommendations and the performance of the recommended securities; and the overall ratings received from clients, the sales force, and peers independent of the firm's investment banking department and other independent rating services. More than that, the firm is also obliged to define the periods during which it may not publish or distribute research reports. During this quiet period, research analysts are prohibited from making public appearances relating to the issuer for a minimum of ten days after an IPO if the firm participated as an underwriter or dealer for the IPO or three days following the date of a secondary offering if the firm acted as a manager or co-manager of the secondary offering. The firm, though, may publish a research report or permit its analysts to make a public appearance during a quiet period if the appearance or disclosure deals with the effects of a significant news event on the subject company (so long as legal or compliance personnel authorize the publication of the research report before it is issued or authorize the public appearance before it is made) or the appearance or disclosure is valid under both Securities Act Rule 139 and Rule 101(c)(1) of Regulation M. After the passage of the JOBS Act, quiet period restrictions do not apply to the publication or distribution of research reports or a public appearance following an IPO or secondary offering of securities for an emerging growth company. Research analysts are also prohibited from: being commissioned by investment banking department personnel to directly or indirectly engage in sales or marketing efforts related to an investment banking services transaction; engaging in any communication with a current or prospective customer about an investment banking services transaction; benefiting in their trading from knowledge of the content or timing of a research report before the intended recipients of the research have had a reasonable opportunity to act on the information in the research report; purchasing or selling any security or any option on or derivative of the security in a manner that is inconsistent with the research analyst's recommendation in the firm's most recent research report; or purchasing or receiving any security before an issuer's IPO if the issuer is principally engaged in the same types of business as companies that the research analyst follows. A research analyst account may trade in a manner inconsistent with the research analyst's most recently published recommendation under financial hardship circumstances – that are set out beforehand by the firm.

Under FINRA Rule 2241(c)(1), a broker-dealer must create, maintain and enforce written policies and procedures to guarantee that purported facts in its research reports are based on reliable information and that any recommendation, rating, or price target has a reasonable basis and is accompanied by a clear explanation of any valuation method that was used and a fair presentation of the risks that may impede achievement of the recommendation, rating, or price target. If a research report contains either a rating or price target for a subject company's security and the firm has assigned a rating or price target to the security for at least one year, the research report must include a line graph of the security's daily closing prices for the shorter of the period that the firm has assigned any rating or price target or three years. The graph must indicate the dates on which the firm assigned or changed each rating or price target; depict each rating or price target assigned or changed on those date; and be current as of the end of the most recent calendar quarter. In some instances, firm research reports must also disclose financial interests, compensations for furnished services, the firm's interests in the securities of the subject company, the firm's market-making activities, and research analyst compensation. Financial interests must

be disclosed if the research analyst or a member of the analyst's household has a financial interest in the debt or equity securities of the subject company. Here, the disclosure must reveal the nature of the interest and whether it takes the form of an option, right, warrant, future, long position, or short position. Compensation and service offerings must be disclosed if the analyst has received compensation based on the firm's revenue's from its investment banking activities. Compensation and provided services must also be disclosed if the firm or any of its affiliates managed or co-managed a public offering of securities for the subject company in the past 12 months; the firm or any of its affiliates received compensation for investment banking services from the subject company in the past twelve months, the firm or any of its affiliates expects to receive or intends to seek compensation for investment banking services from the subject company in the next three months; the subject company – is or over the twelve month period before the publication or distribution date of the research report – has been a client of the firm for investment banking services, non-investment banking securities-related services, or non-securities services; or as of the end of the month immediately before the research report's publication or distribution date – or the end of the second most recent month if the publication or distribution date is less than thirty days after the end of the most recent month – the firm or its affiliates have received any compensation for products or services other than investment banking services in the last twelve months from the subject company in the last twelve months unless this information on affiliates is walled-off from research personnel. The firm's interest in the securities of the subject company must be disclosed if the firm or its affiliates own 1% or more of any class of common equity securities of the company that is the subject of the research report. The firm's market-making activities must be disclosed if the firm was making a market in the securities of the subject company at the time of publication or distribution of the research report. Research analyst compensation must be disclosed if the analyst received any renumeration from the subject firm in the last twelve months. Finally, if the research analyst or one of the firm's associated persons who has the ability to influence the content of a research report knows or has reason to know of any material conflict of interest at the time of the research report's publication or distribution, that conflict of interest must be disclosed. The disclosures must be presented in a clear, comprehensive and prominent manner either on the front page of the research report, on a page that is referred to on the front page, or, for electronic reports, with a hyperlink that takes the viewer directly to the required disclosures  There are different rules for compendium reports – reports that deal with six or more subject companies. Here, paper reports may make the required disclosures available through an operator who can be reached through a toll-free number, mail, a website, or, if the report is electronic, with a hyperlink. No information that otherwise would be required for disclosure, though, that reveals material non-public information on future investment banking transactions must be revealed.

The list of required disclosures does not stop there, however. This is so because research analysts who make public appearances must also reveal information on their financial interests, compensation, and service offerings in connection with these events. Analysts must disclose their financial interests in the subject companies if either the firm or its affiliate owns 1% or more of any class of common equity securities for the subject company or the analyst or a member of her or his household has a financial interest in the subject company's debt or equity securities. Here, the disclosure must reveal the nature of the interest and whether it takes the form of an option, warrant, future, long position, or short position. When it comes to compensation, the research analyst must disclose any compensation she or he received from the subject firm in the last twelve months and whether the firm or an affiliate received any compensation from the subject company

96

in the last twelve months if the analyst knows or has reason to know of the transfer. More than that, the analyst knows or has reason to know of any services she, he, or her or his firm provided to the subject company or that the subject company was one of the firm's clients, those facts must also be disclosed. Finally, the analyst must disclose any material conflict of interest that she or he knows of, or has reason to know of, at the time of the public appearance. No information that otherwise would be required for disclosure, though, that reveals material non-public information on future investment banking transactions must be revealed. If the firm intends to terminate the subject company's coverage it must provide its customers with a notice that was made using the firm's ordinary means to disseminate research reports on the subject company and accompanied by a final research report comparable in scope and detail to prior research reports. If the firm cannot provide a final research report, recommendation, or rating, it must disclose its reason for terminating coverage to its customers.

There is yet a different set of rules when it comes to the distribution of third-party research reports. Indeed, FINRA Rule 2241(h)(1) requires that all third-party research reports be distributed by a broker-dealer and reviewed and approved by a registered principal or NYSE supervisory analyst. Of course, the firm may not distribute third-party research if it knows or has reason to know that the research is not objective or reliable. When the firm releases the report, it must also provide a web address that reveals any material conflict of interest that can reasonably be expected to have influenced the choice of a third-party research provider or the subject company of the report; if the firm of any of its affiliates: managed  or co-managed a public offering of securities for the subject company in the past twelve months, received compensation for investment banking services from the subject company in the past twelve months, expects to receive or intends to seek compensation for investment banking services from the subject company in the next three months, or as of the end of the month immediately before the research report's publication or distribution date – or the end of the second most recent month if the publication or distribution date is less than thirty days after the end of the most recent month – the firm or its affiliates have received any compensation for products or services other than investment banking services in the last twelve months from the subject company in the last twelve months unless this information on affiliates is walled-off from research personnel. The firm must also disclose if the subject company is or over the twelve month period before the publication or distribution date of the research report has been a firm client and if so whether the client has received investment banking services, non-investment banking services, or non-securities services. Firms, though, are not required to review third-party research reports to determine that they contain no untrue statement of material fact or is otherwise false or misleading if the research report is an independent third-party research report. More than that that, FINRA will not apply research report rules to firms for third party reports if the report is made available by a broker-dealer on a customer's request, on a firm maintained website, or to a customer in connection with a solicited order in which an associated person has informed the customer of the availability of independent research on the solicited equity security during the solicitation and the customer has requested the research.

