# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

HABIB OLAPADE

        Plaintiff,

  v.

YALE LAW SCHOOL

        Defendant

3:19 cv 1183 (VLB)

Date: July 29, 2019

## PLAINTIFFS' COMPLAINT FOR PRELIMINARY INJUNCTIVE RELIEF, PERMANENT INJUNCTIVE RELIEF, AND MONETARY DAMAGES

Habib Olapade

16160 Keith Harrow Blvd. Apt. 108

Houston, Texas 77084

281-550-7786

habib3355@outlook.com



FILED
2019 AUG -1 P 1:57
U.S. DISTRICT COURT
NEW HAVEN, CT.

1

## INTRODUCTION

1.      Habib Olapade (Mr. Olapade) brings this action against Yale Law School to enjoin its racially discriminatory decision to academically disqualify him from that institution and prevent him from continuing his studies there.

2.      Mr. Olapade accordingly seeks a preliminary injunction, permanent injunction, compensatory damages, punitive damages, and attorneys' fees and costs from Yale Law School.

## JURISDICTION AND VENUE

3.      This Court has Federal Question Jurisdiction under 28 U.S.C. § 1331 because this action arises under 42 U.S.C. 2000d and other federal statutes.

4.      The Court is authorized to award the requested monetary damages and injunctive relief.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c)(2). A substantial part of the events giving rise to this claim occurred in this District, and Connecticut is Yale Law School's principal place of business.

## PARTIES

6.      Plaintiff is Habib Olapade, an African American male and U.S. citizen who was born in Houston, Texas on July 6, 1995. (See Exhibit A. Habib Olapade's Birth Certificate).

7.      Mr. Olapade has never been convicted of a State or federal offense and, there are no charges currently pending against him in a State or federal court.

8.      Mr. Olapade has lived in Texas for twenty years and is a citizen of that State.

9.      During his life, when Mr. Olapade has not resided in Texas, he has only established temporary domiciles in California, Kentucky, Alabama, New York, Washington D.C., and Connecticut.

10.      Defendant is Yale Law School.

## ALLEGATIONS

11.      As of July 2019, Mr. Olapade has never been to, lived in, or established a domicile in Europe, South America, Australia, Asia, Antarctica, any North American country outside the United States of America, or Africa.

12.      Mr. Olapade matriculated at Stanford University for his undergraduate studies in September of 2013. (See Exhibit B. Habib Olapade's Stanford Transcript).

13.      Mr. Olapade attended Stanford University from 2013 to 2017.

14.      Among legal professionals, Stanford Law School is widely regarded as one of the most rigorous, if not one of the two, three, or five most rigorous, law schools in the United States.

15.      In the United States, unlike the United Kingdom, law is a field of study that is pursued almost exclusively at the graduate, rather than undergraduate, level.

16.    While Mr. Olapade was enrolled at Stanford University as a college student, he took Habeas Corpus, Taxation I, First Amendment: The Speech and Press Clauses, Fourteenth Amendment, Election Law, Legislation and Regulation, Creation of the Constitution, Law and Sociology, American Legal History, and Law, History, Literature, and Philosophy Seminar at Stanford Law School under Jonathan Mitchell, Joseph Bankman, Michael W. McConnell, Nate Persily, Lanhee Chen, Michelle Dauber, Lawrence Friedman, Bernadette Meyler, and Amalia Kessler. (See Exhibit B. Habib Olapade's Stanford Transcript).

17.    At more than 95% of law schools accredited by the American Bar Association, it is not customary for students to have taken Habeas Corpus, Taxation I, First Amendment: The Speech and Press Clauses, Fourteenth Amendment, Election Law, Legislation and Regulation, Creation of the Constitution, Law and Sociology, American Legal History, or Law, History, Literature, and Philosophy Seminar, if at all, until their second or third year in law school because these courses assume basic knowledge of constitutional law, civil procedure, criminal law, contracts, property, or torts.

18.    Mr. Olapade received grades signifying either exceptional or successful mastery of the course material for each of the ten classes he took at Stanford Law School during his undergraduate career. (See Exhibit B. Habib Olapade's Stanford Transcript).

19.    Since Stanford Law School was founded in 1893, no undergraduate student of any race or ethnicity enrolled at Stanford University who did not later matriculate at Stanford Law School under an accelerated Juris Doctor program before 1965, has completed ten law school courses during their college career. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

20.    As of July 16, 2019, no enrolled student of any race or ethnicity who has not been academically disqualified at Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Harvard, or Yale Law Schools has taken ten or more law school courses during their undergraduate career at Chicago, Columbia, the University of Texas, the University of Virginia, Alabama, Vanderbilt, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, or Yale Law Schools. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

21.    While Mr. Olapade was enrolled at Stanford University he published seven papers in the Columbia, Chicago, Washington, Texas, Ohio State, and Williams College Undergraduate Law Reviews on the Fourteenth Amendment, Election Law, the Bill of Attainder Clause, Statutory Interpretation, Federal Indian Law, Federal Courts, the Alien Torts Claim Act, and Statutory Interpretation. During his time in college, Mr. Olapade has

4

also published several blog posts on Constitutional Law, Election Law, Civil Procedure, and Criminal Law for the University of Pennsylvania. (See Exhibit C. Mr. Olapade's Published Papers and Blog Posts From College).

22.     As of July 16, 2019, less than one percent of the enrolled Caucasian and Asian-American student population at Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, or Yale Law Schools respectively has published eight or more journal articles of ten pages or more on a law related subject in any publication prior to their matriculation at their current law school. (See Exhibit C. Habib Olapade's Published Papers and Blog Posts From College). This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

23.     Since Yale Law School was founded in 1824, less than five students total enrolled at Yale Law School, or Yale Law School's predecessor, Litchfield Law School, all of whom are not African-American or Hispanic, have submitted more than 370 pages of written work through their first two years in the Juris Doctor program for classes that counted towards completion of the Juris Doctor degree. (See Exhibit D. Habib Olapade's Submitted Yale Papers).

24.     As of July 16, 2019, no enrolled student of any race or ethnicity who has not been academically disqualified at Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, and Harvard Law Schools has submitted a number of written pages greater than, or equal to, the number of written pages that Mr. Olapade has submitted thus far in his first two years in law school. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

25.     Before June 2019, Mr. Olapade was either an active or inactive member of the Federalist Society, Republican National Lawyers Association, the NAACP, the Texas Appellate Advocate, Texas Appellate Bar Association, Florida Appellate Bar Association, Virginia Appellate Bar Association, Connecticut Appellate Bar Association, New York City Bar Association, New York Country Lawyers Association, Stanford Club of Houston, and the Houston Bar Association before he had even graduated from law school.