Thankfully, there is an exemption from this complicated regulatory morass for firms with limited investment banking activities. This exemption includes firms that over the last three years, participated in tenor fewer investment banking services transactions as a manager or co-manager and generated $5 million or less in gross investment banking revenues from those transactions. These institutions are not required to have policies and procedures: banning investment banking personnel into research analyst compensation decisions; implementing structural information

barriers or other safeguards to ensure that analysts are insulated from review, pressure, or oversight by persons engaged in investment banking services activities or other persons including sales and trading personnel who might be biased in their judgment or supervision; limiting research department budget input by persons engaged in investment banking services; prohibiting persons engaged in investment banking activities from supervision or control of research analysts; limiting input by the investment banking department into research coverage decisions; or prohibiting pre-publication review, clearance, or approval of research reports by persons engaged in investment banking services. Finally, under SEC Regulation AC, analysts who publish, circulate, or provide research reports must include statements indicating that the views expressed in the report accurately reflect the analyst's personal views about the issuers and securities discussed in the report as well as a statement on whether any part of the analyst's compensation was, is, or may directly or indirectly be related to the recommendations of reviews contained the report. If the answer to this inquiry is yes, the report must disclose detail on the source, amount, and purpose of the compensation and an explicit statement that the compensation may influence the recommendations in the report. Investment banking firms are required to keep records of public appearances by research analysts and, within thirty days of the end of any calendar quarter in which the analyst makes the appearance, the bank must create a record that includes the analyst's statements. Regulation AC Applies to both debt and equity research reports.

**FINRA Rules on Outside Activities of Associated Persons**

An outside business activity of a registered representative of a broker-dealer involves acting for another person as their: employee, independent contractor, sole proprietor, officer, director, or partner. A registered person cannot engage in an outside business activity without giving prior written notice to the broker-dealer in the form specified by the broker-dealer. After receipt of a written notice, a broker dealer must consider whether the proposed activity either interferes with or otherwise compromises the registered person's responsibilities to the broker-dealer or the broker-dealer's customers or may be viewed by customers or the public as part of the broker-dealer's business based on the nature of the proposed activity and the manner in which it is offered. Based on the broker-dealer's review of these factors, she or he should consider imposing specific limitations on a registered person's outside business activity. A broker-dealer must also evaluate the proposed activity to determine whether it is characterized properly as outside business activity or should be treated as an outside securities activity subject to the requirements of FINRA Rule 3280. For transactions where an associated person has receive or may receive selling compensation, a broker-dealer that has received notice must advise the associated person in writing whether the broker-dealer approves of the person's participation in the transaction or disapproves of the person's participation in the proposed transaction. If the broker-dealer approves of the participation, the transaction must be recorded on the books and records of the broker dealer, and the broker-dealer must supervise the person's participation in the transaction as if the transaction were executed on behalf of the broker-dealer. If the broker-dealer disapproves of a person's participation, the person may not participate in the transaction in any manner directly or indirectly. For transactions where the broker-dealer has not and will not receive any selling compensation, a broker-dealer who has received notice of the deal must provide the associated person with prompt written acknowledgement of the notice and may require the person to adhere to specified conditions in connection with participation in the transaction. Broker-dealers must also ensure that outside activities are appropriately documented on a registered person's Form U4. Records documenting compliance with these regulations must be kept for three years total – two of which

in a readily accessible place.[174] More than that, broker-dealers are often advised to set up a formal process for seeking approval of new outside activity or to approve existing outside activities of a new associated person; have a process for determining if the proposed activity is a private securities transaction under Rule 3280; review the new activity and its effect on the broker-dealer and its customers; monitor any restrictions imposed on the activity for compliance; require that the associated person report any changes in the scope or structure of the activity; and ensure that notices and approvals or disapprovals of the activity be in writing and maintained in accordance with the broker-dealer's recordkeeping procedures.

Before participating in any private securities transaction, an associated person must provide written notice to the broker-dealer with which that person is associated stating: in detail the proposed transaction, the person's proposed role, and whether the associated person has receive or may receive selling compensation in connection with the transaction. In matters where there are a series of related transactions where no selling compensation has been or will be received, an associated person may provide a single written notice. By way of contrast, a broker-dealer that has received notice of a transaction where an associated person has received or may receive selling compensation must approve or disapprove the associated person's participation in the proposed transaction in writing. If the broker-dealer approves of a person's participation in a transaction, the transaction must be recorded on the books and records of the broker-dealer in the same way as any other broker-dealer transaction. Here, the broker-dealer must supervise the person's participation in the transaction as if the transaction were executed on the broker-dealer's behalf. On the other hand, if the broker-dealer disapproves of the person's participation, she or he may not participate in the transaction directly or indirectly. Finally, in a transaction or series of related transactions where an associated person has not and will not receive any selling compensation, a broker-dealer who has received notice of the transaction must provide the associated person with prompt written acknowledgment of the notice and may require the person to adhere to specified conditions in connection with participation in the transaction.

A different set of rules applies to accounts at other broker-dealers.  More specifically, FINRA Rule 3210 governs broker-dealer oversight of accounts opened or established by their associated persons at other broker-dealers and financial institutions. Here, broker dealers are required to create, maintain, and enforce written policies and procedures that are reasonably designed to prevent and detect possible insider trading activities by the misuse of material, non-public information. Broker-dealers must also set up procedures for the review of all of its associated persons' securities transactions including those conducted through an account maintained at another broker-dealer or financial institution. Associated persons must obtain written approval for the opening of a personal securities trading account at an outside broker-dealer or financial institution; advise the outside broker-dealer in writing that the associated person is affiliated with a FINRA member broker-dealer; and arrange for confirmations and account statements to be provided to the employer broker-dealer to fulfill its duty to monitor the trading activities of its associated persons for potential insider trading. Readers should also note that under FINRA Rule 3210, an associated person is presumed to have a beneficial interest in, and to have established, any account that is held by a spouse; a child, or the child of a spouse so long as the child lives in the same household as the associated person or is financially dependent on the associated person; any other related individual over whose account the associated person has

---

[174] Exchange Act Rule 17a-4(e)(1).