26.     As of July 16, 2019, no enrolled student of any race or ethnicity who has not been academically disqualified at Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, or Yale Law Schools is a member of a

number of legal associations or bar associations that is greater than, or equal to, the number of organizations that Mr. Olapade is a member of. (See Exhibit E. Yale Law School Famous Alumni and Students Excel Comparison Spreadsheet). This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

27.     During his two, not three, years in law school, Mr. Olapade has performed editorial work or is a member of the Yale Journal on Regulation, Yale Journal of Law and Technology, Yale Journal of International Law, Yale Law & Policy Review, Yale Journal of Law & Humanities, and Yale Journal of Health Policy, Law, and Ethics. (See Exhibit F. Law School Journal Emails).

28.     As of July 16, 2019, no enrolled student of any race or ethnicity who has not been academically disqualified at Yale Law School is currently a member of, or has performed editorial work, for a number of Yale Law School sponsored journals that is equal to, or greater than, the number that Mr. Olapade has. (See Exhibit E. Yale Law School Famous Alumni and Students Excel Comparison Spreadsheet). More than that, as of July 16, 2019, no enrolled student of any race or ethnicity who has not been academically disqualified at Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, or Harvard Law Schools is currently a member of, or has performed editorial work, for a number of journals sponsored by her or his law school that is equal to, or greater than, the number that Mr. Olapade has. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

29.     During his two, not three, years in law school, Mr. Olapade has provided pro bono assistance to: the Temporary Restraining Order Project, American Constitution Society , the New Civil Liberties Alliance, Upturn, the New Haven Book Bank, the Connecticut Food Bank, Legal Aid for Hurricane Florence Victims, the New York Bar Committee Against Revenge Porn, the Yale Black Law Students Association Pre-Law Mentoring Pipeline, the Stanford Undergraduate Interview Program, the Asylum Seeker Project, the Capital Assistance Project, the Yale Law School Marshall-Brennan Project, the Asian American Legal Defense Fund, the Lowenstein Human Rights Project, International Refugee Assistance Project, and the Colorado Pro Bono Appeals Project. (See Exhibit G Pro Bono Emails).

30.     As of July 16, 2019, no enrolled student of any race or ethnicity who has not been academically disqualified at Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, or Yale Law Schools has rendered direct, physical pro bono aid to a number of associations that is greater than, or equal to,

the number of organizations that Mr. Olapade has supported during his studies in law school. (See Exhibit E. Yale Law School Famous Alumni and Students Excel Comparison Spreadsheet). This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

31.    From the summer of 2017 to the spring of 2019, building off his mentorship and experience with Mr. Nate Persily, an election law professor at Stanford Law School, Mr. Olapade has campaigned for, or provided legal aid to, three politicians, who are members of either the Democratic or Republican Parties: Ralph Northam, Krish Vignarajah, and Angel Cadena. (See Exhibit H. Political Law Emails) and (See Exhibit I. Political Law Memo Written During Mr. Olapade's First Semester In Law School).

32.    As of July 16, 2019, less than three percent of the enrolled Caucasian and Asian-American student population at Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, or Yale Law Schools respectively has provided assistance to a number of candidates for either Statewide or federal office that is equal to, or greater than, the number that Mr. Olapade has assisted. (See Exhibit E. Yale Law School Famous Alumni and Students Excel Comparison Spreadsheet). This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

33.    During his two, not three, years in law school, Mr. Olapade has maintained a blog – Corpus Juris – devoted towards timely topics in appellate litigation, political law, private equity law, international commercial arbitration, antitrust, and patent law. The blog has at least sixty different entries. (Exhibit J. Corpus Juris Blog Entries).

34.    As of July 16, 2019, at most, less than one-quarter of one percent of the enrolled Caucasian and Asian-American student population at Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, or Yale Law Schools respectively has provided assistance to a number of candidates for either Statewide or federal office that is equal to, or greater than, the number that Mr. Olapade has assisted. (See Exhibit E. Yale Law School Famous Alumni and Students Excel Comparison Spreadsheet). This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

35.    As of January 2019, Mr. Olapade was working on a series of books on private equity law, federal appellate practice, and appellate practice in Alabama, Texas, Mississippi, Louisiana, Virginia, Hawaii, Tennessee, Idaho, Montana, North Carolina,

South Carolina, Kentucky, Maryland, Delaware, and Arkansas that were set for completion in late August 2019 before he was notified of his academic disqualification from the school. (See Exhibit K. Mr. Olapade's Book Drafts I).

36.     Mr. Olapade was planning on completing another set of books on appellate procedure in the New England States, Texas oil and gas law, MLB player agent representation and contract negotiation, as well as a thirty-five book series on the election laws of various States in the American West, South, Old Northwest, and New England areas before his graduation from Yale Law School in the summer of 2020 to position himself for an associate or analyst position at an Investment Banking firm after studying abroad in the United Kingdom at Oxford. (See Exhibit L. Mr. Olapade's Book Drafts II).

37.     As of July 16, 2019, no enrolled student of any race who has not been academic disqualified at Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, or Yale Law Schools respectively has worked on, or published, a number of books equal to the number that Mr. Olapade has set for release. (See Exhibit E. Yale Law School Famous Alumni and Students Excel Comparison Spreadsheet). This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

38.     During his two, not three, years in law school, Mr. Olapade has provided research assistance to six professors at Yale Law School, Akhil Amar, John Witt, Myles Minor, Karin Yefet, Noah Messing, and Pat Weil. (See Exhibit M. Professor Correspondence).

39.     As of July 16, 2019, no enrolled student of any race who has completed two years in a Juris Doctor program and who has not been academic disqualified at Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, or Yale Law Schools respectively has worked for, or assisted, a number of professors equal to the number that Mr. Olapade has assisted. (See Exhibit E. Yale Law School Famous Alumni and Students Excel Comparison Spreadsheet). This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

40.     During his two, not three, years in law school, Mr. Olapade competed in the ABA Diversity Moot Court, Yale Law School Morris Tyler Moot Court, VIS Moot Court, and Yale Law School Transactional Law Competition. Mr. Olapade and his partner, Meenakshi Krishnan, won best team for the ABA diversity Moot in the spring of 2018. (See Exhibit N. Competition Entries and Yale Law School Bulletin Celebrating Mr. Olapade's Victory For The School).

41.     As of July 16, 2019, at most, less than one percent of the enrolled Caucasian and Asian-American student population at Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, or Yale Law Schools respectively has competed in a number of legal competitions equal to, or greater than, the number that Mr. Olapade has participated in. (See Exhibit E. Yale Law School Famous Alumni and Students Excel Comparison Spreadsheet). This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

42.     At Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, and Yale Law Schools, it is customary for most students to begin to prepare for the bar examination, at the earliest, during their third year in law school.