control; or any non-related individual over whose account the associated person has control and to whose financial support the associated person materially contributes. More than that, associated persons are required to provide written notice to the executing broker-dealer, or other financial institution, of an association with the employer broker-dealer before opening or otherwise establishing an account subject to the rule. After receiving a written request from the employer broker-dealer, the executing broker-dealer must transmit duplicate copies of confirmations and statements or the transactional data contained in them. For accounts that were opened before the account owner's association with the employer broker-dealer, the associated person must obtain the employer broker-dealer's consent within thirty days of forming the association relationship to maintain the account. The associated person must also notify the executing broker-dealer or other financial institution in writing of the association with the employer broker-dealer. FINRA Rule 3210 does not apply to transactions in, or accounts limited to transactions in unit investment trusts, municipal fund securities under Municipal Securities Rulemaking Board Rule D-12, qualified tuition programs under §529 of the Internal Revenue Code, monthly investment plan type accounts, or variable contracts or redeemable securities of companies registered under the 1940 Investment Company Act. Finally, broker-dealers should have compliance procedures in place to prevent and deter potential insider trading violations and to address the potential that associated persons might open accounts at outside broker-dealers and other financial institutions. The procedures should include a formal process for associated persons to seek approval to open a securities account at another broker-dealer or financial institution and for new employees to seek approval for existing accounts; a procedure for associated persons to rebut the presumption of beneficial ownership in an outside account; annual certifications for compliance with the firm's policy; account monitoring for potential insider trading activities; and the creation of a form letter for the associated person to advise the outside broker-dealer or financial institution that the person is associated with a FINRA member broker-dealer and requesting that duplicate trade confirmations and accounts be sent directly to the employer broker-dealer. Under FINRA rules, the broker-dealer can consider whether the outside broker-dealer provides duplicate confirmations and account statements in determining whether to approve the opening of the account. The employer broker-dealer, though, need not disapprove of the account opening if that information is not provided directly by an outside broker-dealer or financial institution that is not a member of FINRA. In determining whether the account should be opened, the broker-dealer should consider whether it can fulfill its supervisory duties by evaluating the scope of trading, the type of trading, and the reliability of transaction information obtained from an alternative source.

**FINRA Pay-To-Play Rules**

FINRA Rule 2030 was adopted to regulate the activities of broker-dealers that engage in distribution or solicitation activities with government entities on behalf of investment advisors. Rule 2030 allows broker-dealers to qualify as regulated entities under Rule 206(4)-5 of the 1940 Investment Advisors Act and permits advisers to pay broker-dealers to engage in certain activities on their behalf. Rule 206(4)-5 bans certain investment advisers from: receiving compensation for providing advisory services to a government entity – either directly or indirectly through a pooled investment vehicle – within two years after the investment adviser or its covered associates have made political to an official of the government entity; making payments to third parties to solicit government entities to perform investment advisory services on their behalf; or soliciting or bundling political contributions for a government official or political party for investment advisory

services to a government entity. This regulation applies to any investment advisor registered with the SEC under the 1940 Advisers Act; exempt report advisers, exempt reporting private fund advisers, and exempt reporting venture capital advisers; and exempt foreign private advisers. Rule 206(4)-5's prohibition on payments to individuals for solicitation does not apply if the fund recipient is a regulated person, an executive officer, a general partner, a managing member, or an employee of the investment adviser. A broker or dealer who is registered with the SEC and a member of an SEC-approved national securities association that prohibits members from engaging in distribution or solicitation activities if certain political contributions have been made is a regulated person. FINRA Rule 2030 bans covered members from engaging in distribution or solicitation activities for compensation with a government entity on behalf of an investment advisor that provides or is seeking to provide investment advisory services to that government entity within two years after a political contribution to an official of the government entity is made by a covered member or a covered associate. While the FINRA Rule applies to covered members acting on behalf of any investment advisor who is registered with the SEC, a foreign private advisor exempt from registration under §203(b)(3) of the Advisers Act; or an exempt reporting adviser under Rule 204-4(a) of the Advisers Act, it does not apply to member firms acting on behalf of advisers that are either registered with State securities authorities instead of the SEC or unregistered on the basis of an exemption under the Advisers Act that is not §203(b)(3) or Rule 204-4(a). There are four relevant exceptions to FINRA's pay-to-play rule. First, covered members can apply to FINRA for an exception to the two year cooling off period. Here, FINRA will be able to exempt covered members from the cool off period where the covered member discovers contributions that would trigger the compensation ban both after they have been made and when imposition of the ban would be unnecessary to achieve the rule's intended purpose. Second, contributions made by a covered associated, who is a natural person, to government entity officials from whom the covered associate was entitled to vote at the time of the contributions (if the contributions do not exceed $350 in the aggregate to any one official per election) or not entitled to vote at the time of the contributions (if the contributions do not exceed $150 in the aggregate per election) are exempt. Here, primary and general elections are considered separate elections. Third, if a natural person made a contribution more than six months before becoming a covered associate of a covered member, that donations is exempt unless the covered associate engages in or seeks to engage in distribution or solicitation activities with a government entity on behalf of the covered member. Finally, Finally, if Rule 2030 imposes a restriction on a covered member because of a contribution made by a covered associate and the covered member discovers the contribution within four months of its consummation; the contribution was less than $350; and the contribution was returned within sixty days of its discovery by the covered member. There are some limits to this exception, though, as covered members with 150 or fewer registered representatives can rely on the loophole no more than two times per calendar year and, can only claim the exemption once for each covered associate. All other covered members can rely on the exception no more than three times per calendar year.

A separate set of recordkeeping requirements apply to pay-to-play records. More specifically, FINRA rule 4580 requires covered members that engage in distribution or solicitation activities with a government entity on behalf of any investment adviser that provides or is seeking to provide investment advisory services to the government entity to maintain books and records that would allow FINRA to determine a member's compliance with its pay to play rules during an audit. Rule 4580 requires covered members to maintain a list of the names, titles, and business and residence addresses of all covered associates; the name and business address of each investment

101

adviser on behalf of which the covered member has engaged in distribution or solicitation activities with a government entity in the past five years; all direct or indirect contributions made by the covered member or any of its covered associates to an official of a government entity , or direct or indirect payments to a political party of a State or political subdivision of a State, or to a Political Action Committee; and the name and business address of all government entities with which the covered member has engaged in distribution or solicitation activities for compensation on behalf of an investment adviser, or an investment adviser managing a covered investment pool within the past five years. Direct and indirect contributions made by the covered member or any of its covered associates must be listed in chronological order; indicate the name and title of each contributor and each recipient of the contribution or payment (as well as the amount and date of each contribution or payment); and indicate whether the contribution was the subject of the exception for returned contributions under Rule 2030. Finally, broker-dealers that engage in distribution or solicitation activities with a government entity on behalf of any investment adviser that provides or is seeking to provide investment advisory services to the government entity must have policies and procedures to assist in their compliance with FINRA Rule 2030. These procedures should include measures: requiring newly hired or promoted employees to submit initial and periodic contribution reports on relevant political contributions; instituting pre-clearance requirements for contribution activity by covered associates; creating a process to monitor contribution activity by checking the list of covered associates against public contribution lists and promptly correcting or returning contributions when required; creating and maintain records on covered associates' political contributions to entities with which the firm does business; and implementing training programs for covered associates and other employees on compliance with Rule 2030.