43.     During the second semester of his second year in law school, Mr. Olapade began preparing and compiling a comprehensive UBE bar exam outline spanning several hundred pages for admission to the bars of Alabama, Alaska, Arkansas, Arizona, Colorado, Connecticut, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Minnesota, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Washington, Washington DC, West Virginia, and Wyoming so he could maximize his value to employers, file amicus briefs in State and federal appellate courts in the aforementioned States, intervene on behalf of interest groups in cases pending before State and federal courts in the aforementioned States, provide pro bono services to moderate Democrats and moderate Republican candidates in those States upon graduation, and rise in the ranks of the American legal profession (See Exhibit O. Mr. Olapade's Bar Exam Outline).

44.     As of July 16, 2019, Yale Law School administrators currently possess the two-hundred page draft of the UBE outline that Mr. Olapade compiled during his second year in law school yet nonetheless elected to maintain his status as an academically disqualified student who lacked "the capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on DATE. (See Exhibit P. Email From Mr. Olapade to Mrs. Gerken).

45.     In the interests of keeping his dispute internal and preserving the reputations of several individuals connected with Yale Law School, Mr. Olapade voluntarily provided Heather Gerken (Mrs. Gerken) with copies of nearly all the exhibits he has appended to

this complaint in his friendly appeal letter to her. (See Exhibit P. Email From Mr. Olapade to Mrs. Gerken).

46.     Mr. Olapade was planning on leveraging his membership in the bars of Alabama, Alaska, Arkansas, Arizona, Colorado, Connecticut, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Minnesota, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Washington, Washington DC, West Virginia, Wyoming for comity admission to the bars of Kentucky, Mississippi, Georgia, Michigan, Louisiana, and Wisconsin and regular test-based admission to the bars of California, Delaware, Nevada, and Florida four to five years after his graduation from law school so he could maximize his value to employers, file amicus briefs in State and federal appellate courts in the aforementioned States, intervene on behalf of interest groups in cases pending before State and federal courts in the aforementioned States, provide pro bono services to moderate Democrats and moderate Republican candidates in those States upon graduation, and rise in the ranks of the American legal profession.

47.     Under ABA Standard 509, no ABA accredited law school may admit a student who has been academically disqualified without submitting a letter to the ABA explaining why the law school's admissions office believes that the prior academic disqualification does not indicate a "lack of capacity" to complete the Juris Doctor program at its school and gain admission to a State or federal bar association.

48.     During the summer of 2019, Mr. Olapade applied for, and was denied, transfer admission to Harvard, Chicago, the University of California at Los Angeles, and the University of California at Berkeley Law Schools notwithstanding the veracity of the allegations above.

49.     Mr. Olapade was the target of several race related threats during his first semester of law school at Yale University inside the classroom, outside the classroom, and at university facilities including Payne Whitney Gym and sent an email to Ms. Ellen Cosgrove and the New Haven Police Department documenting these events during November of 2017. (See Exhibit Q. Email From Mr. Olapade to Ms. Cosgrove).

50.  Close to three-quarters of the students described by Mr. Olapade in his email to Ms. Cosgrove were Caucasian and nearly one-half were male. (See Exhibit Q Email From Mr. Olapade to Ms. Cosgrove).

51.     During the second semester of his first year in law school, Mr. Olapade was told by Ms. Cosgrove that one student, ███████ (███████), was convicted of an offense in a Connecticut state court because of a complaint he filed with the New Haven Police Department not Yale University itself.

52.     Given the race and gender, of ███████, and the fact that ███████ was the only individual sanctioned by either Yale University or the New Haven Police Department, Mr. Olapade soon concluded reasonably that the investigation Yale University or the New Haven Police Department conducted was either infected with racial or gender bias or was influenced by the amount of money the students named in his complaint or the parents of the students named in his complaint donated to Yale University.

53.     Although Mr. Olapade was not physically active while he was enrolled at Stanford University, and possessed below average strength while he was enrolled at Cypress Falls High School in Houston, Texas as a long distance runner, once he concluded that he would not be provided protection during the second semester of his first year in law school, Mr. Olapade adopted a strenuous weightlifting workout regimen that he completed first every day, then every second day, then every third day as the weights he lifted increased to protect himself while he was on the campus of Yale University.

54.     Since the winter of 2018, Mr. Olapade has spent hundreds of dollars on protein powder, pre-workout, creatine pills, creatine power, and multivitamins to increase his strength, physical size, and deter race related threats on campus and at Payne Whitney Gymnasium.

55.     Mr. Olapade's workout regime lasts at least four hours every third day of the week, contains sets with exact weight totals that have been performed without controversy or a federal or state investigation by professional Major League Baseball players such as Alex Bregman, Aroldis Chapman, and Bryce Harper, and cannot be completed by 95% of males in the American population. (See Exhibit R. Mr. Olapade's Workout Sequence With Weight Totals).

56.     As of July 16, 2019, less than one-half of one percent of the enrolled student population that has completed two years in a Juris Doctor program and that has not been academically disqualified at Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, or Yale Law Schools respectively can complete Mr. Olapade's workout. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

57.     Mr. Olapade's conclusion that the investigation conducted by Yale University and the New Haven Police Department that resulted in ██████████ conviction was racially motivated and his conclusion that he could not rely on Yale Law School, Yale University, the Yale Police Department, or the New Haven Police Department to protect him from racially motivated harassment was confirmed by events that took place on March 19, 2019 at Payne Whitney Gymnasium. (See Exhibit S. Email from Mr. Olapade to Mr. Olapade On March 19, 2019).

58.     Yale University owns and maintains Payne Whitney Gymnasium, which is located on the campus of Yale College.

59.     Among individuals who have visited a private or public gymnasium at least one week for the past year and NCAA Division I college athletic directors, it is common knowledge that it is physically impossible to perform multiple repetitions of a hex bar deadlift or barbell deadlift over 315 pounds without creating some type of sound when the hex bar or barbell makes contact with the floor.

60.     Among individuals who have visited a private or public gymnasium at least one week for the past year and NCAA Division I college athletic directors, it is common

knowledge that a gymnasium member may encounter un-racked weights on a gym machine or squat rack during the course of that member's workout. Among individuals who have visited a private or public gymnasium at least one week for the past year and NCAA Division I college athletic directors, it is also common knowledge that the conventional response to such an encounter in the vast majority of situations is to place or remove the desired amount of weight on the machine or squat rack rather than to call 9-11 and request that a police officer be sent to the gymnasium to take the weights off the machine or squat rack.

61.     On March 14, 2019, Mr. Olapade entered Payne Whitney Gymnasium at approximately 10:30 AM EST and began his semi-weekly workout with seated calf raises.