## Using Client Funds To Pay Brokerage Commissions For Brokerage and Research Services That Are Higher Than The Lowest Competitively Available Commission Rate

A money manager with authority to place brokerage orders for an advisory client has a duty to obtain the best execution price for its advisory clients. When a money manager pays a commission on a brokerage transaction to a broker-dealer that provides services other than execution services, the commissions paid may be higher than the commissions that would have otherwise been paid to another broker if the money manager had only requested fewer services. This situation can create issues for money mangers under the federal securities laws and FINRA regulations because money managers obtaining brokerage and research services with client commissions do not have to purchase those services with their own funds. Section 28(e) of the 1934 Exchange Act creates a safe harbor for these sticky situations. That provision ensures that a money manager does not breach her or his fiduciary duties under state or federal law simply by paying brokerage commissions to a broker-dealer for effecting a securities transaction in excess of the amount another broker-dealer might charge if the manager determines in good faith that the paid amount is reasonable in relation to the value of the brokerage and research services provided by the broker-dealer given the transaction and the overall responsibilities for executing the deal. For private equity funds, venture capital funds, and investment banks, compliance with this exception is critical because otherwise, if the entity is covered by the 1940 Investment Advisers Act, the 1940 Investment Company Act, or ERISA, it may be in violation of one, if not all three of these statutes by using client funds to pay for research services. In making her or his good faith determination, a manager should consider the commission rate, the value of the provided research, the broker's

execution capability, the broker's responsiveness, and the broker's financial responsibility.[175] The research here must be provided by the broker-dealer in effecting the trade. A broker-dealer provides the research if she or he prepares the research; is financially obligated to pay for the research; or takes steps to ensure that the paid commissions are used only for eligible brokerage and research by paying the research preparer directly, reviewing the services description for red flags, only uses client communications to pay for items that fall within the statutory exemption, or develops and maintains procedures so that research payments are documented and paid for on time. On the other hand, a broker-dealer effects a trade if she or executes the trade; clears the trade; settles the trade; takes financial responsibility for customer trades; maintains records relating to customer trades; monitors trade settlements; or monitors and responds to customer comments on the trading process. If a broker-dealer has entered into a commission sharing arrangement, she or he must satisfy one of the aforementioned criteria for effecting a trade and ensure that both one or more of the four functions are allocated to one of them with relevant self-regulatory organization rules and monitor daily trading activities even when the money manager sends transactions directly to a clearing broker for execution.

For a money manger to qualify for the safe harbor, the acquired products or services must be either eligible brokerage or research; provide lawful and appropriate assistance in the performance of the manager's investment decision-making responsivities; and cost a reasonable amount.[176] The SEC has taken the position that research products and services must contain substantive content including "the expression of reasoning or knowledge." The content does not have to be original and can even be a synthesis, analysis, or compilation of other research. More specifically under §28(e)(3), research includes advice in publications or writings on security value, the advisability of investing in securities (or purchasing or selling securities), or the availability of securities or purchasers or sellers of securities; analysis or reports on issuers, industries, securities, economic factors and trends, portfolio strategies, or the performance of an account. Indeed, the SEC has already found that research reports analyzing the performance of a particular company or stock, quantitative analytical software, software that provides analyses of securities portfolios, discussions with research analysts on the advisability of investing in securities; meetings with corporate executives to obtain oral reports on the performance of a company; seminars or conferences that provide substantive content on a permissible subject-matter such as issuers, industries, and securities; and financial newsletters and trade journals that are not mass-marketed qualify as research under §28(e)(3). A newspaper or trade journal is mass marketed if it is circulated to a wide audience, has a low cost, or is intended for and marketed to the public rather than a small or specialized readership. Pre-trade and post-trade analytics or software that depends on market information to generate market research; research on optimal execution venues and trading strategies; advice from broker-dealers on order execution, execution strategies, market color, and buyer or seller availability; and market date such as stock quotes, last sale prices, and trading volumes also constitutes research under §28(e)(3).

On the other hand, brokerage services include those products and services that relate to the execution of the trade from the point at which the money manager communicates with the broker-dealer to transmit an execution order to the point at which funds or securities are delivered or credited to the advised account. This definition includes: acts hat require the performance of

---

[175] SEC Release 34-54165 Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities Exchange Act of 1934, 2005 WL 4843294 (July 18, 2006).
[176] Id.

functions incidental to a transaction or acts that require the performance of functions required by rule or regulation in connection with a transaction such as the use of trading software used to route orders to market centers; the use of software that provides algorithmic trading strategies; the use of software to transmit orders to direct market access systems; communication services related to the execution, clearing, and settlement of securities transactions; post-trade matching information; message exchanges among broker-dealers, custodians, and institutions related to the trade; routing settlement instructions to custodian banks and broker-dealer clearing agents; and short term custody elated to effecting particular transactions in relation to clearance and trade settlements. The analysis is slightly more complex for mixed use items such as trade analytical software, order management systems, and proxy services that are obtained using client commissions yet serve both investment decision-making and administrative purposes. Here, the investment manager must make a reasonable allocation of the cost of the product according to its use and keep adequate books and records on the allocation. Because this act can create a conflict of interest for the money manager, she or he must disclose it to the client.

While the discussion above has centered on equity instruments, the SEC has confirmed that §28(e)(3) applies to fixed income trades conduced on an agency basis – with the exception of trades that are not executed on an agency basis, principal trades, and other instruments traded net with no explicit commissions. Riskless principal transactions may be eligible where both legs are executed at the same price and the transactions are reported under FINRA's trade reporting rules.[177] There are additional disclosure requirements for transactions that involve registered investment advisers who exercise discretion in allocating client funds for brokerage or research services as the investment adviser must complete SEC Form ADV (See Appendix XXX). Commissions from these fixed-income trades can be used to purchase third-party research.

**Regulation and Reporting Requirements For Shorting**

Shorting is the practice of selling securities than an individual does not won with the intent of acquiring them at a lower price in the future. Here, the seller is said to have a 'short position' from the moment when the securities are sold to the time when she reacquires the securities. This definition includes transactions where the investor borrows the security from the broker-dealer or institutional investor. Shorting is a technique that is used to profit from an expected downward price movement, provide liquidity in response to unanticipated demand, or hedge the risk of a long position in the same security. There are three types of short sales: regular shorts, where the seller determines that the securities can be borrowed by the time the trade is settled, har shorts, where the seller borrows the securities before the sale order is entered, and naked shorts, where the seller does not own any of the securities being sold and has not guaranteed that she can deliver the securities at the time the trade settles. In naked shorts the lack of a guarantee that shares will be available increases the chances that the buyer will not receive securities from the seller on the designated settlement date. If the trade does not settle within three business days, the naked short creates 'phantom shares' that dilute the price of the underlying stock. These failed transactions violate SEC rules as well as the rules for NYSE and NASDAQ. In 2008, the SEC adopted Rule 204T which strengthened delivery requirements on equity security sales by imposing a penalty on any clearing agency participant and any broker-dealer from which the participant received long or short trades for clearance and settlement for having a failed naked short at a clearing agency in any equity security. Here, if a participant in a registered clearing organization does not make the