62.     At the time that Mr. Olapade approached the seated calf raise machine, 125 pounds of un-racked weight was on the machine.

63.     Because Mr. Olapade is an able-bodied male who is twenty-four years of age and lifts in the 95th percentile of his weight class, he placed 225 pounds on the seated calf raise machine without calling Payne Whitney Gymnasium staff or 9-11 about the un-racked weight around him and the un-racked weight on the seated calf raise machine.

64.     As Mr. Olapade was performing weighted abdominal exercises at the end of his workout, he was approached by a Caucasian male standing 5'2 named 'Frank,' who asked Mr. Olapade to assist him in re-racking weight on a machine. 'Frank' refused to provide Mr. Olapade with his last name.

65.     Because Mr. Olapade quickly concluded that 'Frank' was an able-bodied Caucasian male between the ages of 20-30 who did not suffer from a physical disability rather than a woman or elderly individual, Mr. Olapade declined to assist 'Frank' and elected to focus on his weighted abdominal exercises.

66.     As Mr. Olapade was exiting Payne Whitney Gymnasium, he discovered that the Yale Police Department wanted to speak to him about his unwillingness to assist 'Frank.'

67.     Among state and federal law enforcement officers who have visited a private or public gymnasium at least one week for the past year, it is common knowledge that it is physically impossible to perform multiple repetitions of a hex bar deadlift or barbell deadlift over 315 pounds without creating some type of sound when the hex bar or barbell makes contact with the floor.

68.     Among state and federal law enforcement officers who have visited a private or public gymnasium at least one week for the past year, it is common knowledge that a gymnasium member may encounter un-racked weights on a gym machine or squat rack during the course of that member's workout. Among state and federal law enforcement who have visited a private or public gymnasium at least one week for the past year, it is also common knowledge that the conventional response to such an encounter in the vast majority of situations is to place or remove the desired amount of weight on the machine or squat rack rather than to call 9-11 and request that a police officer be sent to the gymnasium to take the weights off the machine or squat rack.

69.     With his characteristic East Texas accent, Mr. Olapade patiently explained to the Yale Police officers speaking to him that he was a student at Yale Law School, attended Stanford for college, was planning on studying abroad, the Payne Whitney Gymnasium

policy, the lack of enforcement, offered to provide the officers with tape of Caucasian, Hispanic, and Asian-American students who also attended Yale University slamming weights in Payne Whitney Gymnasium and leaving weights un-racked, and notified the officers that racially motivated arrests were illegal under 42 U.S.C. 1983 and the Fourteenth Amendment's Equal Protection Clause.

70.     Once Mr. Olapade offered to provide the Yale Police Department with video evidence incriminating Caucasian, Hispanic, and Asian-American Yale University students and instructed the officers on 42 U.S.C. 1983's prohibition on racially motivated arrests, he was permitted to return to his post-workout walk, was not provided with a citation of the incident, was not provided with a police report documenting the incident, and was unable to convince any of the officers who detained him to provide him with their business cards. While Mr. Olapade told the officers that he could not blame them for doing their job and recognized that they were only speaking to him because of a frivolous call, he nonetheless asked the officers to disclose the identity of the caller so he could pursue a civil harassment suit against the caller. The officers declined to provide the name of the caller to Mr. Olapade.

71.     Mr. Olapade sent an email to his brother shortly after the Payne Whitney Gymnasium incident on the same day explaining why the dynamics of the situation should have been suspicious to individuals of both liberal and conservative ideological persuasions. (See Exhibit S. Email From Mr. Olapade to Mr. Olapade).

72.     After both Yale and New Haven Police refused to provide Mr. Olapade with the name of the Payne Whitney staff member Mr. Olapade was inconvenienced by so Mr. Olapade could file charges and a civil complaint against the worker, Mr. Olapade emailed Mr. Anthony Diaz seeking the name of the staff worker. (See Exhibit T. Email From Mr. Olapade to Mr. Diaz I).

73.     Shortly after this incident with Payne Whitney staff and the email to Mr. Diaz, Mr. Olapade's gym membership was temporarily suspended after Senior Athletic Director, Anthony Diaz, emailed Mr. Olapade on April 5, 2019 that he was being disciplined for not re-racking weights, slamming weights during hex bar deadlifts, and not wearing shoes during small portions of his workout routine. (See Exhibit U. Email From Mr. Diaz to Mr. Olapade).

74.     Mr. Olapade emailed Mr. Diaz back on July 11, 2019 indicating that he had taken pictures of un-racked weights in Payne Whitney Gym that currently enrolled Caucasian, Hispanic, and Asian-American Yale graduate students and Yale undergraduate students had placed on exercise machines and squat racks and had taken video of currently enrolled Caucasian, Hispanic, and Asian-American Yale students slamming weights on deadlifts; and was in possession of video of Major League Baseball players performing the exact same exercises that Mr. Diaz disciplined Mr. Olapade for performing as of July 11, 2019. (See Exhibit V. Mr. Olapade's Email to Mr. Diaz).

75.     Mr. Diaz has not responded to Mr. Olapade's July 11, 2019 email. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor



degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

76.     Mr. Olapade's conclusion that the investigation conducted by Yale University and the New Haven Police Department that resulted in ████████ conviction was racially motivated and his conclusion that he could not rely on Yale Law School, Yale University, the Yale Police Department, or the New Haven Police Department to protect him from racially motivated harassment was confirmed by events that took place on DATE at the Omni New Haven Hotel during Yale Law School's on-campus interview program from second year law students.

77.     During the second day of the on-campus interview process at the Omni New Haven Hotel, Mr. Olapade spoke to Ms. Cosgrove and Mr. Joseph Mensah about his first complaint and an individual who was named in that complaint, ████████████ (██ ████).

78.     During her conversation with Mr. Olapade, Ms. Cosgrove told Mr. Olapade that ████████ was 'uncomfortable' that Mr. Olapade has reported to Ms. Cosgrove that ██ ████ had told him to go back to Africa, a continent that he has never been to.

79.     Mr. Olapade reasonably concluded that Ms. Cosgrove's concern for ████████ despite his first complaint was indicative of either personal prejudice or was intended to convey to Mr. Olapade that even the most pugnacious acts of racial discrimination directed towards him would not be seriously addressed by either Yale Law School or Yale University.

80.     Mr. Olapade elected to leave his meeting with Ms. Cosgrove and Mr. Mensah shortly after Ms. Cosgrove told Mr. Olapade that ████████ was uncomfortable with Mr. Olapade's first complaint. Mr. Olapade requested an Uber ride to a Hamden campaign event held by Mr. Angel Cadena ten minutes after leaving both Ms. Cosgrove and Mr. Mensah.