---

[177] Carolina Capital Markets, Inc. SEC No-Action Letter, 2013 WL 3936202 (July 30, 2013).

required delivery on the settlement date, it must close the naked short position at the open of business on the next business day by either buying or borrowing the security. Failure to comply with this requirement means that a participant cannot accept further short sales in the stock until the naked short position is closed unless the participant has previously arranged to borrow or has borrowed the security. In 2009, Rule 204T was permanently adopted.[178] Regulation SHO under the Exchange Act sets out the regulatory framework for short sales and requires, among other things, that broker-dealers locate a source of borrowable shares before selling short and that firms that clear and settle trades purchase shares to close out failed short transactions within thirteen days of the transaction's failure. Under Regulation SHO, a short sale is defined as the sale of any security that the seller does not own or that is completed by the delivery of a security borrowed by, or for the account of, the seller. A seller is considered to have ownership over a security if she or he has title to the security directly or using an agent; owns a security convertible or exchangeable for it, and has tendered for conversion or exchange; owns an option to acquire the security and has exercised the option; owns rights or warrants to subscribe for the security and has exercised the rights or warrants; has bought or entered into an unconditional contract to buy the security but has not yet received the instrument; or holds a security future contract to buy the instrument, has received notice that the position will be physically settled, and is irrevocably bound to receive the underlying security.

Investors must complete or settle their security transactions within two business days. This is so because when an investor purchases a security, the buyer's payment must be received by its brokerage firm no later than three business days after the trade is executed. The three-day settlement period applies to stock, bond, municipal security, mutual fund, and limited partnership transactions. The SEC, though, has adopted a narrow exception for this rule in its recognition of the fact that there are many instances where a broker-dealer may not be able to deliver securities on the settlement date. The exemption which is codified as Rule 15c6-1 under the 1934 Exchange Act bans broker-dealers from effecting or entering into a contract for the purchase or sale of a security that provides for the payment of funds and the delivery of the securities later than the third business day after the contract date unless the contract provided otherwise. Rule 15c6-1, though, does not apply to contracts for an exempted security, government security, municipal security, commercial paper, bankers' acceptances, or commercial bills. The rule also makes the three day settlement period a default rule that the parties can modify through contract in a limited set of circumstances.

Regulation SHO also requires broker-dealers to mark all sell orders from customers as long, short, or short-exempt. The circumstances where an order must be marked as 'short' have already been covered. By way of contrast, an order can be marked as 'short-exempt' where the order is at a price above the current national best bid at the time of submission or when the order falls under an exception under Rule 201. There are seven exemptions that are relevant here. First, an exemption can be claimed if the short sale is effected at the volume weighted average price calculated in accordance with the terms of Rule 201. Second, an exemption can be obtained if the short sale is by a broker or dealer effecting the execution of a customer purchase or long sale on a riskless principal basis. Third, an order can be marked as short-exempt if the short sale is by an underwriter or member of a syndicate in connection with an over-allotment of securities or for purposes of a lay-off sale. Fourth, an exemption can be claimed if the short sale is for a good faith

---

[178] Amendments to Regulation SHO, SEC Release No. 34-60388 (July 27, 2009).

account and submitted to profit from a current price difference between a security on a foreign market and a security on a U.S. market so long as the seller has an offer to buy on the foreign market that allows the seller to immediately cover the short sale. Fifth, an exemption can be obtained if the short sale is for a good faith account for a person who then owns another security by virtue of which she is, or will be, entitled to acquire an equivalent number of securities of the same class as the securities that were sold. The sale must also be effected for the bona fide purpose of profiting from a current difference between the price of the security that was sold and the security that is owned. Here, the acquisition right must be originally attached to, or represented by, another security. Sixth, an order can be marked as short-exempt if the short sale is by a market-maker to offset customer odd-lot orders or to liquidate an odd-lot position that changes the position of the broker or dealer by no more than a unit of trading. Finally, an exemption can be claimed if the short sale is by an individual who is deemed to own the covered security under Rule 201 so long as the owners intends to deliver the security as soon as all restrictions on delivery have been removed. On the other hand, an owner can be marked as long if the seller owns the security that will be sold for the purposes of Rule 200 and the broker dealer has, or reasonably expects to have, physical possession or control of the security that will be sold before settlement. Rule 105 of Regulation M also imposes limits on shorting. This provision prevents investors from improperly profiting by shorting before a follow-on offering with the expectation that the investors must cover the short by using lower priced shares obtained in the offering. More specifically, the regulation bans an investor who shorts during a pre-pricing restricted period from purchasing shares in the offering – even if the shares will not be used to cover the short position. The restricted period is the shorter of five business days preceding pricing or the period beginning with the filing of the registration statement and ending with the pricing. Rule 105 only applies to the class of securities being distributed in the offering. Thus, an investor who buys into the offering is not banned from shorting reference securities – or instruments such as convertible debt or stock options that can be converted into the offered security. This ban is subject to three exceptions. First, a fund within a registered fund complex can buy an offered security if a sister fund shorted during the restricted period. Second, an investor can purchase the offered securities for one account even if there was a short sale in another account held by the investor so long as the trading decisions for the accounts are made separately. Finally, an investor that shorted during the restricted period can purchase in the offering if it makes a bona fide purchase at least one day before pricing. The purchase here must be made no later than the business day before pricing and must be at least equivalent in quantity to the entire amount of securities the investor shorted during the Rule 105 restricted period.

To stem volatility, there are also regulatory restrictions on shorting when a stock is experiencing significant downward pressure. These restrictions kick in only once a stock experiences a price decline of at least 10% of its purchase price in one day. Once this 10% threshold is reached, shorting is permitted only if the price is above the current national best bid. The price restriction applies only during the time that an effective national market system plan calculates and disseminates the national best bid. The rule applies to short sales in the security at issue for the remainder of the trading day as well as the following day. If the price of the security continues to fall and triggers the 10% threshold on a separate occasion, the restriction period will restart. For the purposes of the threshold, the price of the instrument is measured through a limit up, limit down mechanism that prevents trades in individually listed equity securities that are outside a specified price band based on the average price of the security over the five-minute period proceeding the current moment, If the security is particularly liquid and is listed on a well-known

index such as the S&P 500 or Russell 1000, the threshold is set at 5%, the majority of other securities have a 10% threshold, and securities that have a price at, or below, $3, will have a broader price band. The percentage level are doubled during the opening and closing periods of trading.[179] Here, trading centers, national securities exchanges, national securities associations, exchange market makers, OTC market makers, and any other broker or dealer that executes orders internally by trading as principal or crossing orders as agent are required to create, maintain, and enforce written policies and procedures that are reasonably designed to prevent the execution or display of a prohibited short sale. Options and other derivatives used to create synthetic short positions are not subject to a short sale order display or order restrictions.