81.     Despite his perverse encounter with both Mr. Mensah and Ms. Cosgrove and Mr. Mensah's knowledge that Yale Law School had taken absolutely no disciplinary action against any of the individuals listed in Mr. Olapade's first complaint, Mr. Mensah sent Mr. Olapade an email following up on his prior meeting with him.

82.     Mr. Olapade responded by sending a sarcastic message to Mr. Mensah that has apparently alluded some individuals who are either willingly ignorant of, or unknowledgeable about, the events that transpired before the message was sent. (See Exhibit W. Email From Mr. Olapade to Mr. Mensah)

83. In a nearly two year hard-fought effort to protect ████████ career and reputation because both Mr. Olapade and ████████ were amateur art historians, southern, and attended selective colleges, and Mr. Olapade felt that the investigation giving rise to ████████ conviction was infected with racial and sexist prejudice, as well as in an effort to protect the legacy of the first female deanship in the history of the Yale Law School, Mr. Olapade declined to seek legal advice on the incidents that occurred during the first semester of his first year in law school because he concluded that publicity would only enhance the negative disparate racial and gender impact of the status quo; harm ████████ chances for career advancement; negatively impact the reputation of the first female Yale Law School

14

dean; and ruin Mr. Olapade's personal plans to study abroad in the United Kingdom after graduation, find employment in the investment banking profession, and litigate in State or federal appellate courts across the nation. (See Exhibit X. Mr. Olapade's Appeal Letter to Yale Law School).

84.     Had Mr. Olapade not been academically disqualified from Yale Law school in the spring of 2019 or successful in his personal appeal with the Yale Law School administration, he would have been successful in his efforts to protect the reputations of ██████████ and the first female dean of the Yale Law School from further harm, and harm, respectively.

85.     Several students who were not disciplined by Yale University have provided financial contributions or gifts to either the law school or the University more broadly before Mr. Olapade reported the incidents he experienced to Ms. Cosgrove and the donations continued after the reports were entered.

86.     Notwithstanding its prior access to information proving the veracity of Mr. Olapade's allegations on undergraduate law school records, legal publications, secondary journal membership, bar association membership, professor assistant positions, and academic competitions as to currently enrolled students at Yale Law School, only one professor at Yale law School has ever written a letter of recommendation on Mr. Olapade's behalf. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May, 31, 2019.

87.     The letter of recommendation that was written on Mr. Olapade's behalf was for a pro bono position at the local New Haven Book Bank.

88.     Mr. Olapade was academically disqualified from Yale Law School on May 31, 2019 for receiving two failing grades in 'The Role of the State Attorney General' and 'Federal Indian Law' in the spring semester of 2019 despite his submission of one sixty page paper and one fifty-seven page final paper to the professors of both courses. Mr. Olapade also did not receive law school credit for the Constitutional Crisis/Constitutional Reform course he took under Mr. Bruce Ackerman despite submitting a fifty-five page paper to Mr. Ackerman because Mr. Ackerman viewed Mr. Olapade's lack of participation in the course as troubling.

89.     Among law students and members of the legal profession, it is common knowledge that performance on the final exam or final paper is the primary determinant of one's grade in a course taken at an ABA accredited law school.

90.     Among law students and members of the legal profession, it is common knowledge that class comment quality is considered at a marginal basis, if at all, in determining a student's grade in a course taken at an ABA accredited law school.

91.     Among law students and members of the legal profession, it is common knowledge that excessive commenting in class can lead to the consternation and annoyance of both the course instructor and the commenting student's classmates.

92.     Among law students who attend Yale University, it is common knowledge that some law students live in New York City or Boston during the school year and do not

attend class with impunity despite standards promulgated by the American Bar Association before 1970 that require class attendance.

93.    Bill Clinton attended Yale Law School from 1971 to 1973.

94.    In *First In His Class*, a biography of Bill Clinton, Clinton's own biographer, David Maraniss, documents in the thirteenth chapter how Clinton himself proudly admitted that he never attended one session of a Corporate Law class he took at Yale Law School between 1971 and 1973.

95.    Despite his lack of attendance, Bill Clinton was never disciplined by the Yale Law School administration or the American Bar Association for lack of attendance even though he and Mr. Olapade were covered by the same ABA attendance standards. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

96.    'Constitutional Crisis/Constitutional Reform' was taught by Mr. Bruce Ackerman.

97.    The final paper Mr. Olapade submitted to Mr. Ackerman was entitled *Heads Outside Counsel Wins, Tails In-House Attorneys Lose – How Corporate America Can Reduce Multijurisdictional Litigation Costs*, was fifty-five pages, and was concerned primarily with the benefits of a uniform choice of law regime in the United States and federal securities regulations that impact American corporations and private equity funds. (See Exhibit Y. Mr. Olapade's Paper Submitted to Mr. Ackerman).

98. As of May 11, 2019, less than five other students enrolled in the 'Constitutional Crisis/Constitutional Reform' course taught by Mr. Ackerman at Yale Law School during the spring of 2019 have submitted a paper that is equal to, or longer than, the paper that was submitted by Mr. Olapade. And, less than one and one-half percent of all the students Mr. Ackerman has taught at Yale Law School since January 1, 1987 have submitted a paper that is equal to, or longer than, the paper that was submitted to Mr. Ackerman by Mr. Olapade.

99. The five past students of Mr. Ackerman who have turned in final papers that come the closest in length to the final paper submitted to Mr. Ackerman by Mr. Olapade all received passing grades from Mr. Ackerman. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

100.    Mr. Olapade is in the process of releasing one book on private equity law and practice. As of July 16, 2019, Yale Law School administrators currently possess a fifty-page draft of Mr. Olapade's private equity book.

101.    Before Mr. Olapade received a no-credit grade in 'Constitutional Crisis/Constitutional Reform,' he received an email from Ms. Claire Priest stating that both Ms. Cosgrove and Ms. Maldonado, the two Yale Law School administrators who had handled his first complaint and knew about potential incidents of future racial harassment, had been in contact with Mr. Ackerman. (See Exhibit Z. Email From Ms. Priest to Mr. Olapade).

102.    During the second weekend in May of 2019, Mr. Olapade received an email from Mr. Ackerman explaining that Mr. Ackerman had decided not to give Mr. Olapade credit for the Constitutional Crisis/Constitutional Reform class because of his lack of participation in the course.

103.    Both Ms. Cosgrove and Ms. Maldando declined to tell Mr. Ackerman about Mr. Olapade's previous complaint and the potential that he could have been enduring continued racial harassment during the spring semester of 2019.

104.    'The Role of the State Attorney General' was taught by Mr. Peter Brann and Mr. James Tierney.