**Investment Adviser Advertising**

Under the 1940 Investment Advisers Act, an advertisement by an investment adviser cannot contain any statement that any report, analysis, or service is free unless it really is; represent that any graph, chart, formula, or other device can be used to make investment decisions without prominently disclosing in the advertisement any limitations or difficulties in its use; refer to any testimonial by the investment adviser or any advice, analysis, or report by the investment adviser; refer to past specific recommendations of the investment adviser that were or would have been profitable unless the investment adviser offers to provide a list of all recommendations made within the prior period of at last one year and the advertisement and: contain a specific cautionary legend on the first page in print or type as large as the largest print or type using in the body or text and state the name of each recommended security, the date and nature of each recommendation, the market price at that time, the price at which the recommendation was to be acted on, and the market price of each security as of the most recent practicable date. An advertisement here is any circular, notice, letter, or other written communication addressed to more than one person or a notice or other announcement in any publication or by television, or radio that offers any: analysis, report, or publication on securities or that is to be used in making any determination about when to buy or sell any security or about which security to buy or sell; any graph, chart, formula, or other device to be used in making any determination about when to buy or sell any security, or which security to buy and sell; or other investment advisory services with regard to securities. This definition does not include oral communications between an investment adviser and a client or prospective client other than those in radio, television, or other non-traditional media broadcasts; written communications with existing advisory clients about the performance of their account so long as the communication is not for the purpose of offering services or maintaining existing account relationships; or written communications by an adviser that do no more than respond to an unsolicited request by a client, prospective client, or consultant for specific information about the adviser's past specific recommendations.

The 1940 Investment Advisers Act also contains a general anti-fraud provision. Thus, it is a fraudulent, deceptive, or manipulative act, practice, or course of business within the meaning of the statute for any registered investment adviser to directly or indirectly distribute any advertisement that contains an untrue statement of material fact or that is otherwise false or misleading. Whether a specific ad is false or misleading turns on the form and content of the advertisement; the investment adviser's ability to perform what is advertised; the implications or inferences arising from the context of the communication; and the sophistication of the prospective clients. The SEC has provided more guidance, though, when it comes to specific types of

---

[179] National Market System Plan Approval Order (SEC Release No. 34-67091 (May 31, 2012).

advertisements. First, with regard to performance advertising, while there is no set method for an investment adviser's use of actual or hypothetical portfolio performance in advertising, the SEC has generally look to whether the ad "implies, or a reader would infer form it, something about the adviser's competence or about future investment results that would not be true had the advertisement included all material facts."[180] If the firm discloses model and actual portfolio performance, it cannot fail to disclose any material conditions, objectives, or investment strategies used to obtain the advertised performance; suggest or make claims about the potential for profit without also disclosing the possibility of loss; compare results to an index without disclosing all material factors relevant to the comparison; fail to disclose whether and to what extent the results portrayed reflect the re-investment of dividends and other earnings; fail to reflect the deduction of investment advisory fees, brokerage or other commissions, and any other expenses that the client would have paid or actually paid; or fail to disclose the effect of material market or economic conditions on the portrayed results.[181] If the firm discloses model performance results, it cannot fail to disclose the limitations inherent in the model results; fail to disclose material changes in the conditions, objectives, or investment strategies of the model portfolio during the portrayed period and the effect of those changes; fail to disclose that some of the securities or strategies reflected in the model portfolio do not relate or relate only partially to the services currently offered by the investment adviser; or fail to disclose that the investment adviser's clients actually had investment results that were materially different from those portrayed in the model.[182] If the firm discloses the actual performance results of a portfolio in an advertisement, it cannot fail to disclose that the results relate only to a select group of the investment adviser's clients, the basis on which the selection was made, and the effect of this practice on the portrayed results.[183] If the firm discloses the gross and net performance results of a portfolio, it cannot present data that does not reflect the deduction of fees, commission, and expenses that a client would pay. An advertiser, though, may present gross performance results if the advertiser also presents net performance information. Here, both the gross and net performance figures must be presented in an equally prominent manner.[184] If the aforementioned condition cannot be met, the advertiser may still be able to present gross and net performance if she or he is delivering a one-on-one presentation to a wealthy or institutional investor. Here, she or he must still disclose that the performance figures do not reflect the deduction of investment advisory fees; disclose that the client's return will be reduced by the investment advisory fees and any other expenses the client may incur in the management of its investment advisory account; disclose that the investment advisory fees are described in Part 2 of the investment adviser's Form ADV; and provide a representative example that shows that effect that an investment advisory fee compounded over a period of years could have on the total value of a client's portfolio.[185] If the firm presents a client with a model tracking hypothetical performance based on the retroactive application of an adviser's investment strategy over a select

---

[180] SEC Office of Compliance Inspection and Examination, National Exam Program Risk Alert: The Most Frequent Advertising Rule Compliance Issues Identified in OCIE Examinations of Investment Advisors (September 14, 2017); OCIE, Investor Bulletin, Financial Professionals' Use of Professional Honors – Awards, Rankings, and Designations (September 14, 2017); Clover Capital Mgmt., Inc., SEC No-Action Letter, 1986 WL 67379 (Oct. 28, 1986).

[181] Clover Capital Mgmt., Inc., SEC No-Action Letter, 1986 WL 67379 (Oct. 28, 1986).

[182] *Id*.

[183] *Id*.

[184] Association for Investment Management and Research, SEC No-Action Letter, 1996 WL 729385 (Dec. 18, 1996).

[185] In the Matter of Trust & Inv. Advisors, Inc. et al., Advisors Act Rel. No. 4087, 2015 WL 2353173 (May 18, 2015); Inv. Co. Inst. SEC No-Action Letter, 1988 WL 235405 (Sept. 23, 1988).

market period, it should disclose: that the performance was derived from the retroactive application of a model developed with the benefits of hindsight; that the results were not derived from actual trading; the inherent limitations of data derived from the retroactive application of a model developed with the benefit of hindsight and the reasons why actual results may differ; whether the trading strategies retroactively applied were not available during the periods presented; that actual performance with client accounts was materially less than the advertised hypothetical results for the same period; all material economic and market factors that may have affected the adviser's decision-making when using the model to actually manage client funds; the potential for loss; all material facts relevant to any comparison between back-tested performance and its benchmark; and whether the advertised performance reflects the deduction of advisory fees, brokerage, or other commissions.[186]  This information should only be presented to institutional clients.