105.    The final paper Mr. Olapade submitted to Mr. Brann and Mr. Tierney was entitled *Don't Do As I Say Or As I Do – State Constitutional Law In The Texas Supreme Court*, was sixty pages, and was concerned primarily with Texas oil and gas law and the Office of the Texas Solicitor General. (See Exhibit A1. Mr. Olapade's Paper Submitted to Mr. Brann and Mr. Tierney).

106.    No other student enrolled in 'The Role of the State Attorney General' course taught by Mr. Brann or Tierney at Yale or Harvard Law schools has ever submitted a paper that is equal to, or longer than, the paper that was submitted by Mr. Olapade.

107.    The five past students of Mr. Brann and Mr. Tierney who have turned in final papers that come the closest in length to the final paper submitted to Mr. Brann and Mr. Tierney by Mr. Olapade all received passing grades from both instructors. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

108.    Neither Mr. Brann nor Mr. Tierney have ever resided in Texas for a period longer than two weeks.

109.    Mr. Olapade has resided in Texas for over twenty years.

110.    Neither Mr. Brann nor Mr. Tierney have ever practiced law in a State or federal court located in Texas after admission to the Texas bar or pro hac vice admission.

111.    Neither Mr. Brann nor Mr. Tierney have ever published or edited a journal article, blog post, book, or article submission covering any aspect of Texas law or Texas oil and gas law.

112.    Mr. Olapade is in the process of releasing two books on Texas appellate procedure and Texas oil and gas law. As of July 16, 2019, Yale Law School administrators currently possess a fifty-page draft of Mr. Olapade's Texas appellate procedure book as well as copies of books he is writing on Florida and Kentucky appellate procedure.

113.    The course reading assigned by Mr. Brann and Mr. Tierney has little, if any, material covering Texas oil and gas law or the Office of the Texas Solicitor General.

114.    Mr. Brann and Mr. Tierney contacted Mr. Olapade on February 5, 2019 expressing concern about his class absences. (See Exhibit B1. Email from Mr. Brann and Mr. Tierney to Mr. Olapade).

115.    Mr. Olapade respectfully replied to Mr. Brann and Mr. Tierney on February 5, 2019 that he was currently working on the final paper for their class.

116.     Mr. Brann and Mr. Tierney respectively had served as the Solicitor General of the State of Maine and the Attorney General of the State of Maine before accepting visiting positions at Yale Law School.

117.     Because Mr. Olapade was deterred from attending class because of racial threats he was receiving on the campus of Yale University, reasonably believed that he could secure a passing grade by submitting an excellent final paper, knew that it was more likely that not that he would be endangering his career and reputation, the careers and reputations of at least twenty students and faculty members, and the legacy of Yale Law School's first female deanship had he told two outside State Senate confirmed officers, Mr. Brann or Mr. Tierney, of the previous incidents of racial harassment he experienced, Yale University's lack of action or concern about the incidents, and the racially biased investigation that lead to the conclusion of his first complaint, and because Mr. Olapade believed that he could secure admission to a law school in the United Kingdom and an investment banking position on Wall Street upon graduation by simply maintaining the status quo, Mr. Olapade alluded to the harassment in the email he sent to Mr. Brann and Mr. Tierney and declined to meet with both instructors further because he would have had no choice but to either lie about his absences or tell both men the truth.

118.     The final paper that Mr. Olapade submitted to Mr. Brann and Mr. Tierney successfully predicted that the United States Supreme Court would overrule *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City* one month before the United States Supreme Court did so.

119.     Before Mr. Olapade received a failing grade in 'The Role of the State Attorney General,' he received an email from Ms. Claire Priest stating that both Ms. Cosgrove and Ms. Maldonado, the two Yale Law School administrators who had handled his first complaint and knew about potential incidents of future racial harassment, had been in contact with Mr. Brann and Mr. Tierney. (See Exhibit Z. Email From Ms. Priest to Mr. Olapade).

120.     Both Ms. Cosgrove and Ms. Maldando declined to tell Mr. Tierney and Mr. Brann about Mr. Olapade's previous complaint and the potential that he could have been enduring continued racial harassment during the spring semester of 2019.

121.     Once Mr. Olapade received notice of his failing grade in 'The Role of the State Attorney General,' he emailed Mr. Brann at his law firm email address seeking an explanation for the mark on June 16, 2019.

122.     Mr. Brann did not reply to Mr. Olapade until Mr. Olapade emailed him a second time July 18, 2019. (See Exhibit C1. Mr. Brann's Email to Mr. Olapade).

123.     In his second email to Mr. Olapade, Mr. Brann stated that he could not comment on the paper until Mr. Olapade had completed the internal appeal process, he started with Yale Law School on July 16, 2019.

124.     Mr. Brann had a month to reply to Mr. Olapade but elected to contact him two days after Yale Law School internal policies prevented him from commenting on the paper. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris

18

Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

125.    As of July 18, 2019, Mr. Brann and Mr. Tierney have been in possession of Mr. Olapade's final paper for nearly two months and have not provided a substantive academic reason for the failing grade he received. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

126.    Yale University has procedures in place for disciplining students who engage in plagiarism. (See Exhibit D1. Yale University Plagiarism Policy).

127.    As of July 18, 2019, Mr. Olapade has not been accused of academic plagiarism or provided with any process that Yale University affords to students charged with engaging in plagiarism.

128.    'Federal Indian Law' was taught by Mr. Gerald Torres.

129.    Mr. Torres' Federal Indian Law class was taught in Baker Hall, a dormitory for Yale Law School students that is located less than one-tenth of a mile from the main Yale Law School building and that also has classrooms

130.    Access to Baker Hall is restricted to law school students and law school staff who have an identification card issued by Yale University.

131.    After Baker Hall was completed, Yale Law School students and staff were not required to visit Yale University security to obtain an update to their identification card to access Baker Hall.

132.    Despite the fact that he was paying Yale Law School over $60,000 every year in tuiton and related fees, Mr. Olapade's Yale University identification card did not provide him access to Baker Hall. Mr. Olapade was forced to call on, and rely on, Adam Pan and other Caucasian, Hispanic, and Asian-American students to provide him with access to Baker Hall whenever he needed to access the facility for journal meetings, moot court competitions, or conferencing and, in some instances, waited outside in weather below freezing for his classmates to assist him in entering Baker Hall. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on y 31, 2019.

133.    The final paper Mr. Olapade submitted to Mr. Torres was entitled *Oi Too – Why the Time has Come to Close Criminal Jurisdiction Gaps on Native American Reservations*, was fifty-seven pages, and was concerned primarily with exploring pathways for access to justice for domestic violence victims on Native American reservations. (See Exhibit E1. Mr. Olapade's Paper Submitted to Mr. Torres).