If a firm advertises performance reflecting the deduction of a model fee, the resulting fee must be no higher than the performance that would have resulted if actual fees were deducted. Here, the firm must also disclose that the advisory fees are available on request and may be found in Party 2 of the adviser's Form ADV; that actual fees may vary depending on the applicable fee schedule and portfolio size; and that the performance reflects the deduction of the highest fee charged to an advisory customer employing that particular strategy during the period under consideration.[187] Firm management can include the performance of accounts they managed prior to their employment at their current position so long as the advertisement includes all relevant disclosures – including that the performance results were from accounts managed at another entity; the advertisement is consistent with SEC staff interpretations on the advertisement of performance results; all accounts that were managed in a substantially similar manner are advertised unless the exclusion of any of those accounts would not result in materially higher performance; and the accounts managed during the prior period are so similar to the accounts currently under management that the performance would provide relevant information to prospective clients.[188]

Registered investment advisers, though, may not publish, circulate, or distribute any advertisement that either refers directly or indirectly to any testimonial of any kind on the investment adviser or that concerns any advice, analysis, report, or other service rendered by the investment adviser. The SEC has taken the position that the term 'testimonial' includes statements of a client's experience with, or endorsement of, an investment adviser.[189] By way of contrast, investment advisers can publish advertisements that feature public commentary about them without violating prohibitions on testimonial ads. While the determination of whether a social media site is a testimonial turns on the facts and circumstances of the matter, publication of third-party commentary from an Independent Social Media Site does not violate restrictions on testimonial ads so long as the website provides content that is independent of the adviser, the adviser publishes all unedited comments appearing on the website regarding the adviser, and there

---

[186] In re Schield Mgmt. Co., Investment Advisers Act Release No. IA-1872, 2000 WL 694288 (May 31, 2000); In re Leeb Inv. Advisors, Investment Advisers Act Release No. IA-1545, 1996 WL 15627 (Jan. 16, 1996).

[187] J.P. Morgan Inv. Mgmt., Inc., SEC No-Action Letter, 1996 WL 282573 (May 7, 1996).

[188] Fiduciary Mgmt. Assocs., Inc., SEC No-Action Letter, 1984 WL 44964 (Mar. 5, 1984); Horizon Asset Mgmt., LLC, SEC No-Action Letter, 1996 WL 554956 (Sept. 13, 1996).

[189] SEC Division of Investment Management Guidance Update 2014-04 Guidance on the Testimonial Rule and Social Media (Mar. 2014).

is no material connection between the site and the adviser that would call the site's independence into question.[190]

The discussion thus far has not covered partial client lists, article reprints, past specific recommendations, non-performance based recommendations, or lists of partial recommendations. When it comes to partial client lists, an investor can include them in an advertisement if the adviser does not use performance based criteria in determining which clients to include in the list; each client list includes a statement disclosing the objective criteria used to determine which clients to include in the list; and each client list contains a disclaimer that it was unknown whether the listed clients approved or disapproved of the adviser or the advisory services provided.[191] Second, while an article drafted by an unbiased third party that discusses an adviser's performance is not a prohibited testimonial, if the ad reprints an article by an independent financial publication, it may be banned if the reprint, in tandem with the advertisement, implies something about, or causes a reader to infer something about the experience of the adviser's clients; the possibility of a prospective client having an investment experience similar to those of prior clients; or the adviser's competence.[192] Here, third-[arty ratings that are based solely on performance regardless of whether an adviser compensates the third party to verify and rank its performance, are not testimonials. Third-party ratings that contain an implicit statement of a client's experience with an adviser, though, are testimonials as are ratings that solicit client's views about their experience with an adviser. It is important to note, however, that the latter set of advertisements are not prohibited if the rating does not emphasize favorable client responses or ignore unfavorable client responses; the rating represents all or a statistically valid sample of the responses of the adviser's clients; the questionnaire sent to the clients was not prepared to produce any pre-determined results that could benefit any adviser; the questionnaire is structured to make it equally easy for a client to provide a negative or positive response; or the research firm does not perform any subjective analysis of the survey results but instead assigns numerical ratings after averaging the client responses for each adviser.[193] Ven if, though, the third-party rating satisfies the aforementioned criteria, it still may violate the anti-fraud provisions of the 1940 Investment Advisers Act if the advertisement does not disclose the criteria on which the rating was based; the ad does not disclose that the rating is not indicative of future performance; the ad does not prominently disclose who created and conducted the survey and that the adviser paid a fee to participate in the survey; the ad does not disclose that the rating may not be representative of any one client's experience because the rating reflects an average or sample of all the experiences of the adviser's clients; the ad does not clearly and prominently disclose the category for which the rating was calculated or determined, the number of advisers surveyed in that category, and the percentage of advisers that received that rating; the ad states or implies that the adviser was a top-rated adviser in a category when it was not rated first in that category; the ad advertises a favorable rating without disclosing any unfavorable ratings; the ad discloses the criteria on which the rating is based; and the adviser advertises any favorable rating without disclosing facts that the adviser knows would call into question the validity of the rating or the appropriateness of advertising the rating.[194] Third, registered investment advisers are prohibited from releasing any ad that directly or indirectly makes an reference to the adviser's past specific recommendations that would have been profitable

---

[190] *Id.*

[191] Denver Inv. Advisors, Inc., SEC No-Action Letter, 1993 WL 313090 (July 30, 1993).

[192] Stalker Advisory Service, SEC N-Action Letter, 1994 WL 49843 (Jan. 18, 1994).

[193] Dalbar, Inc., SEC No-Action Letter, 1998 WL 136415 (Mar. 24, 1998).

[194] Inv. Adviser Association, SEC No-Action Letter, 2005 WL 7980405 (Dec. 2, 2005).

unless the ad sets out or offers to furnish free of charge a list of all recommendations made within the immediately preceding period of not less than one year and contains the name of each recommended security; the market price at the time the recommendation was made; the price at which the recommendation was to be acted on; the market price of each listed security as of the most recent practicable date; the date and nature of each recommendation; and a legend on the first page in print or type as the largest print or type used. Fourth, registered investment advisers can include discussions of past specific securities that she or he bought, sold, or held in her or his account in quarterly reports to existing and prospective clients if the covered securities are selected on the basis of objective non-performance based criteria; the same selection criteria will be consistently applied each quarter; the ad does not directly or indirectly discuss realized or unrealized profits or losses of the named securities; the ads include cautionary disclosures; and the adviser maintains evidence of the complete list of all securities recommended by the adviser in the preceding year for the specific investment category covered by the ad, the criteria used to select the specific securities listed in each ad, and the information set out in Rule 206(4)-1(a)(2) of the 1940 Investment Advisers Act.[195] Finally, no ad references to selected recommendations that were or would have been profitable without setting out all past recommendations during the preceding year are permitted – even where the ad is accompanied by an offer to provide that information separately.[196]  Investment advisers should keep copies of all written communications sent by the adviser relating to her or his recommendations, handling of customer funds or securities, or transactions. If the adviser sends an ad to more than ten persons, she or he is not required to keep a record of the recipient's name and address unless the ad is sent to persons named on a list – in which case the adviser must retain the list along with a copy of the ad and a memo describing the list or its source. These records must be maintained for five years total and two years in an easily accessible place. Advisers must also keep copies of every notice, circular, ad, newspaper article, investment letter, bulletin, or other communication that she or he sends to ten or more persons. If the communication recommends the purchase or sale of a specific security and does not state the reason for the recommendation, the adviser must retain a memo stating the basis for the recommendation along with a copy of the communication. Finally, advisers must keep copies of all working papers and other records "necessary to form the basis for or demonstrate the calculation of the performance or rate of return of any or all managed accounts or securities recommendations" in any notice, circular, ad, newspaper article investment letter, bulletin, or other communication that the adviser sends to ten or more persons. For managed account performance, the record retention requirements can be satisfied if the adviser retains account statements that show all debits, credits, and other client transactions for the applicable period and all worksheets necessary to demonstrate the performance calculations. All account statements for the period for which performance is calculated must be kept. Advisers must also retain records reflecting the manner in which it calculated any model fees used in ads, and the performance of advised accounts of a predecessor adviser if the performance of those accounts is included in the investment adviser's performance. Although advisers can meet their performance recordkeeping requirement by relying on internally generated records, they should keep records prepared by an independent auditor that verify performance and custodial and brokerage statements that confirm the accuracy of client account statements and other performance related records maintained by the adviser.[197]

---

[195] TCW Group, Staff No-Action Letter, 2008 WL 4878097 (November 7, 2008); Franklin Mgmt., Inc., SEC No-Action Letter, 1998 WL 853257 (Dec. 10, 1998).
[196] Mr. Norman L. Yu & Co., Inc., SEC No-Action Letter, 1971 WL 17417 (Apr. 12, 1971).
[197] Jennison Associates LLC, SEC No-Action Letter, 2000 WL 896020 (July 6, 2000).