134.    At most, only five other students enrolled in the 'Federal Indian Law' course taught by Mr. Torres at Yale, Cornell, and Michigan Law schools have ever submitted a final paper that is equal to, or longer than, the paper that was submitted by Mr. Olapade.

135.    With the exception of Mr. Olapade, each of the five students who turned in a final paper to Mr. Torres that was equal to, or longer than, the paper that was submitted by Mr.

Olapade, received a passing grade. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

136.     Before Mr. Olapade received a failing grade in 'Federal Indian Law,' he received an email from Ms. Claire Priest stating that both Ms. Cosgrove and Ms. Maldonado, the two Yale Law School administrators who had handled his first complaint and knew about potential incidents of future racial harassment, had been in contact with Mr. Torres. (See Exhibit z. Email From Ms. Priest to Mr. Olapade).

137.     Both Ms. Cosgrove and Ms. Maldando declined to tell Mr. Torres about Mr. Olapade's previous complaint and the potential that he could have been enduring continued racial harassment during the spring semester of 2019.

138.     Once Mr. Olapade received notice of his failing grade in 'Federal Indian Law,' he emailed Mr. Torres at his law school email address seeking an explanation for the mark on June 16, 2019 and again on July 18, 2019. (See Exhibit C1. Emails From Mr. Olapade to Mr. Torres).

139.     Mr. Torres has not replied to either of Mr. Olapade's emails.

140.     On July 14, 2019, Mr. Olapade provided Yale Law School with a friendly, informal appeal letter of his academic disqualification to avoid the prospect of any federal litigation. (See Exhibit X. Appeal Letter to Yale Law School).

141.     As of July 16, 2019, the administration of Yale Law School has had access to almost every evidence exhibit Mr. Olapade has currently provided to this Court – including pertinent Title VI cases decided by this Court and Second Circuit after Mr. Olapade voluntarily provided the evidence to the school in an effort to save the professional and personal reputations of at least twenty students and faculty members and avoid a federal lawsuit. (See Exhibit X. Appeal Email to Yale Law School).

142.     Notwithstanding its newfound access to the evidence Mr. Olapade presented, which the law school ostensibly did not have before July 16, 2019 or bother to compile before academically disqualifying Mr. Olapade, access to a general counsel's office for the school, and prior access to information proving the veracity of allegations made in this complaint as to currently enrolled students at Yale Law School, the law school denied Mr. Olapade's appeal of its academic disqualification decision. (See Exhibit H1. Written Explanation of the Law School Denial of Mr. Olapade's Academic Appeal)

143.     Despite the fact that Mr. Olapade incurred almost $125,000 in student loan debt with the federal government to attend Yale Law School and was not provided with access to law school facilities, Mr. Ackerman, Mr. Torres, Mr. Tierney, Mr. Brann, nor any member of the Yale Law School administration provided him with a second chance to submit any additional items to change his grade from an F to a passing grade before academically disqualifying him. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

144.    Mr. Ackerman, Mr. Torres, Mr. Tierney, Mr. Brann, nor any member of the Yale Law School administration who took part in the decision to academically disqualify Mr. Olapade were responsible in part or whole for his admission to Yale Law School.

145.    As of July 16, 2019, during their time in law school, no member of the legal team currently representing Yale Law school has participated in a number of journals, pro bono activities, legal academic competitions, law professor research assistantships or legal organizations that is equal to, or greater than, the number that Mr. Olapade has during his two, not three, years in law school. This fact is probative of racial animus behind Yale Law school's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

146.    As of July 16, 2019, during their time in law school, no member of the legal team currently representing Yale Law School has submitted more than 370 pages of written work through their first two years in the Juris Doctor program for classes that counted towards completion of the Juris Doctor degree.  This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

147.    As of July 16, 2019, during their time in law school, no member of the legal team currently representing Yale Law School has worked on, or published, a number of books equal to the number that Mr. Olapade has set for release. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

148.    As of July 16, 2019, during their time in law school, less than one percent, if any, of all individuals of any race or ethnicity who have received a Juris Doctor, Master of Laws, or Ph.D in law from at Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, or Yale University on or after January 1, 1950; have not been academically disqualified by Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, or Yale University; and gone on to hold: a seat in the United States House of Representatives, a seat in the United States Senate, a seat on the United States Supreme Court, a seat on any of the thirteen United States Court of Appeals, a seat on any of the ninety-four United States District Courts,  the U.S. Presidency, the U.S. Vice Presidency, any Executive Branch position requiring Senate confirmation, the position of United States Solicitor General, the position of acting United States Solicitor General,  the position of United States Attorney General, the position of United States Attorney for any of the ninety-four districts, the position of United States Secretary of State, the position of Legal Adviser to the United

States Department of State, the position of United States Secretary of the Treasury, the position of United States Secretary of Commerce, the position of United States Secretary of Labor, the position of United States Secretary of Defense, the position of United States Assistant Secretary for Indian Affairs, the position of chairperson of the United States Securities and Exchange Commission, the position of United States Secretary of Energy, the position of United States Environmental Agency Protection Administrator, the position of Assistant U.S. Attorney General for the Office of Legal Counsel, the position of U.S. Ambassador to the United Nations, the position of U.S. Ambassador to the United Kingdom, the position of United States National Security Advisor, the position of White House Counsel, the position of United States Senate Legal Counsel, the position of United States House General Counsel, the chairpersonship of the Republican National Committee, the chairpersonship of the Democratic National Committee,  the Governorship of any of the fifty United States, the Lieutenant Governorship of any of the fifty United States, the position of Attorney General of any of the fifty United States, the position of Secretary of State of any of the fifty United States, the position of Solicitor General of any of the fifty United States, an Executive Branch position requiring confirmation from that State's upper house, a seat in the upper house of any of the fifty United States, a seat in the lower House of any of the fifty United States, a seat on any state court of last resort in any of the fifty United States, a seat on any of the fifty intermediate Court of Appeals of any of the fifty United States, the position of Chief Executive Officer, Chief Financial Officer, or General Counsel of any Fortune 500 Corporation; the position of president of the NAACP Legal Defense Fund, American Civil Liberties Union, Mexican American Legal Defense Fund, Asian American Legal Defense Fund, National Rifle Association, or American Legislative Exchange Council; the position of president of the University of Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, or Yale University; the position of Dean of Chicago, Columbia, the University of Texas, the University of Virginia, Michigan, Alabama, Vanderbilt, Northwestern, the University of Pennsylvania, the University of California at Berkeley, the University of California at Los Angeles, New York University, Stanford, Harvard, or Yale Law Schools; or a tenure track faculty position at the University of Texas, the University of Miami, Florida, Florida State, University of Hawaii at Manoa, Pepperdine, the University of California at Berkeley, or the University of California at Los Angeles Law Schools. This fact is probative of racial animus behind Yale Law School's decision to academically disqualify Mr. Olapade from Yale Law School for "lack of capacity" to complete a Juris Doctor degree at any ABA Accredited law school or join the membership of any State or federal bar association on May 31, 2019.