From: donotreply@easy-serve.com

To: Habib Olapade habib3355@outlook.com

Time: Monday 8/12/2019 6:59 AM

| ST ATTEMPT INFORMATION |
|---|
| **Address: 1700 PACIFIC AVE SUITE 4100, DALLAS, TX 75201** |

| Date: | **8/12/2019 2:15 PM** |
|---|---|
| Server Note: | **Went to stated address and spoke with Edward Richards, Security, who stated Suite 4100 was vacant, and they had moved out long ago.** |

From: donotreply@easy-serve.com

To: Habib Olapade habib3355@outlook.com

Time: Monday 8/9/2019  5:04 PM

| | ORDER CONFIRMATION |
|---|---|

**PLEASE CLICK HERE TO PAY FOR THIS ORDER**

**Your order will be promptly processed after payment is received. If you have any questions on pre-payment, please contact our office at 713 655 7239 or info@easy-serve.com. This order will be cancelled if payment is not received within 24 hours.**

**Hello Habib with Pay Pal ,**

**Thank you for trusting us with your service of process.**

**Order#: 265511-1**

**We will be serving the following document(s) for you:**

**SUMMONS IN A CIVIL CASE, PLAINTIFFS' COMPLAINT FOR PRELIMINARY INJUNCTIVE RELIEF, PERMANENT INJUNCTIVE RELIEF, AND MONETARY DAMAGES, PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF, PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION, MOTION BY SELF-REPRESENTED LITIGANT TO**

**PARTICIPATE IN ELECTRONIC FILING, CONSENT TO ELECTRONIC NOTICE BY SELF-REPRESENTED LITIGANT, ORDER ON PRETRIAL DEADLINES, NOTICE REGARDING ELECTRONIC FILING, STANDING PROTECTIVE ORDER, EXHIBIT A-1, EXHIBIT B, EXHIBIT C, EXHIBIT D1, EXHIBIT F, EXHIBIT G, EXHIBIT H, EXHIBIT M, EXHIBIT N, EXHIBIT Q, EXHIBIT 2, EXHIBIT P, EXHIBIT A, EXHIBIT E, EXHIBIT B, EXHIBIT I, EXHIBIT F-1, EXHIBIT Y, EXHIBIT K, EXHIBIT J, EXHIBIT O, EXHIBIT D**

**PROCESS SERVICE RECIPIENT: YALE LAW SCHOOL C/O HEATHER GERKEN**

**Service Of Process Address 1: 127 WALL ST, NEW HAVEN, CT 06511**

**Order Placed: 08/09/2019 at 3:58 PM**

**Reference: 3:19-CV-01183-KAD**

**We will complete our 1st service attempt no later than Monday, September 9, 2019 at 5:00 PM. We will update you with the results of that attempt within 24 hours of that attempt.**

**If additional attempts are necessary, we will complete and document up to zero additional attempts by 9/10/2019.**

**Comments: VIA CMRRR**

**Filing Instructions: If served, we will NOT FILE this paper.**
**If unable to serve, we will prepare a Declaration of Due Diligence and return to you.**

From: donotreply@easy-serve.com

To: Habib Olapade habib3355@outlook.com

Time: 8/9/2019 5:02 PM

| | **ORDER CONFIRMATION** |
| --- | --- |

**PLEASE CLICK HERE TO PAY FOR THIS ORDER**

**Your order will be promptly processed after payment is received. If you have any questions on pre-payment, please contact our office at 713 655 7239 or info@easy-serve.com.**
**This order will be cancelled if payment is not received within 24 hours.**

**Hello Habib with Pay Pal ,**

**Thank you for trusting us with your service of process.**

Order#: 265511-2

We will be serving the following document(s) for you:

SUMMONS IN A CIVIL CASE, PLAINTIFFS' COMPLAINT FOR PRELIMINARY INJUNCTIVE RELIEF, PERMANENT INJUNCTIVE RELIEF, AND MONETARY DAMAGES, PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTIVE RELIEF, PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION, MOTION BY SELF-REPRESENTED LITIGANT TO PARTICIPATE IN ELECTRONIC FILING, CONSENT TO ELECTRONIC NOTICE BY SELF-REPRESENTED LITIGANT, ORDER ON PRETRIAL DEADLINES, NOTICE REGARDING ELECTRONIC FILING, STANDING PROTECTIVE ORDER, EXHIBIT A-1, EXHIBIT B, EXHIBIT C, EXHIBIT D1, EXHIBIT F, EXHIBIT G, EXHIBIT H, EXHIBIT M, EXHIBIT N, EXHIBIT Q, EXHIBIT 2, EXHIBIT P, EXHIBIT A, EXHIBIT E, EXHIBIT B, EXHIBIT I, EXHIBIT F-1, EXHIBIT Y, EXHIBIT K, EXHIBIT J, EXHIBIT O, EXHIBIT D

PROCESS SERVICE RECIPIENT: YALE LAW SCHOOL C/O CARL LEE

Service Of Process Address 1: 1700 PACIFIC AVE SUITE 4100, DALLAS, TX 75201

Order Placed: 08/09/2019 at 3:58 PM

Reference: 3:19-CV-01183-KAD

We will complete our 1st service attempt no later than Monday, August 12, 2019 at 5:00 PM. We will update you with the results of that attempt within 24 hours of that attempt.

If additional attempts are necessary, we will complete and document up to three additional attempts by 8/19/2019.

Comments: PLEASE SERVE CARL B LEE OR ANYONE WHO REPRESENTS THEY ARE AUTHORIZED TO ACCEPT SERVICE

Filing Instructions: If served, we will NOT FILE this paper.
If unable to serve, we will prepare a Declaration of Due Diligence and return to you.


From: Habib Olapade habib3355@outlook.com

To: denise.gilmore@yale.edu

Time: Monday 8/5/2019 1:44 PM


Howdy Denise!

I hope this note finds you swell and that you are having a nice day! I'm just sending this friendly email along to make sure that Susan received the three packages I sent to her about two days ago. I have attached the USPS tracking confirmation to this message. Thanks!


Take it  easy,


Habib