149.    Unless restrained Yale Law School will immediately prevent Mr. Olapade from beginning his last year at Yale Law School and graduating with the Yale Law School class of 2020.

150.    Immediate and irreparable injury, loss, and damage will result to Mr. Olapade by reason of the threatened action of Yale Law School because Mr. Olapade will be unable to

publish his books on private equity law, MLB player representation and contract negotiations, Texas oil and gas law, federal appellate procedure, Alabama appellate procedure, Texas appellate procedure, Mississippi appellate procedure, Louisiana appellate procedure, Virginia appellate procedure, Hawaii appellate procedure, Tennessee appellate procedure, Idaho appellate procedure, Montana appellate procedure, North Carolina appellate procedure, South Carolina appellate procedure, Kentucky appellate procedure, Maryland, appellate procedure Delaware appellate procedure, Arkansas appellate procedure, appellate procedure in the six American New England states, appellate procedure in the five American Old Northwest states, and his thirty-five book series on the various election laws of the United States as a newly minted lawyer; Mr. Olapade will be unable to take the Uniform Bar Exam immediately after graduation and apply for admission to the bars of Alabama, Alaska, Arkansas, Arizona, Colorado, Connecticut, Idaho, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Minnesota, Missouri, Montana, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oregon, Rhode Island, South Carolina, Tennessee, Texas, Utah, Vermont, Washington, Washington DC, West Virginia, Wyoming so he can maximize his value to employers, file amicus briefs in State and federal appellate courts in the aforementioned States, intervene on behalf of interest groups in cases pending before State and federal courts in the aforementioned States, provide pro bono services to moderate Democrats and moderate Republican candidates in those States upon graduation, and rise in the ranks of the American legal profession; Mr. Olapade will be unable to apply for comity admission to the bars of Kentucky, Mississippi, Delaware, Georgia, Michigan, Louisiana, and Wisconsin four to five years after his anticipated graduation from law school and will be prevented from maximizing his value to employers, filing amicus briefs in State and federal appellate courts in the aforementioned States, intervene on behalf of interest groups in cases pending before State and federal courts in the aforementioned States, provide pro bono services to moderate Democrats and moderate Republican candidates in those States upon graduation, and rise in the ranks of the American legal profession; Mr. Olapade will be unable to pursue his original plan of positioning himself for an associate or analyst position at an Investment Banking firm after studying abroad in the United Kingdom at Oxford; and Mr. Olapade will be saddled with close to $125,000 in student debt that he incurred to attend Yale Law School without any degree to procure employment in the legal sector that would assist him in paying the federal loans off. Mr. Olapade has no adequate remedy at law because he has been training to be an appellate, political law, private equity, sports, and oil and gas attorney for the past sixteen years and would have to switch professions on less than seven weeks' notice unless Yale Law School was temporarily enjoined from carrying out its racially discriminatory expulsion (See Exhibit I1 Exit Interview Counseling).

151.    Mr. Olapade moves the court for a preliminary injunction in this cause enjoining the Yale Law School, their agents, servants, employees and attorneys from academically disqualifying him from Yale Law School and treating him in any manner different from how similarly situated third year law students enrolled at Yale Law School are treated with

respect to financial aid awards, course registration, Yale Law School facilities, or Yale Law School extracurricular activities.

152.     If a preliminary injunction is granted, the injury, if any, to Yale Law School, if final judgment is in their favor, will be inconsiderable and will be adequately indemnified by bond.

## CAUSES OF ACTION

### COUNT I

**(42 U.S.C. § 2000(d) – Racially Discriminatory Academic Disqualification Determination Claim)**

153.     The foregoing allegations are realleged and incorporated by reference herein.

154.     42 U.S.C. § 2000(d) provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

155.     Yale Law School receives federal financial assistance.

156.     Yale Law School's decision to academically disqualify Mr. Olapade violates 42 U.S.C. § 2000(d) because Mr. Olapade is an African American male who is protected under the statute, Mr. Olapade suffered an adverse action in the pursuit of his education in the form of an academic disqualification determination (See Exhibit X.), was and is being treated differently from similarly situated Yale Law School students (See Exhibit E.), is qualified to continue in his educational pursuit (See Exhibits B, C, D, F, G, H, J, K, L, N, and O), and any race neutral justification that could be proffered for the academic disqualification decision is clearly pre-textual (See Exhibits B, C, D, E, F, G, H, J, K, L, N, O, and Z).

### COUNT II

**(42 U.S.C. § 2000(d) – Deliberate Indifference Claim)**

157.     The foregoing allegations are realleged and incorporated by reference herein.

158.     42 U.S.C. § 2000(d) provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

159.     Yale Law School receives federal financial assistance.

160.     Yale Law School's decision to decline to take action on Mr. Olapade's complaints of racial harassment violates 42 U.S.C. § 2000(d) because Yale Law School has, currently, and is exercising substantial control over the enrollment status and academic standing of the individuals named in Mr. Olapade's initial complaint to Ms. Cosgrove (Exhibit Q.), Mr. Olapade experienced severe and discriminatory harassment at the hands of the individuals named in the complaint, Ms. Cosgrove, Mr. Mensah, and the staff of the Payne Whitney Gymnasium (Exhibit Q, W, T, U, and V), administrators at Yale Law School have

had actual knowledge of these events for a time period between two years and four months, and multiple members of Yale Law School were deliberately indifference in penalizing Mr. Olapade's harassers notwithstanding the fact that one named individual was convicted in a Connecticut State court.

## PRAYER FOR RELIEF

161.    WHEREOF: Mr. Olapade prays that the Court:
162.    Enjoin the defendants from implanting or enforcing their academic disqualification decision
163.    Award $2,000,000 and the costs incurred by Mr. Olapade, and such additional relief as the interests of justice may require.

DATED: Houston, Texas, July 22, 2019.

Respectfully Submitted,

Dated: July 29, 2019

Houston, Texas

Respectfully submitted,

/s/ Habib Olapade

16160 Keith Harrow Blvd. Apt. 108

Houston, Texas 77084

281-550-7786

habib3355@outlook.com

## CERTIFICATE OF SERVICE

I hereby certify that, on 8/5/2019, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of this court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF system.

Date: 8/5/2019

Respectfully submitted,

/s/ Habib Olapade

16160 Keith Harrow Blvd. Apt. 108

Houston, Texas 77084

281-550-7786

habib3355@outlook.com